ACCEPTED
15-25-00140-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
9/9/2025 6:55 PM
CHRISTOPHER A. PRINE
CLERK

**No. 15-25-00140-CV**

# In the Court of Appeals
# for the Fifteenth Judicial District
# Austin, Texas

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
9/9/2025 6:55:10 PM
CHRISTOPHER A. PRINE
Clerk

———

*In re* Powered by People and Robert Francis O'Rourke,

*Relators.*

———

On Writ of Mandamus
348th Judicial District Court, Tarrant County

———

## RESPONSE TO PETITION FOR WRIT OF MANDAMUS AND MOTION FOR TEMPORARY RELIEF

———

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

William R. Peterson
Solicitor General

Johnathan R. Stone
Chief, Consumer Protection
Division

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

Abigail E. Smith
Assistant Attorney General
State Bar No. 24141756
Abby.smith@oag.texas.gov

Rob Farquharson
Deputy Chief, Consumer Protection
Division

*Counsel for Real Party in Interest the State of Texas*

# TABLE OF CONTENTS

Page(s)

Index of Authorities ............................................................................................iii

Record References ..............................................................................................ix

Introduction......................................................................................................1

Statement of Facts ............................................................................................3

    I.   Unexcused Texas Legislators Flee the State to Break Quorum. .................3

    II.  OAG Investigates Potential DTPA and Other Violations by
        Relators Related to Funding the Quorum Breakers. ...................................4

    III. Procedural History .......................................................................................5

        A.   The State sues Relators for violating the DTPA in Tarrant
             County; Relators subsequently sue OAG in El Paso County. ..............5

        B.   After Relators violate the TRO, the State requests to modify
             the TRO and expedited discovery ahead of the TI hearing,
             and Relators challenge venue. ........................................................8

        C.   Relators leverage the El Paso proceeding to undermine the
             Tarrant County proceeding, including via an anti-suit TRO..............10

        D.   Tarrant County enters an anti-suit TRO, and Relators
             petition this Court............................................................................12

Standard of Review ........................................................................................13

Argument........................................................................................................14

    I.   Mandamus Is Not Warranted Regarding the Denial of Relators'
       Plea to the Jurisdiction. ............................................................................14

        A.   Relators' arguments do not concern jurisdiction. .............................15

        B.   Relators' arguments fail on the merits.................................................16

    II.  Mandamus Is Not Warranted Regarding the Denial of Relators'
       Motion to Transfer Venue. .......................................................................24

        A.   The State filed suit in a venue in which Relators have done
             business and in which the transaction occurred. ...............................24

        B.   Section 65.023(a) does not apply. ....................................................26

    III. Mandamus Is Not Warranted Regarding the Denial of Relators'
       Emergency Motion for Expedited Reciprocal Discovery.........................32

i

    A.  Relators fail to show that the district court clearly abused its discretion in denying emergency "reciprocal" discovery. .................32

    B.  Relators fail to that they lack an adequate remedy on appeal regarding their discovery requests. ......................................34

IV.  Mandamus Is Not Warranted Regarding the TROs. ...............................36

    A.  The trial court did not clearly abuse its discretion in entering the fundraising TROs. .......................................................... 37

    B.  The trial court did not clearly abuse its discretion in entering the anti-suit TRO. ...................................................................44

    C.  Relators had an adequate remedy of law by appeal of any temporary injunction. ...............................................................49

V.  This Court Should Deny Relators' Emergency Motion for Temporary Relief. ...................................................................... 51

Prayer ......................................................................................................53

Certificate of Compliance .........................................................................53

Appendix ................................................................................................... 1

# Index of Authorities

**Page(s)**

**Cases**

*Amstadt v. U.S. Brass Corp.*,
919 S.W.2d 644 (Tex. 1996) ................................................................... 21, 22

*AVCO Corp. v. Interstate Sw., Ltd.*,
145 S.W.3d 257 (Tex. App.—Houston [14th Dist.] 2004, no pet.) ................... 47

*Brown v. Gulf Television Company*,
306 S.W.2d 706 (Tex. 1957) ....................................................................... 28

*Christensen v. Integrity Ins. Co.*,
719 S.W.2d 161 (Tex. 1986) ....................................................................... 45

*Columbia Medical Center of Las Colinas, Inc. v. Hogue*,
271 S.W.3d 238 (Tex. 2008) ....................................................................... 30

*D.C. v. Heller*,
554 U.S. 570 (2008) ................................................................................... 22

*David Jason W. & Pydia, Inc. v. State*,
212 S.W.3d 513 (Tex. App.—Austin 2006, no pet.) ....................................... 29

*Del Valle Indep. Sch. Dist. v. Lopez*,
845 S.W.2d 808 (Tex. 1992) ....................................................................... 36

*Fernandez v. Pimentel*,
360 S.W.3d 643 (Tex. App.—El Paso 2012, no pet.) ...................................... 36

*Flenniken v. Longview Bank & Tr. Co.*,
661 S.W.2d 705 (Tex. 1983) .................................................................. 17, 23

*Forum Ins. Co. v. Bristol-Myers Squibb Co.*,
929 S.W.2d 114 (Tex. App.—Beaumont 1996, writ denied) ............................ 47

*Fourco Glass Co. v. Transmirra Prods. Corp.*,
353 U.S. 222 (1957) ................................................................................... 30

*Frost Nat'l Bank v. Fernandez*,
315 S.W.3d 494 (Tex. 2010) .................................................................48

*Gannon v. Payne*,
706 S.W.2d 304 (Tex. 1986)......................................................... 45, 48

*Gonzalez v. Reliant Energy, Inc.*,
159 S.W.3d 615 (Tex. 2005) ......................................................... 46, 47

*Henry v. McMichael*,
274 S.W.3d 185 (Tex. App.—Houston [1st Dist.] 2008, pet.
denied)..........................................................................................46

*Hobson v. Moore*,
734 S.W.2d 340 (Tex. 1987) .................................................................32

*Holloway v. Fifth Court of Appeals*,
767 S.W.2d 680 (Tex. 1989) .................................................................14

*Holzman v. State*,
2013 WL 398935 (Tex. App.—Corpus Christi–Edinburg Jan. 31,
2013, pet. denied).......................................................................... 18

*Household Retail Servs., Inc. v. State*,
No. 04-00-00734-CV, 2001 WL 984779 (Tex. App.—San Antonio
Aug. 29, 2001, no pet.)..................................................................17, 18

*Houston Livestock Show & Rodeo, Inc. v. Hamrick*,
125 S.W.3d 555 (Tex. App. 2003) .........................................................23

*Howlett v. Tarrant County*,
301 S.W.3d 840 (Tex. App.—Fort Worth 2009, pet. denied) ..........................30

*Illinois, ex rel. Madigan v. Telemarketing Associates, Inc.*,
538 U.S. 600 (2003) ..........................................................................38

*In re Abbott*,
628 S.W.3d 288 (Tex. 2021) .................................................................36

iv

*In re Abbott*,
No. 08-21-00140-CV, 2021 WL 4929910 (Tex. App.—El Paso Oct. 22, 2021, no pet.) ...................................................................................... 49

*In re City of Dallas*,
977 S.W.2d 798 (Tex. App.—Fort Worth 1998, no pet.) ................................. 28

*In re Cnty. of Hidalgo*,
655 S.W.3d 44 (Tex. App.—Corpus Christi–Edinburg 2022, no pet.) ....................................................................................................... 49

*In re Fox River Real Estate Holdings, Inc.*,
596 S.W.3d 759 (Tex. 2020) .................................................................. 19, 27

*In re McAllen Med. Ctr., Inc.*,
275 S.W.3d 458 (Tex. 2008) ........................................................................ 13

*In re Miscavige*,
436 S.W.3d 430 (Tex. App.—Austin 2014, orig. proceeding) .......................... 48

*In re Missouri Pac. R. Co.*,
998 S.W.2d 212 (Tex. 1999) ........................................................................ 26

*In re Office of Attorney Gen.*,
257 S.W.3d 695 (Tex. 2008) ........................................................................ 49

*In re Sanofi-Aventis U.S. LLC*,
711 S.W.3d 732 (Tex. App. [15th Dist.] 2025) ............................................. 26

*In re Sills*,
No. 09-17-00453-CV, 2017 WL 5707631 (Tex. App.—Beaumont Nov. 28, 2017, no pet.) ................................................................................. 50

*In re State*,
711 S.W.3d 641 (Tex. 2024) ................................................................... 51, 52

*In re Tex. Nat. Res. Conservation Comm'n*,
85 S.W.3d 201 (Tex. 2002) .......................................................................... 36

*In re Tex. Parks & Wildlife Dep't*,
No. 05-24-00582-CV, 2024 WL 2348180 (Tex. App.—Dallas May 23, 2024, no pet.) .................................................................................. 36

*In re TT-Fountains of Tomball, Ltd.*,
No. 01-15-00817-CV, 2016 WL 3965117 (Tex. App.—Houston [1st Dist.] July 21, 2016, no pet.) ............................................................ 34

*Martinez v. State*,
No. 2-08-070-CR, 2009 WL 383760 (Tex. App.—Fort Worth Feb. 12, 2009) ................................................................................................. 41

*Miller v. Keyser*,
90 S.W.3d 712 (Tex. 2002) ........................................................................ 16

*Mother & Unborn Baby Care of North Texas, Inc. v. State*,
749 S.W.2d 533 (Tex. App.—Fort Worth 1988, writ denied) ................21, 39, 40

*Perryman v. Spartan Tex. Six Capital Partners, Ltd.*,
546 S.W.3d 110 (Tex. 2018) ..................................................................... 31

*Pike v. Tex. EMC Mgmt., LLC*,
610 S.W.3d 763 (Tex. 2020) ..................................................................... 15

*Ramirez v. Tex. State Bd. of Med. Examiners*,
99 S.W.3d 860 (Tex. App.—Austin 2003, pet. denied) ..................................... 37

*Reynolds v. Murphy*,
188 S.W.3d 252 (Tex. App.—Fort Worth 2006, pet. denied) ..................... 38, 39

*Riverside Nat. Bank v. Lewis*,
603 S.W.2d 169 (Tex. 1980) ..................................................................... 17

*Roberts v. State*,
278 S.W.3d 778 (Tex. App.—San Antonio 2008, pet. ref'd) ........................... 39

*State by & Through Office of Attorney Gen. of Tex. v. City of San Marcos*,
714 S.W.3d 224 (Tex. App. [15th Dist.] 2025) ................................................... 52

*State v. Nonparty Patient No. 1*,
No. 15-25-00023-CV, 2025 WL 2355380 (Tex. App. [15th Dist.]
Aug. 14, 2025)................................................................................ 45, 46

*State v. Walker*,
679 S.W.2d 484 (Tex. 1984) .......................................................... 13

*TC Heartland LLC v. Kraft Foods Group Brands LLC, 581 U.S. 258
(2017)*,
581 U.S. 258 (2017) ....................................................................... 30

*Tex. Right to Life v. Van Stean*,
702 S.W.3d 348 (Tex. 2024) .......................................................... 15

*Tex. v. Colony Ridge, Inc.*,
2024 WL 4553111 (S.D. Tex. Oct. 11, 2024)................................. 18

*United States v. Stringer*,
535 F.3d 929 (9th Cir. 2008) ......................................................... 32

*UPS Ground Freight, Inc. v. Trotter*,
606 S.W.3d 781 (Tex. App.—Tyler 2020, pet. denied)................... 25

*Vill. of Tiki Island v. Premier Tierra Holdings, Inc.*,
464 S.W.3d 435 (Tex. App.—Houston [14th Dist.] 2015, no pet.) ... 14

*Walker v. Packer*,
827 S.W.2d 833 (Tex. 1992) ...................................... 13, 26, 34, 35

*Yuwei Enter., Inc. v. Bayou Soc. Club, LLC*,
No. 14-24-00109-CV, 2025 WL 411683 (Tex. App.—Houston
[14th Dist.] Feb. 6, 2025, no pet.) ................................................ 35

**Statutes**

Tex. Bus. & Com. Code § 17.44(a)................................................... 22

Tex. Bus. & Com. Code § 17.45(6)........................................ 19, 20, 22

Tex. Bus. & Com. Code § 17.46(a)........................................ 17, 22, 23

Tex. Bus. & Com. Code § 17.46(b)(2) ............................................. 17

Tex. Bus. & Com. Code § 17.46(b)(5) ..................... 17

Tex. Bus. & Com. Code §  17.46(b)(7) ..................... 17

Tex. Bus. & Com. Code §  17.46(b)(24) ..................17, 18

Tex. Bus. & Com. Code § 17.47 ................. 16, 17, 21

Tex. Bus. & Com. Code § 17.47(a) ................. 16, 17, 29

Tex. Bus. & Com. Code § 17.47(b) ................. 24, 29, 30, 31

Tex. Bus. & Com. Code § 17.50 ................. 16, 17, 21

Tex. Bus. Orgs. Code §12.201 ..................... 43

Tex. Civ. Prac. & Rem. Code § 17.47(c) .................27, 31

Tex. Civ. Prac. & Rem. Code § 65.011(2) ..................... 45

Tex. Civ. Prac. & Rem. Code § 65.023 ................. *passim*

Tex. Elec. Code § 251.001(2) .....................44

Tex. Elec. Code § 251.001(5) .....................44

Tex. Elec. Code § 253.035(a) .....................44

Tex. Elec. Code § 253.035(d) .....................44

Tex. Gov't Code § 21.001(a) .....................43

Tex. Pen. Code § 36.01(3) .....................6, 7

## Constitutional Provisions and Rules

Tex. Const. art. I, § 8 .....................2

Tex. R. App. P. 29.3 ................. 50, 51

Tex. R. Civ. P. 683 .....................42

U.S. Const. amend. I ................. *passim*

# RECORD REFERENCES

"MR" refers to the mandamus record filed by Relators. "SMR" refers to the supplemental mandamus record filed by Real Party in Interest the State of Texas.

# INTRODUCTION

Relators Powered by People (PxP) and its leader, Robert Francis O'Rourke, have filed a sprawling, last-ditch mandamus petition—nearly 15,000 words long—apparently seeking relief from at least seven different orders issued over a three-week period in Tarrant County district court:

- Temporary Restraining Order signed August 8, 2025, MR.20-22;

- Modified Temporary Restraining Order signed August 15, 2025, MR.391-94;

- Order Denying Defendants' Emergency Motion to Transfer Venue signed August 15, 2025, MR.396;

- Order Denying Defendants' Motion to Dissolve the Temporary Restraining Order signed August 19, 2025, MR.446;

- Emergency Temporary Restraining Order and Order Setting Hearing for Temporary Injunction signed August 25, 2025, MR.975-979,

- Order Denying Defendants' Emergency Motion for Reciprocal Discovery signed August 25, 2025, MR.981; and

- Order Denying Defendants' Plea to the Jurisdiction signed August 25, 2025, MR.984.

Identifying the orders that are the subject of the petition is challenging. According to Relators, they "seek relief from the Court's orders modifying the TRO and denying Relators' Emergency Motion to Dissolve TRO entered on August 15, 2025 and August 19, 2025, respectively" and "order denying their Emergency Motion to Transfer Venue entered on August 15, 2025." Pet. 2. But their primary argument concerns subject matter jurisdiction, Pet. 21–41, and they ask this Court "to order Respondent, the Honorable Megan Fahey to dismiss the case for lack of subject

1

matter jurisdiction." Pet. 75. The State thus interprets the petition as seeking mandamus relief regarding the denial of Relators' Plea to the Jurisdiction, the only filing in which Relators sought dismissal for lack of subject matter jurisdiction.

Parties should not be encouraged to hoard their grievances for an omnibus mandamus filing. Rather than promptly challenging the original temporary restraining order (TRO) signed on August 8, 2025, Relators pursued a parallel proceeding in El Paso County. Only after weeks of failures to wrest jurisdiction from the Tarrant County court—and on the eve of the deposition of Relator O'Rourke and a scheduled injunction hearing—did Relators file this Petition for Writ of Mandamus.

Relators fail to demonstrate a clear abuse of discretion that would warrant mandamus. The Tarrant County court has jurisdiction, and Relators' arguments are both incorrect and concern the merits of the State's claim, not the trial court's jurisdiction. Venue is proper in Tarrant County because the State has adequately alleged DTPA violations by Relators and sought a legal injunction based on that statute, which authorizes venue in Tarrant.

The TROs do not violate either the First Amendment or section I, article 8 of the Texas Constitution (which Relators first raised in this Court) because they do not restrain speech and because deceptive and fraudulent speech is not protected.

Denial of Relators' last-minute emergency discovery request was not an abuse of discretion. It was unduly burdensome on the short timeline Relators requested and sought privileged information and work product. Relators' invocation of "reciprocal discovery" is incorrect. Discovery is rarely "reciprocal." What matters is whether the discovery sought was relevant.

2

The Tarrant County court did not clearly abuse its discretion in entering an anti-suit TRO because Tarrant County—the first-filed court—has dominant jurisdiction over the issues Relators were attempting to relitigate in El Paso.

Most fundamentally, with respect to the TROs, mandamus is not warranted because Relators have an adequate remedy by appealing any temporary injunction entered. Such an approach would allow Relators' arguments to be resolved on a more complete evidentiary record. Having waited weeks after the entry of the original TRO without seeking relief in this Court, Relators cannot demonstrate that they could not have a waited a few additional days to take an appeal in the ordinary course.

Even the district court in this case has condemned Relators' conduct as "crazy gamesmanship." SMR.222 40:19–20. This Court should not reward it. The writ should be denied.

## STATEMENT OF FACTS

### I.  Unexcused Texas Legislators Flee the State to Break Quorum.

On Sunday, August 3, 2025, a group of Democrat legislators left the State of Texas to deprive the House of Representatives of the quorum necessary to pass new congressional redistricting maps during the 89th Legislative Special Session. MR.202 ¶ 14; *see also* Kayla Gua & Eleanor Klibanoff, *Texas House Democrats flee the state in bid to block GOP's proposed congressional map*, Tex. Trib. (Aug. 3, 2025), https://tinyurl.com/mr3nrmd5.

Two days later, on August 5, 2025, the Office of the Attorney General (OAG) became aware from public reporting that Relators were the "top funders"

compensating the absconding legislators to abstain from performing their legislative duties. MR.86 ¶ 10 (citing Owen Dahlkamp, *Beto O'Rourke's political group is a top funder for Texas Democrats' exodus to block GOP congressional map*, Tex. Trib. (Aug. 5, 2025), https://tinyurl.com/4mu462yy); MR.202 ¶¶ 11–14.

A spokesperson for PxP told the press, "[W]e essentially said, 'Hey, if you do this, and we hope you do, we'll have your back on it, including an initial amount to get you off the ground." MR.202 ¶ 13 (quoting Taylor Goldenstein, *Democrats who fled Texas are racking up a huge bill. Who is paying the tab?*, Houst. Chron. (Aug. 5, 2025), https://tinyurl.com/56uzbyve). He said, "As soon as you do it, we'll fund-raise for you, email, text, online social media, and everything that comes in goes toward that effort." *Id.*

## II. OAG Investigates Potential DTPA and Other Violations by Relators Related to Funding the Quorum Breakers.

As part of an investigation into violations of several Texas laws, on Wednesday, August 6, 2025, OAG served a narrowly-focused Request to Examine (RTE) on PxP seeking records from June 1 through August 6, 2025, relating to (1) the solicitation and expenditure of funds to aid and abet the absent legislators in their efforts to evade arrest warrants seeking to return them to the House, and (2) any benefits or compensation offered or provided to legislators in exchange for abstaining from performing their legislative duties. MR.54–63. OAG gave Relators until 5 p.m. on August 8, 2025, to respond to the RTE due to the emergent nature of the violations, the narrow scope of the requests, and concerns about dissipation of funds. MR.55.

On Thursday, August 7, 2025, Relators emailed OAG requesting a two-week extension while they obtained local counsel to "review and respond" to the RTE. MR.71. OAG responded by noting that the investigation was time-sensitive such that a categorical two-week extension was impossible, but if there were specific requests for which timely compliance was impractical, they were open to discussing an extension on a case-by-case basis. MR.70.

OAG continued its investigation, collecting publicly available information and learning of an upcoming rally Relators scheduled in Fort Worth, Texas, on August 9, 2025. *See, e.g.*, SMR.8–9 ¶¶ 30–32. The advertising and representations surrounding this event indicated that violations of the Deceptive Trade Practice Act (DTPA) were likely to occur at and around the rally. *See* MR.1 (alleging that Relators are "misleadingly raising **political** funds to pay for the **personal** expenses" of absent legislators).

On Friday, August 8, 2025, Relators retained local counsel and requested a ten-day extension to respond to the RTE. MR.69. Relators offered no explanation for why they could not comply with *any* of the requests, did not offer to produce documents on a rolling basis, nor did they identify which requests were impractical to respond to. *Id.*

## III. Procedural History

### A. The State sues Relators for violating the DTPA in Tarrant County; Relators subsequently sue OAG in El Paso County.

Later that afternoon, OAG determined that it had obtained sufficient evidence of Relators' ongoing DTPA violations from the public record to sue. Given the risk

of further DTPA violations at Relators' Fort Worth rally scheduled for the next day, on August 8, 2025 at 2:46 pm central, the State filed a DTPA lawsuit in Tarrant County district court. SMR.1.

The State's DTPA theory was based on Relators' false, misleading, and deceptive acts, including those surrounding the Fort Worth rally in Tarrant County. Specifically, the State alleged that Relators "represent to donors, potential donors, and the public at large that donations submitted through Defendant PBP's ActBlue page are being used for lawful political purposes." SMR.9–10 ¶ 34. But because the donations were being used "for impermissible personal purposes to evade" legislative duties, SMR.10 ¶ 35, Relators' use and disbursement of raised funds violated the Texas Elections Code. That statute "expressly prohibits the use of political contributions for personal use," SMR.7–8 ¶ 26 (citing Tex. Elec. Code § 253.035), and defines personal use as "a use that primarily furthers individual or family purposes not connected with the performance of duties or activities as a candidate for or holder of a public office." *Id.* By giving money to unexcused Texas legislators to *evade* their duties as a holder of public office, such money was necessarily not "further[ing]" performance of those duties and thus constituted personal use under Texas law. *Id.*; *see also* SMR.10 ¶ 35. Moreover, as a quid pro quo—"[I]f you do this, . . . we'll have . . . an initial amount to get you off the ground," MR.202 ¶ 13—it may also violate the Texas Penal Code. *See, e.g.*, SMR.7, 10 ¶¶ 24–25, 35.

The State sought an emergency TRO preventing the unlawful solicitation and expenditure of political contributions for non-political purposes. SMR.11–12 ¶¶ 39–

41. Nowhere in this petition or in the proposed TRO did the State seek to delay or obstruct the Fort Worth rally on September 9th.

OAG contacted Relators' counsel to ask whether they wished to be heard at a TRO hearing. MR.68. Roughly an hour later, at 3:25 p.m. central,[1] PxP filed a lawsuit challenging the RTE in El Paso County, alleging the State's investigation violated their constitutional rights and seeking an injunction enjoining enforcement of the RTE. MR.312.

After filing their lawsuit, Relators informed the State they would like to be heard at the Tarrant County TRO hearing, which Relators facilitated with the court. Around 4:30 pm, the Tarrant County court held a hearing where both parties were heard.[2] At the conclusion of the hearing, after considering the pleadings, evidence, and arguments of the parties, Respondent entered a TRO restraining Relators from:

i. Using political funds for the improper, unlawful, and non-political purposes of (1) funding out-of-state travel, hotel, or dining accommodations or services to unexcused Texas legislators during any special legislative session called by the Texas Governor, or (2) funding payments of fines provided by Texas House rules for unexcused legislative absences;

ii. Raising funds for non-political purposes, including to (1) fund out-of-state travel, hotel, or dining accommodations or services to unexcused Texas legislators during any special legislative session called by the Texas Governor, or (2) fund payments of fines provided by Texas House rules for

---

[1] The time stamp at 2:25 pm indicates that the case was filed at 2:25 mountain time, the same as 3:25 pm central.

[2] Given that the hearing was scheduled at the end of the day on a Friday, there was no reporter in attendance, and thus there is no transcript of this hearing.

unexcused legislative absences, through the ActBlue platform or any other platform that purports to exist for political fundraising purposes;

iii. Offering, conferring, or agreeing to confer, travel, hotel, or dining accommodations or services (or funds to support such accommodations or services) to unexcused Texas legislators during any special legislative session called by the Texas Governor as consideration for a violation of such legislators' Constitutional duties; and

iv. Removing any property or funds from the State of Texas during the pendency of this lawsuit.

MR.21. The court scheduled a temporary injunction hearing for August 19, 2025. MR.22.

Less than four hours after the TRO was entered, Relator Francis denied losing in court and represented that he would continue to raise funds despite the TRO. MR.152 ¶ 7.

The next day, on Saturday, August 9, 2025, OAG notified Relators that it was withdrawing the RTE as moot because the issues under investigation and documents sought by the RTE were now being litigated in the first-filed Tarrant County lawsuit. MR.74. The State requested Relators dismiss the El Paso lawsuit as moot. *Id.*

**B. After Relators violate the TRO, the State requests to modify the TRO and expedited discovery ahead of the TI hearing, and Relators challenge venue.**

The next week, the State obtained evidence through the public record that Relators continued to solicit political contributions to be used for non-political purposes:

He tried to stop us from raising money to support these Democrats in the fight, he lost. And one of the worst things that we can do to Ken Paxton is to right now choose to donate to have the backs of these fighters by texting

FIGHT to 20377. Text FIGHT to 20377. He is trying to stop us from raising the resources they need to ultimately prevail and come through and we are not going to let him stop us. Are you with me on that?

MR.154.

On August 11, 2025, Relators filed an emergency motion to transfer venue in Tarrant County, seeking to transfer the State's case to the second-filed venue in El Paso County. MR.29. Later that evening, when the State offered a mutual exchange of expedited discovery ahead of the TI hearing, Relators refused. MR.163.

On the same day in the parallel El Paso litigation, OAG filed a plea to the jurisdiction based on mootness of the RTE, as well as a Plea in Abatement based on dominant jurisdiction, arguing that the case must be heard in the first-filed venue of Tarrant County. MR.533. Later that evening, Relators amended their El Paso petition to seek an anti-suit injunction and TRO barring the State from pursuing a *quo warranto* claim in Tarrant County. MR.553.

On August 12, 2025, based on Relators' ongoing statements and solicitation of funds via ActBlue, the State filed three motions. First, the State filed a Motion to Modify the TRO to require Relators serve a copy of the TRO on ActBlue. MR.125. Second, the State moved to hold Relators in contempt for violating the TRO. MR.149. Third, the State filed an opposed motion for expedited discovery in advance of the TI hearing, seeking essentially the same narrow subset of documents requested under the RTE, a 2.5 hour deposition of PxP's corporate representative, and a 2.5 hour deposition of O'Rourke. MR.162. The State noticed all these motions for a hearing on August 14, 2025, and the court agreed to hear Relators' motion to transfer venue that same day. That same day, the State also filed its First Amended

Petition adding a *quo warranto* claim, and filed a motion for leave to file information in nature of *quo warranto*. MR.198, 219.

On August 14, 2025, the morning of the hearing, Relators filed a motion to dissolve the TRO, a supplemental motion to transfer venue, and response to the State's motion to modify the TRO. MR.249. After the hearing, on August 15, 2025, the Tarrant County court denied Relators' motion to transfer venue, MR.396, granted the State's motion to modify the TRO, MR.391, extended the TRO another 14 days through September 5, 2025, *id.*, reset the TI hearing for September 2, 2025, and ordered the State's requested discovery and TI briefing to conclude by August 29, 2025, SMR.77 57:4–11, SMR.79 59:11–15.[3]

### C. Relators leverage the El Paso proceeding to undermine the Tarrant County proceeding, including via an anti-suit TRO.

Having lost their attempts to dismiss the case in Tarrant County, Relators renewed their efforts to obtain the same relief in El Paso. On August 18, PxP filed a Second Amended Petition in its El Paso lawsuit clarifying that their requested anti-suit TRO and anti-suit injunction would bar only OAG's *quo warranto* claim in Tarrant County. App'x Ex. A. The next day, on August 19, 2025, the El Paso district court entered the anti-suit TRO against OAG and scheduled a TI hearing for August 29, 2025—just one business day before the Tarrant County's TI hearing. MR.718,

---

[3] Relators had also sought to have their motion to dissolve the TRO heard on August 14, but the court set that for argument the following week because the motion had only been filed that morning. The court later denied Relators' motion to dissolve on August 18, 2025. MR.446.

723. The State immediately filed a new emergency request for an anti-suit TRO and anti-suit injunction in Tarrant County to protect the Tarrant County court's dominant jurisdiction against interference by the El Paso court. MR.458.

On August 20, 2025, Relators filed emergency discovery requests in both El Paso and Tarrant counties. In El Paso, PxP sought voluminous information, including of attorneys' mental impressions, privileged investigative information, internal deliberations by OAG employees, and a two-hour apex deposition of Attorney General Ken Paxton. MR.911, 916–19. In Tarrant, Relators sought a narrower but similar set of discovery, including a two-hour deposition of an OAG employee to discuss the rationale of why the State sued Relators. SMR.260–62.[4]

In both counties, OAG and the State argued that the requested discovery was overly broad, unduly burdensome to produce on the requested timeline of less than a week, and that the information sought was protected by attorney-client, work-product, deliberative process, and investigation privileges. *See, e.g.*, MR.901. In El Paso, Attorney General Ken Paxton additionally challenged his deposition as an improper apex deposition. App'x Ex. B. On August 22, 2025, the El Paso court ordered all requested discovery with a deadline of August 28, 2025, including the deposition of General Paxton. MR.929. Because the El Paso court's order of merits discovery implicitly denied the State's plea to the jurisdiction based on the pleadings, the State appealed the denial to this Court and the El Paso matter is administratively stayed.

---

[4] Because pages 449–457 of Relators' mandamus record appears to be missing, the State has supplemented its own mandamus record with a copy of Relators' motion for expedited reciprocal discovery.

### D. Tarrant County enters an anti-suit TRO, and Relators petition this Court.

Back in Tarrant County, on August 21, 2025, Relators filed a plea to the jurisdiction that repeated the same DTPA arguments they had already made in various earlier filings. MR.825. After a hearing on August 25, 2025, the Tarrant County court denied Relators' plea to the jurisdiction, accused Relators' counsel of "crazy gamesmanship" by leveraging the El Paso proceeding to undercut her jurisdiction, and granted the anti-suit TRO to preserve her jurisdiction until the September 2, 2025 TI hearing. SMR.222 40:19–20; MR.975, 984. The court also denied Relators' emergency discovery request as untimely, unduly burdensome, and seeking privileged material. MR.981.

Later that evening, Relators filed a petition for writ of mandamus and emergency motion for temporary relief in this Court.

## Standard of Review

To be entitled to mandamus relief, "a petitioner must show that the trial court clearly abused its discretion and that the relator has no adequate remedy by appeal." *In re McAllen Med. Ctr., Inc.*, 275 S.W.3d 458, 462 (Tex. 2008). *State v. Walker*, 679 S.W.2d 484, 485 (Tex. 1984). A mandamus "writ will issue 'only in situations involving manifest and urgent necessity and not for grievances that may be addressed by other remedies.'" *Walker v. Packer*, 827 S.W.2d 833 (Tex. 1992) (quoting *Holloway v. Fifth Court of Appeals*, 767 S.W.2d 680, 684 (Tex. 1989)). This requirement applies to "pre-trial orders, even those involving discovery." *Id.* at 842 (collecting cases). The burden to "establish the lack of an adequate appellate remedy" falls on the "persons seeking mandamus relief." *Id.* at 840.

An appellate remedy "is not inadequate merely because it may involve more expense or delay than obtaining an extraordinary writ." *Id.* at 842. Rather, a mandamus "is justified only when parties stand to lose their substantial rights," *id.*, such as "when the trial court erroneously orders the disclosure of privileged information which will materially affect the rights of the aggrieved party," "where the party's ability to present a viable claim or defense at trial is vitiated or severely compromised," or "where the trial court disallows discovery and the missing discovery cannot be made part of the appellate record, . . . and the reviewing court is unable to evaluate the effect of the trial court's error on the record before it." *Id.* at 843–44.

13

## Argument

Relators challenge at least seven overlapping orders signed over a three-week period, each involving several subsidiary legal issues. But when that web is untangled, they complain about five primary issues. *First*, that PxP and O'Rourke's alleged conduct is not subject to the DTPA, so there is no standing; *second*, that any suit seeking an injunction against PxP must be filed in El Paso County, so venue is improper in Tarrant County; *third*, that the district court should have granted Relators' untimely and irrelevant request for discovery against the State; *fourth*, that the State's lawsuit and the district court's orders violate the First Amendment because they are a prior restraint and overbroad; and *fifth*, that the State failed to meet the standard for an anti-suit TRO against PxP. As explained below, the district court did not abuse its discretion in its ruling on any of these issues in any of the orders it issued, so mandamus relief should be denied. Temporary relief should be denied for the same reasons.

## I. Mandamus Is Not Warranted Regarding the Denial of Relators' Plea to the Jurisdiction.

Relators fail to demonstrate that the trial court clearly abused its discretion in denying their plea to the jurisdiction. A plea to the jurisdiction should be granted only if either "the plaintiff's pleadings affirmatively negate the existence of jurisdiction," or if "the defendant presents undisputed evidence that negates the existence of the court's jurisdiction." *Vill. of Tiki Island v. Premier Tierra Holdings, Inc.*, 464 S.W.3d 435, 439 (Tex. App.—Houston [14th Dist.] 2015, no pet.).

## A. Relators' arguments do not concern jurisdiction.

Relators contend that "[t]he trial court does not have subject matter jurisdiction over this suit because the State of Texas has no standing to bring the claims it pleads" because "the DTPA does not govern transactions between political donors and donees." Pet. 22.

As the Texas Supreme Court has explained in recent years, Relators' arguments concern the merits and not jurisdiction: "[S]tanding, as that term is properly used, implicates subject-matter jurisdiction, while other issues sometimes referred to as standing, including whether a cause of action exists or whether a given plaintiff has the right to bring such a cause of action, pertain to the merits and generate judgments on the merits." *Tex. Right to Life v. Van Stean*, 702 S.W.3d 348, 354 (Tex. 2024).

This holding captures Relators' arguments precisely: they challenge whether the State, as a plaintiff, has the right to bring a cause of action against them under the DTPA. "[T]he question whether a plaintiff has established his right 'to go forward with [his] suit' or 'satisfied the requisites of a particular statute' pertains 'in reality to the right of the plaintiff to relief rather than to the [subject-matter] jurisdiction of the court to afford it.'" *Pike v. Tex. EMC Mgmt., LLC*, 610 S.W.3d 763, 774 (Tex. 2020) (*quoting Dubai Petroleum Co. v. Kazi*, 12 S.W.3d 71, 76–77 (Tex. 2000)).

Because Relators' arguments concern whether the State has the right to go forward with its suit under the DTPA rather than the subject matter jurisdiction of the court to afford relief, the trial court did not clearly abuse its discretion in denying Relators' plea to the jurisdiction.

## B. Relators' arguments fail on the merits.

Even if Relators' arguments concerned jurisdiction, Relators fail to show a clear abuse of discretion in denying their plea to the jurisdiction because their arguments are incorrect.

### 1. DTPA suits brought by the Attorney General need not involve a "consumer."

Acting on behalf of the State and in the public interest, the Attorney General has brought this suit against Defendants pursuant to Tex. Bus. & Com. Code § 17.47 (the Attorney General provision), *not* Tex. Bus. & Com. Code § 17.50 (the private consumer provision). As such, none of Defendants' arguments about needing a consumer apply to this case.

Section 17.47 authorizes the Attorney General to bring suit whenever it believes the sued individual or entity is "engaging in, has engaged in, or is about to engage in any act or practice" unlawful under the DTPA, and that the State's lawsuit "would be in the public interest." Tex. Bus. & Com. Code § 17.47(a). An act or practice violates the DTPA if it is "[f]alse, misleading, or deceptive" and occurred "in the conduct of any trade or commerce." *Id.* at § 17.46(a). The DTPA is "construed liberally to promote its central purpose" of protecting Texas consumers. *Miller v. Keyser*, 90 S.W.3d 712, 715 (Tex. 2002). By contrast, section 17.50 of the DTPA authorizes lawsuits by a "consumer" that has suffered "economic damages or damages for mental anguish" based on a "false, misleading, or deceptive act," and other similar categories, as defined under the DTPA. Tex. Bus. & Com. Code § 17.50(a).

16

While "[a]n aggrieved *individual*" seeking to bring suit "must meet the statutory definition of 'consumer,'" that "issue is not applicable where the cause of action is brought by the AG." *Household Retail Servs., Inc. v. State*, No. 04-00-00734-CV, 2001 WL 984779, at *3 n.4 (Tex. App.—San Antonio Aug. 29, 2001, no pet.) (emphasis added) (comparing Tex. Bus. & Com. Code § 17.50 (consumer lawsuits) to Tex. Bus. & Com. Code §§ 17.46(a), 17.47(a) (Attorney General lawsuits)). That is because the DTPA's definition of "consumer" "only describes the class of persons entitled to bring suit under § 17.50 [the consumer cause of action]; it does not define the class of persons subject to liability under the DTPA." *Flenniken*, 661 S.W.2d at 706. The Attorney General can bring suit against "[a]ny person engaging in such deceptive practices" if he determines the suit is in the public interest. *Riverside Nat. Bank v. Lewis*, 603 S.W.2d 169, 173 (Tex. 1980) (citing Tex. Bus. & Com. Code § 17.47(a)). Preventing false and misleading representations that warp consumer financial decisions is plainly in the public interest, as the district court expressly recognized in its initial and modified TROs. MR.0020, 0391.

Relators additionally misconstrue Tex. Bus. & Com. Code § 17.47's requirement to allege a "false, misleading, or deceptive act" under the DTPA. In its First Amended Petition, the State satisfied this requirement by alleging that Defendants engaged in "false, misleading, and deceptive acts and practices," including violations of Tex. Bus. & Com. Code §§ 17.46(a), (b)(2), (5), (7), (24). *See* MR.206–07 ¶35. Relators' claim that each of these provisions necessarily requires a consumer is incorrect. Those provisions bar, respectively:

17

17.46(a): False, misleading, or deceptive acts or practices in the conduct of any trade or commerce . . . .

17.46(b)(2): [C]ausing confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services.

17.46(b)(5): [R]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which the person does not.

17.46(b)(7): [R]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another

17.46(b)(24): [F]ailing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed.

Of those four provisions, only one—subsection 24—even mentions the word "consumer." Furthermore, the State is not required to prove the identity of any particular aggrieved consumer to sue under section 17.46(b)(24), or any other provision of the DTPA. Rather, a jury can decide this claim through inference from surveys, expert reports and testimony, and fact witness testimony.

Relators' interpretation has no support in law. They can cite to no decision that the State needs a "consumer" to bring a DTPA suit from the passage of the DTPA in 1972 through the present. *Cf. Household Retail Servs.*, 2001 WL 984779, at *3 n.4 (holding the opposite); *Holzman v. State*, 2013 WL 398935, at *3 (Tex. App.—Corpus Christi–Edinburg Jan. 31, 2013, pet. denied) ("[I]t is not necessary for the State to allege any injury to a patient to recover [] civil penalties[.]"); *see also Tex. v. Colony*

18

*Ridge, Inc.*, 2024 WL 4553111, at \*7 (S.D. Tex. Oct. 11, 2024) ("The State argues that the presence of a consumer, or an injury to a consumer, is not required when the State initiates a DTPA lawsuit. The court agrees."). The district court thus acted within its discretion to deny Relators' various motions based on this argument.

### 2. The State alleges false, misleading, and deceptive acts and practices in the course of "trade" and "commerce."

Relators also argue the State lacks standing because their activities did not occur in the course of "trade" and "commerce." But their arguments require the Court to ignore the DTPA's clear statutory text and thus were properly rejected by the district court.

Relators' argument on this point focuses on defining "trade" and "commerce" as necessarily requiring a "good" or "service." *See, e.g.*, Pet. at 36 ("The definition of 'trade and commerce' under the DTPA expressly includes and incorporates 'good' or 'service' *[sic]* the definition."). But the DTPA's definition plainly encompasses far more activity than just goods and services. Read in its entirety, Texas Business and Commerce Code section 45(6) defines "trade" and "commerce" as "the *advertising*, offering for sale, sale, lease, or *distribution* of any good or service, *of any property, tangible or intangible, real, personal, or mixed, and any other article, commodity, or thing of value,* wherever situated, and shall include any trade or commerce directly or indirectly affecting the people of this state."(emphases added). Goods and services are just one part of the picture—trade and commerce also encompass the "distribution" of "any property" and "any other article, commodity, or thing of value." *Id.*

Here, Relators advertised a service (crowdsourcing lawful political donations), collected large amounts of contributions from Texans toward that service, and then distributed the collected funds for the unlawful purpose of funding personal expenses of unexcused Texas legislators. This involves the "advertising" and "distribution" of a "thing of value" that "directly or indirectly affect[s] the people of this state." *Id.*

Contrary to Relators' argument, it is fairly routine for the Texas Attorney General to bring DTPA enforcement actions against charitable and non-profit entities for fraudulent solicitation or use of donations, including for violations of the exact DTPA provisions at issue in this case. For example, in *Federal Trade Commission v. Cancer Fund of America, Inc.*, the FTC, Texas, and the other 49 states sued a group of cancer charities for violating various federal and state consumer protection laws, including sections 17.46(a) and 17.46(b)(1), (4), (5), (7), and (24) of the DTPA. The cancer charities were sued "in connection with soliciting charitable contributions from donors," representing "that donors' contributions would go to legitimate charitable organizations," then using those funds "primarily [not] for charitable purposes." App'x Ex. C ¶¶ 158–59. A federal district court entered a permanent injunction and monetary judgment against the various charities, including for violations of "Tex. Bus. & Com. Code Ann. §§ 17.41–17.63" (the DTPA). *Fed. Trade Comm'n v. Cancer Fund of Am. Inc.*, No. CV-15-00884-PHX-NVW, 2019 WL 13214435, at *7 (D. Ariz. Mar. 19, 2019) (affirming attorneys' fees for this judgment). The Texas Attorney General has obtained DTPA judgments against other charities for violating the DTPA, including a veterans' charity that falsely represented Texans' charitable

20

donations would go to Texas veterans and a nonprofit museum that deceived donors into believing their donations would fund a death benefit for the survivors of slain Texas Highway patrolmen. App'x Exs. D, E.

Furthermore, at least one higher court in Texas has affirmed that when a DTPA suit is brought by the Attorney General under section 17.47, a charitable institution can be held liable for services it distributed for free—and even for services it advertised but did *not* distribute. In *Mother & Unborn Baby Care of North Texas, Inc. v. State*, 749 S.W.2d 533 (Tex. App.—Fort Worth 1988, writ denied), the Attorney General sued a crisis pregnancy center for advertising as an abortion clinic, then counseling women to *not* abort their babies once they arrived at the center. There were no consumer plaintiffs in the *Mother* case and no sales, yet the Fort Worth Court of Appeals held that "[i]t is immaterial whether [those accused of violating the DTPA] provided a service in exchange for money; the statute as a whole supports the conclusion that transfer of valuable consideration is not necessary." *Id.* at 538. The court further observed that "[i]f in the context of a transaction in goods or services, any person engages in an unconscionable course of action which adversely affects a consumer, that person is subject to liability under the DTPA. *Id.*

Finally, Relators' reliance on *Amstadt* is inapt because that case involved a private consumer lawsuit under DTPA section 17.50, not an Attorney General lawsuit under DTPA section 17.47. *See, e.g.*, *Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 649 (Tex. 1996) ("The DTPA grants consumers a cause of action for false, misleading, or deceptive acts or practices. Tex. Bus. & Com. Code § 17.50(a)(1)."). In *Amstadt*, all the Supreme Court held was that section 17.50 consumer lawsuits must

21

involve a consumer alleging a "transaction in goods or services." *Id.* at 650. The Court made no comment on whether Attorney General lawsuits must do so, and indeed, imposing such a requirement would contradict the plain text of DTPA section 17.45(6). Furthermore, in *Amstadt*, the Supreme Court relied on the DTPA's preamble, which states the law's "underlying purpose[]" is "to protect consumers." Tex. Bus. & Com. Code § 17.44(a). But section 17.44 does not override the plain text of other parts of the statute—unless a statute's language is ambiguous, "a prefatory clause does not limit or expand the scope of the operative clause." *D.C. v. Heller*, 554 U.S. 570, 578 (2008). Rather, section 17.44 is meant to *expand*, not narrow, the DTPA's scope, and states that the DTPA "shall be liberally construed." Tex. Bus. & Com. Code § 17.44(a). Vague pronouncements in the DTPA's preamble cannot override section 17.45(6)'s express inclusion of the "advertising" and "distribution" of a "thing of value" as part of "trade" and "commerce."

The district court thus did not abuse its discretion in rejecting Relators' argument that their conduct did not involve "trade" and "commerce."

### 3. Relators misconstrue the "goods" and "services" requirement.

Relators finally argue that they cannot be sued under the DTPA because they do not provide "goods" or "services" as defined by the DTPA. But this argument fails for at least two reasons: *First*, not all DTPA violations need allege a "good" or "service," and *second*, the State's suit *does* allege goods and services.

*First*, as already explained, the State has alleged Defendants violated the DTPA by violating both section 17.46(a) *and* several subsections of section 17.46(b). *See* MR.206 ¶35. While the four cited subsections of section 17.46(b) do mention "goods

or services," section 17.46(a) expressly does not—rather, all that it requires is a "false, misleading, or deceptive act or practice" that occurs in the "conduct of trade or commerce." Tex. Bus. & Com. Code § 17.46(a). The State's allegations about Defendants satisfy this requirement, and no "good" or "service" is needed.

*Second*, the State's allegations *do* involve the provision of goods and services. PxP advertised and offered to provide the service of crowdsourcing political donations for legal political purposes, but then distributed those funds for an illegal purpose, namely, paying the personal expenses of unexcused Texas legislators to help them break quorum, including funds to pay for a chartered private jet and various travel accommodations. *See, e.g.*, MR.201-02, 204 ¶¶ 11, 14, 23. The service offered is an aggregation of crowdsourced funds for legal political purposes, and the deception is that they were distributed for an illegal purpose. This is a virtually identical fact pattern to the *Cancer Fund* case. *See supra* at 20 (describing a permanent injunction and monetary judgment against cancer charities for violating the DTPA).

While donors may not have bought those goods or services directly, Defendants actively solicited funds from them and distributed those funds. That is more than enough to constitute a DTPA violation. "Privity between the plaintiff and defendant is not a consideration [in DTPA lawsuits]. The only requirement is that the goods or services sought or acquired . . . form the basis of his complaint." *Flenniken v. Longview Bank & Tr. Co.*, 661 S.W.2d 705, 707 (Tex. 1983). Furthermore, liability under the DTPA is not confined to direct dealings, because "deceptive trade practices … can occur following the initial transaction." *Houston Livestock Show & Rodeo, Inc. v. Hamrick*, 125 S.W.3d 555, 574 (Tex. App. 2003).

In sum, the State need not allege a good or service to bring its DTPA claim but has done so. The district court did not abuse its discretion when it refused to dissolve its TRO or grant Relators' plea to the jurisdiction on this basis.

## II. Mandamus Is Not Warranted Regarding the Denial of Relators' Motion to Transfer Venue.

The trial court did not clearly abuse its discretion in denying Relators' motion to transfer venue. Contrary to Relators' arguments, there is no mandatory venue provision at issue. This lawsuit is brought under the DTPA, which has a permissive venue statute that authorizes venue in Tarrant County under the facts alleged.

There are two reasons that the mandatory venue provision relied upon by Relators does not apply. First, because the State's lawsuit is not purely *or* primarily injunctive but rather primarily seeks to impose civil penalties under the DTPA, the mandatory venue provisions of Texas Civil Practice & Remedies Code section 65.023(a) do not apply. Second, the State does not seek an equitable injunction (subject to section 65.023(a)) but rather seeks a *legal* injunction subject to the DTPA's venue provision.

### A. The State filed suit in a venue in which Relators have done business and in which the transaction occurred.

The DTPA's venue statute allows an action to be brought "in the district court of the county in which the person against whom it is brought resides, has his principal place of business, has done business, or in the district court where the transaction occurred." *Id.* § 17.47(b).

The State's petition alleges sufficient facts to demonstrate venue in Tarrant County under the latter two provisions of this venue statute, namely that Relators have "done business" in Tarrant County and that relevant "transaction[s] occurred" in Tarrant County. The First Amended Petition alleges that "a substantial part of the events or omissions giving rise to the State's claims occurred in Tarrant County," that Relators "have done business in Tarrant County," and that "transactions occurred in Tarrant County." MR.200 ¶ 5. It also contains detailed allegations about Relators' specific acts in Tarrant County that violated the DTPA, including specific deceptive statements made by Relator O'Rourke at a Tarrant County rally on August 9, 2025 that "raised funds for non-political purposes" in a "confusing, misleading, and deceptive manner." MR.205–06 ¶¶ 28–30. Additionally, at an evidentiary hearing on August 14, 2025 (where the emergency motion to transfer venue was heard), the State entered a video of the Tarrant County rally into evidence as proof of Relators' deceptive acts and statements. SMR.267.[5]

These allegations satisfy the DTPA venue provisions' requirements, and the State's submitted evidence confirmed those allegations were correct. To the extent Relators seek to challenge the evidence supporting venue, that is inappropriate for at least two reasons. First, "[t]he appellate court cannot review the factual sufficiency of the evidence supporting the plaintiff's venue choice." *UPS Ground Freight, Inc. v. Trotter*, 606 S.W.3d 781, 788 (Tex. App.—Tyler 2020, pet. denied) (citing

---

[5] The State has submitted a flash drive to the Court containing a true and accurate copy of the video admitted into evidence at the August 14, 2025 hearing.

*Ruiz v. Conoco, Inc.*, 868 S.W.2d 752, 758 (Tex. 1993) (op. on reh'g)). And second, by omitting the August 14 evidentiary hearing from the record, Relators have forfeited their right to mandamus relief on this issue. "[T]he parties seeking relief . . . ha[ve] the burden of providing this Court with a sufficient record to establish their right to mandamus relief." *Walker v. Packer*, 827 S.W.2d 833, 837 (Tex. 1992). Because Relators failed to provide this Court with the evidence from this evidentiary hearing that supports venue in Tarrant County, they "have not provided [the Court] with a record upon which they can establish their right to mandamus relief." *Id.*

In any event, Relators cannot rely on mandamus to challenge whether OAG satisfied the DTPA's permissive venue provision because they have an adequate remedy on appeal. While "[a] party seeking to enforce a *mandatory* venue provision by mandamus . . . is not required to prove it lacks an adequate appellate remedy," *In re Sanofi-Aventis U.S. LLC*, 711 S.W.3d 732, 735 (Tex. App. [15th Dist.] 2025), that is not true for a permissive venue provision like the one that applies here under the DTPA. When a venue statute is permissive, venue is "considered an incidental trial ruling correctable by appeal," and mandamus review is denied. *In re Missouri Pac. R. Co.*, 998 S.W.2d 212, 215 (Tex. 1999). Because the DTPA's permissive venue statute applies, Relators can resolve venue on a subsequent appeal, and mandamus is not appropriate.

## B. Section 65.023(a) does not apply.

Relators argue that the mandatory venue provisions of Section 65.023 of the Texas Civil Practice and Remedies Code require that suit be filed in El Paso. They are incorrect.

26

### 1. The State's suit is not purely or primarily injunctive.

Section 65.023(a) does not apply because the relief sought is not "purely or primarily injunctive." "Recognizing the Legislature did not intend for the tail to wag the dog, we have held that section 65.023(a) is operative only when a plaintiff's pleadings in the underlying suit establish the relief sought is 'purely or primarily injunctive.'" *In re Fox River Real Estate Holdings, Inc.*, 596 S.W.3d 759, 765 (Tex. 2020). "In this context, 'primary' necessarily means first in order of rank or importance." *Id.*

Relators argue that the State's Petition "seeks primarily temporary and permanent injunctive relief" primarily based on the fact that the paragraphs in the State's Petition describing the injunctive relief sought are longer than the other paragraphs in its Prayer for Relief. *See* Pet. 60.

But the First Amended Petition demonstrates the State's primary objective is clearly to seek civil penalties under the DTPA and to pursue a *quo warranto* action; any injunctive relief sought is ancillary. Although the State has only *obtained* injunctive relief to this point, the State ultimately seeks significant civil penalties from PxP and O'Rourke. *See* Tex. Civ. Prac. & Rem. Code § 17.47(c) (authorizing the trier of fact to award a civil penalty to be paid to the state in an amount of not more than $10,000 per violation of the DTPA, and an additional $250,000 penalty if the "act or practice that is the subject of the proceeding was calculated to acquire or deprive money or other property from a consumer who was 65 years of age or older when the act or practice occurred."); MR.199. 212 ¶¶ 1, 55(f) (seeking civil penalties in excess of $1 million). The State also seeks attorneys' fees, costs, and expenses. MR.212 ¶

55(g), (h). The State also seeks to bring a *quo warranto* action to revoke PxP's right to operate in Texas. MR.207–08 ¶¶38–44. These are the primary forms of relief sought.

Because this is a civil penalty and *quo warranto* lawsuit that also seeks ancillary injunctive relief, section 65.023(a) does not apply.

### 2. Section 65.023(a) does not apply to the State's suit for a legal injunction under the DTPA.

Even if the State's suit were purely or primarily seeking injunctive relief, section 65.023(a)'s mandatory provision would still not apply because the State seeks *legal* injunctive relief under the DTPA, not *equitable* injunctive relief under the court's inherent powers.

The Supreme Court has distinguished between legal and equitable remedies and held that section 65.023(a)'s mandatory venue provision applies only to the latter category. In *Brown v. Gulf Television Company*, 306 S.W.2d 706, 709 (Tex. 1957), the Supreme Court analyzed Texas Civil Statutes Article 4656, the predecessor to section 65.023(a). *See In re City of Dallas*, 977 S.W.2d 798, 803 n.17 (Tex. App.—Fort Worth 1998, no pet.) (noting Art. 4656 is the predecessor to Section 65.023). In *Brown*, the court noted that when a litigant has "a choice between legal and equitable remedies . . . the Legislature has expressly provided a special venue for injunction suits," which is the mandatory venue provision found in Article 4656 (and now, section 65.023(a)). 306 S.W.2d at 709. The Court further held that "the suit is consequently controlled by Article 4656" only in those cases where "the plaintiff alleges

28

that he has no adequate remedy at law and hence is entitled to and request injunctive relief"—in other words, when the plaintiff has sought an "equitable" injunction. *Id.*

Here, by contrast, the injunction sought by the State is not equitable—it is a legal remedy created by statute. The DTPA authorizes the Attorney General to seek a legal injunction under the following circumstances:

> Whenever the consumer protection division has reason to believe that any person is engaging in, has engaged in, or is about to engage in any act or practice declared to be unlawful by this subchapter, and that proceedings would be in the public interest, the division may bring an action in the name of the state against the person to retrain by temporary restraining order, temporary injunction, or permanent injunction the use of such method, act, or practice.

Tex. Bus. & Com. Code § 17.47(a). The DTPA further permits such legal injunction to be sought in a variety of venues:

> An action brought under Subsection (a) of this section which alleges a claim to relief under this section *may be commenced* in the district court of the county in which the person against whom it is brought *resides, has his principal place of business, has done business, or in the district court where the transaction occurred . . . .*

*Id.* § 17.47(b) (emphasis added). Whichever venue the State chooses, that court has jurisdiction to "issue temporary restraining orders, temporary or permanent injunctions to restrain and prevent violations of this subchapter." *Id.*

When the State seeks an injunction authorized by statute—including an injunction authorized by the DTPA—"the statute's express language supersedes the common law injunctive relief elements such as imminent harm or irreparable injury and lack of an adequate remedy at law." *David Jason W. & Pydia, Inc. v. State*, 212 S.W.3d

513, 519 (Tex. App.—Austin 2006, no pet.) (collecting cases). That includes the general venue provisions in section 65.023(a). Because the State has alleged that "a substantial part of the events or omissions giving rise to the State's claims occurred in Tarrant County," that Relators "have done business in Tarrant County," and that "transactions occurred in Tarrant County," MR.200, the DTPA's venue elements have been satisfied, and venue in Tarrant County is proper.

### 3. Relators' arguments against DTPA venue fail.

Relators' arguments against the DTPA's venue provision rely on framing this as a conflict between a mandatory and a permissive venue statute, but that framing is incorrect—rather, there is no conflict at all because section 65.023(a) does not apply to DTPA injunctions in the first instance. But even if it did, it would be a conflict between a *general* venue statute and a *specific* one. When a general venue statute and a specific venue statute conflict, the specific venue statute controls. *See Fourco Glass Co. v. Transmirra Prods. Corp.*, 353 U.S. 222, 228 (1957) (holding that the terms of a "general corporation venue statute" did not apply to "a special venue statute applicable, specifically, to all defendants in a particular type of action"), *aff'd TC Heartland LLC v. Kraft Foods Group Brands LLC*, 581 U.S. 258, 264 (2017). When "two statutes share a common purpose or object . . . and cannot be harmonized . . . the specific statute appl[ies] to the exclusion of the general." *Howlett v. Tarrant County*, 301 S.W.3d 840, 846 (Tex. App.—Fort Worth 2009, pet. denied). Because the DTPA venue provision specifically applies to legal injunctions the Attorney General seeks under the DTPA, but section 65.023(a) applies generally to equitable injunctions, the DTPA's more specific provision controls.

Furthermore, under Defendants' theory, DTPA section 17.47(b)'s venue provisions would be meaningless. *Columbia Medical Center of Las Colinas, Inc. v. Hogue*, 271 S.W.3d 238, 256 (Tex. 2008) ("The Court must not interpret the statute in a manner that renders any part of the statute meaningless or superfluous."). Section 17.47(b) specifically permits the Attorney General to bring DTPA actions, including actions for TROs and injunctive relief, in any of the following venues: the county where the person sued "resides, has his principal place of business, has done business, or in the district court of the county where the transaction occurred . . . ." Tex. Bus. & Com. Code § 17.47(b). Suits for civil penalties may be brought in the same venues. *Id.* § 17.47(c). But under section 65.023(a) of the Texas Civil Practice & Remedies Code, a writ of injunction may only be brought "in the county in which the party is domiciled." Adopting Relators' reading would effectively delete the phrases, "has done business," and "where the transaction occurred," from the DTPA.

"When the plaintiff files in a proper venue, that choice of venue should be honored absent a mandatory venue statute that requires transfer." *Perryman v. Spartan Tex. Six Capital Partners, Ltd.*, 546 S.W.3d 110, 130 (Tex. 2018) (citation omitted). Because no mandatory venue provision applies and venue is proper in Tarrant County, the district court acted within its discretion to deny venue transfer.

## III. Mandamus Is Not Warranted Regarding the Denial of Relators' Emergency Motion for Expedited Reciprocal Discovery.

### A. Relators fail to show that the district court clearly abused its discretion in denying emergency "reciprocal" discovery.

The district court acted well within its discretion in denying Relators' eleventh-hour emergency discovery request, which—given Relators' conduct in parallel El Paso litigation—amounted to "gamesmanship," per the district court. The request was a transparent attempt to intrude upon the State's privileged, ongoing investigation and to preview the State's litigation strategy in the El Paso proceeding.

As an initial matter, the district court had the discretion to deny Relators' motion because it was untimely. Relators filed an Emergency Motion for Reciprocal Expedited Discovery on August 20, and set it for hearing just four days before discovery for the preliminary injunction hearing was set to conclude . MR.902.

Moreover, the discovery sought by Relators was almost entirely privileged and targeted information related to potential criminal investigations into Relators' alleged violations of the Texas Penal Code. It is well-established that the "government may conduct parallel civil and criminal investigations." *United States v. Stringer*, 535 F.3d 929, 936 (9th Cir. 2008). Moreover, when discovery implicates an ongoing criminal investigation conducted by a law enforcement agency, Texas law recognizes a privilege shielding such investigations from civil discovery. *Hobson v. Moore*, 734 S.W.2d 340, 341 (Tex. 1987) (recognizing a "privilege in civil litigation for law enforcement investigation[s]"). Relators' requests were directed squarely at the OAG—an agency that includes peace officers and criminal prosecutors—and sought information directly tied to alleged criminal conduct, including bribery. The district

court rightly exercised caution to avoid interfering, especially given that discovery under standard timelines will be available later in the case, with full opportunity for briefing.

In addition to the law enforcement privilege, the district court correctly denied the discovery as an improper attempt to access attorney work product. Relators sought to depose an OAG employee regarding the "specific facts that formed the basis for an initiation of a [DTPA] lawsuit"—a request that plainly sought the mental impressions and legal reasoning of the State's attorneys. Such material is categorically protected and not subject to discovery, particularly not under emergency procedures and especially when directed at government counsel. The court's denial was not only appropriate—it was necessary to preserve the integrity of the litigation process.

Rather than argue that the discovery they sought was relevant, Relators rely almost exclusively on the fact that it was "reciprocal" and that their request "closely mirror[ed] the State's requested discovery." Pet. 69. Relators cite no authority supporting their "reciprocal discovery" theory, and it is incorrect. There is no reason to believe that "reciprocal discovery" would lead to the discovery of relevant evidence. Consider, for example, a product liability lawsuit. The injured plaintiffs' medical records would be highly relevant and appropriate for discovery, but "reciprocal discovery" of the defendants' medical records would be irrelevant and inappropriate. The defendant likely has highly relevant design documents, but "reciprocal discovery" of any of the plaintiff's design documents would be unnecessary. What

33

matters is whether discovery is likely to lead to the discovery of admissible evidence, not whether it is "reciprocal."

Here, the OAG has brought suit on behalf of the public to investigate Relators' violations of the DTPA. It is hardly surprising that Relators would possess the only relevant evidence regarding their statutory violations. The trial court did not clearly abuse its discretion in denying Relators' emergency discovery requests into OAG.

## B. Relators fail to that they lack an adequate remedy on appeal regarding their discovery requests.

"Orders relating to discovery matters can generally be corrected on appeal, typically precluding mandamus relief." *In re TT-Fountains of Tomball, Ltd.*, No. 01-15-00817-CV, 2016 WL 3965117, at *15 (Tex. App.—Houston [1st Dist.] July 21, 2016, no pet.). As such, mandamus relief regarding a discovery order will only be appropriate in limited circumstances "involving manifest and urgent necessity," *Walker*, 827 S.W.2d at 840, such as when disallowing the discovery would mean "the missing discovery cannot be made part of the appellate record," *id.* at 843.

This is not such a circumstance. As an initial matter, little to none of the discovery requested by Relators is even discoverable information—it is all either protected by law-enforcement privilege or attorney work-product. But more importantly, the district court did not rule that Relators are *never* entitled to discovery—rather, the district court refused to permit such sensitive, likely privileged discovery to be conducted on Relators' extremely expedited timeline. While the State moved for discovery on August 12, 2025, set the motion for hearing on August 14, 2025, and requested the discovery by end of day August 29, 2025 (15 days later), Relators did not

move for discovery until August 20, did not set the motion for hearing until August 25, and then requested OAG produce documents and provide an OAG employee for deposition by end of day August 29 (4 days later). Given the tight timeline of the case—a temporary injunction hearing had long been set for September 2, 2025—the court properly denied this request as dilatory. But the court never said Relators could *never* receive discovery throughout the course of the case. Rather, Relators would have been permitted to seek discovery through ordinary channels of the case, and to the extent any information is not privileged or work product, that information would become a part of the appellate record.

This discovery concerns only a temporary injunction, not trial, so *Walker v. Packer* arguably does not apply. Unlike trial, Relators would have the opportunity to seek further discovery following entry of any temporary injunction, and if that discovery uncovered any relevant evidence, Relators could seek dissolution of the temporary injunction. *See Yuwei Enter., Inc. v. Bayou Soc. Club, LLC*, No. 14-24-00109-CV, 2025 WL 411683, at *3 (Tex. App.—Houston [14th Dist.] Feb. 6, 2025, no pet.).

In any event, Relators do not argue that the inability to conduct this discovery means that their "ability to present a viable claim or defense at trial is vitiated or severely compromised." 827 S.W.2d 833 (Tex. 1992). As noted above, Relators do not argue relevance, much less argue that the requested discovery was critical to a viable defense. Nor do Relators contend that this Court, in any appeal of the grant of a potential temporary injunction, would be "unable to evaluate the effect of the trial court's error on the record before it." *Id.* at 843–44.

35

As a result, even if the trial court erred in denying their emergency motion for discovery, Relators would have an adequate remedy by appealing any temporary injunction that the district court might enter.

## IV. Mandamus Is Not Warranted Regarding the TROs.

A temporary restraining order, unlike a temporary injunction, "does not constitute a ruling on the merits." *Fernandez v. Pimentel*, 360 S.W.3d 643, 646 (Tex. App.—El Paso 2012, no pet.).; *accord In re Tex. Nat. Res. Conservation Comm'n*, 85 S.W.3d 201, 203–04 (Tex. 2002) (distinguishing between a TRO and a temporary injunction, "which has more stringent proof requirements"). "A temporary restraining order is one entered as part of a motion for a temporary injunction, by which a party is restrained pending the hearing of the motion." *Del Valle Indep. Sch. Dist. v. Lopez*, 845 S.W.2d 808, 809 (Tex. 1992).

Procedural requirements regarding TROs are regularly enforced by courts. *See, e.g.*, *In re Tex. Parks & Wildlife Dep't*, No. 05-24-00582-CV, 2024 WL 2348180, at *2 (Tex. App.—Dallas May 23, 2024, no pet.) ("The trial court thus clearly abused its discretion when it issued its temporary restraining order in violation of the automatic stay."); *In re Texas Nat. Res. Conservation Comm'n*, 85 S.W.3d 201, 207 (Tex. 2002) (excessive extension of a TRO). But substantive review of temporary restraining orders is rare. They are temporary orders, entered on an expedited basis and a limited record. The Texas Supreme Court has held that "if the record establishes that an applicant cannot show a probable right to the relief sought, then the applicant is not entitled to a temporary restraining order." *In re Abbott*, 628 S.W.3d 288, 291 (Tex. 2021) (quoting *In re Turner*, 558 S.W.3d 796, 799 (Tex. App.—Houston [14th

Dist.] 2018, orig. proceeding)). Otherwise, courts typically wait until a temporary injunction issues to provide a substantive review on the merits.

## A. The trial court did not clearly abuse its discretion in entering the fundraising TROs.

Regulating deceptive, misleading, and fraudulent conduct under the DTPA does not violate the First Amendment or the Texas Constitution[6]. Neither the original nor the modified TRO constituted prior restraints because they did not restrain protected speech—to the contrary, those TROs restrained only the deceptive *use*, *raising*, and *offering* of political contributions for defined, illegal, non-political expenses. And that does not violate the First Amendment.

### 1. The original and modified TROs narrowly applied to the use of deceptive, fraudulent, and misleading representations to raise political funds for illegal purposes, *not* to political speech.

Cognizant of the perils of restraining political speech, the district court acted carefully and deliberately to ensure PxP and O'Rourke's political speech was *not* restrained in any way—and contrary to Relators' claim, the record proves that the State never requested, and the district court never considered, shutting down Relators' Fort Worth political rally on August 9, 2025. Rather, the district court's

---

[6] Relators argue for the first time that the TROs violate the Texas Constitution—this issue was never raised in the district court and is thus forfeited. *See* M.R.260–65 (arguing the original TRO violated the First Amendment, without mention of the Texas Constitution); *Ramirez v. Tex. State Bd. of Med. Examiners*, 99 S.W.3d 860, 863 (Tex. App.—Austin 2003, pet. denied) ("[C]onstitutional claims must be asserted in the trial court before they may be raised on appeal."). Regardless, because the TROs did not restrain protected speech, they did not violate the Texas Constitution for the same reasons they did not violate the First Amendment.

original and modified TROs specifically limited only three narrow subsets of conduct: 1) the *use* of political funds for "improper, unlawful, and non-political purposes," 2) the *raising* of political funds for such "non-political purposes" through ActBlue "or any other platform that purports to exist for political fundraising purposes," and 3) the *offering* of such political funds to unexcused Texas legislators to pay for defined non-political expenses. MR.21, 392–93.

Relators were and remain free to make any political statements they want, including about unexcused Texas legislators, and were and remain free to raise funds as they did prior to August 2025. The only conduct the TRO prohibited was the specific act of deceiving consumers into donating political funds via political platforms that would ultimately be used for defined non-political purposes.

### 2. Regulation of fraudulent and deceptive conduct does not constitute a prior restraint.

Even if the TROs did apply to deceptive speech, which they do not, such restriction would not constitute a prior restraint because such speech is unprotected. It is well-established that "the First Amendment does not protect fraudulent or deceptive speech." *Reynolds v. Murphy*, 188 S.W.3d 252, 263 (Tex. App.—Fort Worth 2006, pet. denied). As such, multiple Texas and federal courts have upheld similar restrictions to those imposed by the original and modified TROs as not violating the First Amendment, particularly in the consumer protection context. That is because while the First Amendment "protects the right to engage in . . . solicitation," it "does not shield fraud." *Illinois, ex rel. Madigan v. Telemarketing Associates, Inc.*, 538 U.S. 600, 611–12 (2003). "Like other forms of public deception, fraudulent . . .

solicitation is unprotected speech." *Id.* at 612. Similarly, in the political context, "[b]ribery . . . , while involving 'speech, [is] not protected by the First Amendment." *Roberts v. State*, 278 S.W.3d 778, 790 (Tex. App.—San Antonio 2008, pet. ref'd).

For this reason, Texas courts have held that the DTPA does not violate the First Amendment when applied to deceptive statements or conduct. For example, in *Reynolds v. Murphy*, a subscriber to an investing newsletter brought DTPA and other claims against the author and publisher of that newsletter based on losses he incurred after following the newsletter's investment advice. 188 S.W.3d at 256–57. After the trial court granted summary judgment in favor of the publisher because the First Amendment precluded a DTPA suit, the Second Court of Appeals held that the First Amendment did not apply to DTPA misrepresentations because "the First Amendment does not protect fraudulent or deceptive speech." *Id.* at 263.[7]

The *Mother* case, discussed *supra* at 21, reached a similar conclusion. After a crisis pregnancy center was sued by the Attorney General for misrepresenting itself as an abortion clinic in violation of the DTPA, the center argued that applying the DTPA to their activities "violate[d] their freedom of speech" because they were engaged in "political activity" by advocating against abortion. 749 S.W.2d at 541–42. The Second Court disagreed, holding that the DTPA's purpose of "[p]rotecting the innocent public from those deliberately engaging in deceptive practices is a justifiable

---

[7] The Court ultimately sustained summary judgment on the DTPA claim, but on alternative grounds.

compelling state interest." *Id.* at 542. The Court further held "the DTPA is narrowly tailored to fit its purpose; it does not prohibit speech in any way, it merely insures [*sic*] that the stream of information to the public is not false." *Id.*

The original and modified TROs in this case bear all the hallmarks of the permanent injunction challenged in *Mother*. Just like the crisis pregnancy center was permitted to make any pro-life statements it wanted but was prohibited from deceptively advertising itself to trick Texans, Relators are free to make any political statements they want, so long as they do not make deceptive statements to lure Texans into thinking they are making donations to be used for lawful political purposes, when those donations are actually being used for illegal, personal purposes (likely in violation of Texas bribery laws). As such, the narrowly tailored TROs in this case do not restrain protected speech at all, do not constitute prior restraints, and are not subject to the prior restraint framework proposed by Relators.

### 3. The original and modified TROs are not unconstitutionally overbroad.

For similar reasons—and because Relator O'Rourke expressly said as much on the record of this case—the original and modified TROs are not overbroad. To determine overbreadth and vagueness, "a court's first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct, if it does not, then the overbreadth challenge must fail." *Mother*, 749 S.W.2d at 540. "In Texas courts, an overbreadth challenge is predicated on how the enactment is applied to the accused." *Id.* Typically, applications of the DTPA are not overbroad because they do not "penalize any speech or conduct protected by the first

amendment." *Id.* "The DTPA proscribes activities constitutionally forbidden, but does not further encompass protected speech or conduct." *Id.* If the order is not overbroad, the court next determines whether the proscribed conduct is defined "with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not permit arbitrary and discriminatory enforcement." *Martinez v. State*, No. 2-08-070-CR, 2009 WL 383760, at *5 (Tex. App.—Fort Worth Feb. 12, 2009) (quoting *Lawrence v. State*, 240 S.W.3d 912, 915 (Tex. Crim. App. 2007), *aff'd*, 323 S.W.3d 493 (Tex. Crim. App. 2010)).

As an initial matter, the record of this case contains Relator O'Rourke's express statement that the TRO was not overbroad.[8] During an interview with California Governor Gavin Newsom that aired on August 13, 2025—almost a week after the original TRO was entered—O'Rourke stated in reference to this case: "But the TRO that they got was so incredibly narrow in scope. There are some very technical, specific things that I can't say, and I have not said them, but I have continued to rally, to fight, to raise and to speak my mind." SMR.100 80:21–25. While the State disputes whether Relator O'Rourke violated the TRO, the State and O'Rourke agree that the TRO is narrow, technical, and specific, all of which is sufficient to overcome claims of overbreadth.

Furthermore, Relators' complaint that the modified TRO granted relief never sought by the State is contradicted by the record. The modified TRO contained only

---

[8] This Court admitted those statements into evidence at the August 14, 2025 hearing on the State's Motion to Modify the TRO. SMR.95–96 75:25–76:1

two substantive changes from the original TRO: *first*, at Relators' request, it clarified that Relator O'Rourke could remove his own personal funds from Texas so long as they were not commingled with political contributions to PxP; and *second*, it added standard language from the Texas Rules of Civil Procedure stating that the TRO applied to PxP, O'Rourke, and "their officers, agents, servants, employees, and attorneys, and those persons or entities in active concert or participation with Defendants, who receive actual notice of this Modified Temporary Restraining Order by personal service or otherwise." MR.392; *compare* Tex. R. Civ. P. 683 (defining the proper scope of a restraining order, including that it "is binding only upon those parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise"). Consistent with this addition, and in light of evidence presented to the district court that Relators were still illegally fundraising on ActBlue in contempt of the original TRO, Relators were further ordered to serve a copy of the modified TRO on ActBlue and their bank. MR.393; *see also* SMR.110 90:4–11 (district court noting that all the modified TRO did was bar ActBlue from "remov[ing] Powered By The People's funds from the State of Texas to the extent that they are a third-party holder of the funds belonging to one of the defendants in this case").

This is exactly the relief the State always sought: blocking the illegal use, raising, and offering of political contributions raised through ActBlue and other political platforms. Preventing the removal of such funds from Texas, whether through Relators' direct actions or through the actions of those in concert with them, is consistent with

that relief. Such relief is also within the State's rights under the Texas Business Organizations Code, which provides that whenever the State seeks to enforce its rights against corporations (including section 12.201's authorization of enforcement liens, which the State has sought in this case), "[t]he state has a right to a writ of attachment, garnishment, sequestration, or injunction, without bond, to aid in enforcement of the state's rights." Tex. Bus. Org. Code §12.201. And finally, after the State presented evidence that Relators were still fundraising for illegal purposes via ActBlue, which the district court had specifically restrained, the court's order to serve a copy of the modified TRO on ActBlue fell squarely within the district court's inherent power to exercise "its jurisdiction and the enforcement of its lawful orders, including authority to issue the writs and orders necessary or proper in aid of its jurisdiction." Tex. Gov't Code § 21.001(a).

Nor does the modified TRO "go far beyond the complained-of" illegal conduct." Pet. at 55. The modified TRO does not generically prohibit "raising funds for non-political purposes," as Relators claim—rather, it specifically restrains "[u]sing political funds" for a defined subset of "improper, unlawful, and non-political purposes," "[r]aising funds for non-political purposes . . . *through the ActBlue platform or any other platform that purports to exist for political fundraising purposes*," and offering "to confer travel, hotel, or dining accommodations or services . . . to unexcused Texas legislatures . . . as consideration for a violation of such legislators' Constitutional duties." MR.392–93 (emphasis added). It specifically prohibits the use, raising, or offering of political funds raised on ActBlue for a defined subset of non-political, illegal purposes. Furthermore, Texas law expressly defines "personal use,"

43

"political contribution," and other relevant terms in the modified TRO. *See, e.g.*, Tex. Elec. Code §§ 253.035(a), (d) (prohibiting the use of a "political contribution" for "personal use," and defining "personal use"); Tex. Elec. Code §§ 251.001(2), (5) (defining "contribution" and "political contribution"). As a general purpose committee, PxP files regular reports with the Texas Ethics Commission, and is necessarily familiar with Title 15 and the various Texas state requirements for raising and use of political funds.[9] And in any event, the TRO expressly references these statutory provisions. MR.392.

In sum, the modified TRO is not overbroad. It does not encompass First Amendment-protected speech, and Relators have stated on the public record that they know exactly what it prohibits. The district court acted within its discretion when it modified the TRO. Nor the district court clearly abuse its discretion in refusing to dissolve the TRO.

## B. The trial court did not clearly abuse its discretion in entering the anti-suit TRO.

The district court did not clearly abuse its discretion in entering an anti-suit TRO against Relators because had it not done so, it would have been deprived of jurisdiction over its own litigation by the El Paso court (which had already entered an anti-suit injunction against OAG at Relators' request). Texas district courts may

---

[9] *See, e.g.*, Texas Ethics Commission, *General-Purpose Committee Campaign Finance Report: Filer ID 00084642 Powered by People* (filed July 15, 2025), available at https://prd.tecprd.ethicsefile.com/public/cf/2025/pdfs/ScrubbedReport_101007516.PDF.

not restrain other district courts, but they may restrain *persons* from proceeding with suits filed in other courts of the state by granting an "anti-suit injunction," abating proceedings in a second forum. *Gannon v. Payne*, 706 S.W.2d 304, 305 (Tex. 1986). Texas law authorizes anti-suit injunctions when "a party performs or is about to perform or is procuring or allowing the performance of an act relating to the subject of pending litigation, in violation of the rights of the applicant, and the act would tend to render the judgment in that litigation ineffectual." Tex. Civ. Prac. & Rem. Code § 65.011(2) (emphasis added).

Texas law permits an anti-suit injunction in four instances: 1) to address a threat to the court's jurisdiction; 2) to prevent the evasion of important public policy; 3) to prevent a multiplicity of suits; or 4) to protect a party from vexatious or harassing litigation. *Gannon*, 706 S.W.2d at 307. The party seeking the injunction must show that "a clear equity demands" the injunction. *Christensen v. Integrity Ins. Co.*, 719 S.W.2d 161, 163 (Tex. 1986). Because not just one but *at least* three of these conditions exist in this case, the district court acted within its discretion to grant the anti-suit TRO.

1. **The Tarrant County district court has dominant jurisdiction over the issues in this case, and an anti-suit TRO was required to protect that jurisdiction.**

The Tarrant County district court has dominant jurisdiction over the various issues in this case because the State filed its lawsuit against Relators in Tarrant County first, before PxP sued the Attorney General in El Paso. "Under the dominant-jurisdiction doctrine, when two inherently interrelated suits are brought in

45

different counties, the court in which suit is first filed generally acquires dominant jurisdiction." *State v. Nonparty Patient No. 1*, No. 15-25-00023-CV, 2025 WL 2355380, at *5 (Tex. App. [15th Dist.] Aug. 14, 2025). "When dominant jurisdiction applies, the general rule is that the court in the second-filed action must abate the suit, and the trial court abuses its discretion if it refuses to do so." *Id.*

The Tarrant and El Paso matters are clearly interrelated—both Relators and the El Paso court acknowledged this when the court, at Relators' request, entered an anti-suit TRO enjoining the State from pursuing *quo warranto* in Tarrant County. MR.718. Both lawsuits involve the same parties (PxP, the State, and its counsel the Attorney General), overlapping claims about the same set of facts (various legal violations relating to Relators' solicitation of funds to bankroll unexcused Texas legislators' quorum evasion, including *quo warranto*), and even the same discovery disputes.

Once the Tarrant County district court correctly ruled that venue is proper in Tarrant County, PxP obtained a ruling holding the opposite in El Paso. MR.719 ¶ 2, 721 ¶ 17, 722 ¶ 22. When multiple suits are proceeding on the same subject matter, venue is proper in the first-filed court, and the second-filed case threatens to deprive the first court of jurisdiction, an anti-suit injunction is not only justified—it is necessary. *See Gonzalez v. Reliant Energy, Inc.*, 159 S.W.3d 615, 623 (Tex. 2005) (holding that an anti-suit injunction was appropriate because the Hidalgo County court interfered with the jurisdiction of the Harris County court by directing the clerk of Harris County to remove the case from the docket altogether); *see also Henry v. McMichael*, 274 S.W.3d 185, 193 (Tex. App.—Houston [1st Dist.] 2008, pet. denied) (affirming

an anti-suit temporary injunction issued in a first-filed suit in Brazoria County Court enjoining proceedings in the second-filed Harris County Court to protect its jurisdiction after the Harris County Court refused to grant a Plea in Abatement).

## 2. The anti-suit TRO was required to prevent a multiplicity of suits.

Ordinarily, a parallel suit will be allowed to proceed absent some other circumstances which render an injunction necessary 'to prevent an irreparable miscarriage of justice.'" *Id.* at 652 (quoting *Gannon*, 706 S.W.2d at 307); *see also AVCO Corp. v. Interstate Sw., Ltd.*, 145 S.W.3d 257, 266 (Tex. App.—Houston [14th Dist.] 2004, no pet.) (stating multiplicity argument typically supports issuance of anti-suit injunction when party files numerous lawsuits to relitigate issues in different courts); *Forum Ins. Co. v. Bristol–Myers Squibb Co.*, 929 S.W.2d 114, 119 (Tex. App.—Beaumont 1996, writ denied) (finding multiplicity of suits); *see also Gonzalez*, 159 S.W.3d at 623 (finding that multiplicity of suits warranted anti-suit injunction because the *same party* filed the same claims, against the same defendants, in different Courts).

That is the exact circumstance at issue here, as even Relators have admitted. App'x. Ex. F at 37:4–39:20 (PxP invoking multiplicity of suits as justification to obtain an anti-suit TRO in El Paso). To date, the Tarrant County district court has issued substantive rulings on venue, jurisdiction, and other matters—only to have the El Paso court enjoin those rulings piece by piece a few days later. The constant interjection of the El Paso court into the Tarrant County court's proceedings sets it apart from other situations where parallel litigations run concurrently without interference. This was a sufficient independent justification for the Tarrant County court to issue its anti-suit TRO.

### 3. The anti-suit TRO was necessary to protect the State from the harassing El Paso proceedings.

Finally, an additional and independent justification to issue the anti-suit TRO was to shield the State from PxP's use of the El Paso litigation to probe the State's litigation strategy ahead of the Tarrant County temporary injunction hearing. Texas courts can issue anti-suit injunctions to protect a party from vexatious or harassing litigation. *Gannon*, 706 S.W.2d at 307; *Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 512 (Tex. 2010).

Weeks after the Tarrant County district court set its temporary injunction hearing for September 2, 2025, the El Paso district court deliberately scheduled its own anti-suit temporary injunction hearing for August 29, 2025—just one business day earlier. In connection with that earlier hearing, the El Paso court ordered expansive expedited discovery, including ***an apex deposition of Attorney General Ken Paxton***—despite all PxP's allegations involving actions taken by the Office of the Texas Attorney General, not by General Paxton in his individual capacity. *See In re Miscavige,* 436 S.W.3d 430, 435, 438 (Tex. App.—Austin 2014, orig. proceeding) (barring a named official from being deposed unless the theory of liability does not arise from actions taken while in their official capacity). This transparently sought to uncover the State's evidence and testimony, harass a prominent government official, and drain the State's resources needed to prepare for the September 2 Tarrant hearing. The district court acted properly to prevent this vexatious harassment.

## C. Relators had an adequate remedy of law by appeal of any temporary injunction.

Moreover, Relators fail to demonstrate that they lacked an adequate remedy on appeal that would justify mandamus relief regarding the TROs. Although there are circumstances in which a party will suffer such irreparable harm from the issuance of a TRO that mandamus relief is warranted, such as result should be the exception rather than the rule. By its nature, a TRO is temporary remedy, intended only to prevent irreparable harm pending issuance of temporary injunction. A litigant will ordinarily have an adequate remedy through appeal of temporary injunction.

"The expiration of a TRO generally renders a mandamus petition challenging the TRO moot." *In re Abbott*, No. 08-21-00140-CV, 2021 WL 4929910, at *1 (Tex. App.—El Paso Oct. 22, 2021, no pet.). Courts permit mandamus relief on a TRO when there is a need for the court to act urgently and prevent irreparable harm before a temporary injunction hearing. *See, e.g.*, *In re Office of Attorney Gen.*, 257 S.W.3d 695, 698 (Tex. 2008) (granting mandamus relief on a TRO when the State "could lose federal funding" if forced to comply before a temporary injunction issued); *In re Cnty. of Hidalgo*, 655 S.W.3d 44, 55 (Tex. App.—Corpus Christi–Edinburg 2022, no pet.) (granting mandamus relief because the "case involves important matters of public concern which are time-sensitive" and "an appeal after any temporary injunction is entered would not provide relators with an adequate remedy"). When relators cannot show "that the gravity of interests are sufficiently serious to warrant staying a temporary injunction hearing that may result in an appealable order," mandamus should be denied and the temporary injunction hearing allowed to go forward. *In re*

49

*Sills*, No. 09-17-00453-CV, 2017 WL 5707631, at *1 (Tex. App.—Beaumont Nov. 28, 2017, no pet.) (citing *In re Office of Attorney Gen.*, 257 S.W.3d at 698).

That is the exact circumstance before this Court. No aspect of the TROs challenged by Relators imposes emergency or irreparable harm that requires action from this Court before a temporary injunction hearing and any subsequent appeal of a temporary injunction if one were entered. And if a temporary injunction were entered and Respondents believed that they would suffer irreparable injury during appeal, they could seek relief pending appeal under Texas Rule of Appellate Procedure 29.3.

By waiting three weeks from the issuance of the initial TRO to seek mandamus relief from this Court, Relators implicitly acknowledged the absence of an emergency. If there had been no irreparable harm over the previous 21 days, then there would surely be no irreparable harm from waiting an additional seven days until the hearing on the temporary injunction.

If a temporary injunction were to be ordered by the trial court, any argument that Relators now seek to raise regarding the TROs could be raised in an appeal of the temporary injunction, with a more complete record and a more orderly appellate process. And if a temporary injunction were denied, then appeal would be unnecessary and this Court's (and the parties') resources preserved.

There are circumstances in which a TRO threatens to inflict such irreparable harm or addresses an issue of such importance that a court must intervene before a temporary injunction hearing, but those circumstances represent the exception rather than the rule, and in those circumstances, a party should seek mandamus relief immediately, rather than waiting until shortly before the temporary injunction

50

hearing. In the ordinary case, as here, courts should deny mandamus relief when a party seeks to challenge a TRO, instead allowing the temporary injunction hearing to proceed and allowing the aggrieved party to raise any challenges in the ordinary course through an interlocutory appeal.

## V. This Court Should Deny Relators' Emergency Motion for Temporary Relief.

Because this Court set an identical deadline for responses to the Petition for Writ of Mandamus and Emergency Motion for Temporary Relief, it is unclear whether this Court intends to address Relators' motion or rule only on the merits of the petition. If this Court addresses Relators' motion, because Relators are wrong on the merits, because a stay would irreparably harm the State, and because the temporary relief Relators request would enable them to continue engaging in illegal conduct, their request for temporary relief should likewise be denied. In considering a request for temporary relief under Rule 52.10, the Court's objective is not to preserve the status quo specifically, but rather to "preserve the parties' rights until disposition of the appeal." *In re State*, 711 S.W.3d 641, 645 (Tex. 2024) (analogizing Tex. R. App. P. 52.10 to Tex. R. App. P. 29.3). Thus, the Court should examine "the likely merits of the parties' respective legal positions," as well as "the injury that will befall either party depending on the court's decision." *Id.*

For the reasons explained *supra*, Relators are unlikely to succeed on the merits of their mandamus. "There is little justice in allowing a party who will very likely lose on the merits to interfere with the legal rights of the opposing party during the appeal." *Id.* And as the Tarrant County district court recognized by entering the

51

fundraising TROs, the State will be irreparably harmed if Relators are able to disburse funds (for out-of-state expenses) because "if it is later determined they were paid in violation of" Texas law, "they cannot feasibly be recouped." *Id.* at 647.

Furthermore, "[t]he continuation of illegal conduct . . . 'cannot be justified as preservation of the status quo.'" *State by & Through Office of Attorney Gen. of Tex. v. City of San Marcos*, 714 S.W.3d 224, 245 (Tex. App. [15th Dist.] 2025) (quoting *In re Newton*, 146 S.W.3d 648, 651 (Tex. 2004)). Because Relators seek to continue engaging in illegal fundraising practices, that "status quo" cannot justify a stay.

Finally, Relators are incorrect that they are currently restrained from responding to the State's appeal in the parallel El Paso matter. The Tarrant County anti-suit TRO only restrained Relators from prosecuting "any suit, claim, or proceeding that seeks to restrain or enjoin the State from initiating, filing, or prosecuting the *quo warranto* claims alleged by the State" in Tarrant Count. MR.978. But the State's appeal from El Paso has nothing to do with *quo warranto* or the El Paso court's own anti-suit TRO; rather, that appeal exclusively concerns mootness of the RTE. To the extent the anti-suit TRO in Tarrant County *did* prohibit Relators' participation in that appeal, that TRO expired on September 8, 2025. *See* MR.978 (stating the TRO shall remain in effect "until fourteen days after entry" on August 25, 2025). To the extent this Court's September 3, 2025 order extended such a restriction, the solution is not to enjoin the anti-suit TRO in its entirety; rather, this Court could merely modify the terms of its September 3 order to clarify that Relator PxP may respond to any appeal arising out of the El Paso matter, including the State's interlocutory appeal docketed as 15-25-00141-CV.

# PRAYER

The Court should deny the emergency stay request and mandamus petition and lift the stay, allowing the temporary injunction hearing to proceed in Tarrant County and permitting Relators to appeal any temporary injunction in the ordinary course.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

/s/ Abigail E. Smith
ABIGAIL E. SMITH
Assistant Attorney General
State Bar No. 24141756
Abby.Smith@oag.texas.gov

BRENT WEBSTER
First Assistant Attorney General

WILLIAM R. PETERSON
Solicitor General

ROB FARQUHARSON
Deputy Chief, Consumer Protection Division

JOHNATHAN R. STONE
Chief, Consumer Protection Division

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

*Counsel for Real Party in Interest the State of Texas*

# CERTIFICATE OF COMPLIANCE

Microsoft Word reports that this document contains 14,236 words, excluding exempted text.

/s/ Abigail E. Smith
ABIGAIL E. SMITH

# In the Court of Appeals
# for the Fifteenth Judicial District
# Austin, Texas

—————

*In re* Powered by People and Robert Francis O'Rourke,

*Relators.*

—————

On Writ of Mandamus
348th Judicial District Court, Tarrant County

—————

## REAL PARTY'S APPENDIX

—————

Tab

1.  PxP's Second Amended Petition (El Paso),
    filed August 18, 2025 ..................................................................... A

2.  Defendant Ken Paxton's Response to Plaintiff's Motion
    for Expedited Discovery, filed August 21, 2025 ................................ B

3.  Complaint, *Federal Trade Commission et al. v. Cancer Fund
    of America, Inc. et al.*, filed May 18, 2015 .......................................... C

4.  Original Petition, *State v. Veterans Support Organization*,
    filed March 19, 2014 ...................................................................... D

5.  Original Petition, *State v. Texas Highway Patrol Museum*,
    filed December 14, 2011 ................................................................... E

6.  August 13, 2025 TRO Hearing Transcript (El Paso) ....................... F

# Tab A

El Paso County - 41st District Court

Filed 8/18/2025 12:00 AM
Norma Favela Barceleau
District Clerk
El Paso County
2025DCV3641

**CAUSE NO. 2025DCV3641**

| | | |
|---|---|---|
| **POWERED BY PEOPLE,** | § | **IN THE DISTRICT COURT** |
| *Plaintiff,* | § | |
| | § | |
| **V.** | § | **41st JUDICIAL DISTRICT** |
| | § | |
| **KEN PAXTON,** | § | |
| **IN HIS OFFICIAL CAPACITY AS** | § | |
| **TEXAS ATTORNEY GENERAL** | § | |
| *Defendants.* | § | **EL PASO COUNTY, TEXAS** |

<u>**VERIFIED SECOND AMENDED PETITION FOR DECLARATORY JUDGMENT, MOTION FOR PROTECTIVE ORDER, APPLICATION FOR EMERGENCY TEMPORARY RESTRAINING ORDER, TEMPORARY INJUNCTION, AND OTHER INJUNCTIVE RELIEF**</u>

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiff Powered by People, a volunteer-driven Texas nonprofit composed of thousands of everyday Texans, files this verified second amended petition seeking a temporary restraining order and a protective order against Defendant, Texas Attorney General Ken Paxton, in his official capacity[1]. As explained below, in under a week's time, the State has initiated two unlawful, retaliatory new legal actions against Plaintiff — and is imminently planning to initiate a third. The State has admitted that its actions are in direct response to Plaintiffs' exercise of First Amendment rights in the form of political speech and organizing. "[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *accord Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 295 (5th Cir. 2012). And so, "political speech must prevail" against those who act to suppress it. *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010). This Court must act

---

[1] A redline version reflecting the changes from the First Amended Petition is attached as Exhibit A.

1

immediately and provide the protection requested herein to avoid such grave constitutional injuries.

Specifically, on August 6, 2025, Defendant launched a retaliatory and unlawful investigation into Powered by People, serving Mr. David Wysong and Ms. Gwen Pulido, Board members of Powered by People, with a Request to Examine ("RTE") seeking reams of sensitive and burdensome information from Plaintiff in less than 48 hours time. The State provided no valid reason to support this urgent, invasive, expensive inquiry — instead simply claiming to counsel that it was an "emergency." At the same time, Defendant Paxton admitted publicly that while he does not have "details" to support his allegations, but planned to use this "investigation" to "find out if they've done anything inappropriate," pointing explicitly to Plaintiff's recent political speech, organizing and advocacy.[2] In other words, with the August 6, 2025 action, the State was bluntly using the vast power of the Attorney General's office to effectuate a fishing expedition, constitutional rights be damned.[3] Defendant gave Petitioner a hard deadline of 4:00pm MT August 8, 2025 to respond.

Earlier on August 8, 2025, and unbeknownst to the Defendants, the Attorney General abruptly changed directions, and preparing a new filing in north Texas. As Plaintiff was finalizing its El Paso lawsuit, the Attorney General announced the filing of a new court action in Tarrant County against Plaintiff and Robert "Beto" O'Rourke (the founder of Powered by People). Despite

---

[2] James Morley III, *Texas AG Paxton to Newsmax: O'Rourke's PAC to Be Investigated*, NEWSMAX (Aug. 6, 2025, 5:40 PM EDT), https://www.newsmax.com/newsmax-tv/ken-paxton-texas-redistricting/2025/08/06/id/1221553/.

[3] Even worse, Defendant Paxton — who is running for and actively fundraising for his 2026 run for U.S. Senate — has publicly identified former Congressman Beto O'Rourke, the prominent founder of Powered by People, as a potential 2026 political opponent. Another motivation behind Defendant's action thus appears to be an unlawful desire to retaliate against Mr. O'Rourke, and to use the power of the State of Texas to try to intimidate Mr. O'Rourke from challenging Defendant in a free and fair election.

2

that, as of 9:56 am MT on Friday, counsel for the Attorney General knew that Powered by People was represented by the undersigned counsel, and with plenty of time to do so, the Attorney General did not inform the undersigned counsel of an imminent "emergency" *ex parte* TRO filing and hearing until almost four hours later. Despite the failure to identify any substantial connection to the Tarrant County venue, the State sought a temporary restraining order seemingly aimed to achieve similar goals as the RTE: namely, to chill the exercise of constitutionally protected rights.

Later, a hearing was held before Judge Fahey in Tarrant County. The Tarrant County court entered a Temporary Restraining Order at 5:32pm.[4] The next day, on August 9, 2025, counsel for the State indicated that "effectively immediately" it was withdrawing its RTE issued to Petitioner, Powered by People, and asked counsel for Petitioner to dismiss this instant action.[5]

In the evening of August 11, 2025, in another egregious misuse of power, staff at Defendant's office indicated that that Defendant would be immediately seeking to institute *quo warranto* proceedings in Tarrant County, a County where there is not even a colorable argument for proper venue for such a proceeding. Defendant is abusing the legal system, and his authority within that system, solely for the purpose of harassing and intimidating Plaintiff in order to curtail Plaintiff's protected constitutional activity. He cannot be allowed to run roughshod over the Texas and United States Constitution.

And so, Defendant's withdrawal of the RTE served on Petitioner on August 6, 2025, does not justify dismissal of the instant action. Indeed, far from mooting the controversy between the

---

[4] Earlier today, Plaintiff and Mr. O'Rourke filed a motion to change venue to El Paso County in the Tarrant County case since a substantial part of the events giving rise to the State's alleged claims occurred in El Paso County and venue is not proper in Tarrant County. That motion is attached as Exhibit C. Shortly, Plaintiff and Mr. O'Rourke will also seek to dissolve the TRO issued by Judge Fahey since it lacks support in law and fact.

[5] Attorney Farquharson also indicated that it was withdrawing its RTE issued to Mr. O'Rourke; however to date, Mr. O'Rourke has not been served with an RTE.

parties, the State instead plans to continue to escalate it. Thus, this Court continues to have jurisdiction to hear Petitioner's claims for declaratory and injunctive relief under the First and Fourth Amendment of the U.S. Constitution, since without such relief, Defendant will be free to reserve the RTE at any time, free to file a retaliatory action in *quo warranto*, and free to continue to infringe on Plaintiff's constitutional rights. *See*, *Paxton v. Annunciation House*, Inc., No. 24-0573, 2025 WL 1536224, *56 (Tex. 2025) (finding that even though the attorney general ceased pressing for records, "the records dispute is not moot as the attorney general remains free to simply file more requests if there is no ruling that deems the relevant requests unconstitutional."). Moreover, Plaintiff has asserted a request that attorneys' fees be awarded in this matter. Further, Plaintiff now seeks injunctive relief, including an emergency temporary restraining order, enjoining Defendant from harassing Plaintiff and violating its rights by instituting quo warranto proceedings against Plaintiff in an improper county.

Plaintiffs respectfully show the Court as follows, in support of the requested relief:

## I.    PARTIES

1.      Plaintiff, Powered by People, is a Texas nonprofit corporation. It operates as a political organization pursuant to 26 U.S.C. § 527(e)(1) for the purpose of "directly or indirectly accepting contributions or making expenditures, or both" to influence elections. As a political organization, Powered by People files regular campaign finance reports with the Texas Ethics Commission, and is registered within Texas as a general-purpose committee.

2.      Defendant is Ken Paxton, in his official capacity as Texas Attorney General. He may be served at the Office of the Attorney General, 300 W. 15th Street, Austin, Texas 78701.

## II. DISCOVERY-CONTROL PLAN

3.       Plaintiff intends to conduct discovery under Level 2 of Texas Rule of Civil Procedure 190.3 and affirmatively pleads that this suit is not governed by the expedited-actions process in Texas Rule of Civil Procedure 169 because Plaintiff seeks injunctive relief.

## III. RULE 47 STATEMENT

4.       Pursuant to Texas Rule of Civil Procedure No. 47, Plaintiff is not seeking monetary relief, only non-monetary relief in the form of injunctive and declaratory relief.

## IV. JURISDICTION & VENUE

5.       This Court has subject-matter jurisdiction under TEX. CIV. PRAC. & REM. CODE §§ 65.001 et seq., the Uniform Declaratory Judgment Act found at TEX. CIV. PRAC. & REM. CODE §§ 37.001 et seq., and Texas Government Code Chapter 24.

6.       This Court has statutory jurisdiction in that a substantial part of the events giving rise to this claim occurred in El Paso County.

7.       Venue is proper because the challenged Request to Examine was served in El Paso County. *See* Tex. R. Civ. Pro. 176.6(e) ("[a] person commanded to…produce…designated documents and things…may move for a protective order…either in the court in which the action is pending or in a district court in the county where the subpoena was served."); *see also Paxton v. Annunciation House*, Inc.,  No. 24-0573, 2025 WL 1536224, *24 (Tex. 2025) (determining that Rule 176.6(e) applies to the Attorney General's Requests to Examine). Moreover, jurisdiction remains with this court and the dispute is not moot simply because Defendant has withdrawn the RTE. *Id*. at *56 (Tex. 2025) (Finding that even though the attorney general ceased pressing for records, "the records dispute is not moot as the attorney general remains free to simply file more requests if there is no ruling that deems the relevant requests unconstitutional.")

8. Venue is additionally proper because the quo warranto action that Defendant Paxton seeks to institute is only properly filed in El Paso County. TEX. CIV. PRAC. REM. CODE §§ 66.002 and 15.002

## V. FACTS

9. In 2019, Mr. O'Rourke founded Powered by People, a voter registration and mobilization group that works to expand access to democracy through voter registration and direct voter engagement. Composed of thousands of volunteers in every region of Texas, and with seven full-time employees, Powered by People has spearheaded large voter mobilization efforts, registering thousands of Texans to vote. In addition, at different times, Powered by People has taken on community-centered projects such as raising money for persons who suffered home damage as a result of Texas's electric grid failure, coordinating volunteers at community food banks during the height of the COVID pandemic, going door-to-door to educate elderly members of the public about vaccines during the pandemic, and raising money for and delivering supplies during other national disasters.

10. Powered by People currently has nine employees and maintains its principal place of business in El Paso, Texas.

11. In addition to serving as its founder, Mr. O'Rourke sits on Powered by People's Board of Directors, alongside David Wysong and Gwen Pulido.

12. In recent months, Mr. O'Rourke has been a prominent, outspoken critic of Texas Republicans' attempts to re-draw Texas' congressional map at the behest of President Donald J. Trump. For instance, on July 21, 2025, Mr. O'Rourke appeared on PBS Newshour and argued that President Trump "knows he will lose the slim majority they have in the House of Representatives

6

unless they rig the game mid-decade, which is what they're trying to do in Texas."[6] On July 24, 2024, Mr. O'Rourke appeared at a large rally at the Capital and accused Republicans of "play[ing] games . . . in order to maximize [] political power" at the expense of flood victims.[7]

13.     In support of his political views and the views of Powered by People, Mr. O'Rourke has made numerous successful grassroots fundraising appeals for donations to Powered by People, stating his desire to "have the backs of these heroic state lawmakers" and otherwise support Texas-based organizations who share his opposition to the newly introduced redistricting maps.[8] It is, of course, commonplace for political figures and candidates to tie appeals for resources to achieving policy actions. Indeed, Defendant Paxton himself has implored donors to donate to help him "stop Biden's open border policy" and "stop Democrats and RINOs efforts to takeover [sic] TX."[9]

---

[6] Amna Nawaz, *Stephanie Kotuby & Alexa Gold, O'Rourke says 'we have to fight back' as Trump pushes Texas to redraw congressional maps*, PBS NEWSHOUR (July 21, 2025, 6:40 PM EDT), https://www.pbs.org/newshour/show/orourke-says-we-have-to-fight-back-as-trump-pushes-texas-to-redraw-congressional-maps.

[7] Blaise Gainey, *'We will not let Trump take over': Texans rally as state lawmakers begin redistricting hearings*, KUT (July 24, 2025, 4:36 PM CDT), https://www.kut.org/politics/2025-07-24/we-will-not-let-trump-takeover-texans-rally-as-state-lawmakers-begin-redistricting-hearings.

[8] Owen Dahlkamp, *Beto O'Rourke's political group is a top funder for Texas Democrats' exodus to block GOP congressional map*, Tex. Trib. (Aug. 5, 2025, 1:00 PM CT), https://www.texastribune.org/2025/08/05/texas-democrats-quorum-break-beto-orourke-illinois-funding/.

[9] Ken Paxton, Facebook (Jun. 30, 2021, 2:04 PM EDT), https://www.facebook.com/kenpaxtontx/posts/4198758750185935, (last visited Aug. 8, 2025).



Ken Paxton's post ✕

Ken Paxton ✔
June 30, 2021 · 🌐

President Trump continues fighting for America. He joined me & others at the border to stop Biden's open border policy. Please help me stop Democrats and RINOs efforts to takeover TX. Donate now: https://kenpaxton.com/donate/

👍❤️ 10K                                                    589 comments  1.1K shares

14.     At 2:15pm MT on Wednesday August 6, 2025, Defendant Paxton issued a press release entitled "Attorney General Ken Paxton Launches Investigation into Beto O'Rourke's Radical Group for Unlawfully Funding Runaway Democrats." The release stated that, "[a]s part of the investigation, Attorney General Paxton has issued a Request to Examine, which demands documents and communications from the group regarding potentially unlawful activity, including its involvement in the Democrats' scheme to break quorum."[10]

---

[10] Press Release, Office of the Texas Attorney General, Attorney General Ken Paxton Launches Investigation into Soros-Funded PAC for Unlawfully Funding Runaway Democrat Legislators (Aug. 7, 2025), https://www.texasattorneygeneral.gov/news/releases/attorney-general-ken-paxton-launches-investigation-soros-funded-pac-unlawfully-funding-runaway.

15.     At 7:15pm MT on August 6, 2025, Mr. Wysong received the "Request to Examine" (RTE) via personal service at his home in El Paso, Texas. A true and accurate copy of the RTE, as served upon Mr. Wysong, is attached as Exhibit B.

16.     Indeed, as of this amended filing, Mr. O'Rourke has not been served with the RTE.

17.     The RTE demands eleven categories of potentially extensive documents that may be in the possession of Plaintiff. Several may be subject to privilege.

   a.  For instance, Requests 1 and 2 seek communications between Powered by People and dozens of lawmakers. To the extent any such documents exist, they may be protected by legislative privilege.

   b.  Requests 3 and 4 seek documents and communications "relating to, or discussing, quorum during Texas's current special legislative session." Requests 7 and 8 seek communications regarding the "solicitation of funds" to support certain lawmakers. To the extent any such documents exist, they may be protected by attorney-client privilege.

18.     Despite the extensive and burdensome requests, the likely privileged nature of the information sought, and constitutionally suspect motives involved, the RTE set a compliance deadline of 4:00 pm MT (5:00pm CT) Friday, August 8, 2025. While the State purports to have withdrawn the RTE, thus suspending this deadline, it apparently intends to use a proceeding in *quo warranto* and/or discovery in the ongoing Tarrant County case to access the same or similar information.

19.     While the RTE claimed to encourage Plaintiff to "meet and confer with the Office of the Attorney General" over the scope of the production, when Powered by People's national counsel asked first for a two-week extension the morning of Thursday, August 7, 2025, his request

9

was promptly rejected. Similarly, a subsequent request sent by Texas counsel seeking an extension until August 16, 2025 (the same 10 days a nonparty subpoenaed for documents in a civil lawsuit under TEX. R. CIV. P. 205.2 would be entitled to), went unresponded to by the Office of Attorney General.

20. Defendant purported to issue the RTE pursuant to Texas Business Organizations Code § 12.151 *et seq.*, which allows the Attorney General to inspect corporate records "as the attorney general considers necessary in the performance of a power or duty of the attorney general, of any record of the entity."

21. The RTE threatened that if Powered by People does not comply, penalties "include the Office of the Attorney General initiating a legal action for the entity's 'registration or certificate of formation' to be 'revoked or terminated,' TEX. BUS. ORG. CODE § 12.155. If the Office of the Attorney General deems such penalty warranted, proceedings to revoke or terminate an entity's registration or certificate of formation are initiated through a petition for leave to file an information in the nature of *quo warranto*. TEX. CIV. PRAC. & REM. CODE § 66.002." It is also Class B misdemeanor to fail to or refuse to provide records requested by the Attorney General. *See* TEX. BUS. ORGS. CODE § 12.156.

22. On August 11, 2025, during a conversation with the undersigned counsel, Defendant's counsel indicated that Defendant plans to file a motion for leave to file a petition for *quo warranto* against Powered by People in Tarrant County. The purpose of a *quo warranto* proceeding is to revoke a corporation's charter and ability to conduct business in this state.

23. As defense counsel well knows, a *quo warranto* proceeding in Tarrant County would be completely improper and filing such a pleading there would likely violate attorney ethical

rules. Nonetheless, defense counsel indicated they will do so imminently while refusing to identify any basis for doing so.[11]

24. In that same conversation, in response to Plaintiffs indicating that their position was that no discovery should occur in the case until the Motion To Transfer Venue had been decided, Defendant's counsel stated that, in that case, Defendant would instead "ambush" them with discovery.

25. Defendant Paxton has identified Mr. O'Rourke as a prospective opponent in the 2026 U.S. Senate race, and has already used the prospect of running against Mr. O'Rourke in a fundraising appeal.[12]

---

[11] Tex.Civ. Prac. & Rem. Code 66.002(a), the controlling *quo warranto* statute, says a *quo warranto* petition should be filed with " the district court of the proper county or a district judge." The general venue statute, Tex.Civ. Prac. & Rem. Code 15.002(a), provides, in relevant part, that venue is only proper in the county "in which all or a substantial part of the events or omissions giving rise to the claim occurred,"...or "in the county of the defendant's principal office in this state, if the defendant is not a natural person." Here, that county can only be El Paso County as Powered by People's principal place of business, Board members, senior team are all in El Paso and its and main activities primarily occur in El Paso County. As attested to in the attached declaration, and as Defendants is aware, no activities that Defendant has (unjustifiably) targeted actually occurred in Tarrant County. *See* Ex. A (Declaration of David Wysong).

[12] Ken Paxton (@KenPaxtonTX), X (Apr. 29, 2025, 2:23 PM CDT), https://x.com/KenPaxtonTX/status/1917298692438254050 (last visited Aug. 8, 2025).

11



← **Post**

**Attorney General Ken Paxton** ✓
@KenPaxtonTX ···

Did you hear this? Beto O'Rourke said he might run for Senate again!

Chip in now to tell Beto 'No thanks!!' 👇

## Ken Paxton

### US Senate

### Texas

Donate to Ken Paxton Here

From secure.winred.com

3:23 PM · Apr 29, 2025 · **29.7K** Views

💬 270      🔁 440      ♡ 1.8K      🔖 18      ⬆

💬 Read 270 replies

26.     Recently, through repeated comments, Defendant Paxton has made clear his intention to retaliate against Mr. O'Rourke personally through this RTE for Mr. O'Rourke's First Amendment-protected activities, including his speech, association with others, and advocacy against the proposed congressional maps. As noted above, the press release announcing the RTE characterizes lawful donations made by Powered by People as "Beto Bribes."[13] Defendant Paxton has gone on in recent days to call Mr. O'Rourke "delusional"[14] and to claim he is "scared of

---

[13] Press Release, Office of the Texas Attorney General, Attorney General Ken Paxton Launches Investigation into Beto O'Rourke's Radical Group for Unlawfully Funding Runaway Democrats (Aug. 6, 2025), https://www.texasattorneygeneral.gov/news/releases/attorney-general-ken-paxton-launches-investigation-beto-orourkes-radical-group-unlawfully-funding.

[14] Ken Paxton (@KenPaxtonTX), X (Aug. 7, 2025 3:16 PM),

accountability."[15] And, again, even though Defendant Paxton has publicly admitted that he does not have any "details" or actual proof to support allegations of unlawful behavior,[16] Defendant Paxton has stated that serving the RTE sparks "an investigation into Beto O'Rourke's radical group for unlawfully funding runaway Democrats."[17]

## VI.  CLAIMS FOR RELIEF

### COUNT 1: U.S. Constitution, Freedom of Association (42 U.S.C. § 1983)

27.    Plaintiff realleges and incorporates by reference the foregoing paragraphs as though fully set forth herein.

28.    Freedom of association for the purpose of advancing ideas and airing grievances is a fundamental liberty guaranteed by the First Amendment. *In re Bay Area Citizens Against Lawsuit Abuse*, 982 S.W.2d 371, 375 (Tex. 1998) (quoting *NAACP v. Alabama*, 357 U.S. 449, 460 (1958). The First Amendment's protection of the freedom of association provides "protection to collective effort on behalf of shared goals." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). As the Supreme Court has noted, "[p]rotected association furthers a wide variety of political, social, economic, educational, religious, and cultural ends, and is especially important in preserving political and cultural diversity and in shielding dissident expression from suppression by the majority." *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 606 (2021) (internal quotation marks omitted).

---

https://x.com/KenPaxtonTX/status/1953550789571424322 (last visited Aug. 8, 2025).
[15] Ken Paxton (@KenPaxtonTX), X (Aug. 6, 2025, 6:19 PM CDT), https://x.com/KenPaxtonTX/status/1953234509685768647 (last visited Aug. 8, 2025).
[16] James Morley III, *Texas AG Paxton to Newsmax: O'Rourke's PAC to Be Investigated*, Newsmax (Aug. 6, 2025, 5:40 PM EDT).
[17] Ken Paxton (@KenPaxtonTX), X (Aug. 6, 2025, 3:18 PM CDT), https://x.com/KenPaxtonTX/status/1953188955807273440 (last visited Aug. 8, 2025).

13

29.     The RTE and threatened *quo warranto* proceeding wrongly burdens association in several ways. First, political contributions and expenditures are a form of speech and association. *See In re Siroosian*, 449 S.W.3d 920, 925 (Tex. App.—Dallas 2014, no pet.) (quoting *McCutcheon v. Fed. Election Comm'n*, 134 S.Ct. 1434, 1441 (2014)) ("The right to participate in democracy through political contributions is protected by the First Amendment."). Government actions that tend to limit political spending "operate in an area of the most fundamental First Amendment activities. Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution." *Osterberg v. Peca*, 12 S.W.3d 31, 41 (Tex. 2000) (quoting *Buckley v. Valeo*, 424 U.S. 1 (1976) (per curiam)). Here, Defendant Paxton is overtly penalizing Plaintiff's exercise of free speech, seeking to chill Plaintiff and Mr. O'Rourke from further political spending and donating. "The First Amendment does not permit the government to make any individual choose between the First Amendment right to engage in unfettered political speech and subjection to discriminatory" application of laws. *See Davis v. Fed. Election Comm'n*, 554 U.S. 724, 739 (2008).

30.     Moreover, the Supreme Court has recognized for decades that "compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as [other] forms of governmental action." *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958). That is because disclosure can subject organizations and individuals to threats of harassment, reprisals, and "other manifestations of public hostility." *Id.*

31.     Harassment need not be certain to occur for a plaintiff to state an association claim. The Supreme Court has emphasized instead that the First Amendment is implicated "by 'state action which may have the effect of curtailing the freedom to associate,' and by the 'possible deterrent effect' of disclosure." *Americans for Prosperity Found.*, 594 U.S. at 616 (quoting

*NAACP*, 357 U.S. at 460–61); *see also id.* at 606 ("freedom of association may be violated . . . where individuals are punished for their political affiliation.").

32. Further, the First Amendment protects the right to publish and distribute political writings while remaining anonymous. *Ex parte Odom*, 570 S.W.3d 900, 908 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) (citing *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 342 (1995)).

33. As detailed above, the RTE and the threatened *quo warranto* proceeding are intended to, and would serve to, chill Powered by People's speech and association by deterring their contributions and expenditures, by subjecting supporters and contributors to identification and potential harassment (including from Defendant himself, given his targeting of Mr. O'Rourke) and by forcing disclosure of anonymous political writings, which would in turn make at least some supporters think twice before associating with Powered by People. For particular example, Requests 3 and 4 appear to request any and all communications between Powered by People and any person regarding quorum break. This would implicate third parties, including Powered by People's volunteers, supporters and contributors, and subject them to identification by a vindictive and politically-motivated bad-faith government actor.

**COUNT 2: U.S. Constitution, Retaliation For Protected Speech (42 U.S.C. § 1983)**

34. Plaintiff realleges and incorporates by reference the foregoing paragraphs as though fully set forth herein.

35. The Constitution prohibits the government from taking adverse action against a person for the exercise of their First Amendment rights. *E.g.*, *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019). Accordingly, the State cannot retaliate against a citizen who exercises the right of free speech on a matter of public concern. *Levine v. Maverick Cnty. Water Control & Imp. Dist. No. 1*,

884 S.W.2d 790, 795 (Tex. App.—San Antonio 1994, writ denied). There's no question that "speech concerning illegal conduct, especially in the public sector is of 'public concern,'" and includes Mr. O'Rourke's condemnation of Texas Republicans' attempt to re-draw the congressional maps, which he has characterized as unlawful. *Upton Cnty., Tex. v. Brown*, 960 S.W.2d 808, 826 (Tex. App.—El Paso 1997, reh'g overruled).

36. To demonstrate retaliation, "[a] claimant must show at least that a substantial and motivating factor for the complained-of action resulted from his exercise of free speech." *Levine,* 884 S.W.2d 790 at 795. Here, as demonstrated by Defendant Paxton's personal animus and vitriol against Plaintiff and Mr. O'Rourke based on their protected political speech, including speech criticizing Defendant Paxton himself and speech in the form of political donations, retaliation was wrongfully a "substantial and motivating factor" in the issuance of the RTE. *Id.*

### COUNT 3: U.S. Constitution, Fourth Amendment (42 U.S.C. § 1983) & Art. I, § 9 of the Texas Constitution

37. Plaintiff incorporates by reference every allegation in the preceding paragraphs as if set forth fully herein.

38. The Fourth Amendment, which applies to the States through the Fourteenth Amendment, provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated," and that "no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV.

39. "Based on this constitutional text," the Supreme Court "has repeatedly held that searches conducted outside the judicial process, without prior approval by a judge or a magistrate judge, are *per se* unreasonable subject only to a few specifically established and well-delineated exceptions." *City of Los Angeles v. Patel*, 576 U.S. 409, 419 (2015) (internal quotation marks and alterations omitted).

16

40. The Attorney General's demand for documents was not made pursuant to a judicial warrant backed by probable cause. In fact, Defendant's demand for documents has not been ratified by any court. Nor does Defendant's demand for documents constitute a permissible administrative search, which must be conducted pursuant to some "'special need' other than conducting criminal investigations." *Id*. at 420. The Attorney General has identified no such special need for these documents, and none is apparent.

41. Instead, the RTE is an "administrative search" which must provide for pre-disclosure judicial review that permits the target to challenge the reasonableness of the inquiry, including its scope, relevance, and burden. While the Texas Supreme Court in *Annunciation House v. Paxton* declined to strike down a *facial* challenge to Texas Business Organizations Code § 12.152, it did so assuming that precompliance review would in fact be made available to those served with requests to examine and that such requests would otherwise adhere to Texas law. *Paxton v. Annunciation House, Inc.*, No. 24-0573, 2025 WL 1536224, at *24 (Tex. May 30, 2025); *see also Spirit Aerosystems, Inc. v. Paxton*, 142 F.4th 278, 291 (5th Cir. 2025) ("Although the RTE statute does not by its text incorporate Rule 176.6, the Texas Supreme Court recently held in *Annunciation House* that Rule 176.6 nevertheless provides a mechanism for precompliance review of RTEs. . . The Texas Supreme Court also confirmed that 'the term [immediately] cannot reasonably be read literally,' and that the Attorney General was 'not permit[ted] ... to withhold precompliance review' . . .").

42. Accordingly, for the RTE to be constitutional, it must adhere to the Texas Rules of Civil Procedure governing administrative subpoenas, which incorporate the prohibitions on unreasonable search and seizures found in the U.S. Constitution and in the Texas Constitution. That means: "(1) the agency must conduct its investigation pursuant to an authorized purpose, and

the subpoena must be relevant to that purpose; (2) the agency must follow the necessary statutory procedures; (3) the subpoena must describe the documents sought with adequate particularity, meaning that the scope of its demand for documents must be adequate, but not excessive, for the purposes of the inquiry; (4) the subpoena must not unnecessarily or excessively seek information that the agency already possesses; and (5) the respondent may show that the subpoena is unnecessarily burdensome." *Schade v. Texas Workers' Comp. Comm'n*, 150 S.W.3d 542, 551 (Tex. App.—Austin 2004).

43.     The RTE here fails several of these factors: it was issued for the unauthorized purpose of retaliating against a political rival and to restrict protected rights; even if the purpose of the inquiry were proper, the RTE is vague, seeking a wide range of information with no stated justification; and—between the less-than-48-hour response deadline, requests for sensitive information, including likely attorney client privileged and legislatively privileged information, and far-reaching demands—is patently burdensome. The RTE does not even provide reasonable time to conduct a sufficient privilege search. By contrast, the Texas Rules of Civil Procedure require that, when serving a request for production, a "notice . . . must be served at least 10 days before the subpoena compelling production is served." TEX. R. CIV. P. 205.2. Here, there was no notice, much less a 10 day notice *in advance* of actually serving the subpoena-equivalent RTE.

### COUNT 4: Equal Protection Clauses of the U.S. and Texas Constitution--Selective and Vindictive Enforcement

44.     "[T]he purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

18

45. "[T]o establish a claim of discriminatory enforcement, a party must first show he or she has been singled out for prosecution or enforcement of the regulation or ordinance while others similarly situated and committing the same acts have not." *Maguire Oil Co. v. City of Houston*, 69 S.W.3d 350, 370 (Tex. App.—Texarkana 2002, pet. denied) (internal citations and quotation marks omitted). "Further, the party must also show the government has purposefully discriminated on the basis of an impermissible consideration such as race, religion, or the desire to prevent the exercise of constitutional rights." *Id.* (citations/quotations omitted).

46. Similarly, "a constitutional claim of prosecutorial vindictiveness may be established in either of two distinct ways: 1) proof of circumstances that pose a 'realistic likelihood' of such misconduct sufficient to raise a 'presumption of prosecutorial vindictiveness,' which the State must rebut or face dismissal of the charges; or 2) proof of 'actual vindictiveness'— that is, direct evidence that the prosecutor's charging decision is an unjustifiable penalty resulting solely from the defendant's exercise of a protected legal right." *Neal v. State*, 150 S.W.3d 169, 173 (Tex. Crim. App. 2004); *cf. Hillside Prods., Inc. v. Duchane*, 249 F. Supp. 2d 880, 897–98 (E.D. Mich. 2003) ("[in] vindictive enforcement claims, Plaintiffs must show: (1) exercise of a protected right; (2) the enforcer's 'stake' in the exercise of that right; (3) the unreasonableness of the enforcer's conduct; and (4) that the enforcement was initiated with the intent to punish Plaintiffs for the exercise of the protected right.").

47. Here, Defendant Paxton has made it a clear political priority to single-out and target Powered by People based on personal and political animus. Whereas he has never conducted this type of investigation on an organization that is identified as conservative leaning or supportive of him personally or politically. Notably, he himself has been impeached for charges relating to bribery and corrupt campaign and officeholders, and indicted for other criminal matters. Rather

19

than utilizing his office to conduct a neutral third-party audit of those who contributed to him in order to gain political influence, he wasted millions of taxpayer dollars defending his corrupt practices. Defendant Paxton appears to have based his investigative priorities on advice that is commonly attributed to Joseph Goebbels: "Accuse the other side of that which you are guilty." The fact that he uses the State as an instrumentality to accomplish his illegitimate goals violates the Equal Protection Clause.

## VII. EMERGENCY APPLICATION FOR TEMPORARY RESTRAINING ORDER, MOTION FOR PROTECTIVE ORDER, APPLICATION FOR TEMPORARY INJUNCTION, AND OTHER INJUNCTIVE RELIEF

### *Application for Emergency Temporary Restraining Order*

48.     Defendant has indicated that his office intends to imminently initiate baseless *quo warranto* proceedings in Tarrant County, where there are no grounds for venue. This will be the third baseless action that Defendant initiates against Plaintiff in less than a week.

49.     As demonstrated by the foregoing facts, Defendant is abusing the legal system solely for the purpose of harassing Plaintiff and chilling Plaintiffs' First Amendment rights.

50.     Defendant has no good faith basis for his threatened legal action, and the action is intended to and would have the effect of imminently and irreparably harming Plaintiff by violating Plaintiffs's constitutional rights, as laid out in the preceding legal counts. This matter must be heard immediately, including ex parte if necessary, as Plaintiff will suffer irreparable harm in the absence of temporary relief until a hearing on a temporary injunction can be had.

51.     Plaintiff is willing to post bond.

### *Motion for Protective Order*

52.     Plaintiff re-alleges and incorporates by reference the preceding paragraphs for all purposes the same as if set forth herein verbatim.

20

53. Plaintiff seeks a protective order pursuant to TEX. R. CIV. P. 176.6(e) and TEX. R. CIV. P. 192.6(b). Rule 176.6(e) provides, in relevant part, "[a] person commanded to…produce…designated documents and things…may move for a protective order under Rule 192.6(b) — before the time specified for compliance — either in the court in which the action is pending or in a district court in the county where the subpoena was served."

54. In order to "protect the movant from undue burden, unnecessary expense, harassment, annoyance, or invasion of personal, constitutional, or property rights," TEX. R. CIV. P. 192.6(b) allows a court to "make any order in the interest of justice and may — among other things — order that: (1) the requested discovery not be sought in whole or in part; (2) the extent or subject matter of discovery be limited; (3) the discovery not be undertaken at the time or place specified; (4) the discovery be undertaken only by such method or upon such terms and conditions or at the time and place directed by the court; (5) the results of discovery be sealed or otherwise protected, subject to the provisions of Rule 76a."

55. Further, TEX. R. CIV. P. 192.4 provides protections against, *interalia*, inappropriate document requests, requiring that the "discovery methods permitted by these rules should be limited by the court if it determines, on motion or on its own initiative and on reasonable notice, that: (a) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive; or (b) the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues." *See In re Weekley Homes, L.P.*, 295 S.W.3d 309, 322-23 (Tex. 2009) (noting harm that the party resisting discovery might suffer as result of revealing private conversations, trade secrets, and privileged

21

and other confidential information); *see also In re Houstonian Campus, L.L.C.*, 312 S.W.3d 178, 184 (Tex. App.—Houston [14th Dist.] 2010, orig. proceeding) (considering the harm that party resisting discovery might suffer as a result of revealing members' names).

56. Here, the RTE runs afoul of many of the prohibitions found in Rule 192.6(b) and 192.4, as it:

- *Harasses Plaintiff —* "Discovery is unnecessarily harassing where it is sought for an improper purpose." *Centennial Psychiatric Assocs., LLC v. Cantrell*, No. 14-17-00380-CV, 2017 WL 6544283, at \*9 (Tex. App. Dec. 21, 2017). The entire RTE was sent for the purpose of retaliation against and harassing a political opponent, a clearly improper purpose and abuse of the RTE process. *See supra, para.* 20-21, 29-31.

- *Invades constitutional rights —* As thoroughly addressed in the preceding sections, Defendants' RTE improperly invades on Plaintiffs' Texas and federal constitutional rights. *See supra, para.* 22-42.

- *Is unduly burdensome because:*
  - *There is insufficient time to respond —* Defendants provided a wholly insufficient amount of time to respond and object to the individual document requests within the RTE. They further refused two requests for an extension of the RTE deadline. Requests for document production to a party in civil litigation allow for a 30 day response deadline. Tex. R. Civ. Pro. 196.2(a). A subpoena seeking documents from a nonparty requires at least 10 days notice. Tex. R. Civ. Pro. 205.2. Here, Defendants provided less than 48 hours notice to Plaintiff, an unreasonable amount of time to (1)

gather responsive documents, (2) review those documents for privilege and, (3) compile and provide objections and responses. In the context of a nonparty subpoena, the Eighth Court of Appeals has said "[p]lainly…a day's notice is not reasonable..." *In re State*, 599 S.W.3d 577, 597 (Tex.App.--El Paso, 2020, orig. proceeding). So too in this situation where Defendants provided less than 48 hours from notice of the RTE to deadline for response.

○ *The requests are overly broad* — Additionally, the requests in the RTE are overly broad. An overly broad request for documents that is merely a "fishing expedition" into the other party's files is prohibited. *In re American Optical Corp.*, 988 S.W.2d 711, 713 (Tex.1998); *Dillard Dept. Stores v. Hall*, 909 S.W.2d 491, 492 (Tex.1995). Here, the RTE is expressly a fishing expedition, and one initiated against a perceived political opponent. Neither the rules of civil procedure nor the U.S. or Texas Constitutions allow for such an assault.

○ *There is an alternate source for some of the information* — A request is unduly burdensome when the discovery can be obtained from some other source that is more convenient, less burdensome, or less expensive. Tex. R. Civ. P. 192.4(a); *Brewer & Pritchard, P.C. v. Johnson*, 167 S.W.3d 460, 466 (Tex.App.—Houston [14th Dist.] 2005, pet. denied); *e.g.*, *In re Arras*, 24 S.W.3d 862, 864 (Tex.App.—El Paso 2000, orig. proceeding) (deposition of nonparty for addresses of other parties was inconvenient and burdensome). The RTE requests information about political contributions

23

and expenditures, which, as a candidate for office on multiple occasions himself, the Defendant knows are subject to public filings and therefore obtainable through other means. Powered by People is a nonprofit organization exempt from tax under 26 U.S.C § 527 as a political organization, and is registered with the Federal Election Commission under federal campaign finance law and with the Texas Ethics Commission under state campaign finance law. As an organization registered under these campaign finance laws, Powered by People files regular, public reports of its contributions and expenditures. *See* 52 USC § 30104(a)(4); 11 CFR § 104.5(c); TEX. ELEC. CODE §§ 254.153, 254.154; 1 Tex. Admin. Code §§ 20.423, 20.425. On a regular basis according to schedules determined by these laws, Powered by People files *public* reports of the funds it has received and expenditures made, subject to thresholds for itemization on reports.

● *Requires unnecessary expenses* — Since some of the requests, including Nos. 9 and 11 encompass materials filed in TEC filings, the requests for additional production pursuant to the RTE would require unnecessary expense.

57.     A trial court has "broad discretion" in determining whether to grant a protective order and "balances the parties' competing interests" when making its determination. *Eurecat U.S., Inc. v. Marklund*, 527 S.W.3d 367, 376 (Tex. App.—Houston [14th Dist.], 2017, no. pet.).

58.     Plaintiff's injuries if required to respond to Defendants' RTE are numerous and articulated above.

*Request for Temporary and Permanent Injunctions*

59. Plaintiff re-alleges and incorporates by reference the preceding paragraphs for all purposes the same as if set forth herein verbatim.

60. In addition to the protections afforded by a Rule 176.6(e) protective order, Plaintiff requests and is entitled to temporary and permanent injunctions against Defendant. While the grounds for Plaintiffs' motion for protective order and requests for injunction overlap, there are additional constitutional bases for enjoining the RTE. *Cf. Annunciation House, Inc.,* 2025 WL 1536224, at *24 (determining that a recipient of an RTE may seek precompliance review "whether by Rule 176.6(e)'s protective orders or *other provisions of Texas law*").

61. The Texas Supreme Court has explained that:

> A temporary injunction's purpose is to preserve the *status quo* of the litigation's subject matter pending a trial on the merits. . . . To obtain a temporary injunction, the applicant must plead and prove three specific elements: (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim. An injury is irreparable if the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard.

*Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002). "[T]he only question before the trial court in a temporary injunction hearing is whether the applicant is entitled to preservation of the status quo of the subject matter of the suit pending trial on the merits." *Id.* (quoting *Pub. Util. Comm'n v. Water Servs., Inc.*, 709 S.W.2d 765, 767 (Tex. App.—Austin 1986, no writ). Moreover, "[w]hether to grant or deny a temporary injunction is within the trial court's sound discretion," and a reviewing court should not overturn absent a showing that such discretion was abused. *Id.*

62. Here, Plaintiff is entitled to preservation of the *status quo* because it will suffer imminent, irreparable harm for which no adequate remedy at law exists if Defendants are not restrained enforcing the RTE. *See Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002)

("An injury is irreparable if the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard.") (citing *Canteen Corp. v. Republic of Tex. Props., Inc.*, 773 S.W.2d 398, 401 (Tex. App. —Dallas 1989, no writ)).

63.     Plaintiff will suffer a violation of its constitutional rights, and "[u]nder Texas law, a violation of a constitutionally guaranteed right inflicts irreparable injury warranting injunctive relief." *Operation Rescue-Nat'l v. Planned Parenthood of Houston & Se. Texas, Inc.*, 937 S.W.2d 60, 77 (Tex. App.—San Antonio 1996, writ granted and *aff'd as modified*, 975 S.W.2d 546 (Tex. 1998)) (citing *Southwestern Newspapers Corp. v. Curtis*, 584 S.W.2d 362, 368 (Tex. Civ. App.—Amarillo 1979, no writ); *Iranian Muslim Organization v. City of San Antonio*, 615 S.W.2d 202, 208 (Tex. 1981)).

64.     Once sensitive information has been handed over and disclosure has been compelled, there can be no remuneration. Not only will Plaintiff suffer that irreparable harm, but compliance with the RTE would deprive this Court of its jurisdiction by effectuating the irreversible contested action that is the subject of this Petition. *Cf. Marketshare Telecom, L.L.C. v. Ericsson, Inc.*, 198 S.W.3d 908, 921 (Tex. App. —Dallas 2006, no pet.) (holding that a court "may protect its jurisdiction" by issuing appropriate injunctions).

65.     Further, Plaintiff has stated numerous valid causes of action, *see supra para*. 22-42, and the verified factual allegations demonstrate a probable right to relief. Defendant Paxton has clearly violated the Texas and United States Constitution, as well as the Texas Rules of Civil Procedure.

66.     Plaintiff is willing to post bond. Pursuant to TEX. R. CIV. P. 168, "[w]here the…temporary injunction is against…a subdivision of the State in its governmental capacity, and

26

is such that the State…[and]…the subdivision of the State in its governmental capacity, has no pecuniary interest in the suit and no monetary damages can be shown, the bond shall be allowed in the sum fixed by the judge, and the liability of the applicant shall be for its face amount if the restraining order or temporary injunction shall be dissolved in whole or in part."

67.     Accordingly, Plaintiff asks the Court to set a briefing period for its request for temporary injunction, set the same for a hearing and, after the hearing, issue a temporary injunction against Defendants.

68.     For these same reasons, Plaintiff seeks a permanent injunction prohibiting Defendants from enforcing the RTE.

## PRAYER AND REQUEST FOR RELIEF

For the foregoing reasons, Plaintiff Powered by People requests an immediate protective order pursuant to Tex. R. Civ. P. 192.6(b) and Tex. R. Civ. P. 176.6(e), and a temporary injunction order issued to Defendant preventing enforcement of the RTE in its entirety, and a temporary restraining order restraining Defendant from prosecuting his threatened quo warranto without leave of this court. Further, Plaintiff requests that Defendants be cited to appear and answer, and that on hearing, issue Plaintiff judgment as follows:

(a)     A protective order against Defendants' enforcement of the RTE in its entirety;

(b)     A declaration that Defendants violated the U.S. Constitution and the Texas Constitution, and that the RTE is invalid and unenforceable;

(c)     A temporary and permanent injunction restraining Defendants from enforcing the RTE in its entirety;

(d)     A temporary restraining order restraining Defendants from initiating, filing, or otherwise prosecuting *quo warranto* proceedings against Powered by People without leave of this court while the order is in effect    .

(e)     A temporary and permanent injunction enjoining Defendants from initiating, filing, or otherwise prosecuting *quo warranto* proceedings against Powered by People without leave of this court until such date as this Court deems fit.

(f)     Costs of court;

(g)     Reasonable and necessary attorneys' fees pursuant to 42 U.S.C. § 1988 and other applicable laws, including TEX. CIV. PRAC. & REM. CODE §37.008; and

(h)     Such other and further relief, at law or in equity, to which Plaintiff is justly entitled.

Respectfully submitted,

*/s/ Mimi Marziani*

Mimi Marziani
Texas Bar No. 24091906
mmarziani@msgpllc.com
Joaquin Gonzalez
Texas Bar No. 24109935
jgonzalez@msgpllc.com
Rebecca (Beth) Stevens
bstevens@msgpllc.com
Texas Bar No. 24065381
**MARZIANI, STEVENS & GONZALEZ PLLC**
500 W. 2nd Street, Suite 1900
Austin, TX 78701
Tel: (210) 343-5604

Lynn Coyle
Texas Bar No. 24050049
lynn@coylefirm.com
2700 Richmond Ave.
El Paso, TX 79930
Tel: (915)276-6700

**ATTORNEYS FOR PLAINTIFF**

Docusign Envelope ID: 7DD61BEB-74A2-455A-BF48-3A7E902615E4

## VERIFICATION

My name is David Mills Wysong, my date of birth is May 9, 1972, and my address is 824 Twin Hills Dr., El Paso, Texas 79912, United States. I declare under penalty of perjury that the statements in the foregoing Facts section are true and correct.

Executed in __El Paso_____ County, State of Texas, on the 17th day of August, 2025.

Signed by:

6CAD8FCC6CE546F...

David Mills Wysong

29

VERIFICATION

My name is Joaquin Gonzalez, my date of birth is November 27, 1984, and my address is 1533 Austin Hwy. #102-402, United States. I declare under penalty of perjury that the statements in paragraphs 22-24 in the fact section are true and correct.

Executed in Bexar County, State of Texas, on the 17th day of August, 2025.

/s/ Joaquin Gonzalez

Joaquin Gonzalez

## CERTIFICATE OF SERVICE

By my signature below, I hereby certify that a true and correct copy of the foregoing pleading was served on the following as set forth below on August 17, 2025.

**Via e-service:** Rob.Farquharson@oag.texas.gov
Rob Farquharson
Deputy Chief
Consumer Protection Division
Office of the Attorney General

**Via e-service:** Johnathan.Stone@oag.texas.gov
Johnathan Stone
Chief
Consumer Protection Division
Office of the Attorney General

*/s/ Mimi Marziani*
Mimi Marziani



**EXHIBIT A**

| | | |
|---|---|---|
| **POWERED BY PEOPLE,** | § | **IN THE DISTRICT COURT** |
| *Plaintiff,* | § | |
| | § | |
| **V.** | § | **41st JUDICIAL DISTRICT** |
| | § | |
| **KEN PAXTON,** | § | |
| **IN HIS OFFICIAL CAPACITY AS** | § | |
| **TEXAS ATTORNEY GENERAL** | § | |
| *Defendants.* | § | **EL PASO COUNTY, TEXAS** |

## VERIFIED SECOND AMENDED PETITION FOR DECLARATORY JUDGMENT, MOTION FOR PROTECTIVE ORDER, APPLICATION FOR EMERGENCY TEMPORARY RESTRAINING ORDER, TEMPORARY INJUNCTION, AND OTHER INJUNCTIVE RELIEF

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiff Powered by People, a volunteer-driven Texas nonprofit composed of thousands of everyday Texans, files this verified second amended petition seeking a temporary restraining order and a protective order against Defendant, Texas Attorney General Ken Paxton, in his official capacity[1]. As explained below, in under a week's time, the State has initiated two unlawful, retaliatory new legal actions against Plaintiff — and is imminently planning to initiate a third. The State has admitted that its actions are in direct response to Plaintiffs' exercise of First Amendment rights in the form of political speech and organizing. "[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *accord Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 295 (5th Cir. 2012). And so, "political speech must prevail" against those who act to suppress it. *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010). This Court must act

---

[1] A redline version reflecting the changes from the First Amended Petition is attached as Exhibit A.

**Exhibit A**

immediately and provide the protection requested herein to avoid such grave constitutional injuries.

Specifically, on August 6, 2025, Defendant launched a retaliatory and unlawful investigation into Powered by People, serving Mr. David Wysong and Ms. Gwen Pulido, Board members of Powered by People, with a Request to Examine ("RTE") seeking reams of sensitive and burdensome information from Plaintiff in less than 48 hours time. The State provided no valid reason to support this urgent, invasive, expensive inquiry — instead simply claiming to counsel that it was an "emergency." At the same time, Defendant Paxton admitted publicly that while he does not have "details" to support his allegations, but planned to use this "investigation" to "find out if they've done anything inappropriate," pointing explicitly to Plaintiff's recent political speech, organizing and advocacy.[2] In other words, with the August 6, 2025 action, the State was bluntly using the vast power of the Attorney General's office to effectuate a fishing expedition, constitutional rights be damned.[3] Defendant gave Petitioner a hard deadline of 4:00pm MT August 8, 2025 to respond.

Earlier on August 8, 2025, and unbeknownst to the Defendants, the Attorney General abruptly changed directions, and preparing a new filing in started heading to north Texas. As Plaintiff was finalizing its El Paso lawsuit, the Attorney General announced the filing of a new court action in Tarrant County against Plaintiff and Robert "Beto" O'Rourke (the founder of

---

[2] James Morley III, Texas AG Paxton to Newsmax: O'Rourke's PAC to Be Investigated, NEWSMAX (Aug. 6, 2025, 5:40 PM EDT), https://www.newsmax.com/newsmax-tv/ken-paxton-texas-redistricting/2025/08/06/id/1221553/.

[3] Even worse, Defendant Paxton — who is running for and actively fundraising for his 2026 run for U.S. Senate — has publicly identified former Congressman Beto O'Rourke, the prominent founder of Powered by People, as a potential 2026 political opponent. Another motivation behind Defendant's action thus appears to be an unlawful desire to retaliate against Mr. O'Rourke, and to use the power of the State of Texas to try to intimidate Mr. O'Rourke from challenging Defendant in a free and fair election.

Powered by People). Despite that, as of 9:56 am MT on Friday, counsel for the Attorney General knew that Powered by People was represented by the undersigned counsel, and ~~with plenty of time to do so~~while the one member of the Attorney General's lawyer group apparently drove the approximately three hour drive from Austin to Fort Worth, the Attorney General did not inform the undersigned counsel of an imminent "emergency" *ex parte* TRO filing and hearing until almost four hours later. Despite the failure to identify any substantial connection to the Tarrant County venue, the State sought a temporary restraining order seemingly aimed to achieve similar goals as the RTE: namely, to chill the exercise of constitutionally protected rights.

Later, a hearing was held before Judge Fahey in Tarrant County. The Tarrant County court entered a Temporary Restraining Order at 5:32pm.[4] The next day, on August 9, 2025, counsel for the State indicated that "effectively immediately" it was withdrawing its RTE issued to Petitioner, Powered by People, and asked counsel for Petitioner to dismiss this instant action.[5]

In the~~This~~ evening of August 11, 2025, in another~~the latest~~ egregious misuse of power, staff at Defendant's office ~~has~~ indicated that that Defendant would~~ill~~ be immediately seeking to institute *quo warranto* proceedings in Tarrant County, a County where there is not even a colorable argument for proper venue for such a proceeding. Defendant is abusing the legal system, and his authority within that system, solely for the purpose of harassing and intimidating Plaintiff in order to curtail Plaintiff's protected constitutional activity. He cannot be allowed to run roughshod over the Texas and United States Constitution.

---

[4] Earlier today, Plaintiff and Mr. O'Rourke filed a motion to change venue to El Paso County in the Tarrant County case since a substantial part of the events giving rise to the State's alleged claims occurred in El Paso County and venue is not proper in Tarrant County. That motion is attached as Exhibit ~~B~~C. Shortly, Plaintiff and Mr. O'Rourke will also seek to dissolve the TRO issued by Judge Fahey since it lacks support in law and fact.

[5] Attorney Farquharson also indicated that it was withdrawing its RTE issued to Mr. O'Rourke; however to date, Mr. O'Rourke has not been served with an RTE.

And so, Defendant's withdrawal of the RTE served on Petitioner on August 6, 2025, does not justify dismissal of the instant action. Indeed, far from mooting the controversy between the parties, the State instead plans to continue to escalate it. Thus, this Court continues to have jurisdiction to hear Petitioner's claims for declaratory and injunctive relief under the First and Fourth Amendment of the U.S. Constitution, since without such relief, Defendant will be free to reserve the RTE at any time, free to file a retaliatory action in *quo warranto*, and free to continue to infringe on Plaintiff's constitutional rights. *See*, *Paxton v. Annunciation House*, Inc., No. 24-0573, 2025 WL 1536224, *56 (Tex. 2025) (finding that even though the attorney general ceased pressing for records, "the records dispute is not moot as the attorney general remains free to simply file more requests if there is no ruling that deems the relevant requests unconstitutional."). Moreover, Plaintiff has asserted a request that attorneys' fees be awarded in this matter. Further, Plaintiff now seeks injunctive relief, including an emergency temporary restraining order, enjoining Defendant from harassing Plaintiff and violating its rights by instituting quo warranto proceedings against Plaintiff in an improper county.

Plaintiffs respectfully show the Court as follows, in support of the requested relief:

## I. PARTIES

1. Plaintiff, Powered by People, is a Texas nonprofit corporation. It operates as a political organization pursuant to 26 U.S.C. § 527(e)(1) for the purpose of "directly or indirectly accepting contributions or making expenditures, or both" to influence elections. As a political organization, Powered by People files regular campaign finance reports with the Texas Ethics Commission, and is registered within Texas as a general-purpose committee.

2. Defendant is Ken Paxton, in his official capacity as Texas Attorney General. He may be served at the Office of the Attorney General, 300 W. 15th Street, Austin, Texas 78701.

4

## II.  DISCOVERY-CONTROL PLAN

3.      Plaintiff intends to conduct discovery under Level 2 of Texas Rule of Civil Procedure 190.3 and affirmatively pleads that this suit is not governed by the expedited-actions process in Texas Rule of Civil Procedure 169 because Plaintiff seeks injunctive relief.

## III.  RULE 47 STATEMENT

4.      Pursuant to Texas Rule of Civil Procedure No. 47, Plaintiff is not seeking monetary relief, only non-monetary relief in the form of injunctive and declaratory relief.

## IV.  JURISDICTION & VENUE

5.      This Court has subject-matter jurisdiction under Tex. Civ. Prac. & Rem. Code §§ 65.001 et seq., the Uniform Declaratory Judgment Act found at Tex. Civ. Prac. & Rem. Code §§ 37.001 et seq., and Texas Government Code Chapter 24.

6.      This Court has statutory jurisdiction in that a substantial part of the events giving rise to this claim occurred in El Paso County.

7.      Venue is proper because the challenged Request to Examine was served in El Paso County. *See* Tex. R. Civ. Pro. 176.6(e) ("[a] person commanded to…produce…designated documents and things…may move for a protective order…either in the court in which the action is pending or in a district court in the county where the subpoena was served."); *see also Paxton v. Annunciation House*, Inc.,  No. 24-0573, 2025 WL 1536224, *24 (Tex. 2025) (determining that Rule 176.6(e) applies to the Attorney General's Requests to Examine). Moreover, jurisdiction remains with this court and the dispute is not moot simply because Defendant has withdrawn the RTE. *Id*. at *56 (Tex. 2025) (Finding that even though the attorney general ceased pressing for records, "the records dispute is not moot as the attorney general remains free to simply file more requests if there is no ruling that deems the relevant requests unconstitutional.")

5

5.8.    Venue is additionally proper because the quo warranto action that Defendant Paxton seeks to institute is only properly filed in El Paso County. Tex. Civ. Prac. Rem. Code §§ 66.002 and 15.002

## V.    FACTS

6.9.    In 2019, Mr. O'Rourke founded Powered by People, a voter registration and mobilization group that works to expand access to democracy through voter registration and direct voter engagement. Composed of thousands of volunteers in every region of Texas, and with seven full-time employees, Powered by People has spearheaded large voter mobilization efforts, registering thousands of Texans to vote. In addition, at different times, Powered by People has taken on community-centered projects such as raising money for persons who suffered home damage as a result of Texas's electric grid failure, coordinating volunteers at community food banks during the height of the COVID pandemic, going door-to-door to educate elderly members of the public about vaccines during the pandemic, and raising money for and delivering supplies during other national disasters.

7.10.    Powered by People currently has nine employees and maintains its principal place of business in El Paso, Texas.

8.11.    In addition to serving as its founder, Mr. O'Rourke sits on Powered by People's Board of Directors, alongside David Wysong and Gwen Pulido.

9.12.    In recent months, Mr. O'Rourke has been a prominent, outspoken critic of Texas Republicans' attempts to re-draw Texas' congressional map at the behest of President Donald J. Trump. For instance, on July 21, 2025, Mr. O'Rourke appeared on PBS Newshour and argued that President Trump "knows he will lose the slim majority they have in the House of Representatives

unless they rig the game mid-decade, which is what they're trying to do in Texas."[6] On July 24, 2024, Mr. O'Rourke appeared at a large rally at the Capital and accused Republicans of "play[ing] games . . . in order to maximize [] political power" at the expense of flood victims.[7]

~~10.~~13.  In support of his political views and the views of Powered by People, Mr. O'Rourke has made numerous successful grassroots fundraising appeals for donations to Powered by People, stating his desire to "have the backs of these heroic state lawmakers" and otherwise support Texas-based organizations who share his opposition to the newly introduced redistricting maps.[8] It is, of course, commonplace for political figures and candidates to tie appeals for resources to achieving policy actions. Indeed, Defendant Paxton himself has implored donors to donate to help him "stop Biden's open border policy" and "stop Democrats and RINOs efforts to takeover [sic] TX."[9]

---

[6] Amna Nawaz, *Stephanie Kotuby & Alexa Gold, O'Rourke says 'we have to fight back' as Trump pushes Texas to redraw congressional maps*, PBS NEWSHOUR (July 21, 2025, 6:40 PM EDT), https://www.pbs.org/newshour/show/orourke-says-we-have-to-fight-back-as-trump-pushes-texas-to-redraw-congressional-maps.

[7] Blaise Gainey, *'We will not let Trump take over': Texans rally as state lawmakers begin redistricting hearings*, KUT (July 24, 2025, 4:36 PM CDT), https://www.kut.org/politics/2025-07-24/we-will-not-let-trump-takeover-texans-rally-as-state-lawmakers-begin-redistricting-hearings.

[8] Owen Dahlkamp, *Beto O'Rourke's political group is a top funder for Texas Democrats' exodus to block GOP congressional map*, Tex. Trib. (Aug. 5, 2025, 1:00 PM CT), https://www.texastribune.org/2025/08/05/texas-democrats-quorum-break-beto-orourke-illinois-funding/.

[9] Ken Paxton, Facebook (Jun. 30, 2021, 2:04 PM EDT), https://www.facebook.com/kenpaxtontx/posts/4198758750185935, (last visited Aug. 8, 2025).



**Ken Paxton's post** ✕

**Ken Paxton** ✓
June 30, 2021 · 🌐

President Trump continues fighting for America. He joined me & others at the border to stop Biden's open border policy. Please help me stop Democrats and RINOs efforts to takeover TX. Donate now: https://kenpaxton.com/donate/

🔵❤️ 10K                                         589 comments  1.1K shares

14. At 2:15pm MT on Wednesday August 6, 2025, Defendant Paxton issued a press release entitled "Attorney General Ken Paxton Launches Investigation into Beto O'Rourke's Radical Group for Unlawfully Funding Runaway Democrats." The release stated that, "[a]s part of the investigation, Attorney General Paxton has issued a Request to Examine, which demands documents and communications from the group regarding potentially unlawful activity, including its involvement in the Democrats' scheme to break quorum."[10]

---

[10] Press Release, Office of the Texas Attorney General, Attorney General Ken Paxton Launches Investigation into Soros-Funded PAC for Unlawfully Funding Runaway Democrat Legislators (Aug. 7, 2025), https://www.texasattorneygeneral.gov/news/releases/attorney-general-ken-paxton-launches-investigation-soros-funded-pac-unlawfully-funding-runaway.

12.15.  At 7:15pm MT on August 6, 2025, Mr. Wysong received the "Request to Examine" (RTE) via personal service at his home in El Paso, Texas. A true and accurate copy of the RTE, as served upon Mr. Wysong, is attached as Exhibit AB.

13.16.  Indeed, as of this amended filing, Mr. O'Rourke has not been served with the RTE.

14.17.  The RTE demands eleven categories of potentially extensive documents that may be in the possession of Plaintiff. Several may be subject to privilege.

    a.  For instance, Requests 1 and 2 seek communications between Powered by People and dozens of lawmakers. To the extent any such documents exist, they may be protected by legislative privilege.

    b.  Requests 3 and 4 seek documents and communications "relating to, or discussing, quorum during Texas's current special legislative session." Requests 7 and 8 seek communications regarding the "solicitation of funds" to support certain lawmakers. To the extent any such documents exist, they may be protected by attorney-client privilege.

15.18.  Despite the extensive and burdensome requests, the likely privileged nature of the information sought, and constitutionally suspect motives involved, the RTE set a compliance deadline of 4:00 pm MT (5:00pm CT) Friday, August 8, 2025. While the State purports to have withdrawn the RTE, thus suspending this deadline, it apparently intends to use a proceeding in *quo warranto* and/or discovery in the ongoing Tarrant County case to access the same or similar information.

16.19.  While the RTE claimed to encourage Plaintiff to "meet and confer with the Office of the Attorney General" over the scope of the production, when Powered by People's national counsel asked first for a two-week extension the morning of Thursday, August 7, 2025, his request

9

was promptly rejected. Similarly, a subsequent request sent by Texas counsel seeking an extension until August 16, 2025 (the same 10 days a nonparty subpoenaed for documents in a civil lawsuit under Tex. R. Civ. P. 205.2 would be entitled to), went unresponded to by the Office of Attorney General.

17.20. Defendant purported to issue the RTE pursuant to Texas Business Organizations Code § 12.151 *et seq.*, which allows the Attorney General to inspect corporate records "as the attorney general considers necessary in the performance of a power or duty of the attorney general, of any record of the entity."

18.21. The RTE threatened that if Powered by People does not comply, penalties "include the Office of the Attorney General initiating a legal action for the entity's 'registration or certificate of formation' to be 'revoked or terminated,' Tex. Bus. Org. Code § 12.155. If the Office of the Attorney General deems such penalty warranted, proceedings to revoke or terminate an entity's registration or certificate of formation are initiated through a petition for leave to file an information in the nature of *quo warranto*. Tex. Civ. Prac. & Rem. Code § 66.002." It is also Class B misdemeanor to fail to or refuse to provide records requested by the Attorney General. *See* Tex. Bus. Orgs. Code § 12.156.

19.22. On August 11, 2025, during a conversation with the undersigned counsel, Defendant's counsel indicated that Defendant plans to file a motion for leave to file a petition for *quo warranto* against Powered by People in Tarrant County. The purpose of a *quo warranto* proceeding is to revoke a corporation's charter and ability to conduct business in this state.

20.23. As defense counsel well knows, a *quo warranto* proceeding in Tarrant County would be completely improper and filing such a pleading there would likely violate attorney ethical

10

rules. Nonetheless, defense counsel indicated they will do so imminently while refusing to identify any basis for doing so.[11]

21.24. In that same conversation, in response to Plaintiffs indicating that their position was that no discovery should occur in the case until the Motion To Transfer Venue had been decided, Defendant's counsel stated that, in that case, Defendant would instead "ambush" them with discovery.

22.25. Defendant Paxton has identified Mr. O'Rourke as a prospective opponent in the 2026 U.S. Senate race, and has already used the prospect of running against Mr. O'Rourke in a fundraising appeal.[12]

---

[11] Tex.Civ. Prac. & Rem. Code 66.002(a), the controlling *quo warranto* statute, says a *quo warranto* petition should be filed with " the district court of the proper county or a district judge." The general venue statute, Tex.Civ. Prac. & Rem. Code 15.002(a), provides, in relevant part, that venue is only proper in the county "in which all or a substantial part of the events or omissions giving rise to the claim occurred,"...or "in the county of the defendant's principal office in this state, if the defendant is not a natural person." Here, that county can only be El Paso County as Powered by People's principal place of business, Board members, senior team are all in El Paso and its and main activities primarily occur in El Paso County. As attested to in the attached declaration, and as Defendants is aware, no activities that Defendant has (unjustifiably) targeted actually occurred in Tarrant County. *See* Ex. A (Declaration of David Wysong).

[12] Ken Paxton (@KenPaxtonTX), X (Apr. 29, 2025, 2:23 PM CDT), https://x.com/KenPaxtonTX/status/1917298692438254050 (last visited Aug. 8, 2025).

11



← Post

Attorney General Ken Paxton ✓
@KenPaxtonTX

Did you hear this? Beto O'Rourke said he might run for Senate again!

Chip in now to tell Beto 'No thanks!!' 👇

Ken Paxton

US Senate

Texas

Donate to Ken Paxton Here

From secure.winred.com

3:23 PM · Apr 29, 2025 · **29.7K** Views

💬 270        ↺ 440        ♡ 1.8K        🔖 18        ⬆

💬 Read 270 replies

23.26. Recently, through repeated comments, Defendant Paxton has made clear his intention to retaliate against Mr. O'Rourke personally through this RTE for Mr. O'Rourke's First Amendment-protected activities, including his speech, association with others, and advocacy against the proposed congressional maps. As noted above, the press release announcing the RTE characterizes lawful donations made by Powered by People as "Beto Bribes."[13] Defendant Paxton has gone on in recent days to call Mr. O'Rourke "delusional"[14] and to claim he is "scared of

---

[13] Press Release, Office of the Texas Attorney General, Attorney General Ken Paxton Launches Investigation into Beto O'Rourke's Radical Group for Unlawfully Funding Runaway Democrats (Aug. 6, 2025), https://www.texasattorneygeneral.gov/news/releases/attorney-general-ken-paxton-launches-investigation-beto-orourkes-radical-group-unlawfully-funding.

[14] Ken Paxton (@KenPaxtonTX), X (Aug. 7, 2025 3:16 PM),

accountability."[15] And, again, even though Defendant Paxton has publicly admitted that he does not have any "details" or actual proof to support allegations of unlawful behavior,[16] Defendant Paxton has stated that serving the RTE sparks "an investigation into Beto O'Rourke's radical group for unlawfully funding runaway Democrats."[17]

## VI. CLAIMS FOR RELIEF

### COUNT 1: U.S. Constitution, Freedom of Association (42 U.S.C. § 1983)

~~24.~~27.  Plaintiff realleges and incorporates by reference the foregoing paragraphs as though fully set forth herein.

~~25.~~28.  Freedom of association for the purpose of advancing ideas and airing grievances is a fundamental liberty guaranteed by the First Amendment. *In re Bay Area Citizens Against Lawsuit Abuse*, 982 S.W.2d 371, 375 (Tex. 1998) (quoting *NAACP v. Alabama*, 357 U.S. 449, 460 (1958). The First Amendment's protection of the freedom of association provides "protection to collective effort on behalf of shared goals." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). As the Supreme Court has noted, "[p]rotected association furthers a wide variety of political, social, economic, educational, religious, and cultural ends, and is especially important in preserving political and cultural diversity and in shielding dissident expression from suppression by the majority." *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 606 (2021) (internal quotation marks omitted).

---

https://x.com/KenPaxtonTX/status/1953550789571424322 (last visited Aug. 8, 2025).

[15] Ken Paxton (@KenPaxtonTX), X (Aug. 6, 2025, 6:19 PM CDT), https://x.com/KenPaxtonTX/status/1953234509685768647 (last visited Aug. 8, 2025).

[16] James Morley III, *Texas AG Paxton to Newsmax: O'Rourke's PAC to Be Investigated*, Newsmax (Aug. 6, 2025, 5:40 PM EDT).

[17] Ken Paxton (@KenPaxtonTX), X (Aug. 6, 2025, 3:18 PM CDT), https://x.com/KenPaxtonTX/status/1953188955807273440 (last visited Aug. 8, 2025).

26.29. The RTE and threatened *quo warranto* proceeding wrongly burdens association in several ways. First, political contributions and expenditures are a form of speech and association. *See In re Siroosian*, 449 S.W.3d 920, 925 (Tex. App.—Dallas 2014, no pet.) (quoting *McCutcheon v. Fed. Election Comm'n*, 134 S.Ct. 1434, 1441 (2014)) ("The right to participate in democracy through political contributions is protected by the First Amendment."). Government actions that tend to limit political spending "operate in an area of the most fundamental First Amendment activities. Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution." *Osterberg v. Peca*, 12 S.W.3d 31, 41 (Tex. 2000) (quoting *Buckley v. Valeo*, 424 U.S. 1 (1976) (per curiam)). Here, Defendant Paxton is overtly penalizing Plaintiff's exercise of free speech, seeking to chill Plaintiff and Mr. O'Rourke from further political spending and donating. "The First Amendment does not permit the government to make any individual choose between the First Amendment right to engage in unfettered political speech and subjection to discriminatory" application of laws. *See Davis v. Fed. Election Comm'n*, 554 U.S. 724, 739 (2008).

27.30. Moreover, the Supreme Court has recognized for decades that "compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as [other] forms of governmental action." *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958). That is because disclosure can subject organizations and individuals to threats of harassment, reprisals, and "other manifestations of public hostility." *Id.*

28.31. Harassment need not be certain to occur for a plaintiff to state an association claim. The Supreme Court has emphasized instead that the First Amendment is implicated "by 'state action which may have the effect of curtailing the freedom to associate,' and by the 'possible deterrent effect' of disclosure." *Americans for Prosperity Found.*, 594 U.S. at 616 (quoting

14

*NAACP*, 357 U.S. at 460–61); *see also id.* at 606 ("freedom of association may be violated . . . where individuals are punished for their political affiliation.").

~~29.~~32.  Further, the First Amendment protects the right to publish and distribute political writings while remaining anonymous. *Ex parte Odom*, 570 S.W.3d 900, 908 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) (citing *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 342 (1995)).

~~30.~~33.  As detailed above, the RTE and the threatened *quo warranto* proceeding are intended to, and would serve to, chill Powered by People's speech and association by deterring their contributions and expenditures, by subjecting supporters and contributors to identification and potential harassment (including from Defendant himself, given his targeting of Mr. O'Rourke) and by forcing disclosure of anonymous political writings, which would in turn make at least some supporters think twice before associating with Powered by People. For particular example, Requests 3 and 4 appear to request any and all communications between Powered by People and any person regarding quorum break. This would implicate third parties, including Powered by People's volunteers, supporters and contributors, and subject them to identification by a vindictive and politically-motivated bad-faith government actor.

**COUNT 2: U.S. Constitution, Retaliation For Protected Speech (42 U.S.C. § 1983)**

~~31.~~34.  Plaintiff realleges and incorporates by reference the foregoing paragraphs as though fully set forth herein.

~~32.~~35.  The Constitution prohibits the government from taking adverse action against a person for the exercise of their First Amendment rights. *E.g.*, *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019). Accordingly, the State cannot retaliate against a citizen who exercises the right of free speech on a matter of public concern. *Levine v. Maverick Cnty. Water Control & Imp. Dist. No. 1*,

15

884 S.W.2d 790, 795 (Tex. App.—San Antonio 1994, writ denied). There's no question that "speech concerning illegal conduct, especially in the public sector is of 'public concern,'" and includes Mr. O'Rourke's condemnation of Texas Republicans' attempt to re-draw the congressional maps, which he has characterized as unlawful. *Upton Cnty., Tex. v. Brown*, 960 S.W.2d 808, 826 (Tex. App.—El Paso 1997, reh'g overruled).

36. To demonstrate retaliation, "[a] claimant must show at least that a substantial and motivating factor for the complained-of action resulted from his exercise of free speech." *Levine,* 884 S.W.2d 790 at 795. Here, as demonstrated by Defendant Paxton's personal animus and vitriol against Plaintiff and Mr. O'Rourke based on their protected political speech, including speech criticizing Defendant Paxton himself and speech in the form of political donations, retaliation was wrongfully a "substantial and motivating factor" in the issuance of the RTE. *Id.*

### COUNT 3: U.S. Constitution, Fourth Amendment (42 U.S.C. § 1983) & Art. I, § 9 of the Texas Constitution

37. Plaintiff incorporates by reference every allegation in the preceding paragraphs as if set forth fully herein.

38. The Fourth Amendment, which applies to the States through the Fourteenth Amendment, provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated," and that "no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV.

39. "Based on this constitutional text," the Supreme Court "has repeatedly held that searches conducted outside the judicial process, without prior approval by a judge or a magistrate judge, are *per se* unreasonable subject only to a few specifically established and well-delineated exceptions." *City of Los Angeles v. Patel*, 576 U.S. 409, 419 (2015) (internal quotation marks and alterations omitted).

16

37.40.  The Attorney General's demand for documents was not made pursuant to a judicial warrant backed by probable cause. In fact, Defendant's demand for documents has not been ratified by any court. Nor does Defendant's demand for documents constitute a permissible administrative search, which must be conducted pursuant to some "'special need' other than conducting criminal investigations." *Id*. at 420. The Attorney General has identified no such special need for these documents, and none is apparent.

38.41.  Instead, the RTE is an "administrative search" which must provide for pre-disclosure judicial review that permits the target to challenge the reasonableness of the inquiry, including its scope, relevance, and burden. While the Texas Supreme Court in *Annunciation House v. Paxton* declined to strike down a *facial* challenge to Texas Business Organizations Code § 12.152, it did so assuming that precompliance review would in fact be made available to those served with requests to examine and that such requests would otherwise adhere to Texas law. *Paxton v. Annunciation House, Inc.*, No. 24-0573, 2025 WL 1536224, at *24 (Tex. May 30, 2025); *see also Spirit Aerosystems, Inc. v. Paxton*, 142 F.4th 278, 291 (5th Cir. 2025) ("Although the RTE statute does not by its text incorporate Rule 176.6, the Texas Supreme Court recently held in *Annunciation House* that Rule 176.6 nevertheless provides a mechanism for precompliance review of RTEs. . . The Texas Supreme Court also confirmed that 'the term [immediately] cannot reasonably be read literally,' and that the Attorney General was 'not permit[ted] ... to withhold precompliance review' . . .").

39.42.  Accordingly, for the RTE to be constitutional, it must adhere to the Texas Rules of Civil Procedure governing administrative subpoenas, which incorporate the prohibitions on unreasonable search and seizures found in the U.S. Constitution and in the Texas Constitution. That means: "(1) the agency must conduct its investigation pursuant to an authorized purpose, and

the subpoena must be relevant to that purpose; (2) the agency must follow the necessary statutory procedures; (3) the subpoena must describe the documents sought with adequate particularity, meaning that the scope of its demand for documents must be adequate, but not excessive, for the purposes of the inquiry; (4) the subpoena must not unnecessarily or excessively seek information that the agency already possesses; and (5) the respondent may show that the subpoena is unnecessarily burdensome." *Schade v. Texas Workers' Comp. Comm'n*, 150 S.W.3d 542, 551 (Tex. App.—Austin 2004).

40.43. The RTE here fails several of these factors: it was issued for the unauthorized purpose of retaliating against a political rival and to restrict protected rights; even if the purpose of the inquiry were proper, the RTE is vague, seeking a wide range of information with no stated justification; and—between the less-than-48-hour response deadline, requests for sensitive information, including likely attorney client privileged and legislatively privileged information, and far-reaching demands—is patently burdensome. The RTE does not even provide reasonable time to conduct a sufficient privilege search. By contrast, the Texas Rules of Civil Procedure require that, when serving a request for production, a "notice . . . must be served at least 10 days before the subpoena compelling production is served." Tex. R. Civ. P. 205.2. Here, there was no notice, much less a 10 day notice *in advance* of actually serving the subpoena-equivalent RTE.

### COUNT 4: Equal Protection Clauses of the U.S. and Texas Constitution--Selective and Vindictive Enforcement

41.44. "[T]he purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents.'" *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

18

42.45. "[T]o establish a claim of discriminatory enforcement, a party must first show he or she has been singled out for prosecution or enforcement of the regulation or ordinance while others similarly situated and committing the same acts have not." *Maguire Oil Co. v. City of Houston*, 69 S.W.3d 350, 370 (Tex. App.—Texarkana 2002, pet. denied) (internal citations and quotation marks omitted). "Further, the party must also show the government has purposefully discriminated on the basis of an impermissible consideration such as race, religion, or the desire to prevent the exercise of constitutional rights." *Id.* (citations/quotations omitted).

43.46. Similarly, "a constitutional claim of prosecutorial vindictiveness may be established in either of two distinct ways: 1) proof of circumstances that pose a 'realistic likelihood' of such misconduct sufficient to raise a 'presumption of prosecutorial vindictiveness,' which the State must rebut or face dismissal of the charges; or 2) proof of 'actual vindictiveness'— that is, direct evidence that the prosecutor's charging decision is an unjustifiable penalty resulting solely from the defendant's exercise of a protected legal right." *Neal v. State*, 150 S.W.3d 169, 173 (Tex. Crim. App. 2004); *cf. Hillside Prods., Inc. v. Duchane*, 249 F. Supp. 2d 880, 897–98 (E.D. Mich. 2003) ("[in] vindictive enforcement claims, Plaintiffs must show: (1) exercise of a protected right; (2) the enforcer's 'stake' in the exercise of that right; (3) the unreasonableness of the enforcer's conduct; and (4) that the enforcement was initiated with the intent to punish Plaintiffs for the exercise of the protected right.").

44.47. Here, Defendant Paxton has made it a clear political priority to single-out and target Powered by People based on personal and political animus. Whereas he has never conducted this type of investigation on an organization that is identified as conservative leaning or supportive of him personally or politically. Notably, he himself has been impeached for charges relating to bribery and corrupt campaign and officeholders, and indicted for other criminal matters. Rather

19

than utilizing his office to conduct a neutral third-party audit of those who contributed to him in order to gain political influence, he wasted millions of taxpayer dollars defending his corrupt practices. Defendant Paxton appears to have based his investigative priorities on advice that is commonly attributed to Joseph Goebbels: "Accuse the other side of that which you are guilty." The fact that he uses the State as an instrumentality to accomplish his illegitimate goals violates the Equal Protection Clause.

## VII. EMERGENCY APPLICATION FOR TEMPORARY RESTRAINING ORDER, MOTION FOR PROTECTIVE ORDER, APPLICATION FOR TEMPORARY INJUNCTION, AND OTHER INJUNCTIVE RELIEF

*Application for Emergency Temporary Restraining Order*

45.48.  Defendant has indicated that his office intends to imminently initiate baseless *quo warranto* proceedings in Tarrant County, where there are no grounds for venue. This will be the third baseless action that Defendant initiates against Plaintiff in less than a week.

46.49.  As demonstrated by the foregoing facts, Defendant is abusing the legal system solely for the purpose of harassing Plaintiff and chilling Plaintiffs' First Amendment rights.

47.50.  Defendant has no good faith basis for his threatened legal action, and the action is intended to and would have the effect of imminently and irreparably harming Plaintiff by violating Plaintiffs's constitutional rights, as laid out in the preceding legal counts. This matter must be heard immediately, including ex parte if necessary, as Plaintiff will suffer irreparable harm in the absence of temporary relief until a hearing on a temporary injunction can be had.

48.51.  Plaintiff is willing to post bond.

*Motion for Protective Order*

49.52.  Plaintiff re-alleges and incorporates by reference the preceding paragraphs for all purposes the same as if set forth herein verbatim.

20

50.53. Plaintiff seeks a protective order pursuant to Tex. R. Civ. Pro. 176.6(e) and Tex. R. Civ. Pro. 192.6(b). Rule 176.6(e) provides, in relevant part, "[a] person commanded to…produce…designated documents and things…may move for a protective order under Rule 192.6(b) — before the time specified for compliance — either in the court in which the action is pending or in a district court in the county where the subpoena was served."

51.54. In order to "protect the movant from undue burden, unnecessary expense, harassment, annoyance, or invasion of personal, constitutional, or property rights," Tex. R. Civ. P. 192.6(b) allows a court to "make any order in the interest of justice and may — among other things — order that: (1) the requested discovery not be sought in whole or in part; (2) the extent or subject matter of discovery be limited; (3) the discovery not be undertaken at the time or place specified; (4) the discovery be undertaken only by such method or upon such terms and conditions or at the time and place directed by the court; (5) the results of discovery be sealed or otherwise protected, subject to the provisions of Rule 76a."

52.55. Further, Tex. R. Civ. P. 192.4 provides protections against, *interalia*, inappropriate document requests, requiring that the "discovery methods permitted by these rules should be limited by the court if it determines, on motion or on its own initiative and on reasonable notice, that: (a) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive; or (b) the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues." *See In re Weekley Homes, L.P.*, 295 S.W.3d 309, 322-23 (Tex. 2009) (noting harm that the party resisting discovery might suffer as result of revealing private conversations, trade secrets, and privileged

and other confidential information); *see also In re Houstonian Campus, L.L.C.*, 312 S.W.3d 178, 184 (Tex. App.—Houston [14th Dist.] 2010, orig. proceeding) (considering the harm that party resisting discovery might suffer as a result of revealing members' names).

53.56. Here, the RTE runs afoul of many of the prohibitions found in Rule 192.6(b) and 192.4, as it:

- *Harasses Plaintiff* — "Discovery is unnecessarily harassing where it is sought for an improper purpose." *Centennial Psychiatric Assocs., LLC v. Cantrell*, No. 14-17-00380-CV, 2017 WL 6544283, at *9 (Tex. App. Dec. 21, 2017). The entire RTE was sent for the purpose of retaliation against and harassing a political opponent, a clearly improper purpose and abuse of the RTE process. *See supra, para.* 20-21, 29-31.

- *Invades constitutional rights* — As thoroughly addressed in the preceding sections, Defendants' RTE improperly invades on Plaintiffs' Texas and federal constitutional rights. *See supra, para.* 22-42.

- *Is unduly burdensome because:*
  - *There is insufficient time to respond* — Defendants provided a wholly insufficient amount of time to respond and object to the individual document requests within the RTE. They further refused two requests for an extension of the RTE deadline. Requests for document production to a party in civil litigation allow for a 30 day response deadline. Tex. R. Civ. Pro. 196.2(a). A subpoena seeking documents from a nonparty requires at least 10 days notice. Tex. R. Civ. Pro. 205.2. Here, Defendants provided less than 48 hours notice to Plaintiff, an unreasonable amount of time to (1)

gather responsive documents, (2) review those documents for privilege and, (3) compile and provide objections and responses. In the context of a nonparty subpoena, the Eighth Court of Appeals has said "[p]lainly…a day's notice is not reasonable..." *In re State*, 599 S.W.3d 577, 597 (Tex.App.--El Paso, 2020, orig. proceeding). So too in this situation where Defendants provided less than 48 hours from notice of the RTE to deadline for response.

○ *The requests are overly broad* — Additionally, the requests in the RTE are overly broad. An overly broad request for documents that is merely a "fishing expedition" into the other party's files is prohibited. *In re American Optical Corp.*, 988 S.W.2d 711, 713 (Tex.1998); *Dillard Dept. Stores v. Hall*, 909 S.W.2d 491, 492 (Tex.1995). Here, the RTE is expressly a fishing expedition, and one initiated against a perceived political opponent. Neither the rules of civil procedure nor the U.S. or Texas Constitutions allow for such an assault.

○ *There is an alternate source for some of the information* — A request is unduly burdensome when the discovery can be obtained from some other source that is more convenient, less burdensome, or less expensive. Tex. R. Civ. P. 192.4(a); *Brewer & Pritchard, P.C. v. Johnson*, 167 S.W.3d 460, 466 (Tex.App.—Houston [14th Dist.] 2005, pet. denied); *e.g.*, *In re Arras*, 24 S.W.3d 862, 864 (Tex.App.—El Paso 2000, orig. proceeding) (deposition of nonparty for addresses of other parties was inconvenient and burdensome). The RTE requests information about political contributions

23

and expenditures, which, as a candidate for office on multiple occasions himself, the Defendant knows are subject to public filings and therefore obtainable through other means. Powered by People is a nonprofit organization exempt from tax under 26 U.S.C § 527 as a political organization, and is registered with the Federal Election Commission under federal campaign finance law and with the Texas Ethics Commission under state campaign finance law.  As an organization registered under these campaign finance laws, Powered by People files regular, public reports of its contributions and expenditures.  *See* 52 USC § 30104(a)(4); 11 CFR § 104.5(c); Tex. Elec. Code §§ 254.153, 254.154; 1 Tex. Admin. Code §§ 20.423, 20.425. On a regular basis according to schedules determined by these laws, Powered by People files *public* reports of the funds it has received and expenditures made, subject to thresholds for itemization on reports.

- *Requires unnecessary expenses* — Since some of the requests, including Nos. 9 and 11 encompass materials filed in TEC filings, the requests for additional production pursuant to the RTE would require unnecessary expense.

54.57.  A trial court has "broad discretion" in determining whether to grant a protective order and "balances the parties' competing interests" when making its determination. *Eurecat U.S., Inc. v. Marklund*, 527 S.W.3d 367, 376 (Tex. App.—Houston [14th Dist.], 2017, no. pet.).

55.58.  Plaintiff's injuries if required to respond to Defendants' RTE are numerous and articulated above.

*Request for Temporary and Permanent Injunctions*

56.59.  Plaintiff re-alleges and incorporates by reference the preceding paragraphs for all purposes the same as if set forth herein verbatim.

57.60.  In addition to the protections afforded by a Rule 176.6(e) protective order, Plaintiff requests and is entitled to temporary and permanent injunctions against Defendant. While the grounds for Plaintiffs' motion for protective order and requests for injunction overlap, there are additional constitutional bases for enjoining the RTE. *Cf. Annunciation House, Inc.,* 2025 WL 1536224, at \*24 (determining that a recipient of an RTE may seek precompliance review "whether by Rule 176.6(e)'s protective orders or *other provisions of Texas law*").

58.61.  The Texas Supreme Court has explained that:

> A temporary injunction's purpose is to preserve the *status quo* of the litigation's subject matter pending a trial on the merits. . . . To obtain a temporary injunction, the applicant must plead and prove three specific elements: (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim. An injury is irreparable if the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard.

*Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002). "[T]he only question before the trial court in a temporary injunction hearing is whether the applicant is entitled to preservation of the status quo of the subject matter of the suit pending trial on the merits." *Id.* (quoting *Pub. Util. Comm'n v. Water Servs., Inc.*, 709 S.W.2d 765, 767 (Tex. App.—Austin 1986, no writ). Moreover, "[w]hether to grant or deny a temporary injunction is within the trial court's sound discretion," and a reviewing court should not overturn absent a showing that such discretion was abused. *Id.*

59.62.  Here, Plaintiff is entitled to preservation of the *status quo* because it will suffer imminent, irreparable harm for which no adequate remedy at law exists if Defendants are not restrained enforcing the RTE. *See Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002)

("An injury is irreparable if the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard.") (citing *Canteen Corp. v. Republic of Tex. Props., Inc.*, 773 S.W.2d 398, 401 (Tex. App. —Dallas 1989, no writ)).

63. Plaintiff will suffer a violation of its constitutional rights, and "[u]nder Texas law, a violation of a constitutionally guaranteed right inflicts irreparable injury warranting injunctive relief." *Operation Rescue-Nat'l v. Planned Parenthood of Houston & Se. Texas, Inc.*, 937 S.W.2d 60, 77 (Tex. App.—San Antonio 1996, writ granted and *aff'd as modified*, 975 S.W.2d 546 (Tex. 1998)) (citing *Southwestern Newspapers Corp. v. Curtis*, 584 S.W.2d 362, 368 (Tex. Civ. App.— Amarillo 1979, no writ); *Iranian Muslim Organization v. City of San Antonio*, 615 S.W.2d 202, 208 (Tex. 1981)).

64. Once sensitive information has been handed over and disclosure has been compelled, there can be no remuneration. Not only will Plaintiff suffer that irreparable harm, but compliance with the RTE would deprive this Court of its jurisdiction by effectuating the irreversible contested action that is the subject of this Petition. *Cf. Marketshare Telecom, L.L.C. v. Ericsson, Inc.*, 198 S.W.3d 908, 921 (Tex. App. —Dallas 2006, no pet.) (holding that a court "may protect its jurisdiction" by issuing appropriate injunctions).

65. Further, Plaintiff has stated numerous valid causes of action, *see supra para*. 22-42, and the verified factual allegations demonstrate a probable right to relief. Defendant Paxton has clearly violated the Texas and United States Constitution, as well as the Texas Rules of Civil Procedure.

66. Plaintiff is willing to post bond. Pursuant to Tex. R. Civ. P. 168, "[w]here the…temporary injunction is against…a subdivision of the State in its governmental capacity, and

is such that the State…[and]…the subdivision of the State in its governmental capacity, has no pecuniary interest in the suit and no monetary damages can be shown, the bond shall be allowed in the sum fixed by the judge, and the liability of the applicant shall be for its face amount if the restraining order or temporary injunction shall be dissolved in whole or in part."

64.67. Accordingly, Plaintiff asks the Court to set a briefing period for its request for temporary injunction, set the same for a hearing and, after the hearing, issue a temporary injunction against Defendants.

65.68. For these same reasons, Plaintiff seeks a permanent injunction prohibiting Defendants from enforcing the RTE.

## PRAYER AND REQUEST FOR RELIEF

For the foregoing reasons, Plaintiff Powered by People requests an immediate protective order pursuant to TEX. R. CIV. P. 192.6(b) and TEX. R. CIV. P. 176.6(e), and a temporary injunction restraining order issued to Defendants preventing enforcement of the RTE in its entirety, and a temporary restraining order restraining Defendant from prosecuting his threatened quo warranto without leave of this court. Further, Plaintiff requests that Defendants be cited to appear and answer, and that on hearing, issue Plaintiff judgment as follows:

(a)     A protective order against Defendants' enforcement of the RTE in its entirety;

(b)     A declaration that Defendants violated the U.S. Constitution and the Texas Constitution, and that the RTE is invalid and unenforceable;

(c)     A temporary and permanent injunction restraining Defendants from enforcing the RTE in its entirety;

(d)     A temporary restraining order restraining Defendants from initiating, filing, or otherwise prosecutinginstituting *quo warranto* proceedings against Powered by

27

People without leave of this court while the order is in effect or another district court in El Paso County.

(e) A temporary and permanent injunction enjoining Defendants from initiating, filing, or otherwise prosecutinginstituting *quo warranto* proceedings against Powered by People without leave of this court or another district court in El Paso County until such date as this Court deems fit.

(f) Costs of court;

(g) Reasonable and necessary attorneys' fees pursuant to 42 U.S.C. § 1988 and other applicable laws, including Tex. Civ. Prac. & Rem. Code §37.008; and

(h) Such other and further relief, at law or in equity, to which Plaintiff is justly entitled.

Respectfully submitted,

*/s/ Mimi Marziani*

Mimi Marziani
Texas Bar No. 24091906
mmarziani@msgpllc.com
Joaquin Gonzalez
Texas Bar No. 24109935
jgonzalez@msgpllc.com
Rebecca (Beth) Stevens
bstevens@msgpllc.com
Texas Bar No. 24065381
**MARZIANI, STEVENS & GONZALEZ PLLC**
500 W. 2nd Street, Suite 1900
Austin, TX 78701
Tel: (210) 343-5604

Lynn Coyle
Texas Bar No. 24050049
lynn@coylefirm.com
2700 Richmond Ave.
El Paso, TX 79930
Tel: (915)276-6700

**ATTORNEYS FOR PLAINTIFF**

28

**VERIFICATION**

My name is David Mills Wysong, my date of birth is May 9, 1972, and my address is 824 Twin Hills Dr., El Paso, Texas 79912, United States. I declare under penalty of perjury that the statements in the foregoing Facts section are true and correct.

Executed in _____ County, State of Texas, on the 17th day of August, 2025.

_____

David Mills Wysong

VERIFICATION

My name is Joaquin Gonzalez, my date of birth is November 27, 1984, and my address is 1533 Austin Hwy. #102-402, United States. I declare under penalty of perjury that the statements in paragraphs 22-24 in the fact section are true and correct.

Executed in Bexar County, State of Texas, on the 17th day of August, 2025.


/s/ Joaquin Gonzalez

Joaquin Gonzalez

# CERTIFICATE OF SERVICE

By my signature below, I hereby certify that a true and correct copy of the foregoing pleading was served on the following as set forth below, on August 17, 2025.

**Via e-service:** Rob.Farquharson@oag.texas.gov
Rob Farquharson
Deputy Chief
Consumer Protection Division
Office of the Attorney General

**Via e-service:** Johnathan.Stone@oag.texas.gov
Johnathan Stone
Chief
Consumer Protection Division
Office of the Attorney General

*/s/ Mimi Marziani*
Mimi Marziani

# EXHIBIT B

**CAUSE NO. 348-367652-25**

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT |
| *Plaintiff,* | § | |
| | § | |
| V. | § | 348th JUDICIAL DISTRICT |
| | § | |
| ROBERT FRANCIS O'ROURKE | § | |
| and POWERED BY PEOPLE | § | |
| | § | |
| | § | |
| | § | |
| *Defendants.* | § | TARRANT COUNTY, TEXAS |

---

### DECLARATION OF DAVID WYSONG

My name is David Mills Wysong, my date of birth is May 9, 1972, and my address is 824 Twin Hills Dr., El Paso, Texas 79912, United States. I am of sound mind, and capable of making this declaration. I am a member of the Board of Directors of Powered by People and serve as an authorized representative of the organization. I have personal knowledge of the facts stated herein, and they are true and correct.

1. **Organizational Status**

   a. Powered by People is a Texas nonprofit corporation.

   b. The organization operates as a "political organization" within the meaning of 26 U.S.C. § 527(e)(1) for the purpose of directly or indirectly accepting contributions or making expenditures, or both, to influence elections.

   c. As a political organization, Powered by People files regular campaign finance reports with the Texas Ethics Commission and is registered in Texas as a general-purpose committee.

**Exhibit
B**

    d.  Powered by People sells no goods or services. Its business is purely associational and to promote political speech.

2. **Principal Place of Business**

    **a.**  Powered by People maintains its primary place of business in El Paso County, Texas.

    b.  Powered by People's only commercial office is located at 521 Texas El Paso, TX 79901.

    c.  Powered by People's mailing address is in Bexar County.

    **d.**  All members of Powered by People's Board of Directors reside in El Paso County.

    **e.**  No Powered by People's staff members reside in Tarrant county.

3. **Request to Examine by the State of Texas through Attorney General Ken Paxton**

    a.  I was served with the Request to Examine at my residence in El Paso, Texas at 8:15pm CT on Wednesday, August 6, 2025.

    b.  Attached as Attachment 1 is a true and correct copy of the Request to Examine.

    c.  I understand that a separate board member, Gwen Pulido, was served with the Request to Examine at her El Paso residence at 7:30 pm CT on Wednesday, August 6, 2025.

4. **Facts Regarding Transfers and Fundraising**

    **a.**  Between June 1, 2025 (the relevant date from the Attorney General's Request to Examine) and the date of this declaration, no transfers of funds, or provision of other benefits, have been made by Powered by People to any Texas Democratic lawmaker, including any lawmaker in Tarrant County.

  **b.** All money received since June 1, 2025, by Powered by People were donations and no goods or services were provided to donors by Powered by People in exchange for any donation received.

5. **August 9, 2025 Fort Worth Political Rally**

  a. The August 9, 2025 Powered by People political event referenced in the State's Petition was first announced publicly on July 20, 2025.

  b. The political event that occurred in Fort Worth on August 9, 2025 was a political rally to generate public support and political action against Governor Abbott's efforts to unconstitutionally redistrict the State of Texas.

  c. The political rally was an effort to assemble and associate for the purposes of likeminded political action.

  d. Powered by People did not sell any goods or services at the political rally.

6. Powered by People did not make any offers to fundraise or help pay for legislative fines, hotel, and travel expenses in exchange for any political action or restraint.

7. Powered by People made no statements, representations or offers to public officials promising any benefit, pecuniary gain, or pecuniary advantage.

I declare under penalty of perjury that the statements in the foregoing are true and correct.

Executed in __El Paso_____ County, State of Texas, on the 11th day of August, 2025.

Signed by:

87416D97BBDD430...

David Mills Wysong

Docusign Envelope ID: F016A65F-DDE5-4A31-BDF7-EB03E236C499

# Attachment 1

Docusign Envelope ID: F016A65F-DDE5-4A31-BDF7-EB03E236C499







**OFFICE OF THE ATTORNEY GENERAL**
**CONSUMER PROTECTION DIVISION**

## REQUEST TO EXAMINE

To:     Powered by People                                    *Return Date: August 8, 2025*
        13409 NW Military Hwy.
        Suite 300
        Shavano Park, Texas 78231

        c/o Registered Agent:                                *Via Personal Service*
        Christopher Koob
        13409 NW Military Hwy.
        Suite 300
        Shavano Park, Texas 78231

        c/o Director                                         *Via Personal Service*
        Gwen Pulido
        3127 Wheeling Ave.
        El Paso, Texas 79930

        c/o Director                                         *Via Personal Service*
        Beto O'Rourke
        1100 Los Angeles Dr.
        El Paso, Texas 79902

        c/o Director                                         *Via Personal Service*
        David Wysong
        824 Twin Hills Dr.
        El Paso, Texas 79912

Re:     The Office of the Attorney General's Investigation of Powered by People

The Office of the Attorney General, as the representative of the public's interest, has authority to examine any record of a filing entity or foreign filing entity within the meaning of the Texas Business Organizations Code. Tex. Bus. Org. Code § 12.151. Such examination of records may be

undertaken in accordance with an investigation under Texas Business Organizations Code Section 12.153 to determine whether a Texas-registered entity's conduct violates its governing documents or any laws of this state.

Powered by People is a filing entity within the meaning of the Texas Business Organizations Code. Pursuant to this Office's specific authority under Texas law, including Texas Business Organizations Code Section 12.151, *et seq.*, the Office of the Attorney General is issuing this Request to Examine (RTE) instructing that Powered by People permit the Office of the Attorney General to examine and make copies of, or otherwise produce, the records set forth in Attachment "A."

You are to make available the records described in Attachment "A" to the undersigned Assistant Attorney General or other authorized agent(s). The records may be sent electronically or by certified mail to the Office of the Attorney General, 300 W. 15th. Street, 9th Floor, Austin, TX 78701, and are due by **5 p.m. (CDT) on August 8, 2025**. Please contact one of the persons listed below upon receipt to discuss the logistics of producing physical copies of the requested documents to the Office of the Attorney General. If providing records electronically, please provide them to Rozanne Lopez at Rozanne.lopez@oag.texas.gov.

## NOTICE OF RIGHTS AND PENALTIES

**TAKE NOTICE THAT** you are encouraged to meet and confer with the Office of the Attorney General if you contend that any of the information sought in Attachment A is constitutionally protected or otherwise legally exempt from production to the Office of the Attorney General.

If you cannot reach agreement with the Office of the Attorney General on the scope of documents sought, you may attempt to obtain pre-compliance judicial review of the RTE before 5 p.m. (CDT) on August 8, 2025. *See Paxton v. Annunciation House, Inc.*, No. 24-0573, 2025 WL 1536224, at *24 (Tex. May 30, 2025).

**TAKE FURTHER NOTICE THAT** penalties for a legally unexcused failure or refusal to timely produce records for the Attorney General's examination include the Office of the Attorney General initiating a legal action for the entity's "registration or certificate of formation" to "be revoked or terminated." Tex. Bus. Org. Code § 12.155. If the Office of the Attorney General deems such penalty warranted, proceedings to revoke or terminate an entity's registration or certificate of formation are initiated through a petition for leave to file an information in the nature of *quo warranto*. Tex. Civ. Prac. & Rem. Code § 66.002. In such a proceeding, the registered entity is "entitled to" the same rights "as in cases of trial in civil cases." Tex. R. Civ. P. 781.

ISSUED THIS 6th day of August 2025.

/s/ Rob Farquharson
Rob Farquharson
Deputy Chief
Consumer Protection Division
Office of the Attorney General
Rob.Farquharson@oag.texas.gov

Other Authorized Agents:
Rozanne Lopez, Investigator
Consumer Protection Division
Office of the Attorney General
rozanne.lopez@oag.texas.gov (email)

Johnathan Stone
Chief
Consumer Protection Division
Office of the Texas Attorney General
Johnathan.Stone@oag.texas.gov

## ATTACHMENT "A"

### Instructions

1.  **Read These Instructions/Definitions Carefully.** Your production must comply with these instructions and definitions.

2.  **Duty to Preserve Documents.** All documents and/or other data which relate to the subject matter or requests of this RTE must be preserved. *Any ongoing, scheduled, or other process of document or data destruction involving such documents or data must cease even if it is your normal or routine course of business for you to delete or destroy such documents or data and even if you believe such documents or data are protected from discovery by privilege or otherwise.* Failure to preserve such documents or data may result in legal action and may be regarded as spoliation of evidence under applicable law.

3.  **Relevant Dates.** Unless otherwise noted, the requests in this RTE require production of documents from **June 1, 2025**, to the date of the production of documents in response to this RTE, herein called "the relevant time period."

4.  **Custody and Control.** In responding to this RTE, you are required to produce not only all requested documents in your physical possession, but also all requested documents within your custody and control. A document is in your custody and control if it is in the possession of another person and you have a right to possess that document that is equal or superior to that other person's right of possession. On the rare occasion that you cannot obtain the document, you must provide an explanation as to why you cannot obtain the document which includes the following information:

    a. the name of each author, sender, creator, and initiator of such document;

    b. the name of each recipient, addressee, or party for whom such document was intended;

    c. the date the document was created;

    d. the date(s) the document was in use;

    e. a detailed description of the content of the document;

f. the reason it is no longer in your possession, custody, or control; and

g. the document's present whereabouts.

If the document is no longer in existence, in addition to providing the information indicated above, state on whose instructions the document was destroyed or otherwise disposed of, and the date and manner of the destruction or disposal.

5. **Non-identical Copies to be Produced.** Any copy of a document that differs in any manner, including the presence of handwritten notations, different senders or recipients, etc. must be produced.

6. **No Redaction.** All non-privileged materials or documents produced in response to this RTE shall be produced in complete unabridged, unedited, and unredacted form, even if portions may contain information not explicitly requested, or might include interim or final editions of a document.

7. **Document Organization.** Each document and other tangible thing produced shall be clearly designated as to which request, and each sub-part of a request, that it satisfies. The documents produced shall be identified and segregated to correspond with the number and subsection of the request.

8. **Production of Documents.** You may submit photocopies (with color photocopies where necessary to interpret the document) in lieu of original hard-copy documents if the photocopies provided are true, correct, and complete copies of the original documents. If the requested information is electronically stored information, it shall be produced in electronic form. Electronically stored information shall be produced with the accompanying metadata, codes, and programs necessary for translating it into usable form, or the information shall be produced in a finished usable form. For any questions related to the production of documents you may consult with the Office of the Attorney General representatives above.

9. **Privilege Log.** For each Document and any other requested information that you assert is privileged or for any other reason excludable from production, please provide a privilege log, wherein you:

a. Identify that Document and other requested information;

5

Docusign Envelope ID: F016A65F-DDE5-4A31-BDF7-EB03E236C499

b. State each specific ground for the claim of privilege or other ground for exclusion and the facts supporting each claim of privilege or other ground for exclusion;

c. State the date of the Document or other requested information; the name, job title, and address (including city, state and ZIP Code) of the person who prepared it; the name, address (including city, state, and ZIP Code), and job title of the person to whom it was addressed or circulated or who saw it; and the name, job title, and address (including city, state, and ZIP Code) of the person now in possession of it; and

d. Describe the type and subject matter of the Document or other requested information.

## Definitions

1. **"You," "your,"** or **"Powered by People"** means Powered by People, its past and present directors, officers, employees, agents and representatives, parents and predecessors, divisions, subsidiaries, affiliates, political action committees, partnerships and joint ventures, and includes all persons and entities acting or purporting to act under the guidance or on behalf of any of the above. The terms "subsidiary," "affiliate," and "joint venture" refer to any firm in which there is total or partial ownership (25 percent or more) or control between the company and any other person or entity.

2. **"Benefit"** is used in a manner consistent with § 36.01 of the Texas Penal Code and means anything reasonably regarded as pecuniary gain or pecuniary advantage, including benefit to any other person in whose welfare the beneficiary has a direct and substantial interest.

3. The words **"and"** and **"or"** shall be construed either conjunctively or disjunctively as required by the context to bring within the scope of the request, any document(s) that might be deemed outside its scope by another construction.

4. **"Communication"** means any conversation (internal or external), discussion, letter, email, correspondence, memorandum, meeting, note, or other transmittal of information or message, whether transmitted in writing, orally, electronically, or by any other means.

5. **"Concerning,"** or **"Relating to,"** or **"Related to"** means related to, referring to, pertaining to, concerning, describing, regarding, evidencing, or constituting.

6. **"Document"** shall be construed in the broadest sense possible and encompasses any electronically stored information, writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations—stored in any medium from which information can be obtained either directly or, if necessary, after translation by Powered by People into a reasonably usable form. Although it does not limit the scope of this RTE, the definition and interpretation of "document" under the Texas Rules of Civil Procedure provides a useful reference point.

7. **"Including"** means including, but not limited to.

8. **"Person"** means any natural person or any legal entity, including, without limitation, any corporation, company, limited liability company or corporation, partnership, limited partnership, association, or firm.

7

## Requests: Documents for Production

In accordance with the requirements set forth in the "Definitions" and "Instructions" sections of this RTE, You are specifically required produce the following no later than **5 p.m. (CDT) on August 8, 2025:**

**Request No. 1:**

Produce Communications between You and any other person or group relating to planned or actual travel arrangements, accommodations, or meals outside of Texas for any of the following persons:

Gina Hinojosa
Ron Reynolds
James Talarico
Ann Johnson
Gene Wu
John Bucy
Trey Martinez Fischer
Josey Garcia
Diego Bernal
Toni Rose
Jon Rosenthal
Jalonda Jones
Venton Jones
Rafael Anchia
Sheryl Cole
Ramon Romero
Nicole Collier
Harold Dutton
Chris Turner
Linda Garcia
Charlene Ward Johnson
Jessica González
Ana-María Rodríguez Ramos
Lauren Ashley Simmons
Donna Howard
Lulu Flores
Vikki Goodwin
Cassandra Garcia Hernandez
Mihaela Plesa
Suleman Lalani
Ray López

8

Christina Morales
Barbara Gervin-Hawkins
John Bryant
Rhetta Bowers
Terry Meza
Aicha Davis
Elizabeth Campos
Alma Allen
Ana Hernandez
Salman Bhojani
Erin Gamez
Christian Manuel
Vincent Perez
Mary Gonzalez
Claudia Ordaz
Penny Morales-Shaw
Senfronia Thompson
Hubert Vo
Yvonne Davis
Erin Zwiener
Armando Walle
Bobby Guerra
Mary Ann Perez

**Request No. 2:**

Produce Documents relating to planned or actual travel arrangements, accommodations, or meals for any of the persons identified in Request No. 1.

**Request No. 3:**

Produce Documents relating to, or discussing, quorum during Texas's current special legislative session.

**Request No. 4:**

Produce Communications relating to, or discussing, quorum during Texas's current special legislative session.

**Request No. 5:**

Produce Documents relating to the provision of any Benefit or compensation to the persons identified in Request No. 1.

**Request No. 6:**

Produce Communications regarding the provision of any Benefit or compensation relating to the persons identified in Request No. 1.

**Request No. 7:**

Produce Communications discussing, or relating to, the solicitation of funds to pay for planned or actual travel arrangements, accommodations, or meals for any of the persons listed in Request No. 1.

**Request No. 8:**

Produce Documents relating to the solicitation of funds to pay for planned or actual travel arrangements, accommodations, or meals for any of the persons listed in Request No. 1.

**Request No. 9:**

Produce Documents showing each expenditure that You have made relating to the persons identified in Request No. 1.

**Request No. 10:**

Produce Documents sufficient to show all agreements, contracts, or receipts for services between You and CommuteAir or United Express.

**Request No. 11:**

Produce Documents sufficient to show receipts or confirmations of every political contribution that You made to any of the persons identified in Request No. 1.

# EXHIBIT C

348-367652-25

CAUSE NO. 348-367652-25

| | | |
|---|---|---|
| **THE STATE OF TEXAS** | § | **IN THE DISTRICT COURT** |
| *Plaintiff,* | § | |
| | § | |
| **V.** | § | **348th JUDICIAL DISTRICT** |
| | § | |
| **ROBERT FRANCIS O'ROURKE** | § | |
| **and POWERED BY PEOPLE** | § | |
| | § | |
| | § | |
| *Defendants.* | § | **TARRANT COUNTY, TEXAS** |

---

## EMERGENCY MOTION TO TRANSFER VENUE

Pursuant to Texas Rules of Civil Procedure 86 and 87, Defendants file this objection to improper venue and Emergency Motion to Transfer Venue. The Emergency Motion to Transfer Venue is filed prior to the filing of any other responsive pleading or motion and satisfies Texas's "due order of pleadings," such that any pleadings, motions, or requests for relief filed hereafter are made expressly subject to the venue challenge and request to transfer venue.[1]

## SUMMARY OF ARGUMENT

The Attorney General has filed a frivolous suit in the wrong county. If the suit is to proceed at all, the venue must be transferred to El Paso County, as required by Texas law and rules of civil procedure. Importantly, the State of Texas has asserted no jurisdictional facts supporting Tarrant

---

[1] Plaintiffs intend to file a motion to dissolve the Temporary Restraining Order that was granted on August 8, 2025. Plaintiffs expressly do not intend to waive any objections to venue with that motion, and courts have held that a party appearing solely to file a motion to dissolve a temporary injunction does not waive any plea of privilege. *See, e.g., Box v. Fleming*, 484 S.W.2d 617, 619 (Tex. Civ. App.—Eastland 1972, no writ); *Gibson v. State*, 288 S.W.2d 577, 578 (Tex. Civ. App.—Waco 1956, writ dism'd).

1

County as a proper county for its suit under either Texas's general venue statute or under the more specific venue provisions of the Texas Deceptive Trade Practices Act ("DTPA").

First, the State of Texas's lawsuit seeks primarily permanent injunctive relief against Defendants. Accordingly, the mandatory venue statute found in Section 65.023 of the Texas Civil Practice and Remedies Code governs this suit. Section 65.023 provides that claims for injunctive relief must be brought in the county where the defendant sought to be enjoined is domiciled. In this case, that county is El Paso, not Tarrant.

Second, Section 15.002(a)(1) requires that "all or a substantial part of the events or omissions giving rise to the claim occurred" must have occurred in Tarrant County for venue to be proper in this suit. The State has alleged no particularized facts connected to its claim that actually occurred in Tarrant County; instead, it alleges that potential future solicitations of political contributions might occur in Tarrant County because a political rally was scheduled to occur in Tarrant County on August 9, 2025. The Attorney General's asserted claim is premised on alleged deceptive solicitations for political fundraising activity, *e.g.*, the misleading of donors to give to the Defendants, but zero facts are alleged concerning the location or occurrence of any such allegedly deceptive solicitations, when they occurred, how they occurred, or how the deceptive transactions were, in fact, deceptive.

Even more speciously, the State's claims are also premised on an alleged crime of bribery, which broadly requires an offer of some benefit to a political official in exchange for specific action. Again, not a single fact along these lines is alleged to have occurred or is threatened to occur in Tarrant County. The State has not alleged any jurisdictional facts establishing any, much less "all or a substantial part of the events or omissions giving rise to the claim occurred" in Tarrant County.

Third, Section 17.47(b) of the Texas Business and Commerce Code permits the Attorney General to bring injunction actions under the DTPA in limited circumstances. Although completely inapplicable here, even if the State *could* bring an enforcement action challenging political donations under the DTPA (an assertion which is dubious to begin with given that Defendants only engage in constitutionally protected political activity and do not offer or provide any "goods" or "services" as contemplated by the DTPA), it may do so only in the following counties: (i) where the Defendants reside; (ii) where the Defendants have their principal place of business; (iii) or where the deceptive "transaction occurred." *See* TEX. BUS. & COM. CODE § 17.47(b). It is undisputed that Defendants neither reside nor maintain a principal place of business in Tarrant County, which renders the first two venue options wholly inapplicable.

Further, the State has alleged no facts and cannot allege any facts establishing that any deceptive "transaction occurred" in Tarrant County within the DTPA. At most, the State of Texas has alleged facts establishing the Defendants engaged in core political speech and associational activity and planned a perfectly legal political rally in Tarrant County. But not a single fact concerning either an actual donation occurring in Tarrant County or the offer of a benefit to a public servant occurring in Tarrant County exists in the Petition. Regardless, even if the State had alleged any adequate facts, which it did not, 17.47's permissive venue provision would yield to 65.023's mandatory provision, and it would be reversible error to conclude otherwise. *See, e.g., Wichita Cnty., Tex. v. Hart*, 917 S.W.2d 779, 781 (Tex. 1996) (trial court committed reversible error because "[i]f the plaintiff's chosen venue rests on a permissive venue statute and the defendant files a meritorious motion to transfer based on a mandatory venue provision, the trial court must grant the motion.").

# LEGAL STANDARD

> The general venue rule is that suit shall be filed in either (1) the county in which all or a substantial part of the events giving rise to the claim occurred, (2) the county of the defendant's residence if the defendant is a natural person, or (3) the county of the defendant's principal office if the defendant is not a natural person. TEX. CIV. PRAC. & REM. CODE ANN. § 5.002(a)(1),(2), & (3) (Vernon 2002). When a plaintiff files claims under the DTPA, suit may be brought in a county in which the defendant solicited the transaction. TEX. BUS. & COM. CODE ANN. § 17.56(2)(Vernon 2002).

*The Kay v. N. Texas Rod & Custom*, 109 S.W.3d 924, 925 (Tex. App.— Dallas 2003).

Because venue may be proper in numerous counties, a plaintiff is given the first choice to fix venue in a proper county and do so by filing suit in the county of his choosing. *See Wilson v. Tex. Parks & Wildlife Dep't*, 886 S.W.2d 259, 260 (Tex. 1994). Importantly though, if, as in this case, a plaintiff files suit in an improper county, he waives his first choice of venue, and the defendant may have the suit transferred to another county, as long as venue is proper in that county. *See id.*; *see also* TEX. CIV. PRAC. & REM. CODE § 15.063(1) (providing that trial court shall transfer action to another county of proper venue if county is not proper). "[I]f the county to which transfer is sought is a county of mandatory venue, then it is reversible error to deny a transfer." *Chiriboga v. State Farm Mut. Auto. Ins. Co.*, 96 S.W.3d 673, 677 (Tex. App.—Austin 2003).

If a defendant properly challenges venue and asserts venue facts the plaintiff never specifically denies, then the defendants' venue facts are taken as true. *See* TEX. R. CIV. P. 87(3)(a). To hold otherwise would be to promote forum-shopping, a practice long prohibited in Texas. *See In re Team Rocket, L.P.*, 256 S.W.3d 257, 259 (Tex. 2008).

Rule 87 of the Texas Rules of Civil Procedure governs motions to transfer venue. The venue consideration "shall be made promptly" by the Court. Given the gravity of the Attorney General's actions in this case, which implicate core political speech rights and freedom of association under the First Amendment of the United States Constitution, the Defendants request

4

an expedited and emergency hearing on their transfer motion. *See* TEX. R. CIV. P. 87(1) (permitting hearings earlier than on 45-days notice with leave).

Rule 87(2) requires the party seeking to transfer venue to establish that venue is maintainable in the county to which the case is sought to be transferred. Similarly, Rule 87(2) requires the plaintiff asserting that the venue is proper in the county where the suit was filed must establish that venue is maintainable in the county of suit. "All venue facts, when properly pleaded, shall be taken as true unless specifically denied by the adverse party. When a venue fact is specifically denied, the party pleading the venue fact must make prima facie proof of that venue fact." TEX. R. CIV. P. 87(3). Here, the Defendants specifically deny that venue is proper in Tarrant County and deny all facts alleged in the State's Original Petition which they contend or allege support venue. *See infra* at pg. 10 (specific denials).

To establish that venue is maintainable in the county of suit, the State of Texas must provide *prima facie* proof, which is only "made when the venue facts are properly pleaded and an affidavit, and any duly proved attachments to the affidavit, are filed fully and specifically setting forth the facts supporting such pleading. Affidavits shall be made on personal knowledge, shall set forth specific facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify." TEX. R. CIV. P. 87(3). Here, the State of Texas has offered no specific pleadings or factual evidence establishing that any concrete act, much less "all or substantially all" of the acts giving rise to its claims occurred in Tarrant County. Moreover, mandatory venue lies in "the county in which the [Defendant] is domiciled." TEX. CIV. PRAC. & REM. CODE § 65.023. Accordingly, venue is improper and this Motion to Transfer must be granted.

## VENUE FACTS

### A.     NO FACTS SUPPORT VENUE IN TARRANT COUNTY.

A generous reading of the State's Original Petition provides only the following statements related to venue jurisdiction facts:

- Beto O' Rourke is an individual residing in El Paso County, Texas. Orig. Pet. at ¶ 2 (listing Mr. O'Rourke's home address).[2]
- Powered By People is a non-profit organization with its registered agent residing in Bexar County, Texas. *Id*. at ¶ 3.
- "[A] substantial part of the events or omissions giving rise to the State's claims occurred in Tarrant County." *Id.* at ¶ 4.
- "Defendants have done business in Tarrant County." *Id.*
- "[T]ransactions occurred in Tarrant County." *Id.*

These "allegations" are actually just conclusory legal statements parroting the text of the statute and do not set forth any factual basis supporting proper venue in Tarrant County.

The only factual allegations related to Fort Worth or Tarrant County in the entire body of the Petition are found in paragraphs 30, 31 and 32 of the Petition, but these allegations do not form the basis of any actual "act or omission" giving rise to the State's claim under the DTPA. Paragraph 30 simply states that "*Defendants released plans to bring one of these fundraising rallies to Fort Worth, Texas, on Saturday, August 9th.*" That is not evidence that a single alleged deceptive trade practice took place in Tarrant County or was even planned to occur in Tarrant County; rather, it is a description of lawfully protected First Amendment speech alone. Similarly, paragraph 31 provides only the cursory allegation that: "Like their prior fundraising efforts, Defendants have deceptively framed the rally as a political one to 'fight redistricting & support Texas House Democrats.'" But this framing (a) is not alleged to have occurred in Tarrant County and (b) is not itself actionable conduct supporting a claim. Finally, paragraph 32 states that "on information and

---

[2] Note that the Original Petition is misnumbered, with two paragraphs labeled as number 2.

6

belief" the Defendants are going to engage in deceptive fundraising at the Fort Worth rally, but actually allege only a screenshot of an invitation from Beto O' Rourke to a political rally on Saturday, August 9, 2025, stating nothing more than "Please join us Saturday at 3:00 in Fort Worth."

There is *not a single* factual allegation supporting an actual transaction occurred in Tarrant County, a false statement was made in Tarrant County, or that a false, deceptive act was even contemplated in Tarrant County. The State of Texas's factual basis for maintaining suit in Tarrant County is unsupportable.

Further, between June 1, 2025 (the relevant date from the Attorney General's Request to Examine) and the date of this filing, no transfers of funds, or provision of other benefits, have been made by Powered by People to any Texas Democratic lawmaker, including any lawmaker in Tarrant County. Ex. A, Wysong Decl., ¶ 4.

### B.     FACTS SUPPORTING VENUE IN EL PASO COUNTY.

At 3:15pm CT on Wednesday August 6, 2025, two days before the initiation of this Tarrant County lawsuit, Defendant Paxton issued a press release entitled "Attorney General Ken Paxton Launches Investigation into Beto O'Rourke's Radical Group for Unlawfully Funding Runaway Democrats." The release stated that, "[a]s part of the investigation, Attorney General Paxton has issued a Request to Examine, which demands documents and communications from the group regarding potentially unlawful activity, including its involvement in the Democrats' scheme to break quorum."[3] Thereafter, the State proceeded to serve that Request to Examine upon Defendant

---

[3] Attor-ney Gen-er-al Ken Pax-ton Launch-es Inves-ti-ga-tion into Beto O'Rourke's Rad-i-cal Group for Unlaw-ful-ly Fund-ing Run-away Democrats (Aug. 6, 2025), https://www.texasattorneygeneral.gov/news/releases/attorney-general-ken-paxton-launches-investigation-beto-orourkes-radical-group-unlawfully-funding.

Powered by People's directors, including board member Mr. David Wysong. Ex. A, Wysong Decl., ¶ 3. Specifically, the Attorney General served Powered by People board member Gwen Pulido, at 7:30 pm CT on Wednesday, August 6, 2025, in El Paso, Texas; thereafter Mr. Wysong was served at his residence in El Paso, Texas at 8:15pm CT on August 6, 2025. *Id.*

The Request to Examine set a compliance deadline of Friday, August 8, 2025, at 5:00 pm CT, less than 48 hours after it was first served on Mr. Wysong, one of Powered by People's board members, threatening Powered by People with criminal and civil penalties for noncompliance. Ex. A, Wysong Decl., Attachment 1. Counsel for Powered by People attempted on multiple occasions to seek a reasonable extension of time to respond to the Request to Examine, with a final email sent to the same counsel appearing in this matter, Mr. Rob Farquharson and Mr. Johnathan Stone, the morning of August 8, 2025 at 11:21 am CT. Ex. B, Stevens Decl., Attachment 1. When those requests were not granted, in accordance with Rule 176.6 of the Texas Rules of Civil Procedure[4] and applicable Texas Supreme Court precedent, Defendant Powered by People initiated a lawsuit in El Paso County seeking a protective order and other relief.

But earlier on August 8, 2025, and unbeknownst to the Defendants, the Attorney General abruptly changed directions, and started heading to north Texas. As Powered by People was finalizing its El Paso lawsuit, the Attorney General announced the filing of this court action in Tarrant County,[5] at 2:46pm CT on Friday. Despite the fact that as of 10:56 am CT on Friday,

---

[4] TEX. R. CIV. P. 176.6(e) contains mandatory venue provisions, requiring that a protective order be sought "either in the court in which the action is pending or in a district court in the county where the subpoena was served." As no action was pending in court at the time, the only proper venue was in El Paso or Bexar counties.

[5] Press Release, Office of the Texas Attorney General, Attorney General Ken Paxton Sues Robert Francis O'Rourke for "Beto Bribes" to Democrat Runaways to Impede the Texas Legislature (Aug. 8, 2025), https://www.texasattorneygeneral.gov/news/releases/attorney-general-ken-paxton-sues-robert-francis-orourke-beto-bribes-democrat-runaways-impede-texas.

counsel for the Attorney General knew that Powered by People was represented by the undersigned counsel, and while the one member of the Attorney General's lawyer group apparently drove the approximately three hour drive from Austin to Fort Worth, the Attorney General did not inform the undersigned counsel of the "emergency" hearing on the Attorney General's motion for TRO until almost four hours later. *Compare* Ex. B, Stevens Decl., Attachment 3 (showing attorney Rob Farquharson, the in-person representative for the Attorney General at the TRO hearing, office address in Austin) with Ex. B, Stevens Decl., Attachment 1 (showing the Attorney General attorneys were notified of the undersigned counsel representation on Friday morning). After Defendants' counsel learned of the new action, at 2:46 pm CT, they demanded to be heard at a last-minute TRO hearing. The Defendants did not make or file an answer or otherwise appear for purposes of the lawsuit, but counsel attended to contest the propriety of the TRO alone. The State obtained a Temporary Restraining Order at 5:32pm CT on Friday.

On August 9, 2025, almost certainly because he realized he had unwittingly further established proper venue in El Paso County days earlier, the Attorney General informed Defendants' counsel that the State was withdrawing the Requests to Examine and indicated that he intended to move to dismiss the El Paso suit as moot. Ex. B, Stevens Decl., Attachment 2.[6]

As acknowledged in the State of Texas's Original Petition, Beto O' Rourke does not reside in Tarrant County. He is a resident of El Paso County, Texas.

---

[6] For the reasons explained by the Texas Supreme Court in *Paxton v. Annunciation House, Inc.*, No. 24-0573, 2025 WL 1536224 (Tex. 2025), among other reasons, counsel's purported withdrawal of the Request to Examine does not, in fact, moot the El Paso case. *Id.* at *56 (finding that even though the attorney general ceased pressing for records, "the records dispute is not moot as the attorney general remains free to simply file more requests if there is no ruling that deems the relevant requests unconstitutional").

Also as alleged in the State of Texas's Original Petition, Powered By People maintains a registered agent in Bexar County; further, it maintains its principal place of business in El Paso County, Texas. Ex. A, Wysong Decl., ¶ 2.

The political rally that occurred in Fort Worth on August 9, 2025 was a political rally to generate public support and political action against Governor Abbott's efforts to unconstitutionally redistrict the State of Texas. Ex. A, Wysong Decl., ¶ 5. The political rally was an effort to assemble and associate for the purposes of likeminded political action and the Defendants did not sell any goods or services at the rally. *Id.* Powered by People did not sell any goods or services at the political rally. *Id.*

## SPECIFIC DENIAL

Defendants specifically deny that venue is proper in Tarrant County, Texas, and object to Plaintiff's choice of venue.

Defendants specifically deny that any, all, or a substantial part of acts giving rise to Plaintiff's claims occurred in Tarrant County, if they occurred at all.

Defendants specifically deny that any transactions occurred in Tarrant County that would give rise to the claims asserted.

## ARGUMENT AND AUTHORITIES

### A.    VENUE IS MANDATORY IN EL PASO COUNTY AND REQUIRES TRANSFER.

Venue is mandatory in El Paso County, Texas because the primary purpose of the Attorney General's lawsuit is to seek injunctive relief. Section 65.023 of the Texas Civil Practice and Remedies Code requires that a "writ of injunction against a party who is a resident of this state shall be tried in a district or county court in the county in which the party is domiciled." "The statute placing venue for injunction suits in the county of the defendant's domicile is mandatory."

*In re Continental Airlines, Inc.*, 988 S.W. 733, 736 (Tex. 1988). The application of a mandatory venue statute controls over permissive venue statutes. *See In re Texas Dept. of Transp.*, 218 S.W.3d 74, 76 (Tex. 2007) ("Section 15.016 provides that if an action is governed by a separate mandatory venue provision, then the action shall be brought in the county required by the separate venue provision."); *see also Hart*, 917 S.W.2d at 783 (Tex. 1996) (holding that where statutory venue provision said "may" and Civil Practice and Remedies Code provision said "shall," the mandatory "shall" provision prevailed.).

To determine if a lawsuit "constitutes a suit for permanent injunction for the purpose of determining proper venue, [the courts] only look to the express relief sought in the allegations and prayer of the plaintiff's petition. When those pleadings show that the issuance of a permanent injunction is the primary and principal relief sought in the lawsuit, venue is mandatory in the county of the defendant's domicile." *In re City of Dallas*, 977 S.W.2d 79, 803 (Tex. App.—Fort Worth 1998, orig. proceeding).

Here, it is undisputed that Defendants are both domiciled in El Paso County, which would make venue of any permanent injunctive relief suit against them mandatory in El Paso. The State of Texas's Original Petition is primarily a request for injunctive relief. The State of Texas asserts one cause of action – violation of the DTPA – and seeks primarily temporary and permanent injunctive relief in its Prayer for Relief. Indeed, the first four sub-paragraphs of the Prayer exclusively request injunctive relief, *see* Orig. Pet. at 12, and, at the TRO hearing, the State ignored the DTPA's otherwise mandatory seven day notice requirement by invoking its primary alleged concern that injunctive relief was needed to prevent irreparable harm.

The trial court should enter an order determining that venue is proper only in El Paso County, Texas. *See In re Texas Ass'n of School Boards, Inc.*, 169 S.W.3d 653, 656 (Tex. 2005)

("If a trial court erroneously denies enforcement of a mandatory venue provision, mandamus relief is available without the necessity of showing an inadequate appellate remedy.").

**B. THE STATE OF TEXAS CANNOT ESTABLISH A PRIMA FACIE CASE THAT VENUE IS MAINTAINABLE IN TARRANT COUNTY.**

Prior to 1995, the general-venue law permitted venue wherever any "part" of the cause of action accrued. *Chiriboga*, 96 S.W.3d at 681. The law's current language—requiring a "substantial part" of the cause of action to have accrued in the proper venue—was meant to curb forum-shopping by "narrow[ing] the number of counties in which venue could be maintained to those with a substantial connection to the lawsuit." *Id.* Indeed, the relevant legislative history specifically notes that the purpose of the "substantial part" language was to "eliminate the many loopholes and legal strategies that promote forum shopping—allowing someone to choose the most favorable county despite its tenuous connection to the case." House Research Organization, Bill Analysis, Tex. S.B. 32, 74th Leg., R.S. (1995) (cited in *Chiriboga*, 96 S.W.3d at 681 n.4). Accordingly, "Courts look to the nature of the dispute and whether the forum has a 'real relationship' to it when determining whether a particular event was a 'substantial part' of a claim." *Chiriboga*, 96 S.W.3d at 682.

Here, the State generally alleges that Defendants are engaged in a number of improper practices under the Penal Code, Election Code and DPTA. *See, e.g.*, Orig. Pet. at ¶¶ 35-36. As noted above, the Original Petition asserts simply that "a substantial part of the events or omissions giving rise to the State's claims occurred in Tarrant County," but provides no specific allegations to support that assertion, much less admissible evidence. *See id.* at ¶ 4. Indeed, that allegation is belied by the State's own description of events. By the State's own admission, the acts giving rise to these allegations have occurred "across the state and the nation," as Defendants have "organized

12

and held rallies" and "called and sent emails, texts, and marketing materials to Texas consumers seeking donations." Orig. Pet. at ¶ 14. The State provides (unverified) links to news articles and social media posts to support its claims, but none of them mention Tarrant County at all. Indeed, two of the videos cited by the State allegedly occurred outside of Texas altogether. Orig. Pet. at ¶ 18-19 (citing videos from Oklahoma City and Omaha, respectively).

While the State alleges that a rally was planned to be held in Fort Worth on August 9, 2025, it provides no specific allegations of unlawful acts planned for, much less executed in, Fort Worth, nor does it explain how—even pursuant to its own theory of the case—one rally could give rise to a "substantial" part of the State's claim. *See* Orig. Pet. at ¶ 32 ("on information and belief, Defendants are preparing to engage in the same unlawful and deceptive fundraising practices described above during the Fort Worth rally and intend to use the proceeds of any fundraising to support expenditures that are personal as a matter of law"); *see also Chiriboga*, 96 S.W.3d at 682 ("We are not convinced that the act of purchasing, renewing, or even requesting an addition to an auto policy over the telephone to an agent located in Milam County can be fairly characterized as an act that is 'a substantial part' of the coverage dispute in this case.").

The State may argue that bare allegations that "Defendants have done business in Tarrant County" and/or "[T]ransactions occurred in Tarrant County" are sufficient to establish venue under the DPTA. *See* Orig. Pet. at ¶ 4. But the State must establish that "all or substantial part" of the facts giving rise to its asserted claims occurred in Tarrant County and generic allegations that nationwide communications and donor solicitations occurred is not evidence that all or even a substantial part of the deceptive acts sued upon even touched Tarrant County. *See Kay v. N. Texas Rod & Custom*, 109 S.W.3d 924, 926 (Tex. App.—Dallas 2003) (upholding grant of motion to transfer venue when Plaintiff failed to provide evidence of alleged transaction).

13

Taking a closer look at the actual facts the State of Texas relies upon to conjure up its DTPA claim further proves that Tarrant County is an improper venue. First, the State of Texas refers to an August 5, 2025 news article stating that fundraising efforts would be undertaken to generally support the fight against redistricting maps. Besides being patently protected speech and political activity under the First Amendment, there are no allegations that this statement or asserted expression took place in or was directed at Tarrant County.[7] Nor, as a factual matter, has any of the State's complained-of alleged activity actually occurred in Tarrant County or anywhere else. Ex. A, Wysong Decl., ¶ 4.

In addition, the State references statements made by Beto O' Rourke at political rallies on August 6 and August 7 regarding the fight against redistricting. Notably, these rallies occurred outside the State of Texas altogether. *See* Orig. Pet. at ¶¶ 18-19, n.3 & 4 (citing video snippets of Oklahoma and Nebraska rallies). Self-evidently these statements, even assuming they are somehow actionable deceptive practices, were not made in or took place in Tarrant County.

Finally, the State of Texas relies on two innocuous text message responses from Mr. O' Rourke related to political donations and fundraising. *See* Orig. Pet. at 6 (screen shots). But these text responses are not evidence that any acts or a substantial portion of the acts giving rise to the State of Texas's DTPA claims occurred in Tarrant County at all; rather, the text messages truthfully request donors to pitch in to support Texas Democrats fight against redistricting and that "100% of your donation will go to supporting Texas Democrats in their fight against Trump's power grab." *Id.* Besides being accurate, protected constitutional speech, these statements and text

---

[7] Curiously, the State also cites, seemingly as factual support, a CNN video clip showing statements from various Texas lawmakers as well as analyses from various outside political analysts; the clip neither features nor discusses Defendants and its relevance is unclear. *See* Orig. Pet. at ¶ 16.

messages do not touch upon Tarrant County in any way. There is no evidence that the messages originated from or were directed to donors located in Tarrant County. There is no evidence that Powered By People's ActBlue page is operated in Tarrant County or that any Tarrant County resident received any goods or services in or through Tarrant County from the Defendants.[8]

The Texas Fifteenth Court of Appeals has recently addressed a similar issue in the context of a venue challenge based on the ability to access websites or the internet from the forum county. *See In re Sanofi-Aventis U.S., LLC*, 711 S.W.3d 732, 739-741 (Tex. App.—15th Dist. 2025). In *Sanofi-Aventis*, a *qui tam* action was brought against Sanofi in Harrison County arguing that the defendant offered free nursing services and remuneration to providers to induce prescriptions of Sanofi drugs. *Id.* at 738. Sanofi moved to transfer venue out of Harrison County because no unlawful acts occurred in Harrison County. The Plaintiff asserted that Sanofi did offer free services in Harrison County because Sanofi had representatives visit providers in Harrison County and that any provider could access Sanofi's website, which contained an application for some of the alleged improperly offered services. *See id.*

The Court of Appeals determined that the fact that representatives met with providers in Harrison County was insufficient evidence to establish venue because there were no facts setting forth the "details of what allegedly occurred at those meetings or how those meetings relate to the allegations in [Plaintiff's] pleadings." *Id.* at 739. Further, the Court held that mere access to a

---

[8] The State of Texas attaches the Declaration of Rozanne Lopez to its Original Petition, but the declaration sets forth no actual facts at all. Instead, it provides a blanket statement that "as an investigator in the Office of the Texas Attorney General" she has read the petition and that the factual allegations are true and correct. But it does not specify what "factual allegations" are referenced, what she might consider are actually factual allegations as opposed to legal conclusions, and does not explain how or why she would have any personal knowledge sufficient to provide a statement, sworn or otherwise, concerning the facts related to the Defendants' fundraising activities. This is plainly grossly insufficient to be competent evidence of anything, much less prima facie proof that Tarrant County is a proper venue.

website where such offers of service were made was not sufficient to support the basis for venue under the False Claims Act for illegal kickbacks because the claim requires a person to receive services in return for accessing the website. *See id.* ("Under this theory of venue, [Plaintiff] concedes, as it must, that venue is proper against Sanofi in any of the 254 counties in Texas so long as there is proof of internet access in the county and the ability to access the Sanofi website. We disagree.").

In construing the claim under the False Claims Act, the Court determined that sufficient facts to support venue required that "a person must not only be able to access Sanofi's website in a given county but must also expect to receive something from Sanofi as a result, even if it is simply a promise by Sanofi to do something in the future." *Id.* at 740. The Court went on to find that the plaintiff "provided no evidence that anyone in Harrison County received or that Sanofi promised to provide free nurse services or reimbursement-supporting services in return for accessing Sanofi's website." *Id.*

The State of Texas's venue selection is likewise fatally doomed by the nature of the claim and the complete lack of facts connecting the claim to Tarrant County. The State of Texas has no evidence that anyone in Tarrant County received anything in return for receiving a political donation solicitation, whether that solicitation came from or originated in Tarrant County or not. The State of Texas has no evidence that the Defendants promised any goods or services to anyone in Tarrant County or conducted any commercial transaction whatsoever in Tarrant County. Indeed, even assuming that any political donation was made in or from Tarrant County in response to Defendants' invitations, there is no actionable claim because no good or service was purchased or acquired in Tarrant County and the State of Texas has not alleged and cannot establish such. *See*

*id.* at 741 ("Consequently, the trial court abused its discretion in refusing to transfer [the] suit to Travis County.").

## C. DEFENDANTS HAVE ESTABLISHED THAT EL PASO COUNTY IS THE PROPER VENUE OF THIS PROCEEDING.

In a transfer motion, the party challenging venue must establish that venue is proper in the county to which transfer is sought. *See* TEX. R. Civ. P. 87(3). Here, Defendants request the Court to transfer venue to El Paso County, which is the proper county for adjudicating this dispute.

First, the general venue statute and the specific DTPA venue statute permit the filing of a suit in the county of an individual defendant's place of residence or a corporate defendant's principal place of business. *See* TEX. CIV. PRAC. & REM. CODE § 15.002(a); TEX. BUS. & COMM. CODE § 17.47(b). It is undisputed here that Defendant Beto O' Rourke resides in El Paso County and that Powered By People is a non-profit organization with its principal place of business in El Paso County, Texas. *See* Orig. Pet at 2; Ex. A, Wysong Decl., ¶ 2.

Second, it is also undisputed that the Consumer Protection Division of the Office of the Attorney General first issued and served Requests to Examine to members of the Board of Directors of Powered By People in El Paso County, Texas on August 6, 2025. Ex. A, Wysong Decl., ¶ 3. The issuance of the Consumer Protection Division's issuance of a subpoena to the Defendant through its board members triggered the mandatory venue provisions of Texas Rule of Civil Procedure 176, which require suit to be filed for protection in the county where the subpoena was served. *See* TEX. R. CIV. P. 176.6(e).

As a result, under either a plain reading of the general venue statute, the DTPA venue statute, or the mandatory venue rule related to the quashing of subpoenas, El Paso County is a proper and maintainable county for this suit. There is no basis to dispute these facts and Plaintiff

cannot credibly specifically deny the foregoing facts, thus Defendants have satisfied their burden of proof to transfer venue.

## **PRAYER**

Defendants request this Court promptly set this emergency motion to transfer venue for hearing and transfer venue to El Paso County, where a lawsuit addressing the State of Texas's premature efforts to secure documents from the Defendants is already pending. The State of Texas has not established any facts that support Tarrant County as a proper county for venue; therefore, this Court should enter a transfer order immediately. Defendants reserve all of their rights to challenge the propriety of this lawsuit, including requests for dismissal, sanctions, attorneys fees, and counterclaims, and expressly make any subsequent requests for the Court's action subject to and subordinate to this first-filed Emergency Motion to Transfer Venue.

/s/ Mimi Marziani
Mimi Marziani
Texas Bar No. 24091906
mmarziani@msgpllc.com
Joaquin Gonzalez
Texas Bar No. 24109935
jgonzalez@msgpllc.com
Rebecca (Beth) Stevens
bstevens@msgpllc.com
Texas Bar No. 24065381

MARZIANI, STEVENS & GONZALEZ PLLC
500 W. 2nd Street, Suite 1900
Austin, TX 78701
Tel: (210) 343-5604

-AND-

Sean J. McCaffity
State Bar No. 24013122
Email: smccaffity@textrial.com

George (Tex) Quesada
State Bar No. 16427750
Email: quesada@textrial.com

SOMMERMAN, McCAFFITY, QUESADA
& GEISLER, L.L.P.
3811 Turtle Creek Boulevard, Suite 1400
Dallas, Texas 75219-4461
214/720-0720 (Telephone)
214/720-0184 (Facsimile)

**ATTORNEYS FOR DEFENDANTS**

## CERTIFICATE OF CONFERENCE

On August 11, 2025 I attempted to confer by phone and email with counsel for Plaintiffs, but did not receive a response. I informed counsel that if we did not hear otherwise, we would mark the State as opposed.

*/s/ Joaquin Gonzalez*
Joaquin Gonzalez

19

## CERTIFICATE OF SERVICE

By my signature below, I hereby certify that a true and correct copy of the foregoing pleading was served as set forth below, on August 11, 2025.

**Via e-service:** Rob.Farquharson@oag.texas.gov

**Via e-service:** Johnathan.Stone@oag.texas.gov

Jonathan Stone, Chief
Rob Farquharson, Deputy Chief
Office of the Attorney General of Texas
Consumer Protection Division
300 W. 15th St.
Austin, Texas 78701
*Attorneys for the State of Texas*

/s/ Mimi Marziani
Mimi Marziani

20

Docusign Envelope ID: F016A65F-DDE5-4A31-BDF7-EB03E236C499

# Exhibit A

Docusign Envelope ID: F016A65F-DDE5-4A31-BDF7-EB03E236C499

**CAUSE NO. 348-367652-25**

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT |
| *Plaintiff,* | § | |
| | § | |
| V. | § | 348th JUDICIAL DISTRICT |
| | § | |
| ROBERT FRANCIS O'ROURKE | § | |
| and POWERED BY PEOPLE | § | |
| | § | |
| | § | |
| | § | |
| *Defendants.* | § | TARRANT COUNTY, TEXAS |

---

### DECLARATION OF DAVID WYSONG

My name is David Mills Wysong, my date of birth is May 9, 1972, and my address is 824 Twin Hills Dr., El Paso, Texas 79912, United States. I am of sound mind, and capable of making this declaration. I am a member of the Board of Directors of Powered by People and serve as an authorized representative of the organization. I have personal knowledge of the facts stated herein, and they are true and correct.

1. **Organizational Status**

    a. Powered by People is a Texas nonprofit corporation.

    b. The organization operates as a "political organization" within the meaning of 26 U.S.C. § 527(e)(1) for the purpose of directly or indirectly accepting contributions or making expenditures, or both, to influence elections.

    c. As a political organization, Powered by People files regular campaign finance reports with the Texas Ethics Commission and is registered in Texas as a general-purpose committee.

---

**Exhibit**

**A**

    d.   Powered by People sells no goods or services. Its business is purely associational and to promote political speech.

2. **Principal Place of Business**

    **a.**  Powered by People maintains its primary place of business in El Paso County, Texas.

    b.  Powered by People's only commercial office is located at 521 Texas El Paso, TX 79901.

    c.  Powered by People's mailing address is in Bexar County.

    **d.**  All members of Powered by People's Board of Directors reside in El Paso County.

    **e.**  No Powered by People's staff members reside in Tarrant county.

3. **Request to Examine by the State of Texas through Attorney General Ken Paxton**

    a.  I was served with the Request to Examine at my residence in El Paso, Texas at 8:15pm CT on Wednesday, August 6, 2025.

    b.  Attached as Attachment 1 is a true and correct copy of the Request to Examine.

    c.  I understand that a separate board member, Gwen Pulido, was served with the Request to Examine at her El Paso residence at 7:30 pm CT on Wednesday, August 6, 2025.

4. **Facts Regarding Transfers and Fundraising**

    **a.**  Between June 1, 2025 (the relevant date from the Attorney General's Request to Examine) and the date of this declaration, no transfers of funds, or provision of other benefits, have been made by Powered by People to any Texas Democratic lawmaker, including any lawmaker in Tarrant County.

**b.** All money received since June 1, 2025, by Powered by People were donations and no goods or services were provided to donors by Powered by People in exchange for any donation received.

5. **August 9, 2025 Fort Worth Political Rally**

a. The August 9, 2025 Powered by People political event referenced in the State's Petition was first announced publicly on July 20, 2025.

b. The political event that occurred in Fort Worth on August 9, 2025 was a political rally to generate public support and political action against Governor Abbott's efforts to unconstitutionally redistrict the State of Texas.

c. The political rally was an effort to assemble and associate for the purposes of likeminded political action.

d. Powered by People did not sell any goods or services at the political rally.

6. Powered by People did not make any offers to fundraise or help pay for legislative fines, hotel, and travel expenses in exchange for any political action or restraint.

7. Powered by People made no statements, representations or offers to public officials promising any benefit, pecuniary gain, or pecuniary advantage.

I declare under penalty of perjury that the statements in the foregoing are true and correct.

Executed in __El Paso_____ County, State of Texas, on the 11th day of August, 2025.

David Mills Wysong

Docusign Envelope ID: F016A65F-DDE5-4A31-BDF7-EB03E236C499

# Attachment 1

Docusign Envelope ID: F016A65F-DDE5-4A31-BDF7-EB03E236C499





DELIVERED THIS ___ DAY OF ___

BY ___

PROFESSIONAL CIVIL PROCESS



## OFFICE OF THE ATTORNEY GENERAL
## CONSUMER PROTECTION DIVISION

### REQUEST TO EXAMINE

| | |
|---|---|
| To: **Powered by People**<br>13409 NW Military Hwy.<br>Suite 300<br>Shavano Park, Texas 78231 | *Return Date: August 8, 2025* |
| c/o Registered Agent:<br>Christopher Koob<br>13409 NW Military Hwy.<br>Suite 300<br>Shavano Park, Texas 78231 | *Via Personal Service* |
| c/o Director<br>Gwen Pulido<br>3127 Wheeling Ave.<br>El Paso, Texas 79930 | *Via Personal Service* |
| c/o Director<br>Beto O'Rourke<br>1100 Los Angeles Dr.<br>El Paso, Texas 79902 | *Via Personal Service* |
| c/o Director<br>David Wysong<br>824 Twin Hills Dr.<br>El Paso, Texas 79912 | *Via Personal Service* |

Re:    The Office of the Attorney General's Investigation of Powered by People

The Office of the Attorney General, as the representative of the public's interest, has authority to examine any record of a filing entity or foreign filing entity within the meaning of the Texas Business Organizations Code. Tex. Bus. Org. Code § 12.151. Such examination of records may be

Docusign Envelope ID: F016A65F-DDE5-4A31-BDF7-EB03E236C499

undertaken in accordance with an investigation under Texas Business Organizations Code Section 12.153 to determine whether a Texas-registered entity's conduct violates its governing documents or any laws of this state.

Powered by People is a filing entity within the meaning of the Texas Business Organizations Code. Pursuant to this Office's specific authority under Texas law, including Texas Business Organizations Code Section 12.151, *et seq.*, the Office of the Attorney General is issuing this Request to Examine (RTE) instructing that Powered by People permit the Office of the Attorney General to examine and make copies of, or otherwise produce, the records set forth in Attachment "A."

You are to make available the records described in Attachment "A" to the undersigned Assistant Attorney General or other authorized agent(s). The records may be sent electronically or by certified mail to the Office of the Attorney General, 300 W. 15th. Street, 9th Floor, Austin, TX 78701, and are due by **5 p.m. (CDT) on August 8, 2025**. Please contact one of the persons listed below upon receipt to discuss the logistics of producing physical copies of the requested documents to the Office of the Attorney General. If providing records electronically, please provide them to Rozanne Lopez at Rozanne.lopez@oag.texas.gov.

## NOTICE OF RIGHTS AND PENALTIES

**TAKE NOTICE THAT** you are encouraged to meet and confer with the Office of the Attorney General if you contend that any of the information sought in Attachment A is constitutionally protected or otherwise legally exempt from production to the Office of the Attorney General.

If you cannot reach agreement with the Office of the Attorney General on the scope of documents sought, you may attempt to obtain pre-compliance judicial review of the RTE before 5 p.m. (CDT) on August 8, 2025. *See Paxton v. Annunciation House, Inc.*, No. 24-0573, 2025 WL 1536224, at *24 (Tex. May 30, 2025).

**TAKE FURTHER NOTICE THAT** penalties for a legally unexcused failure or refusal to timely produce records for the Attorney General's examination include the Office of the Attorney General initiating a legal action for the entity's "registration or certificate of formation" to "be revoked or terminated." Tex. Bus. Org. Code § 12.155. If the Office of the Attorney General deems such penalty warranted, proceedings to revoke or terminate an entity's registration or certificate of formation are initiated through a petition for leave to file an information in the nature of *quo warranto*. Tex. Civ. Prac. & Rem. Code § 66.002. In such a proceeding, the registered entity is "entitled to" the same rights "as in cases of trial in civil cases." Tex. R. Civ. P. 781.

Docusign Envelope ID: F016A65F-DDE5-4A31-BDF7-EB03E236C499

ISSUED THIS 6th day of August 2025.

*/s/ Rob Farquharson*
Rob Farquharson
Deputy Chief
Consumer Protection Division
Office of the Attorney General
Rob.Farquharson@oag.texas.gov

Other Authorized Agents:
Rozanne Lopez, Investigator
Consumer Protection Division
Office of the Attorney General
rozanne.lopez@oag.texas.gov (email)

Johnathan Stone
Chief
Consumer Protection Division
Office of the Texas Attorney General
Johnathan.Stone@oag.texas.gov

Docusign Envelope ID: F016A65F-DDE5-4A31-BDF7-EB03E236C499

## ATTACHMENT "A"

### Instructions

1.  **Read These Instructions/Definitions Carefully.** Your production must comply with these instructions and definitions.

2.  **Duty to Preserve Documents.** All documents and/or other data which relate to the subject matter or requests of this RTE must be preserved. *Any ongoing, scheduled, or other process of document or data destruction involving such documents or data must cease even if it is your normal or routine course of business for you to delete or destroy such documents or data and even if you believe such documents or data are protected from discovery by privilege or otherwise.* Failure to preserve such documents or data may result in legal action and may be regarded as spoliation of evidence under applicable law.

3.  **Relevant Dates.** Unless otherwise noted, the requests in this RTE require production of documents from **June 1, 2025**, to the date of the production of documents in response to this RTE, herein called "the relevant time period."

4.  **Custody and Control.** In responding to this RTE, you are required to produce not only all requested documents in your physical possession, but also all requested documents within your custody and control. A document is in your custody and control if it is in the possession of another person and you have a right to possess that document that is equal or superior to that other person's right of possession. On the rare occasion that you cannot obtain the document, you must provide an explanation as to why you cannot obtain the document which includes the following information:

    a.  the name of each author, sender, creator, and initiator of such document;

    b.  the name of each recipient, addressee, or party for whom such document was intended;

    c.  the date the document was created;

    d.  the date(s) the document was in use;

    e.  a detailed description of the content of the document;

4

f. the reason it is no longer in your possession, custody, or control; and

g. the document's present whereabouts.

If the document is no longer in existence, in addition to providing the information indicated above, state on whose instructions the document was destroyed or otherwise disposed of, and the date and manner of the destruction or disposal.

5. **Non-identical Copies to be Produced.** Any copy of a document that differs in any manner, including the presence of handwritten notations, different senders or recipients, etc. must be produced.

6. **No Redaction**. All non-privileged materials or documents produced in response to this RTE shall be produced in complete unabridged, unedited, and unredacted form, even if portions may contain information not explicitly requested, or might include interim or final editions of a document.

7. **Document Organization**. Each document and other tangible thing produced shall be clearly designated as to which request, and each sub-part of a request, that it satisfies. The documents produced shall be identified and segregated to correspond with the number and subsection of the request.

8. **Production of Documents.** You may submit photocopies (with color photocopies where necessary to interpret the document) in lieu of original hard-copy documents if the photocopies provided are true, correct, and complete copies of the original documents. If the requested information is electronically stored information, it shall be produced in electronic form. Electronically stored information shall be produced with the accompanying metadata, codes, and programs necessary for translating it into usable form, or the information shall be produced in a finished usable form. For any questions related to the production of documents you may consult with the Office of the Attorney General representatives above.

9. **Privilege Log.** For each Document and any other requested information that you assert is privileged or for any other reason excludable from production, please provide a privilege log, wherein you:

a. Identify that Document and other requested information;

Docusign Envelope ID: F016A65F-DDE5-4A31-BDF7-EB03E236C499

b.  State each specific ground for the claim of privilege or other ground for exclusion and the facts supporting each claim of privilege or other ground for exclusion;

c.  State the date of the Document or other requested information; the name, job title, and address (including city, state and ZIP Code) of the person who prepared it; the name, address (including city, state, and ZIP Code), and job title of the person to whom it was addressed or circulated or who saw it; and the name, job title, and address (including city, state, and ZIP Code) of the person now in possession of it; and

d.  Describe the type and subject matter of the Document or other requested information.

## Definitions

1. **"You," "your," or "Powered by People"** means Powered by People, its past and present directors, officers, employees, agents and representatives, parents and predecessors, divisions, subsidiaries, affiliates, political action committees, partnerships and joint ventures, and includes all persons and entities acting or purporting to act under the guidance or on behalf of any of the above. The terms "subsidiary," "affiliate," and "joint venture" refer to any firm in which there is total or partial ownership (25 percent or more) or control between the company and any other person or entity.

2. **"Benefit"** is used in a manner consistent with § 36.01 of the Texas Penal Code and means anything reasonably regarded as pecuniary gain or pecuniary advantage, including benefit to any other person in whose welfare the beneficiary has a direct and substantial interest.

3. The words **"and"** and **"or"** shall be construed either conjunctively or disjunctively as required by the context to bring within the scope of the request, any document(s) that might be deemed outside its scope by another construction.

4. **"Communication"** means any conversation (internal or external), discussion, letter, email, correspondence, memorandum, meeting, note, or other transmittal of information or message, whether transmitted in writing, orally, electronically, or by any other means.

5. **"Concerning,"** or **"Relating to,"** or **"Related to"** means related to, referring to, pertaining to, concerning, describing, regarding, evidencing, or constituting.

6. **"Document"** shall be construed in the broadest sense possible and encompasses any electronically stored information, writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations—stored in any medium from which information can be obtained either directly or, if necessary, after translation by Powered by People into a reasonably usable form. Although it does not limit the scope of this RTE, the definition and interpretation of "document" under the Texas Rules of Civil Procedure provides a useful reference point.

7. **"Including"** means including, but not limited to.

8. **"Person"** means any natural person or any legal entity, including, without limitation, any corporation, company, limited liability company or corporation, partnership, limited partnership, association, or firm.

## Requests: Documents for Production

In accordance with the requirements set forth in the "Definitions" and "Instructions" sections of this RTE, You are specifically required produce the following no later than **5 p.m. (CDT)** on **August 8, 2025:**

**Request No. 1:**

Produce Communications between You and any other person or group relating to planned or actual travel arrangements, accommodations, or meals outside of Texas for any of the following persons:

Gina Hinojosa
Ron Reynolds
James Talarico
Ann Johnson
Gene Wu
John Bucy
Trey Martinez Fischer
Josey Garcia
Diego Bernal
Toni Rose
Jon Rosenthal
Jalonda Jones
Venton Jones
Rafael Anchia
Sheryl Cole
Ramon Romero
Nicole Collier
Harold Dutton
Chris Turner
Linda Garcia
Charlene Ward Johnson
Jessica González
Ana-María Rodríguez Ramos
Lauren Ashley Simmons
Donna Howard
Lulu Flores
Vikki Goodwin
Cassandra Garcia Hernandez
Mihaela Plesa
Suleman Lalani
Ray López

8

Christina Morales
Barbara Gervin-Hawkins
John Bryant
Rhetta Bowers
Terry Meza
Aicha Davis
Elizabeth Campos
Alma Allen
Ana Hernandez
Salman Bhojani
Erin Gamez
Christian Manuel
Vincent Perez
Mary Gonzalez
Claudia Ordaz
Penny Morales-Shaw
Senfronia Thompson
Hubert Vo
Yvonne Davis
Erin Zwiener
Armando Walle
Bobby Guerra
Mary Ann Perez

**Request No. 2:**

Produce Documents relating to planned or actual travel arrangements, accommodations, or meals for any of the persons identified in Request No. 1.

**Request No. 3:**

Produce Documents relating to, or discussing, quorum during Texas's current special legislative session.

**Request No. 4:**

Produce Communications relating to, or discussing, quorum during Texas's current special legislative session.

**Request No. 5:**

Produce Documents relating to the provision of any Benefit or compensation to the persons identified in Request No. 1.

## Request No. 6:

Produce Communications regarding the provision of any Benefit or compensation relating to the persons identified in Request No. 1.

## Request No. 7:

Produce Communications discussing, or relating to, the solicitation of funds to pay for planned or actual travel arrangements, accommodations, or meals for any of the persons listed in Request No. 1.

## Request No. 8:

Produce Documents relating to the solicitation of funds to pay for planned or actual travel arrangements, accommodations, or meals for any of the persons listed in Request No. 1.

## Request No. 9:

Produce Documents showing each expenditure that You have made relating to the persons identified in Request No. 1.

## Request No. 10:

Produce Documents sufficient to show all agreements, contracts, or receipts for services between You and CommuteAir or United Express.

## Request No. 11:

Produce Documents sufficient to show receipts or confirmations of every political contribution that You made to any of the persons identified in Request No. 1.

# Exhibit B

Docusign Envelope ID: B2C7CE1F-7A91-4F78-9479-B7B6D5A57B7E

**CAUSE NO. 348-367652-25**

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT |
| *Plaintiff,* | § | |
| | § | |
| V. | § | 348th JUDICIAL DISTRICT |
| | § | |
| ROBERT FRANCIS O'ROURKE | § | |
| and POWERED BY PEOPLE | § | |
| | § | |
| | § | |
| | § | |
| *Defendants.* | § | TARRANT COUNTY, TEXAS |

---

### DECLARATION OF REBECCA (BETH) STEVENS

My name is Rebecca (Beth) Stevens, my date of birth is May 9, 1983 and my business address is 500 W. 2nd Street, Suite 1900, Austin, TX 78701, United States. I am of sound mind, and capable of making this declaration.

I am a counsel for Defendants in the instant case and counsel for Powered by People in the El Paso litigation referenced in Defendants' Motion to Transfer Venue. I have personal knowledge of the facts stated herein, and they are true and correct.

1. Attached hereto as Attachment 1 is a true and correct copy of the email exchange with counsel for the State of Texas on August 8, 2025.

2. Attached hereto as Attachment 2 is a true and correct copy of an email exchange with counsel for the State of Texas on August 8 and August 9, 2025.

3. Attached hereto as Attachment 3 is a true and correct copy of Robert Farquharson's State Bar of Texas page which indicates his address is 300 W. 15th Street, 9th Floor, Austin, TX 78701.

4. Attached hereto as Attachment 4 is a true and correct copy of the file-stamped Verified Original Petition for Declaratory Judgment, Motion for Protective Order, Application for Temporary Injunction, and Other Injunctive Relief filed in Cause No. 2025DCV3641

Docusign Envelope ID: B2C7CE1F-7A91-4F78-9479-B7B6D5A57B7E

*Powered by People v. Ken Paxton, in His Official Capacity as Attorney General,* in El Paso County District Court on August 8, 2025.

I declare under penalty of perjury that the statements in the foregoing are true and correct.

Executed in ___Travis___ County, State of Texas, on the 11th day of August, 2025.

Signed by:

Beth Stevens

F76DC3D52A0F43E...

Rebecca (Beth) Stevens

# Attachment 1



**Beth Stevens <bstevens@msgpllc.com>**

## RE: Powered by People
1 message

**Johnathan Stone** <Johnathan.Stone@oag.texas.gov>                                                         Fri, Aug 8, 2025 at 2:45 PM
To: Beth Stevens <bstevens@msgpllc.com>, "David Mitrani (Sandler Reiff)" <mitrani@sandlerreiff.com>
Cc: Rob Farquharson <Rob.Farquharson@oag.texas.gov>, Mimi Marziani <mmarziani@msgpllc.com>, Joaquin Gonzalez <jgonzalez@msgpllc.com>, Christina Bustos
<bustos@sandlerreiff.com>, Pauline Sisson <Pauline.Sisson@oag.texas.gov>, Rozanne Lopez <Rozanne.Lopez@oag.texas.gov>, Jacob Przada
<Jacob.Przada@oag.texas.gov>

Thank you for your email. We are filing suit today against Robert Francis O'Rourke and Powered by People in Tarrant County, Texas. We are seeking an emergency ex parte TRO.
We are reaching out to see if you wish to be heard. Please let us know as soon as possible.

Kind regards,

**Johnathan Stone**
Chief
Consumer Protection Division
Office of the Attorney General of Texas

Telephone: (512) 936-2613
Johnathan.Stone@oag.texas.gov

This is a confidential communication and intended for the addressee(s) only. Any unauthorized interception or disclosure of this transmission is prohibited pursuant to Tex.
Gov't Code Ch. 552. If you are not the intended recipient of this message, please notify the sender and destroy this and all copies of this communication. Thank you.

**From:** Beth Stevens <bstevens@msgpllc.com>
**Sent:** Friday, August 8, 2025 11:21 AM
**To:** David Mitrani (Sandler Reiff) <mitrani@sandlerreiff.com>
**Cc:** Rob Farquharson <Rob.Farquharson@oag.texas.gov>; Johnathan Stone <Johnathan.Stone@oag.texas.gov>;
rozanne.lopez@oag.texas.gov; Mimi Marziani <mmarziani@msgpllc.com>; Joaquin Gonzalez <jgonzalez@msgpllc.com>; Christina Bustos
<bustos@sandlerreiff.com>; Pauline Sisson <Pauline.Sisson@oag.texas.gov>
**Subject:** Re: Powered by People

Mr. Farquharson,

We understand that you are unable to agree to a 2 week extension.Without waiving any potential objections to the RTE, we request an extension of the RTE deadline to August 16. Texas Rule of Civil Procedure 205.2, concerning subpoenas on nonparties, provides "A notice to produce documents or tangible things...must be served at least 10 days before the subpoena compelling production is served." Of course a party to civil litigation is entitled to even more time (30 days) to produce documents. At this juncture, we simply ask for the same amount of time that a nonparty in receipt of notice to produce documents receives. Will you all allow an extension of the deadline to respond to the RTE to August 16, 10 days from when the notice was received?

Thank you,

Beth

–

**Beth Stevens**

she/her/hers

Founding Partner, MS&G PLLC

bstevens@msgpllc.com

(361)437-9081



Marziani, Stevens
& Gonzalez PLLC

___

On Fri, Aug 8, 2025 at 10:56 AM David Mitrani (Sandler Reiff) <mitrani@sandlerreiff.com> wrote:

All – I am adding Powered by People's in-state counsel to the thread as well.

Thanks,

Dave

--

Dave Mitrani

Partner

Sandler Reiff Lamb Rosenstein & Birkenstock, P.C.

sandlerreiff.com

**From:** Rob Farquharson <Rob.Farquharson@oag.texas.gov>
**Date:** Thursday, August 7, 2025 at 10:27
**To:** David Mitrani (Sandler Reiff) <mitrani@sandlerreiff.com>, Johnathan Stone <Johnathan.Stone@oag.texas.gov>, rozanne.lopez@oag.texas.gov <rozanne.lopez@oag.texas.gov>
**Cc:** Christina Bustos <bustos@sandlerreiff.com>, Pauline Sisson <Pauline.Sisson@oag.texas.gov>
**Subject:** RE: Powered by People

Mr. Mitrani:

Thank you for your email and for confirming receipt of the RTE.

As I am sure you are aware, this is a time-sensitive investigation, and to that end, we cannot agree to a categorical two-week extension.

If there are specific requests that you would like to discuss, or for which you believe compliance is impractical in the time provided, we are happy to speak and address those requests/ materials on a case-by-case basis.

Thanks,

Rob



**From:** David Mitrani (Sandler Reiff) <mitrani@sandlerreiff.com>
**Sent:** Thursday, August 7, 2025 9:13 AM
**To:** Rob Farquharson <Rob.Farquharson@oag.texas.gov>; Johnathan Stone <Johnathan.Stone@oag.texas.gov>;
**Cc:** Christina Bustos <bustos@sandlerreiff.com>
rozanne.lopez@oag.texas.gov
**Subject:** Re: Powered by People

Messers Farquharson, Stone; Ms. Lopez:

My name is David Mitrani from the law firm Sandler Reiff in Washington, DC, our firm is counsel for Powered by People. We are in receipt of the Request to Examine dated August 6, 2025, which was received late last night, with an August 8 deadline.

The organization is in the process of securing Texas counsel for this particular matter. Given the very short timeline for response proposed, and that the organization is seeking Texas counsel, we would ask for a two-week extension to review and respond to the RTE, to Friday August 22, 2025.

Is such an extension amenable?

--

Dave Mitrani

Partner

Sandler Reiff Lamb Rosenstein & Birkenstock, P.C.

Rob Farquharson

Assistant Attorney General

Consumer Protection Division

Office of the Attorney General of Texas

sandlerreiff.com

--

**Beth Stevens**

she/her/hers

Founding Partner, MS&G PLLC

bstevens@msgpllc.com

(361)437-9081



Marziani, Stevens
& Gonzalez PLLC

**CONFIDENTIAL: ATTORNEY-CLIENT PRIVILEGED & ATTORNEY WORK PRODUCT**

Emails and attachments received from us may be protected by the attorney-client privilege, as attorney work-product or based on other privileges or provisions of law. If you are not an intended recipient of this email, do not read, copy, use, forward or disclose the email or any of its attachments to others. Instead, immediately notify the sender by replying to this email and then delete it from your system. We strictly prohibit any unauthorized disclosure, copying, distribution or use of emails or attachments sent by us.

 **20250808 State's Petition, Decl & Attch A.pdf**
1153K

# Attachment 2



**RE: 348-367652-25 STATE OF TEXAS VS ROBERT FRANCIS OROURKE, ET AL**

Beth Stevens <bstevens@msgpllc.com>

1 message

**Rob Farquharson** <Rob.Farquharson@oag.texas.gov>
Sat, Aug 9, 2025 at 1:15 PM
To: Beth Stevens <bstevens@msgpllc.com>, Johnathan Stone <Johnathan.Stone@oag.texas.gov>
Cc: Jacob Przada <Jacob.Przada@oag.texas.gov>, "NDBentley@tarrantcountytx.gov" <ndbentley@tarrantcountytx.gov>, Mimi Marziani <mmarziani@msgpllc.com>, Joaquin Gonzalez <jgonzalez@msgpllc.com>, Emily Samuels <Emily.Samuels@oag.texas.gov>, Pauline Sisson <Pauline.Sisson@oag.texas.gov>

Beth:

We will take a look at this issue on Monday and get back with you.

In the meantime, effective immediately, we are withdrawing our RTEs issued to Robert Francis O'Rourke and PxP. Can you confirm that you will dismiss the second-filed suit in El Paso?

If not, we will move to dismiss as moot, or, in the alternative, move to consolidate/abate the El Paso suit as soon as your Petition is accepted. Please confirm ASAP your opposition or agreement to the consolidation/abatement requests if you do not intend to dismiss the El Paso suit.

Thanks,

Rob



Rob Farquharson
Deputy Chief
Consumer Protection Division
Office of the Attorney General of Texas

**From:** Beth Stevens <bstevens@msgpllc.com>
**Sent:** Friday, August 8, 2025 8:46 PM

**To:** Johnathan Stone <Johnathan.Stone@oag.texas.gov>
**Cc:** Jacob Przada <Jacob.Przada@oag.texas.gov>; NDBentley@tarrantcountytx.gov>; Mimi Marziani <mmarziani@msgpllc.com>; Joaquin Gonzalez <jgonzalez@msgpllc.com>; Rob Farquharson <Rob.Farquharson@oag.texas.gov>; Emily Samuels <Emily.Samuels@oag.texas.gov>; Pauline Sisson <Pauline.Sisson@oag.texas.gov>
**Subject:** Re: 348-367652-25 STATE OF TEXAS VS ROBERT FRANCIS OROURKE, ET AL

Johnathan,

The petition's prayer for relief requests "Injunctive relief prohibiting Defendant PBP from removing any property or funds from the State of Texas during the pendency of this lawsuit." The TRO says "Therefore, by this Order, the Court issues this Temporary Restraining Order, immediately restraining Defendants from the following: iv. Removing any property or funds from the State of Texas during the pendency of this lawsuit." The order is broader than the petition as it includes both defendants in the last provision.

During the hearing, counsel for the State confirmed to the Court that the language in the proposed order (which Defendants' counsel did not have a copy of at the time) tracked the language in the petition (which we had a copy of). Of course it is elementary that temporary relief cannot be greater than the final relief sought in the petition, so we assume and are operating with the understanding that this was a clerical error and that you all will be willing to request an order nunc pro tunc from the court immediately.

Please advise.

Beth

On Fri, Aug 8, 2025 at 5:43 PM Johnathan Stone <Johnathan.Stone@oag.texas.gov> wrote:

Enclosed is the TRO signed by the Court.

Kind regards,

**Johnathan Stone**
Chief

Consumer Protection Division
Office of the Attorney General of Texas

Telephone: (512) 936-2613
Johnathan.Stone@oag.texas.gov

This is a confidential communication and intended for the addressee(s) only. Any unauthorized interception or disclosure of this transmission is prohibited pursuant to Tex. Gov't Code Ch. 552. If you are not the intended recipient of this message, please notify the sender and destroy this and all copies of this communication. Thank you.

**From:** Jacob Przada <Jacob.Przada@oag.texas.gov>
**Sent:** Friday, August 8, 2025 5:19 PM
**To:** NDBentley@tarrantcountytx.gov; Beth Stevens <bstevens@msgpllc.com>; Mimi Marziani <mmarziani@msgpllc.com>; Joaquin Gonzalez <jgonzalez@msgpllc.com>
**Cc:** Johnathan Stone <Johnathan.Stone@oag.texas.gov>; Rob Farquharson <Rob.Farquharson@oag.texas.gov>; Emily Samuels <Emily.Samuels@oag.texas.gov>; Pauline Sisson <Pauline.Sisson@oag.texas.gov>
**Subject:** 348-367652-25 STATE OF TEXAS VS ROBERT FRANCIS OROURKE, ET AL

Good evening,

Please see the attached Proposed Temporary Restraining Order.

Best,



Jacob E. Przada
Assistant Attorney General
Consumer Protection Division
Office of the Attorney General of Texas

--

**Beth Stevens**

she/her/hers

Founding Partner, MS&G PLLC

bstevens@msgpllc.com

(361)437-9081

**CONFIDENTIAL: ATTORNEY-CLIENT PRIVILEGED & ATTORNEY WORK PRODUCT**

Emails and attachments received from us may be protected by the attorney-client privilege, as attorney work-product or based on other privileges or provisions of law. If you are not an intended recipient of this email, do not read, copy, use, forward or disclose the email or any of its attachments to others. Instead, immediately notify the sender by replying to this email and then delete it from your system. We strictly prohibit any unauthorized disclosure, copying, distribution or use of emails or attachments sent by us.

# Attachment 3



# STATE BAR of TEXAS

## ROBERT E. FARQUHARSON
**Eligible to Practice in Texas**

### OFFICE OF THE ATTORNEY GENERAL

**Bar Card Number:** 24100550
**TX License Date:** 05/25/2017

**Primary Practice Location:** Austin , Texas

300 W. 15th Street
9th Floor
Austin, TX 78701

### CONTACT INFORMATION

**Tel: --** 📞



**Practice Areas:** None Reported By Attorney

**Statutory Profile Last Certified On:** 12/22/2023

### PRACTICE INFORMATION

**Firm:** Office of the Attorney General

**Firm Size:** Over 200

**Occupation:** Government Lawyer

**Practice Areas: _None Reported By Attorney_**

### COURTS OF ADMITTANCE

**Federal:**
Fifth Circuit Court of Appeals
Arkansas Western District Court

**Services Provided:**

Deaf/Hard of Hearing Translation: Not Specified

ADA-accessible client service: Not Specified

Language translation: Not Specified

**Fee Options Provided:** ❓

None Reported By Attorney

**Please note:** *Not all payment options are available for all cases, and any payment arrangement must be agreed upon by the attorney and his/her client. The State Bar of Texas is not responsible for payment arrangements between an attorney and his/her client.*

**Foreign Language Assistance:**

None Reported By Attorney

**LAW SCHOOL**

**School**
University of Arizona

**Degree earned**
Doctor of Jurisprudence/Juris Doctor (J.D.)

**Graduation Date**    05/2017

**PUBLIC DISCIPLINARY HISTORY**

**State Bar of Texas**

No Public Disciplinary History

**Other States**

None Reported By Attorney

Texas Eastern District Court

Texas Northern District Court

Texas Western District Court

Texas Southern District Court

**Other Courts:**

None Reported By Attorney

**Other States Licensed:**

None Reported By Attorney

**Please note:** *This information is self-reported by Texas attorneys. Current license or admittance status can only be certified by the appropriate court or licensing entity.*

Sanctions that indicate a judgment is on appeal are still in effect but are not final and subject to change. To request a copy of a disciplinary judgment that is not available online or for more information about a specific disciplinary sanction listed above, please contact the Office of the chief Disciplinary Counsel at (877) 953-5535.

State Bar of Texas | Find A Lawyer | Robert E. Farquharson

The Texas Attorney Profile provides basic information about Attorneys licensed to practice in Texas. Attorney profile information is provided as a public service by the State Bar of Texas as outlined in Section 81.115 of the Texas Government Code. The information contained herein is provided "as is" with no warranty of any kind, express or implied. Neither the State Bar of Texas, nor its Board of Directors, nor any employee thereof may be held responsible for the accuracy of the data. Much of the information has been provided by the attorney and is required to be reviewed and updated by the attorney annually. The information noted with an asterisk (*) is provided by the State Bar of Texas. Access to this site is authorized for public use only. Any unauthorized use of this system is subject to both civil and criminal penalties. This does not constitute a certified lawyer referral service.

# Attachment 4

CAUSE NO. _____

| | | |
|---|---|---|
| **POWERED BY PEOPLE,** | § | **IN THE DISTRICT COURT** |
| *Plaintiff,* | § | |
| | § | |
| **V.** | § | **\_\_\_\_ JUDICIAL DISTRICT** |
| | § | |
| **KEN PAXTON,** | § | |
| **IN HIS OFFICIAL CAPACITY AS** | § | |
| **TEXAS ATTORNEY GENERAL** | § | |
| *Defendants.* | § | **EL PASO COUNTY, TEXAS** |

## VERIFIED ORIGINAL PETITION FOR DECLARATORY JUDGMENT, MOTION FOR PROTECTIVE ORDER, APPLICATION FOR TEMPORARY INJUNCTION, AND OTHER INJUNCTIVE RELIEF

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiff, Powered by People, a volunteer-driven Texas nonprofit composed of thousands of everyday Texans, files this verified original petition seeking a temporary restraining order and a protective order against Defendant, Texas Attorney General Ken Paxton, in his official capacity. As explained below, Defendant seeks reams of sensitive and burdensome information from Plaintiff — including privileged communications, detailed financial information and other materials — in less than 48 hours, and has refused multiple requests for a reasonable extension. The State provides no valid reason to support this urgent, invasive, expensive inquiry. On the contrary, Defendant Paxton publicly admitted that while he does not have "details" to support his allegations, he wants to use this "investigation" to "find out if they've done anything inappropriate," pointing explicitly to Plaintiff's recent political speech, organizing and advocacy.[1] In other words, the State is bluntly using the vast power of the Attorney General's office to

---

[1] James Morley III, *Texas AG Paxton to Newsmax: O'Rourke's PAC to Be Investigated*, NEWSMAX (Aug. 6, 2025, 5:40 PM EDT), https://www.newsmax.com/newsmax-tv/ken-paxton-texas-redistricting/2025/08/06/id/1221553/.

1

effectuate a fishing expedition, constitutional rights be damned. Even worse, Defendant Paxton —

who is running for and actively fundraising for his 2026 run for U.S. Senate — has publicly

identified former Congressman Beto O'Rourke, the prominent founder of Powered by People, as

a potential 2026 political opponent. The true motivation behind Defendant's action thus appears

to be an unlawful desire to retaliate against Mr. O'Rourke, and to use the power of the State of

Texas to try to intimidate Mr. O'Rourke from challenging Defendant in a free and fair election.

Plaintiffs respectfully show the Court as follows, in support of the requested relief:

## I. PARTIES

1. Plaintiff, Powered by People, is a Texas nonprofit corporation. It operates as a

political organization pursuant to 26 U.S.C. § 527(e)(1) for the purpose of "directly or indirectly

accepting contributions or making expenditures, or both" to influence elections. As a political

organization, Powered by People files regular campaign finance reports with the Texas Ethics

Commission, and is registered within Texas as a general-purpose committee.

2. Defendant is Ken Paxton, in his official capacity as Texas Attorney General. He

may be served at the Office of the Attorney General, 300 W. 15th Street, Austin, Texas 78701.

## II. DISCOVERY-CONTROL PLAN

3. Plaintiff intends to conduct discovery under Level 2 of Texas Rule of Civil

Procedure 190.3 and affirmatively pleads that this suit is not governed by the expedited-actions

process in Texas Rule of Civil Procedure 169 because Plaintiff seeks injunctive relief.

## III. RULE 47 STATEMENT

4. Pursuant to Texas Rule of Civil Procedure No. 47, Plaintiff is not seeking monetary relief,

only non-monetary relief in the form of injunctive and declaratory relief.

## IV. JURISDICTION & VENUE

5.      This Court has statutory jurisdiction in that a substantial part of the events giving rise to this claim occurred in El Paso County. Venue is proper because the challenged Request to Examine was served in El Paso County. *See* Tex. R. Civ. Pro. 176.6(e) ("[a] person commanded to…produce…designated documents and things…may move for a protective order…either in the court in which the action is pending or in a district court in the county where the subpoena was served."); *see also Paxton v. Annunciation House*, Inc., No. 24-0573, 2025 WL 1536224, *24 (Tex. 2025) (determining that Rule 176.6(e) applies to the Attorney General's Requests to Examine).

## V. FACTS

6.      In 2019, Mr. O'Rourke founded Powered by People, a voter registration and mobilization group that works to expand access to democracy through voter registration and direct voter engagement. Composed of thousands of volunteers in every region of Texas, and with seven full-time employees, Powered by People has spearheaded large voter mobilization efforts, registering hundreds of thousands of Texans to vote. In addition, at different times, Powered by People has taken on community-centered projects such as raising money for persons who suffered home damage as a result of Texas's electric grid failure, coordinating volunteers at community food banks during the height of the COVID pandemic, going door-to-door to educate elderly members of the public about vaccines during the pandemic, and raising money for and delivering supplies during other national disasters.

7.      Powered by People currently has seven employees and maintains its principal place of business in El Paso, Texas.

8.      In addition to serving as its founder, Mr. O'Rourke sits on Powered by People's Board of Directors, alongside David Wysong and Gwen Pulido.

9.      In recent months, Mr. O'Rourke has been a prominent, outspoken critic of Texas Republicans' attempts to re-draw Texas' congressional map at the behest of President Donald J. Trump. For instance, on July 21, 2025, Mr. O'Rourke appeared on PBS Newshour and argued that President Trump "knows he will lose the slim majority they have in the House of Representatives unless they rig the game mid-decade, which is what they're trying to do in Texas."[2] On July 24, 2024, Mr. O'Rourke appeared at a large rally at the Capital and accused Republicans of "play[ing] games . . . in order to maximize [] political power" at the expense of flood victims.[3]

10.      In support of his political views and the views of Powered by People, Mr. O'Rourke has made numerous successful grassroots fundraising appeals for donations to Powered by People, stating his desire to "have the backs of these heroic state lawmakers" and otherwise support Texas-based organizations who share his opposition to the newly introduced redistricting maps.[4] It is, of course, commonplace for political figures and candidates to tie appeals for resources to achieving policy actions. Indeed, Defendant Paxton himself has implored donors to donate to help him "stop Biden's open border policy" and "stop Democrats and RINOs efforts to takeover [sic] TX."[5]

---

[2] Amna Nawaz, *Stephanie Kotuby & Alexa Gold, O'Rourke says 'we have to fight back' as Trump pushes Texas to redraw congressional maps*, PBS NEWSHOUR (July 21, 2025, 6:40 PM EDT), https://www.pbs.org/newshour/show/orourke-says-we-have-to-fight-back-as-trump-pushes-texas-to-redraw-congressional-maps.

[3] Blaise Gainey, *'We will not let Trump take over': Texans rally as state lawmakers begin redistricting hearings*, KUT (July 24, 2025, 4:36 PM CDT), https://www.kut.org/politics/2025-07-24/we-will-not-let-trump-takeover-texans-rally-as-state-lawmakers-begin-redistricting-hearings.

[4] Owen Dahlkamp, *Beto O'Rourke's political group is a top funder for Texas Democrats' exodus to block GOP congressional map*, Tex. Trib. (Aug. 5, 2025, 1:00 PM CT), https://www.texastribune.org/2025/08/05/texas-democrats-quorum-break-beto-orourke-illinois-funding/.

[5] Ken Paxton, Facebook (Jun. 30, 2021, 2:04 PM EDT), https://www.facebook.com/kenpaxtontx/posts/4198758750185935, (last visited Aug. 8, 2025).

4



11.    Less than 48 hours ago, at 2:15pm MT on Wednesday August 6, 2025, Defendant Paxton issued a press release entitled "Attorney General Ken Paxton Launches Investigation into Beto O'Rourke's Radical Group for Unlawfully Funding Runaway Democrats." The release stated that, "[a]s part of the investigation, Attorney General Paxton has issued a Request to Examine, which demands documents and communications from the group regarding potentially unlawful activity, including its involvement in the Democrats' scheme to break quorum."[6]

---

[6] Press Release, Office of the Texas Attorney General, Attorney General Ken Paxton Launches Investigation into Soros-Funded PAC for Unlawfully Funding Runaway Democrat Legislators (Aug. 7, 2025), https://www.texasattorneygeneral.gov/news/releases/attorney-general-ken-paxton-launches-investigation-soros-funded-pac-unlawfully-funding-runaway.

12. At 7:15pm MT on August 6, 2025, Mr. Wysong received the "Request to Examine" (RTE) via personal service at his home in El Paso, Texas. A true and accurate copy of the RTE, as served upon Mr. Wysong, is attached as Exhibit A.

13. Indeed, as of this filing, Mr. O'Rourke has not been served with the RTE, and in fact is outside of Texas.

14. The RTE demands eleven categories of potentially extensive documents that may be in the possession of Plaintiff. Several may be subject to privilege.

   a. For instance, Requests 1 and 2 seek communications between Powered by People and dozens of lawmakers. To the extent any such documents exist, they may be protected by legislative privilege.

   b. Requests 3 and 4 seek documents and communications "relating to, or discussing, quorum during Texas's current special legislative session." Requests 7 and 8 seek communications regarding the "solicitation of funds" to support certain lawmakers. To the extent any such documents exist, they may be protected by attorney-client privilege.

15. Upon information and belief, between Plaintiff's numerous employees and volunteers, it would take several days, at a minimum, for Plaintiff to fully assemble the materials demanded, and additional time for counsel to thoroughly review those materials for privilege and to determine any necessary objections to lodge against each request.

16. Despite the extensive and burdensome requests, the likely privileged nature of the information sought, and constitutionally suspect motives involved, the RTE sets a compliance deadline of 4:00 pm MT (5:00pm CT) today, Friday, August 8.

6

17.     While the RTE claims to encourage Plaintiff to "meet and confer with the Office of the Attorney General" over the scope of the production, when Powered by People's national counsel asked first for a two-week extension the morning of Thursday, August 7, 2025, his request was promptly rejected. Similarly, a subsequent request sent by Texas counsel seeking an extension until August 16, 2025 (the same 10 days a nonparty subpoenaed for documents in a civil lawsuit under Tex. R. Civ. P. 205.2 would be entitled to), went, as of this filing, unresponded to by the Office of Attorney General.

18.     Defendant purported to issue the RTE pursuant to Texas Business Organizations Code § 12.151 *et seq.*, which allows the Attorney General to inspect corporate records "as the attorney general considers necessary in the performance of a power or duty of the attorney general, of any record of the entity."

19.     The RTE threatened that if Powered by People does not comply, penalties "include the Office of the Attorney General initiating a legal action for the entity's 'registration or certificate of formation' to be 'revoked or terminated,' Tex. Bus. Org. Code § 12.155. If the Office of the Attorney General deems such penalty warranted, proceedings to revoke or terminate an entity's registration or certificate of formation are initiated through a petition for leave to file an information in the nature of *quo warranto*. Tex. Civ. Prac. & Rem. Code § 66.002." It is also Class B misdemeanor to fail to or refuse to provide records requested by the Attorney General. *See* Tex. Bus. Orgs. Code § 12.156.

20.     Defendant Paxton has identified Mr. O'Rourke as a prospective opponent in the 2026 U.S. Senate race, and has already used the prospect of running against Mr. O'Rourke in a fundraising appeal.[7]



21.     Recently, through repeated comments, Defendant Paxton has made clear his intention to retaliate against Mr. O'Rourke personally through this RTE for Mr. O'Rourke's First Amendment-protected activities, including his speech, association with others, and advocacy against the proposed congressional maps. As noted above, the press release announcing the RTE

---

[7] Ken Paxton (@KenPaxtonTX), X (Apr. 29, 2025, 2:23 PM CDT), https://x.com/KenPaxtonTX/status/1917298692438254050 (last visited Aug. 8, 2025).

characterizes lawful donations made by Powered by People as "Beto Bribes."[8] Defendant Paxton has gone on in recent days to call Mr. O'Rourke "delusional"[9] and to claim he is "scared of accountability."[10] And, again, even though Defendant Paxton has publicly admitted that he does not have any "details" or actual proof to support allegations of unlawful behavior,[11] Defendant Paxton has stated that serving the RTE sparks "an investigation into Beto O'Rourke's radical group for unlawfully funding runaway Democrats."[12]

## VI. CLAIMS FOR RELIEF

### COUNT 1: U.S. Constitution, Freedom of Association (42 U.S.C. § 1983)

22.     Plaintiff realleges and incorporates by reference the foregoing paragraphs as though fully set forth herein.

23.     Freedom of association for the purpose of advancing ideas and airing grievances is a fundamental liberty guaranteed by the First Amendment. *In re Bay Area Citizens Against Lawsuit Abuse*, 982 S.W.2d 371, 375 (Tex. 1998) (quoting *NAACP v. Alabama*, 357 U.S. 449, 460 (1958). The First Amendment's protection of the freedom of association provides "protection to collective effort on behalf of shared goals." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). As the Supreme Court has noted, "[p]rotected association furthers a wide variety of political, social,

---

[8] Press Release, Office of the Texas Attorney General, Attorney General Ken Paxton Launches Investigation into Beto O'Rourke's Radical Group for Unlawfully Funding Runaway Democrats (Aug. 6, 2025),
https://www.texasattorneygeneral.gov/news/releases/attorney-general-ken-paxton-launches-investigation-beto-orourkes-radical-group-unlawfully-funding.
[9] Ken Paxton (@KenPaxtonTX), X (Aug. 7, 2025 3:16 PM),
https://x.com/KenPaxtonTX/status/1953550789571424322 (last visited Aug. 8, 2025).
[10] Ken Paxton (@KenPaxtonTX), X (Aug. 6, 2025, 6:19 PM CDT),
https://x.com/KenPaxtonTX/status/1953234509685768647 (last visited Aug. 8, 2025).
[11] James Morley III, *Texas AG Paxton to Newsmax: O'Rourke's PAC to Be Investigated*, Newsmax (Aug. 6, 2025, 5:40 PM EDT).
[12] Ken Paxton (@KenPaxtonTX), X (Aug. 6, 2025, 3:18 PM CDT),
https://x.com/KenPaxtonTX/status/1953188955807273440 (last visited Aug. 8, 2025).

9

economic, educational, religious, and cultural ends, and is especially important in preserving political and cultural diversity and in shielding dissident expression from suppression by the majority." *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 606 (2021) (internal quotation marks omitted).

24. The RTE wrongly burdens association in several ways. First, political contributions and expenditures are a form of speech and association. *See In re Siroosian*, 449 S.W.3d 920, 925 (Tex. App.—Dallas 2014, no pet.) (quoting *McCutcheon v. Fed. Election Comm'n*, 134 S.Ct. 1434, 1441 (2014)) ("The right to participate in democracy through political contributions is protected by the First Amendment."). Government actions that tend to limit political spending "operate in an area of the most fundamental First Amendment activities. Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution." *Osterberg v. Peca*, 12 S.W.3d 31, 41 (Tex. 2000) (quoting *Buckley v. Valeo*, 424 U.S. 1 (1976) (per curiam)). Here, Defendant Paxton is overtly penalizing Plaintiff's exercise of free speech, seeking to chill Plaintiff and Mr. O'Rourke from further political spending and donating. "The First Amendment does not permit the government to make any individual choose between the First Amendment right to engage in unfettered political speech and subjection to discriminatory" application of laws. *See Davis v. Fed. Election Comm'n*, 554 U.S. 724, 739 (2008).

25. Moreover, the Supreme Court has recognized for decades that "compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as [other] forms of governmental action." *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958). That is because disclosure can subject organizations and individuals to threats of harassment, reprisals, and "other manifestations of public hostility." *Id.*

10

26.     Harassment need not be certain to occur for a plaintiff to state an association claim. The Supreme Court has emphasized instead that the First Amendment is implicated "by 'state action which may have the effect of curtailing the freedom to associate,' and by the 'possible deterrent effect' of disclosure." *Americans for Prosperity Found.*, 594 U.S. at 616 (quoting *NAACP*, 357 U.S. at 460–61); *see also id.* at 606 ("freedom of association may be violated . . . where individuals are punished for their political affiliation.").

27.     Further, the First Amendment protects the right to publish and distribute political writings while remaining anonymous. *Ex parte Odom*, 570 S.W.3d 900, 908 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) (citing *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 342 (1995)).

28.     As detailed above, the RTE is intended to, and would serve to, chill Powered by People's speech and association by deterring their contributions and expenditures, by subjecting supporters and contributors to identification and potential harassment (including from Defendant himself, given his targeting of Mr. O'Rourke) and by forcing disclosure of anonymous political writings, which would in turn make at least some supporters think twice before associating with Powered by People. For particular example, Requests 3 and 4 appear to request any and all communications between Powered by People and any person regarding quorum break. This would implicate third parties, including Powered by People's volunteers, supporters and contributors, and subject them to identification by a vindictive and politically-motivated bad-faith government actor.

**COUNT 2: U.S. Constitution, Retaliation For Protected Speech (42 U.S.C. § 1983)**

29.     Plaintiff realleges and incorporates by reference the foregoing paragraphs as though fully set forth herein.

11

30. The Constitution prohibits the government from taking adverse action against a person for the exercise of their First Amendment rights. *E.g.*, *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019). Accordingly, the State cannot retaliate against a citizen who exercises the right of free speech on a matter of public concern. *Levine v. Maverick Cnty. Water Control & Imp. Dist. No. 1*, 884 S.W.2d 790, 795 (Tex. App.—San Antonio 1994, writ denied). There's no question that "speech concerning illegal conduct, especially in the public sector is of 'public concern,'" and includes Mr. O'Rourke's condemnation of Texas Republicans' attempt to re-draw the congressional maps, which he has characterized as unlawful. *Upton Cnty., Tex. v. Brown*, 960 S.W.2d 808, 826 (Tex. App.—El Paso 1997, reh'g overruled).

31. To demonstrate retaliation, "[a] claimant must show at least that a substantial and motivating factor for the complained-of action resulted from his exercise of free speech." *Levine,* 884 S.W.2d 790 at 795. Here, as demonstrated by Defendant Paxton's personal animus and vitriol against Plaintiff and Mr. O'Rourke based on their protected political speech, including speech criticizing Defendant Paxton himself and speech in the form of political donations, retaliation was wrongfully a "substantial and motivating factor" in the issuance of the RTE. *Id.*

**COUNT 3: U.S. Constitution, Fourth Amendment (42 U.S.C. § 1983) & Art. I, § 9 of the Texas Constitution**

32. Plaintiff incorporates by reference every allegation in the preceding paragraphs as if set forth fully herein.

33. The Fourth Amendment, which applies to the States through the Fourteenth Amendment, provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated," and that "no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV.

34. "Based on this constitutional text," the Supreme Court "has repeatedly held that searches conducted outside the judicial process, without prior approval by a judge or a magistrate judge, are *per se* unreasonable subject only to a few specifically established and well-delineated exceptions." *City of Los Angeles v. Patel*, 576 U.S. 409, 419 (2015) (internal quotation marks and alterations omitted).

35. The Attorney General's demand for documents was not made pursuant to a judicial warrant backed by probable cause. In fact, Defendant's demand for documents has not been ratified by any court. Nor does Defendant's demand for documents constitute a permissible administrative search, which must be conducted pursuant to some "'special need' other than conducting criminal investigations." *Id*. at 420. The Attorney General has identified no such special need for these documents, and none is apparent.

36. Instead, the RTE is an "administrative search" which must provide for pre-disclosure judicial review that permits the target to challenge the reasonableness of the inquiry, including its scope, relevance, and burden. While the Texas Supreme Court in *Annunciation House v. Paxton* declined to strike down a *facial* challenge to Texas Business Organizations Code § 12.152, it did so assuming that precompliance review would in fact be made available to those served with requests to examine and that such requests would otherwise adhere to Texas law. *Paxton v. Annunciation House, Inc.*, No. 24-0573, 2025 WL 1536224, at *24 (Tex. May 30, 2025); *see also Spirit Aerosystems, Inc. v. Paxton*, 142 F.4th 278, 291 (5th Cir. 2025) ("Although the RTE statute does not by its text incorporate Rule 176.6, the Texas Supreme Court recently held in *Annunciation House* that Rule 176.6 nevertheless provides a mechanism for precompliance review of RTEs. . . The Texas Supreme Court also confirmed that 'the term [immediately] cannot

reasonably be read literally,' and that the Attorney General was 'not permit[ted] ... to withhold precompliance review' . . .").

37. Accordingly, for the RTE to be constitutional, it must adhere to the Texas Rules of Civil Procedure governing administrative subpoenas, which incorporate the prohibitions on unreasonable search and seizures found in the U.S. Constitution and in the Texas Constitution. That means: "(1) the agency must conduct its investigation pursuant to an authorized purpose, and the subpoena must be relevant to that purpose; (2) the agency must follow the necessary statutory procedures; (3) the subpoena must describe the documents sought with adequate particularity, meaning that the scope of its demand for documents must be adequate, but not excessive, for the purposes of the inquiry; (4) the subpoena must not unnecessarily or excessively seek information that the agency already possesses; and (5) the respondent may show that the subpoena is unnecessarily burdensome." *Schade v. Texas Workers' Comp. Comm'n*, 150 S.W.3d 542, 551 (Tex. App.—Austin 2004).

38. The RTE here fails several of these factors: it was issued for the unauthorized purpose of retaliating against a political rival and to restrict protected rights; even if the purpose of the inquiry were proper, the RTE is vague, seeking a wide range of information with no stated justification; and—between the less-than-48-hour response deadline, requests for sensitive information, including likely attorney client privileged and legislatively privileged information, and far-reaching demands—is patently burdensome. The RTE does not even provide reasonable time to conduct a sufficient privilege search. By contrast, the Texas Rules of Civil Procedure require that, when serving a request for production, a "notice . . . must be served at least 10 days before the subpoena compelling production is served." Tex. R. Civ. P. 205.2. Here, there was no notice, much less a 10 day notice *in advance* of actually serving the subpoena-equivalent RTE.

14

**COUNT 4: Equal Protection Clauses of the U.S. and Texas Constitution--Selective and Vindictive Enforcement**

39. "[T]he purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents.'" *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

40. "[T]o establish a claim of discriminatory enforcement, a party must first show he or she has been singled out for prosecution or enforcement of the regulation or ordinance while others similarly situated and committing the same acts have not." *Maguire Oil Co. v. City of Houston*, 69 S.W.3d 350, 370 (Tex. App.—Texarkana 2002, pet. denied) (internal citations and quotation marks omitted). "Further, the party must also show the government has purposefully discriminated on the basis of an impermissible consideration such as race, religion, or the desire to prevent the exercise of constitutional rights." *Id.* (citations/quotations omitted).

41. Similarly, "a constitutional claim of prosecutorial vindictiveness may be established in either of two distinct ways: 1) proof of circumstances that pose a 'realistic likelihood' of such misconduct sufficient to raise a 'presumption of prosecutorial vindictiveness,' which the State must rebut or face dismissal of the charges; or 2) proof of 'actual vindictiveness'— that is, direct evidence that the prosecutor's charging decision is an unjustifiable penalty resulting solely from the defendant's exercise of a protected legal right." *Neal v. State*, 150 S.W.3d 169, 173 (Tex. Crim. App. 2004); *cf. Hillside Prods., Inc. v. Duchane*, 249 F. Supp. 2d 880, 897–98 (E.D. Mich. 2003) ("[in] vindictive enforcement claims, Plaintiffs must show: (1) exercise of a protected right; (2) the enforcer's 'stake' in the exercise of that right; (3) the unreasonableness of the enforcer's conduct; and (4) that the enforcement was initiated with the intent to punish Plaintiffs for the exercise of the protected right.").

15

42.     Here, Defendant Paxton has made it a clear political priority to single-out and target Powered by People based on personal and political animus. Whereas he has never conducted this type of investigation on an organization that is identified as conservative leaning or supportive of him personally or politically. Notably, he himself has been impeached for charges relating to bribery and corrupt campaign and officeholders, and indicted for other criminal matters. Rather than utilizing his office to conduct a neutral third-party audit of those who contributed to him in order to gain political influence, he wasted millions of taxpayer dollars defending his corrupt practices. Defendant Paxton appears to have based his investigative priorities on advice that is commonly attributed to Joseph Goebbels: "Accuse the other side of that which you are guilty." The fact that he uses the State as an instrumentality to accomplish his illegitimate goals violates the Equal Protection Clause.

## VII.  MOTION FOR PROTECTIVE ORDER, APPLICATION FOR TEMPORARY INJUNCTION, AND OTHER INJUNCTIVE RELIEF

*Motion for Protective Order*

43.     Plaintiff re-alleges and incorporates by reference the preceding paragraphs for all purposes the same as if set forth herein verbatim.

44.     Plaintiff seeks a protective order pursuant to Tex. R. Civ. Pro. 176.6(e) and Tex. R. Civ. Pro. 192.6(b). Rule 176.6(e) provides, in relevant part, "[a] person commanded to…produce…designated documents and things…may move for a protective order under Rule 192.6(b) — before the time specified for compliance — either in the court in which the action is pending or in a district court in the county where the subpoena was served."

45.     In order to "protect the movant from undue burden, unnecessary expense, harassment, annoyance, or invasion of personal, constitutional, or property rights," Tex. R. Civ. P. 192.6(b) allows a court to "make any order in the interest of justice and may — among other things

16

— order that: (1) the requested discovery not be sought in whole or in part; (2) the extent or subject matter of discovery be limited; (3) the discovery not be undertaken at the time or place specified; (4) the discovery be undertaken only by such method or upon such terms and conditions or at the time and place directed by the court; (5) the results of discovery be sealed or otherwise protected, subject to the provisions of Rule 76a."

46.     Further, Tex. R. Civ. P. 192.4 provides protections against, *interalia*, inappropriate document requests, requiring that the "discovery methods permitted by these rules should be limited by the court if it determines, on motion or on its own initiative and on reasonable notice, that: (a) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive; or (b) the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues." *See In re Weekley Homes, L.P.*, 295 S.W.3d 309, 322-23 (Tex. 2009) (noting harm that the party resisting discovery might suffer as result of revealing private conversations, trade secrets, and privileged and other confidential information); *see also In re Houstonian Campus, L.L.C.*, 312 S.W.3d 178, 184 (Tex. App.—Houston [14th Dist.] 2010, orig. proceeding) (considering the harm that party resisting discovery might suffer as result of revealing members' names).

47.     Here, the RTE runs afoul of many of the prohibitions found in Rule 192.6(b) and 192.4, as it:

- *Harasses Plaintiff* — "Discovery is unnecessarily harassing where it is sought for an improper purpose." *Centennial Psychiatric Assocs., LLC v. Cantrell*, No. 14-17-00380-CV, 2017 WL 6544283, at *9 (Tex. App. Dec. 21, 2017). The entire RTE

17

was sent for the purpose of retaliation against and harassing a political opponent, a clearly improper purpose and abuse of the RTE process. *See supra, para.* 20-21, 29-31.

- *Invades constitutional rights* — As thoroughly addressed in the preceding sections, Defendants' RTE improperly invades on Plaintiffs' Texas and federal constitutional rights. *See supra, para.* 22-42.

- *Is unduly burdensome because:*
    - *There is insufficient time to respond* — Defendants provided a wholly insufficient amount of time to respond and object to the individual document requests within the RTE. They further refused two requests for an extension of the RTE deadline. Requests for document production to a party in civil litigation allow for a 30 day response deadline. Tex. R. Civ. Pro. 196.2(a). A subpoena seeking documents from a nonparty requires at least 10 days notice. Tex. R. Civ. Pro. 205.2. Here, Defendants provided less than 48 hours notice to Plaintiff, an unreasonable amount of time to (1) gather responsive documents, (2) review those documents for privilege and, (3) compile and provide objections and responses. In the context of a nonparty subpoena, the Eighth Court of Appeals has said "[p]lainly…a day's notice is not reasonable..." *In re State*, 599 S.W.3d 577, 597 (Tex.App.--El Paso, 2020, orig. proceeding). So too in this situation where Defendants provided less than 48 hours from notice of the RTE to deadline for response.

18

○ *The requests are overly broad* — Additionally, the requests in the RTE are overly broad. An overly broad request for documents that is merely a "fishing expedition" into the other party's files is prohibited. *In re American Optical Corp.*, 988 S.W.2d 711, 713 (Tex.1998); *Dillard Dept. Stores v. Hall*, 909 S.W.2d 491, 492 (Tex.1995). Here, the RTE is expressly a fishing expedition, and one initiated against a perceived political opponent. Neither the rules of civil procedure nor the U.S. or Texas Constitutions allow for such an assault.

○ *There is an alternate source for some of the information* — A request is unduly burdensome when the discovery can be obtained from some other source that is more convenient, less burdensome, or less expensive. Tex. R. Civ. P. 192.4(a); *Brewer & Pritchard, P.C. v. Johnson*, 167 S.W.3d 460, 466 (Tex.App.—Houston [14th Dist.] 2005, pet. denied); *e.g.*, *In re Arras*, 24 S.W.3d 862, 864 (Tex.App.—El Paso 2000, orig. proceeding) (deposition of nonparty for addresses of other parties was inconvenient and burdensome). The RTE requests information about political contributions and expenditures, which, as a candidate for office on multiple occasions himself, the Defendant knows are subject to public filings and therefore obtainable through other means. Powered by People is a nonprofit organization exempt from tax under 26 U.S.C § 527 as a political organization, and is registered with the Federal Election Commission under federal campaign finance law and with the Texas Ethics Commission under state campaign finance law. As an organization registered under these

19

campaign finance laws, Powered by People files regular, public reports of its contributions and expenditures. *See* 52 USC § 30104(a)(4); 11 CFR § 104.5(c); Tex. Elec. Code §§ 254.153, 254.154; 1 Tex. Admin. Code §§ 20.423, 20.425. On a regular basis according to schedules determined by these laws, Powered by People files *public* reports of the funds it has received and expenditures made, subject to thresholds for itemization on reports.

- *Requires unnecessary expenses* — Since some of the requests, including Nos. 9 and 11 encompass materials filed in TEC filings, the requests for additional production pursuant to the RTE would require unnecessary expense.

48.     A trial court has "broad discretion" in determining whether to grant a protective order and "balances the parties' competing interests" when making its determination. *Eurecat U.S., Inc. v. Marklund*, 527 S.W.3d 367, 376 (Tex. App.—Houston [14th Dist.], 2017, no. pet.).

49.     Plaintiff's injuries if required to respond to Defendants' RTE are numerous and articulated above.

### Request for Temporary and Permanent Injunctions

50.     Plaintiff re-alleges and incorporates by reference the preceding paragraphs for all purposes the same as if set forth herein verbatim.

51.     In addition to the protections afforded by a Rule 176.6(e) protective order, Plaintiff requests and is entitled to temporary and permanent injunctions against Defendant. While the grounds for Plaintiffs' motion for protective order and requests for injunction overlap, there are additional constitutional bases for enjoining the RTE. *Cf. Annunciation House, Inc.,* 2025 WL

1536224, at *24 (determining that a recipient of an RTE may seek precompliance review "whether by Rule 176.6(e)'s protective orders or *other provisions of Texas law*").

52.     The Texas Supreme Court has explained that:

> A temporary injunction's purpose is to preserve the *status quo* of the litigation's subject matter pending a trial on the merits. . . . To obtain a temporary injunction, the applicant must plead and prove three specific elements: (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim. An injury is irreparable if the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard.

*Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002). "[T]he only question before the trial court in a temporary injunction hearing is whether the applicant is entitled to preservation of the status quo of the subject matter of the suit pending trial on the merits." *Id.* (quoting *Pub. Util. Comm'n v. Water Servs., Inc.*, 709 S.W.2d 765, 767 (Tex.App.—Austin 1986, no writ). Moreover, "[w]hether to grant or deny a temporary injunction is within the trial court's sound discretion," and a reviewing court should not overturn absent a showing that such discretion was abused. *Id.*

53.     Here, Plaintiff is entitled to preservation of the *status quo* because it will suffer imminent, irreparable harm for which no adequate remedy at law exists if Defendants are not restrained enforcing the RTE. *See Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002) ("An injury is irreparable if the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard.") (citing *Canteen Corp. v. Republic of Tex. Props., Inc.*, 773 S.W.2d 398, 401 (Tex. App. —Dallas 1989, no writ)).

54.      Plaintiff will suffer a violation of its constitutional rights, and "[u]nder Texas law, a violation of a constitutionally guaranteed right inflicts irreparable injury warranting injunctive relief." *Operation Rescue-Nat'l v. Planned Parenthood of Houston & Se. Texas, Inc.*, 937 S.W.2d

21

60, 77 (Tex. App.—San Antonio 1996, writ granted and *aff'd as modified*, 975 S.W.2d 546 (Tex. 1998)) (citing *Southwestern Newspapers Corp. v. Curtis*, 584 S.W.2d 362, 368 (Tex. Civ. App.—Amarillo 1979, no writ); *Iranian Muslim Organization v. City of San Antonio*, 615 S.W.2d 202, 208 (Tex. 1981)).

55.     Once sensitive information has been handed over and disclosure has been compelled, there can be no remuneration.  Not only will Plaintiff suffer that irreparable harm, but compliance with the RTE would deprive this Court of its jurisdiction by effectuating the irreversible contested action that is the subject of this Petition. *Cf. Marketshare Telecom, L.L.C. v. Ericsson, Inc.*, 198 S.W.3d 908, 921 (Tex. App. —Dallas 2006, no pet.) (holding that a court "may protect its jurisdiction" by issuing appropriate injunctions).

56.     Further, Plaintiff has stated numerous valid causes of action, *see supra para*. 22-42, and  the verified factual allegations demonstrate a probable right to relief. Defendant Paxton has clearly violated the Texas and United States Constitution, as well as the Texas Rules of Civil Procedure.

57.     Plaintiff is willing to post bond. Pursuant to Tex. R. Civ. P. 168, "[w]here the…temporary injunction is against…a subdivision of the State in its governmental capacity, and is such that the State…[and]…the subdivision of the State in its governmental capacity, has no pecuniary interest in the suit and no monetary damages can be shown, the bond shall be allowed in the sum fixed by the judge, and the liability of the applicant shall be for its face amount if the restraining order or temporary injunction shall be dissolved in whole or in part."

58.     Accordingly, Plaintiff asks the Court to set a briefing period for its request for temporary injunction, set the same for a hearing and, after the hearing, issue a temporary injunction against Defendants.

59.     For these same reasons, Plaintiff seeks a permanent injunction prohibiting Defendants from enforcing the RTE.

## PRAYER AND REQUEST FOR RELIEF

For the foregoing reasons, Plaintiff Powered by People requests an immediate protective order pursuant to Tex. R. Civ. Pro. 192.6(b) and Tex. R. Civ. Pro. 176.6(e), and a temporary restraining order issued to Defendants preventing enforcement of the RTE in its entirety. Further, Plaintiff requests that Defendants be cited to appear and answer, and that on hearing, issue Plaintiff judgment as follows:

(a)     A protective order against Defendants' enforcement of the RTE in its entirety;

(b)     A declaration that Defendants violated the U.S. Constitution and the Texas Constitution, and that the RTE is invalid and unenforceable;

(c)     A temporary and permanent injunction restraining Defendants from enforcing the RTE in its entirety;

(d)     Costs of court;

(e)     Reasonable and necessary attorneys' fees pursuant to 42 U.S.C. § 1988 and other applicable laws; and

(f)     Such other and further relief, at law or in equity, to which Plaintiff is justly entitled.

Respectfully submitted,


*/s/ Mimi Marziani*

Mimi Marziani
Texas Bar No. 24091906
mmarziani@msgpllc.com
Joaquin Gonzalez
Texas Bar No. 24109935
jgonzalez@msgpllc.com
Rebecca (Beth) Stevens
bstevens@msgpllc.com
Texas Bar No. 24065381
**MARZIANI, STEVENS & GONZALEZ PLLC**
500 W. 2nd Street, Suite 1900
Austin, TX 78701
Tel: (210) 343-5604

Lynn Coyle
Texas Bar No. 24050049
lynn@coylefirm.com
2700 Richmond Ave.
El Paso, TX 79930
Tel: (915)276-6700

**ATTORNEYS FOR PLAINTIFF**

Docusign Envelope ID: 8565E48-075D-489C-916E-B78839BD674F

**VERIFICATION**

My name is David Mills Wysong, my date of birth is May 9, 1972, and my address is 824 Twin Hills Dr., El Paso, Texas 79912, United States. I declare under penalty of perjury that the statements in the foregoing Facts section are true and correct.

Executed in ___El Paso___ County, State of Texas, on the 8th day of August, 2025.

<br/>

<br/>

DocuSigned by:

F5CF50A714244DF...

David Mills Wysong

**CERTIFICATE OF SERVICE**

By my signature below, I hereby certify that a true and correct copy of the foregoing pleading was served on the following as set forth below, on August 8, 2025.

**Via e-service:** Rob.Farquharson@oag.texas.gov
Rob Farquharson
Deputy Chief
Consumer Protection Division
Office of the Attorney General

**Via e-service:** Johnaathan.Stone@oag.texas.gov
Johnathan Stone
Chief
Consumer Protection Division
Office of the Attorney General

*/s/ Mimi Marziani*
Mimi Marziani

**CAUSE NO. _____**

| | | |
|---|---|---|
| **POWERED BY PEOPLE,** | § | **IN THE DISTRICT COURT** |
| *Plaintiff,* | § | |
| | § | |
| **V.** | § | **\_\_\_\_ JUDICIAL DISTRICT** |
| | § | |
| **KEN PAXTON,** | § | |
| **IN HIS OFFICIAL CAPACITY AS** | § | |
| **TEXAS ATTORNEY GENERAL** | § | |
| | § | |
| *Defendant.* | § | **EL PASO COUNTY, TEXAS** |

## ORDER GRANTING PLAINTIFF'S MOTION FOR PROTECTIVE ORDER

On this day came to be heard, Plaintiff Powered By People's Motion for Protective Order. After considering the motion, response and evidence presented, the Court is of the opinion that Plaintiff's Motion for Protective Order should be GRANTED.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that Plaintiff's Motion for Protective Order is hereby GRANTED.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the Request to Examine by Defendant Texas Attorney General Ken Paxton, in his official capacity, for information and documents in Plaintiff's possession _____ is not to be sought, in whole or in part.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that _____

SIGNED on this _____ day of _____, 2025.

_____
JUDGE PRESIDING

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Joaquin Gonzalez on behalf of Joaquin Gonzalez
Bar No. 24109935
jgonzalez@msgpllc.com
Envelope ID: 104472444
Filing Code Description: Amended Filing
Filing Description: Verified Second Amended Petition for Declaratory Judgment, Motion for Protective Order, Application for Emergency Temporary Restraining Order, Temporary Injunction, and Other Injunctive Relief
Status as of 8/18/2025 8:09 AM MST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Lynn Coyle | 24050049 | lynn@coylefirm.com | 8/17/2025 5:32:11 PM | SENT |
| Johnathan Stone | 24071779 | Johnathan.Stone@oag.texas.gov | 8/17/2025 5:32:11 PM | SENT |
| Robert Farquharson | 24100550 | rob.farquharson@oag.texas.gov | 8/17/2025 5:32:11 PM | SENT |
| Pauline Sisson | | pauline.sisson@oag.texas.gov | 8/17/2025 5:32:11 PM | SENT |
| Scott Froman | | scott.froman@oag.texas.gov | 8/17/2025 5:32:11 PM | SENT |
| Mimi Marziani | | mmarziani@msgpllc.com | 8/17/2025 5:32:11 PM | SENT |
| Joaquin Gonzalez | | jgonzalez@msgpllc.com | 8/17/2025 5:32:11 PM | SENT |
| Rob Farquharson | | rob.farquharson@oag.texas.gov | 8/17/2025 5:32:11 PM | SENT |
| Jacob Przada | | Jacob.Przada@oag.texas.gov | 8/17/2025 5:32:11 PM | SENT |
| Tisha James | | Tisha.James@oag.texas.gov | 8/17/2025 5:32:11 PM | SENT |
| Rebecca Stevens | | bstevens@msgpllc.com | 8/17/2025 5:32:11 PM | SENT |
| Emily Samuels | | emily.samuels@oag.texas.gov | 8/17/2025 5:32:11 PM | SENT |
| Abby Smith | | abby.smith@oag.texas.gov | 8/17/2025 5:32:11 PM | SENT |
| Clayton Watkins | | clayton.watkins@oag.texas.gov | 8/17/2025 5:32:11 PM | SENT |

# Tab B

El Paso County - 41st District Court

Filed 8/21/2025 1:01 PM
Norma Favela Barceleau
District Clerk
El Paso County
2025DCV3641

CAUSE NO. 2025DCV3641

| | | |
|---|---|---|
| POWERED BY PEOPLE, | § | IN THE DISTRICT COURT |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 41st JUDICIAL DISTRICT |
| | § | |
| KEN PAXTON, | § | |
| IN HIS OFFICIAL CAPACITY AS | § | |
| TEXAS ATTORNEY GENERAL, | § | |
| | § | |
| Defendant. | § | EL PASO COUNTY, TEXAS |

## DEFENDANT KEN PAXTON'S RESPONSE TO PLAINTIFF'S MOTION FOR EXPEDITED DISCOVERY

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, KEN PAXTON, in his individual capacity as "Third Party Candidate Ken Paxton,"[1] and files this Response to Plaintiff's Motion for Expedited Discovery, and in support thereof would respectfully show unto the Court as follows:

I.

The dispute before the Court involves Plaintiff's complaints related to an investigation initiated by the Office of the Attorney General under its lawful and statutory obligations as an officer of the State of Texas. Plaintiff now apparently seeks to depose Ken Paxton, in his individual capacity, within the next seven (7) days. Plaintiff's request is without merit and should be summarily denied.

II.

Plaintiffs are seeking an apex deposition, which is the deposition of a corporate president or other high-level corporate official. *In re Alcatel, USA, Inc.,* 11 S.W.3d 173, 175 (Tex. 2000). The "apex doctrine" allows corporate officials to avoid unduly burdensome depositions based on

---

[1] Plaintiff refers to Ken Paxton as such in Plaintiff's Motion at P. 6.

their position in the company. *See In re Miscavige,* 436 S.W.3d 430, 435 (Tex. App.—Austin 2014, orig. proceeding). When an official is named as a party to the lawsuit, such official can *only* be deposed on a theory of liability that does not arise from actions taken while in their official capacity. *Id.* at 438. Here, Plaintiff complains of actions taken by the Office of the Texas Attorney General. There is not any basis for liability against Ken Paxton in his individual capacity or as "Third Party Candidate Ken Paxton."

Mr. Paxton has not taken any action against Plaintiff in his individual capacity. Further, Plaintiff has failed to provide any evidence indicating it is unable to procure the information sought from other sources. A showing that a corporate official merely has some knowledge of discoverable information or that the official simply knows about the complained-of activity is insufficient to warrant an apex deposition. *See In re American Airlines,* 634 S.W.3d 38, 41 (Tex. 2021).

Plaintiff's claims are wholly insufficient to provide any basis to depose "Third Party Candidate Ken Paxton," and Plaintiff's Motion should be denied.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

AUSTIN KINGHORN
Deputy Attorney General for Civil Litigation

KIMBERLY GDULA
Chief, General Litigation Division

/s/ *William H. Farrell*
**WILLIAM H. FARRELL**
Assistant Attorney General
Texas Bar No. 00796531
biff.farrell@oag.texas.gov
(512) 979-5561| FAX: (512) 320-0667

Office of the Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Phone: (512) 463-2120
Fax: (512) 320-0667

**COUNSEL FOR DEFENDANT,**
**KEN PAXTON**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served via Texas E-file on this August 21, 2025, on all counsel of record.

/s/ *William H. Farrell*
**WILLIAM H. FARRELL**
Assistant Attorney General

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Amanda Beaver on behalf of William Farrell
Bar No. 796531
amanda.beaver@oag.texas.gov
Envelope ID: 104681775
Filing Code Description: Answer/Response
Filing Description: Response to Emergency Motion
Status as of 8/21/2025 4:43 PM MST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Lynn Coyle | 24050049 | lynn@coylefirm.com | 8/21/2025 1:01:29 PM | SENT |
| Johnathan Stone | 24071779 | Johnathan.Stone@oag.texas.gov | 8/21/2025 1:01:29 PM | SENT |
| Robert Farquharson | 24100550 | rob.farquharson@oag.texas.gov | 8/21/2025 1:01:29 PM | SENT |
| Pauline Sisson | | pauline.sisson@oag.texas.gov | 8/21/2025 1:01:29 PM | SENT |
| Scott Froman | | scott.froman@oag.texas.gov | 8/21/2025 1:01:29 PM | SENT |
| Mimi Marziani | | mmarziani@msgpllc.com | 8/21/2025 1:01:29 PM | SENT |
| Joaquin Gonzalez | | jgonzalez@msgpllc.com | 8/21/2025 1:01:29 PM | SENT |
| Rob Farquharson | | rob.farquharson@oag.texas.gov | 8/21/2025 1:01:29 PM | SENT |
| Jacob Przada | | Jacob.Przada@oag.texas.gov | 8/21/2025 1:01:29 PM | SENT |
| Tisha James | | Tisha.James@oag.texas.gov | 8/21/2025 1:01:29 PM | SENT |
| Rebecca Stevens | | bstevens@msgpllc.com | 8/21/2025 1:01:29 PM | SENT |
| Emily Samuels | | emily.samuels@oag.texas.gov | 8/21/2025 1:01:29 PM | SENT |
| Abby Smith | | abby.smith@oag.texas.gov | 8/21/2025 1:01:29 PM | SENT |
| Clayton Watkins | | clayton.watkins@oag.texas.gov | 8/21/2025 1:01:29 PM | SENT |

Associated Case Party: Ken Paxton

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| William Farrell | | biff.farrell@oag.texas.gov | 8/21/2025 1:01:29 PM | SENT |
| Nicole A.Myette | | nicole.myette@oag.texas.gov | 8/21/2025 1:01:29 PM | SENT |

# Tab C

Tracy S. Thorleifson (WA State Bar #16633)
Sophie H. Calderón (CA State Bar #278135)
Krista K. Bush (WA State Bar #30881)
Connor Shively (WA State Bar #44043)
Attorneys
Federal Trade Commission
915 2nd Ave., Suite 2896
Seattle, WA  98174
Email: tthorleifson@ftc.gov
        scalderon@ftc.gov
        kbush@ftc.gov
        cshively@ftc.gov
Telephone: (206) 220-6350
Attorneys for Plaintiff Federal Trade Commission

Elizabeth K. Korsmo (NM State Bar #8989)
Assistant Attorney General
Office of Attorney General Hector Balderas
408 Galisteo St.
Santa Fe, NM  87501
Email: ekorsmo@nmag.gov
Telephone: (505) 827-6000
Attorney for Plaintiff State of New Mexico

Kyle Beckman (AL State Bar #ASB-6046-E63B)
Assistant Attorney General
Office of Attorney General Luther Strange
501 Washington Ave.
Montgomery, AL  36104-0152
Email: kbeckman@ago.state.al.us
Telephone: (334) 353-2619
Attorney for Plaintiff State of Alabama

Cynthia C. Drinkwater (AK State Bar #8808159)
Assistant Attorney General
Office of Attorney General Craig W. Richards
1031 W. 4th Ave., Suite 200
Anchorage, AK  99501
Email: cynthia.drinkwater@alaska.gov
Telephone: (907) 269-5200
Attorney for Plaintiff State of Alaska

Nancy Vottero Anger (AZ State Bar #006810)
Matthew du Mee (AZ State Bar #028468)
Assistant Attorneys General
Office of Attorney General Mark Brnovich
1275 W. Washington
Phoenix, AZ  85007
Email: nancy.anger@azag.gov
        matthew.dumee@azag.gov
Telephone:    (602) 542-7710 (Anger)
              (602) 542-7731 (DuMee)
Attorneys for Plaintiff State of Arizona

Kevin Wells (AR State Bar #2007-213)
Assistant Attorney General
Office of Attorney General Leslie Rutledge
323 Center St., Suite 500
Little Rock, AR  72201
Email: kevin.wells@arkansasag.gov
Telephone: (501) 682-8063
Attorney for Plaintiff State of Arkansas

Sonja K. Berndt (CA State Bar #131358)
Deputy Attorney General
Office of Attorney General Kamala D. Harris
300 S. Spring St., Suite 1702
Los Angeles, CA  90013
Email: sonja.berndt@doj.ca.gov
Telephone: (213) 897-2179
Attorney for Plaintiff State of California

Alissa Hecht Gardenswartz (CO State Bar #36126)
First Assistant Attorney General
John Feeney-Coyle (CO State Bar #44970)
Assistant Attorney General
Office of Attorney General Cynthia H. Coffman
Ralph L. Carr Colorado Judicial Center
1300 Broadway, 7th Floor
Denver, CO  80203
Email: alissa.gardenswartz@state.co.us
        john.feeney-coyle@state.co.us
Telephone:    (720) 508-6204 (Gardenswartz)
              (720) 508-6232 (Feeney-Coyle)
Attorneys for Plaintiff State of Colorado

LeeAnn Morrill (CO Bar #38742)
First Assistant Attorney General
Public Officials Unit
Office of Attorney General Cynthia H. Coffman
Ralph L. Carr Colorado Judicial Center
1300 Broadway, 6th Floor
Denver, Colorado  80203
Email:  leeann.morrill@state.co.us
Telephone:  (720) 508-6159
Attorney for Plaintiff Secretary of State Wayne Williams

Gary W. Hawes (CT State Bar #415091)
Assistant Attorney General
Office of Attorney General George Jepsen
55 Elm St., P.O. Box 120
Hartford, CT  06141-0120
Email: gary.hawes@ct.gov
Telephone: (860) 808-5020
Attorney for Plaintiff State of Connecticut

Gregory C. Strong (DE State Bar #4664)
Director
Gillian L. Andrews (DE State Bar #5719)
Deputy Attorney General
Office of the Attorney General Matthew P. Denn
Consumer Protection Unit
820 N. French Street, 5th Floor
Wilmington, DE 19801
Email: gregory.strong@state.de.us
        gillian.andrews@state.de.us
Telephone:    (302) 577-8504 (Strong)
              (302) 577-8844 (Andrews)
Attorneys for Plaintiff State of Delaware

Brian R. Caldwell (DC Bar #979680)
Assistant Attorney General
Office of Attorney General Karl A. Racine
441 Fourth St., NW, Suite 600-N
Washington, DC  20001
Email: Brian.Caldwell@dc.gov
Telephone: (202) 727-6211
Attorney for Plaintiff District of Columbia

Rebecca Sirkle (FL State Bar #42312)
Assistant Attorney General
Office of Attorney General Pam Bondi
135 W. Central Blvd., Suite 670
Orlando, FL  32801
Email: Rebecca.Sirkle@myfloridalegal.com
Telephone: (407) 316-4840
Attorney for Plaintiff State of Florida

Daniel Walsh (GA State Bar #735040)
Senior Assistant Attorney General
Office of Attorney General Sam Olens
Department of Law, State of Georgia
40 Capitol Square, SW
Atlanta, GA  30334-1300
Email: dwalsh@law.ga.gov
Telephone: (478) 207-1391
Attorney for Plaintiff State of Georgia and Georgia Secretary of State

Hugh R. Jones (HI State Bar #4783)
Supervising Deputy Attorney General
Jodi L. K. Yi (HI State Bar #6625)
Deputy Attorney General
Office of Attorney General Douglas S. Chin
425 Queen St.
Honolulu, HI  96813
Email: Hugh.R.Jones@Hawaii.gov
        Jodi.K.Yi@Hawaii.gov
Telephone: (808) 586-1470
Attorneys for Plaintiff State of Hawaii

Jane E. Hochberg (ID State Bar #5465)
Deputy Attorney General
Office of Attorney General Lawrence G. Wasden
Consumer Protection Division
954 W. Jefferson St., 2nd Floor
Boise, ID  83720
Email: jane.hochberg@ag.idaho.gov
Telephone: (208) 334-2424
Attorney for Plaintiff State of Idaho

Therese M. Harris (IL State Bar #6190609)
Barry S. Goldberg (IL State Bar #6269821)
Assistant Attorneys General
Office of Attorney General Lisa Madigan
100 West Randolph St., 11th Floor
Chicago, IL  60601
Email: tharris@atg.state.il.us
        bgoldbrg@atg.state.il.us
Telephone: (312) 814-2595
Attorneys for Plaintiff State of Illinois

Richard M. Bramer (IN State Bar #15989-77)
Deputy Attorney General and Director, Consumer Protection Division
Office of Attorney General Gregory F. Zoeller
302 W. Washington St., 5th Floor
Indianapolis, IN  46204
Email:  richard.bramer@atg.in.gov
Telephone:  (317) 232-1008
Attorney for Plaintiff State of Indiana

Steve St. Clair (IA State Bar # AT 0007441)
Assistant Attorney General
Office of Attorney General Tom Miller
1305 E. Walnut, 2nd Floor
Des Moines, IA  50319
Email: steven.stclair@iowa.gov
Telephone: (515) 281-3731
Attorney for Plaintiff State of Iowa

Lynette R. Bakker (KS State Bar #22104)
Assistant Attorney General
Office of Attorney General Derek Schmidt
120 S.W. 10th Ave., 2nd Floor
Topeka, KS  66612
Email: lynette.bakker@ag.ks.gov
Telephone: (785) 296-3751
Attorney for Plaintiff State of Kansas

Leah Cooper Boggs (KY State Bar #83471)
John Ghaelian (KY State Bar #94987)
Assistant Attorneys General
Office of Attorney General Jack Conway
1024 Capital Center Drive

Frankfort, KY  40601
Email: John.Ghaelian2@ky.gov
          Leah.Boggs@ky.gov
Telephone: (502) 696-5389
Attorneys for Plaintiff Commonwealth of Kentucky
Cathryn E. Gits (LA State Bar #35144)

Assistant Attorney General
Office of Attorney General James D. "Buddy" Caldwell
1885 N. Third St.
Baton Rouge, LA  70802
Email: gitsc@ag.state.la.us
Telephone: (225) 326-6400
Attorney for Plaintiff State of Louisiana

Carolyn A. Silsby (ME Bar # 3030)
Assistant Attorney General
Office of Attorney General Janet T. Mills
Burton M. Cross Office Building, 111 Sewall St.
6 State House Station
Augusta, ME  04333
Email:  carolyn.silsby@maine.gov
Telephone: (207) 626-8829
Attorney for Plaintiff State of Maine

C. Beatrice Nuñez-Bellamy
Assistant Attorney General
Office of Attorney General Brian E. Frosh
200 St. Paul Place
Baltimore, MD  21202
Email: bnunezbellamy@oag.state.md.us
Telephone:  (410) 576-6300
Attorney for Plaintiffs State of Maryland and Secretary of State John Wobensmith

Brett J. Blank (MA State Bar #686635)
Assistant Attorney General
Non-Profit Organizations/Public Charities Division
Office of Attorney General Maura Healey
One Ashburton Place, 18th Floor
Boston, MA  02108
Email: brett.blank@state.ma.us
Telephone: (617) 727-2200
Attorney for Plaintiff Commonwealth of Massachusetts

William R. Bloomfield (MI State Bar #P68515)
Assistant Attorney General
Department of Attorney General Bill Schuette
Corporate Oversight Division
525 W. Ottawa St., 6th Floor
Lansing, MI  48933
Email: bloomfieldw@michigan.gov
Telephone: (517) 373-1160
Attorney for Plaintiff State of Michigan


Elizabeth B. Kremenak (MN Bar #0390461)
Assistant Attorney General
Office of Attorney General Lori Swanson
Bremer Tower, Suite 1200
445 Minnesota St.
St. Paul, MN  55101-2130
Email: elizabeth.kremenak@ag.state.mn.us
Telephone: (651) 757-1423
Attorney for Plaintiff State of Minnesota


Tanya Webber (MS State Bar #99405)
Assistant Secretary of State – Charities Division
Office of Secretary of State Delbert Hosemann
125 S. Congress St.
Jackson, MS  39201
Email: Tanya.webber@sos.ms.gov
Telephone: (601) 359-6742
Attorney for Plaintiff Secretary of State of Mississippi


Robert E. Carlson (MO State Bar #54602)
Senior Assistant Attorney General
Office of Attorney General Chris Koster
815 Olive St., Suite 200
St. Louis, MO  63101
Email: bob.carlson@ago.mo.gov
Telephone: (314) 340-6816
Attorney for Plaintiff State of Missouri


E. Edwin Eck (MT State Bar #414)
Deputy Attorney General
Kelley L. Hubbard (MT State Bar #9604)
Assistant Attorney General
Office of Attorney General Timothy C. Fox

P. O. Box 200151
Helena, MT  59601
Email: EdEck@mt.gov
        khubbard@mt.gov
Telephone: (406) 444-2026
Attorneys for Plaintiff State of Montana


Abigail M. Stempson (NE State Bar #23329)
Daniel J. Russell (NE State Bar #25302)
Assistant Attorneys General
Office of Attorney General Douglas Peterson
2115 State Capitol
PO Box 98920
Lincoln, NE  68509
Email: Abigail.stempson@nebraska.gov
        Daniel.russell@nebraska.gov
Telephone: (402) 471-1279
Attorneys for Plaintiff State of Nebraska


JoAnn Gibbs (NV State Bar # 005324)
Chief Multistate Counsel
Office of Attorney General Adam Paul Laxalt
Bureau of Consumer Protection
10791 W. Twain Ave., Suite 100
Las Vegas, NV  89135
Email: jgibbs@ag.nv.gov
Telephone: (702) 486-3789
Attorney for Plaintiff State of Nevada


Thomas J. Donovan (NH State Bar #664)
Director of Charitable Trusts
Office of Attorney General Joseph A. Foster
33 Capitol St.
Concord, NH  03301
Email: tom.donovan@doj.nh.gov
Telephone: (603) 271-1288
Attorney for Plaintiff State of New Hampshire


Erin M. Greene (NJ State Bar #0145102010)
Deputy Attorney General
State of New Jersey
Office of the Attorney General
Division of Law

124 Halsey St.
P.O. Box 45029
Newark, NJ  07101
Email: erin.greene@dol.lps.state.nj.us
Telephone: (973) 648-4846
Attorney for Plaintiff State of New Jersey

Sean Courtney (NY State Bar #2085363)
Yael Fuchs (NY State Bar # 4542684)
Assistant Attorneys General
Office of Attorney General Eric T. Schneiderman
120 Broadway
New York, NY  10271
Email: sean.courtney@ag.ny.gov
        yael.fuchs@ag.ny.gov
Telephone: (212) 416-8402
Attorneys for Plaintiff State of New York

Creecy Johnson (NC State Bar #32619)
Special Deputy Attorney General
Office of Attorney General Roy Cooper
9001 Mail Service Center
Raleigh, NC  27699
Email: ccjohnson@ncdoj.gov
Telephone: (919) 716-6000
Lareena J. Phillips (NC State Bar #36859)
Assistant Attorney General
Counsel for North Carolina Secretary of State Elaine F. Marshall
9001 Mail Service Center
Raleigh, NC  27699
Email:  lphillips@ncdoj.gov
Telephone:  (919) 716-6610
Attorneys for Plaintiff State of North Carolina

Michael C. Thompson (ND State Bar # 06550)
Assistant Attorney General
Office of Attorney General Wayne Stenehjem
Gateway Professional Center
1050 E. Interstate Ave., Ste. 200
Bismarck, ND  58503
Email: mcthompson@nd.gov
Telephone: (701) 328-5570
Attorney for Plaintiff State of North Dakota

Yvonne Tertel (OH State Bar #0019033)
Principal Assistant Attorney General
Office of Attorney General Mike DeWine
150 E. Gay St., 23rd Floor
Columbus, OH  43215
Email: yvonne.tertel@ohioattorneygeneral.gov
Telephone: (614) 466-3181
Attorney for Plaintiff State of Ohio

Malisa McPherson (OK State Bar #32070)
Assistant Attorney General
Public Protection Unit
Office of Attorney General E. Scott Pruitt
313 N.E. 21st St.
Oklahoma City, OK 73105
Email: Malisa.mcpherson@oag.ok.gov
Telephone: (405) 521-6926
Attorney for Plaintiff State of Oklahoma

Heather L. Weigler (OR State Bar #03590)
Assistant Attorney General
Office of Attorney General Ellen Rosenblum
1515 SW 5th Ave., Suite 410
Portland, OR  97201
Email: heather.l.weigler@state.or.us
Telephone: (971) 673-1880
Attorney for Plaintiff State of Oregon

Michael T. Foerster (PA State Bar #78766)
Senior Deputy Attorney General
Office of Attorney General Kathleen G. Kane
14th Floor Strawberry Square
Harrisburg, PA  17120
Email: mfoerster@attorneygeneral.gov
Telephone: (717) 783-2853
Gene J. Herne (PA State Bar #82033)
Senior Deputy Attorney General-in-Charge
Charitable Trusts and Organizations Section
Office of Attorney General Kathleen G. Kane
564 Forbes Avenue, 6th Floor Manor Complex
Pittsburgh, PA 15219

Email:  eherne@attorneygeneral.gov
Telephone:  (412) 565-3581
Attorneys for Plaintiff Commonwealth of Pennsylvania

Genevieve M. Martin (RI State Bar #3918)
Assistant Attorney General
Department of Attorney General Peter F. Kilmartin
150 South Main St.
Providence, RI  02903
Email: gmartin@riag.ri.gov
Telephone: (401) 274-4400 x2300
Attorney for Plaintiff State of Rhode Island

Shannon A. Wiley (SC State Bar #69806)
Deputy General Counsel
Office of Secretary of State Mark Hammond
1205 Pendleton St., Suite 525
Columbia, SC  29201
Email: swiley@sos.sc.gov
Telephone: (803) 734-0246
Attorney for Plaintiff State of South Carolina

Philip D. Carlson (SD State Bar #3913)
Assistant Attorney General
Office of Attorney General Marty J. Jackley
1302 E. Highway 14, Suite 1
Pierre, SD  57301
Email: Phil.Carlson@state.sd.us
Telephone: (605) 773-3215
Attorney for Plaintiff State of South Dakota

Janet M. Kleinfelter (TN State Bar # 13889)
Deputy Attorney General
Office of the Attorney General
425 5th Ave., N.
P.O. Box 20207
Nashville, TN  37202
Email: Janet.Kleinfelter@ag.tn.gov
Telephone: (615) 741-7403
Attorney for Plaintiff Tennessee Secretary of State Tre Hargett

Corey D. Kintzer (TX State Bar #24046219)
Jennifer M. Roscetti (TX State Bar #24066685)
Assistant Attorneys General
Office of Attorney General Ken Paxton
300 W. 15th St., 9th Floor
Austin, TX  78701
Email: Corey.Kintzer@texasattorneygeneral.gov
          Jennifer.Roscetti@texasattorneygeneral.gov
Telephone:    (512) 936-0585 (Kintzer)
                   (512) 475-4183 (Roscetti)
Attorneys for Plaintiff State of Texas

Jeffrey Buckner (UT State Bar #4546)
Assistant Attorney General
Office of Attorney General Sean D. Reyes
160 E. 300 South, Fifth Floor
P. O. Box 140872
Salt Lake City, UT  84114
Email: Jbuckner@utah.gov
Telephone: (801) 366-0310
Attorney for Plaintiff State of Utah and Utah Division of Consumer Protection

Todd W. Daloz (VT State Bar #4734)
Assistant Attorney General
Office of Attorney General William H. Sorrell
109 State St.
Montpelier, VT  05609
Email: todd.daloz@state.vt.us
Telephone: (802) 828-4605
Attorney for Plaintiff State of Vermont

Richard S. Schweiker, Jr. (VA State Bar #34258)
Senior Assistant Attorney General
Office of Attorney General Mark R. Herring
900 E. Main St.
Richmond, VA  23219
Email: rschweiker@oag.state.va.us
Telephone: (804) 786-5643
Attorney for Plaintiff Commonwealth of Virginia

Sarah A. Shifley (WA State Bar #39394)
Assistant Attorney General
Office of Attorney General Robert W. Ferguson

800 5th Ave., Suite 2000, TB-14
Seattle, WA  98104
Email: sarah.shifley@atg.wa.gov
Telephone: (206) 389-3974
Attorney for Plaintiff State of Washington

Michael M. Morrison (WV State Bar #9822)
Assistant Attorney General
Office of Attorney General Patrick Morrisey
P.O. Box 1789
Charleston, WV  25326
Email: Matt.M.Morrison@wvago.gov
Telephone: (304) 558-8986
Laurel K. Lackey (WV State Bar #10267)
Assistant Attorney General
Counsel for Secretary of State Natalie E. Tennant
269 Aikens Center
Martinsburg, WV  25404
Email: Laurel.K.Lackey@wvago.gov
Telephone: (304) 267-0239
Attorneys for Plaintiff State of West Virginia

Francis X. Sullivan (WI State Bar #1030932)
Assistant Attorney General
Office of Attorney General Brad D. Schimel
17 W. Main St., P.O. Box 7857
Madison, WI  53707-7857
Email: sullivanfx@doj.state.wi.us
Telephone: (608) 267-2222
Attorney for Plaintiff State of Wisconsin

Clyde W. Hutchins (WY State bar #6-3549)
Senior Assistant Attorney General
Office of Attorney General Peter K. Michael
123 State Capitol
Cheyenne, WY  82003
Email: clyde.hutchins@wyo.gov
Telephone: (307) 777-7847
Attorney for Plaintiff State of Wyoming

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Federal Trade Commission; and the States of Alabama; Alaska; Arizona; Arkansas; California; Colorado; Connecticut; Delaware; Florida; Georgia; Hawaii; Idaho; Illinois; Indiana; Iowa; Kansas; Kentucky; Louisiana; Maine; Maryland; Massachusetts; Michigan; Minnesota; Mississippi; Missouri; Montana; Nebraska; Nevada; New Hampshire; New Jersey; New Mexico; New York; North Carolina; North Dakota; Ohio; Oklahoma; Oregon; Pennsylvania; Rhode Island; South Carolina; South Dakota; Tennessee; Texas; Utah; Vermont; Virginia; Washington; West Virginia; Wisconsin; and Wyoming; and the District of Columbia;<br><br>               Plaintiffs;<br>vs.<br><br>Cancer Fund of America, Inc., also d/b/a Breast Cancer Financial Assistance Fund, a Delaware corporation; Cancer Support Services, Inc., a District of Columbia corporation; Children's Cancer Fund of America, Inc., an Arizona corporation; The Breast Cancer Society, Inc., also d/b/a The Breast Cancer Society of America, a Delaware corporation; James Reynolds, Sr., individually and in his capacity as an officer or director of Cancer Fund of America, Inc.; Kyle Effler, individually and in his capacities as an officer or director of Cancer Fund of America, Inc., and Cancer Support Services, Inc.; Rose Perkins, individually and in her capacity as an officer or director of Children's Cancer Fund of America, Inc.; and James Reynolds, II, a/k/a James Reynolds, Jr., individually and in his capacity as an officer or director of The Breast Cancer Society, Inc.;<br>               Defendants. | CASE NO.<br><br>**COMPLAINT** |

## COMPLAINT

Plaintiffs, the Federal Trade Commission ("FTC") and the states of Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin, and Wyoming, and the District of Columbia (collectively "Plaintiffs"), for their complaint against Defendants Cancer Fund of America, Inc., also d/b/a Breast Cancer Financial Assistance Fund  ("CFA"); Cancer Support Services, Inc. ("CSS"); Children's Cancer Fund of America, Inc. ("CCFOA"); The Breast Cancer Society, Inc., also d/b/a The Breast Cancer Society of America ("BCS"); James Reynolds, Sr.; Kyle Effler; Rose Perkins; and James Reynolds, II, a/k/a James Reynolds, Jr. (collectively "Defendants") allege:

## <u>SUMMARY OF THE CASE</u>

1. Defendants, four sham charities and the individuals who run them, have engaged in a massive, nationwide fraud, telling generous Americans that their contributions will help people suffering from cancer, but instead, spending the overwhelming majority of donated funds supporting the Individual Defendants, their families and friends, and their fundraisers.  Collectively, between 2008 and 2012, Defendants raised more than $187 million from donors in the United States.  This case is about those sham charities, the individuals who ran them, and the false and deceptive claims they made while raising these enormous sums from an unsuspecting public.

2. In telemarketing calls, direct mail solicitations, websites, regulatory filings, financial documents, and Combined Federal Campaign materials, Defendants have portrayed themselves as legitimate charities with substantial nationwide programs whose

primary purposes were to provide direct support to cancer patients, children with cancer, and breast cancer patients in the United States.  They also have described specific programs that donors' contributions supposedly would support, including, e.g., stating that donations would be used to provide pain medication to children suffering from cancer, transport cancer patients to chemotherapy appointments, or pay for hospice care for cancer patients.  These were lies.  Not one of the Defendants has operated a program that provides cancer patients with pain medication to alleviate their suffering, transports cancer patients to chemotherapy appointments, or pays for hospice care.  Moreover, the vast majority of donors' contributions have not directly assisted cancer patients in the United States or otherwise benefitted any charitable purpose.  Rather, donations have enriched a small group of individuals related by familial and financial interests and the for-profit fundraisers they hired.  This diversion of charitable funds has deceived donors and wasted millions of dollars that could have been spent as donors intended, to help Americans suffering from cancer.

3.      Defendants have hidden their high fundraising and administrative costs from donors by using an accounting scheme involving the shipment of pharmaceuticals and other goods (known as gifts-in-kind or "GIK") to developing countries.  Through this scheme, collectively from 2008 through 2012, Defendants improperly reported over $223 million in revenue and program spending in their financial statements.  This had the effect of making Defendants appear to be larger and more efficient with donors' dollars than they actually were, deceiving the donating public.

4.      Defendants' deceptive conduct has violated Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45(a), and the Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310, as well as state statutes regarding charitable solicitations and prohibiting deceptive and unfair trade practices.

5.      The FTC brings this action under Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b) and 57b, and the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. §§ 6101-6108, to obtain temporary,

preliminary, and permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for Defendants' violations of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and the TSR, 16 C.F.R. Part 310.

6.     This action is also brought, in their representative and individual capacities as provided by state law, by the attorneys general of Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Dakota, Texas, Utah,[1] Vermont, Virginia, Washington, West Virginia, Wisconsin, and Wyoming (collectively the "Attorneys General") and the secretaries of state of Colorado, Georgia, Maryland, North Carolina, South Carolina, Tennessee, Mississippi, and West Virginia (collectively the "Secretaries of State").  The plaintiffs identified in this paragraph are referred to collectively as the "Plaintiff States."

7.     The Plaintiff States bring this action pursuant to consumer protection, business regulation, charitable solicitation, and/or charitable trust enforcement authority conferred on their attorneys general, secretaries of state, and/or state agencies by state law and/or pursuant to *parens patriae* and/or common law authority.  These state laws authorize the Plaintiff States to seek temporary, preliminary, and permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief, to prevent the waste, dissipation, and loss of charitable assets, and/or to stop ongoing donor deception caused by Defendants' violations of state law.  These state laws also authorize the Plaintiff States to obtain civil penalties, attorneys' fees, expenses, and costs.

_____

[1] As used here, the attorney general of Utah refers to the Utah Attorney General as counsel to the Division of Consumer Protection, and in his capacity to enforce the TSR pursuant to the Telemarketing Act.

8.     This action is also brought by the Attorneys General of the Plaintiff States and the Attorney General of the District of Columbia pursuant to Section 6103(a) of the Telemarketing Act, which authorizes attorneys general to initiate federal district court proceedings and seek to enjoin violations of, and enforce compliance with, the TSR, to obtain damages, restitution, and other compensation, and to obtain such further and other relief as the court may deem appropriate to stop Defendants' violations of the TSR.  15 U.S.C. § 6103(a).

## JURISDICTION AND VENUE

9.     This Court has jurisdiction over the federal law claims pursuant to 15 U.S.C. §§ 45(a), 53(b), 57b, 6102(c), 6103(a), and 6105(b), and 28 U.S.C. §§ 1331, 1337(a) and 1345.  This Court has supplemental jurisdiction over the subject matter of the state law claims pursuant to 28 U.S.C. § 1367.

10.     Venue in this District is proper pursuant to 15 U.S.C. §§ 53(b) and 6103(e), and 28 U.S.C. §§ 1391(b) and (c).

## COMMERCE

11.     At all times material to this complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## PLAINTIFFS

12.     Plaintiff FTC is an independent agency of the United States Government created by statute.  15 U.S.C. §§ 41-58.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.  The FTC also enforces the Telemarketing Act, 15 U.S.C. §§ 6101-6108. Pursuant to the Telemarketing Act, the FTC promulgated and enforces the TSR, 16 C.F.R. Part 310, which prohibits deceptive and abusive telemarketing acts or practices. The FTC is authorized to initiate federal district court proceedings, by its own attorneys,

to enjoin violations of the FTC Act and the TSR and to secure such other equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies.  15 U.S.C. §§ 53(b), 56(a)(2)(A), 56(a)(2)(B), 57b, 6102(c), and 6105(b).

13.     The Attorneys General are the chief legal officers for their respective states and commonwealths.  The Secretaries of State are the chief regulators of charities and charitable solicitations for their respective states, and are authorized to enforce their states' laws regarding the solicitation of charitable donations.  The Rhode Island Department of Business Regulation is the chief regulator of charities and charitable solicitations for the State of Rhode Island.  The Utah Division of Consumer Protection is the chief regulator of charities and charitable solicitations for the State of Utah.  The Plaintiff States bring this action pursuant to consumer protection, business regulation, charitable solicitation, and/or charitable trust enforcement authority conferred on them by the following statutes and/or pursuant to *parens patriae* and/or common law authority:

| State | Statute |
| --- | --- |
| Alabama: | ALA. CODE §§ 8-19-1 through -15; and §§ 13A-9-70 through 76. |
| Alaska: | ALASKA STAT. §§ 45.50.471 through 45.50.561; and §§ 45.68.010 through 45.68.900. |
| Arizona: | ARIZ. REV. STAT. ANN. §§ 44-1521 through 44-1534; and §§ 44-6551 through 44-6561. |
| Arkansas: | ARK. CODE ANN. §§ 4-28-401 through 4-28-416; and §§ 4-88-101 through 4-88-115. |
| California: | CAL. GOV. CODE §§ 12580 through 12599.6; CAL. BUS. & PROF. CODE §§ 17200 through 17206; and §§ 17510 through 17510.95. |
| Colorado: | COLO. REV. STAT. §§ 6-1-101 through 115; and §§ 6-16-101 through 114. |
| Connecticut: | CONN. GEN. STAT. §§ 21a-175 through 21a-190l; and §§ 42-110a through 42-110q. |
| Florida: | FLA. STAT. ch. 501, Part II; and ch. 496 (2013). |
| Georgia: | GA. CODE ANN. §§ 43-17-1 through 43-17-23 (2011). |
| Hawaii: | HAW. REV. STAT. § 28-5.2; §§ 467B-9.6, 467B-9.7(d), 467B-10.5; and § 480-15. |
| Idaho: | IDAHO CODE ANN. §§ 48-601 through 619; and §§ 48-1201 through 1206. |
| Illinois: | 225 ILL. COMP. STAT. §§ 460/0.01 through 460/23. |
| Indiana: | IND. CODE §§ 23-7-8-1 through -9; and §§ 24-5-0.5-1 through -12. |

| | |
|---|---|
| Iowa: | IOWA CODE § 714.16. |
| Kansas: | KAN. STAT. ANN. §§ 17-1759 through 17-1776. |
| Kentucky: | KY. REV. STAT. ANN. §§ 367.110 through 367.300. |
| Louisiana: | LA. REV. STAT. ANN. §§ 51:1401 through 1427; and §§ 51:1901 through 1909.1. |
| Maine: | ME. REV. STAT. ANN. tit. 5, §§ 205-A through 214. |
| Maryland: | MD. CODE ANN., BUS. REG. §§ 6-101 through 6-701 (2010 Repl. Vol.) (2014 Suppl.). |
| Massachusetts: | MASS. GEN. LAWS ch. 12 §§ 8 through 8M, 10; ch. 68 §§ 18 through 35; and ch. 93A §§ 1 through 11. |
| Michigan: | MICH. COMP. LAWS §§ 400.271 through 400.294. |
| Minnesota: | MINN. STAT. ch. 309. |
| Mississippi: | MISS. CODE ANN. §§ 79-11-501 through 79-11-529. |
| Missouri: | MO. REV. STAT. ch. 407. |
| Montana: | MONT. CODE ANN. §§ 30-14-103 and 30-14-111. |
| Nebraska: | NEB. REV. STAT. §§ 21-1901 through 21-19,177; §§ 59-1601 through 59-1622; and §§ 87-301 through 87-306. |
| Nevada: | NEV. REV. STAT. §§ 598.1305, 598.0915(15), 598.096, and 598.0963. |
| New Hampshire: | N.H. REV. STAT. ANN. §§ 7:19; 7:20; 7:21; 7:24; 7:28; 7:28-c; 7:28-f; and 641:8. |
| New Jersey: | N.J. STAT. ANN. §§ 45:17A-18 through 45:17A-32(c); §§ 56:8-1 through 56:8-20; and N.J. ADMIN. CODE §§ 13:48-1.1 through 13:48-15.1. |
| New Mexico: | N.M. STAT. §§ 57-12-1 through 57-12-22; and §§ 57-22-1 through 57-22-11 (1978). |
| New York: | N.Y. EXEC. LAW §§ 63(12) and 171-a through 175; N.Y. GEN. BUS. LAW § 349; and N.Y. NOT-FOR-PROFIT CORP. LAW § 112. |
| North Carolina: | N.C. GEN. STAT. §§ 75-1.1 and 131F-23 and -24. |
| North Dakota: | N.D. CENT. CODE §§ 50-22-01 through 50-22-07; and §§ 51-15-01 through 51-15-11. |
| Ohio: | OHIO REV. CODE ANN. § 1716. |
| Oklahoma: | OKLA. STAT. ANN. tit. 18 §§ 552.1 through 552.22. |
| Oregon: | OR. REV. STAT. §§ 128.886; and §§ 646.605 through 646.636. |
| Pennsylvania: | 10 PA. CONS. STAT. §§ 162.1 through 162.23 (1990). |
| Rhode Island: | R.I. GEN. LAWS §§ 5-53.1-1 through 5-53.1-18. |
| South Carolina: | S.C. CODE ANN. §§ 33-56-10 through 33-56-200. |
| South Dakota: | S.D. CODIFIED LAWS §§ 37-30-17 through 37-30-21; and §§ 21-34-1 through 21-34-14. |
| Tennessee: | TENN. CODE ANN. §§ 48-101-501 through 48-101-522. |
| Texas: | TEX. BUS. & COM. CODE ANN. §§ 17.41 through 17.63. |
| Utah: | UTAH CODE ANN. §§13-22-1 through 13-22-23; 13-26-1 through 13-26-11; and 13-11 through 13-11-23. |

| Vermont: | VT. STAT. ANN. tit. 9 §§ 2453 through 2461; and §§ 2471 through 2479. |
| Virginia: | VA. CODE ANN. §§ 57-48 through 57-69. |
| Washington: | WASH. REV. CODE § 19.86 and §19.09. |
| West Virginia: | W.VA. CODE §§ 29-19-1 -15b; and §§ 46A-1-101 through 46a-6-110. |
| Wisconsin: | WIS. STAT. §§ 202.11-202.18. |
| Wyoming: | WYO. STAT. ANN. §§ 40-12-101 through 114. |

14.     Pursuant to authority found in 15 U.S.C. § 6103(a), the Attorneys General of the Plaintiff States and the District of Columbia are also authorized to initiate federal district court proceedings to enjoin telemarketing activities that violate the TSR, and in each such case, to obtain damages, restitution, and other compensation on behalf of their residents, or to obtain such further and other relief as the court may deem appropriate.

## DEFENDANTS

15.     Defendant Cancer Fund of America, Inc. ("CFA"), also d/b/a Breast Cancer Financial Assistance Fund, is a Delaware corporation headquartered in Knoxville, Tennessee.  CFA also maintained administrative offices in Mesa, Arizona from 2002 through 2007, and had employees working in Arizona as recently as 2009.  CFA's articles of incorporation represent that it is organized and will operate as a nonprofit corporation.  CFA has received an exemption from federal income tax from the Internal Revenue Service ("IRS") pursuant to Section 501(c)(3) of the Internal Revenue Code, 26 U.S.C § 501(c)(3).  Notwithstanding this, CFA is organized to carry on business for its own profit or the profit of its members within the meaning of Section 4 of the FTC Act. In 2012, CFA began using the name "Breast Cancer Financial Assistance Fund" in some of its charitable solicitations.  In the past, several states have brought legal actions against CFA for, among other things, inadequate board governance, improperly valuing gift-in-kind contributions, and making misrepresentations about its charitable programs.  Such actions include those brought by Connecticut (Connecticut by Riddle v. Cancer Fund of America, Inc., CV-89-0361764 (Superior Ct.) (stipulated order entered in 1991)); Pennsylvania (Com., by Preate v. Cancer Fund of America, Inc., 277 M.D. 1992

(Commonwealth Ct.) (stipulated order entered in 1995)); New York (State by Vacco v. Cancer Fund of America, Inc., No. 95 Civ. 402993 (N.Y. Sup. Ct.) (stipulated order entered in 1996)); Vermont (State of Vermont v. Civic Dev. Group, et al., No. 863-98 (Superior Ct.) (stipulated order entered in 2001)); Massachusetts (Com. of Massachusetts v. Chenevert, 99-0405 (Superior Ct.) (stipulated order entered in 2005)); and Georgia (Doyle v. Cancer Fund of America, Inc., 2007 CV 131522 (Superior Ct.) (complaint filed in 2007 and resulting in settlement)).  Defendant James Reynolds, Sr. heads CFA.  Acting alone or in concert with others, directly or indirectly, by telemarketing and other means, CFA has made misrepresentations to donors regarding its purported charitable programs. CFA transacts or has transacted business in the District of Arizona and throughout the United States.

16.    Defendant Cancer Support Services, Inc. ("CSS"), also d/b/a Cancer Fund of America Support Services, is incorporated in the District of Columbia as a nonprofit corporation whose purpose is to support the activities of CFA.  CSS's articles of incorporation represent that it is organized and will operate as a nonprofit corporation. Notwithstanding this, CSS is organized to carry on business for its own profit or the profit of its members within the meaning of Section 4 of the FTC Act.  CSS sought and received recognition of tax exemption from the IRS as a Type III Functionally Integrated Section 509(a)(3) supporting organization, as defined by the Internal Revenue Code, 26 U.S.C § 509(a)(3).  The IRS requires that substantially all of such a supporting organization's activities be in direct furtherance of the supported organization's mission, and specifically advises that fundraising is not a direct furtherance activity.  CSS's sole activity is to operate a fundraising call center in Dearborn, Michigan that solicits the public for donations.  After expenses, CSS gives virtually all funds it has raised to CFA as "grants."  CSS entered into an Assurance of Voluntary Compliance with the state of Oregon in 2008 to resolve allegations that it had made misrepresentations in charitable solicitations,  In the Matter of Cancer Fund of America Support Services, No. 0808-11372 (Multnomah Cnty. Circuit Ct., Aug. 11, 2008).  Acting alone or in concert with

others, directly or indirectly, by telemarketing and other means, CSS has made misrepresentations to donors regarding its purported charitable programs.  CSS transacts or has transacted business in the District of Arizona and throughout the United States.

17.     CSS operates and has operated as a common enterprise with CFA.  From 2008 through September 2013, Defendant Kyle Effler ("Effler") served as the president and chief financial officer of CSS.  Effler, who was also the chief financial officer of CFA, operated CSS from his CFA office in Knoxville, Tennessee.  CSS did not pay Effler a salary; managing CSS was one of his job duties at CFA.  Other CFA employees assisted Effler with operating CSS in the course of their employment with CFA.  CFA has maintained CSS's books and records on its computers and has issued CFA credit cards to CSS employees for business use.  In addition, auditors conducted only single reviews of the consolidated financial records of CFA and CSS.  CFA and CSS have filed such audits with state regulators.  CFA employees have served as board members of CSS, undertaking CSS-related functions during CFA work hours.  CFA board members have also served as CSS board members.  CFA board meeting minutes explained that the arrangement with CSS "allows CFA to receive funds in the form of grants, without the accompanying costs of fundraising.  This will greatly improve the efficiency of operations of CFA, and present to the public an organization that manages its resources with greater efficiency."  Defendant James Reynolds, Sr. became interim president following Effler's resignation.

18.     Defendant Children's Cancer Fund of America, Inc. ("CCFOA") is an Arizona nonprofit corporation currently headquartered in Powell, Tennessee.  CCFOA was headquartered in Mesa, Arizona from its inception in 2004 to 2006, and it continues to station one employee in Arizona.  CCFOA's articles of incorporation represent that it is organized and will operate exclusively as a nonprofit corporation.  CCFOA has received an exemption from federal income tax from the IRS pursuant to Section 501(c)(3) of the Internal Revenue Code, 26 U.S.C. § 501(c)(3).  Notwithstanding this, CCFOA is organized to carry on business for its own profit or that of its members within

the meaning of Section 4 of the FTC Act.  Defendant Rose Perkins heads CCFOA. Acting alone or in concert with others, directly or indirectly, by telemarketing and other means, CCFOA has made misrepresentations to donors regarding its purported charitable programs.  CCFOA transacts or has transacted business in the District of Arizona and throughout the United States.

19.     Defendant The Breast Cancer Society, Inc. ("BCS"), also d/b/a The Breast Cancer Society of America, is a Delaware corporation headquartered in Mesa, Arizona. BCS's articles of incorporation represent that it is organized and will operate as a nonprofit corporation.  BCS has received an exemption from federal income tax from the IRS pursuant to Section 501(c)(3) of the Internal Revenue Code, 26 U.S.C § 501(c)(3). Notwithstanding this, BCS is organized to carry on business for its own profit or that of its members within the meaning of Section 4 of the FTC Act.  Defendant James Reynolds, II heads BCS.  Acting alone or in concert with others, directly or indirectly, by telemarketing and other means, BCS has made misrepresentations to donors regarding its purported charitable programs.  BCS transacts or has transacted business in the District of Arizona and throughout the United States.

20.     Defendant James Reynolds, Sr. ("Reynolds, Sr."), an individual, is the executive director of CFA and president of its board of directors.  He has held these positions since 1987.  He is also the interim president of CSS.  Individually and in concert with others, he has formulated, directed, controlled, or participated in the acts and practices of CFA and CSS as set forth herein.  Reynolds, Sr. has the authority to control and has controlled the conduct of CFA.  Among other things, he has hired employees, signed contracts, hired fundraisers, approved telemarketing scripts and other solicitation materials, recruited board members, and overseen the financial affairs of CFA.  Reynolds, Sr. also has the authority to control and has controlled the conduct of CSS.  For example, on behalf of CSS, Reynolds, Sr. has recruited board members, negotiated contracts, approved telemarketing scripts and other solicitation materials, approved loans, terminated existing business relationships, and initiated new business relationships.  In

addition, Effler routinely consulted with Reynolds, Sr. about the management of CSS. Reynolds, Sr. has personally profited from the deception alleged herein. He transacts or has transacted business in this District.

21. Defendant Kyle Effler ("Effler"), an individual, was the president of CSS from mid-2008 through September 2013. He was also employed at CFA from 1990 to October 2014, first as an accountant and later as chief financial officer. Individually and in concert with others, he formulated, directed, controlled, or participated in the acts and practices of CFA and CSS as set forth herein. Among other things, Effler hired employees, signed contracts, approved telemarketing scripts and other fundraising materials, recruited board members, and oversaw the financial affairs of CSS and CFA. Effler has personally profited from the deception alleged herein. He transacts or has transacted business in this District.

22. Defendant Rose Perkins ("Perkins"), an individual, is the former wife of Defendant Reynolds, Sr. She is the president of CCFOA's board of directors and also its executive director. Perkins has held these positions since 2005. From 1987 to 2005, she was employed as vice president of CFA. Individually and in concert with others, she has formulated, directed, controlled, or participated in the acts and practices of CCFOA as set forth herein. Among other things, she has hired employees, signed contracts, hired fundraisers, approved telemarketing scripts and other solicitation materials, recruited board members, and overseen the financial affairs of CCFOA. Perkins has personally profited from the deception alleged herein. She transacts or has transacted business in this District.

23. Defendant James Reynolds, II, a/k/a James Reynolds, Jr. ("Reynolds, II"), an individual, is the son of Reynolds, Sr. He is the chief executive officer of BCS and, until September 2013, was also president of its board of directors. He has held these positions since BCS's inception in 2007. From 1992 through the end of 2008, he was employed by CFA in various positions, most recently as vice president of fundraising. Reynolds, II also was a founding board member of CSS and served as president of the

CSS board of directors until October 2008.  In addition, he incorporated CCFOA in 2004 and served as its president until turning the position over to his then-step-mother, Rose Perkins.  Individually and in concert with others, he has formulated, directed, controlled, or participated in the acts and practices of BCS as set forth herein.  Among other things, he has signed contracts, hired fundraisers, approved telemarketing scripts and other solicitation materials, recruited board members, overseen the financial affairs of BCS, and hired employees, including his current wife, Kristina Reynolds.  Reynolds, II has personally profited from the deception alleged herein.  He transacts or has transacted business in this District.

24.     Hereafter, CFA, CSS, CCFOA, and BCS are referred to collectively as the "Corporate Defendants," and Reynolds, Sr., Effler, Perkins, and Reynolds, II are referred to collectively as the "Individual Defendants."  The Corporate Defendants and Individual Defendants are referred to collectively as "Defendants."

## DEFENDANTS' BUSINESS PRACTICES

### *A Profitable Endeavor*

25.     The Corporate Defendants are sham charities created and controlled by Defendant Reynolds, Sr. and his extended family and friends for their personal profit. Since at least 2008, and continuing to the present, Defendants have collected tens of millions of dollars in contributions from unwitting, generous, donors by claiming to help people suffering from cancer.  Defendants have deceived donors into believing that their contributions support bona fide charities that use contributions primarily to provide cash grants and material supplies directly to cancer patients, children with cancer, and individuals with breast cancer in the United States.

26.      In reality, the Corporate Defendants do not operate as bona fide charities. Instead of operating for the benefit of cancer patients or otherwise serving legitimate, mission-related purposes, Corporate Defendants primarily support private interests. From 2008 through 2012, the Corporate Defendants collectively spent 87.9% of contributions from individual donors paying for-profit fundraisers and other fundraising

costs and compensating the Individual Defendants, related persons, and other employees. In contrast, Defendants collectively spent less than 3% of donors' contributions on the cash and goods sent to cancer patients in the United States.

27. In addition, charitable contributions have financed personal loans to Individual Defendants, employees, and other insiders, and paid for trips for the Individual Defendants, their families, and friends to Las Vegas, New York, Disney World, and other locations. Funds donated to help cancer patients have also paid for goods and services used primarily for the private benefit of Individual Defendants, employees, and other insiders. For example, donated funds were used to pay for vehicles, personal consumer goods, college tuition, gym memberships, Jet Ski outings, dating website subscriptions, luxury cruises, and tickets to concerts and professional sporting events.

28. Defendants' advertised charitable causes were simply the mechanisms through which they created employment opportunities for themselves, their friends, and their family members, and funded other private benefits. The Corporate Defendants operated as personal fiefdoms characterized by rampant nepotism, flagrant conflicts of interest, and excessive insider compensation, with none of the financial and governance controls that any bona fide charity would have adopted.

### A Shared History

29. Family members – Defendants Reynolds, Sr., Perkins, Reynolds, II – and long-time associate Effler control the Corporate Defendants. In addition to these individuals, an inter-related group of their family members, friends, and fellow church members have worked as employees and served as board members of the Corporate Defendants.

30. Reynolds, Sr., who spawned the deceptive fundraising scheme in 1987, has been in control of CFA for more than two decades. He has described CSS and CCFOA as "spin-offs" of CFA, and explained that setting up CCFOA and BCS helped CFA because CFA was "really top heavy" with executives. Reynolds, Sr. started CSS in 2002 to help raise funds for CFA. He and Effler have directed the operations of CSS from

CFA's headquarters.  Reynolds, II and Eric Fransen ("Fransen"), the former BCS board chairman and current BCS vice president, have both served on the CSS board of directors.

31.    CCFOA started as a special project of CFA.  It split off from CFA in late 2004.  Reynolds, II served as its initial president while also employed at CFA.  Fransen also served with Reynolds, II on the CCFOA Board.  They turned CCFOA over to Perkins, who left CFA to run CCFOA.  Five other CFA employees joined Perkins at CCFOA, and two individuals left the CFA board to serve on the CCFOA board.  In 2010, at Reynolds, Sr.'s direction, CFA gave CCFOA a grant of $50,000.

32.    Reynolds, II, who began working at CFA when he was 16, learned the cancer business from his father.  Before starting BCS, while at CFA, Reynolds, II tested fundraising specifically for breast cancer patients, setting up a separate fundraising campaign with CFA's main telemarketer, Associated Community Services.  Donations for this campaign were deposited into CFA accounts until Reynolds, II established BCS and signed a separate fundraising contract with Associated Community Services.  In 2008, at Reynolds, Sr.'s direction, CFA provided BCS a grant of $50,000.

33.    With the formation of each different corporate entity, the Individual Defendants created new opportunities to solicit charitable contributions and new sources of cash to fund their personal lifestyles.  With each different corporate entity, the Individual Defendants also created new opportunities to employ or otherwise provide cash compensation to family members, friends, and fellow church members.

34.    Consistent with their common roots, the Corporate Defendants have operated in a substantially similar manner.  They have hired many of the same fundraisers, contracted with many of the same vendors, accountants, and attorneys, and used similar fundraising materials.  The Corporate Defendants also have engaged in substantially similar international GIK transactions, and have used the same improper methods to claim, value, and classify those transactions.  Because of these similarities, they have deceived the public in similar ways.

*Rampant Nepotism*

35.     From 2008 through at least 2012, the Corporate Defendants failed to observe rudimentary corporate governance practices commonly followed by legitimate charities.  Among other things, CFA, CCFOA, and BCS have served as sources of employment for the Individual Defendants' extended family and friends, without regard for their qualifications.  This has resulted in Defendants hiring and retaining unqualified employees, creating and staffing unnecessary jobs, and authorizing unnecessary employee expenses.  It also has affected programming decisions.  Collectively and individually, between 2008 and 2012, the Corporate Defendants spent more cash compensating the Individual Defendants and their friends and family members than on the cash and goods provided to cancer patients in the United States.

36.     At CFA, Reynolds, Sr. employs or has employed:  his two sons, Defendant Reynolds, II and Michael Reynolds; his former stepson Lance Connatser ("Connatser"), Connatser's wife, Julaporn Connatser, and Connatser's sister-in-law, Sakulrat "Ootz" Perkins; his former stepdaughter, Michelle Morse, her husband, Brian Morse, and her brother-in-law, Eugene Morse; two former sons-in-law, Josh Loveless and James Tyler Smith; and daughters Dawn Reynolds and Lindsay Reynolds (now deceased).  CFA also employs Kyle Effler's son, Brandon Effler.  Reynolds, Sr. has continued to employ family members regardless of where in the country they live.  When Michael Reynolds and Josh Loveless moved to Montana, Reynolds, Sr. had CFA open a "chapter" in Montana – the only such chapter in the country – to keep them on the payroll.  The chapter was not successful and has been closed.

37.     Between 2008 and 2012, CFA paid its employees substantially more than it spent on the cash and goods it provided to cancer patients in the United States.  As the executive director of CFA, Reynolds, Sr. has hired employees, set their salaries, authorized employee benefits, determined bonuses and raises, authorized loans of charity funds to employees, and made promotion decisions – including for his relatives. Reynolds, Sr. has made these decisions on his own, with little or no input or supervision

from the CFA board of directors.  As president of the CFA board, Reynolds, Sr. has voted on annual employee bonuses awarded by the board – including his own.

38.     At CCFOA, Perkins has followed a similar path.  She employs or has employed:  her sister, Claudette Sparks; her two daughters, Michelle Morse and Lindsay Reynolds; her son-in-law, Brian Morse; her former son-in-law James Tyler Smith; her daughter-in-law, Julaporn Connatser; her grandson, Hunter Morse; her long-time friend, Peggy Farvin; her stepdaughter's sister-in-law, Tara Loveless Howard; and her daughter's sister-in-law, Lynda Morse.  CCFOA has also compensated Perkins's step-nephew, Darby Sparks, as an independent contractor.

39.     Between 2008 and 2012, CCFOA paid these employees more than twice the amount it provided in financial assistance to children with cancer in the United States – CCFOA's stated mission.  As the executive director of CCFOA, Perkins has hired these friends and family members, set their salaries, determined their benefits, approved bonuses and raises, and made promotion decisions.  Perkins has handed out across-the-board employee bonuses of up to 10% of salary twice yearly.  She has set bonus amounts based on the cash available in CCFOA's checking account, without regard for budget, spending on program services or other expenses, or employee performance.  As an employee, Perkins has received the same perks and bonuses as other employees, so in effect she has been determining her own benefits and bonuses.  Perkins has made these decisions on her own, with no input or supervision from the CCFOA board of directors and despite the obvious conflicts of interest.

40.     At BCS, Reynolds, II has operated similarly.  After becoming romantically involved with his now-current wife, Kristina Reynolds, he promoted her to be his "Operations and Public Relations Manager" – a newly created, second-in-command position at a significantly higher pay scale, and for which he neither advertised nor interviewed other candidates.  He also hired (or authorized her to hire):  Kristina Reynolds's two sisters, Liana Lopez and Tracy Wilson; Kristina Reynolds's son, Chester Cawood; her step-nephew, Jeffrey Westerman; and her mother, Diana Tenney.  None of

these employees was qualified for their respective positions.  For example, Ms. Tenney, who was previously a caterer, was hired to write grants.  Reynolds, II also hired then-chairman of the BCS board, Eric Fransen, to operate a BCS satellite location – which BCS decided to place in Edgemont, Pennsylvania, conveniently near Fransen's home.  (With Reynolds, II's approval, Fransen then hired his wife and mother-in-law to work there.)

41.     Between 2008 and 2012, BCS paid these employees considerably more than the amount it provided in financial assistance to individuals with breast cancer in the United States – its stated primary purpose.  As the chief executive officer of BCS, Reynolds, II has hired employees, set their salaries, approved a full-time work week of 35 hours, authorized employee benefits (which he took advantage of as well), determined bonuses and raises, authorized loans to employees, and made promotion decisions – including, in each case, for his relatives.  Reynolds, II has made these decisions on his own, with little or no input or supervision from the BCS board of directors and despite the obvious conflicts of interest.  When he was president of the BCS board, Reynolds, II voted on annual employee bonuses awarded by the board.  Although he did not vote on his own bonus, he voted on Fransen's bonus and Fransen voted on Reynolds, II's bonus.

42.     In each instance, rather than hiring employees, setting salaries or approving employee benefits with the goal of promoting genuine charitable purposes, the Individual Defendants have furthered their own private interests – and the corporations' boards have done nothing to stop them.  Bona fide charities do not engage in such conduct.

### *Personal Use of Charitable Assets*

43.     In addition to providing the Individual Defendants, their friends, and their family members with steady, lucrative employment, each Corporate Defendant has spent significant amounts of money on goods, services, and travel purchased for the use and enjoyment of private individuals.  These actions, too, demonstrate that the Corporate Defendants operated primarily for the profit of the individuals who ran them.

44.     At CFA, until recently the organization paid for cars for nine individuals and still provides a car for Reynolds, Sr., despite no apparent need for business travel.  In the past, CFA has also made a short-term, interest free loan, approved by Reynolds, Sr., to Michael Reynolds, and paid college tuition for Reynolds, II, Connatser, Josh Loveless, and Effler.  Until recently, CFA provided employees with company credit cards, but had no written policies about personal use of such cards.  Reimbursement for personal charges on company cards was not required until the end of each year, so in effect CFA was floating short-term, interest-free loans to its employees.  Some personal charges were not repaid at all.  Purchases of gas, car washes, meals at Hooters and other restaurants, cell phone apps and games, and movie tickets were all bought with CFA credit cards and ultimately paid for by donors.  In addition, on one occasion, CFA paid for its board members and employees (and their spouses) to go on a Carnival cruise in the Caribbean, ostensibly for board training purposes.  CFA has funded other such "board training" trips for board members, employees, and their families at other luxury destinations.

45.     CCFOA has operated in a similar manner.  It too provided cars to employees in the past, and continues to provide a car to Perkins, despite no apparent need for business travel.  Likewise, it paid college tuition for Perkins's daughter-in-law, Julaporn Connatser.  CCFOA has also allowed employees to use company credit cards for personal expenses.  Employees were not required to repay CCFOA for these personal expenditures until the end of each calendar year, and thus effectively received interest-free loans from CCFOA.  Perkins has routinely used her CCFOA credit card for personal expenditures, and no one at CCFOA has reviewed her card use to ensure that she has identified and repaid all such personal expenses.  Corporate credit cards have also been used for personal expenses that have not been repaid, including numerous purchases of gas and food, movie tickets, and online purchases from vendors like iTunes.  CCFOA has also paid for extravagant "training" trips for board members, employees, and their families, including on two occasions, all-expense paid trips to Disney World.  CCFOA even paid a babysitter to accompany them.

46.     BCS also operated in a similar manner.  It previously provided employees with cars and continues to provide a car for Reynolds, II, despite no apparent need for business travel.  BCS employees, including Reynolds, II, have enjoyed such perks as gym memberships and college tuition.  BCS also allowed employees to use corporate credit cards for personal expenses, and did not require repayment until the end of each year, effectively providing them with interest-free loans.  BCS credit cards were used to purchase movie tickets, video games, food, gas, car washes, Jet Ski rentals, meals at Hooters, and purchases at Victoria's Secret.  BCS has also provided loans to employees, repaid student loans, and footed the bill for employees' significant others to attend out-of-town events.

47.     The cash used to buy these goods and services and to make these loans was contributed by donors, who were told that their contributions would be spent helping cancer patients.  While bona fide charitable organizations may provide perks or other benefits as part of employee compensation, such benefits are not typically authorized by family members, do not extend to purely personal items, and are governed by clear written employee policies.  Here, the employment opportunities and perks provided to insiders by these sham charities have far exceeded the benefits that they purported to provide to cancer victims.  Bona fide charities do not engage in such conduct.

### Failed Board Oversight

48.     The extravagant insider benefits that the Individual Defendants conferred on their friends and family members have gone unchecked by each organization's board of directors.  This is by design:  board members, hand-picked by the Individual Defendants, have not been independent and have not acted independently.  Instead, they have rubber-stamped decisions by Reynolds, Sr., Effler, Perkins, and Reynolds, II.  The boards of each organization have been populated with relatives of the Individual Defendants, relatives of employees, long-time family friends, employees of other Corporate Defendants, and members of the Individual Defendants' church.  In numerous instances, individual board members have had little or no experience with the

corporations' missions or in nonprofit management, and lack the qualifications required for oversight of these multimillion-dollar enterprises.

49.     These boards have failed to observe even routine corporate governance procedures practiced by legitimate charities.  Board members (other than the Individual Defendants) have not regularly reviewed financial expenditures by the organizations, and not even the board treasurers have engaged in financial oversight or analysis.  CFA and CSS have not used board-approved budgets at all.  At CCFOA and BCS, board members have not participated in creating annual budgets and have approved them without question.  After budgets were approved, the BCS and CCFOA boards did not engage in any ongoing review of expenses or program accomplishments against the budgeted numbers.  Any such review would have revealed to each of the boards the disparity between cash expended on fulfilling the charitable mission and cash expended on corporate insiders, along with other budget issues.  For example, the CCFOA board approved a salary increase for Perkins at a time when CCFOA was scaling back its sole program due to lack of funds.  At BCS, Reynolds, II's salary increased in 2010 from $257,642 to $370,951, but that same year net donations decreased, as did the amount of direct cash aid the organization provided to individuals with breast cancer, its much-touted primary program.  The CFA board was equally oblivious.  Having not reviewed corporate expenses, it authorized increases to staff bonuses and salaries in 2012, at a time when fundraising costs were up and CFA had suspended its main charitable program, supposedly due to lack of funds.

50.     The boards have not set mission-related goals, and have not engaged in strategic or financial planning related to programming.  The boards have not conducted annual elections of officers or board members and have had no term limits for board service.  Nor have they held senior management accountable for hiring unqualified personnel, maintaining inappropriate staff levels, improperly reviewing employee performance, or failing to implement financial controls.  They also failed to limit extravagant and unnecessary employee benefits.

51.     The boards also have not regularly observed conflict of interest policies prohibiting board members from acting on matters in which they were self-interested. Nor have the boards required the corporations or the staff to observe conflict of interest policies that prohibit self-dealing.  For example, at CFA in 2008, at Reynolds, Sr.'s suggestion, the board, including Reynolds, Sr., voted to hold open the job of his son, Reynolds, II, for two years in case his venture with BCS did not succeed.  (The CFA board had provided Perkins the same safe harbor in 2005 when she left CFA for CCFOA.)  At CCFOA, each board member, including Perkins, signed a conflict of interest policy that prohibited compensating interested persons – yet the board knew that Perkins had hired, set salaries, determined bonuses, and set benefits for her relatives. And at BCS, even after then-board chairman Fransen learned that Reynolds, II was romantically involved with his now-current wife, Kristina Reynolds, the BCS board continued to allow Reynolds, II to promote her and set her salary, bonuses, and benefits, at least until their marriage, and to do the same for her sisters, mother, and children.

52.     Again and again, the Corporate Defendants' boards have ratified decisions that furthered the private interests of the Reynolds clan, and ignored or failed to question policies and practices that benefitted those private interests at the expense of their charitable missions.  Boards of bona fide charities do not engage in such conduct.

### *Failed Executive Review*

53.     The boards of directors have exercised no meaningful management or control over the organizations they purport to govern.  The boards have abdicated most responsibilities to the Individual Defendants, over whom they have exercised no meaningful control.  The boards have not reviewed the job performance of Reynolds, Sr., Effler, Perkins, or Reynolds, II.  At CFA and CCFOA, board-approved bonuses were not related to revenue, performance, or achievement of strategic goals, and were approved for multi-year periods, often with minimal board-level discussion.  For example, the boards of CFA and CCFOA authorized twice-yearly staff bonuses of up to 10% of salary, and allowed Reynolds, Sr. and Perkins to determine their own bonuses within that range.  At

CFA, Reynolds, Sr. recommended his own salary increases to the board for approval. At BCS, the board approved a salary range and annual increases for Reynolds, II, but allowed him to set his own salary and annual increases within that range without review. Also at BCS, when Fransen was simultaneously chairman of the board and an employee, he was supervised nominally by Reynolds, II, while also ostensibly supervising Reynolds, II.

54.    The CFA, CCFOA, and BCS boards did not have established compensation committees and approved CEO compensation without independently evaluating the appropriate salary ranges for similarly qualified CEOs or executive directors of comparably sized organizations with similar programs. Instead, these boards have routinely approved salaries in ranges suggested to them by Reynolds, Sr., Perkins, and Reynolds, II, based on information (also provided to them by these individuals) about salaries at other, supposedly comparable organizations. These "comparable" organizations were chosen based in part on annual gross revenues, which for CFA, CCFOA, and BCS included tens of millions of dollars in GIK revenue, not cash income, and did not accurately reflect the size or complexity of their business operations. Boards of directors of bona fide charities do not operate in this manner.

***Telemarketing Contracts Confer Private Benefit on Third Party Fundraisers***

55.    In addition to benefits privately inuring to the Individual Defendants, their families, and their friends, CFA, CCFOA, and BCS have significantly benefitted the private interests of for-profit fundraisers who have solicited in their names, including, for example, Associated Community Services. Contracts with such fundraisers typically have specified that the fundraisers would be paid 80% or more – sometimes as much as 95% – of each dollar raised. As a result, between 2008 and through 2012, CFA, CCFOA, and BCS reported fundraising costs of more than $120 million. (This does not include amounts paid by CSS to its employee-fundraisers.)

56.    Fundraisers have also benefitted from unrestricted access to the lead lists of CFA, CCFOA, and BCS. In numerous instances, fundraising contracts signed by

Reynolds, Sr., Perkins, and Reynolds, II have provided for-profit fundraisers unrestricted use of the donor list developed by that fundraiser, and limited the current and future use of such lists by CFA, CCFOA, and BCS.  Access to these lists has significantly benefited fundraisers, because donors who answer the phone and contribute to one cause are more likely to respond to solicitations for other causes.  Access to names of donors who contributed to CFA, CCFOA, or BCS lowers the cost to fundraisers of acquiring lead lists and increases their response rate when soliciting for other organizations.

57.     For some charities, high fundraising costs can be attributed to start-up expenses or seeking support for unpopular causes.  That is not the case here.  CFA and CCFOA have been in existence for years, and seeking support for cancer-related causes is neither unpopular nor controversial.  Moreover, because it is usually cheaper and easier to obtain contributions from past donors, typically fundraising expenses decline as organizations develop a database of loyal donors.  Yet, by allowing fundraisers unfettered use of their donor lists, CFA, CCFOA, and BCS have never benefitted from the reduced costs associated with soliciting past donors, and have continued to pay even long-term fundraisers the same high rates.  Indeed, in 2011, instead of decreasing the amount paid for fundraising, the largest fundraiser for CFA and CCFOA, Associated Community Services, _increased_ its contractually required payment from 80% to 85% of all funds raised for CFA and CCFOA.  Reynolds, Sr., Perkins, and Reynolds, II have routinely approved these fundraising contracts, and the boards of directors of CFA, CCFOA, and BCS have remained silent, tacitly ratifying their use.

58.     CFA, CCFOA, and BCS have also failed to police the activities of their fundraisers.  After providing fundraisers with approved scripts and other solicitation materials, CFA, CCFOA, and BCS have engaged in no further oversight.  Defendants have done nothing even after a state takes legal action against a fundraiser for making misrepresentations, as, for example, did Michigan in 2013, against Associated Community Services.  In the Matter of Associated Community Services, Inc., File No. 2013-0039412-A (Cease and Desist Order and Notice of Intended Action), available at

http://www.michigan.gov/documents/ag/05.28.13_Notice_of_Intended_Action_with_exhibits_422463_7.pdf.  Indeed, other than cashing the checks, Defendants have done little more than sign the fundraising contracts.

59.     Bona fide charities protect important assets like donor lists.  They also seek to protect their reputations by monitoring their fundraisers and the representations they make to the public.  These Defendants did neither.

### *Donor Deception*

60.     Through telemarketing, direct mail, websites, social media and other online forums, and in publicly filed documents, Corporate Defendants have represented and continue to represent that contributions to them go to support legitimate charities that primarily focus on directly assisting individuals suffering from cancer in the United States.  In addition, in numerous instances, Corporate Defendants have represented that donations funded programs that provided pain medication to cancer patients, transportation to chemotherapy appointments, or paid for hospice care.  As described below, these representations were false.  Relying on those claims, generous Americans opened their pocketbooks and contributed tens of millions of dollars to aid cancer patients.  Defendants exploited this generosity.  Had donors known how their contributions actually would be spent, they would not have contributed.

#### *Misrepresentations that contributions will go to legitimate charities*

61.     Corporate Defendants raised more than $187 million from donors across the country between 2008 and 2012.  Central to the success of their solicitations was the overarching claim, direct or implied, that contributed funds would support bona fide charities whose primary purposes were charitable.  Defendants have made this claim in solicitation materials and telemarketing scripts, including, e.g., claims that:

- CFA is "a national nonprofit charity"; "a national health agency"; "on the forefront of the fight against cancer" or "on the front lines for the fight against cancer";

- CSS is "a nationwide charity just like the Red Cross and the Salvation Army";

- CCFOA "operates exclusively as a charitable organization"; is "a national nonprofit charity"; or "is on the forefront of actually helping needy children with cancer";  and

- BCS is a "national breast cancer charity."

Implicit in every request for a "contribution" and every claim to be a "nonprofit" or a "charity" was the promise that the Corporate Defendants were legitimate charities serving charitable purposes.

62.    In fact, the Corporate Defendants operated primarily for the benefit of private interests.  Their priorities were reflected not just in how they operated, as described in Paragraphs 25 – 59, above, but also in how they spent donors' money.  The bulk of contributed funds went first to the for-profit fundraising companies who solicited the contributions.  The remaining funds were then used primarily for salaries and other benefits enjoyed by the Individual Defendants and their friends and families.  Thus, between 2008 and 2012, CFA and CSS spent 86.4% of donors' contributions paying compensation and fundraising costs.  (CFA and CSS figures are reported together because they operated as a common enterprise and contributions to CSS supported the operations of CFA).  In contrast, CFA and CSS spent 2.8% of donors' contributions on cash and goods provided to cancer patients and nonprofits in the United States.  In the same time period, CCFOA spent 88.8%, of donors' contributions on compensation and fundraising.  In contrast, CCFOA spent 3.4% of donated funds on the cash and goods it provided to families of children with cancer in the United States.  Also between 2008 and 2012, BCS spent 89% of donors' contributions on compensation and fundraising costs.  In contrast, BCS spent 2.4% of donors' contributions on the cash, goods, and other services it provided to breast cancer causes in the United States.

63.    Under these circumstances, it was deceptive to claim that Corporate Defendants were bona fide charities or that contributions would be used primarily for

charitable purposes.  Donors expected that their contributions would be spent primarily on charitable purposes, and likely would have made different donating decisions if they had known the truth.



**Fundraising Expenses and Employee Compensation Compared to Amount Spent on U.S. GIK and Financial Assistance (2008-2012)**

64.     In telemarketing calls, direct mail, websites, social media, and in publicly filed documents, Corporate Defendants described to donors numerous worthwhile programs that contributions would supposedly fund.  These programs included, for example, providing cash grants directly to indigent cancer patients and their families, supplying needy cancer patients directly with medicine and medical supplies, including pain medication, providing transportation to chemotherapy appointments, paying for emergency groceries and utilities, offering treatment counseling, and providing needed goods and supplies to hospices across the country.  These programs supposedly all focused on aiding indigent cancer patients in the United States.  Donors relied on these representations and contributed to support these causes.

65.     In fact, in numerous instances, the Corporate Defendants spent either nothing, or an infinitesimal amount, on the specific programs described.  The purposes for which contributions would be used were central to donors' decisions to contribute funds to these organizations.  If donors had known that most of their contributions would be spent in other ways and for unrelated purposes, and not been deceived, they would have made different donating decisions.  Specific misrepresentations about program benefits by each of the Corporate Defendants are discussed below.

### Misrepresentations by CFA

66.     CFA, in numerous instances, has made misrepresentations about the purpose, size, and scope of its charitable programs.  These misrepresentations have occurred in solicitation materials, such as direct mail pieces and telemarketing scripts that CFA approved for use by telemarketers, on the CFA website, and in other public statements,

67.     In response to these claims, in 2012 alone, generous Americans contributed more than $5.2 million to fundraisers soliciting for CFA.  In total, from 2008 through 2012, donors gave CFA fundraisers $29.7 million.

68.     CFA's misrepresentations have included, but were not limited to, statements like:

- CFA is a "national health agency," "a nationwide patient assistance organization,"  and a "national cancer organization";
- CFA is "making a difference in the lives of tens of thousands of Americans";
- CFA's "number one priority is patient care," it "concentrates its efforts on patient care," is "devoted primarily to direct patient aid," and that "commitment for the care of the individual is still the primary focus of our mission";

- CFA helps "by providing direct services and assistance to financially needy cancer patients and their families, such as the loan of equipment and various supplies, etc.";

- CFA "works to provide aid to indigent patients of this devastating disease";

- CFA is "providing support, products, supplies and services to financially indigent patients";

- CFA is "a Tennessee-based national non-profit organization whose mission is to provide direct support and services to financially indigent patients….";

- CFA "helps tens of thousands of cancer victims and hundreds of hospice organizations on a yearly basis  . . . ."

69.     In fact, CFA's "direct patient aid" program consisted of sending individuals with cancer boxes of seemingly random items.  Such noncash donations are referred to as "gifts-in-kind" ("GIK").  These GIK packages typically included a small quantity of Carnation Instant Breakfast drink, adult briefs and bed pads, and a large assortment of what CFA euphemistically described as "comfort items."  In the past, boxes have included things like sample-size soaps, shampoos, and other toiletries, over-the-counter medications, Little Debbie Snack Cakes, toys, disposable plates and plastic cutlery, scarves, batteries, women's makeup, family-themed DVDs, adult-sized clothing, iPod Nano covers, gift wrap, blank seasonal greeting cards, candy, and/or children's coloring books.  CFA employees and volunteers pre-packed boxes with an assortment of identical items, until supplies of any given item ran out.  Thus, every individual received the same items, regardless of age, gender, clothing size, or personal preference.  Individual recipients could also request latex exam gloves, and, on some occasions, box fans and blankets.

70.     CFA did not consult with medical professionals about the relative need or usefulness to cancer patients of any of the items it provided to individuals.  It had no health care professionals or cancer specialists on its staff.  Reynolds' explanation for buying Little Debbie Snack Cakes for cancer patients was because "they make people

happy."  He justified a switch to purchasing Moon Pies because they "make you happier."

71.    CFA did not require recipients to demonstrate financial hardship.  To receive "direct patient aid," individuals submitted an application to CFA, signed by a medical professional verifying a cancer diagnosis.  There were no other qualifications and no means testing.  Once an individual was accepted, CFA would ship boxes of assorted items to that person every other month for up to two years (except for the months when CFA suspended its shipping due to lack of funds).  After receiving the first package, individuals were required to call CFA to request additional shipments.  In 2012, CFA shipped boxes to 4,378 individuals.  In lieu of shipping boxes to Alaska and Hawaii, CFA provided individuals in those states with cash assistance, sending them checks for $50.  Only 113 individuals received direct financial assistance from CFA from 2008 through 2012.

72.    CFA made the same goods it shipped to individuals available to nonprofits in the United States.  Hospices, health care providers, and other nonprofits could order up to four boxes of Carnation Instant Breakfast, and, when available, slightly larger quantities of adult diapers, bed pads, and exam gloves.  They could also receive boxes of items like those provided to individuals, but in quantities sufficient for five to twenty people.

73.    On some occasions, due to a claimed lack of funds, CFA suspended its program and stopped shipping products to individuals and nonprofits.  For example, it made no shipments from September 2012 to February 2013.  On other occasions, CFA suspended or limited the number of new applicants to whom it would start sending packages.

74.    CFA purchased some of the products it sent to individuals and nonprofits. For example, it routinely bought Carnation Instant Breakfast or other liquid supplement drinks, adult diapers, bed pads, exam gloves, and Little Debbie Snack Cakes. Occasionally it also purchased air freshener, blankets, box fans, and jewelry.

75.     CFA obtained most of the items it sent to individuals and nonprofits – the program described to donors – from procurement agents.  Such agents gather and make available to nonprofits overstocked, out of season, or discontinued merchandise.  To acquire these goods, CFA paid procurement agents between 2% and 5% of the goods' retail value.  Despite paying this relatively small percentage of the goods' retail value, CFA claimed the original retail value of its GIK distributions when reporting its program expenses, rather than reporting the actual amount CFA paid to obtain the goods.  For example, in 2012, CFA reported program expenditures that included donations of GIK goods valued at $2.65 million to individuals and nonprofits in the United States, but only spent $314,000 to acquire these goods.  This actual expenditure amounts to less than 2.3% of donors' contributions to CFA and CSS in 2012.  Almost none of donors' contributions were spent on the actual goods and financial assistance provided to patients, CFA's stated "number one priority."

76.     Moreover, even though CFA claimed that its primary purpose was to provide direct aid to cancer patients or assistance to hospices and other health care providers on a national basis, a significant portion of CFA's U.S. "program" has consisted of donating goods to nonprofits with purposes wholly unrelated to assisting cancer patients.  Many of these organizations were located in and around Knoxville, Tennessee.  For example, CFA contributed merchandise it valued at $688,476 to a Knoxville food bank.  Other contributions went to the Knoxville Toys for Tots drive, a Knoxville Firefighters Association, a Knoxville-area youth soccer program, and a Knoxville nonprofit dedicated to enriching the lives of the disabled through dance.  Senior centers, churches, and schools in the Knoxville area also benefitted.  In 2012, CFA contributed fewer goods to nonprofits with missions related to cancer and health care than it contributed to other kinds of nonprofits.  Donors choosing to support a "national" program of direct aid to cancer patients, or assistance to hospices and other health care providers, reasonably would have expected their contributions to be spent supporting

such programs and not spent supporting food banks, senior centers, and churches in and around Knoxville, Tennessee.

77. In light of its actual program expenditures, CFA was not, in fact, a "national health agency" and its "number one priority" was not "patient care." It did not directly help "tens of thousands of Americans," and its resources were not devoted "primarily to direct patient aid." These claims were deceptive and misled donors to believe that CFA was a large organization that assisted many individuals with cancer in a profound way.

78. In addition, in numerous instances, CFA, directly or through its telemarketing agents, made misrepresentations about specific programs, including, but not limited to claims that:

- CFA helps supply emergency items such as oxygen, transportation to chemotherapy treatment, and medications, and loans equipment to individual cancer patients;
- CFA provides life-saving items to cancer patients;
- CFA provides medical equipment and supplies to cancer patients or "helps provide medical support and services";
- CFA helps cancer patients financially; and
- CFA helps provide cancer patients with pain medications.

79. Most of these claims were simply false. CFA had no program that supplied cancer patients with emergency items such as oxygen, provided transportation to chemotherapy appointments, or loaned equipment to cancer patients. Nor did it provide meaningful "life-saving items," "pain medication," or "medical support and services" to cancer patients.

80. CFA's claim to provide cancer patients with "medical supplies" was also deceptive. Even if adult diapers, bed pads, and vinyl gloves might be construed by donors as "medical supplies," so little of CFA's program expenditures was devoted to

purchasing such items that any claims that donations would be used for such purposes were inherently misleading.

81.     Similarly, claims that CFA helped cancer patients financially implied the existence of a substantial charitable program to do so, and did not accurately represent the extraordinarily limited nature of the financial assistance actually provided by CFA to individuals.  In 2012, the amount of direct cash aid that CFA provided to individuals was just 0.15% of donations to CFA and CSS.  From 2008 through 2012, CFA provided $61,614 in direct cash aid to 113 individuals – 0.1% of the $75.8 million CFA and CSS received in donations.  Under these circumstances, it was deceptive for CFA to claim to engage in a program that provided direct financial aid to cancer patients.

82.     Whether scripted or unscripted, telemarketers' descriptions about the services CFA provided were intended to tug at donors' heartstrings and open their wallets, with little regard for accuracy.  One telemarketing script approved by CFA in 2008 even directed telemarketers trying to convince reluctant donors to say: "I understand [your hesitation to give]; however we never want to have to tell a family that is stretching their finances to the breaking point that 'We're sorry but the CANCER FUND has fallen short of its fundraising goal, so we won't be able to provide you with a wig for your child to cover the hair loss due to chemotherapy!'"  In fact, at that time CFA did not maintain a program to provide wigs for children in chemotherapy.

*Misrepresentations by CSS*

83.     CFA has made additional misrepresentations to donors through its so-called "supporting organization," CSS.  As discussed above, CFA controls the conduct of CSS and together the two corporations have operated as a common enterprise.  The sole mission of CSS is to raise funds for CFA.  Like other professional fundraisers, CSS has spent a significant amount of funds paying for telemarketers, technology, and overhead – at least 73% of every dollar donated.  Unlike other charities, CSS itself has not engaged in the charitable programs it describes to donors.  Instead, it has told donors about charitable programs supposedly engaged in by CFA.

84.     In solicitation materials such as direct mail pieces and telemarketing scripts, on its website, and in other public statements, CSS has claimed that it directly provides aid to cancer patients, hospices, and nonprofit health care organizations.  CSS does none of these things.  In response to such claims, generous Americans gave $8.2 million to CSS in 2012.  Between 2008 and 2012, donors gave CSS over $41.15 million.

85.     CSS has made these misrepresentations in numerous instances, including, but not limited to, statements like:

- "[W]e want to let you know that we are continuing our cancer aid program this year, we are the ones that provide the free supplies & dietary supplements directly to the families that are fighting cancer and also to over 600 hospices and other health care providers. . .";

- "[W]e are NOT about research, we give direct aid to those that already have cancer and are in need";

- "Cancer Support Services is hard at work helping struggling cancer patients get their daily items";

- "Cancer Support Services is diligently working on helping cancer patients in need, we do this by providing cancer patients with the support they need, like dietary supplements, medical supplies, and other items";

- "Cancer Support Services differs greatly from other cancer groups in that its number one priority is funding patient aid rather than research";

- "We help cancer patients anywhere in the United States.  Men, women, children, um, with over two hundred forty types of cancer";

- "[T]ens of thousands of cancer patients contact us for help";

86.     In fact, CSS has never directly provided aid to cancer patients, hospices, or nonprofit health care organizations in the United States.  Instead, it has provided cash grants to CFA.  Claims that CSS engaged in any direct patient aid were false.

87.    In numerous instances, CSS telemarketers have made additional misrepresentations about programs CSS supposedly conducted.  These have included, but are not limited to, statements that CSS itself provides hospice care, as in the following:

- "We also do the hospice care for the terminally ill and we supply over 600 hospice offices with medical supplies all over the United States";

- "We just want you to know that your generous contribution went a long way to help cancer patients out directly with their hospice care and their medical supplies";

- "We also do the hospice care for the terminally ill …";

- "We're the hospice care.  We provide those medical supplies and items for men, women, and children with, with a four-stage cancer";

- "So we're just trying to keep the doors [open for] hospice care, you know that's kind of touch and go you never know …";

- "We're the ones that do the hospice care for the cancer patients afflicted with cancer from infants to adults"; and

- "One hundred percent of our proceeds go to hospice care."

88.    In fact, CSS does not provide hospice care, does not fund hospices, and 100% of donations do not go to hospice care.  CFA also has not provided hospice care to cancer patients.  Such representations were completely fabricated.  Even assuming that CSS telemarketers were describing CFA's programs, the number of hospices in the United States to which CFA has provided any assistance was grossly inflated.  CFA has sent its care packages to some nonprofit health care organizations, including a handful of hospices, but it has not supplied 600 hospices, much less provided them with meaningful amounts of medical supplies.  Donors who relied on these representations and contributed money to CSS were deceived, and legitimate hospice providers deprived of support that might otherwise have gone to them.

*Misrepresentations by CFA and CSS about fundraising costs*

89.     CSS also has used its nonprofit status to mislead donors about the cost of fundraising and to vastly overstate its efficiency in using their contributions.  For example, in numerous instances, CSS has made statements in telemarketing calls including, but not limited to:

- "I'm not a telemarketer so I work directly for the charity…";
- "[T]he great thing about it, us, is that we, I'm not a telemarketer.  We, 100% of the money that we raise goes directly to the charity.  We do not have a professional fundraising company that we have to share your contribution with.  We are the charity calling you directly";
- "One hundred percent of your contribution goes directly to the charity.  I'm not doing a fundraiser and I'm not calling with um, with a telemarketing firm … I'm calling you directly from the charity";
- "We're a nationwide charity just like the Red Cross and the Salvation Army"; and
- "One hundred percent of your contribution goes into the fund where we purchase medical supplies for these cancer patients."

90.     In fact, although CSS is organized as a nonprofit, it operates solely as a telemarketer for CFA.  Despite its (false) assertions, 100% of donors' contributions did not go to support the charitable programs described to them.  Instead, funds donated to CSS first were used to pay CSS's significant fundraising costs and compensation – about 73% of each donation.  After this first cut, most of the remaining funds were sent to CFA.

91.     In its financial statements, CFA reported the revenue it received from CSS but no concomitant costs.  This made it appear that CFA spent donors' money more efficiently than it actually did.  CSS gave CFA $7.96 million between 2008 and 2012, which CFA reported as contributed revenue.  This additional amount caused CFA's ratio of fundraising cost to donations to diminish from 82.9% to 67.4%, making CFA appear more efficient to donors.  In fact, because CFA controlled CSS and CSS engaged in no

programming itself, an accurate representation of the administrative and overhead costs by CFA would have included both the revenue generated by CSS and its expenses. CFA's practice of reporting only the revenue from CSS's operations deceived donors.

92.     Donors have a right to know how their contributions are being spent – and by whom.  Interposing additional entities between the contribution and the charitable program increases costs and dilutes the impact and efficiency of donors' contributions.  If donors had known the truth about CSS's "programs," and not been deceived, they likely would have chosen to avoid such costs and contributed directly to an entity that truly engaged in charitable programs.

### *Misrepresentations by CCFOA*

93.     CCFOA, in numerous instances, has represented that it engages in a substantial charitable program dedicated to providing financial assistance to the families of children suffering from cancer.  CCFOA has made these claims in solicitation materials, such as direct mail pieces and telemarketing scripts that CCFOA approved for use by its telemarketers, on its website, and in other public statements.

94.     In response to such claims, generous Americans contributed $6.36 million to CCFOA in 2012.  Between 2008 and 2012, donors gave CCFOA $39.5 million.

95.     CCFOA's misrepresentations about its programs have included, for example:

- "Finding tangible help when a child is stricken with cancer is both frustrating and difficult to obtain.  We alleviate much of that burden so the family can get on with the business of loving and caring";

- "The Children's Cancer Fund of America is, with your help, assisting children and their parents cope with the daily struggles of cancer by providing direct financial aid to pay for expenses not covered by insurance";

- "The Children's Cancer Fund of America provides financial assistance to medically indigent families having a child with cancer. Monthly checks sent to family to help defray daily living cost";

- "The Children's Cancer Fund of America, Inc., operates exclusively as a charitable organization dedicated to assistance and support of children suffering from cancer and their families through financial aid";

- Donations to CCFOA will go to "many families facing financial devastation in their children's struggle with cancer. . .";

- "We have a combined work experience of nearly 50 years helping cancer patients of all ages, arming us with the knowledge of how to target the most pressing of financial needs, and then rallying to the cause with direct aid";

- "Children's Cancer Fund of America is in the forefront of actually helping needy children with cancer by providing public education and financial assistance to help pay for expenses"; and

- "CCFOA programs fight the ravages of childhood cancer in the following ways: Financial Assistance: Immediate assistance cuts through the red tape to help with immediate needs and expenses not covered by insurance."

96.     Despite CCFOA's representations about its claimed largesse, and the millions of dollars it collected, CCFOA has done almost nothing for children with cancer. For example, in 2012 CCFOA provided $45,026 in financial assistance to 723 recipients – 0.71% of donations. That same year CCFOA paid Perkins a salary of $231,672.

97.     To receive aid, a family needed to call CCFOA to request an application, and then complete and return the original application form with the signature of a medical professional confirming a child's cancer diagnosis. CCFOA imposed no financial qualifications and families received the same monthly amount – between $25 and $100 – for up to 24 months. The amount of the checks sent depended on funds available to CCFOA after paying telemarketers, Perkins's and other staff salaries, and other expenses.

For a time CCFOA issued such checks monthly, but by 2012 the program had been scaled back and checks were issued every other month to enrolled families.

98.     CCFOA started a "Patient Perk Pack" program in August 2012.  On months when checks were not provided, it sent families pre-packaged boxes containing a random assortment of items including, for example, backpacks, school supplies, children's hygiene products, children's coats, religious-themed DVDs, and candy.  Like CFA, CCFOA obtained these items from procurement agents that gather and make available to nonprofits overstocked, out of season, or discontinued merchandise in exchange for a handling fee that is a fraction of the retail value of the items.  CCFOA reported that it provided goods valued at $139,373 to families of children with cancer in 2012, but paid only a fraction of that amount to obtain these goods.  Donors were not told that their contributions would support this program.

99.     Including both its cash assistance and the reported value of the contributed goods given away in "Patient Perk Packs," CCFOA provided aid to individuals in the United States valued at just $184,399 in 2012.  This amounted to 2.9% of the $6.36 million donors contributed, and just 1.2% of CCFOA's reported total contributions (individual donors' contributions plus GIK).  Under these circumstances, CCFOA did not operate a substantial charitable program dedicated to providing financial support to the families of children with cancer, and donors' money was not used for the purposes described to them.

100.     In addition to misrepresentations about its financial assistance program, in numerous instances, CCFOA, directly or through its fundraisers, has made misrepresentations about specific programs including, but not limited, to claims that CCFOA helps children with cancer with "hospice needs," "medical supplies," and "pain medication."  For example, one telemarketing script, authorized by Perkins and used by CCFOA's largest commercial fundraiser, Associated Community Services, claimed that "We [CCFOA] are working to provide pain medication, medical supplies and hospice care when families cannot afford them to battle cancer with no financial worries."  These

claims evoked images of cancer-stricken children suffering untreated pain, waiting for medication that donations to CCFOA could help provide.  While heart-wrenching, the claims were completely false.  CCFOA has never provided pain medication, medical supplies, or hospice care to children with cancer.

### *Misrepresentations by BCS*

101.    BCS, in numerous instances, has made misrepresentations about the purpose, size, and scope of its programs.  BCS made these claims in solicitation materials, such as direct mail pieces and telemarketing scripts approved by BCS for use by its telemarketers, on the BCS website, in statements to the Combined Federal Campaign, and in other public statements.  In response to such claims, generous Americans contributed $15.1 million to BCS in 2012.  From 2008 through 2012, donors contributed $71.7 million to BCS.

102.    Misrepresentations by BCS have included, in numerous instances, claims that providing breast cancer patients in the United States with direct financial assistance is the primary purpose of BCS, and that it has helped thousands of individuals in this way.  Such representations have included, but were not limited to:

- "The Breast Cancer Society is one of the few national breast cancer charities in the United States with a primary focus on providing direct help and assistance to those suffering from breast cancer";
- "The Breast Cancer Society is one of the few national breast cancer charities in the U.S. providing direct help and financial aid to those suffering from breast cancer today!  TBCS is able to assist families in need of assistance with direct financial assistance";
- "Your support provides necessary aid and funding for medical expenses, nutritional, personal care, transportation, utilities, groceries, and much more to breast cancer patients undergoing desperate financial circumstances due to breast cancer";

- "Your pledge to The Breast Cancer Society ensures that individuals will be helped and comforted through this challenging time of their lives; that those we aid will be provided critical assistance to help pay for the necessary supplies and personal care items insurance companies rarely pay for.  The Breast Cancer Society is providing direct HELP to individuals and families";

- "It is the primary mission of TBCS to provide direct aid to those who are suffering from the effects of breast cancer.  We have extensive programs in place that allow both financial and material items to be granted to those in need.  Your generous support makes a difference in thousands of women's lives who are facing breast cancer";

- "Your donation(s) are appreciated, but more importantly they are desperately needed.  [BCS] provides direct support, services, [and] supplies to patients in need and to their care providers.  We seek out countless breast cancer victims that could not otherwise afford proper care";

- "We're back to work … [providing] direct financial assistance to women in the U.S. battling breast cancer";

- "The Breast Cancer Society has been able to provide direct assistance to many thousands of breast cancer patients and their families through our partnership with Associated Community Services";

- "[T]hanks to you and so many other Partners of TBCS, thousands of patients are able to receive financial, medical, and emotional aid"; and

- "A unique mission.  Direct and immediate financial assistance to victims battling breast cancer so they may meet the challenges of the illness and become survivors."

103.    Despite these claims, providing direct financial assistance to breast cancer patients has not been the primary focus or mission of BCS.  Indeed, BCS has not operated a substantial bona fide program providing direct financial assistance to financially needy

individuals with breast cancer at all.  BCS has provided individuals enrolled in its program with $100 each month, for up to six months.  BCS has limited the number of patients to whom it would provide direct financial assistance to no more than 250 individuals per month.  It had no financial eligibility requirements for receiving aid, limiting the program only by requiring recipients to be in active treatment for breast cancer.

104.   In 2012, BCS provided 496 people with a total of $279,432 in cash assistance – 1.8% of individual donors' contributions.  In contrast, in 2012, BCS paid Reynolds, II a salary of $286,901.  Between 2008 and 2012, the amount BCS gave in direct financial assistance to individuals with breast cancer was just 0.68% of its reported total contributions (individual donations plus GIK).

105.   Under these circumstances, BCS has not existed primarily to provide financial assistance directly to financially needy individuals with breast cancer, and it has not helped "thousands" of women annually.  It has provided a relatively small number of individuals with some money.  The level of "direct financial assistance" that BCS provided was so small that it was false and misleading to describe this as BCS's "primary" mission or otherwise represent that BCS engaged in a substantial program financially aiding breast cancer patients.

106.   In numerous instances, BCS, has also made representations about the geographic availability, size, and scope of its Hope Supply Program, including, but not limited to, statements like:

- "The Hope Supply Program is now serving the east and west coasts.  This program offers contributed items that cancer patients can 'shop' for at no cost to them"; and

- "Because of incredibly generous and committed friends like you we are: . . . providing thousands of people access to our local warehouses which are part of the Hope Supply Project."

107.    Through 2012, BCS's Hope Supply Program consisted of two "stores," one in Mesa, Arizona and another in Edgemont, Pennsylvania (near Philadelphia).  BCS opened a third "store" in Bentonville, Arkansas in 2014.  BCS has stocked these "stores" with random merchandise contributed by local retailers, including, e.g., Bed, Bath & Beyond, Babies"R"Us, and The Disney Store.  Like CFA and CCFOA, it has also obtained goods from procurement agents that gather and make available to nonprofits overstocked, out of season, or discontinued merchandise.  Items available at these locations in the past have included baby clothes, children's toys, gift wrap, office supplies, housewares, bedding, women's and children's apparel, shampoo, lotion and other toiletries, over-the-counter medication, and vitamins.  Also like CFA and CCFOA, BCS has spent just a fraction of the goods' reported value to obtain them.  From 2009, when the Mesa "store" opened, through 2012, BCS paid $182,499 for goods that it reported as having a value of $3.6 million.

108.    BCS has made the Hope Supply Program available to anyone who has had breast cancer, whether in active treatment, remission, or cancer free, and imposed no financial eligibility requirements.  Program participants can visit the Hope Supply stores monthly.  There has been no cap on the total number of visits or duration of eligibility.  Participants "shopped" at the store for free, taking whatever they liked, without constraint on quantities or value.  Available "shopping" appointments have been restricted – the "stores" typically have been open only for limited hours, each "shopping" visit lasts up to an hour, and no more than one or two individuals have been allowed to "shop" at any given time.  In 2012, a total of 272 individuals "shopped" at the two BCS locations – 182 in Mesa and 90 in Edgemont.  From 2009 through 2012, fewer than 500 individuals "shopped" at these stores.

109.    Claims that the Hope Supply Program has served "the east and west coasts" were exaggerated.  Practicality limits program participants to those within driving distance of the two stores who have transportation available.  In addition, representations that the program has helped thousands of women were simply not true.

110.    In numerous instances, BCS has also misrepresented that it directly provides breast cancer victims throughout the United States with specific assistance such as medical supplies, health supplies, and treatment including, but not limited to, in statements such as:

- "Last thing we want to do is put you in a bind, but these breast cancer patients rely on us every month for their basic medications";
- "[T]he Breast Cancer Society of America wants to be there to help women in need with direct financial aid, health supplies and commodities, treatment counseling; and countless other levels of support to help them defeat this terrible disease.  This special project of the Breast Cancer Society helps thousands of women in need";
- "We're back to work … [p]roviding emergency groceries and utilities for women suffering from breast cancer";
- "The organization's services are available to those in your community. Help is available both nationally and internationally"; and
- "We are working with the breast cancer aide program.  We provide medical, nutritional, personal care supplies, as well as direct financial assistance to women who suffer from this horrible disease."

111.    Additionally, in numerous instances, through its telemarketing agents, BCS has misrepresented that contributions will provide individual breast cancer patients with the following benefits:

- "medical supplies";
- "insurance";
- "help the ladies with pain meds";
- pay for "medical, nutritional, personal care supplies"; and
- "pay for treatment when patients are short on funds; pre-diagnosis exams, and prescriptions…."

112.    These claims were false.  BCS has not engaged in a substantial program directly helping individuals with breast cancer throughout the United States to receive medical supplies, commodities, or health or personal care supplies.  It does not have a national program that routinely provides breast cancer patients with emergency groceries or pays for utilities, treatment, or pre-diagnosis exams.  Nor does it supply individuals with pain medication or pay for insurance.  While some goods that might be described as medical supplies, health supplies, or personal care items have been available at the two Hope Supply locations, these goods were not available to breast cancer patients throughout the United States, and BCS has not maintained a substantial program making such goods widely available.

*Misrepresentations about Charitable Efficiency:*
*Improperly Reported GIK Used to Disguise Low Charitable Program Expenditures and Minimize High Administrative and Fundraising Costs*

113.    The actual amount spent by CFA, CCFOA, and BCS on the cash and goods provided to cancer patients has been so small because of their high fundraising costs and their use of donated funds for salaries, perks, and other benefits to the extended Reynolds clan.  To mask these high administrative and fundraising costs, which the donating public views unfavorably, Corporate Defendants embarked on an extensive scheme involving shipping GIK goods internationally.  The vast majority of the goods shipped were prescription pharmaceuticals that, in numerous instances, could not be distributed or sold in the United States.  Corporate Defendants' participation in this scheme was limited to paying shipping costs and broker's fees to ship containers of goods to organizations in developing countries – but they reported the full value of the shipments as if the prescription medicine and other goods had been donated to, and distributed by, them.

114.    Corporate Defendants used this scheme to create the bookkeeping illusion that they received millions of dollars in contributed revenue and spent millions of dollars on charitable programs ("program spending") with low administrative and fundraising costs.  Through this scheme, between 2008 and 2012, Corporate Defendants collectively

increased their total reported contributed revenue by over $223 million.  Simultaneously, in the same five-year period they also increased their reported program spending by over $223 million.  This more than doubled their apparent efficiency (the ratio of money spent on program expenses as compared to money spent on total expenses) from 20.7% to 61.5%.  In fact, Corporate Defendants should have reported neither this contributed revenue nor the program expenses associated with these international GIK transactions.

115.    Reynolds, II introduced the international GIK shipping scheme to the CFA board in 2008, while he was still CFA's vice-president.  According to board meeting minutes, "by agreeing to accept goods and cover the shipping costs, CFA can credit these shipments toward patient services with a substantial offset to our fundraising costs."  A PowerPoint presentation to the CFA board by Effler confirmed that effect, observing, "our international shipping component has become very beneficial to boost CFA's program service percentages."  CCFOA began its own shipments in 2009, after Reynolds, Sr. referred the broker CFA used, a company named Charity Services International ("CSI"), to Perkins.  When BCS was formed by Reynolds, II in 2008, it immediately embraced an international GIK shipping scheme.  CSS also reported a handful of shipments.

116.    Corporate Defendants each used CSI, a for-profit entity, to facilitate their GIK transactions.  CSI advertised that participants in its GIK program could help "[r]educe fundraising percentages by booking large gift values."  To accomplish this, CSI provided Corporate Defendants with a turn-key operation that located donors ("upstream donors") with GIK goods that those upstream donors wanted to give to downstream recipients in foreign countries.  These upstream donors – the same two or three organizations were involved in almost all of the Corporate Defendants' international GIK transactions – were nonprofits who had themselves received the goods from some other party, often yet another nonprofit.  CSI itself did not possess or hold title to any of the goods reported as GIK revenue by the Corporate Defendants.

117. CSI provided Corporate Defendants with information about "available" shipments that upstream donors wanted to ship to pre-selected foreign recipients. The information CSI provided included shipping costs, the fees charged by CSI, the estimated value of the shipment, the goods in the shipment, and the destination and recipient of the shipment. If a Corporate Defendant agreed to accept the so-called "donation opportunity," CSI would arrange to ship the goods and provide the Corporate Defendant with paperwork supposedly documenting Defendant's receipt of the donated GIK goods from the upstream donor, the value of the donated goods, and Defendant's distribution of the goods to the downstream foreign recipient. CSI created most of these documents, which in numerous instances were virtually identical form letters, and were often back-dated. They included documents purporting to transfer title to the donated goods from the upstream donor to Corporate Defendants, documents purporting to provide values for the goods, documents purporting to verify receipt of the goods by downstream recipients, and documents discussing the downstream recipient's purported further distribution of the goods.

*Defendants Improperly Reported Receipt and Distribution
of GIK They Did Not Own*

118. Under applicable accounting rules, in numerous instances Corporate Defendants did not have legal ownership of the GIK goods that they claimed to have received. As a result, they should not have reported the goods' value as contributed revenue or program expense. Among other things, Corporate Defendants could not permissibly claim ownership of the donated GIK because, in numerous instances, they had neither physical nor constructive possession of the goods, and did not assume the risks and rewards of ownership.

119. Other than paying CSI's fee, Corporate Defendants, in numerous instances, did nothing to solicit, locate, or facilitate the contributions they supposedly received from upstream donors, which were themselves nonprofits that had received the goods from yet other upstream donors. Corporate Defendants did not know the identity of the pharmaceuticals' manufacturers or the origin of the goods, and they had no direct contact

with the upstream donor.  They did nothing to verify that the supposed donor actually possessed the right to transfer title of the goods, or to determine whether use of the goods had been restricted in any way.  For example, in numerous instances, Corporate Defendants reported receiving donations from an upstream donor, World Help, when World Help did not have title to the goods it supposedly donated to Corporate Defendants.  Corporate Defendants could not legitimately claim to own such goods.

120.    Corporate Defendants also could not permissibly claim ownership of the donated GIK because, in numerous instances, they had no discretion in choosing the beneficiary of the goods.  Other than paying CSI's fee, in numerous instances, Corporate Defendants did nothing to locate or research the foreign beneficiary or facilitate its receipt of the donated goods.  CSI's communications about "donation opportunities" routinely listed the planned destination and foreign recipient for available shipments. Corporate Defendants could accept or reject the opportunity to participate in any given transaction, but could not change the shipment's destination or beneficiary.  In numerous instances, prior to accepting CSI's advertised shipment opportunity, Corporate Defendants had had no prior contact with the foreign recipients.  Corporate Defendants did not typically communicate directly with the foreign recipients at all.  Instead, in numerous instances, such communications were handled by the upstream donors or by CSI.  Corporate Defendants did not verify the recipients' needs for, or potential uses of, the goods, did not restrict such uses, and received little documentation regarding the end uses of the goods, which were often redistributed by the foreign recipients to other organizations.

121.    Corporate Defendants also, in numerous instances, lacked documents related to these GIK transactions that owners of GIK goods are expected to maintain. Without such documentation, Corporate Defendants could not claim the GIK as contributed revenue.  What documentation that Corporate Defendants did have had come from CSI and did not adequately substantiate Corporate Defendants' claimed receipt, possession, and subsequent distribution of the goods.  Among other things, documents

from CSI included thank you letters and distribution reports supposedly sent by foreign recipients to Corporate Defendants but that were instead manufactured by CSI using form letters, letterhead, and digital signatures on file in CSI's computers.  In numerous instances, such documents were backdated.  In other instances, documents described GIK transactions that were literally impossible.  For example, in some instances, the upstream donors purported to transfer title of goods to Corporate Defendants after the shipment had been received by the foreign recipient.

122.   Under these circumstances, Corporate Defendants did not own the GIK goods; they were simply acting as "pass-through" agents between the upstream donors and end recipients.  Such intermediaries may not report the value of goods passing through their hands as contributed revenue or as program service expense in their financial statements.

*Corporate Defendants Improperly Reported the Value of GIK*

123.   Even assuming, *arguendo,* that in some instances Corporate Defendants could have properly claimed the GIK goods' value as contributed revenue or reported it as program expense, in numerous instances, Corporate Defendants used improper valuation methods to inflate the reported values of donated goods.  Corporate Defendants also failed to retain appropriate documentation of those valuations.

124.   Corporate Defendants relied almost exclusively on CSI for valuation information.  In numerous instances, CSI valued pharmaceuticals using the average wholesale price in the United States as listed in the "Red Book: Pharmacy's Fundamental Reference."  That valuation method failed to consider numerous factors including the relevant market for the goods (i.e., whether they could be sold in the United States), the goods' physical condition (including the expiration dates of pharmaceuticals), current market conditions, and the legally permissible uses for the donated goods.  CSI's methods, in numerous instances, resulted in inflated and unsubstantiated claims of value.  For example, in numerous instances, CSI valued particular drugs at U.S. wholesale prices even when there was no U.S. market for the drugs because an upstream donor had

restricted their use to a particular foreign country or because the drugs had expired.  U.S. wholesale drug prices, in numerous instances, are much higher than prices in other markets, so assigning a value based on sale in a U.S. market results in a higher value than, for example, assigning a value based on a market in Africa or Central America.

125.    Corporate Defendants were ultimately responsible for the valuations they reported in financial documents.  In numerous instances, however, they did nothing to oversee, monitor, audit, or otherwise check CSI's processes and procedures for such valuations.  They did not ascertain that the contents of the shipments were as described in the inventory lists they received from CSI.  Nor did they make sure that donated pharmaceuticals were not expired or were in otherwise useable condition.  In numerous instances, inventory lists provided by CSI to Corporate Defendants did not specify the drugs' expiration dates.  In other instances, when expiration dates were provided, some of the listed drugs had expired or were very close to expiring.  (A drug's expiration date affects its monetary value as well as its efficacy.)

126.    Corporate Defendants also failed to maintain records supporting the valuations provided by CSI, including, for example, documents related to CSI's qualifications for conducting appraisals of value, documents detailing the specific valuation method(s) used by CSI, the assumptions made by CSI in determining appraised values, and records of CSI's conclusions of fair value.

*Deceptive Impact of Reporting GIK Transactions*

127.    The increased contributed revenue and program spending Corporate Defendants reported – collectively over $223 million – had the effect of diminishing the reported percentage of revenue they spent on fundraising and administrative costs and increasing the proportion of reported expenses they spent on program services, making Corporate Defendants appear more efficient to donors than they actually were.  Thus, the reported international GIK revenue for the five years from 2008 through 2012 resulted in CFA's reported fundraising expenses being 25.4% of total contributions.  In reality, 67.4% of consumers' donations (including revenue from CSS), or 82.9% without

counting CSS's "contributions" to CFA, were spent on fundraising. For the same period, CCFOA used its international GIK revenue to report fundraising expenses of 47% of total contributions. In reality, 81.5% of consumers' donations were spent on fundraising. Similarly, BCS reported fundraising expenses of 29% of total contributions, while in reality 84.6% of consumers' donations were spent on fundraising. Corporate Defendants also used the inflated contributed revenue amounts when choosing purported "comparable organizations" for setting their executives' pay, thus improperly increasing the Individual Defendants' salaries.

128. Corporate Defendants obtained the paperwork they used to claim these figures for just the cost of the payment to CSI (which included both CSI's fees and shipping costs). For example, in connection with a 2011 shipment to Guatemala, CFA reported contributed revenue and corresponding program expense of over $8 million, but only paid CSI a fee of $50,550. For one 2010 shipment to Ghana for which CCFOA reported contributed revenue and program expense of over $3.8 million, CCFOA paid CSI just $39,960. In addition, for a 2011 shipment to Honduras for which BCS reported contributed revenue and program expense of at least $3.8 million, BCS paid CSI just $28,120. Although Corporate Defendants used such transactions to add hundreds of millions of dollars in program expenses to their financial reports, these "programs" existed entirely on paper. Corporate Defendants did not possess the goods and played no role in their overseas distribution. They hired no additional staff to manage these multimillion-dollar international GIK programs and in most instances spent virtually no staff time on them. In addition, the very high dollar values associated with these transactions largely resulted from overvalued pharmaceuticals.

129. Corporate Defendants claimed these illusory numbers in financial reporting documents like informational tax returns filed with the IRS, commonly known as Forms 990, and in documents filed with numerous state regulators. In connection with such filings, Corporate Defendants certified that the information contained therein was "true, accurate, and complete," sometimes under penalty of perjury. States often make such

documents publicly available so that prospective donors may research charities before making donation decisions. The public, together with state charities regulators, relied on this information in evaluating the performance and effectiveness of the Corporate Defendants. Charity watchdog groups that provide consumers with information about charities also considered Corporate Defendants' reported contributed revenue, program spending, and fundraising and administrative costs when evaluating them. Such financial information was also reported to federal employee donors in Combined Federal Campaign materials.

130. By reporting these GIK transactions as contributed revenue and program expenses, at inflated values, Corporate Defendants represented themselves to be both larger and more efficient than they actually were. They obscured the high percentage of donated funds spent on, among other things, for-profit fundraisers, executive salaries, and employee perks, and concealed the very small amounts spent on the charitable purposes described to donors. As a result, the Forms 990 and other documents filed by Corporate Defendants with the IRS and state regulators, and made publicly available to consumers, were false and misleading.

*Misrepresentations Related to CFA's Inflated GIK Reporting*

131. From 2008 through 2012, CFA improperly reported over $58.5 million in international GIK contributed revenue and commensurate program expenditures associated with its international GIK transactions. CFA used these numbers when publicly touting its size and efficiency, including in newsletters and representations on the Internet. In numerous instances, state regulators relied on CFA's reported numbers to inform their citizens about CFA's efficiency with donor dollars. These numbers were also used by the Combined Federal Campaign to report CFA's alleged fundraising expenses relative to total contributions to prospective donors.

132. As a result of its reporting of these international GIK transactions, CFA deceived donors about its overall size, the resources it devoted to its programs, and how efficiently it used donors' contributions. For example, it increased its apparent efficiency

(the ratio of program expenses to total expenses) by almost 30 percentage points. CFA also disguised the high percentage of donated funds it spent on, among other things, for-profit fundraisers, executive salaries, and employee perks instead of the charitable purposes described to donors. For example, in 2012, CFA reported fundraising costs relative to total contributions (including international GIK income) as 19%. In contrast, 70% of donors' contributions were spent on fundraising.

133. In addition, with these reported international GIK transactions, CFA deceived donors about its primary charitable activities and the focus of its programs. As described above, CFA has represented to donors that its mission is "direct patient aid" for Americans with cancer. CFA has emphasized this purported mission in solicitation materials with claims that it is a "national" health agency, that "CFA is making a difference in the lives of tens of thousands of Americans," that CFA is helping people on a "national basis," and by the very nature of its name, Cancer Fund *of America*.

134. In fact, using CFA's valuations, in 2012 the international GIK accounted for 87.8% of the value of all aid CFA claimed to provide (international and domestic). The international GIK did not assist people with cancer or health-related nonprofits in the United States, and it did not provide direct aid to cancer patients anywhere. Moreover, in numerous instances, the pharmaceuticals involved in these shipments had little to do with treating cancer. For example, the prescription medication lamotrigine, which constituted a significant percentage of the value of shipments claimed by CFA in 2010, 2011, and 2012, is commonly used to treat epilepsy and bipolar disorder, and not to treat cancer. Other medications and medical supplies, like antibiotics and syringes, might have been used in connection with treating cancer patients, but were just as likely to have been used by hospitals and medical clinics to treat other medical conditions.

135. In numerous instances, CFA's claimed shipments went to foreign recipients who then re-distributed the goods to other organizations. CFA had no way of verifying how those organizations used the goods. Moreover, in numerous instances, distribution reports received by CFA explicitly documented that many contributed goods were widely

distributed to the general populace and were not used specifically to assist cancer patients.  For example, one 2011 shipment to Liberia included medicine and medical supplies contributed to clinics and hospitals for general use, as well as products that "helped the Liberian people such as orphans, mothers, children and young adults."  While these were worthy causes, they were not causes that donors were told their contributions would support.

136.    Under these circumstances, CFA's representations to donors about the focus of its programs were deceptive – most of the aid CFA claimed to provide had nothing to do with directly helping cancer patients in the United States and often had nothing at all to do with helping people suffering from cancer.

*Misrepresentations Related to CCFOA's Inflated GIK Reporting*

137.    From 2008 through 2012, CCFOA improperly reported over $29 million in GIK revenue and commensurate program expenditures associated with its international GIK transactions.  CCFOA used these numbers when publicly touting its size and efficiency.  For example, the Combined Federal Campaign used these numbers to inform prospective donors about CCFOA's alleged fundraising expenses relative to total contributions.  Before CCFOA started its international GIK shipping program, the 2009 Combined Federal Campaign reported CCFOA's fundraising expenses relative to total contributions as 84.8% (based on 2008 numbers).  In the 2013 campaign, the Combined Federal Campaign reported CCFOA's fundraising costs relative to total contributions as 38% (based on 2012 numbers).  In reality, in 2012, CCFOA spent 85% of consumers' donations on fundraising expenses.  In numerous instances, state regulators relied on CCFOA's claimed revenue and program expenses to inform their citizens about CCFOA's efficiency.

138.    As a result of its reporting of the international GIK transactions, CCFOA deceived donors about both its overall size and how efficiently it used their contributions. For example, in 2012, its reported efficiency (the ratio of program expenses to total expenses) more than quadrupled, increasing from 13% to 63%.  CCFOA also obscured

the high percentage of donated funds it spent on, among other things, for-profit fundraisers, executive salaries, and employee perks instead of on the charitable purposes it described to donors.

139.    Through these reported international GIK transactions, CCFOA also deceived donors about its primary charitable activities and the focus of its programs.  In solicitation materials and elsewhere, CCFOA has represented to donors that its mission is to provide financial help to the families of American children with cancer.  This has included solicitation materials that focus on claims that CCFOA provides direct financial assistance to pediatric cancer patients and even by the very nature of its name, Children's Cancer Fund *of America*.

140.    Using CCFOA's valuations, in 2012, the international GIK it reported accounted for 98% of the value of all aid CCFOA claimed to provide (international and domestic).  The international GIK shipments, however, had nothing to do with providing financial aid to families of children with cancer in the United States, and often had little to do with cancer – or children – at all.  For example, some shipments contained goods such as deep fat fryers, bread machines, electronic equipment, and adult men's undershirts.  In many instances, the pharmaceuticals involved – which comprised the bulk of the value of the shipments – were not related to treating cancer, much less pediatric cancer.  For example, some medications such as the antibiotic ciprofloxacin, which constituted a large percentage of the value of a 2010 shipment to Guatemala, are expressly contraindicated for use in treatment of children.  In another shipment, the three medications with the highest claimed value were Mirapex, Terbinafine HCL, and Atrovent, which are used to treat Parkinson's disease, skin fungus (jock itch), and mild cold symptoms, respectively.  In numerous instances other medications, medical supplies, and goods that were shipped might have been provided to children with cancer but were just as likely to have been used to treat adults and other medical conditions.

141.    In numerous instances, CCFOA's claimed shipments went to foreign recipients who then re-distributed the goods and pharmaceuticals to other organizations.

CCFOA failed to verify how, or even if, those organizations used the goods. In some instances, distribution reports received by CCFOA explicitly documented that many contributed goods were widely distributed and their use unrestricted to pediatric cancer patients. For example, the majority of one 2011 shipment to Guatemala consisted of medicine and medical supplies that were distributed to rural clinics and hospitals throughout the country for general use. While assisting health care providers in Guatemala was a worthy cause, it was not the cause that donors were told their contributions would support.

142. Under these circumstances, CCFOA's representations to donors about the focus of its programs were deceptive – most of the aid CCFOA claimed to provide was not financial assistance to families of children with cancer in the United States, and often had nothing at all to do with children or cancer.

*Misrepresentations Related to BCS's Inflated GIK Reporting*

143. From 2008 through 2012, BCS improperly reported over $131.9 million in GIK contributed revenue and commensurate program expenditures associated with international GIK transactions. BCS used these international GIK numbers when publicly touting its efficiency, including in statements to reporters and on its website. For example, BCS made statements such as: "We are working hard to reduce our fundraising costs and any additional overhead expenses to maximize what we can do with each and every dollar entrusted to us. For example, we spend only 2% of our revenue on administrative costs, an important step that few national charities with our reach can boast of." BCS's inflated numbers were also used by the Combined Federal Campaign to inform prospective donors about BCS's alleged fundraising expenses relative to total revenue. In addition, in numerous instances, state regulators relied on inflated numbers to inform their citizens about BCS's efficiency.

144. As a result of its reporting of the international GIK transactions, BCS deceived donors about its overall size and how efficiently it used their contributions. For example, in 2012, its reported international GIK program expenses caused its apparent

efficiency (the ratio of program expense to total expenses) to more than triple, increasing from 22% without the reported GIK expenses, to 75% with them.  Also obscured was the high percentage of donated funds relative to total contributions that BCS spent on, among other things, for-profit fundraisers, executive salaries, and employee perks instead of the charitable purposes it described to donors.  For example, in 2012, BCS reported fundraising costs relative to total contributions (including international GIK income) as 24%.  In contrast, 83% of donors' contributions were spent on fundraising.

145.    Using these reported international GIK transactions, BCS also deceived donors about its primary charitable activities and the focus of its programs.  BCS has represented to donors that its mission is to directly help Americans with breast cancer.  Not only did it assume the d/b/a "The Breast Cancer Society of America" for use in some telemarketing solicitations, its solicitation materials focus on claims about BCS's program of "direct" aid to U.S. breast cancer patients, including specific descriptions of financial assistance to women in the United States, and references to the U.S.-based Hope Supply Program.

146.    In fact, using BCS's valuations, between 2008 and 2012 the GIK BCS claimed to ship internationally accounted for 96.2% of the value of all aid reported by BCS (international and domestic).  The international GIK had nothing to do with providing direct assistance to individuals with breast cancer in the United States.  In numerous instances, the pharmaceuticals, medical supplies, and other goods included in BCS's claimed GIK shipments had little, if anything, to do with treating breast cancer.  For example, a 2012 shipment to the Dominican Republic included lamotrigine (used to treat epilepsy and bipolar disorder), ropinirole hydrochloride (used to treat Parkinson's disease and restless leg syndrome), alendronate sodium (used to treat osteoporosis), levocetirizine (an antihistamine), quinine sulfate (an antimalarial drug), and PSE Brom DM (cold medicine).  These drugs are not typically used for the treatment of breast cancer and, in some instances, are not recommended for use by persons who have had cancer.  Some have even been associated with an increased risk of cancer.  In another

example, in 2010, BCS reported shipping over $6 million worth of mebendazole (deworming pills) to Africa and Central America – again, not cancer-related.

147.    In numerous instances, BCS's claimed shipments went to foreign recipients who then re-distributed the goods and pharmaceuticals to other organizations.  BCS failed to verify how, or even if, those organizations used the goods.  Moreover, in numerous instances, distribution reports received by BCS explicitly documented that contributed goods were widely distributed and their use was not restricted to assisting breast cancer patients.  For example, a distribution report for a 2009 shipment to Guatemala made no mention of assisting breast cancer patients.  Similarly, a distribution report for a 2009 shipment to the Philippines that BCS valued at $8.84 million made no mention of assisting breast cancer patients, the cause that donors were told their contributions would support.

148.    Under these circumstances, BCS's representations to donors about the focus of its programs were deceptive – most of the aid BCS claimed to provide was not in the form of financial assistance to individuals with breast cancer in the United States, and often it had nothing at all to do with cancer.



FTC, 50 States, and D.C. v. Cancer Fund of America, Inc., et al.
Complaint, Page 71 of 148

***Defendants Ignored IRS Rules:***

***"Direct Aid" Distributions Fail to Meet Charitable Program Standards***

149.    Defendants' administration of the scant charitable programs they did provide failed to meet the IRS's bare minimum definition of program services.  Most of those purported charitable programs have involved aid to individuals with cancer.  For example, CCFOA has sent funds to some parents with children diagnosed with cancer, CFA has sent some packages of goods to people diagnosed with cancer, and BCS has provided some individuals in active treatment for breast cancer with cash assistance.  To receive such benefits – when new patient applications were being accepted – CFA, CCFOA, and BCS have required only the submission of a completed application with the signature of any medical professional attesting to a cancer diagnosis.  They did not restrict eligibility to those in financial need.  Further, they did not verify the accuracy of information reported on the applications.  Each recipient was given roughly the same aid, without regard to financial need, type of diagnosis, or other material criteria.

150.    Under these circumstances, the distributions to individuals by CFA, CCFOA, and BCS do not meet the definition of charitable contributions set forth in 26 U.S.C. § 170 and in IRS regulations.  Charities operating programs that provide funds and goods directly to individuals must satisfy four criteria to report that expenses associated with such programs are charitable.  First, the charity's program must serve a general charitable class of individuals.  This can include those suffering financial hardship from an unexpected event, such as terrorism or a cancer diagnosis.  Second, the charity must establish criteria for determining which members of the charitable class will receive aid.  Third, the charity must have a standing committee to review applications, apply the criteria, and decide who will receive funds or goods.  Fourth, and most importantly, the charity must verify financial need for the program.  Membership in a charitable class is not sufficient to establish the requisite financial need; there must be documentation of an immediate and significant interruption to a person's finances.

Showing additional expenses or a change in lifestyle are insufficient bases to meet this standard.

151.     CFA, CCFOA, and BCS did not follow these rules.  While they purported to serve persons with cancer, and required completion of basic applications to receive aid, they had neither standing committees to review applications nor verification processes to check applicants' financial need.  BCS did not even require applicants to have an active diagnosis of breast cancer to participate in its Hope Supply program.  As a result, these programs have provided an excessive amount of private benefit that outweighed their public benefit.  Thus, none of these distributions to individuals met IRS requirements, and related expenses should not have been reported as charitable program expenses.  This failure to follow IRS standards for program distributions, like so many other actions, demonstrates that the Corporate Defendants did not operate as bona fide charities.

### *Knowing and Willful Misrepresentations*

152.    Defendants knowingly and willfully misrepresented to donors that CFA, CSS, CCFOA, and BCS were legitimate charities and that donations to their organizations would benefit cancer victims.  In reality, and as Defendants knew, most of the cash collected on behalf of the Corporate Defendants was used to benefit private interests; the so-called "charitable" programs provided little or no assistance to people with cancer.

153.    Defendants also knowingly and willfully made specific false claims to donors.  The Individual Defendants authorized telemarketing scripts and solicitation materials that contained false claims, and tolerated unscripted misrepresentations by telemarketers that they learned about from consumer complaints and law enforcement actions.  In connection with international GIK transactions, Corporate Defendants also knowingly and willfully falsely reported contributed revenue, expenses, and values of GIK goods knowing that such reporting misrepresented the size and the efficiency of their charitable programs and the costs to operate them.  The Individual Defendants knew

that the GIK program expenses associated with these international transactions did not represent actual charitable programs engaged in by the Corporate Defendants.  In addition, the Individual Defendants knew that the validity of reporting GIK transactions as they were doing had been increasingly questioned by the media, the public, regulators, and accounting experts.

154.    Such misrepresentations have persisted throughout CFA's existence.  In the past, it has settled state lawsuits alleging, among other things, that CFA had improperly valued gifts-in-kind and made misrepresentations about its charitable programs – and promised not to repeat such conduct.  Both Reynolds, II and Perkins worked at CFA when such lawsuits were filed, and thus were on notice of the allegations.  Despite these state actions, the deceptive practices have continued – often without modification.  For example, Vermont's 1998 action alleged that CFA misrepresented that donations would be used to provide pain medication to cancer-stricken individuals.  CFA telemarketers have continued to make that claim, as have telemarketers for CCFOA and BCS, even though none of the Corporate Defendants has engaged in any such program.  Similarly, CSS has continued to make the same misrepresentations to donors that triggered a 2008 action by Oregon.

155.    Under these circumstances, Defendants knowingly and willfully engaged in deceptive solicitation and reporting practices and used charitable contributions contrary to the intent of donors.

### *Harm to Donors*

156.    Generous donors contributed more than $187 million to Defendants from 2008 through 2012, believing that their money was going to support legitimate charitable organizations that provided direct aid to cancer patients in the United States.  In fact, the vast majority of contributed funds supported the private interests of for-profit telemarketers or inured to the personal benefit of the Individual Defendants and their family and friends.  Only an insignificant amount of money was actually spent on aid provided to U.S. cancer patients.  Under these circumstances, individual donors were

deceived, and their charitable contributions largely wasted. In addition, donors had less money available to support the many legitimate charitable organizations operating real programs that help individuals with cancer.

## DEFENDANTS' LAW VIOLATIONS

### Count I
**Misrepresentations that Contributions Were for Charitable Purposes**
*(By the FTC and the Plaintiff States)*

157. Plaintiffs incorporate by reference all the foregoing paragraphs.

158. In numerous instances, in connection with soliciting charitable contributions from donors, Defendants, directly or indirectly, expressly or by implication, have represented that donors' contributions would go to legitimate charitable organizations and be used primarily for charitable programs.

159. In truth and in fact, donors' contributions have not gone to legitimate charitable organizations and were not used primarily for charitable purposes. Instead, the contributions have gone to corporate entities controlled by private persons for their individual pecuniary gain and to the for-profit telemarketers they hired, and contributions were not used primarily for charitable programs.

160. Therefore, the representations described in Paragraph 158 were false and misleading and constituted deceptive practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a).

161. The foregoing practices also violate the laws of each Plaintiff State as follows:

| | |
|---|---|
| Alabama: | ALA. CODE §§ 13A-9-76(a)(1), (3) and 8-19-5(27). |
| Alaska: | ALASKA STAT. §§ 45.68.050(1) and 45.50.471. |
| Arizona: | ARIZ. REV. STAT. ANN. §§ 44-1522(A) and 44-6561(A)(3). |
| Arkansas: | ARK. CODE ANN. §§ 4-28-412(1) and 4-88-107(a)(7). |
| California: | CAL. BUS. & PROF. CODE §§ 17200 through 17206; § 17510.2; § 17510.8; CAL. GOV. CODE §§ 12581 through 12582.1; and § 12599.6. |
| Colorado: | COLO. REV. STAT. § 6-1-105(1)(hh); and §§ 6-16-111(1)(g) and (i). |
| Connecticut: | CONN. GEN. STAT. §§ 21a-190h and 42-110b(a). |

| Delaware: | DEL. CODE ANN. tit. 6, §§ 2513(a), 2532(a)(12), and 2595(a), (b)(4) and (6). |
| Florida: | FLA. STAT. §§ 496.415(7), 496.415(16), 496.416, and 501.204(1) (2013). |
| Georgia: | GA. CODE ANN. § 43-17-12(d) (2011). |
| Hawaii: | HAW. REV. STAT. §§ 467B-2.1, 467B-9, and 467B-10.5. |
| Idaho: | IDAHO CODE ANN. § 48-1203(1). |
| Illinois: | 225 ILL. COMP. STAT. §§ 460/15(a); 460/15(b)(6); 460/18(b); and 460/9(c). |
| Indiana: | IND. CODE §§ 23-7-8-7(a)(4); and §§ 24-5-0.5-3(b)(1) and (7). |
| Iowa: | IOWA CODE § 714.16. |
| Kansas: | KAN. STAT. ANN. §§ 17-1769(b), (h), and (i). |
| Kentucky: | KY. REV. STAT. ANN. § 367.170(1). |
| Louisiana: | LA. REV. STAT. ANN. §§ 51:1405 and 51:1905. |
| Maine: | ME. REV. STAT. ANN. tit. 5 § 207. |
| Maryland: | MD. CODE ANN., BUS. REG. §§ 6-608, 6-610 (2010 Repl. Vol.) (2014 Suppl.). |
| Massachusetts: | MASS. GEN. LAWS. ch. 68 § 32 and ch. 93A § 2. |
| Michigan: | MICH. COMP. LAWS § 400.288(f). |
| Minnesota: | MINN. STAT. § 309.55, subd. 5. |
| Mississippi: | MISS. CODE ANN. § 79-11-519(3)(a) and (h). |
| Missouri: | MO. REV. STAT. § 407.020. |
| Montana: | MONT. CODE ANN. § 30-14-103. |
| Nebraska: | NEB. REV. STAT. §§ 59-1602, 87-302(15), and 87-303.01. |
| Nevada: | NEV. REV. STAT. §§ 598.1305 and 598.0915(15). |
| New Hampshire: | N.H. REV. STAT. ANN. §§ 7:28-f, I(a), (b), (e). |
| New Jersey: | N.J. STAT. ANN. §§ 45:17A-32(a) and (c); § 56:8-2.7; and N.J. ADMIN. CODE § 13:48-13.2(a). |
| New Mexico: | N.M. STAT. §§ 57-22-6.3(A)(1), (3) and 57-12-3 (1978). |
| New York: | N.Y. EXEC. LAW §§ 63(12) and 172-d.2-4; N.Y. GEN. BUS. LAW § 349; and N.Y. NOT-FOR-PROFIT CORP. LAW § 719. |
| North Carolina: | N.C. GEN. STAT. § 75-1.1; §§ 131F-20(9), (15), and (18); and § 131F-21. |
| North Dakota: | N.D. CENT. CODE §§ 50-22-04.3 and 51-15-02. |
| Ohio: | OHIO REV. CODE ANN. § 1716.14(A). |
| Oklahoma: | OKLA. STAT. ANN. tit. 18 § 552.14a(A)(5). |
| Oregon: | OR. REV. STAT. §§ 128.886 and 646.608(1)(dd). |
| Pennsylvania: | 10 PA. CONS. STAT. § 162.15(a)(2). |
| Rhode Island: | R.I. GEN. LAWS § 5-53.1-7(2). |
| South Carolina: | S.C. CODE ANN. §§ 33-56-120(A) and 33-56-140(C). |

| South Dakota: | S.D. CODIFIED LAWS §§ 37-30-17 through 37-30-21. |
|---|---|
| Tennessee: | TENN. CODE ANN. §§ 48-101-513(a), (b), and (d). |
| Texas: | TEX. BUS. & COM. CODE ANN. §§ 17.46(a), (b)(5), and (b)(24) (West 2014). |
| Utah: | UTAH CODE ANN. §§ 13-11-1 through 13-11-23; §§ 13-22-1 through 13-22-23; and §§ 13-26-1 through 13-26-11. |
| Vermont: | VT. STAT. ANN. tit. 9 §§ 2453 and 2475. |
| Virginia: | VA. CODE ANN. §§ 57-48 and 57-57(L). |
| Washington: | WASH. REV. CODE §§ 19.86.020, 19.09.100(15), and 19.09.340. |
| West Virginia: | W.VA. CODE § 46A-6-101 *et seq.*; W.VA. CODE §§ 29-19-8, -13. |
| Wisconsin: | WIS. STAT. § 202.16(1)(a), formerly § 440.46(1)(a). |
| Wyoming: | WYO. STAT. ANN. §§ 40-12-105(a)(i), (ii), (iii), and (xv). |

**Count II**
**Misrepresentations about Program Benefits**
*(By the FTC and the Plaintiff States)*

162.    Plaintiffs incorporate by reference all the foregoing paragraphs.

163.    In connection with soliciting charitable contributions from donors, directly or indirectly, expressly or by implication, Defendants have represented that donors' contributions would be used to fund particular charitable programs.  Such representations have included, but are not limited to, claims that contributed funds would be used to:

a.    Help CFA operate a specific substantial charitable program run by a "national health agency,"  "on the forefront of the fight against cancer," whose resources are devoted "primarily to direct patient aid" that (1) provides direct assistance to individuals with cancer in the United States and through which it has helped tens of thousands of individuals; and (2) routinely provides pain medications, medical support and services, medical supplies, financial assistance, life-saving items, oxygen, transportation to chemotherapy treatments, medications, and loaned equipment to individuals suffering from cancer and to hospices and other health care nonprofit organizations serving cancer patients;

b.    Help CSS operate a specific substantial charitable program in the United States through which it directly provides aid to cancer patients, hospices, and nonprofit health care organizations, provides hospice care for cancer patients,

and that donations to CSS will be used more efficiently because CSS is a charity and does not use for-profit fundraisers;

    c.     Help CCFOA operate a specific substantial charitable program in the United States through which it provides financial assistance to the families of children with cancer, helps children suffering from cancer with hospice needs, and provides them with medical supplies and pain medication; and

    d.     Help BCS operate specific substantial charitable programs in the United States that (1) provide financial assistance and other direct aid to thousands of individuals suffering from breast cancer; (2) provide individuals suffering from breast cancer with medical supplies, insurance, pain medication, and pay for other specific items; and (3) provide individuals suffering from breast cancer with widely available access to "shopping" experiences through which they can obtain free goods.

164.   In truth and in fact, little or none of the donors' contributions have funded the particular charitable aid described to them, and in numerous instances the donors' contributions were not meaningfully used to:

    a.     Help CFA operate specific substantial charitable programs run by a "national health agency," "on the forefront of the fight against cancer," whose resources were devoted "primarily to direct patient aid" that (1) provided direct assistance to individuals suffering from cancer in the United States and through which it has directly assisted tens of thousands of individuals; and (2) routinely provide pain medications, medical support and services, medical supplies, financial assistance, life-saving items, oxygen, transportation to chemotherapy treatments, medications, and loaned equipment to individuals suffering from cancer and to hospices and other health care nonprofit organizations serving cancer patients;

    b.     Help CSS operate a specific substantial charitable program in the United States through which it has directly provided aid to cancer patients,

hospices, and nonprofit health care organizations, provided hospice care for cancer patients, or used donors' contributions more efficiently because it is a charity;

c.      Help CCFOA operate a specific substantial charitable program in the United States through which it has provided financial assistance to the families of children suffering from cancer, helped children suffering from cancer with hospice needs, and provided them with medical supplies and pain medication;

d.      Help BCS operate specific substantial charitable programs in the United States that (1) provided financial assistance and other direct aid to thousands of individuals suffering from breast cancer; (2) provided individuals suffering from breast cancer with medical supplies, insurance, pain medication, and paid for other specific items; and (3) provided individuals suffering from breast cancer with widely available access to "shopping" experiences through which they obtained free goods.

165.    Therefore, the representations described in Paragraph 163 are false and misleading and constitute deceptive practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a).

166.    The foregoing practices also violate the laws of each Plaintiff State as follows:

| Alabama: | ALA. CODE §§ 13A-9-76(a)(1), (3) and 8-19-5(27). |
|---|---|
| Alaska: | ALASKA STAT. §§ 45.68.050(1) and 45.50.471. |
| Arizona: | ARIZ. REV. STAT. ANN. § 44-1522(A) and 44-6561(A)(3). |
| Arkansas: | ARK. CODE ANN. §§ 4-28-412(1) and 4-88-107(a)(7). |
| California: | CAL. BUS. & PROF. CODE §§ 17200 through 17206; §§ 17510.2 and 17510.8; CAL. GOV. CODE §§ 12581 through 12582.1; § 12599.6. |
| Colorado: | COLO. REV. STAT. § 6-1-105(1)(hh); and §§ 6-16-111(1)(g) and (i). |
| Connecticut: | CONN. GEN. STAT. §§ 21a-190h and 42-110b(a). |
| Delaware: | DEL. CODE ANN. tit. 6, §§ 2513(a), 2532(a)(12), and 2595(a), (b)(4) and (6). |
| Florida: | FLA. STAT. §§ 496.415(7), 496.415(16), 496.416, and 501.204(1) (2013). |
| Georgia: | GA. CODE ANN. § 43-17-12(d) (2011). |
| Hawaii: | HAW. REV. STAT. §§ 467B-2.1, 467B-6.5, 467B-9, and 467B-10.5. |

| | |
|---|---|
| Idaho: | IDAHO CODE ANN. § 48-1203(1). |
| Illinois: | 225 ILL. COMP. STAT. §§ 460/15(a); 460/15(b)(6); 460/18(b); and 460/9(c). |
| Indiana: | IND. CODE §§ 23-7-8-7(a)(4); and §§ 24-5-0.5-3(b)(1) and (7). |
| Iowa: | IOWA CODE § 714.16. |
| Kansas: | KAN. STAT. ANN. §§ 17-1769(b), (h), and (i). |
| Kentucky: | KY. REV. STAT. ANN. § 367.170(1). |
| Louisiana: | LA. REV. STAT. ANN. §§ 51:1405 and 51:1905. |
| Maine: | ME. REV. STAT. ANN. tit. 5 § 207. |
| Maryland: | MD. CODE ANN., BUS. REG. §§ 6-608, 6-610 (2010 Repl. Vol.) (2014 Suppl.). |
| Massachusetts: | MASS. GEN. LAWS ch. 68 § 32 and ch. 93A § 2. |
| Michigan: | MICH. COMP. LAWS §§ 400.288(j) and (o). |
| Minnesota: | MINN. STAT. § 309.55, subd. 5. |
| Mississippi: | MISS. CODE ANN. §§ 79-11-519(3)(a) and (h). |
| Missouri: | MO. REV. STAT. § 407.020. |
| Montana: | MONT. CODE ANN. § 30-14-103. |
| Nebraska: | NEB. REV. STAT. §§ 59-1602, 87-302(15), and 87-303.01. |
| Nevada: | NEV. REV. STAT. §§ 598.1305 and 598.0915(15). |
| New Hampshire: | N.H. REV. STAT. ANN. §§ 7:28-f, I(a), (b), (e). |
| New Jersey: | N.J. STAT. ANN. §§ 45:17A-32(a), 45:17A-32 (c), 56:8-2.7; and N.J. ADMIN. CODE § 13:48-13.2(a). |
| New Mexico: | N.M. STAT. §§ 57-22-6.3(A)(1), (3) and 57-12-3 (1978). |
| New York: | N.Y. EXEC. L. § 63(12); § 172-d.2-4; and N.Y. GEN. BUS. L. § 349. |
| North Carolina: | N.C. GEN. STAT. §§ 75-1.1; 131F-20(9), (15), and (18); and § 131F-21. |
| North Dakota: | N.D. CENT. CODE §§ 50-22-04.3 and 51-15-02. |
| Ohio: | OHIO REV. CODE ANN. § 1716.14(A). |
| Oklahoma: | OKLA. STAT. ANN. tit. 18 § 552.14a(A)(5). |
| Oregon: | OR. REV. STAT. §§128.886 and 646.608(1)(dd). |
| Pennsylvania: | 10 PA. CONS. STAT. § 162.15(a)(2). |
| Rhode Island: | R.I. GEN. LAWS § 5-53.1-7(2). |
| South Carolina: | S.C. CODE ANN. §§ 33-56-120(A) and 33-56-140(C). |
| South Dakota: | S.D. CODIFIED LAWS §§ 37-30-17 through 37-30-21. |
| Tennessee: | TENN. CODE ANN. §§ 48-101-513(a), (b) and (d). |
| Texas: | TEX. BUS. & COM. CODE ANN. §§ 17.46(a), (b)(5), and (b)(24) (West 2014). |
| Utah: | UTAH CODE ANN. §§ 13-22-1 through 13-22-23; 13-26-1 through 13-26-11; and 13-11-1 through 13-11-23. |
| Vermont: | VT. STAT. ANN. tit. 9 §§ 2453 and 2475. |
| Virginia: | VA. CODE ANN. §§ 57-48 and 57-57(L). |

| Washington: | WASH. REV. CODE §§ 19.86.020, 19.09.100(15), and 19.09.340. |
| West Virginia: | W.VA. CODE § 46A-6-101 *et seq*.; W.VA. CODE §§ 29-19-8, -13. |
| Wisconsin: | WIS. STAT. § 202.16(1)(a), formerly § 440.46(1)(a). |
| Wyoming: | WYO. STAT. ANN. § 40-12-105(a)(xv). |

**Count III**
**Misrepresentations about Revenue and Program Expenses**
**Related to International GIK Shipments**
*(By the FTC and the Plaintiff States)*

167.   Plaintiffs incorporate by reference all the foregoing paragraphs.

168.   In public statements, documents submitted to the Combined Federal Campaign, and financial documents and Forms 990 filed with state regulators and the IRS, Defendants have made representations regarding their total revenues and program expenses, including revenues and program expenses associated with shipments of GIK goods to developing countries.  In connection with such international GIK transactions, in numerous instances, Defendants have represented that:

a.   their reported contributed revenues included the value of GIK goods that Defendants received as donations and subsequently owned;

b.   their reported program expenses included the value of GIK goods that Defendants distributed to organizations in developing countries; and

c.   the values of the GIK goods reported as contributed revenue and program expenses accurately reflected the fair value of the GIK goods measured under appropriate applicable accounting standards.

169.   In truth and in fact, in numerous instances in connection with such international GIK transactions:

a.   Defendants neither received nor took ownership of the GIK goods and therefore should not have reported their value as contributed revenue;

b.   because Defendants did not own the GIK goods they claimed to distribute to organizations in developing countries, they should not have reported the value of such GIK goods as program expenses; and

c.      the reported values of the GIK goods did not accurately reflect the fair value of the goods measured under appropriate applicable accounting standards.

Defendants used these misrepresentations to appear larger, more charitable, and more efficient with donors' contributions than the Defendants actually were, misleading donors, regulators, and others.

170.    Therefore, the acts and practices described in Paragraph 168 constitute deceptive practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a).

171.    The foregoing practices also violate the laws of each Plaintiff State as follows:

| | |
|---|---|
| Alabama: | ALA. CODE §§ 13A-9-76(a)(3-4). |
| Alaska: | ALASKA STAT. § 45.68.010(g). |
| Arizona: | ARIZ. REV. STAT. ANN. § 44-1522(A). |
| Arkansas: | ARK. CODE ANN. §§ 4-28-412(1), 4-28-412(2), 4-28-412(8), and 4-88-107(a)(7). |
| California: | CAL. BUS. & PROF. CODE §§ 17200 through 17206; CAL. GOV. CODE §§ 12581 through 12582.1; § 12599.6. |
| Colorado: | COLO. REV. STAT. § 6-1-105(1)(hh); §§ 6-16-111(1)(f) and(g). |
| Connecticut: | CONN. GEN. STAT. §§ 21a-190h and 42-110b(a). |
| Delaware: | DEL. CODE ANN. tit. 6, §§ 2513(a) and 2532(a)(12). |
| Florida: | FLA. STAT. §§ 496.415(2), 496.416, and 501.204(1) (2013). |
| Georgia: | GA. CODE ANN. § 43-17-12(b) (2011). |
| Hawaii: | HAW. REV. STAT. §§ 467B-2.1, 467B-6.5, 467B-9, and 467B-10.5. |
| Idaho: | IDAHO CODE ANN. § 48-1203(1). |
| Illinois: | 225 ILL. COMP. STAT. §§ 460/15(a); 460/15(b)(6); 460/18(b); and 460/9(c). |
| Indiana: | IND. CODE § 24-5-0.5-3(b)(1). |
| Iowa: | IOWA CODE § 714.16. |
| Kansas: | KAN. STAT. ANN. §§ 17-1769(b) and (h). |
| Kentucky: | KY. REV. STAT. ANN. § 367.170(1). |
| Louisiana: | LA. REV. STAT. ANN. §§ 51:1405 and 51:1905. |
| Maine: | ME. REV. STAT. ANN. tit. 5 § 207. |
| Maryland: | MD. CODE ANN., BUS. REG. §§ 6-608, 6-613 (2010 Repl. Vol.) (2014 Suppl.). |
| Massachusetts: | MASS. GEN. LAWS ch. 12 § 8F; ch. 68 §§ 19, 32; and ch. 93A § 2. |
| Michigan: | MICH. COMP. LAWS § 400.288(u)(ii). |

| Minnesota: | MINN. STAT. § 309.53, subd. 3 and § 309.55, subd. 5. |
| Mississippi | MISS. CODE ANN. § 79-11-519(3)(d). |
| Missouri: | MO. REV. STAT. § 407.020. |
| Montana: | MONT. CODE ANN. § 30-14-103. |
| Nebraska: | NEB. REV. STAT. §§ 59-1602, 87-302(15), and 87-303.01. |
| Nevada: | NEV. REV. STAT. §§ 598.1305 and 598.0915(15) . |
| New Hampshire: | N.H. REV. STAT. ANN. §§ 7:28-f, I (a), (b), (e). |
| New Jersey: | N.J. STAT. ANN. § 45:17A-33(b)(1); § 56:8-2.7; and N.J. ADMIN CODE §§ 13:48-13.3(a)(1). |
| New Mexico: | N.M. STAT. §§ 57-22-6.3(A)(1) and (3); and § 57-12-3 (1978). |
| New York: | N.Y. EXEC. L. §§ 63(12) and 172-d.1-4; and N.Y. GEN. BUS. L. § 349. |
| North Carolina: | N.C. GEN. STAT. § 75-1.1; §§ 131F-20 (9), (15), and (18); and § 131F-21. |
| North Dakota: | N.D. CENT. CODE §§ 51-15-02 and 50-22-04.3. |
| Ohio: | OHIO REV. CODE ANN. § 1716.14(A). |
| Oklahoma: | OKLA. STAT. ANN. tit. 18 § 552.14a(A)(1) and (5). |
| Oregon: | OR. REV. STAT. §§ 128.886 and 646.608(1)(dd). |
| Pennsylvania: | 10 PA. CONS. STAT. § 162.15(a)(2). |
| Rhode Island: | R.I. GEN. LAWS § 5-53.1-7(2). |
| South Carolina: | S.C. CODE ANN. §§ 33-56-120(A) and 33-56-140(C). |
| South Dakota: | S.D. CODIFIED LAWS §§ 37-30-17 through 37-30-21. |
| Tennessee: | TENN. CODE ANN. §§ 48-101-504(a), 48-101-509(a)(1), and 48-101-513(b). |
| Texas: | TEX. BUS. & COM. CODE ANN. §§ 17.46(a), (b)(1), (b)(5), and (b)(24) (West 2014). |
| Utah: | UTAH CODE ANN. § 13-22-15; *see also* UTAH ADMIN. CODE R152-22-4; *accord* UTAH CODE ANN. § 13-22-1(b)(ix). |
| Vermont: | VT. STAT. ANN. tit. 9 § 2453 and 2475. |
| Virginia: | VA. CODE ANN. §§ 57-48 and 57-57(L). |
| Washington: | WASH. REV. CODE §§ 19.86.020, 19.09.100(15), and 19.09.340. |
| West Virginia: | W.VA. CODE § 46A-6-101 *et seq.*; W.VA. CODE §§ 29-19-8, -13. |
| Wisconsin: | WIS. STAT. § 202.16(1)(a), formerly § 440.46(1)(a). |
| Wyoming: | WYO. STAT. ANN. §§ 40-12-105(a)(iii) and (xv). |

## Count IV
### Misrepresentations about Programs Related to International GIK
### *(By the FTC and the Plaintiff States)*

172.   Plaintiffs incorporate by reference all the foregoing paragraphs.

173.   In numerous instances, in connection with soliciting charitable contributions from donors, Defendants have represented, directly or through telemarketers, expressly or by implication, that the primary focus of their charitable programs was to provide direct assistance within the United States to individuals with cancer, children with cancer, or individuals with breast cancer.

174.   In truth and in fact, using Corporate Defendants' reported valuations, the vast majority of the aid that Corporate Defendants claimed to provide was related to the shipment of GIK goods to organizations in developing countries whose use of the goods was not restricted to assisting individuals with cancer and who did not in fact use the goods primarily to assist individuals with cancer.

175.   Therefore, the acts and practices described in Paragraph 173 constitute deceptive practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a).

176.   The foregoing practices also violate the laws of the Plaintiff States as follows:

| | |
|---|---|
| Alabama: | ALA. CODE §§13A-9-76(a)(3-4). |
| Alaska: | ALASKA STAT. §§ 45.68.050(1) and 45.50.471. |
| Arizona: | ARIZ. REV. STAT. ANN. § 44-1522(A). |
| Arkansas: | ARK. CODE ANN. §§ 4-28-412(1) and 4-88-107(a)(7). |
| California: | CAL. BUS. & PROF. CODE §§ 17200 through 17206; CAL. GOV. CODE §§ 12581 through 12582.1; § 12599.6. |
| Colorado: | COLO. REV. STAT. § 6-1-105(1)(hh); and §§ 6-16-111(1)(g) and (i). |
| Connecticut: | CONN. GEN. STAT. §§ 21a-190h and 42-110b(a). |
| Delaware: | DEL. CODE ANN. tit. 6, §§ 2513(a), 2532(a)(12), and 2595(a), (b)(4) and (6). |
| Florida: | FLA. STAT. §§ 496.415(7), 496.416, and 501.204(1) (2013). |
| Georgia: | GA. CODE ANN. § 43-17-12(d) (2011). |

| | |
|---|---|
| Hawaii: | HAW. REV. STAT. §§ 467B-2.1, 467B-6.5, 467B-9, and 467B-10.5. |
| Idaho: | IDAHO CODE ANN. § 48-1203(1). |
| Illinois: | 225 ILL. COMP. STAT. §§ 460/15(a); 460/15(b)(6); 460/18(b); and 460/9(c). |
| Indiana: | IND. CODE §§ 23-7-8-7(a)(4); and §§ 24-5-0.5-3(b)(1) and (7). |
| Iowa: | IOWA CODE § 714.16. |
| Kansas: | KAN. STAT. ANN. §§ 17-1769(b) and (h). |
| Kentucky: | KY. REV. STAT. ANN. § 367.170(1). |
| Louisiana: | LA. REV. STAT. ANN. §§  51:1405 and 51:1905. |
| Maine: | ME. REV. STAT. ANN. tit. 5 § 207. |
| Maryland: | MD. CODE ANN., BUS. REG. §§ 6-608, 6-610 (2010 Repl. Vol.) (2014 Suppl.). |
| Massachusetts: | MASS. GEN. LAWS ch. 68 § 32 and ch. 93A § 2. |
| Michigan: | MICH. COMP. LAWS § 400.288(n). |
| Minnesota: | MINN. STAT. § 309.55, subd. 5. |
| Mississippi: | MISS. CODE ANN. §§79-11-519(3)(a) and (h). |
| Missouri: | MO. REV. STAT. § 407.020. |
| Montana: | MONT. CODE ANN. § 30-14-103. |
| Nebraska: | NEB. REV. STAT. §§ 59-1602, 87-302(15), and 87-303.01. |
| Nevada: | NEV. REV. STAT. §§ 598.1305; and 598.0915(15). |
| New Hampshire: | N.H. REV. STAT. ANN. §§ 7:28-f, I(a), (b), (e). |
| New Jersey: | N.J. STAT. ANN. §§ 45:17A-32(a), 45:17A-32(c), 56:8-2.7; and N.J. ADMIN. CODE § 13:48-13.2(a). |
| New Mexico: | N.M. Stat. §§ 57-22-6.3(A)(1) and (3); and § 57-12-3 (1978). |
| New York: | N.Y. EXEC. L. §§ 63(12) and 172-d.2-4; N.Y. GEN. BUS. L. § 349. |
| North Carolina: | N.C. GEN. STAT. § 75-1.1; §§ 131F-20(9), (15), and (18); and § 131F-21. |
| North Dakota: | N.D. CENT. CODE §§ 51-15-02 and 50-22-04.3. |
| Ohio: | OHIO REV. CODE ANN. § 1716.14(A). |
| Oklahoma: | OKLA. STAT. ANN. tit. 18 § 552.14a(A)(5). |
| Oregon: | OR. REV. STAT. §§ 128.886 and 646.608(1)(dd). |
| Pennsylvania: | 10 PA. CONS. STAT. § 162.15(a)(2). |
| Rhode Island: | R.I. GEN. LAWS § 5-53.1-7(2). |
| South Carolina: | S.C. CODE ANN. §§ 33-56-120(A) and 33-56-140(C). |
| South Dakota: | S.D. CODIFIED LAWS §§ 37-30-17 through 37-30-21. |
| Tennessee: | TENN. CODE ANN. § 48-101-513(b). |
| Texas: | TEX. BUS. & COM. CODE ANN. §§ 17.46(a), (b)(4), (b)(5), (b)(7), and (b)(24) (West 2014). |
| Utah: | UTAH CODE ANN. §§ 13-22-12(1)(b)(v), -13(3); 13-26-11(1)(c); 13-11-4(2)(a), (i), (o). |
| Vermont: | VT. STAT. ANN. tit. 9 § 2453 and 2475. |

| Virginia: | VA. CODE ANN. §§ 57-48 and 57-57(L). |
|---|---|
| Washington: | WASH. REV. CODE §§ 19.86.020, 19.09.100(15), and 19.09.340. |
| West Virginia: | W.VA. CODE § 46A-6-101 *et seq*.; and §§ 29-19-8, -13. |
| Wisconsin: | WIS. STAT. § 202.16(1)(a), formerly § 440.46(1)(a). |
| Wyoming: | WYO. STAT. ANN. §§ 40-12-105(a)(i), (ii), (iii), and (xv). |

**Count V**
**False and Misleading Filings with State Charities Regulators**
(*By the Plaintiff States Alabama, Alaska, Arkansas, California, Colorado, Connecticut, Florida, Georgia, Hawaii, Illinois, Kansas, Kentucky, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, Tennessee, Utah, Virginia, Washington, and West Virginia*) (*collectively, the "charging Plaintiff States"*)

177.    Plaintiffs incorporate by reference all the foregoing paragraphs.

178.    As required by law, each of the Corporate Defendants filed financial statements, often certified under penalty of perjury, with the charging Plaintiff States.  In some instances, to satisfy state law requirements, Defendants filed their Forms 990 together with certain transmittal information; in others, Defendants filed reports cross-referencing to or summarizing the information on their Forms 990; and in other instances, with certain states, Defendants filed full audited financial statements.  The charging Plaintiff States disseminated or otherwise made available the financial information contained in those filings to the public.  Together with the public, state charities regulators relied on the financial information submitted in evaluating the performance and effectiveness of the Corporate Defendants.

179.    For each of the years 2008 through 2012, the financial information filed by each of the Corporate Defendants with the charging Plaintiff States included materially false and misleading information about certain international GIK transactions, including, in numerous instances:

a.      the Corporate Defendants' annual revenues included the value of certain GIK goods that they had received as donations and owned; and

b.      the Corporate Defendants' annual program expenses included the value of certain GIK goods that the Corporate Defendants distributed to recipients in developing countries.

180.    In truth and in fact, in numerous instances in connection with certain international GIK transactions:

a.      the Corporate Defendants did not own the GIK goods they reported receiving as donations and their reported annual revenues should not have included the value of those GIK goods; and

b.      the Corporate Defendants did not own the GIK goods that they claimed to have distributed to recipients in developing countries and their reported annual program expenses should not have included the value of such GIK goods. Through these false statements, the Corporate Defendants disseminated to the public false and misleading depictions of their operations and their effectiveness.

181.    The Corporate Defendants certified, in many instances under penalty of perjury, that the financial information they filed was true and accurate.  The Individual Defendants, including those who signed certifications attesting to the truth and accuracy of the Corporate Defendants' filings, knew that these filings were false and misleading.

182.    In filing and causing to be filed false and misleading financial statements, Defendants have violated the laws of the charging Plaintiff States as follows:

| | |
|---|---|
| Alabama: | ALA. CODE § 13A-9-76(a)(4). |
| Alaska: | ALASKA STAT. §§ 45.68.010(g), 45.68.050(1), and 45.50.471. |
| Arkansas: | ARK. CODE ANN. § 4-28-412(8). |
| California: | CAL. BUS. & PROF. CODE §§ 17200 through 17206; CAL. GOV. CODE §§ 12581 through 12582.1; and § 12599.6. |
| Colorado: | COLO. REV. STAT. § 6-1-105(1)(hh); and §§ 6-16-111(1)(f) and (g). |
| Connecticut: | CONN. GEN. STAT. § 21a-190h. |
| Florida: | FLA. STAT. §§ 496.415(2), 496.416 and 501.204(1) (2013). |
| Georgia: | GA. CODE ANN. § 43-17-12(b) (2011). |
| Hawaii: | Haw. Rev. Stat. §§ 467B-2.1, 467B-6.5, 467B-9, and 467B-10.5. |

| Illinois: | 225 ILL. COMP. STAT. §§ 460/15(a); 460/15(b)(6); and 460/9(c). |
| Kansas: | KAN. STAT. ANN. §§ 17-1769(a), (b), (c). |
| Kentucky: | KY. REV. STAT. ANN. § 367.170(1). |
| Louisiana: | LA. REV. STAT. ANN. §§ 51:1405 and 51:1905. |
| Maryland: | MD. CODE ANN., BUS. REG. §§ 6-608, 6-613 (2010 Repl. Vol.) (2014 Suppl.). |
| Massachusetts: | MASS. GEN. LAWS ch. 12 § 8F and ch. 68 §§ 19, 32. |
| Michigan: | MICH. COMP. LAWS § 400.288(y). |
| Minnesota: | MINN. STAT. §§ 309.53, subd. 3 and 309.55, subd. 5. |
| Mississippi: | MISS. CODE ANN. § 79-11-519(3)(d). |
| New Hampshire: | N.H. REV. STAT. ANN. §§ 7:28-f, I(a), (b), and (e); 7:28-f, II(a), (c), (d) and (e); and 641:8. |
| New Jersey: | N.J. STAT. ANN. §§ 45:17A-33(b)(1) and 56:8-2.7; and N.J. ADMIN. CODE § 13:48-13.3(a)(1). |
| New Mexico: | N.M. STAT. ANN. §§ 57-22-6.3(A)(1), (3); and § 57-12-3 (1978). |
| New York: | N.Y. EXEC. L. §§ 63(12), 172-b.2, and 172-d.1-2; N.Y. GEN. BUS. L. § 349. |
| North Carolina: | N.C. GEN. STAT. § 75-1.1; §§ 131F-20 (9), (15), and (18); and § 131F-21. |
| North Dakota: | N.D. CENT. CODE §§ 50-22-01 through 50-22-07. |
| Ohio: | OHIO REV. CODE ANN. § 1716.14(A). |
| Oklahoma: | OKLA. STAT. ANN. tit. 18 § 552.14a(A)(1). |
| Oregon: | OR. REV. STAT. § 128.886 and OR. REV. STAT. § 646.608(1)(dd). |
| Pennsylvania: | 10 PA. CONS. STAT. § 162.15(a)(2). |
| Rhode Island: | R.I. GEN. LAWS § 5-53.1-7(1). |
| South Carolina: | S.C. CODE ANN. §§ 33-56-120(A) and 33-56-140(C). |
| Tennessee: | TENN. CODE ANN. § 48-101-504(a). |
| Utah: | UTAH CODE ANN. §§ 13-22-12(1)(a), -15. |
| Virginia: | VA. CODE ANN. § 57-57(O). |
| Washington: | WASH. REV. CODE §§ 19.86.020, 19.09.071, 19.09.075(h), and 19.09.340 |
| West Virginia: | W.VA. CODE § 29-19-1 *et seq.* |

**Count VI**
**Means and Instrumentalities of Deception by CFA, CCFOA, & BCS**
(*By the Federal Trade Commission and Plaintiff States Alabama, Alaska, California, Connecticut, Delaware, Florida, Georgia, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Pennsylvania, South Carolina, South Dakota, Texas, Utah, Virginia, Washington, and West Virginia) (collectively, the "charging Plaintiff States")*

183.   Plaintiffs incorporate by reference all the foregoing paragraphs.

184.   In numerous instances, in connection with soliciting charitable contributions from donors, CFA, CCFOA, and BCS, individually or in concert with others, have provided telemarketers with the means and instrumentalities to deceive donors.  The means and instrumentalities that CFA, CCFOA, and BCS have provided include, but are not limited to, affiliation with a purported charitable organization in whose name solicitations can be made and telemarketing scripts and other solicitation materials, such as brochures, donor invoices, and thank you letters that make misrepresentations about the purported programs of CFA, CCFOA, and BCS.

185.   By providing the means and instrumentalities to others for the commission of deceptive acts and practices as described in Paragraph 184, Defendants have violated Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

186.   The foregoing practices also violate the laws of the charging Plaintiff States as follows:

| | |
|---|---|
| Alabama: | ALA. CODE § 8-19-5(27) and § 13A-9-76(a)(3). |
| Alaska: | ALASKA STAT. §§ 45.68.050(1) and 45.50.471. |
| California: | CAL. BUS. & PROF. CODE §§ 17200 through 17206; CAL. GOV. CODE §§ 12581 through 12582.1, 12599.6. |
| Connecticut: | CONN. GEN. STAT. §§ 21a-190h and 42-110b(a). |
| Delaware: | DEL. CODE ANN. tit. 6, §§ 2513(a), 2532(a)(12), and 2595(a), (b)(4) and (6). |
| Florida: | FLA. STAT. § 501.204(1) (2013). |
| Georgia: | GA. CODE ANN. § 10-1-393 (2012). |
| Idaho: | IDAHO CODE § 48-1203(1). |
| Illinois: | 225 ILL. COMP. STAT. § 460/9(c). |

| Indiana: | IND. CODE §§ 23-7-8-7(a)(4); and §§ 24-5-0.5-3(b)(1) and (7). |
|---|---|
| Iowa: | IOWA CODE § 714.16. |
| Kansas: | KAN. STAT. ANN. §§ 17-1764, 17-1765, 17-1766, and 17-1769(b),(c), and (e). |
| Kentucky: | KY. REV. STAT. ANN. § 367.170(1). |
| Louisiana: | LA. REV. STAT. ANN. §§ 51:1405 and 51:1905. |
| Maryland: | MD. CODE ANN., BUS. REG. §§ 6-607, 6-608 (2010 Repl. Vol.) (2014 Suppl.). |
| Massachusetts: | MASS. GEN. LAWS. ch. 68 § 32 and ch. 93A § 2. |
| Michigan: | MICH. COMP. LAWS § 400.288(q). |
| Minnesota: | MINN. STAT. § 309.55, subd. 5. |
| Montana: | MONT. CODE ANN. § 30-14-103. |
| Nebraska: | NEB. REV. STAT. §§ 59-1602, 87-302(15), and 87-303.01. |
| Nevada: | NEV. REV. STAT. §§ 598.1305 and 598.0915(15). |
| New Hampshire: | N.H. REV. STAT. ANN. §§ 7:28-f, I(a), (b), (c), and (e). |
| New Jersey: | N.J. STAT. ANN. §§ 56:8-2.7, 45:17A-32(a), 45:17A-32 (c); and N.J. ADMIN. CODE § 13:48-13.2(a). |
| New Mexico: | N.M. STAT. §§ 57-22-6.3(A)(1), (3); §§ 57-22-8(A), (B); and § 57-12-3 (1978). |
| New York: | NY EXEC. L. §§ 63(12) and 172-d.1-3; N.Y. GEN'L BUS. L. § 349. |
| North Carolina: | N.C. GEN. STAT. § 75-1.1. |
| North Dakota: | N.D. CENT. CODE §§ 50-22-01 through 50-22-07; and §§ 51-15-01 through 51-15-11. |
| Ohio: | OHIO REV. CODE ANN. § 1716.14(A). |
| Pennsylvania: | 10 P.S. § 162.15(a)(2). |
| South Carolina: | S.C. CODE ANN. §§ 33-56-120(A) and 33-56-140(C). |
| South Dakota: | S.D. CODIFIED LAWS §§ 37-30-17 through 37-30-21. |
| Texas: | TEX. BUS. & COM. CODE ANN. § 17.46(a) (WEST 2014). |
| Utah: | UTAH CODE ANN. § 13-26-3(5): *see also* UTAH ADMIN. CODE R152-26-5(3)(a). |
| Virginia: | VA. CODE ANN. §§ 57-48 and 57-57(L). |
| Washington: | WASH. REV. CODE §§ 19.86.020, 19.09.100(15), and 19.09.340. |
| West Virginia: | W.VA. CODE § 29-19-13 and § 46A-6-101 *et seq.* |

## **VIOLATIONS OF THE TELEMARKETING SALES RULE**

187.   Congress directed the FTC to prescribe rules prohibiting abusive and deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101 - 6108, in 1994.  On August 16, 1995, the FTC adopted the Telemarketing Sales Rule (the "Original TSR"), 16 C.F.R. Part 310, which became effective on December 31,

1995.  On January 29, 2003, the FTC amended the Original TSR by issuing a Statement of Basis and Purpose and the final amended Telemarketing Sales Rule (the "TSR").  68 Fed. Reg. 4580, 4669.

188.    The Telemarketing Act also authorizes attorneys general to initiate federal district court proceedings to enjoin telemarketing activities that violate the TSR, and in each such case, to obtain damages, restitution and other compensation on behalf of their residents.  15 U.S.C. § 6103(a).

189.    The TSR defines "charitable contribution" to mean "any contribution or gift of money or any other thing of value."  16 C.F.R. § 310.2(f).

190.    The TSR defines "donor" to mean "any person solicited to make a charitable contribution."  16 C.F.R. § 310.2(m).

191.    The TSR defines "telemarketer" to mean "any person who, in connection with telemarketing, initiates or receives telephone calls from a customer or donor." 16 C.F.R. § 310.2(bb).

192.    The TSR defines "telemarketing" to mean "a plan, program, or campaign which is conducted to induce the purchase of goods or services or a charitable contribution, by use of one or more telephones and which involves one or more interstate telephone call."  16 C.F.R. § 310.2(cc).

193.    The TSR prohibits any person from providing substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any practice that violates Sections 310.3(a), (c), or (d) or 310.4 of the Rule.  16 C.F.R. § 310.3(b).

194.    The TSR prohibits telemarketers from making a false or misleading statement to induce a charitable contribution.  16 C.F.R. Part 310.3(a)(4).

195.    The TSR prohibits, inter alia, telemarketers from misrepresenting, directly or by implication, the nature, purpose, or mission of an entity on behalf of which a charitable contribution is being requested; the purpose for which any charitable contribution will be used; the percentage or amount of any charitable contribution that

will go to a charitable organization or any particular charitable program; and a charitable organization's or telemarketer's affiliation with, or endorsement or sponsorship by, any person or government entity.  16 C.F.R. § 310.3(d)(1), (3), (4), and (6).

**Count VII**
**Assisting & Facilitating Telemarketing Violations by CFA, CCFOA, & BCS**
*(By Plaintiffs Federal Trade Commission and the Attorneys General of the Plaintiff States and the District of Columbia)*

196.    Plaintiffs incorporate by reference all the foregoing paragraphs.

197.    In numerous instances, in connection with soliciting charitable contributions by telephone, CFA, CCFOA, and BCS have provided substantial assistance or support to telemarketers while knowing or consciously avoiding knowing that the telemarketers were engaged in acts or practices that violate Sections 310.3(a) (4) and 310.3(d)(1), (3), (4), and (6) of the TSR, thereby violating Section 310.3(b) of the TSR. 16 C.F.R. § 310.3(b).

**Count VIII**
**Telemarketing Misrepresentations by Defendant CSS**
*(By Plaintiffs Federal Trade Commission and the Attorneys General of the Plaintiff States and the District of Columbia)*

198.    Plaintiffs incorporate by reference all the foregoing paragraphs.

199.    In numerous instances, in connection with soliciting charitable contributions by telephone, CSS has made false or misleading statements to induce a charitable contribution, including:

a.    misrepresenting, directly or by implication, the nature, purpose, or mission of an entity on behalf of which a charitable contribution is being requested;

b.    the purpose for which any charitable contribution will be used; and

c.    the percentage or amount of any charitable contribution that will go to a charitable organization or any particular charitable program.

CSS has thereby violated Sections 310.3(a)(4) and 310.3(d)(1), (3), and (4) of the TSR. 16 C.F.R. § 310.3(a) (4) and 310.3(d) (1), (3), and (4).

## INJURY

200. Donors have suffered and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act, the TSR, and state law. In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices. Absent injunctive relief by this Court, Defendants are likely to continue to injure donors, reap unjust enrichment, and harm the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

201. Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC. The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

202. Section 19 of the FTC Act, 15 U.S.C. § 57b, and Sections 4(a) and 6(b) of the Telemarketing Act, 15 U.S.C. §§ 6103(a) and 6105(b), authorize this Court to grant such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the TSR, including the rescission and reformation of contracts, and the refund of money.

203. Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction to allow the Plaintiff States to enforce their state laws against Defendants in this Court and to grant such relief as provided under the following state laws including injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, the disgorgement of ill-gotten monies, removal of officers and directors, civil penalties,

attorneys' fees, expenses, costs, and such other relief to which the Plaintiff States may be entitled:

| | |
|---|---|
| Alabama: | ALA. CODE §§ 8-19-8 and 13A-9-76(a-b). |
| Alaska: | ALASKA STAT. §§ 45.50.501, 45.50.537, and 45.50.551. |
| Arizona: | ARIZ. REV. STAT. ANN. §§ 44-1528, 44-1531, and 44-1534. |
| Arkansas: | ARK. CODE ANN. §§ 4-28-416 and 4-88-113. |
| California: | CAL. BUS. & PROF. CODE §§ 17200 through 17206; CAL. GOV. CODE §§ 12586.2, 12591, 12591.1, 12597, and 12598. |
| Colorado: | COLO. REV. STAT. §§ 6-1-110, 112 and 113(4); §§ 6-16-111(5) and 6-16-111(6)(c). |
| Connecticut: | CONN. GEN. STAT. §§ 21a-190l and 42-110m(a). |
| Delaware: | DEL. CODE ANN. tit. 6, §§ 2522 through 2526, 2533, and 2597; and tit. 29, §§ 2520 and 2522. |
| Florida: | FLA. STAT. §§ 496.416, 501.207, and 501.2075 (2013). |
| Georgia: | GA. CODE ANN. §§ 43-17-13 through 43-17-14 (2011). |
| Hawaii: | HAW. REV. STAT. § 28-5.2; §§ 467B-9.6, 467B-9.7(d), and 467B-10.5; and § 480-15. |
| Idaho: | IDAHO CODE ANN. §§ 48-606(1), 48-607, and 48-1204. |
| Illinois: | 225 ILL. COMP. STAT. §§ 460/9(f), 9(g), 9(h), and 9(j); 460/15(b)(6) and 15(c); 460/16(a) and 16(b); 460/18(g); and 460/9(c). |
| Indiana: | IND. CODE §§ 23-7-8-8; and 24-5-0.5-4 and -8. |
| Iowa: | IOWA CODE § 714.16. |
| Kansas: | KAN. STAT. ANN. §§ 17-1768, 17-1773(a), and 17-1776. |
| Kentucky: | KY. REV. STAT. ANN. §§ 367.190(1), 367.190(3), 367.200, 367.210, 367.990(2), and 367.665. |
| Louisiana: | LA. REV. STAT. ANN. §§ 51:1403, 51:1407, 51:1408, and 51:1416. |
| Maine: | ME. REV. STAT. ANN. tit. 5 § 209 and tit. 14 § 1522(1)(A); and M.R. Civ. P. 65. |
| Maryland: | MD. CODE ANN., BUS. REG. § 6-205 (2010 Repl. Vol.) (2014 Suppl.). |
| Massachusetts: | MASS. GEN. LAWS ch. 12 § 8F; ch. 68 § 32; and ch. 93A § 4. |
| Michigan: | MICH. COMP. LAWS § 400.290. |
| Minnesota: | MINN. STAT. § 8.31, subds. 1 and 309.57. |
| Mississippi: | MISS. CODE ANN. §§ 79-11-509(4) and (6). |
| Missouri: | MO. REV. STAT. § 407.020. |
| Montana: | MONT. CODE ANN. §§ 30-14-131, 30-14-142, and 30-14-144. |

| Nebraska: | NEB. REV. STAT. §§ 21-1977, 21-19,142(c), 21-19,143, 59-1608, 59-1609, 59-1614, 87-303, 87-303.05, 87-303.07, and 87-303.11. |
|---|---|
| Nevada: | NEV. REV. STAT. §§ 598.0999(1) through (4), and (6). |
| New Hampshire: | N.H. REV. STAT. ANN. §§ 7:28, II(c) through 7:28, II(g). |
| New Jersey: | N.J. STAT. ANN. §§ 45:17A-33(d-e), 56:8-8, 56:8-9, 56:8-11, 56:8-13, and 56:8-19; and N.J. ADMIN. CODE § 13:48-14.1. |
| New Mexico: | N.M. STAT. §§ 57-22-9(A), (B); 57-22-9.1(J); 57-12-8; and 57-12-11 (1978). |
| New York: | N.Y. EXEC. LAW §§ 63(12), 175; and N.Y. NOT-FOR-PROFIT CORP. LAW § 112. |
| North Carolina: | N.C. GEN. STAT. §§ 75-14 through 75-15.2; §§ 75-16.1; and § 131F-24(a). |
| North Dakota: | N.D. CENT. CODE §§ 51-15-07, 51-15-08, 51-15-10, 51-15-11, 50-22-05, and 50-22-06. |
| Ohio: | OHIO REV. CODE ANN. § 1716.16. |
| Oklahoma: | OKLA. STAT. ANN. tit. 18 § 552.14a(D)(1)-(6), (H), (I). |
| Oregon: | OR. REV. STAT. §§ 646.632 and 646.636. |
| Pennsylvania: | 10 PA. CONS. STAT. § 162.19. |
| Rhode Island: | R.I. GEN. LAWS §§ 5-53.1 through 5-53.1-18. |
| South Carolina: | S.C. CODE ANN. § 33-56-140(C). |
| South Dakota: | S.D. CODIFIED LAWS §§ 37-30-17 through 37-30-21; and §§ 21-34-1 through 21-34-14. |
| Tennessee: | TENN. CODE ANN. §§ 48-101-514(a)(1) and 48-101-514(c). |
| Texas: | TEX. BUS. & COM. CODE ANN. §§ 17.47(a), (c), and (d) (West 2014); and TEX. GOV'T CODE § 402.006(c) (West 2014). |
| Utah: | UTAH CODE ANN. § 13-2-5(3); §§ 13-22-3(4)(a), (c) through (g); and §§ 13-11-17, 13-11-17.5, 13-26-8(2), and 13-26-10. |
| Vermont: | VT. STAT. ANN. tit. 9 §§ 2458, 2459, 2460, 2461, and 2475. |
| Virginia: | VA. CODE ANN. §§ 57-59(D) and (E). |
| Washington: | WASH. REV. CODE §§ 19.86.020, 19.86.080, 19.86.140, and 19.09.340. |
| West Virginia: | W.VA. CODE § 46A-7-101 *et seq.*; W.VA. CODE §§ 29-19-15, -15a, and -15b. |
| Wisconsin: | WIS. STAT. § 202.18(1)(b). |
| Wyoming: | WYO. STAT. ANN. §§ 40-12-106, 111, and 113. |

## **PRAYER FOR RELIEF**

WHEREFORE, the FTC, the Plaintiff States, and the District of Columbia respectfully request that the Court:

A.      Award Plaintiffs such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of donor injury during the pendency of this action and to preserve the possibility of effective final relief, including, but not limited to, a preliminary injunction, removal of the corporate officers and directors of each Corporate Defendant, an accounting of assets, and appointment of a receiver;

B.      Enter a permanent injunction to prevent Defendants from future violations of the FTC Act, state law, and the TSR;

C.      Award such relief as the Court finds necessary to redress injury to donors resulting from Defendants' violations of the FTC Act, state laws, and the TSR, including, but not limited to, removal of the corporate officers and directors, rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies;

D.      Award Plaintiffs the costs of bringing this action, attorneys' fees, and such other and additional relief as the Court may determine to be just and proper; and

E.      Award Plaintiff States civil penalties for each violation of their respective state laws, attorneys' fees, and expenses as provided under state law.

/
/
/
/
/
/
/
/
/
/

Respectfully Submitted,

**FOR THE FEDERAL TRADE COMMISSION:**

Jonathan E. Nuechterlein
General Counsel
CHARLES A HARWOOD
Regional Director

By: _____

Tracy S. Thorleifson
Sophie H. Calderón,
Krista K. Bush, and
Connor Shively
Attorneys
Federal Trade Commission
915 2nd Ave., Suite 2896
Seattle, WA  98174
Email: tthorleifson@ftc.gov
        scalderon@ftc.gov
        kbush@ftc.gov
        cshively@ftc.gov
Telephone: (206) 220-6350
Attorneys for Plaintiff Federal Trade Commission

Signed ___May 15___, 2015

**FOR THE STATE OF ALABAMA**
By: _____
Kyle Beckman (AL Bar #ASB-6046-E63B)*
Assistant Attorney General
Office of Attorney General Luther Strange
501 Washington Avenue
Montgomery, AL 36104-0152
kbeckman@ago.state.al.us
Telephone: (334) 353-2619
*Application for *pro hac vice* pending
*Attorney for Plaintiff State of Alabama*
Signed ____OS/12____, 2015

**FOR THE STATE OF ALASKA**

By: _____
Cynthia Drinkwater, Alaska Bar No. 8808159*
Assistant Attorney General
Office of Attorney General Craig W. Richards
1031 W. 4th Ave, Suite 200
Anchorage, AK 99501
cynthia.drinkwater@alaska.gov
Telephone:   (907) 269-5200
*Application for *pro hac vice* pending
*Attorney for Plaintiff State of Alaska*

Signed May ___11___, 2015

**FOR THE STATE OF ARIZONA**

By: _____

Nancy V. Anger (AZ Bar # 6810)
Assistant Attorney General
Office of Attorney General Mark Brnovich
1275 West Washington
Phoenix, Arizona 85007-2997
nancy.anger@azag.gov
Telephone:    (602) 542-4686

*Attorney for Plaintiff State of Arizona*
Signed ____May 5____, 2015

**FOR THE STATE OF ARKANSAS**

By: _____

Kevin Wells (AR Bar # 2007213)*
Assistant Attorney General

Office of Attorney General Leslie Rutledge
323 Center Street, Suite 500
Little Rock, Arkansas 72201
kevin.wells@arkansasag.gov

Telephone:   (501) 682-8063

*Application for *pro hac vice* pending

*Attorney for Plaintiff State of Arkansas*

Signed May 8, 2015

FOR THE STATE OF CALIFORNIA
By: _____
Sonja K. Berndt (CA Bar #131358)*
Deputy Attorney General
Office of Attorney General Kamala Harris
300 S. Spring St.
Suite #1702
Los Angeles, California 90013
Sonja.berndt@doj.ca.gov
Telephone:   (213) 897-2179
*Application for *pro hac vice* pending
*Attorney for Plaintiff State of California*
Signed _____May 4_____, 2015

**FOR THE COLORADO SECRETARY OF STATE**

By: _____
LEANN MORRILL (CO Bar #38742)
First Assistant Attorney General
Office of Attorney General Cynthia H. Coffman
Public Officials Unit
1300 Broadway, 6th Floor
Denver, Colorado 80203
Email: leann.morrill@state.co.us
Telephone: (720) 508-6159

*Attorney for Plaintiff Colorado Secretary of State*

Signed _____May 8_____, 2015


**FOR THE STATE OF COLORADO**

By: _____
ALISSA GARDENSWARTZ (CO Bar# 36126)
First Assistant Attorney General
Office of Attorney General Cynthia H. Coffman
Consumer Protection Section
1300 Broadway, 7th Floor
Denver, Colorado 80203
Email: alissa.gardenswartz@state.co.us
Telephone: (720) 508-6204

*Application for *pro hac vice* pending

*Attorney for Plaintiff Colorado Attorney General*

Signed _____May 8_____, 2015

**FOR THE STATE OF CONNECTICUT**

By: _____

Gary W. Hawes (CT Bar # 415091)*
Assistant Attorney General
Office of Attorney General George Jepsen
55 Elm Street
P.O. Box 120
Hartford, Connecticut 06141-0120
Gary.Hawes@ct.gov
Telephone:    (860) 808-5020
*Application for pro hac vice pending
*Attorney for Plaintiff State of Connecticut*

Signed _____5/7_____, 2015

**FOR THE STATE OF DELAWARE**

By: _____

Gregory C. Strong (DE Bar # 4664)*
Gillian L. Andrews (DE Bar # 5719)
Deputy Attorneys General

Delaware Department of Justice
820 N. French Street, 5th Floor
Wilmington, Delaware 19801
gregory.strong@state.de.us

Telephone:   (302) 577-8504

*Application for *pro hac vice* pending

*Attorneys for Plaintiff State of Delaware*

Signed _____5/14_____, 2015

**FOR THE STATE OF FLORIDA**
By: _____
Rebecca H. Sirkle (FL Bar # 42312)*
Assistant Attorney General
Office of Attorney General Pam Bondi
135 West Central Blvd., Suite 670
Orlando, Florida 32801
Rebecca.Sirkle@myfloridalegal.com
Telephone:    (407) 316-4840
*Application for *pro hac vice* pending
*Attorney for Plaintiff State of Florida*
Signed May 5th, 2015

**FOR THE STATE OF GEORGIA**
By: _____
Daniel S. Walsh Georgia Bar # 735040*
Senior Assistant Attorney General

Office of Attorney General Sam Olens
Department of Law
State of Georgia
Atlanta, Georgia 30306
dwalsh@law.ga.gov

Telephone:   (404) 657-2204

*Application for *pro hac vice* pending

*Attorney for Plaintiff State of Georgia and Plaintiff
Secretary of State for the State of Georgia*

Signed May 8, 2015

**FOR THE STATE OF HAWAII**

By: _Jodi L. K. Yi_

Jodi L. K. Yi    HI Bar #6625*
Deputy Attorney General

Attorney General Douglas S. Chin
Department of the Attorney General
425 Queen Street
Honolulu, Hawaii 96813
Jodi.K.Yi@Hawaii.gov
Telephone:    (808) 586-1470

*Application for *pro hac vice* pending
*Attorney for Plaintiff State of Hawaii*

Signed April 28, 2015

**FOR THE STATE OF IDAHO**

By: _____

JANE HOCHBERG (ID Bar # 5465)*
Deputy Attorney General
Office of Attorney General Lawrence G. Wasden
Consumer Protection Division
954 W. Jefferson Street, 2nd Floor
PO Box 83720
Boise, Idaho 83720-0010
jane.hochberg@ag.idaho.gov
Telephone:   (208) 334-3553
*Application for *pro hac vice* pending
*Attorney for Plaintiff State of Idaho*
Signed *april 30* , 2015

**FOR THE PEOPLE OF THE STATE OF ILLINOIS**

By:

Barry S. Goldberg
Assistant Attorney General (IL Bar # 6269821)*
Assistant Bureau Chief
Charitable Trust Bureau
Office of Illinois Attorney General Lisa Madigan
100 West Randolph Street, 11th Floor
Chicago, Illinois 60601
bgoldberg@atg.state.il.us
Telephone Charitable Trust Bureau: (312) 814-2595

Therese Harris, Bureau Chief
Charitable Trust Bureau
Office of Illinois Attorney General Lisa Madigan
100 West Randolph Street, 11th Floor
Chicago, Illinois 60601
tharris@atg.state.il.us
Telephone Charitable Trust Bureau: (312) 814-2595

*Application for *pro hac vice* pending
*Attorney for Plaintiff State of Illinois*

Signed April 30, 2015

**FOR THE STATE OF INDIANA**

By: _____
Richard M. Bramer (IN Bar # 15989-77)*
Director, Consumer Protection Division
Office of Attorney General Gregory F. Zoeller
302 West Washington Street
IGCS Fifth Floor
Indianapolis, Indiana 46204
richard.bramer@atg.in.gov
Telephone:   (317) 232-1008
*Application for *pro hac vice* pending
*Attorney for Plaintiff State of Indiana*
Signed ___May 7___, 2015

**FOR THE STATE OF IOWA**
By: _____
Steve St. Clair (IA Bar #AT0007441)*
Assistant Attorney General
Office of Attorney General Tom Miller
Hoover Building, 2nd Floor
1305 East Walnut
Des Moines, Iowa 50319
steve.stclair@iowa.gov
Telephone:   (515) 281-5926
*Application for *pro hac vice* pending
*Attorney for Plaintiff State of Iowa*
Signed April 22, 2015

FOR THE STATE OF KANSAS

By: _Lynette R Bakker_

Lynette R. Bakker (KS Bar # 22104)*
Assistant Attorney General
Office of Attorney General Derek Schmidt
120 S.W. 10th Avenue, 2nd Floor
Topeka, Kansas 66612-1597
lynette.bakker@ag.ks.gov
Telephone:    (785) 296-3751
*Application for *pro hac vice* pending
*Attorney for Plaintiff State of Kansas*
Signed _May 5_ , 2015

**FOR THE COMMONWEALTH OF KENTUCKY**

By: _____

Leah Cooper Boggs (KY Bar # 83471)*
Assistant Attorney General
Office of Attorney General Jack Conway
1024 Capital Center Drive
Suite 200
Frankfort, Kentucky 40601
Leah.boggs@ky.gov
Telephone:   (502) 696-5389
*Application for *pro hac vice* pending
*Attorney for Plaintiff State of Kentucky*

Signed ___May 8___, 2015

**FOR THE STATE OF LOUISIANA**
By: _Cathryn E. Gits_
Cathryn E. Gits (LA Bar #35144)
Assistant Attorney General
Office of Attorney General James D. "Buddy"
    Caldwell
1885 N. Third Street
Baton Rouge, Louisiana 70802
gitsc@ag.state.la.us
Telephone:    (225) 326-6400
*Application for *pro hac vice* pending
*Attorney for Plaintiff State of Louisiana*
Signed __May 7__, 2015

**FOR THE STATE OF MAINE**

Janet T. Mills
Maine Attorney General

By: _____
Carolyn A. Silsby (ME Bar # 3030)*
Assistant Attorney General
Office of the Maine Attorney General
Burton Cross State Office Building
111 Sewall Street, 6th Floor
Augusta, Maine 04330
Carolyn.silsby@maine.gov
Telephone:    (207) 626-8829
*Application for *pro hac vice* pending
*Attorney for Plaintiff State of Maine*

Signed _April 22_, 2015

**FOR THE STATE OF MARYLAND**

By: _C. Beatrice Nuñez-Bellamy_
C. Beatrice Nuñez-Bellamy*
Assistant Attorney General
Office of Attorney General Brian E. Frosh
200 St. Paul Place
Baltimore, MD 21202
bnunezbellamy@oag.state.md.us
Telephone: (410) 576-6300
*Application for *pro hac vice* pending
Attorney for Plaintiff State of Maryland and
    Secretary of State John Wobensmith
Signed May 14, 2015

**FOR THE COMMONWEALTH OF MASSACHUSETTS**

**MAURA HEALEY, ATTORNEY GENERAL**

By: _____

Brett J. Blank (MA Bar # 686635)*
Assistant Attorney General

Office of Attorney General Maura Healey
One Ashburton Place
Boston, Massachusetts 02108
brett.blank@state.ma.us
Telephone:    (617) 727-2200

*Application for *pro hac vice* pending

*Attorney for Plaintiff Commonwealth of Massachusetts*

Signed May 8, 2015

FOR THE STATE OF MICHIGAN
By: _____
William R. Bloomfield (MI Bar #68515)*
Assistant Attorney General
Office of Attorney General Bill Schuette
Corporate Oversight Division
P.O. Box 30755
Lansing, MI 48909
bloomfieldw@michigan.gov
Telephone:   (517) 373-1160
*Application for pro hac vice pending
Attorney for Plaintiff State of Michigan
Signed _May 4_____, 2015

FOR THE STATE OF MINNESOTA
By: _Elizabeth Kremenak_
ELIZABETH KREMENAK (MN Bar # 0390461)*
Assistant Attorney General
Office of Attorney General Lori Swanson
445 Minnesota Street, Suite 1200
St. Paul, MN  55101-2130
elizabeth.kremenak@ag.state.mn.us
Telephone:   (651) 757-1423
*Application for pro hac vice pending
Attorney for Plaintiff State of Minnesota
Signed _May 7_, 2015

FOR THE STATE OF MISSISSIPPI

By: _____

Tanya G. Webber (MS Bar #99405)*
Assistant Secretary of State/Charities Division
Office of Secretary of State Delbert Hosemann
Post Office Box 136
Jackson, Mississippi 39205-0136
Tanya.webber@sos.ms.gov
Telephone:   (601) 359-6742
*Application for pro hac vice pending
Attorney for Plaintiff State of Mississippi
Signed __April 29__, 2015

**FOR THE STATE OF MISSOURI**

**CHRIS KOSTER**
Attorney General

ROBERT E. CARLSON, # 54602
Assistant Attorney General

P.O. Box 861
St. Louis, MO 63188
(314) 340-6816
Fax: (314) 340-7957
bob.carlson@ago.mo.gov

*Application for *pro hac vice* pending

*Attorney for Plaintiff State of Missouri*

Signed _May 11_, 2015

**FOR THE STATE OF MONTANA**


By: _Kelley L. Hubbard_

TIMOTHY C. FOX
Montana Attorney General
E. EDWIN ECK, MT Bar No. 414*
Deputy Attorney General
KELLEY L. HUBBARD, MT Bar No. 9604*
Assistant Attorney General

Montana Attorney General's Office
P. O. Box 200151
Helena, MT 59620-0151
EdEck@mt.gov
KHubbard@mt.gov

Telephone:    (406) 444-2026

*Application for *pro hac vice* pending

*Attorneys for Plaintiff State of Montana*

Signed May 5, 2015

**FOR THE STATE OF NEBRASKA**
By: _____
Daniel Russell (NE Bar # 25302)*
Assistant Attorney General
Office of Attorney General Douglas J. Peterson
2115 State Capitol
PO Box 98920
Lincoln, Nebraska 68509
daniel.russell@nebraska.gov
Telephone:   (402) 471-1279
*Application for pro hac vice pending
Attorney for Plaintiff State of Nebraska
Signed ___May   6_____, 2015

FOR THE STATE OF NEVADA

By: _JoAnn Gibbs_

JOANN GIBBS
NV Bar # 005324
Chief Multistate Counsel
Office of Attorney General Adam Paul Laxalt
10791 W. Twain Avenue, Suite 100
Las Vegas, Nevada  89135
jgibbs@ag.nv.gov
Telephone:    (702) 486-3789
*Application for pro hac vice pending
Attorney for Plaintiff State of Nevada

Signed _April 30_, 2015

FOR THE STATE OF NEW HAMPSHIRE

By: _____

Thomas J. Donovan (NH Bar #664)*
Director of Charitable Trusts
Joseph A. Foster, Attorney General
33 Capitol Street
Concord, NH  03301
tom.donovan@doj.nh.gov
Telephone:   (603) 271-1288
*Application for pro hac vice pending
Attorney for Plaintiff State of New Hampshire
Signed May 8 , 2015

**FOR THE STATE OF NEW JERSEY**

JOHN J. HOFFMAN
ACTING ATTORNEY GENERAL OF NEW JERSEY

By: _____
Erin M. Greene (NJ Bar #014512010) *
Deputy Attorney General

State of New Jersey
Office of Attorney General
Department of Law and Public Safety
Division of Law
124 Halsey Street - 5th Floor
P.O. Box 45029
Newark, New Jersey 07101
erin.greene@dol.lps.state.nj.us

Telephone: (973) 648-4846

*Application for *pro hac vice* pending

*Attorney for Plaintiff State of New Jersey*

Signed __May 1__, 2015

FOR THE STATE OF NEW MEXICO
By: _____
Elizabeth Korsmo (NM Bar # 8989)*
Assistant Attorney General
Office of Attorney General Hector Balderas
408 Galisteo St.
Santa Fe, New Mexico 87501
ekorsmo@nmag.gov
Telephone: (505) 827-6000
*Application for pro hac vice pending
Attorney for Plaintiff State of New Mexico
Signed _____ 5/5 _____, 2015

FOR THE STATE OF NEW YORK

ERIC T. SCHNEIDERMAN
Attorney General of the State of New York


By: _____
Yael Fuchs (NY Bar # 4542684)*
Assistant Attorney General
Charities Bureau
120 Broadway, 3rd Floor
New York, New York 10271
Telephone:   (212) 416-8401
yael.fuchs@ag.ny.gov

*Application for *pro hac vice* pending
*Attorney for Plaintiff State of New York*

Signed ___May 6__, 2015

FOR THE STATE OF NORTH CAROLINA
By: _____
Creecy Johnson (NC Bar #32619)*
Special Deputy Attorney General
Office of Attorney General Roy Cooper
9001 Mail Service Center
Raleigh, NC 27699
ccjohnson@ncdoj.gov
Telephone:   (919) 716-6000
*Application for pro hac vice pending
Attorney for Plaintiff State of North Carolina
Signed _____May 7_____, 2015


By: _____
Lareena J. Phillips (NC Bar #36859)*
Assistant Attorney General
Counsel for North Carolina Secretary of State
     Elaine F. Marshall
9001 Mail Service Center
Raleigh, NC 27699
lphillips@ncdoj.gov
Telephone:   (919) 716-6610
*Application for pro hac vice pending
Attorney for Plaintiff State of North Carolina
Signed _____May 7_____, 2015

**FOR THE STATE OF NORTH DAKOTA**

By: _____
Michael C. Thompson (ND Bar # 06550)*
Assistant Attorney General

Office of Attorney General Wayne Stenehjem
Consumer Protection Division
Gateway Professional Center
1050 E. Interstate Ave Ste 200
Bismarck, ND 58503-5574
mcthompson@nd.gov

Telephone:    (701) 328-5570

*Application for *pro hac vice* pending

*Attorney for Plaintiff State of North Dakota*

Signed April 23, 2015

FOR THE STATE OF OHIO

By: _Yvonne Tertel_

Yvonne Tertel (OH Bar # 0019033)*
Principal Assistant Attorney General
Office of Attorney General Mike DeWine
Charitable Law Section
150 E. Gay St., 23rd floor
Columbus, Ohio 43215
yvonne.tertel@ohioattorneygeneral.gov
Telephone: (614) 466-3181
*Application for pro hac vice pending
Attorney for Plaintiff State of Ohio
Signed ___May 6___, 2015

FOR THE STATE OF OKLAHOMA
E. SCOTT PRUITT
OKLAHOMA ATTORNEY GENERAL


_Malisa McPherson_ (signature)

Malisa McPherson (OK Bar #32070)*
Assistant Attorney General
313 N.E. 21st Street
Oklahoma City, Oklahoma 73105
Telephone:  (405) 521-6926
Facsimile:  (405) 522-0085
Malisa.McPherson@oag.ok.gov
*Application for _pro hac vice_ pending
Attorney for Plaintiff State of Oklahoma
Signed May 12, 2015

**FOR THE STATE OF OREGON**

By: _Heather L. Weigler_

Heather L. Weigler, (OR Bar #035900)*
Assistant Attorney General

Office of Attorney General Ellen F. Rosenblum
Oregon Department of Justice
1515 SW 5th Ave., #410
Portland, Oregon 97201
Heather.l.weigler@state.or.us

Telephone:     (971) 673-1910

*Application for *pro hac vice* pending

*Attorney for Plaintiff State of Oregon*

Signed ___May 5___, 2015

FOR THE COMMONWEALTH OF
PENNSYLVANIA
By: *Michael T. Foerster* FMHP
Michael T. Foerster (PA Bar #78766)*
Senior Deputy Attorney General
Office of Attorney General Kathleen Kane
14th Floor
Strawberry Square
Harrisburg, Pennsylvania 17120
mfoerster@attorneygeneral.gov
Telephone:    (717) 783-6084
*Application for pro hac vice pending
Attorney for Plaintiff State of Pennsylvania
Signed *May 13*, 2015

FOR THE STATE OF RHODE ISLAND
By: _____
Genevieve M. Martin (RI Bar# 3918)*
Assistant Attorney General
Office of Attorney General Peter Kilmartin
150 South Main Street
Providence, Rhode Island 02903
gmartin@riag.ri.gov
Telephone:    (401) 274-4400 x2300
*Application for pro hac vice pending
Attorney for Plaintiff State of Rhode Island
Signed _____ 5/1 _____, 2015

**FOR THE STATE OF SOUTH CAROLINA**
By: _____
Shannon A. Wiley (SC Bar # 69806)*
Deputy General Counsel
Office of Secretary of State Mark Hammond
1205 Pendleton St., Suite 525
Columbia, South Carolina 29201
swiley@sos.sc.gov
Telephone:    (803) 734-0246
*Application for pro hac vice pending
Attorney for Plaintiff State of South Carolina
Signed ___May 7___, 2015

FOR THE STATE OF SOUTH DAKOTA

By: _____

Philip D. Carlson (SD Bar # 3913)*
Assistant Attorney General
Office of Attorney General Marty Jackley
1302 E. Highway 14, Ste. 1
Pierre, South Dakota 57501
Phil.Carlson@state.sd.us
Telephone:   (605) 773-3215
*Application for pro hac vice pending
Attorney for Plaintiff State of South Dakota
Signed _April 29_____, 2015

FOR THE STATE OF TENNESSEE

By: _Janet M. Kleinfelter_

[Janet M. Kleinfelter] (TN Bar # 13889)*

Deputy Attorney General

Office of Attorney General Herbert H. Slatery III

P.O. Box 20207

Nashville, Tennessee 37202

Janet.kleinfelter@ag.tn.gov

Telephone:   (615) 741-7403

*Application for pro hac vice pending

Attorney for Plaintiff State of Tennessee

Signed _May 5_____, 2015

FOR THE STATE OF TEXAS

KEN PAXTON
Attorney General of Texas

CHARLES E. ROY
First Assistant Attorney General of Texas

JAMES E. DAVIS
Deputy Assistant Attorney General for Civil
Litigation

TOMMY PRUD'HOMME
Chief, Consumer Protection

By: _____
JENNIFER M ROSCETTI (TX Bar No. 24066685)*
Assistant Attorney General
COREY D. KINTZER (TX Bar No. 24046219)
Assistant Attorney General
Office of Attorney General Ken Paxton
300 West 15th Street
Austin, Texas 78701
Jennifer.Roscetti@texasattorneygeneral.gov

Telephone:   512-475-4673
*Application for pro hac vice pending
Attorney for Plaintiff State of Texas
Signed May 8_____, 2015

FOR THE STATE OF UTAH

By: _____

Jeffrey Buckner (UT Bar 4546)*
Assistant Attorney General
Office of Attorney General Sean Reyes
Commercial Enforcement Division
160 E. 300 South, Fifth Floor
P. O. Box 140872
Salt Lake City, Utah 84114-0872
Jbuckner@utah.gov
Telephone:  (801) 366-0105
*Application for pro hac vice pending
Attorney for Plaintiff State of Utah

Signed _May 12_____, 2015

**FOR THE STATE OF VERMONT**

WILLIAM H. SORRELL
ATTORNEY GENERAL

By: _____
Todd W. Daloz (VT Bar # 4734)*
Assistant Attorney General

Office of Attorney General
109 State St.
Montpelier, Vermont 05609
Todd.Daloz@state.vt.us

Telephone:   (802) 828-4605

*Application for *pro hac vice* pending

*Attorney for Plaintiff State of Vermont*

Signed ___May 8th___, 2015

FOR THE COMMONWEALTH OF VIRGINIA

By: _____

Richard S. Schweiker, Jr. (VA Bar # 34258)*
Senior Assistant Attorney General
Office of Attorney General Mark R. Herring
Consumer Protection Section
900 East Main Street
Richmond, Virginia 23219
rschweiker@oag.state.va.us
Telephone:    (804) 786-5643
*Application for pro hac vice pending
Attorney for Plaintiff State of Virginia
Signed  April 27  , 2015

FOR THE STATE OF WASHINGTON

By: _____

Sarah Shifley (WA Bar # 39394)*

Assistant Attorney General

Office of Attorney General Bob Ferguson

800 Fifth Ave, Ste. 2000

Seattle, WA 98104

sarah.shifley@atg.wa.gov

Telephone:    (206) 389-3974

*Application for pro hac vice pending

Attorney for Plaintiff State of Washington

Signed April 27, 2015

FOR THE STATE OF WEST VIRGINIA
By: _____
Michael M. Morrison (WV Bar # 9822)*
Assistant Attorney General
Office of Attorney General Patrick Morrisey
812 Quarrier Street, 1st Floor
Charleston, West Virginia 25301
P.O. Box 1789
Charleston, West Virginia 25326
Matt.M.Morrison@wvago.gov
Telephone:    (304) 558-8986
*Application for pro hac vice pending
Attorney for Plaintiff State of West Virginia
Signed _____, 2015

By: _____
Laurel K. Lackey (WV Bar # 10267)*
Assistant Attorney General
Counsel for Secretary of State Natalie E. Tennant
Office of Attorney General Patrick Morrisey
269 Aikens Center
Martinsburg, West Virginia 25404
Laurel.K.Lackey@wvago.gov
Telephone:    (304) 267-0239
*Application for pro hac vice pending
Attorney for Plaintiff State of West Virginia
Signed _April 30_____, 2015

FOR THE STATE OF WISCONSIN

BRAD D. SCHIMEL
ATTORNEY GENERAL

By: _Francis X. Sullivan_
Francis X. Sullivan
Assistant Attorney General
Wisconsin State Bar no. 1030932*

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 267-2222
(608) 267-8906 (Fax)
sullivanfx@doj.state.wi.us

*Application for pro hac vice pending

Attorney for Plaintiff State of Wisconsin

Signed _May 4_, 2015

FOR THE STATE OF WYOMING

By: _____

Clyde W. Hutchins (WY Bar # 6-3549)*
Senior Assistant Attorney General
Office of Attorney General Peter K. Michael
123 State Capitol
Cheyenne, WY 82002
clyde.hutchins@wyo.gov
Telephone:    (307) 777-7847
*Application for pro hac vice pending
Attorney for Plaintiff State of Wyoming
Signed May 8, 2015

# FOR THE DISTRICT OF COLUMBIA

KARL A. RACINE
Attorney General for the District of Columbia

ELIZABETH SARAH GERE
Acting Deputy Attorney General
Public Interest Division

BENNETT RUSHKOFF
Chief, Public Advocacy Section


By: _____
BRIAN R. CALDWELL (DC Bar # 979680)*
Assistant Attorney General
Office of Attorney General Karl A. Racine
441 Fourth Street, N.W., Suite # 650-S
Washington, D.C. 20001
brian.caldwell@dc.gov
Telephone:   (202) 727-6211

*Application for pro hac vice pending

*Attorney for Plaintiff District of Columbia*

Signed:  May 7, 2015

Tab D

D-1-GV-14-000323

Cause No._____

| STATE OF TEXAS, | § | IN THE DISTRICT COURT |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| THE VETERANS SUPPORT | § | |
| ORGANIZATION, | § | TRAVIS COUNTY, TEXAS |
| RICHARD VANHOUTEN, | § | |
| MICHELLE VANHOUTEN, | § | |
| STEVEN CASELLA, and | § | |
| ROBERT CRUZ, | § | 53RD |
| Defendants. | § | _____JUDICIAL DISTRICT |

## PLAINTIFF'S ORIGINAL PETITION AND APPLICATIONS FOR TEMPORARY INJUNCTION AND PERMANENT INJUNCTION

**TO THE HONORABLE JUDGE OF SAID COURT:**

NOW COMES, Attorney General GREG ABBOTT, on behalf of the public interest in charity and on behalf of the State of Texas ("State"), hereinafter referred to as "Plaintiff," complaining of Defendants, THE VETERANS SUPPORT ORGANIZATION ("VSO"), RICHARD VANHOUTEN, individually and as CEO of VSO, MICHELLE VANHOUTEN, individually and as Administrative Director of VSO, STEVEN CASELLA, individually and as Director of VSO, ROBERT CRUZ, individually and as Director of VSO, and for cause of action would respectfully show the Court the following:

## DISCOVERY CONTROL PLAN

1. Discovery is intended to be conducted under a Level 2 discovery control plan, pursuant to Texas Rule of Civil Procedure 190.3.

2. This case is not subject to the restrictions of expedited discovery under Texas Rule of Civil Procedure 169 because:

   a. The State seeks non-monetary injunctive relief; and

b.      The State's claims for monetary relief including penalties, consumer redress and attorney's fees and costs are in excess of $100,000.00 and could exceed $1,000,000.00.

## JURISDICTION

3.      This action is brought by the Attorney General, through the Consumer Protection Division, in the name of the State of Texas and in the public interest under the authority granted by section 17.47 of the Texas Deceptive Trade Practices – Consumer Protection Act, Texas Business and Commerce Code sections 17.41-.63 (hereafter "DTPA"), on the grounds that Defendants have engaged in false, deceptive and misleading acts and practices in the course of trade and commerce as defined in, and declared unlawful by, sections 17.46(a) and 17.46(b) of the DTPA. The DTPA permits the Texas Attorney General to bring an action to restrain, by Temporary and Permanent Injunction, the use of any method, act, or practice declared to be unlawful by section 17.46 of the DTPA, when such proceedings are in the public interest.

4.      This action is also brought under the authority of Chapter 1804 of the Texas Occupations Code because Defendant VSO, a veterans organization and/or a veterans organization solicitor as defined in that chapter, has violated its requirements. Chapter 1804 permits the Texas Attorney General to bring an action to restrain, by Temporary and Permanent Injunction, the use of any method, act, or practice declared to be unlawful by section 1804.153 of the Texas Occupations Code.

5.      This action is also brought under the authority of sections 12.151 and 12.155 of the Texas Business Organizations Code because VSO has failed to permit the Texas Attorney General to examine or make copies of its business records, regardless of whether the records are located in this or another state, and thus the State moves to forfeit VSO's right to do business in this state as authorized by section 12.155 of the Texas Business Organizations Code.

6.      Finally, this action is also brought under the common law authority of the Texas Attorney General to enforce and protect public charitable trusts. Defendants, in their individual and corporate capacities, have committed fraud and misrepresentations; have violated a constructive charitable trust; and have breached the common law fiduciary duties owed by officers, directors and employees of charitable organizations to: 1) the charitable organization for whose benefit they were supposed to serve and on whose behalf they solicited and accepted charitable funds; and 2) the citizens of the State of Texas whose financial donations have provided the source of the funding for this entity and individuals.

**DEFENDANTS**

7.      Defendant, the Veterans Support Organization or VSO, is organized as a non-profit, charitable organization under section 501(c)(3) of the Internal Revenue Code, Tax ID number 05-0516084, which did business at 12110 Manchaca Road, Suite 400, Austin, Texas 78748 and 305 Wells Fargo Drive #A8, Houston, Texas 77090, and throughout the state of Texas as alleged herein. VSO may be served with process by serving its President and Director, Richard Vanhouten, at his residence located at 539 SW Lost River Road, Stuart, Florida 34997. VSO is headquartered in Florida.

8.      Defendant RICHARD VANHOUTEN is the President and a Director of VSO and may be served with process at his residence located at 539 SW Lost River Road, Stuart, Florida 34997, or wherever he may be found.

9.      Defendant MICHELLE VANHOUTEN is the Administrative Director of VSO and may be served with process at her residence located at 539 SW Lost River Road, Stuart, Florida 34997, or wherever she may be found.

10.      Defendant STEVEN CASELLA is a Director of VSO and may be served with process at

his residence located at 4900 NW 96th Avenue 4470, Sunrise, Florida 33351, or wherever he may be found.

11.     Defendant ROBERT CRUZ is a Board Member of VSO and may be served with process at his residence located at 3730 NW 116th TER, Sunrise, Florida 33323, or wherever he may be found.

## VENUE

12.     Venue of this suit lies in Travis County, Texas for the following reasons:

a.      All or a substantial part of the events or omissions giving rise to the claim occurred in Travis County.  *See* Tex. Civ. Prac. & Rem. Code §15.002(a) (1).

b.      Defendants have done business in Travis County.  *See* DTPA §17.47(b).

## PUBLIC INTEREST

13.     Plaintiff, State of Texas, has reason to believe that Defendants are engaging in, have engaged in, or are about to engage in, the unlawful acts or practices set forth below, that Defendants have, by means of these unlawful acts and practices, caused damage to and/or acquired money or property from persons, and that Defendants have adversely affected the lawful conduct of trade and commerce in this State.  The Attorney General also has reason to believe that Defendants have caused and will continue to cause injury, loss, and damage to the State of Texas, its veterans, and its charitable donors.

## TRADE AND COMMERCE

14.     Defendants have, at all times described below, engaged in conduct constituting "trade" and "commerce," as those terms are defined in section 17.45(6) of the DTPA.

## ACTS OF AGENTS

15.     Whenever in this petition it is alleged that a Defendant did any act, it is meant that

Defendants performed or participated in the act, or Defendants' officers, agents, trustees or employees performed or participated in the act on behalf of and under the authority of Defendants.

## NOTICE BEFORE SUIT

16.    Pursuant to section 17.47(a) of the Deceptive Trade Practices Act, Defendants were informed generally of the alleged wrongful conduct through issuance of a Request to Examine business records to the organization and through letters to their attorney.

## APPLICABLE LAW

17.    DTPA prohibits "false, misleading, or deceptive acts or practices in the conduct of any trade or commerce . . . ." DTPA § 17.46(a).

18.    The DTPA also prohibits:

   a.  Causing confusion or misunderstanding as to affiliation, connection, or association with, or certification by, another. *Id*. at (b)(3).

   b.  Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he does not have. *Id*. at (b)(5).

   c.  Failing to disclose information concerning the goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed. *Id*. at (b)(24).

19.    Chapter 1804 of the Texas Occupations Code regulates solicitations by veterans organizations. Specifically, this chapter:

   a.  Defines a veterans organization as:

   A formally or informally formed nongovernmental entity that:
   (A) purports to include or represent veterans; or
   (B) includes a term in its name leading a reasonable person to assume the organization is associated with veterans or concerned with veterans' issues.

Tex. Occ. Code Ann. §1804.001(2).

b. Defines a veterans organization solicitor as:

A person who receives monetary compensation for solicitation services for a veterans organization and who solicits:

(A) a contribution of financial support . . . for a veterans organization in person, by telephone, or by mail.

\* \* \* \*

*Id.* at §1804.001(3).

c. Requires a veteran organization to file a registration statement with the Texas Secretary of State and pay a $150 filing fee before beginning solicitations for donations in Texas. *Id*. at § 1804.053.

d. Requires a veterans organization solicitor to register with the Texas Secretary of State's office before beginning solicitations for a veterans organization. Tex. Occ. Code Ann. §1804.054.

e. If the veterans organization uses a veterans organization solicitor, the veterans organization must post a surety bond with the Texas Secretary of State in the following amounts:

(1) a $5,000 bond if the organization solicits in only one county;
(2) a $10,000 bond if the organization solicits in more than one but fewer than six counties; or
(3) a $25,000 bond if the organization solicits in six or more counties.
Tex. Occ. Code Ann. § 1804.101(a) (1)-(3).

f. A veterans organization solicitor must also post a surety bond with the Texas Secretary of State in the following amounts:

(1) a $5,000 bond if the solicitor solicits in only one county;
(2) a $10,000 bond if the solicitor solicits in more than one but fewer than six counties; or
(3) a $25,000 bond if the solicitor solicits in six or more counties.
Tex. Occ. Code Ann. § 1804.102(a) (1)-(3).

g. Each time a solicitation is made, whether orally or in writing, the following disclosure must be made: "The secretary of state has on file important information about persons that seek contributions in the name of veterans, and the number to call about that information is the Solicitation Information Hotline (the number maintained by the secretary of state.") Tex. Occ. Code Ann. § 1804.151.

h.  Both veterans organizations and veterans organization solicitors are required to file reports with the Texas Secretary of State if they raise more than a certain amount of money, $500 annually for the veterans organization and $5000 quarterly for the solicitor. *See id*. at §§ 1804.103 and .104.

i.  Finally, section 1804.153(c) prohibits a veterans organization solicitor from making "a materially false or misleading statement of fact during a solicitation that would lead a responsible person to believe that the proceeds of the solicitation are being used or will be used for a purpose other than the purpose for which the proceeds are actually used."

20.  Texas Business Organizations Code Chapter 12 sets out regulations applicable to corporations and other business organizations that are required to file or register with the Texas Secretary of State's Office. The pertinent provisions are:

a.  Section 12.151, which permits the attorney general to "inspect, examine, and make copies, as the attorney general considers necessary in the performance of a power or duty of the attorney general, of any record of the entity. A record of the entity includes minutes and a book, account, letter, memorandum, document, check, voucher, telegram, constitution, and bylaw."

b.  Section 12.152, which provides that when the attorney general proceeds, "[to] examine the business of a filing entity or foreign filing entity, the attorney general shall make a written request to a managerial official, who shall immediately permit the attorney general to inspect, examine, and make copies of the records of the entity."

c.  Section 12.155, which provides that "[a] foreign filing entity or a filing entity that fails or refuses to permit the attorney general to examine or make copies of a record, without regard to whether the record is located in this or another state, forfeits the right of the entity to do business in this state, and the entity's registration or certificate of formation shall be revoked or terminated."

21.  Chapter 22 of that code also provides the statutory standards applicable to a director and officer of a nonprofit corporation. Both must act with good faith and ordinary care and in a manner that they believe is in the best interest of the nonprofit corporation. *See* Tex. Bus. Org. Code §§ 22.221 and 22.235.

## NATURE OF DEFENDANTS' OPERATIONS

22.     Defendant VSO is a nonprofit organization run by the individual Defendants.  Defendant VSO began soliciting funds in Texas as a nonprofit in 2010.  It represented to the general public from which it was soliciting donations that its charitable purpose was to support **local** homeless veterans and provide them housing and a work program.  However, Defendants have failed to fulfill their charitable purpose in Texas.  Defendants raised over $2.5 million in Texas from 2010 to 2012, however, from 2010 through September 2012, Defendants made grants of only $56,993.69 to Texas veterans, which amounts to 2.24% of the donations received in Texas.  Defendants did pay their Texas "work program participants," which included a number of veterans, but they paid them to raise the $2.5 million.  The records for 2010 and 2011 show that Defendants "helped" jobless individuals (both veterans and non-veterans) by hiring them to solicit on behalf of VSO; VSO paid the solicitors $417,180.00 in 2010 and 2011, which is 16.7% of the total Texas donations.  From the available figures, it appears that the vast majority of donations (over 70%) raised in Texas were sent to Florida and Rhode Island, contrary to Defendants' statements to the public that the funds were being raised for "local" veterans.  Defendants also failed to fulfill their stated charitable purpose of providing work programs and housing primarily to veterans.  Defendants often made a profit on the housing they sublet to their employees (both veterans and non-veterans), and their "work program" was nothing more than structured panhandling which they use to solicit funds.

## SPECIFIC FACTUAL ALLEGATIONS

23.     VSO is incorporated in Rhode Island and registered with the Internal Revenue Service as a 501(c)(3) non-profit corporation. (EXHIBITS A and B). Since its inception in 2001, VSO has promoted itself as a non-profit corporation that honors veterans by offering them employment,

housing, and financial assistance. According to their website, this "honor" is accomplished through VSO's work, housing, and grant programs. (EXHIBIT C).

24.     In VSO's nonprofit corporate filings with Rhode Island's Secretary of State, the Defendants state:

> The Veterans Support Organization (VSO) is a band of veterans and non-veterans whose focus is to support needy United States **<u>veterans in the local area</u>**. Donations collected provide funding for veterans' delinquent utility bills, rent or mortgage; and **<u>provide housing assistance for homeless veterans</u>**. VSO also provides monetary assistance to the local VA hospitals' Volunteer Services Department for the support of various programs offered to veterans. VSO offers a work program for veterans and non-veterans striving to improve their own personal financial status while also helping the needy veterans of **the community**. (Emphasis added)

(EXHIBIT A).

25.     In its Texas registration, Defendants represent that VSO's charitable purpose is to "support needy veterans in the *local area*, housing assistance for homeless veterans, [and] support volunteer services at the local VA hospitals." (EXHIBIT D).   VSO maintained up to 13 chapters throughout the United States, including chapters located in Dallas, Austin, and Houston. (EXHIBIT E).  The Dallas and Austin Chapters became inactive on or about December 2013. The Houston chapter may have become inactive in February 2014.  However, before the chapters became inactive, Defendant VSO was soliciting funds in numerous counties, including but not limited to, Bell, Bexar, Dallas, Harris, Hays, Nueces, and Travis.

26.     Defendant VSO solicited funds from the general public through individuals it placed in front of stores to ask for donations.  In seeking permission to place its solicitors in front of a store, Defendant VSO represented to the store owners and/or managers that:

> VSO is a 501C3 Non Profit Organization providing help to homeless, needy, disabled Veterans *in the area*…Our work program…allows veterans to transition back in to the workforce. It builds job skills, work history and opportunity for financial stability. *What we will do is send a veteran out to the location*. This veteran will educate the public about the programs offered to our nation's heroes, and provide resource information needed for

immediate assistance… .We would like to send a veteran out with a small table to pass out information. . . . ***People are allowed to donate if they want but it is not the main focus.*** The main focus is getting the word out. (EXHIBIT F) (emphasis added).

27.     However, the individuals soliciting in front of the store, who may or may not be veterans, were instructed to ask people going into the store to "Help local needy veterans?" (EXHIBIT G). Moreover, these solicitors were required to solicit a certain amount or face termination.  Thus, contrary to the VSO's representations to the store management, it is clear that VSO's real focus was on getting donations.

28.     Defendants also claimed that the donations were for local veterans.  The individuals soliciting donations were instructed to ask for help for "local veterans" and store managers and owners were told that the organization was helping veterans in "the area."  However, according to VSO's bank and accounting records, most of the money raised by the solicitors was sent to Florida or Rhode Island.  From January 2010 through October 2012, VSO raised $2,553,825.98 in Texas.  However, the gifts, donations and grants it gave to needy veterans in Texas during 2010, 2011 and up to September 2012 was only $56,993.69 or 2.24% of the total Texas donations.

29.     If hiring veterans and nonveterans alike to solicit for VSO could be termed a "work program" for veterans and the solicitors' pay were considered a donation, VSO's  representations regarding donations in Texas is somewhat improved.  But even if that were the case, the majority of the donations were still not used in Texas.  VSO bank records show that in 2010 and 2011 VSO raised $1,618,173.81 in Texas.  For those same years, VSO issued W-2s and 1099s to its Texas solicitors that show it paid the solicitors a total of $417,180 in 2010 and 2011, 25.8% of the money raised in Texas to directly support the Texas "work program" participants.  Gift donations for 2010 and 2011 were $54,577.69 or 3.37% of the total amount of Texas donations.

In all, for 2010 and 2011, giving credence to VSO's assertions that hiring veterans and nonveterans to solicit funds for itself is a work program, VSO used only 29% of the donations raised in Texas for the benefit of individuals in Texas. This, of course, does not consider the housing program, however the "housing" program or assistance essentially paid for itself, thus, the donations do not appear to be used to support housing assistance in Texas.

30.     VSO did not use the money for its stated charitable purpose in Texas and it is questionable whether the money going to Rhode Island and Florida was being used to further VSO's charitable purpose in those or other states. Defendants represented to the public that 86% of donations received went into the work, housing, and grant programs that directly assist veterans. (EXHIBIT H). Later, Defendants represented that 70% of donations went towards its work and housing programs. (EXHIBIT I). They also disseminated information claiming that in 2011 VSO distributed $318,890.00 as part of its grant program. (EXHIBIT J). But VSO's 2011 IRS form 990 reveals a different distribution. VSO reported to the IRS that, in its fiscal year 2011, it received donations of $7,139,442.00 on a nationwide basis. (EXHIBIT K). It also reported that during that same year, it paid $428,324.00 for "Veteran Housing," $2,404,017.00 for "work program labor"[1] and made grants of $46,597.00 **nationwide**. *Id.* Thus, in 2011, according to its report to the IRS, VSO used $2,878,928.00 to support its grant, housing, and work program. To put it another way, VSO used a little less than 41% of the total donations to support its grant, housing, and work programs; a marked contrast to the representations it made to the public that 70 or 86% of its donations went to support the different programs. Further, its

---

[1]In its 990, VSO divided the work program (WP) expenses between "program services expenses" and "fundraising." The OAG did not receive any information on whether the "fundraising" expense also included wages/commissions paid to its solicitors so the OAG is using the total reported as WP expenses; if VSO did not include payments to the solicitors in the "fundraising" expenses, the total attributed to the work program would be $961,607 less.

2011 grant donations figures are clearly contradictory—$318,000.00 it represents to the public in contrast to the $46,597.00 it reports to the IRS.[2]

## THE HOUSING PROGRAM

31.     VSO describes its housing program as a program that provides transitional, clean and sober housing for homeless veterans.  (EXHIBIT I). VSO claims that the housing program's focus is "to get veterans off the streets." *Id*.  On January 15, 2013, Defendant Richard VanHouten stated that, as part of the housing program "VSO operates six housing facilities providing beds for nearly 150 homeless veterans." (EXHIBIT L). Once again, the actual practices of VSO are in marked contrast to its rhetoric.

32.     VSO's "housing" program in Texas consisted of renting two houses, one in Austin and one in Dallas.  VSO would then sublet rooms in these houses to its employee solicitors, who may or may not be veterans. Before the Austin Chapter of VSO ceased operations, VSO offered its housing program in Austin at a five bedroom house it leased for $1495 a month. (EXHIBIT M). Each bedroom held two people and VSO charged each person $125 a week for their share of the room.  If the house was completely full, VSO would collect rent of $5000.00 a month from these individuals.  The individuals were only allowed to participate in the "housing program" if they participated in VSO's "work program."  The individual's rent was then deducted from his/her pay, so VSO ran minimal risk of non-payment.  However, once the individual was terminated from VSO, s/he was also subject to eviction.  An ex-employee of VSO reported that he was not a veteran, but was allowed to live in the "housing" if he paid weekly rent of $125.00 a week.  He

---

[2] Part of the discrepancy could be explained by the fact that VSO uses a fiscal year beginning in October and ending in September for its form 990 and is using a calendar year for other reports.  However, this is just a supposition since the information was not provided to the OAG despite the OAG's repeated requests for full responses to its request to examine VSO's business records.

also reported that if he lost his job, he would also lose his housing. Further, VSO's records reveal that almost one third of the solicitors living in one of the Texas houses were not veterans.

33.     That money was a motivating factor in VSO's housing policy is clear from its records of the housing facilities in Florida.   According to VSO records, 466 individuals left its housing facilities in Florida between 2010 and 2012.  Of those 466, VSO reported that 104 left (or were evicted) because of nonpayment of rent.  In contrast to its statement that it was seeking to help "homeless veterans," in practice VSO was interested in individuals, veterans or not, who could afford to pay for a room.  In fact for some individuals, VSO noted "inability to pay" as a reason for their departure.   An inability to pay would seem to be the rationale for having a housing program to assist veterans, but VSO instead saw it as a reason to displace them.  This practice is clearly inconsistent with its charitable purpose of providing housing assistance to homeless veterans.

## THE WORK PROGRAM

34.     VSO touted its work program as "one of the flagship community-based programs of the VSO," allowing "veterans an opportunity to regain financial independence . . . ." (EXHIBIT N) In truth, the work program VSO offered was little more than structured panhandling.

35.     VSO explained its work program to the public it solicited for funds as:  "VSO hires veterans, provides basic training and work history, and develops relationships with local and national corporations." (EXHIBIT I)  However, VSO's "work program" was not limited to veterans.  According to one ex-employee, VSO hired both veterans and non-veterans.

36.     Further, the training provided consisted of giving an individual hired to solicit  (1) an opportunity to observe a more experienced solicitor for a few days, and (2) a one page document entitled "Position Description and Requirements" which instructed the solicitor to practice good

hygiene and ask each passerby to "Help the local needy veterans?" Some solicitors did receive additional training from upper management but that simply involved exhortations from Defendants and VSO management to the solicitors that they should stand at "parade rest." An ex-employee/solicitor reported that he was told by Richard and Michelle VanHouten to stand at "parade rest" to attract attention. He was not a veteran, and they were aware of that fact, but nonetheless urged him to stand in that manner for purposes of soliciting donations. The ex-employee understood that "parade rest" was a military term referring to a specific drill stance that a military person is commanded to take. (EXHIBIT O).

37.     After this very "basic" training, the new solicitor was driven to a storefront location in a VSO van, provided a uniform, a collection bucket with VSO logos on it, a book touting VSO's programs, sometimes flyers, a table on which to place the book, and instructed to ask for donations by asking each passerby, "Help local needy veterans?" The solicitor was required to stay there or in the general location until the VSO driver came to pick him up, often working from 9-9 Thursday through Sunday, for $7.25 an hour. These stores were located throughout Texas and solicitors from Austin could be driven to solicit in San Antonio, San Marcos and Corpus Christi.

38.     The solicitor was required to raise $225.00 (later $250.00) daily on average. If he did not, VSO's Position Description and Requirements warned the solicitor he could be terminated. Further, once back at the VSO office, the solicitor was subjected to pat downs to ensure that he did not take any donations and had to remain on the VSO premises while the donations were counted; the counting was video-taped with a security camera. Finally, until recently VSO did not even treat solicitors as employees, instead treating them as "independent contractors," for which neither federal income tax nor social security taxes were paid.

39.     The VSO work program simply provided needy people a smock or other uniform and required them to stand in front of a storefront for up to 12 hours to solicit donations for VSO This is hardly a "flagship program," to get veterans back to work.

40.     Because of the foregoing, Defendants have engaged in false, misleading and deceptive acts and practices in the solicitation and acceptance of funds from the public representing that such funds would be used for the specific designated charitable purpose of providing benefits for needy veterans in Texas, as well as needy veterans in the greater Austin community. Defendants have failed to comply with statutory requirements and Defendants knowingly participated in breaches of fiduciary duties as joint tortfeasors and are personally liable as such. The State of Texas further alleges that, by their acts and omissions, Defendants have failed to exercise a degree of care in the conduct of their fiduciary duties that reasonably prudent persons would under similar circumstances to avoid the harm their actions have caused. Defendants, while holding themselves out to be assisting local needy veterans, were instead directing the benefits elsewhere. Defendants have breached their statutory fiduciary duties and their common law charitable trust fiduciary duties.

## VIOLATIONS OF THE DTPA

41.     Defendants, in the course and conduct of trade and commerce, have directly and indirectly engaged in false, misleading and deceptive acts and practices declared to be unlawful by DTPA sections 17.46(a) and 17.46(b), as follows:

    a.  Causing confusion or misunderstanding as to affiliation, connection, or association with, or certification by, another. *Id*. at (b)(3).

b. Representing that services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he does not have. *Id*. at (b)(5).

c. Failing to disclose information concerning services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed. *Id.* at (b)(24).

## VIOLATIONS OF THE TEXAS OCCUPATIONS CODE

42. Defendants' actions violated section 1804.153(c) in that Defendants and their solicitors made materially false or misleading statements of facts during solicitations that would lead a reasonable person to believe that proceeds of the solicitation are being used or will be used for a purpose other than the purpose for which the proceeds are actually used.

43. Section 1804.103 requires that the veterans organization file a report with the Secretary of State's Office on the donations raised and expenses incurred in the State of Texas. VSO failed to make such a report in the years it raised donations in Texas in violation of this section.

44. Section 1804.104 requires the veterans organization solicitor to file a quarterly report on the donations raised in the State of Texas. In this instance, Defendants were the *de facto* solicitors, using employees for the solicitations. However, Defendants wholly failed to make the required reports in violation of this section.

45. Section 1804.151(a) requires a veterans organization solicitor to disclose at the time of each solicitation the following information:

> The secretary of state has on file important information about persons that seek contributions in the name of veterans, and the number to call about that information is the Solicitation Information Hotline (the number maintained by the secretary of state).

State of Texas v. Veterans Support Organizations
Page 16 of 23
First Original Petition and Applications for Temporary and Permanent Injunctions.

46. These disclosures must be made orally if the solicitation is in person. However, an ex-employee/solicitor reported that he was never instructed to make this disclosure and in fact never did. VSO's training material (the WPPC expectations) does not refer to the disclosure and provides no instructions relating to the required disclosure.

## FAILURE TO FULLY RESPOND TO REQUESTS TO EXAMINE

47. On September 28, 2012, the Texas Attorney General launched an investigation to look into possible misrepresentations made by VSO regarding its non-profit services and the failure to disclose information in accordance with Texas law. A Request to Examine ("RTE") was mailed to VSO, requesting documents for the purpose of assessing the organization's operations. (EXHIBIT P).

48. Defendants provided some responsive documents through their attorneys but failed to respond at all to several requests despite assertions that they would fully respond.

49. On November 19, 2012, an email was sent to Defendants' counsel inquiring about the status of the delinquent RTE responses. A voicemail left with Defendants' attorney in December 2013, regarding the status of the responses went unanswered.

50. On February 13, 2014, the Texas Attorney General again notified Defendants' counsel about the delinquent responses. (EXHIBIT Q) VSO's attorney has not responded to these voice messages and letter correspondence. To the date of filing this petition, Defendants have not provided a complete response to the Attorney General's Request to Examine.

## VIOLATIONS OF CHAPTER 22 OF
## THE TEXAS BUSINESS ORGANIZATIONS CODE

51. The individual Defendants violated their statutory duties under chapter 22 of the Texas Business Organization Code because the individual defendants diverted funds collected from

Texas to other areas while at the same time omitted representations to the Texas donating public that the funds donated would be used for "local needy veterans." Further, these individual Defendants did not use ordinary care and act in a manner which a reasonably prudent person would believe to be in the best interest of the nonprofit corporation in allowing the nonprofit corporation to operate in Texas without complying with the statutory requirements for such a corporation.

## FUNDS WERE NOT USED FOR STATED CHARITABLE PURPOSE

52.     Defendants diverted a substantial amount of charitable funds and donations to purposes unrelated to the charitable mission of the VSO in Texas. The vast majority of donations made in Texas have been sent out of state rather than used in the local area for needy local veterans.

## BREACH OF FIDUCIARY DUTIES

53.     Defendants owe a fiduciary duty to the consumers who contributed to the charity to use the funds in a way that fulfills the donors' intent. By soliciting and collecting funds from the general public, and then sending almost all of those donations to Florida under the guise of donating to local, needy veterans, Defendants violated this duty. All monies, pledges, and other property received by Defendants as a result of their solicitations constitute a charitable trust to be used for the charitable purposes for which they were solicited. As a result of their oral and written solicitations, Defendants are Trustees of such charitable trust and are charged with fiduciary duties with regard to said charitable trust. Defendants, by their actions described above in this petition, have breached, and will continue to breach, their fiduciary duties in this regard and have caused and will continue to cause, immediate and irreparable harm by failing to administer this charitable trust in a prudent and reasonable manner to assure that the funds will be used for the purposes for which they were solicited by Defendants.

## FRAUD

54.     Defendants, by and through their intentional acts and omissions described in this petition, have made repeated and materially false representations to the public concerning their solicitation of funds for purported charitable purposes, which were either known to be false when made or were made without knowledge of the truth of the matter asserted. Such false representations were made with the intention that they would be acted upon by the parties to whom the misrepresentations were made. VSO has an active website to which anyone may donate, thus, reliance upon these false representations has resulted in injury to the donors, individuals, and businesses located in the State of Texas and throughout the United States.

## VIOLATION OF CONSTRUCTIVE TRUST

55.     Generous members of the public of the State of Texas donated funds to Defendants for the benefit of worthy charitable causes such as helping veterans in need. Acceptance of funds pursuant to such representations established a constructive trust for the benefit of the public, in such a way as to fulfill the donors' intent. Defendants, therefore, owe a duty to the donors and to the public to ensure that funds raised on behalf of these charitable causes be used for the specific purposes for which they were donated. Defendants breached their duties to their donors who contributed money by failing to use the funds collected for the express purpose for which they were donated. Defendants have thereby violated the constructive trust.

## NEGLIGENCE

56.     Defendants, by their acts and omissions described herein, failed in their capacities as officers, employees and board members to exercise the degree of care in the conduct of their fiduciary duties that reasonably prudent persons would have used under similar circumstances to avoid the harm that their actions have caused.  Defendants' acts and omissions, when viewed

objectively from the standpoint of another at the time of occurrence, involved an extreme degree of risk, considering the probability and magnitude of potential harm their actions could cause. Defendants had or should have had subjective awareness of the risks involved in their actions, but nevertheless proceeded with conscious indifference to the potential harm.

## REMEDIES SOUGHT:
## DISGORGEMENT

57.     All of Defendants' assets are subject to the equitable remedy of disgorgement, which is the forced relinquishment of all benefits that would be unjust for Defendants to retain, including all ill-gotten gains, benefits or profits obtained from Texas consumers that are the result of Defendants' false, misleading, or deceptive conduct as described above.  Defendants should be ordered to disgorge all monies fraudulently solicited in Texas, together with all proceeds, profits, income, interest and accessions thereto.  All funds disgorged should be used to further the stated mission to help needy veterans, and their families, in Texas.

## IMPOSITION OF A CONSTRUCTIVE CHARITABLE TRUST

58.     When Defendants accepted funds from the citizens of Texas that were earmarked for a specific charitable purpose, a constructive trust for the benefit of the public was created. Therefore, all of Defendants' assets are subject to the Court's imposition of a constructive charitable trust, to be held solely for the specific purposes to which they were intended.

## TERMINATION OF VSO'S CERTIFICATE OF REGISTRATION

59.     VSO's Certificate of Registration Should be terminated because of its continued failure to completely respond to the Attorney General's Request to Examine pursuant to Texas Business Organizations Code section 12.555. As a result, VSO should be ordered to cease all business operations in Texas. The Court should also appoint a receiver to aid in the winding up of any remaining business in this State.

## COLLECTION ON BOND

60.     The State seeks collection of the $25,000.00 on the Veteran Solicitor bond issued by

Great American Insurance Company to Veterans Support Organization for the benefit of the

State of Texas.  A copy of said bond is attached. (EXHIBIT R).

## PRAYER

61.     WHEREFORE, Plaintiff prays that Defendants be cited according to law to appear and

answer herein; that after due notice and hearing a TEMPORARY INJUNCTION be issued; and

upon final hearing a PERMANENT INJUNCTION be issued, restraining and enjoining

Defendants, Defendants' officers, agents, successors, assigns, servants, employees,

subcontractors, corporations and any other persons in active concert or participation with

Defendants who receive actual notice of the injunction, from engaging in the following acts or

practices:

   a. Operating any type of corporation, organization, group, association, magazine or periodical which uses as any part of its name "Veterans Support Organization";

   b. Soliciting funds on behalf of or for the benefit of VSO or for any charity or nonprofit organization which uses the name "Veterans Support Organization" in any part of its name;

   c. Transferring, concealing, destroying, mutilating, altering, falsifying, or removing from the jurisdiction of this Court any books, records, documents, invoices, receipts, or other written materials relating to the business of Defendants currently or hereafter in Defendants' possession, custody or control except in response to further orders or subpoenas in this cause;

   d. Destroying, altering, mutilating or otherwise disposing of or changing any records related to any defendant or entity in which any defendant has an ownership interest;

   e. Mailing, faxing, or forwarding any invoice, letter, or thing to any business or person wherein such invoice, letter, or thing seeks, demands, or requests any type of payment or contribution from said business or person;

f. Telephoning, calling, or in any way initiating contact with any business or person for the purpose of seeking, selling, or requesting any type of contribution, money, or funds from said business or person.

62. In addition, Plaintiff STATE OF TEXAS respectfully prays that this Court will:

a. Adjudge against Defendants civil penalties in favor of Plaintiff in an amount up to $20,000 per violation, pursuant to section 17.47(c)(1) of the Texas Business and Commerce Code;

b. Adjudge against Defendants civil penalties in favor of Plaintiff in an amount up to $10,000 per violation, pursuant to section 1804.204 of the Texas Occupations Code;

c. Order the termination of VSO's registration to do business in Texas;

d. Order that the proceeds of the veteran solicitation bond issued by Great American Insurance Company be paid to the STATE OF TEXAS for VSO's failure to comply with the requirements of Chapter 1804 of the Texas Occupations Code;

e. Order Defendants to pay Plaintiff STATE OF TEXAS's attorney fees and costs of court pursuant to Texas Government Code section 4002.006(c) and Texas Property Code sections 114.064 and 123.006;

f. Order the *cy pres* of all assets and funds that were donated and intended for the charitable purposes;

g. Order that VSO's charter to do business in Texas be revoked; and

h. Grant all other relief to which the Plaintiff State of Texas may show itself entitled.

Respectfully submitted,

**GREG ABBOTT**
Attorney General of Texas

**DANIEL T. HODGE**
First Assistant Attorney General

**JOHN SCOTT**
Deputy Assistant Attorney General for
Civil Litigation

**TOMMY PRUD'HOMME**
Chief, Consumer Protection Division

**COREY D. KINTZER**
State Bar No. 24046219
**GABRIELLA GONZALEZ**
State Bar No. 24080184
Assistant Attorneys General
Consumer Protection Division
P.O. Box 12548
Austin, TX 78711-2548
Tel (512) 463-2185
Fax (512) 473-8301
*Attorneys for Plaintiff*

State of Texas v. Veterans Support Organizations
First Original Petition and Applications for Temporary and Permanent Injunctions.

Page 23 of 23

Tab E

| | | |
|---|---|---|
| STATE OF TEXAS,<br>Plaintiff, | §<br>§<br>§ | IN THE PROBATE COURT |
| v. | §<br>§<br>§ | |
| TEXAS HIGHWAY PATROL MUSEUM,<br>TEXAS HIGHWAY PATROL ASSOCIATION,<br>THPA SERVICES, INC;.<br>TIMOTHY TIERNEY, KENNETH LANE<br>DENTON, MARK LOCKRIDGE,<br>STEVEN JENKINS,<br>RUBEN VILLALVA, JR., TED RIOJAS,<br>FRED RIOJAS, GREGG GREER, JAMES<br>COLUNGA AND ROBERT BERNARD, JR.<br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | NUMBER ONE OF<br><br><br><br>TRAVIS COUNTY, TEXAS |

## PLAINTIFF'S ORIGINAL PETITION AND APPLICATION FOR EX PARTE TEMPORARY RESTRAINING ORDER, TEMPORARY INJUNCTION AND PERMANENT INJUNCTION AND ASSET FREEZE AND REQUEST FOR APPOINTMENT OF RECEIVER

**TO THE HONORABLE JUDGE OF SAID COURT:**

COMES NOW, Attorney General GREG ABBOTT, on behalf of the State of Texas ("State"), hereinafter referred to as "Plaintiff," complaining of Defendants TEXAS HIGHWAY PATROL MUSEUM (THPM), TEXAS HIGHWAY PATROL ASSOCIATION (THPA), THPA SERVICES, INC. (SERVICES) (collectively referred to as "THP entities"), TIMOTHY TIERNEY, KENNETH LANE DENTON, MARK LOCKRIDGE, STEVEN JENKINS, RUBEN. VILLALVA, JR., TED RIOJAS, FRED RIOJAS, GREGG GREER, JAMES COLUNGA AND ROBERT BERNARD, JR. and for cause of action would respectfully show the Court the following:

### I. DISCOVERY CONTROL PLAN

1. Discovery is intended to be conducted under a Level 2 discovery control plan, pursuant to Texas Rule of Civil Procedure 190.

### II. JURISDICTION

2. This action is brought by the Attorney General of Texas, GREG ABBOTT, in the name and

on behalf of the interest in charity of the general public of the State of Texas to protect the public interest in the administration and accounting for funds that charitable entities solicit and receive from the public. This action is brought against the individual defendants for violations of their fiduciary duties as set forth in this petition.

3. This action is also brought by the Attorney General through the Consumer Protection Division, in the name of the STATE OF TEXAS and in the public interest, under the authority granted by Section 17.47 of the Texas Deceptive Trade Practices Act, TEX. BUS. & COMM. CODE §§ 17.41 *et seq.* (hereafter "DTPA"), upon the grounds that Defendants have engaged in false, deceptive and misleading acts and practices in the course of trade and commerce as defined in, and declared unlawful by Sections 17.46(a) and 17.46(b) of the DTPA. The DTPA permits the Texas Attorney General to bring an action to restrain, by Temporary and Permanent Injunction, the use of any method, act, or practice declared to be unlawful by Section 17.46 of the DTPA, where such proceedings are in the public interest.

4. This action is also brought under the Texas Law Enforcement Telephone Solicitation Act (hereinafter "LETSA") under Chapter 303 of the Texas Business and Commerce Code.

5. This action is also brought under the common law authority of the Attorney General to enforce and protect public charitable trusts. Defendants, in their individual and corporate capacities, have committed fraud and misrepresentations; have violated a constructive charitable trust; have engaged in a civil conspiracy to defraud; and otherwise have breached the common law fiduciary duties owed by officers, directors and employees of charitable organizations to 1.) the charitable organization for whose benefit they were supposed to serve and on whose behalf they solicited and accepted charitable funds; 2.) to the families of the slain DPS troopers for whom such funds were intended to be used; 3.) to the citizens of the State of Texas whose financial donations have provided

the source of the funding for these entities and individuals.

### III. DEFENDANTS

6.  Defendant TEXAS HIGHWAY PATROL MUSEUM (THPM) is a Texas Nonprofit charitable organization under Section 501(c)(3) of the Internal Revenue Code, which does business at 812 S. Alamo St., San Antonio, Texas 78205 and throughout the state of Texas as alleged herein, and may be served with process by serving its Executive Vice President and registered agent, Timothy Tierney, at its headquarters at 501 Oakland Avenue, Austin, Texas 78703.

7.  Defendant TEXAS HIGHWAY PATROL ASSOCIATION (THPA) is a Texas Nonprofit organization under Section 501(c)(6) of the Internal Revenue Code, which does business throughout the state of Texas including Travis County as alleged herein, and may be served with process by serving its Executive Vice President and registered agent, Timothy Tierney, at its headquarters at 501 Oakland Avenue, Austin, Texas 78703.

8.  Defendant THPA SERVICES, INC. is a for-profit organization registered in Washington, D.C. which does business throughout the state of Texas including Travis County as alleged herein, and may be served with process by serving its Executive Vice President and registered agent, Timothy Tierney, at its headquarters at 501 Oakland Avenue, Austin, Texas 78703.

9.  Defendant TIMOTHY TIERNEY is the Executive Vice-President of the Texas Highway Patrol entities and may be served with process at THPM at 501 Oakland Avenue, Austin, Texas 78703 or his residence at 1004 Elm Street, Austin, Texas 78703.

10.  Defendant KENNETH LANE DENTON is the Director of Texas Highway Patrol Services, Inc. and may be served with process at the THPM at 812 South Alamo, San Antonio, Texas 78205 or his residence at 5150 Broadway, Number 233, San Antonio, Texas 78209.

11.  Defendant MARK LOCKRIDGE is the President of the THPM and a board member of the

THPA and may be served with process at his residence at 209 Chisolm Trail, Waxahachie, Texas 75165.

12. Defendant GREGG GREER is the President of the THPA and THPM and is a board member of the Texas Highway Patrol Museum and may be served with process at his residence located at 2719 Buchanan Rd, Halsville, Texas 75650.

13. Defendant STEVE JENKINS oversees the THPA Services, Inc. magazine ad sales and may be served with process at his place of business located at 111 W. Anderson Lane, Suite E328, Austin Texas 78752.

14. Defendant RUBEN VILLALVA, JR. is the Director of Marketing for the Texas Highway Patrol Museum and may be served with process at his place of business located at 2150 Trawood, Suite A-240, El Paso, Texas or his residence located at 11743 Gwen Evans El Paso, Texas 79936-0723.

15. Defendant TED RIOJAS is a board member of both the Texas Highway Patrol Museum and the Texas Highway Patrol Association and may be served at his residence at 1325 Twin Cove, Kyle, Texas 78640.

16. Defendant FRED RIOJAS is a board member of both the Texas Highway Patrol Museum and the Texas Highway Patrol Association and may be served at his residence at 101 Wright Landing, Cibolo, Texas 78108.

17. Defendant JAMES COLUNGA is a board member of both the Texas Highway Patrol Museum and the Texas Highway Patrol Association and may be served at his residence at 3918 E. Highway 34, Ennis, Texas 75119.

18. Defendant ROBERT BERNARD, JR. is a board member of both the Texas Highway Patrol Museum and the Texas Highway Patrol Association and may be served at his residence at 18 Grant

Circle, Richardson, Texas 75081.

## IV. VENUE

19.    Venue of this suit lies in Travis County, Texas for the following reasons:

a.    Under Section 123.005(a) of the Property Code, venue is proper in Travis County as this case involves breaches of fiduciary duties; and

b.    Under Section 17.47 of the DTPA, venue is proper because Defendants' principal place of business is at 501 Oakland Avenue in Travis County, Austin, Texas.

## V. PUBLIC INTEREST

20.    Plaintiff, State of Texas, has reason to believe that Defendants are engaging in, have engaged in, or are about to engage in, the unlawful acts or practices set forth below, that Defendants have, by means of these unlawful acts and practices, caused damage to and/or acquired money or property from persons, and that Defendants adversely affected the unlawful conduct of trade and commerce, thereby directly or indirectly. The Attorney General further has reason to believe that Defendants have caused and will continue to cause injury, loss and damage to the State of Texas and its charitable donors.

## VI. TRADE AND COMMERCE

21.    Defendants have, at all times described below, engaged in conduct constituting "trade" and "commerce," as those terms are defined in section 17.45(6) of the DTPA.

## VII. ACTS OF AGENTS

22.    Whenever in this petition it is alleged that a Defendant did any act, it is meant that the Defendants performed or participated in the act, or Defendants' officers, agents, trustees or employees performed or participated in the act on behalf of and under the authority of the Defendants.

# VIII. NOTICE BEFORE SUIT NOT GIVEN

23.  Pursuant to § 17.47(a) of the Deceptive Trade Practices Act, contact has not been made with the Defendants herein to inform them of the unlawful conduct alleged herein, for the reason that the Plaintiff is of the opinion that there is good cause to believe that such an emergency exists that immediate and irreparable injury, loss or damage would occur as a result of such delay in obtaining a temporary restraining order, and that Defendants would evade service of process and flee the jurisdiction, destroy relevant records and secret assets if prior notice of this suit were given. However, Defendants were contacted prior to suit and informed generally of the alleged wrongful conduct as Defendants have been issued Civil Investigative Demands and Requests to Examine documents and have been involved in providing sworn statements.

# IX. SPECIFIC FACTUAL ALLEGATIONS

## Texas Highway Patrol Association

24.  Defendant Lane Denton filed Articles of Incorporation with the Texas Secretary of State on behalf of Defendant Texas Highway Patrol Association on June 19, 1990. The purpose of the designated 501(c)(6) corporation was to "improve educational and professional endeavors for highway patrol officers of the Texas Department of Public Safety and to conduct public awareness programs promoting safety activities."

25.  According to their Articles of Amendment filed with the Secretary of the State of Texas, the purpose of The Texas Highway Patrol Association is "to promote the interests of labor, and its principal purpose shall be to better the working conditions of people engaged in common pursuit, which is the worked performed by the highway patrol officers of the Texas Department of Public Safety." Although the designation of THPA remains 501(c)(3) on its forms filed with the Texas Secretary of State, THPA files as a 501(c)(6) organization with the IRS.

## Texas Highway Patrol Museum

26.     On July 8, 1992, Defendant Lane Denton filed Articles of Incorporation for the Texas Highway Patrol Association Hall of Fame and Museum. The purpose of this 501(c)(3) charity was to "operate a museum dedicated to the Texas highway patrol and to promote a higher level of public awareness and understanding about the Texas highway patrol."

27.     Under the Articles of Amendment, the purpose of the Texas Highway Patrol Museum is "exclusively for charitable, religious, educational or scientific purposes, including, for such purposes, the making of distributions to organizations that qualify as exempt under Section 501 (c)(3) of the U.S. Internal Revenue Code.

28.     Although the THP entities are separate and distinct corporations, the public's perception with regard to these entities is that they are one organization, thereby confusing all consumers who receive solicitation phone calls and who donate to the charity. In fact Goldie van Guilden, an employee since 1992 believes that all three entities are one corporation. (*See* Exhibit 1 *attached hereto and incorporated herein*).

29.     Defendants THPA and THPM provide literature to the public that indicates that both organizations are both charitable organizations. (*See* Exhibit 1, *attached hereto and incorporated herein*). There is no distinction to the public that only one is a public charity and the other is not. Charitable donations are to be made to the Museum. However, those employees who are hired to make calls to solicit donations are trained to tell the public that the callers are soliciting on behalf of the Association, which is a 501(c)(6). (*See* Exhibits 2 and 3, *attached hereto and incorporated herein*).

## THPA Services, Inc.

30.     On May 26, 1994, Defendant Lane Denton filed incorporation paperwork for Defendant

THPA Services, Inc.. The stated purpose of this corporation was to "provide membership and other services to police membership associations and other private law enforcement organizations." Presently, Services, Inc. publishes the Texas Highway Patrol Magazine and is a for profit corporation.

## Benefits Advertised are Misleading

31. Defendants claim that they provide "trooper benefits," which consist of a death benefit fund, a funeral benefit and dental insurance. One "trooper benefit" is a monetary benefit of $10,000 to the survivors of any trooper who is killed in the line of duty. The literature provided to consumers purports to provide this benefit to survivors of the slain trooper regardless of whether the trooper was a paid member of the Association. Another "trooper benefit" is a funeral benefit through Dignity Memorial, which is provided only to members of the THPA. This benefit is a "funeral protection certificate valued at $2,500" to be given to the children and grandchildren of the fallen officer. When asked about this benefit, Defendant Tim Tierney replied that THPA does not pay anything and that "it's just a letter sent out and it's all run through Dignity Memorial." If members want to choose to take advantage of this benefit, the trooper must contact Dignity Memorial directly (*See* Exhibit 4, *attached hereto and incorporated herein*). The last trooper benefit is dental insurance for the troopers and families. To utilize this benefit, the trooper must be a paid member of the THPA. THPA also pays for the same dental insurance for its employees, including all of the individual defendants.

32. Defendants also provide "educational benefits" which consist of the Captain Ed Pringle Scholarship Fund. Defendants also claim to have developed an award winning "Crusin' to Coffins" program, which is designed to educate students about the dangers of drinking and driving. However, Defendants did not create or produce of this program. Cruisin' to Coffins was a project

of a boy scout, who prepared it as one of the requirements of obtaining his Eagle Scout status. Defendants' educational programs consist of sending out letters to inquire which school would be interested in receiving a copy of the Crusin' to Coffins DVD. However, the only schools that Defendants have sent letters to are within the city of San Antonio. Defendants allege that they are "continuously planning and designing new programs for area youth." However, after a thorough review of the records of the related entities, no such programs have been found. At his sworn statement, Executive Vice-President Tim Tierney was unable to articulate any new programs for area youth. In fact, the educational programs that are being "continuously" planned have remained the same programs that began 20 years ago and they are not even provided statewide. Defendants allegedly provide "additional benefits" and "much, much more." However, after review of their records for proof of providing additional benefits, no such additional benefits were found.

**Entities are Misleading to the Consumers of Texas**

33. Defendants Texas Highway Patrol Association, Texas Highway Patrol Museum operate businesses which illegally include "Texas Highway Patrol" in their name in violation of Gov't. Code § 411.017. This causes confusion for consumers as to the affiliation of the Defendants with the Texas Department of Public Safety Highway Patrol Division. Defendants are misleading consumers by giving the perception that they are affiliated with the Texas Department of Public Safety. Consumers have complained that when they receive phone calls, the caller ID misleads the consumer to believe it is a call from the actual Highway Patrol Division of the Texas Department of Public Safety. (*See* Exhibit 5, *attached hereto and incorporated herein*).

34. Defendants also use decals in connection with their entities which are deceptively similar to the badge used by the Highway Patrol Division of the Texas Department of Public Safety. (*See* Exhibit 6, *attached hereto and incorporated herein*). No approval to use such decals from the Texas

Department of Public Safety has been obtained by Defendants as required under the law.

35. Defendants falsely represent that 100% of the money solicited as donations will all be paid to the families of slain law enforcement officers. (*See* Exhibit 7, *attached hereto and incorporated herein*).

36. Defendants falsely represent that they are associated with a legitimate law enforcement agency, when in fact, there is no such association or connection with any law enforcement agency. (*See* Exhibit 5, *attached hereto and incorporated herein*).

37. Defendant THPA represents in its instructions used by its telephone solicitors that donations to THPA are tax deductible, when, in fact they are not, as THPA is a 501(c)(6) organization. (*See* Exhibit 2, *attached hereto and incorporated herein*). Further confusion results in the fact that even though it is the Museum who distributes the funds to the slain troopers, the telemarketers for the Museum are given a set of Frequently Asked Questions that they are to follow if questions are asked by the consumers from whom they are soliciting. *Id.* The questions clearly state that telemarketers are to respond to consumers as if the Association is the organization which is doing the soliciting, which only further misleads and confuses members of the public because it is the Museum which distributes the funds to the families of the slain troopers. Furthermore, because the Association is clearly soliciting donations, they are required to register with the OAG under the LETSA. They have not registered and are in violation of the statute. Tierney acknowledged that the Association is in violation of the statute. (*See* Exhibit 8, *attached hereto and incorporated herein*).

38. The Museum is the entity that provides the death benefit. Therefore, because the Museum is a 501(c)(3) organization, donations made to the Museum are tax deductible. However, consumers are able to designate if they want their money to go towards dental insurance, which is a program of the Association. The Association is a 501(c)(6) entity and, therefore, donations designated for the

dental insurance are not tax deductible. However, this information is not relayed to the consumer. Such practice causes further confusion to those who donate their money to the dental program.

**Policies and Procedures of the Board are Not Followed**

39. The OAG has requested that all three of the Texas Highway Patrol entities furnish a copy of their policy manuals. (*See* Exhibit 9, *attached hereto and incorporated herein*). The OAG was provided a copy of one "policy manual" of the Texas Highway Patrol Museum. (*See* Exhibit 10, *attached hereto and incorporated herein*) A letter from the organization's counsel dated April 23, 2009, was provided in the records that Tierney provided in response to the OAG's Request to Examine. (*See* Exhibit 11, *attached hereto and incorporated herein*). In this letter, counsel informs Tierney that the policy manual was required for all public charities by the IRS by the end of 2008. *Id.* In that same letter, counsel instructs Tierney to backdate the board meeting minutes for the November 2008 board meeting to reflect adoption of such manual. *Id.* Furthermore, there is no proof that any of the board members have signed an annual confirmation that each board member has read and will comply with the code as stated in the Museum's policy manual.

40. Even if these policies had been developed, approved and signed by all board members, the Defendants are in violation of the policies and Tierney has admitted such. (*See* Exhibit 12, *attached hereto and incorporated herein*). This is especially true with regard to the Museum's credit card usage policy. When asked about the credit card policy, Tierney's first reply was that they did not have one. *Id.* When he was shown the policy during his sworn statement and asked questions about it, he responded that it was not complied with. The policy requires disciplinary action, including termination, for personal use of credit cards. The policy also states that when the card is used to pay for meals, the staff must indicate on the receipt who was in attendance at the meal and the purpose of the meal. (*See* Exhibit 13, *attached hereto and incorporated herein*). Tierney has admitted that

he never requests receipts from the company cardholders and that he "just takes their word for it" that all expenses are related to the business. (*See* Exhibit 14, *attached hereto and incorporated herein*). There is no independent review of the business expenses of any of the organizations.

## Donor's Intent is Not Carried Out

41. When mailing a donation, the consumer is able to include additional monies if desired. They are also able to "check the box" to designate the charitable programs to which they want their money distributed. However, the Defendants are not fulfilling the donor's intent. In fact, Goldie van Guilden, an employee for almost 20 years, stated that when someone sends in an amount and checks three or more boxes, they are unable to allocate it that way and will simply guess where the donor intended the money to go. (*See* Exhibit 15, *attached hereto and incorporated herein*).

42. The Museum receives both cash and check donations on a daily basis and the donations can be as much as $10,000.00 a day. However, the policies for dealing with cash and checks are not the same. When cash is received in the mail, the cash is counted by the office staff and then taken to upstairs to Tierney's office where it sits for a week or two and then it is deposited into the bank. (*See* Exhibit 16, *attached hereto and incorporated herein*). If one of the office staff needs cash for their own personal use, Tierney allows the employee to take the cash, but the employee will write a check for the money and deposit it into the account of the charity. (*See* Exhibits 17 and 18, *attached hereto and incorporated herein*). Tierney also stated that the office uses the cash donations to pay for birthday luncheons of the staff. (*See* Exhibit 19, *attached hereto and incorporated herein*). These cash donations are not kept in a locked secure box, but are kept in an unlocked filing cabinet. The office does not have video surveillance cameras and there are no checks and balances to insure the accountability of the funds. (*See* Exhibit 20, *attached hereto and incorporated herein*).

## Tax Documents of the Entities

### THPA

43.     The OAG has examined several Form 990s of the Association.  In 2008, THPA reported $17,393 in total expenses, but they failed to designate what expenses were program related.  Their tax return reflects that a $10,000 death benefit was issued to Michaela Burns, widow of Trooper James Scott Burns who was killed in the line of duty in 2008.  (*See* Exhibit 21, *attached hereto and incorporated herein*).  However, it is the Museum which was supposed to have provided the death benefit.

44.     In years 2007, 2008 and 2009, THPA Services, Inc. owed the Association over $600,000.00.  As evidenced in the tax returns of the Association, the loan balance has remained the same.  Defendant Tierney was unable to articulate in his statement the specifics of the loan, including purpose of the loan, whether formal documentation existed on the loan or whether the Board was aware of the loan. (*See* Exhibit 22, *attached hereto and incorporated herein*).

### THPM

45.     The Museum's revenue is primarily comprised of charitable donations from the public.  In 2009, the Museum received contributions that amounted to $2,137,515.  However, minimal funds, if any, were used for charitable purpose. *Id.*

### Spending Habits of the Entities

46.     To make purchases for their expenses, the entities' employees use credit cards (American Express, Citbank and Bank of America).  The OAG has analyzed credit card statements of American Express and Citibank.  The OAG analyzed the American Express account for The Kitchen Door, Inc..  Tierney informed the OAG that he helped his friends, who were the owners of The Kitchen Door, Inc., to get a credit card.  Once his friends ceased using the credit card, Tierney continued to

use the credit card for the THP entities because "American Express changed the way they do their credit lines...the credit line was too low on the Texas Highway Patrol Association account, so I used the other card. But all the charges that are on there are for business expenses related to our organizations." (*See* Exhibit 22, *attached hereto and incorporated herein*). For a one year time period (July 2009-July 2010), the entities charged $239,276.71 on this one credit card alone. Some of the charges included tickets to Sea World, airfare to Massachusetts, movie theater tickets and charges to a video game rental website. (*See* Exhibit 23, *attached hereto and incorporated herein*). Such usage of the money of a public charity is a gross misuse of the funds and does nothing to further the purpose of the charitable mission.

47.     After analyzing the Citibank credit card, similar findings were made. For the time period September 2009 to June 2011, the organizations charged a total of $169,875.50. *Id.* Some of the charges included tickets to Salt Lake City, Utah, tickets to Six Flags Fiesta Texas, plane ticket to Germany, hotel charges from Napa Valley, California and visits to the Alamo Drafthouse Cinema.

**Lane Denton**

48.     Defendant Lane Denton is the Director of THP Services, Inc. and allegedly volunteers at the museum. Denton was formerly the Executive Director with the Texas Department of Public Safety Officer's Association [DPSOA], an organization whose mission is to improve the general welfare of the Department of Public Safety Personnel. While serving as Executive Director with DPSOA, Denton was indicted for stealing and misappropriating monies which belonged to DPSOA (*See* Exhibit 24, *attached hereto and incorporated herein*).

49.     In addition to allegedly stealing and misappropriating funds that did not belong to him, it was also alleged that Denton deliberately violated the policies and procedures of the Board of DPSOA in failing to submit contracts for the Board's approval and failing to obtain two signatures on checks

written by Denton on behalf of the DPSOA. In January 1990, DPSOA terminated Denton's employment. While Denton was under indictment and being tried for the acts he committed while serving as Executive Director with DPSOA, Denton was actively starting the similar Texas Highway Patrol entities as evidenced in the Articles of Incorporation filed with the Secretary of State. (*See* Exhibit 25, *attached hereto and incorporated herein*).

50.     Denton and the other individual Defendants have consistently violated the board policies of the corporate Defendants. Denton uses credit cards in the name of the Texas Highway Patrol for his own personal benefit and gain. (*See* Exhibit 23, *attached hereto and incorporated herein*). There are suspicious charges that do not appear to be related to any business of any of the entities. Charges include purchases from Starbucks, car washes, child care services, grocery stores, restaurants, fitness centers, numerous book stores, meat markets, a thrift store and dental bills. *Id.* No receipts have been provided to demonstrate any business related reason that such charges were made.

51.     Denton appears to have loaned approximately $6,000.00 to the THPA. However, no paperwork was completed on the loan and there is no evidence that the Board of the THPA approved such loan. (*See* Exhibit 21, *attached hereto and incorporated herein*).

**Tim Tierney**

52.     Defendant Tierney has been the Executive Vice President of all three entities since the early 1990's. Tierney acknowledges that he is the one individual that all employees report to. According to him, Tierney's duties consist of paying the bills and overseeing the operations of all three entities. Tierney uses credit cards in the name of the THP for his own personal benefit and does not reimburse the entity. Tim Tierney acknowledges that he is the one person in the entities who pays the bills and is the only one with the authority to sign checks on behalf of the entities. Tierney acknowledges that he does not keep track of his own receipts and he never requires any of his

employees to submit receipts to him to demonstrate that all charges are, in fact, legitimate business expenses. Tim Tierney has grossly misused the charity's money and is under the perception that as long as any expense incurred by him or anyone else within the organization is coded internally as a "business expense," then it is, in fact a legitimate business expense.

53.     Tim Tierney keeps an "office cat" at the Oakland Avenue location in Austin and freely admits that he pays for the expenses of the cat, including exorbitant vet bills, with money donated by the public for the purpose of helping slain troopers' families. (See Exhibit 26, attached hereto and incorporated herein). Tierney states that it is important to keep his employees happy and that is how he justifies having the office cat as a reasonable and prudent business expense. (See Exhibit 27, attached hereto and incorporated herein).

54.     Additionally, Tierney takes numerous trips across the country and alleges such trips are business trips. Yet, on these trips he takes his son, former life partner and others without approval from the Board. Tierney never reimburses the charity for the expenses that he claims are business related when they are clearly personal in nature. For example, on one of these trips, Tierney flew to San Diego and purchased tickets to Sea World for himself, his life partner, Bill Billingsley, and his son, David. The organization paid for all three individuals to fly to San Diego and for the tickets to Sea World. However, Billingsley was in no way affiliated with any of the entities and his son is 11 years old. Yet, Tierney states that he would "bounce ideas from different people" as his justification of this trip being a business expense. (See Exhibit 28, attached hereto and incorporated herein).

55.     Tierney also has several credit card charges to Gold Class Cinemas in Austin. When asked about charges to a movie theater paid for by money donated to benefit law enforcement families, Tierney was unable to articulate exactly what business was discussed or who it was discussed with.

Yet, he was able to state that this "meal and entertainment" expense was reasonable and prudent. (*See* Exhibit 29, *attached hereto and incorporated herein*). However, he said that it could have been his insurance agent discussing the policy renewal. When asked why this would not have just been discussed over the phone, Tierney replied, "I don't know." *Id.* When asked if he could provide receipts of the individuals who were present at those meetings, he stated that he did not keep receipts on those. (*See* Exhibit 30, *attached hereto and incorporated herein*). Tierney further stated that it could be a prudent business practice to keep records of all business meetings and appointments, but "since it's just me, I don't keep those." *Id.*

56.     When questioned about a trip to Hawaii that appeared on the charity credit card, Tierney stated it was a trip for his exchange student. *(See* Exhibit 31, *attached hereto and incorporated herein*). He also stated that it should be on his personal credit card and he did not recall if he reimbursed the charity for that personal expense. Even though it was requested of the entities, Tierney failed to provide the OAG proof of any reimbursements for personal expenses paid for by the entities.

57.     The OAG also inquired about a trip to San Jose, California, where Tierney is from, taken by Tierney, his life partner and their son. Tierney stated the trip could have been related to the Museum or the magazine, but he did not "really recall." The trip was business related according to Tierney because he was visiting his uncle and discussing business with his uncle regarding expansion of the museum. Tierney's uncle is a retired vice president of purchasing of a hardware store. Tierney stated his uncle had "good business sense." He was unable to articulate why his partner and son were with him on the trip, but was able to say it was a reasonable and prudent business expense. However, the Board was not made aware of this trip nor were they ever made aware that Tierney "consulted" with his uncle. (*See* Exhibit 32, *attached hereto and incorporated herein*).

### Ruben Villalva, Jr.

58.     Defendant Ruben Villalva serves as the Director of Marketing, in the El Paso office. His duties includes supervising all the telemarketers who make the calls to the public to request donations to the THPM and THPA. Villalva also has use of a corporate credit card and does not provide receipts for his purchases. (*See* Exhibit 33, *attached hereto and incorporated herein*). Charges incurred by Villalva included charges for XM Satellite radio, cigars, Costco Liquor, the Ultra Wet Lounge in El Paso, as well as numerous restaurants.

### Steve Jenkins

59.     Defendant Steve Jenkins, is the Marketing Manager for Services, Inc. and reports to Lane Denton. Steven Jenkins also has authority to use the company credit card. Jenkins has made charges to various restaurants and grocery stores that are billed to and paid for by the THP entities.

### Board Members

### Mark Lockridge

60.     Defendant Mark Lockridge is the President of the Board of Directors for the Texas Highway Patrol Museum and also serves on the Board of the Association. Tim Tierney acknowledged that Lockridge is president in "name only." Lockridge attends board meetings with his family, is reimbursed by the THP entities for all expenses of himself and family while attending board meetings. Lockridge has never requested to see any records, financial or otherwise of any of the organizations. (*See* Exhibit 34, *attached hereto and incorporated herein*). As President of the Museum, Lockridge has breached his fiduciary duty owed to the charitable donors of the State of Texas to oversee that the Museum acts reasonably and prudently to carry out the stated purpose of the Museum. According to Tierney, Lockridge has never seen the spending reports of the Museum, has never reviewed the compensation packages of the Museum nor has Lockridge made inquiries

into how the Executive Vice President is paid nor does he evaluate the management of the organizations. He does nothing to oversee the operations of the organization. *Id.* However, Lockridge does benefit from the Museum in that when he travels to San Antonio or Washington, D.C. for purported Museum business, all his expenses, including hotel, travel, meal and entertainment expenses of his family members, are paid for by the Museum.

**Gregg Greer**

61.     Defendant Gregg Greer is President of the Board of Directors for the Texas Highway Patrol Association and also serves on the Board of the Museum. Tierney stated that, like Lockridge, Greer serves in name only. Greer, like Lockridge, has also breached his fiduciary duty as President of the Board of the Association and as a board member of the Museum. Greer does nothing to oversee the operations of the entities. However, also like Lockridge, Greer receives all expenses paid to attend board meetings for himself and his family.

**James Colunga**

62.     Defendant James Colunga serves on the boards of both the Association and Museum. Colunga has also breached his fiduciary duties owed to the charitable donors of the State of Texas for the same reasons as listed above for Lockridge and Greer. Colunga also receives all expenses paid by the organizations for himself and his family when attending the board meetings.

**Robert Bernard**

63.     Defendant Robert Bernard serves on the boards of both the Association and Museum. Bernard has also breached his fiduciary duties owed to the charitable donors of the State of Texas for the same reasons as listed above for Lockridge, Greer and Colunga. Bernard also receives all expenses paid by the organizations for himself and his family when attending the board meetings.

64.     All of the above named defendants have participated in soliciting and accepting donations

from the general public representing that such funds would be used for the charitable purposes of the Museum or for such charitable purposes designated by the donor. All Defendants have diverted a substantial amount of charitable funds and donations to purposes unrelated to the charitable mission of the Texas Highway Patrol Museum. All Defendants have also used the charities' assets for their own personal benefit and for their benefit of their families and friends, including but not limited to, numerous credit card charges for personal purchases.

**Deceptive Solicitations and Continued Breaches of Fiduciary Duties**

65.     Defendants mail invoices to individuals for contributions which were never authorized by said individuals and then make aggressive attempts to collect these amounts. (*See* Exhibits 35 and 36, *attached hereto and incorporated herein*).

66.     While soliciting donations over the phone, Defendants falsely represent to individuals that the person making calls to solicit donations for their "charitable purpose" is a highway patrol officer requesting money to help support local fallen officers. (*See* Exhibit 5, *attached hereto and incorporated herein*). Defendants also tell callers that having a THPA decal on their vehicle would be very helpful if stopped by law enforcement in the future. (*See* Exhibit 37, *attached hereto and incorporated herein*)..

67.     Due to the extreme deceptive nature of the calls, [Caller ID reading "Texas Highway Patrol" and the THPM/THPA callers identifying themselves as actual state troopers] Texans are led to believe that family members or loved ones have been in an accident. (*See* Exhibit 5, *attached hereto and incorporated herein*)..

68.     Christy Myrick Mattingly, whose husband Trooper Matthew Myrick was killed in the line of duty on January 20, 2006 never received the $10,000 benefit that the Texas Highway Patrol Museum alleges to distribute upon the death of a trooper in the line of duty. After a review of her

bank records, the only monetary assistance received by the Myrick family was a $700 check from the THPA Services, Inc., which is not the entity which is charged with distributing the death benefit. In his RTE responses, Tierney listed Ms. Mattingly as one of the spouses that was paid the $10,000 death benefit. (*See* Exhibit 38, *attached hereto and incorporated herein*). Yet, on December 9, 2011, almost six years after her husband passed away, Ms. Mattingly received a phone call from Tim Tierney. Tierney told Ms. Mattingly that the organizations were being audited and as a result, he discovered she had not been paid the $10,000 benefit. (*See* Exhibit 39, *attached hereto and incorporated herein*).

69.     Defendants falsely represent to individuals that any contribution made benefits law enforcement. Defendants have even used the names of specific troopers who have died in the line of duty as a method to pressure individuals to donate to their "cause" even though they state that they do not use the names of troopers. (*See* Exhibit 40, *attached hereto and incorporated herein*). Defendants are profiting by successfully manipulating and harassing individuals who receive their telephone calls.

70.     Defendants, in soliciting for donations for families of slain troopers, tell individuals that one hundred percent of their donated monies will go to the families of the slain troopers and will even go so far as to use the names of specific troopers who they are "collecting for." *Id.*

71.     Defendants maintain numerous bank and credit card accounts. Defendants incur personal charges on each account and the majority of the charges incurred on the accounts cannot be attributed to any charitable purpose.

72.     Defendants do not use reasonable and prudent practices that should be utilized by any business and Tierney has acknowledged such. None of the entities have ever used a budget. In fact, in his RTE responses, Tierney stated that budgets are "non-applicable." (*See* Exhibit 41, *attached*

*hereto and incorporated herein*). The entities have no separation of powers in place to insure that charitable donations are being properly spent in accordance with the donors' intent. Tierney relies on the CPA of the entities to detect any type of fraud, but in his sworn statement, Tierney stated that all documents which are sent to the CPA are prepared by Tierney. (*See* Exhibit 42, *attached hereto and incorporated herein*). When it was suggested by the CPA that the entities need to make cost reductions and restructure their fundraising, Tierney's response to the CPA's suggestion was to talk to the Director of Marketing and have him increase the solicitations to the public. (*See* Exhibit 43, *attached hereto and incorporated herein*). When asked if Tierney considered decreasing the expenses, he stated that he has done "all he can" to decrease expenses. The only change Tierney made was switching utility companies. *Id.*

73. Defendants have further breached their fiduciary duties by paying their employees excessive compensation. Executive Vice President Tim Tierney is paid an annual salary exceeding $200,000. Director of Marketing Ruben Villalva, Jr. is paid over $200,000 and Lane Denton, Director of Services, Inc. is paid over $100,000. All receive full medical and dental benefits in addition to their salaries. In addition, Tierney and Denton both have cars that are paid for with funds donated to the charity. Tierney currently drives a 2010 Toyota 4runner and the $1,000.00 a month lease payment is paid for with the organization's money. (*See* Exhibit 44, *attached hereto and incorporated herein*). Prior to the 4runner, Tierney had a 2007 Lexus. Denton currently drives a 2007 Nissan Titan, also paid for by charitable funds. Tierney claims that Denton needs the vehicle for business use, but on the insurance policy, which is paid for by the THP entities, the stated purpose of the vehicle is for pleasure, not for business. Also on the policy paid for by the THP entities is a BMW, which belongs to Tierney's life partner, Bill Billingsley. When asked why the BMW was on the company policy, Tierney replied that the part of the policy that insured Billingsley's vehicle was paid

for with his personal funds. (*See* Exhibit 45, *attached hereto and incorporated herein*). Tierney was unable to provide proof of such payment. Tierrney has acknowledged that none of the board members have ever reviewed the compensation of the employees.

74.     By the acts and practices described above, Defendants have established a pattern of misrepresentations and unethical conduct in which the money collected under the guise of helping troopers' families "when tragedy strikes" is solely for the purpose of obtaining pecuniary benefits for the Defendants.

## X. VIOLATIONS OF THE DTPA

75.     Defendants, in the course and conduct of trade and commerce, have directly and indirectly engaged in false, misleading and deceptive acts and practices declared to be unlawful by DTPA sections 17.46(a) and 17.46(b), to wit:

    a.    Passing off goods or services as those of another, in violation of DTPA section 17.46(b)(1) by use of the term "Texas Highway Patrol," creating a decal that is deceptively similar to the Texas Department of Public Safety Highway Patrol Division and informing members of the public that the person soliciting the donation is a state trooper;

    b.    Causing confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services, in violation of DTPA section 17.46(b)(2) by using a deceptively similar name and logo as the Texas Department of Public Safety Highway Patrol Division and allowing charitable donors to believe all of their contributions are tax deductible and allowing charitable donors to believe that they are being solicited by state troopers;

    c.    Causing confusion or misunderstanding as to affiliation, connection, or association

with, or certification by, another, in violation of DTPA section §17.46(b)(3) by using a deceptively similar name and logo as the Texas Department of Public Safety Highway Patrol Division and allowing charitable donors to believe all of their contributions are tax deductible and will go for the stated purpose of the organization;

d.     Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another, in violation of DTPA section 17.46(b)(7) by using a deceptively similar name and logo as the Texas Department of Public Safety Highway Patrol Division and allowing charitable donors to believe all of their contributions are tax deductible and will go for the state purpose of the organization;

e.     Advertising goods or services with intent not to sell them as advertised, in violation of DTPA section 17.46(b)(9) by informing the public through their brochure that all families of slain troopers will receive a $10,000 benefit and that a special bank account will be set up at local bank for the benefit of the trooper's family when such is not done, and;

f.     Failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction which the consumer would not have entered had the information been disclosed, in violation of DTPA section 17.46(b)(24) by allowing charitable donors to believe that all monies collected go to help assist family members of Texas State Troopers and further the stated purposes of the charitable organization.

# XI. BREACH OF FIDUCIARY DUTIES

76.     By soliciting and collecting funds from the general public under the guise of donating to a charitable purpose, Defendants owe a fiduciary duty to the consumers who contributed to the charity to use the funds in a way that fulfills the donors' intent. As such, all monies, pledges, and other property received by Defendants as a result of their solicitations constitute charitable trusts to be used for the charitable purposes for which they were solicited. As a result of their oral and written solicitations, Defendants are Trustees of such charitable trusts and are charged with fiduciary duties with regard to said charitable trusts. Defendants, by their actions described above in this petition, have breached, and will continue to breach, their fiduciary duties in this regard and have caused and will continue to cause, immediate and irreparable harm by failing to administer these charitable trusts in a prudent and reasonable manner to assure that the funds will be used for the purposes for which they were solicited by Defendants.

77.     Defendants have several different programs, but when questioned about each program and how much money is in each fund, Tierney stated that it all goes into the "general fund." (*See* Exhibit 59, *attached hereto and incorporated herein*). Tierney states that they keep the allocation of funds internally, but everything is in the same bank account and there is no way to delineate how much has been appropriated for each program, thereby further failing to insure the donor's intent is achieved.

78.     It is also clear from reviewing the documents provided by the Defendants that they commingle their funds in various ways. As referenced above, Lane Denton has allegedly loaned THPA money, but did not formalize the loan with the proper documentation. Defendants who have credit card access have all made purchases for transactions which appear to be for personal reasons. Tierney has admitted he allows purchases on the credit cards to be made without requiring any receipts to prove that expenses occurred were  for actual legitimate business expenses. Tierney

merely takes the individual's "word for it." Additionally, the entities have made loans between each other without any formal paperwork or board approval. According to their tax returns, these loans are outstanding and the balance has remained unchanged for years, evidencing further failure to prudently account for charitable funds. (*See* Exhibit 21, *attached hereto and incorporated herein*).

## XII. VIOLATION OF THE TEXAS LAW ENFORCEMENT TELEPHONE SOLICITATION ACT

79.     Defendants have violated the Chapter 303 of the Texas Business and Commerce Code, the LETSA statute, by soliciting funds in violation of the statute. Defendants have violated the LETSA statute by soliciting consumers in Texas under the name of the Texas Highway Patrol Association without registering with the OAG as referenced above in paragraphs 36 and 37.

## XII. FRAUD

80.     Defendants, by and through their intentional acts and omissions described in this petition, have made repeated and materially false representations to the public concerning their solicitation of funds for purported charitable purposes, which were either known to be false when made or were made without knowledge of the truth of the matter asserted. Such false representations were made with the intention that they would be acted upon by the parties to whom the misrepresentations were made. Reliance upon these false representations has resulted in injury to the donors, individuals, and businesses located in the State of Texas and throughout the United States.

## XIII. VIOLATION OF CONSTRUCTIVE TRUST

81.     Generous members of the public of the State of Texas donated funds to Defendants for the benefit of worthy charitable causes such as helping families of slain troopers and educating the public. The same is true for members of the public who made donations to Defendants for assistance to peace officers and their families. Acceptance of funds pursuant to such representations established

a constructive trust for the benefit of the public, in such a way as to fulfill the donors' intent. Defendants, therefore, owe a duty to the donors and to the public to ensure that funds raised on behalf of these charitable causes be used for the specific purposes for which they were donated. Defendants have breached the duties to their donors who contributed money, by failing to use the funds collected for the express purposes for which they were donated. Defendants have thereby violated the constructive trust.

## XIV.  CONSPIRACY TO DEFRAUD

82.     Defendants, in concert with their agents/employees, agreed to willfully and fraudulently obtain funds from the public by engaging in the course of conduct complained of herein, which Defendants knew had the tendency and capacity to deceive.

## XV.  NEGLIGENCE

83.     Defendants, by their acts and omissions described herein, have failed in their capacities as officers, employees and corporate board members to exercise the degree of care in the conduct of their fiduciary duties that reasonably prudent persons would have used under similar circumstances to avoid the harm that their actions have caused.  Defendants' acts and omissions, when viewed objectively from the standpoint of another at the time of occurrence, involved an extreme degree of risk, considering the probability and magnitude of potential harm their actions could cause. Defendants had or should have had subjective awareness of the risks involved in their actions, but nevertheless proceeded with conscious indifference to the potential harm.

## XVI.  GROSSLY NEGLIGENT MISMANAGEMENT

84.     Defendants have violated the special duty of care imposed upon them in their capacities as fiduciaries by failing to oversee the management and control of the Texas Highway Patrol Museum

in accordance with the law governing non-profit charitable organizations. The individual Defendants have exercised their fiduciary duties in such a negligent manner that their lack of diligence and conscious disregard results in a breach of their fiduciary duties and subjects them to damages as a result of their gross negligence.

## XVII. REQUEST FOR APPOINTMENT OF A TEMPORARY RECEIVER

85.     In accordance with principles of equity, the special powers of Texas courts in matters pertaining to charity, the Attorney General requests the appointment of a temporary receiver. In light of the seriousness of the allegations raised in this pleading and the potential for continual damage to the charity and to conserve Defendants' assets and avoid damage to the interests of the public of the State of Texas, the Attorney General also requests the involuntary dissolution and liquidation of the assets by a receiver. The appointment of a temporary receiver is authorized by NPCA, Art. 7.04 and/or 7.05; MCLA, Art. 5.10; and TEX.CIV.PRAC.&REM. CODE §§ 64.001 *et seq.*

86.     The Attorney General requests that a temporary receiver be appointed to represent the interests of Defendant entities during the pendency of this litigation, and to choose legal representation for Defendants in this litigation solely for the benefit of the charitable corporation; and order that such temporary receiver be given the authority and duty to conduct the general business of the charity. No other adequate remedy is available at law or in equity to accomplish these goals.

87.     The Attorney General requests that the Court assign the receiver the following duties and grant the receiver the following authority to exercise those duties:

    a.     The duty and the authority to marshal the assets of the Corporate Defendants, of any kind or nature, whatsoever situated, in order to account for all such assets properly belonging to the Defendants;

b.  The duty and authority to receive and control all books and records of the Corporate Defendants;

c.  The duty and authority to receive all incoming donations, payments, and accounts receivable;

d.  The duty and authority to determine all outstanding and valid debts of the Corporate Defendants and to generally conduct the legitimate business of the Foundation; provided that, the payment of debts must be approved by the Court;

e.  The duty and authority, within sixty (60) days from the entry of this order, to provide the Court and all counsel of record with an audit reflecting the totality of the Corporate Defendants's assets, expenditures, costs, fees and liabilities;

f.  The duty and authority to prepare a written report or reports for the Court and all counsel of record to accompany the audit. The report should include a physical inventory of all personal and real property, noting the market value of the property and the exact location and custodian (if other than the receiver) of all such property;

g.  The duty and authority to make demand upon any person in possession of the subject property that such property be transferred to him/her for the purposes of marshaling and preserving the assets of the corporate entities;

h.  The duty and authority to hire experts and professionals, including legal representatives, to perform duties for the Corporate Defendants and to represent the interests of the Corporate Defendants;

i.  The duty and authority, without further order of this Court, to file, prosecute, defend or settle any suit or suits filed against the Corporate Defendants; and

j.  The duty and authority to file motions seeking the Court's approval to take actions

beyond the scope of the requested receivership order, on behalf of the Corporate Defendants.

88. After the appointment of the temporary receiver, the Attorney General further requests that:

   a. All directors, officers, employees, accountants, attorneys, representatives and third-party consultants of the Corporate Defendants be ordered to place all property of the Corporate Defendants in the possession of the receiver and be prohibited from otherwise moving or transferring any of the assets of the Corporate Defendants;

   b. All depository institutions holding accounts or funds of the Corporate Defendants be directed against transfer or concealing of funds of the Corporate Defendants and against interfering in any way with the lawful acts of the receiver, be directed to provide information to the receiver as requested and be directed to provide the receiver access to the Corporate Defendants' accounts and funds; and

   c. All other third parties holding assets of the Corporate Defendants be ordered to place such assets in the custody of the receiver;

## XVIII.  REMEDIES SOUGHT

## DISGORGEMENT

89. All of Defendants' assets are subject to the equitable remedy of disgorgement, which is the forced relinquishment of all benefits that would be unjust for Defendants to retain, including all ill-gotten gains, benefits or profits that are the result of Defendants' false, misleading, or deceptive conduct as described above.  Defendants should be ordered to disgorge all monies fraudulently solicited together with all of the proceeds, profits, income, interest and accessions thereto.  All funds

disgorged should be used to further the stated mission to help families of slain troopers and educate the public.

## IMPOSITION OF A CONSTRUCTIVE CHARITABLE TRUST

90. When Defendants accepted funds from the citizens of Texas that were earmarked for a specific charitable purpose, a constructive trust for the benefit of the public was created. Therefore, all of Defendants' assets are subject to the Court's imposition of a constructive charitable trust, to be held solely for the specific purposes to which they were intended.

## INVOLUNTARY DISSOLUTION OF DEFENDANTS

91. Defendant corporations should be ordered to dissolve as a result of Defendants' unlawful conduct as described above and pursuant to the Texas Business Organizations Code.

## LIEN FOR LAW VIOLATION

92. Defendant corporations have engaged in the unlawful acts and practices as described above and pursuant to the Texas Business Organizations Code, and as such, all property of such corporations within this State at the time of such violation or which may thereafter come within this State, shall by reason of such violation become liable for such fines or penalties and for costs of suit and costs of collection. The State of Texas shall have a lien on all property owned by the Defendants from the date this suit is instituted.

## XIX. CONCLUSION

93. Defendants have engaged in false, misleading and deceptive acts and practices in the solicitation and acceptance of funds from the public representing that such funds would be used for the specific designated charitable purpose of providing benefits for Texas state highway patrol officers, the promotion of professional law enforcement, providing monetary assistance to families of slain troopers and providing scholarships to troopers' families as well educational programs for

the public. Defendants have engaged in a common scheme and design willfully carried out to create a private benefit to Defendants. Charitable funds have fraudulently been used for Defendants' personal inurement. Individual defendants directly participated in unlawful and unethical conduct and are personally liable for such unlawful and unethical conduct. All Defendants knowingly participated in breaches of fiduciary duties as joint tortfeasors and are personally liable as such. The State of Texas further alleges, by their acts and omissions, Defendants have failed to exercise a degree of care in the conduct of their fiduciary duties that reasonable prudent persons would under similar circumstances to avoid the harm their actions have caused. Defendants, while holding themselves out to be organizations which provide support to Texas State Troopers in their times of need, were benefitting to the direct detriment of the charitable cause they claimed to be helping. The Defendants have breached their statutory fiduciary duties and their common law charitable trust fiduciary duties.

## XX. NECESSITY OF IMMEDIATE RELIEF TO PRESERVE DEFENDANTS' ASSETS

94.     Plaintiff requests immediate relief by way of a Temporary Restraining Order and Temporary Injunction to preserve and protect Defendants' assets from dissipation. Defendants' assets are subject to dissipation for the following reasons:

A.     Defendants receive thousands of dollars on a daily basis from consumers through their schemes and use fraudulently solicited funds for personal gain;

B.     Monies received from consumers are dissipated quickly by Defendants, who use the money to pay off credit card purchases made by the individual defendants for their own benefit and have no charitable purpose whatsoever; and

C.     Defendants named herein receive monies as salaries or other compensation, dissipate such monies quickly for personal use, and otherwise deplete their bank accounts

monthly through other expenses. Defendants maintain and are signatories on the following known accounts:

a. Prosperity Bank, Account Numbers XXX1441 (Texas Highway Patrol Museum), XXX1601 (Texas Highway Patrol Association), XXX1521 (THPA Services, Inc. , Inc.;

b. Randolph Brooks Federal Credit Union, Account Number XXX153-7 (Texas Highway Patrol Museum);

c. Charles Schwab, Account Number XXXX-4899 (Texas Highway Patrol Association);

d. American Express, Account Numbers ending in 27001 (Texas Highway Patrol Association and Ruben Villalva)

e. Citibank, Account Numbers XXXX XXXX XXXX 0609 (Tierney and THP); XXXX XXXX XXXX 0388; XXXX XXXX XXXX 2371 (Villalva and THP); XXXX XXXX XXXX 7634 (Villalva and THP); XXXX XXXX XXXX 1960 (Jenkins and THP); XXXX XXXX XXXX 1690 (Jenkins and THP); XXXX XXXX XXXX 4394 (Denton and THP); and XXXX XXXX XXXX 5943 (Denton and THP).

f. Bank of America Royal Carribean, Account Number ending in 4239.

95. For these reasons, the assets of the individual Defendants and the corporate Defendants named herein are subject to dissipation and secretion, and therefore should be frozen pending final trial so that meaningful use can be made for the charitable purpose for which the monies were obtained, and that full and final relief can be awarded at trial.

## XXI.  REQUEST TO CONDUCT DISCOVERY PRIOR TO TEMPORARY INJUNCTION HEARING

96.     Plaintiff requests leave of this Court to conduct telephonic, oral, written, and other Depositions (containing Requests for Production) of witnesses prior to any scheduled Temporary Injunction hearing, and prior to Defendants' answer date.  There are a number of victims and other witnesses who may need to be deposed prior to any scheduled Temporary Injunction hearing.  Some of these witnesses may live outside the State of Texas, and thus cannot appear at any scheduled Temporary Injunction hearing.  Any depositions, telephonic or otherwise, would be conducted with reasonable, shortened notice to Defendants and their attorneys.  Plaintiff also requests leave of this Court to file any corresponding Business Records Affidavits with reasonable, shortened notice.

## XXII.  TRIAL BY JURY

97.     Plaintiff herein requests a jury trial and tenders the jury fee to the Travis County District Clerk's office pursuant to Texas Rule of Civil Procedure 216 and Texas Government Code section 51.604 (West 2005 & Supp. 2007).

## XXIII.  PRAYER

98.     WHEREFORE, Plaintiff prays that Defendants be cited according to law to appear and answer herein; that a EX PARTE TEMPORARY RESTRAINING ORDER be issued; that after due notice and hearing a TEMPORARY INJUNCTION be issued; and upon final hearing a PERMANENT INJUNCTION be issued, restraining and enjoining Defendants, Defendants' officers, agents, successors, assigns, servants, employees, subcontractors, corporations and any other persons in active concert or participation with Defendants who receive actual notice of the injunction, from engaging in the following acts or practices:

1.      Transferring, concealing, destroying, or removing from the jurisdiction of this Court

any books, records, documents, invoices, or other written or electronic materials relating to the business of Defendants currently or hereafter in Defendants' possession, custody, or control except in response to further orders or subpoenas in this cause;

2. Transferring, spending, hypothecating, concealing, encumbering, withdrawing, removing, or allowing the transfer, removal, or withdrawal from any financial institution or from the jurisdiction of this Court any money, stocks, bonds, assets, notes, equipment, funds, accounts receivable, policies of insurance, trust agreements, or other property, real, personal or mixed, wherever situated, belonging to or owned by, in the possession or custody of, standing in the name of, or claimed by Defendants without further order of this court; including but not limited to all bank accounts, credit card accounts, real and personal property located at 501 Oakland Avenue, Austin, Texas 78703; 812 S. Alamo, San Antonio, Texas 78205; 111 W. Anderson Lane, Suite E328, Austin Texas 78701; 8209 Long Point Drive, Houston Texas ; 2150 Trawood, Suite A-240, El Paso, Texas; 11037 FM 1960 Road, A-1, Houston, Texas; 3993 FM 1960, Houston, Texas; and 3040 FM 1960, #156, Houston, Texas.

3. Opening or causing to be opened any safe deposit boxes or storage facilities titled in the name of Defendants or any of Defendants' assumed names, or subject to access or control by Defendants, without providing Plaintiff and the Court prior notice by motion seeking such access;

4. Soliciting funds on behalf of or for the benefit of Defendants for any charity or nonprofit organization which uses "Texas Department of Public Safety," "Department of Public Safety," "Texas Ranger," or "Texas Highway Patrol" as any part of its name;

5. Representing, expressly or by implication, that Defendants, their publications,

museum or other organizations are affiliated with, endorsed by, authorized by, supported by, associated with, or in any way related to any law enforcement organization, group or cause including "Texas Department of Public Safety," "Department of Public Safety," "Texas Ranger," or "Texas Highway Patrol";

6.     Mailing, faxing, or forwarding any invoice, letter, or thing to any business or person wherein such invoice, letter, or thing seeks, demands, or requests any type of payment or contribution from said business or person;

7.     Telephoning, calling or in any way initiating contact with any business or person for the purpose of seeking, selling, or requesting any type of contribution, money, or funds for advertising from said business or person;

8.     Operating any type of telemarketing operation on behalf of any publication; and

9.     Operating any type of corporation, organization, group, association, museum, magazine or periodical which uses as any part of its name "Texas Department of Public Safety," "Department of Public Safety," "Texas Ranger," or "Texas Highway Patrol."

99.     In addition, Plaintiff STATE OF TEXAS respectfully prays that this Court will:

1.     Adjudge against Defendants civil penalties in favor of Plaintiff in an amount up to $20,000 per violation, pursuant to section 17.47(c)(1) of the Texas Business and Commerce Code;

2.     Order Defendants to pay Plaintiff STATE OF TEXAS' attorney fees and costs of court pursuant to TEX. GOV'T. CODE §402.006(c), and TEX. PROP. CODE ANN. §§ 123.005(b) 114.064;

3.     Order the cy pres of all assets and funds that were donated and intended for the charitable purposes; and

4.    Grant all other relief to which the Plaintiff State of Texas may show itself

entitled.

Respectfully submitted,

**GREG ABBOTT**
ATTORNEY GENERAL OF TEXAS

**DANIEL T. HODGE**
First Assistant Attorney General

**BILL COBB**
Deputy Attorney General for
Civil Litigation

**TOMMY PRUD'HOMME**
Chief, Consumer Protection Division

**KARYN A. MEINKE**
State Bar No. 2403285
Assistant Attorney General
Consumer Protection Division
115 E. Travis, Suite 925
San Antonio, Texas 78205
Telephone: 210-225-4191
Facsimile: 210-225-1075

**MARY T. HENDERSON**
State Bar No. 19713750
Assistant Attorney General
Consumer Protection Division
300 West 15th Street
Austin, Texas 78701

**Attorneys for State of Texas**

**CAUSE NO. _____**

| | | |
|---|---|---|
| STATE OF TEXAS, | § | IN THE PROBATE COURT |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| TEXAS HIGHWAY PATROL MUSEUM, | § | |
| TEXAS HIGHWAY PATROL ASSOCIATION, | § | |
| THPA SERVICES, INC;. | § | NUMBER ONE OF |
| TIMOTHY TIERNEY, KENNETH LANE | § | |
| DENTON,MARK LOCKRIDGE, | § | |
| STEVEN JENKINS, | § | |
| RUBEN VILLALVA, JR., TED RIOJAS, | § | |
| FRED RIOJAS, GREGG GREER, JAMES | § | |
| COLUNGA AND ROBERT BERNARD, JR. | § | |
| Defendants. | § | TRAVIS COUNTY, TEXAS |

## NOTICE OF INTENTION TO TAKE THE DEPOSITION OF MARK LOCKRIDGE

PLEASE TAKE NOTICE that pursuant to Rule 199 of the Texas Rules of Civil Procedure, the State of Texas intends to take the oral deposition of MARK LOCKRIDGE, to be used as evidence at the trial of this cause. The deposition will begin on December 19, 2011, at 9:00 a.m. C.S.T., before a Certified Court Reporter, taking answers under oath to such questions as may be propounded by the respective parties or their attorneys in the above-styled and numbered cause. This deposition will continue from day to day until completed.

MARK LOCKRIDGE and his counsel if any, are requested to appear at the Office of the Attorney General, Consumer Protection Division, 300 West 15th Street, 9th floor, Austin, Texas 78701 to attend the deposition. The deposition will be taken before a certified court reporter who will also administer the oath to MARK LOCKRIDGE.

Respectfully submitted,

KARYN A. MEINKE
State Bar No. 24032859
Assistant Attorney General
Consumer Protection and
Public Health Division
115 E. Travis, Suite 925
San Antonio, Texas 78205

Telephone: 210-225-4191
Facsimile: 210-225-1075
**ATTORNEY FOR PLAINTIFF**
**THE STATE OF TEXAS**

## CERTIFICATE OF SERVICE

I certify that a true copy of the above *Notice of Intention to Take the Oral Deposition* of Mark Lockridge was included with *Plaintiff's Original Petition and Application for Ex Parte Temporary Restraining Order, Temporary Injunction and Permanent Injunction and Asset Freeze and Request for Appointment of Receiver*, and given to a private process server for service on the Defendant, together with the citation issued in this cause on the 15th day of December, 2011.

_____
**KARYN A. MEINKE**

**CAUSE NO. _____**

| | | |
|---|---|---|
| STATE OF TEXAS, | § | IN THE PROBATE COURT |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| TEXAS HIGHWAY PATROL MUSEUM, | § | |
| TEXAS HIGHWAY PATROL ASSOCIATION, | § | |
| THPA SERVICES, INC;. | § | NUMBER ONE OF |
| TIMOTHY TIERNEY, KENNETH LANE | § | |
| DENTON,MARK LOCKRIDGE, | § | |
| STEVEN JENKINS, | § | |
| RUBEN VILLALVA, JR., TED RIOJAS, | § | |
| FRED RIOJAS, GREGG GREER, JAMES | § | |
| COLUNGA AND ROBERT BERNARD, JR. | § | |
| Defendants. | § | TRAVIS COUNTY, TEXAS |

## NOTICE OF INTENTION TO TAKE THE
## DEPOSITION OF RUBEN VILLALVA, JR.

PLEASE TAKE NOTICE that pursuant to Rule 199 of the Texas Rules of Civil Procedure, the State of Texas intends to take the oral deposition of RUBEN VILLALVA, JR, to be used as evidence at the trial of this cause. The deposition will begin on December, 21, 2011, at 9:00 a.m. C.S.T., before a Certified Court Reporter, taking answers under oath to such questions as may be propounded by the respective parties or their attorneys in the above-styled and numbered cause. This deposition will continue from day to day until completed.

RUBEN VILLALVA, JR. and his counsel if any, are requested to appear at the 300 West 15th Street, 9th floor, Austin, Texas 78701, to attend the deposition. The deposition will be taken before a certified court reporter who will also administer the oath to RUBEN VILLALVA, JR.

Respectfully submitted,

KARYN MEINKE
State Bar No. 24032859
Assistant Attorney General
Consumer Protection and
Public Health Division
115 E. Travis, Suite 925
San Antonio, Texas 78205

Telephone: 210-225-4191
Facsimile: 210-225-1075
**ATTORNEY FOR PLAINTIFF**
**THE STATE OF TEXAS**

## CERTIFICATE OF SERVICE

I certify that a true copy of the above *Notice of Intention to Take the Oral Deposition* of Ruben Villalva, Jr. was included with *Plaintiff's Original Petition and Application for Ex Parte Temporary Restraining Order, Temporary Injunction and Permanent Injunction and Asset Freeze and Request for Appointment of Receiver*, and given to a private process server for service on the Defendant, together with the citation issued in this cause on the 15 th day of December, 2011.

_____
**KARYN A. MEINKE**

# CAUSE NO. _____

| | | |
|---|---|---|
| STATE OF TEXAS,<br>Plaintiff, | §<br>§<br>§ | IN THE PROBATE COURT |
| v. | §<br>§ | |
| TEXAS HIGHWAY PATROL MUSEUM,<br>TEXAS HIGHWAY PATROL ASSOCIATION,<br>THPA SERVICES, INC;.<br>TIMOTHY TIERNEY, KENNETH LANE<br>DENTON,MARK LOCKRIDGE,<br>STEVEN JENKINS,<br>RUBEN VILLALVA, JR., TED RIOJAS,<br>FRED RIOJAS, GREGG GREER, JAMES<br>COLUNGA AND ROBERT BERNARD, JR.<br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | NUMBER ONE OF<br><br>TRAVIS COUNTY, TEXAS |

## NOTICE OF INTENTION TO TAKE THE
## DEPOSITION OF KENNETH LANE DENTON

PLEASE TAKE NOTICE that pursuant to Rule 199 of the Texas Rules of Civil Procedure, the State of Texas intends to take the oral deposition of KENNETH LANE DENTON, to be used as evidence at the trial of this cause. The deposition will begin on December 22, at 9:00 a.m. C.S.T., before a Certified Court Reporter, taking answers under oath to such questions as may be propounded by the respective parties or their attorneys in the above-styled and numbered cause. This deposition will continue from day to day until completed.

KENNETH LANE DENTON and his counsel if any, are requested to appear at the Texas Highway Patrol Museum at 812 S. Alamo, San Antonio, Texas 78205, to attend the deposition. The deposition will be taken before a certified court reporter who will also administer the oath to KENNETH LANE DENTON.

Respectfully submitted,

**KARYN A. MEINKE**
State Bar No. 24032859
Assistant Attorney General
Consumer Protection and
Public Health Division
115 E. Travis, Suite 925
San Antonio, Texas 78205
Telephone: 210-225-4191

Facsimile: 210-225-1075
**ATTORNEY FOR PLAINTIFF**
**THE STATE OF TEXAS**

## CERTIFICATE OF SERVICE

I certify that a true copy of the above *Notice of Intention to Take the Oral Deposition* of Kenneth Lane Denton was included with *Plaintiff's Original Petition and Application for Ex Parte Temporary Restraining Order, Temporary Injunction and Permanent Injunction and Asset Freeze and Request for Appointment of Receiver*, and given to a private process server for service on the Defendant, together with the citation issued in this cause on the 15th day of December, 2011.

_____
**KARYN A. MEINKE**

**CAUSE NO. _____**

| | | |
|---|---|---|
| STATE OF TEXAS, | § | IN THE PROBATE COURT |
|     Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| TEXAS HIGHWAY PATROL MUSEUM, | § | |
| TEXAS HIGHWAY PATROL ASSOCIATION, | § | |
| THPA SERVICES, INC;. | § | NUMBER ONE OF |
| TIMOTHY TIERNEY, KENNETH LANE | § | |
| DENTON,MARK LOCKRIDGE, | § | |
| STEVEN JENKINS, | § | |
| RUBEN VILLALVA, JR., TED RIOJAS, | § | |
| FRED RIOJAS, GREGG GREER, JAMES | § | |
| COLUNGA AND ROBERT BERNARD, JR. | § | |
|     Defendants. | § | TRAVIS COUNTY, TEXAS |

## NOTICE OF INTENTION TO TAKE THE
## DEPOSITION OF MARK LOCKRIDGE

PLEASE TAKE NOTICE that pursuant to Rule 199 of the Texas Rules of Civil Procedure, the State of Texas intends to take the oral deposition of MARK LOCKRIDGE, to be used as evidence at the trial of this cause. The deposition will begin on December 19, 2011, at 9:00 a.m. C.S.T., before a Certified Court Reporter, taking answers under oath to such questions as may be propounded by the respective parties or their attorneys in the above-styled and numbered cause. This deposition will continue from day to day until completed.

MARK LOCKRIDGE and his counsel if any, are requested to appear at the Office of the Attorney General, Consumer Protection Division, 300 West 15th Street, 9th floor, Austin, Texas 78701 to attend the deposition. The deposition will be taken before a certified court reporter who will also administer the oath to MARK LOCKRIDGE.

Respectfully submitted,

KARYN A. MEINKE
State Bar No. 24032859
Assistant Attorney General
Consumer Protection and
Public Health Division
115 E. Travis, Suite 925
San Antonio, Texas 78205

Telephone: 210-225-4191
Facsimile: 210-225-1075
**ATTORNEY FOR PLAINTIFF**
**THE STATE OF TEXAS**

## CERTIFICATE OF SERVICE

I certify that a true copy of the above *Notice of Intention to Take the Oral Deposition* of Mark Lockridge was included with *Plaintiff's Original Petition and Application for Ex Parte Temporary Restraining Order, Temporary Injunction and Permanent Injunction and Asset Freeze and Request for Appointment of Receiver*, and given to a private process server for service on the Defendant, together with the citation issued in this cause on the 15th day of December, 2011.

_____
**KARYN A. MEINKE**

**CAUSE NO. _____**

| | | |
|---|---|---|
| STATE OF TEXAS, | § | IN THE PROBATE COURT |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| TEXAS HIGHWAY PATROL MUSEUM, | § | |
| TEXAS HIGHWAY PATROL ASSOCIATION, | § | |
| THPA SERVICES, INC;. | § | NUMBER ONE OF |
| TIMOTHY TIERNEY, KENNETH LANE | § | |
| DENTON,MARK LOCKRIDGE, | § | |
| STEVEN JENKINS, | § | |
| RUBEN VILLALVA, JR., TED RIOJAS, | § | |
| FRED RIOJAS, GREGG GREER, JAMES | § | |
| COLUNGA AND ROBERT BERNARD, JR. | § | |
| Defendants. | § | TRAVIS COUNTY, TEXAS |

## NOTICE OF INTENTION TO TAKE THE DEPOSITION OF RUBEN VILLALVA, JR.

PLEASE TAKE NOTICE that pursuant to Rule 199 of the Texas Rules of Civil Procedure, the State of Texas intends to take the oral deposition of RUBEN VILLALVA, JR, to be used as evidence at the trial of this cause. The deposition will begin on December, 21, 2011, at 9:00 a.m. C.S.T., before a Certified Court Reporter, taking answers under oath to such questions as may be propounded by the respective parties or their attorneys in the above-styled and numbered cause. This deposition will continue from day to day until completed.

RUBEN VILLALVA, JR. and his counsel if any, are requested to appear at the 300 West 15th Street, 9th floor, Austin, Texas 78701, to attend the deposition. The deposition will be taken before a certified court reporter who will also administer the oath to RUBEN VILLALVA, JR.

Respectfully submitted,

KARYN MEINKE
State Bar No. 24032859
Assistant Attorney General
Consumer Protection and
Public Health Division
115 E. Travis, Suite 925
San Antonio, Texas 78205

Telephone: 210-225-4191
Facsimile: 210-225-1075
**ATTORNEY FOR PLAINTIFF**
**THE STATE OF TEXAS**

## CERTIFICATE OF SERVICE

I certify that a true copy of the above *Notice of Intention to Take the Oral Deposition* of Ruben Villalva, Jr. was included with *Plaintiff's Original Petition and Application for Ex Parte Temporary Restraining Order, Temporary Injunction and Permanent Injunction and Asset Freeze and Request for Appointment of Receiver*, and given to a private process server for service on the Defendant, together with the citation issued in this cause on the _____ th day of December, 2011.

_____
**KARYN A. MEINKE**

**CAUSE NO. _____**

| | | |
|---|---|---|
| STATE OF TEXAS,<br>    Plaintiff, | §<br>§<br>§ | IN THE PROBATE COURT |
| v. | §<br>§<br>§ | |
| TEXAS HIGHWAY PATROL MUSEUM,<br>TEXAS HIGHWAY PATROL ASSOCIATION,<br>THPA SERVICES, INC;.<br>TIMOTHY TIERNEY, KENNETH LANE<br>DENTON,MARK LOCKRIDGE,<br>STEVEN JENKINS,<br>RUBEN VILLALVA, JR., TED RIOJAS,<br>FRED RIOJAS, GREGG GREER, JAMES<br>COLUNGA AND ROBERT BERNARD, JR.<br>    Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | NUMBER ONE OF<br><br><br>TRAVIS COUNTY, TEXAS |

## NOTICE OF INTENTION TO TAKE THE DEPOSITION OF KENNETH LANE DENTON

PLEASE TAKE NOTICE that pursuant to Rule 199 of the Texas Rules of Civil Procedure, the State of Texas intends to take the oral deposition of KENNETH LANE DENTON, to be used as evidence at the trial of this cause. The deposition will begin on December 22, at 9:00 a.m. C.S.T., before a Certified Court Reporter, taking answers under oath to such questions as may be propounded by the respective parties or their attorneys in the above-styled and numbered cause. This deposition will continue from day to day until completed.

KENNETH LANE DENTON and his counsel if any, are requested to appear at the Texas Highway Patrol Museum at 812 S. Alamo, San Antonio, Texas 78205, to attend the deposition. The deposition will be taken before a certified court reporter who will also administer the oath to KENNETH LANE DENTON.

Respectfully submitted,

KARYN A. MEINKE
State Bar No. 24032859
Assistant Attorney General
Consumer Protection and
Public Health Division
115 E. Travis, Suite 925
San Antonio, Texas 78205
Telephone: 210-225-4191

Facsimile: 210-225-1075
**ATTORNEY FOR PLAINTIFF**
**THE STATE OF TEXAS**

## CERTIFICATE OF SERVICE

I certify that a true copy of the above *Notice of Intention to Take the Oral Deposition* of Kenneth Lane Denton was included with *Plaintiff's Original Petition and Application for Ex Parte Temporary Restraining Order, Temporary Injunction and Permanent Injunction and Asset Freeze and Request for Appointment of Receiver*, and given to a private process server for service on the Defendant, together with the citation issued in this cause on the 15th day of December, 2011.

_____
**KARYN A. MEINKE**

# CIVIL CASE INFORMATION SHEET

CAUSE NUMBER *(FOR CLERK USE ONLY):* _____ COURT *(FOR CLERK USE ONLY):* _____

STYLED **STATE V. TEXAS HIGHWAY PATROL MUSEUM, ET AL**
*(e.g., John Smith v. All American Insurance Co; In re Mary Ann Jones; In the Matter of the Estate of George Jackson)*

A civil case information sheet must be completed and submitted when an original petition or application is filed to initiate a new civil, family law, probate, or mental health case or when a post-judgment petition for modification or motion for enforcement is filed in a family law case. The information should be the best available at the time of filing. This sheet, approved by the Texas Judicial Council, is intended to collect information that will be used for statistical purposes only. It neither replaces nor supplements the filings or service of pleading or other documents as required by law or rule. The sheet does not constitute a discovery request, response, or supplementation, and it is not admissible at trial.

| 1. Contact information for person completing case information sheet: | | Names of parties in case: | Person or entity completing sheet is: |
|---|---|---|---|
| Name:<br>Karyn A. Meinke | Email:<br>karyn.meinke@oag.state.tx.us | Plaintiff(s)/Petitioner(s):<br><br>State of Texas<br>____ | ☒Attorney for Plaintiff/Petitioner<br>☐*Pro Se* Plaintiff/Petitioner<br>☐Title IV-D Agency<br>☐Other: _____ |
| Address:<br>115 E. Travis, Suite 925 | Telephone:<br>210-225-4191 | | |
| City/State/Zip:<br>San Antonio, TX 78205 | Fax:<br>210-225-1075 | Defendant(s)/Respondent(s):<br><br>Texas Highway Patrol Museum,<br>Texas Highway Patrol Association,<br>THPA Services, Inc.<br>Timothy Tierney,<br>Kenneth Lane Denton,<br>Mark Lockridge,<br>Steven Jenkins,<br>Ruben Villalva, Jr.<br>Ted Riojas,<br>Fred Riojas,<br>Gregg Greer,<br>James Colunga and<br>Robert Bernard, Jr. | **Additional Parties in Child Support Case:**<br><br>Custodial Parent:<br>____<br><br>Non-Custodial Parent:<br>____<br><br>Presumed Father:<br>____ |
| Signature:<br>/s/ *Karyn A. Meinke* | State Bar No:<br>24032859 | | |
| | | [Attach additional page as necessary to list all parties] | |

**2. Indicate case type, or identify the most important issue in the case *(select only 1)*:**

| Civil | | | Family Law | |
|---|---|---|---|---|
| **Contract** | **Injury or Damage** | **Real Property** | **Marriage Relationship** | **Post-judgment Actions (non-Title IV-D)** |
| *Debt/Contract*<br>☒Consumer/DTPA<br>☐Debt/Contract<br>☐Fraud/Misrepresentation<br>☐Other Debt/Contract:<br><br>*Foreclosure*<br>☐Home Equity—Expedited<br>☐Other Foreclosure<br>☐Franchise<br>☐Insurance<br>☐Landlord/Tenant<br>☐Non-Competition<br>☐Partnership<br>☐Other Contract: | ☐Assault/Battery<br>☐Construction<br>☐Defamation<br>*Malpractice*<br>☐Accounting<br>☐Legal<br>☐Medical<br>☐Other Professional<br>Liability: _____<br><br>☐Motor Vehicle Accident<br>☐Premises<br>*Product Liability*<br>☐Asbestos/Silica<br>☐Other Product Liability<br>List Product: _____<br><br>☐Other Injury or Damage: _____ | ☐Eminent Domain/<br>Condemnation<br>☐Partition<br>☐Quiet Title<br>☐Trespass to Try Title<br>☐Other Property:<br>____<br><br>**Related to Criminal Matters**<br>☐Expunction<br>☐Judgment Nisi<br>☐Non-Disclosure<br>☐Seizure/Forfeiture<br>☐Writ of Habeas Corpus—<br>Pre-indictment<br>☐Other: _____ | ☐Annulment<br>☐Declare Marriage Void<br>*Divorce*<br>☐With Children<br>☐No Children<br><br><br>**Other Family Law**<br>☐Enforce Foreign<br>Judgment<br>☐Habeas Corpus<br>☐Name Change<br>☐Protective Order<br>☐Removal of Disabilities<br>of Minority<br>☐Other: _____ | ☐Enforcement<br>☐Modification—Custody<br>☐Modification—Other<br>**Title IV-D**<br>☐Enforcement/Modification<br>☐Paternity<br>☐Reciprocals (UIFSA)<br>☐Support Order<br><br>**Parent-Child Relationship**<br>☐Adoption/Adoption with<br>Termination<br>☐Child Protection<br>☐Child Support<br>☐Custody or Visitation<br>☐Gestational Parenting<br>☐Grandparent Access<br>☐Paternity/Parentage<br>☐Termination of Parental<br>Rights<br>☐Other Parent-Child: _____ |
| **Employment** | **Other Civil** | | | |
| ☐Discrimination<br>☐Retaliation<br>☐Termination<br>☐Workers' Compensation<br>☐Other Employment: _____ | ☐Administrative Appeal<br>☐Antitrust/Unfair<br>Competition<br>☐Code Violations<br>☐Foreign Judgment<br>☐Intellectual Property | ☐Lawyer Discipline<br>☐Perpetuate Testimony<br>☐Securities/Stock<br>☐Tortious Interference<br>☐Other: _____ | | |
| **Tax** | **Probate & Mental Health** | | | |
| ☐Tax Appraisal<br>☐Tax Delinquency<br>☐Other Tax | *Probate/Wills/Intestate Administration*<br>☐Dependent Administration<br>☐Independent Administration<br>☐Other Estate Proceedings | ☐Guardianship—Adult<br>☐Guardianship—Minor<br>☐Mental Health<br>☒Other: Breach of Fiduciary Duties | | |

**3. Indicate procedure or remedy, if applicable *(may select more than 1)*:**

| | | |
|---|---|---|
| ☐ Appeal from Municipal or Justice Court | ☐ Declaratory Judgment | ☐ Prejudgment Remedy |
| ☐ Arbitration-related | ☐ Garnishment | ☐ Protective Order |
| ☐ Attachment | ☐ Interpleader | ☒ Receiver |
| ☐ Bill of Review | ☐ License | ☐ Sequestration |
| ☐ Certiorari | ☐ Mandamus | ☒ Temporary Restraining Order/Injunction |
| ☐ Class Action | ☐ Post-judgment | ☐ Turnover |



# SUPPLEMENTARY PROBATE CASE INFORMATION SHEET
## TRAVIS COUNTY PROBATE COURT No. 1

CAUSE NO. C-1-PB-_____ - _____

**This sheet is a supplement to the Civil Case Information Sheet required by Texas Rule of Civil Procedure 78a. Both the Civil Case Information Sheet and this supplementary sheet should be completed whenever an original petition or application is filed in this Court.** Except for the case style, there's no duplication between the two sheets. If you are e-filing the original petition or application, an information sheet <u>cannot</u> be the lead document.

The information should be the best available at the time of filing, understanding that the information may change before trial. This information does not constitute a discovery request, response, or supplementation, and is not admissible at trial.

---

**1. Case style.** Please indicate the correct case style. For <u>example</u>, "Estate of Decedent's name," "Guardianship of the Person and Estate of Proposed Ward's name," or "Plaintiff(s) v. Defendant(s)." If "Plaintiff v. Defendant," list <u>all</u> parties; attach additional page as necessary (an estate or guardianship cannot be a party; it's the executor, administrator, or guardian who has the capacity to sue or be sued).

State of Texas v. Texas Highway Patrol Museum, Texas Highway Patrol Association, THPA Services, Inc., Timothy Tierney, Kenneth Lane Denton, Mark Lockridge, Steven Jenkins, Ruben Villalva, Jr., Ted Riojas, Fred Riojas, Gregg Greer, James Colunga and Robert Bernard, Jr.

---

| **2. Related case(s). Has this case been previously filed, or is it related to a case previously filed in this court or in another court?** | ☒ No |
| | ☐ Yes, in this court. Cause No. C-1-PB- |
| |    (☐ - new case is guardianship after 683; will be same cause number) |
| |    (☐ - new case is guardianship after chapter 48; new cause number & new style) |
| | ☐ Yes, in another court: |
| |    Court:      Cause No. |
| | Attach page(s) as needed. If you are attaching page(s) with information about additional related cases, check here: ☐ |

---

**3. Indicate case type (check only one):**

| Independent Administration | All Other Estate Proceedings | Ancillary Cases (new cause #) |
|---|---|---|
| ☐ Probate Letters Testamentary (independent) (PBL + 3020) | ☐ Probate Muniment of Title (PMU + 3021) ☐ Muniment of Title **more than 4 years after date of death** (PMU + 3021) | ☐ Ancillary action related to an Independent Administration (includes court-ordered severance) (PIA + 3115) |
| ☐ Indep. Admin., Will Annexed (PAI + 3030) | ☐ Heirship / No Administration (PHE + 3033) | ☐ Ancillary action related to a Dependent Administration (includes court-ordered severance) (PDA + 3116) |
| ☐ Indep. Admin. with Heirship (PAH + 3032) | ☐ Small Estate Affidavit (PSM + 3040) | |
| ☐ Foreign Will Letters (independent) (§ 95 + § 105) (PWL + 3102) | ☐ Foreign Will Recording <u>only</u> (§ 95) (PWR + 3044) | ☐ Ancillary action related to Guardianship of an Adult (includes court-ordered severance) (PAA + 3117) |
| **Dependent Administration** | ☐ § 75 Will Deposit or Application to Produce Will (PWD + 3041) | ☐ Ancillary action related to Guardianship of a Minor (includes court-ordered severance) (PAM + 3118) |
| ☐ Dependent Administration (<u>all</u> dependent administrations: executor, will annexed, with heirship, or with heirship to follow) (PAD + 3031) | ☐ 36B Application to Open Safety Deposit Box (PDB + 3103) | |
| ☐ Temporary Administration (PAT + 3019) | ☐ 108 Emergency Intervention (funeral, burial, rental) (PEI + 3104) | ☐ Ancillary action that is in this court because a trustee is a party (includes court-ordered severance) (PTP + 3119) |
| ☐ Foreign Will Letters (dependent) (§ 95 + § 105) (PW1 + 3043) | ☐ 887 Custodial Account (887 + 3014) | |
| | ☐ 889 Sale of Property of Minor (PSP + 3035) | |

| Guardianship / 867 Trust – Adult | Guardianship / 867 Trust – Minor | 683 Investigations & Chapter 48 |
|---|---|---|
| ☐ Guard'ship Adult Person only (PG1 + 3023) | ☐ Guard'ship Minor Person only (PM1 + 3047) | ☐ Court Initiated / 683 (PCI + 3028) |
| ☐ Guard'ship Adult Estate only (PG2 + 3024) | ☐ Guard'ship Minor Estate only (PM2 + 3049) | ☐ Chapter 48 Protection (PEL + 3122) |
| ☐ Guard'ship Adult Per & Estate (PG3 + 3022) | ☐ Guard'ship Minor Per & Estate (PM3 + 3025) | **All Other Cases** |
| ☐ Guard'ship Adult Temporary (PGT + 3027) | ☐ Guard'ship Minor Temporary (PMT + 3105) | ☒ Trust action <u>not</u> related to estate or guardianship (PBT + 3018) *(if related to estate or guardianship, see "ancillary cases" above)* |
| ☐ 867 or QIT Trust Adult (867 + 3016) | ☐ 867 Trust Minor (86M + 3106) | |
| ☐ 881 Appointment of Non-Resident Guardian – Adult (PNA + 3108) | ☐ 881 Appointment of Non-Resident Guardian – Minor (PNM + 3107) | ☐ 885 Receivership of Minor or Incapacitated (PRM + 3120) |
| ☐ 883 Incapacitated Spouse; Community Property (883 + 3015) | | |

---

| | | ☐ 903 Contracts of Minors (PCM + 3121) |
|---|---|---|

# Our mission

Since 1991, it has been our mission to lead the community to provide support for Texas Highway Troopers – with programs the state or the DPS do not provide, and to assist any trooper's family when tragedy strikes, regardless if they belong to the Texas Highway Patrol Association and Museum.

The Texas Highway Patrol Association helps develop strong bonds of trooper camaraderie, providing benefits for Texas state highway patrol officers and the promotion of professional law enforcement.

We also built the Texas Highway Patrol Museum – A facility established through an endowment honoring the Highway Patrol's past and present and provide educational programs for area youth. Located in San Antonio, just a few blocks from the Alamo.

The Texas Highway Patrol Association and Museum is proud to also offer, in addition to our Death Benefit fund, a separate Survivor Benefit Fund – when an officer is killed in the line of duty, the Museum establishes this special fund with a local bank. Media are alerted to this fund, and 100% of the donations collected in this fund go directly to the family of the trooper.



www.thpm.org

**You've always counted on them ...
now can they count on you?**

The Texas Highway Patrol Association and Museum are absolutely dependant on the generous financial support from **people like you** – people who care about making our streets and homes safe. We are always here to answer questions.

To make a contribution, please send to:

**501 OAKLAND AVENUE
AUSTIN, TX 78703-5113
1-888-745-8598**

** *If you have received an invoice to make a contribution/donation and have questions or concerns, please contact us.*

**Thank you in advance for your support of the Texas law enforcement community!**
On behalf of all our members, we wish you and your family a safe and prosperous year.



**ADVERTENCIA**

**Apreciable Contribuyente**
Sabemos que usted recibe múltiples peticiones de donativos, por lo que lo invitamos a verificar la autenticidad de La Asociación de Patrullas del Estado de Texas. Sientase comodo de comunicarse con nosotros a nuestras oficinas centrales, el número de teléfono se encuentra en su recibo de contribución, estamos a sus ordenes para aclarar cualquier duda que tenga o simplemente para verificar la información que contiene su folleto. Por favor no olvide mandar su contribución con la porción de abajo del recibo para que reciba crédito. En nombre de la asociación, muchas gracias por su apoyo y que tenga feliz año en compañía de su familia.

Si usted tiene alguna pregunta
por favor llame el numero:
**1-888-745-8598**



PLAINTIFF'S EXHIBIT



# The IRS considers the Texas Highway Patrol Association and Museum as a 501(c)(3) charitable organization.

We do not utilize an outside telemarketing company to help our organization raise money. These outside firms, generally *keep a large percentage of the money raised.* Thus, 100% of the funds we raise, stay within the Texas Highway Patrol Association & Museum and its programs. This is what sets us aside from similar programs.



## Trooper Benefits

### Death Benefit Fund
We established this fund to provide financial support to the families left behind when tragedy strikes. Should an officer be killed in the line of duty, the surviving family members will receive $10,000 in immediate assistance. We will also establish a special account with a local bank - 100% of any contribution to this fund will go directly to the family.

### Funeral Benefits
Additional funeral benefits are offered in conjunction with Deputy Memorial's Funeral, Cremation and Cemetery's Trooper Benefit Program. THPA members will receive dignified and honorable tributes at no cost for a trooper killed in the line of duty. A funeral protection certificate valued at $2,500 will also be given to the children and grandchildren of the fallen officer.

### Dental Insurance
THPA is concerned for the health of troopers and their families. This is why we started the Dental Benefits Program. Through this program, THPA pays dental insurance for all members of the association and their families. We want to ensure that troopers stay safe and healthy.

## Educational Benefits

### College Scholarship Fund
The Captain Ed Pringle Scholarship Fund was established for the children of active or retired Texas DPS highway patrol officers. Funds are applied directly to education tuition costs and are awarded once a year. THPA has helped numerous students with their educational costs and we are proud of our continuing commitment to our youth.

### Educational Programs
Our Association and Museum developed an award-winning Cruisin' to Coffins program developed to educate students about the hazards of driving while under the influence of alcohol. We also have other programs geared for younger children – stressing the dangers of strangers, drugs and more. We are also continuously planning and designing new programs for area youth.

### Museum
We created the Texas Highway Patrol Museum located in San Antonio, Texas. Come experience exhibits such as: The Hall of Honor, a memorial to the officers who lost their lives in the line of duty, The La Sevsen History Hall, a walk through the history of the Texas Highway Patrol, and artifacts donated by family of past troopers.

## Additional Benefits

### Texas Highway Patrol Magazine
A quarterly magazine that highlights some of the activities and issues involving crime, justice and articles pertaining to law enforcement. A professional publication, geared to law enforcement officers, but is available to the general public for a small subscription fee.



### And much, much more!
We are involved with many more great projects and continue to add more and more to the list! From benefits to programs to public service announcements. We are constantly striving to improve and enhance the lives of highway patrol officers while improving the climate of public safety and law enforcement in Texas.

Texas Highway Patrol Museum
Located a few blocks from the Alamo in San Antonio, Texas.







# Serving Troopers and the Public for nearly 20 years!!

# TEXAS HIGHWAY PATROL ASSOCIATION
## Frequently Asked Questions

## Our mission

Is to lead the community in providing support for highway patrolmen, and their families when tragedy strikes. To make this possible, we have developed several programs that benefit the officers and their families. The Association's purposes specifically include development of strong bonds of trooper camaraderie, providing benefits for all state highway patrol officers and the promotion of professional law enforcement. We also built the Texas Highway Patrol Museum - A facility was established through an endowment honoring the Highway Patrol's past and present members and provides educational programs for area youth. Located in San Antonio a few blocks from the Alamo. We also have a Survivor Benefit Fund -When an officer is killed in the line of duty, the Museum establishes a fund with a local bank. Media are alerted to this fund and 100% of the donations raised go directly to the family of the trooper. In the past few years over $60,000 has been raised and turned over to the families.

1.  **Asked a question you do not know** -- I apologize, but I don't know that information ... You can call the State Headquarters office of the information line and someone will assist you with that information. The telephone number is 1-888-745-8598

2.  **SEND INFORMATION TO READ**--The reason we take the time to call you personally is to answer all of your questions and to make sure that you want to get involved, this helps in achieving! The goal of keeping fundraising costs down and not needlessly wasting the money. Before the envelope is mailed to you, I need you to make a commitment that you will be sending back your *pledge*

3.  **What sets us aside from the other organizations**--- We are a 501(c)(3) organization, and all donations are tax deductible. We do not hire a outside telemarketing company. This is what sets us aside from many other law enforcement organization in the state that calls you.

4.  **How do you handle this?** After you let us know you Want to help out we will mail you a donation package out 1st- this way it's safe and convenient for you to handle-it's only after you receive it that you would return it by return mail to our headquarters in Austin

5.  **Don't my taxes pay for these programs?** NO. The THPA does not receive any federal or funding for its programs the organization relies solely on funding from concerned citizens, like yourself, that want to get involved in supporting law enforcement throughout the State.

6.  **What will my donation be used for?** Your support will help to provide benefits and programs to improve the quality of life for membered state troopers in fact, the THPA provides its members with Death Benefits and the THPA has also established a scholarship foundation to award grants to the children of membered state troopers each $1000 a year. We also provide dental insurance and we've also built a museum in San Antonio that honors all those troopers who have sacrificed their lives in the line of duty and the marketing of these programs. The THPA is here to help to improve the quality of law enforcement for all of us ... *will you stand behind the membered state troopers and their programs this year?*

7.  **Is my donation tax deductible?** YES. According to the IRS, the Texas Highway Patrol Association has been designated as a 501(c)(3) non-profit , charitable organization. Therefore, contributions to THPA are tax deductible. We do not hire a outside telemarketing company.

8.  **Will a THPA decal keep me from getting a ticket?** The decal is an expression of support for the thousands of peace officers who put their life on the line daily so we may live in a free society.

9.  **How did you get my number?** I am calling from a basic local telephone database. THPA seeks to reach out to every concerned citizen to seek support and to disseminate information.

    **I am on "the do not call list" -why did you call me?** The THPA maintains our own, voluntary list of persons who do not want to be contacted. Let me verify your information and I will have your name added to the list. Please note, updating the list and removing your name from our telephone database will require additional time to process. You may be contacted again before removal of your name is completed. (Obtain information required full name and telephone number).

10. **Are you a police officer?** I am not a police officer or a volunteer. I directly work for the Texas Highway Patrol Association. I am not a telemarketer I am a direct employee of the THPA who's only focus is on raising funds, so that the membered state troopers can devote their time to law enforcement can *we count on your support for the officers this year?*

11. **What is the THPA?** The Texas Highway Patrol Association is a professional organization of highway patrolmen, and state police members dedicated to promoting better law enforcement and providing important benefits to its members.

12. **Why do state-funded state troopers need charity to do their job?** Benefits provided by THPA do not replace the salaries, services, or essential materials supplied by state agencies. Voluntary organizations, like the THPA, help provide an opportunity for citizens to contribute to help underwrite the costs of life insurance, scholarships, and brotherhood assistance for troopers or their families who suffer loss.


**PLAINTIFF'S EXHIBIT**



Welcome to our 3 day boot camp. To make it through our camp you must work hard to learn these simple yet effective tips today.  This is the foundation to becoming a good employee with THPA.  If you execute these work habits, we will ask you to return for more training.  Good Work Ethic!!!! We do not tolerate any type of rude or abusive behavior. A violation of this will result in your immediate termination.

| Always be polite and courteous regardless on how they treat you. Hang up politely and always thank them for their time.  It will cost you your job. | Follow our presentation. Do not change or make up your own presentation. Our method works and if you feel you need to change something don't. | | | | Voice level needs to be at "6" not 5 or 4 on EVERY CALL. You'll be warned 2 times and the 3rd will result in termination. |
|---|---|---|---|---|---|
| | |  |  | Always sit up straight. Dial quickly. DO NOT let the phone ring more than 2 1/2 times by the 2nd ring; you next number needs to be ready to be dialed. Your phone is never hung up unless you have a question. | |



# (HELLO)

## MR. _____????(YES)

## THIS IS MR. _____,
## I'M WITH THE TEXAS HIGHWAY
## PATROL ASSOCIATION & Museum?

# (GOOD  /BAD  )

(Always be polite and courteous & never slam your phone)

PLAINTIFF'S EXHIBIT

3

The reason for my call is our membered Texas highway patrol officers ... Are currently sponsoring the 2012 decal campaign....

Money raised from donations like yours helps pay for educational programs at our Museum, scholarships for their children, dental insurance and a death benefit for families whenever a patrolman is killed in the line of duty and the marketing of these programs.

| 1. Mission | 2. WHAT YOU GET | 3. NO OUSTSIDE TELE-MARKETERS | 4. ONLY HERE BECAUSE OF YOU | 5. HOW WE DO THIS | 6. HOW MANY TIMES |
|---|---|---|---|---|---|
| To make this possible, we have developed several programs that benefit the officers and their families. We are a 501(c)(3) organization, and all donations are tax deductible. | We're also going to include two of our THPA Stickers so that everyone out there on our roads knows that you support. | We don't hire an outside Telemarketing Company & Everything is done in-house and its 100% tax deductible. | Remember these programs are not provided by the state or the dept. they are only here because of families like yourself. | We don't ask for any money over the phone. The way we handle this is after you've committed on helping us we mail you a receipt and a envelope 1st. Only after you get that in the mail, we ask you to send it back to our main office in Austin. | It's just a onetime pledge. Your one time support would be greatly appreciated. |

If we provided you with an envelope Mr./Mrs./_____, would you be able to put a little something in there to help out just this one time???

Our goal IS GET the whole community INVOLVED in supporting law enforcement---- and helping with these needful programs... without putting yourself in a financial bind or hardship.. Let me mail you the smallest $10 dollar program ... you still get the decals... you help with the death benefit, scholarships...

(Always be polite and courteous)
Thank you for your time maybe next year thank you...

## 1st Commitment Test

Now because these programs only survive by acts of kindness from supporters like yourself we ask all of our supporters for a FIRM COMMITMENT... What that simply means is that it won't put you or your family in a financial bind or hardship to return the $___ the day you receive your program.. Which will be in in 2 days, this (DAY) the (Date) of (Month).. Would that be alright with you?

## 2nd Verification

Fantastic let me just verify some quick mailing information I got you here at (Number), is that a street, road, Blvd.? Is that a house or an apartment? And that is (City)?___ And your zip code is?_____. Okay for receipt purposes, may I have your first name? (THE PERSON YOU ARE SPEAKING TO NAME ONLY). Will that be okay?

## 3rd CLOSE

Wonderful! in a couple of days you're going to receive your federally coded 501c3 Tax Deductible receipt along with a self-addressed return envelope with your $___dollar program. Just to let you know, your envelope will require a stamp when you send in your contribution okay???

And will you be returning a check or a money order? Okay you make your ___ directly payable to the Texas Highway Patrol Association or if it's easier for you, you could make it out to THPA. That would be on your program of course.

Just so we are clear you... There is NO PROBLEM MAILING IN YOUR $___ DOLLAR check/money order when you receive our program in 2 days ___, The ___, (Month) Right???

Do you have any questions that I can clear up with you before I let you go?

In a couple of minutes you'll receive a phone call to verify the mailing information. That's not going to be a problem? Because if it is we could always get it done now???

Fantastic in behalf of the Texas Highway Patrol Association we thank you for your act of kindness and for your loyal support, Have a safe year out in the highway.

---

I am on "the do not call list" -why did you call me?

The THPM maintains our own, voluntary list of persons who do not want to be contacted. Let me verify your information and I will have your name added to the list. Please note, updating the list and removing your name from our telephone database will require additional time to process. You may be contacted again before removal of your name is completed. (Obtain information required full name and telephone number).

A.   It was sons and daughters of the highway patrol officers or -- active or retired or their spouses going to any higher education type of education.

Q.   **Okay.  So the scholarship doesn't have to -- it wasn't made for family members of troopers who were slain?**

A.   Well, I believe that we had -- I don't know if it was specific like that.

Q.   **Okay.**

A.   But if a trooper was slain and their -- they came to us, we would definitely do that.

Q.   **Okay.**

A.   And we did start -- I know at one point we did publicize that to --

Q.   **Okay.**

A.   -- troopers' families as we let them know.

Q.   **And to receive a scholarship, does a person's family member, do they have to be a member trooper?**

A.   They do have to be a member trooper, yes.

Q.   **Okay.  And the death benefit -- the 10,000-dollar death benefit, you do not have to be a member.**

A.   That's correct.  It applies to all highway patrol troopers.

Q.   **Okay.  What about the dental insurance?**

PLAINTIFF'S
EXHIBIT
4

A.    That's for membership.  And it includes the --
the member and his family living in the household.

Q.    Okay.  And y'all pay that 100 percent?

A.    Yes.  The dental insurance we do.

Q.    Do you know at this point in time how many
troopers take advantage of the dental insurance?

A.    I'd have to look at the dental insurance bill
to add it up and tell you.

Q.    Do you have a -- can you guesstimate?

A.    I...

Q.    Okay.

A.    I mean, I count it up every month and add it,
so I know it's come out of that account.

Q.    And the dental insurance, it's the same program
that you provide to your employees as well?

A.    Yes.  And that's -- that gets paid out of a
different account.

Q.    Okay.  And how -- at this point in time, and
we're still back in the early '90s, did the Highway
Patrol Association make money?

A.    Well, when I got there, there was an outside
fund-raising company raising money, and within maybe two
months of my getting there, that outside fund-raising
person left the fund-raising company and came to work
for us.  So all the fund-raising was starting to be done

in house.

Q.   So it started -- then you-all have been doing in house fund-raising for quite a while.

A.   Yes.

Q.   So mid '90s?  '94, '95?

A.   Yes.  I'd say '3 or '4.  It was pretty quickly after I was hired.

Q.   What was the name of that individual?

A.   C.R. or Rubin Villalva.

Q.   And he is still with you?

A.   Correct.

Q.   And he is your director of marketing.

A.   Yes.

Q.   Okay.

        MR. BROWN:  V-i-l-l-a-l-v-a.

        MS. MEINKE:  Correct.

Q.   (BY MS. MEINKE)  Can you tell me a little bit about Mr. Villalva?  Do you know anything about his educational background?

A.   I don't know about his education, no.

Q.   Okay.  What do you know about him?

A.   I know that he was running the fund-raising for other companies previous.

Q.   Okay.

A.   And was -- was making a lot of money doing

that; and then he came to our organization and said that he could make us more money working for us than working outside from a different company.

Q.   Okay.  And he is in El Paso?

A.   Correct.

Q.   Has he always been in El Paso?

A.   Yes.

Q.   Okay.  Is the outside fund-raiser company that he was working for, that was in El Paso at the time?

A.   I believe the name of it was TelStar, and I don't think they were in the State of Texas.

Q.   Did he live -- so did he live out of state?

A.   No.  I have had conversations where they would fly him to their office when they needed him to do things.  So I don't know if he lived -- I really don't know if he moved.

Q.   Okay.  That's fine.

A.   Okay.

Q.   Okay.  Is C.R. a state trooper?

A.   No, he's not.

Q.   Do you know who some of his other clients were?

A.   I don't know.

Q.   Do you know -- were his client -- was he -- well, I strike that.

Okay.  Did you grow up here in Austin?

STATE OF TEXAS                          §
                                        §
COUNTY OF TRAVIS                        §

## AFFIDAVIT OF RODNEY SHAHEEN

BEFORE ME, the undersigned notary public, on this day personally appeared Rodney Shaheen who proved himself to be the person whose name is subscribed hereon through his Texas driver's license which contained his photograph and signature, and who after being by me duly sworn, upon his oath deposed and said:

"My name is Rodney Shaheen, I am over 18 years of age, and am competent to make this affidavit. I live at 914 North Bend Dr., Austin, TX 78758. The following facts are based upon my personal knowledge and are true and correct.

Since 2010, I have received several phone calls from an individual identifying himself as a Texas state trooper. The caller ID revealed "TX State Troop" or TX Hwy Pat," and I thought it was a legitimate law enforcement agency. On one occasion when they called me, I immediately thought one of my kids was in an accident. I asked the caller if he was a Texas state trooper and the caller stated, "yes." He sounded like a "State Trooper" because of the way he talked. The caller told me that even though this was an official call not to worry that I had done nothing wrong. The caller told me how many Texas officers had died in the current year. I then asked him if he was a professional fund raiser and he said no. He again identified himself as an officer and that 100% of what I donated would go to the families of officers killed in the line of duty.

After I got off the phone with him, I searched for the number he called from on the internet and found out it was the Texas Highway Patrol Association, a group I have repeatedly told not to contact me since less than 35% of the donations they receive go to the intended source. I noticed in the calls, that the Texas Highway Patrol Association had changed up their script and it was delivered expertly and with authority.

I heard a radio public safety ad stating that the Texas Department of Public Safety does not solicit any monies from the public so I new it was a scam. We thought that all this time, we were helping officers and their families.

Further affiant saith not."

RODNEY SHAHEEN

SUBSCRIBED AND SWORN TO before me on the 14th day of November, 2011.

Rebecca Henly
Notary Public State of Texas

PLAINTIFF'S EXHIBIT

5



**2012 SUPPORTER**



**2012 SUPPORTER**



**2011 SUPPORTER**



**2011 SUPPORTER**





**PLAINTIFF'S EXHIBIT**

6

000207





**GOLD SUPPORTER** **GOLD SUPPORTER**





3/14/08

**GLEN or PAM SCHONERSTEDT**
119 BOWIE LN 806/894-7186
LEVELLAND, TEXAS 79336

2416

Date 3-11-08 20_____

88-2106/1113

Pay to the
order of _Texas Highway Patrol Assoc._____ $ 20.00

_Twenty + no_____ 100 _____ DOLLARS 🔒

**AimBank**
110 College Ave. (806) 894-2266
Levelland, TX 79336

Club 55

For_____ _Pam Schonerstedt_____ MP

⑈1113 21063⑈ ⑈60 055 5⑈ 2416

We were told this
would go 100% to
a fallen officer's
family — that is
our desire.



**PLAINTIFF'S EXHIBIT**

7

yet.

Q.    Did you understand that if the Texas Highway Patrol Association does solicit, you would have to register under the LETSA statute with the office of the Attorney General.  Correct?

A.    That's correct.

Q.    And, in fact, your attorney sent you a letter that you've provided to us.  There's an e-mail that went from your attorney to the Office of the Attorney General to Susan Galloway.  Does that name sound familiar to you?

A.    Yes.

Q.    Okay.  Do you know who Lisa is at Ken Brown's office?

A.    Yes.

Q.    Okay.  She wrote Susan Galloway at the Attorney General's office:

"Dear Susan:  Tim Tierney said that the Texas Highway Patrol Association no longer does any fund-raising or solicitation.  Do they still need to register?  Tim says that all business of the Highway Patrol Museum are done through THPM only.  THPA is not used for anything at this point in time.  Let me know if there's something we have to submit to terminate that registration, or if we need to keep registering anyway."

PLAINTIFF'S EXHIBIT
8

And this was in May of 2009. Do you remember when all this occurred?

A. I don't remember offhand.

Q. Okay. But do you remember telling Mr. Brown's office, whether himself or Susan, that the Highway Patrol Association no longer does any fund-raising or soliciting?

A. I don't remember telling them that. I think that --

Q. But you know that they no longer do any soliciting.

A. Yes.

Q. Okay. But doesn't this employment contract state otherwise?

A. Well, I think it's just C.R. did not change that to "Museum."

Q. That's a pretty big error, don't you think?

A. I don't think so.

Q. Okay. Oh, you don't? Because you understand if the association is doing the soliciting, you're in violation of the LETSA statute because you're not registered with LETSA. Correct?

A. Do you have a copy of our LETSA statute?

Q. Of the -- of whose --

A. Of the one that we filed.

Q. You're not registered with the AG's office; the THPA is not registered?

A. Okay.

Q. So if they're doing the registering [sic], you're in violation of the LETSA statute. Correct?

A. I don't know.

Q. You don't know. Okay.

Okay. Are you -- do you have any knowledge about the loan to Lane Denton for $6705 for cash advances and expenses in 2009?

A. No, I don't.

Q. You don't know -- have any knowledge of that?

A. No.

Q. Because it's recorded on the 990 form.

A. I don't know what it is.

Q. Do you think you should know what it is?

A. I should know what that is.

Q. Okay. What about the fact that the Texas Highway Patrol Association has loaned over $600,000 to the Texas Highway Patrol Association Services, Inc. Are you aware of that?

A. I believe -- well, I wasn't aware of the amount, but I know that Ken Gorence keeps track of that information.

Q. But can you tell me under what circumstances



## ATTORNEY GENERAL OF TEXAS

### GREG ABBOTT

October 12, 2011

Kim Brown
Brown & Bolen, PLLC
1310 Ranch Road 620 South, Suite 203A
Lakeway, Texas 78734

*Via Facsimile 512-263-7454,*
*Via Regular Mail*
*and Via CM,RRR # 7010 2780 0001 8910 8572*

RE:   Texas Highway Patrol Association, Texas Highway Patrol Services, Inc. and Texas Highway Patrol Museum - Responses to Civil Investigative Demands and Request to Examine Documents

Dear Mr. Brown:

I am writing in reference to our office's review of the business and charitable practices of your clients, Texas Highway Patrol Association, Texas Highway Patrol Services, Inc. and Texas Highway Patrol Museum. Please be advised that the undersigned is now the attorney of record overseeing this investigation.

In response to prior Civil Investigative Demand [CID] requests, your clients provided to the OAG several documents contained in boxes that were not effectively labeled for us to be able to appropriately determine which document was being provided for each specific CID request. After reviewing these responsive documents, our office has discovered that we need to review additional documents requested herein.

Therefore, pursuant to the Texas Business Organizations Code, Tex. Bus. Org. Code, Section 12.151 et seq., and the common law of Texas, the Attorney General directs Texas Highway Patrol Association, Texas Highway Patrol Services, Inc. and Texas Highway Patrol Museum to produce the documentary material specified below. You are to produce and to make available all of the documents requested below to the undersigned. **This material shall be produced and made available on October 26, 2011** for inspection and copying at (a) your place of business or (b) in such a manner as may be agreed upon in writing by the undersigned. In the alternative, this material may be produced in original or copy form by mailing or shipping it for receipt on or before **October 26, 2011**, to the attention of the undersigned at: Office of the Attorney General, Consumer Protection & Public Health Division, 115 E. Travis, Suite 925, San Antonio, Texas 78205-1615.

When providing your responses, clearly identify the documents being provided in response to each separate request to examine, also identifying to which organization the document applies. If your clients do not have any documents responsive to our request, please indicate same.

In accordance with the above statutes, please provide the following documents for **YEARS 2008-2011** [unless otherwise noted] from **ALL THREE ORGANIZATIONS** [unless otherwise noted]:


PLAINTIFF'S
EXHIBIT
9

1. Copies of all Mission Statements and/or business plans/ strategic plans;

2. Copies of all written policies and procedures, including but not limited to, employee handbooks and financial policies;

3. Copies of all Board of Directors' handbooks;

4. All documents that identify all former and current officers and directors of the Association, Museum and Services;

5. All documents that identify any and all compensation paid to all officers and directors of the three entities;

6. Copies of all minutes and resolutions from all Board of Directors' meetings, or meetings of any committees created by the Board of Directors for all three organizations;

7. All documentation evidencing all educational programs provided by these organizations. Include to whom the program is/was provided, where and when the program is/was provided;

8. Documents that identify all former and current employees, and volunteers, their titles and job duties, and the amount of compensation paid to each employee and volunteer;

9. Job descriptions on file for each officer, director, employee of any position, or volunteer, and documents that reflect the basis to demonstrate that the individual is qualified for each respective position;

10. Copies of all IRS Form 990's, including all schedules, attachments, supplements and amendments thereto;

11. Copies of all independent audits or reviews, including all recommendations, management letters, and/or reports. This includes, but is not limited to all audited and unaudited financial statements, annual reports and other documents reporting financial condition and total income and expenditures;

12. Copies of annual operating budgets;

13. Documents that identify all financial institutions with bank accounts held in the name of and/or held on behalf of each organization;

14. Copies of all bank account statements, cancelled checks, itemization of deposits, and reconciliation reports for all accounts named in response to Item 13;

15. Documents that identify the former and current authorized signatories for all of each organization's bank accounts named in response to Item 13;

16. Copies of all receipts, purchase orders, invoices, expense reports and/or other documents which support, describe, or explain all of each organizations' expenditures made by cash or check;

17. Documents that identify all revolving credit accounts, including but not limited to credit card accounts, store credit accounts, and debit accounts used by or held in the name of each organization, or in the name of any other former or current officer, director, or employee of these organizations on behalf of these organizations;

18. Copies of all billing statements and receipts related to purchases made with all credit or debit cards held in the name of each organization, or in the name of any former or current officer or director of each organization on behalf of each organization;

19. Copies of all agreements between each organization and any former or current employee for the repayment or reimbursement to each organization of personal expenditures made on each organizations' credit cards or with each organizations' funds, and all related documents including, but not limited to, all correspondence that identifies the amount determined to be due to each organization, the schedule of repayment, and identify all payments made to date;

20. Documents that identify cash advances paid to any former or current director, officer, employee, consultant, volunteer, or other person, including to whom the cash advances were paid;

21. Documents that identify loans given by each organization to any former or current director, officer, employee, consultant, volunteer, or other person;

22. Documents that identify reimbursements *from* each organization to any former or current director, officer, agent, employee, consultant, volunteer, or other person, including all requests for reimbursement, expense reports and supporting receipts;

23. Copies of all canceled checks or other documents from each organization, director, officer, employee, consultant, volunteer or other person, as defined herein, which show reimbursement *to* each organization by any director, officer, employee, consultant, volunteer, or other person, for any personal or non-business expenditures;

24. Copies of each organization's chart of accounts that are used for recording daily receipts and disbursements, monthly accounting reports, and annual reports. Include all sub-accounts for which provision has been made;

25. Copies of each organization general ledgers;

26. Copies of each organizations' year-end schedules of accounts payable and accounts receivable;

27. Copies of all IRS Form 1099's and other documents that identify all consultants, independent contractors, or other persons who have provided consulting or any other professional services to each organization, including the amount of compensation paid to said persons and underlying documents that support the reported amounts on each Form 1099;

28. Copies of all IRS Form 1099's and other documents that identify all consultants, independent contractors, employees, or other persons who have conducted any solicitation of donations on behalf of each organization, including the amount of compensation paid to said persons and each and all of the scripts used for such solicitations;

29. Documents that identify all loans made to each organization by any bank, governmental agency or person, as defined herein. This request includes, but is not limited to, loan applications, correspondence with lenders, loan agreements, and security agreements related to the loans;

30. Documents that identify all individual donors, governmental entities, private foundations, funds, endowments, trusts, and/or other charitable entities or public sources which provide or have provided contributions, of any amount, through any means, to each organization, and the respective amounts and dates of these contributions;

31. Documents that identify each organization's use of the contributions inquired about in Item 30, including all underlying documents in support thereof, which confirm that the contributions have been used for the intended charitable purposes;

32. Copies of all reports, audits, memoranda, and correspondence, in draft or final form, prepared by governmental grant making agencies which relate to each organization;

33. Documents that identify all property and assets owned, leased, or rented, or previously owned, leased or rented by each organization or in which each organization otherwise has or has had a financial interest, including descriptions of how such property was used or is currently being used, and the current appraised value or stated value of such property and assets;

34. Copies of all contracts and/or agreements between each organization and any person relating to the operations or management of each organization;

35. Documents that identify any business or personal transaction between each organization and any current or former officer, director, consultant, employee, or volunteer of each organization, or any person related by blood or marriage to any current or former officer or director of each organization, including but not limited to, any loan, salary advance, reimbursement, payment for services, or any other agreement;

36. Copies of all citizen complaints, concerns, or requests, written or electronic, relating to any aspect of each organization's operations, including, but not limited to, solicitations of funds and expenditures of funds;

37. Copies of all press reports relating to each organization;

38. Copies of all insurance policies of any nature secured to provide coverage for each organization for money damages in the event of an adverse judgment against these organizations or any of their officers, directors, or employees;

39. Documents that identify the names of all corporations, for profit or non profit, or any other business entities, in which any of each organization former or current officers, directors, employees, or volunteers have any interest or serve as a board member, officer, or director;

40. Copies of all licenses, permits, registrations and certifications that each organization is required to obtain, or which each organization has obtained on a voluntary basis, if any;

41. Copies of all documents showing in detail the operations of, and purpose of, the Trooper's

Benefit Fund;

42. Copies of all documents which purport to establish a monetary fund for the Trooper's Benefit Fund;

43. Copies of all documents showing in what financial institution(s) any monies are held, and in what amount, for the Trooper's Benefit Fund;

44. Copies of all documents showing any and all monies the Trooper's Benefit Fund has been paid to or on the behalf of any and all families of officers killed in the line of duty, and the name(s) and contact information of the recipient(s) of those funds;

45. Copies of all documents showing in detail the operations of, and purpose of, the Funeral Benefits, and the Dignity Memorial Funeral, Cremation and Cemetery 's Trooper Benefit Program;

46. Copies of all documents which establish any relationship between the Texas Highway Patrol Association, the Dignity Memorial Funeral, Cremation and Cemetery's Trooper Benefit Program;

47. Copies of any and all documents which show any and all funeral protection certificates issued to or on the behalf of any and all children and/or grandchildren of the organization's employees, and the name(s) and contact information of the recipient(s) of those certificates;

48. Copies of all documents showing in detail the operations of, and purpose of, the Captain Ed Pringle Scholarship Fund;

49. Copies of all documents which purport to establish a monetary fund for the Captain Ed Pringle Scholarship Fund;

50. Copies of all documents showing in what financial institution(s) any monies are held, and in what amount, for the Captain Ed Pringle Scholarship Fund;

51. Copies of all documents showing any and all monies the Captain Ed Pringle Scholarship Fund has paid to or on the behalf of any student, and the name(s) and contact information of the recipient(s) of those Scholarships;

52. Copies of all documents showing in detail the operations of, and purpose of, the Dental Benefits Program;

53. Copies of all documents which purport to establish a monetary fund for the Dental Benefits Program;

54. Copies of all documents showing in what financial institution(s) any monies are held, and in what amount, for the Dental Benefits Program;

55. Copies of all documents showing any and all monies the Dental Benefits Program has paid to or on the behalf of any and all Texas Highway Patrol employees, and the name(s) and contact information of the recipient(s) of those funds;

56. Copies of all documents showing in detail the operations of, and purpose of, the Remember Our Friends Project;

57. Copies of all documents which purport to establish a monetary fund for the Remember Our Friends Project;

58. Copies of all documents showing in what financial institution(s) any monies are held, and in what amount, for the Remember Our Friends Project;

59. Copies of all documents showing any and all monies the Remember Our Friends Project has paid to or on the behalf of any and all employees, and the name(s) and contact information of the recipient(s) of those funds;

60. Copies of all documents showing in detail the operations of, and purpose of, the Crusin' to Coffins Program;

61. Copies of all documents which purport to establish a monetary fund for the Crusin' to Coffins Program;

62. Copies of all documents showing in what financial institution(s) any monies are held, and in what amount, for the Crusin' to Coffins Program;

63. Copies of all documents showing any and all monies the Crusin' to Coffins Program has paid to or on the behalf of all employees, and the name(s) and contact information of the recipient(s) of those funds;

64. Copies of all scripts provided to telemarketers or anyone else calling consumers for donations, on behalf of the organization;

65. Copies of all training materials provided to telemarketers or anyone else calling consumers for donations, on behalf of the organization;

66. A list of all non-profit organization(s) or charity(s) of which you or any other member of the organization, are a member;

67. Copies of all documents showing any monies belonging to the organization, that have been donated to or spent on behalf of any other non-profit organization(s) or charity(s);

68. Copies of all documents showing any and all credit or debit cards held in the name of or for the benefit of these organization;

69. A list of all persons authorized to use any credit or debit cards held in the name of or for the benefit of these organizations including their position or affiliation with the organization;

70. Copies of all monthly statements for the use any credit or debit cards held in the name of or for the benefit of these organizations;

71. Copies of all documents showing in detail how officers', directors', agents' and employees' salaries, benefits and/or any other form of compensation for services rendered to these organizations are calculated and determined;

72. Copies of all documents showing payment for contract labor and/or services for which these organizations has rendered payment;

73. Copies of all documents showing any and all monies the organization has paid for these organizations products offered and sold in support of the organization, including t-shirts and magazine subscriptions;

74. Copies of all documents showing consumer complaints received and any and all materials addressing any remedial procedures;

75. Copies of all documents showing any and all monies paid for marketing efforts, including telemarketing services;

76. Copies of all documents showing in detail any and all monies paid for board meeting expenses;

77. All documentation which indicates each entity's organizational chart for each year and who has served on each Board since January 2008;

78. All credit card records for all people who had access to or use of each credit card that was paid for, by or on behalf of these organizations, including a list of all names of the card holders from January 1, 2008 through the present;

79. All copies of all loan documents between these organizations and any other organization, individual, employee, officer or director January 1, 2008 through the present;

80. All documentation that demonstrates these organization's compliance with the Sarbanes-Oxley Act, including but not limited to any whistle blower policy, records retention policy and conflicts policy;

81. All copies of all travel, expense, reimbursement and investment policies and procedures for these organizations January 1, 2008 through the present;

82. All audio recordings that are made during the course of telephone fund raising;

84. Copies of all board training materials of these organizations;

85. All documentation which indicates all educational programs provided by these organizations. Please include to whom the program is provided, where and when the program is provided January 1, 2008 through the present;

86. All documentation reflecting all costs associated with the educational programs referred to in CID request No. 85. Please include all financial materials reflecting all costs associated with each program, including, but not limited to all invoices, receipts from January 1, 2008 through the present;

87. All documentation, including but not limited to credit card statements, receipts or bank account statements, of all expenses paid to Century Animal Hospital or any other business for the care/treatment/food/boarding or other expense for the "office cat" referred to in the sworn statement of Tim Tierney [see pages 148 and 165 of the sworn statement]

or any other office pet from January 1, 2008 through the present;

88. All telephone records for all telephone numbers, including both land lines and cell phones utilized by these organizations January 1, 2008 through the present;

89. All utility company records for all properties associated with these organization from January 1, 2008 through the present;

90. All receipts for all expenses incurred by or on behalf of these organizations or anyone affiliated or associated with your organization since January 1, 2008;

91. All documentation that indicates the criteria for being inducted into the Museum Hall of Fame, including but not limited to, all costs associated with the selection of being chosen for induction into the Hall of Fame. Also, include the names of the persons who make the decisions regarding how the Hall of Fame members are chosen;

92. All documentation which reflect all expenses related to the National Police Memorial Annual Ride in Washington, D.C. since January 1, 2008 through the present incurred by any person associated with these organizations. This includes all receipts or invoices for airline tickets, lodging, meals, entertainment expenses or any other expenses of any kind associated with these trips which was paid for by your organization. Please include in your documentation all persons for whom expenses were paid;

93. All documentation which reflects the donation/receipt of any law DPS related artifacts kept at the Museum located in San Antonio, Texas, including, but not limited to the DPS vehicle door which is on display at said location;

94. All documentation which includes records of ALL families of DPS troopers who have ever received monies from the Trooper Benefit Fund. Note: this request is not limited in time;

95. All documentation which demonstrates all families or individuals who have ever received scholarships/funeral protections funds or any funds from these organizations. Please note this request is not limited in time;

96. All records of ALL persons, whether employees of your organization or troopers, who are receiving dental benefits paid by these organizations from January 1, 2008 through the present. Please include the name as well as address and phone number of each person;

97. Any and all documents which reflect all funding used to produce the "Cruising' to Coffins" program, all schools to which the program was presented and which of those schools presented the program. Please include documents of the total amount of money that has been spent on this program, how the funds were spent and when the funds were spent. Please include all documents from the time the of the program's inception through the present;

98. Copies of your publication for the past year;

99. All documents regarding payments for any other programs or services related to any DPS officer or employee, including the "Texas Police Volleyball" event referenced by Tim Tierney at page 44 of his sworn statement the "Police Unity Tour" at page of 41 of the statement and the "Friends Project;"

100.    List of all current and former members, including names, addresses and phone numbers, who belong to these organizations;

101.    All documents which demonstrate how much money has been received as donations by your organization since January 1, 2008. Please include a list of the names of each donor, including any contact information you have for each individual;

102.    Copies of all personnel files, including all background checks for your employees;

103.    Copies of all employee handbooks utilized by your organization;

104.    Copies of all fundraising materials, including pledge forms, special event information or the like utilized by these organizations;

105.    Copies of all risk management programs for these organizations;

106.    Copies of all fidelity insurance policies held by these organizations;

107.    Copies of all budgets utilized by these organizations since January 1, 2008 through the present. Please include the dates in which the budget was approved by the board;

108.    Copies of all receipt, purchase orders, invoices, expense reports or other documents which support, describe, or explain all of these organizations' expenditures made by cash or check from January 1, 2008 to the present;

109.    Copies of all visitor ledgers or other documents which reflect persons who have visited the Museum in San Antonio, Texas;

110.    All documents that indicate all special events or functions that have been held at the Museum. Include all operating costs of such events or functions. Also, include all who was invited to and attended such functions;

111.    All documents which indicate your organization has permission, in writing, from any public safety agency or organization, to use any name, symbol or statement similar to a name symbol, or statement used by a public safety agency or organization.

    Should you have any questions, please do not hesitate to call. We look forward to receiving your responses.

Sincerely,

KARYN A. MEINKE
Assistant Attorney General
210-225-4191 Telephone
210-225-1075 Facsimile

cc:     file

# Texas Highway Patrol Museum

# Policy Manual

PLAINTIFF'S
EXHIBIT

10


## Table of Contents

| Policy | Date adopted | Page |
|---|---|---|
| Code of Conduct | November 8, 2008 | 2 |
| Code of Ethics | November 8, 2008 | 3 |
| Diversity Inclusivity | November 8, 2008 | 5 |
| Document Retention | November 8, 2008 | 6 |
| Sexual Harassment | November 8, 2008 | 10 |
| Public Records | November 8, 2008 | 11 |
| Minutes of Board Meetings | November 8, 2008 | 12 |
| Whistle Blower Protection | November 8, 2008 | 13 |
| Staff Travel | November 8, 2008 | 14 |
| Credit Card Usage | November 8, 2008 | 15 |

# CODE OF CONDUCT

Members of the Texas Highway Patrol Museum (THPM) Board of Directors are required to receive a copy of the code of conduct upon nomination and must sign the code prior to installation. The directors will agree:

- To act in the best interests of, and fulfill their obligations to, THPM and its constituents-members;
- To act honestly, fairly, ethically and with integrity;
- To conduct themselves in a professional, courteous and respectful manner;
- To comply with all applicable laws, rules and regulations;
- To act in good faith, responsibly, with due care, competence and diligence, without allowing their independent judgment to be subordinated;
- To act in a manner to enhance and maintain the reputation of THPM;
- To disclose potential conflicts of interest that they may have regarding any matters that may come before the board, and abstain from discussion and voting on any matter, in which the director has or may have a conflict of interest;
- To make available to and share with directors any information that may be appropriate to ensure proper conduct and sound operation of THPM's governance and management;
- To respect the confidentiality of information relating to the affairs of THPM acquired in the course of service, except when authorized or legally required to disclose such information;
- To not use information acquired in the course of service for personal advantage;
- To not violate any federal, state or local laws governing THPM and to understand and adhere with all governing documents applicable to THPM.

A director who has concerns regarding compliance with this code of conduct should raise those concerns with the executive director or the chairman of the board. In the unlikely event that a waiver of this code for a director would be in the best interest of THPM, it must be approved by the unanimous vote of the board.

Directors will annually sign a confirmation that they have read and will comply with this code.

Date Adopted: November 8, 2008

# CODE OF ETHICS, BOARD OF DIRECTORS AND OFFICERS

Service on the board of directors of Texas Highway Patrol Museum (THPM) is an important honor and responsibility. Much commitment, time and energy is expected of officers and the Board of Directors of THPM.

The membership of THPM relies on its officers and Board to act in its best interests, to be knowledgeable about and proactive on the issues facing the law enforcement community, to study the questions before it and to base decisions on reliable information, to be a good steward of the resources of THPM, and to be honest and trustworthy in all actions.

To assure the trust and ethical expectations of the members of THPM, I affirm the following:

## Duty of Care

In all matters affecting THPM, I will act in good faith and exercise my best efforts in the performance of my duties.

I will faithfully prepare for discussions and decisions that affect THPM by reading information sent to me by THPM officers and staff and by striving to be knowledgeable on issues of importance to THPM and its members.

I will be responsible for disseminating information I receive as a Director to all members, with my primary responsibility to inform my members.

I will make decisions based on factual data rather than unsubstantiated opinions.

I will make decisions based on what is in the best interest of all members of THPM, rather than any one group, individual, or special interest.

I will be honest in doing the work of THPM and in speaking on behalf of THPM and its leadership in order to foster trust among THPM members and the public.

I will respect my fellow Directors and the members of THPM, acknowledging differences of opinion, providing for open and respectful discussion, and making decisions only after listening to all points of view and all available data.

I will publicly support the majority decisions made by the Board of Directors.

I will support and encourage participation in all THPM programs including endorsed programs.

I will hold my own business to the highest standards of professionalism, quality, and integrity, because the manner in which I conduct my individual business affairs can affect the public image of THPM.

## Confidentially

I will not disclose, beyond its intended scope, any information which is marked, designated, or treated as confidential by the Board, officers, or staff and which I receive as a Director of THPM.

I understand that my obligation to maintain confidentiality extends indefinitely beyond my term of office.

## Conflict of Interest

I acknowledge that information, programs, research, services, and methods of operation are developed by THPM for all members and as a Director I am obligated to pass on this information to my constituencies. Therefore I will not expropriate for myself, my business, or another association any information I receive as a result of my position as a Director of the THPM prior to disseminating this information to my constituents.

I will not create any program that is in direct competition with a THPM program including the Annual Conference, or other programs that the THPM may develop in the future.

I will openly declare any actual or perceived conflict of interest that may result from my taking part in discussion or decision making on an issue before the THPM while having business, professional, or personal interests that could bias my decisions. I further acknowledge the Board of Directors has the sole responsibility for determining whether my interests constitute a conflict and if so what the remedy will be.

Date Adopted: November 8, 2008

# DIVERSITY - INCLUSIVITY

The Texas Highway Patrol Museum (THPM) shall communicate and promote diversity and inclusivity among the membership, leadership and staff.

To promote inclusivity, the following statement shall be communicated to all members and prospective members in reference to membership and the membership application:

> In principle and in practice, THPM values and seeks diverse and inclusive participation within the field of law enforcement. THPM promotes involvement and access to leadership opportunity to all members regardless of race, ethnicity, gender, religion, age, sexual orientation, nationality, or disability.

THPM will continue to provide leadership and commit time and resources to advance this objective. THPM will develop strategies and initiatives to promote and welcome diversity within the board, staff, and membership of THPM and provide tools for its members' regarding diversity.

Date Adopted: November 8, 2008

# DOCUMENT RETENTION POLICY

Texas Highway Patrol Museum (THPM) shall retain records for the period of their immediate or current use, unless longer retention is necessary for historical reference or to comply with contractual or legal requirements. Records and documents outlined in this policy include paper, electronic files (including emails) and voice mail records regardless of where the document is stored, including network servers, desktop or laptop computers and handheld computers and other wireless devices with text messaging capabilities. Any employee of THPM, or any other person who is in possession of records belonging to THPM who is uncertain as to what records to retain or destroy, when to do so, or how to destroy them, may seek assistance from THPM's Document Retention Policy (DRP) manager who is Tim Tierney.

In accordance with applicable federal law(s), THPM shall not knowingly destroy a document with the intent to obstruct or influence an "investigation or proper administration of any matter within the jurisdiction of any department, agency of the United States...or in relation to or contemplation of such matter or case". If an official investigation is under way or even suspected, document purging must stop in order to avoid criminal obstruction. In order to eliminate accidental or innocent destruction, THPM has the following document retention policy:

| TYPE OF RECORD | SPECIFIC RECORD | RETENTION PERIOD |
|---|---|---|
| Accounting Records | | |
| | Annual financial statements | Permanent |
| | Monthly financial statements | 3 years |
| | General ledger | 20 years |
| | Annual audit records | 10 years |
| | Journal entries | 7 years |
| | Special reports | 7 years |
| | Canceled checks | 7 years |
| | A/P paid invoices | 7 years |
| | Business expense records | 7 years |
| | Credit card receipts | 3 years |
| | Cash receipts | 3 years |
| | A/R invoices | 7 years |
| | Data for acquired/divested assets | Permanent |
| | Data for nonacquired/nondivested | 5 years |
| | Accounts payable | 7 years |
| | Accounts receivable | 7 years |
| | Audit reports | 7 years |
| | Chart of accounts | Permanent |
| | Expense records | 7 years |
| | Inventory records | 7 years |

| TYPE OF RECORD | SPECIFIC RECORD | RETENTION PERIOD |
|---|---|---|
| | Loan documents | 7 years after final payment |
| | Purchase orders | 7 years |
| | Sales records | 7 years |
| | Stop payment orders | 3 years |
| | Bank reconciliations | 3 years |
| **Tax Records** | | |
| | Federal tax returns | Permanent |
| | State & local tax returns | Permanent |
| | Form 990 & supporting | Permanent |
| | Form 990-T & supporting | Permanent |
| | Supporting documentation for taxes | 4 years |
| | City & State excise tax reports & supporting documentation | 5 years (or longer if designated by state law) |
| | Unclaimed property filings & supporting documentation | 6 years (or longer if designated by state law) |
| | 1099 forms | 7 years |
| | Magnetic tape & similar records | 1 year |
| | Payroll taxes (W2, W3) | Permanent |
| | Payroll taxes (Form 941, state withholding forms, state unemployment returns) | 7 years (or longer if designated by state law) |
| **Payroll Records** | | |
| | Wage rate tables | 3 years |
| | Cost of living tables | 3 years |
| | Wage | 6 years |
| | Salary | 6 years |
| | Payroll deductions | 6 years |
| | Time cards or forms | 5 years |
| | W-2 forms | 7 years |
| | W-4 forms | 7 years |
| | Garnishments | 4 years after termination |
| | Payroll registers | Permanent |
| | State employment forms | 4 years |
| | State unemployment tax | Permanent |
| | Cancelled payroll checks | 7 years |
| | Deductions register | 7 years |
| | Earnings records | 7 years |
| | Changes or adjustments to | 7 years |

| TYPE OF RECORD | SPECIFIC RECORD | RETENTION PERIOD |
|---|---|---|
| **Insurance Records** | | |
| | Policies (including expired) Permanent | 5 years |
| | Claims for loss/damage, | |
| **Workplace Records** | | |
| | Incorporation records (including | Permanent |
| | Meeting minutes | Permanent |
| | Policy statements | Permanent |
| | Employee directories | 5 years |
| **Legal Records** | | |
| | General Contracts | 3 years after termination |
| | Real estate contracts & records | Permanent |
| | Personal injury records | 7 years |
| | Trademark registration | Permanent |
| | Copyright registration | Permanent |
| | Patents | Permanent |
| | Litigation claims | 5 years following close of case |
| | Court documents & records | 5 years following close of case |
| | Deposition transcripts | 5 years following close of case |
| | Discovery materials | 3 years following close of case |
| | Leases | 6 years after termination |
| **Personnel Records** | | |
| | Employment applications (persons not hired) | 1 year |
| | Employment applications (persons hired) | 3 years following termination of employment |
| | Employee resumes & employment history | 3 years following termination employment |
| | Evaluations | 3 years following termination of employment |
| | Promotions, raises, reclassifications & job descriptions | 5 years following termination of employment |
| | Disciplinary warnings, demotion, lay-off & discharge | 5 years following termination of employment |
| | Employment & termination | Permanent |
| | Beneficiary information | Permanent |
| | Medical and safety records | 6 years |
| | Accident reports | 6 years |
| | Education assistance | While employed |
| | Sick leave benefits | While employed |
| | Retirement plans | Permanent |

| TYPE OF RECORD | SPECIFIC RECORD | RETENTION PERIOD |
|---|---|---|
| | Incentive plans (after | 6 years |
| | Pension plans | Permanent |
| Technical Materials | | |
| | Manuals | Permanent |
| | Standards | Permanent |
| | Committee Meeting Minutes | Permanent |
| | Correspondence | 5 years after manual or standard |
| | Invoices to customers | 7 years |

The retention periods described herein are guidelines. There are circumstances under which a record or document may have to be maintained longer than the guidelines. This will be a decision made by the Document Retention Policy Manager.

Date Adopted: November 8, 2008

# SEXUAL HARASSMENT

Texas Highway Patrol Museum (THPM) is committed to providing a work environment that is free from discrimination. In keeping with this commitment, we maintain a strict policy prohibiting any kind of unlawful harassment or discrimination, including racial, sexual, ethnic, handicap, age, or religious harassment. This policy prohibits harassment in any form, such as verbal, physical, and visual harassment.

The definition of sexual harassment includes: (1) quid pro quo sexual harassment where employment or continuing employment is based on the granting of a sexual favor, and (2) the creation of a hostile work environment to the extent that an employee feels coerced or intimidated. A hostile work environment can be created by words and/or actions. Words or actions are considered unlawful sexual harassment if; among other things, they are (1) sexual in nature, and (2) unwelcome.

Any employee who believes he or she has been harassed by a co-worker, supervisor, client or agent of THPM should promptly report the facts of the incident or incidents and the names of the individuals involved to his or her supervisor, or to any member of management with whom they feel most comfortable.

Supervisors should report all complaints of harassment to the CEO to ensure that they are resolved promptly and effectively. The CEO or an outside party will investigate the complaint, and the employee will be advised of the findings and conclusion.

All actions taken to resolve complaints of harassment through internal investigations shall be conducted as confidentially as possible and practical. Any supervisor, manager, or any other employee who is found, after appropriate investigation, to have engaged in harassment of another employee will be subject to disciplinary action, up to and including termination. Employees who utilize the complaint procedure outlined in this policy will not be retaliated against and will not have their employment adversely affected by making such a complaint.

If you have any questions concerning this policy, please feel free to contact the CEO or other member of management.

Date Adopted: November 8, 2008

# PUBLIC RECORDS

Informational tax returns filed by Texas Highway Patrol Museum (THPM) with the U.S. Internal Revenue Service are available for inspection at THPM's business office during regular business hours. A copy of THPM's federal tax informational return is filed annually with the Texas Attorney General, in accordance with applicable state law and that agency makes such records available for inspection and copying in its office and online. Copies of THPM's financial statements are available for inspection at THPM's business office during normal business hours. Copies of THPM's governing documents and policies are available for inspection at THPM's business office during normal business hours.

Date Adopted: November 8, 2008

# MINUTES OF BOARD MEETINGS

A record of discussions and all decisions and actions of Texas Highway Patrol Museum's (THPM) Board of Directors is made contemporaneously with the Board meeting. A copy of the meeting minutes is delivered to each director and the minutes are approved at the next board meeting. The approved minutes become a part of THPM's permanent business records.

Date Adopted: November 8, 2008

# WHISTLE BLOWER PROTECTION

If a staff member of the Texas Highway Patrol Museum (THPM) is concerned about the decisions of the executive director or another staff member with supervisory or executive authority, the chairman of the board is available to discuss those concerns without fear of retaliation or retribution.

Staff members must respect the lines of authority and not approach other persons about a concern.

There shall be no retribution for a staff member who reports a situation through the proper channels.

Date Adopted: November 8, 2008

## STAFF TRAVEL

A staff member traveling on behalf of the Texas Highway Patrol Museum (THPM) shall provide information regarding travel itinerary (flights, hotel, and if used for booking, the travel agency's telephone number) as well as personal emergency contact information, to the staff member's supervisor prior to departure. The employee promptly shall notify the supervisor if and when any travel plans change.

Date Adopted: November 8, 2008

# CREDIT CARD USAGE

Any credit card provided by the Texas Highway Patrol Museum (THPM) for business use by an employee is for THPM business use only. Cardholders may not, under any circumstance, use the credit card for personal purchases nor for guaranteeing any type of personal reservations (hotel, rental cars, etc.) or for any other personal use. Any personal use of a THPM business credit card will be grounds for disciplinary action, including possible termination of employment.

When the credit card is used to pay for meals, staff must indicate on the receipt who was in attendance and the purpose of the meal. If a staff member allows other staff members to use the THPM credit card for approved purchases; it is the cardholder's responsibility to acquire the charge receipts for reimbursement submission.

The monthly statements for credit card accounts must be mailed to THPM's accounts payable manager and not to the individual cardholder. The accounts payable manager will review the monthly bill and then ask the employee to approve the charges and attach the receipts. Repeated failure to approve statements in a timely manner may result in forfeiture by the employee of THPM's credit card.

Date Adopted: November 8, 2008

## BROWN & SCHAEFER, P.C.
### ATTORNEYS AT LAW

**KIM D. BROWN**
Board Certified, Residential Real Estate Law
Texas Board of Legal Specialization

**TROY D. BOLEN**
Also Licensed in Colorado

**LANA S. HARRIS**
Of Counsel

Telephone:
(512) 263-7450
Fax:
(512) 263-7454

1310 Ranch Rd. 620 So.
Suite 204
Lakeway, Texas 78734-6342

Email:
mailbox@brown-schaefer.com

April 23, 2009

Tim J. Tierney
Texas Highway Patrol Museum
501 Oakland Ave.
Austin, Texas 78703

Re:   THPM Policies Manual

Dear Tim:

In early March I was contacted by Ken Gorence, who indicated that it was important for the THPM Board to have adopted (effective by the end of 2008) some policies relating to the operation of the organization, because it appears that the IRS is going to start paying attention to whether non-profit organizations have such policies in place.

Ken provided me with some materials to review, and those materials he sent also referenced some other helpful information sources relating to the types of policies that should be adopted and possible content for the policies. Leesa assisted me in reading through the free sample packet, and I decided to purchase the more detailed booklet entitled How to Create a Policy Manual, which contained even more suggestions and drafts of proposed policies.

From all of those information sources, I have selected the proposed policies that seem most applicable and workable for THPM. I spent some time reviewing and redrafting the content of these proposed policies to make them as direct and simple as possible. In the case of all or most of these proposed "new" policies, I believe that they reflect existing business or operational practices of THPM and/or generally accepted business practices that should not be problematic for any well-run nonprofit association.

It is my recommendation that the Board acknowledge adoption of these policies as of the date of its last Board meeting during 2008, and that the adoption of the policies be reflected in the meeting minutes when they are approved by the Board. Leesa can update the document by adding the date of adoption when you send us that Board meeting date. Please also send us a copy of the Board's approved meeting minutes that reflect approval during 2008 of these policies.



PLAINTIFF'S EXHIBIT

11

This project turned out to be more work and more time-consuming than I would have thought up front, but it seems clear from Ken's communications and what I read in the materials we gathered that it is mandatory for THPM to have adopted these types of policies, in order to meet current IRS requirements.

If you or any of the Board members have any questions about these new THPM policies, do not hesitate to communicate those issues to my office.

Sincerely,

Kim D. Brown

enclosures

cc:    Ken Gorence, CPA

KDB\TierneyT_Ltr_042309

reimbursement sent for that, for the extra tickets.

Q.   **So she was kind of joking, saying --**

A.   With her husband.

Q.   **-- "Give me the money back.  I'm broke."**

A.   Yes.

Q.   **Do you think that's appropriate behavior of someone who is a board member of a public charity?**

A.   Well, let me see that again, please.  The e-mail goes from Diana -- it says "To hunk," which I'm guessing would be James, and from Diana to James.  I mean, I don't know.  If a wife tells a husband, "Hey, get me some money.  I'm broke.  I used the credit card. We've got to pay it off" or -- I think that's a joke between the two of them.  It doesn't affect me.

THE VIDEOGRAPHER:  I have about one minute.  We should change the tape.

MS. MEINKE:  Okay.  That's fine.  We can stop.

THE VIDEOGRAPHER:  The end of Tape 1.  We go off the record at 11:36.

(Recess taken)

THE VIDEOGRAPHER:  Okay.  We're back on. This is the beginning of Tape 2.  It's 11:54.

Q.   **(BY MS. MEINKE)** Mr. Tierney, do any of the **organizations have any type of policy with regard to**



PLAINTIFF'S
EXHIBIT

12

credit cards?

A.    No.

Q.    They don't?

A.    Huh-uh.  I mean, there's no set policy, anything written.

Q.    There's nothing in writing?

A.    Huh-uh.

Q.    Okay.  I want to give you what I am marking as Exhibit No. 11 --

(Exhibit No. 11 marked)

Q.    (BY MS. MEINKE) -- that you provided to the office of the Attorney General in response to their request to examine documents.  It is called the Texas Highway Patrol Museum Policy Manual.  You provided that to us, correct?

A.    Um-hmm.

Q.    Can I take a look at it?  And on page 15 -- do you remember when this was adopted?

A.    A few years back.  I don't remember exactly.

Q.    Adopted November 8, 2008.

Do you remember the museum adopting this manual back then?

A.    Yes.

Q.    Okay.  Did they have any sort of policy manual before November 8, 2008?

A.     Not that I believe.

Q.     So since 1992, the first time the museum adopted a policy manual was in 2008?

A.     Correct.

Q.     Okay.  You only provided us a policy manual for the museum.

Does the association have a policy manual?

A.     I don't believe so.

Q.     Okay.  What about Services, Inc.?

A.     No.

Q.     Is there any plans in the future to adopt a policy manual?

A.     I haven't planned anything yet.

Q.     What made you adopt this manual?

A.     I think it was under the direction of our CPA, that it was a new IRS requirement.

Q.     Do you think it's good practice to have a policy manual regardless of what the IRS wants you to do?

A.     Sure, yes.

Q.     But you don't have one in the other two organizations?

A.     Right.

Q.     And you didn't have one up until 2008?

A.     Right.

and not to the individual cardholder.  The accounts payable manager will review the monthly bill and ask the employee to approve the charges for the attached receipt.  Repeated failure to approve statements in a timely manner may result in forfeiture by the employee of THPM's credit card."

Q.    And, Mr. Tierney, who is the accounts payable manager?

A.    Well, I pay the bills; so I guess that would be me.

Q.    Can I see that, please?

Is that policy strictly adhered to?

A.    No, it's not.

Q.    Why not?

A.    Well, I -- I get receipts from Steve Jenkins on his credit cards.  I don't get receipts on Lane Denton from his credit cards but -- well, that is THP Services. So, yeah.

Q.    Okay.  So you said it's not strictly adhered to.  So would you agree, then, that you're violating your own policy manual?

A.    Yes, I guess I have without realizing it.  Yes.

Q.    Okay.  Who developed these policies?

A.    It either came from Kim Brown's office -- it may have come from Kim Brown's office.  I don't really

# CREDIT CARD USAGE

Any credit card provided by the Texas Highway Patrol Museum (THPM) for business use by an employee is for THPM business use only. Cardholders may not, under any circumstance, use the credit card for personal purchases nor for guaranteeing any type of personal reservations (hotel, rental cars, etc.) or for any other personal use. Any personal use of a THPM business credit card will be grounds for disciplinary action, including possible termination of employment.

When the credit card is used to pay for meals, staff must indicate on the receipt who was in attendance and the purpose of the meal. If a staff member allows other staff members to use the THPM credit card for approved purchases; it is the cardholder's responsibility to acquire the charge receipts for reimbursement submission.

The monthly statements for credit card accounts must be mailed to THPM's accounts payable manager and not to the individual cardholder. The accounts payable manager will review the monthly bill and then ask the employee to approve the charges and attach the receipts. Repeated failure to approve statements in a timely manner may result in forfeiture by the employee of THPM's credit card.

Date Adopted: November 8, 2008

PLAINTIFF'S
EXHIBIT

13

credit card expenses?

A. I didn't realize that that was the total for one year. If they're business expenses, then it doesn't bother me.

Q. How do you know those are business expenses? Does he provide you receipts, or do you just take his word for it?

A. I take his word for it.

Q. You think that's a reasonable and prudent practice?

A. Yes.

Q. It's a reasonable and prudent practice to take the words of a convicted felon, telling you that these are reasonable and business expenses?

A. Well, he hired me. He was my boss. And I still think of him as a boss in a way and so --

Q. But you already stated that you agree you owe a duty to the people who are giving money to this charity.

A. Lane Denton's expenses are paid from THP Services.

Q. Okay. But you said you're the go-to guy for all three entities, correct?

A. Yes.

Q. So don't you want to know what all three entities are spending their money on?

PLAINTIFF'S EXHIBIT



probably. I'm not sure.

Q. You just pick un?

A. Right. Cause we couldn't divide them into all of them, that -- with just that one amount cause we don't put it in change parts. We just put a dollar amount.

Q. Okay. And who makes that decision, you guys just do when you get the check in?

A. Yeah.

Q. So whoever's -- whoever's processing the check besides...

A. We -- like I said, when we enter donations, we just enter into the database, and then we just print out after we're done entering.

Q. No, I understand. But if somebody has a check, and say they've got -- you know, this -- this contributor -- the invoice amount's $50 but they want to add another 10, and they have -- they check three boxes for where the additional donation goes to. Who decides where it goes? Is it whoever's entering the checks they just make -- make a judgment call on that?

A. Yeah. We just kind of guess which one they would probably put in, cause you couldn't put both of them in, all those choices. Probably put one or the other that they chose, probably. I'm not sure.

Q. Okay. There's not -- well, I mean, you're the

PLAINTIFF'S
EXHIBIT
15

A. Right.

Q. It would've been accounted for by the people who gave the cash, right? I mean, is there another petty cash fund --

A. Oh, no.

Q. -- that sits in the office?

A. Oh, no.

Q. Okay.

A. That I know of.

Q. It's just a petty cash fund based on what comes in each day?

A. Yes.

Q. And so is that then maintained at all? Is there any cash that's kept in the office?

A. Like, on a daily basis?

Q. Yes, ma'am.

A. We just put -- paper clip it and then we put -- Tim takes it. And then when it -- and then it gets deposited. He bring -- counts it up and brings it down, and then we deposit it when...

Q. Okay. So Tim takes the cash?

A. Uh-huh.

Q. And then who accounts for who gets deposited?

A. Like, when we -- he counts it and we -- he brings it down for Mary to deposit into the bank.

Integrity Legal Support Solutions
www.integrity-texas.com



PLAINTIFF'S EXHIBIT

Q. Brings it down from where?

A. Well, like -- like, he would put it, paper clip the amount that is -- came in. Cause we don't stamp the check -- the cash with the checks, if that's what you're asking. It gets paper-clipped separately so it doesn't get stuck with the checks. Like --

Q. Right?

A. -- the cash pile.

Q. The cash get -- the cash --

A. Right.

Q. -- gets counted out. Does the cash get counted by area or is it all put together?

A. Once we've done the area that we've entered into the database, the cash goes all into one pile, and then we put a little Post-It note showing the amount for that petty cash for that day.

Q. Then --

A. And then we paper clip it and put it in Tim's file.

Q. In Tim's file?

A. To show that -- or box, not file, but box to show that there was petty cash. So he keeps track.

Q. So -- but you don't put the checks in his box.

A. No, cause we stamp the checks and make the deposit slips for the checks.

Q. And then Tim separately makes the deposits of the cash?

A. We -- they just go in a pile. And then when -- like I said, they go. And when there's enough to deposit, then he gets a big -- one big deposit slip.

Q. Well, it seems like on your daily totals there's always enough to deposit. There's anywhere from 5,000 to $8,000 --

A. We get --

Q. -- a day, right?

A. On the cash?

Q. Well, in checks --

A. Checks and stuff.

Q. -- at least.

A. I just know it's not -- we just pull it out and then we paper clip the cash amount and -- so Tim knows that there was petty cash.

Q. What difference does it make?

A. I don't -- that's just how we've been doing it.

Q. So Gloria doesn't -- I mean, I'm sorry, Maria doesn't deposit the cash? She only deposits the checks?

A. Yes. And then she deposits the cash and brings it down to -- we deposit it.

Q. Now, I don't understand what you're saying there. When he brings it down --

A. Well, he offices upstairs.

Q. Okay.

A. Sorry. His office is upstairs. We're downstairs.

Q. So he -- he counts the cash, and then he doesn't give it back to Maria --

A. Yes. That's --

Q. -- to then --

A. -- what I'm --

Q. -- deposit?

A. That's what I'm saying, is that she -- he brings it down for her to make the deposit for cash.

Q. But --

A. After he verifies it. After he verifies it.

Q. What do you mean he verifies it?

A. Well, I don't know about verify. But I just know we paper -- like I said, we paper clip it, and then we put it in his in-box with his paperwork with the bills and stuff after we enter the donations.

Q. And then --

A. Separate it. And then...

Q. And then he doesn't deposit the cash, he brings it downstairs again to Maria to deposit?

A. To deposit. Cause they stay paper clipped until they're ready to be deposited.

Q. But he doesn't verify the -- verify the checks, he only verifies the cash; is that right?

A. Just shows how much came in petty cash for that day.

Q. But it's really not petty cash, is it, it's donations. It's people's donations coming in, right?

A. Yes.

Q. Okay. And so does he then sometimes just take the cash?

A. No.

Q. It always gets deposited?

A. Yes.

Q. Okay. You know that --

A. Yes.

Q. -- for a fact?

A. Yes.

Q. Okay. Unless you use it for petty cash --

A. We write the --

Q. -- for yourselves, and then you write a check to the organization?

A. Yes.

Q. And who keeps track of all of that?

A. That would probably be Tim.

Q. So do you ask anybody if you can take money for petty cash?

petty cash in the office until it gets deposited --

A. Yes.

Q. -- is that right? And this has a received stamp, 8-18-09. What -- what is that for?

A. That was probably the -- that, I didn't do. I'm not sure. That's just the stamp that -- it has "Received" on it, and that was the date that we probably -- that it was done. But they wanted it -- wanted it to be deposited on the 27th for that check.

Q. Okay. So you -- you sometimes will use the contributor's moneys for petty cash and then eventually pay it back to the Museum?

A. Yes.

Q. How often does that happen?

A. I -- not very often.

Q. Show you another Exhibit, 7.

(Exhibit No. 7 marked)

MR. BROWN: Is this from produced documents --

MS. HENDERSON: Yes.

MR. BROWN: -- or garbage?

MS. HENDERSON: Produced documents.

A. Okay.

Q. (By Ms. Henderson) And this is a check from Gilda Dominguez. She's one of your coworkers; is that





PLAINTIFF'S EXHIBIT

17

right?

A. Uh-huh.

Q. Also petty cash, I guess.

A. For $11.

Q. For $11. And it shows -- also it had a received stamp, 8- --

A. Oh, same date.

Q. -- -18-09.

A. Okay.

Q. And she wrote the check on 8-18-09; is that right?

A. Yes.

Q. So would that be another example of --

A. Yes.

Q. -- writing a check for petty cash?

A. Yes.

(Exhibit No. 8 marked)

Q. (By Ms. Henderson) And then Exhibit No. 8 is another petty cash check?

MR. BROWN: Is this from produced documents?

MS. HENDERSON: Yes, produced documents.

A. Yes.

Q. (By Ms. Henderson) And this is from Maria Flores; is that right?

A. Yes.

Q. For $20; is that right?

A. Yes.

Q. Also on the 18th of --

A. Yes.

Q. -- August, 2009.

A. Yes.

Q. And she put a notation, petty cash --

A. Petty cash.

Q. -- as well. And that was also -- has a received stamp, 8-18-09.

A. Right.

Q. Is there -- was there an event happening that day --

A. Oh, we --

Q. -- that you know of?

A. It could've been for, like, just the -- cause we couldn't get to our own bank to get it so we can go put gas in the car or maybe to get lunch or some -- I'm not sure on those.

Q. I realize that's two years ago. But it just -- it striked (sic) me as interesting, though.

A. Oh, okay.

Q. You all had --

A. Yeah.

Q. -- money out for petty cash pretty much the same

GOLDIE VAN GULDEN
2100 WILLOWBEND DRIVE APT. 20A
ROUND ROCK, TX 78664

256

88-8778/3119

8-27-09
Date

Pay to the order of _T HPM_____ $ 40.00

Forty + no/100 _____ Dollars

P.O. BOX 201039
AUSTIN, TEXAS 78720-1039
512-116-7540
TEXANS CREDIT UNION, RICHARDSON, TX

**TEXANS**
CREDIT UNION

For _Petty Cash_          Goldie van Gulden          MP

⑆311987786⑆   20003909190⑈0256

Harland Clarke

8/18/09

PLAINTIFF'S
EXHIBIT

18

A.   Usually it -- sometimes.  I'm sorry, Monday -- Tuesdays are a lighter mail day, so sometimes she may not go to the bank till the next day.

Q.   Okay.  **Why is the cash kept separately and not deposited on an almost daily basis like the checks are?**

A.   I don't know.  We've just been doing that since the inception.

Q.   **Who told you to do it?**

A.   I don't know.  It -- it's always been done that way since the beginning.

Q.   **Wouldn't it be a prudent business practice to take all the money to the bank at one time?**

A.   That could be.  Yes.  We occasionally use petty cash to pay for birthday lunches at the office.  So if the cash was not there at that time, we wouldn't have anything in that box.

Q.   **Okay.  So the cash that you get in -- well, let me back up.**

**You say you put it in a box in your office upstairs.**

A.   Um-hmm.

Q.   **Is there a lock on that box?**

A.   It's a -- it's a locked cash box, yes.

Q.   **Who has the key to that box?**

A.   I don't keep it locked, but it's a locked cash

PLAINTIFF'S
EXHIBIT

19

-- it's a cash box that has a lock on it and it goes into my file cabinet.

Q. So anyone could go in there and take that cash.

A. Anyone could go in there and take that cash.

Q. Okay. And you mentioned birthday lunches. You use that cash to pay for office staff birthday lunches?

A. Yes.

Q. Do you think that's a reasonable and prudent use of that money that was donated to help slain troopers' families?

A. Yes.

Q. Why?

A. Because it's an administrative expense. It's a meal and entertainment expense.

Q. Okay. I'm going to hand you what I'm marking Exhibit 29.

(Exhibit No. 29 marked)

Q. (BY MS. MEINKE) It is a check, looks like it was written to the Highway Patrol Museum on Goldie Van Gilden's account. And in the memo it says "Petty cash" and it's for $40. Can you please explain to me what that was?

A. She cashed a personal check and we took out $40 from the petty cash, and then deposited her check in the bank so that she didn't have to run to an ATM machine.

Q.   So let's say we finally get the rain that we need, there's a huge flood, and the Oakland Avenue office is completely washed out.

Would you still be able to retrieve all your company's financial information?

A.   Yes.

Q.   Do you have any type of video surveillance in any of your offices to protect the assets of the company or any kind of cash or monetary --

A.   No.  We have an alarm system, but that's all we have.

Q.   Do you do background checks on your employees?

A.   No.

Q.   Have you ever?

A.   No.  The employees in my office have been there -- most of them have been there for ten to 15 years.

Q.   Okay.  Did you ever do a background check when they first started?

A.   No.

Q.   What about the telemarketers?  Do you do background checks on them?

A.   I don't deal with the telemarketers.

Q.   Do you recognize the name Larry Phillips?

A.   I believe he works in the Services magazine



PLAINTIFF'S
EXHIBIT

STATE OF TEXAS     §
                          §
COUNTY OF TRAVIS    §

# AFFIDAVIT OF SUSAN DOWNMAN

Before me, the undersigned authority, personally appeared Susan Downman, who being by me duly sworn, deposed as follows:

1. My name is Susan Downman. I am over the age of eighteen and I reside in Travis County, Texas. I have never been convicted of a crime, and I am fully competent to make this affidavit. I have personal knowledge of the facts stated herein. My business address is 300 West 15th Street, Austin, Texas 78701.

2. I am employed as an investigator with the Charitable Trusts Section of the Consumer Protection Division of the Office of the Texas Attorney General. In this capacity, I have assisted with the Division's investigation of the Texas Highway Patrol Association and Texas Highway Patrol Museum (hereafter "Association" and Museum"). Specifically, I reviewed copies of Forms 990 (Return of Organization Exempt from Income Tax) filed by the Association and the Museum with the IRS. The Form 990 is an annual return filed by certain federally tax-exempt organizations, which provides information regarding the reporting organization's mission, programs and finances.

3. In my capacity as investigator in the Charitable Trusts Section of the Consumer Protection Division, I also serve as custodian for all records filed pursuant to the Texas Law Enforcement Telephone Solicitation Act, Tex. Bus. & Comm. Code Ann. §§ 303.001 - 054 (hereafter the "Act"). The Act regulates certain law enforcement related organizations that engage in telephone solicitation in Texas by requiring these organizations, prior to soliciting contributions from the public, to file a registration statement with the Office of the Attorney General.

PLAINTIFF'S EXHIBIT 21

4. The purpose of this affidavit is to set forth information regarding the registration status of the Association and Museum, as well as the content of the Form 990s. With the exception of donor names and addresses, information reported on the Form 990 is public information. Copies of the public portion of the Forms 990 are available from a variety of sources, including Philanthropic Research, Inc., doing business as GuideStar, which is the source for the returns attached to this affidavit. For reference purposes, copies of IRS Forms 990 for the Texas Highway Patrol Association (EIN 74-2573422) for calendar years 2007, 2008 and 2009 are attached hereto as Exhibits A, B and C, respectively, and Forms 990 for the Texas Highway Patrol Museum (EIN 74-2639283) for calendar years 2007, 2008 and 2009 are attached hereto as Exhibits D, E and F, respectively. The 2009 returns are currently the most recent returns available for the Association and Museum through GuideStar. Similarly, pursuant to Tex. Bus. & Comm. Code Ann. §303.003, with the exception of documents that identify the donors to a law-enforcement related charitable organization, any document required to be filed with the attorney general under this Act is public information.

## IRS Form 990s for the Texas Highway Association

5. The Association is a Texas nonprofit corporation and tax-exempt business league under Section 501(c)(6) of the Internal Revenue Code. As such, the Association's primary exempt purpose as stated on its Form 990 is to promote awareness of Texas Highway Patrol Officers as a profession. The Association also reports providing specific programs, including dental insurance benefits to members, financial assistance (death benefits) to the families of troopers killed in the line of duty, and public service announcements and other remembrances of slain troopers, in furtherance of its exempt purpose. [Exhibits A, B and C, Part III (Statement of Program Service Accomplishments)]

6. The Association receives revenue from multiple sources including public contributions and membership dues. Total annual revenue reported by the Association for calendar years 2007 through 2009, including revenue from public contributions and membership dues is set forth below:

| | 2007 | 2008 | 2009 |
|---|---|---|---|
| Public contributions | $8,255 | $15,322 | $12,524 |
| Membership dues | 1,524 | 2,059 | 1,705 |
| Other revenue | 1,460 | 2,656 | 377 |
| Total revenue: | $11,239 | $20,037 | $14,606 |

[Exhibit A, Part I and Exhibits B and C, Part VIII]

7. On its 2007 Form 990, the Association reported $20,957 in total expenses, $17,300 of which are designated as program-related. [Exhibit A, Part II, Line 44(A) and (B)] The program-related expenses include a $10,000 payment to Stephanie Holmes, widow of Trooper Todd Holmes of Gilmer, Texas, who was killed in the line of duty on March 14, 2007, and $3,591 in other "death, sickness and hospitalization expenses." [Exhibit A, Part II, Lines 23 and 24]

8. In 2008, the Association reported $17,393 in total expenses, but did not designate which expenses were program-related. The return reflects, however, a $10,000 expense for death benefits paid to Michaela Burns, widow of Trooper James Scott Burns of Jefferson, Texas, who was killed in the line of duty on April 29, 2008 [Exhibit B, Schedule I, Part III.], and $3,242 in other benefits paid to members. [Exhibit B, Part IX, Line 4]

9. In 2009, the Association reported $8,557 in total expenses, but did not designate which expenses were program-related. $3,284 of this amount is noted as benefits paid to members. [Exhibit C, Part IX, Line 4]

10. From 2007 to 2009, the Association was governed by a Board of Director composed of the following individuals: Gregg Greer, Tim Tierney, Fred Riojas, Ted Riojas, C. R. Villalva, Mark Lockridge, Robert Bernard, Jr., and James Colunga. In all years, the Association reported that it paid zero compensation to any of its officers, directors, and key employees. [Exhibit A, Part V-A and Exhibits B and C, Part VII, Column D]

11. The Association's 990 balance sheet reflects the following assets, liabilities and fund balances by year:

|  | 2007 | 2008 | 2009 |
|---|---|---|---|
| Assets | $765,850 | $898,351 | $901,715 |
| Liabilities | 18,014 | 15,786 | 13,101 |
| Net Assets | $879,921 | $882,565 | $888,614 |

[Exhibit A, Part IV, Exhibits B and C, Part X]

12. These balance sheets evidence that the Association's primary asset consists of notes and loans receivable from related organizations, specifically accounts receivable from the Museum and from THPA Services, Inc. ("Services"). An organization is classified as "related" to the Association if it is controlled by the Association or controlled by the same person or persons as the Association. According to the 990, Services is a wholly-owned subsidiary of the Association, which provides magazine publishing and advertising sales to the Association.

13. The 990s evidence that Services owed the Association $637,973 in 2007, 2008 and 2009; the amount of this account receivable has remained unchanged during the time period examined. Similarly, the 990s evidence that the Museum owed the Association $126,819 in 2007, $39,254 in 2008 and $34,515 in 2009. [Exhibit A, Statement 5 and Exhibits B and C, Schedule R, Part V.]

IRS Form 990s for to the Texas Highway Patrol Museum

14. The Museum (formerly known as the Texas Highway Patrol Association Hall of Fame and Museum) is a Texas nonprofit corporation and tax-exempt charitable organization as described in Section 501(c)(3) of the Internal Revenue Code. The Museum's primary exempt purpose as stated on its Forms 990 is the "establishment and operation of a Hall of Fame and Museum to honor Texas Highway Patrol Officers and to educate the general public." [Exhibits D, E and F, Part III]

15. The Museum derives revenue primarily from public contributions. Total annual revenue reported by the Museum for calendar years 2007 through 2009, including revenue from public contributions, is set forth below:

|  | 2007 | 2008 | 2009 |
|---|---|---|---|
| Public contributions | $1,656,223 | $1,746,658 | $2,137,515 |
| Other revenue | 42,773 | 76,659 | 78,130 |
| Total revenue: | $1,708,996 | $1,823,317 | $2,215,645 |

[Exhibit D, Part I and Exhibits E and F, Part VIII]

16. As a charity, the IRS requires the Museum to allocate which portion of its expenses are program-related, meaning those expenses which serve to further the organization's charitable purpose. The Museum is further required to allocate the remaining expenses between management and fundraising functions. Below are the Museum's expenses from 2007 through 2009, as reported for each category.

|  | 2007 | 2008 | 2009 |
|---|---|---|---|
| Program service | $696,361 | $694,049 | $839,968 |
| Management | 471,785 | 435,497 | 514,527 |

| | | | |
|---|---|---|---|
| Fundraising | 576,477 | 594,997 | 714,471 |
| Total Expenses: | $1,744,623 | $1,724,543 | $2,068,966 |

[Statement of Functional Expenses, Exhibit D, Part II, Line 44 and Exhibits E and F, Part IX, Line 25] In each year, expenses allocated to program services represent 40% of the Museum's total expenses, while management and fundraising expenses represent approximately 25% and 35% of total expenses, respectively.

17. With respect to its charitable mission, the Museum reported that the total amount of its program service expenses each year were to support the operation of the Museum and the following specific programs:

"Among the specific exhibits presented is the Hall of Honor, a memorial to the officers who lost their lives in the line of duty. Also presented is the History Hall, which is designed to educate the general public about the rich history of the Texas Highway Patrol."

"The organization also continued to present educational programs to students specifically targeting the hazards of driving under the influence of alcohol."
[Exhibits D, E and F, Part III]

18. From 2007 to 2009, the Museum was governed by a Board of Directors identical to the Board of the Association, composed of the following individuals: Gregg Greer, Tim Tierney, Fred Riojas, Ted Riojas, C. R. Villalva, Mark Lockridge, Robert Bernard, Jr., and James Colunga. The 990s evidence that the Museum provided compensation to certain officers and key employees. Specifically, the Museum paid its Executive Vice-President, Tim Tierney, compensation of $139,118 in 2007, $137,076 in 2008 and $118,302 in 2009. The Museum's 990s further evidence that Tim

Tierney received compensation from a related organization of $56,350 in 2008, and $76,091 in 2009. The Museum also paid its Director of Marketing, C. R. Villalva, $156,738 in 2007, $163,075 in 2008 and $211,190 in 2009. [Exhibit D, Part V-A and Exhibits E and F, Part VII.]  The 2009 Form 990 further discloses that C. R. Villalva is paid wages each year in an amount equal to 10% of annual fundraising revenue. [Exhibit F, Schedule J, Part III.]

19. The Museum's 990 Balance Sheet reports the following assets, liabilities and fund balances by year:

|  | 2007 | 2008 | 2009 |
|---|---|---|---|
| Assets | $928,633 | $942,406 | $978,897 |
| Liabilities | 372,695 | 287,692 | 177,504 |
| Net Assets | $555,938 | $654,714 | $801,393 |

[Exhibit D, Part IV (Balance Sheet), Exhibits E and F, Part X (Balance Sheet)]

20. The Museum's 990s also discloses the amounts owed to the Association as stated in Paragraph 10, above. The Museum's 990s further evidence other liabilities to THPA Services, Inc. Specifically, the Museum owed THPA Services, Inc., $10,247 in 2007, $66,787 in 2008 and $46,187 in 2009. [Exhibit D, Statement 12 and Exhibits E and F, Schedule R, Part X]

Registration by the Museum under the Texas Law Enforcement Telephone Solicitation Act

21. The Museum filed its initial registration with the Office of Attorney General in 2000. The Museum has renewed its registration annually and the most recent registration on file is dated June 7, 2011. On the 2011 registration, in response to items numbered 12 and 14, requesting the total amount of contributions and total fundraising costs for the preceding fiscal year, the Museum referenced an unaudited financial statement that was not included with the submitted materials.

[Exhibit G, Registration Form, Page 3] On August 18, 2011, this office requested in writing a copy of the unaudited financial statement and clarification regarding the correct amounts for those items. [Exhibit H] Mr. Tim Tierney responded by letter dated August 23, 2011, which stated in pertinent part: "I contacted our CPA and have attached the Statement of Revenues and Expenses as well as a Balance Sheet. I was informed that of the total expenses, approximately 1/3 is related to fundraising. Thus...item 14 is $666,026.39." The Statement of Revenues and Expenses provided by Mr. Tierney indicates total Museum expenses of $1,998,278.99. The expenses include not only salaries for telemarketing services, but also a wide range of expenses relating to general operations such as accounting fees, office supplies, and rent. According to Mr. Tierney's letter, all of these expenses were included in the calculation of fundraising costs for the Museum. [Exhibit I]

Registration by the Association under the Texas Law Enforcement Telephone Solicitation Act

22. The Association filed its initial registration under the Act with the Office of Attorney General in 2003. On May 8, 2009, this office mailed a renewal notice to Brown & Schaeffer, P.C., a law firm which typically handles the Association's registration filings. [Exhibit J] On May 13, 2009, a legal assistant from Brown & Schaeffer, P.C. advised me the Association was no longer conducting fundraising or solicitations and inquired about the need to register. [Exhibit K] The law firm then provided this office with a letter stating the Association "now solicits no contributions and receives no funding from telephone solicitation activities." [Exhibit L] Based on this representation, this office closed the registration file for the Association.

23. Further affiant sayeth not.



Susan Downman
Investigator, Charitable Trusts Section
Consumer Protection & Public Health Division
Office of the Attorney General

SWORN TO AND SUBSCRIBED before me on this _____ day of December, 2011, to certify which, witness my hand and seal.

LINDA VELASQUEZ
Notary Public
STATE OF TEXAS
Commission Exp. 07-28-2014
Notary without Bond

Notary Public, State of Texas

# EXHIBIT A

Form **990**

Department of the Treasury
Internal Revenue Service

# Return of Organization Exempt From Income Tax

Under section 501(c) 527 or 4947(a)(1) of the Internal Revenue Code (except black lung benefit trust or private foundation)

▶ The organization may have to use a copy of this return to satisfy state reporting requirements

OMB No 1545-0047

**2007**

Open to Public Inspection

ENVELOPE POSTMARK DATE OCT 3 0 2008

**A** For the 2007 calendar year, or tax year beginning _____ and ending _____

| **B** Check if applicable | **C** Name of organization | **D** Employer identification number |
|---|---|---|
| ☐ Address change | *Please use IRS label or print or type See Specific Instructions* | |
| ☐ Name change | Texas Highway Patrol Association | 74-2573422 |
| ☐ Initial return | Number and street (or P O box if mail is not delivered to street address) · Room/suite | **E** Telephone number |
| ☐ Termination | 501 Oakland Avenue | (512) 491-9117 |
| ☐ Amended return | City or town, state or country, and ZIP + 4 | **F** Accounting method: ☒ Cash ☐ Accrual |
| ☐ Application pending | Austin, TX 78703-5113 | ☐ Other (specify) ▶ |

● Section 501(c)(3) organizations and 4947(a)(1) nonexempt charitable trusts must attach a completed Schedule A (Form 990 or 990-EZ)

**G** Website ▶ WWW.THPA.ORG

**J** Organization type (check only one) ▶ ☒ 501(c) ( 6 ) ◀ (insert no) ☐ 4947(a)(1) or ☐ 527

**K** Check here ▶ ☐ if the organization is not a 509(a)(3) supporting organization and its gross receipts are normally not more than $25,000 A return is not required, but if the organization chooses to file a return, be sure to file a complete return

**H and I are not applicable to section 527 organizations**

**H(a)** Is this a group return for affiliates? ☐ Yes ☒ No
**H(b)** If "Yes," enter number of affiliates ▶ N/A
**H(c)** Are all affiliates included? N/A ☐ Yes ☐ No (If "No," attach a list)
**H(d)** Is this a separate return filed by an organization covered by a group ruling? ☐ Yes ☒ No
**I** Group Exemption Number ▶ N/A
**M** Check ▶ ☒ if the organization is **not** required to attach Sch B (Form 990, 990-EZ, or 990-PF)

**L** Gross receipts Add lines 6b, 8b, 9b, and 10b to line 12 ▶ | 15,703.

## Part I Revenue, Expenses, and Changes in Net Assets or Fund Balances

| | | | |
|---|---|---|---|
| 1 | Contributions, gifts, grants, and similar amounts received | | |
| a | Contributions to donor advised funds | 1a | |
| b | Direct public support (not included on line 1a) | 1b | 8,255. |
| c | Indirect public support (not included on line 1a) | 1c | |
| d | Government contributions (grants) (not included on line 1a) | 1d | |
| e | Total (add lines 1a through 1d) (cash $ 8,255. noncash $ _____ ) | 1e | 8,255. |
| 2 | Program service revenue including government fees and contracts (from Part VII, line 93) | 2 | |
| 3 | Membership dues and assessments | 3 | 1,524. |
| 4 | Interest on savings and temporary cash investments | 4 | 75. |
| 5 | Dividends and interest from securities | 5 | 5,825. |
| 6 a | Gross rents | 6a | |
| b | Less rental expenses | 6b | |
| c | Net rental income or (loss) Subtract line 6b from line 6a | 6c | |
| 7 | Other investment income (describe ▶ ) | 7 | |

RECEIVED NOV 1 0 2008 OGDEN, UT

1064 CSC

SCANNED DEC 0 2 2008

| 8 a | Gross amount from sales of assets other than inventory | (A) Securities | (B) Other | |
|---|---|---|---|---|
| | | 24. 8a | | |
| b | Less cost or other basis and sales expenses | 4,464. 8b | | |
| c | Gain or (loss) (attach schedule) | -4,440. 8c | | |
| d | Net gain or (loss) Combine line 8c, columns (A) and (B) STMT 1 | | | 8d | -4,440. |

| 9 | Special events and activities (attach schedule) If any amount is from gaming, check here ▶ ☐ | | |
|---|---|---|---|
| a | Gross revenue (not including $ _____ of contributions reported on line 1b) | 9a | |
| b | Less direct expenses other than fundraising expenses | 9b | |
| c | Net income or (loss) from special events Subtract line 9b from line 9a | 9c | |
| 10 a | Gross sales of inventory, less returns and allowances | 10a | |
| b | Less cost of goods sold | 10b | |
| c | Gross profit or (loss) from sales of inventory (attach schedule) Subtract line 10b from line 10a | 10c | |
| 11 | Other revenue (from Part VII, line 103) | 11 | |
| 12 | Total revenue Add lines 1e, 2, 3, 4, 5, 6c, 7, 8d, 9c, 10c, and 11 | 12 | 11,239. |

**Expenses**

| 13 | Program services (from line 44, column (B)) | 13 | 17,300. |
|---|---|---|---|
| 14 | Management and general (from line 44, column (C)) | 14 | 1,829. |
| 15 | Fundraising (from line 44, column (D)) | 15 | 1,828. |
| 16 | Payments to affiliates (attach schedule) | 16 | |
| 17 | Total expenses Add lines 16 and 44, column (A) | 17 | 20,957. |

**Net Assets**

| 18 | Excess or (deficit) for the year Subtract line 17 from line 12 | 18 | -9,718. |
|---|---|---|---|
| 19 | Net assets or fund balances at beginning of year (from line 73, column (A)) | 19 | 889,639. |
| 20 | Other changes in net assets or fund balances (attach explanation) | 20 | 0. |
| 21 | Net assets or fund balances at end of year Combine lines 18, 19, and 20 | 21 | 879,921. |

723001 12-27-07 LHA For Privacy Act and Paperwork Reduction Act Notice, see the separate instructions.

Form **990** (2007)

| **Part II** Statement of Functional Expenses | | | | | |
|---|---|---|---|---|---|

All organizations must complete column (A) Columns (B), (C), and (D) are required for section 501(c)(3) and (4) organizations and section 4947(a)(1) nonexempt charitable trusts but optional for others

| Do not include amounts reported on line 6b, 8b, 9b, 10b, or 16 of Part I | | (A) Total | (B) Program services | (C) Management and general | (D) Fundraising |
|---|---|---|---|---|---|
| 22a Grants paid from donor advised funds (attach schedule) (cash $ 0. noncash $ 0.) If this amount includes foreign grants, check here ▶ ☐ | 22a | | | | |
| 22b Other grants and allocations (attach schedule) (cash $ 0. noncash $ 0.) If this amount includes foreign grants, check here ▶ ☐ | 22b | | | | |
| 23 Specific assistance to individuals (attach schedule) STATEMENT 2 | 23 | 10,000. | 10,000. | | |
| 24 Benefits paid to or for members (attach schedule) STATEMENT 3 | 24 | 3,591. | 3,591. | | |
| 25a Compensation of current officers, directors, key employees, etc listed in Part V-A | 25a | 0. | 0. | 0. | 0. |
| b Compensation of former officers, directors, key employees, etc listed in Part V-B | 25b | 0. | 0. | 0. | 0. |
| c Compensation and other distributions, not included above, to disqualified persons (as defined under section 4958(f)(1)) and persons described in section 4958(c)(3)(B) | 25c | | | | |
| 26 Salaries and wages of employees not included on lines 25a, b, and c | 26 | | | | |
| 27 Pension plan contributions not included on lines 25a, b, and c | 27 | | | | |
| 28 Employee benefits not included on lines 25a - 27 | 28 | | | | |
| 29 Payroll taxes | 29 | | | | |
| 30 Professional fundraising fees | 30 | | | | |
| 31 Accounting fees | 31 | 3,188. | 1,594. | 797. | 797. |
| 32 Legal fees | 32 | 55. | 28. | 14. | 13. |
| 33 Supplies | 33 | | | | |
| 34 Telephone | 34 | | | | |
| 35 Postage and shipping | 35 | | | | |
| 36 Occupancy | 36 | 4,073. | 2,037. | 1,018. | 1,018. |
| 37 Equipment rental and maintenance | 37 | | | | |
| 38 Printing and publications | 38 | | | | |
| 39 Travel | 39 | | | | |
| 40 Conferences, conventions, and meetings | 40 | | | | |
| 41 Interest | 41 | | | | |
| 42 Depreciation, depletion, etc. (attach schedule) | 42 | | | | |
| 43 Other expenses not covered above (itemize): | | | | | |
| a SPECIAL EVENTS | 43a | 50. | 50. | | |
| b | 43b | | | | |
| c | 43c | | | | |
| d | 43d | | | | |
| e | 43e | | | | |
| f | 43f | | | | |
| g | 43g | | | | |
| 44 Total functional expenses  Add lines 22a through 43g  (Organizations completing columns (B)-(D), carry these totals to lines 13-15) | 44 | 20,957. | 17,300. | 1,829. | 1,828. |

Joint Costs. Check ▶ ☐ if you are following SOP 98-2

Are any joint costs from a combined educational campaign and fundraising solicitation reported in (B) Program services?   ▶ ☐ Yes ☒ No

If "Yes," enter (i) the aggregate amount of these joint costs $ N/A , (ii) the amount allocated to Program services $ N/A .
(iii) the amount allocated to Management and general $ N/A , and (iv) the amount allocated to Fundraising $ N/A

723011
12-27-07

Form **990** (2007)

| Part III | Statement of Program Service Accomplishments *(See the instructions )* |
|---|---|

Form 990 is available for public inspection and, for some people, serves as the primary or sole source of information about a particular organization How the public perceives an organization in such cases may be determined by the information presented on its return  Therefore, please make sure the return is complete and accurate and fully describes, in Part III, the organization's programs and accomplishments

What is the organization's primary exempt purpose?  ▶  __SEE STATEMENT 4__

All organizations must describe their exempt purpose achievements in a clear and concise manner  State the number of clients served, publications issued, etc  Discuss achievements that are not measurable  (Section 501(c)(3) and (4) organizations and 4947(a)(1) nonexempt charitable trusts must also enter the amount of grants and allocations to others.)

**Program Service Expenses**
(Required for 501(c)(3) and (4) orgs , and 4947(a)(1) trusts, but optional for others )

**a** PROMOTED AWARENESS OF TEXAS HIGHWAY PATROL OFFICERS AS A PROFESSION

(Grants and allocations       $                                        ) If this amount includes foreign grants, check here  ▶ ☐       **3,709.**

**b** PROVIDED DENTAL INSURANCE BENEFITS TO MEMBERS

(Grants and allocations       $                                        ) If this amount includes foreign grants, check here  ▶ ☐       **3,591.**

**c** PROVIDED FINANCIAL ASSISTANCE (DEATH BENEFITS) TO THE FAMILIES OF TROOPERS KILLED IN THE LINE OF DUTY

(Grants and allocations       $                                        ) If this amount includes foreign grants, check here  ▶ ☐       **10,000.**

**d** PROVIDED PUBLIC SERVICE ANNOUNCEMENTS AND OTHER REMBRANCES OF SLAIN TROOPERS

(Grants and allocations       $                                        ) If this amount includes foreign grants, check here  ▶ ☐

**e** Other program services (attach schedule)

(Grants and allocations       $                                        ) If this amount includes foreign grants, check here  ▶ ☐

**f** Total of Program Service Expenses (should equal line 44, column (B), Program services)   ▶       **17,300.**

Form **990** (2007)

723021
12-27-07

13481027 000078                2007.06010 TEXAS HIGHWAY PATROL ASSOCI 30104005

| Part IV | Balance Sheets *(See the instructions.)* | | | | |
|---|---|---|---|---|---|

**Note:** *Where required, attached schedules and amounts within the description column should be for end-of-year amounts only*

| | | | | **(A)** Beginning of year | | **(B)** End of year |
|---|---|---|---|---|---|---|
| **Assets** | 45 | Cash - non-interest-bearing | | 7,092. | 45 | 11,215. |
| | 46 | Savings and temporary cash investments | | 32,393. | 46 | 58,778. |
| | 47 a | Accounts receivable | 47a | | | |
| | b | Less: allowance for doubtful accounts | 47b | | 47c | |
| | 48 a | Pledges receivable | 48a | | | |
| | b | Less: allowance for doubtful accounts | 48b | | 48c | |
| | 49 | Grants receivable | | | 49 | |
| | 50 a | Receivables from current and former officers, directors, trustees, and key employees | | | 50a | |
| | b | Receivables from other disqualified persons (as defined under section 4958(f)(1)) and persons described in section 4958(c)(3)(B) | | | 50b | |
| | 51 a | Other notes and loans receivable | 51a | 765,850. | | |
| | b | Less: allowance for doubtful accounts STMT 5 | 51b | 806,672. | 51c | 765,850. |
| | 52 | Inventories for sale or use | | | 52 | |
| | 53 | Prepaid expenses and deferred charges | | | 53 | |
| | 54 a | Investments - publicly-traded securities ▶ ☐ Cost ☐ FMV | | | 54a | |
| | b | Investments - other securities ▶ ☐ Cost ☐ FMV | | | 54b | |
| | 55 a | Investments - land, buildings, and equipment: basis | 55a | | | |
| | b | Less: accumulated depreciation | 55b | | 55c | |
| | 56 | Investments - other | | | 56 | |
| | 57 a | Land, buildings, and equipment: basis | 57a | | | |
| | b | Less: accumulated depreciation | 57b | | 57c | |
| | 58 | Other assets, including program-related investments (describe ▶ SEE STATEMENT 6 ) | | 63,547. | 58 | 62,092. |
| | 59 | **Total assets** (must equal line 74). Add lines 45 through 58 | | 909,704. | 59 | 897,935. |
| **Liabilities** | 60 | Accounts payable and accrued expenses | | 1,176. | 60 | 1,176. |
| | 61 | Grants payable | | | 61 | |
| | 62 | Deferred revenue | | | 62 | |
| | 63 | Loans from officers, directors, trustees, and key employees   STMT 7 | | 6,705. | 63 | 6,705. |
| | 64 a | Tax-exempt bond liabilities | | | 64a | |
| | b | Mortgages and other notes payable | | | 64b | |
| | 65 | Other liabilities (describe ▶ SEE STATEMENT 8 ) | | 12,184. | 65 | 10,133. |
| | 66 | **Total liabilities.** Add lines 60 through 65 | | 20,065. | 66 | 18,014. |
| **Net Assets or Fund Balances** | | Organizations that follow SFAS 117, check here ▶ ☒ and complete lines 67 through 69 and lines 73 and 74. | | | | |
| | 67 | Unrestricted | | 889,639. | 67 | 879,921. |
| | 68 | Temporarily restricted | | | 68 | |
| | 69 | Permanently restricted | | | 69 | |
| | | Organizations that do not follow SFAS 117, check here ▶ ☐ and complete lines 70 through 74. | | | | |
| | 70 | Capital stock, trust principal, or current funds | | | 70 | |
| | 71 | Paid-in or capital surplus, or land, building, and equipment fund | | | 71 | |
| | 72 | Retained earnings, endowment, accumulated income, or other funds | | | 72 | |
| | 73 | Total net assets or fund balances. Add lines 67 through 69 or lines 70 through 72 (Column (A) must equal line 19 and column (B) must equal line 21) | | 889,639. | 73 | 879,921. |
| | 74 | **Total liabilities and net assets/fund balances.** Add lines 66 and 73 | | 909,704. | 74 | 897,935. |

Form **990** (2007)

723031
12-27-07

**Part IV-A** Reconciliation of Revenue per Audited Financial Statements With Revenue per Return *(See the instructions )*

| | | | |
|---|---|---|---|
| **a** | Total revenue, gains, and other support per audited financial statements | **a** | N/A |
| **b** | Amounts included on line **a** but not on Part I, line 12 | | |
| 1 | Net unrealized gains on investments | **b1** | |
| 2 | Donated services and use of facilities | **b2** | |
| 3 | Recoveries of prior year grants | **b3** | |
| 4 | Other (specify): _____ | **b4** | |
| | Add lines **b1** through **b4** | | |
| **c** | Subtract line **b** from line **a** | **b** | |
| **d** | Amounts included on Part I, line 12, but not on line **a**: | **c** | |
| 1 | Investment expenses not included on Part I, line 6b | **d1** | |
| 2 | Other (specify) _____ | **d2** | |
| | Add lines **d1** and **d2** | **d** | |
| **e** | Total revenue (Part I, line 12) Add lines **c** and **d** ▶ | **e** | |

**Part IV-B** Reconciliation of Expenses per Audited Financial Statements With Expenses per Return

| | | | |
|---|---|---|---|
| **a** | Total expenses and losses per audited financial statements | **a** | N/A |
| **b** | Amounts included on line **a** but not on Part I, line 17 | | |
| 1 | Donated services and use of facilities | **b1** | |
| 2 | Prior year adjustments reported on Part I, line 20 | **b2** | |
| 3 | Losses reported on Part I, line 20 | **b3** | |
| 4 | Other (specify): _____ | **b4** | |
| | Add lines **b1** through **b4** | | |
| **c** | Subtract line **b** from line **a** | **b** | |
| **d** | Amounts included on Part I, line 17, but not on line **a**: | **c** | |
| 1 | Investment expenses not included on Part I, line 6b | **d1** | |
| 2 | Other (specify): _____ | **d2** | |
| | Add lines **d1** and **d2** | **d** | |
| **e** | Total expenses (Part I, line 17) Add lines **c** and **d** ▶ | **e** | |

**Part V-A** Current Officers, Directors, Trustees, and Key Employees (List each person who was an officer, director, trustee, or key employee at any time during the year even if they were not compensated ) *(See the instructions.)*

| (A) Name and address | (B) Title and average hours per week devoted to position | (C) Compensation (If not paid, enter -0-.) | (D) Contributions to employee benefit plans & deferred compensation plans | (E) Expense account and other allowances |
|---|---|---|---|---|
| GREGG GREER<br>TEXAS DPS – HIGHWAY PATROL, P.O. BOX<br>HALLSVILLE, TX 75650 | PRESIDENT & DIRECTOR<br>5.00 | 0. | 0. | 0. |
| TIM TIERNEY<br>501 OAKLAND AVENUE<br>AUSTIN, TX 78703-5113 | EXECUTIVE VICE-PRESIDENT<br>5.00 | 0. | 0. | 0. |
| FRED RIOJAS<br>TEXAS DPS – HIGHWAY PATROL, 1802 N. 1<br>KINGSVILLE, TX 78363 | DIRECTOR<br>5.00 | 0. | 0. | 0. |
| C.R. VILLALVA<br>501 OAKLAND AVENUE<br>AUSTIN, TX 78703-5113 | DIRECTOR OF MARKETING<br>5.00 | 0. | 0. | 0. |
| TED RIOJAS<br>TEXAS DPS – HIGHWAY PATROL, 902 S. LO<br>HARLINGEN, TX 78550 | DIRECTOR<br>5.00 | 0. | 0. | 0. |
| MARK LOCKRIDGE<br>TEXAS DPS – 701 S. IH 35 E<br>WAXAHACHIE, TX 75165 | DIRECTOR<br>5.00 | 0. | 0. | 0. |
| ROBERT BERNARD, JR.<br>TEXAS DPS – 701 S. IH 35 E<br>WAXAHACHIE, TX 75165 | DIRECTOR<br>5.00 | 0. | 0. | 0. |
| JAMES COLUNGA<br>TEXAS DPS – HIGHWAY PATROL, P.O. BOX<br>ENNIS, TX 75120 | DIRECTOR<br>5.00 | 0. | 0. | 0. |

723041 12-27-07

Form **990** (2007)

13481027 000078    2007.06010 TEXAS HIGHWAY PATROL ASSOCI 30104005

## Part V-A | Current Officers, Directors, Trustees, and Key Employees (continued)

| | | Yes | No |
|---|---|---|---|
| 75 a | Enter the total number of officers, directors, and trustees permitted to vote on organization business at board meetings ▶ 6 | | |
| b | Are any officers, directors, trustees, or key employees listed in Form 990, Part V-A, or highest compensated employees listed in Schedule A, Part I, or highest compensated professional and other independent contractors listed in Schedule A Part II-A or II-B, related to each other through family or business relationships? If "Yes," attach a statement that identifies the individuals and explains the relationship(s)    **75b** | | X |
| c | Do any officers, directors, trustees, or key employees listed in Form 990, Part V-A, or highest compensated employees listed in Schedule A, Part I, or highest compensated professional and other independent contractors listed in Schedule A. Part II-A or II-B, receive compensation from any other organizations, whether tax exempt or taxable, that are related to the organization? See the instructions for the definition of "related organization."   SEE STATEMENT 10   **75c** | X | |
| | If "Yes," attach a statement that includes the information described in the instructions. | | |
| d | Does the organization have a written conflict of interest policy?   **75d** | | X |

## Part V-B | Former Officers, Directors, Trustees, and Key Employees That Received Compensation or Other Benefits (If any former officer, director, trustee, or key employee received compensation or other benefits (described below) during the year, list that person below and enter the amount of compensation or other benefits in the appropriate column. See the instructions.)

| (A) Name and address | (B) Loans and Advances | (C) Compensation (if not paid, enter -0-) | (D) Contributions to employee benefit plans & deferred compensation plans | (E) Expense account and other allowances |
|---|---|---|---|---|
| NONE | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

## Part VI | Other Information (See the instructions)

| | | Yes | No |
|---|---|---|---|
| 76 | Did the organization make a change in its activities or methods of conducting activities? If "Yes," attach a detailed statement of each change   **76** | | X |
| 77 | Were any changes made in the organizing or governing documents but not reported to the IRS?   **77** | | X |
| | If "Yes," attach a conformed copy of the changes | | |
| 78 a | Did the organization have unrelated business gross income of $1,000 or more during the year covered by this return?   **78a** | | X |
| b | If "Yes," has it filed a tax return on **Form 990-T** for this year?   N/A   **78b** | | |
| 79 | Was there a liquidation, dissolution, termination, or substantial contraction during the year? If "Yes," attach a statement   **79** | | X |
| 80 a | Is the organization related (other than by association with a statewide or nationwide organization) through common membership, governing bodies, trustees, officers, etc., to any other exempt or nonexempt organization?   **80a** | X | |
| b | If "Yes," enter the name of the organization ▶   SEE STATEMENT 9 | | |
| | and check whether it is ☐ exempt or ☐ nonexempt | | |
| 81 a | Enter direct and indirect political expenditures (See line 81 instructions.)   **81a**   0. | | |
| b | Did the organization file **Form 1120-POL** for this year?   **81b** | | X |

Form **990** (2007)

723161/12-27-07

| **Part VI** | **Other Information** *(continued)* | | | **Yes** | **No** |
|---|---|---|---|---|---|

82 a  Did the organization receive donated services or the use of materials, equipment, or facilities at no charge or at substantially less than fair rental value? — **82a** — X

b  If "Yes," you may indicate the value of these items here. Do not include this amount as revenue in Part I or as an expense in Part II. (See instructions in Part III.) — **82b** N/A

83 a  Did the organization comply with the public inspection requirements for returns and exemption applications? — **83a** X

b  Did the organization comply with the disclosure requirements relating to *quid pro quo* contributions?  N/A — **83b**

84 a  Did the organization solicit any contributions or gifts that were not tax deductible? — **84a** X

b  If "Yes," did the organization include with every solicitation an express statement that such contributions or gifts were not tax deductible? — **84b** X

85 a  *501(c)(4), (5), or (6)* Were substantially all dues nondeductible by members? — **85a** X

b  Did the organization make only in-house lobbying expenditures of $2,000 or less? — **85b** X

If "Yes" was answered to either 85a or 85b, **do not** complete 85c through 85h below unless the organization received a waiver for proxy tax owed for the prior year

c  Dues, assessments, and similar amounts from members — **85c** N/A

d  Section 162(e) lobbying and political expenditures — **85d** N/A

e  Aggregate nondeductible amount of section 6033(e)(1)(A) dues notices — **85e** N/A

f  Taxable amount of lobbying and political expenditures (line 85d less 85e) — **85f** N/A

g  Does the organization elect to pay the section 6033(e) tax on the amount on line 85f? — N/A — **85g**

h  If section 6033(e)(1)(A) dues notices were sent, does the organization agree to add the amount on line 85f to its reasonable estimate of dues allocable to nondeductible lobbying and political expenditures for the following tax year? — N/A — **85h**

86  *501(c)(7) organizations.* Enter: **a** Initiation fees and capital contributions included on line 12 — **86a** N/A

b  Gross receipts, included on line 12, for public use of club facilities — **86b** N/A

87  *501(c)(12) organizations.* Enter: **a** Gross income from members or shareholders — **87a** N/A

b  Gross income from other sources. (Do not net amounts due or paid to other sources against amounts due or received from them.) — **87b** N/A

88 a  At any time during the year, did the organization own a 50% or greater interest in a taxable corporation or partnership, or an entity disregarded as separate from the organization under Regulations sections 301.7701-2 and 301.7701-3? If "Yes," complete Part IX — **88a** X

b  At any time during the year, did the organization, directly or indirectly, own a controlled entity within the meaning of section 512(b)(13)? If "Yes," complete Part XI — **88b** X

89 a  *501(c)(3) organizations.* Enter: Amount of tax imposed on the organization during the year under: section 4911 ▶ N/A , section 4912 ▶ N/A , section 4955 ▶ N/A

b  *501(c)(3) and 501(c)(4) organizations.* Did the organization engage in any section 4958 excess benefit transaction during the year or did it become aware of an excess benefit transaction from a prior year? If "Yes," attach a statement explaining each transaction — N/A — **89b**

c  Enter: Amount of tax imposed on the organization managers or disqualified persons during the year under sections 4912, 4955, and 4958 ▶ 0.

d  Enter: Amount of tax on line 89c, above, reimbursed by the organization ▶ 0.

e  *All organizations.* At any time during the tax year, was the organization a party to a prohibited tax shelter transaction? — **89e** — X

f  *All organizations.* Did the organization acquire a direct or indirect interest in any applicable insurance contract? — **89f** — X

g  *For supporting organizations and sponsoring organizations maintaining donor advised funds.* Did the supporting organization, or a fund maintained by a sponsoring organization, have excess business holdings at any time during the year? — **89g** — X

90 a  List the states with which a copy of this return is filed ▶ TX

b  Number of employees employed in the pay period that includes March 12, 2007 — **90b** — 0

91 a  The books are in care of ▶ TIM TIERNEY    Telephone no ▶ (512) 491-9117

Located at ▶ 501 OAKLAND AVENUE, AUSTIN, TX    ZIP + 4 ▶ 78703-5113

b  At any time during the calendar year, did the organization have an interest in or a signature or other authority over a financial account in a foreign country (such as a bank account, securities account, or other financial account)? If "Yes," enter the name of the foreign country ▶ N/A — **91b** — X

See the instructions for exceptions and filing requirements for **Form TD F 90-22.1**, Report of Foreign Bank and Financial Accounts

Form **990** (2007)

723162 / 12-27-07

13481027 000078        2007.06010 TEXAS HIGHWAY PATROL ASSOCI 30104005

| Part VI | Other Information (continued) | | | | | Yes | No |

c At any time during the calendar year did the organization maintain an office outside of the United States?     | 91c | | X

If "Yes," enter the name of the foreign country ▶  N/A

92 Section 4947(a)(1) nonexempt charitable trusts filing Form 990 in lieu of Form 1041 - Check here
and enter the amount of tax-exempt interest received or accrued during the tax year    ▶ | 92 |     ▶ ☐

| Part VII | Analysis of Income-Producing Activities (See the instructions ) |

Note: Enter gross amounts unless otherwise indicated

| | | Unrelated business income | | Excluded by section 512, 513, or 514 | | (E) Related or exempt function income |
|---|---|---|---|---|---|---|
| | | (A) Business code | (B) Amount | (C) Exclusion code | (D) Amount | |
| 93 | Program service revenue: | | | | | |
| a | | | | | | |
| b | | | | | | |
| c | | | | | | |
| d | | | | | | |
| e | | | | | | |
| f | Medicare/Medicaid payments | | | | | |
| g | Fees and contracts from government agencies | | | | | |
| 94 | Membership dues and assessments | | | | | 1,524. |
| 95 | Interest on savings and temporary cash investments | | | 14 | 75. | |
| 96 | Dividends and interest from securities | | | 14 | 5,825. | |
| 97 | Net rental income or (loss) from real estate: | | | | | |
| a | debt-financed property | | | | | |
| b | not debt-financed property | | | | | |
| 98 | Net rental income or (loss) from personal property | | | | | |
| 99 | Other investment income | | | | | |
| 100 | Gain or (loss) from sales of assets other than inventory | | | 18 | -4,440. | |
| 101 | Net income or (loss) from special events | | | | | |
| 102 | Gross profit or (loss) from sales of inventory | | | | | |
| 103 | Other revenue: | | | | | |
| a | | | | | | |
| b | | | | | | |
| c | | | | | | |
| d | | | | | | |
| e | | | | | | |
| 104 | Subtotal (add columns (B), (D), and (E)) | | 0. | | 1,460. | 1,524. |
| 105 | Total (add line 104, columns (B), (D), and (E)) | | | | | 2,984. |

Note: Line 105 plus line 1e, Part I, should equal the amount on line 12, Part I.   ▶

| Part VIII | Relationship of Activities to the Accomplishment of Exempt Purposes (See the instructions.) |

| Line No. ▼ | Explain how each activity for which income is reported in column (E) of Part VII contributed importantly to the accomplishment of the organization's exempt purposes (other than by providing funds for such purposes) |
|---|---|
| 94 | TAXPAYER IS A MEMBERSHIP ORGANIZATION EXEMPT UNDER CODE SECTION 501(C)(6); SUCH DUES ARE VITAL TO ITS EXEMPT PURPOSES AS A PROFESSIONAL ORGANIZATION. |

| Part IX | Information Regarding Taxable Subsidiaries and Disregarded Entities (See the instructions ) |

| (A) Name, address, and EIN of corporation, partnership, or disregarded entity | (B) Percentage of ownership interest | (C) Nature of activities | (D) Total income | (E) End-of-year assets |
|---|---|---|---|---|
| THPA SERVICES, INC. - 501 OAKLAND AVENUE, AUSTIN, TX 78703 - 74-2709623 | % % % 100% % | MAGAZINE PUBLISHING AND ADVERTISING SALES | 1,185,810. | 92,333. |

| Part X | Information Regarding Transfers Associated with Personal Benefit Contracts (See the instructions ) |

(a) Did the organization, during the year, receive any funds, directly or indirectly, to pay premiums on a personal benefit contract?   ☐ Yes ☒ No

(b) Did the organization, during the year, pay premiums, directly or indirectly, on a personal benefit contract?   ☐ Yes ☒ No

Note: If "Yes" to (b), file Form 8870 and Form 4720 (see instructions).

Form **990** (2007)

723163
12-27-07

**Part XI** | Information Regarding Transfers To and From Controlled Entities. *Complete only if the organization is a controlling organization as defined in section 512(b)(13)*

| | | | | Yes | No |
|---|---|---|---|---|---|
| 106 | Did the reporting organization make any transfers **to** a controlled entity as defined in section 512(b)(13) of the Code? If "Yes," complete the schedule below for each controlled entity. | | | | X |

| | (A)<br>Name, address, of each<br>controlled entity | (B)<br>Employer<br>Identification<br>Number | (C)<br>Description of<br>transfer | (D)<br>Amount of<br>transfer |
|---|---|---|---|---|
| a | TEXAS HIGHWAY PATROL MUSEUM<br>501 OAKLAND AVENUE<br>AUSTIN, TX 78703-5113 | 74-2639283 | SEE STATEMENT 11 | 126,819. |
| b | THPA SERVICES, INC.<br>501 OAKLAND AVENUE<br>AUSTIN, TX 78703-5113 | 74-2709623 | | 637,973. |
| c | TEXAS HIGHWAY PATROL MUSEUM<br>501 OAKLAND AVENUE<br>AUSTIN, TX 78703-5113 | 74-2639283 | ↓ | 2,400. |
| | Totals | | | 767,192. |

| | | | | Yes | No |
|---|---|---|---|---|---|
| 107 | Did the reporting organization **receive** any transfers **from** a controlled entity as defined in section 512(b)(13) of the Code? If "Yes," complete the schedule below for each controlled entity. | | | | X |

| | (A)<br>Name, address, of each<br>controlled entity | (B)<br>Employer<br>Identification<br>Number | (C)<br>Description of<br>transfer | (D)<br>Amount of<br>transfer |
|---|---|---|---|---|
| a | | | | |
| b | | | | |
| c | | | | |
| | Totals | | | |

| | | | Yes | No |
|---|---|---|---|---|
| 108 | Did the organization have a binding written contract in effect on August 17, 2006, covering the interest, rents, royalties, and annuities described in question 107 above? | | | X |

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than officer) is based on all information of which preparer has any knowledge

Please
Sign
Here

Signature of officer ▶    ✓ 10-25-08    Date

▶ TIM TIERNEY, EXECUTIVE VICE-PRESIDENT
Type or print name and title

| Paid<br>Preparer's<br>Use Only | Preparer's<br>signature ▶ | Date<br>10-29-08 | Check if<br>self-<br>employed ▶ ☐ | Preparer's SSN or PTIN (See Gen. Inst. X) |
|---|---|---|---|---|
| | Firm's name (or<br>yours if<br>self-employed),<br>address, and<br>ZIP + 4 | KENNETH C. GORENCE, P.C.<br>▶ P.O. BOX 28279<br>▶ AUSTIN, TX 78755 | EIN ▶ | |
| | | | Phone no ▶ (512) 342-8081 | |

Form **990** (2007)

723164/12-27-07

13481027 000078                    2007.06010 TEXAS HIGHWAY PATROL ASSOCI 30104005

TEXAS HIGHWAY PATROL ASSOCIATION                            74-2573422

| FORM 990 | GAIN (LOSS) FROM PUBLICLY TRADED SECURITIES | | | STATEMENT 1 |

| DESCRIPTION | GROSS SALES PRICE | COST OR OTHER BASIS | EXPENSE OF SALE | NET GAIN OR (LOSS) |
|---|---|---|---|---|
| 2 SH ACCREDITED HOME LEND | 24. | 1,164. | 0. | -1,140. |
| 5,000 SH SYNCRONYS SOFT CORP | 0. | 725. | 0. | -725. |
| 20,000 SH NATIONAL INST COS AMER | 0. | 2,575. | 0. | -2,575. |
| TO FORM 990, PART I, LINE 8 | 24. | 4,464. | 0. | -4,440. |

| FORM 990 | SPECIFIC ASSISTANCE TO INDIVIDUALS | STATEMENT 2 |

| DESCRIPTION | AMOUNT |
|---|---|
| DEATH BENEFIT PAID TO STEPHANIE HOLMES, WIDOW OF GILMER, TEXAS TROOPER TODD HOLMES, KILLED IN THE LINE OF DUTY, MARCH 14, 2007. | 10,000. |
| TOTAL TO FORM 990, PART II, LINE 23 | 10,000. |

| FORM 990 | BENEFITS PAID TO OR FOR MEMBERS | STATEMENT 3 |

| DESCRIPTION | AMOUNT |
|---|---|
| DEATH, SICKNESS, AND HOSPITALIZATION EXPENSES | 3,591. |
| TOTAL TO FORM 990, PART II, LINE 24 | 3,591. |

| FORM 990 | STATEMENT OF ORGANIZATION'S PRIMARY EXEMPT PURPOSE PART III | STATEMENT 4 |

EXPLANATION

TO PROMOTE AWARENESS OF TEXAS HIGHWAY PATROL OFFICERS AS A PROFESSION

TEXAS HIGHWAY PATROL ASSOCIATION                                    74-2573422

---

| FORM 990 | OTHER NOTES AND LOANS RECEIVABLE | STATEMENT 5 |
|---|---|---|

| DESCRIPTION | DOUBTFUL ACCT ALLOWANCE | BALANCE DUE |
|---|---|---|
| A/R - THPA SERVICES, INC. | 0. | 637,973. |
| A/R - NATIONAL POLICE YOUTH ATHLETIC LEAGUE | 0. | 1,058. |
| A/R - THPA HALL OF FAME & MUSEUM | 0. | 126,819. |
| TOTALS INCLUDED ON FORM 990, PART IV, LINE 51 | 0. | 765,850. |

---

| FORM 990 | OTHER ASSETS | STATEMENT 6 |
|---|---|---|

| DESCRIPTION | BEGINNING OF YEAR | END OF YEAR |
|---|---|---|
| DEPOSITS | 1,530. | |
| INVESTMENT IN THPA SERVICES, INC. | 1,000. | 1,000. |
| CASH SURRENDER VALUE OF LIFE INSURANCE | 61,017. | 61,092. |
| TOTAL TO FORM 990, PART IV, LINE 58 | 63,547. | 62,092. |

TEXAS HIGHWAY PATROL ASSOCIATION                                    74-2573422

═══════════════════════════════════════════════════════════════════════════════

FORM 990      LOANS PAYABLE TO OFFICER'S, DIRECTOR'S, ETC.        STATEMENT    7
───────────────────────────────────────────────────────────────────────────────

|                                              | ORIGINAL      |
| LENDER'S NAME AND TITLE                      | LOAN AMOUNT   |

LANE DENTON, FORMER EXECUTIVE DIRECTOR                         6,705.

| DATE OF   MATURITY |                      |               |
| NOTE      DATE     | TERMS OF REPAYMENT   | INTEREST RATE |

                                                             .00%

SECURITY PROVIDED BY BORROWER          PURPOSE OF LOAN

                                       CASH ADVANCES & EXPENSES

|                               | FMV OF        |             |
| DESCRIPTION OF CONSIDERATION  | CONSIDERATION | BALANCE DUE |
|                               |          0.   |     6,705.  |

TOTAL TO FORM 990, PART IV, LINE 63, COLUMN B                   6,705.

═══════════════════════════════════════════════════════════════════════════════

FORM 990                    OTHER LIABILITIES                     STATEMENT    8
───────────────────────────────────────────────────────────────────────────────

|                                     | BEGINNING   |             |
| DESCRIPTION                         | OF YEAR     | END OF YEAR |
| TRUST LIABILITY (GARCIA DEATH BENEFIT) | 12,184.  |    10,133.  |
| TOTAL TO FORM 990, PART IV, LINE 65 |   12,184.   |    10,133.  |

═══════════════════════════════════════════════════════════════════════════════

FORM 990      IDENTIFICATION OF RELATED ORGANIZATIONS            STATEMENT    9
                          PART VI, LINE 80B
───────────────────────────────────────────────────────────────────────────────

| NAME OF ORGANIZATION                   | EXEMPT | NONEXEMPT |
| CITIZENS FOR SPECIAL ARTISTS           |   X    |           |
| NATIONAL POLICE YOUTH ATHLETIC LEAGUE  |   X    |           |
| TEXAS HIGHWAY PATROL MUSEUM            |   X    |           |
| THPA SERVICES, INC.                    |        |     X     |

TEXAS HIGHWAY PATROL ASSOCIATION                                    74-2573422

FORM 990              PART V-A OFFICER COMPENSATION FROM              STATEMENT  10
                           RELATED ORGANIZATIONS

| | | EMPLOYEE | |
| OFFICER'S NAME | COMPENSATION | BENEFIT PLAN CONTRIBUTION | EXPENSE ACCOUNT |

TIM TIERNEY                            47,773.

NAME OF RELATED ORGANIZATION                         EMPLOYER ID NUMBER

THPA SERVICES, INC.                                     74-2709623

RELATIONSHIP BETWEEN ORGANIZATIONS

---

| | | EMPLOYEE | |
| OFFICER'S NAME | COMPENSATION | BENEFIT PLAN CONTRIBUTION | EXPENSE ACCOUNT |

TIM TIERNEY                           139,118.

NAME OF RELATED ORGANIZATION                         EMPLOYER ID NUMBER

TEXAS HIGHWAY PATROL MUSEUM                             74-2639283

RELATIONSHIP BETWEEN ORGANIZATIONS

---

| | | EMPLOYEE | |
| OFFICER'S NAME | COMPENSATION | BENEFIT PLAN CONTRIBUTION | EXPENSE ACCOUNT |

C.R. VILLALVA                         156,738.

NAME OF RELATED ORGANIZATION                         EMPLOYER ID NUMBER

TEXAS HIGHWAY PATROL MUSEUM                             74-2639283

RELATIONSHIP BETWEEN ORGANIZATIONS

| FORM 990 | DESCRIPTION OF TRANSFER<br>PART XI, LINE 106 | STATEMENT 11 |
|---|---|---|

NAME OF CONTROLLED ENTITY

EMPLOYER ID

TEXAS HIGHWAY PATROL MUSEUM

74-2639283

DESCRIPTION OF TRANSFER

REPRESENTS ACCOUNT RECEIVABLE ON THE REPORTING ORGANIZATION'S BOOKS
(12-31-06 BALANCE WAS 167,641; 12-31-07 BALANCE IS 126,819)

NAME OF CONTROLLED ENTITY

EMPLOYER ID

THPA SERVICES, INC.

74-2709623

DESCRIPTION OF TRANSFER

REPRESENTS ACCOUNT RECEIVABLE ON THE REPORTING ORGANIZATION'S BOOKS
(12-31-06 BALANCE WAS 637,973; 12-31-07 BALANCE REMAINS AT 637,973)

NAME OF CONTROLLED ENTITY

EMPLOYER ID

TEXAS HIGHWAY PATROL MUSEUM

74-2639283

DESCRIPTION OF TRANSFER

REPRESENTS OFFICE RENT PAID BY THE REPORTING ORGANIZATION



## SUPPORT

## FOR OUR TROOPER MEMBERS

### Service and protection for

### Texas' finest

---

We are the
# Texas Highway Patrol Association & Museum

A non-profit organization representing the finest group of law enforcers in the nation:

## Texas Highway Patrol officers

Highly trained and specialized, Texas Highway Patrol officers are on the front lines of the most critical issues facing law enforcers in the United States.

Since 1990 we've concentrated our efforts on behalf of these dedicated men and women, providing them with the finest benefits possible. We've worked with the legislature for pay increases, provided scholarships for troopers' children, dental insurance for their families, and we were there with emergency relief for the families left behind when an officer was killed. We also provide the law enforcement community with the profession's most-heralded magazine.

But we don't stop there. We're constantly improving our product and adding exciting new dimensions to the association. For example, we have completed our greatest challenge ever: a vibrant and interactive law enforcement museum honoring the Texas Highway Patrol and the officers who have been killed in the line of duty over the years. The Texas Highway Patrol Museum is located in historic downtown San Antonio at 812 South Alamo Street, just 15 minutes from the Alamo. Our hours are 10am – 4pm Tuesday through Saturday.

It is through our commitment of service to our trooper members that the Texas Highway Patrol Museum distinguishes itself from other organizations and associations in this state.



---

## NOTICE

Dear Supporter:

The Texas Highway Patrol Association and Museum (THPA) welcomes any requests for information from our supporters and will gladly verify the legitimacy of our organization and its fund-raising efforts.

We would like to assure you that this fund-raising program is conducted solely by THPA, which ensures that 100 percent of the funds raised will go directly to our organization and programs. Unlike many other police groups, we take pride in not using outside fund-raising companies, which often take a large portion of the money raised as a service fee.

The Texas Highway Patrol Association and Museum is a non-profit 501(c)(3) organization. Contributions or gifts to the Museum are deductible as charitable contributions for federal income tax purposes.

The Texas Highway Patrol Association and Museum is always willing to answer questions from the public. If you need information on our programs, benefits packages or public service projects, please contact our administrative offices toll-free at:

### 1-800-245-8598

You may also obtain information about the Texas Highway Patrol Association and Museum by contacting the Texas Secretary of State at 1019 Brazos Street, Room 214, Austin, Texas, 78701 or by calling:

1-800-648-9642.

Once again thank you for your support! On behalf of all our members, we wish you and your family a safe and prosperous year.

## ADVERTENCIA

Apreciable Contribuyente:

La Asociación de Patrullas del Estado de Tejas quiere que usted verifique la autenticidad de la asociación, porque sabemos que usted recibe varias peticiones de contribución. Queremos asegurar al contribuyente con cualquier duda que tenga o simplemente para verificar la información que contiene su programa. Estamos a sus órdenes en nuestra oficina central. El número de teléfono se encuentra en el recibo. Por favor no se le olvide mandar su contribucion con la porcion de abajo del recibo para que reciba credito. En nombre de la asociación, muchas gracias por su apoyo y que tenga feliz año en companía de su familia.

Si usted tiene alguna pregunta por favor llame el numero:

### 1-800-245-8598

---

Texas
# HIGHWAY PATROL
### ASSOCIATION & MUSEUM

*Administrative Offices*
501 Oakland Avenue
Austin, Texas 78703-5113
800-245-8598
www.thpm.org

# Texas Highway Patrol Association & Museum

## WHO WE ARE

The Texas Highway Patrol Association and Museum stands as a vibrant and dynamic monument to the brave men and women who make up the extraordinary institution that is the Texas Highway Patrol. The Museum serves to represent the past, present and future contributions of the finest law enforcers in the nation- Texas Highway Patrol Officers.

Highly skilled and specialized, these officers risk their lives daily to serve and protect the people of Texas.

An institution rich with history, tradition, service and sacrifice, our museum educates the public on the true duty and sacrifice put forth by these elite men and women.

Come experience exhibits and program such as: The Hall of Honor; a memorial to the officers who lost their lives in the line of duty, The History Hall, a walk through the history of the Texas Highway Patrol, A Day in the Life of a Trooper photo montage, and several artifacts donated by family of past troopers.

We are pleased to invite you to visit the **Texas Highway Patrol Museum** in San Antonio on 812 South Alamo St. Open Tuesday-Saturday, 10am - 4pm.



For more information about museum programs and events, or to discover how you can support THPA. Please contact the museum at:

**1-800-795-8472**

*or our administrative office at*
501 Oakland Avenue
Austin, TX 78703-5113

**1-800-245-8598**

www.thpm.org

## WHAT WE DO

**Death Benefit Fund:** Since the DPS was established, many officers have been killed in the line of duty. We established the Trooper's Benefit Fund to give financial support to the families left behind when tragedy strikes. Should an officer be killed in the line of duty, the surviving family members will receive $10,000 in immediate assistance.

**Funeral Benefits:** Are offered in conjunction with Dignity Memorial® Funeral, Cremation and Cemetery's Trooper Benefit Program. Members will receive dignified and honorable tributes at no cost for troopers killed in the line of duty. Additional benefits include a funeral protection certificate for the children and grandchildren (valued at $2,500).

**College Scholarship Fund:** THPA firmly believes that a better future for Texas lies in educating our children. The Captain Ed Pringle Scholarship Fund has been established for the children of active members belonging to the Texas Highway Patrol Association. Funds are applied directly to education tuition costs and are awarded once a year. THPA has helped scores of students with their education and is proud of our continuing commitment to our youth.

**Dental Insurance:** THPA is concerned for the health of troopers and their families. This is why we started the Dental Benefits Program. Through this program, THPA pays dental insurance for all members of the association and their families. We want to ensure that troopers stay safe and healthy.

**Texas Highway Patrol Magazine:**
We publish a quarterly magazine that highlights some of the activities and issues involving crime, justice and law enforcement. A wealth of information and entertainment, the magazine is a professional publication that boasts some of the best writers and photographers in law enforcement journalism today. The finest magazine of its kind, the Texas Highway Patrol Magazine is a must for people interested in Texas law enforcement.

**Remember our Friends Project:** THPA provides assistance to Highway Patrol Officers who were shot or seriously injured in the line of duty. THPA strives to assist the families of injured or killed officers whenever we can. Thanks to the Remember Our Friends Project, we raised over $75,000 for Trooper Randall Vetter's family, who was shot and later succumbed to his injuries. THPA also regularly sends the families of slain highway patrol officers to the National Police Memorial in Washington, DC., where all law enforcement officers killed in the line of duty are honored in the annual ceremony.

**Educational Programs:** Since 1999, THPA has sponsored its award-winning **Cruisin' to Coffins** program. *Cruisin' to Coffins* an educational program designed to educate students in grades 9-12 about the hazards of driving while under the influence of alcohol. The program is held in April, Alcohol Awareness month, in order to educate students on this topic before prom and graduation celebrations. The program includes presentations from Texas Highway Patrol officers and volunteer speakers from community organizations such as MADD and the San Antonio Council on Alcohol and Drug Abuse. THPA will soon take this program state-wide. We are also happy to arrange safety education lectures to be given by a State Trooper for schools that call in advance and specify their topic of interest.

**And much, much more!** THPA is involved with many more great projects and continues to add more and more to the list! From benefits to programs to public service announcements, THPA is constantly striving to improve and enhance the lives of highway patrol officers while improving the climate of public safety and law enforcement in Texas.

# Form **8868**

(Rev April 2008)

Department of the Treasury
Internal Revenue Service

## Application for Extension of Time To File an Exempt Organization Return

▶ File a separate application for each return.

OMB No 1545-1709

- If you are filing for an **Automatic 3-Month Extension**, complete only Part I and check this box . . . . . . . . . ▶ ☑
- If you are filing for an **Additional (Not Automatic) 3-Month Extension, complete only Part II** (on page 2 of this form).

**Do not complete Part II unless** you have already been granted an automatic 3-month extension on a previously filed Form 8868.

**Part I**  Automatic 3-Month Extension of Time. Only submit original (no copies needed).

A corporation required to file Form 990-T and requesting an automatic 6-month extension—check this box and complete Part I only . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐

*All other corporations (including 1120-C filers), partnerships, REMICs, and trusts must use Form 7004 to request an extension of time to file income tax returns.*

**Electronic Filing (e-file).** Generally, you can electronically file Form 8868 if you want a 3-month automatic extension of time to file one of the returns noted below (6 months for a corporation required to file Form 990-T). However, you cannot file Form 8868 electronically if (1) you want the additional (not automatic) 3-month extension or (2) you file Forms 990-BL, 6069, or 8870, group returns, or a composite or consolidated Form 990-T. Instead, you must submit the fully completed and signed page 2 (Part II) of Form 8868. For more details on the electronic filing of this form, visit *www.irs.gov/efile* and click on *e-file for Charities & Nonprofits.*

| Type or print | Name of Exempt Organization | Employer Identification number |
|---|---|---|
| File by the due date for filing your return See instructions | **TEXAS HIGHWAY PATROL ASSOCIATION** | 74 : 2573422 |
| | Number, street, and room or suite no. If a P.O. box, see instructions | |
| | **501 OAKLAND AVENUE** | |
| | City, town or post office, state, and ZIP code  For a foreign address, see instructions | |
| | **AUSTIN, TX 78703** | |

**Check type of return to be filed** (file a separate application for each return):

☑ Form 990
☐ Form 990-BL
☐ Form 990-EZ
☐ Form 990-PF

☐ Form 990-T (corporation)
☐ Form 990-T (sec. 401(a) or 408(a) trust)
☐ Form 990-T (trust other than above)
☐ Form 1041-A

☐ Form 4720
☐ Form 5227
☐ Form 6069
☐ Form 8870

- The books are in the care of ▶ **TEXAS HIGHWAY PATROL ASSOCIATION**

Telephone No. ▶ ( __512__ ) __491-9117__     FAX No. ▶ ( __512__ ) __491-6026__

- If the organization does not have an office or place of business in the United States, check this box . . . . . . ▶ ☐
- If this is for a Group Return, enter the organization's four digit Group Exemption Number (GEN)_____ . If this is for the whole group, check this box . . . . . ▶ ☐ . If it is for part of the group, check this box . . . . . . ▶ ☐ and attach a list with the names and EINs of all members the extension will cover.

1   I request an automatic 3-month (6 months for a corporation required to file Form 990-T) extension of time until __AUGUST 15__ , 20 __08__ , to file the exempt organization return for the organization named above  The extension is for the organization's return for:

▶ ☐ calendar year 20 __07__ or
▶ ☐ tax year beginning ........................, 20 ......, and ending ........................, 20 ........

2   If this tax year is for less than 12 months, check reason:  ☐ Initial return  ☐ Final return  ☐ Change in accounting period

| | | | |
|---|---|---|---|
| 3a | If this application is for Form 990-BL, 990-PF, 990-T, 4720, or 6069, enter the tentative tax, less any nonrefundable credits. See instructions. | 3a | $ |
| b | If this application is for Form 990-PF or 990-T, enter any refundable credits and estimated tax payments made  Include any prior year overpayment allowed as a credit. | 3b | $ |
| c | **Balance Due.** Subtract line 3b from line 3a. Include your payment with this form, or, if required, deposit with FTD coupon or, if required, by using EFTPS (Electronic Federal Tax Payment System)  See instructions. | 3c | $ |

**Caution.** If you are going to make an electronic fund withdrawal with this Form 8868, see Form 8453-EO and Form 8879-EO for payment instructions

**For Privacy Act and Paperwork Reduction Act Notice, see Instructions.**

Cat No 27916D

Form **8868** (Rev 4-2008)

Form 8868 (Rev 4-2008)

Page **2**

- If you are filing for an **Additional (Not Automatic) 3-Month Extension**, complete only Part II and check this box . ▶ ☑
- **Note.** Only complete Part II if you have already been granted an automatic 3-month extension on a previously filed Form 8868.
- If you are filing for an **Automatic 3-Month Extension**, complete only Part I (on page 1).

| **Part II** | Additional (Not Automatic) 3-Month Extension of Time. You must file original and one copy. | | |
|---|---|---|---|

| **Type or print** | Name of Exempt Organization<br>**TEXAS HIGHWAY PATROL ASSOCIATION** | | Employer identification number<br>74 : 2573422 |
|---|---|---|---|
| **File by the extended due date for filing the return See instructions** | Number, street, and room or suite no. If a P.O box, see instructions.<br>**501 OAKLAND AVENUE** | | For IRS use only |
| | City, town or post office, state, and ZIP code. For a foreign address, see instructions.<br>**AUSTIN, TX 78703** | | |

**Check type of return to be filed** (File a separate application for each return):

☑ Form 990　　　　☐ Form 990-PF

☐ Form 990-BL　　☐ Form 990-T (sec. 401(a) or 408(a) trust)

☐ Form 990-EZ　　☐ Form 990-T (trust other than above)

☐ Form 1041-A　　☐ Form 6069

☐ Form 4720　　　☐ Form 8870

☐ Form 5227

**STOP! Do not complete Part II if you were not already granted an automatic 3-month extension on a previously filed Form 8868.**

- The books are in the care of ▶ **TEXAS HIGHWAY PATROL ASSOCIATION**
- Telephone No. ▶ ( **512** ) **491-9117**　FAX No. ▶ ( **512** ) **491-6026**
- If the organization does not have an office or place of business in the United States, check this box . . . . . . ▶ ☐
- If this is for a Group Return, enter the organization's four digit Group Exemption Number (GEN) _____ . If this is for the whole group, check this box . . . . . ▶ ☐ . If it is for part of the group, check this box . . . . . . ▶ ☐ and attach a list with the names and EINs of all members the extension is for.

4　I request an additional 3-month extension of time until ............... **NOVEMBER 15** ..............., 20 **08**.

5　For calendar year **2007**, or other tax year beginning ..................., 20...., and ending ..................., 20.....

6　If this tax year is for less than 12 months, check reason: ☐ Initial return ☐ Final return ☐ Change in accounting period

7　State in detail why you need the extension ...................................................................................
　**TAXPAYER IS AWAITING INFORMATION NECESSARY TO FILE A COMPLETE AND ACCURATE RETURN.**

| | | | |
|---|---|---|---|
| **8a** | If this application is for Form 990-BL, 990-PF, 990-T, 4720, or 6069, enter the tentative tax, less any nonrefundable credits. See instructions. | **8a** | $ |
| **b** | If this application is for Form 990-PF, 990-T, 4720, or 6069, enter any refundable credits and estimated tax payments made. Include any prior year overpayment allowed as a credit and any amount paid previously with Form 8868. | **8b** | $ |
| **c** | **Balance Due.** Subtract line 8b from line 8a. Include your payment with this form, or, if required, deposit with FTD coupon or, if required, by using EFTPS (Electronic Federal Tax Payment System). See instructions. | **8c** | $ |

**Signature and Verification**

Under penalties of perjury, I declare that I have examined this form, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete, and that I am authorized to prepare this form

Signature ▶　　　　　　　　Title ▶ **CPA**　　　　　　Date ▶ **7-30-08**

Form **8868** (Rev 4-2008)

**ATTACHMENT TO FORM 990**
**TEXAS HIGHWAY PATROL ASSOCIATION**
**TAXABLE YEAR ENDED 12/31/07**

74-2573422

Part III – Page 3 – Statement of Program Service Accomplishments – Continued

**See Materials Attached for Details**

# EXHIBIT B

Form **990**

Department of the Treasury
Internal Revenue Service

## Return of Organization Exempt From Income Tax

Under section 501(c), 527, or 4947(a)(1) of the Internal Revenue Code (except black lung benefit trust or private foundation)

▶ The organization may have to use a copy of this return to satisfy state reporting requirements.

OMB No 1545-0047

**2008**

Open to Public Inspection

**A** For the 2008 calendar year, or tax year beginning ____ and ending ____

| **B** Check if applicable | **C** Name of organization | | **D** Employer identification number |
|---|---|---|---|
| ☐ Address change | Please use IRS label or print or type See Specific Instructions | TEXAS HIGHWAY PATROL ASSOCIATION | 74-2573422 |
| ☐ Name change | | Doing Business As | |
| ☐ Initial return | | Number and street (or P.O. box if mail is not delivered to street address)  Room/suite | **E** Telephone number |
| ☐ Termination | | 501 OAKLAND AVENUE | (512) 491-9117 |
| ☐ Amended return | | City or town, state or country, and ZIP + 4 | **G** Gross receipts $ 20,037. |
| ☐ Application pending | | AUSTIN, TX 78703-5113 | |

**F** Name and address of principal officer: TIM TIERNEY
SAME AS C ABOVE

**H(a)** Is this a group return for affiliates? ☐ Yes ☒ No
**H(b)** Are all affiliates included? ☐ Yes ☐ No
If "No," attach a list. (see instructions)

**I** Tax-exempt status: ☒ 501(c) ( 6 ) ◀ (insert no.) ☐ 4947(a)(1) or ☐ 527
**J** Website: ▶ WWW.THPA.ORG

**H(c)** Group exemption number ▶

**K** Type of organization: ☒ Corporation ☐ Trust ☐ Association ☐ Other ▶    **L** Year of formation: 1990  **M** State of legal domicile: TX

### Part I | Summary

| Activities & Governance | | | |
|---|---|---|---|
| **1** | Briefly describe the organization's mission or most significant activities: TO PROMOTE AWARENESS OF TEXAS HIGHWAY PATROL OFFICERS AS A PROFESSION | | |
| **2** | Check this box ▶ ☐ if the organization discontinued its operations or disposed of more than 25% of its assets. | | |
| **3** | Number of voting members of the governing body (Part VI, line 1a) | **3** | 6 |
| **4** | Number of independent voting members of the governing body (Part VI, line 1b) | **4** | 6 |
| **5** | Total number of employees (Part V, line 2a) | **5** | 0 |
| **6** | Total number of volunteers (estimate if necessary) | **6** | 0 |
| **7a** | Total gross unrelated business revenue from Part VIII, line 12, column (C) | **7a** | 0. |
| **b** | Net unrelated business taxable income from Form 990-T, line 34 | **7b** | 0. |

| Revenue | | Prior Year | Current Year |
|---|---|---|---|
| **8** | Contributions and grants (Part VIII, line 1h) | 8,255. | 17,381. |
| **9** | Program service revenue (Part VIII, line 2g) | 1,524. | |
| **10** | Investment income (Part VIII, column (A), lines 3, 4, and 7d) | 5,900. | 2,502. |
| **11** | Other revenue (Part VIII, column (A), lines 5, 6d, 8c, 9c, 10c, and 11e) | -4,440. | 154. |
| **12** | Total revenue - add lines 8 through 11 (must equal Part VIII, column (A), line 12) | 11,239. | 20,037. |

| Expenses | | | |
|---|---|---|---|
| **13** | Grants and similar amounts paid (Part IX, column (A), lines 1-3) | 10,000. | 10,000. |
| **14** | Benefits paid to or for members (Part IX, column (A), line 4) | | |
| **15** | Salaries, other compensation, employee benefits (Part IX, column (A), lines 5-10) | 3,591. | 3,242. |
| **16a** | Professional fundraising fees (Part IX, column (A), line 11e) | | |
| **b** | Total fundraising expenses (Part IX, column (D), line 25) ▶ | | |
| **17** | Other expenses (Part IX, column (A), lines 11a-11d, 11f-24f) | 7,366. | 4,151. |
| **18** | Total expenses. Add lines 13-17 (must equal Part IX, column (A), line 25) | 20,957. | 17,393. |
| **19** | Revenue less expenses. Subtract line 18 from line 12 | -9,718. | 2,644. |

| Net Assets or Fund Balances | | Beginning of Year | End of Year |
|---|---|---|---|
| **20** | Total assets (Part X, line 16) | 897,935. | 898,351. |
| **21** | Total liabilities (Part X, line 26) | 18,014. | 15,786. |
| **22** | Net assets or fund balances. Subtract line 21 from line 20 | 879,921. | 882,565. |

### Part II | Signature Block

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete Declaration of preparer (other than officer) is based on all information of which preparer has any knowledge

| Sign Here | ▶ _[signature]_ | 11-4-09 |
|---|---|---|
| | Signature of officer | Date |
| | ▶ TIM TIERNEY, EXECUTIVE VICE-PRESIDENT | |
| | Type or print name and title | |

| Paid Preparer's Use Only | Preparer's signature ▶ _[signature]_ | Date 11/3/09 | Check if self-employed ▶ ☐ | Preparer's identifying number (see instructions) |
|---|---|---|---|---|
| | Firm's name (or yours if self-employed), address, and ZIP + 4 ▶ | KENNETH C. GORENCE, P.C. P.O. BOX 28279 AUSTIN, TX 78755 | EIN ▶ | |
| | | | Phone no. ▶ (512)342-8081 | |

May the IRS discuss this return with the preparer shown above? (see instructions) ☒ Yes ☐ No

832001 12-18-08   LHA   **For Privacy Act and Paperwork Reduction Act Notice, see the separate instructions.**    Form **990** (2008)

| Part III | Statement of Program Service Accomplishments (see instructions) |

**1**   Briefly describe the organization's mission:

TO PROMOTE AWARENESS OF TEXAS HIGHWAY PATROL OFFICERS AS A PROFESSION

**2**   Did the organization undertake any significant program services during the year which were not listed on
the prior Form 990 or 990-EZ?                                  ☐ Yes ☒ No
If "Yes", describe these new services on Schedule O.

**3**   Did the organization cease conducting, or make significant changes in how it conducts, any program services?     ☐ Yes ☒ No
If "Yes", describe these changes on Schedule O.

**4**   Describe the exempt purpose achievements for each of the organization's three largest program services by expenses.
Section 501(c)(3) and 501(c)(4) organizations and section 4947(a)(1) trusts are required to report the amount of grants and
allocations to others, the total expenses, and revenue, if any, for each program service reported.

**4a**   (Code: _____ ) (Expenses $ _____ including grants of $ _____ ) (Revenue $ _____ )
PROMOTED AWARENESS OF TEXAS HIGHWAY PATROL OFFICERS AS A PROFESSION

**4b**   (Code: _____ ) (Expenses $ _____ including grants of $ _____ ) (Revenue $ _____ )
PROVIDED DENTAL INSURANCE BENEFITS TO MEMBERS

**4c**   (Code: _____ ) (Expenses $ _____ including grants of $ _____ ) (Revenue $ _____ )
PROVIDED FINANCIAL ASSISTANCE (DEATH BENEFITS) TO THE FAMILIES OF
TROOPERS KILLED IN THE LINE OF DUTY

**4d**   Other program services. (Describe in Schedule O.)
(Expenses $ _____ including grants of $ _____ ) (Revenue $ _____ )

**4e**   Total program service expenses ▶ $ _____
(Must equal Part IX, Line 25, column (B).)

832002
12-18-08

Form **990** (2008)

15091102 000078          2008.04050 TEXAS HIGHWAY PATROL ASSOCI 30604013

| Part IV | Checklist of Required Schedules | | | |
|---|---|---|---|---|

| | | | Yes | No |
|---|---|---|---|---|
| 1 | Is the organization described in section 501(c)(3) or 4947(a)(1) (other than a private foundation)? If "Yes," complete Schedule A | 1 | | X |
| 2 | Is the organization required to complete Schedule B, Schedule of Contributors? | 2 | | X |
| 3 | Did the organization engage in direct or indirect political campaign activities on behalf of or in opposition to candidates for public office? If "Yes," complete Schedule C, Part I | 3 | | X |
| 4 | **Section 501(c)(3) organizations.** Did the organization engage in lobbying activities? If "Yes," complete Schedule C, Part II | 4 | | |
| 5 | **Section 501(c)(4), 501(c)(5), and 501(c)(6) organizations.** Is the organization subject to the section 6033(e) notice and reporting requirement and proxy tax? If "Yes," complete Schedule C, Part III | 5 | | X |
| 6 | Did the organization maintain any donor advised funds or any accounts where donors have the right to provide advice on the distribution or investment of amounts in such funds or accounts? If "Yes," complete Schedule D, Part I | 6 | | X |
| 7 | Did the organization receive or hold a conservation easement, including easements to preserve open space, the environment, historic land areas, or historic structures? If "Yes," complete Schedule D, Part II | 7 | | X |
| 8 | Did the organization maintain collections of works of art, historical treasures, or other similar assets? If "Yes," complete Schedule D, Part III | 8 | | X |
| 9 | Did the organization report an amount in Part X, line 21; serve as a custodian for amounts not listed in Part X; or provide credit counseling, debt management, credit repair, or debt negotiation services? If "Yes," complete Schedule D, Part IV | 9 | | X |
| 10 | Did the organization hold assets in term, permanent, or quasi-endowments? If "Yes," complete Schedule D, Part V | 10 | | X |
| 11 | Did the organization report an amount in Part X, lines 10, 12, 13, 15, or 25? If "Yes," complete Schedule D, Parts VI, VII, VIII, IX, or X as applicable | 11 | X | |
| 12 | Did the organization receive an audited financial statement for the year for which it is completing this return that was prepared in accordance with GAAP? If "Yes," complete Schedule D, Parts XI, XII, and XIII | 12 | | X |
| 13 | Is the organization a school as described in section 170(b)(1)(A)(ii)? If "Yes," complete Schedule E | 13 | | X |
| 14a | Did the organization maintain an office, employees, or agents outside of the U.S.? | 14a | | X |
| b | Did the organization have aggregate revenues or expenses of more than $10,000 from grantmaking, fundraising, business, and program service activities outside the U.S.? If "Yes," complete Schedule F, Part I | 14b | | X |
| 15 | Did the organization report on Part IX, column (A), line 3, more than $5,000 of grants or assistance to any organization or entity located outside the United States? If "Yes," complete Schedule F, Part II | 15 | | X |
| 16 | Did the organization report on Part IX, column (A), line 3, more than $5,000 of aggregate grants or assistance to individuals located outside the United States? If "Yes," complete Schedule F, Part III | 16 | | X |
| 17 | Did the organization report more than $15,000 on Part IX, column (A), line 11e? If "Yes," complete Schedule G, Part I | 17 | | X |
| 18 | Did the organization report more than $15,000 total on Part VIII, lines 1c and 8a? If "Yes," complete Schedule G, Part II | 18 | | X |
| 19 | Did the organization report more than $15,000 on Part VIII, line 9a? If "Yes," complete Schedule G, Part III | 19 | | X |
| 20 | Did the organization operate one or more hospitals? If "Yes," complete Schedule H | 20 | | X |
| 21 | Did the organization report more than $5,000 on Part IX, column (A), line 1? If "Yes," complete Schedule I, Parts I and II | 21 | | X |
| 22 | Did the organization report more than $5,000 on Part IX, column (A), line 2? If "Yes," complete Schedule I, Parts I and III | 22 | X | |
| 23 | Did the organization answer "Yes" to Part VII, Section A, questions 3, 4, or 5? If "Yes," complete Schedule J | 23 | X | |
| 24a | Did the organization have a tax-exempt bond issue with an outstanding principal amount of more than $100,000 as of the last day of the year, that was issued after December 31, 2002? If "Yes," answer questions 24b-24d and complete Schedule K. If "No", go to question 25 | 24a | | X |
| b | Did the organization invest any proceeds of tax-exempt bonds beyond a temporary period exception? | 24b | | |
| c | Did the organization maintain an escrow account other than a refunding escrow at any time during the year to defease any tax-exempt bonds? | 24c | | |
| d | Did the organization act as an "on behalf of" issuer for bonds outstanding at any time during the year? | 24d | | |
| 25a | **Section 501(c)(3) and 501(c)(4) organizations.** Did the organization engage in an excess benefit transaction with a disqualified person during the year? If "Yes," complete Schedule L, Part I | 25a | | |
| b | Did the organization become aware that it had engaged in an excess benefit transaction with a disqualified person from a prior year? If "Yes," complete Schedule L, Part I | 25b | | |
| 26 | Was a loan to or by a current or former officer, director, trustee, key employee, highly compensated employee, or disqualified person outstanding as of the end of the organization's tax year? If "Yes," complete Schedule L, Part II | 26 | X | |
| 27 | Did the organization provide a grant or other assistance to an officer, director, trustee, key employee, or substantial contributor, or to a person related to such an individual? If "Yes," complete Schedule L, Part III | 27 | | X |

Form **990** (2008)

832003
12-18-08

3

**Part IV** | **Checklist of Required Schedules** *(continued)*

|  |  | Yes | No |
|---|---|---|---|
| **28** | During the tax year, did any person who is a current or former officer, director, trustee, or key employee: |  |  |
| **a** | Have a direct business relationship with the organization (other than as an officer, director, trustee, or employee), or an indirect business relationship through ownership of more than 35% in another entity (individually or collectively with other person(s) listed in Part VII, Section A)? If "Yes," complete Schedule L, Part IV |  |  |
|  | **28a** |  | X |
| **b** | Have a family member who had a direct or indirect business relationship with the organization? If "Yes," complete Schedule L, Part IV |  |  |
|  | **28b** |  | X |
| **c** | Serve as an officer, director, trustee, key employee, partner, or member of an entity (or a shareholder of a professional corporation) doing business with the organization? If "Yes," complete Schedule L, Part IV |  |  |
|  | **28c** |  | X |
| **29** | Did the organization receive more than $25,000 in non-cash contributions? If "Yes," complete Schedule M | **29** |  | X |
| **30** | Did the organization receive contributions of art, historical treasures, or other similar assets, or qualified conservation contributions? If "Yes," complete Schedule M | **30** |  | X |
| **31** | Did the organization liquidate, terminate, or dissolve and cease operations? If "Yes," complete Schedule N, Part I | **31** |  | X |
| **32** | Did the organization sell, exchange, dispose of, or transfer more than 25% of its net assets? If "Yes," complete Schedule N, Part II | **32** |  | X |
| **33** | Did the organization own 100% of an entity disregarded as separate from the organization under Regulations sections 301.7701-2 and 301.7701-3? If "Yes," complete Schedule R, Part I | **33** |  | X |
| **34** | Was the organization related to any tax-exempt or taxable entity? If "Yes," complete Schedule R, Parts II, III, IV, and V, line 1 | **34** | X |  |
| **35** | Is any related organization a controlled entity within the meaning of section 512(b)(13)? If "Yes," complete Schedule R, Part V, line 2 | **35** | X |  |
| **36** | **Section 501(c)(3) organizations.** Did the organization make any transfers to an exempt non-charitable related organization? If "Yes," complete Schedule R, Part V, line 2 | **36** |  |  |
| **37** | Did the organization conduct more than 5% of its activities through an entity that is not a related organization and that is treated as a partnership for federal income tax purposes? If "Yes," complete Schedule R, Part VI | **37** |  | X |

Form **990** (2008)

832004
12-18-08

15091102 000078               2008.04050 TEXAS HIGHWAY PATROL ASSOCI 30604013

| Part V | Statements Regarding Other IRS Filings and Tax Compliance |
|---|---|

|  |  | Yes | No |
|---|---|---|---|
| **1a** Enter the number reported in Box 3 of Form 1096, Annual Summary and Transmittal of U.S. Information Returns. Enter -0- if not applicable — **1a** | 0 |  |  |
| **b** Enter the number of Forms W-2G included in line 1a. Enter -0- if not applicable — **1b** | 0 |  |  |
| **c** Did the organization comply with backup withholding rules for reportable payments to vendors and reportable gaming (gambling) winnings to prize winners? **1c** | | X | |
| **2a** Enter the number of employees reported on Form W-3, Transmittal of Wage and Tax Statements, filed for the calendar year ending with or within the year covered by this return — **2a** | 0 |  |  |
| **b** If at least one is reported on line 2a, did the organization file all required federal employment tax returns? **2b** | |  | |
| **Note.** If the sum of lines 1a and 2a is greater than 250, you may be required to e-file this return. (see instructions) | |  | |
| **3a** Did the organization have unrelated business gross income of $1,000 or more during the year covered by this return? **3a** | |  | X |
| **b** If "Yes," has it filed a Form 990-T for this year? If "No," provide an explanation in Schedule O **3b** | |  | |
| **4a** At any time during the calendar year, did the organization have an interest in, or a signature or other authority over, a financial account in a foreign country (such as a bank account, securities account, or other financial account)? **4a** | |  | X |
| **b** If "Yes," enter the name of the foreign country: ▶ | |  | |
| See the instructions for exceptions and filing requirements for Form TD F 90-22.1, Report of Foreign Bank and Financial Accounts. | |  | |
| **5a** Was the organization a party to a prohibited tax shelter transaction at any time during the tax year? **5a** | |  | X |
| **b** Did any taxable party notify the organization that it was or is a party to a prohibited tax shelter transaction? **5b** | |  | X |
| **c** If "Yes," to question 5a or 5b, did the organization file Form 8886-T, Disclosure by Tax-Exempt Entity Regarding Prohibited Tax Shelter Transaction? **5c** | |  | |
| **6a** Did the organization solicit any contributions that were not tax deductible? **6a** | | X | |
| **b** If "Yes," did the organization include with every solicitation an express statement that such contributions or gifts were not tax deductible? **6b** | | X | |
| **7** **Organizations that may receive deductible contributions under section 170(c).** | |  | |
| **a** Did the organization provide goods or services in exchange for any quid pro quo contribution of more than $75? **7a** | |  | |
| **b** If "Yes," did the organization notify the donor of the value of the goods or services provided? **7b** | |  | |
| **c** Did the organization sell, exchange, or otherwise dispose of tangible personal property for which it was required to file Form 8282? **7c** | |  | |
| **d** If "Yes," indicate the number of Forms 8282 filed during the year — **7d** | |  | |
| **e** Did the organization, during the year, receive any funds, directly or indirectly, to pay premiums on a personal benefit contract? **7e** | |  | |
| **f** Did the organization, during the year, pay premiums, directly or indirectly, on a personal benefit contract? **7f** | |  | |
| **g** For all contributions of qualified intellectual property, did the organization file Form 8899 as required? **7g** | |  | |
| **h** For contributions of cars, boats, airplanes, and other vehicles, did the organization file a Form 1098-C as required? **7h** | |  | |
| **8** **Section 501(c)(3) and other sponsoring organizations maintaining donor advised funds and section 509(a)(3) supporting organizations.** Did the supporting organization, or a fund maintained by a sponsoring organization, have excess business holdings at any time during the year? **8** | |  | |
| **9** **Section 501(c)(3) and other sponsoring organizations maintaining donor advised funds.** | |  | |
| **a** Did the organization make any taxable distributions under section 4966? **9a** | |  | |
| **b** Did the organization make a distribution to a donor, donor advisor, or related person? **9b** | |  | |
| **10** **Section 501(c)(7) organizations. Enter: N/A** | |  | |
| **a** Initiation fees and capital contributions included on Part VIII, line 12 — **10a** | |  | |
| **b** Gross receipts, included on Form 990, Part VIII, line 12, for public use of club facilities — **10b** | |  | |
| **11** **Section 501(c)(12) organizations. Enter: N/A** | |  | |
| **a** Gross income from members or shareholders — **11a** | |  | |
| **b** Gross income from other sources (Do not net amounts due or paid to other sources against amounts due or received from them.) — **11b** | |  | |
| **12a** Section 4947(a)(1) non-exempt charitable trusts. Is the organization filing Form 990 in lieu of Form 1041? **12a** | |  | |
| **b** If "Yes," enter the amount of tax-exempt interest received or accrued during the year    N/A  **12b** | |  | |

Form **990** (2008)

**Part VI** **Governance, Management, and Disclosure** *(Sections A, B, and C request information about policies not required by the Internal Revenue Code.)*

## Section A. Governing Body and Management

*For each "Yes" response to lines 2-7b below, and for a "No" response to lines 8 or 9b below, describe the circumstances, processes, or changes in Schedule O. See instructions.*

| | | | Yes | No |
|---|---|---|---|---|
| 1a | Enter the number of voting members of the governing body | **1a** 6 | | |
| b | Enter the number of voting members that are independent | **1b** 6 | | |
| 2 | Did any officer, director, trustee, or key employee have a family relationship or a business relationship with any other officer, director, trustee, or key employee? | 2 | | X |
| 3 | Did the organization delegate control over management duties customarily performed by or under the direct supervision of officers, directors or trustees, or key employees to a management company or other person? | 3 | | X |
| 4 | Did the organization make any significant changes to its organizational documents since the prior Form 990 was filed? | 4 | | X |
| 5 | Did the organization become aware during the year of a material diversion of the organization's assets? | 5 | | X |
| 6 | Does the organization have members or stockholders? | 6 | X | |
| 7a | Does the organization have members, stockholders, or other persons who may elect one or more members of the governing body? | 7a | X | |
| b | Are any decisions of the governing body subject to approval by members, stockholders, or other persons? | 7b | | X |
| 8 | Did the organization contemporaneously document the meetings held or written actions undertaken during the year by the following: | | | |
| a | The governing body? | 8a | X | |
| b | Each committee with authority to act on behalf of the governing body? | 8b | X | |
| 9a | Does the organization have local chapters, branches, or affiliates? | 9a | | X |
| b | If "Yes," does the organization have written policies and procedures governing the activities of such chapters, affiliates, and branches to ensure their operations are consistent with those of the organization? | 9b | | |
| 10 | Was a copy of the Form 990 provided to the organization's governing body before it was filed? All organizations must describe in Schedule O the process, if any, the organization uses to review the Form 990 | 10 | | X |
| 11 | Is there any officer, director or trustee, or key employee listed in Part VII, Section A, who cannot be reached at the organization's mailing address? If "Yes," provide the names and addresses in Schedule O | 11 | | X |

## Section B. Policies

| | | | Yes | No |
|---|---|---|---|---|
| 12a | Does the organization have a written conflict of interest policy? If "No," go to line 13 | 12a | X | |
| b | Are officers, directors or trustees, and key employees required to disclose annually interests that could give rise to conflicts? | 12b | X | |
| c | Does the organization regularly and consistently monitor and enforce compliance with the policy? If "Yes," describe in Schedule O how this is done | 12c | X | |
| 13 | Does the organization have a written whistleblower policy? | 13 | X | |
| 14 | Does the organization have a written document retention and destruction policy? | 14 | X | |
| 15 | Did the process for determining compensation of the following persons include a review and approval by independent persons, comparability data, and contemporaneous substantiation of the deliberation and decision: | | | |
| a | The organization's CEO, Executive Director, or top management official? | 15a | | X |
| b | Other officers or key employees of the organization? | 15b | | X |
| | Describe the process in Schedule O. (see instructions) | | | |
| 16a | Did the organization invest in, contribute assets to, or participate in a joint venture or similar arrangement with a taxable entity during the year? | 16a | | X |
| b | If "Yes," has the organization adopted a written policy or procedure requiring the organization to evaluate its participation in joint venture arrangements under applicable federal tax law, and taken steps to safeguard the organization's exempt status with respect to such arrangements? | 16b | | |

## Section C. Disclosure

17   List the states with which a copy of this Form 990 is required to be filed ▶ TX

18   Section 6104 requires an organization to make its Forms 1023 (or 1024 if applicable), 990, and 990-T (501(c)(3)s only) available for public inspection. Indicate how you make these available. Check all that apply.

☐ Own website          ☐ Another's website          [X] Upon request

19   Describe in Schedule O whether (and if so, how), the organization makes its governing documents, conflict of interest policy, and financial statements available to the public.

20   State the name, physical address, and telephone number of the person who possesses the books and records of the organization: ▶

TIM TIERNEY - (512) 491-9117
501 OAKLAND AVENUE, AUSTIN, TX   78703-5113

832006
12-18-08

Form **990** (2008)

## Part VII Compensation of Officers, Directors, Trustees, Key Employees, Highest Compensated Employees, and Independent Contractors

Section A. Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees

**1a** Complete this table for all persons required to be listed. Use Schedule J-2 if additional space is needed.

• List all of the organization's **current** officers, directors, trustees (whether individuals or organizations), regardless of amount of compensation, and **current** key employees. Enter -0- in columns (D), (E), and (F) if no compensation was paid.

• List the organization's five **current** highest compensated employees (other than an officer, director, trustee, or key employee) who received reportable compensation (Box 5 of Form W-2 and/or Box 7 of Form 1099-MISC) of more than $100,000 from the organization and any related organizations.

• List all of the organization's **former** officers, key employees, and highest compensated employees who received more than $100,000 of reportable compensation from the organization and any related organizations.

• List all of the organization's **former directors or trustees** that received, in the capacity as a former director or trustee of the organization, more than $10,000 of reportable compensation from the organization and any related organizations.

List persons in the following order: individual trustees or directors; institutional trustees; officers; key employees; highest compensated employees; and former such persons.

[X] Check this box if the organization did not compensate any officer, director, trustee, or key employee.

| (A) Name and Title | (B) Average hours per week | (C) Position (check all that apply) | | | | | | (D) Reportable compensation from the organization (W-2/1099-MISC) | (E) Reportable compensation from related organizations (W-2/1099-MISC) | (F) Estimated amount of other compensation from the organization and related organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Individual trustee or director | Institutional trustee | Officer | Key employee | Highest compensated employee | Former | | | |
| GREGG GREER PRESIDENT & DIRECTOR | 5.00 | X | | X | | | | 0. | 0. | 0. |
| FRED RIOJAS DIRECTOR | 5.00 | X | | | | | | 0. | 0. | 0. |
| TED RIOJAS DIRECTOR | 5.00 | X | | | | | | 0. | 0. | 0. |
| MARK LOCKRIDGE DIRECTOR | 5.00 | X | | | | | | 0. | 0. | 0. |
| ROBERT BERNARD, JR. DIRECTOR | 5.00 | X | | | | | | 0. | 0. | 0. |
| JAMES COLUNGA DIRECTOR | 5.00 | X | | | | | | 0. | 0. | 0. |
| TIM TIERNEY EXECUTIVE VICE-PRESIDENT | 5.00 | | | X | | | | 0. | 193,425. | 0. |
| C.R. VILLALVA DIRECTOR OF MARKETING | 5.00 | | | X | | | | 0. | 163,075. | 0. |

832007 12-18-08

Form **990** (2008)

15091102 000078          2008.04050 TEXAS HIGHWAY PATROL ASSOCI 30604013

**Part VII** Section A. Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees *(continued)*

| (A)<br>Name and title | (B)<br>Average hours per week | (C)<br>Position<br>(check all that apply) | | | | | | (D)<br>Reportable compensation from the organization (W-2/1099-MISC) | (E)<br>Reportable compensation from related organizations (W-2/1099-MISC) | (F)<br>Estimated amount of other compensation from the organization and related organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Individual trustee or director | Institutional trustee | Officer | Key employee | Highest compensated employee | former | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| **1b Total** ► | | | | | | | | 0. | 356,500. | 0. |

2 Total number of individuals (including those in 1a) who received more than $100,000 in reportable compensation from the organization ► 0

| | | Yes | No |
|---|---|---|---|
| 3 | Did the organization list any **former** officer, director or trustee, key employee, or highest compensated employee on line 1a? *If "Yes," complete Schedule J for such individual* | | X |
| 4 | For any individual listed on line 1a, is the sum of reportable compensation and other compensation from the organization and related organizations greater than $150,000? *If "Yes," complete Schedule J for such individual* | X | |
| 5 | Did any person listed on line 1a receive or accrue compensation from any unrelated organization for services rendered to the organization? *If "Yes," complete Schedule J for such person* | | X |

**Section B. Independent Contractors**

1 Complete this table for your five highest compensated independent contractors that received more than $100,000 of compensation from the organization. NONE

| (A)<br>Name and business address | (B)<br>Description of services | (C)<br>Compensation |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

2 Total number of independent contractors (including those in 1) who received more than $100,000 in compensation from the organization ► 0

Form **990** (2008)

832008 12-18-08

8

15091102 000078      2008.04050 TEXAS HIGHWAY PATROL ASSOCI 30604013

| Part VIII | Statement of Revenue | | | **(A)** Total revenue | **(B)** Related or exempt function revenue | **(C)** Unrelated business revenue | **(D)** Revenue excluded from tax under sections 512, 513, or 514 |
|---|---|---|---|---|---|---|---|
| Contributions, gifts, grants and other similar amounts | **1 a** Federated campaigns | 1a | | | | | |
| | **b** Membership dues | 1b | 2,059. | | | | |
| | **c** Fundraising events | 1c | | | | | |
| | **d** Related organizations | 1d | | | | | |
| | **e** Government grants (contributions) | 1e | | | | | |
| | **f** All other contributions, gifts, grants, and similar amounts not included above | 1f | 15,322. | | | | |
| | **g** Noncash contributions included in lines 1a-1f $ | | | | | | |
| | **h Total.** Add lines 1a-1f ▶ | | | 17,381. | | | |
| Program Service Revenue | **2 a** | Business Code | | | | | |
| | **b** | | | | | | |
| | **c** | | | | | | |
| | **d** | | | | | | |
| | **e** | | | | | | |
| | **f** All other program service revenue | | | | | | |
| | **g Total.** Add lines 2a-2f ▶ | | | | | | |
| Other Revenue | **3** Investment income (including dividends, interest, and other similar amounts) ▶ | | | 1,091. | | | 1,091. |
| | **4** Income from investment of tax-exempt bond proceeds ▶ | | | | | | |
| | **5** Royalties ▶ | | | | | | |
| | | (i) Real | (ii) Personal | | | | |
| | **6 a** Gross Rents | | | | | | |
| | **b** Less: rental expenses | | | | | | |
| | **c** Rental income or (loss) | | | | | | |
| | **d** Net rental income or (loss) ▶ | | | | | | |
| | **7 a** Gross amount from sales of assets other than inventory | (i) Securities 1,411. | (ii) Other | | | | |
| | **b** Less: cost or other basis and sales expenses | | | | | | |
| | **c** Gain or (loss) | 1,411. | | | | | |
| | **d** Net gain or (loss) ▶ | | | 1,411. | 1,411. | | |
| | **8 a** Gross income from fundraising events (not including $ _____ of contributions reported on line 1c). See Part IV, line 18 | a | | | | | |
| | **b** Less: direct expenses | b | | | | | |
| | **c** Net income or (loss) from fundraising events ▶ | | | | | | |
| | **9 a** Gross income from gaming activities. See Part IV, line 19 | a | | | | | |
| | **b** Less: direct expenses | b | | | | | |
| | **c** Net income or (loss) from gaming activities ▶ | | | | | | |
| | **10 a** Gross sales of inventory, less returns and allowances | a | 154. | | | | |
| | **b** Less: cost of goods sold | b | | | | | |
| | **c** Net income or (loss) from sales of inventory ▶ | | | 154. | 154. | | |
| | Miscellaneous Revenue | Business Code | | | | | |
| | **11 a** | | | | | | |
| | **b** | | | | | | |
| | **c** | | | | | | |
| | **d** All other revenue | | | | | | |
| | **e Total.** Add lines 11a-11d ▶ | | | | | | |
| | **12 Total Revenue.** Add lines 1h, 2g, 3, 4, 5, 6d, 7d, 8c, 9c, 10c, and 11e ▶ | | | 20,037. | 1,565. | 0. | 1,091. |

832009
02-02-09

Form **990** (2008)

15091102 000078　　　　　　2008.04050 TEXAS HIGHWAY PATROL ASSOCI 30604013

| Part IX | Statement of Functional Expenses | | | | |
|---|---|---|---|---|---|

Section 501(c)(3) and 501(c)(4) organizations must complete all columns.
All other organizations must complete column (A) but are not required to complete columns (B), (C), and (D).

| Do not include amounts reported on lines 6b, 7b, 8b, 9b, and 10b of Part VIII. | | (A) Total expenses | (B) Program service expenses | (C) Management and general expenses | (D) Fundraising expenses |
|---|---|---|---|---|---|
| 1 | Grants and other assistance to governments and organizations in the U.S. See Part IV, line 21 | | | | |
| 2 | Grants and other assistance to individuals in the U.S. See Part IV, line 22 | 10,000. | | | |
| 3 | Grants and other assistance to governments, organizations, and individuals outside the U.S. See Part IV, lines 15 and 16 | | | | |
| 4 | Benefits paid to or for members | 3,242. | | | |
| 5 | Compensation of current officers, directors, trustees, and key employees | | | | |
| 6 | Compensation not included above, to disqualified persons (as defined under section 4958(f)(1)) and persons described in section 4958(c)(3)(B) | | | | |
| 7 | Other salaries and wages | | | | |
| 8 | Pension plan contributions (include section 401(k) and section 403(b) employer contributions) | | | | |
| 9 | Other employee benefits | | | | |
| 10 | Payroll taxes | | | | |
| 11 | Fees for services (non-employees): | | | | |
| a | Management | | | | |
| b | Legal | | | | |
| c | Accounting | 3,688. | | | |
| d | Lobbying | | | | |
| e | Professional fundraising services. See Part IV, line 17 | | | | |
| f | Investment management fees | | | | |
| g | Other | | | | |
| 12 | Advertising and promotion | | | | |
| 13 | Office expenses | | | | |
| 14 | Information technology | | | | |
| 15 | Royalties | | | | |
| 16 | Occupancy | 2,400. | | | |
| 17 | Travel | | | | |
| 18 | Payments of travel or entertainment expenses for any federal, state, or local public officials | | | | |
| 19 | Conferences, conventions, and meetings | | | | |
| 20 | Interest | | | | |
| 21 | Payments to affiliates | | | | |
| 22 | Depreciation, depletion, and amortization | | | | |
| 23 | Insurance | | | | |
| 24 | Other expenses. Itemize expenses not covered above. (Expenses grouped together and labeled miscellaneous may not exceed 5% of total expenses shown on line 25 below.) | | | | |
| a | SPECIAL EVENTS | 150. | | | |
| b | BANK CHARGES | 4. | | | |
| c | TELEPHONE (EXCISE TAX) | -2,091. | | | |
| d | | | | | |
| e | | | | | |
| f | All other expenses | | | | |
| 25 | Total functional expenses. Add lines 1 through 24f | 17,393. | | | |
| 26 | Joint Costs. Check here ▶ ☐ if following SOP 98-2. Complete this line only if the organization reported in column (B) joint costs from a combined educational campaign and fundraising solicitation | | | | |

832010 12-18-08

15091102 000078　　　　2008.04050 TEXAS HIGHWAY PATROL ASSOCI 30604013

| Part X | Balance Sheet |
|---|---|

| | | | (A)<br>Beginning of year | | (B)<br>End of year |
|---|---|---|---|---|---|
| Assets | 1 | Cash - non-interest-bearing | 11,215. | **1** | 13,907. |
| | 2 | Savings and temporary cash investments | 58,778. | **2** | 151,267. |
| | 3 | Pledges and grants receivable, net | | **3** | |
| | 4 | Accounts receivable, net | | **4** | |
| | 5 | Receivables from current and former officers, directors, trustees, key employees, or other related parties. Complete Part II of Schedule L | | **5** | |
| | 6 | Receivables from other disqualified persons (as defined under section 4958(f)(1)) and persons described in section 4958(c)(3)(B). Complete Part II of Schedule L | | **6** | |
| | 7 | Notes and loans receivable, net | 765,850. | **7** | 671,085. |
| | 8 | Inventories for sale or use | | **8** | |
| | 9 | Prepaid expenses and deferred charges | | **9** | |
| | 10a | Land, buildings, and equipment: cost basis **10a** | | | |
| | b | Less: accumulated depreciation. Complete Part VI of Schedule D **10b** | | **10c** | |
| | 11 | Investments - publicly traded securities | | **11** | |
| | 12 | Investments - other securities. See Part IV, line 11 | | **12** | |
| | 13 | Investments - program-related. See Part IV, line 11 | | **13** | |
| | 14 | Intangible assets | | **14** | |
| | 15 | Other assets. See Part IV, line 11 | 62,092. | **15** | 62,092. |
| | 16 | Total assets. Add lines 1 through 15 (must equal line 34) | 897,935. | **16** | 898,351. |
| Liabilities | 17 | Accounts payable and accrued expenses | 1,176. | **17** | 1,176. |
| | 18 | Grants payable | | **18** | |
| | 19 | Deferred revenue | | **19** | |
| | 20 | Tax-exempt bond liabilities | | **20** | |
| | 21 | Escrow account liability. Complete Part IV of Schedule D | | **21** | |
| | 22 | Payables to current and former officers, directors, trustees, key employees, highest compensated employees, and disqualified persons. Complete Part II of Schedule L | 6,705. | **22** | 6,705. |
| | 23 | Secured mortgages and notes payable to unrelated third parties | | **23** | |
| | 24 | Unsecured notes and loans payable | | **24** | |
| | 25 | Other liabilities. Complete Part X of Schedule D | 10,133. | **25** | 7,905. |
| | 26 | Total liabilities. Add lines 17 through 25 | 18,014. | **26** | 15,786. |
| Net Assets or Fund Balances | | Organizations that follow SFAS 117, check here ▶ ☐ and complete lines 27 through 29, and lines 33 and 34. | | | |
| | 27 | Unrestricted net assets | | **27** | |
| | 28 | Temporarily restricted net assets | | **28** | |
| | 29 | Permanently restricted net assets | | **29** | |
| | | Organizations that do not follow SFAS 117, check here ▶ ☒ and complete lines 30 through 34. | | | |
| | 30 | Capital stock or trust principal, or current funds | 0. | **30** | 0. |
| | 31 | Paid-in or capital surplus, or land, building, or equipment fund | 0. | **31** | 0. |
| | 32 | Retained earnings, endowment, accumulated income, or other funds | 879,921. | **32** | 882,565. |
| | 33 | Total net assets or fund balances | 879,921. | **33** | 882,565. |
| | 34 | Total liabilities and net assets/fund balances | 897,935. | **34** | 898,351. |

| Part XI | Financial Statements and Reporting |
|---|---|

| | | Yes | No |
|---|---|---|---|
| 1 | Accounting method used to prepare the Form 990: ☒ Cash  ☐ Accrual  ☐ Other | | |
| 2a | Were the organization's financial statements compiled or reviewed by an independent accountant? | **2a** X | |
| b | Were the organization's financial statements audited by an independent accountant? | **2b** | X |
| c | If "Yes" to lines 2a or 2b, does the organization have a committee that assumes responsibility for oversight of the audit, review, or compilation of its financial statements and selection of an independent accountant? | **2c** | X |
| 3a | As a result of a federal award, was the organization required to undergo an audit or audits as set forth in the Single Audit Act and OMB Circular A-133? | **3a** | X |
| b | If "Yes," did the organization undergo the required audit or audits? | **3b** | |

832011 12-18-08

# Political Campaign and Lobbying Activities

**For Organizations Exempt From Income Tax Under section 501(c) and section 527**

▶ To be completed by organizations described below.
▶ Attach to Form 990 or Form 990-EZ.

OMB No 1545-0047

**2008**

Open to Public
Inspection

**If the organization answered "Yes," to Form 990, Part IV, line 3, or Form 990-EZ, Part VI, line 46 (Political Campaign Activities), then**
- Section 501(c)(3) organizations: Complete Parts I-A and B. Do not complete Part I-C.
- Section 501(c) (other than section 501(c)(3)) organizations: Complete Parts I-A and C below. Do not complete Part I-B.
- Section 527 organizations: Complete Part I-A only.

**If the organization answered "Yes," to Form 990, Part IV, line 4, or Form 990-EZ, Part VI, line 47 (Lobbying Activities), then**
- Section 501(c)(3) organizations that have filed Form 5768 (election under section 501(h)): Complete Part II-A. Do not complete Part II-B.
- Section 501(c)(3) organizations that have NOT filed Form 5768 (election under section 501(h)): Complete Part II-B. Do not complete Part II-A.

**If the organization answered "Yes," to Form 990, Part IV, line 5 (Proxy Tax), then**
- Section 501(c)(4), (5), or (6) organizations: Complete Part III.

| Name of organization | Employer identification number |
|---|---|
| TEXAS HIGHWAY PATROL ASSOCIATION | 74-2573422 |

**Part I-A** To be completed by all organizations exempt under section 501(c) and section 527 organizations.
See the instructions for Schedule C for details.

1 Provide a description of the organization's direct and indirect political campaign activities in Part IV.
2 Political expenditures ▶ $ _____
3 Volunteer hours

**Part I-B** To be completed by all organizations exempt under section 501(c)(3).
See the instructions for Schedule C for details.

1 Enter the amount of any excise tax incurred by the organization under section 4955 ▶ $ _____
2 Enter the amount of any excise tax incurred by organization managers under section 4955 ▶ $ _____
3 If the organization incurred a section 4955 tax, did it file Form 4720 for this year? ☐ Yes ☐ No
4a Was a correction made? ☐ Yes ☐ No
b If "Yes," describe in Part IV.

**Part I-C** To be completed by all organizations exempt under section 501(c), except section 501(c)(3).
See the instructions for Schedule C for details.

1 Enter the amount directly expended by the filing organization for section 527 exempt function activities ▶ $ _____
2 Enter the amount of the filing organization's funds contributed to other organizations for section 527 exempt function activities ▶ $ _____
3 Total of direct and indirect exempt function expenditures. Add lines 1 and 2 and enter here and on Form 1120-POL, line 17b ▶ $ _____
4 Did the filing organization file **Form 1120-POL** for this year? ☐ Yes ☐ No
5 State the names, addresses and employer identification number (EIN) of all section 527 political organizations to which payments were made. Enter the amount paid and indicate if the amount was paid from the filing organization's funds or were political contributions received and promptly and directly delivered to a separate political organization, such as a separate segregated fund or a political action committee (PAC). If additional space is needed, provide information in Part IV.

| (a) Name | (b) Address | (c) EIN | (d) Amount paid from filing organization's funds. If none, enter -0-. | (e) Amount of political contributions received and promptly and directly delivered to a separate political organization. If none, enter -0-. |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

LHA    For Privacy Act and Paperwork Reduction Act Notice, see the Instructions for Form 990.          Schedule C (Form 990 or 990-EZ) 2008
832041  12-18-08

15091102 000078          2008.04050 TEXAS HIGHWAY PATROL ASSOCI 30604013

**Part II-A** To be completed by organizations exempt under section 501(c)(3) that filed Form 5768 (election under section 501(h)). See the instructions for Schedule C for details.

**A** Check ▶ ☐ if the filing organization belongs to an affiliated group.

**B** Check ▶ ☐ if the filing organization checked box A and "limited control" provisions apply.

| Limits on Lobbying Expenditures (The term "expenditures" means amounts paid or incurred.) | (a) Filing organization's totals | (b) Affiliated group totals |
|---|---|---|
| **1a** Total lobbying expenditures to influence public opinion (grassroots lobbying) | | |
| **b** Total lobbying expenditures to influence a legislative body (direct lobbying) | | |
| **c** Total lobbying expenditures (add lines 1a and 1b) | | |
| **d** Other exempt purpose expenditures | | |
| **e** Total exempt purpose expenditures (add lines 1c and 1d) | | |
| **f** Lobbying nontaxable amount. Enter the amount from the following table in both columns. | | |

| If the amount on line 1e, column (a) or (b) is: | The lobbying nontaxable amount is: |
|---|---|
| Not over $500,000 | 20% of the amount on line 1e. |
| Over $500,000 but not over $1,000,000 | $100,000 plus 15% of the excess over $500,000. |
| Over $1,000,000 but not over $1,500,000 | $175,000 plus 10% of the excess over $1,000,000. |
| Over $1,500,000 but not over $17,000,000 | $225,000 plus 5% of the excess over $1,500,000. |
| Over $17,000,000 | $1,000,000. |

| | (a) | (b) |
|---|---|---|
| **g** Grassroots nontaxable amount (enter 25% of line 1f) | | |
| **h** Subtract line 1g from line 1a. Enter -0- if line g is more than line a | | |
| **i** Subtract line 1f from line 1c. Enter -0- if line f is more than line c | | |
| **j** If there is an amount other than zero on either line 1h or line 1i, did the organization file Form 4720 reporting section 4911 tax for this year? | ☐ Yes | ☐ No |

**4-Year Averaging Period Under Section 501(h)**

(Some organizations that made a section 501(h) election do not have to complete all of the five columns below. See the instructions for lines 2a through 2f of the instructions.)

**Lobbying Expenditures During 4-Year Averaging Period**

| Calendar year (or fiscal year beginning in) | (a) 2005 | (b) 2006 | (c) 2007 | (d) 2008 | (e) Total |
|---|---|---|---|---|---|
| **2a** Lobbying non-taxable amount | | | | | |
| **b** Lobbying ceiling amount (150% of line 2a, column(e)) | | | | | |
| **c** Total lobbying expenditures | | | | | |
| **d** Grassroots non-taxable amount | | | | | |
| **e** Grassroots ceiling amount (150% of line 2d, column (e)) | | | | | |
| **f** Grassroots lobbying expenditures | | | | | |

Schedule C (Form 990 or 990-EZ) 2008

832042 12-18-08

**Part II-B** To be completed by organizations exempt under section 501(c)(3) that have NOT filed Form 5768 (election under section 501(h)). See the instructions for Schedule C for details.

| | | (a) | | (b) |
|---|---|---|---|---|
| | | Yes | No | Amount |
| 1 | During the year, did the filing organization attempt to influence foreign, national, state or local legislation, including any attempt to influence public opinion on a legislative matter or referendum, through the use of: | | | |
| a | Volunteers? | | | |
| b | Paid staff or management (include compensation in expenses reported on lines 1c through 1i)? | | | |
| c | Media advertisements? | | | |
| d | Mailings to members, legislators, or the public? | | | |
| e | Publications, or published or broadcast statements? | | | |
| f | Grants to other organizations for lobbying purposes? | | | |
| g | Direct contact with legislators, their staffs, government officials, or a legislative body? | | | |
| h | Rallies, demonstrations, seminars, conventions, speeches, lectures, or any other means? | | | |
| i | Other activities? If "Yes," describe in Part IV | | | |
| j | Total lines 1c through 1i | | | |
| 2a | Did the activities in line 1 cause the organization to be not described in section 501(c)(3)? | | | |
| b | If "Yes," enter the amount of any tax incurred under section 4912 | | | |
| c | If "Yes," enter the amount of any tax incurred by organization managers under section 4912 | | | |
| d | If the filing organization incurred a section 4912 tax, did it file Form 4720 for this year? | | | |

**Part III-A** To be completed by all organizations exempt under section 501(c)(4), section 501(c)(5), or section 501(c)(6). See the instructions for Schedule C for details.

| | | | Yes | No |
|---|---|---|---|---|
| 1 | Were substantially all (90% or more) dues received nondeductible by members? | 1 | X | |
| 2 | Did the organization make only in-house lobbying expenditures of $2,000 or less? | 2 | | X |
| 3 | Did the organization agree to carryover lobbying and political expenditures from the prior year? | 3 | | X |

**Part III-B** To be completed by all organizations exempt under section 501(c)(4), section 501(c)(5), or section 501(c)(6) if BOTH Part III-A, questions 1 and 2 are answered "No" OR if Part III-A, question 3 is answered "Yes." See Schedule C instructions for details.

| | | | |
|---|---|---|---|
| 1 | Dues, assessments and similar amounts from members | 1 | |
| 2 | Section 162(e) non-deductible lobbying and political expenditures (do not include amounts of political expenses for which the section 527(f) tax was paid). | | |
| a | Current year | 2a | |
| b | Carryover from last year | 2b | |
| c | Total | 2c | |
| 3 | Aggregate amount reported in section 6033(e)(1)(A) notices of nondeductible section 162(e) dues | 3 | |
| 4 | If notices were sent and the amount on line 2c exceeds the amount on line 3, what portion of the excess does the organization agree to carryover to the reasonable estimate of nondeductible lobbying and political expenditure next year? | 4 | |
| 5 | Taxable amount of lobbying and political expenditures (line 2c total minus 3 and 4) | 5 | |

**Part IV** Supplemental Information

Complete this part to provide the descriptions required for Part I-A, line 1; Part I-B, line 4; Part I-C, line 5; and Part II-B, line 1i. Also, complete this part for any additional information.

832043  12-18-08

Schedule C (Form 990 or 990-EZ) 2008

15091102 000078                    2008.04050 TEXAS HIGHWAY PATROL ASSOCI 30604013

# Schedule D
(Form 990)

Department of the Treasury
Internal Revenue Service

## Supplemental Financial Statements

▶ Attach to Form 990. To be completed by organizations that
answered "Yes," to Form 990, Part IV, line 6, 7, 8, 9, 10, 11, or 12.

OMB No 1545-0047

**2008**

Open to Public
Inspection

Name of the organization

TEXAS HIGHWAY PATROL ASSOCIATION

Employer Identification number
74-2573422

**Part I** | **Organizations Maintaining Donor Advised Funds or Other Similar Funds or Accounts.** Complete if the
organization answered "Yes" to Form 990, Part IV, line 6.

| | | (a) Donor advised funds | (b) Funds and other accounts |
|---|---|---|---|
| 1 | Total number at end of year | | |
| 2 | Aggregate contributions to (during year) | | |
| 3 | Aggregate grants from (during year) | | |
| 4 | Aggregate value at end of year | | |

5  Did the organization inform all donors and donor advisors in writing that the assets held in donor advised funds
are the organization's property, subject to the organization's exclusive legal control?  ☐ Yes  ☐ No

6  Did the organization inform all grantees, donors, and donor advisors in writing that grant funds may be used only
for charitable purposes and not for the benefit of the donor or donor advisor or other impermissible private benefit?  ☐ Yes  ☐ No

**Part II** | **Conservation Easements.** Complete if the organization answered "Yes" to Form 990, Part IV, line 7.

1  Purpose(s) of conservation easements held by the organization (check all that apply).

☐ Preservation of land for public use (e.g., recreation or pleasure)   ☐ Preservation of an historically important land area

☐ Protection of natural habitat   ☐ Preservation of certified historic structure

☐ Preservation of open space

2  Complete lines 2a-2d if the organization held a qualified conservation contribution in the form of a conservation easement on the last day
of the tax year.

| | | | Held at the End of the Year |
|---|---|---|---|
| a | Total number of conservation easements | 2a | |
| b | Total acreage restricted by conservation easements | 2b | |
| c | Number of conservation easements on a certified historic structure included in (a) | 2c | |
| d | Number of conservation easements included in (c) acquired after 8/17/06 | 2d | |

3  Number of conservation easements modified, transferred, released, extinguished, or terminated by the organization during the taxable
year ▶ _____

4  Number of states where property subject to conservation easement is located ▶ _____

5  Does the organization have a written policy regarding the periodic monitoring, inspection, violations, and
enforcement of the conservation easements it holds?  ☐ Yes  ☐ No

6  Staff or volunteer hours devoted to monitoring, inspecting, and enforcing easements during the year ▶ _____

7  Amount of expenses incurred in monitoring, inspecting, and enforcing easements during the year ▶ $ _____

8  Does each conservation easement reported on line 2(d) above satisfy the requirements of section 170(h)(4)(B)(i)
and section 170(h)(4)(B)(ii)?  ☐ Yes  ☐ No

9  In Part XIV, describe how the organization reports conservation easements in its revenue and expense statement, and balance sheet, and
include, if applicable, the text of the footnote to the organization's financial statements that describes the organization's accounting for
conservation easements.

**Part III** | **Organizations Maintaining Collections of Art, Historical Treasures, or Other Similar Assets.**
Complete if the organization answered "Yes" to Form 990, Part IV, line 8.

1a  If the organization elected, as permitted under SFAS 116, not to report in its revenue statement and balance sheet works of art, historical
treasures, or other similar assets held for public exhibition, education, or research in furtherance of public service, provide, in Part XIV, the text of
the footnote to its financial statements that describes these items.

b  If the organization elected, as permitted under SFAS 116, to report in its revenue statement and balance sheet works of art, historical treasures,
or other similar assets held for public exhibition, education, or research in furtherance of public service, provide the following amounts relating to
these items:

(i)  Revenues included in Form 990, Part VIII, line 1   ▶ $ _____

(ii)  Assets included in Form 990, Part X   ▶ $ _____

2  If the organization received or held works of art, historical treasures, or other similar assets for financial gain, provide
the following amounts required to be reported under SFAS 116 relating to these items:

a  Revenues included in Form 990, Part VIII, line 1   ▶ $ _____

b  Assets included in Form 990, Part X   ▶ $ _____

LHA  **For Privacy Act and Paperwork Reduction Act Notice, see the Instructions for Form 990.**   Schedule D (Form 990) 2008

832051
12-23-08

15091102 000078               2008.04050 TEXAS HIGHWAY PATROL ASSOCI 30604013

## Part III   Organizations Maintaining Collections of Art, Historical Treasures, or Other Similar Assets (continued)

3   Using the organization's accession and other records, check any of the following that are a significant use of its collection items (check all that apply):

a   ☐ Public exhibition                     d   ☐ Loan or exchange programs
b   ☐ Scholarly research                    e   ☐ Other _____
c   ☐ Preservation for future generations

4   Provide a description of the organization's collections and explain how they further the organization's exempt purpose in Part XIV.

5   During the year, did the organization solicit or receive donations of art, historical treasures, or other similar assets to be sold to raise funds rather than to be maintained as part of the organization's collection? . . . . . ☐ Yes   ☐ No

## Part IV   Trust, Escrow and Custodial Arrangements. Complete if organization answered "Yes" to Form 990, Part IV, line 9, or reported an amount on Form 990, Part X, line 21.

1a   Is the organization an agent, trustee, custodian or other intermediary for contributions or other assets not included on Form 990, Part X? . . . . . . . . . . . . . . . ☐ Yes   ☐ No

b   If "Yes," explain the arrangement in Part XIV and complete the following table:

|   |   | Amount |
|---|---|---|
| c  Beginning balance | 1c | |
| d  Additions during the year | 1d | |
| e  Distributions during the year | 1e | |
| f  Ending balance | 1f | |

2a   Did the organization include an amount on Form 990, Part X, line 21? . . . . . . . . . . . . ☐ Yes   ☐ No
b   If "Yes," explain the arrangement in Part XIV.

## Part V   Endowment Funds. Complete if organization answered "Yes" to Form 990, Part IV, line 10.

|   | (a) Current year | (b) Prior year | (c) Two years back | (d) Three years back | (e) Four years back |
|---|---|---|---|---|---|
| 1a  Beginning of year balance | | | | | |
| b  Contributions | | | | | |
| c  Investment earnings or losses | | | | | |
| d  Grants or scholarships | | | | | |
| e  Other expenditures for facilities and programs | | | | | |
| f  Administrative expenses | | | | | |
| g  End of year balance | | | | | |

2   Provide the estimated percentage of the year end balance held as:
a   Board designated or quasi-endowment ▶ _____ %
b   Permanent endowment ▶ _____ %
c   Term endowment ▶ _____ %

3a   Are there endowment funds not in the possession of the organization that are held and administered for the organization by:

|   | Yes | No |
|---|---|---|
| (i)  unrelated organizations ... 3a(i) | | |
| (ii)  related organizations ... 3a(ii) | | |
| b  If "Yes" to 3a(ii), are the related organizations listed as required on Schedule R? ... 3b | | |

4   Describe in Part XIV the intended uses of the organization's endowment funds.

## Part VI   Investments - Land, Buildings, and Equipment. See Form 990, Part X, line 10.

| Description of investment | (a) Cost or other basis (investment) | (b) Cost or other basis (other) | (c) Depreciation | (d) Book value |
|---|---|---|---|---|
| 1a  Land | | | | |
| b  Buildings | | | | |
| c  Leasehold improvements | | | | |
| d  Equipment | | | | |
| e  Other | | | | |

Total. Add lines 1a-1e. (Column (d) should equal Form 990, Part X, column (B), line 10(c).) . . . ▶ | 0.

Schedule D (Form 990) 2008

## Part VII | Investments - Other Securities. See Form 990, Part X, line 12.

| (a) Description of security or category (including name of security) | (b) Book value | (c) Method of valuation: Cost or end-of-year market value |
|---|---|---|
| Financial derivatives and other financial products | | |
| Closely-held equity interests | | |
| Other | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| **Total.** (Col (b) should equal Form 990, Part X, col (B) line 12.) ► | | |

## Part VIII | Investments - Program Related. See Form 990, Part X, line 13.

| (a) Description of investment type | (b) Book value | (c) Method of valuation: Cost or end-of-year market value |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| **Total.** (Col (b) should equal Form 990, Part X, col (B) line 13.) ► | | |

## Part IX | Other Assets. See Form 990, Part X, line 15.

| (a) Description | (b) Book value |
|---|---|
| INVESTMENT IN THPA SERVICES, INC. | 1,000. |
| CASH SURRENDER VALUE OF LIFE INSURANCE | 61,092. |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| **Total.** (Column (b) should equal Form 990, Part X, col (B) line 15.) ► | 62,092. |

## Part X | Other Liabilities. See Form 990, Part X, line 25.

| (a) Description of liability | (b) Amount | |
|---|---|---|
| Federal income taxes | | |
| TRUST LIABILITY (GARCIA DEATH BENEFIT) | 7,905. | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| **Total.** (Column (b) should equal Form 990, Part X, col (B) line 25.) ► | 7,905. | |

In Part XIV, provide the text of the footnote to the organization's financial statements that reports the organization's liability for uncertain tax positions under FIN 48.

| Part XI | Reconciliation of Change in Net Assets from Form 990 to Financial Statements | | |
|---|---|---|---|
| 1 | Total revenue (Form 990, Part VIII, column (A), line 12) | 1 | 20,037. |
| 2 | Total expenses (Form 990, Part IX, column (A), line 25) | 2 | 17,393. |
| 3 | Excess or (deficit) for the year. Subtract line 2 from line 1 | 3 | 2,644. |
| 4 | Net unrealized gains (losses) on investments | 4 | |
| 5 | Donated services and use of facilities | 5 | |
| 6 | Investment expenses | 6 | |
| 7 | Prior period adjustments | 7 | |
| 8 | Other (Describe in Part XIV) | 8 | |
| 9 | Total adjustments (net). Add lines 4-8 | 9 | |
| 10 | Excess or (deficit) for the year per financial statements. Combine lines 3 and 9 | 10 | 2,644. |

| Part XII | Reconciliation of Revenue per Audited Financial Statements With Revenue per Return | | | |
|---|---|---|---|---|
| 1 | Total revenue, gains, and other support per audited financial statements | | 1 | |
| 2 | Amounts included on line 1 but not on Form 990, Part VIII, line 12: | | | |
| a | Net unrealized gains on investments | 2a | | |
| b | Donated services and use of facilities | 2b | | |
| c | Recoveries of prior year grants | 2c | | |
| d | Other (Describe in Part XIV) | 2d | | |
| e | Add lines 2a through 2d | | 2e | |
| 3 | Subtract line 2e from line 1 | | 3 | |
| 4 | Amounts included on Form 990, Part VIII, line 12, but not on line 1: | | | |
| a | Investment expenses not included on Form 990, Part VIII, line 7b | 4a | | |
| b | Other (Describe in Part XIV) | 4b | | |
| c | Add lines 4a and 4b | | 4c | |
| 5 | Total revenue. Add lines 3 and 4c. (This should equal Form 990, Part I, line 12.) | | 5 | |

| Part XIII | Reconciliation of Expenses per Audited Financial Statements With Expenses per Return | | | |
|---|---|---|---|---|
| 1 | Total expenses and losses per audited financial statements | | 1 | |
| 2 | Amounts included on line 1 but not on Form 990, Part IX, line 25: | | | |
| a | Donated services and use of facilities | 2a | | |
| b | Prior year adjustments | 2b | | |
| c | Losses reported on Form 990, Part IX, line 25 | 2c | | |
| d | Other (Describe in Part XIV) | 2d | | |
| e | Add lines 2a through 2d | | 2e | |
| 3 | Subtract line 2e from line 1 | | 3 | |
| 4 | Amounts included on Form 990, Part IX, line 25, but not on line 1: | | | |
| a | Investment expenses not included on Form 990, Part VIII, line 7b | 4a | | |
| b | Other (Describe in Part XIV) | 4b | | |
| c | Add lines 4a and 4b | | 4c | |
| 5 | Total expenses. Add lines 3 and 4c. (This should equal Form 990, Part I, line 18.) | | 5 | |

| Part XIV | Supplemental Information |
|---|---|

Complete this part to provide the descriptions required for Part II, lines 3, 5, and 9; Part III, lines 1a and 4; Part IV, lines 1b and 2b; Part V, line 4; Part X; Part XI, line 8; Part XII, lines 2d and 4b; and Part XIII, lines 2d and 4b.

SCHEDULE I
(Form 990)

Department of the Treasury
Internal Revenue Service

OMB No 1545-0047

2008

**Open to Public Inspection**

# Grants and Other Assistance to Organizations, Governments, and Individuals in the U.S.

▲ Complete if the organization answered "Yes," on Form 990, Part IV, lines 21 or 22.

▲ Attach to Form 990.

Name of the organization
**TEXAS HIGHWAY PATROL ASSOCIATION**

Employer identification number
74-2573422

| Part I | General Information on Grants and Assistance |
| --- | --- |

1   Does the organization maintain records to substantiate the amount of the grants or assistance, the grantees' eligibility for the grants or assistance, and the selection
criteria used to award the grants or assistance?  ........ [X] Yes  [ ] No

2   Describe in Part IV the organization's procedures for monitoring the use of grant funds in the United States.

| Part II | Grants and Other Assistance to Governments and Organizations in the United States. Complete if the organization answered "Yes " on Form 990, Part IV, line 21, for any |
| --- | --- |

recipient that received more than $5,000. Check this box if no one recipient received more than $5,000. Use Part IV and Schedule I-1 (Form 990) if additional space is needed   ........ ▲ [ ]

| 1 (a) Name and address of organization or government | (b) EIN | (c) IRC section if applicable | (d) Amount of cash grant | (e) Amount of non-cash assistance | (f) Method of valuation (book, FMV, appraisal, other) | (g) Description of non-cash assistance | (h) Purpose of grant or assistance |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

2   Enter total number of section 501(c)(3) and government organizations  ........ ▲

3   Enter total number of other organizations  ........ ▲

LHA   For Privacy Act and Paperwork Reduction Act Notice, see the Instructions for Form 990.

832101 12-18-08

Schedule I (Form 990) 2008

19

TEXAS HIGHWAY PATROL ASSOCIATION 74-2573422 Page 2

**Part III** | **Grants and Other Assistance to Individuals in the United States.** Complete if the organization answered "Yes" on Form 990, Part IV, line 22.
Use Schedule I-1 (Form 990) if additional space is needed.

| (a) Type of grant or assistance | (b) Number of recipients | (c) Amount of cash grant | (d) Amount of non-cash assistance | (e) Method of valuation (book, FMV, appraisal, other) | (f) Description of non-cash assistance |
|---|---|---|---|---|---|
| DEATH BENEFIT PAID TO MICHAELA BURNS, WIDOW OF JEFFERSON, TX TROOPER JAMES SCOTT BURNS, KILLED IN THE LINE OF DUTY ON APRIL 29, 2008. | 1 | 10,000. | 0. | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**Part IV** | **Supplemental Information.** Complete this part to provide the information required in Part I, line 2, and any other additional information.

SCHEDULE I, PART I, LINE 2: THE ONLY ASSISTANCE THE ORGANIZATION PROVIDES

TO INDIVIDUALS INSIDE THE U.S. IS A $10,000 PER OFFICER DEATH BENEFIT PAID

TO THE FAMILIES OF TEXAS HIGHWAY PATROL OFFICERS KILLED IN THE LINE OF

DUTY. SUCH INCIDENTS ARE A MATTER OF PUBLIC RECORD.

# Compensation Information

**For certain Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees**

▶ Attach to Form 990. To be completed by organizations that answered "Yes" to Form 990, Part IV, line 23.

OMB No 1545-0047

**2008**

Open to Public Inspection

| Name of the organization | Employer identification number |
|---|---|
| TEXAS HIGHWAY PATROL ASSOCIATION | 74-2573422 |

## Part I | Questions Regarding Compensation

| | | | Yes | No |
|---|---|---|---|---|
| **1a** Check the appropriate box(es) if the organization provided any of the following to or for a person listed in Form 990, Part VII, Section A, line 1a. Complete Part III to provide any relevant information regarding these items.<br>☐ First-class or charter travel      ☐ Housing allowance or residence for personal use<br>☐ Travel for companions      ☐ Payments for business use of personal residence<br>☐ Tax indemnification and gross-up payments      ☐ Health or social club dues or initiation fees<br>☐ Discretionary spending account      ☐ Personal services (e.g., maid, chauffeur, chef) | | | | |
| **b** If line 1a is checked, did the organization follow a written policy regarding payment or reimbursement or provision of all of the expenses described above? If "No," complete Part III to explain | 1b | | | |
| **2** Did the organization require substantiation prior to reimbursing or allowing expenses incurred by all officers, directors, trustees, and the CEO/Executive Director, regarding the items checked in line 1a? | 2 | | | |
| **3** Indicate which, if any, of the following the organization uses to establish the compensation of the organization's CEO/Executive Director. Check all that apply.<br>☐ Compensation committee      ☐ Written employment contract<br>☐ Independent compensation consultant      ☐ Compensation survey or study<br>☐ Form 990 of other organizations      ☐ Approval by the board or compensation committee | | | | |
| **4** During the year, did any person listed in Form 990, Part VII, Section A, line 1a: | | | | |
| **a** Receive a severance payment or change of control payment? | 4a | | | X |
| **b** Participate in, or receive payment from, a supplemental nonqualified retirement plan? | 4b | | | X |
| **c** Participate in, or receive payment from, an equity-based compensation arrangement? | 4c | | | X |
| If "Yes" to any of lines 4a-c, list the persons and provide the applicable amounts for each item in Part III. | | | | |
| **Only 501(c)(3) and 501(c)(4) organizations must complete lines 5-8.** | | | | |
| **5** For persons listed in Form 990, Part VII, Section A, line 1a, did the organization pay or accrue any compensation contingent on the revenues of: | | | | |
| **a** The organization? | 5a | | | |
| **b** Any related organization? | 5b | | | |
| If "Yes," to line 5a or 5b, describe in Part III. | | | | |
| **6** For persons listed in Form 990, Part VII, Section A, line 1a, did the organization pay or accrue any compensation contingent on the net earnings of: | | | | |
| **a** The organization? | 6a | | | |
| **b** Any related organization? | 6b | | | |
| If "Yes" to line 6a or 6b, describe in Part III. | | | | |
| **7** For persons listed in Form 990, Part VII, Section A, line 1a, did the organization provide any non-fixed payments not described in lines 5 and 6? If "Yes," describe in Part III | 7 | | | |
| **8** Were any amounts reported in Form 990, Part VII, paid or accrued pursuant to a contract that was subject to the initial contract exception described in Regs. section 53.4958-4(a)(3)? If "Yes," describe in Part III | 8 | | | |

LHA **For Privacy Act and Paperwork Reduction Act Notice, see the Instructions for Form 990.**

Schedule J (Form 990) 2008

832111
12-23-08

Schedule J (Form 990) 2008    TEXAS HIGHWAY PATROL ASSOCIATION    74-2573422    Page 2

**Part II | Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees.** Use Schedule J-1 if additional space is needed.

For each individual whose compensation must be reported in Schedule J, report compensation from the organization on row (i) and from related organizations, described in the instructions, on row (ii).
Do not list any individuals that are not listed on Form 990, Part VII.

**Note.** The sum of columns (B)(i)-(iii) must equal the applicable column (D) or column (E) amounts on Form 990, Part VII, line 1a.

| (A) Name | | (B) Breakdown of W-2 and/or 1099-MISC compensation | | | (C) Deferred compensation | (D) Nontaxable benefits | (E) Total of columns (B)(i)-(D) | (F) Compensation reported in prior Form 990 or Form 990-EZ |
|---|---|---|---|---|---|---|---|---|
| | | (i) Base compensation | (ii) Bonus & incentive compensation | (iii) Other compensation | | | | |
| TIM TIERNEY | (i) | 0. | 0. | 0. | 0. | 0. | 0. | 0. |
| | (ii) | 193,425. | 0. | 0. | 0. | 0. | 193,425. | 186,891. |
| C.R. VILLALVA | (i) | 0. | 0. | 0. | 0. | 0. | 0. | 0. |
| | (ii) | 163,075. | 0. | 0. | 0. | 0. | 163,075. | 156,738. |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |

832112 12-23-08    Schedule J (Form 990) 2008

# Transactions with Interested Persons

▶ Attach to Form 990 or Form 990-EZ.
▶ To be completed by organizations that answered
"Yes" on Form 990, Part IV, lines 25a, 25b, 26, 27, 28a, 28b, or 28c,
or Form 990-EZ, Part V, lines 38a or 40b.

OMB No 1545-0047

**2008**

Open To Public
Inspection

**Name of the organization**

TEXAS HIGHWAY PATROL ASSOCIATION

**Employer identification number**
74-2573422

## Part I   Excess Benefit Transactions (section 501(c)(3) and section 501(c)(4) organizations only).

To be completed by organizations that answered "Yes" on Form 990, Part IV, line 25a or 25b, or Form 990-EZ, Part V, line 40b.

| 1   (a) Name of disqualified person | (b) Description of transaction | (c) Corrected? | |
|---|---|---|---|
| | | Yes | No |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

2   Enter the amount of tax imposed on the organization managers or disqualified persons during the year under section 4958 ▶ $ _____

3   Enter the amount of tax, if any, on line 2, above, reimbursed by the organization ▶ $ _____

## Part II   Loans to and/or From Interested Persons.

To be completed by organizations that answered "Yes" on Form 990, Part IV, line 26, or Form 990-EZ, Part V, line 38a.

| (a) Name of interested person and purpose | (b) Loan to or from the organization? | | (c) Original principal amount | (d) Balance due | (e) In default? | | (f) Approved by board or committee? | | (g) Written agreement? | |
|---|---|---|---|---|---|---|---|---|---|---|
| | To | From | | | Yes | No | Yes | No | Yes | No |
| LANE DENTON – CAS | X | | 6,705. | 6,705. | | X | | X | | X |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| **Total** | | | ▶ $ | 6,705. | | | | | | |

## Part III   Grants or Assistance Benefiting Interested Persons.

To be completed by organizations that answered "Yes" on Form 990, Part IV, line 27.

| (a) Name of interested person | (b) Relationship between interested person and the organization | (c) Amount of grant or type of assistance |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |

## Part IV   Business Transactions Involving Interested Persons.

To be completed by organizations that answered "Yes" on Form 990, Part IV, lines 28a, 28b, or 28c.

| (a) Name of interested person | (b) Relationship between interested person and the organization | (c) Amount of transaction | (d) Description of transaction | (e) Sharing of organization's revenues? | |
|---|---|---|---|---|---|
| | | | | Yes | No |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

LHA   For Privacy Act and Paperwork Reduction Act Notice, see the Instructions for Form 990.

Schedule L (Form 990 or 990-EZ) 2008

SEE SCHEDULE O FOR SCHEDULE L CONTINUATIONS

SCHEDULE O
(Form 990)

Department of the Treasury
Internal Revenue Service

# Supplemental Information to Form 990

▶ Attach to Form 990. To be completed by organizations to provide additional information for responses to specific questions for the Form 990 or to provide any additional information.

OMB No 1545-0047

**2008**

Open to Public Inspection

Name of the organization

**TEXAS HIGHWAY PATROL ASSOCIATION**

Employer identification number

74-2573422

FORM 990, PART III, LINE 4D, OTHER PROGRAM SERVICES:

PROVIDED PUBLIC SERVICE ANNOUNCEMENTS AND OTHER REMBRANCES OF SLAIN

TROOPERS

FORM 990, PART VI, SECTION A, LINE 6: THE TAXPAYER IS A MEMBERSHIP

ORGANIZATION EXEMPT UNDER CODE SECTION 501(C)(6); SUCH MEMBERS ARE REQUIRED

TO PAY DUES WHICH ARE VITAL TO THE ORGANIZATION'S EXEMPT PURPOSES AS A

PROFESSIONAL ORGANIZATION.

FORM 990, PART VI, SECTION A, LINE 7A: MEMBERS MAY ELECT ONE OR MORE

MEMBERS OF THE GOVERNING BODY (BOARD OF DIRECTORS).

FORM 990, PART VI, SECTION A, LINE 10: THE ORGANIZATION'S FORM 990 IS

PREPARED BY AN INDEPENDENT ACCOUNTING FIRM.  THE EXECUTIVE DIRECTOR MEETS

EACH YEAR WITH SUCH FIRM TO REVIEW, SIGN AND FILE FORM 990.

FORM 990, PART VI, SECTION B, LINE 12C: THE ORGANIZATION MONITORS AND

ENFORCES COMPLIANCE WITH THE CONFLICT OF INTEREST POLICY AT EACH ANNUAL AND

SPECIAL MEETING OF DIRECTORS.

FORM 990, PART VI, SECTION C, LINE 19: THE ORGANIZATION MAKES ITS

GOVERNING DOCUMENTS, CONFLICT OF INTEREST POLICY, AND FINANCIAL STATEMENTS

AVAILABLE TO THE PUBLIC UPON REQUEST.

SCHEDULE L, PART II, LOANS TO AND FROM INTERESTED PERSONS:

(A) NAME OF PERSON: LANE DENTON

LHA  For Privacy Act and Paperwork Reduction Act Notice, see the Instructions for Form 990.
832211
12-18-08

Schedule O (Form 990) 2008

15091102 000078          2008.04050 TEXAS HIGHWAY PATROL ASSOCI 30604013

SCHEDULE O
(Form 990)

Department of the Treasury
Internal Revenue Service

# Supplemental Information to Form 990

► Attach to Form 990. To be completed by organizations to provide
additional information for responses to specific questions for the
Form 990 or to provide any additional information.

OMB No 1545-0047

**2008**

Open to Public
Inspection

Name of the organization

TEXAS HIGHWAY PATROL ASSOCIATION

Employer identification number
74-2573422

**(A) PURPOSE OF LOAN: CASH ADVANCES & EXPENSES**

LHA For Privacy Act and Paperwork Reduction Act Notice, see the Instructions for Form 990.

832211
12-18-08

Schedule O (Form 990) 2008

25

SCHEDULE R
(Form 990)
Department of the Treasury
Internal Revenue Service

OMB No 1545-0047
2008
Open to Public Inspection

**Related Organizations and Unrelated Partnerships**

▶ Attach to Form 990. To be completed by organizations that answered "Yes" to Form 990, Part IV, lines 33, 34, 35, 36, or 37.
▶ See separate instructions.

Name of the organization

TEXAS HIGHWAY PATROL ASSOCIATION

Employer identification number
74-2573422

**Part I** Identification of Disregarded Entities

| (A) Name, address, and EIN of disregarded entity | (B) Primary activity | (C) Legal domicile (state or foreign country) | (D) Total income | (E) End-of-year assets | (F) Direct controlling entity |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**Part II** Identification of Related Tax-Exempt Organizations

| (A) Name, address, and EIN of related organization | (B) Primary activity | (C) Legal domicile (state or foreign country) | (D) Exempt Code section | (E) Public charity status (if section 501(c)(3)) | (F) Direct controlling entity |
|---|---|---|---|---|---|
| CITIZENS FOR SPECIAL ARTISTS - 74-2571329 5150 BROADWAY, SUITE 233 SAN ANTONIO, TX 78209 | EDUCATIONAL | TEXAS | 501(C)(3) | | |
| NATIONAL POLICE YOUTH ATHLETIC LEAGUE - 74-2571333, 5150 BROADWAY, SUITE 233, SAN ANTONIO, TX 78209 | EDUCATIONAL | TEXAS | 501(C)(3) | | |
| TEXAS HIGHWAY PATROL MUSEUM - 74-2639283 501 OAKLAND AVENUE AUSTIN, TX 78703 | HALL OF FAME AND MUSEUM | | 501(C)(3) | | |
| | | | | | |
| | | | | | |

LHA For Privacy Act and Paperwork Reduction Act Notice, see the Instructions for Form 990.

832161
12-23-08

Schedule R (Form 990) 2008

26

**Part III  Identification of Related Organizations Taxable as a Partnership**

| (A) Name, address, and EIN of related organization | (B) Primary activity | (C) Legal domicile (state or foreign country) | (D) Direct controlling entity | (E) Predominant income (related, investment, unrelated) | (F) Share of total income | (G) Share of end-of-year assets | (H) Disproportionate allocations? Yes | No | (I) Code V-UBI amount in box 20 of Schedule K-1 (Form 1065) | (J) General or managing partner? Yes | No |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |

**Part IV  Identification of Related Organizations Taxable as a Corporation or Trust**

| (A) Name, address, and EIN of related organization | (B) Primary activity | (C) Legal domicile (state or foreign country) | (D) Direct controlling entity | (E) Type of entity (C corp, S corp, or trust) | (F) Share of total income | (G) Share of end-of-year assets | (H) Percentage ownership |
|---|---|---|---|---|---|---|---|
| THPA SERVICES, INC. - 74-2709623<br>501 OAKLAND AVENUE<br>AUSTIN, TX 78703 | MAGAZINES & AD SALES | TX | TEXAS HIGHWAY PATROL ASSOCIATION | C CORP | 0. | 0. | .00% |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

832162 12-23-08

27

**Part V   Transactions With Related Organizations**

Note. Complete line 1 if any entity is listed in Parts II, III, or IV.

| | | Yes | No |
|---|---|---|---|
| 1 During the tax year, did the organization engage in any of the following transactions with one or more related organizations listed in Parts II-IV? | | | |
| a Receipt of (i) interest (ii) annuities (iii) royalties (iv) rent from a controlled entity | 1a | | X |
| b Gift, grant, or capital contribution to other organization(s) | 1b | | X |
| c Gift, grant, or capital contribution from other organization(s) | 1c | | X |
| d Loans or loan guarantees to or for other organization(s) | 1d | X | |
| e Loans or loan guarantees by other organization(s) | 1e | | X |
| f Sale of assets to other organization(s) | 1f | | X |
| g Purchase of assets from other organization(s) | 1g | | X |
| h Exchange of assets | 1h | | X |
| i Lease of facilities, equipment, or other assets to other organization(s) | 1i | | X |
| j Lease of facilities, equipment, or other assets from other organization(s) | 1j | X | |
| k Performance of services or membership or fundraising solicitations for other organization(s) | 1k | | X |
| l Performance of services or membership or fundraising solicitations by other organization(s) | 1l | X | |
| m Sharing of facilities, equipment, mailing lists, or other assets | 1m | | X |
| n Sharing of paid employees | 1n | X | |
| o Reimbursement paid to other organization for expenses | 1o | | X |
| p Reimbursement paid by other organization for expenses | 1p | | X |
| q Other transfer of cash or property to other organization(s) | 1q | | X |
| r Other transfer of cash or property from other organization(s) | 1r | | X |

2 If the answer to any of the above is "Yes," see the instructions for information on who must complete this line, including covered relationships and transaction thresholds.

| (A) Name of other organization(s) | (B) Transaction type (a-r) | (C) Amount involved |
|---|---|---|
| (1) NATIONAL POLICE YOUTH ATHLETIC LEAGUE | D | 1,058. |
| (2) THPA SERVICES, INC. | D | 637,973. |
| (3) TEXAS HIGHWAY PATROL MUSEUM | D | 32,054. |
| (4) TEXAS HIGHWAY PATROL MUSEUM | J | 2,400. |
| (5) TEXAS HIGHWAY PATROL MUSEUM | L | 3,600. |
| (6) TEXAS HIGHWAY PATROL MUSEUM | N | 1,200. |

**Part VI**   **Unrelated Organizations Taxable as a Partnership**

Provide the following information for each entity taxed as a partnership through which the organization conducted more than five percent of its activities (measured by total assets or gross revenue) that was not a related organization. See instructions regarding exclusion for certain investment partnerships.

| (A) Name, address, and EIN of entity | (B) Primary activity | (C) Legal domicile (state or foreign country) | (D) Are all partners section 501(c)(3) organizations? | | (E) Share of end-of-year assets | (F) Disproportionate allocations? | | (G) Code V-UBI amount in box 20 of Schedule K-1 (Form 1065) | (H) General or managing partner? | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Yes | No | | Yes | No | | Yes | No |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

**ATTACHMENT TO FORM 990**                                    74-2573422
**TEXAS HIGHWAY PATROL ASSOCIATION**
**TAXABLE YEAR ENDED 12/31/08**

Part III - Page 2 - Statement of Program Service Accomplishments - Continued

*See Materials Attached for Details*



# TEXAS HIGHWAY PATROL
## ASSOCIATION & MUSEUM

Administrative Offices
501 Oakland Avenue
Austin, Texas 78703-5113
800-245-8598
www.thpm.org

# SUPPORT
## FOR OUR TROOPER MEMBERS
Service and protection for
Texas' finest

## NOTICE

Dear Supporter:

The Texas Highway Patrol Association and Museum (THPA) welcomes any requests for information from our supporters and will gladly verify the legitimacy of our organization and its fund-raising efforts.

We would like to assure you that this fund-raising program is conducted solely by THPA, which ensures that 100 percent of the funds raised will go directly to our organization and programs. Unlike many other police groups, we take pride in not using outside fund-raising companies, which often take a large portion of the money raised as a service fee.

The Texas Highway Patrol Association and Museum is a non-profit 501(c)(3) organization. Contributions or gifts to the Museum are deductible as charitable contributions for federal income tax purposes.

The Texas Highway Patrol Association and Museum is always willing to answer questions from the public. If you need information on our programs, benefits packages or public service projects, please contact our administrative offices toll-free at:

### 1-800-245-8598

You may also obtain information about the Texas Highway Patrol Association and Museum by contacting the Texas Secretary of State at 1019 Brazos Street, Room 214, Austin, Texas, 78701 or by calling:

1-800-648-9642.

Once again thank you for your support! On behalf of all our members, we wish you and your family a safe and prosperous year.

## ADVERTENCIA

Apreciable Contribuyente:

La Asociación de Patrullas del Estado de Tejas quiere que usted verifique la autenticidad de la asociación, porque sabemos que usted recibe varias peticiones de contribución. Queremos asegurar al contribuyente con cualquier duda que tenga o simplemente para verificar la información que contiene su programa. Estamos a sus órdenes en nuestra oficina central. El número de teléfono se encuentra en el recibo. Por favor no se le olvide mandar su contribución con la porción de abajo del recibo para que reciba crédito. En nombre de la asociación, muchas gracias por su apoyo y que tenga feliz año en compañía de su familia.

Si usted tiene alguna pregunta por favor llame el numero:

### 1-800-245-8598

## We are the
## Texas Highway Patrol
## Association & Museum

A non-profit organization representing the finest group of law enforcers in the nation:

### Texas Highway Patrol officers

Highly trained and specialized, Texas Highway Patrol officers are on the front lines of the most critical issues facing law enforcers in the United States

Since 1990 we've concentrated our efforts on behalf of these dedicated men and women, providing them with the finest benefits possible. We've worked with the legislature for pay increases, provided scholarships for troopers' children, dental insurance for their families, and we were there with emergency relief for the families left behind when an officer was killed. We also provide the law enforcement community with the profession's most-heralded magazine.

But we don't stop there. We're constantly improving our product and adding exciting new dimensions to the association. For example, we have completed our greatest challenge ever: a vibrant and interactive law enforcement museum honoring the Texas Highway Patrol and the officers who have been killed in the line of duty over the years. The Texas Highway Patrol Museum is located in historic downtown San Antonio at 812 South Alamo Street, just 15 minutes from the Alamo. Our hours are 10am – 4pm Tuesday through Saturday.

It is through our commitment of service to our trooper members that the Texas Highway Patrol Museum distinguishes itself from other organizations and associations in this state.



# Texas Highway Patrol Association & Museum

## WHO WE ARE

The Texas Highway Patrol Association and Museum stands as a vibrant and dynamic monument to the brave men and women who make up the extraordinary institution that is the Texas Highway Patrol. The Museum serves to represent the past, present and future contributions of the finest law enforcers in the nation-Texas Highway Patrol Officers.

Highly skilled and specialized, these officers risk their lives daily to serve and protect the people of Texas.

An institution rich with history, tradition, service and sacrifice, our museum educates the public on the true duty and sacrifice put forth by these elite men and women.

Come experience exhibits and program such as: The Hall of Honor, a memorial to the officers who lost their lives in the line of duty, The History Hall, a walk through the history of the Texas Highway Patrol, A Day in the Life of a Trooper photo montage, and several artifacts donated by family of past troopers

We are pleased to invite you to visit the **Texas Highway Patrol Museum** in San Antonio on 812 South Alamo St. Open Tuesday-Saturday, 10am – 4pm.



For more information about museum programs and events, or to discover how you can support THPA. Please contact the museum at:

**1-800-795-8472**

*or our administrative office at*
501 Oakland Avenue
Austin, TX 78703-5113

**1-800-245-8598**

www.thpm.org

## WHAT WE DO

**Death Benefit Fund:** Since the DPS was established, many officers have been killed in the line of duty. We established the Trooper's Benefit Fund to give financial support to the families left behind when tragedy strikes. Should an officer be killed in the line of duty, the surviving family members will receive $10,000 in immediate assistance.

**Funeral Benefits:** Are offered in conjunction with Dignity Memorial® Funeral, Cremation and Cemetery's Trooper Benefit Program. Members will receive dignified and honorable tributes at no cost for troopers killed in the line of duty. Additional benefits include a funeral protection certificate for the children and grandchildren (valued at $2,500).

**College Scholarship Fund:** THPA firmly believes that a better future for Texas lies in educating our children. The Captain Ed Pringle Scholarship Fund has been established for the children of active members belonging to the Texas Highway Patrol Association. Funds are applied directly to education tuition costs and are awarded once a year. THPA has helped scores of students with their education and is proud of our continuing commitment to our youth.

**Dental Insurance:** THPA is concerned for the health of troopers and their families. This is why we started the Dental Benefits Program. Through this program, THPA pays dental insurance for all members of the association and their families. We want to ensure that troopers stay safe and healthy.

### Texas Highway Patrol Magazine:
We publish a quarterly magazine that highlights some of the activities and issues involving crime, justice and law enforcement. A wealth of information and entertainment, the magazine is a professional publication that boasts some of the best writers and photographers in law enforcement journalism today. The finest magazine of its kind, the Texas Highway Patrol Magazine is a must for people interested in Texas law enforcement.

**Remember our Friends Project:** THPA provides assistance to Highway Patrol Officers who were shot or seriously injured in the line of duty. THPA strives to assist the families of injured or killed officers whenever we can. Thanks to the Remember Our Friends Project, we raised over $75,000 for Trooper Randall Vetter's family, who was shot and later succumbed to his injuries. THPA also regularly sends the families of slain highway patrol officers to the National Police Memorial in Washington, D.C., where all law enforcement officers killed in the line of duty are honored in the annual ceremony.

**Educational Programs:** Since 1999, THPA has sponsored its award-winning **Cruisin' to Coffins** program. *Cruisin' to Coffins* an educational program designed to educate students in grades 9-12 about the hazards of driving while under the influence of alcohol. The program is held in April, Alcohol Awareness month, in order to educate students on this topic before prom and graduation celebrations. The program includes presentations from Texas Highway Patrol officers and volunteer speakers from community organizations such as MADD and the San Antonio Council on Alcohol and Drug Abuse. THPA will soon take this program state-wide. We are also happy to arrange safety education lectures to be given by a State Trooper for schools that call in advance and specify their topic of interest.

**And much, much more!** THPA is involved with many more great projects and continues to add more and more to the list! From benefits to programs to public service announcements, THPA is constantly striving to improve and enhance the lives of highway patrol officers while improving the climate of public safety and law enforcement in Texas.

● If you are filing for an **Additional (Not Automatic) 3-Month Extension, complete only Part II** and check this box . ▶ ☑

**Note.** Only complete Part II if you have already been granted an automatic 3-month extension on a previously filed Form 8868.

● If you are filing for an **Automatic 3-Month Extension, complete only Part I** (on page 1).

| **Part II** | **Additional (Not Automatic) 3-Month Extension of Time.** Only file the original (no copies needed). |
|---|---|

| **Type or print** | Name of Exempt Organization **TEXAS HIGHWAY PATROL ASSOCIATION** | | Employer identification number **74 : 2573422** |
|---|---|---|---|
| File by the extended due date for filing the return See instructions | Number, street, and room or suite no If a P.O. box, see instructions **501 OAKLAND AVENUE** | | For IRS use only |
| | City, town or post office, state, and ZIP code For a foreign address, see instructions. **AUSTIN, TX 78703** | | |

**Check type of return to be filed** (File a separate application for each return):

☑ Form 990     ☐ Form 990-PF     ☐ Form 1041-A     ☐ Form 6069

☐ Form 990-BL     ☐ Form 990-T (sec. 401(a) or 408(a) trust)     ☐ Form 4720     ☐ Form 8870

☐ Form 990-EZ     ☐ Form 990-T (trust other than above)     ☐ Form 5227

**STOP! Do not complete Part II if you were not already granted an automatic 3-month extension on a previously filed Form 8868.**

● The books are in the care of ▶ TEXAS HIGHWAY PATROL ASSOCIATION

Telephone No. ▶ ( 512 ) 491-9117     FAX No. ▶ ( 512 ) 491-6026

● If the organization does not have an office or place of business in the United States, check this box . . . . ▶ ☐

● If this is for a Group Return, enter the organization's four digit Group Exemption Number (GEN) _____ . If this is for the whole group, check this box . . . . . . ▶ ☐ . If it is for part of the group, check this box . . . . . . ▶ ☐ and attach a list with the names and EINs of all members the extension is for.

4   I request an additional 3-month extension of time until............... **NOVEMBER 15** ............, 20 **09** .

5   For calendar year **2008** , or other tax year beginning........................ , 20...., and ending ......................... 20..... .

6   If this tax year is for less than 12 months, check reason: ☐ Initial return ☐ Final return ☐ Change in accounting period

7   State in detail why you need the extension ....................................................................................
     **TAXPAYER IS AWAITING INFORMATION NECESSARY TO FILE**
     **A COMPLETE AND ACCURATE RETURN.**

| | | | |
|---|---|---|---|
| **8a** | If this application is for Form 990-BL, 990-PF, 990-T, 4720, or 6069, enter the tentative tax, less any nonrefundable credits. See instructions. | **8a** | $ |
| **b** | If this application is for Form 990-PF, 990-T, 4720, or 6069, enter any refundable credits and estimated tax payments made. Include any prior year overpayment allowed as a credit and any amount paid previously with Form 8868. | **8b** | $ |
| **c** | **Balance Due.** Subtract line 8b from line 8a. Include your payment with this form, or, if required, deposit with FTD coupon or, if required, by using EFTPS (Electronic Federal Tax Payment System). See instructions. | **8c** | $ |

**Signature and Verification**

Under penalties of perjury, I declare that I have examined this form, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete, and that I am authorized to prepare this form

Signature ▶ _(signature)_     Title ▶ **CPA**     Date ▶ **8-6-09**

Form **8868** (Rev 4-2009)

# Form 8868

**(Rev April 2008)**

Department of the Treasury
Internal Revenue Service

## Application for Extension of Time To File an Exempt Organization Return

► File a separate application for each return.

OMB No 1545-1709

- If you are filing for an **Automatic 3-Month Extension**, complete only Part I and check this box . . . . . . . . . ► ☑
- If you are filing for an **Additional (Not Automatic) 3-Month Extension**, complete only Part II (on page 2 of this form).

**Do not complete Part II unless** you have already been granted an automatic 3-month extension on a previously filed Form 8868.

**Part I**    Automatic 3-Month Extension of Time. Only submit original (no copies needed).

A corporation required to file Form 990-T and requesting an automatic 6-month extension—check this box and complete Part I only . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ► ☐

*All other corporations (including 1120-C filers), partnerships, REMICs, and trusts must use Form 7004 to request an extension of time to file income tax returns.*

**Electronic Filing (e-file).** Generally, you can electronically file Form 8868 if you want a 3-month automatic extension of time to file one of the returns noted below (6 months for a corporation required to file Form 990-T). However, you cannot file Form 8868 electronically if (1) you want the additional (not automatic) 3-month extension or (2) you file Forms 990-BL, 6069, or 8870, group returns, or a composite or consolidated Form 990-T. Instead, you must submit the fully completed and signed page 2 (Part II) of Form 8868. For more details on the electronic filing of this form, visit *www.irs gov/efile* and click on *e-file for Charities & Nonprofits.*

| Type or print | Name of Exempt Organization<br>**TEXAS HIGHWAY PATROL ASSOCIATION** | Employer identification number |
|---|---|---|
| File by the due date for filing your return See instructions | | 74 : 2573422 |
| | Number, street, and room or suite no If a P O box, see instructions<br>**501 OAKLAND AVENUE** | |
| | City, town or post office, state, and ZIP code. For a foreign address, see Instructions.<br>**AUSTIN, TX 78703** | |

**Check type of return to be filed** (file a separate application for each return):

| | | |
|---|---|---|
| ☑ Form 990 | ☐ Form 990-T (corporation) | ☐ Form 4720 |
| ☐ Form 990-BL | ☐ Form 990-T (sec. 401(a) or 408(a) trust) | ☐ Form 5227 |
| ☐ Form 990-EZ | ☐ Form 990-T (trust other than above) | ☐ Form 6069 |
| ☐ Form 990-PF | ☐ Form 1041-A | ☐ Form 8870 |

- The books are in the care of ► **TEXAS HIGHWAY PATROL ASSOCIATION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Telephone No. ► ( **512** ) **491-9117** . . . . . . FAX No. ► ( **512** ) **491-6026** . . . . . . .

- If the organization does not have an office or place of business in the United States, check this box . . . . . . ► ☐
- If this is for a Group Return, enter the organization's four digit Group Exemption Number (GEN)_____ . If this is for the whole group, check this box . . . . . . ► ☐ . If it is for part of the group, check this box . . . . . . ► ☐ and attach a list with the names and EINs of all members the extension will cover.

**1**   I request an automatic 3-month (6 months for a corporation required to file Form 990-T) extension of time until ...**AUGUST 15**... , 20.**09** , to file the exempt organization return for the organization named above. The extension is for the organization's return for:

    ► ☑ calendar year 20..**08**.. or

    ► ☐ tax year beginning .............................. , 20 ....... , and ending .............................. , 20........

**2**   If this tax year is for less than 12 months, check reason: ☐ Initial return ☐ Final return ☐ Change in accounting period

| | | | |
|---|---|---|---|
| **3a** | If this application is for Form 990-BL, 990-PF, 990-T, 4720, or 6069, enter the tentative tax, less any nonrefundable credits. See instructions. | **3a** | $ |
| **b** | If this application is for Form 990-PF or 990-T, enter any refundable credits and estimated tax payments made. Include any prior year overpayment allowed as a credit. | **3b** | $ |
| **c** | **Balance Due.** Subtract line 3b from line 3a. Include your payment with this form, or, if required, deposit with FTD coupon or, if required, by using EFTPS (Electronic Federal Tax Payment System). See instructions. | **3c** | $ |

**Caution.** If you are going to make an electronic fund withdrawal with this Form 8868, see Form 8453-EO and Form 8879-EO for payment instructions

**For Privacy Act and Paperwork Reduction Act Notice, see Instructions.**      Cat No 27916D      Form **8868** (Rev 4-2008)

# EXHIBIT C

Form **990**

Department of the Treasury
Internal Revenue Service

# Return of Organization Exempt From Income Tax

Under section 501(c), 527, or 4947(a)(1) of the Internal Revenue Code (except black lung benefit trust or private foundation)

▶ The organization may have to use a copy of this return to satisfy state reporting requirements.

OMB No 1545-0047

**2009**

Open to Public Inspection

**A** For the 2009 calendar year, or tax year beginning _____ and ending _____

| **B** Check if applicable | Please use IRS label or print or type See Specific Instructions | **C** Name of organization TEXAS HIGHWAY PATROL ASSOCIATION | | **D** Employer identification number 74-2573422 |
|---|---|---|---|---|
| ☐ Address change | | Doing Business As | | |
| ☐ Name change | | Number and street (or P.O. box if mail is not delivered to street address) 501 OAKLAND AVENUE | Room/suite | **E** Telephone number (512) 491-9117 |
| ☐ Initial return | | City or town, state or country, and ZIP + 4 AUSTIN, TX 78703-5113 | | **G** Gross receipts $ 14,606. |
| ☐ Terminated | | | | |
| ☐ Amended return | | | | |
| ☐ Application pending | | **F** Name and address of principal officer: TIM TIERNEY SAME AS C ABOVE | | **H(a)** Is this a group return for affiliates? ☐ Yes ☒ No |

**I** Tax-exempt status: ☒ 501(c) ( 6 ) ◀ (insert no.) ☐ 4947(a)(1) or ☐ 527

**H(b)** Are all affiliates included? ☐ Yes ☐ No
If "No," attach a list. (see instructions)

**J** Website: ▶ WWW.THPA.ORG

**H(c)** Group exemption number ▶

**K** Form of organization: ☒ Corporation ☐ Trust ☐ Association ☐ Other ▶    **L** Year of formation: 1990 **M** State of legal domicile: TX

## Part I | Summary

**Activities & Governance**

1 Briefly describe the organization's mission or most significant activities: TO PROMOTE AWARENESS OF TEXAS HIGHWAY PATROL OFFICERS AS A PROFESSION

2 Check this box ▶ ☐ if the organization discontinued its operations or disposed of more than 25% of its net assets.

| | | | |
|---|---|---|---|
| 3 Number of voting members of the governing body (Part VI, line 1a) | | 3 | 6 |
| 4 Number of independent voting members of the governing body (Part VI, line 1b) | | 4 | 6 |
| 5 Total number of employees (Part V, line 2a) | | 5 | 0 |
| 6 Total number of volunteers (estimate if necessary) | | 6 | 0 |
| 7a Total gross unrelated business revenue from Part VIII, column (C), line 12 | | 7a | 0. |
| b Net unrelated business taxable income from Form 990-T, line 34 | | 7b | 0. |

**Revenue**

| | | Prior Year | Current Year |
|---|---|---|---|
| 8 Contributions and grants (Part VIII, line 1h) | | 17,381. | 14,229. |
| 9 Program service revenue (Part VIII, line 2g) | | | |
| 10 Investment income (Part VIII, column (A), lines 3, 4, and 7d) | | 2,502. | 377. |
| 11 Other revenue (Part VIII, column (A), lines 5, 6d, 8c, 9c, 10c, and 11e) | | 154. | |
| 12 Total revenue - add lines 8 through 11 (must equal Part VIII, column (A), line 12) | | 20,037. | 14,606. |

**Expenses**

| | | | |
|---|---|---|---|
| 13 Grants and similar amounts paid (Part IX, column (A), lines 1-3) | | 10,000. | |
| 14 Benefits paid to or for members (Part IX, column (A), line 4) | | | |
| 15 Salaries, other compensation, employee benefits (Part IX, column (A), lines 5-10) | | 3,242. | 3,284. |
| 16a Professional fundraising fees (Part IX, column (A), line 11e) | | | |
| b Total fundraising expenses (Part IX, column (D), line 25) ▶ | | | |
| 17 Other expenses (Part IX, column (A), lines 11a-11d, 11f-24f) | | 4,151. | 5,273. |
| 18 Total expenses Add lines 13-17 (must equal Part IX, column (A), line 25) | | 17,393. | 8,557. |
| 19 Revenue less expenses. Subtract line 18 from line 12 | | 2,644. | 6,049. |

**Net Assets or Fund Balances**

| | | Beginning of Current Year | End of Year |
|---|---|---|---|
| 20 Total assets (Part X, line 16) | | 898,351. | 901,715. |
| 21 Total liabilities (Part X, line 26) | | 15,786. | 13,101. |
| 22 Net assets or fund balances. Subtract line 21 from line 20 | | 882,565. | 888,614. |

RECEIVED NOV 1 6 2010 IRS-OSC

## Part II | Signature Block

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than officer) is based on all information of which preparer has any knowledge

**Sign Here**

▶ Signature of officer _____ Date 11-10-10

▶ TIM TIERNEY, EXECUTIVE VICE-PRESIDENT
Type or print name and title

**Paid Preparer's Use Only**

| Preparer's signature ▶ | Date 11/10/10 | Check if self-employed ▶ ☐ | Preparer's identifying number (see instructions) |
|---|---|---|---|
| Firm's name (or yours if self-employed), address, and ZIP + 4 ▶ | KENNETH C. GORENCE, P.C. P.O. BOX 28279 AUSTIN, TX 78755 | | EIN ▶ Phone no. ▶ (512) 342-8081 |

May the IRS discuss this return with the preparer shown above? (see instructions) ☒ Yes ☐ No

932001 02-04-10 LHA **For Privacy Act and Paperwork Reduction Act Notice, see the separate instructions.** Form **990** (2009)

SCANNED DEC 07 2010

10

**Part III** | **Statement of Program Service Accomplishments**

1  Briefly describe the organization's mission:

TO PROMOTE AWARENESS OF TEXAS HIGHWAY PATROL OFFICERS AS A PROFESSION

2  Did the organization undertake any significant program services during the year which were not listed on
the prior Form 990 or 990-EZ? ............................................................................................. ☐ Yes ☒ No
If "Yes," describe these new services on Schedule O.

3  Did the organization cease conducting, or make significant changes in how it conducts, any program services? ........... ☐ Yes ☒ No
If "Yes," describe these changes on Schedule O.

4  Describe the exempt purpose achievements for each of the organization's three largest program services by expenses.
Section 501(c)(3) and 501(c)(4) organizations and section 4947(a)(1) trusts are required to report the amount of grants and
allocations to others, the total expenses, and revenue, if any, for each program service reported.

4a  (Code: _____) (Expenses $ _____ including grants of $ _____) (Revenue $ _____)
PROMOTED AWARENESS OF TEXAS HIGHWAY PATROL OFFICERS AS A PROFESSION

4b  (Code: _____) (Expenses $ _____ including grants of $ _____) (Revenue $ _____)
PROVIDED DENTAL INSURANCE BENEFITS TO MEMBERS

4c  (Code: _____) (Expenses $ _____ including grants of $ _____) (Revenue $ _____)
PROVIDED FINANCIAL ASSISTANCE (DEATH BENEFITS) TO THE FAMILIES OF
TROOPERS KILLED IN THE LINE OF DUTY

4d  Other program services. (Describe in Schedule O.)
(Expenses $ _____ including grants of $ _____) (Revenue $ _____)

4e  Total program service expenses ▶ $ _____

932002
02-04-10

Form **990** (2009)

09441110 000078                    2009.05000 TEXAS HIGHWAY PATROL ASSOCI 31405001

| Part IV | Checklist of Required Schedules |
|---|---|

|  |  | Yes | No |
|---|---|---|---|
| **1** | Is the organization described in section 501(c)(3) or 4947(a)(1) (other than a private foundation)? If "Yes," complete Schedule A | **1** |  | X |
| **2** | Is the organization required to complete Schedule B, Schedule of Contributors? | **2** |  | X |
| **3** | Did the organization engage in direct or indirect political campaign activities on behalf of or in opposition to candidates for public office? If "Yes," complete Schedule C, Part I | **3** |  | X |
| **4** | **Section 501(c)(3) organizations.** Did the organization engage in lobbying activities? If "Yes," complete Schedule C, Part II | **4** |  |  |
| **5** | **Section 501(c)(4), 501(c)(5), and 501(c)(6) organizations.** Is the organization subject to the section 6033(e) notice and reporting requirement and proxy tax? If "Yes," complete Schedule C, Part III | **5** |  | X |
| **6** | Did the organization maintain any donor advised funds or any similar funds or accounts where donors have the right to provide advice on the distribution or investment of amounts in such funds or accounts? If "Yes," complete Schedule D, Part I | **6** |  | X |
| **7** | Did the organization receive or hold a conservation easement, including easements to preserve open space, the environment, historic land areas, or historic structures? If "Yes," complete Schedule D, Part II | **7** |  | X |
| **8** | Did the organization maintain collections of works of art, historical treasures, or other similar assets? If "Yes," complete Schedule D, Part III | **8** |  | X |
| **9** | Did the organization report an amount in Part X, line 21; serve as a custodian for amounts not listed in Part X; or provide credit counseling, debt management, credit repair, or debt negotiation services? If "Yes," complete Schedule D, Part IV | **9** |  | X |
| **10** | Did the organization, directly or through a related organization, hold assets in term, permanent, or quasi-endowments? If "Yes," complete Schedule D, Part V | **10** |  | X |
| **11** | Is the organization's answer to any of the following questions "Yes"? If so, complete Schedule D, Parts VI, VII, VIII, IX, or X as applicable | **11** | X |  |
| • | Did the organization report an amount for land, buildings, and equipment in Part X, line 10? If "Yes," complete Schedule D, Part VI. |  |  |  |
| • | Did the organization report an amount for investments · other securities in Part X, line 12 that is 5% or more of its total assets reported in Part X, line 16? If "Yes," complete Schedule D, Part VII. |  |  |  |
| • | Did the organization report an amount for investments · program related in Part X, line 13 that is 5% or more of its total assets reported in Part X, line 16? If "Yes," complete Schedule D, Part VIII. |  |  |  |
| • | Did the organization report an amount for other assets in Part X, line 15 that is 5% or more of its total assets reported in Part X, line 16? If "Yes," complete Schedule D, Part IX. |  |  |  |
| • | Did the organization report an amount for other liabilities in Part X, line 25? If "Yes," complete Schedule D, Part X. |  |  |  |
| • | Did the organization's separate or consolidated financial statements for the tax year include a footnote that addresses the organization's liability for uncertain tax positions under FIN 48? If "Yes," complete Schedule D, Part X. |  |  |  |
| **12** | Did the organization obtain separate, independent audited financial statements for the tax year? If "Yes," complete Schedule D, Parts XI, XII, and XIII. | **12** |  | X |
| **12A** | Was the organization included in consolidated, independent audited financial statements for the tax year? If "Yes," completing Schedule D, Parts XI, XII, and XIII is optional | **12A** Yes / No: X |  |  |
| **13** | Is the organization a school described in section 170(b)(1)(A)(ii)? If "Yes," complete Schedule E | **13** |  | X |
| **14a** | Did the organization maintain an office, employees, or agents outside of the United States? | **14a** |  | X |
| **b** | Did the organization have aggregate revenues or expenses of more than $10,000 from grantmaking, fundraising, business, and program service activities outside the United States? If "Yes," complete Schedule F, Part I | **14b** |  | X |
| **15** | Did the organization report on Part IX, column (A), line 3, more than $5,000 of grants or assistance to any organization or entity located outside the United States? If "Yes," complete Schedule F, Part II | **15** |  | X |
| **16** | Did the organization report on Part IX, column (A), line 3, more than $5,000 of aggregate grants or assistance to individuals located outside the United States? If "Yes," complete Schedule F, Part III | **16** |  | X |
| **17** | Did the organization report a total of more than $15,000 of expenses for professional fundraising services on Part IX, column (A), lines 6 and 11e? If "Yes," complete Schedule G, Part I | **17** |  | X |
| **18** | Did the organization report more than $15,000 total of fundraising event gross income and contributions on Part VIII, lines 1c and 8a? If "Yes," complete Schedule G, Part II | **18** |  | X |
| **19** | Did the organization report more than $15,000 of gross income from gaming activities on Part VIII, line 9a? If "Yes," complete Schedule G, Part III | **19** |  | X |
| **20** | Did the organization operate one or more hospitals? If "Yes," complete Schedule H | **20** |  | X |

Form **990** (2009)

| **Part IV** | **Checklist of Required Schedules** (continued) | | Yes | No |
|---|---|---|---|---|
| 21 | Did the organization report more than $5,000 of grants and other assistance to governments and organizations in the United States on Part IX, column (A), line 1? If "Yes," complete Schedule I, Parts I and II | 21 | | X |
| 22 | Did the organization report more than $5,000 of grants and other assistance to individuals in the United States on Part IX, column (A), line 2? If "Yes," complete Schedule I, Parts I and III | 22 | | X |
| 23 | Did the organization answer "Yes" to Part VII, Section A, line 3, 4, or 5 about compensation of the organization's current and former officers, directors, trustees, key employees, and highest compensated employees? If "Yes," complete Schedule J | 23 | X | |
| 24a | Did the organization have a tax-exempt bond issue with an outstanding principal amount of more than $100,000 as of the last day of the year, that was issued after December 31, 2002? If "Yes," answer lines 24b through 24d and complete Schedule K. If "No", go to line 25 | 24a | | X |
| b | Did the organization invest any proceeds of tax-exempt bonds beyond a temporary period exception? | 24b | | |
| c | Did the organization maintain an escrow account other than a refunding escrow at any time during the year to defease any tax-exempt bonds? | 24c | | |
| d | Did the organization act as an "on behalf of" issuer for bonds outstanding at any time during the year? | 24d | | |
| 25a | **Section 501(c)(3) and 501(c)(4) organizations.** Did the organization engage in an excess benefit transaction with a disqualified person during the year? If "Yes," complete Schedule L, Part I | 25a | | |
| b | Is the organization aware that it engaged in an excess benefit transaction with a disqualified person in a prior year, and that the transaction has not been reported on any of the organization's prior Forms 990 or 990-EZ? If "Yes," complete Schedule L, Part I | 25b | | |
| 26 | Was a loan to or by a current or former officer, director, trustee, key employee, highly compensated employee, or disqualified person outstanding as of the end of the organization's tax year? If "Yes," complete Schedule L, Part II | 26 | X | |
| 27 | Did the organization provide a grant or other assistance to an officer, director, trustee, key employee, substantial contributor, or a grant selection committee member, or to a person related to such an individual? If "Yes," complete Schedule L, Part III | 27 | | X |
| 28 | Was the organization a party to a business transaction with one of the following parties, (see Schedule L, Part IV instructions for applicable filing thresholds, conditions, and exceptions): | | | |
| a | A current or former officer, director, trustee, or key employee? If "Yes," complete Schedule L, Part IV | 28a | | X |
| b | A family member of a current or former officer, director, trustee, or key employee? If "Yes," complete Schedule L, Part IV | 28b | | X |
| c | An entity of which a current or former officer, director, trustee, or key employee of the organization (or a family member) was an officer, director, trustee, or direct or indirect owner? If "Yes," complete Schedule L, Part IV | 28c | | X |
| 29 | Did the organization receive more than $25,000 in non-cash contributions? If "Yes," complete Schedule M | 29 | | X |
| 30 | Did the organization receive contributions of art, historical treasures, or other similar assets, or qualified conservation contributions? If "Yes," complete Schedule M | 30 | | X |
| 31 | Did the organization liquidate, terminate, or dissolve and cease operations? If "Yes," complete Schedule N, Part I | 31 | | X |
| 32 | Did the organization sell, exchange, dispose of, or transfer more than 25% of its net assets? If "Yes," complete Schedule N, Part II | 32 | | X |
| 33 | Did the organization own 100% of an entity disregarded as separate from the organization under Regulations sections 301.7701-2 and 301.7701-3? If "Yes," complete Schedule R, Part I | 33 | | X |
| 34 | Was the organization related to any tax-exempt or taxable entity? If "Yes," complete Schedule R, Parts II, III, IV, and V, line 1 | 34 | X | |
| 35 | Is any related organization a controlled entity within the meaning of section 512(b)(13)? If "Yes," complete Schedule R, Part V, line 2 | 35 | X | |
| 36 | **Section 501(c)(3) organizations.** Did the organization make any transfers to an exempt non-charitable related organization? If "Yes," complete Schedule R, Part V, line 2 | 36 | | |
| 37 | Did the organization conduct more than 5% of its activities through an entity that is not a related organization and that is treated as a partnership for federal income tax purposes? If "Yes," complete Schedule R, Part VI | 37 | | X |
| 38 | Did the organization complete Schedule O and provide explanations in Schedule O for Part VI, lines 11 and 19? **Note.** All Form 990 filers are required to complete Schedule O. | 38 | X | |

Form **990** (2009)

932004
02-04-10

09441110 000078          2009.05000 TEXAS HIGHWAY PATROL ASSOCI 31405001

| Part V | Statements Regarding Other IRS Filings and Tax Compliance |

| | | | Yes | No |
|---|---|---|---|---|
| 1a | Enter the number reported in Box 3 of Form 1096, Annual Summary and Transmittal of U.S. Information Returns. Enter -0- if not applicable **1a** `0` | | | |
| b | Enter the number of Forms W-2G included in line 1a. Enter -0- if not applicable **1b** `0` | | | |
| c | Did the organization comply with backup withholding rules for reportable payments to vendors and reportable gaming (gambling) winnings to prize winners? | **1c** | | |
| 2a | Enter the number of employees reported on Form W-3, Transmittal of Wage and Tax Statements, filed for the calendar year ending with or within the year covered by this return **2a** `0` | | | |
| b | If at least one is reported on line 2a, did the organization file all required federal employment tax returns? | **2b** | | |
| | Note. If the sum of lines 1a and 2a is greater than 250, you may be required to e-file this return. (see instructions) | | | |
| 3a | Did the organization have unrelated business gross income of $1,000 or more during the year covered by this return? | **3a** | | X |
| b | If "Yes," has it filed a Form 990-T for this year? If "No," provide an explanation in Schedule O | **3b** | | |
| 4a | At any time during the calendar year, did the organization have an interest in, or a signature or other authority over, a financial account in a foreign country (such as a bank account, securities account, or other financial account)? | **4a** | | X |
| b | If "Yes," enter the name of the foreign country: ▶ | | | |
| | See the instructions for exceptions and filing requirements for Form TD F 90-22.1, Report of Foreign Bank and Financial Accounts. | | | |
| 5a | Was the organization a party to a prohibited tax shelter transaction at any time during the tax year? | **5a** | | X |
| b | Did any taxable party notify the organization that it was or is a party to a prohibited tax shelter transaction? | **5b** | | X |
| c | If "Yes," to line 5a or 5b, did the organization file Form 8886-T, Disclosure by Tax-Exempt Entity Regarding Prohibited Tax Shelter Transaction? | **5c** | | |
| 6a | Does the organization have annual gross receipts that are normally greater than $100,000, and did the organization solicit any contributions that were not tax deductible? | **6a** | X | |
| b | If "Yes," did the organization include with every solicitation an express statement that such contributions or gifts were not tax deductible? | **6b** | X | |
| 7 | **Organizations that may receive deductible contributions under section 170(c).** | | | |
| a | Did the organization receive a payment in excess of $75 made partly as a contribution and partly for goods and services provided to the payor? | **7a** | | |
| b | If "Yes," did the organization notify the donor of the value of the goods or services provided? | **7b** | | |
| c | Did the organization sell, exchange, or otherwise dispose of tangible personal property for which it was required to file Form 8282? | **7c** | | |
| d | If "Yes," indicate the number of Forms 8282 filed during the year **7d** | | | |
| e | Did the organization, during the year, receive any funds, directly or indirectly, to pay premiums on a personal benefit contract? | **7e** | | |
| f | Did the organization, during the year, pay premiums, directly or indirectly, on a personal benefit contract? | **7f** | | |
| g | For all contributions of qualified intellectual property, did the organization file Form 8899 as required? | **7g** | | |
| h | For contributions of cars, boats, airplanes, and other vehicles, did the organization file a Form 1098-C as required? | **7h** | | |
| 8 | **Sponsoring organizations maintaining donor advised funds and section 509(a)(3) supporting organizations.** Did the supporting organization, or a donor advised fund maintained by a sponsoring organization, have excess business holdings at any time during the year? | **8** | | |
| 9 | **Sponsoring organizations maintaining donor advised funds.** | | | |
| a | Did the organization make any taxable distributions under section 4966? | **9a** | | |
| b | Did the organization make a distribution to a donor, donor advisor, or related person? | **9b** | | |
| 10 | **Section 501(c)(7) organizations.** Enter: | | | |
| a | Initiation fees and capital contributions included on Part VIII, line 12 **10a** | | | |
| b | Gross receipts, included on Form 990, Part VIII, line 12, for public use of club facilities **10b** | | | |
| 11 | **Section 501(c)(12) organizations.** Enter: | | | |
| a | Gross income from members or shareholders **11a** | | | |
| b | Gross income from other sources (Do not net amounts due or paid to other sources against amounts due or received from them.) **11b** | | | |
| 12a | **Section 4947(a)(1) non-exempt charitable trusts.** Is the organization filing Form 990 in lieu of Form 1041? | **12a** | | |
| b | If "Yes," enter the amount of tax-exempt interest received or accrued during the year **12b** | | | |

Form **990** (2009)

932005
02-04-10

**Part VI** Governance, Management, and Disclosure *For each "Yes" response to lines 2 through 7b below, and for a "No" response to line 8a, 8b, or 10b below, describe the circumstances, processes, or changes in Schedule O See instructions.*

## Section A. Governing Body and Management

| | | | | Yes | No |
|---|---|---|---|---|---|
| **1a** | Enter the number of voting members of the governing body | 1a | 6 | | |
| **b** | Enter the number of voting members that are independent | 1b | 6 | | |
| **2** | Did any officer, director, trustee, or key employee have a family relationship or a business relationship with any other officer, director, trustee, or key employee? | | **2** | | X |
| **3** | Did the organization delegate control over management duties customarily performed by or under the direct supervision of officers, directors or trustees, or key employees to a management company or other person? | | **3** | | X |
| **4** | Did the organization make any significant changes to its organizational documents since the prior Form 990 was filed? | | **4** | | X |
| **5** | Did the organization become aware during the year of a material diversion of the organization's assets? | | **5** | | X |
| **6** | Does the organization have members or stockholders? | | **6** | X | |
| **7a** | Does the organization have members, stockholders, or other persons who may elect one or more members of the governing body? | | **7a** | X | |
| **b** | Are any decisions of the governing body subject to approval by members, stockholders, or other persons? | | **7b** | | X |
| **8** | Did the organization contemporaneously document the meetings held or written actions undertaken during the year by the following: | | | | |
| **a** | The governing body? | | **8a** | X | |
| **b** | Each committee with authority to act on behalf of the governing body? | | **8b** | X | |
| **9** | Is there any officer, director, trustee, or key employee listed in Part VII, Section A, who cannot be reached at the organization's mailing address? *If "Yes," provide the names and addresses in Schedule O* | | **9** | | X |

## Section B. Policies *(This Section B requests information about policies not required by the Internal Revenue Code )*

| | | | Yes | No |
|---|---|---|---|---|
| **10a** | Does the organization have local chapters, branches, or affiliates? | **10a** | | X |
| **b** | If "Yes," does the organization have written policies and procedures governing the activities of such chapters, affiliates, and branches to ensure their operations are consistent with those of the organization? | **10b** | | |
| **11** | Has the organization provided a copy of this Form 990 to all members of its governing body before filing the form? | **11** | | X |
| **11A** | Describe in Schedule O the process, if any, used by the organization to review this Form 990. | | | |
| **12a** | Does the organization have a written conflict of interest policy? *If "No," go to line 13* | **12a** | X | |
| **b** | Are officers, directors or trustees, and key employees required to disclose annually interests that could give rise to conflicts? | **12b** | X | |
| **c** | Does the organization regularly and consistently monitor and enforce compliance with the policy? *If "Yes," describe in Schedule O how this is done* | **12c** | X | |
| **13** | Does the organization have a written whistleblower policy? | **13** | X | |
| **14** | Does the organization have a written document retention and destruction policy? | **14** | X | |
| **15** | Did the process for determining compensation of the following persons include a review and approval by independent persons, comparability data, and contemporaneous substantiation of the deliberation and decision? | | | |
| **a** | The organization's CEO, Executive Director, or top management official | **15a** | | X |
| **b** | Other officers or key employees of the organization | **15b** | | X |
| | If "Yes" to line 15a or 15b, describe the process in Schedule O. (See instructions ) | | | |
| **16a** | Did the organization invest in, contribute assets to, or participate in a joint venture or similar arrangement with a taxable entity during the year? | **16a** | | X |
| **b** | If "Yes," has the organization adopted a written policy or procedure requiring the organization to evaluate its participation in joint venture arrangements under applicable federal tax law, and taken steps to safeguard the organization's exempt status with respect to such arrangements? | **16b** | | |

## Section C. Disclosure

**17** List the states with which a copy of this Form 990 is required to be filed ▶ TX

**18** Section 6104 requires an organization to make its Forms 1023 (or 1024 if applicable), 990, and 990-T (501(c)(3)s only) available for public inspection. Indicate how you make these available. Check all that apply.
☐ Own website　　☐ Another's website　　☒ Upon request

**19** Describe in Schedule O whether (and if so, how), the organization makes its governing documents, conflict of interest policy, and financial statements available to the public.

**20** State the name, physical address, and telephone number of the person who possesses the books and records of the organization: ▶
TIM TIERNEY - (512) 491-9117
501 OAKLAND AVENUE, AUSTIN, TX 78703-5113

932006
02-04-10

**Part VII** Compensation of Officers, Directors, Trustees, Key Employees, Highest Compensated Employees, and Independent Contractors

**Section A.** Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees

**1a** Complete this table for all persons required to be listed. Report compensation for the calendar year ending with or within the organization's tax year. Use Schedule J-2 if additional space is needed.

- List all of the organization's **current** officers, directors, trustees (whether individuals or organizations), regardless of amount of compensation. Enter -0- in columns (D), (E), and (F) if no compensation was paid.
- List all of the organization's **current** key employees  See instructions for definition of "key employee."
- List the organization's five **current** highest compensated employees (other than an officer, director, trustee, or key employee) who received reportable compensation (Box 5 of Form W-2 and/or Box 7 of Form 1099-MISC) of more than $100,000 from the organization and any related organizations.
- List all of the organization's **former** officers, key employees, and highest compensated employees who received more than $100,000 of reportable compensation from the organization and any related organizations.
- List all of the organization's **former directors or trustees** that received, in the capacity as a former director or trustee of the organization, more than $10,000 of reportable compensation from the organization and any related organizations.

List persons in the following order: individual trustees or directors; institutional trustees; officers; key employees; highest compensated employees; and former such persons.

[X] Check this box if the organization did not compensate any current officer, director, or trustee.

| (A) Name and Title | (B) Average hours per week | (C) Position (check all that apply) | | | | | | (D) Reportable compensation from the organization (W-2/1099-MISC) | (E) Reportable compensation from related organizations (W-2/1099-MISC) | (F) Estimated amount of other compensation from the organization and related organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Individual trustee or director | Institutional trustee | Officer | Key employee | Highest compensated employee | Former | | | |
| GREGG GREER PRESIDENT & DIRECTOR | 5.00 | X | | X | | | | 0. | 0. | 0. |
| FRED RIOJAS DIRECTOR | 5.00 | X | | | | | | 0. | 0. | 0. |
| TED RIOJAS DIRECTOR | 5.00 | X | | | | | | 0. | 0. | 0. |
| MARK LOCKRIDGE DIRECTOR | 5.00 | X | | | | | | 0. | 0. | 0. |
| ROBERT BERNARD, JR. DIRECTOR | 5.00 | X | | | | | | 0. | 0. | 0. |
| JAMES COLUNGA DIRECTOR | 5.00 | X | | | | | | 0. | 0. | 0. |
| TIM TIERNEY EXECUTIVE VICE-PRESIDENT | 5.00 | | | X | | | | 0. | 194,393. | 0. |
| C.R. VILLALVA DIRECTOR OF MARKETING | 5.00 | | | X | | | | 0. | 211,190. | 0. |

932007 02-04-10

Form **990** (2009)

**Part VII** Section A.   Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees *(continued)*

| (A) Name and title | (B) Average hours per week | (C) Position (check all that apply) | | | | | | (D) Reportable compensation from the organization (W-2/1099-MISC) | (E) Reportable compensation from related organizations (W-2/1099-MISC) | (F) Estimated amount of other compensation from the organization and related organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Individual trustee or director | Institutional trustee | Officer | Key employee | Highest compensated employee | Former | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| **1b Total** ▶ | | | | | | | | 0. | 405,583. | 0. |

**2** Total number of individuals (including but not limited to those listed above) who received more than $100,000 in reportable compensation from the organization ▶    0

| | | Yes | No |
|---|---|---|---|
| **3** | Did the organization list any **former** officer, director or trustee, key employee, or highest compensated employee on line 1a? *If "Yes," complete Schedule J for such individual* | | |
| 3 | | | X |
| **4** | For any individual listed on line 1a, is the sum of reportable compensation and other compensation from the organization and related organizations greater than $150,000? *If "Yes," complete Schedule J for such individual* | | |
| 4 | | X | |
| **5** | Did any person listed on line 1a receive or accrue compensation from any unrelated organization for services rendered to the organization? *If "Yes," complete Schedule J for such person* | | |
| 5 | | | X |

**Section B. Independent Contractors**

**1** Complete this table for your five highest compensated independent contractors that received more than $100,000 of compensation from the organization.    NONE

| (A) Name and business address | (B) Description of services | (C) Compensation |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

**2** Total number of independent contractors (including but not limited to those listed above) who received more than $100,000 in compensation from the organization ▶    0

932008 02-04-10      Form **990** (2009)

09441110 000078      2009.05000 TEXAS HIGHWAY PATROL ASSOCI 31405001

| Part VIII | Statement of Revenue | | | | | |
|---|---|---|---|---|---|---|

| | | | | **(A)** Total revenue | **(B)** Related or exempt function revenue | **(C)** Unrelated business revenue | **(D)** Revenue excluded from tax under sections 512, 513, or 514 |
|---|---|---|---|---|---|---|---|
| **Contributions, gifts, grants and other similar amounts** | **1 a** Federated campaigns | 1a | | | | | |
| | **b** Membership dues | 1b | 1,705. | | | | |
| | **c** Fundraising events | 1c | | | | | |
| | **d** Related organizations | 1d | | | | | |
| | **e** Government grants (contributions) | 1e | | | | | |
| | **f** All other contributions, gifts, grants, and similar amounts not included above | 1f | 12,524. | | | | |
| | **g** Noncash contributions included in lines 1a-1f $ | | | | | | |
| | **h** Total. Add lines 1a-1f ▶ | | | 14,229. | | | |
| **Program Service Revenue** | **2 a** _____ | Business Code | | | | | |
| | **b** _____ | | | | | | |
| | **c** _____ | | | | | | |
| | **d** _____ | | | | | | |
| | **e** _____ | | | | | | |
| | **f** All other program service revenue | | | | | | |
| | **g** Total. Add lines 2a-2f ▶ | | | | | | |
| **Other Revenue** | **3** Investment income (including dividends, interest, and other similar amounts) ▶ | | | 217. | | | 217. |
| | **4** Income from investment of tax-exempt bond proceeds ▶ | | | | | | |
| | **5** Royalties ▶ | | | | | | |
| | | (i) Real | (ii) Personal | | | | |
| | **6 a** Gross Rents | | | | | | |
| | **b** Less: rental expenses | | | | | | |
| | **c** Rental income or (loss) | | | | | | |
| | **d** Net rental income or (loss) ▶ | | | | | | |
| | **7 a** Gross amount from sales of assets other than inventory | (i) Securities 160. | (ii) Other | | | | |
| | **b** Less: cost or other basis and sales expenses | | | | | | |
| | **c** Gain or (loss) | 160. | | | | | |
| | **d** Net gain or (loss) ▶ | | | 160. | 160. | | |
| | **8 a** Gross income from fundraising events (not including $ _____ of contributions reported on line 1c). See Part IV, line 18 | a | | | | | |
| | **b** Less: direct expenses | b | | | | | |
| | **c** Net income or (loss) from fundraising events ▶ | | | | | | |
| | **9 a** Gross income from gaming activities. See Part IV, line 19 | a | | | | | |
| | **b** Less: direct expenses | b | | | | | |
| | **c** Net income or (loss) from gaming activities ▶ | | | | | | |
| | **10 a** Gross sales of inventory, less returns and allowances | a | | | | | |
| | **b** Less: cost of goods sold | b | | | | | |
| | **c** Net income or (loss) from sales of inventory ▶ | | | | | | |
| | Miscellaneous Revenue | Business Code | | | | | |
| | **11 a** _____ | | | | | | |
| | **b** _____ | | | | | | |
| | **c** _____ | | | | | | |
| | **d** All other revenue | | | | | | |
| | **e** Total. Add lines 11a-11d ▶ | | | | | | |
| | **12** Total revenue. See instructions. ▶ | | | 14,606. | 160. | 0. | 217. |

932009
02-04-10

Form **990** (2009)

09441110 000078                2009.05000 TEXAS HIGHWAY PATROL ASSOCI 31405001

| Part IX | Statement of Functional Expenses |

Section 501(c)(3) and 501(c)(4) organizations must complete all columns.
All other organizations must complete column (A) but are not required to complete columns (B), (C), and (D).

| Do not include amounts reported on lines 6b, 7b, 8b, 9b, and 10b of Part VIII. | (A) Total expenses | (B) Program service expenses | (C) Management and general expenses | (D) Fundraising expenses |
|---|---|---|---|---|
| **1** Grants and other assistance to governments and organizations in the U.S. See Part IV, line 21 | | | | |
| **2** Grants and other assistance to individuals in the U.S. See Part IV, line 22 | | | | |
| **3** Grants and other assistance to governments, organizations, and individuals outside the U.S. See Part IV, lines 15 and 16 | | | | |
| **4** Benefits paid to or for members | 3,284. | | | |
| **5** Compensation of current officers, directors, trustees, and key employees | | | | |
| **6** Compensation not included above, to disqualified persons (as defined under section 4958(f)(1)) and persons described in section 4958(c)(3)(B) | | | | |
| **7** Other salaries and wages | | | | |
| **8** Pension plan contributions (include section 401(k) and section 403(b) employer contributions) | | | | |
| **9** Other employee benefits | | | | |
| **10** Payroll taxes | | | | |
| **11** Fees for services (non-employees): | | | | |
| **a** Management | | | | |
| **b** Legal | | | | |
| **c** Accounting | 2,864. | | | |
| **d** Lobbying | | | | |
| **e** Professional fundraising services. See Part IV, line 17 | | | | |
| **f** Investment management fees | | | | |
| **g** Other | | | | |
| **12** Advertising and promotion | | | | |
| **13** Office expenses | | | | |
| **14** Information technology | | | | |
| **15** Royalties | | | | |
| **16** Occupancy | 2,400. | | | |
| **17** Travel | | | | |
| **18** Payments of travel or entertainment expenses for any federal, state, or local public officials | | | | |
| **19** Conferences, conventions, and meetings | | | | |
| **20** Interest | | | | |
| **21** Payments to affiliates | | | | |
| **22** Depreciation, depletion, and amortization | | | | |
| **23** Insurance | | | | |
| **24** Other expenses. Itemize expenses not covered above. (Expenses grouped together and labeled miscellaneous may not exceed 5% of total expenses shown on line 25 below.) | | | | |
| **a** BANK CHARGES | 9. | | | |
| **b** | | | | |
| **c** | | | | |
| **d** | | | | |
| **e** | | | | |
| **f** All other expenses | | | | |
| **25** Total functional expenses. Add lines 1 through 24f | 8,557. | | | |
| **26** Joint costs. Check here ▶ ☐ if following SOP 98-2. Complete this line only if the organization reported in column (B) joint costs from a combined educational campaign and fundraising solicitation | | | | |

932010 02-04-10

Form **990** (2009)

09441110 000078      2009.05000 TEXAS HIGHWAY PATROL ASSOCI 31405001

| Part X | Balance Sheet | | | | |

| | | | (A) Beginning of year | | (B) End of year |
|---|---|---|---|---|---|
| **Assets** | 1 | Cash - non-interest-bearing | 13,907. | 1 | 20,400. |
| | 2 | Savings and temporary cash investments | 151,267. | 2 | 151,623. |
| | 3 | Pledges and grants receivable, net | | 3 | |
| | 4 | Accounts receivable, net | | 4 | |
| | 5 | Receivables from current and former officers, directors, trustees, key employees, and highest compensated employees. Complete Part II of Schedule L | | 5 | |
| | 6 | Receivables from other disqualified persons (as defined under section 4958(f)(1)) and persons described in section 4958(c)(3)(B). Complete Part II of Schedule L | | 6 | |
| | 7 | Notes and loans receivable, net | 671,085. | 7 | 666,345. |
| | 8 | Inventories for sale or use | | 8 | |
| | 9 | Prepaid expenses and deferred charges | | 9 | |
| | 10a | Land, buildings, and equipment: cost or other basis. Complete Part VI of Schedule D | 10a | | |
| | b | Less: accumulated depreciation | 10b | 10c | |
| | 11 | Investments - publicly traded securities | | 11 | |
| | 12 | Investments - other securities. See Part IV, line 11 | | 12 | |
| | 13 | Investments - program-related. See Part IV, line 11 | | 13 | |
| | 14 | Intangible assets | | 14 | |
| | 15 | Other assets. See Part IV, line 11 | 62,092. | 15 | 63,347. |
| | 16 | **Total assets.** Add lines 1 through 15 (must equal line 34) | 898,351. | 16 | 901,715. |
| **Liabilities** | 17 | Accounts payable and accrued expenses | 1,176. | 17 | 1,176. |
| | 18 | Grants payable | | 18 | |
| | 19 | Deferred revenue | | 19 | |
| | 20 | Tax-exempt bond liabilities | | 20 | |
| | 21 | Escrow or custodial account liability. Complete Part IV of Schedule D | | 21 | |
| | 22 | Payables to current and former officers, directors, trustees, key employees, highest compensated employees, and disqualified persons. Complete Part II of Schedule L | 6,705. | 22 | 6,705. |
| | 23 | Secured mortgages and notes payable to unrelated third parties | | 23 | |
| | 24 | Unsecured notes and loans payable to unrelated third parties | | 24 | |
| | 25 | Other liabilities. Complete Part X of Schedule D | 7,905. | 25 | 5,220. |
| | 26 | **Total liabilities.** Add lines 17 through 25 | 15,786. | 26 | 13,101. |
| **Net Assets or Fund Balances** | | Organizations that follow SFAS 117, check here ▶ ☐ and complete lines 27 through 29, and lines 33 and 34. | | | |
| | 27 | Unrestricted net assets | | 27 | |
| | 28 | Temporarily restricted net assets | | 28 | |
| | 29 | Permanently restricted net assets | | 29 | |
| | | Organizations that do not follow SFAS 117, check here ▶ ☒ and complete lines 30 through 34. | | | |
| | 30 | Capital stock or trust principal, or current funds | 0. | 30 | 0. |
| | 31 | Paid-in or capital surplus, or land, building, or equipment fund | 0. | 31 | 0. |
| | 32 | Retained earnings, endowment, accumulated income, or other funds | 882,565. | 32 | 888,614. |
| | 33 | Total net assets or fund balances | 882,565. | 33 | 888,614. |
| | 34 | Total liabilities and net assets/fund balances | 898,351. | 34 | 901,715. |

Form **990** (2009)

932011 02-04-10

09441110 000078        2009.05000 TEXAS HIGHWAY PATROL ASSOCI 31405001

| Part XI | Financial Statements and Reporting |
| --- | --- |

|  |  | Yes | No |
| --- | --- | --- | --- |
| **1** | Accounting method used to prepare the Form 990: [X] Cash   ☐ Accrual   ☐ Other _____ <br> If the organization changed its method of accounting from a prior year or checked "Other," explain in Schedule O. | | |
| **2a** | Were the organization's financial statements compiled or reviewed by an independent accountant? | **2a** X | |
| **b** | Were the organization's financial statements audited by an independent accountant? | **2b** | X |
| **c** | If "Yes" to line 2a or 2b, does the organization have a committee that assumes responsibility for oversight of the audit, review, or compilation of its financial statements and selection of an independent accountant? <br> If the organization changed either its oversight process or selection process during the tax year, explain in Schedule O. | **2c** | X |
| **d** | If "Yes" to line 2a or 2b, check a box below to indicate whether the financial statements for the year were issued on a consolidated basis, separate basis, or both: <br> [X] Separate basis   ☐ Consolidated basis   ☐ Both consolidated and separate basis | | |
| **3a** | As a result of a federal award, was the organization required to undergo an audit or audits as set forth in the Single Audit Act and OMB Circular A-133? | **3a** | X |
| **b** | If "Yes," did the organization undergo the required audit or audits? If the organization did not undergo the required audit or audits, explain why in Schedule O and describe any steps taken to undergo such audits. | **3b** | |

Form **990** (2009)

# Schedule D
(Form 990)

Department of the Treasury
Internal Revenue Service

## Supplemental Financial Statements

▶ Complete if the organization answered "Yes," to Form 990,
Part IV, line 6, 7, 8, 9, 10, 11, or 12.
▶ Attach to Form 990. ▶ See separate Instructions.

OMB No 1545-0047

## 2009

Open to Public
Inspection

Name of the organization

TEXAS HIGHWAY PATROL ASSOCIATION

Employer Identification number
74-2573422

### Part I — Organizations Maintaining Donor Advised Funds or Other Similar Funds or Accounts. Complete if the organization answered "Yes" to Form 990, Part IV, line 6.

| | | (a) Donor advised funds | (b) Funds and other accounts |
|---|---|---|---|
| 1 | Total number at end of year | | |
| 2 | Aggregate contributions to (during year) | | |
| 3 | Aggregate grants from (during year) | | |
| 4 | Aggregate value at end of year | | |

5 Did the organization inform all donors and donor advisors in writing that the assets held in donor advised funds are the organization's property, subject to the organization's exclusive legal control?  ☐ Yes  ☐ No

6 Did the organization inform all grantees, donors, and donor advisors in writing that grant funds can be used only for charitable purposes and not for the benefit of the donor or donor advisor, or for any other purpose conferring impermissible private benefit?  ☐ Yes  ☐ No

### Part II — Conservation Easements. Complete if the organization answered "Yes" to Form 990, Part IV, line 7.

1 Purpose(s) of conservation easements held by the organization (check all that apply).
☐ Preservation of land for public use (e g., recreation or pleasure)
☐ Protection of natural habitat
☐ Preservation of open space
☐ Preservation of an historically important land area
☐ Preservation of a certified historic structure

2 Complete lines 2a through 2d if the organization held a qualified conservation contribution in the form of a conservation easement on the last day of the tax year.

| | | Held at the End of the Tax Year |
|---|---|---|
| a | Total number of conservation easements | 2a |
| b | Total acreage restricted by conservation easements | 2b |
| c | Number of conservation easements on a certified historic structure included in (a) | 2c |
| d | Number of conservation easements included in (c) acquired after 8/17/06 | 2d |

3 Number of conservation easements modified, transferred, released, extinguished, or terminated by the organization during the tax year ▶ _____

4 Number of states where property subject to conservation easement is located ▶ _____

5 Does the organization have a written policy regarding the periodic monitoring, inspection, handling of violations, and enforcement of the conservation easements it holds?  ☐ Yes  ☐ No

6 Staff and volunteer hours devoted to monitoring, inspecting, and enforcing conservation easements during the year ▶ _____

7 Amount of expenses incurred in monitoring, inspecting, and enforcing conservation easements during the year ▶ $ _____

8 Does each conservation easement reported on line 2(d) above satisfy the requirements of section 170(h)(4)(B)(i) and section 170(h)(4)(B)(ii)?  ☐ Yes  ☐ No

9 In Part XIV, describe how the organization reports conservation easements in its revenue and expense statement, and balance sheet, and include, if applicable, the text of the footnote to the organization's financial statements that describes the organization's accounting for conservation easements

### Part III — Organizations Maintaining Collections of Art, Historical Treasures, or Other Similar Assets. Complete if the organization answered "Yes" to Form 990, Part IV, line 8.

1a If the organization elected, as permitted under SFAS 116, not to report in its revenue statement and balance sheet works of art, historical treasures, or other similar assets held for public exhibition, education, or research in furtherance of public service, provide, in Part XIV, the text of the footnote to its financial statements that describes these items.

b If the organization elected, as permitted under SFAS 116, to report in its revenue statement and balance sheet works of art, historical treasures, or other similar assets held for public exhibition, education, or research in furtherance of public service, provide the following amounts relating to these items:

(i) Revenues included in Form 990, Part VIII, line 1  ▶ $ _____

(ii) Assets included in Form 990, Part X  ▶ $ _____

2 If the organization received or held works of art, historical treasures, or other similar assets for financial gain, provide the following amounts required to be reported under SFAS 116 relating to these items:

a Revenues included in Form 990, Part VIII, line 1  ▶ $ _____

b Assets included in Form 990, Part X  ▶ $ _____

LHA For Privacy Act and Paperwork Reduction Act Notice, see the Instructions for Form 990.

932051
02-01-10

Schedule D (Form 990) 2009

09441110 000078                    2009.05000 TEXAS HIGHWAY PATROL ASSOCI 31405001

**Part III** | **Organizations Maintaining Collections of Art, Historical Treasures, or Other Similar Assets** *(continued)*

3　Using the organization's acquisition, accession, and other records, check any of the following that are a significant use of its collection items (check all that apply):

a　☐ Public exhibition

b　☐ Scholarly research

c　☐ Preservation for future generations

d　☐ Loan or exchange programs

e　☐ Other _____

4　Provide a description of the organization's collections and explain how they further the organization's exempt purpose in Part XIV.

5　During the year, did the organization solicit or receive donations of art, historical treasures, or other similar assets to be sold to raise funds rather than to be maintained as part of the organization's collection?　☐ Yes　☐ No

**Part IV** | **Escrow and Custodial Arrangements.** Complete if organization answered "Yes" to Form 990, Part IV, line 9, or reported an amount on Form 990, Part X, line 21.

1a　Is the organization an agent, trustee, custodian or other intermediary for contributions or other assets not included on Form 990, Part X?　☐ Yes　☐ No

b　If "Yes," explain the arrangement in Part XIV and complete the following table:

|  |  | Amount |
|---|---|---|
| c　Beginning balance | 1c |  |
| d　Additions during the year | 1d |  |
| e　Distributions during the year | 1e |  |
| f　Ending balance | 1f |  |

2a　Did the organization include an amount on Form 990, Part X, line 21?　☐ Yes　☐ No

b　If "Yes," explain the arrangement in Part XIV.

**Part V** | **Endowment Funds.** Complete if the organization answered "Yes" to Form 990, Part IV, line 10.

|  | (a) Current year | (b) Prior year | (c) Two years back | (d) Three years back | (e) Four years back |
|---|---|---|---|---|---|
| 1a　Beginning of year balance |  |  |  |  |  |
| b　Contributions |  |  |  |  |  |
| c　Net investment earnings, gains, and losses |  |  |  |  |  |
| d　Grants or scholarships |  |  |  |  |  |
| e　Other expenditures for facilities and programs |  |  |  |  |  |
| f　Administrative expenses |  |  |  |  |  |
| g　End of year balance |  |  |  |  |  |

2　Provide the estimated percentage of the year end balance held as:

a　Board designated or quasi-endowment ▶ _____ %

b　Permanent endowment ▶ _____ %

c　Term endowment ▶ _____ %

3a　Are there endowment funds not in the possession of the organization that are held and administered for the organization by:

|  |  | Yes | No |
|---|---|---|---|
| (i)　unrelated organizations | 3a(i) |  |  |
| (ii)　related organizations | 3a(ii) |  |  |
| b　If "Yes" to 3a(ii), are the related organizations listed as required on Schedule R? | 3b |  |  |

4　Describe in Part XIV the intended uses of the organization's endowment funds.

**Part VI** | **Investments - Land, Buildings, and Equipment.** See Form 990, Part X, line 10.

| Description of investment | (a) Cost or other basis (investment) | (b) Cost or other basis (other) | (c) Accumulated depreciation | (d) Book value |
|---|---|---|---|---|
| 1a　Land |  |  |  |  |
| b　Buildings |  |  |  |  |
| c　Leasehold improvements |  |  |  |  |
| d　Equipment |  |  |  |  |
| e　Other |  |  |  |  |
| **Total.** Add lines 1a through 1e. *(Column (d) must equal Form 990, Part X, column (B), line 10(c))* ▶ |  |  |  | 0. |

Schedule D (Form 990) 2009

932052
02-01-10

## Part VII | Investments - Other Securities. See Form 990, Part X, line 12.

| (a) Description of security or category (including name of security) | (b) Book value | (c) Method of valuation: Cost or end-of-year market value |
|---|---|---|
| Financial derivatives | | |
| Closely-held equity interests | | |
| Other | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| **Total.** (Col (b) must equal Form 990, Part X, col (B) line 12.) ▶ | | |

## Part VIII | Investments - Program Related. See Form 990, Part X, line 13.

| (a) Description of investment type | (b) Book value | (c) Method of valuation: Cost or end-of-year market value |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| **Total.** (Col (b) must equal Form 990, Part X, col (B) line 13.) ▶ | | |

## Part IX | Other Assets. See Form 990, Part X, line 15.

| (a) Description | (b) Book value |
|---|---|
| INVESTMENT IN THPA SERVICES, INC. | 1,000. |
| CASH SURRENDER VALUE OF LIFE INSURANCE | 61,092. |
| PREPAID EXPENSES | 1,255. |
| | |
| | |
| | |
| | |
| | |
| | |
| **Total.** (Column (b) must equal Form 990, Part X, col (B) line 15.) ▶ | 63,347. |

## Part X | Other Liabilities. See Form 990, Part X, line 25.

| 1. (a) Description of liability | (b) Amount |
|---|---|
| Federal income taxes | |
| TRUST LIABILITY (GARCIA DEATH BENEFIT) | 5,220. |
| | |
| | |
| | |
| | |
| | |
| | |
| **Total.** (Column (b) must equal Form 990, Part X, col (B) line 25.) ▶ | 5,220. |

**2. FIN 48 Footnote.** In Part XIV, provide the text of the footnote to the organization's financial statements that reports the organization's liability for uncertain tax positions under FIN 48.

932053
02-01-10

## Part XI | Reconciliation of Change in Net Assets from Form 990 to Audited Financial Statements

| | | | |
|---|---|---|---|
| 1 | Total revenue (Form 990, Part VIII, column (A), line 12) | 1 | |
| 2 | Total expenses (Form 990, Part IX, column (A), line 25) | 2 | |
| 3 | Excess or (deficit) for the year. Subtract line 2 from line 1 | 3 | |
| 4 | Net unrealized gains (losses) on investments | 4 | |
| 5 | Donated services and use of facilities | 5 | |
| 6 | Investment expenses | 6 | |
| 7 | Prior period adjustments | 7 | |
| 8 | Other (Describe in Part XIV.) | 8 | |
| 9 | Total adjustments (net). Add lines 4 through 8 | 9 | |
| 10 | Excess or (deficit) for the year per audited financial statements  Combine lines 3 and 9 | 10 | |

## Part XII | Reconciliation of Revenue per Audited Financial Statements With Revenue per Return

| | | | | | |
|---|---|---|---|---|---|
| 1 | Total revenue, gains, and other support per audited financial statements | | | 1 | |
| 2 | Amounts included on line 1 but not on Form 990, Part VIII, line 12: | | | | |
| a | Net unrealized gains on investments | 2a | | | |
| b | Donated services and use of facilities | 2b | | | |
| c | Recoveries of prior year grants | 2c | | | |
| d | Other (Describe in Part XIV.) | 2d | | | |
| e | Add lines 2a through 2d | | | 2e | |
| 3 | Subtract line 2e from line 1 | | | 3 | |
| 4 | Amounts included on Form 990, Part VIII, line 12, but not on line 1: | | | | |
| a | Investment expenses not included on Form 990, Part VIII, line 7b | 4a | | | |
| b | Other (Describe in Part XIV.) | 4b | | | |
| c | Add lines 4a and 4b | | | 4c | |
| 5 | Total revenue. Add lines 3 and 4c. (This must equal Form 990, Part I, line 12.) | | | 5 | |

## Part XIII | Reconciliation of Expenses per Audited Financial Statements With Expenses per Return

| | | | | | |
|---|---|---|---|---|---|
| 1 | Total expenses and losses per audited financial statements | | | 1 | |
| 2 | Amounts included on line 1 but not on Form 990, Part IX, line 25: | | | | |
| a | Donated services and use of facilities | 2a | | | |
| b | Prior year adjustments | 2b | | | |
| c | Other losses | 2c | | | |
| d | Other (Describe in Part XIV.) | 2d | | | |
| e | Add lines 2a through 2d | | | 2e | |
| 3 | Subtract line 2e from line 1 | | | 3 | |
| 4 | Amounts included on Form 990, Part IX, line 25, but not on line 1: | | | | |
| a | Investment expenses not included on Form 990, Part VIII, line 7b | 4a | | | |
| b | Other (Describe in Part XIV.) | 4b | | | |
| c | Add lines 4a and 4b | | | 4c | |
| 5 | Total expenses. Add lines 3 and 4c. (This must equal Form 990, Part I, line 18.) | | | 5 | |

## Part XIV | Supplemental Information

Complete this part to provide the descriptions required for Part II, lines 3, 5, and 9; Part III, lines 1a and 4; Part IV, lines 1b and 2b; Part V, line 4; Part X, line 2; Part XI, line 8; Part XII, lines 2d and 4b; and Part XIII, lines 2d and 4b. Also complete this part to provide any additional information.

# Compensation Information

**For certain Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees**

▶ Complete if the organization answered "Yes" to Form 990, Part IV, line 23.

▶ Attach to Form 990.  ▶ See separate instructions.

OMB No 1545-0047

**2009**

Open to Public Inspection

Name of the organization

**TEXAS HIGHWAY PATROL ASSOCIATION**

Employer identification number

**74-2573422**

| Part I | Questions Regarding Compensation |

|  |  |  | Yes | No |
|---|---|---|---|---|
| **1a** | Check the appropriate box(es) if the organization provided any of the following to or for a person listed in Form 990, Part VII, Section A, line 1a. Complete Part III to provide any relevant information regarding these items. |  |  |  |
| | ☐ First-class or charter travel ☐ Travel for companions ☐ Tax indemnification and gross-up payments ☐ Discretionary spending account | ☐ Housing allowance or residence for personal use ☐ Payments for business use of personal residence ☐ Health or social club dues or initiation fees ☐ Personal services (e g , maid, chauffeur, chef) |  |  |
| **b** | If any of the boxes on line 1a are checked, did the organization follow a written policy regarding payment or reimbursement or provision of all of the expenses described above? If "No," complete Part III to explain | **1b** |  |  |
| **2** | Did the organization require substantiation prior to reimbursing or allowing expenses incurred by all officers, directors, trustees, and the CEO/Executive Director, regarding the items checked in line 1a? | **2** |  |  |
| **3** | Indicate which, if any, of the following the organization uses to establish the compensation of the organization's CEO/Executive Director. Check all that apply. |  |  |  |
| | ☐ Compensation committee ☐ Independent compensation consultant ☐ Form 990 of other organizations | ☐ Written employment contract ☐ Compensation survey or study ☐ Approval by the board or compensation committee |  |  |
| **4** | During the year, did any person listed in Form 990, Part VII, Section A, line 1a, with respect to the filing organization or a related organization: |  |  |  |
| **a** | Receive a severance payment or change-of-control payment? | **4a** |  | X |
| **b** | Participate in, or receive payment from, a supplemental nonqualified retirement plan? | **4b** |  | X |
| **c** | Participate in, or receive payment from, an equity-based compensation arrangement? | **4c** |  | X |
| | If "Yes" to any of lines 4a-c, list the persons and provide the applicable amounts for each item in Part III. |  |  |  |
| | **Only section 501(c)(3) and 501(c)(4) organizations must complete lines 5-9.** |  |  |  |
| **5** | For persons listed in Form 990, Part VII, Section A, line 1a, did the organization pay or accrue any compensation contingent on the revenues of: |  |  |  |
| **a** | The organization? | **5a** |  |  |
| **b** | Any related organization? | **5b** |  |  |
| | If "Yes" to line 5a or 5b, describe in Part III. |  |  |  |
| **6** | For persons listed in Form 990, Part VII, Section A, line 1a, did the organization pay or accrue any compensation contingent on the net earnings of: |  |  |  |
| **a** | The organization? | **6a** |  |  |
| **b** | Any related organization? | **6b** |  |  |
| | If "Yes" to line 6a or 6b, describe in Part III. |  |  |  |
| **7** | For persons listed in Form 990, Part VII, Section A, line 1a, did the organization provide any non-fixed payments not described in lines 5 and 6? If "Yes," describe in Part III | **7** |  |  |
| **8** | Were any amounts reported in Form 990, Part VII, paid or accrued pursuant to a contract that was subject to the initial contract exception described in Regs. section 53.4958-4(a)(3)? If "Yes," describe in Part III | **8** |  |  |
| **9** | If "Yes" to line 8, did the organization also follow the rebuttable presumption procedure described in Regulations section 53 4958-6(c)? | **9** |  |  |

LHA  **For Privacy Act and Paperwork Reduction Act Notice, see the Instructions for Form 990.**

Schedule J (Form 990) 2009

932111
02-02-10

**Part II** | **Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees.** Use Schedule J-1 if additional space is needed.

For each individual whose compensation must be reported in Schedule J, report compensation from the organization on row (i) and from related organizations, described in the instructions, on row (ii).

Do not list any individuals that are not listed on Form 990, Part VII.

**Note.** The sum of columns (B)(i)-(iii) must equal the applicable column (D) or column (E) amounts on Form 990, Part VII, line 1a.

| (A) Name | | (B) Breakdown of W-2 and/or 1099-MISC compensation | | | (C) Retirement and other deferred compensation | (D) Nontaxable benefits | (E) Total of columns (B)(i)-(D) | (F) Compensation reported in prior Form 990 or Form 990-EZ |
|---|---|---|---|---|---|---|---|---|
| | | (i) Base compensation | (ii) Bonus & incentive compensation | (iii) Other reportable compensation | | | | |
| TIM TIERNEY | (i) | 0. | 0. | 0. | 0. | 0. | 0. | 0. |
| | (ii) | 194,393. | 0. | 0. | 0. | 0. | 194,393. | 193,425. |
| C.R. VILLALVA | (i) | 0. | 0. | 0. | 0. | 0. | 0. | 0. |
| | (ii) | 211,190. | 0. | 0. | 0. | 0. | 211,190. | 163,075. |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |

932112 02-02-10

Schedule J (Form 990) 2009

18

SCHEDULE L
(Form 990 or 990-EZ)

Department of the Treasury
Internal Revenue Service

# Transactions With Interested Persons

▶ Complete if the organization answered
"Yes" on Form 990, Part IV, line 25a, 25b, 26, 27, 28a, 28b, or 28c,
or Form 990-EZ, Part V, line 38a or 40b.
▶ Attach to Form 990 or Form 990-EZ ▶ See separate instructions.

OMB No 1545-0047

**2009**

Open To Public
Inspection

| Name of the organization | Employer identification number |
|---|---|
| TEXAS HIGHWAY PATROL ASSOCIATION | 74-2573422 |

**Part I** Excess Benefit Transactions (section 501(c)(3) and section 501(c)(4) organizations only).
Complete if the organization answered "Yes" on Form 990, Part IV, line 25a or 25b, or Form 990-EZ, Part V, line 40b.

| 1 (a) Name of disqualified person | (b) Description of transaction | (c) Corrected? Yes | No |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

2 Enter the amount of tax imposed on the organization managers or disqualified persons during the year under section 4958 ▶ $ _____

3 Enter the amount of tax, if any, on line 2, above, reimbursed by the organization ▶ $ _____

**Part II** Loans to and/or From Interested Persons.
Complete if the organization answered "Yes" on Form 990, Part IV, line 26, or Form 990-EZ, Part V, line 38a.

| (a) Name of interested person and purpose | (b) Loan to or from the organization? To | From | (c) Original principal amount | (d) Balance due | (e) In default? Yes | No | (f) Approved by board or committee? Yes | No | (g) Written agreement? Yes | No |
|---|---|---|---|---|---|---|---|---|---|---|
| LANE DENTON - CAS | X | | 6,705. | 6,705. | | X | | X | | X |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

Total ▶ $ 6,705.

**Part III** Grants or Assistance Benefiting Interested Persons.
Complete if the organization answered "Yes" on Form 990, Part IV, line 27.

| (a) Name of interested person | (b) Relationship between interested person and the organization | (c) Amount and type of assistance |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |

**Part IV** Business Transactions Involving Interested Persons.
Complete if the organization answered "Yes" on Form 990, Part IV, line 28a, 28b, or 28c.

| (a) Name of interested person | (b) Relationship between interested person and the organization | (c) Amount of transaction | (d) Description of transaction | (e) Sharing of organization's revenues? Yes | No |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

LHA For Privacy Act and Paperwork Reduction Act Notice, see the
Instructions for Form 990 or 990-EZ.

Schedule L (Form 990 or 990-EZ) 2009

SEE SCHEDULE O FOR SCHEDULE L CONTINUATIONS

932131 02-01-10

SCHEDULE O
(Form 990)

Department of the Treasury
Internal Revenue Service

**Supplemental Information to Form 990**

Complete to provide Information for responses to specific questions on
Form 990 or to provide any additional information.
► Attach to Form 990.

OMB No 1545-0047

**2009**

Open to Public
Inspection

Name of the organization

TEXAS HIGHWAY PATROL ASSOCIATION

Employer identification number
74-2573422

FORM 990, PART III, LINE 4D, OTHER PROGRAM SERVICES:

PROVIDED PUBLIC SERVICE ANNOUNCEMENTS AND OTHER REMBRANCES OF SLAIN

TROOPERS

FORM 990, PART VI, SECTION A, LINE 6: THE TAXPAYER IS A MEMBERSHIP

ORGANIZATION EXEMPT UNDER CODE SECTION 501(C)(6); SUCH MEMBERS ARE REQUIRED

TO PAY DUES WHICH ARE VITAL TO THE ORGANIZATION'S EXEMPT PURPOSES AS A

PROFESSIONAL ORGANIZATION.

FORM 990, PART VI, SECTION A, LINE 7A: MEMBERS MAY ELECT ONE OR MORE

MEMBERS OF THE GOVERNING BODY (BOARD OF DIRECTORS).

FORM 990, PART VI, SECTION B, LINE 11: THE ORGANIZATION'S FORM 990 IS

PREPARED BY AN INDEPENDENT ACCOUNTING FIRM.  THE EXECUTIVE DIRECTOR MEETS

EACH YEAR WITH SUCH FIRM TO REVIEW, SIGN AND FILE FORM 990.

FORM 990, PART VI, SECTION B, LINE 12C: THE ORGANIZATION MONITORS AND

ENFORCES COMPLIANCE WITH THE CONFLICT OF INTEREST POLICY AT EACH ANNUAL AND

SPECIAL MEETING OF DIRECTORS.

FORM 990, PART VI, SECTION C, LINE 19: THE ORGANIZATION MAKES ITS

GOVERNING DOCUMENTS, CONFLICT OF INTEREST POLICY, AND FINANCIAL STATEMENTS

AVAILABLE TO THE PUBLIC UPON REQUEST.

SCHEDULE L, PART II, LOANS TO AND FROM INTERESTED PERSONS:

(A) NAME OF PERSON: LANE DENTON

SCHEDULE O
(Form 990)

Department of the Treasury
Internal Revenue Service

# Supplemental Information to Form 990

**Complete to provide information for responses to specific questions on Form 990 or to provide any additional information.**
▶ Attach to Form 990.



OMB No 1545-0047

## 2009

Open to Public
Inspection

| Name of the organization | Employer identification number |
|---|---|
| TEXAS HIGHWAY PATROL ASSOCIATION | 74-2573422 |

(A) PURPOSE OF LOAN: CASH ADVANCES & EXPENSES

LHA  For Privacy Act and Paperwork Reduction Act Notice, see the Instructions for Form 990.
932211
02-03-10

Schedule O (Form 990) 2009

09441110 000078            2009.05000 TEXAS HIGHWAY PATROL ASSOCI 31405001

# SCHEDULE R (Form 990)

Department of the Treasury
Internal Revenue Service

## Related Organizations and Unrelated Partnerships

► Complete if the organization answered "Yes" to Form 990, Part IV, line 33, 34, 35, 36, or 37.
► Attach to Form 990.   ► See separate instructions.

OMB No 1545-0047

**2009**

Open to Public Inspection

**Name of the organization**  TEXAS HIGHWAY PATROL ASSOCIATION

**Employer identification number**  74-2573422

**Part I**   Identification of Disregarded Entities (Complete if the organization answered "Yes" to Form 990, Part IV, line 33 )

| (a) Name, address, and EIN of disregarded entity | (b) Primary activity | (c) Legal domicile (state or foreign country) | (d) Total income | (e) End-of-year assets | (f) Direct controlling entity |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**Part II**   Identification of Related Tax-Exempt Organizations (Complete if the organization answered "Yes" to Form 990, Part IV, line 34 because it had one or more related tax-exempt organizations during the tax year.)

| (a) Name, address, and EIN of related organization | (b) Primary activity | (c) Legal domicile (state or foreign country) | (d) Exempt Code section | (e) Public charity status (if section 501(c)(3)) | (f) Direct controlling entity |
|---|---|---|---|---|---|
| CITIZENS FOR SPECIAL ARTISTS - 74-2571329 5150 BROADWAY, SUITE 233 SAN ANTONIO, TX 78209 | EDUCATIONAL | TEXAS | 501(C)(3) | | |
| NATIONAL POLICE YOUTH ATHLETIC LEAGUE - 74-2571333, 5150 BROADWAY, SUITE 233, SAN ANTONIO, TX 78209 | EDUCATIONAL | TEXAS | 501(C)(3) | | |
| TEXAS HIGHWAY PATROL MUSEUM - 74-2639283 501 OAKLAND AVENUE AUSTIN, TX 78703 | HALL OF FAME AND MUSEUM | | 501(C)(3) | | |
| | | | | | |
| | | | | | |

LHA  For Privacy Act and Paperwork Reduction Act Notice, see the Instructions for Form 990.

832161 02-04-10

Schedule R (Form 990) 2009

22

**Part III**   Identification of Related Organizations Taxable as a Partnership (Complete if the organization answered "Yes" to Form 990, Part IV, line 34 because it had one or more related organizations treated as a partnership during the tax year.)

| (a) Name, address, and EIN of related organization | (b) Primary activity | (c) Legal domicile (state or foreign country) | (d) Direct controlling entity | (e) Predominant income (related, unrelated, excluded from tax under sections 512-514) | (f) Share of total income | (g) Share of end-of-year assets | (h) Disproportionate allocations? Yes | (h) Disproportionate allocations? No | (i) Code V-UBI amount in box 20 of Schedule K-1 (Form 1065) | (j) General or managing partner? Yes | (j) General or managing partner? No |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |

**Part IV**   Identification of Related Organizations Taxable as a Corporation or Trust (Complete if the organization answered "Yes" to Form 990, Part IV, line 34 because it had one or more related organizations treated as a corporation or trust during the tax year.)

| (a) Name, address, and EIN of related organization | (b) Primary activity | (c) Legal domicile (state or foreign country) | (d) Direct controlling entity | (e) Type of entity (C corp, S corp, or trust) | (f) Share of total income | (g) Share of end-of-year assets | (h) Percentage ownership |
|---|---|---|---|---|---|---|---|
| THPA SERVICES, INC. - 74-2709623<br>501 OAKLAND AVENUE<br>AUSTIN, TX 78703 | MAGAZINES & AD SALES | TX | TEXAS HIGHWAY PATROL ASSOCIATION | C CORP | 0. | 0. | 100% |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

932162 07-21-10          Schedule R (Form 990) 2009

**Part V    Transactions With Related Organizations** (Complete if the organization answered "Yes" to Form 990, Part IV, line 34, 35, or 36.)

**Note.** Complete line 1 if any entity is listed in Parts II, III, or IV of this schedule

| | | Yes | No |
|---|---|---|---|
| 1 During the tax year, did the organization engage in any of the following transactions with one or more related organizations listed in Parts II-IV? | | | |
| a Receipt of (i) interest (ii) annuities (iii) royalties or (iv) rent from a controlled entity | 1a | | X |
| b Gift, grant, or capital contribution to other organization(s) | 1b | | X |
| c Gift, grant, or capital contribution from other organization(s) | 1c | | X |
| d Loans or loan guarantees to or for other organization(s) | 1d | X | |
| e Loans or loan guarantees by other organization(s) | 1e | | X |
| f Sale of assets to other organization(s) | 1f | | X |
| g Purchase of assets from other organization(s) | 1g | | X |
| h Exchange of assets | 1h | | X |
| i Lease of facilities, equipment, or other assets to other organization(s) | 1i | | X |
| j Lease of facilities, equipment, or other assets from other organization(s) | 1j | X | |
| k Performance of services or membership or fundraising solicitations for other organization(s) | 1k | | X |
| l Performance of services or membership or fundraising solicitations by other organization(s) | 1l | X | |
| m Sharing of facilities, equipment, mailing lists, or other assets | 1m | | X |
| n Sharing of paid employees | 1n | X | |
| o Reimbursement paid to other organization for expenses | 1o | | X |
| p Reimbursement paid by other organization for expenses | 1p | | X |
| q Other transfer of cash or property to other organization(s) | 1q | | X |
| r Other transfer of cash or property from other organization(s) | 1r | | X |

2 If the answer to any of the above is "Yes," see the instructions for information on who must complete this line, including covered relationships and transaction thresholds.

| (a) Name of other organization(s) | (b) Transaction type (a-r) | (c) Amount involved |
|---|---|---|
| (1) NATIONAL POLICE YOUTH ATHLETIC LEAGUE | D | 1,058. |
| (2) THPA SERVICES, INC. | D | 637,973. |
| (3) TEXAS HIGHWAY PATROL MUSEUM | D | 27,315. |
| (4) TEXAS HIGHWAY PATROL MUSEUM | J | 2,400. |
| (5) TEXAS HIGHWAY PATROL MUSEUM | L | 3,600. |
| (6) TEXAS HIGHWAY PATROL MUSEUM | N | 1,200. |

932163 02-04-10

Schedule R (Form 990) 2009

24

**Part VI**   Unrelated Organizations Taxable as a Partnership (Complete if the organization answered "Yes" to Form 990, Part IV, line 37.)

Provide the following information for each entity taxed as a partnership through which the organization conducted more than five percent of its activities (measured by total assets or gross revenue) that was not a related organization. See instructions regarding exclusion for certain investment partnerships.

| (a) Name, address, and EIN of entity | (b) Primary activity | (c) Legal domicile (state or foreign country) | (d) Are all partners section 501(c)(3) organizations? | | (e) Share of end-of-year assets | (f) Disproportionate allocations? | | (g) Code V-UBI amount in box 20 of Schedule K-1 (Form 1065) | (h) General or managing partner? | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Yes | No | | Yes | No | | Yes | No |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

# Form **8868**

(Rev April 2009)

Department of the Treasury
Internal Revenue Service

## Application for Extension of Time To File an Exempt Organization Return

► File a separate application for each return.

OMB No 1545-1709

- If you are filing for an **Automatic 3-Month Extension, complete only Part I** and check this box . . . ► ☑
- If you are filing for an **Additional (Not Automatic) 3-Month Extension, complete only Part II** (on page 2 of this form).

*Do not complete Part II unless* you have already been granted an automatic 3-month extension on a previously filed Form 8868.

**Part I** Automatic 3-Month Extension of Time. Only submit original (no copies needed).

A corporation required to file Form 990-T and requesting an automatic 6-month extension—check this box and complete Part I only . . . . . . . . . . . . . . . . . . . . . . ► ☐

*All other corporations (including 1120-C filers), partnerships, REMICs, and trusts must use Form 7004 to request an extension of time to file income tax returns.*

**Electronic Filing (e-file).** Generally, you can electronically file Form 8868 if you want a 3-month automatic extension of time to file one of the returns noted below (6 months for a corporation required to file Form 990-T). However, you cannot file Form 8868 electronically if (1) you want the additional (not automatic) 3-month extension or (2) you file Forms 990-BL, 6069, or 8870, group returns, or a composite or consolidated Form 990-T. Instead, you must submit the fully completed and signed page 2 (Part II) of Form 8868 For more details on the electronic filing of this form, visit *www.irs.gov/efile* and click on e-file for Charities & Nonprofits.

| Type or print | Name of Exempt Organization | Employer identification number |
|---|---|---|
| | TEXAS HIGHWAY PATROL ASSOCIATION | 74 : 2573422 |
| File by the due date for filing your return See instructions | Number, street, and room or suite no If a P O box, see instructions | |
| | 501 OAKLAND AVENUE | |
| | City, town or post office, state, and ZIP code For a foreign address, see instructions | |
| | AUSTIN, TX 78703-5113 | |

**Check type of return to be filed** (file a separate application for each return):

☑ Form 990
☐ Form 990-BL
☐ Form 990-EZ
☐ Form 990-PF

☐ Form 990-T (corporation)
☐ Form 990-T (sec. 401(a) or 408(a) trust)
☐ Form 990-T (trust other than above)
☐ Form 1041-A

☐ Form 4720
☐ Form 5227
☐ Form 6069
☐ Form 8870

- The books are in the care of ► TEXAS HIGHWAY PATROL ASSOCIATION

Telephone No. ► ( 512 ) 491-9117    FAX No. ► ( 512 ) 491-6026

- If the organization does not have an office or place of business in the United States, check this box . . . . ► ☐
- If this is for a Group Return, enter the organization's four digit Group Exemption Number (GEN)_____ . If this is for the whole group, check this box . . . . . ► ☐ If it is for part of the group, check this box . . . . ► ☐ and attach a list with the names and EINs of all members the extension will cover

**1** I request an automatic 3-month (6 months for a corporation required to file Form 990-T) extension of time until ...**AUGUST 15**..., 20..**10**.., to file the exempt organization return for the organization named above. The extension is for the organization's return for:

► ☑ calendar year 20..**09**.. or
► ☐ tax year beginning ........................................., 20......, and ending ......................................, 20..........

**2** If this tax year is for less than 12 months, check reason. ☐ Initial return ☐ Final return ☐ Change in accounting period

| | | | |
|---|---|---|---|
| **3a** | If this application is for Form 990-BL, 990-PF, 990-T, 4720, or 6069, enter the tentative tax, less any nonrefundable credits. See instructions. | 3a | $ |
| **b** | If this application is for Form 990-PF or 990-T, enter any refundable credits and estimated tax payments made. Include any prior year overpayment allowed as a credit | 3b | $ |
| **c** | **Balance Due.** Subtract line 3b from line 3a. Include your payment with this form, or, if required, deposit with FTD coupon or, if required, by using EFTPS (Electronic Federal Tax Payment System) See instructions. | 3c | $ |

**Caution.** If you are going to make an electronic fund withdrawal with this Form 8868, see Form 8453-EO and Form 8879-EO for payment instructions.

**For Privacy Act and Paperwork Reduction Act Notice, see Instructions.**      Cat No 27916D      Form **8868** (Rev 4-2009)

Form 8868 (Rev 4-2009)

Page **2**

- If you are filing for an **Additional (Not Automatic) 3-Month Extension, complete only Part II** and check this box ▶ ☑
  **Note.** Only complete Part II if you have already been granted an automatic 3-month extension on a previously filed Form 8868.
- If you are filing for an **Automatic 3-Month Extension, complete only Part I** (on page 1).

## Part II — Additional (Not Automatic) 3-Month Extension of Time. Only file the original (no copies needed).

| Type or print | Name of Exempt Organization **TEXAS HIGHWAY PATROL ASSOCIATION** | | Employer identification number 74 : 2573422 |
|---|---|---|---|
| File by the extended due date for filing the return. See instructions | Number, street, and room or suite no. If a P.O. box, see instructions **501 OAKLAND AVENUE** | | For IRS use only |
| | City, town or post office, state, and ZIP code. For a foreign address, see instructions. **AUSTIN, TX 78703-5113** | | |

**Check type of return to be filed** (File a separate application for each return):

☑ Form 990  ☐ Form 990-PF  ☐ Form 1041-A  ☐ Form 6069
☐ Form 990-BL  ☐ Form 990-T (sec. 401(a) or 408(a) trust)  ☐ Form 4720  ☐ Form 8870
☐ Form 990-EZ  ☐ Form 990-T (trust other than above)  ☐ Form 5227

**STOP!** Do not complete Part II if you were not already granted an automatic 3-month extension on a previously filed Form 8868.

- The books are in the care of ▶ TEXAS HIGHWAY PATROL ASSOCIATION
  Telephone No. ▶ ( 512 ) 491-9117  FAX No. ▶ ( 512 ) 491-6026
- If the organization does not have an office or place of business in the United States, check this box . . . . . ▶ ☐
- If this is for a Group Return, enter the organization's four digit Group Exemption Number (GEN) _____ If this is for the whole group, check this box . . . . . ▶ ☐  If it is for part of the group, check this box . . . ▶ ☐ and attach a list with the names and EINs of all members the extension is for.

4  I request an additional 3-month extension of time until _____ NOVEMBER 15 _____, 20 10
5  For calendar year 2009 , or other tax year beginning _____, 20 ___, and ending _____, 20 ___
6  If this tax year is for less than 12 months, check reason: ☐ Initial return ☐ Final return ☐ Change in accounting period
7  State in detail why you need the extension _____
   TAXPAYER IS AWAITING INFORMATION NECESSARY TO FILE A COMPLETE AND ACCURATE RETURN.

| | | | |
|---|---|---|---|
| **8a** | If this application is for Form 990-BL, 990-PF, 990-T, 4720, or 6069, enter the tentative tax, less any nonrefundable credits. See instructions | **8a** | $ |
| **b** | If this application is for Form 990-PF, 990-T, 4720, or 6069, enter any refundable credits and estimated tax payments made. Include any prior year overpayment allowed as a credit and any amount paid previously with Form 8868. | **8b** | $ |
| **c** | **Balance Due.** Subtract line 8b from line 8a. Include your payment with this form, or, if required, deposit with FTD coupon or, if required, by using EFTPS (Electronic Federal Tax Payment System). See instructions. | **8c** | $ |

## Signature and Verification

Under penalties of perjury, I declare that I have examined this form, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete, and that I am authorized to prepare this form.

Signature ▶ _____  Title ▶ CPA  Date ▶ 8-11-10

Form **8868** (Rev 4-2009)

# SUPPORT

## for
## TEXAS HIGHWAY TROOPERS



*Helping those
that keep our highways safe!*



Benefits
Scholarships
Education
Museum

# CONTRIBUTE

The Texas Highway Patrol Association and Museum are absolutely dependant on the generous financial support from **people like you** – people who care about making our streets and homes safe. We are always here to answer questions.

To make a contribution, please send to:

### 501 OAKLAND AVENUE
### AUSTIN, TX 78703-5113
### 1-888-745-8598

*\*\* If you have received an invoice to make a contribution/donation and have questions or concerns, please contact us.*

## Thank you in advance for your support of the Texas law enforcement community!

On behalf of all our members, we wish you and your family a safe and prosperous year.

### ADVERTENCIA

Apreciable Contribuyente:
Sabemos que usted recibe múltiples peticiones de donativos, por lo que lo invitamos a verificar la autenticidad de La Asociación de Patrullas del Estado de Texas. Siéntase comodo de comunicarse con nosotros a nuestras oficinas centrales, el número de teléfono se encuentra en su recibo de contribución, estamos a sus ordenes para aclarar cualquier duda que tenga o simplemente para verificar la información que contiene su folleto. Por favor no olvide mandar su contribución con la porción de abajo del recibo para que reciba credito. En nombre de la asociación, muchas gracias por su apoyo y que tenga feliz año en compañia de su familia.

Si usted tiene alguna pregunta
por favor llame el numero:
### 1-888-745-8598

# Our mission

Since 1991, it has been our mission to lead the community to provide support for Texas Highway Troopers – with programs the state or the DPS do not provide, and to assist any trooper's family when tragedy strikes, regardless if they belong to the Texas Highway Patrol Association and Museum.

The Texas Highway Patrol Association helps develop strong bonds of trooper camaraderie, providing benefits for Texas state highway patrol officers and the promotion of professional law enforcement.

We also built the Texas Highway Patrol Museum – A facility established through an endowment honoring the Highway Patrol's past and present and provides educational programs for area youth. Located in San Antonio, just a few blocks from the Alamo.

The Texas Highway Patrol Association and Museum is proud to also offer, in addition to our Death Benefit fund, a separate Survivor Benefit Fund – when an officer is killed in the line of duty, the Museum establishes this special fund with a local bank. Media are alerted to this fund, and 100% of the donations collected in this fund go directly to th    mily of the trooper.



*www.thpm.org*

You've always counted on them ....
. now can they count on you?

## The IRS considers the Texas Highway Patrol Association and Museum as a 501(c)(3) charitable organization.

We do not utilize an outside telemarketing company to help our organization raise money. *These outside firms, generally keep a large percentage of the money raised.* Thus, 100% of the funds we raise, stay within the Texas Highway Patrol Association & Museum and its programs. This is what sets us aside from similar programs.



## Additional Benefits

**Texas Highway Patrol Magazine**
A quarterly magazine that highlights some of the activities and issues involving crime, justice and articles pertaining to law enforcement. A professional publication, geared to law enforcement officers, but is available to the general public for a small subscription fee.

## And much, much more!
We are involved with many more great projects and continue to add more and more to the list! From benefits to programs to public service announcements, We are constantly striving to improve and enhance the lives of highway patrol officers while improving the climate of public safety and law enforcement in Texas.



## Educational Benefits

**College Scholarship Fund**
The Captain Ed Pringle Scholarship Fund was established for the children of active or retired Texas DPS highway patrol officers. Funds are applied directly to education tuition costs and are awarded once a year. THPA has helped numerous students with their educational costs and we are proud of our continuing commitment to our youth.

**Educational Programs**
Our Association and Museum developed an award-winning *Cruisin' to Coffins* program – designed to educate students about the hazards of driving while under the influence of alcohol. We also have other programs geared for younger children – stressing the dangers of strangers, drugs and more. We are also continuously planning and designing new programs for area youth.

**Museum**
We created the **Texas Highway Patrol Museum** located in San Antonio, Texas. Come experience exhibits such as: *The Hall of Honor*, a memorial to the officers who lost their lives in the line of duty, *The Les Strawn History Hall*; a walk through the history of the Texas Highway Patrol, and artifacts donated by family of past troopers.



## Trooper Benefits

**Death Benefit Fund**
We established this fund to provide financial support to the families left behind when tragedy strikes. Should an officer be killed in the line of duty, the surviving family members receive $10,000 in immediate assistance. We will also establish a special account with a local bank – 100% of any contribution to this fund will go directly to the family.

**Funeral Benefits**
Additional funeral benefits are offered in conjunction with *Dignity Memorial's® Funeral, Cremation and Cemetery's Trooper Benefit Program.* THPA members will receive dignified and honorable tributes at no cost for a trooper killed in the line of duty. A funeral protection certificate valued at $2,500 will also be given to the children and grandchildren of the fallen officer.

**Dental Insurance**
THPA is concerned for the health of troopers and their families. This is why we started the **Dental Benefits Program.** Through this program, THPA pays dental insurance for all members of the association and their families. We want to ensure that troopers stay safe and healthy.

# Serving Troopers and the Public for nearly 20 years!!

Texas Highway Patrol Museum
*Located a few blocks from the Alamo in San Antonio, Texas.*

Part III – Page 2 – Statement of Program Service Accomplishments – Continued

**See Materials Attached for Details**

# EXHIBIT D

| Form **990** | **Return of Organization Exempt From Income Tax** | OMB No 1545-0047 |
|---|---|---|
| | Under section 501(c), 527, or 4947(a)(1) of the Internal Revenue Code (except black lung benefit trust or private foundation) | **2007** |
| Department of the Treasury Internal Revenue Service | ▶ The organization may have to use a copy of this return to satisfy state reporting requirements | Open to Public Inspection |

**A** For the 2007 calendar year, or tax year beginning ____ and ending ____

| **B** Check if applicable | Please use IRS label or print or type See Specific Instructions | **C** Name of organization  TEXAS HIGHWAY PATROL MUSEUM, FORMERLY  TX HWY PATROL ASSN HALL OF FAME & MUSEUM | **D** Employer identification number  74-2639283 |
|---|---|---|---|
| ☐ Address change | | Number and street (or P O box if mail is not delivered to street address)  501 OAKLAND AVENUE | Room/suite | **E** Telephone number  512-491-9117 |
| ☐ Name change | | | |
| ☐ Initial return | | City or town, state or country, and ZIP + 4  AUSTIN, TX 78703-5113 | **F** Accounting method ☒ Cash ☐ Accrual  ☐ Other (specify) ▶ |
| ☐ Termination | | | |
| ☐ Amended return | | | |
| ☐ Application pending | | | |

● Section 501(c)(3) organizations and 4947(a)(1) nonexempt charitable trusts must attach a completed Schedule A (Form 990 or 990-EZ)

**H** and **I** are not applicable to section 527 organizations

**H(a)** Is this a group return for affiliates? ☐ Yes ☒ No
**H(b)** If "Yes," enter number of affiliates ▶ N/A
**H(c)** Are all affiliates included? N/A ☐ Yes ☐ No (If "No," attach a list)
**H(d)** Is this a separate return filed by an organization covered by a group ruling? ☐ Yes ☒ No

**G** Website: ▶ WWW.TXHM.ORG

**J** Organization type (check only one) ▶ ☒ 501(c) ( 3 ) ◀ (insert no ) ☐ 4947(a)(1) or ☐ 527

**K** Check here ▶ ☐ if the organization is not a 509(a)(3) supporting organization and its gross receipts are normally not more than $25,000 A return is not required, but if the organization chooses to file a return, be sure to file a complete return

**I** Group Exemption Number ▶ N/A

**M** Check ▶ ☒ if the organization is not required to attach Sch B (Form 990, 990-EZ, or 990-PF)

**L** Gross receipts Add lines 6b, 8b, 9b, and 10b to line 12 ▶  1,765,795.

## Part I  Revenue, Expenses, and Changes in Net Assets or Fund Balances

| | | | | |
|---|---|---|---|---|
| 1 | Contributions, gifts, grants, and similar amounts received | | | |
| a | Contributions to donor advised funds | 1a | | |
| b | Direct public support (not included on line 1a) | 1b | 1,656,223. | |
| c | Indirect public support (not included on line 1a) | 1c | | |
| d | Government contributions (grants) (not included on line 1d) | 1d | | |
| e | Total (add lines 1a through 1d) (cash $ 1,656,223. noncash $ _____ ) | | 1e | 1,656,223. |
| 2 | Program service revenue including government fees and contracts (from Part VII, line 93) | | 2 | |
| 3 | Membership dues and assessments | | 3 | |
| 4 | Interest on savings and temporary cash investments | | 4 | |
| 5 | Dividends and interest from securities | | 5 | |
| 6 a | Gross rents  SEE STATEMENT 1 | 6a | 75,354. | |
| b | Less rental expenses  SEE STATEMENT 2 | 6b | 19,609. | |
| c | Net rental income or (loss) Subtract line 6b from line 6a | | 6c | 55,745. |
| 7 | Other investment income (describe ▶ ) | | 7 | |
| 8 a | Gross amount from sales of assets other than inventory | (A) Securities / (B) Other 8a | 33,112. | |
| b | Less cost or other basis and sales expenses | 8b | 37,190. | |
| c | Gain or (loss) (attach schedule) | 8c | -4,078. | |
| d | Net gain or (loss) Combine line 8c, columns (A) and (B)  STMT 3 | | 8d | -4,078. |
| 9 | Special events and activities (attach schedule) If any amount is from gaming, check here ▶ ☐ | | | |
| a | Gross revenue (not including $ _____ of contributions reported on line 1b) | 9a | | |
| b | Less direct expenses other than fundraising expenses | 9b | | |
| c | Net income or (loss) from special events Subtract line 9b from line 9a | | 9c | |
| 10 a | Gross sales of inventory, less returns and allowances | 10a | 1,106. | |
| b | Less cost of goods sold | 10b | | |
| c | Gross profit or (loss) from sales of inventory (attach schedule) Subtract line 10b from line 10a  STMT 4 | | 10c | 1,106. |
| 11 | Other revenue (from Part VII, line 103) | | 11 | |
| 12 | **Total revenue.** Add lines 1e, 2, 3, 4, 5, 6c, 7, 8d, 9c, 10c, and 11 | | 12 | 1,708,996. |

**Expenses**

| | | | |
|---|---|---|---|
| 13 | Program services (from line 44, column (B)) | 13 | 696,361. |
| 14 | Management and general (from line 44, column (C)) | 14 | 471,785. |
| 15 | Fundraising (from line 44, column (D)) | 15 | 576,477. |
| 16 | Payments to affiliates (attach schedule) | 16 | |
| 17 | **Total expenses.** Add lines 16 and 44, column (A) | 17 | 1,744,623. |

**Net Assets**

| | | | |
|---|---|---|---|
| 18 | Excess or (deficit) for the year Subtract line 17 from line 12 | 18 | -35,627. |
| 19 | Net assets or fund balances at beginning of year (from line 73, column (A)) | 19 | 591,565. |
| 20 | Other changes in net assets or fund balances (attach explanation) | 20 | 0. |
| 21 | Net assets or fund balances at end of year Combine lines 18, 19, and 20 | 21 | 555,938. |

RECEIVED NOV 07 2008 OGDEN, UT  815  IRS-OSC

723001 12-27-07  LHA  **For Privacy Act and Paperwork Reduction Act Notice, see the separate instructions.**  Form 990 (2007)

TEXAS HIGHWAY PATROL MUSEUM, FORMERLY
TX HWY PATROL ASSN HALL OF FAME & MUSEUM     74-2639283     Page 2

## Part II  Statement of Functional Expenses

All organizations must complete column (A) Columns (B), (C), and (D) are required for section 501(c)(3) and (4) organizations and section 4947(a)(1) nonexempt charitable trusts but optional for others

| Do not include amounts reported on line 6b, 8b, 9b, 10b or 16 of Part I | | (A) Total | (B) Program services | (C) Management and general | (D) Fundraising |
|---|---|---|---|---|---|
| 22a Grants paid from donor advised funds (attach schedule) (cash $ 0. noncash $ 0. ) If this amount includes foreign grants, check here ▶ ☐ | 22a | | | | |
| 22b Other grants and allocations (attach schedule) (cash $ 0. noncash $ 0. ) If this amount includes foreign grants, check here ▶ ☐ | 22b | | | | |
| 23 Specific assistance to individuals (attach schedule) | 23 | | | | |
| 24 Benefits paid to or for members (attach schedule) | 24 | | | | |
| 25a Compensation of current officers, directors, key employees, etc listed in Part V-A | 25a | 295,856. | 90,710. | 172,132. | 33,014. |
| b Compensation of former officers, directors, key employees, etc listed in Part V-B | 25b | 0. | 0. | 0. | 0. |
| c Compensation and other distributions, not included above, to disqualified persons (as defined under section 4958(f)(1)) and persons described in section 4958(c)(3)(B) | 25c | | | | |
| 26 Salaries and wages of employees not included on lines 25a, b, and c | 26 | 799,239. | 369,477. | 82,832. | 346,930. |
| 27 Pension plan contributions not included on lines 25a, b, and c | 27 | | | | |
| 28 Employee benefits not included on lines 25a - 27 | 28 | | | | |
| 29 Payroll taxes | 29 | 77,945. | 30,411. | 39,931. | 7,603. |
| 30 Professional fundraising fees | 30 | | | | |
| 31 Accounting fees | 31 | 18,699. | 2,982. | 14,226. | 1,491. |
| 32 Legal fees | 32 | 866. | 75. | 541. | 250. |
| 33 Supplies | 33 | 17,831. | 8,915. | 4,458. | 4,458. |
| 34 Telephone | 34 | 109,714. | 38,415. | 18,791. | 52,508. |
| 35 Postage and shipping | 35 | 100,416. | 40,166. | 30,125. | 30,125. |
| 36 Occupancy | 36 | 150,363. | 62,694. | 44,769. | 42,900. |
| 37 Equipment rental and maintenance | 37 | | | | |
| 38 Printing and publications | 38 | 36,809. | 14,679. | 11,065. | 11,065. |
| 39 Travel | 39 | 12,802. | | 6,446. | 6,356. |
| 40 Conferences, conventions, and meetings | 40 | 11,303. | 11,303. | | |
| 41 Interest | 41 | 13,206. | 8,694. | 2,723. | 1,789. |
| 42 Depreciation, depletion, etc. (attach schedule) | 42 | 8,696. | | 8,696. | |
| 43 Other expenses not covered above (itemize) | | | | | |
| a _____ | 43a | | | | |
| b _____ | 43b | | | | |
| c _____ | 43c | | | | |
| d _____ | 43d | | | | |
| e _____ | 43e | | | | |
| f _____ | 43f | | | | |
| g SEE STATEMENT 5 | 43g | 90,878. | 17,840. | 35,050. | 37,988. |
| 44 Total functional expenses. Add lines 22a through 43g (Organizations completing columns (B)-(D), carry these totals to lines 13-15) | 44 | 1,744,623. | 696,361. | 471,785. | 576,477. |

Joint Costs. Check ▶ ☐ if you are following SOP 98-2.

Are any joint costs from a combined educational campaign and fundraising solicitation reported in (B) Program services?     ▶ ☐ Yes ☒ No

If "Yes," enter (i) the aggregate amount of these joint costs $ N/A     , (ii) the amount allocated to Program services $ N/A     ,

(iii) the amount allocated to Management and general $ N/A     , and (iv) the amount allocated to Fundraising $ N/A

723011
12-27-07

Form 990 (2007)

16341027 000078                    2007.06010 TEXAS HIGHWAY PATROL MUSEUM 30104006

TEXAS HIGHWAY PATROL MUSEUM, FORMERLY
TX HWY PATROL ASSN HALL OF FAME & MUSEUM    74-2639283    Page 3

## Part III    Statement of Program Service Accomplishments (See the instructions)

Form 990 is available for public inspection and, for some people, serves as the primary or sole source of information about a particular organization How the public perceives an organization in such cases may be determined by the information presented on its return. Therefore, please make sure the return is complete and accurate and fully describes, in Part III, the organization's programs and accomplishments

What is the organization's primary exempt purpose? ▶  SEE STATEMENT 6

All organizations must describe their exempt purpose achievements in a clear and concise manner State the number of clients served, publications issued, etc. Discuss achievements that are not measurable (Section 501(c)(3) and (4) organizations and 4947(a)(1) nonexempt charitable trusts must also enter the amount of grants and allocations to others)

**Program Service Expenses** (Required for 501(c)(3) and (4) orgs , and 4947(a)(1) trusts, but optional for others)

**a** PERFORMED FUNDRAISING EFFORTS FOR AND OPERATED A MUSEUM AND A HALL OF FAME TO HONOR TEXAS HIGHWAY PATROL OFFICERS AND TO EDUCATE THE GENERAL PUBLIC.

(Grants and allocations    $                        ) If this amount includes foreign grants, check here ▶ ☐            696,361.

**b** AMONG THE SPECIFIC EXHIBITS PRESENTED IS THE HALL OF HONOR, A MEMORIAL TO THE OFFICERS WHO LOST THEIR LIVES IN THE LINE OF DUTY.  ALSO PRESENTED IS THE HISTORY HALL, WHICH IS DESIGNED TO EDUCATE THE GENERAL PUBLIC ABOUT THE RICH HISTORY OF THE TEXAS HIGHWAY PATROL.

(Grants and allocations    $                        ) If this amount includes foreign grants, check here ▶ ☐

**c** THE ORGANIZATION ALSO CONTINUED TO PRESENT EDUCATIONAL PROGRAMS TO STUDENTS SPECIFICALLY TARGETING THE HAZARDS OF DRIVING UNDER THE INFLUENCE OF ALCOHOL.

(Grants and allocations    $                        ) If this amount includes foreign grants, check here ▶ ☐

**d** THE ORGANIZATION ALSO CONTINUED ITS POLICY OF PROVIDING SELECTED PUBLIC SERVICE ANNOUNCEMENTS.

(Grants and allocations    $                        ) If this amount includes foreign grants, check here ▶ ☐

**e** Other program services (attach schedule)
(Grants and allocations    $                        ) If this amount includes foreign grants, check here ▶ ☐

**f** Total of Program Service Expenses (should equal line 44, column (B), Program services)        ▶        696,361.

Form **990** (2007)

723021
12-27-07

16341027 000078        2007.06010 TEXAS HIGHWAY PATROL MUSEUM 30104006

TEXAS HIGHWAY PATROL MUSEUM, FORMERLY
TX HWY PATROL ASSN HALL OF FAME & MUSEUM      74-2639283   Page 4

| Part IV | Balance Sheets (See the instructions) | | | | |

**Note:** Where required, attached schedules and amounts within the description column should be for end-of-year amounts only

| | | | | (A) Beginning of year | | (B) End of year |
|---|---|---|---|---|---|---|
| **Assets** | 45 | Cash - non-interest-bearing | | 70,008. | 45 | 48,238. |
| | 46 | Savings and temporary cash investments | | | 46 | |
| | 47 a | Accounts receivable | 47a | | | |
| | b | Less allowance for doubtful accounts | 47b | | 47c | |
| | 48 a | Pledges receivable | 48a | | | |
| | b | Less allowance for doubtful accounts | 48b | | 48c | |
| | 49 | Grants receivable | | | 49 | |
| | 50 a | Receivables from current and former officers, directors, trustees, and key employees | | | 50a | |
| | b | Receivables from other disqualified persons (as defined under section 4958(f)(1)) and persons described in section 4958(c)(3)(B) | | | 50b | |
| | 51 a | Other notes and loans receivable | 51a | | | |
| | b | Less allowance for doubtful accounts | 51b | | 51c | |
| | 52 | Inventories for sale or use | | 2,100. | 52 | 2,100. |
| | 53 | Prepaid expenses and deferred charges | | 20,382. | 53 | 12,711. |
| | 54 a | Investments - publicly-traded securities ▶ ☐ Cost ☐ FMV | | | 54a | |
| | b | Investments - other securities ▶ ☐ Cost ☐ FMV | | | 54b | |
| | 55 a | Investments - land, buildings, and equipment basis | 55a | 601,634. | | |
| | b | Less: accumulated depreciation STMT 7 | 55b | 27,971. | 873,090. | 55c | 573,663. |
| | 56 | Investments - other | | | 56 | |
| | 57 a | Land, buildings, and equipment: basis | 57a | 293,633. | | |
| | b | Less: accumulated depreciation STMT 8 | 57b | 45,306. | | 57c | 248,327. |
| | 58 | Other assets, including program-related investments (describe ▶ SEE STATEMENT 9 ) | | 61,801. | 58 | 43,594. |
| | 59 | Total assets (must equal line 74). Add lines 45 through 58 | | 1,027,381. | 59 | 928,633. |
| **Liabilities** | 60 | Accounts payable and accrued expenses | | 2,897. | 60 | 22,377. |
| | 61 | Grants payable | | | 61 | |
| | 62 | Deferred revenue | | | 62 | |
| | 63 | Loans from officers, directors, trustees, and key employees | | | 63 | |
| | 64 a | Tax-exempt bond liabilities | | | 64a | |
| | b | Mortgages and other notes payable STMT 10 STMT 11 | | 265,277. | 64b | 213,252. |
| | 65 | Other liabilities (describe ▶ SEE STATEMENT 12 ) | | 167,642. | 65 | 137,066. |
| | 66 | Total liabilities. Add lines 60 through 65 | | 435,816. | 66 | 372,695. |
| **Net Assets or Fund Balances** | | Organizations that follow SFAS 117, check here ▶ ☐ and complete lines 67 through 69 and lines 73 and 74. | | | | |
| | 67 | Unrestricted | | | 67 | |
| | 68 | Temporarily restricted | | | 68 | |
| | 69 | Permanently restricted | | | 69 | |
| | | Organizations that do not follow SFAS 117, check here ▶ ☒ and complete lines 70 through 74. | | | | |
| | 70 | Capital stock, trust principal, or current funds | | 0. | 70 | 0. |
| | 71 | Paid-in or capital surplus, or land, building, and equipment fund | | 0. | 71 | 0. |
| | 72 | Retained earnings, endowment, accumulated income, or other funds | | 591,565. | 72 | 555,938. |
| | 73 | Total net assets or fund balances. Add lines 67 through 69 or lines 70 through 72 (Column (A) must equal line 19 and column (B) must equal line 21) | | 591,565. | 73 | 555,938. |
| | 74 | Total liabilities and net assets/fund balances. Add lines 66 and 73 | | 1,027,381. | 74 | 928,633. |

Form **990** (2007)

723031
12-27-07

**Part IV-A** Reconciliation of Revenue per Audited Financial Statements With Revenue per Return *(See the instructions )*

| | | | | |
|---|---|---|---|---|
| a | Total revenue, gains, and other support per audited financial statements | | a | N/A |
| b | Amounts included on line a but not on Part I, line 12 | | | |
| 1 | Net unrealized gains on investments | b1 | | |
| 2 | Donated services and use of facilities | b2 | | |
| 3 | Recoveries of prior year grants | b3 | | |
| 4 | Other (specify) _____ | b4 | | |
| | Add lines b1 through b4 | | b | |
| c | Subtract line b from line a | | c | |
| d | Amounts included on Part I, line 12, but not on line a: | | | |
| 1 | Investment expenses not included on Part I, line 6b | d1 | | |
| 2 | Other (specify) _____ | d2 | | |
| | Add lines d1 and d2 | | d | |
| e | **Total revenue** (Part I, line 12) Add lines c and d ► | | e | |

**Part IV-B** Reconciliation of Expenses per Audited Financial Statements With Expenses per Return

| | | | | |
|---|---|---|---|---|
| a | Total expenses and losses per audited financial statements | | a | N/A |
| b | Amounts included on line a but not on Part I, line 17. | | | |
| 1 | Donated services and use of facilities | b1 | | |
| 2 | Prior year adjustments reported on Part I, line 20 | b2 | | |
| 3 | Losses reported on Part I, line 20 | b3 | | |
| 4 | Other (specify) _____ | b4 | | |
| | Add lines b1 through b4 | | b | |
| c | Subtract line b from line a | | c | |
| d | Amounts included on Part I, line 17, but not on line a: | | | |
| 1 | Investment expenses not included on Part I, line 6b | d1 | | |
| 2 | Other (specify) _____ | d2 | | |
| | Add lines d1 and d2 | | d | |
| e | **Total expenses** (Part I, line 17). Add lines c and d ► | | e | |

**Part V-A** Current Officers, Directors, Trustees, and Key Employees (List each person who was an officer, director, trustee, or key employee at any time during the year even if they were not compensated.) *(See the instructions )*

| (A) Name and address | (B) Title and average hours per week devoted to position | (C) Compensation (If not paid, enter -0- ) | (D) Contributions to employee benefit plans & deferred compensation plans | (E) Expense account and other allowances |
|---|---|---|---|---|
| MARK LOCKRIDGE TEXAS DPS - HIGHWAY PATROL, 701 S. IH WAXAHACHIE, TX 75165 | PRESIDENT 5.00 | 0. | 0. | 0. |
| GREGG GREER TEXAS DPS - HIGHWAY PATROL, P.O. BOX HALLSVILLE, TX 75650 | DIRECTOR 5.00 | 0. | 0. | 0. |
| TIM TIERNEY 501 OAKLAND AVENUE AUSTIN, TX 78703-5113 | EXECUTIVE VICE-PRESIDENT 40.00 | 139,118. | 0. | 0. |
| FRED RIOJAS TEXAS DPS - HIGHWAY PATROL, 1802 N. 1 KINGSVILLE, TX 78363 | DIRECTOR 5.00 | 0. | 0. | 0. |
| TED RIOJAS TEXAS DPS - HIGHWAY PATROL, 902 S. LO HARLINGEN, TX 78363 | DIRECTOR 5.00 | 0. | 0. | 0. |
| C.R. VILLALVA 501 OAKLAND AVENUE AUSTIN, TX 78703-5113 | DIRECTOR OF MARKETING 40.00 | 156,738. | 0. | 0. |
| ROBERT BERNARD, JR. TEXAS DPS - HIGHWAY PATROL, 701 S. IH WAXAHACHIE, TX 75165 | DIRECTOR 5.00 | 0. | 0. | 0. |
| JAMES COLUNGA TEXAS DPS - HIGHWAY PATROL, P.O. BOX ENNIS, TX 75120 | DIRECTOR 5.00 | 0. | 0. | 0. |

Form **990** (2007)

723041 12-27-07

TEXAS HIGHWAY PATROL MUSEUM, FORMERLY
TX HWY PATROL ASSN HALL OF FAME & MUSEUM          74-2639283          Page **6**

## Part V-A  Current Officers, Directors, Trustees, and Key Employees (continued)

|  |  | Yes | No |
|---|---|---|---|
| **75 a** Enter the total number of officers, directors, and trustees permitted to vote on organization business at board meetings ▶ _____ 6 |  |  |  |
| **b** Are any officers, directors, trustees, or key employees listed in Form 990, Part V-A, or highest compensated employees listed in Schedule A, Part I, or highest compensated professional and other independent contractors listed in Schedule A, Part II-A or II-B, related to each other through family or business relationships? If "Yes," attach a statement that identifies the individuals and explains the relationship(s) | **75b** |  | X |
| **c** Do any officers, directors, trustees, or key employees listed in Form 990, Part V-A, or highest compensated employees listed in Schedule A, Part I, or highest compensated professional and other independent contractors listed in Schedule A, Part II-A or II-B, receive compensation from any other organizations, whether tax exempt or taxable, that are related to the organization? See the instructions for the definition of "related organization."   SEE STATEMENT 14 | **75c** | X |  |
| If "Yes," attach a statement that includes the information described in the instructions |  |  |  |
| **d** Does the organization have a written conflict of interest policy? | **75d** |  | X |

## Part V-B  Former Officers, Directors, Trustees, and Key Employees That Received Compensation or Other Benefits (If any former officer, director, trustee, or key employee received compensation or other benefits (described below) during the year, list that person below and enter the amount of compensation or other benefits in the appropriate column. See the instructions.)

| (A) Name and address | (B) Loans and Advances | (C) Compensation (if not paid, enter -0-) | (D) Contributions to employee benefit plans & deferred compensation plans | (E) Expense account and other allowances |
|---|---|---|---|---|
| NONE |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

## Part VI  Other Information (See the instructions)

|  |  | Yes | No |
|---|---|---|---|
| **76** Did the organization make a change in its activities or methods of conducting activities? If "Yes," attach a detailed statement of each change | **76** |  | X |
| **77** Were any changes made in the organizing or governing documents but not reported to the IRS? If "Yes," attach a conformed copy of the changes. | **77** |  | X |
| **78 a** Did the organization have unrelated business gross income of $1,000 or more during the year covered by this return? | **78a** | X |  |
| **b** If "Yes," has it filed a tax return on **Form 990-T** for this year? | **78b** | X |  |
| **79** Was there a liquidation, dissolution, termination, or substantial contraction during the year? If "Yes," attach a statement | **79** |  | X |
| **80 a** Is the organization related (other than by association with a statewide or nationwide organization) through common membership, governing bodies, trustees, officers, etc., to any other exempt or nonexempt organization? | **80a** | X |  |
| **b** If "Yes," enter the name of the organization▶   SEE STATEMENT 13 _____ and check whether it is ☐ exempt or ☐ nonexempt |  |  |  |
| **81 a** Enter direct and indirect political expenditures. (See line 81 instructions.)   **81a** | 0. |  |  |
| **b** Did the organization file **Form 1120-POL** for this year? | **81b** |  | X |

Form **990** (2007)

723161/12-27-07

TEXAS HIGHWAY PATROL MUSEUM, FORMERLY
TX HWY PATROL ASSN HALL OF FAME & MUSEUM    74-2639283

| Part VI | Other Information *(continued)* | | | Yes | No |
|---|---|---|---|---|---|
| 82 a | Did the organization receive donated services or the use of materials, equipment, or facilities at no charge or at substantially less than fair rental value? | | 82a | | X |
| b | If "Yes," you may indicate the value of these items here  Do not include this amount as revenue in Part I or as an expense in Part II (See instructions in Part III.) | 82b  N/A | | | |
| 83 a | Did the organization comply with the public inspection requirements for returns and exemption applications? | | 83a | X | |
| b | Did the organization comply with the disclosure requirements relating to *quid pro quo* contributions? | N/A | 83b | | |
| 84 a | Did the organization solicit any contributions or gifts that were not tax deductible? | N/A | 84a | | |
| b | If "Yes," did the organization include with every solicitation an express statement that such contributions or gifts were not tax deductible? | N/A | 84b | | |
| 85 a | *501(c)(4), (5), or (6)*  Were substantially all dues nondeductible by members? | N/A | 85a | | |
| b | Did the organization make only in-house lobbying expenditures of $2,000 or less? | N/A | 85b | | |
| | If "Yes" was answered to either 85a or 85b, **do not** complete 85c through 85h below unless the organization received a waiver for proxy tax owed for the prior year | | | | |
| c | Dues, assessments, and similar amounts from members | 85c  N/A | | | |
| d | Section 162(e) lobbying and political expenditures | 85d  N/A | | | |
| e | Aggregate nondeductible amount of section 6033(e)(1)(A) dues notices | 85e  N/A | | | |
| f | Taxable amount of lobbying and political expenditures (line 85d less 85e) | 85f  N/A | | | |
| g | Does the organization elect to pay the section 6033(e) tax on the amount on line 85f? | N/A | 85g | | |
| h | If section 6033(e)(1)(A) dues notices were sent, does the organization agree to add the amount on line 85f to its reasonable estimate of dues allocable to nondeductible lobbying and political expenditures for the following tax year? | N/A | 85h | | |
| 86 | *501(c)(7) organizations.* Enter: a Initiation fees and capital contributions included on line 12 | 86a  N/A | | | |
| b | Gross receipts, included on line 12, for public use of club facilities | 86b  N/A | | | |
| 87 | *501(c)(12) organizations.* Enter: a Gross income from members or shareholders | 87a  N/A | | | |
| b | Gross income from other sources. (Do not net amounts due or paid to other sources against amounts due or received from them) | 87b  N/A | | | |
| 88 a | At any time during the year, did the organization own a 50% or greater interest in a taxable corporation or partnership, or an entity disregarded as separate from the organization under Regulations sections 301.7701-2 and 301 7701-3? If "Yes," complete Part IX | | 88a | | X |
| b | At any time during the year, did the organization, directly or indirectly, own a controlled entity within the meaning of section 512(b)(13)? If "Yes," complete Part XI | | 88b | | X |
| 89 a | *501(c)(3) organizations.* Enter  Amount of tax imposed on the organization during the year under: section 4911 ▶ _____0 ._ , section 4912 ▶ _____0 ._ , section 4955 ▶ _____0 ._ | | | | |
| b | *501(c)(3) and 501(c)(4) organizations.* Did the organization engage in any section 4958 excess benefit transaction during the year or did it become aware of an excess benefit transaction from a prior year? If "Yes," attach a statement explaining each transaction | | 89b | | X |
| c | Enter: Amount of tax imposed on the organization managers or disqualified persons during the year under sections 4912, 4955, and 4958 | ▶ _____0 ._ | | | |
| d | Enter: Amount of tax on line 89c, above, reimbursed by the organization | ▶ _____0 ._ | | | |
| e | *All organizations*  At any time during the tax year, was the organization a party to a prohibited tax shelter transaction? | | 89e | | X |
| f | *All organizations*  Did the organization acquire a direct or indirect interest in any applicable insurance contract? | | 89f | | X |
| g | *For supporting organizations and sponsoring organizations maintaining donor advised funds.* Did the supporting organization, or a fund maintained by a sponsoring organization, have excess business holdings at any time during the year? | | 89g | | X |
| 90 a | List the states with which a copy of this return is filed ▶ TX | | | | |
| b | Number of employees employed in the pay period that includes March 12, 2007 | | 90b | | 96 |
| 91 a | The books are in care of ▶ TIM TIERNEY | | | | |
| | Located at ▶ 501 OAKLAND AVENUE, AUSTIN, TX | Telephone no ▶ (512) 491-9117 | | | |
| | | ZIP + 4 ▶ 78703-5113 | | | |
| b | At any time during the calendar year, did the organization have an interest in or a signature or other authority over a financial account in a foreign country (such as a bank account, securities account, or other financial account)? If "Yes," enter the name of the foreign country ▶ N/A | | 91b | | X |
| | See the instructions for exceptions and filing requirements for **Form TD F 90-22.1**, Report of Foreign Bank and Financial Accounts. | | | | |

Form **990** (2007)

| Part VI | Other Information *(continued)* | | | | Yes | No |
|---|---|---|---|---|---|---|
| c | At any time during the calendar year, did the organization maintain an office outside of the United States? | | | | 91c | X |
| | If "Yes," enter the name of the foreign country ▶ N/A | | | | | |

92  Section 4947(a)(1) nonexempt charitable trusts filing Form 990 in lieu of **Form 1041**- Check here
and enter the amount of tax-exempt interest received or accrued during the tax year        ▶ | 92 |        ▶ ☐

| Part VII | Analysis of Income-Producing Activities *(See the instructions.)* |
|---|---|

**Note:** *Enter gross amounts unless otherwise indicated*

| | | (A) Business code | (B) Amount | (C) Exclusion code | (D) Amount | (E) Related or exempt function income |
|---|---|---|---|---|---|---|
| 93 | Program service revenue: | | | | | |
| a | | | | | | |
| b | | | | | | |
| c | | | | | | |
| d | | | | | | |
| e | | | | | | |
| f | Medicare/Medicaid payments | | | | | |
| g | Fees and contracts from government agencies | | | | | |
| 94 | Membership dues and assessments | | | | | |
| 95 | Interest on savings and temporary cash investments | | | | | |
| 96 | Dividends and interest from securities | | | | | |
| 97 | Net rental income or (loss) from real estate | | | | | |
| a | debt-financed property | 900000 | -1,430. | | | |
| b | not debt-financed property | | | 16 | 57,175. | |
| 98 | Net rental income or (loss) from personal property | | | | | |
| 99 | Other investment income | | | | | |
| 100 | Gain or (loss) from sales of assets other than inventory | | | 18 | -4,078. | |
| 101 | Net income or (loss) from special events | | | | | |
| 102 | Gross profit or (loss) from sales of inventory | | | | | 1,106. |
| 103 | Other revenue: | | | | | |
| a | | | | | | |
| b | | | | | | |
| c | | | | | | |
| d | | | | | | |
| e | | | | | | |
| 104 | Subtotal (add columns (B), (D), and (E)) | | -1,430. | | 53,097. | 1,106. |
| 105 | Total (add line 104, columns (B), (D), and (E)) | | | | ▶ | 52,773. |

**Note:** *Line 105 plus line 1e, Part I, should equal the amount on line 12, Part I.*

| Part VIII | Relationship of Activities to the Accomplishment of Exempt Purposes *(See the instructions.)* |
|---|---|

| Line No. ▼ | Explain how each activity for which income is reported in column (E) of Part VII contributed importantly to the accomplishment of the organization's exempt purposes (other than by providing funds for such purposes) |
|---|---|
| 102 | THE SALE OF INCIDENTAL MEMORABILIA FACILITATED THE PUBLIC'S AWARENESS AND APPRECIATION OF THE MUSEUM AND HALL OF FAME. |

| Part IX | Information Regarding Taxable Subsidiaries and Disregarded Entities *(See the instructions.)* |
|---|---|

| (A) Name, address, and EIN of corporation, partnership, or disregarded entity | (B) Percentage of ownership interest | (C) Nature of activities | (D) Total income | (E) End-of-year assets |
|---|---|---|---|---|
| N/A | % | | | |
| | % | | | |
| | % | | | |
| | % | | | |

| Part X | Information Regarding Transfers Associated with Personal Benefit Contracts *(See the instructions.)* |
|---|---|

(a) Did the organization, during the year, receive any funds, directly or indirectly, to pay premiums on a personal benefit contract?        ☐ Yes        ☒ No

(b) Did the organization, during the year, pay premiums, directly or indirectly, on a personal benefit contract?        ☐ Yes        ☒ No

**Note:** *If "Yes" to (b), file Form 8870 and Form 4720 (see instructions)*

Form **990** (2007)

TEXAS HIGHWAY PATROL MUSEUM, FORMERLY
TX HWY PATROL ASSN HALL OF FAME & MUSEUM    74-2639283    Page **9**

| Part XI | Information Regarding Transfers To and From Controlled Entities. *Complete only if the organization is a controlling organization as defined in section 512(b)(13).*    N/A |

**106**  Did the reporting organization **make** any transfers **to** a controlled entity as defined in section 512(b)(13) of the Code? If "Yes," complete the schedule below for each controlled entity.

| | (A) Name, address, of each controlled entity | (B) Employer Identification Number | (C) Description of transfer | (D) Amount of transfer |
|---|---|---|---|---|
| a | | | | |
| b | | | | |
| c | | | | |
| | Totals | | | |

**107**  Did the reporting organization **receive** any transfers **from** a controlled entity as defined in section 512(b)(13) of the Code? If "Yes," complete the schedule below for each controlled entity.

| | (A) Name, address, of each controlled entity | (B) Employer Identification Number | (C) Description of transfer | (D) Amount of transfer |
|---|---|---|---|---|
| a | | | | |
| b | | | | |
| c | | | | |
| | Totals | | | |

**108**  Did the organization have a binding written contract in effect on August 17, 2006, covering the interest, rents, royalties, and annuities described in question 107 above?    Yes  No

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than officer) is based on all information of which preparer has any knowledge.

**Please Sign Here**

Signature of officer                     Date  10-29-08

TIM TIERNEY, EXECUTIVE VICE-PRESIDENT
Type or print name and title

**Paid Preparer's Use Only**

Preparer's signature ▶                     Date 10-29-08    Check if self-employed ▶ ☐    Preparer's SSN or PTIN (See Gen. Inst. X)

Firm's name (or yours if self-employed), address, and ZIP + 4 ▶ KENNETH C. GORENCE, P.C.
P.O. BOX 28279
AUSTIN, TX 78755

EIN ▶

Phone no ▶ (512) 342-8081

Form **990** (2007)

723164/12-27-07

**SCHEDULE A**
(Form 990 or 990-EZ)

Department of the Treasury
Internal Revenue Service

# Organization Exempt Under Section 501(c)(3)

(Except Private Foundation) and Section 501(e), 501(f), 501(k),
501(n), or 4947(a)(1) Nonexempt Charitable Trust
**Supplementary Information–(See separate instructions.)**
▶ MUST be completed by the above organizations and attached to their Form 990 or 990-EZ

OMB No 1545-0047

**2007**

Name of the organization
TEXAS HIGHWAY PATROL MUSEUM, FORMERLY
TX HWY PATROL ASSN HALL OF FAME & MUSEUM

Employer identification number
74 2639283

| Part I | Compensation of the Five Highest Paid Employees Other Than Officers, Directors, and Trustees |

(See page 1 of the instructions. List each one. If there are none, enter "None.")

| (a) Name and address of each employee paid more than $50,000 | (b) Title and average hours per week devoted to position | (c) Compensation | (d) Contributions to employee benefit plans & deferred compensation | (e) Expense account and other allowances |
|---|---|---|---|---|
| NONE | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Total number of other employees paid over $50,000 ▶ | 0

| Part II-A | Compensation of the Five Highest Paid Independent Contractors for Professional Services |

(See page 2 of the instructions. List each one (whether individuals or firms). If there are none, enter "None.")

| (a) Name and address of each independent contractor paid more than $50,000 | (b) Type of service | (c) Compensation |
|---|---|---|
| NONE | | |
| | | |
| | | |
| | | |
| | | |
| | | |

Total number of others receiving over $50,000 for professional services ▶ | 0

| Part II-B | Compensation of the Five Highest Paid Independent Contractors for Other Services |

(List each contractor who performed services other than professional services, whether individuals or firms. If there are none, enter "None." See page 2 of the instructions.)

| (a) Name and address of each independent contractor paid more than $50,000 | (b) Type of service | (c) Compensation |
|---|---|---|
| NONE | | |
| | | |
| | | |
| | | |
| | | |
| | | |

Total number of other contractors receiving over $50,000 for other services ▶ | 0

723101/12-27-07   LHA **For Paperwork Reduction Act Notice, see the Instructions for Form 990 and Form 990-EZ**

10

Schedule A (Form 990 or 990-EZ) 2007

TEXAS HIGHWAY PATROL MUSEUM, FORMERLY
TX HWY PATROL ASSN HALL OF FAME & MUSEUM    74-2639283    Page 2

## Part III    Statements About Activities (See page 2 of the instructions.)

|  |  | Yes | No |
|---|---|---|---|
| 1 During the year, has the organization attempted to influence national, state, or local legislation, including any attempt to influence public opinion on a legislative matter or referendum? If "Yes," enter the total expenses paid or incurred in connection with the lobbying activities ▶ $ _____ $ _____ (Must equal amounts on line 38, Part VI-A, or line i of Part VI-B ) | | | |
| Organizations that made an election under section 501(h) by filing Form 5768 must complete Part VI-A Other organizations checking "Yes" must complete Part VI-B AND attach a statement giving a detailed description of the lobbying activities | 1 | | X |
| 2 During the year, has the organization, either directly or indirectly, engaged in any of the following acts with any substantial contributors, trustees, directors, officers, creators, key employees, or members of their families, or with any taxable organization with which any such person is affiliated as an officer, director, trustee, majority owner, or principal beneficiary? (If the answer to any question is "Yes," attach a detailed statement explaining the transactions.) | | | |
| a Sale, exchange, or leasing of property? | 2a | | X |
| b Lending of money or other extension of credit?                        SEE STATEMENT 15 | 2b | X | |
| c Furnishing of goods, services, or facilities?                          SEE STATEMENT 16 | 2c | X | |
| d Payment of compensation (or payment or reimbursement of expenses if more than $1,000)?  SEE STATEMENT 17 | 2d | X | |
| e Transfer of any part of its income or assets? | 2e | | X |
| 3 a Did the organization make grants for scholarships, fellowships, student loans, etc ? (If "Yes," attach an explanation of how the organization determines that recipients qualify to receive payments )     SEE STATEMENT 18 | 3a | X | |
| b Did the organization have a section 403(b) annuity plan for its employees? | 3b | | X |
| c Did the organization receive or hold an easement for conservation purposes, including easements to preserve open space, the environment, historic land areas or historic structures? If "Yes," attach a detailed statement | 3c | | X |
| d Did the organization provide credit counseling, debt management, credit repair, or debt negotiation services? | 3d | | X |
| 4 a Did the organization maintain any donor advised funds? If "Yes," complete lines 4b through 4g If "No," complete lines 4f and 4g | 4a | | X |
| b Did the organization make any taxable distributions under section 4966?            N/A | 4b | | |
| c Did the organization make a distribution to a donor, donor advisor, or related person?     N/A | 4c | | |
| d Enter the total number of donor advised funds owned at the end of the tax year | ▶ | N/A | |
| e Enter the aggregate value of assets held in all donor advised funds owned at the end of the tax year | ▶ | N/A | |
| f Enter the total number of separate funds or accounts owned at the end of the year (excluding donor advised funds included on line 4d) where donors have the right to provide advice on the distribution or investment of amounts in such funds or accounts | ▶ | 0. | |
| g Enter the aggregate value of assets in all funds or accounts included on line 4f at the end of the tax year | ▶ | 0. | |

Schedule A (Form 990 or 990-EZ) 2007

723111
12-27-07

## Part IV  Reason for Non-Private Foundation Status  (See pages 4 through 8 of the instructions.)

I certify that the organization is not a private foundation because it is  (Please check only ONE applicable box)

5  ☐  A church, convention of churches, or association of churches. Section 170(b)(1)(A)(i)

6  ☐  A school. Section 170(b)(1)(A)(ii)  (Also complete Part V)

7  ☐  A hospital or a cooperative hospital service organization. Section 170(b)(1)(A)(iii)

8  ☐  A federal, state, or local government or governmental unit. Section 170(b)(1)(A)(v)

9  ☐  A medical research organization operated in conjunction with a hospital. Section 170(b)(1)(A)(iii) Enter the hospital's name, city, and state ▶ _____

10 ☐  An organization operated for the benefit of a college or university owned or operated by a governmental unit. Section 170(b)(1)(A)(iv)
(Also complete the **Support Schedule** in Part IV-A)

11a ☒  An organization that normally receives a substantial part of its support from a governmental unit or from the general public. Section 170(b)(1)(A)(vi)  (Also complete the **Support Schedule** in Part IV-A)

11b ☐  A community trust. Section 170(b)(1)(A)(vi)  (Also complete the **Support Schedule** in Part IV-A)

12 ☐  An organization that normally receives: (1) more than 33 1/3% of its support from contributions, membership fees, and gross receipts from activities related to its charitable, etc., functions - subject to certain exceptions, and (2) no more than 33 1/3% of its support from gross investment income and unrelated business taxable income (less section 511 tax) from businesses acquired by the organization after June 30, 1975. See section 509(a)(2)  (Also complete the **Support Schedule** in Part IV-A)

13 ☐  An organization that is not controlled by any disqualified persons (other than foundation managers) and otherwise meets the requirements of section 509(a)(3). Check the box that describes the type of supporting organization

☐ Type I          ☐ Type II          ☐ Type III-Functionally Integrated          ☐ Type III-Other

Provide the following information about the supported organizations. (See page 8 of the instructions.)

| (a)<br>Name(s) of supported organization(s) | (b)<br>Employer identification number (EIN) | (c)<br>Type of organization (described in lines 5 through 12 above or IRC section) | (d)<br>Is the supported organization listed in the supporting organization's governing documents? | | (e)<br>Amount of support |
|---|---|---|---|---|---|
| | | | Yes | No | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

Total ▶

14 ☐  An organization organized and operated to test for public safety. Section 509(a)(4)  (See page 8 of the instructions.)

Schedule A (Form 990 or 990-EZ) 2007

723121
12-27-07

TEXAS HIGHWAY PATROL MUSEUM, FORMERLY
TX HWY PATROL ASSN HALL OF FAME & MUSEUM   74-2639283   Page 4

**Part IV-A** Support Schedule (Complete only if you checked a box on line 10, 11, or 12.) **Use cash method of accounting**
Note: You may use the worksheet in the instructions for converting from the accrual to the cash method of accounting

| Calendar year (or fiscal year beginning in) ▶ | (a) 2006 | (b) 2005 | (c) 2004 | (d) 2003 | (e) Total |
|---|---|---|---|---|---|
| 15 Gifts, grants, and contributions received (Do not include unusual grants See line 28 ) | 1,820,261. | 2,336,176. | 1,880,201. | 362,352. | 6,398,990. |
| 16 Membership fees received | | | | | |
| 17 Gross receipts from admissions, merchandise sold or services performed, or furnishing of facilities in any activity that is related to the organization's charitable, etc , purpose | 1,365. | 1,592. | 185. | 920. | 4,062. |
| 18 Gross income from interest, dividends, amounts received from payments on securities loans (section 512(a)(5)), rents, royalties, income from similar sources, and unrelated business taxable income (less section 511 taxes) from businesses acquired by the organization after June 30, 1975 | | | | | |
| 19 Net income from unrelated business activities not included in line 18 | | | | | |
| 20 Tax revenues levied for the organization's benefit and either paid to it or expended on its behalf | | | | | |
| 21 The value of services or facilities furnished to the organization by a governmental unit without charge Do not include the value of services or facilities generally furnished to the public without charge | | | | | |
| 22 Other income Attach a schedule Do not include gain or (loss) from sale of capital assets | | | | | |
| 23 Total of lines 15 through 22 | 1,821,626. | 2,337,768. | 1,880,386. | 363,272. | 6,403,052. |
| 24 Line 23 minus line 17 | 1,820,261. | 2,336,176. | 1,880,201. | 362,352. | 6,398,990. |
| 25 Enter 1% of line 23 | 18,216. | 23,378. | 18,804. | 3,633. | |

26 Organizations described on lines 10 or 11  **a** Enter 2% of amount in column (e), line 24  ▶ | 26a | 127,980.

**b** Prepare a list for your records to show the name of and amount contributed by each person (other than a governmental unit or publicly supported organization) whose total gifts for 2003 through 2006 exceeded the amount shown in line 26a Do not file this list with **your** return  Enter the total of all these excess amounts  ▶ | 26b | 0.

**c** Total support for section 509(a)(1) test  Enter line 24, column (e)  ▶ | 26c | 6,398,990.

**d** Add  Amounts from column (e) for lines   18 _____  19 _____  22 _____  26b _____  ▶ | 26d |

**e** Public support (line 26c minus line 26d total)  ▶ | 26e | 6,398,990.

**f** Public support percentage (line 26e (numerator) divided by line 26c (denominator))  ▶ | 26f | 100.0000 %

27 Organizations described on line 12  **a** For amounts included in lines 15, 16, and 17 that were received from a "disqualified person," prepare a list for your records to show the name of, and total amounts received in each year from, each "disqualified person " Do not file this list with your return  Enter the sum of such amounts for each year   N/A
(2006) _____  (2005) _____  (2004) _____  (2003) _____

**b** For any amount included in line 17 that was received from each person (other than "disqualified persons"), prepare a list for your records to show the name of, and amount received for each year, that was more than the **larger** of **(1)** the amount on line 25 for the year or **(2)** $5,000  (Include in the list organizations described in lines 5 through 11b, as well as individuals ) Do not file this list with your return  After computing the difference between the amount received and the larger amount described in **(1)** or **(2)**, enter the sum of these differences (the excess amounts) for each year   N/A
(2006) _____  (2005) _____  (2004) _____  (2003) _____

**c** Add  Amounts from column (e) for lines   15 _____  16 _____  17 _____  20 _____  21 _____  ▶ | 27c | N/A

**d** Add  Line 27a total _____ and line 27b total _____  ▶ | 27d | N/A

**e** Public support (line 27c total minus line 27d total)  ▶ | 27e | N/A

**f** Total support for section 509(a)(2) test  Enter amount on line 23, column (e)  ▶ | 27f | N/A

**g** Public support percentage (line 27e (numerator) divided by line 27f (denominator))  ▶ | 27g | N/A %

**h** Investment income percentage (line 18, column (e) (numerator) divided by line 27f (denominator))  ▶ | 27h | N/A %

28 Unusual Grants: For an organization described in line 10, 11, or 12 that received any unusual grants during 2003 through 2006, prepare a list for your records to show, for each year, the name of the contributor, the date and amount of the grant, and a brief description of the nature of the grant  Do not file this list with your return  Do not include these grants in line 15

NONE

| Part V | Private School Questionnaire (See page 9 of the instructions.) |
| --- | --- |
| | (To be completed ONLY by schools that checked the box on line 6 in Part IV) |

N/A

|  |  |  | Yes | No |
| --- | --- | --- | --- | --- |
| 29 | Does the organization have a racially nondiscriminatory policy toward students by statement in its charter, bylaws, other governing instrument, or in a resolution of its governing body? | 29 | | |
| 30 | Does the organization include a statement of its racially nondiscriminatory policy toward students in all its brochures, catalogues, and other written communications with the public dealing with student admissions, programs, and scholarships? | 30 | | |
| 31 | Has the organization publicized its racially nondiscriminatory policy through newspaper or broadcast media during the period of solicitation for students, or during the registration period if it has no solicitation program, in a way that makes the policy known to all parts of the general community it serves?<br>If "Yes," please describe, if "No," please explain (If you need more space, attach a separate statement ) | 31 | | |

| 32 | Does the organization maintain the following | | | |
| --- | --- | --- | --- | --- |
| a | Records indicating the racial composition of the student body, faculty, and administrative staff? | 32a | | |
| b | Records documenting that scholarships and other financial assistance are awarded on a racially nondiscriminatory basis? | 32b | | |
| c | Copies of all catalogues, brochures, announcements, and other written communications to the public dealing with student admissions, programs, and scholarships? | 32c | | |
| d | Copies of all material used by the organization or on its behalf to solicit contributions? | 32d | | |
| | If you answered "No" to any of the above, please explain (If you need more space, attach a separate statement ) | | | |

| 33 | Does the organization discriminate by race in any way with respect to | | | |
| --- | --- | --- | --- | --- |
| a | Students' rights or privileges? | 33a | | |
| b | Admissions policies? | 33b | | |
| c | Employment of faculty or administrative staff? | 33c | | |
| d | Scholarships or other financial assistance? | 33d | | |
| e | Educational policies? | 33e | | |
| f | Use of facilities? | 33f | | |
| g | Athletic programs? | 33g | | |
| h | Other extracurricular activities? | 33h | | |
| | If you answered "Yes" to any of the above, please explain (If you need more space, attach a separate statement ) | | | |

| 34 a | Does the organization receive any financial aid or assistance from a governmental agency? | 34a | | |
| --- | --- | --- | --- | --- |
| b | Has the organization's right to such aid ever been revoked or suspended? | 34b | | |
| | If you answered "Yes" to either 34a or b, please explain using an attached statement | | | |
| 35 | Does the organization certify that it has complied with the applicable requirements of sections 4 01 through 4 05 of Rev Proc 75-50, 1975-2 C B 587, covering racial nondiscrimination? If "No," attach an explanation | 35 | | |

Schedule A (Form 990 or 990-EZ) 2007

723141
12-27-07

16341027 000078          2007.06010 TEXAS HIGHWAY PATROL MUSEUM 30104006

TEXAS HIGHWAY PATROL MUSEUM, FORMERLY
TX HWY PATROL ASSN HALL OF FAME & MUSEUM   74-2639283

## Part VI-A  Lobbying Expenditures by Electing Public Charities (See page 11 of the instructions.)   N/A

(To be completed ONLY by an eligible organization that filed Form 5768)

Check ▶ a ☐ if the organization belongs to an affiliated group   Check ▶ b ☐ if you checked "a" and "limited control" provisions apply

| Limits on Lobbying Expenditures<br>(The term "expenditures" means amounts paid or incurred.) | | (a)<br>Affiliated group<br>totals | (b)<br>To be completed for all<br>electing organizations |
|---|---|---|---|
| | | N/A | |
| 36  Total lobbying expenditures to influence public opinion (grassroots lobbying) | 36 | | |
| 37  Total lobbying expenditures to influence a legislative body (direct lobbying) | 37 | | |
| 38  Total lobbying expenditures (add lines 36 and 37) | 38 | | |
| 39  Other exempt purpose expenditures | 39 | | |
| 40  Total exempt purpose expenditures (add lines 38 and 39) | 40 | | |
| 41  Lobbying nontaxable amount. Enter the amount from the following table - | 41 | | |
| 42  Grassroots nontaxable amount (enter 25% of line 41) | 42 | | |
| 43  Subtract line 42 from line 36. Enter -0- if line 42 is more than line 36 | 43 | | |
| 44  Subtract line 41 from line 38. Enter -0- if line 41 is more than line 38 | 44 | | |

**If the amount on line 40 is -**

| If the amount on line 40 is - | The lobbying nontaxable amount is - |
|---|---|
| Not over $500,000 | 20% of the amount on line 40 |
| Over $500,000 but not over $1,000,000 | $100,000 plus 15% of the excess over $500,000 |
| Over $1,000,000 but not over $1,500,000 | $175,000 plus 10% of the excess over $1,000,000 |
| Over $1,500,000 but not over $17,000,000 | $225,000 plus 5% of the excess over $1,500,000 |
| Over $17,000,000 | $1,000,000 |

**Caution**  If there is an amount on either line 43 or line 44, you must file Form 4720.

### 4-Year Averaging Period Under Section 501(h)

(Some organizations that made a section 501(h) election do not have to complete all of the five columns below See the instructions for lines 45 through 50 on page 13 of the instructions.)

| Calendar year (or<br>fiscal year beginning in) ▶ | Lobbying Expenditures During 4-Year Averaging Period | | | | N/A |
|---|---|---|---|---|---|
| | (a)<br>2007 | (b)<br>2006 | (c)<br>2005 | (d)<br>2004 | (e)<br>Total |
| 45  Lobbying nontaxable amount | | | | | 0. |
| 46  Lobbying ceiling amount (150% of line 45(e)) | | | | | 0. |
| 47  Total lobbying expenditures | | | | | 0. |
| 48  Grassroots nontaxable amount | | | | | 0. |
| 49  Grassroots ceiling amount (150% of line 48(e)) | | | | | 0. |
| 50  Grassroots lobbying expenditures | | | | | 0. |

## Part VI-B  Lobbying Activity by Nonelecting Public Charities

(For reporting only by organizations that did not complete Part VI-A) (See page 14 of the instructions.)   N/A

| During the year, did the organization attempt to influence national, state or local legislation, including any attempt to influence public opinion on a legislative matter or referendum, through the use of | Yes | No | Amount |
|---|---|---|---|
| a  Volunteers | | | |
| b  Paid staff or management (Include compensation in expenses reported on lines c through h.) | | | |
| c  Media advertisements | | | |
| d  Mailings to members, legislators, or the public | | | |
| e  Publications, or published or broadcast statements | | | |
| f  Grants to other organizations for lobbying purposes | | | |
| g  Direct contact with legislators, their staffs, government officials, or a legislative body | | | |
| h  Rallies, demonstrations, seminars, conventions, speeches, lectures, or any other means | | | |
| i  Total lobbying expenditures (Add lines c through h.) | | | 0. |

If "Yes" to any of the above, also attach a statement giving a detailed description of the lobbying activities

723151
12-27-07

Schedule A (Form 990 or 990-EZ) 2007

16341027 000078          2007.06010 TEXAS HIGHWAY PATROL MUSEUM 30104006

**Part VII** Information Regarding Transfers To and Transactions and Relationships With Noncharitable Exempt Organizations (See page 14 of the instructions.)

51  Did the reporting organization directly or indirectly engage in any of the following with any other organization described in section 501(c) of the Code (other than section 501(c)(3) organizations) or in section 527, relating to political organizations?

|   |   |   | Yes | No |
|---|---|---|---|---|
| a | Transfers from the reporting organization to a noncharitable exempt organization of | | | |
|   | (i) Cash | **51a(i)** | | X |
|   | (ii) Other assets | **a(ii)** | | X |
| b | Other transactions | | | |
|   | (i) Sales or exchanges of assets with a noncharitable exempt organization | **b(i)** | | X |
|   | (ii) Purchases of assets from a noncharitable exempt organization | **b(ii)** | | X |
|   | (iii) Rental of facilities, equipment, or other assets | **b(iii)** | X | |
|   | (iv) Reimbursement arrangements | **b(iv)** | | X |
|   | (v) Loans or loan guarantees | **b(v)** | X | |
|   | (vi) Performance of services or membership or fundraising solicitations | **b(vi)** | | X |
| c | Sharing of facilities, equipment, mailing lists, other assets, or paid employees | **c** | | X |

d  If the answer to any of the above is "Yes," complete the following schedule. Column (b) should always show the fair market value of the goods, other assets, or services given by the reporting organization. If the organization received less than fair market value in any transaction or sharing arrangement, show in column (d) the value of the goods, other assets, or services received.

| (a) Line no | (b) Amount involved | (c) Name of noncharitable exempt organization | (d) Description of transfers, transactions, and sharing arrangements |
|---|---|---|---|
| BIII | 2,400. | TEXAS HIGHWAY PATROL ASSOCIATION (501(C)(6)) | SEE STATEMENT 19 |
| BV | | TEXAS HIGHWAY PATROL ASSOCIATION (501(C)(6)) | |

52 a  Is the organization directly or indirectly affiliated with, or related to, one or more tax-exempt organizations described in section 501(c) of the Code (other than section 501(c)(3)) or in section 527?  ▶ [X] Yes  [ ] No

b  If "Yes," complete the following schedule.

| (a) Name of organization | (b) Type of organization | (c) Description of relationship |
|---|---|---|
| TEXAS HIGHWAY PATROL ASSOCIATION | 501(C)(6) | SEE STATEMENT 20 |

723152
12-27-07

2007 DEPRECIATION AND AMORTIZATION REPORT

FORM 990 PAGE 2

990

| Asset No | Description | Date Acquired | Method | Life | Line No | Unadjusted Cost Or Basis | Bus % Excl | Reduction In Basis | Basis For Depreciation | Accumulated Depreciation | Current Sec 179 | Current Year Deduction |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | COMPUTERS & OFFICE MACHINERY | | | | | | | | | | | |
| 101 | COMPUTER CITY MACPRODUCTS-THIRD WAVE | 091793 | 200DB | 5.00 | 17 | 535. | | | 535. | 535. | | 0. |
| 102 | SCANNER (D)TIM J | 012594 | 200DB | 5.00 | 17 | 1,002. | | | 1,002. | 1,002. | | 0. |
| 103 | TIERNEY-COMPUTER | 060595 | 200DB | 5.00 | 17 | 5,358. | | | 5,358. | 5,358. | | 0. |
| 104 | OFFICE EQUIPMENT | 010698 | 200DB | 5.00 | 17 | 613. | | | 613. | 613. | | 0. |
| 105 | DIGITAL GRAPHICS | 032699 | 200DB | 5.00 | 17 | 120. | | | 120. | 120. | | 0. |
| 106 | PHONE SYSTEM | 021000 | 200DB | 5.00 | 17 | 487. | | | 487. | 487. | | 0. |
| 107 | MAC COMPUTER | 112003 | 200DB | 5.00 | 17 | 2,851. | | 1,426. | 1,425. | 1,133. | | 156. |
| 108 | COMPUTER - GOLDIE | 010804 | 200DB | 5.00 | 17 | 629. | | | 629. | 482. | | 69. |
| 109 | PALM PILOT - TIM | 010804 | 200DB | 5.00 | 17 | 515. | | | 515. | 394. | | 57. |
| 110 | (D)COMPUTER - MARY | 070804 | 200DB | 5.00 | 17 | 359. | | | 359. | 249. | | 44. |
| 111 | COMPUTER - GOLDIE | 080204 | 200DB | 5.00 | 17 | 450. | | | 450. | 313. | | 55. |
| 112 | TELEPHONE SYSTEM | 010105 | 200DB | 5.00 | 17 | 158. | | | 158. | 82. | | 30. |
| 113 | (D)SONY LAPTOP VAIO | 010105 | 200DB | 5.00 | 17 | 257. | | | 257. | 133. | | 50. |
| 114 | PRINTER/FAX/COPIER LASERJET 3200 | 010105 | 200DB | 5.00 | 17 | 176. | | | 176. | 91. | | 34. |
| 115 | INSERTER MAIL BURSTER & | 010105 | 200DB | 5.00 | 17 | 2,996. | | | 2,996. | 1,558. | | 575. |
| 116 | PHONE SYSTEM UPGRADE | 010105 | 200DB | 5.00 | 17 | 395. | | | 395. | 205. | | 76. |
| 117 | PHONE SYSTEM UPGRADE | 010105 | 200DB | 5.00 | 17 | 462. | | | 462. | 240. | | 89. |

(D) - Asset disposed

*ITC, Section 179, Salvage, Bonus, Commercial Revitalization Deduction, GO Zone

728102
04-27-07

17

2007 DEPRECIATION AND AMORTIZATION REPORT

FORM 990 PAGE 2

990

| Asset No | Description | Date Acquired | Method | Life | Line No | Unadjusted Cost Or Basis | Bus % Excl | Reduction In Basis * | Basis For Depreciation | Accumulated Depreciation | Current Sec 179 | Current Year Deduction |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 118 | COMPUTER (GILDA) | 010105 | 200DB | 5.00 | 17 | 128. | | | 128. | 66. | | 25. |
| 119 | EMACHINE LAPTOP | 010105 | 200DB | 5.00 | 17 | 334. | | | 334. | 174. | | 64. |
| 120 | (D)COMPUTER - GILDA | 010105 | 200DB | 5.00 | 17 | 175. | | | 175. | 91. | | 34. |
| 121 | DELL MONITOR | 021505 | 200DB | 5.00 | 17 | 395. | | | 395. | 205. | | 76. |
| 122 | DELL COMPUTER | 021505 | 200DB | 5.00 | 17 | 821. | | | 821. | 427. | | 158. |
| 123 | OKIDATA PRINTER | 021505 | 200DB | 5.00 | 17 | 390. | | | 390. | 203. | | 75. |
| 124 | EMACHINES LAPTOP | 021505 | 200DB | 5.00 | 17 | 1,028. | | | 1,028. | 535. | | 197. |
| 125 | AMY - COMPUTERS | 041505 | 200DB | 5.00 | 17 | 618. | | | 618. | 322. | | 118. |
| 126 | MOTHERBOARD - MARY | 011107 | 200DB | 5.00 | 19B | 557. | | | 557. | | | 111. |
| 127 | COMPUTER | 013107 | 200DB | 5.00 | 19B | 2,182. | | | 2,182. | | | 436. |
| 128 | LAPTOP - TIM | 062007 | 200DB | 5.00 | 19B | 830. | | | 830. | | | 166. |
| 129 | COMPUTERS - MARY & GILDA | 072307 | 200DB | 5.00 | 19B | 540. | | | 540. | | | 108. |
| | * 990 PAGE 2 TOTAL - COMPUTERS & OFFICE MAC | | | | | 25,361. | | 1,426. | 23,935. | 15,018. | 0. | 2,803. |
| | EQUIPMENT - MUSEUM | | | | | | | | | | | |
| 201 | MUSEUM EQUIPMENT | 052698 | 200DB | 5.00 | 17 | 3,197. | | | 3,197. | 3,197. | | 0. |
| 202 | VIDEO | 120403 | 200DB | 5.00 | 17 | 2,850. | | 1,425. | 1,425. | 1,133. | | 156. |
| 203 | VIDEO | 072103 | 200DB | 5.00 | 17 | 525. | | 263. | 262. | 213. | | 30. |
| 204 | VIDEO - DYING HIGH | 090903 | 200DB | 5.00 | 17 | 950. | | 475. | 475. | 388. | | 54. |

* ITC, Section 179, Salvage, Bonus, Commercial Revitalization Deduction, GO Zone

(D) - Asset disposed

18

728102
04-27-07

**2007 DEPRECIATION AND AMORTIZATION REPORT**

FORM 990 PAGE 2

| Asset No | Description | Date Acquired | Method | Life | Line No | Unadjusted Cost Or Basis | Bus % Excl | Reduction In Basis * | Basis For Depreciation | Accumulated Depreciation | Current Sec 179 | Current Year Deduction |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 205 | PROJECTOR | 051204 | 200DB | 5.00 | 17 | 703. | | | 703. | 514. | | 80. |
| 206 | PROJECTOR | 052404 | 200DB | 5.00 | 17 | 1,000. | | | 1,000. | 730. | | 114. |
| 207 | PROJECTOR CRUSIN' TO COFFINS | 060704 | 200DB | 5.00 | 17 | 180. | | | 180. | 131. | | 20. |
| 208 | EXHIBIT DISPLAY STANDS | 060704 | 200DB | 5.00 | 17 | 557. | | | 557. | 406. | | 63. |
| 209 | (PAWLICK) DISPLAY STANDS | 031505 | 200DB | 7.00 | 17 | 300. | | | 300. | 116. | | 53. |
| 210 | (FURNITURE MAYHAM) | 111505 | 200DB | 7.00 | 17 | 897. | | | 897. | 348. | | 157. |
| | * 990 PAGE 2 TOTAL - EQUIPMENT - MUSEUM | | | | | 11,159. | | 2,163. | 8,996. | 7,176. | 0. | 727. |
| 301 | FURNITURE & FIXTURES GALLERY ARTWORK - MAIN STREET | 021797 | 200DB | 5.00 | 17 | 1,160. | | | 1,160. | 1,160. | | 0. |
| 302 | SKIRTS FOR TELEMARKETING TABLES | 080199 | 200DB | 5.00 | 17 | 350. | | | 350. | 350. | | 0. |
| 303 | SIGN BY DESIGN IV | 050701 | 200DB | 7.00 | 17 | 2,122. | | | 2,122. | 1,837. | | 189. |
| 304 | SIGN - CRUISING TO COFFINS | 101403 | 200DB | 5.00 | 17 | 300. | | 150. | 150. | 120. | | 16. |
| 305 | SIGN BRACKETS | 120403 | 200DB | 5.00 | 17 | 838. | | 419. | 419. | 333. | | 46. |
| 306 | SIGN BRACKETS | 071003 | 200DB | 5.00 | 17 | 300. | | 150. | 150. | 123. | | 17. |
| 307 | CARPET CLEANING MACHINE | 010105 | 200DB | 7.00 | 17 | 254. | | | 254. | 98. | | 45. |
| 308 | DESK | 010105 | 200DB | 7.00 | 17 | 225. | | | 225. | 87. | | 39. |
| | * 990 PAGE 2 TOTAL - FURNITURE & FIXTURES | | | | | 5,549. | | 719. | 4,830. | 4,108. | 0. | 352. |
| | VEHICLES | | | | | | | | | | | |

(D) - Asset disposed

* ITC, Section 179, Salvage, Bonus, Commercial Revitalization Deduction, GO Zone

728102
04-27-07

19

2007 DEPRECIATION AND AMORTIZATION REPORT
FORM 990 PAGE 2

990

| Asset No | Description | Date Acquired | Method | Life | Line No | Unadjusted Cost Or Basis | Bus % Excl | Reduction In Basis * | Basis For Depreciation | Accumulated Depreciation | Current Sec 179 | Current Year Deduction |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 402 | HOF MUSTANG | 070700 | 200DB | 5.00 | 17 | 5,800. | | | 5,800. | 5,800. | | 0. |
| 403 | (D)2004 LEXUS GX 470 | 120304 | 200DB | 5.00 | 17 | 48,763. | | | 48,763. | 10,088. | | 1,675. |
| | * 990 PAGE 2 TOTAL - VEHICLES | | | | | 54,563. | | 0. | 54,563. | 15,888. | 0. | 1,675. |
| 501 | LEASEHOLD IMPROVEMENTS - WIRING LEASEHOLD IMPROVEMENTS | 121803 | SL | 39.00 | 17 | 1,835. | | | 1,835. | 144. | | 47. |
| 502 | LEASEHOLD IMPROVEMENTS EL PASO LEASEHOLD | 042604 | SL | 39.00 | 17 | 1,000. | | | 1,000. | 70. | | 26. |
| 503 | IMPROVEMENTS LEASEHOLD IMPROVEMENTS | 010105 | SL | 39.00 | 17 | 2,030. | | | 2,030. | 104. | | 52. |
| 504 | - OTHER LEASEHOLD IMPROVEMENTS | 010105 | SL | 39.00 | 17 | 437. | | | 437. | 23. | | 11. |
| | * 990 PAGE 2 TOTAL - LEASEHOLD IMPROVEMENTS | | | | | 5,302. | | 0. | 5,302. | 341. | 0. | 136. |
| 601 | ZIP SOFTWARE | 050704 | SL | 1.00 | 16 | 1,489. | | | 1,489. | 1,489. | | 0. |
| 602 | SOFTWARE | 010105 | SL | 3.00 | 17 | 79. | | | 79. | 52. | | 27. |
| | * 990 PAGE 2 TOTAL - SOFTWARE | | | | | 1,568. | | 0. | 1,568. | 1,541. | 0. | 27. |
| 901 | LAND - 501 OAKLAND | 123104 | L | | | 128,975. | | | 128,975. | | | 0. |
| 902 | BUILDING - 501 OAKLAND | 123104 | SL | 39.00 | 17 | 116,068. | | | 116,068. | 5,952. | | 2,976. |
| | * 990 PAGE 2 TOTAL - LAND & BUILDINGS | | | | | 245,043. | | 0. | 245,043. | 5,952. | 0. | 2,976. |
| | * GRAND TOTAL 990 PAGE 2 DEPR | | | | | 348,545. | | 4,308. | 344,237. | 50,024. | 0. | 8,696. |

* ITC, Section 179, Salvage, Bonus, Commercial Revitalization Deduction, GO Zone

(D) - Asset disposed

728102
04-27-07

TEXAS HIGHWAY PATROL MUSEUM, FORMERLY TX                 74-2639283
═══════════════════════════════════════════════════════════════════

FORM 990                    RENTAL INCOME                STATEMENT    1
═══════════════════════════════════════════════════════════════════

| KIND AND LOCATION OF PROPERTY | ACTIVITY NUMBER | GROSS RENTAL INCOME |
|---|---|---|
| | 1 | |
| RENTAL - NOT DEBT FINANCED (MUSEUM FACILITY) | 2 | 69,354. |
| RENTAL - DEBT FINANCED (OAKLAND OFFICE) | 3 | 4,104. |
| RENTAL - NOT DEBT FINANCED (OAKLAND OFFICE) | 4 | 1,896. |
| | | |
| TOTAL TO FORM 990, PART I, LINE 6A | | 75,354. |


═══════════════════════════════════════════════════════════════════

FORM 990                    RENTAL EXPENSES              STATEMENT    2
═══════════════════════════════════════════════════════════════════

| DESCRIPTION | ACTIVITY NUMBER | AMOUNT | TOTAL |
|---|---|---|---|
| DEPRECIATION | | 8,048. | |
| INSURANCE | | 3,470. | |
| - SUBTOTAL - | 2 | | 11,518. |
| DEPRECIATION | | 872. | |
| INSURANCE | | 791. | |
| INTEREST EXPENSE | | 3,871. | |
| - SUBTOTAL - | 3 | | 5,534. |
| DEPRECIATION | | 403. | |
| INSURANCE | | 365. | |
| INTEREST EXPENSE | | 1,789. | |
| - SUBTOTAL - | 4 | | 2,557. |
| | | | |
| TOTAL TO FORM 990, PART I, LINE 6B | | | 19,609. |

| FORM 990 | GAIN (LOSS) FROM SALE OF OTHER ASSETS | STATEMENT 3 |
|---|---|---|

| DESCRIPTION | DATE ACQUIRED | DATE SOLD | METHOD ACQUIRED |
|---|---|---|---|
| 2004 LEXUS GX 470 | 12/03/04 | 03/23/07 | PURCHASED |

| NAME OF BUYER | GROSS SALES PRICE | COST OR OTHER BASIS | EXPENSE OF SALE | DEPREC | NET GAIN OR (LOSS) |
|---|---|---|---|---|---|
| VARIOUS | 33,112. | 48,763. | 0. | 11,763. | -3,888. |

| DESCRIPTION | DATE ACQUIRED | DATE SOLD | METHOD ACQUIRED |
|---|---|---|---|
| VARIOUS COMPUTER & OFFICE MACHINERY | 01/01/05 | 07/31/07 | PURCHASED |

| NAME OF BUYER | GROSS SALES PRICE | COST OR OTHER BASIS | EXPENSE OF SALE | DEPREC | NET GAIN OR (LOSS) |
|---|---|---|---|---|---|
| VARIOUS | 0. | 6,149. | 0. | 5,959. | -190. |
| TO FM 990, PART I, LN 8 | 33,112. | 54,912. | 0. | 17,722. | -4,078. |

| FORM 990 | INCOME AND COST OF GOODS SOLD<br>INCLUDED ON PART I, LINE 10 | STATEMENT 4 |

INCOME

```
 1. GROSS RECEIPTS . . . . . . . . . . . . .        1,106
 2. RETURNS AND ALLOWANCES . . . . . . . . . .
 3. LINE 1 LESS LINE 2 . . . . . . . . . . . .               1,106
                                                       _____
 4. COST OF GOODS SOLD (LINE 13) . . . . . . .
 5. GROSS PROFIT (LINE 3 LESS LINE 4) . . . . .              1,106
                                                       ============
COST OF GOODS SOLD

 6. INVENTORY AT BEGINNING OF YEAR . . . . . . .    2,100
 7. MERCHANDISE PURCHASED . . . . . . . . . . .
 8. COST OF LABOR . . . . . . . . . . . . . .
 9. MATERIALS AND SUPPLIES . . . . . . . . . .
10. OTHER COSTS . . . . . . . . . . . . . . .
11. ADD LINES 6 THROUGH 10 . . . . . . . . . .              2,100
                                                       _____
12. INVENTORY AT END OF YEAR . . . . . . . . .     2,100
13. COST OF GOODS SOLD (LINE 11 LESS LINE 12). .
                                                       ============
```

| FORM 990 | OTHER EXPENSES | | STATEMENT | 5 |

| DESCRIPTION | (A)<br>TOTAL | (B)<br>PROGRAM<br>SERVICES | (C)<br>MANAGEMENT<br>AND GENERAL | (D)<br>FUNDRAISING |
|---|---|---|---|---|
| AUTO EXPENSE | 11,168. | | 5,584. | 5,584. |
| BANK CHARGES | 190. | | 185. | 5. |
| INSURANCE | 43,217. | 16,240. | 18,857. | 8,120. |
| SCHOLARSHIPS | 1,600. | 1,600. | | |
| MAILING LISTS | 3,866. | | 210. | 3,656. |
| DECALS | 16,920. | | | 16,920. |
| DELIVERY SERVICE | 13,099. | | 9,396. | 3,703. |
| DUES & SUBSCRIPTIONS | 668. | | 668. | |
| DONATIONS | 150. | | 150. | |
| TOTAL TO FM 990, LN 43 | 90,878. | 17,840. | 35,050. | 37,988. |

| FORM 990 | STATEMENT OF ORGANIZATION'S PRIMARY EXEMPT PURPOSE<br>PART III | STATEMENT | 6 |

EXPLANATION

THE ESTABLISHMENT AND OPERATION OF A HALL OF FAME AND MUSEUM TO HONOR TEXAS
HIGHWAY PATROL OFFICERS AND TO EDUCATE THE GENERAL PUBLIC.

| FORM 990 | DEPRECIATION OF ASSETS HELD FOR INVESTMENT | STATEMENT | 7 |

| DESCRIPTION | COST OR<br>OTHER BASIS | ACCUMULATED<br>DEPRECIATION | BOOK VALUE |
|---|---|---|---|
| LAND - HALL OF FAME FACILITY<br>(NOT DEBT FINANCED) | 182,706. | 0. | 182,706. |
| BUILDING - HALL OF FAME<br>FACILITY (NOT DEBT FINANCED) | 313,909. | 24,146. | 289,763. |
| LAND - 501 OAKLAND<br>(DEBT-FINANCED) | 37,808. | 0. | 37,808. |
| BUILDING - 501 OAKLAND<br>(DEBT-FINANCED) | 34,025. | 2,616. | 31,409. |
| LAND - 501 OAKLAND (NOT<br>DEBT-FINANCED) | 17,467. | 0. | 17,467. |
| BUILDING - 501 OAKLAND (NOT<br>DEBT-FINANCED) | 15,719. | 1,209. | 14,510. |
| TOTAL TO FORM 990, PART IV, LN 55 | 601,634. | 27,971. | 573,663. |

FORM 990         DEPRECIATION OF ASSETS NOT HELD FOR INVESTMENT      STATEMENT    8

| DESCRIPTION | COST OR OTHER BASIS | ACCUMULATED DEPRECIATION | BOOK VALUE |
|---|---|---|---|
| COMPUTER CITY | 535. | 535. | 0. |
| MACPRODUCTS-THIRD WAVE SCANNER | 1,002. | 1,002. | 0. |
| OFFICE EQUIPMENT | 613. | 613. | 0. |
| DIGITAL GRAPHICS | 120. | 120. | 0. |
| PHONE SYSTEM | 487. | 487. | 0. |
| MAC COMPUTER | 2,851. | 2,715. | 136. |
| COMPUTER - GOLDIE | 629. | 551. | 78. |
| PALM PILOT - TIM | 515. | 451. | 64. |
| COMPUTER - GOLDIE | 450. | 368. | 82. |
| TELEPHONE SYSTEM | 158. | 112. | 46. |
| LASERJET 3200 PRINTER/FAX/COPIER | 176. | 125. | 51. |
| MAIL BURSTER & INSERTER | 2,996. | 2,133. | 863. |
| PHONE SYSTEM UPGRADE | 395. | 281. | 114. |
| PHONE SYSTEM UPGRADE | 462. | 329. | 133. |
| COMPUTER (GILDA) | 128. | 91. | 37. |
| EMACHINE LAPTOP | 334. | 238. | 96. |
| DELL MONITOR | 395. | 281. | 114. |
| DELL COMPUTER | 821. | 585. | 236. |
| OKIDATA PRINTER | 390. | 278. | 112. |
| EMACHINES LAPTOP | 1,028. | 732. | 296. |
| AMY - COMPUTERS | 618. | 440. | 178. |
| MOTHERBOARD - MARY | 557. | 111. | 446. |
| COMPUTER | 2,182. | 436. | 1,746. |
| LAPTOP - TIM | 830. | 166. | 664. |
| COMPUTERS - MARY & GILDA | 540. | 108. | 432. |
| MUSEUM EQUIPMENT | 3,197. | 3,197. | 0. |
| VIDEO | 2,850. | 2,714. | 136. |
| VIDEO | 525. | 506. | 19. |
| VIDEO - DYING HIGH | 950. | 917. | 33. |
| PROJECTOR | 703. | 594. | 109. |
| PROJECTOR | 1,000. | 844. | 156. |
| PROJECTOR | 180. | 151. | 29. |
| CRUSIN' TO COFFINS EXHIBIT | 557. | 469. | 88. |
| DISPLAY STANDS (PAWLICK) | 300. | 169. | 131. |
| DISPLAY STANDS (FURNITURE MAYHAM) | 897. | 505. | 392. |
| ARTWORK - MAIN STREET GALLERY | 1,160. | 1,160. | 0. |
| SKIRTS FOR TELEMARKETING TABLES | 350. | 350. | 0. |
| SIGN BY DESIGN IV | 2,122. | 2,026. | 96. |
| SIGN - CRUISING TO COFFINS | 300. | 286. | 14. |
| SIGN BRACKETS | 838. | 798. | 40. |
| SIGN BRACKETS | 300. | 290. | 10. |
| CARPET CLEANING MACHINE | 254. | 143. | 111. |
| DESK | 225. | 126. | 99. |

TEXAS HIGHWAY PATROL MUSEUM, FORMERLY TX        74-2639283

| | | | |
|---|---:|---:|---:|
| HOF MUSTANG | 5,800. | 5,800. | 0. |
| LEASEHOLD IMPROVEMENTS - WIRING | 1,835. | 191. | 1,644. |
| LEASEHOLD IMPROVEMENTS | 1,000. | 96. | 904. |
| EL PASO LEASEHOLD IMPROVEMENTS | 2,030. | 156. | 1,874. |
| LEASEHOLD IMPROVEMENTS - OTHER | 437. | 34. | 403. |
| ZIP SOFTWARE | 1,489. | 1,489. | 0. |
| SOFTWARE | 79. | 79. | 0. |
| LAND - 501 OAKLAND | 128,975. | 0. | 128,975. |
| BUILDING - 501 OAKLAND | 116,068. | 8,928. | 107,140. |
| TOTAL TO FORM 990, PART IV, LN 57 | 293,633. | 45,306. | 248,327. |

---

| FORM 990 | OTHER ASSETS | STATEMENT 9 |
|---|---|---|

| DESCRIPTION | BEGINNING OF YEAR | END OF YEAR |
|---|---:|---:|
| MUSEUM EXHIBITS | 43,444. | 43,444. |
| ACCOUNTS RECEIVABLE - OTHER | 2,700. | 150. |
| ACCOUNTS RECEIVABLE - THPA SERVICES, INC. | 15,657. | |
| TOTAL TO FORM 990, PART IV, LINE 58 | 61,801. | 43,594. |

---

| FORM 990 | MORTGAGES PAYABLE | STATEMENT 10 |
|---|---|---|

| DESCRIPTION | BALANCE DUE |
|---|---:|
| COMPASS BANK | 192,899. |
| COMPASS BANK | 20,353. |
| TOTAL INCLUDED ON FORM 990, PART IV, LINE 64B, COLUMN B | 213,252. |

TEXAS HIGHWAY PATROL MUSEUM, FORMERLY TX                    74-2639283

FORM 990                OTHER NOTES AND LOANS PAYABLE          STATEMENT   11

| LENDER'S NAME | | TERMS OF REPAYMENT | |
|---|---|---|---|
| UNIVERSITY FEDERAL CREDIT UNION | | MONTHLY | |

| DATE OF NOTE | MATURITY DATE | ORIGINAL LOAN AMOUNT | INTEREST RATE |
|---|---|---|---|
| 12/03/04 | 06/03/08 | 47,763. | .00% |

SECURITY PROVIDED BY BORROWER          PURPOSE OF LOAN

2004 LEXUS GX470

RELATIONSHIP OF LENDER

NONE

| DESCRIPTION OF CONSIDERATION | FMV OF CONSIDERATION | BALANCE DUE |
|---|---|---|
| | 0. | 0. |

TOTAL INCLUDED ON FORM 990, PART IV, LINE 64, COLUMN B


FORM 990                      OTHER LIABILITIES               STATEMENT   12

| DESCRIPTION | BEGINNING OF YEAR | END OF YEAR |
|---|---|---|
| ACCOUNTS PAYABLE - TEXAS HIGHWAY PATROL ASSOCIATION | 167,642. | 126,819. |
| ACCOUNTS PAYABLE - THPA SERVICES, INC. | | 10,247. |
| TOTAL TO FORM 990, PART IV, LINE 65 | 167,642. | 137,066. |

| FORM 990 | IDENTIFICATION OF RELATED ORGANIZATIONS PART VI, LINE 80B | STATEMENT 13 |
|---|---|---|

| NAME OF ORGANIZATION | EXEMPT | NONEXEMPT |
|---|---|---|
| TEXAS HIGHWAY PATROL ASSOCIATION | X | |
| CITIZENS FOR SPECIAL ARTISTS | X | |
| NATIONAL POLICE YOUTH ATHLETIC LEAGUE | X | |
| THPA SERVICES, INC. | | X |

FORM 990          PART V-A OFFICER COMPENSATION FROM          STATEMENT   14
                         RELATED ORGANIZATIONS

| OFFICER'S NAME | COMPENSATION | EMPLOYEE BENEFIT PLAN CONTRIBUTION | EXPENSE ACCOUNT |
|---|---|---|---|
| TIM TIERNEY | 47,773. | | |

NAME OF RELATED ORGANIZATION                          EMPLOYER ID NUMBER

THPA SERVICES, INC.                                      74-2709623

RELATIONSHIP BETWEEN ORGANIZATIONS

FOR PROFIT ENTITY 100% OWNED BY RELATED 501(C)(6) ORGANIZATION, THPA

SCHEDULE A                    EXPLANATION OF TRANSACTIONS                  STATEMENT   15
                                PART III, LINE 2B

THE ORGANIZATION'S BOOKS AS OF 12-31-06 REFLECTED A LOAN MADE IN A
PREVIOUS PERIOD TO THPA SERVICES, INC. IN THE AMOUNT OF $15,657.  THIS
AMOUNT WAS PAID OFF DURING THE YEAR, AND THE REPORTING ORGANIZATION
ACTUALLY BORROWED $10,247 FROM THPA SERVICES, INC., WHICH APPEARS AS A
12-31-07 PAYABLE.

SCHEDULE A              EXPLANATION OF TRANSACTIONS              STATEMENT  16
                          PART III, LINE 2C


THE ORGANIZATION AGAIN LEASED OFFICE SPACE TO THPA SERVICES, INC.  THE
TOTAL RENTAL INCOME RECEIVED IN 2006 WAS $3,600.

SCHEDULE A                    EXPLANATION OF TRANSACTIONS              STATEMENT    17
                                   PART III, LINE 2D

THE EXECUTIVE VICE PRESIDENT OF THE ORGANIZATION IS A SALARIED
EMPLOYEE, AND IN 2007 HE RECEIVED $139,118.   THE DIRECTOR OF MARKETING
IS LIKEWISE A SALARIED EMPLOYEE OF THE ORGANIZATION, AND IN 2007 HE
RECEIVED $156,738.   THE DIRECTORS OF THE ORGANIZATION DO NOT RECEIVE
ANY COMPENSATION.   REASONABLE TRAVEL AND BUSINESS EXPENSES INCURRED BY
DIRECTORS AND OFFICERS IN CONNECTION WITH ORGANIZATION ENDEAVORS ARE
REIMBURSED UPON PRESENTATION OF PROPER DOCUMENTATION.   TOTAL TRAVEL
EXPENSES INCURRED BY THE ORGANIZATION (AS PRESENTED AT LINE 39, PART
II, FORM 990) AMOUNTED TO $12,802.

SCHEDULE A      EXPLANATION OF QUALIFICATIONS TO RECEIVE PAYMENTS    STATEMENT   18
                            PART III, LINE  3A

ALL APPLICANTS WHO APPLY ARE DEEMED QUALIFIED AND RECEIVE SCHOLARSHIPS
PROVIDED THEY ARE FAMILY MEMBERS OF A TEXAS HIGHWAY PATROL TROOPER.

SCHEDULE A       INVOLVEMENT WITH NONCHARITABLE ORGANIZATIONS        STATEMENT   19
                      PART VII, LINE 51, COLUMN (D)


NAME OF NONCHARITABLE EXEMPT ORGANIZATION

TEXAS HIGHWAY PATROL ASSOCIATION (501(C)(6))


DESCRIPTION OF TRANSFERS, TRANSACTIONS, AND SHARING ARRANGEMENTS

THE REPORTING ORGANIZATION LEASED OFFICE SPACE TO TEXAS HIGHWAY PATROL
ASSOCIATION DURING 2006 COLLECTING RENT IN THE AMOUNT INDICATED.




NAME OF NONCHARITABLE EXEMPT ORGANIZATION

TEXAS HIGHWAY PATROL ASSOCIATION (501(C)(6))


DESCRIPTION OF TRANSFERS, TRANSACTIONS, AND SHARING ARRANGEMENTS

THE REPORTING ORGANIZATION HAD $167,642 IN LOANS DUE TO TEXAS HIGHWAY
PATROL ASSOCIATION AT DECEMBER 31, 2006.  AS OF DECEMBER 31, 2007, $126,819
WAS STILL OWED BY THE ORGANIZATION TO THE 501(C)(6) ENTITY.

SCHEDULE A          AFFILIATION WITH TAX-EXEMPT ORGANIZATIONS          STATEMENT   20
                          PART VII, LINE 52, COLUMN (C)


NAME OF AFFILIATED OR RELATED ORGANIZATION

TEXAS HIGHWAY PATROL ASSOCIATION


DESCRIPTION OF RELATIONSHIP WITH AFFILIATED OR RELATED ORGANIZATION

COMMON DIRECTORS AND OFFICERS

# Form **8868**

(Rev April 2008)

Department of the Treasury
Internal Revenue Service

## Application for Extension of Time To File an Exempt Organization Return

▶ File a separate application for each return.

OMB No 1545-1709

- If you are filing for an **Automatic 3-Month Extension**, complete only **Part I** and check this box . . . . . . . . ▶ ☑
- If you are filing for an **Additional (Not Automatic) 3-Month Extension**, complete only **Part II** (on page 2 of this form).

**Do not complete Part II unless** you have already been granted an automatic 3-month extension on a previously filed Form 8868.

**Part I**    Automatic 3-Month Extension of Time. Only submit original (no copies needed).

A corporation required to file Form 990-T and requesting an automatic 6-month extension—check this box and complete Part I only . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐

*All other corporations (including 1120-C filers), partnerships, REMICs, and trusts must use Form 7004 to request an extension of time to file income tax returns.*

**Electronic Filing (e-file).** Generally, you can electronically file Form 8868 if you want a 3-month automatic extension of time to file one of the returns noted below (6 months for a corporation required to file Form 990-T). However, you cannot file Form 8868 electronically if (1) you want the additional (not automatic) 3-month extension or (2) you file Forms 990-BL, 6069, or 8870, group returns, or a composite or consolidated Form 990-T. Instead, you must submit the fully completed and signed page 2 (Part II) of Form 8868. For more details on the electronic filing of this form, visit *www.irs gov/efile* and click on *e-file for Charities & Nonprofits.*

| Type or print | Name of Exempt Organization **TEXAS HIGHWAY PATROL MUSEUM** | Employer identification number |
|---|---|---|
| File by the due date for filing your return See instructions | Number, street, and room or suite no If a P.O. box, see instructions. **501 OAKLAND AVENUE** | 74 : 2639283 |
| | City, town or post office, state, and ZIP code For a foreign address, see instructions **AUSTIN, TX 78703** | |

**Check type of return to be filed** (file a separate application for each return):

☑ Form 990      ☐ Form 990-T (corporation)      ☐ Form 4720
☐ Form 990-BL      ☐ Form 990-T (sec. 401(a) or 408(a) trust)      ☐ Form 5227
☐ Form 990-EZ      ☐ Form 990-T (trust other than above)      ☐ Form 6069
☐ Form 990-PF      ☐ Form 1041-A      ☐ Form 8870

- The books are in the care of ▶ **TEXAS HIGHWAY PATROL MUSEUM**

Telephone No. ▶ ( **512** )   **491-9117**      FAX No. ▶ ( **512** )   **491-6026**

- If the organization does not have an office or place of business in the United States, check this box . . . . . ▶ ☐
- If this is for a Group Return, enter the organization's four digit Group Exemption Number (GEN)_____ If this is for the whole group, check this box . . . . . . ▶ ☐ If it is for part of the group, check this box . . . . . ▶ ☐ and attach a list with the names and EINs of all members the extension will cover.

1   I request an automatic 3-month (6 months for a corporation required to file Form 990-T) extension of time until ............**AUGUST 15**............ , 20 **08** , to file the exempt organization return for the organization named above. The extension is for the organization's return for:

▶ ☐ calendar year 200**7** or
▶ ☐ tax year beginning ............................... , 20 ....... , and ending ............................... , 20 ........

2   If this tax year is for less than 12 months, check reason: ☐ Initial return ☐ Final return ☐ Change in accounting period

| | | |
|---|---|---|
| 3a If this application is for Form 990-BL, 990-PF, 990-T, 4720, or 6069, enter the tentative tax, less any nonrefundable credits. See instructions. | 3a | $ |
| b If this application is for Form 990-PF or 990-T, enter any refundable credits and estimated tax payments made. Include any prior year overpayment allowed as a credit. | 3b | $ |
| c **Balance Due.** Subtract line 3b from line 3a. Include your payment with this form, or, if required, deposit with FTD coupon or, if required, by using EFTPS (Electronic Federal Tax Payment System). See instructions. | 3c | $ |

**Caution.** If you are going to make an electronic fund withdrawal with this Form 8868, see Form 8453-EO and Form 8879-EO for payment instructions

**For Privacy Act and Paperwork Reduction Act Notice, see Instructions.**      Cat No 27916D      Form **8868** (Rev 4-2008)

Form 8868 (Rev 4-2008)

Page 2

- If you are filing for an **Additional (Not Automatic) 3-Month Extension**, complete only Part II and check this box . ▶ ☑
  **Note.** Only complete Part II if you have already been granted an automatic 3-month extension on a previously filed Form 8868.
- If you are filing for an **Automatic 3-Month Extension**, complete only Part I (on page 1).

## Part II — Additional (Not Automatic) 3-Month Extension of Time. You must file original and one copy.

| Type or print | Name of Exempt Organization | | Employer identification number |
|---|---|---|---|
| | **TEXAS HIGHWAY PATROL MUSEUM** | | 74 : 2639283 |
| File by the extended due date for filing the return See instructions | Number, street, and room or suite no. If a P.O. box, see instructions. **501 OAKLAND AVENUE** | | For IRS use only |
| | City, town or post office, state, and ZIP code. For a foreign address, see instructions. **AUSTIN, TX 78703** | | |

**Check type of return to be filed** (File a separate application for each return):

☑ Form 990
☐ Form 990-BL
☐ Form 990-EZ
☐ Form 990-PF
☐ Form 990-T (sec. 401(a) or 408(a) trust)
☐ Form 990-T (trust other than above)
☐ Form 1041-A
☐ Form 4720
☐ Form 5227
☐ Form 6069
☐ Form 8870

**STOP!** Do not complete Part II if you were not already granted an automatic 3-month extension on a previously filed Form 8868.

- The books are in the care of ▶ **TEXAS HIGHWAY PATROL MUSEUM**
  Telephone No. ▶ ( 512 ) 491-9117 FAX No. ▶ ( 512 ) 491-6026
- If the organization does not have an office or place of business in the United States, check this box . . . . . ▶ ☐
- If this is for a Group Return, enter the organization's four digit Group Exemption Number (GEN) _____ . If this is for the whole group, check this box . . . . . ▶ ☐ . If it is for part of the group, check this box. . . . . . ▶ ☐ and attach a list with the names and EINs of all members the extension is for.

4  I request an additional 3-month extension of time until .......... **NOVEMBER 15** ........... , 20 **08**
5  For calendar year **2007** , or other tax year beginning ..................... , 20.... , and ending ..................... , 20....
6  If this tax year is for less than 12 months, check reason: ☐ Initial return ☐ Final return ☐ Change in accounting period
7  State in detail why you need the extension ..................
   **TAXPAYER IS AWAITING INFORMATION NECESSARY TO FILE A COMPLETE AND ACCURATE RETURN.**

| | | | |
|---|---|---|---|
| **8a** | If this application is for Form 990-BL, 990-PF, 990-T, 4720, or 6069, enter the tentative tax, less any nonrefundable credits. See instructions. | 8a | $ |
| **b** | If this application is for Form 990-PF, 990-T, 4720, or 6069, enter any refundable credits and estimated tax payments made. Include any prior year overpayment allowed as a credit and any amount paid previously with Form 8868. | 8b | $ |
| **c** | **Balance Due.** Subtract line 8b from line 8a. Include your payment with this form, or, if required, deposit with FTD coupon or, if required, by using EFTPS (Electronic Federal Tax Payment System). See instructions. | 8c | $ |

### Signature and Verification

Under penalties of perjury, I declare that I have examined this form, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete, and that I am authorized to prepare this form.

Signature ▶ _[signature]_    Title ▶ **CPA**    Date ▶ **7-30-08**

Form **8868** (Rev. 4-2008)

# EXHIBIT E

Form **990**

Department of the Treasury
Internal Revenue Service

# Return of Organization Exempt From Income Tax

Under section 501(c), 527, or 4947(a)(1) of the Internal Revenue Code (except black lung benefit trust or private foundation)

▶ The organization may have to use a copy of this return to satisfy state reporting requirements.

OMB No 1545-0047

# 2008

Open to Public Inspection

**A** For the 2008 calendar year, or tax year beginning _____ and ending _____

| **B** Check if applicable | | **C** Name of organization | **D** Employer identification number |
|---|---|---|---|
| ☐ Address change | Please use IRS label or print or type See Specific Instructions | TEXAS HIGHWAY PATROL MUSEUM, FORMERLY TX HWY PATROL ASSN HALL OF FAME & MUSEUM | 74-2639283 |
| ☐ Name change | | Doing Business As | |
| ☐ Initial return | | Number and street (or P.O. box if mail is not delivered to street address)  Room/suite | **E** Telephone number |
| ☐ Termination | | 501 OAKLAND AVENUE | 512-491-9117 |
| ☐ Amended return | | City or town, state or country, and ZIP + 4 | **G** Gross receipts $   1,840,646. |
| ☐ Application pending | | AUSTIN, TX 78703-5113 | |

**F** Name and address of principal officer: TIM TIERNEY
SAME AS C ABOVE

H(a) Is this a group return for affiliates? ☐ Yes ☒ No
H(b) Are all affiliates included? ☐ Yes ☐ No
If "No," attach a list. (see instructions)

**I** Tax-exempt status: ☒ 501(c) ( 3 ) ◀ (insert no.) ☐ 4947(a)(1) or ☐ 527

**J** Website: ▶ WWW.TXHM.ORG

H(c) Group exemption number ▶

**K** Type of organization: ☒ Corporation ☐ Trust ☐ Association ☐ Other ▶ | **L** Year of formation: 1992 | **M** State of legal domicile TX

## Part I Summary

| | | | |
|---|---|---|---|
| 1 | Briefly describe the organization's mission or most significant activities: THE ESTABLISHMENT AND OPERATION OF A HALL OF FAME AND MUSEUM TO HONOR TEXAS HIGHWAY PATROL OFFICERS | | |
| 2 | Check this box ▶ ☐ if the organization discontinued its operations or disposed of more than 25% of its assets. | | |
| 3 | Number of voting members of the governing body (Part VI, line 1a) | 3 | 6 |
| 4 | Number of independent voting members of the governing body (Part VI, line 1b) | 4 | 6 |
| 5 | Total number of employees (Part V, line 2a) | 5 | 317 |
| 6 | Total number of volunteers (estimate if necessary) | 6 | 0 |
| 7a | Total gross unrelated business revenue from Part VIII, line 12, column (C) | 7a | 732. |
| b | Net unrelated business taxable income from Form 990-T, line 34 | 7b | 0. |

| | | Prior Year | Current Year |
|---|---|---|---|
| 8 | Contributions and grants (Part VIII, line 1h) | 1,656,223. | 1,746,658. |
| 9 | Program service revenue (Part VIII, line 2g) | | |
| 10 | Investment income (Part VIII, column (A), lines 3, 4, and 7d) | | 198. |
| 11 | Other revenue (Part VIII, column (A), lines 5, 6d, 8c, 9c, 10c, and 11e) | 52,773. | 76,461. |
| 12 | Total revenue - add lines 8 through 11 (must equal Part VIII, column (A), line 12) | 1,708,996. | 1,823,317. |
| 13 | Grants and similar amounts paid (Part IX, column (A), lines 1-3) | | |
| 14 | Benefits paid to or for members (Part IX, column (A), line 4) | | |
| 15 | Salaries, other compensation, employee benefits (Part IX, column (A), lines 5-10) | 1,095,095. | 1,178,299. |
| 16a | Professional fundraising fees (Part IX, column (A), line 11e) | | |
| b | Total fundraising expenses (Part IX, column (D), line 25) ▶ 594,997. | | |
| 17 | Other expenses (Part IX, column (A), lines 11a-11d, 11f-24f) | 649,528. | 546,244. |
| 18 | Total expenses Add lines 13-17 (must equal Part IX, column (A), line 25) | 1,744,623. | 1,724,543. |
| 19 | Revenue less expenses. Subtract line 18 from line 12 | -35,627. | 98,774. |

| | | Beginning of Year | End of Year |
|---|---|---|---|
| 20 | Total assets (Part X, line 16) | 928,633. | 942,406. |
| 21 | Total liabilities (Part X, line 26) | 372,695. | 287,692. |
| 22 | Net assets or fund balances. Subtract line 21 from line 20 | 555,938. | 654,714. |

## Part II Signature Block

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than officer) is based on all information of which preparer has any knowledge

| Sign Here | ▶ Signature of officer | 11-4-09 Date |
|---|---|---|
| | ▶ TIM TIERNEY, EXECUTIVE VICE-PRESIDENT  Type or print name and title | |

| Paid Preparer's Use Only | Preparer's signature ▶ | Date 11/3/09 | Check if self-employed ▶ ☐ | Preparer's identifying number (see instructions) |
|---|---|---|---|---|
| | Firm's name (or yours if self-employed), address, and ZIP + 4 ▶ KENNETH C. GORENCE, P.C.  P.O. BOX 28279  AUSTIN, TX 78755 | | EIN ▶ | |
| | | | Phone no ▶ (512)342-8081 | |

May the IRS discuss this return with the preparer shown above? (see instructions)   ☒ Yes ☐ No

832001 12-18-08   LHA  **For Privacy Act and Paperwork Reduction Act Notice, see the separate instructions.**   Form **990** (2008)

SEE SCHEDULE O FOR ORGANIZATION MISSION STATEMENT CONTINUATION

TEXAS HIGHWAY PATROL MUSEUM, FORMERLY
TX HWY PATROL ASSN HALL OF FAME & MUSEUM    74-2639283    Page 2

**Part III** | **Statement of Program Service Accomplishments** (see instructions)

1   Briefly describe the organization's mission:

THE ESTABLISHMENT AND OPERATION OF A HALL OF FAME AND MUSEUM TO HONOR
TEXAS HIGHWAY PATROL OFFICERS AND TO EDUCATE THE GENERAL PUBLIC.

2   Did the organization undertake any significant program services during the year which were not listed on
the prior Form 990 or 990-EZ?     ☐ Yes ☒ No
If "Yes", describe these new services on Schedule O.

3   Did the organization cease conducting, or make significant changes in how it conducts, any program services?    ☐ Yes ☒ No
If "Yes", describe these changes on Schedule O.

4   Describe the exempt purpose achievements for each of the organization's three largest program services by expenses.
Section 501(c)(3) and 501(c)(4) organizations and section 4947(a)(1) trusts are required to report the amount of grants and
allocations to others, the total expenses, and revenue, if any, for each program service reported.

4a   (Code:      ) (Expenses $   694,049. including grants of $       ) (Revenue $  1,743,158. )
PERFORMED FUNDRAISING EFFORTS FOR AND OPERATED A MUSEUM AND A HALL OF
FAME TO HONOR TEXAS HIGHWAY PATROL OFFICERS AND TO EDUCATE THE GENERAL
PUBLIC.

4b   (Code:      ) (Expenses $        including grants of $       ) (Revenue $      )
AMONG THE SPECIFIC EXHIBITS PRESENTED IS THE HALL OF HONOR, A MEMORIAL
TO THE OFFICERS WHO LOST THEIR LIVES IN THE LINE OF DUTY. ALSO
PRESENTED IS THE HISTORY HALL, WHICH IS DESIGNED TO EDUCATE THE GENERAL
PUBLIC ABOUT THE RICH HISTORY OF THE TEXAS HIGHWAY PATROL.

4c   (Code:      ) (Expenses $        including grants of $       ) (Revenue $      )
THE ORGANIZATION ALSO CONTINUED TO PRESENT EDUCATIONAL PROGRAMS TO
STUDENTS SPECIFICALLY TARGETING THE HAZARDS OF DRIVING UNDER THE
INFLUENCE OF ALCOHOL.

4d   Other program services. (Describe in Schedule O.)
(Expenses $       including grants of $      ) (Revenue $      )

4e   **Total program service expenses ▶ $**   694,049. *(Must equal Part IX, Line 25, column (B).)*

| Part IV | Checklist of Required Schedules | | | |
|---|---|---|---|---|
| | | | Yes | No |
| 1 | Is the organization described in section 501(c)(3) or 4947(a)(1) (other than a private foundation)? If "Yes," complete Schedule A | 1 | X | |
| 2 | Is the organization required to complete Schedule B, Schedule of Contributors? | 2 | | X |
| 3 | Did the organization engage in direct or indirect political campaign activities on behalf of or in opposition to candidates for public office? If "Yes," complete Schedule C, Part I | 3 | | X |
| 4 | Section 501(c)(3) organizations. Did the organization engage in lobbying activities? If "Yes," complete Schedule C, Part II | 4 | | X |
| 5 | Section 501(c)(4), 501(c)(5), and 501(c)(6) organizations. Is the organization subject to the section 6033(e) notice and reporting requirement and proxy tax? If "Yes," complete Schedule C, Part III | 5 | | |
| 6 | Did the organization maintain any donor advised funds or any accounts where donors have the right to provide advice on the distribution or investment of amounts in such funds or accounts? If "Yes," complete Schedule D, Part I | 6 | | X |
| 7 | Did the organization receive or hold a conservation easement, including easements to preserve open space, the environment, historic land areas, or historic structures? If "Yes," complete Schedule D, Part II | 7 | | X |
| 8 | Did the organization maintain collections of works of art, historical treasures, or other similar assets? If "Yes," complete Schedule D, Part III | 8 | | X |
| 9 | Did the organization report an amount in Part X, line 21; serve as a custodian for amounts not listed in Part X; or provide credit counseling, debt management, credit repair, or debt negotiation services? If "Yes," complete Schedule D, Part IV | 9 | | X |
| 10 | Did the organization hold assets in term, permanent, or quasi-endowments? If "Yes," complete Schedule D, Part V | 10 | | X |
| 11 | Did the organization report an amount in Part X, lines 10, 12, 13, 15, or 25? If "Yes," complete Schedule D, Parts VI, VII, VIII, IX, or X as applicable | 11 | X | |
| 12 | Did the organization receive an audited financial statement for the year for which it is completing this return that was prepared in accordance with GAAP? If "Yes," complete Schedule D, Parts XI, XII, and XIII | 12 | | X |
| 13 | Is the organization a school as described in section 170(b)(1)(A)(ii)? If "Yes," complete Schedule E | 13 | | X |
| 14a | Did the organization maintain an office, employees, or agents outside of the U.S.? | 14a | | X |
| b | Did the organization have aggregate revenues or expenses of more than $10,000 from grantmaking, fundraising, business, and program service activities outside the U.S.? If "Yes," complete Schedule F, Part I | 14b | | X |
| 15 | Did the organization report on Part IX, column (A), line 3, more than $5,000 of grants or assistance to any organization or entity located outside the United States? If "Yes," complete Schedule F, Part II | 15 | | X |
| 16 | Did the organization report on Part IX, column (A), line 3, more than $5,000 of aggregate grants or assistance to individuals located outside the United States? If "Yes," complete Schedule F, Part III | 16 | | X |
| 17 | Did the organization report more than $15,000 on Part IX, column (A), line 11e? If "Yes," complete Schedule G, Part I | 17 | | X |
| 18 | Did the organization report more than $15,000 total on Part VIII, lines 1c and 8a? If "Yes," complete Schedule G, Part II | 18 | | X |
| 19 | Did the organization report more than $15,000 on Part VIII, line 9a? If "Yes," complete Schedule G, Part III | 19 | | X |
| 20 | Did the organization operate one or more hospitals? If "Yes," complete Schedule H | 20 | | X |
| 21 | Did the organization report more than $5,000 on Part IX, column (A), line 1? If "Yes," complete Schedule I, Parts I and II | 21 | | X |
| 22 | Did the organization report more than $5,000 on Part IX, column (A), line 2? If "Yes," complete Schedule I, Parts I and III | 22 | | X |
| 23 | Did the organization answer "Yes" to Part VII, Section A, questions 3, 4, or 5? If "Yes," complete Schedule J | 23 | X | |
| 24a | Did the organization have a tax-exempt bond issue with an outstanding principal amount of more than $100,000 as of the last day of the year, that was issued after December 31, 2002? If "Yes," answer questions 24b-24d and complete Schedule K. If "No", go to question 25 | 24a | | X |
| b | Did the organization invest any proceeds of tax-exempt bonds beyond a temporary period exception? | 24b | | |
| c | Did the organization maintain an escrow account other than a refunding escrow at any time during the year to defease any tax-exempt bonds? | 24c | | |
| d | Did the organization act as an "on behalf of" issuer for bonds outstanding at any time during the year? | 24d | | |
| 25a | Section 501(c)(3) and 501(c)(4) organizations. Did the organization engage in an excess benefit transaction with a disqualified person during the year? If "Yes," complete Schedule L, Part I | 25a | | X |
| b | Did the organization become aware that it had engaged in an excess benefit transaction with a disqualified person from a prior year? If "Yes," complete Schedule L, Part I | 25b | | X |
| 26 | Was a loan to or by a current or former officer, director, trustee, key employee, highly compensated employee, or disqualified person outstanding as of the end of the organization's tax year? If "Yes," complete Schedule L, Part II | 26 | | X |
| 27 | Did the organization provide a grant or other assistance to an officer, director, trustee, key employee, or substantial contributor, or to a person related to such an individual? If "Yes," complete Schedule L, Part III | 27 | | X |

Form **990** (2008)

TEXAS HIGHWAY PATROL MUSEUM, FORMERLY
TX HWY PATROL ASSN HALL OF FAME & MUSEUM    74-2639283    Page **4**

## Part IV | Checklist of Required Schedules *(continued)*

| | | Yes | No |
|---|---|---|---|
| 28 | During the tax year, did any person who is a current or former officer, director, trustee, or key employee: | | |
| a | Have a direct business relationship with the organization (other than as an officer, director, trustee, or employee), or an indirect business relationship through ownership of more than 35% in another entity (individually or collectively with other person(s) listed in Part VII, Section A)? *If "Yes," complete Schedule L, Part IV* **28a** | | X |
| b | Have a family member who had a direct or indirect business relationship with the organization? *If "Yes," complete Schedule L, Part IV* **28b** | | X |
| c | Serve as an officer, director, trustee, key employee, partner, or member of an entity (or a shareholder of a professional corporation) doing business with the organization? *If "Yes," complete Schedule L, Part IV* **28c** | | X |
| 29 | Did the organization receive more than $25,000 in non-cash contributions? *If "Yes," complete Schedule M* **29** | | X |
| 30 | Did the organization receive contributions of art, historical treasures, or other similar assets, or qualified conservation contributions? *If "Yes," complete Schedule M* **30** | | X |
| 31 | Did the organization liquidate, terminate, or dissolve and cease operations? *If "Yes," complete Schedule N, Part I* **31** | | X |
| 32 | Did the organization sell, exchange, dispose of, or transfer more than 25% of its net assets? *If "Yes," complete Schedule N, Part II* **32** | | X |
| 33 | Did the organization own 100% of an entity disregarded as separate from the organization under Regulations sections 301.7701-2 and 301.7701-3? *If "Yes," complete Schedule R, Part I* **33** | | X |
| 34 | Was the organization related to any tax-exempt or taxable entity? *If "Yes," complete Schedule R, Parts II, III, IV, and V, line 1* **34** | X | |
| 35 | Is any related organization a controlled entity within the meaning of section 512(b)(13)? *If "Yes," complete Schedule R, Part V, line 2* **35** | | X |
| 36 | Section 501(c)(3) organizations. Did the organization make any transfers to an exempt non-charitable related organization? *If "Yes," complete Schedule R, Part V, line 2* **36** | X | |
| 37 | Did the organization conduct more than 5% of its activities through an entity that is not a related organization and that is treated as a partnership for federal income tax purposes? *If "Yes," complete Schedule R, Part VI* **37** | | X |

Form **990** (2008)

832004
12-18-08

17251029 000078                    2008.04050 TEXAS HIGHWAY PATROL MUSEUM 30204021

TEXAS HIGHWAY PATROL MUSEUM, FORMERLY
TX HWY PATROL ASSN HALL OF FAME & MUSEUM 74-2639283 Page 5

| Part V | Statements Regarding Other IRS Filings and Tax Compliance | | | |
|---|---|---|---|---|
| | | | Yes | No |
| **1a** Enter the number reported in Box 3 of Form 1096, Annual Summary and Transmittal of U.S. Information Returns. Enter -0- if not applicable | 1a | 0 | | |
| **b** Enter the number of Forms W-2G included in line 1a. Enter -0- if not applicable | 1b | 0 | | |
| **c** Did the organization comply with backup withholding rules for reportable payments to vendors and reportable gaming (gambling) winnings to prize winners? | | | 1c | X | |
| **2a** Enter the number of employees reported on Form W-3, Transmittal of Wage and Tax Statements, filed for the calendar year ending with or within the year covered by this return | 2a | 317 | | |
| **b** If at least one is reported on line 2a, did the organization file all required federal employment tax returns? | | | 2b | X | |
| **Note.** If the sum of lines 1a and 2a is greater than 250, you may be required to e-file this return. (see instructions) | | | | |
| **3a** Did the organization have unrelated business gross income of $1,000 or more during the year covered by this return? | | | 3a | X | |
| **b** If "Yes," has it filed a Form 990-T for this year? If "No," provide an explanation in Schedule O | | | 3b | X | |
| **4a** At any time during the calendar year, did the organization have an interest in, or a signature or other authority over, a financial account in a foreign country (such as a bank account, securities account, or other financial account)? | | | 4a | | X |
| **b** If "Yes," enter the name of the foreign country: ▶ | | | | |
| See the instructions for exceptions and filing requirements for Form TD F 90-22.1, Report of Foreign Bank and Financial Accounts. | | | | |
| **5a** Was the organization a party to a prohibited tax shelter transaction at any time during the tax year? | | | 5a | | X |
| **b** Did any taxable party notify the organization that it was or is a party to a prohibited tax shelter transaction? | | | 5b | | X |
| **c** If "Yes," to question 5a or 5b, did the organization file Form 8886-T, Disclosure by Tax-Exempt Entity Regarding Prohibited Tax Shelter Transaction? | | | 5c | | |
| **6a** Did the organization solicit any contributions that were not tax deductible? | | | 6a | | X |
| **b** If "Yes," did the organization include with every solicitation an express statement that such contributions or gifts were not tax deductible? | | | 6b | | |
| **7** Organizations that may receive deductible contributions under section 170(c). | | | | |
| **a** Did the organization provide goods or services in exchange for any quid pro quo contribution of more than $75? | | | 7a | | X |
| **b** If "Yes," did the organization notify the donor of the value of the goods or services provided? | | | 7b | | |
| **c** Did the organization sell, exchange, or otherwise dispose of tangible personal property for which it was required to file Form 8282? | | | 7c | | X |
| **d** If "Yes," indicate the number of Forms 8282 filed during the year | 7d | | | |
| **e** Did the organization, during the year, receive any funds, directly or indirectly, to pay premiums on a personal benefit contract? | | | 7e | | X |
| **f** Did the organization, during the year, pay premiums, directly or indirectly, on a personal benefit contract? | | | 7f | | X |
| **g** For all contributions of qualified intellectual property, did the organization file Form 8899 as required? | | | 7g | | X |
| **h** For contributions of cars, boats, airplanes, and other vehicles, did the organization file a Form 1098-C as required? | | | 7h | | X |
| **8** Section 501(c)(3) and other sponsoring organizations maintaining donor advised funds and section 509(a)(3) supporting organizations. Did the supporting organization, or a fund maintained by a sponsoring organization, have excess business holdings at any time during the year? | | | 8 | | |
| **9** Section 501(c)(3) and other sponsoring organizations maintaining donor advised funds. | | | | |
| **a** Did the organization make any taxable distributions under section 4966? | | | 9a | | |
| **b** Did the organization make a distribution to a donor, donor advisor, or related person? | | | 9b | | |
| **10** Section 501(c)(7) organizations. Enter: N/A | | | | |
| **a** Initiation fees and capital contributions included on Part VIII, line 12 | 10a | | | |
| **b** Gross receipts, included on Form 990, Part VIII, line 12, for public use of club facilities | 10b | | | |
| **11** Section 501(c)(12) organizations. Enter: N/A | | | | |
| **a** Gross income from members or shareholders | 11a | | | |
| **b** Gross income from other sources (Do not net amounts due or paid to other sources against amounts due or received from them.) | 11b | | | |
| **12a** Section 4947(a)(1) non-exempt charitable trusts. Is the organization filing Form 990 in lieu of Form 1041? | | | 12a | | |
| **b** If "Yes," enter the amount of tax-exempt interest received or accrued during the year N/A | 12b | | | |

Form **990** (2008)

TEXAS HIGHWAY PATROL MUSEUM, FORMERLY
TX HWY PATROL ASSN HALL OF FAME & MUSEUM    74-2639283    Page **6**

**Part VI** Governance, Management, and Disclosure *(Sections A, B, and C request information about policies not required by the Internal Revenue Code.)*

## Section A. Governing Body and Management

| | | | Yes | No |
|---|---|---|---|---|
| | *For each "Yes" response to lines 2-7b below, and for a "No" response to lines 8 or 9b below, describe the circumstances, processes, or changes in Schedule O. See instructions.* | | | |
| 1a | Enter the number of voting members of the governing body ... **1a** 6 | | | |
| b | Enter the number of voting members that are independent ... **1b** 6 | | | |
| 2 | Did any officer, director, trustee, or key employee have a family relationship or a business relationship with any other officer, director, trustee, or key employee? | 2 | | X |
| 3 | Did the organization delegate control over management duties customarily performed by or under the direct supervision of officers, directors or trustees, or key employees to a management company or other person? | 3 | | X |
| 4 | Did the organization make any significant changes to its organizational documents since the prior Form 990 was filed? | 4 | | X |
| 5 | Did the organization become aware during the year of a material diversion of the organization's assets? | 5 | | X |
| 6 | Does the organization have members or stockholders? | 6 | | X |
| 7a | Does the organization have members, stockholders, or other persons who may elect one or more members of the governing body? | 7a | | X |
| b | Are any decisions of the governing body subject to approval by members, stockholders, or other persons? | 7b | | X |
| 8 | Did the organization contemporaneously document the meetings held or written actions undertaken during the year by the following: | | | |
| a | The governing body? | 8a | X | |
| b | Each committee with authority to act on behalf of the governing body? | 8b | X | |
| 9a | Does the organization have local chapters, branches, or affiliates? | 9a | | X |
| b | If "Yes," does the organization have written policies and procedures governing the activities of such chapters, affiliates, and branches to ensure their operations are consistent with those of the organization? | 9b | | |
| 10 | Was a copy of the Form 990 provided to the organization's governing body before it was filed? All organizations must describe in Schedule O the process, if any, the organization uses to review the Form 990 | 10 | | X |
| 11 | Is there any officer, director or trustee, or key employee listed in Part VII, Section A, who cannot be reached at the organization's mailing address? *If "Yes," provide the names and addresses in Schedule O* | 11 | | X |

## Section B. Policies

| | | | Yes | No |
|---|---|---|---|---|
| 12a | Does the organization have a written conflict of interest policy? *If "No," go to line 13* | 12a | X | |
| b | Are officers, directors or trustees, and key employees required to disclose annually interests that could give rise to conflicts? | 12b | X | |
| c | Does the organization regularly and consistently monitor and enforce compliance with the policy? *If "Yes," describe in Schedule O how this is done* | 12c | X | |
| 13 | Does the organization have a written whistleblower policy? | 13 | X | |
| 14 | Does the organization have a written document retention and destruction policy? | 14 | X | |
| 15 | Did the process for determining compensation of the following persons include a review and approval by independent persons, comparability data, and contemporaneous substantiation of the deliberation and decision: | | | |
| a | The organization's CEO, Executive Director, or top management official? | 15a | | X |
| b | Other officers or key employees of the organization? | 15b | | X |
| | Describe the process in Schedule O. (see instructions) | | | |
| 16a | Did the organization invest in, contribute assets to, or participate in a joint venture or similar arrangement with a taxable entity during the year? | 16a | | X |
| b | If "Yes," has the organization adopted a written policy or procedure requiring the organization to evaluate its participation in joint venture arrangements under applicable federal tax law, and taken steps to safeguard the organization's exempt status with respect to such arrangements? | 16b | | |

## Section C. Disclosure

17   List the states with which a copy of this Form 990 is required to be filed ▶ TX

18   Section 6104 requires an organization to make its Forms 1023 (or 1024 if applicable), 990, and 990-T (501(c)(3)s only) available for public inspection. Indicate how you make these available. Check all that apply.
☐ Own website   ☐ Another's website   ☒ Upon request

19   Describe in Schedule O whether (and if so, how), the organization makes its governing documents, conflict of interest policy, and financial statements available to the public.

20   State the name, physical address, and telephone number of the person who possesses the books and records of the organization: ▶ _____
TIM TIERNEY - (512) 491-9117
501 OAKLAND AVENUE, AUSTIN, TX  78703-5113

832006
12-18-08

Form **990** (2008)

17251029 000078          2008.04050 TEXAS HIGHWAY PATROL MUSEUM 30204021

TEXAS HIGHWAY PATROL MUSEUM, FORMERLY
TX HWY PATROL ASSN HALL OF FAME & MUSEUM    74-2639283    Page **7**

| **Part VII** Compensation of Officers, Directors, Trustees, Key Employees, Highest Compensated Employees, and Independent Contractors |
|---|

**Section A. Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees**

**1a** Complete this table for all persons required to be listed. Use Schedule J-2 if additional space is needed.

- List all of the organization's **current** officers, directors, trustees (whether individuals or organizations), regardless of amount of compensation, and **current** key employees. Enter -0- in columns (D), (E), and (F) if no compensation was paid.

- List the organization's five **current** highest compensated employees (other than an officer, director, trustee, or key employee) who received reportable compensation (Box 5 of Form W-2 and/or Box 7 of Form 1099-MISC) of more than $100,000 from the organization and any related organizations.

- List all of the organization's **former** officers, key employees, and highest compensated employees who received more than $100,000 of reportable compensation from the organization and any related organizations.

- List all of the organization's **former directors or trustees** that received, in the capacity as a former director or trustee of the organization, more than $10,000 of reportable compensation from the organization and any related organizations.

List persons in the following order: individual trustees or directors; institutional trustees; officers; key employees; highest compensated employees; and former such persons.

☐ Check this box if the organization did not compensate any officer, director, trustee, or key employee.

| (A)<br>Name and Title | (B)<br>Average hours per week | (C) Position (check all that apply) | | | | | | (D)<br>Reportable compensation from the organization (W-2/1099-MISC) | (E)<br>Reportable compensation from related organizations (W-2/1099-MISC) | (F)<br>Estimated amount of other compensation from the organization and related organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Individual trustee or director | Institutional trustee | Officer | Key employee | Highest compensated employee | Former | | | |
| MARK LOCKRIDGE<br>PRESIDENT | 5.00 | X | | X | | | | 0. | 0. | 0. |
| GREGG GREER<br>DIRECTOR | 5.00 | X | | | | | | 0. | 0. | 0. |
| FRED RIOJAS<br>DIRECTOR | 5.00 | X | | | | | | 0. | 0. | 0. |
| TED RIOJAS<br>DIRECTOR | 5.00 | X | | | | | | 0. | 0. | 0. |
| ROBERT BERNARD, JR.<br>DIRECTOR | 5.00 | X | | | | | | 0. | 0. | 0. |
| JAMES COLUNGA<br>DIRECTOR | 5.00 | X | | | | | | 0. | 0. | 0. |
| TIM TIERNEY<br>EXECUTIVE VICE-PRESIDENT | 40.00 | | | X | | | | 137,076. | 56,350. | 0. |
| C.R. VILLALVA<br>DIRECTOR OF MARKETING | 40.00 | | | X | | | | 163,075. | 0. | 0. |

832007 12-18-08

Form **990** (2008)

17251029 000078                    2008.04050 TEXAS HIGHWAY PATROL MUSEUM 30204021

TEXAS HIGHWAY PATROL MUSEUM, FORMERLY
TX HWY PATROL ASSN HALL OF FAME & MUSEUM        74-2639283     Page **8**

**Part VII** Section A.   Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees *(continued)*

| (A) Name and title | (B) Average hours per week | (C) Position (check all that apply) | | | | | | | (D) Reportable compensation from the organization (W-2/1099-MISC) | (E) Reportable compensation from related organizations (W-2/1099-MISC) | (F) Estimated amount of other compensation from the organization and related organizations |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Individual trustee or director | Institutional trustee | Officer | Key employee | Highest compensated employee | Former | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| **1b Total** | | | | | | | | ▶ | 300,151. | 56,350. | 0. |

2   Total number of individuals (including those in 1a) who received more than $100,000 in reportable compensation from the organization ........................................................................ ▶     2

| | | Yes | No |
|---|---|---|---|
| 3 | Did the organization list any **former** officer, director or trustee, key employee, or highest compensated employee on line 1a? *If "Yes," complete Schedule J for such individual* | **3** | X |
| 4 | For any individual listed on line 1a, is the sum of reportable compensation and other compensation from the organization and related organizations greater than $150,000? *If "Yes," complete Schedule J for such individual* | **4** X | |
| 5 | Did any person listed on line 1a receive or accrue compensation from any unrelated organization for services rendered to the organization? *If "Yes," complete Schedule J for such person* | **5** | X |

**Section B. Independent Contractors**

1   Complete this table for your five highest compensated independent contractors that received more than $100,000 of compensation from the organization.    NONE

| (A) Name and business address | (B) Description of services | (C) Compensation |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |

2   Total number of independent contractors (including those in 1) who received more than $100,000 in compensation from the organization ▶       0

832008  12-18-08                                                               Form **990** (2008)

17251029 000078            2008.04050 TEXAS HIGHWAY PATROL MUSEUM 30204021

TEXAS HIGHWAY PATROL MUSEUM, FORMERLY
TX HWY PATROL ASSN HALL OF FAME & MUSEUM   74-2639283   Page **9**

| Part VIII | Statement of Revenue |
| --- | --- |

| | | | | (A) Total revenue | (B) Related or exempt function revenue | (C) Unrelated business revenue | (D) Revenue excluded from tax under sections 512, 513, or 514 |
| --- | --- | --- | --- | --- | --- | --- | --- |
| **Contributions, gifts, grants and other similar amounts** | 1 a | Federated campaigns | 1a | | | | |
| | b | Membership dues | 1b | | | | |
| | c | Fundraising events | 1c | | | | |
| | d | Related organizations | 1d | | | | |
| | e | Government grants (contributions) | 1e | | | | |
| | f | All other contributions, gifts, grants, and similar amounts not included above | 1f | 1746658. | | | |
| | g | Noncash contributions included in lines 1a-1f $ | | | | | |
| | h | **Total.** Add lines 1a-1f ▶ | | 1,746,658. | | | |
| **Program Service Revenue** | 2 a | | Business Code | | | | |
| | b | | | | | | |
| | c | | | | | | |
| | d | | | | | | |
| | e | | | | | | |
| | f | All other program service revenue | | | | | |
| | g | **Total.** Add lines 2a-2f ▶ | | | | | |
| **Other Revenue** | 3 | Investment income (including dividends, interest, and other similar amounts) ▶ | | 596. | | | 596. |
| | 4 | Income from investment of tax-exempt bond proceeds ▶ | | | | | |
| | 5 | Royalties ▶ | | | | | |
| | | | (i) Real | (ii) Personal | | | |
| | 6 a | Gross Rents | 93,283. | | | | |
| | b | Less: rental expenses | 16,931. | | | | |
| | c | Rental income or (loss) | 76,352. | | | | |
| | d | Net rental income or (loss) ▶ | | | 76,352. | | 732. | 75,620. |
| | 7 a | Gross amount from sales of assets other than inventory | (i) Securities | (ii) Other | | | |
| | b | Less: cost or other basis and sales expenses | | 398. | | | |
| | c | Gain or (loss) | | -398. | | | |
| | d | Net gain or (loss) ▶ | | -398. | -398. | | |
| | 8 a | Gross income from fundraising events (not including $ _____ of contributions reported on line 1c). See Part IV, line 18 a | | | | | |
| | b | Less: direct expenses b | | | | | |
| | c | Net income or (loss) from fundraising events ▶ | | | | | |
| | 9 a | Gross income from gaming activities. See Part IV, line 19 a | | | | | |
| | b | Less: direct expenses b | | | | | |
| | c | Net income or (loss) from gaming activities ▶ | | | | | |
| | 10 a | Gross sales of inventory, less returns and allowances a | 109. | | | | |
| | b | Less: cost of goods sold b | | | | | |
| | c | Net income or (loss) from sales of inventory ▶ | | 109. | 109. | | |
| | | Miscellaneous Revenue | Business Code | | | | |
| | 11 a | | | | | | |
| | b | | | | | | |
| | c | | | | | | |
| | d | All other revenue | | | | | |
| | e | **Total.** Add lines 11a-11d ▶ | | | | | |
| | 12 | **Total Revenue.** Add lines 1h, 2g, 3, 4, 5, 6d, 7d, 8c, 9c, 10c, and 11e ▶ | | 1,823,317. | -289. | 732. | 76,216. |

832009
02-02-09

Form **990** (2008)

17251029 000078          2008.04050 TEXAS HIGHWAY PATROL MUSEUM 30204021

TEXAS HIGHWAY PATROL MUSEUM, FORMERLY
TX HWY PATROL ASSN HALL OF FAME & MUSEUM    74-2639283    Page **10**

## Part IX | Statement of Functional Expenses

Section 501(c)(3) and 501(c)(4) organizations must complete all columns.
All other organizations must complete column (A) but are not required to complete columns (B), (C), and (D).

| Do not include amounts reported on lines 6b, 7b, 8b, 9b, and 10b of Part VIII. | (A) Total expenses | (B) Program service expenses | (C) Management and general expenses | (D) Fundraising expenses |
|---|---|---|---|---|
| **1** Grants and other assistance to governments and organizations in the U.S. See Part IV, line 21 | | | | |
| **2** Grants and other assistance to individuals in the U.S. See Part IV, line 22 | | | | |
| **3** Grants and other assistance to governments, organizations, and individuals outside the U.S. See Part IV, lines 15 and 16 | | | | |
| **4** Benefits paid to or for members | | | | |
| **5** Compensation of current officers, directors, trustees, and key employees | 300,151. | 152,675. | 101,153. | 46,323. |
| **6** Compensation not included above, to disqualified persons (as defined under section 4958(f)(1)) and persons described in section 4958(c)(3)(B) | | | | |
| **7** Other salaries and wages | 798,367. | 303,869. | 141,586. | 352,912. |
| **8** Pension plan contributions (include section 401(k) and section 403(b) employer contributions) | | | | |
| **9** Other employee benefits | | | | |
| **10** Payroll taxes | 79,781. | 31,379. | 40,558. | 7,844. |
| **11** Fees for services (non-employees): | | | | |
| **a** Management | | | | |
| **b** Legal | 1,060. | 50. | 685. | 325. |
| **c** Accounting | 25,306. | 13,424. | 5,941. | 5,941. |
| **d** Lobbying | | | | |
| **e** Professional fundraising services. See Part IV, line 17 | | | | |
| **f** Investment management fees | | | | |
| **g** Other | | | | |
| **12** Advertising and promotion | | | | |
| **13** Office expenses | 17,443. | 8,466. | 4,518. | 4,459. |
| **14** Information technology | | | | |
| **15** Royalties | | | | |
| **16** Occupancy | 146,663. | 58,052. | 44,772. | 43,839. |
| **17** Travel | 9,331. | | 4,609. | 4,722. |
| **18** Payments of travel or entertainment expenses for any federal, state, or local public officials | | | | |
| **19** Conferences, conventions, and meetings | 16,710. | 16,710. | | |
| **20** Interest | 9,697. | 5,541. | 2,771. | 1,385. |
| **21** Payments to affiliates | | | | |
| **22** Depreciation, depletion, and amortization | 6,502. | | 6,502. | |
| **23** Insurance | 38,725. | 15,132. | 15,894. | 7,699. |
| **24** Other expenses. Itemize expenses not covered above. (Expenses grouped together and labeled miscellaneous may not exceed 5% of total expenses shown on line 25 below) | | | | |
| **a** TELEPHONE | 110,948. | 39,560. | 15,889. | 55,499. |
| **b** POSTAGE | 79,090. | 31,636. | 23,727. | 23,727. |
| **c** PRINTING | 31,893. | 12,755. | 9,570. | 9,568. |
| **d** DELIVERY SERVICE | 13,742. | | 9,529. | 4,213. |
| **e** AUTO EXPENSE | 13,249. | | 6,624. | 6,625. |
| **f** All other expenses | 25,885. | 4,800. | 1,169. | 19,916. |
| **25** Total functional expenses. Add lines 1 through 24f | 1,724,543. | 694,049. | 435,497. | 594,997. |
| **26** Joint Costs. Check here ▶ ☐ if following SOP 98-2. Complete this line only if the organization reported in column (B) joint costs from a combined educational campaign and fundraising solicitation | | | | |

832010 12-18-08

Form **990** (2008)

17251029 000078        2008.04050 TEXAS HIGHWAY PATROL MUSEUM 30204021

TEXAS HIGHWAY PATROL MUSEUM, FORMERLY
TX HWY PATROL ASSN HALL OF FAME & MUSEUM    74-2639283    Page **11**

## Part X | Balance Sheet

| | | | (A) Beginning of year | | (B) End of year |
|---|---|---|---|---|---|
| **Assets** | 1 | Cash - non-interest-bearing | 48,238. | 1 | 61,536. |
| | 2 | Savings and temporary cash investments | | 2 | |
| | 3 | Pledges and grants receivable, net | | 3 | |
| | 4 | Accounts receivable, net | | 4 | |
| | 5 | Receivables from current and former officers, directors, trustees, key employees, or other related parties. Complete Part II of Schedule L | | 5 | |
| | 6 | Receivables from other disqualified persons (as defined under section 4958(f)(1)) and persons described in section 4958(c)(3)(B). Complete Part II of Schedule L | | 6 | |
| | 7 | Notes and loans receivable, net | | 7 | |
| | 8 | Inventories for sale or use | 2,100. | 8 | 2,100. |
| | 9 | Prepaid expenses and deferred charges | 12,711. | 9 | 21,124. |
| | 10a | Land, buildings, and equipment: cost basis [10a] 894,840. | | | |
| | b | Less: accumulated depreciation. Complete Part VI of Schedule D [10b] 88,673. | 821,990. | 10c | 806,167. |
| | 11 | Investments - publicly traded securities | | 11 | |
| | 12 | Investments - other securities. See Part IV, line 11 | | 12 | |
| | 13 | Investments - program-related. See Part IV, line 11 | | 13 | |
| | 14 | Intangible assets | | 14 | |
| | 15 | Other assets. See Part IV, line 11 | 43,594. | 15 | 51,479. |
| | 16 | **Total assets. Add lines 1 through 15 (must equal line 34)** | 928,633. | 16 | 942,406. |
| **Liabilities** | 17 | Accounts payable and accrued expenses | 22,377. | 17 | 17,052. |
| | 18 | Grants payable | | 18 | |
| | 19 | Deferred revenue | | 19 | |
| | 20 | Tax-exempt bond liabilities | | 20 | |
| | 21 | Escrow account liability. Complete Part IV of Schedule D | | 21 | |
| | 22 | Payables to current and former officers, directors, trustees, key employees, highest compensated employees, and disqualified persons. Complete Part II of Schedule L | | 22 | |
| | 23 | Secured mortgages and notes payable to unrelated third parties | 213,252. | 23 | 171,799. |
| | 24 | Unsecured notes and loans payable | | 24 | |
| | 25 | Other liabilities. Complete Part X of Schedule D | 137,066. | 25 | 98,841. |
| | 26 | **Total liabilities. Add lines 17 through 25** | 372,695. | 26 | 287,692. |
| **Net Assets or Fund Balances** | | Organizations that follow SFAS 117, check here ▶ ☐ and complete lines 27 through 29, and lines 33 and 34. | | | |
| | 27 | Unrestricted net assets | | 27 | |
| | 28 | Temporarily restricted net assets | | 28 | |
| | 29 | Permanently restricted net assets | | 29 | |
| | | Organizations that do not follow SFAS 117, check here ▶ [X] and complete lines 30 through 34. | | | |
| | 30 | Capital stock or trust principal, or current funds | 0. | 30 | 0. |
| | 31 | Paid-in or capital surplus, or land, building, or equipment fund | 0. | 31 | 0. |
| | 32 | Retained earnings, endowment, accumulated income, or other funds | 555,938. | 32 | 654,714. |
| | 33 | Total net assets or fund balances | 555,938. | 33 | 654,714. |
| | 34 | Total liabilities and net assets/fund balances | 928,633. | 34 | 942,406. |

## Part XI | Financial Statements and Reporting

| | | Yes | No |
|---|---|---|---|
| 1 | Accounting method used to prepare the Form 990: [X] Cash ☐ Accrual ☐ Other | | |
| 2a | Were the organization's financial statements compiled or reviewed by an independent accountant? | 2a | X | |
| b | Were the organization's financial statements audited by an independent accountant? | 2b | | X |
| c | If "Yes" to lines 2a or 2b, does the organization have a committee that assumes responsibility for oversight of the audit, review, or compilation of its financial statements and selection of an independent accountant? | 2c | | X |
| 3a | As a result of a federal award, was the organization required to undergo an audit or audits as set forth in the Single Audit Act and OMB Circular A-133? | 3a | | X |
| b | If "Yes," did the organization undergo the required audit or audits? | 3b | | |

832011 12-18-08

11

17251029 000078          2008.04050 TEXAS HIGHWAY PATROL MUSEUM 30204021

| SCHEDULE A<br>(Form 990 or 990-EZ)<br><br>Department of the Treasury<br>Internal Revenue Service | **Public Charity Status and Public Support**<br>To be completed by all section 501(c)(3) organizations and section 4947(a)(1)<br>nonexempt charitable trusts.<br>▶ Attach to Form 990 or Form 990-EZ. ▶ See separate instructions. | OMB No 1545-0047<br><br>**2008**<br>Open to Public<br>Inspection |
|---|---|---|

| Name of the organization | TEXAS HIGHWAY PATROL MUSEUM, FORMERLY<br>TX HWY PATROL ASSN HALL OF FAME & MUSEUM | Employer Identification number<br>74-2639283 |
|---|---|---|

| **Part I** | **Reason for Public Charity Status** (All organizations must complete this part.) (see instructions) |

The organization is not a private foundation because it is: (Please check only **one** organization.)

1. ☐ A church, convention of churches, or association of churches described in **section 170(b)(1)(A)(i)**.
2. ☐ A school described in **section 170(b)(1)(A)(ii)**. (Attach Schedule E.)
3. ☐ A hospital or a cooperative hospital service organization described in **section 170(b)(1)(A)(iii)**. (Attach Schedule H.)
4. ☐ A medical research organization operated in conjunction with a hospital described in **section 170(b)(1)(A)(iii)**. Enter the hospital's name, city, and state: _____
5. ☐ An organization operated for the benefit of a college or university owned or operated by a governmental unit described in **section 170(b)(1)(A)(iv)**. (Complete Part II.)
6. ☐ A federal, state, or local government or governmental unit described in **section 170(b)(1)(A)(v)**.
7. ☒ An organization that normally receives a substantial part of its support from a governmental unit or from the general public described in **section 170(b)(1)(A)(vi)**. (Complete Part II.)
8. ☐ A community trust described in **section 170(b)(1)(A)(vi)**. (Complete Part II.)
9. ☐ An organization that normally receives: (1) more than 33 1/3% of its support from contributions, membership fees, and gross receipts from activities related to its exempt functions - subject to certain exceptions, and (2) no more than 33 1/3% of its support from gross investment income and unrelated business taxable income (less section 511 tax) from businesses acquired by the organization after June 30, 1975. See **section 509(a)(2)**. (Complete the Part III.)
10. ☐ An organization organized and operated exclusively to test for public safety. See **section 509(a)(4)**. (see instructions)
11. ☐ An organization organized and operated exclusively for the benefit of, to perform the functions of, or to carry out the purposes of one or more publicly supported organizations described in section 509(a)(1) or section 509(a)(2). See **section 509(a)(3)**. Check the box that describes the type of supporting organization and complete lines 11e through 11h.
   - a ☐ Type I     b ☐ Type II     c ☐ Type III - Functionally integrated     d ☐ Type III - Other
   - e ☒ By checking this box, I certify that the organization is not controlled directly or indirectly by one or more disqualified persons other than foundation managers and other than one or more publicly supported organizations described in section 509(a)(1) or section 509(a)(2).
   - f   If the organization received a written determination from the IRS that it is a Type I, Type II, or Type III supporting organization, check this box .......................................................... ☐
   - g   Since August 17, 2006, has the organization accepted any gift or contribution from any of the following persons?

|   |   | Yes | No |
|---|---|---|---|
| (i) A person who directly or indirectly controls, either alone or together with persons described in (ii) and (iii) below, the governing body of the supported organization? | **11g(i)** | | |
| (ii) A family member of a person described in (i) above? | **11g(ii)** | | |
| (iii) A 35% controlled entity of a person described in (i) or (ii) above? | **11g(iii)** | | |

   - h   Provide the following information about the organizations the organization supports.

| (i) Name of supported organization | (ii) EIN | (iii) Type of organization (described on lines 1-9 above or IRC section (see instructions)) | (iv) Is the organization in col. (i) listed in your governing document? | | (v) Did you notify the organization in col (i) of your support? | | (vi) Is the organization in col (i) organized in the U.S ? | | (vii) Amount of support |
|---|---|---|---|---|---|---|---|---|---|
| | | | Yes | No | Yes | No | Yes | No | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| **Total** | | | | | | | | | |

LHA **For Privacy Act and Paperwork Reduction Act Notice, see the Instructions for Form 990.**          Schedule A (Form 990 or 990-EZ) 2008

**Part II** **Support Schedule for Organizations Described in Sections 170(b)(1)(A)(iv) and 170(b)(1)(A)(vi)**
(Complete only if you checked the box on line 5, 7, or 8 of Part I.)

## Section A. Public Support

| Calendar year (or fiscal year beginning in) ▶ | (a) 2004 | (b) 2005 | (c) 2006 | (d) 2007 | (e) 2008 | (f) Total |
|---|---|---|---|---|---|---|
| 1 Gifts, grants, contributions, and membership fees received. (Do not include any "unusual grants.") | 1880201. | 2336176. | 1820261. | 1656223. | 1746658. | 9439519. |
| 2 Tax revenues levied for the organization's benefit and either paid to or expended on its behalf | | | | | | |
| 3 The value of services or facilities furnished by a governmental unit to the organization without charge | | | | | | |
| 4 Total. Add lines 1 - 3 | 1880201. | 2336176. | 1820261. | 1656223. | 1746658. | 9439519. |
| 5 The portion of total contributions by each person (other than a governmental unit or publicly supported organization) included on line 1 that exceeds 2% of the amount shown on line 11, column (f) | | | | | | |
| 6 Public Support. Subtract line 5 from line 4 | | | | | | 9439519. |

## Section B. Total Support

| Calendar year (or fiscal year beginning in) ▶ | (a) 2004 | (b) 2005 | (c) 2006 | (d) 2007 | (e) 2008 | (f) Total |
|---|---|---|---|---|---|---|
| 7 Amounts from line 4 | 1880201. | 2336176. | 1820261. | 1656223. | 1746658. | 9439519. |
| 8 Gross income from interest, dividends, payments received on securities loans, rents, royalties and income from similar sources | | | | | | |
| 9 Net income from unrelated business activities, whether or not the business is regularly carried on | | | | | | |
| 10 Other income. Do not include gain or loss from the sale of capital assets (Explain in Part IV.) | | | | | | |
| 11 Total support. Add lines 7 through 10 | | | | | | 9439519. |

| | | |
|---|---|---|
| 12 Gross receipts from related activities, etc. (see instructions) | 12 | 4,357. |

13 First five years. If the Form 990 is for the organization's first, second, third, fourth, or fifth tax year as a section 501(c)(3) organization, check this box and stop here ▶ ☐

## Section C. Computation of Public Support Percentage

| | | | |
|---|---|---|---|
| 14 Public support percentage for 2008 (line 6, column (f) divided by line 11, column (f)) | 14 | 100.00 | % |
| 15 Public support percentage from 2007 Schedule A, Part IV-A, line 26f | 15 | 100.00 | % |

16a 33 1/3% support test - 2008. If the organization did not check the box on line 13, and line 14 is 33 1/3% or more, check this box and stop here. The organization qualifies as a publicly supported organization ▶ ☒

b 33 1/3% support test - 2007. If the organization did not check a box on line 13 or 16a, and line 15 is 33 1/3% or more, check this box and stop here. The organization qualifies as a publicly supported organization ▶ ☐

17a 10% -facts-and-circumstances test - 2008. If the organization did not check a box on line 13, 16a, or 16b, and line 14 is 10% or more, and if the organization meets the "facts-and-circumstances" test, check this box and stop here. Explain in Part IV how the organization meets the "facts-and-circumstances" test. The organization qualifies as a publicly supported organization ▶ ☐

b 10% -facts-and-circumstances test - 2007. If the organization did not check a box on line 13, 16a, 16b, or 17a, and line 15 is 10% or more, and if the organization meets the "facts-and-circumstances" test, check this box and stop here. Explain in Part IV how the organization meets the "facts-and-circumstances" test. The organization qualifies as a publicly supported organization ▶ ☐

18 Private foundation. If the organization did not check a box on line 13, 16a, 16b, 17a, or 17b, check this box and see instructions ▶ ☐

Schedule A (Form 990 or 990-EZ) 2008

| Part III | Support Schedule for Organizations Described in Section 509(a)(2) (Complete only if you checked the box on line 9 of Part I) |

### Section A. Public Support

| Calendar year (or fiscal year beginning in)▶ | (a) 2004 | (b) 2005 | (c) 2006 | (d) 2007 | (e) 2008 | (f) Total |
|---|---|---|---|---|---|---|
| 1 Gifts, grants, contributions, and membership fees received. (Do not include any "unusual grants.") | | | | | | |
| 2 Gross receipts from admissions, merchandise sold or services performed, or facilities furnished in any activity that is related to the organization's tax-exempt purpose | | | | | | |
| 3 Gross receipts from activities that are not an unrelated trade or business under section 513 | | | | | | |
| 4 Tax revenues levied for the organization's benefit and either paid to or expended on its behalf | | | | | | |
| 5 The value of services or facilities furnished by a governmental unit to the organization without charge | | | | | | |
| 6 Total. Add lines 1 - 5 | | | | | | |
| 7a Amounts included on lines 1, 2, and 3 received from disqualified persons | | | | | | |
| b Amounts included on lines 2 and 3 received from other than disqualified persons that exceed the greater of 1% of the total of lines 9, 10c, 11, and 12 for the year or $5,000 | | | | | | |
| c Add lines 7a and 7b | | | | | | |
| 8 Public support (Subtract line 7c from line 6.) | | | | | | |

### Section B. Total Support

| Calendar year (or fiscal year beginning in)▶ | (a) 2004 | (b) 2005 | (c) 2006 | (d) 2007 | (e) 2008 | (f) Total |
|---|---|---|---|---|---|---|
| 9 Amounts from line 6 | | | | | | |
| 10a Gross income from interest, dividends, payments received on securities loans, rents, royalties and income from similar sources | | | | | | |
| b Unrelated business taxable income (less section 511 taxes) from businesses acquired after June 30, 1975 | | | | | | |
| c Add lines 10a and 10b | | | | | | |
| 11 Net income from unrelated business activities not included in line 10b, whether or not the business is regularly carried on | | | | | | |
| 12 Other income. Do not include gain or loss from the sale of capital assets (Explain in Part IV.) | | | | | | |
| 13 Total support (Add lines 9, 10c, 11, and 12) | | | | | | |

14 **First five years.** If the Form 990 is for the organization's first, second, third, fourth, or fifth tax year as a section 501(c)(3) organization, check this box and **stop here**  ▶ ☐

### Section C. Computation of Public Support Percentage

| 15 Public support percentage for 2008 (line 8, column (f) divided by line 13, column (f)) | 15 | % |
|---|---|---|
| 16 Public support percentage from 2007 Schedule A, Part IV-A, line 27g | 16 | % |

### Section D. Computation of Investment Income Percentage

| 17 Investment income percentage for 2008 (line 10c, column (f) divided by line 13, column (f)) | 17 | % |
|---|---|---|
| 18 Investment income percentage from 2007 Schedule A, Part IV-A, line 27h | 18 | % |

19a **33 1/3% support tests - 2008.** If the organization did not check the box on line 14, and line 15 is more than 33 1/3%, and line 17 is not more than 33 1/3%, check this box and **stop here.** The organization qualifies as a publicly supported organization  ▶ ☐

b **33 1/3% support tests - 2007.** If the organization did not check a box on line 14 or line 19a, and line 16 is more than 33 1/3%, and line 18 is not more than 33 1/3%, check this box and **stop here.** The organization qualifies as a publicly supported organization  ▶ ☐

20 **Private foundation.** If the organization did not check a box on line 14, 19a, or 19b, check this box and see instructions  ▶ ☐

**Schedule A (Form 990 or 990-EZ) 2008**

832023 12-17-08

17251029 000078                    2008.04050 TEXAS HIGHWAY PATROL MUSEUM 30204021

# Schedule D
(Form 990)

Department of the Treasury
Internal Revenue Service

## Supplemental Financial Statements

▶ Attach to Form 990. To be completed by organizations that
answered "Yes," to Form 990, Part IV, line 6, 7, 8, 9, 10, 11, or 12.

OMB No. 1545-0047

**2008**

Open to Public
Inspection

| Name of the organization | TEXAS HIGHWAY PATROL MUSEUM, FORMERLY TX HWY PATROL ASSN HALL OF FAME & MUSEUM | Employer identification number 74-2639283 |
|---|---|---|

## Part I  Organizations Maintaining Donor Advised Funds or Other Similar Funds or Accounts. Complete if the
organization answered "Yes" to Form 990, Part IV, line 6.

| | | (a) Donor advised funds | (b) Funds and other accounts |
|---|---|---|---|
| 1 | Total number at end of year | | |
| 2 | Aggregate contributions to (during year) | | |
| 3 | Aggregate grants from (during year) | | |
| 4 | Aggregate value at end of year | | |

5  Did the organization inform all donors and donor advisors in writing that the assets held in donor advised funds
are the organization's property, subject to the organization's exclusive legal control? ☐ Yes ☐ No

6  Did the organization inform all grantees, donors, and donor advisors in writing that grant funds may be used only
for charitable purposes and not for the benefit of the donor or donor advisor or other impermissible private benefit? ☐ Yes ☐ No

## Part II  Conservation Easements. Complete if the organization answered "Yes" to Form 990, Part IV, line 7.

1  Purpose(s) of conservation easements held by the organization (check all that apply).

☐ Preservation of land for public use (e.g., recreation or pleasure)     ☐ Preservation of an historically important land area

☐ Protection of natural habitat     ☐ Preservation of certified historic structure

☐ Preservation of open space

2  Complete lines 2a-2d if the organization held a qualified conservation contribution in the form of a conservation easement on the last day
of the tax year.

| | | | Held at the End of the Year |
|---|---|---|---|
| a | Total number of conservation easements | 2a | |
| b | Total acreage restricted by conservation easements | 2b | |
| c | Number of conservation easements on a certified historic structure included in (a) | 2c | |
| d | Number of conservation easements included in (c) acquired after 8/17/06 | 2d | |

3  Number of conservation easements modified, transferred, released, extinguished, or terminated by the organization during the taxable
year ▶ _____

4  Number of states where property subject to conservation easement is located ▶ _____

5  Does the organization have a written policy regarding the periodic monitoring, inspection, violations, and
enforcement of the conservation easements it holds? ☐ Yes ☐ No

6  Staff or volunteer hours devoted to monitoring, inspecting, and enforcing easements during the year ▶ _____

7  Amount of expenses incurred in monitoring, inspecting, and enforcing easements during the year ▶ $ _____

8  Does each conservation easement reported on line 2(d) above satisfy the requirements of section 170(h)(4)(B)(i)
and section 170(h)(4)(B)(ii)? ☐ Yes ☐ No

9  In Part XIV, describe how the organization reports conservation easements in its revenue and expense statement, and balance sheet, and
include, if applicable, the text of the footnote to the organization's financial statements that describes the organization's accounting for
conservation easements.

## Part III  Organizations Maintaining Collections of Art, Historical Treasures, or Other Similar Assets.
Complete if the organization answered "Yes" to Form 990, Part IV, line 8.

1a  If the organization elected, as permitted under SFAS 116, not to report in its revenue statement and balance sheet works of art, historical
treasures, or other similar assets held for public exhibition, education, or research in furtherance of public service, provide, in Part XIV, the text of
the footnote to its financial statements that describes these items.

b  If the organization elected, as permitted under SFAS 116, to report in its revenue statement and balance sheet works of art, historical treasures,
or other similar assets held for public exhibition, education, or research in furtherance of public service, provide the following amounts relating to
these items:

(i)  Revenues included in Form 990, Part VIII, line 1 ▶ $ _____

(ii)  Assets included in Form 990, Part X ▶ $ _____

2  If the organization received or held works of art, historical treasures, or other similar assets for financial gain, provide
the following amounts required to be reported under SFAS 116 relating to these items:

a  Revenues included in Form 990, Part VIII, line 1 ▶ $ _____

b  Assets included in Form 990, Part X ▶ $ _____

**LHA  For Privacy Act and Paperwork Reduction Act Notice, see the Instructions for Form 990.**     Schedule D (Form 990) 2008

832051
12-23-08

17251029 000078          2008.04050 TEXAS HIGHWAY PATROL MUSEUM 30204021

TEXAS HIGHWAY PATROL MUSEUM, FORMERLY
TX HWY PATROL ASSN HALL OF FAME & MUSEUM   74-2639283  Page **2**

## Part III Organizations Maintaining Collections of Art, Historical Treasures, or Other Similar Assets *(continued)*

**3** Using the organization's accession and other records, check any of the following that are a significant use of its collection items (check all that apply):

a ☐ Public exhibition

b ☐ Scholarly research

c ☐ Preservation for future generations

d ☐ Loan or exchange programs

e ☐ Other _____

**4** Provide a description of the organization's collections and explain how they further the organization's exempt purpose in Part XIV.

**5** During the year, did the organization solicit or receive donations of art, historical treasures, or other similar assets to be sold to raise funds rather than to be maintained as part of the organization's collection? ........ ☐ Yes ☐ No

## Part IV Trust, Escrow and Custodial Arrangements. Complete if organization answered "Yes" to Form 990, Part IV, line 9, or reported an amount on Form 990, Part X, line 21.

**1a** Is the organization an agent, trustee, custodian or other intermediary for contributions or other assets not included on Form 990, Part X? ........ ☐ Yes ☐ No

**b** If "Yes," explain the arrangement in Part XIV and complete the following table:

|  |  | Amount |
|---|---|---|
| c Beginning balance | 1c | |
| d Additions during the year | 1d | |
| e Distributions during the year | 1e | |
| f Ending balance | 1f | |

**2a** Did the organization include an amount on Form 990, Part X, line 21? ........ ☐ Yes ☐ No

**b** If "Yes," explain the arrangement in Part XIV.

## Part V Endowment Funds. Complete if organization answered "Yes" to Form 990, Part IV, line 10.

|  | (a) Current year | (b) Prior year | (c) Two years back | (d) Three years back | (e) Four years back |
|---|---|---|---|---|---|
| 1a Beginning of year balance | | | | | |
| b Contributions | | | | | |
| c Investment earnings or losses | | | | | |
| d Grants or scholarships | | | | | |
| e Other expenditures for facilities and programs | | | | | |
| f Administrative expenses | | | | | |
| g End of year balance | | | | | |

**2** Provide the estimated percentage of the year end balance held as:

a Board designated or quasi-endowment ▶ _____ %

b Permanent endowment ▶ _____ %

c Term endowment ▶ _____ %

**3a** Are there endowment funds not in the possession of the organization that are held and administered for the organization by:

|  |  | Yes | No |
|---|---|---|---|
| (i) unrelated organizations | 3a(i) | | |
| (ii) related organizations | 3a(ii) | | |
| b If "Yes" to 3a(ii), are the related organizations listed as required on Schedule R? | 3b | | |

**4** Describe in Part XIV the intended uses of the organization's endowment funds.

## Part VI Investments - Land, Buildings, and Equipment. See Form 990, Part X, line 10.

| Description of investment | (a) Cost or other basis (investment) | (b) Cost or other basis (other) | (c) Depreciation | (d) Book value |
|---|---|---|---|---|
| 1a Land | 237,981. | 128,975. | | 366,956. |
| b Buildings | 363,653. | 120,543. | 49,382. | 434,814. |
| c Leasehold improvements | | | | |
| d Equipment | | | | |
| e Other | | 43,688. | 39,291. | 4,397. |
| Total. Add lines 1a-1e. *(Column (d) should equal Form 990, Part X, column (B), line 10(c).)* ▶ | | | | 806,167. |

Schedule D (Form 990) 2008

TEXAS HIGHWAY PATROL MUSEUM, FORMERLY
TX HWY PATROL ASSN HALL OF FAME & MUSEUM  74-2639283  Page **3**

## Part VII  Investments - Other Securities. See Form 990, Part X, line 12.

| (a) Description of security or category (including name of security) | (b) Book value | (c) Method of valuation: Cost or end-of-year market value |
|---|---|---|
| Financial derivatives and other financial products | | |
| Closely-held equity interests | | |
| Other | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| Total. (Col (b) should equal Form 990, Part X, col (B) line 12 ) ▶ | | |

## Part VIII  Investments - Program Related. See Form 990, Part X, line 13.

| (a) Description of investment type | (b) Book value | (c) Method of valuation: Cost or end-of-year market value |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| Total. (Col (b) should equal Form 990, Part X, col (B) line 13 ) ▶ | | |

## Part IX  Other Assets. See Form 990, Part X, line 15.

| (a) Description | (b) Book value |
|---|---|
| MUSEUM EXHIBITS | 46,944. |
| ACCOUNTS RECEIVABLE - EMPLOYEES | 4,535. |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| Total. (Column (b) should equal Form 990, Part X, col (B) line 15.) ▶ | 51,479. |

## Part X  Other Liabilities. See Form 990, Part X, line 25.

| (a) Description of liability | (b) Amount |
|---|---|
| Federal income taxes | |
| ACCOUNTS PAYABLE - TEXAS HIGHWAY PATROL ASSOCIATION | 32,054. |
| ACCOUNTS PAYABLE - THPA SERVICES, INC. | 66,787. |
| | |
| | |
| | |
| | |
| | |
| | |
| Total. (Column (b) should equal Form 990, Part X, col (B) line 25.) ▶ | 98,841. |

In Part XIV, provide the text of the footnote to the organization's financial statements that reports the organization's liability for uncertain tax positions under FIN 48.

832053
12-23-08

TEXAS HIGHWAY PATROL MUSEUM, FORMERLY
TX HWY PATROL ASSN HALL OF FAME & MUSEUM  74-2639283  Page 4

## Part XI  Reconciliation of Change in Net Assets from Form 990 to Financial Statements

| | | | |
|---|---|---|---|
| 1 | Total revenue (Form 990, Part VIII, column (A), line 12) | 1 | 1,823,317. |
| 2 | Total expenses (Form 990, Part IX, column (A), line 25) | 2 | 1,724,543. |
| 3 | Excess or (deficit) for the year. Subtract line 2 from line 1 | 3 | 98,774. |
| 4 | Net unrealized gains (losses) on investments | 4 | |
| 5 | Donated services and use of facilities | 5 | |
| 6 | Investment expenses | 6 | |
| 7 | Prior period adjustments | 7 | |
| 8 | Other (Describe in Part XIV) | 8 | 2. |
| 9 | Total adjustments (net). Add lines 4-8 | 9 | 2. |
| 10 | Excess or (deficit) for the year per financial statements. Combine lines 3 and 9 | 10 | 98,776. |

## Part XII  Reconciliation of Revenue per Audited Financial Statements With Revenue per Return

| | | | | |
|---|---|---|---|---|
| 1 | Total revenue, gains, and other support per audited financial statements | | 1 | |
| 2 | Amounts included on line 1 but not on Form 990, Part VIII, line 12: | | | |
| a | Net unrealized gains on investments | 2a | | |
| b | Donated services and use of facilities | 2b | | |
| c | Recoveries of prior year grants | 2c | | |
| d | Other (Describe in Part XIV) | 2d | | |
| e | Add lines 2a through 2d | | 2e | |
| 3 | Subtract line 2e from line 1 | | 3 | |
| 4 | Amounts included on Form 990, Part VIII, line 12, but not on line 1: | | | |
| a | Investment expenses not included on Form 990, Part VIII, line 7b | 4a | | |
| b | Other (Describe in Part XIV) | 4b | | |
| c | Add lines 4a and 4b | | 4c | |
| 5 | Total revenue. Add lines 3 and 4c. (This should equal Form 990, Part I, line 12.) | | 5 | |

## Part XIII  Reconciliation of Expenses per Audited Financial Statements With Expenses per Return

| | | | | |
|---|---|---|---|---|
| 1 | Total expenses and losses per audited financial statements | | 1 | |
| 2 | Amounts included on line 1 but not on Form 990, Part IX, line 25: | | | |
| a | Donated services and use of facilities | 2a | | |
| b | Prior year adjustments | 2b | | |
| c | Losses reported on Form 990, Part IX, line 25 | 2c | | |
| d | Other (Describe in Part XIV) | 2d | | |
| e | Add lines 2a through 2d | | 2e | |
| 3 | Subtract line 2e from line 1 | | 3 | |
| 4 | Amounts included on Form 990, Part IX, line 25, but not on line 1: | | | |
| a | Investment expenses not included on Form 990, Part VIII, line 7b | 4a | | |
| b | Other (Describe in Part XIV) | 4b | | |
| c | Add lines 4a and 4b | | 4c | |
| 5 | Total expenses. Add lines 3 and 4c. (This should equal Form 990, Part I, line 18.) | | 5 | |

## Part XIV  Supplemental Information

Complete this part to provide the descriptions required for Part II, lines 3, 5, and 9; Part III, lines 1a and 4; Part IV, lines 1b and 2b; Part V, line 4; Part X; Part XI, line 8; Part XII, lines 2d and 4b; and Part XIII, lines 2d and 4b.

PART XI, LINE 8 - OTHER ADJUSTMENTS:

ROUNDING

17251029 000078          2008.04050 TEXAS HIGHWAY PATROL MUSEUM 30204021

# Compensation Information

**For certain Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees**

▶ **Attach to Form 990. To be completed by organizations that answered "Yes" to Form 990, Part IV, line 23.**

OMB No 1545-0047

## 2008

Open to Public
Inspection

| Name of the organization | TEXAS HIGHWAY PATROL MUSEUM, FORMERLY TX HWY PATROL ASSN HALL OF FAME & MUSEUM | Employer identification number 74-2639283 |

## Part I | Questions Regarding Compensation

|  |  | Yes | No |
|---|---|---|---|
| **1a** Check the appropriate box(es) if the organization provided any of the following to or for a person listed in Form 990, Part VII, Section A, line 1a. Complete Part III to provide any relevant information regarding these items. |  |  |  |

☐ First-class or charter travel     ☐ Housing allowance or residence for personal use
☐ Travel for companions     ☐ Payments for business use of personal residence
☐ Tax indemnification and gross-up payments     ☐ Health or social club dues or initiation fees
☐ Discretionary spending account     ☐ Personal services (e.g., maid, chauffeur, chef)

|  | Yes | No |
|---|---|---|
| **b** If line 1a is checked, did the organization follow a written policy regarding payment or reimbursement or provision of all of the expenses described above? If "No," complete Part III to explain    **1b** |  |  |
| **2** Did the organization require substantiation prior to reimbursing or allowing expenses incurred by all officers, directors, trustees, and the CEO/Executive Director, regarding the items checked in line 1a?    **2** |  |  |

**3** Indicate which, if any, of the following the organization uses to establish the compensation of the organization's CEO/Executive Director. Check all that apply.

☐ Compensation committee     ☐ Written employment contract
☐ Independent compensation consultant     ☐ Compensation survey or study
☐ Form 990 of other organizations     ☐ Approval by the board or compensation committee

|  | Yes | No |
|---|---|---|
| **4** During the year, did any person listed in Form 990, Part VII, Section A, line 1a: |  |  |
| **a** Receive a severance payment or change of control payment?    **4a** |  | X |
| **b** Participate in, or receive payment from, a supplemental nonqualified retirement plan?    **4b** |  | X |
| **c** Participate in, or receive payment from, an equity-based compensation arrangement?    **4c** |  | X |
| If "Yes" to any of lines 4a-c, list the persons and provide the applicable amounts for each item in Part III. |  |  |
| **Only 501(c)(3) and 501(c)(4) organizations must complete lines 5-8.** |  |  |
| **5** For persons listed in Form 990, Part VII, Section A, line 1a, did the organization pay or accrue any compensation contingent on the revenues of: |  |  |
| **a** The organization?    **5a** |  | X |
| **b** Any related organization?    **5b** |  | X |
| If "Yes," to line 5a or 5b, describe in Part III. |  |  |
| **6** For persons listed in Form 990, Part VII, Section A, line 1a, did the organization pay or accrue any compensation contingent on the net earnings of: |  |  |
| **a** The organization?    **6a** |  | X |
| **b** Any related organization?    **6b** |  | X |
| If "Yes" to line 6a or 6b, describe in Part III. |  |  |
| **7** For persons listed in Form 990, Part VII, Section A, line 1a, did the organization provide any non-fixed payments not described in lines 5 and 6? If "Yes," describe in Part III    **7** |  | X |
| **8** Were any amounts reported in Form 990, Part VII, paid or accrued pursuant to a contract that was subject to the initial contract exception described in Regs. section 53.4958-4(a)(3)? If "Yes," describe in Part III    **8** |  | X |

**LHA For Privacy Act and Paperwork Reduction Act Notice, see the Instructions for Form 990.**     Schedule J (Form 990) 2008

832111
12-23-08

17251029 000078     2008.04050 TEXAS HIGHWAY PATROL MUSEUM 30204021

TEXAS HIGHWAY PATROL MUSEUM, FORMERLY
TX HWY PATROL ASSN HALL OF FAME & MUSEUM 74-2639283    Page 2

**Part II** | **Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees.** Use Schedule J-1 if additional space is needed.

For each individual whose compensation must be reported in Schedule J, report compensation from the organization on row (i) and from related organizations, described in the instructions, on row (ii).

Do not list any individuals that are not listed on Form 990, Part VII.

**Note.** The sum of columns (B)(i)-(iii) must equal the applicable column (D) or column (E) amounts on Form 990, Part VII, line 1a.

| (A) Name | | (B) Breakdown of W-2 and/or 1099-MISC compensation | | | (C) Deferred compensation | (D) Nontaxable benefits | (E) Total of columns (B)(i)-(D) | (F) Compensation reported in prior Form 990 or Form 990-EZ |
|---|---|---|---|---|---|---|---|---|
| | | (i) Base compensation | (ii) Bonus & incentive compensation | (iii) Other compensation | | | | |
| TIM TIERNEY | (i) | 137,076. | 0. | 0. | 0. | 0. | 137,076. | 139,118. |
| | (ii) | 56,350. | 0. | 0. | 0. | 0. | 56,350. | 47,773. |
| C.R. VILLALVA | (i) | 163,075. | 0. | 0. | 0. | 0. | 163,075. | 156,738. |
| | (ii) | 0. | 0. | 0. | 0. | 0. | 0. | 0. |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |

832112 12-23-08

**SCHEDULE O**
(Form 990)

Department of the Treasury
Internal Revenue Service

**Supplemental Information to Form 990**

▶ Attach to Form 990. To be completed by organizations to provide additional information for responses to specific questions for the Form 990 or to provide any additional information.

OMB No 1545-0047

**2008**

Open to Public
Inspection

Name of the organization | Employer identification number

TEXAS HIGHWAY PATROL MUSEUM, FORMERLY
TX HWY PATROL ASSN HALL OF FAME & MUSEUM | 74-2639283

FORM 990, PART I, LINE 1, DESCRIPTION OF ORGANIZATION MISSION:

AND TO EDUCATE THE GENERAL PUBLIC.

FORM 990, PART III, LINE 4D, OTHER PROGRAM SERVICES:

THE ORGANIZATION ALSO CONTINUED ITS POLICY OF PROVIDING SELECTED PUBLIC

SERVICE ANNOUNCEMENTS.

FORM 990, PART VI, SECTION A, LINE 10: THE ORGANIZATION'S FORM 990 IS

PREPARED BY AN INDEPENDENT ACCOUNTING FIRM. THE ORGANIZATION'S EXECUTIVE

DIRECTOR MEETS EACH YEAR WITH SUCH FIRM TO REVIEW, SIGN AND FILE FORM 990.

FORM 990, PART VI, SECTION B, LINE 12C: THE ORGANIZATION MONITORS AND

ENFORCES COMPLIANCE WITH THE CONFLICT OF INTEREST POLICY AT EACH ANNUAL AND

SPECIAL MEETING OF DIRECTORS.

FORM 990, PART VI, SECTION C, LINE 19: THE ORGANIZATION MAKES ITS

GOVERNING DOCUMENTS, CONFLICT OF INTEREST POLICY, AND FINANCIAL STATEMENTS

AVAILABLE TO THE PUBLIC UPON REQUEST.

**SCHEDULE R**
**(Form 990)**
Department of the Treasury
Internal Revenue Service

**Related Organizations and Unrelated Partnerships**
▶ Attach to Form 990. To be completed by organizations that answered "Yes" to Form 990, Part IV, lines 33, 34, 35, 36, or 37.
▶ See separate instructions.

Name of the organization   TEXAS HIGHWAY PATROL MUSEUM, FORMERLY
TX HWY PATROL ASSN HALL OF FAME & MUSEUM

Employer identification number
74-2639283

**Part I**  Identification of Disregarded Entities

| (A) Name, address, and EIN of disregarded entity | (B) Primary activity | (C) Legal domicile (state or foreign country) | (D) Total income | (E) End-of-year assets | (F) Direct controlling entity |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**Part II**  Identification of Related Tax-Exempt Organizations

| (A) Name, address, and EIN of related organization | (B) Primary activity | (C) Legal domicile (state or foreign country) | (D) Exempt Code section | (E) Public charity status (if section 501(c)(3)) | (F) Direct controlling entity |
|---|---|---|---|---|---|
| TEXAS HIGHWAY PATROL ASSOCIATION - 74-2573422, 501 OAKLAND AVENUE, AUSTIN, TX 78703 | PROFESSIONAL ASSOCIATION-PROMOTES AWARENESS OF TX PATROL | TEXAS | 501 (C)(6) | | |
| NATIONAL POLICE YOUTH ATHLETIC LEAGUE - 74-2571333, 5150 BROADWAY, SUITE 233, SAN ANTONIO, TX 78209 | EDUCATIONAL | TEXAS | 501 (C)(3) | | |
| CITIZENS FOR SPECIAL ARTISTS - 74-2571329 5150 BROADWAY SUITE 233 SAN ANTONIO, TX 78209 | EDUCATIONAL | TEXAS | 501 (C)(3) | | |
| | | | | | |

LHA  For Privacy Act and Paperwork Reduction Act Notice, see the Instructions for Form 990.

Schedule R (Form 990) 2008

832161
12-23-08

TEXAS HIGHWAY PATROL MUSEUM, FORMERLY
TX HWY PATROL ASSN HALL OF FAME & MUSEUM  74-2639283  Page 2

**Part III  Identification of Related Organizations Taxable as a Partnership**

| (A) Name, address, and EIN of related organization | (B) Primary activity | (C) Legal domicile (state or foreign country) | (D) Direct controlling entity | (E) Predominant income (related, investment, unrelated) | (F) Share of total income | (G) Share of end-of-year assets | (H) Disproportionate allocations? Yes / No | (I) Code V-UBI amount in box 20 of Schedule K-1 (Form 1065) | (J) General or managing partner? Yes / No |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

**Part IV  Identification of Related Organizations Taxable as a Corporation or Trust**

| (A) Name, address, and EIN of related organization | (B) Primary activity | (C) Legal domicile (state or foreign country) | (D) Direct controlling entity | (E) Type of entity (C corp, S corp, or trust) | (F) Share of total income | (G) Share of end-of-year assets | (H) Percentage ownership |
|---|---|---|---|---|---|---|---|
| THPA SERVICES INC. - 74-2709623 501 OAKLAND AVENUE AUSTIN TX 78703 | MAGAZINE PUBLISHING AND ADVERTISING SALES | TX | TEXAS HIGHWAY PATROL ASSOCIATION | C CORP | 0. | 0. | .00% |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

832162 12-23-08

23

**Part V  Transactions With Related Organizations**

Note. Complete line 1 if any entity is listed in Parts II, III, or IV.

1  During the tax year, did the organization engage in any of the following transactions with one or more related organizations listed in Parts II-IV?

| | | Yes | No |
|---|---|---|---|
| a | Receipt of (i) interest (ii) annuities (iii) royalties (iv) rent from a controlled entity | 1a | | X |
| b | Gift, grant, or capital contribution to other organization(s) | 1b | | X |
| c | Gift, grant, or capital contribution from other organization(s) | 1c | | X |
| d | Loans or loan guarantees to or for other organization(s) | 1d | | X |
| e | Loans or loan guarantees by other organization(s) | 1e | X | |
| f | Sale of assets to other organization(s) | 1f | | X |
| g | Purchase of assets from other organization(s) | 1g | | X |
| h | Exchange of assets | 1h | | X |
| i | Lease of facilities, equipment, or other assets to other organization(s) | 1i | X | |
| j | Lease of facilities, equipment, or other assets from other organization(s) | 1j | | X |
| k | Performance of services or membership or fundraising solicitations for other organization(s) | 1k | X | |
| l | Performance of services or membership or fundraising solicitations by other organization(s) | 1l | | X |
| m | Sharing of facilities, equipment, mailing lists, or other assets | 1m | | |
| n | Sharing of paid employees | 1n | X | |
| o | Reimbursement paid to other organization for expenses | 1o | | X |
| p | Reimbursement paid by other organization for expenses | 1p | | X |
| q | Other transfer of cash or property to other organization(s) | 1q | | X |
| r | Other transfer of cash or property from other organization(s) | 1r | | X |

2  If the answer to any of the above is "Yes," see the instructions for information on who must complete this line, including covered relationships and transaction thresholds.

| (A) Name of other organization(s) | (B) Transaction type (a-r) | (C) Amount involved |
|---|---|---|
| (1) TEXAS HIGHWAY PATROL ASSOCIATION | E | 32,054. |
| (2) THPA SERVICES, INC. | E | 66,787. |
| (3) TEXAS HIGHWAY PATROL ASSOCIATION | I | 2,400. |
| (4) THPA SERVICES, INC. | I | 3,600. |
| (5) TEXAS HIGHWAY PATROL ASSOCIATION | K | 3,600. |
| (6) TEXAS HIGHWAY PATROL ASSOCIATION | N | 1,200. |

832163 12-23-08

Schedule R (Form 990) 2008

TEXAS HIGHWAY PATROL MUSEUM, FORMERLY

**Part VI   Unrelated Organizations Taxable as a Partnership**

Provide the following information for each entity taxed as a partnership through which the organization conducted more than five percent of its activities (measured by total assets or gross revenue) that was not a related organization. See instructions regarding exclusion for certain investment partnerships.

| (A) Name, address, and EIN of entity | (B) Primary activity | (C) Legal domicile (state or foreign country) | (D) Are all partners section 501(c)(3) organizations? | | (E) Share of end-of-year assets | (F) Disproportionate allocations? | | (G) Code V-UBI amount in box 20 of Schedule K-1 (Form 1065) | (H) General or managing partner? | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Yes | No | | Yes | No | | Yes | No |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

832164
12-23-08

25

- If you are filing for an **Additional (Not Automatic) 3-Month Extension**, complete only Part II and check this box ▸ ☑
- **Note.** Only complete Part II if you have already been granted an automatic 3-month extension on a previously filed Form 8868.
- If you are filing for an **Automatic 3-Month Extension**, complete only Part I (on page 1).

| **Part II** | Additional (Not Automatic) 3-Month Extension of Time. Only file the original (no copies needed). | | |
|---|---|---|---|
| **Type or print** | Name of Exempt Organization **TEXAS HIGHWAY PATROL MUSEUM** | | Employer identification number |
| File by the extended due date for filing the return See instructions | Number, street, and room or suite no  If a P.O. box, see instructions. **501 OAKLAND AVENUE** | | 74 : 2639283 |
| | | | For IRS use only |
| | City, town or post office, state, and ZIP code. For a foreign address, see instructions. **AUSTIN, TX 78703** | | |

**Check type of return to be filed** (File a separate application for each return):

☑ Form 990      ☐ Form 990-PF      ☐ Form 1041-A      ☐ Form 6069
☐ Form 990-BL      ☐ Form 990-T (sec. 401(a) or 408(a) trust)      ☐ Form 4720      ☐ Form 8870
☐ Form 990-EZ      ☐ Form 990-T (trust other than above)      ☐ Form 5227

**STOP! Do not complete Part II if you were not already granted an automatic 3-month extension on a previously filed Form 8868.**

- The books are in the care of ▸ **TEXAS HIGHWAY PATROL MUSEUM**
  Telephone No. ▸ ( 512 ) .... 491-9117 ....   FAX No. ▸ ( 512 ) .... 491-6026
- If the organization does not have an office or place of business in the United States, check this box . . . . . ▸ ☐
- If this is for a Group Return, enter the organization's four digit Group Exemption Number (GEN) _____ . If this is for the whole group, check this box . . . . . . ▸ ☐ . If it is for part of the group, check this box . . . . . . ▸ ☐ and attach a list with the names and EINs of all members the extension is for.

4   I request an additional 3-month extension of time until ......... **NOVEMBER 15** ........, 20 **09** .
5   For calendar year **2008** , or other tax year beginning ................., 20.... , and ending ................., 20.... .
6   If this tax year is for less than 12 months, check reason: ☐ Initial return ☐ Final return ☐ Change in accounting period
7   State in detail why you need the extension ...........
    **TAXPAYER IS AWAITING INFORMATION NECESSARY TO FILE**
    **A COMPLETE AND ACCURATE RETURN.**

| | | | |
|---|---|---|---|
| 8a | If this application is for Form 990-BL, 990-PF, 990-T, 4720, or 6069, enter the tentative tax, less any nonrefundable credits. See instructions. | 8a | $ |
| b | If this application is for Form 990-PF, 990-T, 4720, or 6069, enter any refundable credits and estimated tax payments made. Include any prior year overpayment allowed as a credit and any amount paid previously with Form 8868. | | |
| | | 8b | $ |
| c | Balance Due. Subtract line 8b from line 8a. Include your payment with this form, or, if required, deposit with FTD coupon or, if required, by using EFTPS (Electronic Federal Tax Payment System). See instructions. | 8c | $ |

**Signature and Verification**

Under penalties of perjury, I declare that I have examined this form, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete, and that I am authorized to prepare this form.

Signature ▸ _____    Title ▸ **CPA**    Date ▸ **8-6-09**

Form **8868** (Rev. 4-2009)

Part III - Page 2 - Statement of Program Service Accomplishments - Continued

*See Materials Attached for Details*



**FOR OUR TROOPER MEMBERS**
Service and protection for
Texas' finest

# Form **8868**

(Rev. April 2008)

Department of the Treasury
Internal Revenue Service

## Application for Extension of Time To File an Exempt Organization Return

► File a separate application for each return.

OMB No. 1545-1709

- If you are filing for an **Automatic 3-Month Extension,** complete only Part I and check this box . . . . . . . . ► ☑
- If you are filing for an **Additional (Not Automatic) 3-Month Extension,** complete only Part II (on page 2 of this form).

*Do not complete Part II unless* you have already been granted an automatic 3-month extension on a previously filed Form 8868.

**Part I**    Automatic 3-Month Extension of Time. Only submit original (no copies needed).

A corporation required to file Form 990-T and requesting an automatic 6-month extension—check this box and complete Part I only . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ► ☐

*All other corporations (including 1120-C filers), partnerships, REMICs, and trusts must use Form 7004 to request an extension of time to file income tax returns.*

**Electronic Filing (e-file).** Generally, you can electronically file Form 8868 if you want a 3-month automatic extension of time to file one of the returns noted below (6 months for a corporation required to file Form 990-T). However, you cannot file Form 8868 electronically if (1) you want the additional (not automatic) 3-month extension or (2) you file Forms 990-BL, 6069, or 8870, group returns, or a composite or consolidated Form 990-T. Instead, you must submit the fully completed and signed page 2 (Part II) of Form 8868. For more details on the electronic filing of this form, visit *www.irs.gov/efile* and click on e-file for Charities & Nonprofits.

| Type or print | Name of Exempt Organization | Employer identification number |
|---|---|---|
| File by the due date for filing your return. See instructions | **TEXAS HIGHWAY PATROL MUSEUM** | 74 : 2639283 |
| | Number, street, and room or suite no. If a P.O box, see instructions. | |
| | **501 OAKLAND AVENUE** | |
| | City, town or post office, state, and ZIP code. For a foreign address, see instructions. | |
| | **AUSTIN, TX 78703** | |

**Check type of return to be filed** (file a separate application for each return):

- ☑ Form 990
- ☐ Form 990-BL
- ☐ Form 990-EZ
- ☐ Form 990-PF

- ☐ Form 990-T (corporation)
- ☐ Form 990-T (sec. 401(a) or 408(a) trust)
- ☐ Form 990-T (trust other than above)
- ☐ Form 1041-A

- ☐ Form 4720
- ☐ Form 5227
- ☐ Form 6069
- ☐ Form 8870

- The books are in the care of ► **TEXAS HIGHWAY PATROL MUSEUM**

Telephone No. ► ( 512 ) 491-9117      FAX No. ► ( 512 ) 491-6026

- If the organization does not have an office or place of business in the United States, check this box . . . . . . ► ☐
- If this is for a Group Return, enter the organization's four digit Group Exemption Number (GEN)_____ . If this is for the whole group, check this box . . . . . ► ☐ . If it is for part of the group, check this box . . . . . ► ☐ and attach a list with the names and EINs of all members the extension will cover.

1   I request an automatic 3-month (6 months for a corporation required to file Form 990-T) extension of time until ....**AUGUST 15**...., 20.**09**., to file the exempt organization return for the organization named above. The extension is for the organization's return for:

- ► ☑ calendar year 20..**08**.. or
- ► ☐ tax year beginning ................................, 20......, and ending ................................., 20 ......

2   If this tax year is for less than 12 months, check reason: ☐ Initial return   ☐ Final return   ☐ Change in accounting period

| | | | |
|---|---|---|---|
| 3a | If this application is for Form 990-BL, 990-PF, 990-T, 4720, or 6069, enter the tentative tax, less any nonrefundable credits. See instructions. | 3a | $ |
| b | If this application is for Form 990-PF or 990-T, enter any refundable credits and estimated tax payments made. Include any prior year overpayment allowed as a credit. | 3b | $ |
| c | **Balance Due.** Subtract line 3b from line 3a. Include your payment with this form, or, if required, deposit with FTD coupon or, if required, by using EFTPS (Electronic Federal Tax Payment System). See instructions. | 3c | $ |

**Caution.** If you are going to make an electronic fund withdrawal with this Form 8868, see Form 8453-EO and Form 8879-EO for payment instructions.

**For Privacy Act and Paperwork Reduction Act Notice, see Instructions.**      Cat No 27916D      Form **8868** (Rev. 4-2008)

EXHIBIT F

Form **990**

Department of the Treasury
Internal Revenue Service

# Return of Organization Exempt From Income Tax

Under section 501(c), 527, or 4947(a)(1) of the Internal Revenue Code (except black lung benefit trust or private foundation)

▶ The organization may have to use a copy of this return to satisfy state reporting requirements.

OMB No 1545-0047

## 2009

Open to Public Inspection

**A** For the 2009 calendar year, or tax year beginning _____ and ending _____

| B Check if applicable: | C Name of organization | D Employer identification number |
|---|---|---|
| ☐ Address change | Please use IRS label or print or type. See Specific Instructions. | TEXAS HIGHWAY PATROL MUSEUM, FORMERLY TX HWY PATROL ASSN HALL OF FAME & MUSEUM | 74-2639283 |
| ☐ Name change | | Doing Business As | |
| ☐ Initial return | | Number and street (or P.O box if mail is not delivered to street address) 501 OAKLAND AVENUE  Room/suite | E Telephone number 512-491-9117 |
| ☐ Termin-ated | | City or town, state or country, and ZIP + 4  AUSTIN, TX 78703-5113 | G Gross receipts $ 2,231,104. |
| ☐ Amended return | | | |
| ☐ Applica-tion pending | | | |

**F** Name and address of principal officer: TIM TIERNEY
SAME AS C ABOVE

**H(a)** Is this a group return for affiliates? ☐ Yes ☒ No
**H(b)** Are all affiliates included? ☐ Yes ☐ No
If "No," attach a list. (see instructions)

**I** Tax-exempt status: ☒ 501(c) ( 3 ) ◀ (insert no.) ☐ 4947(a)(1) or ☐ 527

**J** Website: ▶ WWW.TXHM.ORG

**H(c)** Group exemption number ▶

**K** Form of organization: ☒ Corporation ☐ Trust ☐ Association ☐ Other ▶ | **L** Year of formation: 1992 | **M** State of legal domicile: TX

## Part I | Summary

**Activities & Governance**

1 Briefly describe the organization's mission or most significant activities: THE ESTABLISHMENT AND OPERATION OF A HALL OF FAME AND MUSEUM TO HONOR TEXAS HIGHWAY PATROL OFFICERS

2 Check this box ▶ ☐ if the organization discontinued its operations or disposed of more than 25% of its net assets.

| | | |
|---|---|---|
| 3 Number of voting members of the governing body (Part VI, line 1a) | **3** | 6 |
| 4 Number of independent voting members of the governing body (Part VI, line 1b) | **4** | 6 |
| 5 Total number of employees (Part V, line 2a) | **5** | 384 |
| 6 Total number of volunteers (estimate if necessary) | **6** | 0 |
| 7a Total gross unrelated business revenue from Part VIII, column (C), line 12 | **7a** | 5,087. |
| b Net unrelated business taxable income from Form 990-T, line 34 | **7b** | 2,510. |

**Revenue**

| | | Prior Year | Current Year |
|---|---|---|---|
| 8 | Contributions and grants (Part VIII, line 1h) | 1,746,658. | 2,137,515. |
| 9 | Program service revenue (Part VIII, line 2g) | | |
| 10 | Investment income (Part VIII, column (A), lines 3, 4, and 7d) | 198. | 96. |
| 11 | Other revenue (Part VIII, column (A), lines 5, 6d, 8c, 9c, 10c, and 11e) | 76,461. | 78,034. |
| 12 | Total revenue - add lines 8 through 11 (must equal Part VIII, column (A), line 12) | 1,823,317. | 2,215,645. |

**Expenses**

| | | | |
|---|---|---|---|
| 13 | Grants and similar amounts paid (Part IX, column (A), lines 1-3) | | |
| 14 | Benefits paid to or for members (Part IX, column (A), line 4) | | |
| 15 | Salaries, other compensation, employee benefits (Part IX, column (A), lines 5-10) | 1,178,299. | 1,450,472. |
| 16a | Professional fundraising fees (Part IX, column (A), line 11e) | | |
| b | Total fundraising expenses (Part IX, column (D), line 25) ▶ 714,471. | | |
| 17 | Other expenses (Part IX, column (A), lines 11a-11d, 11f-24f) | 546,244. | 618,494. |
| 18 | Total expenses. Add lines 13-17 (must equal Part IX, column (A), line 25) | 1,724,543. | 2,068,966. |
| 19 | Revenue less expenses. Subtract line 18 from line 12 | 98,774. | 146,679. |

**Net Assets or Fund Balances**

| | | Beginning of Current Year | End of Year |
|---|---|---|---|
| 20 | Total assets (Part X, line 16) | 942,406. | 978,897. |
| 21 | Total liabilities (Part X, line 26) | 287,692. | 177,504. |
| 22 | Net assets or fund balances. Subtract line 21 from line 20 | 654,714. | 801,393. |

## Part II | Signature Block

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than officer) is based on all information of which preparer has any knowledge.

**Sign Here**

▶ _[signature]_ Signature of officer | ▶ 11-10-10 Date

▶ TIM TIERNEY, EXECUTIVE VICE-PRESIDENT
Type or print name and title

**Paid Preparer's Use Only**

| Preparer's signature ▶ _[signature]_ | Date 11/9/10 | Check if self-employed ▶ ☐ | Preparer's identifying number (see instructions) |
|---|---|---|---|
| Firm's name (or yours if self-employed), address, and ZIP + 4 ▶ KENNETH C. GORENCE, P.C.  P.O. BOX 28279  AUSTIN, TX 78755 | | EIN ▶ | |
| | | Phone no ▶ (512)342-8081 | |

May the IRS discuss this return with the preparer shown above? (see instructions) ☒ Yes ☐ No

932001 02-04-10 **LHA For Privacy Act and Paperwork Reduction Act Notice, see the separate instructions.**

SEE SCHEDULE O FOR ORGANIZATION MISSION STATEMENT CONTINUATION

Form **990** (2009)

**Part III** | **Statement of Program Service Accomplishments**

1  Briefly describe the organization's mission:

THE ESTABLISHMENT AND OPERATION OF A HALL OF FAME AND MUSEUM TO HONOR
TEXAS HIGHWAY PATROL OFFICERS AND TO EDUCATE THE GENERAL PUBLIC.

2  Did the organization undertake any significant program services during the year which were not listed on
the prior Form 990 or 990-EZ?
If "Yes," describe these new services on Schedule O.    ☐ Yes ☒ No

3  Did the organization cease conducting, or make significant changes in how it conducts, any program services?    ☐ Yes ☒ No
If "Yes," describe these changes on Schedule O.

4  Describe the exempt purpose achievements for each of the organization's three largest program services by expenses.
Section 501(c)(3) and 501(c)(4) organizations and section 4947(a)(1) trusts are required to report the amount of grants and
allocations to others, the total expenses, and revenue, if any, for each program service reported.

4a  (Code:          ) (Expenses $     839,968. including grants of $          ) (Revenue $   2,137,515. )
PERFORMED FUNDRAISING EFFORTS FOR AND OPERATED A MUSEUM AND A HALL OF
FAME TO HONOR TEXAS HIGHWAY PATROL OFFICERS AND TO EDUCATE THE GENERAL
PUBLIC.

4b  (Code:          ) (Expenses $          including grants of $          ) (Revenue $          )
AMONG THE SPECIFIC EXHIBITS PRESENTED IS THE HALL OF HONOR, A MEMORIAL
TO THE OFFICERS WHO LOST THEIR LIVES IN THE LINE OF DUTY.  ALSO
PRESENTED IS THE HISTORY HALL, WHICH IS DESIGNED TO EDUCATE THE GENERAL
PUBLIC ABOUT THE RICH HISTORY OF THE TEXAS HIGHWAY PATROL.

4c  (Code:          ) (Expenses $          including grants of $          ) (Revenue $          )
THE ORGANIZATION ALSO CONTINUED TO PRESENT EDUCATIONAL PROGRAMS TO
STUDENTS SPECIFICALLY TARGETING THE HAZARDS OF DRIVING UNDER THE
INFLUENCE OF ALCOHOL.

4d  Other program services. (Describe in Schedule O.)
(Expenses $          including grants of $          ) (Revenue $          )
4e  Total program service expenses ▶ $     839,968.

932002
02-04-10

TEXAS HIGHWAY PATROL MUSEUM, FORMERLY
TX HWY PATROL ASSN HALL OF FAME & MUSEUM    74-2639283    Page 3

| Part IV | Checklist of Required Schedules |
|---------|-------------------------------|

| | | | Yes | No |
|---|---|---|---|---|
| 1 | Is the organization described in section 501(c)(3) or 4947(a)(1) (other than a private foundation)? If "Yes," complete Schedule A | 1 | X | |
| 2 | Is the organization required to complete Schedule B, Schedule of Contributors? | 2 | | X |
| 3 | Did the organization engage in direct or indirect political campaign activities on behalf of or in opposition to candidates for public office? If "Yes," complete Schedule C, Part I | 3 | | X |
| 4 | **Section 501(c)(3) organizations.** Did the organization engage in lobbying activities? If "Yes," complete Schedule C, Part II | 4 | | X |
| 5 | **Section 501(c)(4), 501(c)(5), and 501(c)(6) organizations.** Is the organization subject to the section 6033(e) notice and reporting requirement and proxy tax? If "Yes," complete Schedule C, Part III | 5 | | |
| 6 | Did the organization maintain any donor advised funds or any similar funds or accounts where donors have the right to provide advice on the distribution or investment of amounts in such funds or accounts? If "Yes," complete Schedule D, Part I | 6 | | X |
| 7 | Did the organization receive or hold a conservation easement, including easements to preserve open space, the environment, historic land areas, or historic structures? If "Yes," complete Schedule D, Part II | 7 | | X |
| 8 | Did the organization maintain collections of works of art, historical treasures, or other similar assets? If "Yes," complete Schedule D, Part III | 8 | | X |
| 9 | Did the organization report an amount in Part X, line 21; serve as a custodian for amounts not listed in Part X; or provide credit counseling, debt management, credit repair, or debt negotiation services? If "Yes," complete Schedule D, Part IV | 9 | | X |
| 10 | Did the organization, directly or through a related organization, hold assets in term, permanent, or quasi-endowments? If "Yes," complete Schedule D, Part V | 10 | | X |
| 11 | Is the organization's answer to any of the following questions "Yes"? If so, complete Schedule D, Parts VI, VII, VIII, IX, or X as applicable | 11 | X | |
| • | Did the organization report an amount for land, buildings, and equipment in Part X, line 10? If "Yes," complete Schedule D, Part VI. | | | |
| • | Did the organization report an amount for investments · other securities in Part X, line 12 that is 5% or more of its total assets reported in Part X, line 16? If "Yes," complete Schedule D, Part VII. | | | |
| • | Did the organization report an amount for investments · program related in Part X, line 13 that is 5% or more of its total assets reported in Part X, line 16? If "Yes," complete Schedule D, Part VIII. | | | |
| • | Did the organization report an amount for other assets in Part X, line 15 that is 5% or more of its total assets reported in Part X, line 16? If "Yes," complete Schedule D, Part IX. | | | |
| • | Did the organization report an amount for other liabilities in Part X, line 25? If "Yes," complete Schedule D, Part X. | | | |
| • | Did the organization's separate or consolidated financial statements for the tax year include a footnote that addresses the organization's liability for uncertain tax positions under FIN 48? If "Yes," complete Schedule D, Part X. | | | |
| 12 | Did the organization obtain separate, independent audited financial statements for the tax year? If "Yes," complete Schedule D, Parts XI, XII, and XIII. | 12 | | X |
| 12A | Was the organization included in consolidated, independent audited financial statements for the tax year? If "Yes," completing Schedule D, Parts XI, XII, and XIII is optional     12A  Yes / No  X | | | |
| 13 | Is the organization a school described in section 170(b)(1)(A)(ii)? If "Yes," complete Schedule E | 13 | | X |
| 14a | Did the organization maintain an office, employees, or agents outside of the United States? | 14a | | X |
| b | Did the organization have aggregate revenues or expenses of more than $10,000 from grantmaking, fundraising, business, and program service activities outside the United States? If "Yes," complete Schedule F, Part I | 14b | | X |
| 15 | Did the organization report on Part IX, column (A), line 3, more than $5,000 of grants or assistance to any organization or entity located outside the United States? If "Yes," complete Schedule F, Part II | 15 | | X |
| 16 | Did the organization report on Part IX, column (A), line 3, more than $5,000 of aggregate grants or assistance to individuals located outside the United States? If "Yes," complete Schedule F, Part III | 16 | | X |
| 17 | Did the organization report a total of more than $15,000 of expenses for professional fundraising services on Part IX, column (A), lines 6 and 11e? If "Yes," complete Schedule G, Part I | 17 | | X |
| 18 | Did the organization report more than $15,000 total of fundraising event gross income and contributions on Part VIII, lines 1c and 8a? If "Yes," complete Schedule G, Part II | 18 | | X |
| 19 | Did the organization report more than $15,000 of gross income from gaming activities on Part VIII, line 9a? If "Yes," complete Schedule G, Part III | 19 | | X |
| 20 | Did the organization operate one or more hospitals? If "Yes," complete Schedule H | 20 | | X |

Form **990** (2009)

932003
02-04-10

TEXAS HIGHWAY PATROL MUSEUM, FORMERLY
TX HWY PATROL ASSN HALL OF FAME & MUSEUM    74-2639283    Page **4**

| Part IV | Checklist of Required Schedules (continued) |
|---|---|

|  |  | Yes | No |
|---|---|---|---|
| 21 | Did the organization report more than $5,000 of grants and other assistance to governments and organizations in the United States on Part IX, column (A), line 1? If "Yes," complete Schedule I, Parts I and II **21** | | X |
| 22 | Did the organization report more than $5,000 of grants and other assistance to individuals in the United States on Part IX, column (A), line 2? If "Yes," complete Schedule I, Parts I and III **22** | | X |
| 23 | Did the organization answer "Yes" to Part VII, Section A, line 3, 4, or 5 about compensation of the organization's current and former officers, directors, trustees, key employees, and highest compensated employees? If "Yes," complete Schedule J **23** | X | |
| 24a | Did the organization have a tax-exempt bond issue with an outstanding principal amount of more than $100,000 as of the last day of the year, that was issued after December 31, 2002? If "Yes," answer lines 24b through 24d and complete Schedule K. If "No", go to line 25 **24a** | | X |
| b | Did the organization invest any proceeds of tax-exempt bonds beyond a temporary period exception? **24b** | | |
| c | Did the organization maintain an escrow account other than a refunding escrow at any time during the year to defease any tax-exempt bonds? **24c** | | |
| d | Did the organization act as an "on behalf of" issuer for bonds outstanding at any time during the year? **24d** | | |
| 25a | **Section 501(c)(3) and 501(c)(4) organizations.** Did the organization engage in an excess benefit transaction with a disqualified person during the year? If "Yes," complete Schedule L, Part I **25a** | | X |
| b | Is the organization aware that it engaged in an excess benefit transaction with a disqualified person in a prior year, and that the transaction has not been reported on any of the organization's prior Forms 990 or 990-EZ? If "Yes," complete Schedule L, Part I **25b** | | X |
| 26 | Was a loan to or by a current or former officer, director, trustee, key employee, highly compensated employee, or disqualified person outstanding as of the end of the organization's tax year? If "Yes," complete Schedule L, Part II **26** | | X |
| 27 | Did the organization provide a grant or other assistance to an officer, director, trustee, key employee, substantial contributor, or a grant selection committee member, or to a person related to such an individual? If "Yes," complete Schedule L, Part III **27** | | X |
| 28 | Was the organization a party to a business transaction with one of the following parties, (see Schedule L, Part IV instructions for applicable filing thresholds, conditions, and exceptions): | | |
| a | A current or former officer, director, trustee, or key employee? If "Yes," complete Schedule L, Part IV **28a** | | X |
| b | A family member of a current or former officer, director, trustee, or key employee? If "Yes," complete Schedule L, Part IV **28b** | | X |
| c | An entity of which a current or former officer, director, trustee, or key employee of the organization (or a family member) was an officer, director, trustee, or direct or indirect owner? If "Yes," complete Schedule L, Part IV **28c** | | X |
| 29 | Did the organization receive more than $25,000 in non-cash contributions? If "Yes," complete Schedule M **29** | | X |
| 30 | Did the organization receive contributions of art, historical treasures, or other similar assets, or qualified conservation contributions? If "Yes," complete Schedule M **30** | | X |
| 31 | Did the organization liquidate, terminate, or dissolve and cease operations? If "Yes," complete Schedule N, Part I **31** | | X |
| 32 | Did the organization sell, exchange, dispose of, or transfer more than 25% of its net assets? If "Yes," complete Schedule N, Part II **32** | | X |
| 33 | Did the organization own 100% of an entity disregarded as separate from the organization under Regulations sections 301.7701-2 and 301.7701-3? If "Yes," complete Schedule R, Part I **33** | | X |
| 34 | Was the organization related to any tax-exempt or taxable entity? If "Yes," complete Schedule R, Parts II, III, IV, and V, line 1 **34** | X | |
| 35 | Is any related organization a controlled entity within the meaning of section 512(b)(13)? If "Yes," complete Schedule R, Part V, line 2 **35** | | X |
| 36 | **Section 501(c)(3) organizations.** Did the organization make any transfers to an exempt non-charitable related organization? If "Yes," complete Schedule R, Part V, line 2 **36** | X | |
| 37 | Did the organization conduct more than 5% of its activities through an entity that is not a related organization and that is treated as a partnership for federal income tax purposes? If "Yes," complete Schedule R, Part VI **37** | | X |
| 38 | Did the organization complete Schedule O and provide explanations in Schedule O for Part VI, lines 11 and 19? **Note.** All Form 990 filers are required to complete Schedule O. **38** | X | |

Form **990** (2009)

932004
02-04-10

TEXAS HIGHWAY PATROL MUSEUM, FORMERLY
TX HWY PATROL ASSN HALL OF FAME & MUSEUM     74-2639283     Page **5**

| Part V | Statements Regarding Other IRS Filings and Tax Compliance |
|---|---|

|  |  |  | Yes | No |
|---|---|---|---|---|
| **1a** Enter the number reported in Box 3 of Form 1096, Annual Summary and Transmittal of U.S. Information Returns. Enter -0- if not applicable | **1a** | 0 |  |  |
| **b** Enter the number of Forms W-2G included in line 1a. Enter -0- if not applicable | **1b** | 0 |  |  |
| **c** Did the organization comply with backup withholding rules for reportable payments to vendors and reportable gaming (gambling) winnings to prize winners? | **1c** |  |  |  |
| **2a** Enter the number of employees reported on Form W-3, Transmittal of Wage and Tax Statements, filed for the calendar year ending with or within the year covered by this return | **2a** | 384 |  |  |
| **b** If at least one is reported on line 2a, did the organization file all required federal employment tax returns? | **2b** |  | X |  |
| **Note.** If the sum of lines 1a and 2a is greater than 250, you may be required to *e-file* this return. (see instructions) |  |  |  |  |
| **3a** Did the organization have unrelated business gross income of $1,000 or more during the year covered by this return? | **3a** |  | X |  |
| **b** If "Yes," has it filed a Form 990-T for this year? If "No," *provide an explanation in Schedule O* | **3b** |  | X |  |
| **4a** At any time during the calendar year, did the organization have an interest in, or a signature or other authority over, a financial account in a foreign country (such as a bank account, securities account, or other financial account)? | **4a** |  |  | X |
| **b** If "Yes," enter the name of the foreign country: ▶ |  |  |  |  |
| See the instructions for exceptions and filing requirements for Form TD F 90-22.1, Report of Foreign Bank and Financial Accounts. |  |  |  |  |
| **5a** Was the organization a party to a prohibited tax shelter transaction at any time during the tax year? | **5a** |  |  | X |
| **b** Did any taxable party notify the organization that it was or is a party to a prohibited tax shelter transaction? | **5b** |  |  | X |
| **c** If "Yes," to line 5a or 5b, did the organization file Form 8886-T, Disclosure by Tax-Exempt Entity Regarding Prohibited Tax Shelter Transaction? | **5c** |  |  |  |
| **6a** Does the organization have annual gross receipts that are normally greater than $100,000, and did the organization solicit any contributions that were not tax deductible? | **6a** |  |  | X |
| **b** If "Yes," did the organization include with every solicitation an express statement that such contributions or gifts were not tax deductible? | **6b** |  |  |  |
| **7** **Organizations that may receive deductible contributions under section 170(c).** |  |  |  |  |
| **a** Did the organization receive a payment in excess of $75 made partly as a contribution and partly for goods and services provided to the payor? | **7a** |  |  | X |
| **b** If "Yes," did the organization notify the donor of the value of the goods or services provided? | **7b** |  |  |  |
| **c** Did the organization sell, exchange, or otherwise dispose of tangible personal property for which it was required to file Form 8282? | **7c** |  |  | X |
| **d** If "Yes," indicate the number of Forms 8282 filed during the year | **7d** |  |  |  |
| **e** Did the organization, during the year, receive any funds, directly or indirectly, to pay premiums on a personal benefit contract? | **7e** |  |  | X |
| **f** Did the organization, during the year, pay premiums, directly or indirectly, on a personal benefit contract? | **7f** |  |  | X |
| **g** For all contributions of qualified intellectual property, did the organization file Form 8899 as required? | **7g** |  |  |  |
| **h** For contributions of cars, boats, airplanes, and other vehicles, did the organization file a Form 1098-C as required? | **7h** |  |  |  |
| **8** **Sponsoring organizations maintaining donor advised funds and section 509(a)(3) supporting organizations.** Did the supporting organization, or a donor advised fund maintained by a sponsoring organization, have excess business holdings at any time during the year? | **8** |  |  |  |
| **9** **Sponsoring organizations maintaining donor advised funds.** |  |  |  |  |
| **a** Did the organization make any taxable distributions under section 4966? | **9a** |  |  |  |
| **b** Did the organization make a distribution to a donor, donor advisor, or related person? | **9b** |  |  |  |
| **10** **Section 501(c)(7) organizations.** Enter: |  |  |  |  |
| **a** Initiation fees and capital contributions included on Part VIII, line 12 | **10a** |  |  |  |
| **b** Gross receipts, included on Form 990, Part VIII, line 12, for public use of club facilities | **10b** |  |  |  |
| **11** **Section 501(c)(12) organizations.** Enter: |  |  |  |  |
| **a** Gross income from members or shareholders | **11a** |  |  |  |
| **b** Gross income from other sources (Do not net amounts due or paid to other sources against amounts due or received from them.) | **11b** |  |  |  |
| **12a** **Section 4947(a)(1) non-exempt charitable trusts.** Is the organization filing Form 990 in lieu of Form 1041? | **12a** |  |  |  |
| **b** If "Yes," enter the amount of tax-exempt interest received or accrued during the year | **12b** |  |  |  |

Form **990** (2009)

TEXAS HIGHWAY PATROL MUSEUM, FORMERLY
TX HWY PATROL ASSN HALL OF FAME & MUSEUM          74-2639283          Page **6**

| **Part VI** | Governance, Management, and Disclosure | *For each "Yes" response to lines 2 through 7b below, and for a "No" response to line 8a, 8b, or 10b below, describe the circumstances, processes, or changes in Schedule O. See instructions.* |

### Section A. Governing Body and Management

|  |  |  | Yes | No |
|---|---|---|---|---|
| **1a** | Enter the number of voting members of the governing body | **1a** | 6 | |
| **b** | Enter the number of voting members that are independent | **1b** | 6 | |
| **2** | Did any officer, director, trustee, or key employee have a family relationship or a business relationship with any other officer, director, trustee, or key employee? | **2** | | X |
| **3** | Did the organization delegate control over management duties customarily performed by or under the direct supervision of officers, directors or trustees, or key employees to a management company or other person? | **3** | | X |
| **4** | Did the organization make any significant changes to its organizational documents since the prior Form 990 was filed? | **4** | | X |
| **5** | Did the organization become aware during the year of a material diversion of the organization's assets? | **5** | | X |
| **6** | Does the organization have members or stockholders? | **6** | | X |
| **7a** | Does the organization have members, stockholders, or other persons who may elect one or more members of the governing body? | **7a** | | X |
| **b** | Are any decisions of the governing body subject to approval by members, stockholders, or other persons? | **7b** | | X |
| **8** | Did the organization contemporaneously document the meetings held or written actions undertaken during the year by the following: | | | |
| **a** | The governing body? | **8a** | X | |
| **b** | Each committee with authority to act on behalf of the governing body? | **8b** | X | |
| **9** | Is there any officer, director, trustee, or key employee listed in Part VII, Section A, who cannot be reached at the organization's mailing address? *If "Yes," provide the names and addresses in Schedule O* | **9** | | X |

### Section B. Policies *(This Section B requests information about policies not required by the Internal Revenue Code.)*

|  |  |  | Yes | No |
|---|---|---|---|---|
| **10a** | Does the organization have local chapters, branches, or affiliates? | **10a** | | X |
| **b** | If "Yes," does the organization have written policies and procedures governing the activities of such chapters, affiliates, and branches to ensure their operations are consistent with those of the organization? | **10b** | | |
| **11** | Has the organization provided a copy of this Form 990 to all members of its governing body before filing the form? | **11** | | X |
| **11A** | Describe in Schedule O the process, if any, used by the organization to review this Form 990. | | | |
| **12a** | Does the organization have a written conflict of interest policy? *If "No," go to line 13* | **12a** | X | |
| **b** | Are officers, directors or trustees, and key employees required to disclose annually interests that could give rise to conflicts? | **12b** | X | |
| **c** | Does the organization regularly and consistently monitor and enforce compliance with the policy? *If "Yes," describe in Schedule O how this is done* | **12c** | X | |
| **13** | Does the organization have a written whistleblower policy? | **13** | X | |
| **14** | Does the organization have a written document retention and destruction policy? | **14** | X | |
| **15** | Did the process for determining compensation of the following persons include a review and approval by independent persons, comparability data, and contemporaneous substantiation of the deliberation and decision? | | | |
| **a** | The organization's CEO, Executive Director, or top management official | **15a** | | X |
| **b** | Other officers or key employees of the organization | **15b** | | X |
|  | If "Yes" to line 15a or 15b, describe the process in Schedule O. (See instructions.) | | | |
| **16a** | Did the organization invest in, contribute assets to, or participate in a joint venture or similar arrangement with a taxable entity during the year? | **16a** | | X |
| **b** | If "Yes," has the organization adopted a written policy or procedure requiring the organization to evaluate its participation in joint venture arrangements under applicable federal tax law, and taken steps to safeguard the organization's exempt status with respect to such arrangements? | **16b** | | |

### Section C. Disclosure

**17** List the states with which a copy of this Form 990 is required to be filed ▶ TX

**18** Section 6104 requires an organization to make its Forms 1023 (or 1024 if applicable), 990, and 990-T (501(c)(3)s only) available for public inspection. Indicate how you make these available. Check all that apply.
☐ Own website    ☐ Another's website    ☒ Upon request

**19** Describe in Schedule O whether (and if so, how), the organization makes its governing documents, conflict of interest policy, and financial statements available to the public.

**20** State the name, physical address, and telephone number of the person who possesses the books and records of the organization: ▶
TIM TIERNEY - (512) 491-9117
501 OAKLAND AVENUE, AUSTIN, TX  78703-5113

932006
02-04-10

Form **990** (2009)

TEXAS HIGHWAY PATROL MUSEUM, FORMERLY
TX HWY PATROL ASSN HALL OF FAME & MUSEUM    74-2639283    Page **7**

| **Part VII** | Compensation of Officers, Directors, Trustees, Key Employees, Highest Compensated Employees, and Independent Contractors |

**Section A.** Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees

**1a** Complete this table for all persons required to be listed. Report compensation for the calendar year ending with or within the organization's tax year. Use Schedule J-2 if additional space is needed.

• List all of the organization's **current** officers, directors, trustees (whether individuals or organizations), regardless of amount of compensation. Enter -0- in columns (D), (E), and (F) if no compensation was paid.

• List all of the organization's **current** key employees. See instructions for definition of "key employee."

• List the organization's five current highest compensated employees (other than an officer, director, trustee, or key employee) who received reportable compensation (Box 5 of Form W-2 and/or Box 7 of Form 1099-MISC) of more than $100,000 from the organization and any related organizations.

• List all of the organization's **former** officers, key employees, and highest compensated employees who received more than $100,000 of reportable compensation from the organization and any related organizations.

• List all of the organization's **former directors or trustees** that received, in the capacity as a former director or trustee of the organization, more than $10,000 of reportable compensation from the organization and any related organizations.

List persons in the following order: individual trustees or directors; institutional trustees; officers; key employees; highest compensated employees; and former such persons.

☐ Check this box if the organization did not compensate any current officer, director, or trustee.

| (A) Name and Title | (B) Average hours per week | (C) Position (check all that apply) | | | | | | (D) Reportable compensation from the organization (W-2/1099-MISC) | (E) Reportable compensation from related organizations (W-2/1099-MISC) | (F) Estimated amount of other compensation from the organization and related organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Individual trustee or director | Institutional trustee | Officer | Key employee | Highest compensated employee | Former | | | |
| MARK LOCKRIDGE PRESIDENT | 5.00 | X | | X | | | | 0. | 0. | 0. |
| GREGG GREER DIRECTOR | 5.00 | X | | | | | | 0. | 0. | 0. |
| FRED RIOJAS DIRECTOR | 5.00 | X | | | | | | 0. | 0. | 0. |
| TED RIOJAS DIRECTOR | 5.00 | X | | | | | | 0. | 0. | 0. |
| ROBERT BERNARD, JR. DIRECTOR | 5.00 | X | | | | | | 0. | 0. | 0. |
| JAMES COLUNGA DIRECTOR | 5.00 | X | | | | | | 0. | 0. | 0. |
| TIM TIERNEY EXECUTIVE VICE-PRESIDENT | 40.00 | | | X | | | | 118,302. | 76,091. | 0. |
| C.R. VILLALVA DIRECTOR OF MARKETING | 40.00 | | | X | | | | 211,190. | 0. | 0. |

932007 02-04-10

TEXAS HIGHWAY PATROL MUSEUM, FORMERLY
TX HWY PATROL ASSN HALL OF FAME & MUSEUM     74-2639283     Page **8**

**Part VII** Section A. Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees (continued)

| (A) Name and title | (B) Average hours per week | (C) Position (check all that apply) | | | | | | (D) Reportable compensation from the organization (W-2/1099-MISC) | (E) Reportable compensation from related organizations (W-2/1099-MISC) | (F) Estimated amount of other compensation from the organization and related organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Individual trustee or director | Institutional trustee | Officer | Key employee | Highest compensated employee | Former | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| **1b  Total** ▶ | | | | | | | | 329,492. | 76,091. | 0. |

**2** Total number of individuals (including but not limited to those listed above) who received more than $100,000 in reportable compensation from the organization  ▶

2

| | | Yes | No |
|---|---|---|---|
| **3** | Did the organization list any **former** officer, director or trustee, key employee, or highest compensated employee on line 1a? *If "Yes," complete Schedule J for such individual* | | |
| | **3** | | X |
| **4** | For any individual listed on line 1a, is the sum of reportable compensation and other compensation from the organization and related organizations greater than $150,000? *If "Yes," complete Schedule J for such individual* | | |
| | **4** | X | |
| **5** | Did any person listed on line 1a receive or accrue compensation from any unrelated organization for services rendered to the organization? *If "Yes," complete Schedule J for such person* | | |
| | **5** | | X |

**Section B. Independent Contractors**

**1**   Complete this table for your five highest compensated independent contractors that received more than $100,000 of compensation from the organization.     NONE

| (A) Name and business address | (B) Description of services | (C) Compensation |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

**2**   Total number of independent contractors (including but not limited to those listed above) who received more than $100,000 in compensation from the organization  ▶     0

932008 02-04-10

Form **990** (2009)

TEXAS HIGHWAY PATROL MUSEUM, FORMERLY
TX HWY PATROL ASSN HALL OF FAME & MUSEUM    74-2639283    Page **9**

| **Part VIII** | **Statement of Revenue** | | | (A) Total revenue | (B) Related or exempt function revenue | (C) Unrelated business revenue | (D) Revenue excluded from tax under sections 512, 513, or 514 |
|---|---|---|---|---|---|---|---|
| **Contributions, gifts, grants and other similar amounts** | **1 a** Federated campaigns | 1a | | | | | |
| | **b** Membership dues | 1b | | | | | |
| | **c** Fundraising events | 1c | | | | | |
| | **d** Related organizations | 1d | | | | | |
| | **e** Government grants (contributions) | 1e | | | | | |
| | **f** All other contributions, gifts, grants, and similar amounts not included above | 1f | 2,137,515. | | | | |
| | **g** Noncash contributions included in lines 1a-1f $ | | | | | | |
| | **h** Total. Add lines 1a-1f ▶ | | | 2,137,515. | | | |
| **Program Service Revenue** | **2 a** | Business Code | | | | | |
| | **b** | | | | | | |
| | **c** | | | | | | |
| | **d** | | | | | | |
| | **e** | | | | | | |
| | **f** All other program service revenue | | | | | | |
| | **g** Total. Add lines 2a-2f ▶ | | | | | | |
| **Other Revenue** | **3** Investment income (including dividends, interest, and other similar amounts) ▶ | | | 96. | | | 96. |
| | **4** Income from investment of tax-exempt bond proceeds ▶ | | | | | | |
| | **5** Royalties ▶ | | | | | | |
| | | (i) Real | (ii) Personal | | | | |
| | **6 a** Gross Rents | 92,720. | | | | | |
| | **b** Less: rental expenses | 15,459. | | | | | |
| | **c** Rental income or (loss) | 77,261. | | | | | |
| | **d** Net rental income or (loss) ▶ | | | 77,261. | | 5,087. | 72,174. |
| | **7 a** Gross amount from sales of assets other than inventory | (i) Securities | (ii) Other | | | | |
| | **b** Less: cost or other basis and sales expenses | | | | | | |
| | **c** Gain or (loss) | | | | | | |
| | **d** Net gain or (loss) ▶ | | | | | | |
| | **8 a** Gross income from fundraising events (not including $ _____ of contributions reported on line 1c). See Part IV, line 18 | a | | | | | |
| | **b** Less: direct expenses | b | | | | | |
| | **c** Net income or (loss) from fundraising events ▶ | | | | | | |
| | **9 a** Gross income from gaming activities. See Part IV, line 19 | a | | | | | |
| | **b** Less: direct expenses | b | | | | | |
| | **c** Net income or (loss) from gaming activities ▶ | | | | | | |
| | **10 a** Gross sales of inventory, less returns and allowances | a | 773. | | | | |
| | **b** Less: cost of goods sold | b | | | | | |
| | **c** Net income or (loss) from sales of inventory ▶ | | | 773. | | | 773. |
| | | Miscellaneous Revenue | Business Code | | | | |
| | **11 a** | | | | | | |
| | **b** | | | | | | |
| | **c** | | | | | | |
| | **d** All other revenue | | | | | | |
| | **e** Total. Add lines 11a-11d ▶ | | | | | | |
| | **12** Total revenue. See instructions ▶ | | | 2,215,645. | 0. | 5,087. | 73,043. |

932009
02-04-10

TEXAS HIGHWAY PATROL MUSEUM, FORMERLY
TX HWY PATROL ASSN HALL OF FAME & MUSEUM    74-2639283    Page **10**

## Part IX | Statement of Functional Expenses

Section 501(c)(3) and 501(c)(4) organizations must complete all columns.
All other organizations must complete column (A) but are not required to complete columns (B), (C), and (D).

| Do not include amounts reported on lines 6b, 7b, 8b, 9b, and 10b of Part VIII. | (A) Total expenses | (B) Program service expenses | (C) Management and general expenses | (D) Fundraising expenses |
|---|---|---|---|---|
| 1 Grants and other assistance to governments and organizations in the U.S. See Part IV, line 21 | | | | |
| 2 Grants and other assistance to individuals in the U.S. See Part IV, line 22 | | | | |
| 3 Grants and other assistance to governments, organizations, and individuals outside the U.S. See Part IV, lines 15 and 16 | | | | |
| 4 Benefits paid to or for members | | | | |
| 5 Compensation of current officers, directors, trustees, and key employees | 329,492. | 174,035. | 101,389. | 54,068. |
| 6 Compensation not included above, to disqualified persons (as defined under section 4958(f)(1)) and persons described in section 4958(c)(3)(B) | | | | |
| 7 Other salaries and wages | 1,021,255. | 388,385. | 180,277. | 452,593. |
| 8 Pension plan contributions (include section 401(k) and section 403(b) employer contributions) | | | | |
| 9 Other employee benefits | | | | |
| 10 Payroll taxes | 99,725. | 38,224. | 51,945. | 9,556. |
| 11 Fees for services (non-employees): | | | | |
| a Management | | | | |
| b Legal | 4,112. | | 3,812. | 300. |
| c Accounting | 19,623. | 10,351. | 4,636. | 4,636. |
| d Lobbying | | | | |
| e Professional fundraising services See Part IV, line 17 | | | | |
| f Investment management fees | | | | |
| g Other | | | | |
| 12 Advertising and promotion | 215. | | | 215. |
| 13 Office expenses | 23,670. | 11,364. | 6,153. | 6,153. |
| 14 Information technology | | | | |
| 15 Royalties | | | | |
| 16 Occupancy | 146,637. | 62,224. | 42,186. | 42,227. |
| 17 Travel | 11,703. | | 4,649. | 7,054. |
| 18 Payments of travel or entertainment expenses for any federal, state, or local public officials | | | | |
| 19 Conferences, conventions, and meetings | 24,118. | 24,118. | | |
| 20 Interest | 6,661. | 3,806. | 1,903. | 952. |
| 21 Payments to affiliates | | | | |
| 22 Depreciation, depletion, and amortization | 20,277. | | 20,277. | |
| 23 Insurance | 54,337. | 23,246. | 20,193. | 10,898. |
| 24 Other expenses. Itemize expenses not covered above (Expenses grouped together and labeled miscellaneous may not exceed 5% of total expenses shown on line 25 below.) | | | | |
| a TELEPHONE | 114,046. | 39,099. | 19,007. | 55,940. |
| b POSTAGE | 103,898. | 41,612. | 31,143. | 31,143. |
| c PRINTING | 41,928. | 16,804. | 12,562. | 12,562. |
| d DECALS | 12,682. | | | 12,682. |
| e AUTO EXPENSE | 10,908. | | 5,454. | 5,454. |
| f All other expenses | 23,679. | 6,700. | 8,941. | 8,038. |
| 25 Total functional expenses. Add lines 1 through 24f | 2,068,966. | 839,968. | 514,527. | 714,471. |
| 26 Joint costs. Check here ▶ ☐ if following SOP 98-2. Complete this line only if the organization reported in column (B) joint costs from a combined educational campaign and fundraising solicitation | | | | |

932010 02-04-10

Form **990** (2009)

TEXAS HIGHWAY PATROL MUSEUM, FORMERLY
TX HWY PATROL ASSN HALL OF FAME & MUSEUM   74-2639283   Page **11**

**Part X** | **Balance Sheet**

| | | | | (A)<br>Beginning of year | | (B)<br>End of year |
|---|---|---|---|---|---|---|
| **Assets** | 1 | Cash - non-interest-bearing | | 61,536. | 1 | 101,091. |
| | 2 | Savings and temporary cash investments | | | 2 | |
| | 3 | Pledges and grants receivable, net | | | 3 | |
| | 4 | Accounts receivable, net | | | 4 | |
| | 5 | Receivables from current and former officers, directors, trustees, key employees, and highest compensated employees. Complete Part II of Schedule L | | | 5 | |
| | 6 | Receivables from other disqualified persons (as defined under section 4958(f)(1)) and persons described in section 4958(c)(3)(B). Complete Part II of Schedule L | | | 6 | |
| | 7 | Notes and loans receivable, net | | | 7 | |
| | 8 | Inventories for sale or use | | 2,100. | 8 | 2,100. |
| | 9 | Prepaid expenses and deferred charges | | 21,124. | 9 | 17,054. |
| | 10a | Land, buildings, and equipment: cost or other basis. Complete Part VI of Schedule D   10a 917,972. | | | | |
| | b | Less: accumulated depreciation   10b 110,299. | | 806,167. | 10c | 807,673. |
| | 11 | Investments - publicly traded securities | | | 11 | |
| | 12 | Investments - other securities. See Part IV, line 11 | | | 12 | |
| | 13 | Investments - program-related. See Part IV, line 11 | | | 13 | |
| | 14 | Intangible assets | | | 14 | |
| | 15 | Other assets. See Part IV, line 11 | | 51,479. | 15 | 50,979. |
| | 16 | **Total assets.** Add lines 1 through 15 (must equal line 34) | | 942,406. | 16 | 978,897. |
| **Liabilities** | 17 | Accounts payable and accrued expenses | | 17,052. | 17 | 31,317. |
| | 18 | Grants payable | | | 18 | |
| | 19 | Deferred revenue | | | 19 | |
| | 20 | Tax-exempt bond liabilities | | | 20 | |
| | 21 | Escrow or custodial account liability. Complete Part IV of Schedule D | | | 21 | |
| | 22 | Payables to current and former officers, directors, trustees, key employees, highest compensated employees, and disqualified persons. Complete Part II of Schedule L | | | 22 | |
| | 23 | Secured mortgages and notes payable to unrelated third parties | | 171,799. | 23 | 72,685. |
| | 24 | Unsecured notes and loans payable to unrelated third parties | | | 24 | |
| | 25 | Other liabilities. Complete Part X of Schedule D | | 98,841. | 25 | 73,502. |
| | 26 | **Total liabilities.** Add lines 17 through 25 | | 287,692. | 26 | 177,504. |
| **Net Assets or Fund Balances** | | Organizations that follow SFAS 117, check here ▶ ☐ and complete lines 27 through 29, and lines 33 and 34. | | | | |
| | 27 | Unrestricted net assets | | | 27 | |
| | 28 | Temporarily restricted net assets | | | 28 | |
| | 29 | Permanently restricted net assets | | | 29 | |
| | | Organizations that do not follow SFAS 117, check here ▶ ☒ and complete lines 30 through 34. | | | | |
| | 30 | Capital stock or trust principal, or current funds | | 0. | 30 | 0. |
| | 31 | Paid-in or capital surplus, or land, building, or equipment fund | | 0. | 31 | 0. |
| | 32 | Retained earnings, endowment, accumulated income, or other funds | | 654,714. | 32 | 801,393. |
| | 33 | Total net assets or fund balances | | 654,714. | 33 | 801,393. |
| | 34 | Total liabilities and net assets/fund balances | | 942,406. | 34 | 978,897. |

Form **990** (2009)

11

TEXAS HIGHWAY PATROL MUSEUM, FORMERLY
TX HWY PATROL ASSN HALL OF FAME & MUSEUM     74-2639283     Page **12**

| **Part XI** | **Financial Statements and Reporting** |

| | | Yes | No |
|---|---|---|---|
| **1** | Accounting method used to prepare the Form 990: [X] Cash ☐ Accrual ☐ Other _____ If the organization changed its method of accounting from a prior year or checked "Other," explain in Schedule O. | | |
| **2a** | Were the organization's financial statements compiled or reviewed by an independent accountant? **2a** | X | |
| **b** | Were the organization's financial statements audited by an independent accountant? . . . . **2b** | | X |
| **c** | If "Yes" to line 2a or 2b, does the organization have a committee that assumes responsibility for oversight of the audit, review, or compilation of its financial statements and selection of an independent accountant? . . . . . **2c** | | X |
| | If the organization changed either its oversight process or selection process during the tax year, explain in Schedule O. | | |
| **d** | If "Yes" to line 2a or 2b, check a box below to indicate whether the financial statements for the year were issued on a consolidated basis, separate basis, or both: [X] Separate basis ☐ Consolidated basis ☐ Both consolidated and separate basis | | |
| **3a** | As a result of a federal award, was the organization required to undergo an audit or audits as set forth in the Single Audit Act and OMB Circular A-133? . . . . . . . . . . . . . . . . . . . . . **3a** | | X |
| **b** | If "Yes," did the organization undergo the required audit or audits? If the organization did not undergo the required audit or audits, explain why in Schedule O and describe any steps taken to undergo such audits. . . . **3b** | | |

Form **990** (2009)

932012 02-04-10

**SCHEDULE A**
(Form 990 or 990-EZ)

Department of the Treasury
Internal Revenue Service

# Public Charity Status and Public Support

Complete if the organization is a section 501(c)(3) organization or a section 4947(a)(1) nonexempt charitable trust.

► Attach to Form 990 or Form 990-EZ. ► See separate instructions.

OMB No 1545-0047

## 2009

Open to Public Inspection

Name of the organization  TEXAS HIGHWAY PATROL MUSEUM, FORMERLY
TX HWY PATROL ASSN HALL OF FAME & MUSEUM

Employer identification number
74-2639283

| **Part I** | **Reason for Public Charity Status** (All organizations must complete this part.) See instructions. |

The organization is not a private foundation because it is: (For lines 1 through 11, check only one box.)

1 ☐ A church, convention of churches, or association of churches described in **section 170(b)(1)(A)(i)**.

2 ☐ A school described in **section 170(b)(1)(A)(ii)**. (Attach Schedule E.)

3 ☐ A hospital or a cooperative hospital service organization described in **section 170(b)(1)(A)(iii)**.

4 ☐ A medical research organization operated in conjunction with a hospital described in **section 170(b)(1)(A)(iii)**. Enter the hospital's name, city, and state: _____

5 ☐ An organization operated for the benefit of a college or university owned or operated by a governmental unit described in **section 170(b)(1)(A)(iv)**. (Complete Part II.)

6 ☐ A federal, state, or local government or governmental unit described in **section 170(b)(1)(A)(v)**.

7 ☒ An organization that normally receives a substantial part of its support from a governmental unit or from the general public described in **section 170(b)(1)(A)(vi)**. (Complete Part II.)

8 ☐ A community trust described in **section 170(b)(1)(A)(vi)**. (Complete Part II.)

9 ☐ An organization that normally receives: (1) more than 33 1/3% of its support from contributions, membership fees, and gross receipts from activities related to its exempt functions - subject to certain exceptions, and (2) no more than 33 1/3% of its support from gross investment income and unrelated business taxable income (less section 511 tax) from businesses acquired by the organization after June 30, 1975. See **section 509(a)(2)**. (Complete Part III.)

10 ☐ An organization organized and operated exclusively to test for public safety. See **section 509(a)(4)**.

11 ☐ An organization organized and operated exclusively for the benefit of, to perform the functions of, or to carry out the purposes of one or more publicly supported organizations described in section 509(a)(1) or section 509(a)(2). See **section 509(a)(3)**. Check the box that describes the type of supporting organization and complete lines 11e through 11h.

a ☐ Type I   b ☐ Type II   c ☐ Type III - Functionally integrated   d ☐ Type III - Other

e ☐ By checking this box, I certify that the organization is not controlled directly or indirectly by one or more disqualified persons other than foundation managers and other than one or more publicly supported organizations described in section 509(a)(1) or section 509(a)(2).

f  If the organization received a written determination from the IRS that it is a Type I, Type II, or Type III supporting organization, check this box ☐

g  Since August 17, 2006, has the organization accepted any gift or contribution from any of the following persons?

| | | Yes | No |
|---|---|---|---|
| (i) A person who directly or indirectly controls, either alone or together with persons described in (ii) and (iii) below, the governing body of the supported organization? | **11g(i)** | | |
| (ii) A family member of a person described in (i) above? | **11g(ii)** | | |
| (iii) A 35% controlled entity of a person described in (i) or (ii) above? | **11g(iii)** | | |

h  Provide the following information about the supported organization(s).

| (i) Name of supported organization | (ii) EIN | (iii) Type of organization (described on lines 1-9 above or IRC section (see Instructions)) | (iv) Is the organization in col. (i) listed in your governing document? | | (v) Did you notify the organization in col. (i) of your support? | | (vi) Is the organization in col. (i) organized in the U S ? | | (vii) Amount of support |
|---|---|---|---|---|---|---|---|---|---|
| | | | Yes | No | Yes | No | Yes | No | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| **Total** | | | | | | | | | |

LHA **For Privacy Act and Paperwork Reduction Act Notice, see the Instructions for Form 990 or 990-EZ.**

Schedule A (Form 990 or 990-EZ) 2009

932021 02-08-10

10591109 000078          2009.05000 TEXAS HIGHWAY PATROL MUSEUM 31305020

**Part II**  Support Schedule for Organizations Described in Sections 170(b)(1)(A)(iv) and 170(b)(1)(A)(vi)
(Complete only if you checked the box on line 5, 7, or 8 of Part I.)

### Section A. Public Support

| Calendar year (or fiscal year beginning in) ▶ | (a) 2005 | (b) 2006 | (c) 2007 | (d) 2008 | (e) 2009 | (f) Total |
|---|---|---|---|---|---|---|
| 1 Gifts, grants, contributions, and membership fees received. (Do not include any "unusual grants.") | 2336176. | 1820261. | 1656223. | 1746658. | | 7559318. |
| 2 Tax revenues levied for the organization's benefit and either paid to or expended on its behalf | | | | | | |
| 3 The value of services or facilities furnished by a governmental unit to the organization without charge | | | | | | |
| 4 Total. Add lines 1 through 3 | 2336176. | 1820261. | 1656223. | 1746658. | | 7559318. |
| 5 The portion of total contributions by each person (other than a governmental unit or publicly supported organization) included on line 1 that exceeds 2% of the amount shown on line 11, column (f) | | | | | | |
| 6 Public support. Subtract line 5 from line 4 | | | | | | 7559318. |

### Section B. Total Support

| Calendar year (or fiscal year beginning in) ▶ | (a) 2005 | (b) 2006 | (c) 2007 | (d) 2008 | (e) 2009 | (f) Total |
|---|---|---|---|---|---|---|
| 7 Amounts from line 4 | 2336176. | 1820261. | 1656223. | 1746658. | | 7559318. |
| 8 Gross income from interest, dividends, payments received on securities loans, rents, royalties and income from similar sources | | | | | | |
| 9 Net income from unrelated business activities, whether or not the business is regularly carried on | | | | | | |
| 10 Other income. Do not include gain or loss from the sale of capital assets (Explain in Part IV.) | | | | | | |
| 11 Total support. Add lines 7 through 10 | | | | | | 7559318. |
| 12 Gross receipts from related activities, etc. (see instructions) | | | | | 12 | 4,172. |

13 **First five years.** If the Form 990 is for the organization's first, second, third, fourth, or fifth tax year as a section 501(c)(3) organization, check this box and **stop here** .......................................................... ▶ ☐

### Section C. Computation of Public Support Percentage

| | | |
|---|---|---|
| 14 Public support percentage for 2009 (line 6, column (f) divided by line 11, column (f)) | 14 | 100.00 % |
| 15 Public support percentage from 2008 Schedule A, Part II, line 14 | 15 | 100.00 % |

16a **33 1/3% support test - 2009.** If the organization did not check the box on line 13, and line 14 is 33 1/3% or more, check this box and **stop here.** The organization qualifies as a publicly supported organization .......................................... ▶ ☒

b **33 1/3% support test - 2008.** If the organization did not check a box on line 13 or 16a, and line 15 is 33 1/3% or more, check this box and **stop here.** The organization qualifies as a publicly supported organization .......................................... ▶ ☐

17a **10% -facts-and-circumstances test - 2009.** If the organization did not check a box on line 13, 16a, or 16b, and line 14 is 10% or more, and if the organization meets the "facts-and-circumstances" test, check this box and **stop here.** Explain in Part IV how the organization meets the "facts-and-circumstances" test. The organization qualifies as a publicly supported organization .......................................... ▶ ☐

b **10% -facts-and-circumstances test - 2008.** If the organization did not check a box on line 13, 16a, 16b, or 17a, and line 15 is 10% or more, and if the organization meets the "facts-and-circumstances" test, check this box and **stop here.** Explain in Part IV how the organization meets the "facts-and-circumstances" test. The organization qualifies as a publicly supported organization .......................................... ▶ ☐

18 **Private foundation.** If the organization did not check a box on line 13, 16a, 16b, 17a, or 17b, check this box and see instructions .......................................... ▶ ☐

Schedule A (Form 990 or 990-EZ) 2009

932022
02-08-10

## Part III | Support Schedule for Organizations Described in Section 509(a)(2) (Complete only if you checked the box on line 9 of Part I)

Page 3

### Section A. Public Support

| Calendar year (or fiscal year beginning in)▶ | (a) 2005 | (b) 2006 | (c) 2007 | (d) 2008 | (e) 2009 | (f) Total |
|---|---|---|---|---|---|---|
| 1 Gifts, grants, contributions, and membership fees received. (Do not include any "unusual grants.") | | | | | | |
| 2 Gross receipts from admissions, merchandise sold or services performed, or facilities furnished in any activity that is related to the organization's tax-exempt purpose | | | | | | |
| 3 Gross receipts from activities that are not an unrelated trade or business under section 513 | | | | | | |
| 4 Tax revenues levied for the organization's benefit and either paid to or expended on its behalf | | | | | | |
| 5 The value of services or facilities furnished by a governmental unit to the organization without charge | | | | | | |
| 6 Total. Add lines 1 through 5 | | | | | | |
| 7a Amounts included on lines 1, 2, and 3 received from disqualified persons | | | | | | |
| b Amounts included on lines 2 and 3 received from other than disqualified persons that exceed the greater of $5,000 or 1% of the amount on line 13 for the year | | | | | | |
| c Add lines 7a and 7b | | | | | | |
| 8 Public support (Subtract line 7c from line 6) | | | | | | |

### Section B. Total Support

| Calendar year (or fiscal year beginning in)▶ | (a) 2005 | (b) 2006 | (c) 2007 | (d) 2008 | (e) 2009 | (f) Total |
|---|---|---|---|---|---|---|
| 9 Amounts from line 6 | | | | | | |
| 10a Gross income from interest, dividends, payments received on securities loans, rents, royalties and income from similar sources | | | | | | |
| b Unrelated business taxable income (less section 511 taxes) from businesses acquired after June 30, 1975 | | | | | | |
| c Add lines 10a and 10b | | | | | | |
| 11 Net income from unrelated business activities not included in line 10b, whether or not the business is regularly carried on | | | | | | |
| 12 Other income. Do not include gain or loss from the sale of capital assets (Explain in Part IV.) | | | | | | |
| 13 Total support (Add lines 9, 10c, 11, and 12.) | | | | | | |

14 First five years. If the Form 990 is for the organization's first, second, third, fourth, or fifth tax year as a section 501(c)(3) organization, check this box and stop here ▶ ☐

### Section C. Computation of Public Support Percentage

| | | |
|---|---|---|
| 15 Public support percentage for 2009 (line 8, column (f) divided by line 13, column (f)) | 15 | % |
| 16 Public support percentage from 2008 Schedule A, Part III, line 15 | 16 | % |

### Section D. Computation of Investment Income Percentage

| | | |
|---|---|---|
| 17 Investment income percentage for 2009 (line 10c, column (f) divided by line 13, column (f)) | 17 | % |
| 18 Investment income percentage from 2008 Schedule A, Part III, line 17 | 18 | % |

19a 33 1/3% support tests - 2009. If the organization did not check the box on line 14, and line 15 is more than 33 1/3%, and line 17 is not more than 33 1/3%, check this box and stop here. The organization qualifies as a publicly supported organization ▶ ☐

b 33 1/3% support tests - 2008. If the organization did not check a box on line 14 or line 19a, and line 16 is more than 33 1/3%, and line 18 is not more than 33 1/3%, check this box and stop here. The organization qualifies as a publicly supported organization ▶ ☐

20 Private foundation. If the organization did not check a box on line 14, 19a, or 19b, check this box and see instructions ▶ ☐

Schedule A (Form 990 or 990-EZ) 2009

932023 02-08-10

10591109 000078                    2009.05000 TEXAS HIGHWAY PATROL MUSEUM 31305020

# Schedule D
(Form 990)

Department of the Treasury
Internal Revenue Service

## Supplemental Financial Statements

▶ Complete if the organization answered "Yes," to Form 990,
Part IV, line 6, 7, 8, 9, 10, 11, or 12.
▶ Attach to Form 990. ▶ See separate instructions.

OMB No 1545-0047

## 2009

Open to Public
Inspection

| Name of the organization | TEXAS HIGHWAY PATROL MUSEUM, FORMERLY TX HWY PATROL ASSN HALL OF FAME & MUSEUM | Employer identification number 74-2639283 |
|---|---|---|

### Part I   Organizations Maintaining Donor Advised Funds or Other Similar Funds or Accounts. Complete if the organization answered "Yes" to Form 990, Part IV, line 6.

| | | (a) Donor advised funds | (b) Funds and other accounts |
|---|---|---|---|
| 1 | Total number at end of year | | |
| 2 | Aggregate contributions to (during year) | | |
| 3 | Aggregate grants from (during year) | | |
| 4 | Aggregate value at end of year | | |

5 Did the organization inform all donors and donor advisors in writing that the assets held in donor advised funds are the organization's property, subject to the organization's exclusive legal control? ☐ Yes ☐ No

6 Did the organization inform all grantees, donors, and donor advisors in writing that grant funds can be used only for charitable purposes and not for the benefit of the donor or donor advisor, or for any other purpose conferring impermissible private benefit? ☐ Yes ☐ No

### Part II   Conservation Easements. Complete if the organization answered "Yes" to Form 990, Part IV, line 7.

1 Purpose(s) of conservation easements held by the organization (check all that apply).
☐ Preservation of land for public use (e.g., recreation or pleasure)
☐ Protection of natural habitat
☐ Preservation of open space
☐ Preservation of an historically important land area
☐ Preservation of a certified historic structure

2 Complete lines 2a through 2d if the organization held a qualified conservation contribution in the form of a conservation easement on the last day of the tax year.

| | | | Held at the End of the Tax Year |
|---|---|---|---|
| a | Total number of conservation easements | 2a | |
| b | Total acreage restricted by conservation easements | 2b | |
| c | Number of conservation easements on a certified historic structure included in (a) | 2c | |
| d | Number of conservation easements included in (c) acquired after 8/17/06 | 2d | |

3 Number of conservation easements modified, transferred, released, extinguished, or terminated by the organization during the tax year ▶ _____

4 Number of states where property subject to conservation easement is located ▶ _____

5 Does the organization have a written policy regarding the periodic monitoring, inspection, handling of violations, and enforcement of the conservation easements it holds? ☐ Yes ☐ No

6 Staff and volunteer hours devoted to monitoring, inspecting, and enforcing conservation easements during the year ▶ _____

7 Amount of expenses incurred in monitoring, inspecting, and enforcing conservation easements during the year ▶ $ _____

8 Does each conservation easement reported on line 2(d) above satisfy the requirements of section 170(h)(4)(B)(i) and section 170(h)(4)(B)(ii)? ☐ Yes ☐ No

9 In Part XIV, describe how the organization reports conservation easements in its revenue and expense statement, and balance sheet, and include, if applicable, the text of the footnote to the organization's financial statements that describes the organization's accounting for conservation easements.

### Part III   Organizations Maintaining Collections of Art, Historical Treasures, or Other Similar Assets. Complete if the organization answered "Yes" to Form 990, Part IV, line 8.

1a If the organization elected, as permitted under SFAS 116, not to report in its revenue statement and balance sheet works of art, historical treasures, or other similar assets held for public exhibition, education, or research in furtherance of public service, provide, in Part XIV, the text of the footnote to its financial statements that describes these items.

b If the organization elected, as permitted under SFAS 116, to report in its revenue statement and balance sheet works of art, historical treasures, or other similar assets held for public exhibition, education, or research in furtherance of public service, provide the following amounts relating to these items:

(i) Revenues included in Form 990, Part VIII, line 1 ▶ $ _____

(ii) Assets included in Form 990, Part X ▶ $ _____

2 If the organization received or held works of art, historical treasures, or other similar assets for financial gain, provide the following amounts required to be reported under SFAS 116 relating to these items:

a Revenues included in Form 990, Part VIII, line 1 ▶ $ _____

b Assets included in Form 990, Part X ▶ $ _____

LHA  **For Privacy Act and Paperwork Reduction Act Notice, see the Instructions for Form 990.**

932051
02-01-10

Schedule D (Form 990) 2009

TEXAS HIGHWAY PATROL MUSEUM, FORMERLY
TX HWY PATROL ASSN HALL OF FAME & MUSEUM   74-2639283   Page **2**

## Part III   Organizations Maintaining Collections of Art, Historical Treasures, or Other Similar Assets (continued)

3   Using the organization's acquisition, accession, and other records, check any of the following that are a significant use of its collection items (check all that apply):

a   ☐ Public exhibition

b   ☐ Scholarly research

c   ☐ Preservation for future generations

d   ☐ Loan or exchange programs

e   ☐ Other _____

4   Provide a description of the organization's collections and explain how they further the organization's exempt purpose in Part XIV.

5   During the year, did the organization solicit or receive donations of art, historical treasures, or other similar assets to be sold to raise funds rather than to be maintained as part of the organization's collection?   ☐ Yes   ☐ No

## Part IV   Escrow and Custodial Arrangements. Complete if organization answered "Yes" to Form 990, Part IV, line 9, or reported an amount on Form 990, Part X, line 21.

1a   Is the organization an agent, trustee, custodian or other intermediary for contributions or other assets not included on Form 990, Part X?   ☐ Yes   ☐ No

b   If "Yes," explain the arrangement in Part XIV and complete the following table:

|   | | Amount |
|---|---|---|
| c   Beginning balance | 1c | |
| d   Additions during the year | 1d | |
| e   Distributions during the year | 1e | |
| f   Ending balance | 1f | |

2a   Did the organization include an amount on Form 990, Part X, line 21?   ☐ Yes   ☐ No

b   If "Yes," explain the arrangement in Part XIV.

## Part V   Endowment Funds. Complete if the organization answered "Yes" to Form 990, Part IV, line 10.

|   | (a) Current year | (b) Prior year | (c) Two years back | (d) Three years back | (e) Four years back |
|---|---|---|---|---|---|
| 1a Beginning of year balance | | | | | |
| b Contributions | | | | | |
| c Net investment earnings, gains, and losses | | | | | |
| d Grants or scholarships | | | | | |
| e Other expenditures for facilities and programs | | | | | |
| f Administrative expenses | | | | | |
| g End of year balance | | | | | |

2   Provide the estimated percentage of the year end balance held as:

a   Board designated or quasi-endowment ▶ _____ %

b   Permanent endowment ▶ _____ %

c   Term endowment ▶ _____ %

3a   Are there endowment funds not in the possession of the organization that are held and administered for the organization by:

|   | | Yes | No |
|---|---|---|---|
| (i)   unrelated organizations | 3a(i) | | |
| (ii)   related organizations | 3a(ii) | | |
| b   If "Yes" to 3a(ii), are the related organizations listed as required on Schedule R? | 3b | | |

4   Describe in Part XIV the intended uses of the organization's endowment funds.

## Part VI   Investments - Land, Buildings, and Equipment. See Form 990, Part X, line 10.

| Description of investment | (a) Cost or other basis (investment) | (b) Cost or other basis (other) | (c) Accumulated depreciation | (d) Book value |
|---|---|---|---|---|
| 1a   Land | | 366,956. | | 366,956. |
| b   Buildings | | 484,101. | 61,608. | 422,493. |
| c   Leasehold improvements | | | | |
| d   Equipment | | 60,127. | 47,926. | 12,201. |
| e   Other | | 6,788. | 765. | 6,023. |
| Total. Add lines 1a through 1e. (Column (d) must equal Form 990, Part X, column (B), line 10(c).)   ▶ | | | | 807,673. |

Schedule D (Form 990) 2009

932052
02-01-10

TEXAS HIGHWAY PATROL MUSEUM, FORMERLY
TX HWY PATROL ASSN HALL OF FAME & MUSEUM   74-2639283   Page **3**

**Part VII** Investments - Other Securities. See Form 990, Part X, line 12.

| (a) Description of security or category (including name of security) | (b) Book value | (c) Method of valuation: Cost or end-of-year market value |
|---|---|---|
| Financial derivatives | | |
| Closely-held equity interests | | |
| Other | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| Total. (Col (b) must equal Form 990, Part X, col (B) line 12 ) ▶ | | |

**Part VIII** Investments - Program Related. See Form 990, Part X, line 13.

| (a) Description of investment type | (b) Book value | (c) Method of valuation: Cost or end-of-year market value |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| Total. (Col (b) must equal Form 990, Part X, col (B) line 13 ) ▶ | | |

**Part IX** Other Assets. See Form 990, Part X, line 15.

| (a) Description | (b) Book value |
|---|---|
| MUSEUM EXHIBITS | 46,944. |
| ACCOUNTS RECEIVABLE - EMPLOYEES | 4,035. |
| | |
| | |
| | |
| | |
| | |
| | |
| Total. (Column (b) must equal Form 990, Part X, col (B) line 15 ) ▶ | 50,979. |

**Part X** Other Liabilities. See Form 990, Part X, line 25.

| 1. (a) Description of liability | (b) Amount |
|---|---|
| Federal income taxes | |
| ACCOUNTS PAYABLE - TEXAS HIGHWAY PATROL ASSOCIATION | |
| ACCOUNTS PAYABLE - THPA SERVICES, INC. | 27,315. |
| | 46,187. |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| Total. (Column (b) must equal Form 990, Part X, col (B) line 25.) ▶ | 73,502. |

2. FIN 48 Footnote. In Part XIV, provide the text of the footnote to the organization's financial statements that reports the organization's liability for uncertain tax positions under FIN 48.

932053
02-01-10

TEXAS HIGHWAY PATROL MUSEUM, FORMERLY
TX HWY PATROL ASSN HALL OF FAME & MUSEUM    74-2639283  Page **4**

| **Part XI** | **Reconciliation of Change in Net Assets from Form 990 to Audited Financial Statements** | |
|---|---|---|
| 1 | Total revenue (Form 990, Part VIII, column (A), line 12) | 1 |
| 2 | Total expenses (Form 990, Part IX, column (A), line 25) | 2 |
| 3 | Excess or (deficit) for the year. Subtract line 2 from line 1 | 3 |
| 4 | Net unrealized gains (losses) on investments | 4 |
| 5 | Donated services and use of facilities | 5 |
| 6 | Investment expenses | 6 |
| 7 | Prior period adjustments | 7 |
| 8 | Other (Describe in Part XIV.) | 8 |
| 9 | Total adjustments (net). Add lines 4 through 8 | 9 |
| 10 | Excess or (deficit) for the year per audited financial statements. Combine lines 3 and 9 | 10 |

| **Part XII** | **Reconciliation of Revenue per Audited Financial Statements With Revenue per Return** | | |
|---|---|---|---|
| 1 | Total revenue, gains, and other support per audited financial statements | | 1 |
| 2 | Amounts included on line 1 but not on Form 990, Part VIII, line 12: | | |
| a | Net unrealized gains on investments | 2a | |
| b | Donated services and use of facilities | 2b | |
| c | Recoveries of prior year grants | 2c | |
| d | Other (Describe in Part XIV.) | 2d | |
| e | Add lines 2a through 2d | | 2e |
| 3 | Subtract line 2e from line 1 | | 3 |
| 4 | Amounts included on Form 990, Part VIII, line 12, but not on line 1: | | |
| a | Investment expenses not included on Form 990, Part VIII, line 7b | 4a | |
| b | Other (Describe in Part XIV.) | 4b | |
| c | Add lines 4a and 4b | | 4c |
| 5 | Total revenue. Add lines 3 and 4c. *(This must equal Form 990, Part I, line 12.)* | | 5 |

| **Part XIII** | **Reconciliation of Expenses per Audited Financial Statements With Expenses per Return** | | |
|---|---|---|---|
| 1 | Total expenses and losses per audited financial statements | | 1 |
| 2 | Amounts included on line 1 but not on Form 990, Part IX, line 25: | | |
| a | Donated services and use of facilities | 2a | |
| b | Prior year adjustments | 2b | |
| c | Other losses | 2c | |
| d | Other (Describe in Part XIV.) | 2d | |
| e | Add lines 2a through 2d | | 2e |
| 3 | Subtract line 2e from line 1 | | 3 |
| 4 | Amounts included on Form 990, Part IX, line 25, but not on line 1: | | |
| a | Investment expenses not included on Form 990, Part VIII, line 7b | 4a | |
| b | Other (Describe in Part XIV.) | 4b | |
| c | Add lines 4a and 4b | | 4c |
| 5 | Total expenses. Add lines 3 and 4c. *(This must equal Form 990, Part I, line 18.)* | | 5 |

| **Part XIV** | **Supplemental Information** |
|---|---|

Complete this part to provide the descriptions required for Part II, lines 3, 5, and 9; Part III, lines 1a and 4; Part IV, lines 1b and 2b; Part V, line 4; Part X, line 2; Part XI, line 8; Part XII, lines 2d and 4b; and Part XIII, lines 2d and 4b. Also complete this part to provide any additional information.

10591109 000078
19
2009.05000 TEXAS HIGHWAY PATROL MUSEUM 31305020

# SCHEDULE J
## (Form 990)

Department of the Treasury
Internal Revenue Service

# Compensation Information

**For certain Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees**

► Complete if the organization answered "Yes" to Form 990, Part IV, line 23.

► Attach to Form 990. ► See separate instructions.

OMB No 1545-0047

# 2009

Open to Public Inspection

**Name of the organization** TEXAS HIGHWAY PATROL MUSEUM, FORMERLY TX HWY PATROL ASSN HALL OF FAME & MUSEUM

**Employer identification number** 74-2639283

## Part I | Questions Regarding Compensation

| | | | Yes | No |
|---|---|---|---|---|
| **1a** Check the appropriate box(es) if the organization provided any of the following to or for a person listed in Form 990, Part VII, Section A, line 1a. Complete Part III to provide any relevant information regarding these items. | | | | |
| ☐ First-class or charter travel  ☐ Housing allowance or residence for personal use | | | | |
| ☐ Travel for companions  ☐ Payments for business use of personal residence | | | | |
| ☐ Tax indemnification and gross-up payments  ☐ Health or social club dues or initiation fees | | | | |
| ☐ Discretionary spending account  ☐ Personal services (e.g., maid, chauffeur, chef) | | | | |
| **b** If any of the boxes on line 1a are checked, did the organization follow a written policy regarding payment or reimbursement or provision of all of the expenses described above? If "No," complete Part III to explain | | 1b | | |
| **2** Did the organization require substantiation prior to reimbursing or allowing expenses incurred by all officers, directors, trustees, and the CEO/Executive Director, regarding the items checked in line 1a? | | 2 | | |
| **3** Indicate which, if any, of the following the organization uses to establish the compensation of the organization's CEO/Executive Director. Check all that apply. | | | | |
| ☐ Compensation committee  ☐ Written employment contract | | | | |
| ☐ Independent compensation consultant  ☐ Compensation survey or study | | | | |
| ☐ Form 990 of other organizations  ☐ Approval by the board or compensation committee | | | | |
| **4** During the year, did any person listed in Form 990, Part VII, Section A, line 1a, with respect to the filing organization or a related organization: | | | | |
| **a** Receive a severance payment or change-of-control payment? | | 4a | | X |
| **b** Participate in, or receive payment from, a supplemental nonqualified retirement plan? | | 4b | | X |
| **c** Participate in, or receive payment from, an equity-based compensation arrangement? | | 4c | | X |
| If "Yes" to any of lines 4a-c, list the persons and provide the applicable amounts for each item in Part III. | | | | |
| **Only section 501(c)(3) and 501(c)(4) organizations must complete lines 5-9.** | | | | |
| **5** For persons listed in Form 990, Part VII, Section A, line 1a, did the organization pay or accrue any compensation contingent on the revenues of: | | | | |
| **a** The organization? | | 5a | X | |
| **b** Any related organization? | | 5b | | X |
| If "Yes" to line 5a or 5b, describe in Part III. | | | | |
| **6** For persons listed in Form 990, Part VII, Section A, line 1a, did the organization pay or accrue any compensation contingent on the net earnings of: | | | | |
| **a** The organization? | | 6a | | X |
| **b** Any related organization? | | 6b | | X |
| If "Yes" to line 6a or 6b, describe in Part III. | | | | |
| **7** For persons listed in Form 990, Part VII, Section A, line 1a, did the organization provide any non-fixed payments not described in lines 5 and 6? If "Yes," describe in Part III | | 7 | | X |
| **8** Were any amounts reported in Form 990, Part VII, paid or accrued pursuant to a contract that was subject to the initial contract exception described in Regs. section 53.4958-4(a)(3)? If "Yes," describe in Part III | | 8 | | X |
| **9** If "Yes" to line 8, did the organization also follow the rebuttable presumption procedure described in Regulations section 53.4958-6(c)? | | 9 | | |

LHA **For Privacy Act and Paperwork Reduction Act Notice, see the Instructions for Form 990.**

Schedule J (Form 990) 2009

932111
02-02-10

TEXAS HIGHWAY PATROL MUSEUM, FORMERLY
TX HWY PATROL ASSN HALL OF FAME & MUSEUM   74-2639283

**Part II** Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees. Use Schedule J-1 if additional space is needed.

For each individual whose compensation must be reported in Schedule J, report compensation from the organization on row (i) and from related organizations, described in the instructions, on row (ii).
Do not list any individuals that are not listed on Form 990, Part VII.

**Note.** The sum of columns (B)(i)-(iii) must equal the applicable column (D) or column (E) amounts on Form 990, Part VII, line 1a.

| (A) Name | | (B) Breakdown of W-2 and/or 1099-MISC compensation | | | (C) Retirement and other deferred compensation | (D) Nontaxable benefits | (E) Total of columns (B)(i)-(D) | (F) Compensation reported in prior Form 990 or Form 990-EZ |
|---|---|---|---|---|---|---|---|---|
| | | (i) Base compensation | (ii) Bonus & incentive compensation | (iii) Other reportable compensation | | | | |
| TIM TIERNEY | (i) | 118,302. | 0. | 0. | 0. | 0. | 118,302. | 137,076. |
| | (ii) | 76,091. | 0. | 0. | 0. | 0. | 76,091. | 56,350. |
| C.R. VILLALVA | (i) | 211,190. | 0. | 0. | 0. | 0. | 211,190. | 163,075. |
| | (ii) | 0. | 0. | 0. | 0. | 0. | 0. | 0. |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |
| | (i) | | | | | | | |
| | (ii) | | | | | | | |

932112 02-02-10

21

Schedule J (Form 990) 2009

TEXAS HIGHWAY PATROL MUSEUM, FORMERLY
TX HWY PATROL ASSN HALL OF FAME & MUSEUM
74-2639283

**Part III** Supplemental Information

Complete this part to provide the information, explanation, or descriptions required for Part I, lines 1a, 1b, 4c, 5a, 5b, 6a, 6b, 7, and 8. Also complete this part for any additional information.

PART I, LINE 5: THE DIRECTOR OF MARKETING IS PAID SALARIES AND WAGES EACH

YEAR IN AN AMOUNT EQUAL TO 10% OF ANNUAL FUND RAISING REVENUE.

932113 02-02-10

# SCHEDULE O
(Form 990)

Department of the Treasury
Internal Revenue Service

# Supplemental Information to Form 990

Complete to provide information for responses to specific questions on
Form 990 or to provide any additional information.
▶ Attach to Form 990.

OMB No 1545-0047

# 2009

Open to Public
Inspection

| Name of the organization | Employer identification number |
|---|---|
| TEXAS HIGHWAY PATROL MUSEUM, FORMERLY TX HWY PATROL ASSN HALL OF FAME & MUSEUM | 74-2639283 |

FORM 990, PART I, LINE 1, DESCRIPTION OF ORGANIZATION MISSION:

AND TO EDUCATE THE GENERAL PUBLIC.

FORM 990, PART III, LINE 4D, OTHER PROGRAM SERVICES:

THE ORGANIZATION ALSO CONTINUED ITS POLICY OF PROVIDING SELECTED PUBLIC

SERVICE ANNOUNCEMENTS.

FORM 990, PART VI, SECTION B, LINE 11: THE ORGANIZATION'S FORM 990 IS

PREPARED BY AN INDEPENDENT ACCOUNTING FIRM.  THE ORGANIZATION'S EXECUTIVE

DIRECTOR MEETS EACH YEAR WITH SUCH FIRM TO REVIEW, SIGN AND FILE FORM 990.

FORM 990, PART VI, SECTION B, LINE 12C: THE ORGANIZATION MONITORS AND

ENFORCES COMPLIANCE WITH THE CONFLICT OF INTEREST POLICY AT EACH ANNUAL AND

SPECIAL MEETING OF DIRECTORS.

FORM 990, PART VI, SECTION C, LINE 19: THE ORGANIZATION MAKES ITS

GOVERNING DOCUMENTS, CONFLICT OF INTEREST POLICY, AND FINANCIAL STATEMENTS

AVAILABLE TO THE PUBLIC UPON REQUEST.

LHA  For Privacy Act and Paperwork Reduction Act Notice, see the Instructions for Form 990.
932211
02-03-10

Schedule O (Form 990) 2009

10591109 000078

23
2009.05000 TEXAS HIGHWAY PATROL MUSEUM 31305020

SCHEDULE R
(Form 990)

Department of the Treasury
Internal Revenue Service

OMB No 1545-0047

Open to Public
Inspection

## Related Organizations and Unrelated Partnerships

▶ Complete if the organization answered "Yes" to Form 990, Part IV, line 33, 34, 35, 36, or 37.
▶ Attach to Form 990.   ▶ See separate instructions.

Name of the organization   TEXAS HIGHWAY PATROL MUSEUM, FORMERLY
TX HWY PATROL ASSN HALL OF FAME & MUSEUM

Employer identification number
74-2639283

**Part I** Identification of Disregarded Entities (Complete if the organization answered "Yes" to Form 990, Part IV, line 33.)

| (a) Name, address, and EIN of disregarded entity | (b) Primary activity | (c) Legal domicile (state or foreign country) | (d) Total income | (e) End-of-year assets | (f) Direct controlling entity |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**Part II** Identification of Related Tax-Exempt Organizations (Complete if the organization answered "Yes" to Form 990, Part IV, line 34 because it had one or more related tax-exempt organizations during the tax year.)

| (a) Name, address, and EIN of related organization | (b) Primary activity | (c) Legal domicile (state or foreign country) | (d) Exempt Code section | (e) Public charity status (if section 501(c)(3)) | (f) Direct controlling entity |
|---|---|---|---|---|---|
| TEXAS HIGHWAY PATROL ASSOCIATION - 74-2573422, 501 OAKLAND AVENUE, AUSTIN, TX 78703 | PROFESSIONAL ASSOCIATION-PROMOTES AWARENESS OF TX PATROL | TEXAS | 501 (C)(6) | | |
| NATIONAL POLICE YOUTH ATHLETIC LEAGUE - 74-2571333, 5150 BROADWAY SUITE 233, SAN ANTONIO, TX 78209 | EDUCATIONAL | TEXAS | 501 (C)(3) | | |
| CITIZENS FOR SPECIAL ARTISTS - 74-2571329 5150 BROADWAY, SUITE 233 SAN ANTONIO, TX 78209 | EDUCATIONAL | TEXAS | 501 (C)(3) | | |
| | | | | | |

LHA  **For Privacy Act and Paperwork Reduction Act Notice, see the Instructions for Form 990.**

Schedule R (Form 990) 2009

932161
02-04-10

TEXAS HIGHWAY PATROL MUSEUM, FORMERLY
TX HWY PATROL ASSN HALL OF FAME & MUSEUM          74-2639283          Page 2

**Part III   Identification of Related Organizations Taxable as a Partnership** (Complete if the organization answered "Yes" to Form 990, Part IV, line 34 because it had one or more related organizations treated as a partnership during the tax year.)

| (a) Name, address, and EIN of related organization | (b) Primary activity | (c) Legal domicile (state or foreign country) | (d) Direct controlling entity | (e) Predominant income (related, unrelated, excluded from tax under sections 512-514) | (f) Share of total income | (g) Share of end-of-year assets | (h) Disproportionate allocations? Yes | No | (i) Code V-UBI amount in box 20 of Schedule K-1 (Form 1065) | (j) General or managing partner? Yes | No |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |

**Part IV   Identification of Related Organizations Taxable as a Corporation or Trust** (Complete if the organization answered "Yes" to Form 990, Part IV, line 34 because it had one or more related organizations treated as a corporation or trust during the tax year.)

| (a) Name, address, and EIN of related organization | (b) Primary activity | (c) Legal domicile (state or foreign country) | (d) Direct controlling entity | (e) Type of entity (C corp, S corp, or trust) | (f) Share of total income | (g) Share of end-of-year assets | (h) Percentage ownership |
|---|---|---|---|---|---|---|---|
| THPA SERVICES, INC. - 74-2709623 501 OAKLAND AVENUE AUSTIN, TX 78703 | MAGAZINE PUBLISHING AND ADVERTISING SALES | TX | TEXAS HIGHWAY PATROL ASSOCIATION | C CORP | 0. | 0. | 100. |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

932162 07-21-10

25

Schedule R (Form 990) 2009

## Part V    Transactions With Related Organizations (Complete if the organization answered "Yes" to Form 990, Part IV, line 34, 35, or 36.)

Note. Complete line 1 if any entity is listed in Parts II, III, or IV of this schedule.

| | | Yes | No |
|---|---|:---:|:---:|
| 1 | During the tax year, did the organization engage in any of the following transactions with one or more related organizations listed in Parts II-IV? | | |
| a | Receipt of (i) interest (ii) annuities (iii) royalties or (iv) rent from a controlled entity | 1a | X |
| b | Gift, grant, or capital contribution to other organization(s) | 1b | X |
| c | Gift, grant, or capital contribution from other organization(s) | 1c | X |
| d | Loans or loan guarantees to or for other organization(s) | 1d | X |
| e | Loans or loan guarantees by other organization(s) | 1e X | |
| f | Sale of assets to other organization(s) | 1f | X |
| g | Purchase of assets from other organization(s) | 1g | X |
| h | Exchange of assets | 1h | X |
| i | Lease of facilities, equipment, or other assets to other organization(s) | 1i X | |
| j | Lease of facilities, equipment, or other assets from other organization(s) | 1j | X |
| k | Performance of services or membership or fundraising solicitations for other organization(s) | 1k X | |
| l | Performance of services or membership or fundraising solicitations by other organization(s) | 1l | X |
| m | Sharing of facilities, equipment, mailing lists, or other assets | 1m | X |
| n | Sharing of paid employees | 1n X | |
| o | Reimbursement paid to other organization for expenses | 1o | X |
| p | Reimbursement paid by other organization for expenses | 1p | X |
| q | Other transfer of cash or property to other organization(s) | 1q | X |
| r | Other transfer of cash or property from other organization(s) | 1r | X |

2    If the answer to any of the above is "Yes," see the instructions for information on who must complete this line, including covered relationships and transaction thresholds.

| (a) Name of other organization(s) | (b) Transaction type (a-r) | (c) Amount involved |
|---|:---:|---:|
| (1) TEXAS HIGHWAY PATROL ASSOCIATION | E | 27,315. |
| (2) THPA SERVICES, INC. | E | 46,187. |
| (3) TEXAS HIGHWAY PATROL ASSOCIATION | I | 2,400. |
| (4) THPA SERVICES, INC. | I | 3,600. |
| (5) TEXAS HIGHWAY PATROL ASSOCIATION | K | 3,600. |
| (6) TEXAS HIGHWAY PATROL ASSOCIATION | N | 1,200. |

TEXAS HIGHWAY PATROL MUSEUM, FORMERLY
TX HWY PATROL ASSN HALL OF FAME & MUSEUM                74-2639283      Page 4

**Part VI** Unrelated Organizations Taxable as a Partnership (Complete if the organization answered 'Yes' to Form 990, Part IV, line 37.)

Provide the following information for each entity taxed as a partnership through which the organization conducted more than five percent of its activities (measured by total assets or gross revenue)
that was not a related organization. See instructions regarding exclusion for certain investment partnerships.

| (a) Name, address, and EIN of entity | (b) Primary activity | (c) Legal domicile (state or foreign country) | (d) Are all partners section 501(c)(3) organizations? | | (e) Share of end-of-year assets | (f) Disproportionate allocations? | | (g) Code V-UBI amount in box 20 of Schedule K-1 (Form 1065) | (h) General or managing partner? | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Yes | No | | Yes | No | | Yes | No |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

Schedule R (Form 990) 2009

932164
02-04-10

27

# Form **8868**

(Rev April 2009)

Department of the Treasury
Internal Revenue Service

## Application for Extension of Time To File an Exempt Organization Return

▶ File a separate application for each return.

OMB No 1545-1709

- If you are filing for an **Automatic 3-Month Extension**, complete only Part I and check this box . . . . . . . ▶ ☑
- If you are filing for an **Additional (Not Automatic) 3-Month Extension**, complete only Part II (on page 2 of this form).

*Do not complete Part II unless* you have already been granted an automatic 3-month extension on a previously filed Form 8868.

**Part I** — Automatic 3-Month Extension of Time. Only submit original (no copies needed).

A corporation required to file Form 990-T and requesting an automatic 6-month extension—check this box and complete Part I only . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐

*All other corporations (including 1120-C filers), partnerships, REMICs, and trusts must use Form 7004 to request an extension of time to file income tax returns*

**Electronic Filing (e-file).** Generally, you can electronically file Form 8868 if you want a 3-month automatic extension of time to file one of the returns noted below (6 months for a corporation required to file Form 990-T). However, you cannot file Form 8868 electronically if (1) you want the additional (not automatic) 3-month extension or (2) you file Forms 990-BL, 6069, or 8870, group returns, or a composite or consolidated Form 990-T. Instead, you must submit the fully completed and signed page 2 (Part II) of Form 8868. For more details on the electronic filing of this form, visit *www irs.gov/efile* and click on *e-file for Charities & Nonprofits.*

| Type or print | Name of Exempt Organization | Employer identification number |
|---|---|---|
| File by the due date for filing your return See instructions | **TEXAS HIGHWAY PATROL MUSEUM** | 74 : 2639283 |
| | Number, street, and room or suite no If a P O box, see instructions | |
| | **501 OAKLAND AVENUE** | |
| | City, town or post office, state, and ZIP code For a foreign address, see instructions | |
| | **AUSTIN, TX 78703-5113** | |

**Check type of return to be filed** (file a separate application for each return).

☑ Form 990
☐ Form 990-BL
☐ Form 990-EZ
☐ Form 990-PF

☐ Form 990-T (corporation)
☐ Form 990-T (sec. 401(a) or 408(a) trust)
☐ Form 990-T (trust other than above)
☐ Form 1041-A

☐ Form 4720
☐ Form 5227
☐ Form 6069
☐ Form 8870

- The books are in the care of ▶ **TEXAS HIGHWAY PATROL MUSEUM**

Telephone No. ▶ ( 512 )    491-9117     FAX No ▶ ( 512 )    491-6026

- If the organization does not have an office or place of business in the United States, check this box . . . . . ▶ ☐
- If this is for a Group Return, enter the organization's four digit Group Exemption Number (GEN)_____. If this is for the whole group, check this box . . . ▶ ☐ . If it is for part of the group, check this box . . . . . . ▶ ☐ and attach a list with the names and EINs of all members the extension will cover

1    I request an automatic 3-month (6 months for a corporation required to file Form 990-T) extension of time until ........**AUGUST 15**........ , 20 **10** , to file the exempt organization return for the organization named above. The extension is for the organization's return for:

▶ ☑ calendar year 20 **09** or
▶ ☐ tax year beginning ................................. , 20 ...... , and ending .................................... , 20 ........

2    If this tax year is for less than 12 months, check reason: ☐ Initial return ☐ Final return ☐ Change in accounting period

| | | | |
|---|---|---|---|
| 3a | If this application is for Form 990-BL, 990-PF, 990-T, 4720, or 6069, enter the tentative tax, less any nonrefundable credits. See instructions. | 3a | $ |
| b | If this application is for Form 990-PF or 990-T, enter any refundable credits and estimated tax payments made Include any prior year overpayment allowed as a credit | 3b | $ |
| c | **Balance Due.** Subtract line 3b from line 3a. Include your payment with this form, or, if required, deposit with FTD coupon or, if required, by using EFTPS (Electronic Federal Tax Payment System). See instructions. | 3c | $ |

**Caution.** If you are going to make an electronic fund withdrawal with this Form 8868, see Form 8453-EO and Form 8879-EO for payment instructions.

**For Privacy Act and Paperwork Reduction Act Notice, see Instructions.**        Cat No 27916D        Form **8868** (Rev 4-2009)

Form 8868 (Rev 4-2009)

- If you are filing for an **Additional (Not Automatic) 3-Month Extension, complete only Part II** and check this box . ▶ ☑
- **Note.** Only complete Part II if you have already been granted an automatic 3-month extension on a previously filed Form 8868.
- If you are filing for an **Automatic 3-Month Extension, complete only Part I (on page 1).**

| **Part II** | **Additional (Not Automatic) 3-Month Extension of Time.** Only file the original (no copies needed). |
|---|---|

| Type or print | Name of Exempt Organization | | Employer identification number |
|---|---|---|---|
| | **TEXAS HIGHWAY PATROL MUSEUM** | | 74 : 2639283 |
| File by the extended due date for filing the return See instructions | Number, street, and room or suite no If a P O box, see instructions | | For IRS use only |
| | **501 OAKLAND AVENUE** | | |
| | City, town or post office, state, and ZIP code For a foreign address, see instructions. | | |
| | **AUSTIN, TX 78703-5113** | | |

**Check type of return to be filed** (File a separate application for each return):

- ☑ Form 990
- ☐ Form 990-BL
- ☐ Form 990-EZ
- ☐ Form 990-PF
- ☐ Form 990-T (sec. 401(a) or 408(a) trust)
- ☐ Form 990-T (trust other than above)
- ☐ Form 1041-A
- ☐ Form 4720
- ☐ Form 5227
- ☐ Form 6069
- ☐ Form 8870

**STOP! Do not complete Part II if you were not already granted an automatic 3-month extension on a previously filed Form 8868.**

- The books are in the care of ▶ **TEXAS HIGHWAY PATROL MUSEUM**
  Telephone No. ▶ ( 512 ) 491-9117 FAX No. ▶ ( 512 ) 491-6026
- If the organization does not have an office or place of business in the United States, check this box . . . . . ▶ ☐
- If this is for a Group Return, enter the organization's four digit Group Exemption Number (GEN) _____ . If this is for the whole group, check this box . . . . . ▶ ☐ . If it is for part of the group, check this box . . . . ▶ ☐ and attach a list with the names and EINs of all members the extension is for.

4 I request an additional 3-month extension of time until ............ **NOVEMBER 15** ............ , 20 **10**

5 For calendar year **2009** , or other tax year beginning ..................... , 20.... , and ending ..................... , 20.....

6 If this tax year is for less than 12 months, check reason: ☐ Initial return ☐ Final return ☐ Change in accounting period

7 State in detail why you need the extension ...........
**TAXPAYER IS AWAITING INFORMATION NECESSARY TO FILE A COMPLETE AND ACCURATE RETURN.**

| 8a | If this application is for Form 990-BL, 990-PF, 990-T, 4720, or 6069, enter the tentative tax, less any nonrefundable credits. See instructions. | 8a | $ |
|---|---|---|---|
| b | If this application is for Form 990-PF, 990-T, 4720, or 6069, enter any refundable credits and estimated tax payments made Include any prior year overpayment allowed as a credit and any amount paid previously with Form 8868. | 8b | $ |
| c | Balance Due. Subtract line 8b from line 8a. Include your payment with this form, or, if required, deposit with FTD coupon or, if required, by using EFTPS (Electronic Federal Tax Payment System). See instructions. | 8c | $ |

### Signature and Verification

Under penalties of perjury. I declare that I have examined this form, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete, and that I am authorized to prepare this form

Signature ▶ _[signature]_ Title ▶ CPA Date ▶ 8 71·10

Form **8868** (Rev 4-2009)

# EXHIBIT G



# OFFICE OF THE ATTORNEY GENERAL
## LAW ENFORCEMENT TELEPHONE SOLICITATION ACT
### Tex. Rev. Civ. Stat. Ann. Art. 9023e (Vernon's 1997)

## REGISTRATION FORM

Charitable Trusts Section
Consumer Protection Division
P.O. Box 12548
Austin, Texas 78711-2548
800-621-0508        512-463-2185

|  |  |
|---|---|
| ☐ Initial Registration | ☒ Renewal Registration |

1. Registrant name:  **TEXAS HIGHWAY PATROL MUSEUM**

   Assumed name (dba) or publication name:

   Street Address:      501 OAKLAND AVE.

   Mailing Address:     501 OAKLAND AVE.

   City: AUSTIN                          State: TX                Zip: 78703

   Telephone: (512 ) 491-9117            Fax: (512 ) 491-6026

   Federal Tax ID# 74-2639283            State Tax Employer ID#

2. Attach a list providing the mailing address, street address, phone number and fax number of each office, chapter, local unit, branch or affiliate of registering organization.

3. Name and address of organization's registered agent:
   Tim Tierney, Executive Vice President, Texas Highway Patrol Museum
   501 Oakland Ave., Austin, Texas  78703

4. Name, title, address and phone numbers of each officer, director, and executive director or other chief operating officer:
   see attached

LETS\97V1

# Texas Highway Patrol Association
# &
# Texas Highway Patrol Museum
# Board of Directors & Officers:

Texas Highway Patrol Association & Museum Board of Directors:
President: Sergeant Mark Lockridge, Museum
President: Sergeant Gregg Greer, Association
Executive Vice President, Tim Tierney
Director of Marketing, C.R. Villalva

Board Members:
Sergeant Fred Riojas,
Sergeant Ted Riojas,
Sergeant Robert Bernard, Jr.
Trooper James Colunga

5. Name of each officer, director, or employee who is either compensated by the organization or has custody and control of funds of the organization:
Tim Tierney

6. Name of each officer, director, or employee who has been convicted of or pleaded nolo contendere to a misdemeanor involving fraud or the theft, misappropriation, misapplication, or misuse of property of another, or any felony, including the offense, and state, court and date of each conviction or plea of nolo contendere:
n/a

7. Incorporation date: July 8, 1992   State of incorporation: Texas

   Date organization began doing business: July 9, 1992

   Fiscal Year Ends: 12/31   (Month/Day)

8. If not incorporated, type of organization and date established:

9. Provide a statement describing the organization's charitable purposes and a list of the programs for which funds are solicited:
Texas Highway Museum provides exhibits in the museum to educate the public on the importance of safety and awareness of the State Trooper and the job in protecting the citizens of Texas. We also feature yearly education for area high school students in our "Cruising for Coffins" program about drinking and driving. Funds are solicited for this program and to add more interactive displays for the museum to educate the public at large.

10. List the names, addresses and telephone numbers of the organization's accountants and auditors, and the method of accounting used:
Ken Gorance, CPA, 4501 Spicewood Springs Road, #1029, Austin, Texas  78759
Phone: 512-342-8081; Fax: 512-342-0458
Cash Basis accounting method

11. Provide the name and address of each commercial telephone solicitor, including subcontracted commercial telephone solicitors, engaged by the organization during the preceding 12 months (attach additional sheets as necessary):

Name:   none used

Address:

Name:

Address:

12. The total amount of contributions received during ☐ the preceding 12 months **or** ☒ the preceding fiscal year:

$See unaudited financial statement attached

13. The total amount paid to commercial telephone solicitors during ☐ the preceding 12 months **or** ☐ the preceding fiscal year:

$0.00

14. The total fund-raising costs during ☐ the preceding 12 months **or** ☒ the preceding fiscal year:

$See unaudited financial statement attached

15. Has the organization applied for and been granted tax exempt status by the IRS?
☐ No  ☒ Yes  Date of Application July 3, 1997

Date Exemption granted: 07/1991  IRS Exempt Code, if granted 501(c)(3)

16. Has tax exemption ever been denied, revoked or modified?: ☐ Yes  ☒ No
If yes, date of action:

17. Is the organization eligible to receive tax-deductible contributions under § 170, IRS Code of 1986 (26 U.S.C § 170)? ☒ Yes  ☐ No

## ATTACHMENTS

1. Attach a copy of the organization's most recently filed IRS Form 990 and other federal tax returns, including all supplements, amendments and attachments to those returns, and any requests for extension to file those returns. If the organization has not filed a 990, attach a statement as to the reason none is filed, and a copy of the organizations most recent financial statements, including audited financial statements, if any have been prepared.

2. Attach $50.00 filing fee payable to the Attorney General of Texas.

3. Attach a signed copy of the commercial telephone solicitor statement obtained from each commercial telephone solicitor and each subcontracted telephone solicitor:

## COMMERCIAL TELEPHONE SOLICITOR STATEMENT

I, **Tim J. Tierney**, an authorized representative of:

**Texas Highway Patrol Museum** declare I am engaged by the registering organization to perform telephone solicitations. I have complied with all state and local registration laws.

_Tim J. Tierney_
Printed name

_[signature]_
Signature

REGISTRATION UNDER THIS ACT DOES NOT IMPLY ENDORSEMENT BY THE STATE OF TEXAS OR THE ATTORNEY GENERAL, AND ORGANIZATIONS AND ENTITIES ARE PROHIBITED FROM STATING OR IMPLYING TO THE CONTRARY.

LETSA97V1

## REGISTRANT AFFIDAVIT

I, _____, an authorized representative of :

_____,

declare that the registering organization has attempted in good faith to comply with all applicable Texas, county, and municipal ordinances regarding telephone solicitations and hereby certify that the above information contained in the registration statement and all attachments to the statement are true, correct, and complete, to the best of my knowledge.

_____
Signature of affiant

Sworn to and subscribed before me on the _____ day of _____, 20_____

DENISE B. PENICK
Notary Public, State of Texas
My Commission Expires
NOVEMBER 7, 2013

_____
NOTARY PUBLIC

LETSA97V1

# EXHIBIT H



OFFICE *of the* ATTORNEY GENERAL
GREG ABBOTT

August 18, 2011

Tim Tierney
Texas Highway Patrol Museum
501 Oakland Ave.
Austin, TX 78703

Re:     Registration under the Law Enforcement Telephone Solicitation Act, Tex. Bus. & Comm.
        Code Ann. §§ 303.001 - 054.

Dear Mr. Tierney,

In reviewing the registration documents recently filed by the Texas Highway Patrol Museum, I noticed that the amounts needed for questions 12 and 14 were not filled in, and instead, reference was made to an unaudited financial statement that was not attached as indicated. This letter is to request a copy of the unaudited financial statement, so that the registration statement will be complete and contain all the information required by law. It would also be helpful if you could indicate which amounts on the financial statement correspond to the amounts requested on the form. I have enclosed a copy of the registration statement and marked the items in question for your convenience.

Thank you for your attention to this matter.

Sincerely,

Susan Downman
Investigator, Charitable Trusts
Consumer Protection and Public Health Division
(512) 463-3772 (direct)
(512) 322-0578 (fax)
susan.downman@oag.state.tx.us

Enc.

# EXHIBIT I

# TEXAS HIGHWAY PATROL
## ASSOCIATION • MAGAZINE • MUSEUM

501 Oakland Ave • Austin, TX 78703-5113 • OFFICE

August 23, 2011

Susan Downman
Charitable Trusts
Consumer Protection and Public Health Division
Office of the Attorney General
PO Box 12548
Austin TX 78711-2548

Dear Mrs. Downman:

I contacted our CPA and have attached the Statement of Revenues and Expenses as well as a Balance Sheet. I was informed that of the total expenses, approximately 1/3 is related to fundraising. Thus for total amount of contributions for item 12 is $2,130.492.00, and 1/3 of expenses for fundraising, item 14 is $666,026.39.

Should you need any additional information, please contact me.

Sincerely,

Tim J. Tierney
Executive Vice President

e-mail: tjt@thpa.org

TEXAS ATTORNEY GENERAL

11 AUG 24 PM 4: 31

CONSUMER DIV/AUSTIN

TEXAS ATTORNEY GENERAL

11 JUN -8 AM 11: 19

CONSUMER DIV/AUSTIN



# OFFICE OF THE ATTORNEY GENERAL
## LAW ENFORCEMENT TELEPHONE SOLICITATION ACT
### Tex. Rev. Civ. Stat. Ann. Art. 9023e (Vernon's 1997)

## REGISTRATION FORM

Charitable Trusts Section
Consumer Protection Division
P.O. Box 12548
Austin, Texas 78711-2548
800-621-0508          512-463-2185

☐ Initial Registration          ☒ Renewal Registration

1. Registrant name: **TEXAS HIGHWAY PATROL MUSEUM**

   Assumed name (dba) or publication name:

   Street Address:     501 OAKLAND AVE.

   Mailing Address:    501 OAKLAND AVE.

   City: AUSTIN                    State: TX              Zip: 78703

   Telephone: (512 ) 491-9117      Fax: (512 ) 491-6026

   Federal Tax ID# 74-2639283      State Tax Employer ID#

2. Attach a list providing the mailing address, street address, phone number and fax number of each office, chapter, local unit, branch or affiliate of registering organization.

3. Name and address of organization's registered agent:
   Tim Tierney, Executive Vice President, Texas Highway Patrol Museum
   501 Oakland Ave., Austin, Texas  78703

4. Name, title, address and phone numbers of each officer, director, and executive director or other chief operating officer:
   see attached

LETSA97V1

5. Name of each officer, director, or employee who is either compensated by the organization or has custody and control of funds of the organization:

Tim Tierney

6. Name of each officer, director, or employee who has been convicted of or pleaded nolo contendere to a misdemeanor involving fraud or the theft, misappropriation, misapplication, or misuse of property of another, or any felony, including the offense, and state, court and date of each conviction or plea of nolo contendere:

n/a

7. Incorporation date: July 8, 1992 ___ State of incorporation: Texas

Date organization began doing business: July 9, 1992

Fiscal Year Ends: 12/31 _____(Month/Day)

8. If not incorporated, type of organization and date established:

9. Provide a statement describing the organization's charitable purposes and a list of the programs for which funds are solicited:

Texas Highway Museum provides exhibits in the museum to educate the public on the importance of safety and awareness of the State Trooper and the job in protecting the citizens of Texas. We also feature yearly education for area high school students in our "Cruising for Coffins" program about drinking and driving. Funds are solicited for this program and to add more interactive displays for the museum to educate the public at large.

10. List the names, addresses and telephone numbers of the organization's accountants and auditors, and the method of accounting used:

Ken Gorance, CPA, 4501 Spicewood Springs Road, #1029, Austin, Texas 78759
Phone: 512-342-8081; Fax: 512-342-0458
Cash Basis accounting method

11. Provide the name and address of each commercial telephone solicitor, including subcontracted commercial telephone solicitors, engaged by the organization during the preceding 12 months (attach additional sheets as necessary):

Name: none used

Address:

LETSA97V1

Name:

_____

Address:

_____

_____

12. The total amount of contributions received during ☐ the preceding 12 months **or** ☒ the preceding fiscal year:

$See unaudited financial statement attached
_____

13. The total amount paid to commercial telephone solicitors during ☐ the preceding 12 months **or** ☐ the preceding fiscal year:

$0.00
_____

14. The total fund-raising costs during ☐ the preceding 12 months **or** ☒ the preceding fiscal year:

$See unaudited financial statement attached
_____

15. Has the organization applied for and been granted tax exempt status by the IRS?
    ☐ No    ☒ Yes    Date of Application July 3, 1997

    Date Exemption granted: 07/1991    IRS Exempt Code, if granted 501(c)(3)

16. Has tax exemption ever been denied, revoked or modified?: ☐ Yes    ☒ No
    If yes, date of action:

17. Is the organization eligible to receive tax-deductible contributions under § 170, IRS Code of 1986 (26 U.S.C § 170)? ☒ Yes    ☐ No

## ATTACHMENTS

1. Attach a copy of the organization's most recently filed IRS Form 990 and other federal tax returns, including all supplements, amendments and attachments to those returns, and any requests for extension to file those returns. If the organization has not filed a 990, attach a statement as to the reason none is filed, and a copy of the organizations most recent financial statements, including audited financial statements, if any have been prepared.

2. Attach $50.00 filing fee payable to the Attorney General of Texas.

3. Attach a signed copy of the commercial telephone solicitor statement obtained from each commercial telephone solicitor and each subcontracted telephone solicitor:

LETSA97V1

# Texas Highway Patrol Museum
## Statement of Revenues & Expenses: Income Tax Basis
### January through December 2010

|  | Jan - Dec 10 |
|---|---:|
| **Ordinary Income/Expense** | |
| **Income** | |
| 4100 · Contributions - General | |
| 4110 · Contributions - Area 2 | 55,065.58 |
| 4115 · Contributions - Area 3 | 381,502.98 |
| 4120 · Contributions - Area 4 | 461,446.56 |
| 4125 · Contributions - Area 5 | 453,393.01 |
| 4130 · Contributions - Area 6 | 367,771.36 |
| 4140 · Contributions - Ed Programs | 409,809.17 |
| 4190 · Contributions - Returned Checks | 1,907.00 |
| 4500 · Sales - Museum | (1,158.60) |
| **Total Income** | 755.28 |
| | 2,130,492.34 |
| **Expense** | |
| 5010 · Accounting Fees | |
| 5030 · Amortization | 11,225.31 |
| 5040 · Auto Expense | 29.00 |
| 5070 · Bank Charges | 17,466.65 |
| 5080 · Board Meetings - Meals | 133.78 |
| 5090 · Board Meetings - Facilities | 4,292.80 |
| 5100 · Board Meetings - Supplies | 33,388.80 |
| 5110 · Board Meetings - Travel | 10.29 |
| 5130 · Computer Expense | 20,514.91 |
| 5131 · Computer Expense - Contract Lab | |
| **Total 5130 · Computer Expense** | 63.75 |
| | 63.75 |
| 5155 · Computer Supplies | 13,839.02 |
| 5170 · Contract Labor | 555.00 |
| 5220 · Decals | 15,744.50 |
| 5230 · Delivery Services | 8,217.43 |
| 5240 · Depreciation | 2,917.58 |
| 5270 · Donations to Related Programs | 100.00 |
| 5280 · Dues & Subscriptions | 75.00 |
| 5360 · Insurance | |
| 5350 · Insurance - Auto | |
| 5355 · Insurance - Building | 927.92 |
| 5380 · Insurance - Disability | 5,033.13 |
| 5390 · Insurance - Health | 2,111.19 |
| **Total 5360 · Insurance** | 20,291.48 |
| | 28,363.72 |
| 5410 · Interest Expense | 1,476.25 |
| 5440 · Legal & Professional Fees | 5,100.00 |
| 5450 · Licenses & Permits | 521.39 |
| 5470 · Meals & Entertainment | 14,462.46 |
| 5480 · Miscellaneous | 9,907.89 |
| 5500 · Office Supplies & Expenses | 21,554.97 |
| 5530 · Payroll Processing | 6,814.56 |
| 5540 · Postage | 130,952.67 |
| 5550 · Printing | 43,069.65 |
| 5685 · Rent - Storage | 2,600.00 |
| 5690 · Rent - Area 2 D/HE | 41,904.20 |
| 5700 · Rent - Area 3 EP | 68,040.00 |
| 5730 · Rent - Area 6 SA/HSW | 25,879.84 |
| 5740 · Repairs & Maintenance | 7,025.65 |
| 5745 · Repairs & Maintenance - Oakland | 5.43 |
| 5750 · Salaries | |
| 5755 · Salaries - Administrative | |
| 5770 · Salaries - Museum - Staff | 236,080.30 |
| 5790 · Salaries - Manager - Area 2 | 15,789.12 |
| 5791 · Salaries - Managers Buffer A2 | (13,914.96) |
| **Total 5790 · Salaries - Manager - Area 2** | (13,914.96) |
| 5800 · Salaries - Manager - Area 3 | |
| 5801 · Salaries - Managers Buffer A3 | (1,455.07) |
| 5800 · Salaries - Manager - Area 3 - Other | 50,404.81 |
| **Total 5800 · Salaries - Manager - Area 3** | 48,949.74 |

# Texas Highway Patrol Museum
## Statement of Revenues & Expenses: Income Tax Basis
### January through December 2010

|  | Jan - Dec 10 |
|---|---:|
| 5810 · Salaries - Manager - Area 4 | |
| 5811 · Salaries - Managers Buffer A4 | (3,950.09) |
| 5810 · Salaries - Manager - Area 4 - Other | 92,164.01 |
| Total 5810 · Salaries - Manager - Area 4 | 88,213.92 |
| 5820 · Salaries - Manager - Area 5 | |
| 5821 · Salaries - Managers Buffer A5 | 1,427.08 |
| 5820 · Salaries - Manager - Area 5 - Other | 38,441.71 |
| Total 5820 · Salaries - Manager - Area 5 | 39,868.79 |
| 5830 · Salaries - Manager - Area 6 | |
| 5831 · Salaries - Mgrs Buffer A6 | (3,306.59) |
| 5830 · Salaries - Manager - Area 6 - Other | 32,870.98 |
| Total 5830 · Salaries - Manager - Area 6 | 29,564.39 |
| 5840 · Salaries - Mkting Director | 228,919.93 |
| 5860 · Salaries - Telemkting - Area 2 | 144,914.62 |
| 5870 · Salaries - Telemkting - Area 3 | 136,019.29 |
| 5880 · Salaries - Telemkting - Area 4 | 120,960.15 |
| 5890 · Salaries - Telemkting - Area 5 | 121,100.41 |
| 5900 · Salaries - Telemkting - Area 6 | 101,517.95 |
| Total 5750 · Salaries | 1,297,983.65 |
| 5910 · Scholarships | 2,300.00 |
| 5920 · Security Alarm | 1,213.32 |
| 5950 · Taxes - Payroll | |
| 5951 · Taxes - P/R - Unemployment | 4,493.76 |
| 5950 · Taxes - Payroll - Other | 15,339.83 |
| Total 5950 · Taxes - Payroll | 19,833.59 |
| 5970 · Taxes - Property | 168.19 |
| 5975 · Taxes - Sales | 257.12 |
| 5990 · Telephone - Austin | 4,512.74 |
| 6000 · Telephone - Area 2 D/HE | 9,612.38 |
| 6010 · Telephone - Area 3 EP | 51,106.56 |
| 6020 · Telephone - Area 4 HN | 15,173.90 |
| 6030 · Telephone - Area 5 HW | 13,476.26 |
| 6040 · Telephone - Area 6 SA/HSW | 13,610.95 |
| 6050 · Telephone - San Antonio Museum | 2,471.47 |
| 6070 · Travel | |
| 6080 · Travel - Mkting Director | 2,568.31 |
| 6070 · Travel - Other | 3,177.00 |
| Total 6070 · Travel | 5,745.31 |
| 6090 · Utilities - Austin | 3,770.42 |
| 6100 · Utilities - Area 2 D/HE | 2,171.27 |
| 6110 · Utilities - Area 3 EP | 8,110.72 |
| 6120 · Utilities - Area 4 HN | 1,791.18 |
| 6130 · Utilities - Area 5 HW | 2,048.73 |
| 6140 · Utilities - Area 6 SA/HSW | 1,891.78 |
| 6150 · Utilities - San Antonio Museum | 4,776.95 |
| Total Expense | 1,998,278.99 |
| Net Ordinary Income | 132,213.35 |

See Accountants' Compilation Report

# Texas Highway Patrol Museum
## Statement of Revenues & Expenses: Income Tax Basis
### January through December 2010

|  | Jan - Dec 10 |
|---|---|
| Other Income/Expense |  |
| Other Income |  |
| 8010 · Misc Income |  |
| 8020 · Interest Income | 0.00 |
| 8095 · Gain/Loss on Sale of Assets | 57.62 |
| 8100 · THPM Bldg Lease Inc - Loomis | 200.00 |
| 8110 · Oakland Avenue Lease Income | 86,175.18 |
| 8130 · Billboard Rental - Oakland | 1,000.00 |
| Total Other Income | 12,000.00 |
|  | 99,432.80 |
| Net Other Income | 99,432.80 |
| Net Income | 231,646.15 |

See Accountants' Compilation Report

# Texas Highway Patrol Museum
## Statement of Assets, Liabilities & Fund Balances: Tax Basis
### As of December 31, 2010

|  | Dec 31, 10 |
|---|---|
| **ASSETS** | |
| **Current Assets** | |
| **Checking/Savings** | |
| 1001 · Prosperity Bank | 98,836.73 |
| 1002 · RBFCU Money Market | 130,976.93 |
| 1003 · RBFCU Savings | 10.00 |
| **Total Checking/Savings** | 229,823.66 |
| **Other Current Assets** | |
| 1325 · A/R Employees | 4,034.93 |
| 1400 · Prepaid Expenses | 8,060.00 |
| 1500 · Inventory - Museum | 2,100.00 |
| **Total Other Current Assets** | 14,194.93 |
| **Total Current Assets** | 244,018.59 |
| **Fixed Assets** | |
| 1600 · Computers & Office Machinery | 40,174.98 |
| 1605 · Computer Software | 1,086.00 |
| 1610 · Equipment - Museum | 7,962.17 |
| 1615 · Furniture & Fixtures | 5,549.00 |
| 1620 · Vehicles | 7,863.03 |
| 1625 · Accumulated Depreciation | (48,774.84) |
| 1650 · Leasehold Improvements | 6,788.50 |
| 1655 · Acc Amort - Leasehold Imp | (794.00) |
| 1660 · Building - HoFM | 313,908.63 |
| 1661 · Building - 501 Oakland Ave | 165,812.17 |
| 1663 · Bldg Improvements - THPM | 4,380.00 |
| 1665 · Accumulated Depn Bldgs | (63,676.74) |
| 1670 · Land - HoFM Site | 182,705.75 |
| 1671 · Land - 501 Oakland Ave | 184,250.00 |
| **Total Fixed Assets** | 807,234.65 |
| **Other Assets** | |
| 1705 · Museum Exhibits | 46,944.34 |
| 1750 · Deposits Security | 8,994.21 |
| **Total Other Assets** | 55,938.55 |
| **TOTAL ASSETS** | 1,107,191.79 |
| **LIABILITIES & EQUITY** | |
| **Liabilities** | |
| **Current Liabilities** | |
| **Accounts Payable** | |
| 2005 · A/P THPA Services, Inc | 35,586.76 |
| 2010 · A/P - THPA | 28,448.80 |
| **Total Accounts Payable** | 64,035.56 |
| **Other Current Liabilities** | |
| 2130 · Outstanding Checks | 10,117.68 |
| **Total Other Current Liabilities** | 10,117.68 |
| **Total Current Liabilities** | 74,153.24 |
| **Total Liabilities** | 74,153.24 |
| **Equity** | |
| 3900 · Fund Balance Operating | 801,392.40 |
| Net Income | 231,646.15 |
| **Total Equity** | 1,033,038.55 |
| **TOTAL LIABILITIES & EQUITY** | 1,107,191.79 |

See Accountants' Compilation Report

# EXHIBIT J



May 8, 2009

Leesa Clause
Brown & Schaefer, P.C.
1310 Ranch Road 620 So., Suite 204
Lakeway, TX 78734-6342

Re:  Renewal Notice for *Texas Highway Patrol Association and Texas Highway Patrol Museum*;  Law Enforcement Telephone Solicitation Act, Tex. Bus. & Comm. Code Ann. §§ 303.001 – .054.

Dear Ms. Clause,

My records indicate that the registration under the Texas Law Enforcement Telephone Solicitation Act (the "Act"), referenced above, for both the Texas Highway Patrol Association and the Texas Highway Patrol Museum expires on May 15, 2009. Registration must be renewed annually by filing a renewal registration statement and paying a $50.00 filing fee.

The necessary form is available as a fill-in .pdf document on the Office of the Attorney General's website at the following link:  http://www.oag.state.tx.us/consumer/charityregform.pdf

Additional information regarding the Act and registration requirements may be found at: http://www.oag.state.tx.us/consumer/charityregform.pdf

Please call or write I can assist you further.

Sincerely,

Susan Galloway
Investigator, Charitable Trusts
Consumer Protection and Public Health Division
P.O. Box 12548
Austin, Texas 78711-2548
(512) 463-3772 (direct)
(512) 322-0578 (fax)
susan.galloway@oag.state.tx.us

# EXHIBIT K

**From:** Susan Galloway
**To:** mailbox@brown-schaefer.com
**Date:** 5/13/2009 1:05 PM
**Subject:** Re: Texas Highway Patrol Museum

Hi Leesa,

Thanks for letting me know. The Association does not need to register with the Attorney General's office if it is not soliciting donations by telephone. If possible, I would appreciate a letter that states THPA is withdrawing its registration because it no longer conducts telephone solicitations. You can send that along with the registration paperwork for THPM or fax it to me and I will update the file accordingly and take THPA off my registration list.

Sincerely,
Susan

Susan Galloway
Investigator, Charitable Trusts
Consumer Protection Division
P.O. Box 12548
Austin, TX 78711-2548
(512) 463-3772 direct
(512) 322-0578 fax

>>> "BROWN & SCHAEFER, P.C." <mailbox@brown-schaefer.com> 5/13/2009 10:37 AM >>>
Dear Susan:

Tim Tierney says that the Texas Highway Patrol Association (THPA) no longer does any fundraising/solicitation. Do they still need to register?

Tim says that all "business" of the Texas Highway Patrol Museum (THPM) are done though THPM only.

THPA is not used for anything at this point in time.

Let me know if there is something we have to submit to "terminate" that registration or if we need to keep registering it anyway.

Thanks,
Leesa

BROWN & SCHAEFER, P.C.
Attorneys
1310 Ranch Road 620 So., Suite 204
Lakeway, TX 78734

Phone: 512-263-7450
Fax:    512-263-7454

# EXHIBIT L

# BROWN & SCHAEFER, P.C.
## ATTORNEYS AT LAW

Telephone:
(512) 263-7450
Fax:
(512) 263-7454

1310 Ranch Rd. 620 So.
Suite 204
Lakeway, Texas 78734-6342

Email:
mailbox@brown-schaefer.com

KIM D. BROWN
Board Certified, Residential Real Estate Law
Texas Board of Legal Specialization

TROY D. BOLEN
Also Licensed in Colorado

LANA S. HARRIS
Of Counsel

May 13, 2009

Tim J. Tierney
Texas Highway Patrol Museum
501 Oakland Ave.
Austin, Texas 78703

Re:    Application of Law Enforcement Telephone Solicitation Act ("LETSA", Chapter 303 of the Texas Business and Commerce Code) to Texas Highway Patrol Association ("THPA")

Dear Tim:

You have asked me to review the relevant provisions of the LETSA statute and its legal application to THPA. The following comments are the results of that review.

THPA is a Texas nonprofit corporation, qualified as a tax-exempt organization under Section 501(c)(6) of the U.S. Internal Revenue Code. THPA's primary source of operating revenue is annual dues collected from its members, and THPA provides membership benefits to those dues-paying members (including, for example, some supplemental insurance coverage that is not currently affordably available to the member state troopers through their state employment benefits).

Section 303.001(3) includes the following Definition: "'Law enforcement-related charitable organization' means a person who solicits a contribution and is or purports to be established or operating for a charitable purpose relating to law enforcement." The next Definition, under Section 303.001(4) states, "'Telephone solicitation' means the use of a telephone to solicit another person to make a charitable contribution to a law enforcement-related charitable organization." The Registration requirement of LETSA is found under Section 303.051 (Record of Organizations), which states: "The attorney general shall maintain: (1) a register of law enforcement-related charitable organizations subject to this chapter; and (2) a registry of law enforcement-related charitable organizations that submit to the attorney general a completed registration statement containing the information required by Section 303.052."

Since THPA now solicits no contributions and receives no funding from telephone solicitation activities, it is actually not a "law enforcement-related charitable organization" under the above quoted definition. Therefore, THPA is not now subject to the registration requirements of LETSA.

It is my understanding that THPA has in recent years filed a LETSA registration with the Texas Attorney General, in combination with the registration filed by its related entity, the Texas Highway Patrol Museum ("THPM"). THPM is a separate Texas nonprofit organization qualified as a tax-exempt organization under Section 501(c)(3) of the U.S. Internal Revenue Code. THPM's primary source of operating revenue is funds collected through telephone solicitation activities, and THPM operates its museum and educational programs provided to Texas law enforcement personnel and the public at large. THPM is obviously a "law enforcement-related charitable organization" under the above quoted definition and definitely subject to the LETSA registration requirements.

It is my understanding from conversations with Ken Gorence, the CPA who supervises the financial records and reporting of both THPA and THPM, that the joint LETSA registration probably made some practical sense in past years when THPM basically raised funds jointly on behalf of THPA and THPM and the operating functions of the organizations were somewhat overlapping. However, in recent years the functions of the two organizations were reorganized and separated, and the past financial ties and financial support relationship between THPA and THPM were removed, so that the two organizations now function as separate financial entities with clearly defined operating tasks, separate funding sources (as described above) and separate financial books and accounts. That is why, in my opinion, the joint registration of THPA and THPM should be discontinued, and only THPM should continue to comply with the LETSA registration requirements.

If there seems to be any controversy between THPA and the Texas Attorney General's office about the information or conclusions stated above, I would be glad to set up or participate in a discussion or meeting with a representative of that office, and I am fairly certain that Ken Gorence could also participate as needed, to provide verification of the reorganization and separation of THPA and THPM in recent years.

Sincerely,

Kim D. Brown

cc:     Ken Gorence, CPA

KDB\TierneyT_Ltr_051309

Q.    (BY MR. CUSTER)   You are part of the Kitchen Door, Incorporated; is that correct?

A.    I have -- My friends were owners of that and I helped them out by getting a credit card --

Q.    Huh?

A.    -- for the company.   And then they used it as -- for the -- for their company, the Kitchen Door for a while.   And they stopped using it.

And I started using it for our expenses because American Express changed the way they do their credit lines.   They used to -- used to be able to transfer it from one to the other.

Q.    Hmm?

A.    And they stopped doing that.   And so our credit line was too low on the Texas Highway Patrol Association account, so I used that other card.   But all the charges that are on there are for business expenses related to our organizations.

Q.    And it's card ending number 92009?

A.    That sounds familiar, right.

Q.    Okay.

MR. BROWN:   So when it was being used by the Kitchen Door, were they paying the bill directly?

THE WITNESS:   Yeah.   They were.   Um-hmm. And there were no -- I wasn't using it.



ESQUIRE
an Alexander Gallo Company

PLAINTIFF'S
EXHIBIT
22

Toll Free: 800.969.3027
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

State of Texas  §
              §
County of Travis  §

## Affidavit of Henry Wood

Before me, the undersigned authority, personally appeared Henry Wood, who being by me duly sworn, deposed as follows:

1. My name is Henry Wood. I am over the age of eighteen and I reside in Travis County, Texas. I have never been convicted of a crime, and I am fully competent to make this affidavit. I have personal knowledge of the facts stated herein. My business address is 300 West 15th Street, Austin, Texas 78701.

2. I am employed as an Auditor with the Internal Audit Division of the Office of the Texas Attorney General. In this capacity, I have assisted the Consumer Protection Division's (CPD) investigation of the Texas Highway Patrol Museum, Texas Highway Patrol Association, and THPA Services, Inc.

3. I reviewed bank records and credit card statements which had been obtained as a result of Civil Investigative Demands (CID) issued to the above three entities and the applicable financial institutions.

4. Using the financial information provided, I reviewed a portion of the credit card statements for three of the five identified credit card accounts used by key personnel of the three entities during the scope period of the CID.



PLAINTIFF'S EXHIBIT 23

5.  The first account I reviewed was the American Express credit card (account in the name of Tim Tierney, The Kitchen Door, Inc.) ending in 2-92009. My review included all transactions made with the card commencing with the first use by Mr. Tierney on July 15, 2009 and continuing through the closing of the account in July 2010.

6.  Using the detailed listing of charges contained within each statement, I entered each transaction into Microsoft Excel including the name of the vendor, purchase amount, and the closing date of the statement on which each transaction occurred. After entering the information from the credit card statements, I assigned each transaction a category of expenditure based on the nature of the expenditure. For example, transactions involving airlines were grouped under the category "Airfare," transactions involving hotel stays were grouped under the category of "Hotel." Transactions with no readily apparent category were assigned to "Unknown."

7.  The chart below shows the breakout of the charges summarized by expenditure category including total charges by category and total charges for the time period reviewed (July 2009 through July 2010) of $239,276.71.

| July 2009 – July 2010 | |
|---|---|
| Category | Total |
| Advertising | $6,599.50 |
| [illegible] | $5,538.74 |
| Auto | $728.85 |
| Books | $18.35 |
| Cash | $21,788.26 |
| [illegible] | $846.12 |
| [illegible] | $728.30 |
| [illegible] | $89.95 |
| Gas | $1,317.01 |
| General Office | $3,206.97 |
| Grocery | $9,294.94 |
| Home Improvement | $23.23 |
| [illegible] | $100.00 |
| Hotel | $9,714.68 |
| Insurance | $386.24 |
| Medical Services | $895.00 |
| News Monitoring | $2,632.65 |
| [illegible] Service | $143.48 |
| Postal | $16,639.76 |
| Printing | $37,163.22 |
| Restaurant | $9,854.58 |
| School | $52.54 |
| Tele-Communications | $92,238.95 |
| Transportation | $244.58 |
| Unknown | $7,758.94 |
| Utilities | $10,665.69 |
| Vehicle | $606.18 |
| Grand Total | $239,276.71 |

8. Although the above arbitrary classification does not provide direct support regarding the appropriateness or inappropriateness of individual transactions, it does provide a high level overview on the types of purchases being made by Mr. Tierney and being paid for with funds of the above entities. Some of the important areas to note from the above chart include:

- Restaurant charges - $9,854.38

- Grocery charges - $9,294.94

- Airfare charges - $5,538.74

- Unknown - $7,758.94 (Charges with no readily apparent category of expenditure)

9. A small sample of transactions charged by Mr. Tierney and identified in the credit card statements include:

- Tickets to Sea World – San Diego (03/22/10 - $64.00)

- Airfare for Mr. Tierney, his partner, and his son to visit family in California (09/09/09 – $179.20 each)

- Airfare for Mr. Tierney, his son and friend to Boston, Massachusetts (05/06/10 – $234.80 each)

- Three separate trips to Gold Class Movie Cinema in May 2010 totaling $161.07

- Airfare for foreign exchange student staying with Mr. Tierney to fly to Hawaii (05/28/10 - $1,415.69)

- Two charges for a video game rental website on 05/31/10 totaling $17.27

- Airfare for Mr. Tierney, his partner, and his son to travel from San Diego California (03/21/10 – $99.65 each)

- Dinner at Edgewater Grill – (03/12/10 - $156.50)

- Dinner at Matt's El Rancho – (10/21/09 - $78.31)

10. After developing the above chart, I reconciled payments made to the credit card account (2-92009) and listed on the credit card statement with the bank records provided by Prosperity Bank. After establishing the Prosperity Bank account in September 2009, Mr. Tierney made payments totaling $178,944.11 from the Texas Highway Patrol Museum account and payments totaling $56,139.60 from the THPA Services Inc., account. No payments to the American Express credit card (2-92009) were made from a non Texas Highway Patrol account during this time.

11. The second credit card account I reviewed was the Citi Business Credit Card (account in the name of Tim Tierney, Texas Highway Patrol) ending in 0609. The review included all transactions made with the card from September 2009 through June 8, 2011. In addition to Mr. Tierney, this account was also used by three other individuals including K. Lane Denton, Steven Jenkins, and Ruben Villalva beginning in August 2010.

12. Using the detailed listing of charges contained within each statement I entered each transaction into Microsoft Excel including the name of the vendor, purchase amount, and the closing date of the statement on which each transaction occurred. After entering the information from the credit card statements I assigned to each transaction a category of expenditure based on the nature of the expenditure.

13. The chart below shows the breakout of the charges summarized by expenditure category including total charges by individual, by category and total charges for the time period reviewed (September 2009 through June 2011) of $169,875.50.

| September 2009 – June 2011 | | | | | |
|---|---|---|---|---|---|
| Category | K. L. Denton | R. Villalva | S. Jenkins | T. Tierney | Grand Total |
| Advertising | | $931.58 | | $1,805.79 | $2,737.37 |
| Airfare | $1,660.30 | $1,871.00 | | $4,407.21 | $7,938.51 |
| Books | $3,401.66 | | | $7.37 | $3,409.03 |
| Building Maintenance | | $325.00 | | $1,365.66 | $1,690.66 |
| Car Rental | | $973.59 | | $480.64 | $1,454.23 |
| Church | | $710.00 | | $118.35 | $828.35 |
| Clothing | | | | $287.49 | $287.49 |
| Electronics | $177.42 | $277.16 | | $1,839.23 | $2,293.81 |
| Entertainment | $1,645.51 | $3,266.31 | $45.57 | $1,441.98 | $6,399.37 |
| Fitness Club | $203.28 | | | | $203.28 |
| Gas | $2,583.89 | $969.65 | $450.52 | $948.09 | $4,952.15 |
| General Office | $1,806.22 | $3,524.63 | $876.85 | $3,303.64 | $9,511.34 |
| Grocery | $968.22 | $478.61 | $2,274.95 | $42.16 | $3,763.94 |
| Home Improvement | $2,372.68 | $213.53 | | $4.84 | $2,591.05 |
| Home Security | | | | $865.22 | $865.22 |
| Hotel | $9,785.13 | $1,507.93 | | $1,220.97 | $12,514.03 |
| Housing | | $100.00 | | | $100.00 |
| Insurance | | | | $927.92 | $927.92 |
| NSW Monitoring | | | | $7,449.55 | $7,449.55 |
| Postal | $1,660.80 | $57.15 | | $13,801.91 | $15,519.86 |
| Printing | | $1,430.73 | | $12,557.64 | $13,988.37 |
| Private School | | | | $100.00 | $100.00 |
| Restaurant | $11,521.79 | $7,374.21 | $1,215.31 | $6,321.04 | $26,432.35 |
| Telecommunications | | $2,383.62 | | $9,024.22 | $11,407.84 |
| Transportation | $773.00 | | | $58.25 | $831.25 |
| Unknown | $4,480.12 | $4,168.91 | $104.08 | $3,412.77 | $12,165.88 |
| Utilities | | $484.00 | | $16,786.21 | $17,270.21 |
| Vehicle | $1,204.32 | $571.39 | | $98.49 | $1,874.20 |
| Vault Expenses | | | | $368.24 | $368.24 |
| Grand Total | | | | | |

14. Although the above arbitrary classification does not provide direct support regarding the appropriateness or inappropriateness of individual transactions, it does provide a high level overview on the types of purchases being made by key entity

personnel and being paid for with funds of the three entities. Some of the important areas to note from the above chart include:

- Restaurant charges - $26,432.35

- Entertainment charges - $6,399.37

- Book store purchases - $3,409.03

- Grocery charges - $3,763.94

- Airfare charges - $7,938.51

- Unknown - $17,270.21 (Charges with no readily apparent category of expenditure)

15. A small sample of transactions charged by Mr. Tierney and identified in the credit card statements include:

- Dinner at Abel's on the Lake (11/20/10 – $73.25)

- Tickets to Six Flags Fiesta Texas (12/01/10 – $156.32)

- Airfare to Salt Lake City on JetBlue Airlines (09/10/10 - $1,723.20)

- Airfare for Mr. Tierney to visit his foreign exchange student in Germany on British Airways (09/13/10 - $1,213.10)

- Hotel stay at the Westin Verasa – Napa Valley California (09/19/10 - $323.79)

- Two separate trips to the Alamo Drafthouse in November 2010 totaling $186.64

- Dinner at Threadgill's (11/07/10 – $65.05)

- Dinner at Fabi and Rosi (12/23/10 - $129.75)

16. A small sample of transactions charged by Mr. Denton and identified in the credit card statements include:

- Three separate trips to the La Fonda Restaurant in September 2010 totaling $362.77

- Purchase at Spectrum Fitness Club of $203.28 on September 1, 2010

- Dinner at Palm Restaurant in San Antonio for $284.57 on August 19, 2010

- Dinner at Palm Restaurant in San Antonio for $158.21 on September 10, 2010

- Dinner at Palm Restaurant in San Antonio for $136.86 on September 16, 2010

- Costco Liquors for $61.60 on October 19, 2010

- Warwick Melrose Hotel – Dallas on October 23, 2010 for $149.03

- Crescent Hotel Dallas – for $256.90 on October 25, 2010

- Purchase at ABC Home Furnishings during trip in New York of $285.00 on May 17, 2011

- The Modern Restaurant at the Museum of Modern Art for $122.79 on May 17, 2011

- Marriot Courtyard New York for $697.73 on May 19, 2011

17. A small sample of transactions charged by Mr. Jenkins and identified in the credit card statements include:

- 28 visits to the La Casita Restaurant in Austin, Texas from August 10, 2010 through June 3, 2011 totaling $619.67

- Dinner at Carrabba's Restaurant in Austin, Texas on November 4, 2010 for $235.69

- Sixteen trips to HEB Grocery store between August 10th, 2010 through June 6, 2011 totaling $2,215.10

18. A small sample of transactions charged by Mr. Villalva and identified in the credit card statements include:

- Dinner at the El Taco Tote in El Paso on September 1st, 2010 for $112.11

- Dinner at Pelican's Restaurant in El Paso on September 12th, 2010 for $130.48

- XM Satellite Radio purchase on September 14th, 2010 for $81.88

- Purchase at CigarsInternational.com for $91.44 on October 13th, 2010

- Purchase at Boombah.com (Sports Apparel Website) on October 29th, 2010 for $363.52

- Purchase at Boombah.com (Sports Apparel Website) on November 2nd, 2010 for $425.02

- Purchase at the Aria Bar and Aria Gold Lounge in Las Vegas on November 24, 2010 for $92.47

- Tickets to the 2010 Sun Bowl in El Paso for $258.97 purchased on December 6th, 2010

- Chase Suites El Paso on January 2nd, 2011 for $203.28

- 2 Purchases at Geske Fire Grill in El Paso on January 7th, 2011 for $374.33

19. After developing the above chart, I then reconciled payments made to the credit card account (0609) with the bank records provided by Prosperity Bank. After establishing the Prosperity Bank account in September 2009 Mr. Tierney made payments totaling $91,264.91 from the Texas Highway Patrol Museum account and payments totaling $78,923.93 from the THPA Services Inc. account. No payments to the Citi Business credit card (0609) were made from a non Texas Highway Patrol account during this time.

20. The third credit card I reviewed was the American Express Starwood Preferred Guest Business Card (account in the name of Tim Tierney, Texas Highway Patrol) ending in 3-62007). I reviewed the April 2009 to May 2009 statement for this account. Mr. K. Lane Denton also has a card on this account.

21. A small sample of transactions charged by Mr. Denton and identified in this credit card statement include:

- Starbucks (04/11/09 – $33.47)

- Borders Books (04/16/09 - $46.11)

- Purchases at Costco Wholesale Club (04/22/09 - $237.69)

- Palm Restaurant (04/27/09 - $73.69)

- Hilton Hotels Houston (04/16/09 - $143.86)

- Loews Hotel Washington DC – (04/17/09 - $4846.03)

- Hilton Hotels Houston (05/02/09 - $259.69)

- La Fonda Restaurant – (05/10/09 - $107.65)

22. Based solely on a review of the credit card statements, I cannot make a determination as to whether the expenditures are truly of a business nature and thereby appropriate. However, even at a cursory level, every month thousands of dollars of expenditures occur, which on the surface would appear to have no direct correlation to the mission of any of the three entities.

23. Further Affiant Sayeth Not.

Henry Wood
Auditor
Internal Audit Division
Office of the Attorney General

SWORN TO AND SUBSCRIBED before me on this 13th day of December, 2011, to certify which, witness my hand and seal.

LINDA VELASQUEZ
Notary Public
STATE OF TEXAS
Commission Exp. 07-28-2014
Notary without Bond

Notary Public, State of Texas

Prepared For
**TIM TIERNEY**
**THE KITCHEN DOOR INC**

DUPLICATE COPY

Account Number

Page 4 of 10



## New Activity continued

| Date | Description | Amount $ |
|---|---|---|

| 03/21/10 | OSF - DUSSINI 08 227SAN DIEGO<br>619-233-4323<br>Description<br>FOOD/BEVERAGE | 54.58 |
| 03/21/10 | HARRYS MARKET 334501SAN DIEGO<br>MISC FOOD STORE<br>Description<br>GROCERIES/SUND | 8.69 |
| 03/21/10 | MCI SB LOCAL SERVICEHIGHLANDS RANCH<br>800-4364444 | 573.53 |
| 03/21/10 | ROBERTOS TACO SHOP 0SAN DIEGO<br>8584881610<br>Description                Price<br>FAST FOOD RESTAURAN   28.46 | 28.46 |
| 03/21/10 | HYATT RGCY MISSION BSAN DIEGO<br>Arrival Date          Departure Date<br>03/21/10               03/22/10<br>00000000<br>LODGING | 25.13 |
| 03/21/10 | Yellow Cab of San DiSan Diego<br>TAXICAB & LIMOUSINE | 26.60 |
| 03/22/10 | GEXA ENERGY      (713) 961-9399<br>GEXA ENERGY ELEC. BILL | 94.81 |
| 03/22/10 | SEA WORLD-SAN DIEGO SAN DIEGO<br>6192263856<br>Description          Price<br>AMUSEMENT PARK, CIR   64.00 | 64.00 |
| 03/22/10 | ATTM*287018631382NBIALPHARETTA<br>800-331-0500<br>Description<br>TELEPHONE SERV | 147.69 |
| 03/23/10 | AMERICAN AIRLINES   ONBOARD SALE TX<br>AMERICAN AIRLINES<br>From:                To:              Carrier:   Class:<br>SAN DIEGO CA   DALLAS/FT WORTH TX   AA      XX<br>NOT AVAILABLE<br>Ticket Number: 00100416223720        Date of Departure: 03/23<br>Passenger Name: TIERNEY T<br>Document Type: INFLIGHT CHARGES | 10.49 |
| 03/23/10 | MAUDIES ORIGINAL LP AUSTIN<br>5124733740<br>TIP                         6.00 | 34.09 |
| 03/23/10 | Yellow Cab of San DiSan Diego<br>TAXICAB & LIMOUSINE | 24.00 |
| 03/24/10 | CHILI'S GRILL#503   SAN JOSE<br>1-800-983-4637 | 102.17 |
| 03/24/10 | HYATT RGCY MISSION BSAN DIEGO<br>Arrival Date          Departure Date<br>03/20/10               03/23/10<br>00000000<br>LODGING | 9.90 |
| 03/24/10 | HYATT RGCY MISSION BSAN DIEGO<br>Arrival Date          Departure Date<br>03/20/10               03/23/10<br>00000000<br>LODGING | 800.00 |
| 03/25/10 | GEXA ENERGY      (713) 961-9399<br>GEXA ENERGY ELEC. BILL | 291.56 |

THP Amer Exp CID2011 -3736

Continued on next page

# DUPLICATE COPY

Prepared For
**TIM TIERNEY**
**THE KITCHEN DOOR INC**

Account Number

Closing Date
10/08/09

Page 3 of 8

## New Activity continued

| | | | | | Amount $ |
|---|---|---|---|---|---|
| 09/09/09 | ALASKA AIRLINES    WEB-ALASKAAIRWA | | | | |
| | ALASKA AIRLINES | | | | 179.20 |
| | From:<br>AUSTIN TX | To:<br>SAN JOSE CA<br>AUSTIN TX | Carrier:<br>AS<br>AS | Class:<br>T1<br>T1 | | |
| | Ticket Number: 02721388257475 | | | | |
| | Passenger Name: TIERNEY, TIM | | | | |
| | Document Type: PASSENGER TICKET | | | | |
| 09/09/09 | ALASKA AIRLINES    WEB-ALASKAAIRWA | | | | |
| | ALASKA AIRLINES | | | | 179.20 |
| | From:<br>AUSTIN TX | To:<br>SAN JOSE CA<br>AUSTIN TX | Carrier:<br>AS<br>AS | Class:<br>T1<br>T1 | | |
| | Ticket Number: 02721388257486 | | | | |
| | Passenger Name: GENE, BILLINGSLEY | | | | |
| | Document Type: PASSENGER TICKET | | | | |
| 09/09/09 | ALASKA AIRLINES    WEB-ALASKAAIRWA | | | | |
| | ALASKA AIRLINES | | | | 179.20 |
| | From:<br>AUSTIN TX | To:<br>SAN JOSE CA<br>AUSTIN TX | Carrier:<br>AS<br>AS | Class:<br>T1<br>T1 | | |
| | Ticket Number: 02721388257490 | | | | |
| | Passenger Name: BILLINGSLEY TIERNEY, | | | | |
| | Document Type: PASSENGER TICKET | | | | |
| 09/09/09 | STAMPS.COM    SERVICE FEE | | | | |
| | O89517454 90405 | | | | 15.99 |
| 09/09/09 | MARIE CALLENDER PIE SUNSET VALLEY | | | | |
| | RESTAURANT | | | | 68.21 |
| | FOOD/BEVERAGE | 58.21 | | | |
| | TIP | 10.00 | | | |
| 09/09/09 | AED SUPERSTORE 54292WOODRUFF | | | | |
| | 8005440048 | | | | 895.00 |
| | Description | Price | | | |
| | MEDICAL/LAB/DNTL/OP | 895.00 | | | |
| 09/09/09 | SIR SPEEDY 4092 6500AUSTIN | | | | |
| | 5123389818 | | | | 343.30 |
| | Description | Price | | | |
| | QUICK COPY, REPRODU | 343.30 | | | |
| 09/10/09 | KOBEJAPANESESTEAKHOUAUSTIN | | | | |
| | RESTAURANT | | | | 89.29 |
| | FOOD/BEVERAGE | 76.38 | | | |
| | TIP | 12.91 | | | |
| 09/10/09 | COSTCO WHSE #00641 9AUSTIN | | | | |
| | WHOLESALE CLUB | | | | 496.94 |
| 09/11/09 | THE BRICK OVEN RESTAAUSTIN | | | | |
| | RESTAURANT | | | | 77.55 |
| | TIP | 12.00 | | | |
| 09/12/09 | RESTAURANT COM INC RARLINGTON HTS | | | | |
| | 800-979-8985 | | | | 8.00 |
| 09/13/09 | CHEVRON LAKE AUSTIN AUSTIN | | | | |
| | 5124777477 | | | | 47.23 |
| | Description | Price | | | |
| | FUEL/MISCELLANEOUS | 47.23 | | | |
| 09/13/09 | THE SOUP PEDDLER 110AUSTIN | | | | |
| | 5125543834 | | | | 83.35 |
| | Description | Price | | | |
| | CATERER | 83.35 | | | |
| 09/14/09 | GEXA ENERGY    (713) 961-9399 | | | | |
| | GEXA ENERGY ELEC. BILL | | | | 455.87 |

THP Amer Exp CID2011 -3684

Continued on reverse

Prepared For
**TIM TIERNEY**
**THE KITCHEN DOOR INC**

Account Number

| New Activity continued | | | | | Amount $ |
|---|---|---|---|---|---|
| 05/03/10 | 5TH STREET CAR WASH AUSTIN<br>5124738379<br>Description    Price<br>CAR WASH    2.75 | | | | 2.75 |
| 05/03/10 | ATT BUS PHONE PMT 800-499-7928<br>AT&T ONL PMT | | | | 748.81 |
| 05/03/10 | ATT BUS PHONE PMT 800-499-7928<br>AT&T ONL PMT | | | | 1,075.13 |
| 05/04/10 | TORCHY'S TACOS - #3 AUSTIN<br>RESTAURANT<br>TIP    2.00 | | | | 29.71 |
| 05/05/10 | LivingSocial 1089295Washington<br>2024089777 | | | | 150.00 |

| 05/06/10 | AMERICAN AIRLINES DALLAS, TX | | | | 234.80 |
|---|---|---|---|---|---|
| | AMERICAN AIRLINES | | | | |
| | From: | To: | Carrier: | Class: | |
| | AUSTIN TX | DALLAS/FT WORTH TX | AA | QA | |
| | | BOSTON MA | AA | QA | |
| | | DALLAS/FT WORTH TX | AA | QA | |
| | | AUSTIN TX | AA | QA | |
| | Ticket Number: 00123192228463 | | Date of Departure: 05/06 | | |
| | Passenger Name: TIERNEY/TIM | | | | |
| | Document Type: PASSENGER TICKET | | | | |

| 05/06/10 | AMERICAN AIRLINES DALLAS, TX | | | | 234.80 |
|---|---|---|---|---|---|
| | AMERICAN AIRLINES | | | | |
| | From: | To: | Carrier: | Class: | |
| | AUSTIN TX | DALLAS/FT WORTH TX | AA | QA | |
| | | BOSTON MA | AA | QA | |
| | | DALLAS/FT WORTH TX | AA | QA | |
| | | AUSTIN TX | AA | QA | |
| | Ticket Number: 00123192242651 | | Date of Departure: 05/06 | | |
| | Passenger Name: BILLINGSLEYTIERNEY/D | | | | |
| | Document Type: PASSENGER TICKET | | | | |

| 05/06/10 | AMERICAN AIRLINES DALLAS, TX | | | | 234.80 |
|---|---|---|---|---|---|
| | AMERICAN AIRLINES | | | | |
| | From: | To: | Carrier: | Class: | |
| | AUSTIN TX | DALLAS/FT WORTH TX | AA | QA | |
| | | BOSTON MA | AA | QA | |
| | | DALLAS/FT WORTH TX | AA | QA | |
| | | AUSTIN TX | AA | QA | |
| | Ticket Number: 00123192242673 | | Date of Departure: 05/06 | | |
| | Passenger Name: JONES/MICHAEL | | | | |
| | Document Type: PASSENGER TICKET | | | | |

| 05/06/10 | JBL*SOCIALGOLD SAN FRANCISCO<br>415-237-0573 | | | | 39.99 |
|---|---|---|---|---|---|
| 05/06/10 | GALAXY CAFE WEST LYNAUSTIN<br>5124783434<br>TIP    2.00 | | | | 23.94 |
| 05/07/10 | TEXACO COAST TO COASAUSTIN<br>5129739730<br>Description    Price<br>FUEL/MISCELLANEOUS    29.78 | | | | 29.78 |
| 05/08/10 | COSTCO WHSE #0641 00S AUSTIN<br>5123823013 | | | | 517.40 |
| 05/08/10 | MANGIA PIZZA LAKE AUAUSTIN<br>200902287 78703<br>EATING PLACES AND RESTAURANTS | | | | 27.87 |
| 05/08/10 | OFFICEMAX, INC. 0377512-472-1644<br>512-472-1644<br>8-1/2 X 11<br>SURGE PROTECTORS | | | | 53.56 |

THP Amer Exp CID2011 -3748

Continued on next page

Prepared For
TIM TIERNEY
THE KITCHEN DOOR INC

Account Number

## New Activity continued

| | | | Amount $ |
|---|---|---|---|
| 05/15/10 | SMITH & WOLLENSKY 10WASHINGTON | | 86.78 |
| | RESTAURANT | | |
| | FOOD/BEVERAGE | 71.78 | |
| | TIP | 15.00 | |
| 05/15/10 | NATIONAL AQUARIUM INBALTIMORE | | 13.00 |
| | 410-659-4252 | | |
| 05/16/10 | THE SOUP PEDDLER 110AUSTIN | | 47.63 |
| | 5125543834 | | |
| | Description | Price | |
| | CATERER | 47.63 | |
| 05/16/10 | T G I FRIDAY'S C792 WASHINGTON | | 14.51 |
| | RESTAURANT | | |
| | FOOD/BEVERAGE | 12.51 | |
| | TIP | 2.00 | |
| 05/17/10 | GEXA ENERGY (713) 961-9399 | | 221.85 |
| | GEXA ENERGY ELEC. BILL | | |
| 05/17/10 | THE DUPONT HOTEL 440WASHINGTON | | 7,751.60 |
| | Arrival Date | Departure Date | |
| | 05/11/10 | 05/17/10 | |
| | 00000000 | | |
| | LODGING | | |
| 05/17/10 | SUZI'S CHINA KITCHENAUSTIN | | 45.13 |
| | 5124418400 | | |
| | FOOD/BEVERAGE | 37.13 | |
| | TIP | 8.00 | |
| 05/18/10 | AUSTIN BUSINESS PRIN5128366902 | | 1,491.99 |
| | 97347 78753 | | |
| | PUBLISHING AND PRINTING | | |
| 05/18/10 | THE DUPONT HOTEL 440WASHINGTON | | 8,116.75 |
| | Arrival Date | Departure Date | |
| | 05/11/10 | 05/17/10 | |
| | 00000000 | | |
| | LODGING | | |
| 05/18/10 | THE DUPONT HOTEL 440WASHINGTON | | 23.32 |
| | Arrival Date | Departure Date | |
| | 05/11/10 | 05/17/10 | |
| | 00000000 | | |
| | LODGING | | |
| 05/19/10 | GALAXY CAFE WEST LYNAUSTIN | | 28.21 |
| | 5124783434 | | |
| | TIP | 3.00 | |
| 05/20/10 | GEXA ENERGY (713) 961-9399 | | 100.74 |
| | GEXA ENERGY ELEC. BILL | | |
| 05/20/10 | MANGIA PIZZA LAKE AUAUSTIN | | 34.69 |
| | 200902769 78703 | | |
| | EATING PLACES AND RESTAURANTS | | |
| 05/20/10 | GOLD CLASS AUSTIN 30AUSTIN | | 69.00 |
| | 5125683400 | | |
| | Description | Price | |
| | MOTION PICTURE THEA | 69.00 | |
| 05/20/10 | CHARLES MAUND TOYOTAAUSTIN | | 60.18 |
| | 5124582222 | | |
| | Description | Price | |
| | AUTO/TRUCK DEALER | 60.18 | |
| 05/21/10 | MCI SB LOCAL SERVICEHIGHLANDS RANCH | | 557.01 |
| | 800-4364444 | | |
| 05/21/10 | COLE INFORMATION SEROMAHA | | 313.95 |
| | 877-414-3332 | | |

Continued on next page

# DUPLICATE COPY

Prepared For
**TIM TIERNEY**
**THE KITCHEN DOOR INC**

Account Number

Closing Date
06/10/10

Page 5 of 13

## New Activity continued

| Date | Description | | Amount $ |
|---|---|---|---|
| 05/22/10 | SWEETISH HILL BAKERYAUSTIN<br>5124727370<br>Description   Price<br>FOOD AND BEVERAGE  9.20 | | 9.20 |
| 05/23/10 | MAUDIE'S ORIGINAL 88AUSTIN<br>RESTAURANT<br>TIP | 5.00 | 30.11 |
| 05/23/10 | PEI WEI ASIAN DINER-AUSTIN<br>6029578986 | | 22.68 |
| 05/23/10 | GOLD CLASS AUSTIN 30AUSTIN<br>5125683400<br>Description   Price<br>MOTION PICTURE THEA  48.07 | | 48.07 |
| 05/24/10 | 5TH STREET CAR WASH AUSTIN<br>5124738379<br>Description   Price<br>CAR WASH  3.25 | | 3.25 |
| 05/24/10 | BILL PAYMENT   800-288-2020<br>AT&T EZC PMT | | 221.12 |
| 05/24/10 | ATTM*287018631382NBIALPHARETTA<br>800-331-0500<br>Description<br>TELEPHONE SERV | | 147.95 |
| 05/24/10 | HUT'S HAMBURGERS 542AUSTIN<br>5124720693<br>TIP | 5.00 | 24.11 |
| 05/25/10 | GEXA ENERGY   (713) 961-9399<br>GEXA ENERGY ELEC. BILL | | 206.89 |
| 05/25/10 | AUSTIN JAVA-PARKWAY AUSTIN<br>5128040326<br>Description<br>RESTAURANT CHARGES | | 26.07 |
| 05/26/10 | MCI SB LOCAL SERVICEHIGHLANDS RANCH<br>800-4364444 | | 497.42 |
| 05/26/10 | MCI SB LOCAL SERVICEHIGHLANDS RANCH<br>800-4364444 | | 581.66 |
| 05/26/10 | MCI SB LOCAL SERVICEHIGHLANDS RANCH<br>800-4364444 | | 1,802.88 |
| 05/26/10 | MCI SB LOCAL SERVICEHIGHLANDS RANCH<br>800-4364444 | | 357.93 |
| 05/26/10 | MCI SB LOCAL SERVICEHIGHLANDS RANCH<br>800-4364444 | | 13.51 |
| 05/26/10 | MCI SB LOCAL SERVICEHIGHLANDS RANCH<br>800-4364444 | | 946.82 |
| 05/26/10 | MCI SB LOCAL SERVICEHIGHLANDS RANCH<br>800-4364444 | | 584.28 |
| 05/27/10 | LONE STAR OVERNIGHT AUSTIN<br>512-873-8067<br>Description<br>BUSINESS SERVI | | 324.90 |
| 05/27/10 | SNOW PEA KOREAN N AUSTIN<br>5124543228<br>FOOD/BEVERAGE  33.60<br>TIP  6.00 | | 39.60 |

THP Amer Exp CID2011 -3757

*Continued on reverse*

Prepared For
TIM TIERNEY
THE KITCHEN DOOR INC

DUPLICATE COPY
Account Number

Page 6 of 13

## New Activity continued

| Date | Description | | Amount $ |
|------|-------------|---|---------|
| 05/27/10 | GOLD CLASS AUSTIN 30AUSTIN 5125683400 | | 44.00 |
| | Description   Price MOTION PICTURE THEA  44.00 | | |

| 05/28/10 | AMERICAN AIRLINES  HENDERSON  NV AMERICAN AIRLINES | | 1,415.69 |

| From: | To: | Carrier: | Class: |
|-------|-----|----------|--------|
| AUSTIN TX | DALLAS/FT WORTH TX | AA | LX |
| | HONOLULU HI | AA | LX |
| | LIHUE KAUAI HI | HA | I |
| | HONOLULU HI | HA | G |

Ticket Number: 00178788340172
Passenger Name: HUHNEN/PATRIZIA
Document Type: PASSENGER TICKET
Date of Departure: 12/23

| 05/28/10 | TEXACO COAST TO COASAUSTIN 5123268344 | | 54.67 |
|----------|----|---|-------|
| | Description   Price FUEL/MISCELLANEOUS  54.67 | | |
| 05/28/10 | BOOK PEOPLE 32220161AUSTIN 512-472-5050 Description BOOKS/SUPPLIES | | 18.35 |
| 05/28/10 | COSTCO WHSE #0641 00S AUSTIN 5123823013 | | 277.53 |
| 05/28/10 | AUSTIN BUSINESS PRIN5128366902 97471 78753 PUBLISHING AND PRINTING | | 1,974.94 |
| 05/29/10 | USPS POSTAGE(STAMPS.888-434-0055 310-482-5846 | | 400.00 |
| 05/30/10 | Z TEJAS 6TH STREET #AUSTIN 480-612-6380 Description FOOD/BEVERAGE | | 60.00 |
| 05/31/10 | ASI*JUNGLEDISK   SERVICE SERVICE 866-749-7545 | | 20.89 |
| 05/31/10 | ZOCALO CAFE 65000000AUSTIN 5724728226 TIP   4.00 | | 23.59 |
| 05/31/10 | ZOCALO CAFE 65000000AUSTIN 5724728226 | | 5.00 |
| 05/31/10 | SUPPORT@GAMEFLY.COM LOS ANGELES SUBSCRIPTIONS | | 7.58 |
| 05/31/10 | SUPPORT@GAMEFLY.COM LOS ANGELES SUBSCRIPTIONS | | 9.69 |
| 05/31/10 | 24 DINER 54292980244AUSTIN 5124678776 TIP   6.00 | | 32.63 |
| 06/01/10 | 5TH STREET CAR WASH AUSTIN 5124738379 Description   Price CAR WASH  2.00 | | 2.00 |
| 06/01/10 | USPS POSTAL ST100207KANSAS CITY 800-3447779 | | 619.00 |
| 06/01/10 | HOLY CACAO INC 02810AUSTIN 5128512253 FOOD/BEVERAGE  9.00 TIP   3.00 | | 12.00 |

THP Amer Exp CID2011 -3758

Continued on next page

Prepared For
TIM TIERNEY
THE KITCHEN DOOR INC

Account Number

Closing Date
04/09/10

## New Activity continued

| Date | Description | | Amount $ |
|---|---|---|---|
| 03/11/10 | BURGER KING 4 051247LOS ANGELES 310-6463472 FOOD | 13.13 | 13.13 |
| 03/12/10 | EDGEWATER GRILL SAN DIEGO RESTAURANT | | 156.50 |
| 03/13/10 | IHG SANISPMS SAN DIEGO Arrival Date 03/11/10 Departure Date 03/13/10 00000000 LODGING | | 448.72 |
| 03/17/10 | GEXA ENERGY (713) 961-9399 GEXA ENERGY ELEC. BILL | | 364.51 |
| 03/18/10 | USPS POSTAGE(STAMPS.888-434-0055 310-482-5846 | | 300.00 |
| 03/18/10 | LONE STAR OVERNIGHT AUSTIN 512-873-8067 Description BUSINESS SERVI | | 360.13 |
| 03/18/10 | GRANDE OMNIA 4511927877-647-2633 124100 78666 CABLE/SATELITE | | 1,013.93 |
| 03/19/10 | AUSTIN BUSINESS PRIN5128366902 96464 78753 PUBLISHING AND PRINTING | | 1,974.94 |
| 03/20/10 | AMERICAN CAB SAN DIEGO DIRECT MKTG MISC | | 17.70 |
| 03/20/10 | AMER CUP SNACK085500SAN DIEGO 619-2315100 FOOD | 6.51 | 6.51 |
| 03/20/10 | AMER CUP SNACK085500SAN DIEGO 619-2315100 FOOD | 3.47 | 3.47 |
| 03/21/10 | AMERICAN AIRLINES DALLAS, TX AMERICAN AIRLINES From: SAN DIEGO CA To: LOS ANGELES CA AUSTIN TX Carrier: AA AA Class: VA VA Ticket Number: 00123587944413 Date of Departure: 03/21 Passenger Name: TIERNEY/TIM Document Type: ADDITIONAL COLLECTION | | 99.65 |
| 03/21/10 | AMERICAN AIRLINES DALLAS, TX AMERICAN AIRLINES From: SAN DIEGO CA To: LOS ANGELES CA AUSTIN TX Carrier: AA AA Class: VA VA Ticket Number: 00123587944446 Date of Departure: 03/21 Passenger Name: BILLINGSLEY/BILLY Document Type: ADDITIONAL COLLECTION | | 99.65 |
| 03/21/10 | AMERICAN AIRLINES DALLAS, TX AMERICAN AIRLINES From: SAN DIEGO CA To: LOS ANGELES CA AUSTIN TX Carrier: AA AA Class: VA VA Ticket Number: 00123587944494 Date of Departure: 03/21 Passenger Name: BILLINGSLEY/DAVID Document Type: ADDITIONAL COLLECTION | | 99.65 |

THP Amer Exp CID2011 -3735

Continued on reverse

## DUPLICATE COPY

Prepared For
TIM TIERNEY
THE KITCHEN DOOR INC

Account Number

Closing Date
04/09/10

Page 3 of 10

## New Activity continued

| Date | Description | | Amount $ |
|---|---|---|---|
| 03/11/10 | BURGER KING 4 051247LOS ANGELES<br>310-6463472<br>FOOD | 13.13 | 13.13 |
| 03/12/10 | EDGEWATER GRILL    SAN DIEGO<br>RESTAURANT | | 156.50 |
| 03/13/10 | IHG SANISPMS      SAN DIEGO<br>Arrival Date      Departure Date<br>03/11/10           03/13/10<br>00000000<br>LODGING | | 448.72 |
| 03/17/10 | GEXA ENERGY      (713) 961-9399<br>GEXA ENERGY ELEC. BILL | | 364.51 |
| 03/18/10 | USPS POSTAGE(STAMPS.888-434-0055<br>310-482-5846 | | 300.00 |
| 03/18/10 | LONE STAR OVERNIGHT AUSTIN<br>512-873-8067<br>Description<br>BUSINESS SERVI | | 360.13 |
| 03/18/10 | GRANDE OMNIA 4511927877-647-2633<br>124100 78666<br>CABLE/SATELITE | | 1,013.93 |
| 03/19/10 | AUSTIN BUSINESS PRIN5128366902<br>96464 78753<br>PUBLISHING AND PRINTING | | 1,974.94 |
| 03/20/10 | AMERICAN CAB     SAN DIEGO<br>DIRECT MKTG MISC | | 17.70 |
| 03/20/10 | AMER CUP SNACK085500SAN DIEGO<br>619-2315100<br>FOOD | 6.51 | 6.51 |
| 03/20/10 | AMER CUP SNACK085500SAN DIEGO<br>619-2315100<br>FOOD | 3.47 | 3.47 |
| 03/21/10 | AMERICAN AIRLINES   DALLAS,   TX<br>AMERICAN AIRLINES<br>From:              To:<br>SAN DIEGO CA       LOS ANGELES CA<br>                   AUSTIN TX<br>Ticket Number: 00123587944413<br>Passenger Name: TIERNEY/TIM<br>Document Type: ADDITIONAL COLLECTION<br>Carrier:    Class:<br>AA          VA<br>AA          VA<br>Date of Departure: 03/21 | | 99.65 |
| 03/21/10 | AMERICAN AIRLINES   DALLAS,   TX<br>AMERICAN AIRLINES<br>From:              To:<br>SAN DIEGO CA       LOS ANGELES CA<br>                   AUSTIN TX<br>Ticket Number: 00123587944446<br>Passenger Name: BILLINGSLEY/BILLY<br>Document Type: ADDITIONAL COLLECTION<br>Carrier:    Class:<br>AA          VA<br>AA          VA<br>Date of Departure: 03/21 | | 99.65 |
| 03/21/10 | AMERICAN AIRLINES   DALLAS,   TX<br>AMERICAN AIRLINES<br>From:              To:<br>SAN DIEGO CA       LOS ANGELES CA<br>                   AUSTIN TX<br>Ticket Number: 00123587944494<br>Passenger Name: BILLINGSLEY/DAVID<br>Document Type: ADDITIONAL COLLECTION<br>Carrier:    Class:<br>AA          VA<br>AA          VA<br>Date of Departure: 03/21 | | 99.65 |

THP Amer Exp CID2011 -3735

Continued on reverse

# DUPLICATE COPY

Prepared For
TIM TIERNEY
THE KITCHEN DOOR INC

Account Number

Closing Date
11/08/09

Page 3 of 12

## New Activity for TIM TIERNEY
Card XXXX-XXXXX2-92009



| Date | Description | Price | Amount $ |
|---|---|---|---|
| 10/08/09 | LONE STAR OVERNIGHT AUSTIN<br>5128738067<br>Description<br>BUSINESS SERVI | | 230.94 |
| 10/09/09 | STAMPS.COM          SERVICE FEE<br>O090734501 90405 | | 15.99 |
| 10/12/09 | SIR SPEEDY 4092 6500AUSTIN<br>5123389818<br>Description          Price<br>QUICK COPY, REPRODU   783.49 | | 783.49 |
| 10/12/09 | THE SOUP PEDDLER 110AUSTIN<br>5125543834<br>Description          Price<br>CATERER          55.21 | | 55.21 |
| 10/14/09 | MCI SB LOCAL SERVICEHIGHLANDS RANCH<br>800-4364444 | | 37.28 |
| 10/14/09 | GEXA ENERGY      (713) 961-9399<br>GEXA ENERGY ELEC. BILL | | 444.45 |
| 10/15/09 | COSTCO WHSE #0641 00S AUSTIN<br>5123823013 | | 342.75 |
| 10/16/09 | AUSTIN BUSINESS PRIN5128366902<br>94716 78753<br>PUBLISHING AND PRINTING | | 1,367.48 |
| 10/17/09 | ZPIZZA AUSTIN      AUSTIN<br>FAST FOOD RESTAURANT | | 40.21 |
| 10/19/09 | GRANDE OMNIA 0099  877-647-2633<br>124100 78666<br>CABLE/SATELITE | | 914.22 |
| 10/20/09 | CHILI'S GRILL#613  AUSTIN<br>1-800-983-4637 | | 29.85 |
| 10/21/09 | MCI SB LOCAL SERVICEHIGHLANDS RANCH<br>800-4364444 | | 568.18 |
| 10/21/09 | MATT'S EL RANCHO 003AUSTIN<br>512-462-9333<br>Description<br>FOOD/BEVERAGE | | 78.31 |
| 10/21/09 | OFFICE DEPOT      AUSTIN      TX<br>RETAIL<br>CRT,IJ,RMFR,74/75,BK,TRCLR,2PK<br>INK,REPLACE HP 74,BLACK<br>ROC No. 304147661 | | 56.26 |
| 10/22/09 | USPS POSTAGE(STAMPS.888-434-0055<br>310-482-5846 | | 300.00 |
| 10/22/09 | OFFICE DEPOT      GRAND PRAIRIE   TX<br>RETAIL<br>ENVELOPE,CLASP,28LB,#75,100BX<br>PEN,GEL,RT,UNI-BALL,7MM,DZ,BLU<br>LABEL,ADDR,OD,LSR,7500CT,WHITE<br>ADDITIONAL PURCHASES<br>ROC No. 079995001 | | 265.50 |
| 10/22/09 | SNOW PEA KOREAN N AUSTIN<br>5124543228<br>FOOD/BEVERAGE          29.60<br>TIP          7.00 | | 36.60 |

THP Amer Exp CID2011 -3692

Continued on reverse

| Trans | Post | Description | | Amount |
|-------|------|-------------|---|--------|
| 11/17 | 11/17 | LONE STAR OVERNIGHT LP  5128738067  TX | | $391.35 |
| 11/18 | 11/18 | CAFE EXPRESS  AUSTIN  TX | | $31.25 |
| 11/18 | 11/18 | BUY.COM  888-328-9268 CA | | $189.95 |
| 11/18 | 11/18 | OZARKA WATER  800-950-9397 CA | | $104.00 |
| 11/19 | 11/19 | GEXA ENERGY  713-9619399  TX | | $148.52 |
| 11/19 | 11/19 | SHELL OIL 57542085709  AUSTIN  TX | | $46.84 |
| 11/19 | 11/19 | SNOW PEA KOREAN N CHINEAUSTIN  TX | | $67.80 |
| 11/19 | 11/19 | LOWES #01727*  AUSTIN  TX | | $4.84 |
| 11/20 | 11/20 | CITY PUBLIC SVC  800-967-9649 TX | | $602.95 |
| 11/21 | 11/21 | ABEL'S ON THE LAKE  AUSTIN  TX | | $73.25 |
| 11/22 | 11/22 | CHEZ ZEE  AUSTIN  TX | | $81.77 |
| 11/22 | 11/22 | USPS 480040385524801029  AUSTIN  TX | | $39.60 |
| 11/22 | 11/22 | THE UPS STORE #5815  AUSTIN  TX | | $25.49 |
| 11/22 | 11/22 | ATTM*287018631382NBI  800-331-0500 GA | | $146.21 |
| 11/22 | 11/22 | DRI*SiteVault - Backup  regnow.com/csMN | | $19.00 |
| 11/23 | 11/23 | GROUPON INC.  877-7887858  IL | | $25.00 |
| 11/23 | 11/23 | GEXA ENERGY  713-9619399  TX | | $212.12 |
| 11/24 | 11/24 | ALAMO DRAFTHOU00000836  AUSTIN  TX | | $10.50 |
| 11/24 | 11/24 | ALAMO DRAFTHOU00000836  AUSTIN  TX | | $21.00 |
| 11/24 | 11/24 | ALAMO DRAFTHOU00000836  AUSTIN  TX | | $85.04 |
| 11/25 | 11/25 | BIRCH COMM  8882750777  GA | | $208.52 |
| 11/26 | 11/26 | MAGNOLIA CAFE SOUTH  AUSTIN  TX | | $23.92 |
| 11/26 | 11/26 | FEDEX 854270854741  800-4633339  TN | | $16.47 |
| 11/26 | 11/26 | 5TH STREET CAR WASH  AUSTIN  TX | | $3.25 |
| 11/27 | 11/27 | PARKSIDE  ROUND ROCK  TX | | $227.09 |
| 11/27 | 11/27 | GOLD CLASS AUSTIN  AUSTIN  TX | | $67.07 |
| 11/27 | 11/27 | GOLD CLASS AUSTIN  512-568-3400 TX | | $87.00 |
| 11/28 | 11/28 | LAMAD-WESTLAKE #55  WEST LAKE HLSTX | | $23.34 |
| 11/29 | 11/29 | MAUDIE'S ORIGINAL  AUSTIN  TX | | $58.84 |
| 11/29 | 11/29 | DISCOUNT ELECTRONICS  512-4590026  TX | | $155.88 |
| 11/30 | 11/30 | FRANKENSTEIN COMPUTERS  AUSTIN  TX | | $60.00 |
| 11/30 | 11/30 | 7-ELEVEN 24397  AUSTIN  TX | | $25.00 |
| 11/30 | 11/30 | THE FRISCO SHOP  AUSTIN  TX | | $75.87 |
| 12/01 | 12/01 | AUSTIN LAND AND CATTLE  AUSTIN  TX | | $146.35 |
| 12/01 | 12/01 | NEWSFINDER  262-5445262  WI | | $154.00 |
| 12/01 | 12/01 | INK OASIS  800-455-5987 MI | | $121.56 |
| 12/01 | 12/01 | AUSTIN BESTLINE  512-328-9095 TX | | $3.87 |
| 12/01 | 12/01 | AUSTIN BESTLINE  512-328-9095 TX | | $49.94 |
| 12/01 | 12/01 | AUSTIN BESTLINE  512-328-9095 TX | | $240.19 |
| 12/01 | 12/01 | SIX FLAGS FIESTA TEXAS  321-249-0110 TX | | $156.32 |
| 12/01 | 12/01 | JUNGLEDISK.COM  678-710-7745 TX | | $22.98 |
| 12/02 | 12/02 | 8X8, INC. 888-898-8733  888-8988733  CA | | $5.80 |
| 12/02 | 12/02 | NEWZ GROUP  800-474-1111 MO | | $384.50 |
| 12/03 | 12/03 | TIME WARNER CABLE  210-5829708  TX | | $70.45 |
| 12/04 | 12/04 | CHEVRON 00203164  AUSTIN  TX | | $53.48 |
| 12/04 | 12/04 | OMA'S HAUS  NEW BRAUNFELSTX | | $36.84 |
| 12/04 | 12/04 | AMAYAS TACO VILLAGE  AUSTIN  TX | | $44.91 |
| 12/06 | 12/06 | USPS POSTAGE(STAMPS.COM) 888-434-0055 CA | | $490.00 |
| 12/06 | 12/06 | OFFICE MAX  AUSTIN  TX | | $25.96 |
| 12/06 | 12/06 | OFFICE DEPOT #1079  800-463-3768 TX | | $89.86 |
| 12/06 | 12/06 | WESTIN LA CANTERA  SAN ANTONIO  TX | | $25.30 |
| 12/06 | 12/06 | WESTIN LA CANTERA  SAN ANTONIO  TX | | $36.22 |
| 12/07 | 12/07 | MANGIA PIZZA  AUSTIN  TX | | $45.15 |
| 12/07 | 12/07 | LONE STAR OVERNIGHT LP  5128738067  TX | | $484.03 |

**Total Standard Purch** — $8,993.64

**Subtotal of Activity for Account Number** ▓▓▓▓▓▓▓▓▓▓▓ $8,993.64

**STEVEN JENKINS**
Employee Credit Line  $3,000  **Account Number** ▓▓▓▓▓▓▓▓▓▓
Employee Cash Advance Limit  $3,000

**Purchases**
  **Standard Purch**

| Trans | Post | Description | | Amount |
|-------|------|-------------|---|--------|
| 11/08 | 11/09 | LONE STAR AWARDS I  AUSTIN  TX | | $8.50 |
| 11/12 | 11/12 | LA CASITA  AUSTIN  TX | | $22.90 |
| 11/15 | 11/15 | TEXACO 00351876  AUSTIN  TX | | $39.07 |
| 11/17 | 11/17 | CRESTVIEW MINIMAX  AUSTIN  TX | | $5.15 |
| 11/19 | 11/19 | LA CASITA  AUSTIN  TX | | $18.34 |
| 11/24 | 11/24 | HEB GROCERY #202  AUSTIN  TX | | $34.54 |
| 12/01 | 12/01 | HEB GROCERY #202  AUSTIN  TX | | $159.90 |
| 12/03 | 12/03 | LA CASITA  AUSTIN  TX | | $26.69 |
| 12/07 | 12/07 | TEXACO 00351876  AUSTIN  TX | | $42.00 |

**Total Standard Purch** — $357.09

**Subtotal of Activity for Account Number** ▓▓▓▓▓▓▓▓▓▓ $357.09

**RUBEN C VILLALVA**
Employee Credit Line  $6,000  **Account Number** ▓▓▓▓▓▓▓▓▓▓
Employee Cash Advance Limit  $6,000

## BUSINESS ACCOUNT SUMMARY

### Business Payments, Credits and Adjustments

**TEXAS HIGHWAY PATROL**

| Trans | Post | Description | Amount |
|---|---|---|---|
| | 09/15 | CLICK-TO-PAY PAYMENT, THANK YOU | $7,422.96- |
| | 09/16 | CLICK-TO-PAY PAYMENT, THANK YOU | $4,438.89- |
| Total Business Payments, Credits and Adjustments | | | $11,861.85- |

### Business Activity

**Purchases**
**Standard Purch**

| Trans | Post | Description | Amount |
|---|---|---|---|
| | 10/08 | FOREIGN TRANSACTION FEE*INTEREST CHARGE | $36.39 |
| Total Standard Purch | | | $36.39 |

### Interest Charge Summary

| | Nominal APR | Periodic INTEREST CHARGE | Transaction Fee/INTEREST CHARGE |
|---|---|---|---|
| PURCHASES | | | |
| Standard Purch | 16.990% | $0.00 | $36.39 |
| ADVANCES | | | |
| Standard Adv | 21.990% | $0.00 | $0.00 |

**Total INTEREST CHARGE** $36.39

## CARDHOLDER SUMMARY

### Cardholder Activity

| Cardholder | Account Number | Amount |
|---|---|---|
| TIM TIERNEY | | $11,057.02 |
| STEVEN JENKINS | | $305.55 |
| RUBEN C VILLALVA | | $2,181.91 |
| K DENTON | | $5,145.07 |

### Transaction Activity

**TIM TIERNEY**

| | | Account Number ▬▬▬▬ |
|---|---|---|
| Employee Credit Line | $38,000 | |
| Employee Cash Advance Limit | $30,000 | |

**Purchases**
**Standard Purch**

| Trans | Post | Description | Amount |
|---|---|---|---|
| 09/08 | 09/09 | CIPOLLINA 512-4475211 TX | $73.70 |
| 09/08 | 09/09 | TONER PLUS SOUTHWEST LLC 512-3398213 TX | $89.00 |
| 09/09 | 09/09 | MAUDIE'S ORIGINAL AUSTIN TX | $34.63 |
| 09/09 | 09/09 | STAMPS.COM 888-434-0055 CA | $15.99 |
| 09/09 | 09/09 | LONE STAR OVERNIGHT LP 5128738067 TX | $702.33 |
| 09/10 | 09/10 | ARTZ RIB HOUSE AUSTIN TX | $43.23 |
| 09/10 | 09/10 | TEXAS ASSOC OF MUSEUMS 512-328-6812 TX | $100.00 |
| 09/10 | 09/10 | BROADVIEW SECURITY 800-445-0872 TX | $32.38 |
| 09/10 | 09/10 | JETBLUE 2792149458161SALT LAKE CTYUT | $1,723.20 |
| 09/12 | 09/12 | CHEVRON 00201969 AUSTIN TX | $49.13 |
| 09/12 | 09/12 | MOTHER'S CAFE AUSTIN TX | $29.09 |
| 09/13 | 09/13 | GEXA ENERGY 713-9619399 TX | $603.38 |
| 09/13 | 09/13 | ROMEO'S AUSTIN TX | $75.33 |
| 09/13 | 09/13 | OFFICE DEPOT #1079 800-463-3768 TX | $167.90 |
| 09/13 | 09/13 | BRITISH A 1252472292859LONDON GB | $1,213.10 |
| 09/14 | 09/14 | VONAGE *PRICE+TAXES 866-243-4357 NJ | $37.79 |
| 09/15 | 09/15 | 1800GOFEDEX 10010007 800-6221147 TN | $34.61 |
| 09/15 | 09/15 | USPS POSTAGE(STAMPS.COM) 888-434-0055 CA | $400.00 |
| 09/15 | 09/15 | HULA HUT AUSTIN TX | $36.31 |
| 09/16 | 09/16 | BREED CO INC AUSTIN TX | $12.61 |
| 09/16 | 09/16 | MANGIA PIZZA AUSTIN TX | $89.35 |
| 09/17 | 09/17 | OFFICE DEPOT #1079 800-463-3768 TX | $96.68 |
| 09/17 | 09/17 | AUSTIN SPECIALTY ADVERTIS512-3457868 TX | $1,109.60 |
| 09/18 | 09/18 | MUSTARDS ST HELENA CA | $90.80 |
| 09/19 | 09/19 | OZARKA WATER 800-950-9397 CA | $72.74 |
| 09/19 | 09/19 | CHEVRON 00095542 DUBLIN CA | $35.06 |
| 09/19 | 09/19 | USPS 05685495523501846 SAN JOSE CA | $5.00 |
| 09/19 | 09/19 | PARKING CO OF AMER Q01 DEL VALLE TX | $24.00 |
| 09/20 | 09/20 | THE WESTIN VERASA NAPA CA | $323.79 |
| | | DOLLAR RAC SJC SAN JOSE CA | $78.84 |

THP Citi CID 2011 - 603

## BUSINESS ACCOUNT SUMMARY

### Business Payments, Credits and Adjustments

**TEXAS HIGHWAY PATROL**

| Trans | Post | Description | Amount |
|---|---|---|---|
| | 11/18 | CLICK-TO-PAY PAYMENT, THANK YOU | $552.17- |
| | 11/19 | CLICK-TO-PAY PAYMENT, THANK YOU | $3,624.08- |
| | 11/22 | CLICK-TO-PAY PAYMENT, THANK YOU | $7,227.45- |
| | 11/23 | CLICK-TO-PAY PAYMENT, THANK YOU | $3,228.87- |
| | 12/01 | CLICK-TO-PAY PAYMENT, THANK YOU | $3,193.40- |

Total Business Payments, Credits and Adjustments $17,825.97-

### Business Activity

**Purchases**

Standard Purch

| Trans | Post | Description | Amount |
|---|---|---|---|
| | 12/08 | PURCHASES*INTEREST CHARGE*PERIODIC RATE | $239.08 |

Total Standard Purch $239.08

### Interest Charge Summary

| | Nominal APR | Periodic INTEREST CHARGE | Transaction Fee/INTEREST CHARGE |
|---|---|---|---|
| PURCHASES | | | |
| Standard Purch | 16.990% | $239.08 | $0.00 |
| ADVANCES | | | |
| Standard Adv | 21.990% | $0.00 | $0.00 |

Total INTEREST CHARGE

$239.08

## CARDHOLDER SUMMARY

### Cardholder Activity

| Cardholder | Account Number | Amount |
|---|---|---|
| TIM TIERNEY | | $8,993.64 |
| STEVEN JENKINS | ██████████ | $357.09 |
| RUBEN C VILLALVA | ██████████ | $2,506.90 |
| K DENTON | | $3,519.67 |

### Transaction Activity

**TIM TIERNEY**
Employee Credit Line $38,000     Account Number 4465 4500 2757 0388
Employee Cash Advance Limit $30,000

**Purchases**

Standard Purch

| Trans | Post | Description | Amount |
|---|---|---|---|
| 11/07 | 11/09 | THREADGILLS WORLD HEADQUACYPRESS TX | $65.05 |
| 11/07 | 11/09 | COURTYARD BY MARRIOTT SARSAN ANTONIO TX | $136.80 |
| 11/08 | 11/09 | CALIF. PIZZA KIT 203 AUSTIN TX | $87.17 |
| 11/09 | 11/09 | AUSTIN THEATRE 512-472-2901 TX | $100.00 |
| 11/09 | 11/09 | SNOW PEA KOREAN N CHINEAUSTIN TX | $58.55 |
| 11/09 | 11/09 | GRANDE COMMUNICATIONS 877-647-2633 TX | $52.01 |
| 11/09 | 11/09 | STAMPS.COM 888-434-0055 CA | $15.99 |
| 11/09 | 11/09 | AMERICAN AI 0017878834054HENDERSON NV | $145.40 |
| 11/09 | 11/09 | AMERICAN AI 0017878834055HENDERSON NV | $145.40 |
| 11/10 | 11/10 | BROADVIEW SECURITY 800-445-0872 TX | $40.49 |
| 11/11 | 11/11 | CREER BELIEVE 210-3894642 TX | $283.00 |
| 11/12 | 11/12 | OFFICE MAX AUSTIN TX | $15.68 |
| 11/12 | 11/12 | ADT*SECURITY SERVICES 800-238-2455 FL | $128.96 |
| 11/13 | 11/13 | MANGIA PIZZA AUSTIN TX | $43.69 |
| 11/13 | 11/13 | ALAMO DRAFTHOU00000836 AUSTIN TX | $21.00 |
| 11/13 | 11/13 | ALAMO DRAFTHOU00000836 AUSTIN TX | $49.10 |
| 11/13 | 11/13 | GEXA ENERGY 713-9619399 TX | $350.64 |
| 11/13 | 11/13 | VONAGE *PRICE + TAXES 866-243-4357 NJ | $35.13 |
| 11/14 | 11/14 | EASTSIDE CAFE AUSTIN TX | $58.55 |
| 11/14 | 11/14 | IHOP 1476 00014761 AUSTIN TX | $26.56 |
| 11/16 | 11/16 | MAUDIE'S ORIGINAL AUSTIN TX | $44.88 |
| 11/16 | 11/16 | GENIE CAR WASH AUSTIN TX | $59.99 |
| 11/16 | 11/16 | USPS POSTAGE(STAMPS.COM) 888-434-0055 CA | $400.00 |
| 11/17 | 11/17 | AMERICAN AI 0010614676050AA.COM/AA RESTX | $150.00 |
| 11/17 | 11/17 | TONER PLUS SOUTHWEST LLC 512-3398213 TX | $158.85 |
| 11/17 | 11/17 | AMERICAN AI 0010614690470AA.COM/AA RESTX | $25.00 |
| 11/17 | 11/17 | VIRGIN AMER 9840000000002BURLINGAME CA | $269.41 |

| Trans | Post | Description | | Amount |
|---|---|---|---|---|
| 11/17 | 11/17 | LONE STAR OVERNIGHT LP 5128738067 | TX | $391.35 |
| 11/18 | 11/18 | CAFE EXPRESS AUSTIN TX | | $31.25 |
| 11/18 | 11/18 | BUY.COM 888-328-9268 CA | | $189.95 |
| 11/18 | 11/18 | OZARKA WATER 800-950-9397 CA | | $104.00 |
| 11/19 | 11/19 | GEXA ENERGY 713-9619399 TX | | $148.52 |
| 11/19 | 11/19 | SHELL OIL 57542085709 AUSTIN TX | | $46.84 |
| 11/19 | 11/19 | SNOW PEA KOREAN N CHINEAUSTIN | TX | $67.80 |
| 11/19 | 11/19 | LOWES #01727* AUSTIN TX | | $4.84 |
| 11/20 | 11/20 | CITY PUBLIC SVC 800-967-9849 TX | | $602.95 |
| 11/21 | 11/21 | ABEL'S ON THE LAKE AUSTIN TX | | $73.25 |
| 11/22 | 11/22 | CHEZ ZEE AUSTIN TX | | $81.77 |
| 11/22 | 11/22 | USPS 48040395524801029 AUSTIN TX | | $39.60 |
| 11/22 | 11/22 | THE UPS STORE #5815 AUSTIN TX | | $25.49 |
| 11/22 | 11/22 | ATTM*287018631382NBI 800-331-0500 GA | | $146.21 |
| 11/23 | 11/23 | DRI*SiteVault - Backup regnow.com/csMN | | $19.00 |
| 11/23 | 11/23 | GROUPON INC. 877-7887858 IL | | $25.00 |
| 11/23 | 11/23 | GEXA ENERGY 713-9619399 TX | | $212.12 |
| 11/24 | 11/24 | ALAMO DRAFTHOU00000836 AUSTIN | TX | $10.50 |
| 11/24 | 11/24 | ALAMO DRAFTHOU00000836 AUSTIN | TX | $21.00 |
| 11/24 | 11/24 | ALAMO DRAFTHOU00000836 AUSTIN | TX | $85.04 |
| 11/25 | 11/25 | BIRCH COMM 8882750777 GA | | $208.52 |
| 11/26 | 11/26 | MAGNOLIA CAFE SOUTH AUSTIN | TX | $23.92 |
| 11/26 | 11/26 | FEDEX 854270954741 800-4633339 TN | | $16.47 |
| 11/26 | 11/26 | 5TH STREET CAR WASH AUSTIN TX | | $3.25 |
| 11/27 | 11/27 | PARKSIDE ROUND ROCK TX | | $227.09 |
| 11/27 | 11/27 | GOLD CLASS AUSTIN AUSTIN TX | | $67.07 |
| 11/27 | 11/27 | GOLD CLASS AUSTIN 512-568-3400 TX | | $87.00 |
| 11/28 | 11/28 | LAMAD-WESTLAKE #55 WEST LAKE HLSTX | | $23.34 |
| 11/29 | 11/29 | MAUDIE'S ORIGINAL AUSTIN TX | | $58.84 |
| 11/29 | 11/29 | DISCOUNT ELECTRONICS 512-4590026 TX | | $155.88 |
| 11/30 | 11/30 | FRANKENSTEIN COMPUTERS AUSTIN TX | | $60.00 |
| 11/30 | 11/30 | 7-ELEVEN 24397 AUSTIN TX | | $25.00 |
| 11/30 | 11/30 | THE FRISCO SHOP AUSTIN TX | | $75.87 |
| 12/01 | 12/01 | AUSTIN LAND AND CATTLE AUSTIN | TX | $146.35 |
| 12/01 | 12/01 | NEWSFINDER 262-5445262 WI | | $154.00 |
| 12/01 | 12/01 | INK OASIS 800-455-5987 MI | | $121.56 |
| 12/01 | 12/01 | AUSTIN BESTLINE 512-328-9095 TX | | $3.87 |
| 12/01 | 12/01 | AUSTIN BESTLINE 512-328-9095 TX | | $49.94 |
| 12/01 | 12/01 | AUSTIN BESTLINE 512-328-9095 TX | | $240.19 |
| 12/01 | 12/01 | SIX FLAGS FIESTA TEXAS 321-249-0110 TX | | $156.32 |
| 12/02 | 12/02 | JUNGLEDISK.COM 678-710-7745 TX | | $22.98 |
| 12/02 | 12/02 | 8X8, INC. 888-898-8733 888-8988733 CA | | $5.80 |
| 12/03 | 12/03 | NEWZ GROUP 800-474-1111 MO | | $384.50 |
| 12/04 | 12/04 | TIME WARNER CABLE 210-5829708 TX | | $70.45 |
| 12/04 | 12/04 | CHEVRON 00203164 AUSTIN TX | | $53.48 |
| 12/04 | 12/04 | OMA'S HAUS NEW BRAUNFELSTX | | $36.84 |
| 12/06 | 12/06 | AMAYAS TACO VILLAGE AUSTIN TX | | $44.91 |
| 12/06 | 12/06 | USPS POSTAGE(STAMPS.COM) 888-434-0055 CA | | $490.00 |
| 12/06 | 12/06 | OFFICE MAX AUSTIN TX | | $25.96 |
| 12/06 | 12/06 | OFFICE DEPOT #1079 800-463-3768 TX | | $89.86 |
| 12/07 | 12/07 | WESTIN LA CANTERA SAN ANTONIO TX | | $25.30 |
| 12/07 | 12/07 | WESTIN LA CANTERA SAN ANTONIO TX | | $36.22 |
| 12/07 | 12/07 | MANGIA PIZZA AUSTIN TX | | $45.15 |
| | | LONE STAR OVERNIGHT LP 5128738067 TX | | $484.03 |
| | | **Total Standard Purch** | | $8,993.64 |

**Subtotal of Activity for Account Number** ████████████  $8,993.64

**STEVEN JENKINS**
Employee Credit Line    $3,000    Account Number █████████████
Employee Cash Advance Limit  $3,000

**Purchases**
Standard Purch

| Trans | Post | Description | | Amount |
|---|---|---|---|---|
| 11/08 | 11/09 | LONE STAR AWARDS I AUSTIN TX | | $8.50 |
| 11/12 | 11/12 | LA CASITA AUSTIN TX | | $22.90 |
| 11/15 | 11/15 | TEXACO 00351878 AUSTIN TX | | $39.07 |
| 11/17 | 11/17 | CRESTVIEW MINIMAX AUSTIN TX | | $5.15 |
| 11/19 | 11/19 | LA CASITA AUSTIN TX | | $18.34 |
| 11/24 | 11/24 | HEB GROCERY #202 AUSTIN TX | | $34.54 |
| 12/01 | 12/01 | HEB GROCERY #202 AUSTIN TX | | $159.90 |
| 12/03 | 12/03 | LA CASITA AUSTIN TX | | $26.69 |
| 12/07 | 12/07 | TEXACO 00351876 AUSTIN TX | | $42.00 |
| | | **Total Standard Purch** | | $357.09 |

**Subtotal of Activity for Account Number** ████████████  $357.09

**RUBEN C VILLALVA**
Employee Credit Line    $6,000    Account Number █████████████
Employee Cash Advance Limit  $6,000

| Trans | Post | Description | | Amount |
|-------|------|-------------|--|--------|
| 12/19 | 12/19 | THE TAVERN | AUSTIN TX | $42.68 |
| 12/20 | 12/20 | ADT*SECURITY SERVICES | 800-238-2455 FL | $32.24 |
| 12/21 | 12/21 | 5TH STREET CAR WASH | AUSTIN TX | $3.25 |
| 12/21 | 12/21 | 5TH STREET CAR WASH | AUSTIN TX | $4.50 |
| 12/21 | 12/21 | Z TEJAS 6TH STREET #101 | AUSTIN TX | $7.25 |
| 12/22 | 12/22 | ATTM*287018631382NBI | 800-331-0500 GA | $146.21 |
| 12/22 | 12/22 | RUBBER STAMPS UNLTD | 888-451-7300 MI | $65.73 |
| 12/23 | 12/23 | FABI AND ROSI | AUSTIN TX | $129.75 |
| 12/24 | 12/24 | GEXA ENERGY | 713-9619399 TX | $118.48 |
| 12/25 | 12/25 | BIRCH COMM | 8882750777 GA | $159.14 |
| 12/28 | 12/28 | GEXA ENERGY | 713-9619399 TX | $220.95 |
| 12/31 | 12/31 | KATZ DELI | AUSTIN TX | $66.96 |
| 01/01 | 01/01 | JUNGLEDISK.COM | 678-710-7745 TX | $22.45 |
| 01/02 | 01/02 | 8X8, INC. 888-898-8733 | 888-8988733 CA | $5.82 |
| 01/03 | 01/03 | NEWSFINDER | 262-5445262 WI | $259.00 |
| 01/03 | 01/03 | TIME WARNER CABLE | 210-5829708 TX | $70.45 |
| 01/04 | 01/04 | AUSTIN BESTLINE | 512-328-9095 TX | $7.44 |
| 01/04 | 01/04 | AUSTIN BESTLINE | 512-328-9095 TX | $52.83 |
| 01/04 | 01/04 | AUSTIN BESTLINE | 512-328-9095 TX | $231.93 |
| 01/05 | 01/05 | USPS POSTAGE(STAMPS.COM) | 888-434-0055 CA | $390.00 |
| 01/06 | 01/06 | NEWZ GROUP | 800-474-1111 MO | $422.50 |
| 01/09 | 01/09 | LONE STAR OVERNIGHT LP | 5128738067 TX | $396.91 |
| 01/09 | 01/09 | GRANDE COMMUNICATIONS | 877-647-2633 TX | $52.01 |
| 01/10 | 01/10 | STAMPS.COM | 888-434-0055 CA | $15.99 |
| | | BROADVIEW SECURITY | 800-445-0872 TX | $235.12 |
| Total Standard Purch | | | | $5,447.21 |

**Subtotal of Activity for Account Number** ████████████ **$5,447.21**

**STEVEN JENKINS**
Employee Credit Line    $3,000    Account Number ████████████
Employee Cash Advance Limit    $3,000

**Purchases**
Standard Purch

| Trans | Post | Description | | Amount |
|-------|------|-------------|--|--------|
| 12/09 | 12/09 | LONE STAR AWARDS I | AUSTIN TX | $8.50 |
| 12/09 | 12/09 | OFFICE DEPOT #2784 | AUSTIN TX | $183.53 |
| 12/10 | 12/10 | LA CASITA | AUSTIN TX | $22.90 |
| 12/17 | 12/17 | LA CASITA | AUSTIN TX | $22.90 |
| 12/24 | 12/24 | ALAMO SOUTH LA00000851 | AUSTIN TX | $45.57 |
| 12/24 | 12/24 | LA CASITA | AUSTIN TX | $26.69 |
| 01/04 | 01/04 | HEB GROCERY #202 | AUSTIN TX | $38.77 |
| 01/07 | 01/07 | LA CASITA | AUSTIN TX | $22.90 |
| Total Standard Purch | | | | $371.76 |

**Subtotal of Activity for Account Number** ████████████ **$371.76**

**RUBEN C VILLALVA**
Employee Credit Line    $6,000    Account Number ████████████
Employee Cash Advance Limit    $6,000

**Credits, Fees and Adjustments**

| Trans | Post | Description | | Amount |
|-------|------|-------------|--|--------|
| 12/08 | 12/09 | CIGARS | 4842850400 PA | $5.95- |
| 12/08 | 12/09 | CIGARS | 4842850400 PA | $59.95- |
| 01/08 | 01/08 | SRR*XM SATELLITERADIO | 800-XMRADIO NY | $2.99- |
| 01/08 | 01/08 | SRR*XM SATELLITERADIO | 800-XMRADIO NY | $14.36- |
| Total Credits, Fees and Adjustments | | | | $83.25- |

**Purchases**
Standard Purch

| Trans | Post | Description | | Amount |
|-------|------|-------------|--|--------|
| 12/07 | 12/09 | SOUTHWESTAIR5262141757473DALLAS | TX | $146.40 |
| 12/08 | 12/09 | BOOMBAH | 815-941-1431 IL | $393.53 |
| 12/08 | 12/09 | TWC*TIME WARNER CABLE | 800-222-5355 TX | $42.21 |
| 12/09 | 12/09 | CIGARS | 484-285-0400 PA | $76.45 |
| 12/10 | 12/10 | HARVEST MANOR FARMS LLC | 319-8414134 IA | $461.15 |
| 12/11 | 12/11 | COSTCO LIQUOR - 45 | EL PASO TX | $89.83 |
| 12/13 | 12/13 | FUDDRUCKERS | EL PASO TX | $65.73 |
| 12/14 | 12/14 | AT&T DATA | 800-331-0500 GA | $30.71 |
| 12/16 | 12/16 | TEXAS ROADHOUSE #2178 | EL PASO TX | $500.00 |
| 12/16 | 12/16 | GREENSHEET HOU - 1996 | 713-371-3500 TX | $14.00 |
| 12/17 | 12/17 | DIAMOND 1273 SHAMROCK | EL PASO TX | $27.05 |
| 12/17 | 12/17 | OFFICE DEPOT #498 | EL PASO TX | $17.52 |
| 12/17 | 12/17 | AT&T X173 7442 | EL PASO TX | $54.11 |
| 12/20 | 12/20 | FUDDRUCKERS | EL PASO TX | $167.87 |
| 12/21 | 12/21 | ISMAEL STUDIO | 915-8554553 TX | $95.00 |
| 12/21 | 12/21 | D EMBROIDERY CORP | EL PASO TX | $32.00 |
| 12/21 | 12/21 | D EMBROIDERY CORP | EL PASO TX | $156.00 |
| 12/23 | 12/23 | ISMAEL STUDIO | 915-8554553 TX | $65.00 |

| Trans | Post | Description | | Amount |
|-------|------|-------------|---|--------|
| 10/02 | 10/02 | CIRCLE K 05312   Q47   EL PASO   TX | | $34.14 |
| 10/04 | 10/04 | PAYPAL *SCOTTPATRIC   402-935-7733 CA | | $420.19 |
| 10/05 | 10/05 | PAYPAL *ONESOURCETO   402-935-7733 CA | | $64.50 |
| 10/05 | 10/05 | PAYPAL *MONTTANA2   402-935-7733 CA | | $160.00 |
| 10/07 | 10/07 | 7-11 #57630   EL PASO   TX | | $27.35 |
| 10/07 | 10/07 | PEOPLE PC INT SVC   866-226-1015 CA | | $12.85 |
| **Total Standard Purch** | | | | **$2,181.91** |

| Subtotal of Activity for Account Number | | $2,181.91 |
|---|---|---|

**K DENTON**                              Account Number
Employee Credit Line         $30,000
Employee Cash Advance Limit  $15,000

**Credits, Fees and Adjustments**

| Trans | Post | Description | | Amount |
|-------|------|-------------|---|--------|
| 09/22 | 09/22 | SPRINT STORE #418   SAN ANTONIO  TX | | $43.24- |
| **Total Credits, Fees and Adjustments** | | | | **$43.24-** |

**Purchases**

**Standard Purch**

| Trans | Post | Description | | Amount |
|-------|------|-------------|---|--------|
| 09/08 | 09/09 | YAYAS THAI RESTAURANT   SAN ANTONIO  TX | | $41.18 |
| 09/09 | 09/09 | S PRESA FOOD MART   SAN ANTONIO  TX | | $20.00 |
| 09/09 | 09/09 | USPS 48796402134806893   SAN ANTONIO  TX | | $13.25 |
| 09/10 | 09/10 | LA FONDA   SAN ANTONIO  TX | | $94.51 |
| 09/10 | 09/10 | MEYER GLASS CO   SAN ANTONIO  TX | | $137.50 |
| 09/10 | 09/10 | PALM RESTAURANT   SAN ANTONIO  TX | | $158.21 |
| 09/13 | 09/13 | SOUTHWESTAIR5262124763740DALLAS   TX | | $119.40 |
| 09/13 | 09/13 | BORDERS BKS&MU01001866   SAN ANTONIO  TX | | $77.20 |
| 09/13 | 09/13 | OREILLY AUTO 00006205   SAN ANTONIO  TX | | $6.48 |
| 09/13 | 09/13 | OREILLY AUTO 00006205   SAN ANTONIO  TX | | $35.64 |
| 09/13 | 09/13 | VALERO 2330   SAN ANTONIO  TX | | $59.54 |
| 09/15 | 09/15 | OFFICE MAX   SAN ANTONIO  TX | | $19.39 |
| 09/16 | 09/16 | OFFICE MAX   SAN ANTONIO  TX | | $149.99 |
| 09/16 | 09/16 | LA FONDA   SAN ANTONIO  TX | | $69.02 |
| 09/17 | 09/17 | PALM RESTAURANT   SAN ANTONIO  TX | | $138.86 |
| 09/17 | 09/17 | RADIOSHACK COR00192179   SAN ANTONIO  TX | | $64.85 |
| 09/17 | 09/17 | CLEANING IDEAS #2   210-2279161  TX | | $39.15 |
| 09/18 | 09/18 | LOWES #01645*   SAN ANTONIO  TX | | $127.39 |
| 09/19 | 09/19 | PIC N PAC #08   SEGUIN   TX | | $52.07 |
| 09/20 | 09/20 | OFFICE MAX   SAN ANTONIO  TX | | $129.97 |
| 09/21 | 09/21 | SPRINT STORE #418   SAN ANTONIO  TX | | $43.24 |
| 09/21 | 09/21 | DIAMOND 2196 SHAMROCK   ALAMO HEIGHT TX | | $12.62 |
| 09/22 | 09/22 | CLEANING IDEAS #2   210-2279161  TX | | $29.50 |
| 09/22 | 09/22 | GREEN VEGITARIAN CUISI   SAN ANTONIO  TX | | $28.90 |
| 09/22 | 09/22 | BORDERS BKS&MU01001866   SAN ANTONIO  TX | | $80.69 |
| 09/23 | 09/23 | OFFICE MAX   SAN ANTONIO  TX | | $68.98 |
| 09/23 | 09/23 | OFFICE MAX   SAN ANTONIO  TX | | $93.24 |
| 09/24 | 09/24 | CANDLELIGHT COFFEE HOUSE SAN ANTONIO  TX | | $50.12 |
| 09/24 | 09/24 | STARBUCKS USA 00147165   SAN ANTONIO  TX | | $26.27 |
| 09/25 | 09/25 | PALM RESTAURANT   SAN ANTONIO  TX | | $35.57 |
| 09/26 | 09/26 | EXXONMOBIL   47195300   SAN ANTONIO  TX | | $59.45 |
| 09/27 | 09/27 | LA FONDA   SAN ANTONIO  TX | | $199.24 |
| 09/27 | 09/27 | BORDERS BKS&MU01001866   SAN ANTONIO  TX | | $38.54 |
| 09/27 | 09/27 | JOSEPHINE STREET CAF   210-2246169  TX | | $61.37 |
| 09/27 | 09/27 | HEB GROCERY #556   SAN ANTONIO  TX | | $92.00 |
| 09/30 | 09/30 | NY TIMES NATL SALES   800-698-4637 NY | | $64.01 |
| 09/30 | 09/30 | STARBUCKS USA 00147165   SAN ANTONIO  TX | | $20.00 |
| 09/30 | 09/30 | LOWES #01645*   SAN ANTONIO  TX | | $10.25 |
| 10/03 | 10/03 | HOTEL HARRINGTON   WASHINGTON  DC | | $1,000.00 |
| 10/04 | 10/04 | EXXONMOBIL   47195300   SAN ANTONIO  TX | | $63.06 |
| 10/05 | 10/05 | SPECTRUM-CHECKFREE   210-490-1980 TX | | $101.64 |
| 10/05 | 10/05 | WOLF CAMERA #1681   SAN ANTONIO  TX | | $18.79 |
| 10/06 | 10/06 | OFFICE MAX   SAN ANTONIO  TX | | $11.98 |
| 10/07 | 10/07 | MEYER GLASS CO   SAN ANTONIO  TX | | $1,400.00 |
| | | BORDERS BKS&MU01001866   SAN ANTONIO  TX | | $27.25 |
| **Total Standard Purch** | | | | **$5,168.31** |

| Subtotal of Activity for Account Number | | $5,145.07 |
|---|---|---|

THP Citi CID 2011 - 605

| Trans | Post | Description | | Amount |
|-------|------|-------------|------|--------|
| 08/24 | 08/24 | PAYPAL *CLVILLALVA | 402-935-7733 CA | $169.38 |
| 08/25 | 08/25 | ISMAEL STUDIO | EL PASO TX | $221.00 |
| 08/26 | 08/26 | GREENSHEET | 7133713936 TX | $14.00 |
| 08/26 | 08/26 | ADVANCE AUTO PARTS #8512 SPRING TX | | $81.17 |
| 08/26 | 08/26 | OFFICE DEPOT #2796 | EL PASO TX | $75.76 |
| 08/30 | 08/30 | THRIFTY NICKEL | EL PASO TX | $72.00 |
| 08/31 | 08/31 | 7-11 #57615 | EL PASO TX | $40.00 |
| 08/31 | 08/31 | WALGREENS #6435 | EL PASO TX | $59.35 |
| 09/01 | 09/01 | THRIFTY NICKEL | EL PASO TX | $72.00 |
| 09/01 | 09/01 | OASIS LANES | EL PASO TX | $22.00 |
| 09/01 | 09/01 | OASIS LANES | EL PASO TX | $32.50 |
| 09/02 | 09/02 | EL TACO TOTE Q24 EL PASO TX | | $112.11 |
| 09/02 | 09/02 | OASIS LANES | EL PASO TX | $113.35 |
| 09/03 | 09/03 | CHEVRON 00070883 | EL PASO TX | $30.02 |
| 09/04 | 09/04 | SUBWAY 00108944 EL PASO TX | | $8.66 |
| 09/04 | 09/04 | UTELPASO 30082572 EL PASO TX | | $27.50 |
| 09/07 | 09/07 | PELICANS RESTAURANT EAST EL PASO TX | | $46.02 |
| | | PEOPLE PC INT SVC | 866-226-1015 CA | $12.95 |
| **Total Standard Purch** | | | | **$2,059.50** |

**Subtotal of Activity for Account Number** ████████  $2,059.50

**K DENTON**

Employee Credit Line          $30,000          Account Number ████████
Employee Cash Advance Limit   $15,000

**Purchases**

**Standard Purch**

| Trans | Post | Description | | Amount |
|-------|------|-------------|------|--------|
| 08/18 | 08/18 | VALERO 2330 | SAN ANTONIO TX | $50.00 |
| 08/18 | 08/18 | HEB GROCERY #585 | SAN ANTONIO TX | $42.00 |
| 08/18 | 08/18 | GOODYEAR AUTO SVS CT 4724SAN ANTONIO TX | | $119.51 |
| 08/19 | 08/19 | PALM RESTAURANT | SAN ANTONIO TX | $284.57 |
| 08/21 | 08/21 | APPLE STORE #R290 | SAN ANTONIO TX | $29.00 |
| 08/23 | 08/23 | NY TIMES NATL SALES | 800-698-4637 NY | $62.47 |
| 08/24 | 08/24 | USPS 48796402134806893 SAN ANTONIO TX | | $13.00 |
| 08/25 | 08/25 | BORDERS BKS&MU01001866 SAN ANTONIO TX | | $28.90 |
| 08/25 | 08/25 | VALERO 2327 | SAN ANTONIO TX | $55.55 |
| 08/25 | 08/25 | OFFICE MAX | SAN ANTONIO TX | $82.41 |
| 08/26 | 08/26 | WOLF CAMERA #1661 | SAN ANTONIO TX | $23.13 |
| 08/26 | 08/26 | GUNN NISSAN | SAN ANTONIO TX | $36.89 |
| 08/26 | 08/26 | OFFICE MAX | SAN ANTONIO TX | $43.23 |
| 08/27 | 08/27 | LA FONDA | SAN ANTONIO TX | $133.52 |
| 08/30 | 08/30 | MISSION CITY CONTAINER SAN ANTONIO TX | | $237.18 |
| 08/30 | 08/30 | NY TIMES NATL SALES | 800-698-4637 NY | $64.01 |
| 08/31 | 08/31 | OFFICE DEPOT #2218 | SAN ANTONIO TX | $20.20 |
| 09/01 | 09/01 | SPECTRUM CLUBS INC #311 210-822-4742 TX | | $203.28 |
| 09/02 | 09/02 | VALERO 2140 | SAN ANTONIO TX | $61.20 |
| 09/03 | 09/03 | STARBUCKS USA 00147165 SAN ANTONIO TX | | $21.62 |
| 09/03 | 09/03 | MISSION CITY CONTAINER SAN ANTONIO TX | | $77.50 |
| 09/05 | 09/05 | SAMMY'S RESTAURANT | CASTROVILLE TX | $27.61 |
| 09/05 | 09/05 | BRUSH COUNTRY STEAK HOUS PEARSAL TX | | $50.64 |
| 09/06 | 09/06 | CHEVRON 00108574 | SAN ANTONIO TX | $88.10 |
| **Total Standard Purch** | | | | **$1,855.52** |

**Subtotal of Activity for Account Number** ████████  $1,855.52

THP Citi CID 2011 - 600

| Trans | Post | Description | | Amount |
|---|---|---|---|---|
| 10/02 | 10/02 | CIRCLE K 05312    Q47    EL PASO    TX | | $34.14 |
| 10/04 | 10/04 | PAYPAL *SCOTTPATRIC    402-935-7733 CA | | $420.19 |
| 10/05 | 10/05 | PAYPAL *ONESOURCETO    402-935-7733 CA | | $84.50 |
| 10/05 | 10/05 | PAYPAL *MONTTANA2    402-935-7733 CA | | $160.00 |
| 10/07 | 10/07 | 7-11 #57630    EL PASO    TX | | $27.35 |
| 10/07 | 10/07 | PEOPLE PC INT SVC    866-226-1015 CA | | $12.95 |
| | | Total Standard Purch | | $2,181.91 |

| Subtotal of Activity for Account Number | ██████████ | $2,181.91 |
|---|---|---|

**K DENTON**
Employee Credit Line    $30,000          Account Number ██████████
Employee Cash Advance Limit  $15,000

**Credits, Fees and Adjustments**

| Trans | Post | Description | | Amount |
|---|---|---|---|---|
| 09/22 | 09/22 | SPRINT STORE #418    SAN ANTONIO  TX | | $43.24- |
| | | Total Credits, Fees and Adjustments | | $43.24- |

**Purchases**

Standard Purch

| Trans | Post | Description | | Amount |
|---|---|---|---|---|
| 09/08 | 09/09 | YAYAS THAI RESTAURANT    SAN ANTONIO  TX | | $41.18 |
| 09/09 | 09/09 | S PRESA FOOD MART    SAN ANTONIO  TX | | $20.00 |
| 09/09 | 09/09 | USPS 48796402134806893    SAN ANTONIO  TX | | $13.25 |
| 09/10 | 09/10 | LA FONDA    SAN ANTONIO  TX | | $94.51 |
| 09/10 | 09/10 | MEYER GLASS CO    SAN ANTONIO  TX | | $137.50 |
| 09/10 | 09/10 | PALM RESTAURANT    SAN ANTONIO  TX | | $158.21 |
| 09/13 | 09/13 | SOUTHWESTAIR5262124763740DALLAS    TX | | $119.40 |
| 09/13 | 09/13 | BORDERS BKS&MU01001866    SAN ANTONIO  TX | | $77.20 |
| 09/13 | 09/13 | OREILLY AUTO  00006205    SAN ANTONIO  TX | | $6.48 |
| 09/13 | 09/13 | OREILLY AUTO  00006205    SAN ANTONIO  TX | | $35.64 |
| 09/13 | 09/13 | VALERO 2330    SAN ANTONIO  TX | | $59.54 |
| 09/15 | 09/15 | OFFICE MAX    SAN ANTONIO  TX | | $19.39 |
| 09/16 | 09/16 | OFFICE MAX    SAN ANTONIO  TX | | $149.99 |
| 09/16 | 09/16 | LA FONDA    SAN ANTONIO  TX | | $69.02 |
| 09/17 | 09/17 | PALM RESTAURANT    SAN ANTONIO  TX | | $138.86 |
| 09/17 | 09/17 | RADIOSHACK COR00192179    SAN ANTONIO  TX | | $64.85 |
| 09/17 | 09/17 | CLEANING IDEAS #2    210-2279161  TX | | $39.15 |
| 09/18 | 09/18 | LOWES #01645*    SAN ANTONIO  TX | | $127.39 |
| 09/19 | 09/19 | PIC N PAC #08    SEGUIN    TX | | $52.07 |
| 09/20 | 09/20 | OFFICE MAX    SAN ANTONIO  TX | | $129.97 |
| 09/21 | 09/21 | SPRINT STORE #418    SAN ANTONIO  TX | | $43.24 |
| 09/21 | 09/21 | DIAMOND 2196 SHAMROCK    ALAMO HEIGHT TX | | $12.62 |
| 09/22 | 09/22 | CLEANING IDEAS #2    210-2279161  TX | | $29.50 |
| 09/22 | 09/22 | GREEN VEGITARIAN CUISI    SAN ANTONIO  TX | | $28.90 |
| 09/22 | 09/22 | BORDERS BKS&MU01001866    SAN ANTONIO  TX | | $80.69 |
| 09/23 | 09/23 | OFFICE MAX    SAN ANTONIO  TX | | $68.98 |
| 09/23 | 09/23 | OFFICE MAX    SAN ANTONIO  TX | | $93.24 |
| 09/24 | 09/24 | CANDLELIGHT COFFEE HOUSE SAN ANTONIO  TX | | $50.12 |
| 09/24 | 09/24 | STARBUCKS USA 00147165    SAN ANTONIO  TX | | $26.27 |
| 09/25 | 09/25 | PALM RESTAURANT    SAN ANTONIO  TX | | $35.57 |
| 09/28 | 09/28 | EXXONMOBIL  47195300    SAN ANTONIO  TX | | $59.45 |
| 09/27 | 09/27 | LA FONDA    SAN ANTONIO  TX | | $199.24 |
| 09/27 | 09/27 | BORDERS BKS&MU01001866    SAN ANTONIO  TX | | $38.54 |
| 09/27 | 09/27 | JOSEPHINE STREET CAF    210-2246169  TX | | $61.37 |
| 09/27 | 09/27 | HEB GROCERY #558    SAN ANTONIO  TX | | $92.00 |
| 09/30 | 09/30 | NY TIMES NATL SALES    800-698-4637 NY | | $64.01 |
| 09/30 | 09/30 | STARBUCKS USA 00147165    SAN ANTONIO  TX | | $20.00 |
| 09/30 | 09/30 | LOWES #01645*    SAN ANTONIO  TX | | $10.25 |
| 10/03 | 10/03 | HOTEL HARRINGTON    WASHINGTON  DC | | $1,000.00 |
| 10/04 | 10/04 | EXXONMOBIL  47195300    SAN ANTONIO  TX | | $63.06 |
| 10/05 | 10/05 | SPECTRUM-CHECKFREE    210-490-1980 TX | | $101.84 |
| 10/05 | 10/05 | WOLF CAMERA #1681    SAN ANTONIO  TX | | $18.79 |
| 10/06 | 10/06 | OFFICE MAX    SAN ANTONIO  TX | | $11.98 |
| 10/07 | 10/07 | MEYER GLASS CO    SAN ANTONIO  TX | | $1,400.00 |
| | | BORDERS BKS&MU01001866    SAN ANTONIO  TX | | $27.25 |
| | | Total Standard Purch | | $5,188.31 |

| Subtotal of Activity for Account Number | ██████████ | $5,145.07 |
|---|---|---|

THP Citi CID 2011 - 605

TIM TIERNEY
TEXAS HIGHWAY PATROL
Business Account████████████
October 8 - November 8, 2010

| 10/09 | 10/09 | XM *SATELLITE RADIO | 800-XMRADIO DC | $40.94 |
|---|---|---|---|---|
| 10/11 | 10/11 | FUDDRUCKERS | EL PASO TX | $53.90 |
| 10/12 | 10/12 | RELIANT ENERGY | 866-222-7100 TX | $450.00 |
| 10/12 | 10/12 | CKT*CRICKETCOMM | 800-274-2538 CA | $105.49 |
| 10/13 | 10/13 | CIGARS | 484-285-0400 PA | $91.44 |
| 10/14 | 10/14 | GREENSHEET | 7133713938 TX | $14.00 |
| 10/14 | 10/14 | TAQUERIA LOS CUNAD | EL PASO TX | $42.40 |
| 10/15 | 10/15 | AT&T DATA | 800-331-0500 GA | $30.71 |
| 10/18 | 10/18 | FUDDRUCKERS | EL PASO TX | $50.48 |
| 10/21 | 10/21 | GREENSHEET | 7133713938 TX | $14.00 |
| 10/21 | 10/21 | FINA 7-ELEVEN #630 | EL PASO TX | $75.00 |
| 10/23 | 10/23 | AOL* SERVICE 1010 | 800-827-6364 NY | $77.88 |
| 10/23 | 10/23 | PELICANS RESTAURANT EAST EL PASO TX | | $81.64 |
| 10/26 | 10/26 | PAYPAL *RAINCITYWHO | 402-935-7733 CA | $19.24 |
| 10/26 | 10/26 | PAYPAL *ABACUS 247 | 402-935-7733 AZ | $46.99 |
| 10/27 | 10/27 | SOUTHWESTAIR5260630354968DALLAS TX | | $10.00 |
| 10/27 | 10/27 | SOUTHWESTAIR5260630354965DALLAS TX | | $10.00 |
| 10/27 | 10/27 | SOUTHWESTAIR5262133989884DALLAS TX | | $359.40 |
| 10/28 | 10/28 | WM SUPERCENTER | EL PASO TX | $108.50 |
| 10/28 | 10/28 | SPORTS LINE | EL PASO TX | $35.00 |
| 10/29 | 10/29 | GREENSHEET | 7133713938 TX | $14.00 |
| 10/29 | 10/29 | TORO BURGER BAR | EL PASO TX | $84.88 |
| 11/01 | 11/01 | BOOMBAH | 815-941-1431 IL | $363.52 |
| 11/02 | 11/02 | FUDDRUCKERS | EL PASO TX | $46.67 |
| 11/02 | 11/02 | BOOMBAH | MORRIS IL | $425.02 |
| 11/04 | 11/04 | BARRIGAS RESTAURANT | EL PASO TX | $43.51 |
| 11/05 | 11/05 | GREENSHEET | 7133713938 TX | $14.00 |
| 11/05 | 11/05 | D EMBROIDERY CORP | EL PASO TX | $60.00 |
| 11/07 | 11/07 | D EMBROIDERY CORP | EL PASO TX | $204.00 |
| 11/07 | 11/07 | PIZZA HUT 23842 | EL PASO TX | $31.60 |
| 11/07 | 11/07 | PEOPLE PC INT SVC | 866-226-1015 CA | $12.95 |
| | | TWC*TIME WARNER CABLE | 800-222-5355 TX | $42.21 |
| | | Total Standard Purch | | $3,193.40 |

Subtotal of Activity for Account Number          ████████████          $3,193.40

K DENTON
Employee Credit Line          $30,000          Account Number ████████████
Employee Cash Advance Limit          $15,000

Credits, Fees and Adjustments

| Trans | Post | Description | Amount |
|---|---|---|---|
| 11/06 | 11/06 | COURTYARD BY MARRIOTT SARSAN ANTONIO TX | $136.60- |
| | | Total Credits, Fees and Adjustments | $136.60- |

Purchases
Standard Purch

| Trans | Post | Description | Amount |
|---|---|---|---|
| 10/08 | 10/09 | THE WASH TUB BROADWAY SAN ANTONIO TX | $30.99 |
| 10/08 | 10/09 | HEB GROCERY #556 SAN ANTONIO TX | $84.00 |
| 10/11 | 10/11 | EXXONMOBIL 47195300 SAN ANTONIO TX | $58.50 |
| 10/11 | 10/11 | STARBUCKS USA 00147165 SAN ANTONIO TX | $28.04 |
| 10/12 | 10/12 | USPS 48796402134806893 SAN ANTONIO TX | $10.70 |
| 10/12 | 10/12 | USPS 48796402134806893 SAN ANTONIO TX | $88.00 |
| 10/13 | 10/13 | BORDERS BKS&MU01001866 SAN ANTONIO TX | $87.55 |
| 10/14 | 10/14 | RESTAURANT DEPOT SAN ANTONIO TX | $99.96 |
| 10/15 | 10/15 | LA FONDA SAN ANTONIO TX | $65.97 |
| 10/15 | 10/15 | CANDLELIGHT COFFEE HOUSE SAN ANTONIO TX | $56.90 |
| 10/18 | 10/18 | EXXONMOBIL 47195300 SAN ANTONIO TX | $84.82 |
| 10/18 | 10/18 | JOSEPHINE STREET CAF 210-2246169 TX | $22.87 |
| 10/19 | 10/19 | LA FONDA SAN ANTONIO TX | $56.94 |
| 10/19 | 10/19 | COSTCO LIQUORS #22 SAN ANTONIO TX | $61.60 |
| 10/22 | 10/22 | STARBUCKS USA 00062547 DALLAS TX | $25.00 |
| 10/22 | 10/22 | LUCKY'S CAFE # 719 DALLAS TX | $12.27 |
| 10/22 | 10/22 | PALM RESTAURANT-DALLAS DALLAS TX | $79.54 |
| 10/23 | 10/23 | SOUTHWESTAIR5262132978264DALLAS TX | $93.00 |
| 10/23 | 10/23 | WARWICK MELROSE HOTEL DALLAS TX | $149.03 |
| 10/23 | 10/23 | EATZI'S DALLAS TX | $74.95 |
| 10/25 | 10/25 | RSWD CRESCENT HOTEL DALLAS TX | $256.90 |
| 10/25 | 10/25 | NY TIMES NATL SALES 800-698-4637 NY | $57.22 |
| 10/25 | 10/25 | BOLNERS MEAT MARKET SAN ANTONIO TX | $52.71 |
| 10/26 | 10/26 | EL MIRADOR RESTAURANT SAN ANTONIO TX | $44.68 |
| 10/28 | 10/28 | LA FONDA SAN ANTONIO TX | $49.45 |
| 10/28 | 10/28 | CHEVRON 00108477 SAN ANTONIO TX | $62.38 |
| 10/28 | 10/28 | USPS 48796402134806893 SAN ANTONIO TX | $11.14 |
| 10/28 | 10/28 | HALF PRICE BOOKS #010 SAN ANTONIO TX | $102.83 |
| 11/01 | 11/01 | GARDENIA RESTAURANT SAN ANTONIO TX | $13.17 |
| 11/01 | 11/01 | EL MIRADOR RESTAURANT SAN ANTONIO TX | $24.35 |
| 11/02 | 11/02 | BORDERS BKS&MU01001868 SAN ANTONIO TX | $38.68 |
| 11/02 | 11/02 | FEDEX OFFICE #0135 SAN ANTONIO TX | $2.27 |
| | | FEDEX OFFICE #0135 SAN ANTONIO TX | $14.01 |

THP Citi CID 2011 - 610

How to Reach Us
1-800-732-6000

Customer Service
CitiBusiness Card, PO Box 6235
Sioux Falls, SD 57117-6235
www.citicards.com

Account Number ████████

## K DENTON (continued)

| Trans | Post | Description | | | Amount |
|---|---|---|---|---|---|
| 05/16 | 05/16 | AMTRAK 1367765008687 WASHINGTON DDC | 0412US | AE 0 | 209.00 |
| J324IBOK | | 2479262II37 | | | |
| | | NAME: DENTON/KENNETH | | | |
| | | DEPART: 05/16/11 | | | |
| | | WAS TO NYP : 2V: CLASS: S : STOP-X | | | |
| | | TO | | | |
| 05/17 | 05/17 | MTA MVM 59TH ST /COLUMB 718-330-1234 NY | 0411US | AE 0 | 10.00 |
| 9L98HR3O | | 2461043II38 | | | |
| 05/17 | 05/17 | MTA MVM 59TH ST /COLUMB 718-330-1234 NY | 0411US | AE 0 | 10.00 |
| GL98HR3O | | 2461043II38 | | | |
| 05/17 | 05/17 | ABC HOME FURNISHINGS 400 NEW YORK NY | 0571US | AE 0 | 285.00 |
| PT2OSINC | | 2479262II37 | | | |
| 05/17 | 05/17 | ABC KITCHEN NEW YORK NY | 0582US | AE 0 | 151.01 |
| KGSC*SSS | | 2479262II37 | | | |
| 05/18 | 05/18 | THE MODERN AT MOMA NEW YORK NY | 0582US | AE 0 | 122.79 |
| GM65Y9MG | | 2479262II38 | | | |
| 05/18 | 05/18 | RIZZOLI BOOKSTORE #31 NEW YORK NY | 0594US | AE 0 | 170.47 |
| 2OTS8SH3 | | 2432301I39 | | | |
| 05/18 | 05/18 | DA MARINO NEW YORK NY | 0582US | AE 0 | 210.77 |
| 61BKWNK6 | | 2432302II38 | | | |
| 05/19 | 05/19 | FEDEX 873972071224 800-4633339 TN | 0421US | AVIO | 38.46 |
| KN1XJTJM | | 2473309II39 | | | |
| 05/19 | 05/19 | BISTROT DU COIN WASHINGTON DC | 0582US | AE 0 | 17.33 |
| CWCOL*16 | | 2416407II39 | | | |
| 05/19 | 05/19 | COURTYARD BY MARRIOTT TMD NEW YORK NY | 03690US | AE 0 | 697.73 |
| DSBNJR3O | | 2432302II40 | | | |
| 05/19 | 05/19 | EATALY PIZZA PASTA NEW YORK NY | 0582US | AE 0 | 65.49 |
| D3CHYMDL | | 2461043II40 | | | |
| 05/19 | 05/19 | EATALY SUPERMARKET 212-5390204 NY | 054IUS | AE 0 | 110.86 |
| WIKUYMDL | | 2470752II40 | | | |
| 05/19 | 05/19 | AMTRAK 1391I74061749 NEW YORK PENNNY | 0412US | AE 0 | 209.00 |
| VOMZ380K | | 2479262II40 | | | |
| | | NAME: DENTON/KENNETH | | | |
| | | DEPART: 05/19/11 | | | |

## K DENTON (continued)

| Trans | Post | Description | | | Amount |
|---|---|---|---|---|---|
| 05/20 | 05/20 | NYP TO WAS : 2V: CLASS: S : STOP-X | | | |
| 2VYST6SJ | | TO | | | |
| | | SOUTHWEST AIR 52627I536777 6DALLAS TX | N306GUS | ON O | 33.60 |
| | | 240362II41 | | | |
| | | NAME: DENTON/KENNETH LANE | | | |
| | | DEPART: 05/22/11 | | | |
| | | BWI TO SAT : WN: CLASS: Y: STOP. | | | |
| 05/20 | 05/20 | WHITE HOUSE GIFTS WASHINGTON DC | 0594US | AE 0 | 104.62 |
| F8RWN416 | | 242I073II41 | | | |
| 05/20 | 05/20 | MANDARIN ORIENTAL NY NEW YORK NY | C357US | AE 0 | 1026.03 |
| KILS1OSI 61 | | 24906041II40 | | | |
| 05/21 | 05/21 | KRAMERBOOKS WASHINGTON DC | 0594US | AE 0 | 68.78 |
| RTLSYOOD | | 2425477II42 | | | |
| 05/21 | 05/21 | NEWSEUM WASHINGTON DC | 0799US | AE 0 | 19.03 |
| RC8NBSC3 | | 2434291II42 | | | |
| 05/21 | 05/21 | ANNES PARAMOUNT STEAK WASHINGTON DC | 0582US | AE 0 | 47.75 |
| YD*O9716 | | 2443565II42 | | | |
| 05/21 | 05/21 | SUPERSHUTTLE EXECUCAR BWI 800-258-3826 MD | 0478US | AVIO | 39.00 |
| LSKH5CO6 | | 2449398II42 | | | |
| 05/22 | 05/22 | INT'L SPY MUSEUM STORE WASHINGTON DC | 0594US | AE 0 | 150.99 |
| FXKSILSS | | 2476197II43 | | | |
| 05/22 | 05/22 | FEDEX 524373050008824 800-4633339 TN | 0425US | AVIO | 29.23 |
| N8P8G9JM | | 2464407II42 | | | |
| 05/24 | 05/24 | HOTEL HARRINGTON WASHINGTON DC | C7OIUS | OX O | 479.19 |
| OWOOSO4J | | 2475542II43 | | | |
| 05/24 | 05/24 | JOSEPHINE STREET CAF 210-2246169 TX | 0582US | AE 0 | 41.22 |
| 4RVPWRB3 | | 2422390II45 | | | |
| 05/25 | 05/25 | SOUTHWEST AIR 52627I63317058 DALLAS TX | 0306GUS | AVIO | 509.40 |
| NRDXHGSJ | | 2403621II45 | | | |
| | | NAME: DENTON/KENNETH LANE | | | |
| | | DEPART: 05/31/11 | | | |
| | | SAT TO BWI : WN: CLASS: Q : STOP. | | | |
| | | BWI TO SAT : WN: CLASS: Q : STOP. | | | |
| 05/25 | 05/25 | HABITAT HOME CENTERS #1 SAN ANTONIO TX | | | 86.50 |

5 of 8

THP Citi CID 2011 - 653

How to Reach Us
1-800-732-6000

Customer Service
CitiBusiness Card, PO Box 6235
Sioux Falls, SD 57117-6235
www.citicards.com

Account Number ▇▇▇▇▇

## TIM TIERNEY (continued)

| Trans | Post | Description | | Amount |
|---|---|---|---|---|
| | | Subtotal of Activity for Account Number ▇▇▇▇ | | $2,458.83 |

Employee Credit Limit $3,000
Employee Cash Advance Limit $3,000
Card Account: ▇▇▇▇ 7654

## STEVEN JENKINS

**Purchases**

**Standard Purchases**

| Trans | Post | Description | | | Amount |
|---|---|---|---|---|---|
| 09/09 | 09/09 | LA CASITA | AUSTIN | TX | 23.71 |
| 42HHK6TD | 61 | 0581ZUS | | AE O | |
| 09/14 | 09/14 | LONE STAR AWARDS I | AUSTIN | TX | 17.00 |
| 2003NXZ2 | 61 | 05999US | | AE O | |
| 09/16 | 09/16 | LA CASITA | AUSTIN | TX | 23.71 |
| CXHHK6TD | 61 | 0581ZUS | | AE O | |
| 09/23 | 09/23 | LA CASITA | AUSTIN | TX | 21.81 |
| 5Q2HK6TD | 61 | 0581ZUS | | AE O | |
| 10/02 | 10/02 | TEXACO 0035876 | AUSTIN | TX | 51.60 |
| 82BSX400 | 61 | 0554ZUS | | AC O | |
| 10/06 | 10/06 | JOE'S CRAB-ROUND ROCK | ROUND ROCK | TX | 182.70 |
| B3BNL900 | 61 | 0581ZUS | | AE O | |
| 10/07 | 10/07 | OFFICE DEPOT #2784 | AUSTIN | TX | 146.72 |
| B05PN9X2 | 61 | 05943US | | AE O | |
| | | Subtotal of Activity for Account Number ▇▇▇▇ | | | $467.25 |

Employee Credit Limit $7,000
Employee Cash Advance Limit $3,000
Card Account: ▇▇▇▇ 7654

## RUBEN C VILLALVA

**Credits and Adjustments**

| Trans | Post | Description | | | Amount |
|---|---|---|---|---|---|
| 10/04 | 10/04 | OFFICE DEPOT #2581 | EL PASO | TX | -140.70 |
| C54M49X2 | 71 | 5943US | | SA O | |
| 10/05 | 10/05 | RADIOSHACK COR00186858 | EL PASO | TX | -28.12 |
| 98MZLSCV | 71 | 5732US | | ON O | |

## RUBEN C VILLALVA (continued)

**Standard Purchases**

| Trans | Post | Description | | | Amount |
|---|---|---|---|---|---|
| 09/07 | 09/09 | THRIFTY NICKEL | EL PASO | TX | 72.00 |
| 205*64GO | 61 | 073US | ON O | | 24013392SI |
| 09/10 | 09/10 | PELICANS RESTAURANT EAST EL PASO | TX | | 116.98 |
| VVQH77GO | 61 | 0581ZUS | AE O | | 2473693253 |
| 09/11 | 09/11 | AT&T DATA | 800-331-0500 GA | | 30.76 |
| *MY7X2I0 | 61 | 0484US | AVTO | | 2449398I255 |
| 09/12 | 09/12 | OFFICE DEPOT #195 | EL PASO | TX | 240.85 |
| KULM8X2 | 61 | 05943US | AE O | | 2444574I256 |
| 09/12 | 09/12 | FUDDRUCKERS | EL PASO | TX | 50.54 |
| J9P8G903 | 61 | 0581ZUS | AE O | | 2476I97I256 |
| 09/15 | 09/15 | LOC*LIFELOCK | 800-5433562 AZ | | 27.00 |
| J9AR8JZKB | 61 | 05968US | AV20 | | 2435781I258 |
| 09/15 | 09/15 | APL*APPLE ITUNES STORE | 866-712-7753 CA | | 1.07 |
| 7RLSV800 | 61 | 0573US | AWTO | | 2449216I258 |
| 09/15 | 09/15 | J2 *EFAX PLUS SERVICE | 323-817-3205 CA | | 10.00 |
| *FLM2800 | 61 | 05968US | AV20 | | 2469216I258 |
| 09/16 | 09/16 | BARNES & NOBLE #2744 | EL PASO | TX | 27.01 |
| 4BLF59X2 | 61 | 05943US | AE O | | 2444500I260 |
| 09/16 | 09/16 | PAYPAL *PHOTOBUCKET | 402-935-7733 CO | | 2.99 |
| K299SPR | 61 | 05999US | AWTO | | 2449215I259 |
| 09/18 | 09/18 | FUDDRUCKERS | EL PASO | TX | 15.16 |
| FGV2N903 | 61 | 0581ZUS | AE O | | 2476I97I262 |
| 09/19 | 09/19 | USPS.COM CLICK66K006II | 800-2447779 DC | | 5.19 |
| 0Z2ZVG5C | 61 | 09402US | AWTO | | 2416407I262 |
| 09/19 | 09/19 | DISCOUNT PRINTING | 915-599-2201 TX | | 30.00 |
| *5KI9PKI | 61 | 0274US | AVTO | | 2432300I263 |
| 09/19 | 09/19 | PAYPAL *INNERCIRCLE | 402-935-7733 NV | | 29.95 |
| FM71Q8PR | 61 | 05943US | AWTO | | 2449215I262 |
| 09/19 | 09/19 | FUDDRUCKERS | EL PASO | TX | 12.96 |
| 1Q81P5O364 | | 0581ZUS | AE O | 2476I97I264 | |
| 09/19 | 09/19 | FUDDRUCKERS | EL PASO | TX | 34.60 |

THP Citi CID 2011 - 681

How to Reach Us
1-800-732-6000

Customer Service
CitiBusiness Card PO Box 6235
Sioux Falls, SD 57117-6235
www.citicard.com

Account Number
···· ···· ···· 0609

**K DENTON (continued)**

| Trans | Post | Description | | Amount |
|-------|------|-------------|---|--------|
| | | MCAZVN16 | 0594 2US AE 0 | 2449398243 | |
| 08/30 | 08/30 | SCHNABEL'S TRUE VALUE HARDSAN ANTONIO TX | | 67.30 |
| | | GJVSTNGW | 0523US AE 0 | 245097242 | |
| 08/31 | 08/31 | BORDERS BKS&MU0100866 SAN ANTONIO TX | | 165.00 |
| | | ORHNP4CCO | 0581 2US AE 0 | 2416407243 | |
| 09/01 | 09/01 | JOSEPHINE STREET CAF 210-224 6169 TX | | 21.70 |
| | | KYXIXHH3 | 0581 2US AE 0 | 2422390245 | |
| 09/01 | 09/01 | HALF PRICE BOOKS #010 SAN ANTONIO TX | | 81.70 |
| | | QR9XMN06 | 0594 2US AE 0 | 2449398245 | |
| 09/01 | 09/01 | HOTEL HARRINGTON WASHINGTON DC | | 1000.00 |
| | | K2TB8*NJ | 0701US AP 0 | 2475542244 | |
| 09/02 | 09/02 | EXXONMOBIL 4795300 SAN ANTONIO TX | | 83.41 |
| | | WT22B108 | 0554 2US AC 0 | 2416405246 | |
| 09/02 | 09/02 | BORDERS BKS&MU0100866 SAN ANTONIO TX | | 144.51 |
| | | BGNVP4CCO | 0581 2US AE 0 | 2416407245 | |
| 09/03 | 09/03 | BORDERS BKS&MU0100866 SAN ANTONIO TX | | 198.86 |
| | | DWNO15C0 | 0594 2US AE 0 | 2416407247 | |
| 09/03 | 09/03 | SUNSET RIDGE HOME & HRDW SAN ANTONIO TX | | 11.021 |
| | | QF7CP*8 | 0525US AE 0 | 2473309247 | |
| 09/04 | 09/04 | STARBUCKS CORP0047165 SAN ANTONIO TX | | 25.00 |
| | | RG3XM** | 0581 4US AE 0 | 2416407247 | |
| 09/04 | 09/04 | OFFICE MAX SAN ANTONIO TX | | 126.04 |
| | | 3KDN38X2 | 0594 3US AE 0 | 2444500248 | |
| 09/06 | 09/06 | USPS 48795300203480655 4 SAN ANTONIO TX | | 14.13 |
| | | HG3BOO5C | 0940 2US AE 0 | 2416407249 | |
| 09/06 | 09/06 | JOSEPHINE STREET CAF 210-224 6169 TX | | 17.95 |
| | | RSY**4G3 | 0581 2US AE 0 | 2422390250 | |
| 09/06 | 09/06 | SPECTRUM-CHECKFREE 210-490-1980 TX | | 101.64 |
| | | PYXBP8X2 | 0799 7US AV20 | 2444500249 | |
| 09/07 | 09/07 | OTTO DUKES MACHINERY INC 210-224 5576 TX | | 22.59 |
| | | MY7MF66S | 0507 2US AE 0 | 2463923250 | |
| Subtotal of Activity for Account Number ···· ···· ···· 1004 | | | | $6,193.63 |

**STEVEN JENKINS**

Purchases
Standard Purchases

| Trans | Post | Description | | | Amount |
|-------|------|-------------|---|---|--------|
| | | | | Employee Credit Line: $3,000 | |
| | | | | Employee Cash Advance Line: $3,000 | |
| | | | | Card Account | |
| 08/09 | 08/09 | OFFICE DEPOT #2784 AUSTIN TX | | | 167.94 |
| | | WXITY8X2 | 0594 3US AE 0 | 2444574222 | |
| 08/12 | 08/12 | LA CASITA AUSTIN TX | | | 22.17 |
| | | HZIHK67D | 0581 2US AE 0 | 2425477226 | |
| 08/15 | 08/15 | TEXACO 0035 1876 AUSTIN TX | | | 49.45 |
| | | BLJ3H500 | 0554 2US AC 0 | 2404603227 | |
| 08/15 | 08/15 | HEB #202 AUSTIN TX | | | 31.61 |
| | | *S7CJYL | 0541US AE 0 | 2442731227 | |
| 08/26 | 08/26 | LA CASITA AUSTIN TX | | | 23.71 |
| | | *YIHK67D | 0581 2US AE 0 | 2425477240 | |
| 09/02 | 09/02 | LA CASITA AUSTIN TX | | | 23.71 |
| | | KX1HK67D | 0581 2US AE 0 | 2425477247 | |
| Subtotal of Activity for Account Number ···· ···· ···· 1960 | | | | | $318.59 |

**RUBEN C VILLALVA**

Credits and Adjustments

| Trans | Post | Description | | | Amount |
|-------|------|-------------|---|---|--------|
| | | | | Employee Credit Line: $7,000 | |
| | | | | Employee Cash Advance Line: $3,000 | |
| | | | | Card Account | |
| 08/08 | 08/09 | RADIOSHACK COR00199372 EL PASO TX | | | -42.18 |
| | | HRNCJPCV | 5732US ON 0 | 7416407220 | |
| 08/10 | 08/10 | THE HOME DEPOT 8852 3 EL PASO TX | | | -54.63 |
| | | 3MKSfF90 | 5200US OA10 | 7460431223 | |

Purchases
Standard Purchases

| Trans | Post | Description | | | Amount |
|-------|------|-------------|---|---|--------|
| 08/08 | 08/09 | FREEWAY CARPET EL PASO TX | | | 175.00 |
| | | *32AVNQ0 | 0571 3US AK 0 | 2401039221 | |
| 08/09 | 08/09 | OFFICE DEPOT #2798 EL PASO TX | | | 18.22 |
| | | J7fTY8X2 | 0594 3US AE 0 | 2444574222 | |
| 08/09 | 08/09 | PAYPAL *JCFB 402-935-7733 CA | | | 176.81 |

THP Citi CID 2011 - 676

How to Reach Us
1-800-732-6000

Customer Service
CitiBusiness Card, PO Box 6235
Sioux Falls, SD 57117-6235
www.citicards.com

Account Number

## K DENTON (continued)

| Trans | Post | Description | | | Amount |
|---|---|---|---|---|---|
| 07/29 | 07/29 | ESTATE LIQUIDTN CO IN | SAN ANTONIO TX | | 293.25 |
| QY4KTVZ5 | | 61 | Q593IUS | AE O | |
| 07/30 | 07/30 | SPECTRUM CLUBS INC #311 | 210-822-4742 TX | | 203.28 |
| M52QVS42 | | 61 | 0799TUS | AE O | |
| 08/01 | 08/01 | LA FONDA | SAN ANTONIO TX | | 54.41 |
| M87VH*OO | | 61 | 0582US | AE O | |
| 08/02 | 08/02 | HALF PRICE BOOKS #010 | SAN ANTONIO TX | | 29.39 |
| 7W8MTN06 | | 61 | 0594US | AE O | |
| 08/03 | 08/03 | CAPPYS RESTAURANT | SAN ANTONIO TX | | 93.91 |
| CA3H9D00 | | 61 | 0582US | AE O | |
| 08/03 | 08/03 | CONTINENTAL 00521795489591 | HOUSTON TX | | 480.00 |
| JDRNY62K | | 61 | 0306US | AW70 | |
| | | NAME: DENTON/KENNETH LANE | | | |
| | | DEPART: 08/08/11 | | | |
| | | SAT TO IAH : CO: CLASS: S : STOP: | | | |
| | | IAH TO DCA : CO: CLASS: S : STOP:X | | | |
| | | DCA TO IAH : CO: CLASS: L : STOP:O | | | |
| | | IAH TO SAT : CO: CLASS: L : STOP:X | | | |
| 08/03 | 08/03 | USPS 48796402134806993 | SAN ANTONIO TX | | 147.56 |
| XMF0DOSC | | 61 | 0940ZUS | AE O | |
| 08/03 | 08/03 | OFFICE MAX | SAN ANTONIO TX | | 84.41 |
| N7LTO9X2 | | 61 | 0593US | AE O | |
| 08/04 | 08/04 | TEXAS PIE COMPANY | KYLE TX | | 11.05 |
| 67NTTGQO | | 61 | 0582US | AE O | |
| 08/04 | 08/04 | EXXONMOBIL 47195300 | SAN ANTONIO TX | | 81.61 |
| F2PP*108 | | 61 | C554US | AC O | |
| 08/04 | 08/04 | TEXAS LAND AND0007 I025 | AUSTIN TX | | 177.26 |
| 7478JFX* | | 61 | 0582US | AE O | |
| 08/04 | 08/04 | BOOK PEOPLE | AUSTIN TX | | 109.65 |
| 8R6YT7I6 | | 61 | 0594US | AE O | |
| 08/04 | 08/04 | SPECTRUM CLUBS INC #399 | 210-4901980 TX | | 101.64 |
| 8NTPO66S | | 61 | 0799TUS | AK O | |
| 08/04 | 08/04 | UNCOMMON OBJECTS | AUSTIN TX | | 13.60 |
| KYV8MC*6 | | 61 | 0593US | AE O | |

## K DENTON (continued)

| Trans | Post | Description | | | Amount |
|---|---|---|---|---|---|
| 08/05 | 08/05 | BORDERS BKS&MUSIO10011866 | SAN ANTONIO TX | | 124.12 |
| GPFDISCQ | | 61 | 0594ZUS | AE O | |
| 08/05 | 08/05 | BORDERS BKS&MUSIO10011866 | SAN ANTONIO TX | | 660.00 |
| 2HFDISCQ | | 61 | 0582US | AE O | |
| 08/05 | 08/05 | OFFICE MAX | SAN ANTONIO TX | | 62.37 |
| X907H9X2 | | 61 | 0594US | AE O | |
| 08/06 | 08/06 | BORDERS BKS&MUSIO10011866 | SAN ANTONIO TX | | 193.95 |
| NH7GSCQ | | 61 | 0594US | AE O | |
| 08/06 | 08/06 | HABITAT HOME CENTERS #1 | SAN ANTONIO TX | | 108.13 |
| MMXWG66S | | 61 | 0520US | AE O | |
| 08/07 | 08/07 | STARBUCKS CORP0004 7165 | SAN ANTONIO TX | | 25.00 |
| MCE246B* | | 61 | 0584US | AE O | |

**Subtotal of Activity for Account Number xxxx xxxx xxxx 1004  $3,678.21**

Employee Credit Line: $1,000
Employee Cash Advance Line: $1,000
Card Account

## STEVEN JENKINS

### Purchases
### Standard Purchases

| Trans | Post | Description | | | Amount |
|---|---|---|---|---|---|
| 07/08 | 07/09 | LA CASITA | AUSTIN TX | | 21.85 |
| 9Y1HK67D | | 61 | 0582US | AE O | |
| 07/14 | 07/14 | ELEVATION BURGER | AUSTIN TX | | 66.48 |
| MQLVSG00 | | 61 | 0582US | AE O | |
| 07/15 | 07/15 | LONE STAR AWARDS I | AUSTIN TX | | 8.50 |
| LCTS2Y2 | | 61 | 0599US | AE O | |
| 07/15 | 07/15 | LA CASITA | AUSTIN TX | | 23.98 |
| MO2HK67D | | 61 | 0582US | AE O | |
| 07/22 | 07/22 | LA CASITA | AUSTIN TX | | 23.95 |
| WY1HK67D | | 61 | 0582US | AE O | |
| 07/26 | 07/26 | CHEVRON 00202793 | AUSTIN TX | | 59.40 |
| 86XQ1400 | | 61 | 0554ZUS | AC O | |
| 07/29 | 07/29 | LA CASITA | AUSTIN TX | | 21.81 |
| C1HK67D | | 61 | 0582US | AE O | |
| 08/03 | 08/03 | HEB #202 | AUSTIN TX | | 160.90 |

4 of 7

How to Reach Us
1-800-732-6000

Customer Service
Citi Business Card PO Box 6235
Sioux Falls, SD 57117-6235   www.citicards.com

Account Number
.... .... .... 0609

## STEVEN JENKINS (continued)

| Trans | Post | Description | | | Amount |
|---|---|---|---|---|---|
| 022KCJYL 08/05 | 06/05 | 61 LA CASITA | 0541US AUSTIN TX | AE 0 | 244273215 |
| PX1HK5TD | | 61 | Q581US | AE 0 | 242547T1219 21.85 |

Subtotal of Activity for Account Number .... .... .... 1960 — $4408.72

## RUBEN C VILLALVA

### Credits and Adjustments

| Trans | Post | Description | | | Amount |
|---|---|---|---|---|---|
| 07/23 | 07/23 | THE HOME DEPOT #8523 | EL PASO TX | | -41.71 |
| H9HJJF90 | | 71 | 5200US | 0A10 | 7461043205 |
| 07/26 | 07/26 | TARGET 00008235 | EL PASO TX | | -163.77 |
| P734CRL2 | | 71 | 531QUS | ON 0 | 7416407T1207 |
| 07/26 | 07/26 | OFFICE DEPOT #2798 | EL PASO TX | | -16.23 |
| 6TWC09X2 | | 71 | 5943US | 5A 0 | 7444574T1208 |
| 07/27 | 07/27 | WM SUPERCENTER | EL PASO TX | | -64.95 |
| HRGNWSF* | | 71 | 5411US | CA 0 | 7422638T1209 |
| 07/28 | 07/28 | LOWES #02928* | EL PASO TX | | -36.80 |
| G8*3JT00 | | 71 | 5200US | ON 0 | 7469266T1209 |

### Purchases

### Standard Purchases

| Trans | Post | Description | | | Amount |
|---|---|---|---|---|---|
| 07/08 | 07/09 | TWC*TIME WARNER CABLE | 800-222-5355 TX | | 68.29 |
| SS8TFH00 | | 61 | Q489US | AV20 | 2469261189 |
| 07/09 | 07/09 | DUTY FREE AMERICAS #160 | LUKEVILLE AZ | | 63.00 |
| 12CRPFSN | | 61 | Q5309US | AE 0 | 2423168191 |
| 07/09 | 07/09 | GAMEWORKS TEMPE | TEMPE AZ | | 99.97 |
| 0MFHHHS2 | | 61 | Q581US | AE 0 | 2476497T190 |
| 07/10 | 07/10 | J2 *EFAX PLUS SERVICE | 323-817-3205 CA | | 10.00 |
| VJ8TVN00 | | 61 | Q5968US | AV20 | 2469261191 |
| 07/13 | 07/13 | AT&T DATA | 800-331-0500 GA | | 30.76 |
| MT842020 | | 61 | Q481US | AV70 | 2449398195 |
| 07/17 | 07/17 | PELICANS RESTAURANT EAST | EL PASO TX | | 86.29 |
| BM0R9LD0 | | 61 | Q581US | AE 0 | 2473693T198 |

## RUBEN C VILLALVA (continued)

| Trans | Post | Description | | | Amount |
|---|---|---|---|---|---|
| 07/18 | 07/18 | AOL * SERVICE | 800-827-9492 NY | | 97.35 |
| VYDXJH00 | | 61 | T4816US | JN20 | 2469261199 |
| 07/19 | 07/19 | SAMS INTERNET | 888-746-7726 AR | | 145.02 |
| MK053KR* | | 61 | Q5300US | ON 0 | 2422638201 |
| 07/19 | 07/19 | WALGREENS #3826 | EL PASO TX | | 111.85 |
| LVXN09X2 | | 61 | Q591US | AE 0 | 2444500201 |
| 07/19 | 07/19 | APL *ITUNES | 866-712-7753 CA | | 3.22 |
| S36G2000 | | 61 | Q573US | AW70 | 2469261200 |
| 07/19 | 07/19 | PAYPAL *INNERCIRCLE | 402-935-7733 NV | | 29.95 |
| B1VGSW00 | | 61 | Q594US | AW70 | 2469261200 |
| 07/20 | 07/20 | PAYPAL *OFFICERDMED | 402-935-7733 CA | | 705.55 |
| T6967SNR | | 61 | Q899US | AW70 | 2449215202 |
| 07/20 | 07/20 | THE HOME DEPOT #8523 | EL PASO TX | | 135.88 |
| 0NG*GF90 | | 61 | Q5200US | AE 0 | 2461043202 |
| 07/21 | 07/21 | CITYWIDE LOCKSMITH/ROG | EL PASO TX | | 27.00 |
| 4CT33028 | | 61 | Q769US | AE 0 | 2407105203 |
| 07/21 | 07/21 | PAYPAL | 402-935-7733 CA | | 55.00 |
| 3TT5WSNR | | 61 | Q8999US | AW70 | 2449215202 |
| 07/21 | 07/21 | THE HOME DEPOT #8523 | EL PASO TX | | 154.03 |
| 1531FFP061 | | 61 | Q5200US | AE 0 | 2461043203 |
| 07/22 | 07/22 | PAYPAL *CHICAGOPART | 402-935-7733 IL | | 9.80 |
| JBSLQWNR | | 61 | Q533US | AW70 | 2449215203 |
| 07/22 | 07/22 | PAYPAL *JRLASERGROU | 402-935-7733 CA | | 21.20 |
| YYYJQWNR | | 61 | Q9999US | AW70 | 2449215203 |
| 07/22 | 07/22 | PAYPAL *ONESOURCETO | 402-935-7733 CA | | 40.95 |
| 0MYXMQWNR | | 64 | Q8999US | AW70 | 2449215203 |
| 07/22 | 07/22 | PAYPAL *BEACHBUMINT | 402-935-7733 CA | | 199.00 |
| SPALQWNR | | 61 | Q8999US | AW70 | 2449215203 |
| 07/23 | 07/23 | WM SUPERCENTER | EL PASO TX | | 75.69 |
| 0OTHSF* | | 61 | Q541US | JN 0 | 2422638205 |
| 07/23 | 07/23 | THE HOME DEPOT #8523 | EL PASO TX | | 21.02 |
| OWGJF90 | | 61 | Q5200US | AE 0 | 2461043205 |
| 07/24 | 07/24 | OFFICE DEPOT #195 | EL PASO TX | | 163.31 |
| TVYF8X2 | | 61 | Q5943US | AE 0 | 2444574T206 |

THP Citi CID 2011 - 669

How to Reach Us
1-800-732-6000

Customer Service
CitiBusiness Card PO Box 6235
Sioux Falls, SD 57117-6235
www.citicards.com

Account Number [redacted]

## K DENTON (continued)

Display Credit Limit: $3,000
Display Cash Advance Limit: $3,000

| Trans | Post | Description | | Amount |
|---|---|---|---|---|
| 55MPP7W0 T*LBYBX2 | 06/28 06/28 | 61 OFFICE MAX SAN ANTONIO TX | 054RUS 4E0 | 2443565180 | |
| 25880FY7 | 06/28 06/28 | WARWICK MELROSE HOTEL DALLAS TX | 05943US AE0 | 2444500180 | 104.96 |
| JYCCTRC0 | 06/29 06/29 | 61 LA FONDA SAN ANTONIO TX | C701US ON0 058ZUS AE0 | 2476197179 | 138.19 |
| QLM74SH3 | 06/29 06/29 | JOSEPHINE STREET CAF 210-2246169 TX | 058ZUS AE0 | 2401391180 | 28.69 |
| KHN8JJYL | 07/01 07/01 | HEB #385 SAN ANTONIO TX | 054RUS AE0 | 2422390181 | 18.03 |
| DMN892C0 | 07/03 07/03 | LA FONDA SAN ANTONIO TX | 058ZUS AE0 | 2442733182 | 84.00 |
| Z*TP592V | 07/04 07/04 | WOLF CAMERA #1681 SAN ANTONIO TX | 05946US AE0 | 2401391184 | 56.49 |
| FSOXTDSC | 07/05 07/05 | USPS 46796402134806893 SAN ANTONIO TX | 09440US AE0 | 2413629186 | 50.21 |
| -52KFHP7 | 07/05 07/05 | ARROW KEY SERVICE 210-3419595 TX | 07399US AV10 | 2416407186 | 32.56 |
| LNRYM400 | 07/05 07/05 | GOTICKETS, INC 919-481-4868 NC | 0792QUS AW70 | 2420765187 | 58.95 |
| 4P2CN8X2 | 07/05 07/05 | 61 OFFICE MAX SAN ANTONIO TX | 05943US AE0 | 2444500187 | 133.04 |
| 8343Y3D0 | 07/06 07/06 | LA FONDA SAN ANTONIO TX | 058ZUS AE0 | 2401391187 | 96.44 |
| OGSMP6FS | 07/06 07/06 | JIMS RESTAURANT 4 SAN ANTONIO TX | 058ZUS AE0 | 2409511188 | 103.37 |
| 882K*108 | 07/06 07/06 | EXXONMOBIL 47195300 SAN ANTONIO TX | C554A2US AC0 | 2416405188 | 12.90 |
| Z261OY-- | 07/06 07/06 | STARBUCKS CORPO0047165 SAN ANTONIO TX | 058IAUS AE0 | 2416407188 | 80.03 |
| Y1PBT*00 | 07/07 07/07 | BORDERS.COM 800-770-7811 MI | 0594A2US AW70 | 2469216188 | 25.00 |
| | | | | | 16.19 |

Subtotal of Activity for Account Number $6,438.13

## STEVEN JENKINS

Display Credit Limit: $1,000
Display Cash Advance Limit: $1,000

### Purchases
#### Standard Purchases

| Trans | Post | | Description | | Amount |
|---|---|---|---|---|---|
| 06/10 06/10 | HWIHK67D | | 61 LA CASITA AUSTIN TX 058ZUS AE0 | 2425477163 | 22.12 |
| 06/14 06/14 | SRYHVZY2 | | 61 LONE STAR AWARDS I AUSTIN TX 05999US AE0 | 2422431166 | 8.50 |
| 06/17 06/17 | CYIHK67D | | 61 LA CASITA AUSTIN TX 058ZUS AE0 | 2425477170 | 23.71 |
| 06/24 06/24 | RZIHK67D | | 61 LA CASITA AUSTIN TX 058IZUS AE0 | 2425477177 | 23.71 |
| 06/28 06/28 | *TTORP30 | | 61 HP HOME STORE 888-999-4747 CA AW70 | 2423337180 | 77.93 |
| 07/01 07/01 | YJYWX400 | | 61 TEXACO 00351876 AUSTIN TX 05045US AC0 | 2404603182 | 58.01 |
| 07/01 07/01 | 92HHK67D | | 61 LA CASITA AUSTIN TX 0554ZUS AE0 | 2425477184 | 22.R |
| 07/07 07/07 | KZOCCJYL | | HEB #202 AUSTIN TX 058IZUS AE0 | 2427331188 | 160.90 |

Subtotal of Activity for Account Number xxxx xxxx xxxx 1960 $396.99

## RUBEN C VILLALVA

Display Credit Limit: $7,000
Display Cash Advance Limit: $6,000

### Credits and Adjustments

| Trans | Post | Description | | Amount |
|---|---|---|---|---|
| 06/14 06/14 | JWM44#900 | EXPEDIA*137409356846 800-367-3476 NV 472US ON70 | 7469216165 | -216.98 |
| 06/22 06/22 | WK242800 | SXM*SIRIUSXM.COM/ACCT 877-253-3888 NY 4899US ON20 | 7469216173 | -4.62 |

THP Citi CID 2011 - 661

How to Reach Us
1-800-732-6000

Customer Service
CitiBusiness Card, PO Box 6235
Sioux Falls, SD 57117-6235
www.citicards.com

Account Number

## K DENTON (continued)

| Trans | Post | Description | | | Amount |
|---|---|---|---|---|---|
| 67T-LL6GS | | 61 | 052TJUS | AE 0 | |
| 05/25 | 05/25 | LOWES #0645* | SAN ANTONIO TX | | |
| JZKKLFOQ | | 61 | 05200US | AE 0 | 77.34 |
| 05/26 | 05/26 | OFFICE MAX | SAN ANTONIO TX | | |
| P2TZ99X2 | | 61 | 05943US | AE 0 | 147.45 |
| 05/27 | 05/27 | BORDERS BKS&MUOI00866 | SAN ANTONIO TX | | |
| PJH515CO | | 61 | 05942US | AE 0 | 24.10 |
| 05/28 | 05/28 | EXXONMOBIL 47195300 | SAN ANTONIO TX | | |
| 8ZCK*108 | | 61 | J5542US | JN 0 | 89.29 |
| 05/29 | 05/29 | LOWES #0645* | SAN ANTONIO TX | | |
| CKD9W700 | | 61 | 05200US | AE 0 | 231.36 |
| 05/30 | 05/30 | LA FONDA | SAN ANTONIO TX | | |
| 99WWJCBO | | 61 | 0582US | AE 0 | 68.63 |
| 05/30 | 05/30 | HALF PRICE BOOKS #029 | SAN ANTONIO TX | | |
| 7H6ZVN16 | | 61 | 05942US | AE 0 | 155.81 |
| 05/31 | 05/31 | STARBUCKS SAT 20302238 | SAN ANTONIO TX | | |
| SXKQ4LQF | | 61 | 05814US | AE 0 | 5.65 |
| 05/31 | 05/31 | AGORA RESTAURANT | WASHINGTON DC | | |
| O6QJNKSD | | 61 | 0582US | AE 0 | 39.90 |
| 05/31 | 05/31 | SUPERSHUTTLE EXECUCARBWI | 8002563826 MD | | 79.00 |
| 3PMH5C06 | | 61 | 04799US | AK 0 | |
| 06/01 | 06/01 | FOUNDATION FOR THE | WASHINGTON DC | | |
| PJGH93Y2 | | 61 | 05947US | AE 0 | 50.85 |
| 06/01 | 06/01 | CLYDE'S OF GEORGETOWN | WASHINGTON DC | | |
| VSBZ3BSS | | 61 | 0582US | AE 0 | 58.42 |
| 06/02 | 06/02 | WESTIN GEORGETOWN DINING | WASHINGTON DC | | |
| 6KK3F4D4 | | 61 | 0582US | AE 0 | 47.90 |
| 06/03 | 06/03 | AIRPORT PARKING SA GPS | SANANTONIO TX | | |
| *1D3RMWD3 | | 61 | 09399US | KE 0 | 40.00 |
| 06/04 | 06/04 | FEDEX 640471615O3B368 | 800-4633339 TN | | |
| L6YD9*-JM | | 61 | 042SUS | AVO | 14.29 |
| 06/04 | 06/04 | CANDLELIGHT COFFEE HOUSE | SAN ANTONIO TX | | |
| NLZQD8SS | | 61 | 0582US | AE 0 | 21.05 |
| 06/06 | 06/06 | USPS 4879640ZTS4806893 | SAN ANTONIO TX | | 18.30 |

| 2463923145 |
| 2469261146 |
| 2444500147 |
| 2416407147 |
| 2416405149 |
| 2449226149 |
| 2401391150 |
| 2449398151 |
| 2416407152 |
| 2425477152 |
| 2449398152 |
| 2422443153 |
| 2439122153 |
| 2475542154 |
| 2449280156 |
| 2416407155 |
| 2449398156 |

6 of 8

## K DENTON (continued)

| Trans | Post | Description | | | Amount |
|---|---|---|---|---|---|
| WPKHNO5C | | 61 | 09402US | AE 0 | |
| 06/07 | 06/07 | BORDERS BKS&MUOI001866 | SAN ANTONIO TX | | 50.27 |
| 8GTJP4CQ | | 61 | 05942US | AE 0 | |

Subtotal of Activity for Account Number •••• •••• 1004    $10,766.53

Disclosure Credit Line: $3,000
Disclosure Cash Advance Line: $3,000

## STEVEN JENKINS

### Purchases
### Standard Purchases

| Trans | Post | Description | | | Amount |
|---|---|---|---|---|---|
| 9Q2HK67D | | 61 | 0582US | AE 0 | |
| 05/13 | 05/13 | LA CASITA | AUSTIN TX | | 20.76 |
| NHR3BJYL | | 61 | 0541IUS | AE 0 | |
| 05/17 | 05/17 | HEB #202 | AUSTIN TX | | 105.95 |
| VYTHK67D | | 61 | 0582US | AE 0 | |
| 05/27 | 05/27 | LA CASITA | AUSTIN TX | | 20.22 |
| WL6Y22Y2 | | 61 | | AUSTIN TX | | |
| 06/01 | 06/01 | LONE STAR AWARDS I | 09999US | AE 0 | 8.50 |
| 1D8BCJYL | | 61 | | AUSTIN TX | | |
| 06/02 | 06/02 | HEB #202 | 0541IUS | AE 0 | 18.21 |
| NHITW4QO | | 61 | | AUSTIN TX | | |
| 06/03 | 06/03 | CHEVRON 00202793 | 05542US | ACO | 60.00 |
| JXHHJ67D | | 61 | | AUSTIN TX | | |
| 06/07 | 06/07 | LA CASITA | 0582US | AE 0 | 20.22 |
| KSG2CJYL | | 61 | | AUSTIN TX | | |
| | | HEB #202 | 0541IUS | AE 0 | 211.90 |

| 2425477135 |
| 2442733137 |
| 2425477149 |
| 2422443153 |
| 2442733152 |
| 2404603153 |
| 2425477156 |
| 2442733158 |

Subtotal of Activity for Account Number •••• •••• •••• 1960    $465.76

Disclosure Credit Line: $7,000
Disclosure Cash Advance Line: $4,000

## RUBEN C VILLALVA

### Credits and Adjustments

| Trans | Post | Description | | | Amount |
|---|---|---|---|---|---|
| LDOYR8X2 | | 71 | 5943US | SA 0 | |
| 05/09 | 05/10 | OFFICE DEPOT #2798 | EL PASO TX | | -156.95 |

| 7444574130 |

THP Citi CID 2011 - 654

How to Reach Us
1-800-732-6000

Customer Service
CitiBusiness Card, PO Box 6235
Sioux Falls, SD 57117-6235
www.citicards.com

Account Number ████████

Employee Credit Line: $3,000
Employee Cash Advance Line: $3,000
Card Account: ████████

## STEVEN JENKINS

### Purchases
### Standard Purchases

| Trans | Post | Description | | | Amount | |
|---|---|---|---|---|---|---|
| 04/11 | 04/11 | QT 134 | Q1001346 SPRINGFIELD | MO | 2.15 | |
| PVXYOGXW | 61 | Q5542US | | AC 0 | 46.39 | |
| 04/16 | 04/16 | BARTLETT'S | AUSTIN | TX | 34.00 | |
| BX306LOO | 61 | Q5812US | | AE 0 | 2439900801 | |
| 04/26 | 04/26 | HEB #202 | AUSTIN | TX | 266.85 | |
| 2RM*JYL | 61 | Q5411US | | AE 0 | 2449216107 | |
| 04/28 | 04/28 | HOBBY-LOBBY #0045 | AUSTIN | TX | 54.08 | |
| FCYL2*SS | 61 | Q5945US | | AE 0 | 2442731116 | |
| 04/29 | 04/29 | LA CASITA | AUSTIN | TX | 24.79 | |
| XY1HK6TD | 61 | Q5812US | | AE 0 | 2444500119 | |
| 05/03 | 05/03 | HEB #202 | AUSTIN | TX | 205.14 | |
| IGGOBJYL | 61 | Q5411US | | AE 0 | 2425477121 | |
| 05/06 | 05/06 | LA CASITA | AUSTIN | TX | 25.97 | |
| BZ1HK6TD | 61 | Q5812US | | AE 0 | 2425477123 | |

Subtotal of Activity for Account Number ████: $457.22

## RUBEN C VILLALVA (continued)

| Trans | Post | Description | | | Amount | |
|---|---|---|---|---|---|---|
| 04/15 | 04/15 | APL*ITUNES | 866-712-7753 | CA | 2.15 | |
| WRZ*J900 | 61 | Q5735US | | AW70 | 2469216105 | |
| 04/16 | 04/16 | J2 *EFAX PLUS SERVICE | 323-817-3205 | CA | 10.00 | |
| H6LTVF00 | 61 | Q5968US | | AV20 | 2469216106 | |
| 04/19 | 04/19 | PAYPAL *INNERCIRCLE | 402-935-7733 | NV | 29.95 | |
| 6D44Y4PR | 61 | Q5948US | | AW70 | 2449215109 | |
| 04/20 | 04/20 | NORMA'S BOOKKEEPING & TAX 281-8214688 | TX | | 28.00 | |
| XTM4L665 | 61 | Q6931US | | AK 0 | 2453001111 | |
| 04/21 | 04/21 | DIAMOND 1276 SHAMROCK | EL PASO | TX | 11.90 | |
| HOCP9RF3 | 61 | Q5481US | | AE 0 | 2442731112 | |
| 04/22 | 04/22 | DISCOUNT PRINTING | EL PASO | TX | 80.50 | |
| WRY05JK3 | 61 | Q2714US | | AE 0 | 2423001113 | |
| 04/22 | 04/22 | PAYPAL *DIHA07189 | 402-935-7733 | CA | 22.00 | |
| FF*JZ8PR | 61 | Q8999US | | AW70 | 2449215112 | |
| 04/22 | 04/22 | PAYPAL *DIHA07189 | 402-935-7733 | CA | 22.00 | |
| O81FZ8PR | 61 | Q8999US | | AW70 | 2449215112 | |
| 04/23 | 04/23 | CESAR FIRE GRILL | EL PASO | TX | 150.39 | |
| BLOWP2Y2 | 61 | Q5812US | | AE 0 | 2422443114 | |
| 04/24 | 04/24 | APL*ITUNES | 866-712-7753 | CA | 5.40 | |
| HJXHFCZ00 | 61 | Q5735US | | AW70 | 2469216114 | |
| 04/25 | 04/25 | OFFICE DEPOT 6498 | EL PASO | TX | 228.58 | |
| 4QZ20912 | 61 | Q5943US | | AE 0 | 2444574116 | |
| 04/28 | 04/28 | OFFICE DEPOT #195 | EL PASO | TX | 13.21 | |
| CN3YX8XZ | 61 | Q5943US | | AE 0 | 2444574119 | |
| 04/29 | 04/29 | WING DADDYS | EL PASO | TX | 82.20 | |
| JBGYVV03 | 61 | Q5812US | | AE 0 | 2422443120 | |
| 04/30 | 04/30 | TWC*TIME WARNER CABLE | 800-222-5355 | TX | 74.28 | |
| 035ML400 | 61 | Q4899US | | AW70 | 2469216120 | |
| 05/02 | 05/02 | WALGREENS #6435 | EL PASO | TX | 102.43 | |
| P8LHXQH | 61 | Q5992US | | AE 0 | 2444500123 | |
| 05/02 | 05/02 | APL*ITUNES | 866-712-7753 | CA | 1.07 | |
| MLXB5F00 | 61 | Q5735US | | AW70 | 2469216122 | |
| 05/03 | 05/03 | THRIFTY NICKEL | EL PASO | TX | 36.00 | |
| 88PRGS*0 | 61 | Q731US | | ON 0 | 2401391124 | |

## RUBEN C VILLALVA

### Purchases
### Standard Purchases

| Trans | Post | Description | | | Amount | |
|---|---|---|---|---|---|---|
| 04/10 | 04/10 | PELICANS RESTAURANT EAST | EL PASO | TX | 59.15 | |
| RJBT3390 | 61 | Q5812US | | AE 0 | 2473693800 | |
| 04/11 | 04/11 | OASIS LANES | EL PASO | TX | 88.30 | |
| VMM5X8K4 | 61 | Q7933US | | AE 0 | 2407105801 | |
| 04/11 | 04/11 | OFFICE DEPOT 8498 | EL PASO | TX | 12.25 | |
| V9SVPBX2 | 61 | Q5943US | | AE 0 | 2444574102 | |
| 04/12 | 04/12 | APL*ITUNES | 866-712-7753 | CA | 2.47 | |
| BRB09K00 | 61 | Q5735US | | AW70 | 2469216102 | |
| 04/14 | 04/14 | AT&T DATA | 800-331-0500 | GA | 30.76 | |
| ZZ5DFZ10 | 61 | Q484US | | AV70 | 2449398805 | |

THP Citi CID 2011 - 647

**How to Reach Us**
1-800-732-6000

**Customer Service**
CitiBusiness Card, PO Box 6235
Sioux Falls, SD 57117-6235
www.citicards.com

Account Number ████████

## TIM TIERNEY (continued)

| Trans | Post | Description | | | Amount |
|-------|------|-------------|---|---|--------|
| 04/01 | 04/01 | NEWZ GROUP | 800-474-1111 MO | | 520.35 |
| R86N4TO6 | | 61 | 0899US | AW70 | 2476501092 |
| 04/02 | 04/02 | AMAZON MKTPLACE PMTS | AMZN.COM/BILL WA | | 63.64 |
| JVH*CN00 | | 61 | 0594ZUS | AW70 | 2469261092 |
| 04/03 | 04/03 | TIME WARNER CABLE | 210-5829708 TX | | 70.45 |
| 2W17HOR2 | | 61 | 0489US | AV20 | 2441800(1094 |
| 04/04 | 04/04 | NEWSFINDER | 262-5445262 WI | | 154.00 |
| G8F588PW | | 61 | 0993US | AY70 | 2407105(1095 |
| 04/04 | 04/04 | LONE STAR OVERNIGHT | 512-8708067 TX | | 286.70 |
| KDWYG665 | | 61 | 0425US | ON70 | 2419304(1094 |
| 04/05 | 04/05 | AUSTIN BESTLINE | 512-328-9095 TX | | 41.78 |
| ZK0BJCCL | | 61 | 0481US | ON70 | 2422369(1096 |
| 04/05 | 04/05 | AUSTIN BESTLINE | 512-328-9095 TX | | 203.22 |
| 7DFBJCCL | | 61 | 0484US | ON70 | 2422369(1096 |
| 04/06 | 04/06 | Amazon.com | AMZN.COM/BILL WA | | 10.17 |
| WJ700L00 | | 61 | 0594ZUS | AW70 | 2469261096 |

Subtotal of Activity for Account Number ████████  $1,400.10

Employee Credit Limit $3,000
Employee Cash Advance Limit $3,000
Card Account: ████████

## STEVEN JENKINS

### Purchases
### Standard Purchases

| Trans | Post | Description | | | Amount |
|-------|------|-------------|---|---|--------|
| 03/11 | 03/11 | LA CASITA | AUSTIN TX | | 18.33 |
| CZ1HK67D | | 61 | 0582US | AE0 | 2425477(1072 |
| 03/15 | 03/15 | LA SOMBRA BAR GRILL | AUSTIN TX | | 66.85 |
| VN09RR72 | | 61 | 0582US | AE0 | 2409591076 |
| 03/17 | 03/17 | LONE STAR AWARDS I | AUSTIN TX | | 23.09 |
| 82MN22Y2 | | 61 | 0599US | AE0 | 2422443(1077 |
| 03/18 | 03/18 | WHATABURGER 347  026 | AUSTIN TX | | 17.35 |
| G2D*M*VF | | 61 | 0581US | AE0 | 244250(1077 |
| 03/25 | 03/25 | LA CASITA | AUSTIN TX | | 20.46 |
| CZ1HK67D | | 61 | 0582US | AE0 | 2425477(1086 |
| 03/30 | 03/30 | LA SOMBRA BAR GRILL | AUSTIN TX | | 17.07 |

## STEVEN JENKINS (continued)

| Trans | Post | Description | | | Amount |
|-------|------|-------------|---|---|--------|
| 6Y20RWL2 | | 61 | 0582US | | 240195(1091 |
| 03/30 | 03/30 | FAIRFIELD FOOD MART | AUSTIN TX | | 43.46 |
| TJ4SCRF3 | | 61 | 0554ZUS | AC70 | 2442733(1090 |
| 04/04 | 04/04 | LONE STAR AWARDS I | AUSTIN TX | | 8.50 |
| VTWJVZY2 | | 61 | 0599US | AE0 | 2422443(1095 |
| 04/05 | 04/05 | OFFICE DEPOT #2784 | AUSTIN TX | | 145.80 |
| GDP6VBX2 | | 61 | 0594US | AE0 | 2444574(1096 |
| 04/07 | 04/07 | TEXACO 0035I876 | AUSTIN TX | | 57.70 |
| NOR7K4D0 | | 61 | 0554ZUS | AC70 | 2404603(1097 |

Subtotal of Activity for Account Number ████████  $418.61

Employee Credit Limit $7,000
Employee Cash Advance Limit $4,000
Card Account: ████████

## RUBEN C VILLALVA

### Credits and Adjustments

| Trans | Post | Description | | | Amount |
|-------|------|-------------|---|---|--------|
| 03/10 | 03/10 | PAYPAL *WANG PENG | 402935733 CA | | -49.00 |
| TH1YOHPR | | 71 | 8999US | 0A70 | 7449251(069 |
| 04/08 | 04/08 | APL*APPLE ONLINE STORE | 800-676-2775 CA | | -0.01 |
| JTNK500 | | 71 | 5734US | ON70 | 7469261098 |
| 04/08 | 04/08 | APL*APPLE ONLINE STORE | 800-676-2775 CA | | -139.64 |
| JBRK*500 | | 71 | 5734US | ON70 | 7469261096 |

### Standard Purchases

| Trans | Post | Description | | | Amount |
|-------|------|-------------|---|---|--------|
| 03/08 | 03/09 | THRIFTY NICKEL | EL PASO TX | | 36.00 |
| 815D0M70 | | 61 | 0731US | ON0 | 2401391068 |
| 03/08 | 03/09 | SAMS INTERNET | 888-746-7726 AR | | 121.76 |
| T4YKWJR* | | 61 | 0530US | ON70 | 2422638068 |
| 03/08 | 03/09 | SAMS INTERNET | 888-746-7726 AR | | 121.76 |
| 01YKWJR* | | 61 | 0530US | ON70 | 2426381068 |
| 03/08 | 03/09 | SAMS INTERNET | 888-746-7726 AR | | 123.42 |
| 15YKWJR* | | 61 | 0530US | ON70 | 2426381068 |
| 03/08 | 03/09 | SAMS INTERNET | 888-746-7726 AR | | 130.28 |
| 94YKWJR* | | 61 | 0530US | ON70 | 2426381068 |

THP Citi CID 2011 - 638

How to Reach Us
1-800-732-6000

Customer Service
CitiBusiness Card, PO Box 6235
Sioux Falls, SD 57117-6235
www.citicards.com

Account Number ▓▓▓▓

## TIM TIERNEY (continued)

| Trans | Post | Description | | | | Amount | |
|---|---|---|---|---|---|---|---|
| 02/23 | 02/23 | GEXA ENERGY | 713-9619399 | TX | | | |
| 73Y1P17O 61 | | 0490OUS | AV10 | | | 75.35 | 2429910054 |
| 02/24 | 02/24 | GEXA ENERGY | 713-9619399 | TX | | | |
| X3JX25370 | | 0490OUS | AV10 | | | 309.98 | 2429910055 |
| 02/25 | 02/25 | BIRCH COMM | 8882750777 | GA | | | |
| V3VDN0PR 61 | | Q4814US | ON70 | | | 161.97 | 244925056 |
| 02/27 | 02/27 | HYDE PARK BAR & GRILL | AUSTIN | TX | | | |
| 4MY411T06 61 | | Q5813US | AE0 | | | 52.52 | 2469051059 |
| 02/28 | 02/28 | LONE STAR OVERNIGHT | 512-8706067 | TX | | | |
| 0CZ2D66S 61 | | 0425US | AE0 | | | 853.18 | 2419304059 |
| 02/28 | 02/28 | CORAZON | AUSTIN | TX | | | |
| 40Z51DM6 61 | | Q5812US | AE0 | | | 108.45 | 2433011060 |
| 03/01 | 03/01 | JUNGLEDISK.COM | 678-710-7745 | TX | | | |
| DC568000 61 | | Q5734US | AW70 | | | 24.42 | 2469261060 |
| 03/01 | 03/01 | AUSTIN UTILITES | 866-694-5861 | TX | | | |
| V3LHSC00 61 | | 0490OUS | AW70 | | | 1004.95 | 2469261060 |
| 03/02 | 03/02 | NEWSFINDER | 262-5445262 | WI | | | |
| H5S66CPW 61 | | Q893US | AV10 | | | 154.00 | 2407051062 |
| 03/02 | 03/02 | AUSTIN BESTLINE | 512-328-9095 | TX | | | |
| 37F9LJCCL 61 | | Q4814US | ON70 | | | 3.15 | 2422369062 |
| 03/02 | 03/02 | AUSTIN BESTLINE | 512-328-9095 | TX | | | |
| 1SK8JCCL 61 | | Q4814US | ON70 | | | 42.88 | 2422369062 |
| 03/02 | 03/02 | AUSTIN BESTLINE | 512-328-9095 | TX | | | |
| 0VLBJCCL 61 | | Q4814US | ON70 | | | 217.25 | 2422369062 |
| 03/02 | 03/02 | BX8, INC. 888-898-8733 | 888-8998733 | CA | | | |
| SX*RPH20 61 | | 0596BUS | AV20 | | | 5.82 | 2433239062 |
| 03/03 | 03/03 | NEWZ GROUP | 800-474-TRI | MO | | | |
| Z8ZR4T06 64 | | 08999US | AW70 | | | 471.90 | 2476501063 |
| 03/04 | 03/04 | TIME WARNER CABLE | 210-5829708 | TX | | | |
| GG4LSSV1 61 | | Q4899US | AV20 | | | 70.45 | 2448001064 |
| 03/04 | 03/04 | CENTURY ANIMAL HOSPTAL | 512-4429518 | TX | | | |
| JIRWC665 61 | | Q0742US | AE0 | | | 49.39 | 2469581063 |

**Subtotal of Activity for Account Number** ▓▓▓▓ **$7,298.73**

## STEVEN JENKINS

Purchases
Standard Purchases

| Trans | Post | Description | | | Amount | |
|---|---|---|---|---|---|---|
| 02/06 | 02/09 | HEB #202 | AUSTIN | TX | | |
| *F579JYL | 61 | Q541US | AE0 | | 160.90 | 2442731039 |
| 02/11 | 02/11 | LA CASITA | AUSTIN | TX | | |
| GYTHK67D | 61 | Q5812US | AE0 | | 22.36 | 2425477044 |
| 02/12 | 02/12 | TEXACO 0035876 | AUSTIN | TX | | |
| D6GCX400 | 61 | Q5542US | AC0 | | 33.00 | 2404603043 |
| 02/18 | 02/18 | LA CASITA | AUSTIN | TX | | |
| HZ1HK67D | 61 | Q5812US | AE0 | | 19.92 | 2425477051 |
| 02/25 | 02/25 | LA CASITA | AUSTIN | TX | | |
| TX1HK67D | 61 | Q5812US | AE0 | | 21.81 | 2425477058 |
| 02/26 | 02/26 | TORCHYS TACOS - 7 | AUSTIN | TX | | |
| 04P5V8K4 | 61 | Q5802US | AE0 | | 23.78 | 2407051058 |
| 03/01 | 03/01 | SHIPLEY DONUTS AUSTIN | AUSTIN | TX | | |
| RX9F0*70 | 61 | Q584US | AE0 | | 7.00 | 2401391060 |
| 03/03 | 03/03 | HEB #202 | AUSTIN | TX | | |
| 84PZ-JYL | 61 | Q541US | AE0 | | 160.90 | 2442731062 |
| 03/04 | 03/04 | LA CASITA | AUSTIN | TX | | |
| 32HHK67D | 61 | Q5802US | AE0 | | 21.27 | 2425477062 |
| 03/06 | 03/06 | TEXACO 0035876 | AUSTIN | TX | | |
| 8CNI46500 | 61 | Q5542US | AC0 | | 31.15 | 2404603065 |

**Subtotal of Activity for Account Number** ▓▓▓▓ **$502.09**

Employee Credit Line: $1,000
Employee Cash Advance Line: $1,000
Card Account: ▓▓▓▓

## RUBEN C VILLALVA

Purchases
Standard Purchases

| Trans | Post | Description | | | Amount | |
|---|---|---|---|---|---|---|
| 02/07 | 02/09 | THRIFTY NICKEL | EL PASO | TX | | |
| R*VBGC60 | 61 | 0737IUS | ON0 | | 36.00 | 2400391039 |
| 02/08 | 02/09 | SEASONS A/C AND HEATIN | 281-894-6677 | TX | | |
| QGAL2T06 | 61 | 0717IUS | AV10 | | 69.95 | 2434291040 |

Employee Credit Line: $1,000
Employee Cash Advance Line: $1,000
Card Account: ▓▓▓▓

3 of 6

THP Citi CID 2011 - 632

How to Reach Us
1-800-732-6000

Customer Service
CitiBusiness Card PO Box 6235
Sioux Falls, SD 57117-6235
www.citicards.com

Account Number ████████

## TIM TIERNEY (continued)

| Trans | Post | | Description | | Amount | |
|---|---|---|---|---|---|---|
| 01/28 | 01/28 | 68CIN4P30 | USPS POSTAGE(STAMPS.COM) 888-434-0055 CA | AW7O | 300.00 | 2440140029 |
| 02/01 | 02/01 | FT*PHBPW | 61 NEWSFINDER 262-5445262 WI | Q940ZUS | 154.00 | 2407051033 |
| 02/01 | 02/01 | KKZZ6600 | 61 JUNGLEDISK.COM 0893US | AVIO | 23.78 | 2469261032 |
| 02/01 | 02/01 | HNKM4TO6 | 61 NEWZ GROUP 800-474-1111 MO 0573US | AW7O | 708.45 | 2476501033 |
| 02/02 | 02/02 | KZHYVF20 | 61 8X8, INC. 888-898-8733 888-898-8733 CA Q8999US | AW7O | 5.82 | 2432391034 |
| 02/03 | 02/03 | W2LBJCCL | 61 AUSTIN BESTLINE 512-328-9095 TX | ON7O | 5.07 | 2422369035 |
| 02/03 | 02/03 | FTG8JCCL | 61 AUSTIN BESTLINE 512-328-9095 TX 0484US | ON7O | 57.70 | 2422369035 |
| 02/03 | 02/03 | NBHRJCCL | 61 AUSTIN BESTLINE 512-328-9095 TX 0484US | ON7O | 221.60 | |
| 02/03 | 02/03 | 4TFL8T01 | 61 TIME WARNER CABLE 210-5829708 TX Q489US | AV2O | 70.45 | 2418001035 |

Subtotal of Activity for Account Number ████████ **$5,457.79**

Employee Credit Line: $1,000
Employee Cash Advance Line: $1,000
Card Account: xxx 3371

## STEVEN JENKINS
Purchases
Standard Purchases

| Trans | Post | | Description | | Amount | |
|---|---|---|---|---|---|---|
| 01/11 | 01/11 | ZMJFVZY2 | 61 LONE STAR AWARDS 1 AUSTIN TX Q5999US | AE O | 8.50 | 2422443102 |
| 01/11 | 01/11 | TIZZ6JYL | 61 HEB GROCERY #202 AUSTIN TX | AE O | 160.90 | |
| 01/14 | 01/14 | VYIHKG7D | 61 LA CASITA AUSTIN TX Q582US | AE O | 22.64 | 2442733101 |
| 01/21 | 01/21 | 4QNS5500 | 61 TEXACO 0035876 AUSTIN TX | AE O | 43.56 | 2425477106 |
| 01/21 | 01/21 | OJQWS8X2 | 61 LA CASITA 0554US AUSTIN TX | AC O | 22.90 | 2404603021 |

## STEVEN JENKINS (continued)

| Trans | Post | | Description | | Amount | |
|---|---|---|---|---|---|---|
| 01/25 | 01/25 | MYIHKG7D | 61 LONE STAR AWARDS 1 AUSTIN TX Q582US | AE O | 279.00 | 2425477023 |
| 01/28 | 01/28 | KOOCV2Y2 | 61 LA CASITA AUSTIN TX Q599US | AE O | 22.90 | 2422443026 |
| 02/01 | 02/01 | WXIHKG7D | 61 CRESTVIEW MINIMAX AUSTIN TX Q582US | AE O | 11.24 | 2425477030 |
| 02/04 | 02/04 | O6CY78ML | 61 LA CASITA AUSTIN TX Q582US | AE O | 22.90 | 2442733033 |
| 02/07 | 02/07 | 5WHHKG7D | 61 LONE STAR AWARDS 1 AUSTIN TX Q5999US | AE O | 8.50 | 2425477037 |
| 02/07 | 02/07 | SBXGV2Y2 | 61 HEB #202 AUSTIN TX 0541US | AE O | 47.54 | 2422443039 |
| | | M3MC8JYL | | | | 2442733036 |

Subtotal of Activity for Account Number ████████ **$650.60**

Employee Credit Line: $4,000
Employee Cash Advance Line: $4,000
Card Account: xxx 3371

## RUBEN C VILLALVA
Credits and Adjustments

| Trans | Post | Description | | Amount | |
|---|---|---|---|---|---|
| 02/03 | 02/03 | ST*NK3PR 71 PAYPAL *SEATDATA 8999US | QAT0 402935733 CA | -9.95 | 7449250034 |

Purchases
Standard Purchases

| Trans | Post | | Description | | Amount | |
|---|---|---|---|---|---|---|
| 01/10 | 01/10 | Z5RXR850 | 61 THRIFTY NICKEL EL PASO TX 073US | ON O | 36.00 | 2401391011 |
| 01/10 | 01/10 | 4CHTW9PW | 61 ISMAEL STUDIO 915-8554553 TX 0722US | AV7O | 33.00 | 2407105101 |
| 01/11 | 01/11 | KLOWS8X2 | 61 OFFICE DEPOT #501 800-463-3768 AZ Q5965US | AW7O | 159.63 | 2444574102 |
| 01/11 | 01/11 | OJQWS8X2 | 61 OFFICE DEPOT #1127 800-463-3768 TX Q5965US | AW7O | 179.27 | 2444574102 |
| 01/12 | 01/12 | 2WYZZ8X2 | 61 OFFICE DEPOT #1127 800-463-3768 TX 0596US | AW7O | 179.27 | 2444574103 |

THP Citi CID 2011 - 627

| Trans | Post | Description | | | Amount |
|---|---|---|---|---|---|
| 12/19 | 12/19 | THE TAVERN | AUSTIN | TX | $42.68 |
| 12/20 | 12/20 | ADT*SECURITY SERVICES | 800-238-2455 | FL | $32.24 |
| 12/21 | 12/21 | 5TH STREET CAR WASH | AUSTIN | TX | $3.25 |
| 12/21 | 12/21 | 5TH STREET CAR WASH | AUSTIN | TX | $4.50 |
| 12/21 | 12/21 | Z TEJAS 6TH STREET #101 | AUSTIN | TX | $7.25 |
| 12/22 | 12/22 | ATTM*287018631382NBI | 800-331-0500 | GA | $146.21 |
| 12/22 | 12/22 | RUBBER STAMPS UNLTD | 888-451-7300 | MI | $65.73 |
| 12/23 | 12/23 | FABI AND ROSI | AUSTIN | TX | $129.75 |
| 12/24 | 12/24 | GEXA ENERGY | 713-9619399 | TX | $118.48 |
| 12/25 | 12/25 | BIRCH COMM | 8882750777 | GA | $159.14 |
| 12/28 | 12/28 | GEXA ENERGY | 713-9619399 | TX | $220.85 |
| 12/31 | 12/31 | KATZ DELI | AUSTIN | TX | $66.96 |
| 01/01 | 01/01 | JUNGLEDISK.COM | 678-710-7745 | TX | $22.45 |
| 01/02 | 01/02 | 8X8, INC. 888-898-8733 | 888-8988733 | CA | $5.82 |
| 01/03 | 01/03 | NEWSFINDER | 262-5445262 | WI | $259.00 |
| 01/03 | 01/03 | TIME WARNER CABLE | 210-5829708 | TX | $70.45 |
| 01/04 | 01/04 | AUSTIN BESTLINE | 512-328-9095 | TX | $7.44 |
| 01/04 | 01/04 | AUSTIN BESTLINE | 512-328-9095 | TX | $52.83 |
| 01/04 | 01/04 | AUSTIN BESTLINE | 512-328-9095 | TX | $231.93 |
| 01/04 | 01/04 | USPS POSTAGE(STAMPS.COM) | 888-434-0055 | CA | $390.00 |
| 01/05 | 01/05 | NEWZ GROUP | 800-474-1111 | MO | $422.50 |
| 01/06 | 01/06 | LONE STAR OVERNIGHT LP | 5128738067 | TX | $396.91 |
| 01/09 | 01/09 | GRANDE COMMUNICATIONS | 877-647-2633 | TX | $52.01 |
| 01/09 | 01/09 | STAMPS.COM | 888-434-0055 | CA | $15.99 |
| 01/10 | 01/10 | BROADVIEW SECURITY | 800-445-0872 | TX | $235.12 |
| | | Total Standard Purch | | | $5,447.21 |

**Subtotal of Activity for Account Number** ████████████ **$5,447.21**

### STEVEN JENKINS

| | |
|---|---|
| Employee Credit Line | $3,000 |
| Employee Cash Advance Limit | $3,000 |

Account Number 4122 9900 1696 1960

**Purchases**

Standard Purch

| Trans | Post | Description | | | Amount |
|---|---|---|---|---|---|
| 12/09 | 12/09 | LONE STAR AWARDS I | AUSTIN | TX | $8.50 |
| 12/09 | 12/09 | OFFICE DEPOT #2784 | AUSTIN | TX | $183.53 |
| 12/10 | 12/10 | LA CASITA | AUSTIN | TX | $22.90 |
| 12/17 | 12/17 | LA CASITA | AUSTIN | TX | $22.90 |
| 12/24 | 12/24 | ALAMO SOUTH LA00000851 | AUSTIN | TX | $45.57 |
| 12/24 | 12/24 | LA CASITA | AUSTIN | TX | $26.89 |
| 01/04 | 01/04 | HEB GROCERY #202 | AUSTIN | TX | $38.77 |
| 01/07 | 01/07 | LA CASITA | AUSTIN | TX | $22.90 |
| | | Total Standard Purch | | | $371.76 |

**Subtotal of Activity for Account Number** ████████████ **$371.76**

### RUBEN C VILLALVA

| | |
|---|---|
| Employee Credit Line | $6,000 |
| Employee Cash Advance Limit | $6,000 |

Account Number 4122 9900 2919 2371

**Credits, Fees and Adjustments**

| Trans | Post | Description | | | Amount |
|---|---|---|---|---|---|
| 12/08 | 12/09 | CIGARS | 4842850400 | PA | $5.95- |
| 12/08 | 12/09 | CIGARS | 4842850400 | PA | $59.95- |
| 01/08 | 01/08 | SRR*XM SATELLITERADIO | 800-XMRADIO | NY | $2.99- |
| 01/08 | 01/08 | SRR*XM SATELLITERADIO | 800-XMRADIO | NY | $14.36- |
| | | Total Credits, Fees and Adjustments | | | $83.25- |

**Purchases**

Standard Purch

| Trans | Post | Description | | | Amount |
|---|---|---|---|---|---|
| 12/07 | 12/09 | SOUTHWESTAIR5262141757473DALLAS | | TX | $146.40 |
| 12/08 | 12/09 | BOOMBAH | 815-941-1431 | IL | $383.53 |
| 12/08 | 12/09 | TWC*TIME WARNER CABLE | 800-222-5355 | TX | $42.21 |
| 12/09 | 12/09 | CIGARS | 484-285-0400 | PA | $76.45 |
| 12/10 | 12/10 | HARVEST MANOR FARMS LLC | 319-8414134 | IA | $461.15 |
| 12/11 | 12/11 | COSTCO LIQUOR - 45 | EL PASO | TX | $89.83 |
| 12/13 | 12/13 | FUDDRUCKERS | EL PASO | TX | $65.73 |
| 12/14 | 12/14 | AT&T DATA | 800-331-0500 | GA | $30.71 |
| 12/16 | 12/16 | TEXAS ROADHOUSE #2178 | EL PASO | TX | $500.00 |
| 12/16 | 12/16 | GREENSHEET HOU - 1996 | 713-371-3500 | TX | $14.00 |
| 12/17 | 12/17 | DIAMOND 1273 SHAMROCK | EL PASO | TX | $27.05 |
| 12/17 | 12/17 | OFFICE DEPOT #498 | EL PASO | TX | $17.52 |
| 12/17 | 12/17 | AT&T X173 7442 | EL PASO | TX | $54.11 |
| 12/20 | 12/20 | FUDDRUCKERS | EL PASO | TX | $167.87 |
| 12/21 | 12/21 | ISMAEL STUDIO | 915-8554553 | TX | $95.00 |
| 12/21 | 12/21 | D EMBROIDERY CORP | EL PASO | TX | $32.00 |
| 12/21 | 12/21 | D EMBROIDERY CORP | EL PASO | TX | $156.00 |
| 12/23 | 12/23 | ISMAEL STUDIO | 915-8554553 | TX | $65.00 |

November 8 - December 8, 2010

| | | | | |
|---|---|---|---|---|
| 11/17 | 11/17 | LONE STAR OVERNIGHT LP 5128738067 | TX | |
| 11/18 | 11/18 | CAFE EXPRESS AUSTIN TX | | $391.35 |
| 11/18 | 11/18 | BUY.COM 888-328-9266 CA | | $31.25 |
| 11/18 | 11/18 | OZARKA WATER 800-950-9397 CA | | $189.95 |
| 11/19 | 11/19 | GEXA ENERGY 713-9619399 TX | | $104.00 |
| 11/19 | 11/19 | SHELL OIL 57542085709 AUSTIN TX | | $148.52 |
| 11/19 | 11/19 | SNOW PEA KOREAN N CHINEAUSTIN TX | | $46.84 |
| 11/19 | 11/19 | LOWES #01727* AUSTIN TX | | $67.80 |
| 11/20 | 11/20 | CITY PUBLIC SVC 800-967-9649 TX | | $4.84 |
| 11/21 | 11/21 | ABEL'S ON THE LAKE AUSTIN TX | | $602.95 |
| 11/22 | 11/22 | CHEZ ZEE AUSTIN TX | | $73.25 |
| 11/22 | 11/22 | USPS 48040395524801029 AUSTIN TX | | $81.77 |
| 11/22 | 11/22 | THE UPS STORE #5815 AUSTIN TX | | $39.60 |
| 11/22 | 11/22 | ATTM*287018631382NBI 800-331-0500 GA | | $25.49 |
| 11/23 | 11/23 | DRI*SiteVault - Backup regnow.com/csMN | | $146.21 |
| 11/23 | 11/23 | GROUPON INC. 877-7887858 IL | | $19.00 |
| 11/23 | 11/23 | GEXA ENERGY 713-9619399 TX | | $25.00 |
| 11/24 | 11/24 | ALAMO DRAFTHOU00000836 AUSTIN TX | | $212.12 |
| 11/24 | 11/24 | ALAMO DRAFTHOU00000836 AUSTIN TX | | $10.50 |
| 11/24 | 11/24 | ALAMO DRAFTHOU00000836 AUSTIN TX | | $21.00 |
| 11/25 | 11/25 | BIRCH COMM 8882750777 GA | | $85.04 |
| 11/26 | 11/26 | MAGNOLIA CAFE SOUTH AUSTIN TX | | $208.52 |
| 11/26 | 11/26 | FEDEX 854270954741 800-4633339 TN | | $23.92 |
| 11/27 | 11/27 | 5TH STREET CAR WASH AUSTIN TX | | $16.47 |
| 11/27 | 11/27 | PARKSIDE ROUND ROCK TX | | $3.25 |
| 11/27 | 11/27 | GOLD CLASS AUSTIN AUSTIN TX | | $227.09 |
| 11/28 | 11/27 | GOLD CLASS AUSTIN AUSTIN TX | | $67.07 |
| 11/28 | 11/28 | LAMAD-WESTLAKE #55 512-568-3400 TX | | $87.00 |
| 11/29 | 11/29 | MAUDIE'S ORIGINAL WEST LAKE HLSTX | | $23.34 |
| 11/29 | 11/29 | DISCOUNT ELECTRONICS AUSTIN TX | | $58.84 |
| 11/30 | 11/30 | FRANKENSTEIN COMPUTERS 512-4590026 TX | | $155.88 |
| 11/30 | 11/30 | 7-ELEVEN 24397 AUSTIN TX | | $60.00 |
| 11/30 | 11/30 | THE FRISCO SHOP AUSTIN TX | | $25.00 |
| 12/01 | 12/01 | AUSTIN LAND AND CATTLE AUSTIN TX | | $75.87 |
| 12/01 | 12/01 | NEWSFINDER 262-5445262 WI | | $146.35 |
| 12/01 | 12/01 | INK OASIS 800-455-5987 MI | | $154.00 |
| 12/01 | 12/01 | AUSTIN BESTLINE 512-328-9095 TX | | $121.56 |
| 12/01 | 12/01 | AUSTIN BESTLINE 512-328-9095 TX | | $3.87 |
| 12/01 | 12/01 | AUSTIN BESTLINE 512-328-9095 TX | | $49.94 |
| 12/01 | 12/01 | SIX FLAGS FIESTA TEXAS 321-249-0110 TX | | $240.19 |
| 12/02 | 12/02 | JUNGLEDISK.COM 678-710-7745 TX | | $156.32 |
| 12/02 | 12/02 | 8X8, INC. 888-898-8733 888-8988733 CA | | $22.98 |
| 12/03 | 12/03 | NEWZ GROUP 800-474-1111 MO | | $5.80 |
| 12/04 | 12/04 | TIME WARNER CABLE 210-5829708 TX | | $384.50 |
| 12/04 | 12/04 | CHEVRON 00203164 AUSTIN TX | | $70.45 |
| 12/04 | 12/04 | OMA'S HAUS NEW BRAUNFELSTX | | $53.48 |
| 12/06 | 12/06 | AMAYAS TACO VILLAGE AUSTIN TX | | $36.84 |
| 12/06 | 12/06 | USPS POSTAGE(STAMPS.COM) 888-434-0055 CA | | $44.91 |
| 12/06 | 12/06 | OFFICE MAX AUSTIN TX | | $490.00 |
| 12/06 | 12/06 | OFFICE DEPOT #1079 800-463-3788 TX | | $25.96 |
| 12/06 | 12/06 | WESTIN LA CANTERA SAN ANTONIO TX | | $89.86 |
| 12/07 | 12/07 | WESTIN LA CANTERA SAN ANTONIO TX | | $25.30 |
| 12/07 | 12/07 | MANGIA PIZZA AUSTIN TX | | $36.22 |
| | | LONE STAR OVERNIGHT LP 5128738067 TX | | $45.15 |

Total Standard Purch $484.03

Subtotal of Activity for Account Number ████████████ $8,993.64

**STEVEN JENKINS** ████████████ $8,993.64
Employee Credit Line $3,000    Account Number ████████████
Employee Cash Advance Limit $3,000

Purchases
Standard Purch

| Trans | Post | Description | | | Amount |
|---|---|---|---|---|---|
| 11/08 | 11/09 | LONE STAR AWARDS I AUSTIN TX | | | $8.50 |
| 11/12 | 11/12 | LA CASITA AUSTIN TX | | | $22.90 |
| 11/15 | 11/15 | TEXACO 00351876 AUSTIN TX | | | $39.07 |
| 11/17 | 11/17 | CRESTVIEW MINIMAX AUSTIN TX | | | $5.15 |
| 11/19 | 11/19 | LA CASITA AUSTIN TX | | | $18.34 |
| 11/24 | 11/24 | HEB GROCERY #202 AUSTIN TX | | | $34.54 |
| 12/01 | 12/01 | HEB GROCERY #202 AUSTIN TX | | | $159.90 |
| 12/03 | 12/03 | LA CASITA AUSTIN TX | | | $26.69 |
| 12/07 | 12/07 | TEXACO 00351876 AUSTIN TX | | | $42.00 |

Total Standard Purch $357.09

Subtotal of Activity for Account Number ████████████ $357.09

**RUBEN C VILLALVA** ████████████ $357.09
Employee Credit Line $6,000    Account Number ████████████
Employee Cash Advance Limit $6,000

| Trans | Post | Description | | Amount |
|---|---|---|---|---|
| 10/19 | 10/19 | OZARKA WATER | 800-950-9397 CA | $113.09 |
| 10/19 | 10/19 | AMAZON MKTPLACE PMTS | AMZN.COM/BILLWA | $370.70 |
| 10/20 | 10/20 | HOOVER'S COOKING - #1 AUSTIN TX | | $74.64 |
| 10/20 | 10/20 | TONER PLUS SOUTHWEST LLC 512-3398213 TX | | $354.00 |
| 10/21 | 10/21 | GROUPON INC. | 877-7887858 IL | $25.00 |
| 10/21 | 10/21 | GEXA ENERGY | 713-9619399 TX | $173.87 |
| 10/21 | 10/21 | Bestbuy.com 00009944 888-237-8289 MN | | $350.61 |
| 10/22 | 10/22 | OFFICE DEPOT #1079 800-463-3768 TX | | $87.93 |
| 10/22 | 10/22 | GEXA ENERGY | 713-9619399 TX | $283.93 |
| 10/22 | 10/22 | GEXA ENERGY | 713-9619399 TX | $443.50 |
| 10/22 | 10/22 | PEI WEI #0078 Q02 AUSTIN TX | | $18.67 |
| 10/23 | 10/23 | MYR*MYRON MANUFACTURIN 201-843-6796 NJ | | $461.12 |
| 10/24 | 10/24 | ATTM*287018631382NBI 800-331-0500 GA | | $148.61 |
| 10/25 | 10/25 | MAUDIE'S ORIGINAL AUSTIN TX | | $33.98 |
| 10/25 | 10/25 | DOCUMATION OF SAN ANTONIO210-3414431 TX | | $105.00 |
| 10/25 | 10/25 | BIRCH COMM | 8882750777 GA | $500.63 |
| 10/25 | 10/25 | EP ELECTRIC BILLMATRIX 800-987-9649 TX | | $602.95 |
| 10/26 | 10/26 | EP ELECTRIC BILLMATRIX 800-987-9649 TX | | $602.95 |
| 10/26 | 10/26 | LONE STAR OVERNIGHT LP 5128738067 TX | | $297.54 |
| 10/27 | 10/27 | BLUE STAR CAFETERIA AUSTIN TX | | $93.89 |
| 10/27 | 10/27 | 5TH STREET CAR WASH AUSTIN TX | | $3.50 |
| 10/27 | 10/27 | DOCUMENT IO CORP 866-867-9144 NY | | $210.00 |
| 10/28 | 10/28 | GALAXY CAFE WEST LYNN LTDAUSTIN TX | | $31.94 |
| 10/28 | 10/28 | CALIF. PIZZA KIT 203 AUSTIN TX | | $70.94 |
| 10/28 | 10/28 | MYFAX *PROTUS IP SOLN 866-563-9212 GA | | $150.00 |
| 10/29 | 10/29 | GALAXY CAFE WEST LYNN LTDAUSTIN TX | | $4.25 |
| 11/01 | 11/01 | ROMEO'S AUSTIN TX | | $38.06 |
| 11/01 | 11/01 | CHEVRON 00201969 AUSTIN TX | | $53.85 |
| 11/01 | 11/01 | PAPPASITO'S CANTINA #034 AUSTIN TX | | $90.47 |
| 11/02 | 11/02 | JUNGLEDISK.COM 678-710-7745 TX | | $19.88 |
| 11/02 | 11/02 | AUSTIN BESTLINE 512-328-9095 TX | | $8.80 |
| 11/02 | 11/02 | AUSTIN BESTLINE 512-328-9095 TX | | $50.16 |
| 11/02 | 11/02 | AUSTIN BESTLINE 512-328-9095 TX | | $214.58 |
| 11/02 | 11/02 | 8X8, INC. 888-898-8733 888-8988733 CA | | $5.80 |
| 11/02 | 11/02 | USPS POSTAGE(STAMPS.COM) 888-434-0055 CA | | $300.00 |
| 11/03 | 11/03 | SNOW PEA KOREAN N CHINEAUSTIN TX | | $45.55 |
| 11/03 | 11/03 | TIME WARNER CABLE 210-5829708 TX | | $70.45 |
| 11/03 | 11/03 | J&R SOUND/MAILORDER 800-426-6027 NY | | $39.99 |
| 11/04 | 11/04 | NEWSFINDER 262-5445262 WI | | $154.00 |
| 11/04 | 11/04 | NEWZ GROUP 800-474-1111 MO | | $567.85 |
| 11/04 | 11/04 | BUY.COM 888-328-9288 CA | | $48.38 |
| 11/04 | 11/04 | WESTIN LA CANTERA SAN ANTONIO TX | | $185.63 |
| 11/04 | 11/04 | WESTIN LA CANTERA SAN ANTONIO TX | | $185.63 |
| 11/04 | 11/04 | COLE INFORMATION SERVICES877-4143332 NE | | $313.95 |
| 11/06 | 11/06 | LONE STAR OVERNIGHT LP 5128738067 TX | | $379.82 |
| 11/06 | 11/06 | MACARONI GR13800001388 W. LAKE HILLSTX | | $63.66 |
| 11/07 | 11/07 | COUNTY LINE RIVERWALK SAN ANTONIO TX | | $168.24 |
| | | KWIK-MART #1 00797050 AUSTIN TX | | $49.20 |
| | **Total Standard Purch** | | | **$10,886.62** |

**Subtotal of Activity for Account Number** ████████ **$10,455.32**

---

**STEVEN JENKINS**
Employee Credit Line $3,000   Account Number ████████
Employee Cash Advance Limit $3,000

**Purchases**
Standard Purch

| Trans | Post | Description | | Amount |
|---|---|---|---|---|
| 10/08 | 10/09 | LA CASITA AUSTIN TX | | $18.65 |
| 10/10 | 10/10 | CRAIGSLIST ORG 415-5666394 CA | | $50.00 |
| 10/14 | 10/14 | MIGHTY FINE BURGERS Q AUSTIN TX | | $21.28 |
| 10/16 | 10/16 | TEXACO 00351876 AUSTIN TX | | $34.25 |
| 10/20 | 10/20 | LONE STAR AWARDS I AUSTIN TX | | $8.50 |
| 10/29 | 10/29 | LA CASITA AUSTIN TX | | $22.90 |
| 11/02 | 11/02 | HEB GROCERY #202 AUSTIN TX | | $160.90 |
| 11/04 | 11/04 | CARRABBA'S #3411 AUSTIN TX | | $235.69 |
| | **Total Standard Purch** | | | **$552.17** |

**Subtotal of Activity for Account Number** ████████ **$552.17**

---

**RUBEN C VILLALVA**
Employee Credit Line $6,000   Account Number ████████
Employee Cash Advance Limit $6,000

**Purchases**
Standard Purch

| Trans | Post | Description | | Amount |
|---|---|---|---|---|
| 10/07 | 10/09 | GREENSHEET 7133713938 TX | | $14.00 |
| 10/08 | 10/09 | D EMBROIDERY CORP EL PASO TX | | $102.00 |
| 10/08 | 10/09 | TWC*TIME WARNER CABLE 800-222-5355 TX | | $18.03 |

| Trans | Post | Description | | Amount |
|---|---|---|---|---|
| 09/20 | 09/20 | GEXA ENERGY | 713-9619399 TX | |
| 09/21 | 09/21 | SNOW PEA KOREAN N CHINEAUSTIN TX | | $193.21 |
| 09/21 | 09/21 | LONE STAR OVERNIGHT LP 5128738067 TX | | $55.30 |
| 09/21 | 09/21 | MOTHER'S CAFE AUSTIN TX | | $240.78 |
| 09/23 | 09/23 | MAUDIE'S ORIGINAL AUSTIN TX | | $34.66 |
| 09/23 | 09/23 | GEXA ENERGY 713-9619399 TX | | $35.23 |
| 09/24 | 09/24 | MANGIA PIZZA AUSTIN TX | | $297.92 |
| 09/25 | 09/25 | PLAXO, INC. 650-3856961 CA | | $30.80 |
| 09/25 | 09/25 | BEST BUY MHT 00011536 AUSTIN TX | | $59.95 |
| 09/27 | 09/27 | KWIK-MART #1 00797050 AUSTIN TX | | $59.52 |
| 09/28 | 09/28 | EP ELECTRIC BILLMATRIX 800-967-9649 TX | | $50.06 |
| 09/29 | 09/29 | GALAXY CAFE WEST LYNN LTDAUSTIN TX | | $602.95 |
| 09/30 | 09/30 | HYDE PARK BAR & GRILL AUSTIN TX | | $32.44 |
| 09/30 | 09/30 | ASI*JUNGLEDISK 888-749-7545 WA | | $33.45 |
| 09/30 | 09/30 | NEWSFINDER SWAUKESHA WI | | $19.59 |
| 10/01 | 10/01 | MAUDIE'S ORIGINAL AUSTIN TX | | $154.00 |
| 10/02 | 10/02 | 8X8, INC. 888-898-8733 888-8988733 CA | | $35.09 |
| 10/03 | 10/03 | TIME WARNER CABLE 210-5829708 TX | | $5.80 |
| 10/03 | 10/03 | ROMEO'S AUSTIN TX | | $70.45 |
| 10/04 | 10/04 | AUSTIN BESTLINE 512-328-9095 TX | | $42.72 |
| 10/04 | 10/04 | AUSTIN BESTLINE 512-328-9095 TX | | $4.69 |
| 10/04 | 10/04 | AUSTIN BESTLINE 512-328-9095 TX | | $38.25 |
| 10/04 | 10/04 | CIPOLLINA 512-4475211 TX | | $203.64 |
| 10/04 | 10/04 | ATTM*287018631382NBI 800-331-0500 GA | | $48.05 |
| 10/05 | 10/05 | NEWZ GROUP 800-474-1111 MO | | $316.52 |
| 10/05 | 10/05 | ROUNDERS PIZZA AUSTIN TX | | $388.30 |
| 10/06 | 10/06 | COLE INFORMATION SERVICES877-4143332 NE | | $25.65 |
| 10/07 | 10/07 | LONE STAR OVERNIGHT LP 5128738067 TX | | $239.20 |
| | | CREATIVE TVL0001304100177702-4503958 NV | | $322.23 |
| | | | | $35.00 |
| **Total Standard Purch** | | | | **$11,057.02** |

**Subtotal of Activity for Account Number** ▉▉▉▉▉▉▉ **$11,057.02**

**STEVEN JENKINS**

| | | Account Number ▉▉▉▉▉▉▉ |
|---|---|---|
| Employee Credit Line | $30,000 | |
| Employee Cash Advance Limit | $15,000 | |

**Purchases**
### Standard Purch

| Trans | Post | Description | | Amount |
|---|---|---|---|---|
| 09/10 | 09/10 | CHEVRON 00202793 AUSTIN TX | | $35.40 |
| 09/10 | 09/10 | LA CASITA AUSTIN TX | | $22.90 |
| 09/20 | 09/20 | LONE STAR AWARDS I AUSTIN TX | | $8.50 |
| 09/24 | 09/24 | LA CASITA AUSTIN TX | | $22.90 |
| 10/05 | 10/05 | HEB GROCERY #202 AUSTIN TX | | $215.85 |
| **Total Standard Purch** | | | | **$305.55** |

**Subtotal of Activity for Account Number** ▉▉▉▉▉▉▉ **$305.55**

**RUBEN C VILLALVA**

| | | Account Number ▉▉▉▉▉▉▉ |
|---|---|---|
| Employee Credit Line | $30,000 | |
| Employee Cash Advance Limit | $15,000 | |

**Purchases**
### Standard Purch

| Trans | Post | Description | | Amount |
|---|---|---|---|---|
| 09/08 | 09/09 | AT&T X175 10290 EL PASO TX | | $214.00 |
| 09/09 | 09/09 | GREENSHEET 7133713938 TX | | $14.00 |
| 09/11 | 09/11 | ISMAEL STUDIO EL PASO TX | | $85.00 |
| 09/12 | 09/12 | PELICANS RESTAURANT EAST EL PASO TX | | $130.48 |
| 09/13 | 09/13 | PAYPAL *SPORT DEPOT 4029357733 NY | | $106.15 |
| 09/13 | 09/13 | J2 *EFAX PLUS SERVICE 323-817-3205 CA | | $1.10 |
| 09/14 | 09/14 | XM *SATELLITE RADIO 800-XMRADIO DC | | $81.88 |
| 09/15 | 09/15 | AT&T DATA 800-331-0500 GA | | $30.71 |
| 09/15 | 09/15 | J2 *EFAX PLUS SERVICE 323-817-3205 CA | | $10.00 |
| 09/16 | 09/16 | GREENSHEET 7133713938 TX | | $14.00 |
| 09/16 | 09/16 | EL TACO TOTE Q24 EL PASO TX | | $35.28 |
| 09/17 | 09/17 | CATTLEMANS STEAKHO FABENS TX | | $131.48 |
| 09/17 | 09/17 | SAMS INTERNET 888-746-7726 AR | | $54.59 |
| 09/17 | 09/17 | SAMS INTERNET 888-746-7726 AR | | $83.51 |
| 09/17 | 09/17 | SAMS INTERNET 888-746-7726 AR | | $93.46 |
| 09/17 | 09/17 | SAMS INTERNET 888-746-7726 AR | | $94.73 |
| 09/23 | 09/23 | UTEP INTERCOLLEGIATE A EL PASO TX | | $35.00 |
| 09/25 | 09/25 | GREENSHEET 7133713938 TX | | $14.00 |
| 09/26 | 09/26 | UTELPASO 30082572 EL PASO TX | | $20.75 |
| 09/30 | 09/30 | PAYPAL *ANDY 402-935-7733 CA | | $85.00 |
| 10/01 | 10/01 | TACO CABANA 00302976 EL PASO TX | | $13.28 |
| 10/01 | 10/01 | GESKE FIRE GRILL EL PASO TX | | $11.74 |
| 10/01 | 10/01 | GESKE FIRE GRILL EL PASO TX | | $97.66 |
| 10/02 | 10/02 | OREILLY AUTO 00028084 EL PASO TX | | $12.98 |
| | | J2 *EFAX PLUS SERVICE 323-817-3205 CA | | $10.00 |

| Trans | Post | Description | | | Amount |
|---|---|---|---|---|---|
| 08/24 | 08/24 | CHEVRON 00201969 | AUSTIN | TX | $51.95 |
| 08/24 | 08/24 | USPS 48040301334804328 | AUSTIN | TX | $44.00 |
| 08/24 | 08/24 | OFFICE MAX | AUSTIN | TX | $47.30 |
| 08/24 | 08/24 | OFFICE DEPOT #1080 | 800-463-3768 CO | | $5.98 |
| 08/24 | 08/24 | OFFICE DEPOT #1079 | 800-463-3768 TX | | $73.85 |
| 08/24 | 08/24 | SUZIS CHINA KITCHEN | 512-441-8400 TX | | $85.48 |
| 08/25 | 08/25 | GRANDE COMMUNICATIONS | 877-847-2633 TX | | $109.02 |
| 08/25 | 08/25 | DISCOUNT ELECTRONICS | AUSTIN | TX | $397.00 |
| 08/25 | 08/25 | OFFICE MAX | AUSTIN | TX | $21.84 |
| 08/26 | 08/26 | NEWSFINDER | SWAUKESHA | WI | $154.00 |
| 08/26 | 08/26 | MAUDIE'S ORIGINAL | AUSTIN | TX | $49.35 |
| 08/26 | 08/26 | USPS POSTAGE(STAMPS.COM) | 888-434-0055 CA | | $300.00 |
| 08/27 | 08/27 | Amazon.com | AMZN.COM/BILLWA | | $119.99 |
| 08/27 | 08/27 | FRANKENSTEIN COMPUTERS | AUSTIN | TX | $30.00 |
| 08/27 | 08/27 | HOOVER'S COOKING - #1 | AUSTIN | TX | $39.88 |
| 08/27 | 08/27 | Amazon.com | AMZN.COM/BILLWA | | $54.99 |
| 08/30 | 08/30 | THE GALLERY COLLECTION | 201-8418998 NJ | | $118.35 |
| 08/30 | 08/30 | CHEVRON 00201969 | AUSTIN | TX | $43.74 |
| 08/30 | 08/30 | OFFICE MAX | AUSTIN | TX | $1.78 |
| 08/31 | 08/31 | GALAXY CAFE WEST LYNN LTD | AUSTIN | TX | $28.79 |
| 08/31 | 08/31 | ROMEO'S | AUSTIN | TX | $55.63 |
| 08/31 | 08/31 | SUSAN G KOMEN HOUSTON | 713-7839188 TX | | $250.00 |
| 08/31 | 08/31 | ASI*JUNGLEDISK | 866-749-7545 WA | | $19.53 |
| 09/01 | 09/01 | ZOCALO CAFE | AUSTIN | TX | $23.05 |
| 09/02 | 09/02 | SNOW PEA KOREAN N CHINE | AUSTIN | TX | $45.90 |
| 09/02 | 09/02 | FRANKENSTEIN COMPUTERS | AUSTIN | TX | $60.00 |
| 09/02 | 09/02 | 8X8, INC. 888-898-8733 | 888-8988733 CA | | $5.81 |
| 09/02 | 09/02 | NEWZ GROUP | 800-474-1111 MO | | $403.50 |
| 09/03 | 09/03 | NEWSFINDER | SWAUKESHA | WI | $154.00 |
| 09/03 | 09/03 | MANGIA PIZZA | AUSTIN | TX | $28.41 |
| 09/03 | 09/03 | AUSTIN BESTLINE | 512-328-9095 TX | | $5.22 |
| 09/03 | 09/03 | AUSTIN BESTLINE | 512-328-9095 TX | | $41.84 |
| 09/03 | 09/03 | AUSTIN BESTLINE | 512-328-9095 TX | | $213.70 |
| 09/04 | 09/04 | DLX FOR BUSINESS | 800-328-0304 MN | | $134.20 |
| 09/04 | 09/04 | EXXONMOBIL 47205380 | AUSTIN | TX | $34.48 |
| 09/05 | 09/05 | ZOCALO CAFE | AUSTIN | TX | $11.99 |
| 09/05 | 09/05 | USAA P&C PREMIUM | 800-531-8111 TX | | $541.68 |
| | | EASTSIDE CAFE | AUSTIN | TX | $41.61 |
| **Total Standard Purch** | | | | | **$7,408.04** |

**Subtotal of Activity for Account Number** ▓▓▓▓▓▓▓▓ **$7,280.40**

## STEVEN JENKINS
Employee Credit Line $30,000
Employee Cash Advance Limit $15,000

Account Number ▓▓▓▓▓▓▓▓

**Purchases**

Standard Purch

| Trans | Post | Description | | | Amount |
|---|---|---|---|---|---|
| 08/10 | 08/10 | HEB GROCERY #202 | AUSTIN | TX | $105.95 |
| 08/13 | 08/13 | LA CASITA | AUSTIN | TX | $22.66 |
| 08/16 | 08/16 | LONE STAR AWARDS I | AUSTIN | TX | $17.00 |
| 08/17 | 08/17 | TEXACO 00351876 | AUSTIN | TX | $28.00 |
| 08/20 | 08/20 | LA CASITA | AUSTIN | TX | $18.87 |
| 08/26 | 08/26 | JOE'S CRAB-AUSTIN | AUSTIN | TX | $172.62 |
| 09/01 | 09/01 | OFFICE DEPOT #2784 | AUSTIN | TX | $160.43 |
| 09/01 | 09/01 | HEB GROCERY #202 | AUSTIN | TX | $160.90 |
| **Total Standard Purch** | | | | | **$686.43** |

**Subtotal of Activity for Account Number** ▓▓▓▓▓▓▓▓ **$686.43**

## RUBEN C VILLALVA
Employee Credit Line $30,000
Employee Cash Advance Limit $15,000

Account Number ▓▓▓▓▓▓▓▓

**Purchases**

Standard Purch

| Trans | Post | Description | | | Amount |
|---|---|---|---|---|---|
| 08/12 | 08/12 | GREENSHEET | 7133713938 TX | | $14.00 |
| 08/12 | 08/12 | WHATABURGER 634 Q26 | EL PASO | TX | $22.61 |
| 08/16 | 08/16 | AT&T DATA | 800-331-0500 GA | | $30.71 |
| 08/16 | 08/16 | PEOPLE PC INT SVC | 866-226-1015 CA | | $12.95 |
| 08/17 | 08/17 | OFFICE DEPOT #498 | EL PASO | TX | $117.65 |
| 08/17 | 08/17 | PAYPAL *MONTTANA2 | 402-935-7733 CA | | $409.00 |
| 08/19 | 08/19 | BIG 5 SPORTING #251 | EL PASO | TX | $10.81 |
| 08/19 | 08/19 | GREENSHEET | 7133713938 TX | | $14.00 |
| 08/19 | 08/19 | WHATABURGER 634 Q26 | EL PASO | TX | $26.28 |
| 08/19 | 08/19 | DIAMOND 1273 SHAMROCK | EL PASO | TX | $5.00 |
| 08/24 | 08/24 | TWC*TIME WARNER CABLE | 800-222-5355 TX | | $125.54 |
| 08/24 | 08/24 | CHEVRON 00070883 | EL PASO | TX | $49.00 |
| | | EL NOPAL RESTAURAN | EL PASO | TX | $12.18 |

THP Citi CID 2011 - 599

| Trans | Post | Description | | Amount |
|---|---|---|---|---|
| 08/24 | 08/24 | PAYPAL *CLVILLALVA | 402-935-7733 CA | $169.38 |
| 08/25 | 08/25 | ISMAEL STUDIO | EL PASO TX | $221.00 |
| 08/26 | 08/26 | GREENSHEET | 7133713938 TX | $14.00 |
| 08/26 | 08/26 | ADVANCE AUTO PARTS #8512 SPRING TX | | $81.17 |
| 08/26 | 08/26 | OFFICE DEPOT #2798 | EL PASO TX | $75.76 |
| 08/30 | 08/30 | THRIFTY NICKEL | EL PASO TX | $72.00 |
| 08/31 | 08/31 | 7-11 #57615 | EL PASO TX | $40.00 |
| 08/31 | 08/31 | WALGREENS #6435 | EL PASO TX | $59.35 |
| 09/01 | 09/01 | THRIFTY NICKEL | EL PASO TX | $72.00 |
| 09/01 | 09/01 | OASIS LANES | EL PASO TX | $22.00 |
| 09/01 | 09/01 | OASIS LANES | EL PASO TX | $32.50 |
| 09/02 | 09/02 | EL TACO TOTE Q24 | EL PASO TX | $112.11 |
| 09/02 | 09/02 | OASIS LANES | EL PASO TX | $113.35 |
| 09/03 | 09/03 | CHEVRON 00070883 | EL PASO TX | $30.02 |
| 09/04 | 09/04 | SUBWAY 00108944 | EL PASO TX | $8.66 |
| 09/04 | 09/04 | UTELPASO 30082572 | EL PASO TX | $27.50 |
| 09/07 | 09/07 | PELICANS RESTAURANT EAST EL PASO TX | | $46.02 |
| | | PEOPLE PC INT SVC | 866-226-1015 CA | $12.95 |

Total Standard Purch

$2,059.50

Subtotal of Activity for Account Number  ▓▓▓▓▓▓   $2,059.50

---

K DENTON
Employee Credit Line            $30,000
Employee Cash Advance Limit     $15,000

Account Number ▓▓▓▓▓▓

Purchases

Standard Purch

| Trans | Post | Description | | Amount |
|---|---|---|---|---|
| 08/18 | 08/18 | VALERO 2330 | SAN ANTONIO TX | $50.00 |
| 08/18 | 08/18 | HEB GROCERY #585 | SAN ANTONIO TX | $42.00 |
| 08/18 | 08/18 | GOODYEAR AUTO SVS CT 4724 SAN ANTONIO TX | | $119.51 |
| 08/19 | 08/19 | PALM RESTAURANT | SAN ANTONIO TX | $284.57 |
| 08/21 | 08/21 | APPLE STORE #R290 | SAN ANTONIO TX | $29.00 |
| 08/23 | 08/23 | NY TIMES NATL SALES | 800-698-4637 NY | $62.47 |
| 08/24 | 08/24 | USPS 48796402134806893 SAN ANTONIO TX | | $13.00 |
| 08/25 | 08/25 | BORDERS BKS&MU01001866 SAN ANTONIO TX | | $28.90 |
| 08/25 | 08/25 | VALERO 2327 | SAN ANTONIO TX | $55.55 |
| 08/25 | 08/25 | OFFICE MAX | SAN ANTONIO TX | $82.41 |
| 08/26 | 08/26 | WOLF CAMERA #1681 | SAN ANTONIO TX | $23.13 |
| 08/26 | 08/26 | GUNN NISSAN | SAN ANTONIO TX | $36.89 |
| 08/26 | 08/26 | OFFICE MAX | SAN ANTONIO TX | $43.23 |
| 08/27 | 08/27 | LA FONDA | SAN ANTONIO TX | $133.52 |
| 08/30 | 08/30 | MISSION CITY CONTAINER SAN ANTONIO TX | | $237.18 |
| 08/30 | 08/30 | NY TIMES NATL SALES | 800-698-4637 NY | $64.01 |
| 08/31 | 08/31 | OFFICE DEPOT #2218 | SAN ANTONIO TX | $20.20 |
| 09/01 | 09/01 | SPECTRUM CLUBS INC #311 210-822-4742 TX | | $203.28 |
| 09/02 | 09/02 | VALERO 2140 | SAN ANTONIO TX | $61.20 |
| 09/03 | 09/03 | STARBUCKS USA 00147165 SAN ANTONIO TX | | $21.62 |
| 09/03 | 09/03 | MISSION CITY CONTAINER SAN ANTONIO TX | | $77.50 |
| 09/05 | 09/05 | SAMMY'S RESTAURANT | CASTROVILLE TX | $27.61 |
| 09/05 | 09/05 | BRUSH COUNTRY STEAK HOUS PEARSAL TX | | $50.64 |
| 09/06 | 09/06 | CHEVRON 00108574 | SAN ANTONIO TX | $88.10 |

Total Standard Purch

$1,855.52

Subtotal of Activity for Account Number  ▓▓▓▓▓▓   $1,855.52

THP Citi CID 2011 - 600

| Trans | Post | Description | | | Amount |
|---|---|---|---|---|---|
| 09/20 | 09/20 | GEXA ENERGY | 713-9618399 | TX | $193.21 |
| 09/21 | 09/21 | SNOW PEA KOREAN N CHINEAUSTIN | | TX | $55.30 |
| 09/21 | 09/21 | LONE STAR OVERNIGHT LP 5128738067 | | TX | $240.78 |
| 09/21 | 09/21 | MOTHER'S CAFE | AUSTIN | TX | $34.66 |
| 09/23 | 09/23 | MAUDIE'S ORIGINAL | AUSTIN | TX | $35.23 |
| 09/23 | 09/23 | GEXA ENERGY | 713-9618399 | TX | $297.92 |
| 09/24 | 09/24 | MANGIA PIZZA | AUSTIN | TX | $30.80 |
| 09/25 | 09/25 | PLAXO, INC. | 650-3856961 | CA | $59.95 |
| 09/25 | 09/25 | BEST BUY MHT 00011536 AUSTIN | | TX | $59.52 |
| 09/27 | 09/27 | KWIK-MART #1 00797050 AUSTIN | | TX | $50.06 |
| 09/28 | 09/28 | EP ELECTRIC BILLMATRIX 800-967-9649 | | TX | $602.95 |
| 09/29 | 09/29 | GALAXY CAFE WEST LYNN LTDAUSTIN | | TX | $32.44 |
| 09/30 | 09/30 | HYDE PARK BAR & GRILL AUSTIN | | TX | $33.45 |
| 09/30 | 09/30 | ASI*JUNGLEDISK | 866-749-7545 | WA | $19.59 |
| 09/30 | 09/30 | NEWSFINDER | SWAUKESHA | WI | $154.00 |
| 10/01 | 10/01 | MAUDIE'S ORIGINAL | AUSTIN | TX | $35.09 |
| 10/02 | 10/02 | 8X8, INC. 888-898-8733 | 888-8988733 | CA | $5.80 |
| 10/03 | 10/03 | TIME WARNER CABLE | 210-5829708 | TX | $70.45 |
| 10/03 | 10/03 | ROMEO'S | AUSTIN | TX | $42.72 |
| 10/04 | 10/04 | AUSTIN BESTLINE | 512-328-9095 | TX | $4.69 |
| 10/04 | 10/04 | AUSTIN BESTLINE | 512-328-9095 | TX | $38.25 |
| 10/04 | 10/04 | AUSTIN BESTLINE | 512-328-9095 | TX | $203.84 |
| 10/04 | 10/04 | CIPOLLINA | 512-4475211 | TX | $48.05 |
| 10/04 | 10/04 | ATTM*287018631382NBI | 800-331-0500 | GA | $316.52 |
| 10/05 | 10/05 | NEWZ GROUP | 800-474-1111 | MO | $388.30 |
| 10/05 | 10/05 | ROUNDERS PIZZA | AUSTIN | TX | $25.65 |
| 10/06 | 10/06 | COLE INFORMATION SERVICES877-4143332 | | NE | $239.20 |
| 10/07 | 10/07 | LONE STAR OVERNIGHT LP 5128738067 | | TX | $322.23 |
| | | CREATIVE TVL0001304100177702-4503958 | | NV | $35.00 |
| **Total Standard Purch** | | | | | **$11,057.02** |

**Subtotal of Activity for Account Number** ▓▓▓▓▓    **$11,057.02**

---

**STEVEN JENKINS**    Account Number ▓▓▓▓▓
Employee Credit Line   $30,000
Employee Cash Advance Limit   $15,000

**Purchases**
**Standard Purch**

| Trans | Post | Description | | | Amount |
|---|---|---|---|---|---|
| 09/10 | 09/10 | CHEVRON 00202793 | AUSTIN | TX | $35.40 |
| 09/10 | 09/10 | LA CASITA | AUSTIN | TX | $22.90 |
| 09/20 | 09/20 | LONE STAR AWARDS I | AUSTIN | TX | $8.50 |
| 09/24 | 09/24 | LA CASITA | AUSTIN | TX | $22.90 |
| 10/05 | 10/05 | HEB GROCERY #202 | AUSTIN | TX | $215.85 |
| **Total Standard Purch** | | | | | **$305.55** |

**Subtotal of Activity for Account Number** ▓▓▓▓▓    **$305.55**

---

**RUBEN C VILLALVA**    Account Number ▓▓▓▓▓
Employee Credit Line   $30,000
Employee Cash Advance Limit   $15,000

**Purchases**
**Standard Purch**

| Trans | Post | Description | | | Amount |
|---|---|---|---|---|---|
| 09/08 | 09/09 | AT&T X175 10290 | EL PASO | TX | $214.00 |
| 09/09 | 09/09 | GREENSHEET | 7133713938 | TX | $14.00 |
| 09/11 | 09/11 | ISMAEL STUDIO | EL PASO | TX | $85.00 |
| 09/12 | 09/12 | PELICANS RESTAURANT EAST EL PASO | | TX | $130.48 |
| 09/13 | 09/13 | PAYPAL *SPORT DEPOT | 4029357733 | NY | $108.15 |
| 09/13 | 09/13 | J2 *EFAX PLUS SERVICE | 323-817-3205 | CA | $1.10 |
| 09/14 | 09/14 | XM *SATELLITE RADIO | 800-XMRADIO | DC | $81.88 |
| 09/15 | 09/15 | AT&T DATA | 800-331-0500 | GA | $30.71 |
| 09/15 | 09/15 | J2 *EFAX PLUS SERVICE | 323-817-3205 | CA | $10.00 |
| 09/16 | 09/16 | GREENSHEET | 7133713938 | TX | $14.00 |
| 09/16 | 09/16 | EL TACO TOTE Q24 | EL PASO | TX | $35.28 |
| 09/17 | 09/17 | CATTLEMANS STEAKHO | FABENS | TX | $131.48 |
| 09/17 | 09/17 | SAMS INTERNET | 888-746-7726 | AR | $54.59 |
| 09/17 | 09/17 | SAMS INTERNET | 888-746-7726 | AR | $83.51 |
| 09/17 | 09/17 | SAMS INTERNET | 888-746-7726 | AR | $93.46 |
| 09/17 | 09/17 | SAMS INTERNET | 888-746-7726 | AR | $94.73 |
| 09/17 | 09/17 | UTEP INTERCOLLEGIATE A EL PASO | | TX | $35.00 |
| 09/23 | 09/23 | GREENSHEET | 7133713938 | TX | $14.00 |
| 09/25 | 09/25 | UTELPASO 30082572 EL PASO | | TX | $20.75 |
| 09/28 | 09/28 | PAYPAL *ANDY | 402-935-7733 | CA | $65.00 |
| 09/30 | 09/30 | TACO CABANA 00302976 EL PASO | | TX | $13.28 |
| 10/01 | 10/01 | GESKE FIRE GRILL | EL PASO | TX | $11.74 |
| 10/01 | 10/01 | GESKE FIRE GRILL | EL PASO | TX | $97.66 |
| 10/01 | 10/01 | OREILLY AUTO 00028084 EL PASO | | TX | $12.98 |
| 10/02 | 10/02 | J2 *EFAX PLUS SERVICE | 323-817-3205 | CA | $10.00 |

THP Citi CID 2011 - 604

| Trans | Post | Description | | Amount |
|---|---|---|---|---|
| 10/09 | 10/09 | XM *SATELLITE RADIO | 800-XMRADIO DC | $40.94 |
| 10/11 | 10/11 | FUDDRUCKERS | EL PASO TX | $53.90 |
| 10/12 | 10/12 | RELIANT ENERGY | 866-222-7100 TX | $450.00 |
| 10/12 | 10/12 | CKT*CRICKETCOMM | 800-274-2538 CA | $105.49 |
| 10/13 | 10/13 | CIGARS | 484-285-0400 PA | $91.44 |
| 10/14 | 10/14 | GREENSHEET | 7133713938 TX | $14.00 |
| 10/14 | 10/14 | TAQUERIA LOS CUNAD | EL PASO TX | $42.40 |
| 10/15 | 10/15 | AT&T DATA | 800-331-0500 GA | $30.71 |
| 10/18 | 10/18 | FUDDRUCKERS | EL PASO TX | $50.48 |
| 10/21 | 10/21 | GREENSHEET | 7133713938 TX | $14.00 |
| 10/21 | 10/21 | FINA 7-ELEVEN #630 | EL PASO TX | $75.00 |
| 10/23 | 10/23 | AOL* SERVICE 1010 | 800-827-6364 NY | $77.88 |
| 10/23 | 10/23 | PELICANS RESTAURANT | EAST EL PASO TX | $81.64 |
| 10/26 | 10/26 | PAYPAL *RAINCITYWHO | 402-935-7733 CA | $19.24 |
| 10/26 | 10/26 | PAYPAL *ABACUS 247 | 402-935-7733 AZ | $46.99 |
| 10/27 | 10/27 | SOUTHWESTAIR5260630354966DALLAS TX | | $10.00 |
| 10/27 | 10/27 | SOUTHWESTAIR5260630354965DALLAS TX | | $10.00 |
| 10/27 | 10/27 | SOUTHWESTAIR5262133989864DALLAS TX | | $359.40 |
| 10/28 | 10/28 | WM SUPERCENTER | EL PASO TX | $108.50 |
| 10/28 | 10/28 | SPORTS LINE | EL PASO TX | $35.00 |
| 10/28 | 10/28 | GREENSHEET | 7133713938 TX | $14.00 |
| 10/29 | 10/29 | TORO BURGER BAR | EL PASO TX | $84.88 |
| 10/29 | 10/29 | BOOMBAH | 815-941-1431 IL | $363.52 |
| 11/01 | 11/01 | FUDDRUCKERS | EL PASO TX | $46.67 |
| 11/02 | 11/02 | BOOMBAH | MORRIS IL | $425.02 |
| 11/02 | 11/02 | BARRIGAS RESTAURANT | EL PASO TX | $43.51 |
| 11/04 | 11/04 | GREENSHEET | 7133713938 TX | $14.00 |
| 11/05 | 11/05 | D EMBROIDERY CORP | EL PASO TX | $60.00 |
| 11/05 | 11/05 | D EMBROIDERY CORP | EL PASO TX | $204.00 |
| 11/07 | 11/07 | PIZZA HUT 23642 | EL PASO TX | $31.60 |
| 11/07 | 11/07 | PEOPLE PC INT SVC | 866-226-1015 CA | $12.95 |
| 11/07 | 11/07 | TWC*TIME WARNER CABLE | 800-222-5355 TX | $42.21 |
| | | Total Standard Purch | | $3,193.40 |

**Subtotal of Activity for Account Number** ███████████  $3,193.40

**K DENTON**
Employee Credit Line        $30,000          Account Number ███████████
Employee Cash Advance Limit $15,000

**Credits, Fees and Adjustments**

| Trans | Post | Description | Amount |
|---|---|---|---|
| 11/06 | 11/06 | COURTYARD BY MARRIOTT SARSAN ANTONIO TX | $136.60- |
| | | Total Credits, Fees and Adjustments | $136.60- |

**Purchases**

Standard Purch

| Trans | Post | Description | | Amount |
|---|---|---|---|---|
| 10/08 | 10/09 | THE WASH TUB BROADWAY | SAN ANTONIO TX | $30.99 |
| 10/08 | 10/09 | HEB GROCERY #556 | SAN ANTONIO TX | $84.00 |
| 10/11 | 10/11 | EXXONMOBIL 47195300 | SAN ANTONIO TX | $58.50 |
| 10/11 | 10/11 | STARBUCKS USA 00147165 | SAN ANTONIO TX | $26.04 |
| 10/12 | 10/12 | USPS 48796402134806893 | SAN ANTONIO TX | $10.70 |
| 10/12 | 10/12 | USPS 48796402134806893 | SAN ANTONIO TX | $88.00 |
| 10/13 | 10/13 | BORDERS BKS&MU01001866 | SAN ANTONIO TX | $87.55 |
| 10/14 | 10/14 | RESTAURANT DEPOT | SAN ANTONIO TX | $99.96 |
| 10/15 | 10/15 | LA FONDA | SAN ANTONIO TX | $65.97 |
| 10/15 | 10/15 | CANDLELIGHT COFFEE HOUSE | SAN ANTONIO TX | $56.90 |
| 10/18 | 10/18 | EXXONMOBIL 47195300 | SAN ANTONIO TX | $84.82 |
| 10/18 | 10/18 | JOSEPHINE STREET CAF | 210-2246169 TX | $22.87 |
| 10/19 | 10/19 | LA FONDA | SAN ANTONIO TX | $56.94 |
| 10/19 | 10/19 | COSTCO LIQUORS #22 | SAN ANTONIO TX | $61.60 |
| 10/22 | 10/22 | STARBUCKS USA 00062547 | DALLAS TX | $25.00 |
| 10/22 | 10/22 | LUCKY'S CAFE #719 | DALLAS TX | $12.27 |
| 10/22 | 10/22 | PALM RESTAURANT-DALLAS | DALLAS TX | $79.54 |
| 10/23 | 10/23 | SOUTHWESTAIR5262132978264DALLAS TX | | $93.00 |
| 10/23 | 10/23 | WARWICK MELROSE HOTEL | DALLAS TX | $149.03 |
| 10/25 | 10/25 | EATZI'S | DALLAS TX | $74.95 |
| 10/25 | 10/25 | RSWD CRESCENT HOTEL | DALLAS TX | $256.90 |
| 10/25 | 10/25 | NY TIMES NATL SALES | 800-698-4637 NY | $57.22 |
| 10/26 | 10/26 | BOLNERS MEAT MARKET | SAN ANTONIO TX | $52.71 |
| 10/26 | 10/26 | EL MIRADOR RESTAURANT | SAN ANTONIO TX | $44.68 |
| 10/28 | 10/28 | LA FONDA | SAN ANTONIO TX | $49.45 |
| 10/28 | 10/28 | CHEVRON 00108477 | SAN ANTONIO TX | $62.35 |
| 10/28 | 10/28 | USPS 48796402134806893 | SAN ANTONIO TX | $11.14 |
| 10/28 | 10/28 | HALF PRICE BOOKS #010 | SAN ANTONIO TX | $102.83 |
| 11/01 | 11/01 | GARDENIA RESTAURANT | SAN ANTONIO TX | $13.17 |
| 11/01 | 11/01 | EL MIRADOR RESTAURANT | SAN ANTONIO TX | $24.35 |
| 11/02 | 11/02 | BORDERS BKS&MU01001866 | SAN ANTONIO TX | $38.68 |
| 11/02 | 11/02 | FEDEX OFFICE #0135 | SAN ANTONIO TX | $2.27 |
| | | FEDEX OFFICE #0135 | SAN ANTONIO TX | $14.01 |

THP Citi CID 2011 - 610

TIM TIERNEY
TEXAS HIGHWAY PATROL
Business Account ████████████
November 8 - December 8, 2010

**Credits, Fees and Adjustments**

| Trans | Post | Description | | | Amount |
|-------|------|-------------|---|---|--------|
| 11/19 | 11/19 | CAESAR'S PLACE ADV RSVN  LAS VEGAS | NV | | $123.20- |
| 11/20 | 11/20 | BOOMBAH          MORRIS    IL | | | $199.92- |
| **Total Credits, Fees and Adjustments** | | | | | **$323.12-** |

**Purchases**

**Standard Purch**

| Trans | Post | Description | | | Amount |
|-------|------|-------------|---|---|--------|
| 11/08 | 11/09 | SRR*XM SATELLITERADIO  800-XMRADIO NY | | | $40.48 |
| 11/08 | 11/09 | FUDDRUCKERS          EL PASO    TX | | | $47.26 |
| 11/09 | 11/09 | CAESAR'S PLACE ADV RSVN  LAS VEGAS | NV | | $123.20 |
| 11/10 | 11/10 | AT&T X175 10290      EL PASO    TX | | | $37.86 |
| 11/10 | 11/10 | CIGARS           484-285-0400 PA | | | $65.90 |
| 11/10 | 11/10 | CIGARS           484-285-0400 PA | | | $125.88 |
| 11/11 | 11/11 | WESTERN BEVERAGE - 78  EL PASO    TX | | | $36.78 |
| 11/11 | 11/11 | TAQUERIA LOS CUNAD   EL PASO    TX | | | $138.89 |
| 11/11 | 11/11 | GREENSHEET HOU - 1996  713-371-3500 TX | | | $14.00 |
| 11/13 | 11/13 | ISMAEL STUDIO      915-8554553  TX | | | $51.00 |
| 11/13 | 11/13 | PELICANS RESTAURANT EAST EL PASO   TX | | | $115.92 |
| 11/15 | 11/15 | AT&T DATA        800-331-0500 GA | | | $29.99 |
| 11/15 | 11/15 | FUDDRUCKERS         EL PASO    TX | | | $44.45 |
| 11/18 | 11/18 | GREENSHEET HOU - 1996  713-371-3500 TX | | | $14.00 |
| 11/19 | 11/19 | OFFICE DEPOT #498    EL PASO    TX | | | $17.31 |
| 11/20 | 11/20 | PIZZA HUT 23842     EL PASO    TX | | | $26.19 |
| 11/22 | 11/22 | ISMAEL STUDIO      915-8554553  TX | | | $160.00 |
| 11/22 | 11/22 | SHELL OIL 93004138522  GUADALUPE   AZ | | | $46.44 |
| 11/23 | 11/23 | STRIP LIQUOR       LAS VEGAS   NV | | | $48.04 |
| 11/23 | 11/23 | AOL* SERVICE 1110    800-827-6364 NY | | | $25.96 |
| 11/24 | 11/24 | TERRIBLES #267      LAS VEGAS   NV | | | $20.97 |
| 11/24 | 11/24 | ARIA - BAR MODERNO    LAS VEGAS   NV | | | $14.47 |
| 11/24 | 11/24 | ARIA - GOLD LOUNGE    LAS VEGAS   NV | | | $26.00 |
| 11/24 | 11/24 | ARIA - GOLD LOUNGE    LAS VEGAS   NV | | | $50.00 |
| 11/24 | 11/24 | SO PT CATALINA BAR    LAS VEGAS   NV | | | $21.00 |
| 11/26 | 11/26 | MGM GRAND / ARENA #327  LAS VEGAS  NV | | | $45.00 |
| 11/28 | 11/28 | JOE'S CRAB SHACK-TEMPE  TEMPE     AZ | | | $130.08 |
| 11/28 | 11/28 | BOWLINS CONTENTIAL DIVIDELORDSBURG   NM | | | $25.46 |
| 11/29 | 11/29 | FINA 7-ELEVEN #843    EL PASO    TX | | | $37.83 |
| 11/29 | 11/29 | FUDDRUCKERS         EL PASO    TX | | | $53.68 |
| 11/30 | 11/30 | PAYPAL *LIANG WENLE   402-935-7733 CA | | | $69.00 |
| 12/01 | 12/01 | ENTERPRISE RENT-A-CAR  HOUSTON    TX | | | $376.09 |
| 12/02 | 12/02 | GREENSHEET HOU - 1996  713-371-3500 TX | | | $14.00 |
| 12/02 | 12/02 | K BOBS RUIDOSO      RUIDOSO    NM | | | $54.72 |
| 12/03 | 12/03 | PAYPAL *WEIMEI518    402-935-7733 CA | | | $75.00 |
| 12/03 | 12/03 | SRR*XM SATELLITERADIO  800-XMRADIO NY | | | $40.48 |
| 12/05 | 12/05 | SQ *ANTONIO LUJAN    877-417-4551 CA | | | $172.00 |
| 12/05 | 12/05 | PELICANS RESTAURANT EAST EL PASO   TX | | | $69.31 |
| 12/06 | 12/06 | TM *HYUNDAI SUN BOWL F  800-653-8000 FL | | | $63.14 |
| 12/06 | 12/06 | TM *HYUNDAI SUN BOWL F  800-653-8000 FL | | | $63.14 |
| 12/06 | 12/06 | TM *HYUNDAI SUN BOWL F  800-653-8000 FL | | | $132.69 |
| 12/06 | 12/06 | FUDDRUCKERS         EL PASO    TX | | | $51.44 |
| 12/07 | 12/07 | PEOPLE PC INT SVC    866-226-1015 CA | | | $12.95 |
| **Total Standard Purch** | | | | | **$2,830.02** |

**Subtotal of Activity for Account Number** ████████████ **$2,506.90**

---

**K DENTON**
Employee Credit Line        $30,000       Account Number ████████████
Employee Cash Advance Limit    $15,000

**Purchases**

**Standard Purch**

| Trans | Post | Description | | | Amount |
|-------|------|-------------|---|---|--------|
| 11/07 | 11/09 | COURTYARD BY MARRIOTT SARSAN ANTONIO  TX | | | $273.20 |
| 11/07 | 11/09 | COURTYARD BY MARRIOTT SARSAN ANTONIO  TX | | | $327.26 |
| 11/07 | 11/09 | COURTYARD BY MARRIOTT SARSAN ANTONIO  TX | | | $327.37 |
| 11/08 | 11/09 | LA FONDA         SAN ANTONIO  TX | | | $78.26 |
| 11/08 | 11/09 | USPS 48795102034806554  SAN ANTONIO  TX | | | $44.00 |
| 11/08 | 11/09 | SOUTH CONGRESS CAF    AUSTIN     TX | | | $49.81 |
| 11/09 | 11/09 | USPS 48796402134806893  SAN ANTONIO  TX | | | $13.13 |
| 11/09 | 11/09 | VALERO 2280       SAN ANTONIO  TX | | | $67.69 |
| 11/12 | 11/12 | BORDERS BKS&MU01001866  SAN ANTONIO  TX | | | $85.28 |
| 11/12 | 11/12 | BED BATH & BEYOND #141  SAN ANTONIO  TX | | | $43.54 |
| 11/12 | 11/12 | OFFICE MAX        SAN ANTONIO  TX | | | $63.27 |
| 11/12 | 11/12 | GARDENIA RESTAURANT    SAN ANTONIO  TX | | | $16.00 |
| 11/12 | 11/12 | SHERWIN WILLIAMS #7311  ALAMO HGHTS  TX | | | $21.64 |
| 11/13 | 11/13 | LA FRITE BELGIAN BISTRO SAN ANTONIO  TX | | | $117.18 |
| 11/13 | 11/13 | GONZALES FOOD MARKET B  GONZALES    TX | | | $34.36 |
| 11/13 | 11/13 | EXXONMOBIL  47451471  GONZALES    TX | | | $54.18 |

| Trans | Post | Description | Amount |
|---|---|---|---|
| 12/23 | 12/23 | PIZZA HUT 23643        EL PASO   TX | $92.77 |
| 12/23 | 12/23 | GREENSHEET HOU - 1996   713-371-3500 TX | $14.00 |
| 12/23 | 12/23 | AOL* SERVICE 1210     800-827-6364 NY | $25.96 |
| 12/24 | 12/24 | J2 *EFAX PLUS SERVICE   323-817-3205 CA | $10.00 |
| 12/28 | 12/28 | PILOT      00007288   EDINBURG   TX | $35.45 |
| 12/28 | 12/28 | PILOT      00007288   EDINBURG   TX | $75.00 |
| 12/28 | 12/28 | EL TACO TOTE        EL PASO   TX | $49.11 |
| 12/28 | 12/28 | ROAD RUNNER RV PARTS&SVC 915-5984469 TX | $146.90 |
| 12/28 | 12/28 | FUDDRUCKERS       EL PASO   TX | $86.62 |
| 12/29 | 12/29 | BUSINESS SERVICES EL PASOEL PASO    TX | $141.00 |
| 12/30 | 12/30 | GREENSHEET HOU - 1996   713-371-3500 TX | $14.00 |
| 12/30 | 12/30 | DENMAN PROPANE 1507000  EL PASO   TX | $34.00 |
| 01/01 | 01/01 | CHEVRON 00074309      EL PASO   TX | $39.48 |
| 01/01 | 01/01 | PAYPAL *PINGDANSHIF    402-935-7733 CA | $90.00 |
| 01/02 | 01/02 | CHASE SUITES EL PASO 405 EL PASO    TX | $203.28 |
| 01/03 | 01/03 | ENTERPRISE RENT-A-CAR   HOUSTON    TX | $437.28 |
| 01/03 | 01/03 | SRR*XM SATELLITERADIO   800-XMRADIO  NY | $39.87 |
| 01/04 | 01/04 | OFFICE DEPOT #5101    800-463-3768 AZ | $128.26 |
| 01/04 | 01/04 | OFFICE DEPOT #1127    800-463-3768 TX | $150.56 |
| 01/06 | 01/06 | Best Buy   00002378  EL PASO   TX | $169.92 |
| 01/07 | 01/07 | GESKE FIRE GRILL     EL PASO   TX | $72.04 |
| 01/07 | 01/07 | GESKE FIRE GRILL     EL PASO   TX | $302.29 |
| 01/07 | 01/07 | WALGREENS #3826      EL PASO   TX | $37.81 |
| 01/07 | 01/07 | PEOPLE PC INT SVC    866-226-1015 CA | $12.95 |
| 01/07 | 01/07 | TWC*TIME WARNER CABLE  800-222-5355 TX | $42.21 |
| | | **Total Standard Purch** | **$4,865.32** |

---

**Subtotal of Activity for Account Number** [redacted]     **$4,782.07**

**K DENTON**

| | | | |
|---|---|---|---|
| Employee Credit Line | $30,000 | Account Number [redacted] | |
| Employee Cash Advance Limit | $15,000 | | |

**Purchases**

**Standard Purch**

| Trans | Post | Description | Amount |
|---|---|---|---|
| 12/07 | 12/09 | OFFICE MAX        SAN ANTONIO  TX | $53.09 |
| 12/08 | 12/09 | JOSEPHINE STREET CAF   210-2246169  TX | $66.03 |
| 12/11 | 12/11 | ATTM*385002097463SAN    800-331-0500 TX | $55.20 |
| 12/13 | 12/13 | SAC N PAC 108       SAN MARCOS   TX | $50.00 |
| 12/13 | 12/13 | FRIESENHAUS        NEW BRAUNFELSTX | $50.62 |
| 12/14 | 12/14 | STARBUCKS USA 00147165  SAN ANTONIO  TX | $5.24 |
| 12/14 | 12/14 | GOODYEAR AUTO SVS CT 4724SAN ANTONIO  TX | $874.15 |
| 12/15 | 12/15 | LA FONDA        SAN ANTONIO  TX | $81.83 |
| 12/15 | 12/15 | STARBUCKS USA 00086348   SAN MARCOS   TX | $25.00 |
| 12/15 | 12/15 | SAC N PAC 108       SAN MARCOS   TX | $63.82 |
| 12/15 | 12/15 | COVER 3        AUSTIN   TX | $197.27 |
| 12/16 | 12/16 | EL GALLO RESTAURANT    AUSTIN   TX | $51.44 |
| 12/16 | 12/16 | IL SOGNO LLC       SAN ANTONIO  TX | $145.97 |
| 12/17 | 12/17 | FLEMINGS #5405     SAN ANTONIO  TX | $187.61 |
| 12/17 | 12/17 | HEB GROCERY #385     SAN ANTONIO  TX | $84.00 |
| 12/19 | 12/19 | PALM RESTAURANT     SAN ANTONIO  TX | $144.05 |
| 12/20 | 12/20 | LA FONDA        SAN ANTONIO  TX | $110.57 |
| 12/20 | 12/20 | WOLF CAMERA #1681     SAN ANTONIO  TX | $30.44 |
| 12/20 | 12/20 | BORDERS BKS&MU01001866   SAN ANTONIO  TX | $75.49 |
| 12/20 | 12/20 | STARBUCKS USA 00147165   SAN ANTONIO  TX | $25.00 |
| 12/20 | 12/20 | ARROW KEY SERVICE    210-3419585  TX | $4.50 |
| 12/20 | 12/20 | JOSEPHINE STREET CAF   210-2246169  TX | $34.19 |
| 12/20 | 12/20 | GUNN NISSAN       SAN ANTONIO  TX | $36.89 |
| 12/20 | 12/20 | NY TIMES NATL SALES    800-698-4637 NY | $57.22 |
| 12/21 | 12/21 | EXXONMOBIL   47195300   SAN ANTONIO  TX | $67.04 |
| 12/21 | 12/21 | USPS 48796402134806893   SAN ANTONIO  TX | $32.85 |
| 12/22 | 12/22 | CHEVRON 00105923     UNIVERSITY PATX | $52.37 |
| 12/22 | 12/22 | USPS 487964021348066893   SAN ANTONIO  TX | $8.10 |
| 12/24 | 12/24 | BORDERS   01006121  DALLAS    TX | $81.10 |
| 12/24 | 12/24 | HALF PRICE BOOKS #001   DALLAS    TX | $114.12 |
| 12/25 | 12/25 | LOVE S COUNTRY00002311   HILLSBORO   TX | $35.16 |
| 12/27 | 12/27 | MISSION CITY CONTAINER   SAN ANTONIO  TX | $77.50 |
| 12/27 | 12/27 | CLEANING IDEAS #2    210-2279161  TX | $98.85 |
| 12/28 | 12/28 | BED BATH & BEYOND #141   SAN ANTONIO  TX | $28.96 |
| 12/28 | 12/28 | OFFICE MAX       SAN ANTONIO  TX | $123.77 |
| 12/28 | 12/28 | HALF PRICE BOOKS #010   SAN ANTONIO  TX | $56.10 |
| 12/29 | 12/29 | ROSARRIOS       SAN ANTONIO  TX | $9.65 |
| 12/29 | 12/29 | HEB GROCERY #556     SAN ANTONIO  TX | $42.00 |
| 12/29 | 12/29 | DIAMOND 2196 SHAMROCK   ALAMO HEIGHT TX | $70.40 |
| 12/29 | 12/29 | Amazon.com     AMZN.COM/BILLWA | $22.31 |
| 12/30 | 12/30 | PALM RESTAURANT     SAN ANTONIO  TX | $81.75 |
| 01/01 | 01/01 | BORDERS BKS&MU01001866   SAN ANTONIO  TX | $129.52 |
| 01/02 | 01/02 | SA GOODWILL-AUSTIN HWY   SAN ANTONIO  TX | $48.63 |
| 01/03 | 01/03 | USPS 48795102034806554   SAN ANTONIO  TX | $5.65 |


Prepared For
**TIM J TIERNEY**
**TEXAS HIGHWAY PATROL**

Account Number
▬▬▬▬▬

Closing Date
05/10/09

Page 7 of 14

## Jew Activity continued

| | | Amount $ |
|---|---|---|
| 4/11/09 | STARBUCKS USA 062430SAN ANTONIO | 33.47 |
| | 1-800-STARBUC | |
| 14/12/09 | LA FONDA SAN ANTONIO TX | 68.32 |
| | 01/FOOD AND BEVERAGE | |
| | FOOD/BEV       59.32 | |
| | TIP       9.00 | |
| )4/12/09 | STARBUCKS USA 147165SAN ANTONIO | 10.38 |
| | 1-800-STARBUC | |
| )4/14/09 | CAFE EXPRESS #11103 HOUSTON | 20.43 |
| | 8323252424 | |
| | Description | |
| | RESTAURANT CHARGES | |
| )4/14/09 | VALERO 2196 00000000ALAMO HEIGHTS | 64.93 |
| | 2108227486 | |
| )4/14/09 | CHEVRON HILLTOP CHEVGIDDINGS | 30.93 |
| | 0000000000 | |
| | Description      Price | |
| | FUEL/MISCELLANEOUS    30.93 | |
| 04/15/09 | CHAPPELL HILL MEAT MCHAPPELL HILL | 53.53 |
| | FREEZER & LOCKER MEAT | |
| | FOOD/BEVERAGE      51.53 | |
| | TIP      2.00 | |
| 04/16/09 | Hilton Hotels Post OHouston | 143.86 |
| | Arrival Date      Departure Date | |
| | 04/14/09      04/15/09 | |
| | 00000000 | |
| | LODGING | |
| 04/16/09 | OFFICEMAX, INC. 0855210-821-6551 | 18.99 |
| | 210-821-6551 | |
| | SINGLE SIDED | |
| 04/16/09 | BORDERS BKS&MU001866SAN ANTONIO | 46.11 |
| | 210-8289496 | |
| 04/16/09 | ENTERPRISE RENTACAR SAN ANTONIO | 183.39 |
| |      Location      Date | |
| | Rental:   SAN ANTONIO   09/04/14 | |
| | Return:   SAN ANTONIO   09/04/16 | |
| | Agreement Number: D843009 | |
| | Renter Name: DENTON KEN | |
| 04/16/09 | FEDEX# 865870488235 FedEx #1-800-622-1 | 60.35 |
| | NO REFERENCE INFO98011 | |
| | TO: CREDIT FONCIER DE FRANCE FR | |
| | FROM: KENNETH LANE DENTON 78209 | |
| | 001 COURIER PAK 1LB AWB865870488235 | |
| | FedEx #1-800-622-1147 | |
| 04/17/09 | LA FONDA SAN ANTONIO TX | 15.90 |
| | 01/FOOD AND BEVERAGE | |
| | FOOD/BEV      13.90 | |
| | TIP      2.00 | |
| 04/17/09 | LA FONDA SAN ANTONIO TX | 56.64 |
| | 01/FOOD AND BEVERAGE | |
| | FOOD/BEV      51.64 | |
| | TIP      5.00 | |
| 04/17/09 | LOEWS HOTEL THE MADIWASHINGTON | 4,846.03 |
| | Arrival Date      Departure Date | |
| | 05/11/09      05/18/09 | |
| | 00000000 | |
| | LODGING | |
| | CARDEPOSIT | |

*Continued on reverse*

## New Activity continued

| Date | Description | | Amount $ |
|---|---|---|---|
| 04/18/09 | OFFICEMAX, INC. 0855210-821-6551 | | |
| | 210-821-6551 | | 52.32 |
| | TAGS | | |
| | REMOVABLE ID OBJECT | | |
| | WHITE | | |
| 04/18/09 | JIM'S RESTAURANT #4 SAN ANTONIO | | |
| | 2108281493 | | 13.07 |
| | FOOD/BEVERAGE | 12.07 | |
| | TIP | 1.00 | |
| 04/19/09 | VALERO 1011 00000000SAN ANTONIO | | |
| | 5122258921 | | 19.48 |
| 04/22/09 | GUNN NISSAN    SAN ANTONIO | | |
| | AUTO DEALER (NEW/USED | | 37.08 |
| 04/22/09 | VALERO 2466 00000000SAN ANTONIO | | |
| | 2104962873 | | 46.62 |
| 04/22/09 | VONAGE AMERICA    866-243-4357 | | |
| | VONAGE PRICE+TAXES | | 31.66 |
| 04/22/09 | COSTCO WHSE #00693 9SAN ANTONIO | | |
| | WHOLESALE CLUB | | 237.69 |
| 04/22/09 | LA FONDA SAN ANTONIO TX | | |
| | 01/FOOD AND BEVERAGE | | 131.09 |
| | FOOD/BEV | 111.09 | |
| | TIP | 20.00 | |
| 04/24/09 | SOUPER SALAD LOOP 54SAN ANTONIO | | |
| | 2103497687 | | 13.02 |
| | FOOD/BEVERAGE | 13.02 | |
| 04/24/09 | LOWES     SAN ANTONIO    TX | | |
| | HOME IMPROVEMENT | | 78.79 |
| | ROC No. 0705944659 | | |
| 04/26/09 | OFFICEMAX, INC. 0855210-821-6551 | | |
| | 210-821-6551 | | 4.55 |
| | SINGLE SIDED | | |
| | DOUBLE SIDED | | |
| 04/26/09 | STARBUCKS USA 147165SAN ANTONIO | | |
| | 1-800-STARBUC | | 12.11 |
| 04/27/09 | FEDEX OFFICE #0135 0SAN ANTONIO | | |
| | 0000 782096 | | 2.44 |
| | ES B&W S/S WHITE 8.5 X11 | | |
| 04/27/09 | PALM REST-SAN ANTONISAN ANTONIO | | |
| | 2102267256 | | 73.69 |
| | FOOD/BEVERAGE | 63.69 | |
| | TIP | 10.00 | |
| 04/27/09 | HEB GROCERY #372   SAN ANTONIO | | |
| | 2102468755 | | 84.00 |
| 04/27/09 | FEDEX# 865870475268 FedEx #1-800-622-1 | | |
| | NO REFERENCE INFO98011 | | 70.80 |
| | TO: CREDIT FONCIER FR | | |
| | FROM: KENNETH L DENTON 78209 | | |
| | 001 COURIER PAK 1LB AWB865870475268 | | |
| | FedEx #1-800-622-1147 | | |
| 04/28/09 | LA FRITE BELGIAN BISSAN ANTONIO | | |
| | 2102247555 | | 35.28 |
| | TIP | 5.00 | |

Continued on next page

Prepared For
TIM J TIERNEY
TEXAS HIGHWAY PATROL

Account Number

Closing Date
05/10/09

Page 9 of 14

## New Activity continued

| | | Amount $ |
|---|---|---|

| 04/29/09 | SOUTHWEST AIRLINES  DALLAS    TX | 419.20 |

SOUTHWEST AIRLINES

| From: | To: | Carrier: | Class: |
|---|---|---|---|
| SAN ANTONIO TX | BALTIMORE MD | WN | Q |
| | SAN ANTONIO TX | WN | Q |

Ticket Number: 52621267796719
Date of Departure: 05/11
Passenger Name: DENTON/LANE CEO
Document Type: PASSENGER TICKET

| 04/29/09 | Hilton Advance PurchMemphis | 208.26 |
|---|---|---|
| | 800-236-7113 | |

| 04/30/09 | TINY BOXWOODS    HOUSTON | 63.29 |
|---|---|---|

RESTAURANT
FOOD/BEVERAGE          56.29
TIP                    7.00

| 05/01/09 | BORDERS BKS&MU003813HOUSTON | 42.06 |
|---|---|---|
| | 713-5240200 | |

| 05/01/09 | STARBUCKS USA 062414HOUSTON | 25.00 |
|---|---|---|
| | 1-800-STARBUC | |

| 05/01/09 | TEXACO FOOD MART ONESAN MARCOS | 36.55 |
|---|---|---|
| | 5127546611 | |

Description          Price
FUEL/MISCELLANEOUS   36.55

| 05/01/09 | FARM TO MARKET GROCEAUSTIN | 47.69 |
|---|---|---|

GROCERY STORE

| 05/01/09 | CHAPPELL HILL MEAT MCHAPPELL HILL | 26.78 |
|---|---|---|

FREEZER & LOCKER MEAT
FOOD/BEVERAGE          24 78
TIP                    2 00

| 05/02/09 | Hilton Hotels Post OHouston | 259.69 |
|---|---|---|

| Arrival Date | Departure Date |
|---|---|
| 04/30/09 | 05/01/09 |
| 00000000 | |
| LODGING | |

| 05/02/09 | NATIONAL CAR RENTAL MINNEAPOLIS | 52.73 |
|---|---|---|

| | Location | Date |
|---|---|---|
| Rental: | SAN ANTONIO | 09/04/30 |
| Return: | SAN ANTONIO | 09/05/02 |

Agreement Number: 616584272
Renter Name: DENTON

| 05/03/09 | SAMMINISTRIES 300003SAN ANTONIO | 150.00 |
|---|---|---|
| | 2102201240 | |

Description          Price
PERSONAL SERVICES    150.00

| 05/04/09 | SCHNABELS TRU VALUE SAN ANTONIO | 38.36 |
|---|---|---|

HARDWARE STORE
Description
584791

| 05/04/09 | EXXONMOBIL     SAN ANTONIO | 46.14 |
|---|---|---|
| | 2102819735 | |

Description
GAS/SERVICES

| 05/05/09 | USPS 4879830207   SAN ANTONIO | 25.75 |
|---|---|---|
| | 2102270861 | |

| 05/05/09 | JOSEPHINE STREET CAFSAN ANTONIO | 23.44 |
|---|---|---|
| | 2102246169 | |

Description          Price
FOOD AND BEVERAGE    23.44

Continued on reverse

## New Activity continued

Amount $

| | | | |
|---|---|---|---|
| 05/05/09 | YMCASATX AUTODRAFT 0SAN ANTONIO | | 69.00 |
| | 2106565777 | | |
| | Description | Price | |
| | CHILD CARE SERVICES | 69.00 | |

| | | |
|---|---|---|
| 05/06/09 | OFFICEMAX, INC. 0855210-821-6551 | 12.24 |
| | 210-821-6551 | |
| | CAMERAS | |
| | SINGLE SIDED | |

| | | |
|---|---|---|
| 05/06/09 | ADAMS WHOLESALE SUPPSAN ANTONIO | 546.17 |
| | CATALOG MERCHANDISE | |

| | | |
|---|---|---|
| 05/07/09 | CAFE EXPRESS #11103 HOUSTON | 10.00 |
| | 8323252424 | |
| | Description | |
| | RESTAURANT CHARGES | |

| | | |
|---|---|---|
| 05/07/09 | CAFE EXPRESS #11103 HOUSTON | 16.32 |
| | 8323252424 | |
| | Description | |
| | RESTAURANT CHARGES | |

| | | | |
|---|---|---|---|
| 05/07/09 | TINY BOXWOODS    HOUSTON | | 32.15 |
| | RESTAURANT | | |
| | FOOD/BEVERAGE | 28.15 | |
| | TIP | 4.00 | |

| | | |
|---|---|---|
| 05/07/09 | SHELL OIL 5754344140HOUSTON | 5.35 |
| | GAS STATION | |

| | | |
|---|---|---|
| 05/07/09 | PETRO #305 SAN ANTONSAN ANTONIO | 14.40 |
| | 1111111111 | |
| | Description | |
| | FOOD/BEVERAGE | |

| | | |
|---|---|---|
| 05/08/09 | VALERO 2166 00000000HOUSTON | 21.90 |
| | 7137836045 | |

| | | | | |
|---|---|---|---|---|
| 05/08/09 | NATIONAL CAR RENTAL MINNEAPOLIS | | | 67.69 |
| | | Location | Date | |
| | Rental: | SAN ANTONIO | 09/05/07 | |
| | Return: | SAN ANTONIO | 09/05/08 | |
| | Agreement Number: 616612872 | | | |
| | Renter Name: KENNETH L DENTON | | | |

| | | |
|---|---|---|
| 05/08/09 | UHAUL RENTAL/PURCHASHOUSTON | 226.60 |
| | (800)528-0463 | |

| | | | |
|---|---|---|---|
| 05/08/09 | LOVE'S COUNTRY STOREKATY | | 41.96 |
| | GAS STATION | | |
| | Quantity | Description | |
| | 20 | FUEL | |

| | | | |
|---|---|---|---|
| 05/08/09 | EMPIRE CAFE 65000000HOUSTON | | 32.44 |
| | 7135285282 | | |
| | TIP | 2.00 | |

| | | | |
|---|---|---|---|
| 05/09/09 | Hilton Hotels Post OHouston | | 15.16 |
| | Arrival Date | Departure Date | |
| | 05/07/09 | 05/08/09 | |
| | 00000000 | | |
| | LODGING | | |

| | | |
|---|---|---|
| 05/09/09 | BOLNERS MEAT MARKET SAN ANTONIO | 36.87 |
| | GROCERY STORE | |

| | | | |
|---|---|---|---|
| 05/10/09 | LA FONDA SAN ANTONIO TX | | 107.65 |
| | 01/FOOD AND BEVERAGE | | |
| | FOOD/BEV | 95.65 | |
| | TIP | 12.00 | |

## Total of New Activity for K LANE DENTON

9,775.88

Continued on next page

MNI #:     0887126
CSO #:     953/S-3
CSM #:     250/dl

THE STATE OF TEXAS

VS.

__Kenneth Lane Denton__

NO. 922838

§     IN THE   299th   DISTRICT COURT
§
§     OF
§
§     TRAVIS COUNTY, TEXAS

## ORDER RELEASING DEFENDANT FROM DEFERRED ADJUDICATION COMMUNITY SUPERVISION

On this day, the Court reviewed all proceedings in the above cause in which the Defendant,
__Kenneth Lane Denton__, was placed on a Deferred Adjudication pursuant to Sec. 5 (a), Art. 42.12, Texas Code of Criminal Procedure.

It appears to the Court that said Defendant has complied with the terms and conditions of said Deferred Adjudication; and it further appears that the period of Community Supervision has expired and that the Defendant herein should be discharged.

IT IS THEREFORE ORDERED that all charges filed in this case against the Defendant are hereby dismissed and the Defendant is discharged pursuant to Article 42.12 § 5(c) Texas Code of Criminal Procedure.

Signed this _13_ day of _March_ 2006.

_____
Asst. Community Supervision Officer

_____
JUDGE PRESIDING

**PLAINTIFF'S EXHIBIT**
24

Filed in The District Court
of Travis County, Texas

MAR 13 2006
At _10:20_ A.M.
Amalia Rodriguez-Mendoza, Clerk

507

5/05

D.C. NO._____

JP/MU#_____

PID#_____  DA#_____

# THE STATE OF TEXAS

TO ANY SHERIFF OR PEACE OFFICER OF THE STATE OF TEXAS - GREETINGS:
YOU ARE HEREBY COMMANDED TO ARREST _____

and his safely keep, so that you have him before the Honorable _____ Judicial District Court of Travis County, Texas, at the Court House of said County, in the City of Austin instanter, then and there to answer The State of Texas upon an indictment in said Court, charging him with the offense of

_____

HEREIN FAIL NOT, but due return make hereof as the law directs.
Given under my hand and seal of office at Austin, Texas, this the _____ day of _____, 19_____.

(   ) No Return on Warrant
(   ) No Bond in File
(   ) Not in Jail
(   ) Bond Forfeiture
BONDSMAN:_____

DATE OF BOND:_____

COMMENTS:

AMALIA RODRIGUEZ-MENDOZA
Clerk of the District Courts
of Travis County, Texas

BY:_____
Deputy

BOND: $_____

------------------------

## OFFICER'S RETURN

Came to hand the _____ day of _____, A.D., 19_____, and executed on the _____ day of _____, A.D., 19_____, by arresting the within named _____, at _____ in _____ County Texas, by:

(1) placing him in the County Jail of _____ County, Texas.
(2) taking his bond which is returned herewith.
(3) _____       _____

Returned this the _____ day of _____, A.D., 19_____.

Fees       $_____
Mileage    $_____
Total      $_____

_____
Sheriff, _____ County, Texas
BY:_____
Deputy

IN THE 299th JUDICIAL DISTRICT COURT OF TRAVIS COUNTY, TEXAS

NO. 0922838 THE STATE OF TEXAS VS. Kenneth Lane Denton

## JUDGMENT OF GUILT BY JURY - PUNISHMENT FIXED BY COURT

Judge Presiding: Jon Wisser

Date of Judgement: July 21, 1994

Attorney for State: Claire Dawson Brown

Attorney for Defendant: Joe James Sawyer

Offense Convicted of: Theft, Count I

Degree: Third Degree Felony     Date Offense
                                Committed: December 31, 1988

Charging Instrument: indictment     Plea: Not Guilty

Jury Verdict: Guilty     Foreperson: Cheryl Perry

Plea to Enhancement Paragraph(s):     None
Findings on Enhancement Paragraph(s):     None

Findings on Use of a Deadly Weapon: None
Punishment Assessed by: Court

Date Sentence Imposed: September 21, 1995          Costs: $126.50

Punishment and Place of Confinement: Ten (10) years in the Texas
Department of Criminal Justice Institutional Division

Date to Commence: September 21, 1995     Time Credited: June 4, 1992

Total Amount of Restitution/Reparation: 67,201.88
          Name: Travis County District Attorney
       Address: 314 West 11th
    City/State: Austin, Texas 78767
Concurrent Unless Otherwise Specified.


Notice of Appeal: None

0922838

THE STATE OF TEXAS

VS.

Kenneth Lane Denton

§
§
§
§
§

IN THE 299th

DISTRICT COURT OF

TRAVIS COUNTY, TEXAS

## JUDGMENT OF GUILT BY JURY

On July 21, 1994, A.D., this cause was called for trial, and the State appeared by her District Attorney, and the defendant, Kenneth Lane Denton, appeared in person in open court, with his/her counsel, Joe James Sawyer, also being present, and the said defendant having been duly arraigned, entered a plea of Not Guilty to the charge contained in the indictment herein, both parties announced ready for trial, and thereupon a jury was selected and seated consisting of Cheryl Perry, and eleven others who were duly sworn. Thereupon the indictment was read and the defendant entered his/hers plea of Not Guilty to the following charge contained in the indictment and read to the jury by the State:

All of the evidence was presented by both the State and the defendant and the charge was read to the jury by the Court and thereupon the jury heard the arguments of both sides and retired in charge of the proper officer to consider of their verdict and afterward were brought into open court by the proper officer, the defendant and his/her counsel, being present, and returned the following verdict which was received by the Court and is here now entered upon the minutes upon the minutes of the Court; to wit:

"We, the Jury, find the defendant, Kenneth Lane Denton, guilty of the offense of Theft, as alleged within the indictment."

/S/ Cheryl Perry
Foreperson of the Jury

On September 21, 1995, A.D., this cause being again called, the State appeared by her District Attorney, and the defendant, Kenneth Lane Denton, appeared in person in open court, his counsel, Joe James Sawyer, also being present and the defendant having requested that the Court assess punishment, the Court proceeded to hear all the evidence in the matter of punishment and after having heard the arguments of counsel, is of the opinion and so finds that the punishment of said defendant, Kenneth Lane Denton, should be fixed at confinement in the Texas Department of Criminal Justice Institutional Division for a period of Ten (10) year(s) and that the imposition of the sentence in this cause should be suspended and the defendant placed on probation:

It is therefore ORDERED, ADJUDGED, by the Court that the defendant, Kenneth Lane Denton, is guilty of the offense of Theft, Count I

COMMITTED ON: December 31, 1988 and that punishment be fixed as determined by the Court, that is by confinement in the Texas Department of Criminal Justice Institutional Division for a period of Ten (10) year(s) and that the imposition of the sentence in this cause should be suspended for Six (6) years and the defendant is ORDERED placed on probation under the supervision of the Court and the duly appointed and acting Community Supervision Officer of Travis County, Texas, said sentence to begin September 21, 1995 and subject to the following conditions of probation, viz; that during the term of probation, the defendant shall;

1. Obey all orders of the Court and the Community Supervision Officer.
2. Commit no offense against the laws of this or any state or of the United States.
3. Avoid injurious or vicious habits.
4. Avoid the use of all narcotics, habit forming drugs, alcoholic beverages, and controlled substances.
5. Avoid persons or places of disreputable or harmful character (including association with any person previously convicted of a felony crime without the permission of the Community Supervision officer).
6. Report to your Community Supervision Officer on 2ND WEDNESDAY OF EACH MONTH AT 9:00A.M. and at any subsequent time as instructed by your Community Supervision Officer.
7. Permit the Community Supervision Officer to visit you at your home or elsewhere.
8. Work faithfully at suitable employment as far as possible and, if unemployed, participate in the Community Supervision and Corrections Department's pre-employment program as directed by the court and/or Community Supervision Officer.
9. Register with and remain registered with the Texas Employment Commission during periods of unemployment.
10. Do not change the place of residence without the permission of the Community Supervision Officer and report within five (5) days of any change in employment or marital status.
11. Remain in Travis County, Texas, unless permitted to depart by the Court and/or the Community Supervision Officer.
12. Register with and remain registered with the Travis County Domestic Relations Office, if ordered by the court and/or your Community Supervision Officer.
13. Support your dependents.
14. Pay to and through the Community Supervision and Corrections Department of Travis County, Texas, the following:
   A. COMMUNITY SUPERVISION FEE IN THE AMOUNT of 40.00 each month, starting on and on the 21st day of each month thereafter,
   B. COURT COSTS in the amount of $126.50, in

payments of $15.00 each month starting on 10-21-95 and on the 21st day of each month thereafter until the total is paid.

C. FINE in the amount of 36,000.00, in payments of $90.00 each month starting on 10-21-95 and on the 21st day of each month thereafter until the total is paid.

D. RESTITUTION in the amount of $67,201.88, in payments of $960.00 each month starting on 10-21-95 and on the 21st day of each month thereafter until the total is paid.

E. ATTORNEY FEES in the amount of $, in payments of $ each month starting on and on the 21st day of each month thereafter until the total is paid.

F. CRIME STOPPERS FEE in the amount of $10.00 by 11-21-95.

G. PERSONAL BOND FEE of $20.00 (or) _____ within 30 days to the Personal Bond Office.

15. All court ordered monies must be paid off sixty (60) days prior to discharge.

16. While on Community Supervision, you must have on your person at all times, a current valid DPS photo identification card or a valid department of public safety photo driver's license. You must obtain this photo identification within 30 days of the date of your Community Supervision.

17. Refrain from disorderly conduct, abusive language, or disturbing the peace while present at the office of the Department.

18. Report to the Day Resource Center for orientation and any subsequent program designated, i.e. Pre-Employment Program, if unemployed, adult education classes, or counseling as needed.

19. Do not operate a motor vehicle without a valid Texas Driver's License and proof of insurance.

20. Submit a urine specimen at the direction of the Community supervision Officer, daily if ordered, and pay all costs if required.

21. Report to

x_____ TRAVIS COUNTY COUNSELING CENTER FELONY Theft program_____

_____ TAIP SCREENING AND FOLLOW ALL RECOMMENDATIONS

_____ TCADA LICENSED INTENSIVE OUTPATIENT TREATMENT

_____ INPATIENT TREATMENT

_____ SACA'S FIFTEEN (15) HOUR DRUG OFFENDER EDUCATION PROGRAM

_____ AUSTIN STRESS CLINIC FOR ASSESSMENT AND PLACEMENT , FOLLOW ALL RECOMMENDATIONS

_____ DAY REPORTING CENTER AND FOLLOW ANY COUNSELING AND/OR TREATMENT

_____ ANY COUNSELING/TREATMENT DESIGNATED BY YOUR BY YOUR COMMUNITY SUPERVISION OFFICER,

**FOLLOW ALL RECOMMENDATIONS**

on the date designated by your Community Supervision Officer, cooperate and participate while you are a client thereof, pay all costs of treatment, and remain until successfully discharged by the proper authorities.

22. Complete 240 hours of Community Service Restitution at a place approved by the court and designated by the Community Supervision and Corrections Department.

23. Serve _60_ days in the Travis County Jail, beginning _____; straight time/work release.(work release)

Signed the ___4___ day of _Juny_____,A.D., 1996.

_____
Judge Presiding

299

D.A.# 92-7860/PID#0235879/NC

No. 92-____2838____ The State of Texas vs. KENNETH LANE DENTON

Indictment - THEFT/MISSAPPLICATION OF FIDUCIARY PROPERTY

Bond $_____

In The 147th Judicial District Court of Travis County, Texas

IN THE NAME AND BY AUTHORITY OF THE STATE OF TEXAS:

THE GRAND JURY, for the County of Travis, State of Texas duly selected, empaneled, sworn, charged, and organized as such at the APRIL Term A.D. of 1992 of the 147th Judicial District Court for said County, upon its oath presents in and to said court at said term that Kenneth Lane Denton on or about the following dates and in the following amounts, and before the presentment of this indictment, in the County of Travis, and State of Texas, did then and there knowingly and intentionally unlawfully acquire and otherwise exercise control over property, namely, lawful United States currency, of the Texas Department of Public Safety Officer's Association, the owner, without the owner's effective consent, and with intent to deprive said owner of said property:

| DATE | AMOUNT |
|---|---|
| December 31, 1988 | $ 2,175.00 |
| January 31, 1989 | $ 189.75 |
| January 31, 1989 | $ 550.00 |
| March 2, 1989 | $ 2,425.00 |
| April 10, 1989 | $ 2,425.00 |
| May 4, 1989 | $ 2,937.50 |
| May 4, 1989 | $ 547.00 |

| | |
|---|---|
| June 1, 1989 | $ 1,362.50 |
| June 1, 1989 | $ 6,325.00 |
| June 1, 1989 | $12,500.00 |
| July 11, 1989 | $19,425.00 |
| July 11, 1989 | $ 2,125.00 |
| August 4, 1989 | $ 3,100.00 |
| September 5, 1989 | $ 4,955.13 |
| September 28, 1989 | $ 5,000.00 |
| October 10, 1989 | $ 1,160.00 |

And the Grand Jury aforesaid, upon their oaths aforesaid, at said term does further present that all of said amounts as alleged in the above paragraph were obtained pursuant to one scheme and continuing course of conduct and that the aggregate amount totals twenty thousand dollars ($20,000) or more but less than one hundred thousand dollars ($100,000),

And the Grand Jury further presents that Kenneth Lane Denton, hereinafter referred to as the defendant, on or about the following dates and in the following amounts, and before the presentment of this indictment, in the County of Travis and the State of Texas, did then and there intentionally and knowingly misapply property, to wit: lawful United States Currency, of the value of ten thousand dollars ($10,000) or more but less than one hundred thousand dollars ($100,000), he held as a fiduciary but not as a commercial bailee, in a manner that involved substantial risk of loss to the Texas Department of Public Safety Officer's Association, the owner

of said property, by then and there dealing with said property contrary to an agreement under which the defendant held said property, ~~and dealing with said property contrary to law,~~ *yMW 10-10-94*

| DATE | AMOUNT |
|------|--------|
| December 31, 1988 | $ 2,175.00 |
| January 31, 1989 | $ 189.75 |
| January 31, 1989 | $ 550.00 |
| March 2, 1989 | $ 2,425.00 |
| April 10, 1989 | $ 2,425.00 |
| May 4, 1989 | $ 2,937.50 |
| May 4, 1989 | $ 547.00 |
| June 1, 1989 | $ 1,362.50 |
| June 1, 1989 | $ 6,325.00 |
| June 1, 1989 | $12,500.00 |
| July 11, 1989 | $19,425.00 |
| July 11, 1989 | $ 2,125.00 |
| August 4, 1989 | $ 3,100.00 |
| September 5, 1989 | $ 4,955.13 |
| September 28, 1989 | $ 5,000.00 |
| October 10, 1989 | $ 1,160.00 |

And the Grand Jury aforesaid, upon their oaths aforesaid, at said term does further present that all of said amounts as alleged in the above paragraph were obtained pursuant to one scheme and continuing course of conduct and that the aggregate amount totals ten thousand dollars ($10,000) or more but less than one hundred thousand dollars ($100,000),

against the peace and dignity of the State.


_____ Mary White

MARY WHITE
FOREPERSON OF THE GRAND JURY

X **REGULAR**
___ **IN JAIL**

___ DEFERRED ADJUDICATION
___ CONDITIONAL DISCHARGE

___ POST
___ SHOCK

No. 922838

THE STATE OF TEXAS
VS.

KENNETH L. DENTON

IN THE 299th JUDICIAL DISTRICT
COURT OF TRAVIS COUNTY, TEXAS

Offense: Theft Count I

## CONDITIONS OF COMMUNITY SUPERVISION

In accordance with the authority by the Community Supervision Law of the State of Texas, you have been placed on community supervision this date, _September 5, 1995_ for a period of _6 yrs_ by the Honorable _Jon Wisser_ Judge, _299th_ Judicial District Court of Travis County, Texas. It is the order of the Court that you shall comply with the following conditions of community supervision:

( 1) Obey all orders of the Court and the Community Supervision Officer.
( 2) Commit no offense against the laws of this or any State or of the United States.
( 3) Avoid injurious or vicious habits.
( 4) Avoid the use of all narcotics, habit forming drugs, alcoholic beverages, and controlled substances.
( 5) Avoid persons or places of disreputable or harmful character (including association with any person previously convicted of a felony crime without the permission of the Community Supervision Officer).
( 6) Report to your Community Supervision Officer on the second Wednesday of each month at 9:00 AM and at any subsequent time as instructed by your Community Supervision Officer.
( 7) Permit the Community Supervision Officer to visit you at your home or elsewhere.
( 8) Work faithfully at suitable employment as far as possible and, if unemployed, participate in the Community Supervision and Corrections Department's Pre-Employment Program as directed by the Court and/or Community Supervision Officer.
( 9) Register with and remain registered with the Texas Employment Commission during periods of unemployment.
(10) Do not change place of residence without the permission of the Community Supervision Officer and report within five days of any change in employment or marital status.
(11) Remain within Travis County, Texas, unless permitted to depart by the Court or the Community Supervision Officer.
(12) Register with and remain registered with the Travis County Domestic Relations Office, if ordered by the Court and/or your Community Supervision Officer.
(13) Support your dependents.
(14) Pay to and through the Community Supervision and Corrections Department of Travis County, Texas, the following:

    a. COMMUNITY SUPERVISION FEE in the amount $40.00 each month, starting on _9-21-95_ and on the _21st_ day of each month thereafter;

    b. COURT COSTS in the amount of $126.50 each month starting on _10-21-95_, in payments of $ _15.00_ day of each month thereafter until the total is paid; and on the _21st_

    c. FINE in the amount of $ _6,000_ each month starting on _10-21-95_, in payments of $ _90.00_ day of each month thereafter until the total is paid; and on the _21st_

    d. RESTITUTION in the amount of $ _67,201 88_ each month starting on _10-21-95_, in payments of $ _960.00_ day of each month thereafter until the total is paid; and on the _21_

    e. ATTORNEY FEES in the amount of $_____ each month starting on _____, in payments of $_____ day of each month thereafter until the total is paid; and on the _____

    f. CRIME STOPPERS FEE in the amount of $10.00 by _11-21-95_.

    g. PERSONAL BOND FEE of $20.00 (or) _____ within thirty (30) days to the Personal Bond Office.

(15) All Court ordered monies must be paid off sixty (60) days prior to discharge.

GJS

Cause No. ____922838____      Name: ____KENNE L. DENTON____

## ADDITIONAL CONDITIONS OF COMMUNITY SUPERVISION

(16) While on community supervision, you must have on your person at all times a current, valid Texas Department of Public Safety photo identification card or a valid Texas Department of Public Safety photo driver's license. You must obtain this photo identification within thirty (30) days of the date of your community supervision.

(17) Refrain from disorderly conduct, abusive language, or disturbing the peace while present at the office of the Department.

(18) Report to the Day Resource Center for orientation and any subsequent program designated, i.e. Pre-Employment Program, if unemployed, adult education classes, or counseling classes as needed.

(19) Do not operate a motor vehicle without a valid Texas driver's license and proof of automobile liability insurance.

(20) Submit a urine specimen at the direction of the Community Supervision Officer, daily if ordered, and pay all costs if required.

X (21) Report to

     X    Travis County Counseling Center Felony___Theft Program

     ____ T.A.I.P. screening and follow all recommendations

     ____ TCADA licensed intensive outpatient treatment

     ____ Inpatient treatment

     ____ S.M.A.R.T. and S.M.A.R.T. Aftercare. Pay a treatment fee of $_____ in payments of $_____, monthly starting on _____, and on the _____ of each month.

     ____ SACA'S fifteen (15) hour Drug Offender Education Program

     ____ Austin Stress Clinic for assessment and placement, follow all recommendations

     ____ Day Reporting Center and follow any counseling and/or treatment

     ____ Any counseling/treatment designated by your Community Supervision Officer, follow all recommendations

     ____ _____

     ____ _____

     ____ _____

on the date designated by your Community Supervision Officer, cooperate and participate while you are a client thereof, pay all costs of treatment, and remain until successfully discharged by the proper authorities.

____ (22) Assigned to Intensive Community Supervision for Specialized Caseload-_____ (in lieu of incarceration in IDTDCJ) for a period of two (2) years or until the level of supervision is changed by the Court and/or Community Supervision Officer.

____ (23) Show proof of a high school diploma within ninety (90) days or obtain GED within _____ year(s).

____ (24) Complete ___240___ hours of Community Service Restitution at a place approved by the Court and designated by the Community Supervision and Corrections Department.

____ (25) Attend Alcoholics/ Narcotics/ Cocaine Anonymous meetings _____ per week and provide proper documentation to your Community Supervision Officer.

X (26) Serve _10_ ~~os~~ days in the Travis County Jail, beginning _____ ; straight time / work release.

____ (27) Do not open or maintain a checking account until approved, in writing, by the Court and/or your Community Supervision Officer.

____ (28) Have no contact with the victim(s), in this cause, either in writing, in person, by phone, or through third parties.

____ (29) Have no contact with gangs or gang members during term of community supervision.

~~X~~ (30) Have no contact and do not associate with ~~Department of Public Safety Officers Association, John Crestia and Frank Holland~~

~~X~~ (31) ~~Do not serve on the Board of Directors for any non-profit organization and refrain from fund raising, either as a solicitor, employer, or manager.~~

~~XXXXX(32)X~~ ~~Furthermore, do not accept employment where he has access to or control over funds that do not belong to him personally.~~ 𝒬𝓌

____ (33) _____

PAGE 2

Cause No. _922838_        Name: _____KENNETH L. DENTON_____

## ADDITIONAL CONDITIONS OF COMMUNITY SUPERVISION

You are hereby advised that under the law of this State, the Court shall determine the terms and conditions of your community supervision, and may at any time during the period of community supervision, alter or modify the conditions of your community supervision. The Court also has the authority at any time during the period of your community supervision to revoke your community supervision for violation of any of the conditions set out above.

Witness our signature this _____21_____ day of _____Sept_____, 19_95_.

_____
Judge Presiding

We, the undersigned, certify delivery of the Conditions of Community Supervision to the above named defendant.

_____      _____
Community Supervision Officer           District Clerk

### Defendant's Receipt

I acknowledge receipt of one copy of the Conditions of my Community Supervision which were read to me by my attorney and I understand and agree to obey these Conditions of Community Supervision.

X _____
Defendant

_____
Defendant's Right Thumb

GJS

_X_ REGULAR
___ IN JAIL

___ DEFERRED ADJUDICATION
___ CONDITIONAL DISCHARGE

___ POST
___ SHOCK

No. _922838_

THE STATE OF TEXAS
VS.

KENNETH L. DENTON

IN THE 299th JUDICIAL DISTRICT
COURT OF TRAVIS COUNTY, TEXAS

Offense: _Missapplication of Fiduciary Property_
_Count II_

## CONDITIONS OF COMMUNITY SUPERVISION

In accordance with the authority by the Community Supervision Law of the State of Texas, you have been placed on community supervision this date, _September 31, 1995_, you for a period of _10 years_ by the Honorable _Jon Wisser_, Judge, 299th Judicial District Court of Travis County, Texas. It is the order of the Court that you shall comply with the following conditions of community supervision:

( 1) Obey all orders of the Court and the Community Supervision Officer.
( 2) Commit no offense against the laws of this or any State or of the United States.
( 3) Avoid injurious or vicious habits.
( 4) Avoid the use of all narcotics, habit forming drugs, alcoholic beverages, and controlled substances.
( 5) Avoid persons or places of disreputable or harmful character (including association with any person previously convicted of a felony crime without the permission of the Community Supervision Officer).
( 6) Report to your Community Supervision Officer on the second Wednesday of each month at 9:00 AM and at any subsequent time as instructed by your Community Supervision Officer.
( 7) Permit the Community Supervision Officer to visit you at your home or elsewhere.
( 8) Work faithfully at suitable employment as far as possible and, if unemployed, participate in the Community Supervision and Corrections Department's Pre-Employment Program as directed by the Court and/or Community Supervision Officer.
( 9) Register with and remain registered with the Texas Employment Commission during periods of unemployment.
(10) Do not change place of residence without the permission of the Community Supervision Officer and report within five days of any change in employment or marital status.
(11) Remain within Travis County, Texas, unless permitted to depart by the Court or the Community Supervision Officer.
(12) Register with and remain registered with the Travis County Domestic Relations Office, if ordered by the Court and/or your Community Supervision Officer.
(13) Support your dependents.
(14) Pay to and through the Community Supervision and Corrections Department of Travis County, Texas, the following:

   a. COMMUNITY SUPERVISION FEE in the amount $40.00 each month, starting on _____ and on the _____ day of each month thereafter;

   b. COURT COSTS in the amount of $ _126.50_ , in payments of $ _15.00_ each month starting on _____ day of each month thereafter until the total is paid; and on the _____

   c. FINE in the amount of $ _6,000_ , in payments of $ _90.00_ each month starting on _10-31-95_ and on the _31st_ day of each month thereafter until the total is paid;

   d. RESTITUTION in the amount of $ _67,000.00_ _201 ??_ , in payments of $ _960.00_ each month starting on _10-31-95_ and on the _31st_ day of each month thereafter until the total is paid; (to be paid up front)

   e. ATTORNEY FEES in the amount of $ _____ , in payments of $ _____ each month starting on _____ and on the _____ day of each month thereafter until the total is paid;

   f. CRIME STOPPERS FEE in the amount of $10.00 by _____ .

   g. PERSONAL BOND FEE of $20.00 (or) _____ within thirty (30) days to the Personal Bond Office.

(15) All Court ordered monies must be paid off sixty (60) days prior to discharge.

GJS

_X_ _Probationer should not sell his own ??_

Cause No. 922838                         Name: ____KENNE__ __. DENTON____

## ADDITIONAL CONDITIONS OF COMMUNITY SUPERVISION

(16) While on community supervision, you must have on your person at all times a current, valid Texas Department of Public Safety photo identification card or a valid Texas Department of Public Safety photo driver's license. You must obtain this photo identification within thirty (30) days of the date of your community supervision.

(17) Refrain from disorderly conduct, abusive language, or disturbing the peace while present at the office of the Department.

(18) Report to the Day Resource Center for orientation and any subsequent program designated, i.e. Pre-Employment Program, if unemployed, adult education classes, or counseling classes as needed.

(19) Do not operate a motor vehicle without a valid Texas driver's license and proof of automobile liability insurance.

(20) Submit a urine specimen at the direction of the Community Supervision Officer, daily if ordered, and pay all costs if required.

__X__ (21) Report to

    __X__ Travis County Counseling Center Felony _Theft Program_

    _____ T.A.I.P. screening and follow all recommendations

    _____ TCADA licensed intensive outpatient treatment

    _____ Inpatient treatment

    _____ S.M.A.R.T. and S.M.A.R.T. Aftercare. Pay a treatment fee of $_____ in payments of $_____, monthly starting on _____, and on the _____ of each month.

    _____ SACA'S fifteen (15) hour Drug Offender Education Program

    _____ Austin Stress Clinic for assessment and placement, follow all recommendations

    _____ Day Reporting Center and follow any counseling and/or treatment

    _____ Any counseling/treatment designated by your Community Supervision Officer, follow all recommendations

    _____

    _____

    _____

on the date designated by your Community Supervision Officer, cooperate and participate while you are a client thereof, pay all costs of treatment, and remain until successfully discharged by the proper authorities.

_____ (22) Assigned to Intensive Community Supervision for Specialized Caseload-_____ (in lieu of incarceration in IDTDCJ) for a period of two (2) years or until the level of supervision is changed by the Court and/or Community Supervision Officer.

_____ (23) Show proof of a high school diploma within ninety (90) days or obtain GED within _____ year(s).

__X__ (24) Complete ~~00~~ 240 hours of Community Service Restitution at a place approved by the Court and designated by the Community Supervision and Corrections Department.

_____ (25) Attend Alcoholics/ Narcotics/ Cocaine Anonymous meetings _____ per week and provide proper documentation to your Community Supervision Officer.

__X__ (26) Serve 60 days in the Travis County Jail, beginning _____; straight time /[work release]

_____ (27) Do not open or maintain a checking account until approved, in writing, by the Court and/or your Community Supervision Officer.

_____ (28) Have no contact with the victim(s), in this cause, either in writing, in person, by phone, or through third parties.

_____ (29) Have no contact with gangs or gang members during term of community supervision.

__X__ (30) Have no contact and do not associate with ~~Department of Public Safety Officers Association, JOHN Crestia and Frank Holland~~

__X__ (31) ~~Do not serve on the Board of Directors for any non-profit organization and refrain from fund raising, either as a solicitor, employer, or manager. Further-~~

XXXXXX(32)X ~~more, do not accept employment where~~ he has access to or control over funds that ~~do not belong to him personally.~~

_____ (33) _____

4/95                                    PAGE 2

Cause No. 922838                      Name:      KENNETH L. DENTON

## ADDITIONAL CONDITIONS OF COMMUNITY SUPERVISION

You are hereby advised that under the law of this State, the Court shall determine the terms and conditions of your community supervision, and may at any time during the period of community supervision, alter or modify the conditions of your community supervision. The Court also has the authority at any time during the period of your community supervision to revoke your community supervision for violation of any of the conditions set out above.

Witness our signature this _____21_____ day of _____Sept_____, 19_95_.

_____
Judge Presiding

We, the undersigned, certify delivery of the Conditions of Community Supervision to the above named defendant.

_____                    _____
Community Supervision Officer                              District Clerk

### Defendant's Receipt

I acknowledge receipt of one copy of the Conditions of my Community Supervision which were read to me by my attorney and I understand and agree to obey these Conditions of Community Supervision.

X _____
Defendant

_____
Defendant's Right Thumb

GJS

PAGE    3



# The State of Texas

## SECRETARY OF STATE
### CERTIFICATE OF INCORPORATION

### OF

TEXAS HIGHWAY PATROL ASSOCIATION
CHARTER NO. 1157746

The undersigned, as Secretary of State of the State of Texas, hereby certifies that Articles of Incorporation for the above corporation duly signed pursuant to the provisions of the Texas Non-Profit Corporation Act, have been received in this office and are found to conform to law.

ACCORDINGLY, the undersigned, as Secretary of State, and by virtue of the authority vested in the Secretary by law, hereby issues this Certificate of Incorporation and attaches hereto a copy of the Articles of Incorporation.

Dated _____ JUNE 19 _____, 19 90 .



*George S Bayoud Jr.*
_____
Secretary of State

dae



**PLAINTIFF'S EXHIBIT**

25

# ARTICLES OF INCORPORATION

## OF

## TEXAS HIGHWAY PATROL ASSOCIATION

FILED
In the Office of the
Secretary of State of Texas

JUN 19 1990

Corporations Section

I, the undersigned person over the age of eightenn (18), acting as an incorporator, adopt the following Articles of Incorporation of Texas Highway Patrol Association (referred to as the "Corporation") under the Texas Non-Profit Corporation Act (referred to as the "Act")

## ARTICLE 1

## NAME

The name of the Corporation is Texas Highway Patrol Association

## ARTICLE 2

## NONPROFIT CORPORATION

The Corporation is a nonprofit corporation  Upon dissolution, all of the Corporation's assets shall be distributed to the State of Texas or an organization exempt from taxes under Internal Revenue Code Section 501(c)(3) for one or more purposes that are exempt under the Texas franchise tax  The incorporators have been authorized to execute these Articles of Incorporation by the consent of a majority of the members of the unincorporated association

## ARTICLE 3

## DURATION

The Corporation shall continue until dissolved as provided by law and be perpetual. 

Subject to the limitations in these Articles of Incorporation, the Corporation shall have the authority to take any action it deems to be necessary, appropriate, or convenient relating to the management of the Corporation, including, but not limited to, the powers to

1  Have succession to its corporate name

2  Make and alter bylaws

3  Conduct affairs, carry on operations, and have officers anywhere in the world

4  Have and alter a corporate seal, and use the seal by causing it or a facsimile to be impressed on, affixed to, or reproduced in any manner on instruments to be executed by the Corporation's officers

5  Purchase, receive, lease, or otherwise acquire, own, hold, improve, use, or otherwise deal in any interest in real or personal property wherever situated

6  Invest and reinvest in property that the Board of Directors deems advisable, including an option to acquire an asset

7  Purchase, receive, subscribe for, acquire, own, hold, vote, employ, mortgage, lend, pledge, sell, dispose of, or otherwise use and deal in and with shares, interests, and obligations of other corporations, whether for profit or not for profit, associations, partnerships, individuals, and government agencies and instrumentalities

8  Sell, convey, exchange, convert, grant an option, assign, build, manage, operate, control, or otherwise dispose of Corporation property

9  Partition, divide, subdivide, assign, develop, and improve Corporation property

10  Make or obtain the vacation of plats, adjust boundaries, adjust differences in valuation on exchange or partition, and dedicate easements for public use, of Corporation property, with or without consideration

11  Make ordinary and extraordinary repairs and alterations in buildings, demolish improvements, raise party walls or buildings, and erect party walls or buildings on Corporation property

12  Lease Corporation property for any legal purpose, and enter into any covenants and agreements relating to the leased property or any improvements that may be erected on the property

13  Take the following actions regarding natural resources related to Corporation property

(a) Enter into oil, gas, liquid or gaseous hydrocarbon, sulphur, metal, and any and all other natural resource leases

(b) Enter into any pooling, unitization, repressurization, community, and other types of agreements relating to the exploration, development, operation, and conservation of properties containing minerals or other natural resources

(c) Drill, mine, and otherwise develop oil, gas, and other minerals

(d) Contract for the installation and operation of absorption and repressuring plants

(e) Install and maintain pipelines

14 Borrow money on behalf of the Corporation from any person, firm, or corporation for any Corporation purpose However, the Corporation shall not borrow money from an officer or director without the approval of the Board of Directors, not including the vote of any director who is involved in the transaction in a personal capacity

15 Make contracts, incur liabilities, issue notes, bonds and other obligations, and secure obligations by mortgage or pledge of Corporation property, franchises, and income

16 Encumber or hypothecate Corporation property for any Corporation purpose by mortgage, deed of trust, pledge, or otherwise

17 Lend money for the purposes of the Corporation, invest and reinvest funds, and take and hold real and personal property as security for the payment of funds loaned or invested

18 Enforce any mortgage or deed of trust or pledge owned by the Corporation and, at any sale under any such mortgage, deed of trust, or pledge, bid and purchase at Corporation expense any property subject to the security instrument

19 Lend money to and otherwise assist the Corporation's employees, but not its officers and directors

20 Vote and give proxies to vote any Corporation securities

21 · Pay any assessments or other charges levied on any Corporation stock or other security

22 Exercise any subscription, conversion, or other rights or options that may attach to the holders of any Corporation stocks, bonds, securities, or other instruments

23 Continue and operate, sell, or liquidate any business or partnership interests received by the Corporation

24 Participate in any plans or proceedings for the foreclosure, reorganizaiton, consolidation, merger, or liquidation of any corporation or organization that has issued securities owned by the Corporation and, incident to that participation, deposit securities with and transfer title of securities to any protective or other committee established to further or defeat any such plan or proceeding

25 Carry, at the expense of the Corporation, insurance or make other arrangements for payemnt of liabilities to protect the Corporation or the directors, officers, members, agents, and employees of the Corporation as representatives of another enterprise, provided that the terms of the insurance or other arrangements are consistent with the provisions of Revised Civil Statutes Article 1396-2 22A.

26 Make donations for the public welfare, or charitable, scientific, or educational purposes, and in time of war, make donations in aid of war activities

27 Abandon any Corporation asset

28 Elect or appoint officers and agents for any period of time, define their duties, and fix their compensation

29 Establish pension plans and trusts and pay pensions to all or certain classes of its officers and employees

30 Employ an attorney, investment adviser, accountant, broker, tax specialist, or any other agent, and pay reasonable compensation for all services performed by any of them as a Corporation expense.

31. Compromise, participate in mediation, submit to arbitration, release with or without consideration, extend time for payment, and otherwise adjust any claims in favor of or against the Corporation

32 Commence or defend any litigation in the corporate name with respect to the Corporation or any Corporation property, at the expense of the Corporation

33 Cease the Corporation's activities and terminate its existence by voluntary dissolution and distribute assets on dissolution to members as provided by law, regardless of the provisions of Article 1396-6 02 Section A(3) or Article 1396-7 06 Section B93) of the Revised Civil Statutes

34 Do all acts, take part in any proceedings, and exercise all rights and privileges as could an absolute owner of Corporation property, subject to the limitations expressly stated in these Articles of Incorporation  The enumeration of powers in these Articles of Incorporation shall not limit the general or implied powers of the Corporation or any additional powers provided by law

## ARTICLE 4

## PURPOSES

The purposes for which the Corporation is organized are to perform charitable activities within the meaning of Internal Revenue Code Section 501(c)(3) and Texas Tax Code Section 11,18 (c)(1)  Specifically, the Corporation is organized to improve educational and professional endeavors for highway patrol officers of the Texas Department of Public Safety  To conduct public awareness programs promoting safety activities

## ARTICLE 5

## RESTRICTIONS AND REQUIREMENTS

The Corporation shall not pay dividends or other corporate income to its members, directors or officers or otherwise accrue distributable profits or permit the realization of private gain  The Corporation shall not have the power to take any action porhibited by the Act  The Corporation shall not have the power to engage in any activites, except to an insubstantial degree, that are not in furtherance of the purposes set forth above

TCFSK - 6

The Corporation shall have no power to take any action that would be

inconsistent with the requirements for a tax exemption under Internal Revenue Code Section 501(c)(3) and related regulations, rulings, and procedures   The Corporation shall have no power to take any action that would be inconsistent with the requirements for receiving tax deductible charitable contributions under Internal Revenue Code Section 170(c)(2) and related regulations, rulings, and procedures   Regardless of any other provision in these Articles of Incorporation or state law, the Corporation shall have no power to

1   Engage in activities or use its assets in manners that are not in furtherance of one or more exempt purposes, as set forth above and defined by the Internal Revenue Code and related regulations, rulings and procedures, except to an insubstantial degree

2   Serve a private interest other than one that is clearly incidental to an overriding public interest

3   Devote more than an insubstantial  part of its activities to attempting to influence legislation by propaganda or otherwise, except as provided by the Internal Revenue Code and related regulations, rulings, and procedures

4   Participate in or intervene in any political campaign on behalf of or in opposition to any candidate for public office   The prohibited activities inlcude the publishing or distributing of statements and any other direct or indirect campaign activites

5   Have objectives that characterize it as an "action organization" as defined by the Internal Revenue Code and related regulations, rulings, and procedures

6   Distribute its assets on dissolution other than for one or more exempt purposes, on dissolution, the Corporation's assets shall be distributed to the state government for a public purpose, or to an organization exempt from taxes under Internal Revenue Code Section 501(c)(3) to be used to accomplish the general purposes for which the Corporation was organized

7   Permit any part of the net earnings of the Corporation to inure to the benefit of any private shareholder or member of the Corporation or any private individual

8   Carry on an unrelated trade or business except as a secondary purpose related to the Corporation's primary, exempt, purposes.

- 7

The Corporation shall make distributions at such times and in such

manners as to avoid the tax under Internal Revenue Code Section 4942 The Corporation shall not engage in any act of self-dealing as defined in Section 4941(d) The Corporation shall not retain excess business holdings as defined in Section 4943(c) The Corporation shall not make any investments that would subject it to the tax described in Section 4944 The Corporation shall not make any taxable expenditures as defined in Seciton 4945(e)

## ARTICLE 6

## MEMBERSHIP

The Corporation shall have one or more classes of members as provided in the bylaws of the Corporation

## ARTICLE 7

## INITIAL REGISTERED OFFICE AND AGENT

The street address of the initial registered office of the Corporation is 610 Brazos, Suite 425, Austin, TX 78701 The name of the initial registered agent at this office is Lane Denton

## ARTICLE 8

## BOARD OF DIRECTORS

The qualifications, manner of selection, duties, terms, and other matters relating to the Board of Directors (referred to as the "Board of Directors") shall be provided in the bylaws The initial Board of Direcors shall consist of three persons The number of directors may be increased or decreased only by amendment of these Articles of Incorporation the initial Board of Directors shall consist of the following persons at the following addresses

| Name of Directors | Street Address |
|---|---|
| Lane Denton | 401 E 4th St #425, Austin, TX 78701 |
| Hope Dominguez | Rt 1, China Spring TX |
| Kevin Jordan | 206 East 15th, Austin, TX 78701 |

- 8

## ARTICLE 9

## LIMITATION ON LIABILITY OF DIRECTORS

A Director is not liable to the corporation or members for monetary damages for an act or omission in the director's capacity as director except to the extent otherwise provided by a statute of the State of Texas

## ARTICLE 10

### INDEMNIFICATION

The Corporation may indemnify a person who was, is or is threatened to be made a named defendant or respondent in litigation or other proceedings because the person is or was a director or other person related to the Corporation as provided by the provisions in the Act governing indemnification   As provided in the bylaws, the Officers shall have the power to define the requirements and limitations for the Corporation to indemnify directors, officers, members or others related to the corporation

## ARTICLE 11

### CONSTRUCTION

All references in these Articles of Incorporation to statutes, regulations, or other sources or legal authority shall refer to the authorities cited, or their successors, as they may be amended from time to time

## ARTICLE 12

### INCORPORATORS

The name and street address of the incorporator is

Name of Incorporator          Street Address
Lane Denton                   610 Brazos, Suite 425
                              Austin, Texas 78701

## ARTICLE 14

I execute these Articles of Incorporation on June 19 ____, 1990

Lane Denton

ARTICLES OF AMENDMENT

OF

TEXAS HIGHWAY PATROL ASSOCIATION
(a Texas Non-Profit Corporation)



FILED
In the Office of the
Secretary of State of Texas
MAY 2 0 2005
Corporations Section

The following amendments to the Articles of Incorporation are adopted pursuant to the applicable provisions of Article 1396-4 01 et seq , Texas Revised Civil Statutes

## ARTICLE 1

### Name

(There is no change to Article One of the original Articles of Incorporation )

## ARTICLE 2

### Non-Profit Corporation

A    The Corporation is a non-profit corporation

B    Upon the dissolution of the Corporation, assets shall be applied and distributed as follows

(1)    All liabilities and obligations of the Corporation shall be paid, satisfied and discharged, in case its property and assets are not sufficient to satisfy or discharge all the corporation's liabilities and obligations, the corporation shall apply them so far as they will go and to the just and equitable payment of the liabilities and obligations

(2)    Assets held by the Corporation upon condition requiring return, transfer or conveyance, which condition occurs by reason of the dissolution, shall be returned, transferred or conveyed in accordance with such requirements.

(3)    The remaining assets of the Corporation shall be distributed only for tax exempt purposes to one or more organizations which are exempt under Section 501(c)3), U S Internal Revenue Code, or its successor statute, or which are described in Section 170(c)(1) or (2), U S Internal Revenue Code, or its successor statute, pursuant to a plan of distribution adopted as provided in the Texas Non-Profit Corporation Act, Article 1396-1 01, Texas Revised Civil Statutes, or shall be distributed to the federal government, or to a state or local government, for a public purpose  Any such assets not so disposed of shall be disposed of by a court of competent jurisdiction of the county in which the principal office of the Corporation is then located, exclusively for such purposes or to such organization(s) as said Court shall determine, which are organized and operated for such purposes

1

**C** The above provisions amend and entirely replace Article 2 of the original Articles of Incorporation

# ARTICLE 3

## Duration and Powers

**A** The period of its duration is perpetual

**B** The Corporation shall have the power to take any action it deems to be necessary, appropriate or convenient relating to the operation and management of the Corporation, as described in the Texas Non-Profit Corporation Act (Article 1396-1 01, Texas Revised Civil Statutes), or its successor statute

**C** The above provisions amend and entirely replace Article 3 of the original Articles of Incorporation

# ARTICLE 4

## Purposes

The Corporation is organized to protect and promote the interests of labor, and its principal purpose shall be to better the working conditions of people engaged in a common pursuit, which is the work performed by the highway patrol officers of the Texas Department of Public Safety (This provision amends and entirely replaces Article 4 of the original Articles of Incorporation )

# ARTICLE 5

## Restrictions and Requirements

**A** No part of the net earnings of the Corporation shall inure to the benefit of, or be distributable to its members, directors, officers, or other private persons, except that the Corporation shall be authorized and empowered to pay reasonable compensation for services rendered and to make payments and distributions in furtherance of the purposes set forth in Article Four hereof No substantial part of the activities of the Corporation shall be attempting to influence legislation, and the Corporation shall not participate in, or intervene in (including the publishing or distribution of statements), any political campaign on behalf of any candidate for public office

**B** Notwithstanding any other provision of these Articles, the Corporation shall not carry on any other activities not permitted to be carried on by a corporation exempt from Federal Income Tax under Section 501(c)(5) of the U S Internal Revenue Code, or its successor statute

**C** The above provisions amend and entirely replace Article 5 of the original Articles of Incorporation

2

## ARTICLE 6

### Membership

(There is no change to Article 6 of the original Articles of Incorporation )

## ARTICLE 7

### Initial Registered Agent and Agent

(There is no change to Article 7 of the original Articles of Incorporation )

## ARTICLE 8

### Board of Directors

(There is no change to Article 8 of the original Articles of Incorporation )

## ARTICLE 9

### Limitation on Liability of Directors

(There is no change to Article 9 of the original Articles of Incorporation )

## ARTICLE 10

### Indemnification

(There is no change to Article 10 of the original Articles of Incorporation )

## ARTICLE 11

### Construction

(There is no change to Article 11 of the original Articles of Incorporation )

## ARTICLE 12

### Incorporators

(There is no change to Article 12 of the original Articles of Incorporation )

The foregoing amendments were adopted at a meeting of the Board of Directors of the Corporation held on December 6, 2003, receiving the vote of a majority of the directors in office, there being no members having voting rights in respect thereof, and the Board authorized and instructed the undersigned to execute and file this instrument with the Texas Secretary of State to evidence the amendments

Dated and effective as of December 6, 2003

TIM TIERNEY
Executive Vice President

KDB\THPA CLN\THPA-AMD

4

FILED
In the Office of the
Secretary of State of Texas
MAY 20 2005
Corporations Section

ARTICLES OF AMENDMENT

OF

## THE TEXAS HIGHWAY PATROL ASSOCIATION HALL OF FAME AND MUSEUM
(a Texas Non-Profit Corporation)

The following amendments to the Articles of Incorporation are adopted pursuant to the applicable provisions of Article 1396-4 01, Texas Revised Civil Statutes

### ARTICLE ONE

#### Name

The name of the Corporation is TEXAS HIGHWAY PATROL MUSEUM (the "Corporation") (This provision amends and entirely replaces Article One of the original Articles of Incorporation, which stated the name of the corporation as THE TEXAS HIGHWAY PATROL ASSOCIATION HALL OF FAME AND MUSEUM )

### ARTICLE TWO

#### Duration

(There is no change to Article Two of the original Articles of Incorporation )

### ARTICLE THREE

#### Non-Profit Corporation

A     The Corporation is a non-profit corporation

B     No part of the net earnings of the Corporation shall inure to the benefit of, or be distributable to its members, directors, officers, or other private persons, except that the Corporation shall be authorized and empowered to pay reasonable compensation for services rendered and to make payments and distributions in furtherance of the purposes set forth in Article Four hereof  No substantial part of the activities of the Corporation shall be attempting to influence legislation, and the Corporation shall not participate in, or intervene in (including the publishing or distribution of statements), any political campaign on behalf of any candidate for public office

C     Notwithstanding any other provision of these Articles, the Corporation shall not carry on any other activities not permitted to be carried on (a) by a corporation exempt from Federal Income Tax under Section 501(c)(3) of the U S Internal Revenue Code, or its successor statute, or (b) by a corporation, contributions to which are deductible under Section 170(c)(2) of the U S Internal Revenue Code, or its successor statute

1

D  Upon the dissolution of the Corporation, assets shall be applied and distributed as follows

(1)  All liabilities and obligations of the Corporation shall be paid, satisfied and discharged, in case its property and assets are not sufficient to satisfy or discharge all the corporation's liabilities and obligations, the corporation shall apply them so far as they will go and to the just and equitable payment of the liabilities and obligations

(2)  Assets held by the Corporation upon condition requiring return, transfer or conveyance, which condition occurs by reason of the dissolution, shall be returned, transferred or conveyed in accordance with such requirements

(3)  The remaining assets of the Corporation shall be distributed only for tax exempt purposes to one or more organizations which are exempt under Section 501(c)3), U S Internal Revenue Code, or its successor statute, or which are described in Section 170(c)(1) or (2), U S Internal Revenue Code, or its successor statute, pursuant to a plan of distribution adopted as provided in the Texas Non-Profit Corporation Act, Article 1396-1 01, Texas Revised Civil Statutes, or shall be distributed to the federal government, or to a state or local government, for a public purpose  Any such assets not so disposed of shall be disposed of by a court of competent jurisdiction of the county in which the principal office of the Corporation is then located, exclusively for such purposes or to such organization(s) as said Court shall determine, which are organized and operated for such purposes

## ARTICLE FOUR

### Purpose

The Corporation is organized exclusively for charitable, religious, educational or scientific purposes, including, for such purposes, the making of distributions to organizations that qualify as exempt under Section 501(c)(3) of the U S  Internal Revenue Code, or its successor statute  (This provision amends and entirely replaces Article Four of the original Articles of Incorporation )

## ARTICLE FIVE

### Initial Registered Office and Agent

(There is no change to Article Five of the original Articles of Incorporation )

## ARTICLE SIX

### Initial Board of Directors

(There is no change to Article Six of the original Articles of Incorporation )

2

## ARTICLE SEVEN

### Incorporator

(There is no change to Article Seven of the original Articles of Incorporation )

## ARTICLE EIGHT

### Limitation on Liability of Directors

A director is not liable to the Corporation or members for monetary damages for an act or omission in the director's capacity as director except to the extent otherwise provided by a statute of the State of Texas (This is a new provision not included in the original Articles of Incorporation )

## ARTICLE NINE

### Indemnification

The Corporation may indemnify a person who was, is or is threatened to be made a named defendant or respondent in litigation or other proceedings because is or was a director or other person related to the Corporation, as provided by the provisions in the Texas Non-Profit Corporation Act governing indemnification (This is a new provision not included in the original Articles of Incorporation )

The foregoing amendments were adopted at a meeting of the Board of Directors of the Corporation held on December 6, 2003, receiving the vote of a majority of the directors in office, there being no members having voting rights in respect thereof, and the Board authorized and instructed the undersigned to execute and file this instrument with the Texas Secretary of State to evidence the amendments

Dated and effective as of December 6, 2003

TIM TIERNEY
Executive Vice President

KDB\THPA.CLNHOFM-AMD

3

# Articles of Incorporation

FILED
In the Office of the
Secretary of State of Texas

JUL 0 8 1992

Corporations Section

### Article One

### Name

The name of the corporation is .The Texas Highway Patrol Association Hall of Fame and Museum.

### Article Two

### Duration

The Period of its duration is perpetual.

### Article Three

### Nonprofit Corporation

The corporation is a nonprofit corporation. As such a corporation, no part of the corporation's income shall be distributable to its members, directors or officers.

### Article Four

### Purpose

The purposes for which the corporation is organized are to perform charitable activities within the meaning of Internal Revenue Code Section 501(c)(3) and Texas Tax Code Section 11,18(c)(1). Specifically, the corporation is organized to operate a museum dedicated to the Texas highway patrol and to promote a higher level of public awareness and understanding about the Texas highway patrol.

### Article Five

### Initial Registered Office and Agent

the street address of the initial registered office of the corporation is 610 Brazos, Ste. 410, Austin, TX 78701. The name of the initial registered agent at this office is Lane Denton.

## Article Six

### Board of Directors

The number of directors constituting the initial board of directors is three. The names and addresses of the persons who are to serve as directors until their successors are elected and qualified are:

| Name | Address |
| --- | --- |
| Lane Denton | 2815 Rio Grande, Austin, TX |
| Harvey Katz | 1619 New Hampshire, Washington, DC |
| Chris Mashburn | 119 Solon, Waxahachie, TX |

### Article Seven

### Incorporator

The name and address of the incorporator is:

| Name | Address |
| --- | --- |
| Lane Denton | 2815 Rio Grande, Austin, TX |

Lane Denton , Incorporator



# The State of Texas

## SECRETARY OF STATE

## CERTIFICATE OF INCORPORATION

### OF

THE TEXAS HIGHWAY PATROL ASSOCIATION HALL OF FAME AND MUSEUM
CHARTER #1236871

The undersigned, as Secretary of State of the State of Texas, hereby certifies that Articles of Incorporation for the above corporation duly signed pursuant to the provisions of the Texas Non-Profit Corporation Act, have been received in this office and are found to conform to law.

ACCORDINGLY, the undersigned, as Secretary of State, and by virtue of the authority vested in the Secretary by law, hereby issues this Certificate of Incorporation and attaches hereto a copy of the Articles of Incorporation.

Dated ___JULY 8_____, 19__92___.



_John Hannah Jr._
_Secretary of State_

mfg



FILED
In the Office of the
Secretary of State of Texas

AUG 1 8 1999

# APPLICATION FOR CERTIFICATE OF AUTHORITY Corporations Section

Pursuant to the provisions of article 8.05 of the Texas Business Corporation Act, the undersigned corporation hereby applies for a certificate of authority to transact business in Texas:

1. The name of the corporation is __THPA SERVICES, INC.__

2. A. If the name of the corporation in its jurisdiction of incorporation does not contain the word "corporation," "company," "incorporated," or "limited" (or an abbreviation thereof), then the name of the corporation with the word or abbreviation which it elects to add for use in Texas is:

   B. If the corporate name is not available in Texas, then set forth the name under which the corporation will qualify and transact business in Texas: __THPA AFFILIATE SERVICES, INC.__

3. It is incorporated under the laws of __THE DISTRICT OF COLUMBIA__

4. The date of its incorporation is __MAY 26, 1994__ and the period of duration is __PERPETUAL__ .(State "Perpetual" or term of years.)

5. The address of its principal office in the state or country under the laws of which it is incorporated is: __SUITE A-211, 101 G STREET, SW, WASHINGTON, DC 20024__

6. The street address of its proposed registered office in Texas is (a P.O. Box is not sufficient) __8906 WALL ST., #409, AUSTIN, TEXAS 78754__

   and the name of its proposed registered agent in Texas at such address is __TIM TIERNEY__

7. The purpose or purposes of the corporation which it proposes to pursue in the transaction of business in Texas are:

PROVIDING MEMBERSHIP AND OTHER SERVICES TO POLICE MEMBERSHIP ASSOCIATIONS

8. It is authorized to pursue such purpose or purposes in the state or country under the laws of which it is incorporated.

9. The names and respective addresses of its directors are:

| NAME | ADDRESS |
|---|---|
| HARVEY M. KATZ | STE A-211, 101 G ST., SW, WASHINGTON, DC 20023 |
| TIM TIERNEY | 8906 WALL ST., STE 402, AUSTIN, TX 78754 |
| LANE DENTON | 8906 WALL ST., STE 402, AUSTIN, TX 78754 |

10. The names and respective addresses of its officers are:

| NAME | ADDRESS (city and state) | OFFICE |
|---|---|---|
| HARVEY M. KATZ | STE A-211, 101 G ST., SW, WASHINGTON, DC20023 | PRESIDENT |
| LANE DENTON | 8906 WALL ST., STE 402, AUSTIN, TX 78754 | VICE PRESIDENT |
| TIM TIERNEY | 8906 WALL ST., STE 402, AUSTIN, TX 78754 | SECRETARY/TREASURER |

11. The aggregate number of shares which it has authority to issue, itemized by classes, par value of shares, shares without par value, and series, if any, within a class, is:

| NUMBER OF SHARES | CLASS | SERIES | PAR VALUE PER SHARE OR STATEMENT THAT SHARES ARE WITHOUT PAR VALUE |
|---|---|---|---|
| 1,000 | COMMON | ONE | WITHOUT PAR VALUE |
| | | | |
| | | | |

The aggregate number of its issued shares, itemized by classes, par value of shares, shares without par value, and series, if any, within a class, is:

| NUMBER OF SHARES | CLASS | SERIES | PAR VALUE PER SHARE OR STATEMENT THAT SHARES ARE WITHOUT PAR VALUE |
|---|---|---|---|
| 100 | COMMON | ONE | WITHOUT PAR VALUE |
|  |  |  |  |
|  |  |  |  |

13. The amount of its stated capital is $ 1,000.00 . (See instructions for definition of stated capital.)

14. Consideration of the value of at least One Thousand Dollars ($1,000.00) has been paid for the issuance of its shares.

15. The application is accompanied by a certificate issued by the secretary of state or other authorized officer of the jurisdiction of incorporation evidencing the corporate existence and dated within 90 days of the date of receipt of the application.

THPA SERVICES, INC.
Name of Corporation

By: TIM TIERNEY

Its  SECRETARY/TREASURER
Authorized Officer

# Century Animal Hospital



512-442-9518

801 E. William Cannon Dr.
Austin, Texas          78745

**Tim Tierney**
**1004 Elm St**
**Austin, TX  78703**

Invoice Nº:          **43173**

Date:          **February 19, 2008**

| ID | Patient | Code | Description | Qty | Price | Ext | N/A | TX |
|----|---------|------|-------------|-----|-------|-----|-----|-----|
| CAH | Bert | B901 | Bordetella | 1.0 | 13.50 | 13.50 | N/A | |
| CAH | Bert | A1703 | HAZARDOUS WASTE FEE | 1.0 | 4.75 | 4.75 | N/A | |
| VB | Lou | AB02 | Ultrasound - Diagnostic (L.H.) | 1.0 | 202.00 | 202.00 | N/A | |
| VB | Lou | A4309 | Blood Pressure Measurement | 1.0 | 30.00 | 30.00 | N/A | |
| CKN | Bert | B901 | Bordetella | 1.0 | 13.50 | 13.50 | N/A | |
| CKN | Bert | A1807 | HAZARDOUS WASTE FEE | 1.0 | 4.75 | 4.75 | N/A | |
| CKN | Bert | A4002 | Examination/Consultation | 1.0 | 48.00 | 48.00 | N/A | |
| CKN | Bert | B1121 | Amoxitabs 400mg Tablet | 30.0 | N/A | 37.45 | N/A | |
| CKN | Bert | A1104 | Blood Chemistry/CBC/T4 | 1.0 | 95.00 | 95.00 | N/A | |

Tx1: Sale tax

Notes:

Ip

| | | |
|---|---|---|
| Subtotal | 448.95 | N/A |
| | N/A | |
| Sale tax | 0.00 | |
| Sale amount | 448.95 | |

| Prior balance | Sale amount | Payment | By | Balance owing |
|---------------|-------------|---------|-----|---------------|
| 0.00 | 448.95 | 232.00 | Visa/MC | 216.95 |
| | | 216.95 | Visa/MC | 0.00 |

Office Hours:  Monday - Friday 7:30 am - 6:00 pm
Doctors' Hours by appointment

We treat your pet as though it were our own.
Thank you for entrusting us with your pet's care.

Remember to give monthly heartworm preventative to both dogs and cats.
Go to: www.remindmypet.com to get an email reminder at no cost.
Visit our website at www.centuryanimalhospital.com



PLAINTIFF'S
EXHIBIT

# Century Animal Hospital



801 E. William Cannon Dr.
Austin, Texas          78745

**Tim Tierney**
**1004 Elm St**
**Austin, TX  78703**

Invoice N°: 50583

Date: October 15, 2008

| ID | Patient | Code | Description | Qty | Price | Ext | N/A | TX |
|----|---------|------|-------------|-----|-------|-----|-----|----|
| VB | Lou | A4309 | Blood Pressure Measurement | 1.0 | 30.00 | 30.00 | N/A | |
| VB | Lou | A4002 | Examination/Consultation | 1.0 | 50.00 | 50.00 | N/A | |
| VB | Lou | A1104 | Blood Chemistry/CBC/T4 | 1.0 | 100.00 | 100.00 | N/A | |
| VB | Lou | A1A03 | HAZARDOUS WASTE FEE | 1.0 | 4.75 | 4.75 | N/A | |
| VB | Sebastian | A1710 | VARL 40 Allergen Test | 1.0 | 150.00 | 150.00 | N/A | |
| VB | Sebastian | A2026 | HAZARDOUS WASTE FEE | 1.0 | 4.75 | 4.75 | N/A | |
| VB | Sebastian | A4002 | Examination/Consultation | 1.0 | 50.00 | 50.00 | N/A | |
| VB | Bert | A701 | Dental Cleaning - Routine K-9 | 1.0 | 85.00 | 85.00 | N/A | |
| VB | Bert | A2703 | Anesthesia IV + Isoflurane | 1.0 | 88.00 | 88.00 | N/A | |
| VB | Bert | A2701 | Anesthetic Monitoring | 1.0 | 15.00 | 15.00 | N/A | |
| VB | Bert | A2709 | Propoflo | 1.0 | N/A | 19.33 | N/A | |
| VB | Bert | A4317 | Catheterization IV | 1.0 | 42.00 | 42.00 | N/A | |
| VB | Bert | A4335 | Fluids Intravenous + IV Setup | 1.0 | 50.00 | 50.00 | N/A | |
| VB | Bert | B2003 | Acepromazine Inj. 10mg/ml | 0.1 | N/A | 17.05 | N/A | |
| VB | Bert | A4031 | HAZARDOUS WASTE FEE | 1.0 | 4.75 | 4.75 | N/A | |
| VB | Bert | A727 | OraVet Barrier Sealant | 1.0 | 15.00 | 15.00 | N/A | |
| VB | Bert | C3215 | T/D sample | 1.0 | N/A | 0.00 | N/A | |
| VB | Bert | B2105 | Cefazolin Sodium  100mg/ml | 6.0 | N/A | 24.34 | N/A | |
| VB | Bert | A4002 | Examination/Consultation | 0.5 | 50.00 | 25.00 | N/A | |
| VB | Bert | A2704 | Anesthesia Iso Add'l/Minute | 55.0 | 2.00 | 110.00 | N/A | |
| VB | Bert | A708 | Oral Periodontal Therapeutic | 1.0 | 58.00 | 58.00 | N/A | |
| VB | Bert | B1165 | Clindamycin HCL150mg Caps | 20.0 | N/A | 13.75 | N/A | |

Tx1: Sale tax

Notes:

k s

| | | |
|---|---|---|
| Subtotal | 956.72 | N/A |
| | N/A | |
| Sale tax | 0.00 | |
| Sale amount | 956.72 | |

| Prior balance | Sale amount | Payment | By | Balance owing |
|---------------|-------------|---------|-----|---------------|
| 0.00 | 956.72 | 771.97 | Visa/MC | 184.75 |
| | | 184.75 | Visa/MC | 0.00 |

Office Hours:  Monday - Friday 7:30 am - 6:00 pm
Doctors' Hours by appointment

We treat your pet as though it were our own.
Thank you for entrusting us with your pet's care.

THP CID Response Oct. 2011 - 000167

A.    Yeah.  He used to have one.  He no longer does.

Q.    **Why doesn't he have one anymore?**

A.    He works mostly out of Mexico, creating our magazine; and so there's no reason for him to be needing any charges of any type, business charges.  If there's items such as software that he needs, we purchase it either on my card -- well -- or -- it would come from my card.  Then it would go to him.

Q.    **Okay.  Let's talk a little bit about Lou.  Lou is the office cat, correct?**

A.    Yes.

Q.    **And you talked a little bit about Lou with Mr. Custer in the San Antonio office, correct?**

A.    Yes.

Q.    **You made the comment that you always wondered what you would say about the office cat if ever questioned by the IRS.**

A.    Right.

Q.    **Why would you say something like that?**

A.    Well, because I don't know how to code Lou under all of our categories of codings, which I gave you yesterday.  And Sandy Simmons said to code him as an office supply so -- because we don't have a vet category so --

Q.    **Okay.  How does having an office cat further**

PLAINTIFF'S
EXHIBIT

the mission of the Texas Highway Patrol Museum or Association?

A. Well, it is important -- our employees are happy having a cat around.

Q. Is the mission of the entity to keep the employees happy?

A. Well, I think in any job, you want to keep employees happy.

Q. How do you think the consumers of Texas who are giving money that's to be used to help slain troopers would feel about their money going to pay for an office cat?

MR. BROWN: Objection. Form.

Q. (BY MS. MEINKE) Go ahead. Answer it.

A. I don't know. You're -- I don't know.

Q. Do you ever give money to charities yourself personally?

A. Yes.

Q. Who do you donate to?

A. Gold Ribbon Rescue on occasion. That's the -- that's mostly the one that I donate to.

Q. Who are some others that you donated to?

A. I don't remember.

Q. Would it bother you if the money you gave to Gold Ribbon Rescue went to help pay for trips for the

places you visited in San Diego?

A.    I don't remember.  I'd have to look it up.

Q.    And tell me again how the amusement, going to Sea World, is a business expense.

A.    It's just part of meal and entertainment at the time.

Q.    Okay.  Is it a prudent business expense for a public charity?

A.    It may have been paid out of THPA Services. I'm not sure how it was coded.

Q.    Anybody else accompanying you on that trip?

A.    I believe my son was with me at the time.

Q.    Did one of the entities pay for your son to travel there as well?

A.    I don't remember.  Let's see.  I don't -- on here I don't see a -- an airline charge, so let me look back here.  Okay.  Yeah.  It looks like Bill Billingsley was there and my son David was there.

Q.    Okay.  And who paid for Bill Billingsley and your son?

A.    The company.

Q.    Is that a prudent business expense?

A.    I believe so.

Q.    Why?

A.    Because they were accompanying me on my trip.

PLAINTIFF'S EXHIBIT
28

Q. Did they help do any business for the organizations?

A. Well, I mean, I would -- I bounce off ideas from different people, so I'm sure I must have talked with Bill about items.

Q. Does he work for the organization?

A. No, he does not.

Q. Could you have picked up the phone and called him?

A. Probably could have.

Q. How do you think the public who donate would feel about Bill Billingsley and your son going on that trip?

A. I don't know.

MR. BROWN: Objection to the form of the question to the extent that it assumes information not in evidence.

Q. (BY MS. MEINKE) Whatever came of having a different publisher handle the magazine?

A. We still haven't gotten a resolution of that yet.

Q. Are you going to do it?

A. We're thinking about it. We're thinking about not doing it in-house still.

Q. Is that discussed at a board meeting?

(Exhibit No. 15 marked)

Q.    (BY MS. MEINKE) And the date of the transaction I'm looking at is May 14, 2010, of Johnson IMAX Theater and May 14, 2010, Lockheed Martin IMAX.

Can you please tell me what those are?

A.    I believe they are movies at one of the -- the Air and Space Museum in Washington, D.C.

Q.    Okay.  Both of them are?

A.    I don't know.  I would guess so, because it says Washington.  But I know Lockheed Martin sounds like the Air and Space Museum.  I'm not sure about Johnson.

Q.    Can you tell me how that expense related to the business of the entities?

A.    It was a meal and entertainment expense while in Washington, D.C.

Q.    And is it's a prudent and reasonable expense?

A.    Yes.

Q.    And then, also, on Exhibit 15, if you could look at May 20, 2010, and explain to me how a 69-dollar charge to Gold Class Cinema in Austin is a business expense.

A.    I'm not sure who went with me at the time.  It could have been one of the people that I -- like our -- I mean, I'm giving an example -- like, our insurance agent would have gone with me.  I'm not sure who it was



PLAINTIFF'S
EXHIBIT
39

at the time.

Q.    What is Gold Class theater?

A.    It a movie theater.

Q.    Can you tell me about the movie theater?

A.    It has seats.  They show movies.

Q.    It is a typical movie theater like an AMC theater.

A.    I believe so.

Q.    $69 is a pretty steep charge even though we both know movies are expensive that day.

What all would have been bought at the movie theater?

A.    Maybe a drink or snacks or --

Q.    Do they serve alcoholic beverages there?

A.    Yes.

Q.    Do you think that's a prudent business expense?

A.    Yes.

Q.    And tell me again how that is a prudent business expense.

A.    Because if I have it as a meal and entertainment expense, depending on who I was there with, we were discussing business in their lounge before the movie.

Q.    Okay.  I was going to say, how would you discuss business in the middle of a movie.

What kind of business would you have been discussing at a movie theater?

A. It wouldn't have been during the movie. It would have been in the lounge before the movie.

Q. Right. And what kind of business would you have been discussing?

A. Well, during that time if it was our health insurance agency, we'd be -- renewal. Our renewal's used to be in June. So we would have been discussing health insurance.

Q. And you had to do that at a movie theater?

A. Could have been done at a restaurant.

Q. Why not just do it over the phone?

A. I don't know.

Q. All the charges that we've discussed thus far -- the IMAX theater, Sea World, Gold Class Cinema -- did it ever cross your mind that maybe you should reimburse the entity with your own personal money for these expenses?

A. No.

Q. Does your accountant know that you're conducting business at movie theaters?

A. Well, they would see meal and entertainment expenses.

Q. Is that a yes or a no?

A.    No.

Q.    Can you give me receipts of who was present at these meetings?

A.    I don't keep receipts on those.

Q.    Wouldn't it be a prudent business practice to keep records of all your business meetings and appointments?

A.    It could be; but since it's just me, I don't -- I don't keep those.

Q.    But you just stated these were for business purposes?

A.    Correct.  I use the business card for business purposes.

Q.    What do you think Mark Lockridge would say if he knew you were doing this?

A.    I think he would say this is a meal and entertainment expense.

Q.    Has he ever been made aware of some of your charges?

A.    No.

Q.    What about Fifth Street Car Wash in Austin?  Is a car wash a reasonable and prudent business?

A.    Yes.

Q.    It is?  How is that?

A.    Because the company car needs to be washed.

PLAINTIFF'S
EXHIBIT

30

Q.    Okay.  But you also said you have your own personal car.

A.    Right.

Q.    Can you show me how we would know this is for the company car?

A.    Well, my personal car -- I can't show you that, no.  What are the charges on that?

Q.    $3.25 on May 24.

A.    Okay.

Q.    Do you conduct business meetings at Hut's Hamburgers in Austin?

A.    I conducted business meetings at many restaurants in Austin.

Q.    Why do you do business meetings of a public charity at restaurants and movie theaters?

A.    I don't know.  Why not?

Q.    Okay.  Who is -- I'm probably going to butcher this name -- Patricia -- Patricia -- Huhnen, H-u-h-n-e-n?

A.    She's an exchange student that I had last year living with me.

Q.    Okay.  On May 28 She went from Henderson, Nevada, to Dallas; and looks like the final designation was Hawaii.

A.    Henderson is the location of our travel agency.

PLAINTIFF'S EXHIBIT

31

Q.    Okay.

MS. MEINKE:  I'm losing track of what number we're on.  Number 16.

(Exhibit No. 16 marked)

Q.    (BY MS. MEINKE) May 28.  Explain to me how flying your exchange student to Hawaii is a prudent and reasonable business expense for a public charity.

A.    That would not be.  That should have been on my personal credit card.

Q.    Did you reimburse the entity for that?

A.    I don't recall.  I don't recall.

Q.    Can you check to refresh your memory?

A.    I can check.

Q.    Who is Gene Billingsley?

A.    Gene Billingsley.  I think that's Bill Billingsley's middle name.  Gene.

(Exhibit No. 17 marked)

Q.    (BY MS. MEINKE)  I'm handing you what's been marked as Exhibit 17.  In September of '09, you and Gene Billingsley, and then someone else, Billingsley, Tierney --

A.    David.

Q.    David, your son, went to San Jos�, California, on Alaska Airlines.

Can you please tell me how that is a

reasonable and prudent business expense?

A.    When I was out there, I was consulting with somebody about business ideas.

Q.    Okay.  Who was that somebody, and what were those business ideas?

A.    Robert Lewis and museum-related -- either expansion or -- it could have been about the magazine.  I don't really recall.  This is in 2009.

Q.    Who is Robert Lewis?

A.    He is my uncle.

Q.    And how -- why would you be consulting your uncle on museum-related expansion?

A.    Because he was a president and vice president of a hardware store in that area and is very knowledgeable in business.

Q.    Okay.  So what's the name of the hardware store?

A.    It's Orchard Supply Hardware.

Q.    Does he own it?

A.    My grandfather started it with some other people.

Q.    So what is Robert Lewis's position with the company?

A.    He's no longer with the company.  He's retired.

Q.    When did he retire?



PLAINTIFF'S EXHIBIT

Q.   Why would Services Inc. be paying for a museum-related business trip?

A.   Well, some of it's repeated in that there's the magazine and there's discussion about that.  So if it was discussing publishing of the magazine or ideas -- story ideas of the magazine.

Q.   But you just said you were going out there to talk about -- to talk to Robert Lewis about expanding the museum.

A.   Well, I'm sure we talked about all of the -- the whole entire organization.  This is, again, 2009.  I don't recall exactly everything that we talked beaut.

Q.   Does your uncle typically advise you on the magazine in the museum?

A.   Not typically.

Q.   How many times has he advised you in the past?

A.   Well, every time I see him, we would -- I don't know how many times.

Q.   Have you ever paid him?

A.   No.

     (Exhibit No. 18 marked)

Q.   (BY MS. MEINKE)  And I also want to hand you, continuing with American Express statement, Exhibit 18.

          In May you took a trip, yourself, to Boston with your son, and with a Michael Jones, to

Q. What about C.R.? Do you review his credit card charges?

A. Again, I code -- I send them to him in the mail -- or in the e-mail, the spreadsheet; he codes them and sends them back to me, and I put it in the computer.

Q. Okay. Just so I can understand, when you say C.R. codes them, what does that mean?

A. That's the coding of like whether it's an office expense or an office supply or telephone or meal and entertainment.

Q. Does C.R. have a vehicle?

A. Not a company vehicle, no.

Q. Okay. Then why on his credit card does he have two charges to XM satellite radio?

A. I don't know.

Q. Does that bother you?

A. Well, he drives from El Paso to Houston frequently, so it doesn't bother me.

Q. So you think that's a prudent business expense --

A. Yes, I do.

Q. -- for a public charity to pay for satellite radio on a personal vehicle of one of your employees?

A. Yes.

(Exhibit No. 24, 25, 26 marked)

PLAINTIFF'S
EXHIBIT

33

A.    I'm pretty positive that's the way it is.  I mean, we can look at the tax records.

Q.    Have these been the same board members -- or how long have these individuals been the board members?

A.    I don't remember when everyone started.  I would -- I'm guessing that they've all been at least ten years on the board.

Q.    On all three boards?

A.    Yes.

Q.    Do any of these individuals have any type of financial expertise that you're aware of?

A.    I'm not aware.

Q.    Do any of these board members have any say in the compensation that's given to yourself or any of the other employees of the organization?

A.    They haven't in the past, no.

Q.    Have you ever discussed compensation at the board meetings?

A.    I don't recall.  I don't believe so.

Q.    Have any of the board members ever inquired about the compensation of yourself or any of the other employees?

A.    No.

Q.    What does Mark Lockridge do as president of the museum?

PLAINTIFF'S
EXHIBIT
34

A. He holds the title of president of the museum.

Q. Does he have any involvement in anything other than holding the title?

A. Well, he's a trooper. He's involved with other troopers.

Q. But as far as any operations of the organization --

A. No.

Q. What about Greg Greer? What does he do?

A. Same answer as Mark Lockridge.

Q. Which was?

A. That he's a trooper, highway patrol trooper, and he represents the troopers and brings questions to the board meetings, if there's questions, or informs us of what's going on with other troopers.

Q. What types of questions has he brought up at the board meetings?

A. Well, we discuss medal of valor awards that we give out. We discuss how the magazine articles are and if there's any suggestions for future articles. This last meeting, we discussed creating a humanitarian award for one particular trooper who went out of his way to help out in Dallas at a food shelter.

Q. And that humanitarian award was discussed at the November 12 board meeting.



# Attorney General of Texas
## Greg Abbott

**Consumer Protection Division**
Complaint Form Report

Today's Date:     08/06/2010 15:18
Complaint:          338858

### Consumer's Information:

**Name:**    Vogt, John

**Address:**    1252 N> Main St.

**City, State, Zip:**    Boerne, TX  78006
**County:**

Date Filed:     4/19/2010

Home Phone:    (830)2492884
Work Phone:
**Age:**   65 or Over
Support documents will be sent:

Staging ID: 32518

### Business or individual complaint is filed against:

**Business:**    Texas Highway Patrol
**Address:**    501 Oakland Blvd.

Phone:
Contact Person:

**City, State, Zip:**
**County:**

Website:
Email address:

First Contacted Via:

   (other):

Solicitation Other Language:   6

Where transaction took place:    Austin

   (other):    Austin

Transaction Dates:    2/3/2010 00:00:00

Contract Signed:     No
Original Amount:
Amount Paid:
Payment:    Unknown
Date Of Payment:

Complained to Business:
If so, when?
Business Response?
none
Have you contacted another agency or attorney about this complaint?
Name and Address of agency or attorney?
No

What action was taken by this agency or attorney?
Description Of Complaint:
company called and asked for donation. I refused. several days later received a bill. and another, a phone call and another and another. Each time they were told to quit calling.  No effect.



PLAINTIFF'S EXHIBIT
36



# Attorney General of Texas
## Greg Abbott

### Consumer's Information:

**Name:**   Dobbs, Ted

**Address:**   507 Indian Creek Drive

**City, State, Zip:**   Trophy Club, TX 76262

**County:**

**Date Filed:**   3/18/2011

**Home Phone:**   (817)4301065

**Work Phone:**   (214)214-244-5011

**Age:**   30 to 39

**Support documents will be sent:**

**Staging ID:** 52568

### Business or individual complaint is filed against:

**Business:**   Texas Highway Patrol Association & M

**Address:**   501 Oakland Avenue

**City, State, Zip:**   Austin, TX 78703-5113

**County:**

**Phone:**   (800)2458598

**Contact Person:**   , ng to anyone

**Website:**   www.thpm.org

**Email address:**

**First Contacted Via:**

   (other):

**Solicitation Other Language:**   6

**Where transaction took place:**   Austin

   (other):   Austin

**Transaction Dates:**   3/15/2011 00:00:00

**Contract Signed:**   No

**Original Amount:**   100.000

**Amount Paid:**   100.000

**Payment:**   Unknown

**Date Of Payment:**

---

**Complained to Business:**

**If so, when?**

**Business Response?**

They said they would remove me from the list that, and that they completely understand why I'm filing a complaint. Especially, since they never called me despite the bill they sent saying so. They've called in the past, and have been very aggressive about getting a donation. I've repeatedly said no, and to remove me off the list.

**Have you contacted another agency or attorney about this complaint?**

**Name and Address of agency or attorney?**

Yes

**What action was taken by this agency or attorney?**

They connected me to this site to file a formal complaint.

**Description Of Complaint:**

I received a bill for $100 from The Texas Highway Patrol Association & Museum with a claim that they called on March 12, 2011. I don't even have a voice mail from them. I don't understand how it can be legal for a non-profit to bully people into making donations by sending out a bill with a due date and amount implying that if you don't pay you will get bad credit. Donations are something that you give out of kindness not out of fear. The fact that they are seemingly associated with the Texas Highway Patrol makes it that much more intimidating.

Page 1 of 1





# TEXAS HIGHWAY PATROL
## ASSOCIATION & MUSEUM

www.thpm.org

YOUR CONTRIBUTION TO THE
**TEXAS HIGHWAY PATROL ASSOCIATION and MUSEUM**
IS GRATEFULLY ACKNOWLEDGED AND APPRECIATED

Local Office:

Called Date    03/12/20

Contributor #   482126

Payable Upon Receipt                    $.

Due On:   03/15/2011

MR. TED DOBBS
507 INDIAN CREEK DR
ROANOKE TX 76262-9773

*(handwritten)* HEADQUARTERS — 512-424-2000
— 800-621-0508
TX ATTORNEY GOV —
CONSUMER PROTECTION DIVISION — 800-648-9642

En Espanol revise detras de es
*Spanish Translation*

The Texas Highway Patrol Association and Museum represents our state's dedicated Highway Patrol Officers — men and wome front lines who are prepared to make the ultimate sacrifice protecting our streets, communities and neighborhoods.

Your generous donation is tax deductible, and will be used to support the museum and programs honoring these dedicated in Your donation helps provide a death benefit fund, dental insurance, scholarships for the children of Texas troopers, exhibits, ed programs and events benefiting our youth, community and law enforcement across the state.

Of course, you are under no obligation to support THPA and your support does not entitle you to any legal privileges or im Our program is operated solely by the Texas Highway Patrol Association and Museum and its employees. THPA does not outside fund-raising company. Thus, 100% of the funds raised remain with THPA and its programs.

You may obtain additional information about our organization by contacting THPA's administrative offices at 501 Oaklan Austin, TX 78703 or by calling (800) 245-8598. You may also contact the Texas Secretary of State at 1019 Brazos Street, Room 21 TX 78701, (800) 648-9642.

Contributions or gifts to the Texas Highway Patrol Association and Museum, a 501(c)(3) organization, are considered non charitable contributions for federal income tax purposes as designated by the Internal Revenue Service.

We have included a brochure that explains our benefits and programs offered by the Texas Highway Patrol Association and The museum is open to the public Tuesday through Saturday from 10a.m. to 4pm. To visit the museum, please stop by 812 Sou Street in San Antonio, Texas.

RETAIN THIS PORTION FOR YOUR RECORDS   *Guarde esta porcion para sus archivos*

*A portion of the funds raised will be used to defray some of the administrative and operational expenses*

---

817-430-1065         **TEAR HERE / ARRANCA AQUI**                    03/12/2

MR. TED DOBBS
507 INDIAN CREEK DR
ROANOKE TX 76262-9773

Please Make Check Payable To:
*Por favor as el cheque para:*
**TEXAS HIGHWAY PATROL
ASSOCIATION & MUSEUM**
Contributor #
                                     482126
Paid Amount $ 100.00

The address below should appear in the window of the return envelope
*Ten cuidado que la dirección abajo aparece en la ventana del sobre*

Texas Highway Patrol Association and Museum
Administrative Office
501 Oakland Avenue
Austin TX 78703-5113    #437

☐ Please send me an additional decal
*Por favor me puede mandar dos calcomonias adiciona.*

☐ I would like to make an additional donation of $
   ☐ Death Benefit          ☐ Dental Insu

**GREG ABBOTT**
Attorney General of Texas

File#: ᵛ

Consumer Complaint Form

! The information you report on this form will be used to help us investigate violations of consumer laws.
! **The Attorney General's Office does not resolve individual consumer complaints.**
! This complaint and the information you provide are records open to the public under Texas Law.
! We may send a copy of this form to the Business, so **please write legibly and use black ink only.**
! Please attach copies of any documents necessary to explain the transaction but **do not send original documents.**
! The Attorney General's Office will contact you if additional information is needed.

| Consumer Information | Business or Individual Complaint is Against |
|---|---|
| Name  Jana Jones | Name  Texas Highway Patrol Assn |
| Address  16513 CR 1450 | Address  501 Oakland Ave |
| City  Wolfforth | City  Austin |
| State  Texas          Zip  79382 | State  Texas          Zip  78703-5113 |
| Home Phone (806) 863-4290  Work Phone (806) 775-7894 | Phone (888) 745-8598 |
| Email address  janasjones@hotmail.com | Person you dealt with: Can't remember officer's name |
| Age ☐Under 19 ☐20-29 ☐30-39 ☐40-49 ☑50-59 ☐60-64 ☐65 or over | Website or Email address: |

1. Initial contact between you and the business:
   ☐ Person came to my home
   ☐ I went to company's place of business
   ☑ I received a telephone call from business
   ☐ I telephoned the business
   ☑ I received information in the mail
   ☐ I responded to radio/television ad
   ☐ I responded to printed advertisement
   ☐ I responded to a Website or e-mail solicitation
   ☐ I responded to a solicitation in a language other than English (What language?)
   ☐ Other _____

2. Where did the transaction take place?
   ☑ At home
   ☐ At business
   ☐ By mail
   ☐ Over the phone
   ☐ Over the computer
   ☐ Trade Show or Hotel
   ☐ Other _____

3. Date(s) of Transaction(s)
   1/12/11

4. Did you sign a contract?
   ☐ Yes (please enclose a copy)
   ☑ No

5. How much did the company/individual ask you to pay? 25.00

6. How much did you actually pay? $ Did not pay   ☐ Cash ☐ Credit Card ☐ Loan ☐ Check
   ☐ Bank Account Debit ☐ Wire Transfer ☐ Money Order ☐ Cashiers Check ☐Debit Card

   Date(s) of Payment: N/A

**PLAINTIFF'S EXHIBIT**

37

7. Have you contacted another agency or attorney about this complaint? ☐ Yes ☑ No
   If yes, list name and address of the agency or attorney.
   _____
   _____
   _____

8. What action was taken by this agency or attorney?
   Asked to file a complaint
   _____

9. Please describe your complaint in detail (attach extra sheets if necessary).
   Call came in the evening at my home. The officer Identified himself as a Highway Patrolman soliciting support for local fallen officers families - 9 in our local area in 2010. Asked for $100⁰⁰ or more pledge but anything in $5.00 increments would help. He also stated he was an active volunteer officer himself. He guarenteed all funds stayed local. He stressed this is not a scam since I was skeptical. He did state that it would be very helful if I had the support sticker on my windshield or car if I was stopped in the future.
   I heard on the local news that night that there was a law enforcement solisiting scam going on in our area + it gave a # to contact the attorney general's office. The charitable Trust Dept asked that I file a complaint.
   Attached are the copies of the forms + stickers I received.

10. Have you complained to the business? ☑ No ☐ Yes  If yes, when? _____
    What was the business' response?
    _____
    _____
    _____
    _____

11. Have you been sued in relation to this transaction?
    NO

Texas law prohibits us from giving legal advice or opinions or acting as your personal attorney. If you desire legal advice, we suggest you consider contacting a private attorney to discuss your complaint.

In signing this complaint I understand that the Attorney General does not represent private citizens seeking the return of their money or other personal remedies. I am filing this complaint for informational purposes only.
**The above statements are true and accurate to the best of my knowledge.**

Signature _____   Date 1/19/11

Please return this form to:  Office of the Attorney General
                             P.O. Box 12548
                             Austin, Texas 78711-2548

FORM 05-002-E
MARCH 2004



# TEXAS HIGHWAY PATROL
## ASSOCIATION & MUSEUM

www.thpm.org

YOUR CONTRIBUTION TO THE
TEXAS HIGHWAY PATROL ASSOCIATION and MUSEUM
IS GRATEFULLY ACKNOWLEDGED AND APPRECIATED

Local Office: (281) 469 9511

Called Date 01/12/2011

Contributor # 448148

$ 25.00

Payable Upon Receipt

Due On: 01/16/2011

MRS. JANA JONES
16513 COUNTY ROAD 1450
WOLFFORTH TX 79382-4733

En Espanol revise detras de esta pajema
*Spanish Translation on reverse*

The Texas Highway Patrol Association and Museum represents our state's dedicated Highway Patrol Officers – men and women on the front lines who are prepared to make the ultimate sacrifice protecting our streets, communities and neighborhoods.

Your generous donation is tax deductible, and will be used to support the museum and programs honoring these dedicated individuals. Your donation helps provide a death benefit fund, dental insurance, scholarships for the children of Texas troopers, exhibits, educational programs and events benefiting our youth, community and law enforcement across the state.

Of course, you are under no obligation to support THPA and your support does not entitle you to any legal privileges or immunities. Our program is operated solely by the Texas Highway Patrol Association and Museum and its employees. THPA does not utilize an outside fund-raising company. Thus, 100% of the funds raised remain with THPA and its programs.

You may obtain additional information about our organization by contacting THPA's administrative offices at 501 Oakland Avenue, Austin, TX 78703 or by calling (800) 245-8598. You may also contact the Texas Secretary of State at 1019 Brazos Street, Room 214, Austin, TX 78701, (800) 648-9642.

Contributions or gifts to the Texas Highway Patrol Association and Museum, a 501(c)(3) organization, are considered non-profit or charitable contributions for federal income tax purposes as designated by the Internal Revenue Service.

We have included a brochure that explains our benefits and programs offered by the Texas Highway Patrol Association and Museum. The museum is open to the public Tuesday through Saturday from 10a.m. to 4p.m. To visit the museum, please stop by 812 South Alamo Street in San Antonio, Texas.

### RETAIN THIS PORTION FOR YOUR RECORDS / *Guarde esta porcion para sus archivos*

*A portion of the funds raised will be used to defray some of the administrative and operational expenses.*

806-863-4290

## TEAR HERE / ARRANCA AQUI

01/13/2011

MRS. JANA JONES
16513 COUNTY ROAD 1450
WOLFFORTH TX 79382-4733

Please Make Check Payable To:
*Por favor as el cheque para:*
TEXAS HIGHWAY PATROL
ASSOCIATION & MUSEUM
Contributor #
448148
Paid Amount $ 25.00

The address below should appear in the window of the return envelope /
*Ten cuidado que la dirección abajo aparece en la ventana del sobre*

Texas Highway Patrol Association and Museum
*Administrative Office*
501 Oakland Avenue    #537
Austin TX 78703-5113

☐ Please send me an additional decal
*Por favor me puede mandar dos calcumonias adicional*

☐ I would like to make an additional donation of $_____
    ☐ Death Benefit    ☐ Dental Insurance
    ☐ Scholarship Fund    ☐ General Programs
    ☐ Educational Youth Programs

RETURN THIS PORTION WITH YOUR CHECK IN THE ENVELOPE PROVIDED / *Regrese esta porcion con su cheque o money order*

Estimado Amigo,

Nuestros Miembros Oficiales del Highway Patrol Museo quieren darle las gracias por ayudar la organización más fina de la aplicación de la ley en el país. Esperamos que usted demuestre orgullosamente las calcomanías nuevas. Nuestros patrocinadores quieren que sepa que somos el único grupo en Tejas que hace su propia recaudación de fondos, y el 100% del dinero va directamente al THPA y no a los bolsillos de alguna compañia de telefónica y estamos orgullosos de eso. Lo cierto es que estos programas no son proporcionados por el estado ni el departamento, únicamente se mantienen por partidarios amables como ustedes y como apreciamos sinceramente eso. Usted esta ayudando a una organización legitima y nosotros le damos las gracias por su valioso apoyo.

THPA es una grupo profesional registrada legitimamente y sirviendo al publico desde año 1990. Y recuerde que tristemente los beneficios de muerte sólo sobreviven por los sacrificios de familias tan buenas como ustedes, es importante que nosotros contemos con ustedes solo esta vez. Va ayudar al Mueso en San Antonio que honora a los policias del estado que han muerto en la linea del trabajo mantener los programas para ayudar cuando la familia de un policía del estado que muere trágicamente en la linea del trabajo, en Memoria de Nuestro Amigo es para ayudar a los oficiales que han sido balaceados o seriamente heridos en la linea del trabajo y su ayuda también beneficia con becas escolares. Es muy importante que se sienta seguro de que usted esta ayudando al mejor grupo en todo el estado y dejeme reforzarle que también va ayudar para mejorar leyes, las cuales ayudan a servir y proteger de mejor manera aquí por su comunidad y muchos mas programas. durante el ano. Estos son unos del los muchos beneficios y programas que usted va ayudar durante este ano.

Recuerde que la THPA es una organización caritativa y su contribución si es deducible en sus impuestos al fin del ano. Si usted tiene cualquier pregunta considerando su promesa, llama por favor a nuestra oficina del estado al 800-245-8598. Todo nuestro personal es empleado directo del THPA y nosotros estamos para servirle. Para asegurar el crédito apropiado, regrese por favor la porción más baja de esta factura con su promesa. Por supuesto usted no está bajo ninguna obligación de sostener al THPA. Su apoyo no les permite ningunos privilegios ni inmunidades legales. Recuerde que usted esta ayudando a una organización legitima y nosotros le damos las gracias por su valioso apoyo que dios los bendiga.

Gracias de parte de los miembros Policias del Highway Patrol Museo.

# THANKS FOR YOUR SUPPORT



TEXAS
HIGHWAY PATROL
ASSOCIATION & MUSEUM



RETURN THIS PORTION WITH YOUR CHECK IN THE ENVELOPE PROVIDED / Regrese esta porcion con su cheque o money order



## The IRS considers the Texas Highway Patrol Association and Museum as a 501(c)(3) charitable organization.

We do not utilize an outside telemarketing company to help our organization raise money. *These outside firms, generally keep a large percentage of the money raised.* Thus, 100% of the funds we raise, stay within the Texas Highway Patrol Association & Museum and its programs. This is what sets us aside from similar programs.

## Additional Benefits



### Texas Highway Patrol Magazine
A quarterly magazine that highlights some of the activities and issues involving crime, justice and articles pertaining to law enforcement. A professional publication, geared to law enforcement officers, but is available to the general public for a small subscription fee.

### And much, much more!
We are involved with many more great projects and continue to add more and more to the list! From benefits to programs to public service announcements, We are constantly striving to improve and enhance the lives of highway patrol officers while improving the climate of public safety and law enforcement in Texas.



## Educational Benefits

### College Scholarship Fund
The Captain Ed Pringle Scholarship Fund was established for the children of active or retired Texas DPS highway patrol officers. Funds are applied directly to education tuition costs and are awarded once a year. THPA has helped numerous students with their educational costs and we are proud of our continuing commitment to our youth.

### Educational Programs
Our Association and Museum developed an award-winning *Cruisin' to Coffins* program – designed to educate students about the hazards of driving while under the influence of alcohol.   We also have other programs geared for younger children – stressing the dangers of strangers, drugs and more. We are also continuously planning and designing new programs for area youth.

### Museum
We created the Texas Highway Patrol Museum located in San Antonio, Texas. Come experience exhibits such as: *The Hall of Honor*; a memorial to the officers who lost their lives in the line of duty, *The Les Strawn History Hall*; a walk through the history of the Texas Highway Patrol, and artifacts donated by family of past troopers.



## Trooper Benefits

### Death Benefit Fund
We established this fund to provide financial support to the families left behind when tragedy strikes. Should an officer be killed in the line of duty, the surviving family members will receive $10,000 in immediate assistance. We will also establish a special account with a local bank – 100% of any contribution to this fund will go directly to the family.

### Funeral Benefits
Additional funeral benefits are offered in conjunction with *Dignity Memorial's® Funeral, Cremation and Cemetery's Trooper Benefit Program*. THPA members will receive dignified and honorable tributes at no cost for a trooper killed in the line of duty.   A funeral protection certificate valued at $2,500 will also be given to the children and grandchildren of the fallen officer.

### Dental Insurance
THPA is concerned for the health of troopers and their families.  This is why we started the Dental Benefits Program. Through this program, THPA pays dental insurance for all members of the association *and* their families. We want to ensure that troopers stay safe and healthy.

# Serving Troopers and the Public for nearly 20 years!!

Texas Highway Patrol Museum
*Located a few blocks from the Alamo in San Antonio, Texas.*

# SUPPORT

## TEXAS HIGHWAY TROOPERS



*Helping those that keep our highways safe!*



**Benefits**

**Scholarships**

**Education**

**Museum**

---

# CONTRIBUTE

The Texas Highway Patrol Association and Museum are absolutely dependant on the generous financial support from **people like you** – people who care about making our streets and homes safe. We are always here to answer questions.

To make a contribution, please send to:

**501 OAKLAND AVENUE**
**AUSTIN, TX 78703-5113**
**1-888-745-8598**

*\*\*If you have received an invoice to make a contribution/donation and have questions or concerns, please contact us.*

**Thank you in advance for your support of the Texas law enforcement community!**

On behalf of all our members, we wish you and your family a safe and prosperous year.

---

### ADVERTENCIA

Apreciable Contribuyente:

Sabemos que usted recibe múltiples peticiones de donativos, por lo que lo invitamos a verificar la autenticidad de La Asociación de Patrullas del Estado de Texas. Sientase comodo de comunicarse con nosotros a nuestras oficinas centrales, el número de teléfono se encuentra en su recibo de contribución, estamos a sus ordenes para aclarar cualquier duda que tenga o simplemente para verificar la información que contiene su folleto. Por favor no olvide mandar su contribución con la porción de abajo del recibo para que reciba crédito. En nombre de la asociación, muchas gracias por su apoyo y que tenga feliz año en compañía de su familia.

Si usted tiene alguna pregunta
por favor llame el numero:
**1-888-745-8598**

---

# Our mission

Since 1991, it has been our mission to lead the community to provide support for Texas Highway Troopers – with programs the state or the DPS do not provide, and to assist any trooper's family when tragedy strikes, regardless if they belong to the Texas Highway Patrol Association and Museum.

The Texas Highway Patrol Association helps develop strong bonds of trooper camaraderie, providing benefits for Texas state highway patrol officers and the promotion of professional law enforcement.

We also built the Texas Highway Patrol Museum – A facility established through an endowment honoring the Highway Patrols. Past and present and provides educational programs for area youth. Located in San Antonio just a few blocks from the Alamo.

The Texas Highway Patrol Association and Museum is proud to also offer, in addition to our Death Benefit fund, a separate Survivor Benefit fund when an officer is killed in the line of duty. The Museum establishes this special fund with a local bank. Media are alerted to this fund and 100% of the donations collected in this fund go directly to the family of the trooper.



www.thpm.org

**You've always counted on them ....**

**now can they count on you?**



**2011 SUPPORTER**



**2011 SUPPORTER**

Copy of envelope

PRESORTED
FIRST CLASS MAIL
U.S. POSTAGE PAID
AUSTIN, TX
PERMIT NO. 1621



TEXAS
HIGHWAYPATROL
ASSOCIATION • MAGAZINE • MUSEUM

501 Oakland Ave. • Austin • Texas • 78703-5113

#44

**Trooper Jonathan Thomas McDonald**
Texas Department of Public Safety - Texas Highway Patrol
EOW: Monday, November 15, 2010
Cause: Automobile accident
$10,000 death benefit
Laura McDonald
c/o Stg Ruben Garcia
98425 E County Road Ste 7000
Slaton TX 79364

**Corporal David Ralph Slaton**
Texas Department of Public Safety - Texas Highway Patrol
EOW: Monday, September 20, 2010
Cause: Automobile accident
$10,000 death benefit
Lynetta Slaton
113 2nd St
Bowie TX 76230-6308

**Trooper James Scott Burns**
Texas Department of Public Safety - Texas Highway Patrol
EOW: Tuesday, April 29, 2008
Cause: Gunfire
$10,000 death benefit
Michaela Burns
PO Box 1313
Linden, TX 75563.

**Trooper Todd Holmes**
Texas Department of Public Safety - Texas Highway Patrol
EOW: Wednesday, March 14, 2007
Cause: Automobile accident
$10,000 death benefit
Stephanie Holmes
6054 FM 555
Gilmer TX 75644

**Trooper Eduardo Chavez**
Texas Department of Public Safety - Texas Highway Patrol
EOW: Tuesday, May 2, 2006
Cause: Automobile accident
$10,000 death benefit Mrs. Iliana Chavez
1001 Leticia


PLAINTIFF'S
EXHIBIT

33

Edinburg TX 78539-9634

**Trooper Matthew DeWayne Myrick**
Texas Department of Public Safety - Texas Highway Patrol
EOW: Friday, January 20, 2006
Cause: Automobile accident
$10,000 death benefit

**Trooper Billy Jack Zachary**
Texas Department of Public Safety - Texas Highway Patrol
EOW: Sunday, January 1, 2006
Cause: Struck by vehicle
$10,000 death benefit fund
Tara Zachary
501 Ferndale Ln
Monahans TX 79756-2932

**Trooper Kurt David Knapp  - memorial fund set up**
Texas Department of Public Safety - Texas Highway Patrol
EOW: Saturday, May 8, 2004
Cause: Automobile accident
Jennifer Knapp
4143 Fredericksburg Rd
Kerrville TX 78028
$10,000 death benefit
$1225.00 from memorial fund

**Trooper Randall Wade Vetter – memorial fund set up**
Texas Department of Public Safety - Texas Highway Patrol
EOW: Monday, August 7, 2000
Cause: Gunfire
Cynthia Vetter
1050 NorthPark Ridge
New Braunfels TX 78130
Aug 8, 2000 $10,000 death benefit
Aug 22, 2000 $40,000.00 memorial funds directly to Cynthia
Nov 6, 2000 $10,727.12 memorial funds directly to Cynthia

**Trooper Terry Wayne Miller – memorial fund set up**
Texas Department of Public Safety - Texas Highway Patrol
EOW: Tuesday, October 12, 1999
Cause: Gunfire

STATE OF TEXAS                                    §
       *TARRANT*                             §
COUNTY OF ~~PARKER~~ *KS*                          §

## <u>AFFIDAVIT OF CHRISTY MYRICK MATTINGLY</u>

BEFORE ME, the undersigned notary public, on this day personally appeared Christy Myrick Mattingly who proved herself to be the person whose name is subscribed hereon through her Texas driver's license which contained her photograph and signature, and who after being by me duly sworn, upon her oath deposed and said:

"My name is Christy Myrick Mattingly; I am over 18 years of age, and am competent to make this affidavit. I live at 411 Cattlebaron Parc Drive, Ft. Worth, TX 76108. The following facts are based upon my personal knowledge and are true and correct.

"My late husband, Trooper Matthew Myrick was employed as a Trooper with the Texas Department of Public Safety- Texas Highway Patrol Division and was killed in the line of duty while responding to an accident on January 20, 2006.

"After a review of all of my personal records and contacting my bank to determine if I received any monetary support from the Texas Highway Patrol Museum after my husband passed away, the only monies that I received from a Texas Highway Patrol organization was a check for $700.00 and that check was from THPA Services, Inc..

"On December 9, 2011, I received a call from Tim Tierney. Mr. Tierney advised that he was undergoing an audit and after checking his books, he realized that he did not send me the $10,000 death benefit. He asked me for my current address so he could mail me a check.

Further affiant saith not."



CHRISTY MYRICK MATTINGLY

SUBSCRIBED AND SWORN TO before me on the _12_ day of _December_ ,2011.

KATHLEEN M. SHANNON
Notary Public, State of Texas
My Commission Expires
February 06, 2014



**PLAINTIFF'S EXHIBIT**

39

Page 1 of 2

STATE OF TEXAS

COUNTY OF YOAKUM

§
§
§

## AFFIDAVIT OF KATHY SMILEY

BEFORE ME, the undersigned notary public, on this day personally appeared Kathy Smiley who proved herself to be the person whose name is subscribed hereon through her Texas driver's license which contained her photograph and signature, and who after being by me duly sworn, upon her oath deposed and said:

"My name is Kathy Smiley, I am over 18 years of age, and am competent to make this affidavit. I live at 525 E. Elm, Denver City, TX 79323. The following facts are based upon my personal knowledge and are true and correct.

On January 10, 2011, I received a phone call from the Texas Highway Patrol soliciting donations for a fallen patrol officer, Trooper McDonald and his family. Trooper McDonald was killed in November 2010 in Post, Texas. The Texas Highway patrol caller stated they were collecting donations for his widow and baby. After speaking with them on the phone, they sent me a packet. I was going to send out a donation to help Trooper McDonald and his family. However, the day before I received the packet, the local news station in Lubbock Texas revealed that the actual Texas Highway Patrol law enforcement agency does not directly solicit funds from the public and so I decided not to send them my money because it was a scam.

I never sent the money. I received a phone call from a lady asking what happened to the money. I told her that I was not going to send any money and that I forwarded the paper work from Texas Highway Patrol to the Texas Attorney General's office. The woman immediately hung up the phone.

Further affiant saith not."

_____
KATHY SMILEY

SUBSCRIBED AND SWORN TO before me on the _14_ day of _November_, 2011.

_____
Notary Public in and for the
State of Texas

PLAINTIFF'S
EXHIBIT

40



1.  Copies of all Mission Statements and/or business plans/ strategic plans;

    Answer: See Red Binder # 1 - This would be our articles of incorporation

2.  Copies of all written policies and procedures, including but not limited to, employee handbooks and financial policies;

    Answer: Response to be furnished later

3.  Copies of all Board of Directors' handbooks;

    Answer: See Disk 1 in Binder 1 "Board of directors policy manual"

4.  All documents that identify all former and current officers and directors of the Association, Museum and Services;

    Answer: See Binder #1, Item 4. THPA Services directors are Tim Tierney, Lane Denton, Mark Lockridge.

5.  All documents that identify any and all compensation paid to all officers and directors of the three entities.

    Answer: See W-3 statements in Box #1, and Tax Returns on Disk #1

6.  Copies of all minutes and resolutions from all Board of Directors' meetings, or meetings of any committees created by the Board of Directors for all three organizations;

    Answer: See Binder #1, item #6

7.  All documentation evidencing all educational programs provided by these organizations. Include to whom the program is/was provided, where and when the program is/was provided;

    Answer: See Binder #1, item #7 , also box 10 and 11

8.  Documents that identify all former and current employees, and volunteers, their titles and job duties, and the amount of compensation paid to each employee and volunteer;

    Answer: See W-3 statements in Box #1 and Payroll Reports for 2008 in Box #2, 2009 in box 6, and 2010. Also Binder #1 Marked item 8 & 9

9.  Job descriptions on file for each officer, director, employee of any position, or volunteer, and documents that reflect the basis to demonstrate that the individual is qualified for each respective position;

    Answer: See item 8 above

10. Copies of all IRS Form 990's, including all schedules, attachments, supplements and amendments thereto;

    Answer: See disk #1 "Tax Returns"



PLAINTIFF'S EXHIBIT

11. Copies of all independent audits or reviews, including all recommendations, management letters, and/or reports. This includes, but is not limited to all audited and unaudited financial statements, annual reports and other documents reporting financial condition and total income and expenditures;

Answer: Non-applicable

12. Copies of annual operating budgets;

Answer: Non-applicable

13. Documents that identify all financial institutions with bank accounts held in the name of and/or held on behalf of each organization;

Answer: See Binder #1, Item #13 & 15 as well as account statements in #14 below

14. Copies of all bank account statements, cancelled checks, itemization of deposits, and reconciliation reports for all accounts named in response to Item 13;

Answer: See Box #1, and disk #1 "2010 Bank Statements"

15. Documents that identify the former and current authorized signatories for all of each organization's bank accounts named in response to Item 13;

Answer: See #13 above

16. Copies of all receipts, purchase orders, invoices, expense reports and/or other documents which support, describe, or explain all of each organizations' expenditures made by cash or check;

Answer: See #17 below

17. Documents that identify all revolving credit accounts, including but not limited to credit card accounts, store credit accounts, and debit accounts used by or held in the name of each organization, or in the name of any other former or current officer, director, or employee of these organizations on behalf of these organizations;

Answer: See all vendor files and invoices. Box 2 = 2008 THPA, THPA Services. Box 3 = 2008 THPM. Box 4 = 2009 THPM, Box 5 = 2009 Services & THPA, 2010 = Disk 1 "2010 Vendor Files"

18. Copies of all billing statements and receipts related to purchases made with all credit or debit cards held in the name of each organization, or in the name of any former or current officer or director of each organization on behalf of each organization;

Answer: See 17 above

19. Copies of all agreements between each organization and any former or current employee for the repayment or reimbursement to each organization of personal expenditures made on each organizations' credit cards or with each organizations' funds, and all related documents including, but not limited to, all correspondence that identifies the amount determined to be due

to each organization, the schedule of repayment, and identify all payments made to date;

Answer: Non-applicable

20. Documents that identify cash advances paid to any former or current director, officer, employee, consultant, volunteer, or other person, including to whom the cash advances were paid;

Answer: Cash advances are only for the Austin office staff of Maria Flores, Goldie VanGulden and Gilda Dominguez. Re-payment was done through payroll, and would be on the payroll worksheets/journals. See Box 2 for 2008 payroll, box 6 for 2009 payroll THPM Austin office. 2010, Disk 1 "2010 Payroll THPM"

21. Documents that identify loans given by each organization to any former or current director, officer, employee, consultant, volunteer, or other person;

Answer: none

22. Documents that identify reimbursements *from* each organization to any former or current director, officer, agent, employee, consultant, volunteer, or other person, including all requests for reimbursement, expense reports and supporting receipts;

Answer: Non-applicable

23. Copies of all canceled checks or other documents from each organization, director, officer, employee, consultant, volunteer or other person, as defined herein, which show reimbursement to each organization by any director, officer, employee, consultant, volunteer, or other person, for any personal or non-business expenditures;

Answer: Non-applicable

24. Copies of each organization's chart of accounts that are used for recording daily receipts and disbursements, monthly accounting reports, and annual reports. Include all sub-accounts for which provision has been made;

Answer: See disk 1, CPA folder – all items are from our CPA Sandy Simmons, 2010 is not yet complete, will be complete by the IRS filing deadline.

25. Copies of each organization general ledgers;

Answer: See disk 1, CPA folder – all items are from our CPA Sandy Simmons, 2010 is not yet complete, but will be complete by the IRS filing deadline.

26. Copies of each organizations' year-end schedules of accounts payable and accounts receivable;

Answer: See disk 1, CPA folder – all items are from our CPA Sandy Simmons, 2010 is not yet complete, but will be complete by the IRS filing deadline

27. Copies of all IRS Form 1099's and other documents that identify all consultants, independent contractors, or other persons who have provided consulting or any other professional services to

each organization, including the amount of compensation paid to said persons and underlying documents that support the reported amounts on each Form 1099;

Answer: See #8 above

28. Copies of all IRS Form 1099's and other documents that identify all consultants, independent contractors, employees, or other persons who have conducted any solicitation of donations on behalf of each organization, including the amount of compensation paid to said persons and each and all of the scripts used for such solicitations;

Answer: Non-applicable

29. Documents that identify all loans made to each organization by any bank, governmental agency or person, as defined herein. This request includes, but is not limited to, loan applications, correspondence with lenders, loan agreements, and security agreements related to the loans;

Answer: Non-applicable

30. Documents that identify all individual donors, governmental entities, private foundations, funds, endowments, trusts, and/or other charitable entities or public sources which provide or have provided contributions, of any amount, through any means, to each organization, and the respective amounts and dates of these contributions;

Answer: See disk 1 "Donations Received" files THPM paid1 – paid7 by date received

31. Documents that identify each organization's use of the contributions inquired about in Item 30, including all underlying documents in support thereof, which confirm that the contributions have been used for the intended charitable purposes;

Answer: See tax returns in item 10 above

32. Copies of all reports, audits, memoranda, and correspondence, in draft or final form, prepared by governmental grant making agencies which relate to each organization;

Answer: Non-applicable

33. Documents that identify all property and assets owned, leased, or rented, or previously owned, leased or rented by each organization or in which each organization otherwise has or has had a financial interest, including descriptions of how such property was used or is currently being used, and the current appraised value or stated value of such property and assets;

Answer: See Box #1 for lease envelope, and binder #1 for appraisal information

34. Copies of all contracts and/or agreements between each organization and any person relating to the operations or management of each organization;

Answer: Non-applicable

35. Documents that identify any business or personal transaction between each organization and any current or former officer, director, consultant, employee, or volunteer of each organization, or any person related by blood or marriage to any current or former officer or

director of each organization, including but not limited to, any loan, salary advance, reimbursement, payment for services, or any other agreement;

Answer: Non-applicable

36. Copies of all citizen complaints, concerns, or requests, written or electronic, relating to any aspect of each organization's operations, including, but not limited to, solicitations of funds and expenditures of funds;

Answer: Most complaints are handled over the phone by CR Villalva, very few are written or electronic. Of the few we have received, they were in a box that was lost coming back from the last audit. There may be copies of these in your office from the previous request.

37. Copies of all press reports relating to each organization;

Answer: Non-applicable

38. Copies of all insurance policies of any nature secured to provide coverage for each organization for money damages in the event of an adverse judgment against these organizations or any of their officers, directors, or employees;

Answer: See disk #1 "Barclay Insurance D and O"

39. Documents that identify the names of all corporations, for profit or non profit, or any other business entities, in which any of each organization former or current officers, directors, employees, or volunteers have any interest or serve as a board member, officer, or director;

Answer: Tim Tierney on the board for Gold Ribbon Rescue since 1998 and co-President of Mathews Elementary PTA since 2009. We do not ask on our membership application whether a trooper is a member of other non-profit organizations. Nor do we ask this of our employees, volunteers or officers and directors.

40. Copies of all licenses, permits, registrations and certifications that each organization is required to obtain, or which each organization has obtained on a voluntary basis, if any;

Answer: Non-applicable

41. Copies of all documents showing in detail the operations of, and purpose of, the Trooper's Benefit Fund;

Answer: See attached Exhibit # _____

42. Copies of all documents which purport to establish a monetary fund for the Trooper's Benefit Fund;

Answer: We have a money market account with RBFCU (see bank statements), while this money is not specifically marked for the Trooper Benefit Fund, it is available for that should many troopers be killed in the line of duty at one time.

43. Copies of all documents showing in what financial institution(s) any monies are held, and in what amount, for the Trooper's Benefit Fund;

Answer: General funds with Prosperity Bank, Money Market with Randolph Brooks Federal Credit Union.

44. Copies of all documents showing any and all monies the Trooper's Benefit Fund has been paid to or on the behalf of any and all families of officers killed in the line of duty, and the name(s) and contact information of the recipient(s) of those funds;

Answer: See binder #1, item 44

45. Copies of all documents showing in detail the operations of, and purpose of, the Funeral Benefits, and the Dignity Memorial Funeral, Cremation and Cemetery 's Trooper Benefit Program;

Answer: See Binder #1, item 45

46. Copies of all documents which establish any relationship between the Texas Highway Patrol Association, the Dignity Memorial Funeral, Cremation and Cemetery's Trooper Benefit Program;

Answer: no documents - David Simchik, with Dignity contacted us about setting up the program. See letter in #45

47. Copies of any and all documents which show any and all funeral protection certificates issued to, or on the behalf of any and all children and/or grandchildren of the organization's employees, and the name(s) and contact information of the recipient(s) of those certificates;

Answer: These items were furnished by Dignity.

48. Copies of all documents showing in detail the operations of, and purpose of, the Captain Ed Pringle Scholarship Fund;

Answer: The purpose of the scholarship is to provide retired and active member troopers a scholarship for their spouses or children to attend a higher education facility. The scholarship is $500 per year, with an additional $300 going to the one person with the best essay. Essay questions change yearly.

49. Copies of all documents which purport to establish a monetary fund for the Captain Ed Pringle Scholarship Fund;

Answer: See general ledgers, funds are in our main account with Prosperity Bank.

50. Copies of all documents showing in what financial institution(s) any monies are held, and in what amount, for the Captain Ed Pringle Scholarship Fund;

Answer: Prosperity Bank, no actual amount in a separate account, it's part of our total funds.

51. Copies of all documents showing any and all monies the Captain Ed Pringle Scholarship Fund has paid to or on the behalf of any student, and the name(s) and contact information of the recipient(s) of those Scholarships;

Answer: See binder #1, item 51

52. Copies of all documents showing in detail the operations of, and purpose of, the Dental Benefits Program;

Answer: The dental benefit program provided by Compdent/Texas Dental Plans, provides a discount on dental services when visiting a doctor in their network. This is paid for by THPA and THPA Services, for troopers, employees and everyone in their households. See Binder #1 item 52.

53. Copies of all documents which purport to establish a monetary fund for the Dental Benefits Program;

Answer: See general ledgers, funds are in our accounts with Prosperity Bank

54. Copies of all documents showing in what financial institution(s) any monies are held, and in what amount, for the Dental Benefits Program;

Answer: See #53 above

55. Copies of all documents showing any and all monies the Dental Benefits Program has paid to or on the behalf of any and all Texas Highway Patrol employees, and the name(s) and contact information of the recipient(s) of those funds;

Answer: See binder #1, item 53. Recipient of the funds is Texas Dental Plans.

56. Copies of all documents showing in detail the operations of, and purpose of, the member Our Friends Project;

Answer: Remember our Friends sponsors troopers or others involved with the museum for things such as Texas police games or activities that a trooper is involved with. It has also been used in the past to help provide support for a trooper that has been injured in the line of duty.

57. Copies of all documents which purport to establish a monetary fund for the Remember Our Friends Project;

Answer: See general ledgers, funds are in our accounts with Prosperity Bank

58. Copies of all documents showing in what financial institution(s) any monies are held, and in what amount, for the Remember Our Friends Project;

Answer: No set amount or special account, funds are held in Prosperity Bank for THPM

59. Copies of all documents showing any and all monies the Remember Our Friends Project has paid to or on the behalf of any and all employees, and the name(s) and contact information of the recipient(s) of those funds;

Answer: Has not paid to any employees.

60. Copies of all documents showing in detail the operations of, and purpose of, the Crusin' to Coffins Program;

Answer: See item #7

61. Copies of all documents which purport to establish a monetary fund for the Crusin' to Coffins Program;

Answer: no fund, payment comes out of our general funds.

62. Copies of all documents showing in what financial institution(s) any monies are held, and in what amount, for the Crusin' to Coffins Program;

Answer: Prosperity Bank no set account.

63. Copies of all documents showing any and all monies the Crusin' to Coffins Program has paid to or on the behalf of all employees, and the name(s) and contact information of the recipient(s) of those funds;

Answer: Has not paid to or on behalf of any employee

64. Copies of all scripts provided to telemarketers or anyone else calling consumers for donations, on behalf of the organization;

Answer: Response to be furnished later

65. Copies of all training materials provided to telemarketers or anyone else calling consumers for donations, on behalf of the organization;

Answer: Response to be furnished later

66. A list of all non-profit organization(s) or charity(s) of which you or any other member of the organization, are a member;

Answer: See #39 above. The organization is a member of the Texas Association of Museums

67. Copies of all documents showing any monies belonging to the organization, that have been donated to or spent on behalf of any other non-profit organization(s) or charity(s);

Answer: See binder 1 item 67

68. Copies of all documents showing any and all credit or debit cards held in the name of or for the benefit of these organization;

Answer: Non-applicable

69. A list of all persons authorized to use any credit or debit cards held in the name of or for the benefit of these organizations including their position or affiliation with the organization;

Answer: Non-applicable

70. Copies of all monthly statements for the use any credit or debit cards held in the name of or for the benefit of these organizations;

Answer: Non-applicable

71. Copies of all documents showing in detail how officers', directors', agents' and employees' salaries, benefits and/or any other form of compensation for services rendered to these organizations are calculated and determined;

Answer: See binder #1, item 71

72. Copies of all documents showing payment for contract labor and/or services for which these organizations has rendered payment;

Answer: See binder #1 item 72

73. Copies of all documents showing any and all monies the organization has paid for these organizations products offered and sold in support of the organization, including t-shirts and magazine subscriptions;

Answer: See Vendor Files. T-shirts are paid from Services and the company is Austin Specialty Advertising.

74. Copies of all documents showing consumer complaints received and any and all materials addressing any remedial procedures;

Answer: Most complaints are handled over the phone from C.R. Villalva.

75. Copies of all documents showing any and all monies paid for marketing efforts, including telemarketing services;

Answer: See CPA documents and IRS Statements for fundraising

76. Copies of all documents showing in detail any and all monies paid for board meeting expenses;

Answer: See attached Exhibit # _____

77. All documentation which indicates each entity's organizational chart for each year and who has served on each Board since January 2008;

Answer: See Item #4

78. All credit card records for all people who had access to or use of each credit card that was paid for, by or on behalf of these organizations, including a list of all names of the card holders from January 1, 2008 through the present;

Answer: See #18

79. All copies of all loan documents between these organizations and any other organization, individual, employee, officer or director January 1, 2008 through the present;

Answer: Non-applicable

80. All documentation that demonstrates these *organizations's* compliance with the Sarbanes Oxley Act, including but not limited to any whistle blower policy, records retention policy and conflicts policy;

Answer: Non-applicable

81 All copies of all travel, expense, reimbursement and investment policies and procedures for these organizations January 1, 2008 through the present;

Answer: See credit cards, and vendor files

82. All audio recordings that are made during the course of telephone fund raising;

Answer: Non-Applicable

84. Copies of all board training materials of these organizations;

Answer: Non-applicable

85. All documentation which indicates all educational programs provided by these organizations. Please include to whom the program is provided, where and when the program is provided January 1, 2008 through the present;

Answer: See item #7

86. All documentation reflecting all costs associated with the educational programs referred to in CID request No. 85. Please include all financial materials reflecting all costs associated with each program, including, but not limited to all invoices, receipts from January 1, 2008 through the present;

Answer: Costs are not broken out by project or program, they are paid out of general funds, and would show up in vendor files. Most costs with educational programs were incurred prior to 2008 for video reproduction and dvd creation, as well as printing.

87. All documentation, including but not limited to credit card statements, receipts or bank account statements, of all expenses paid to Century Animal Hospital or any other business for the care/treatment/food/boarding or other expense for the "office cat" referred to in the sworn statement of Tim Tierney [see pages 148 and 165 of the sworn statement] or any other office pet from January 1, 2008 through the present;

Answer: See Binder #1, item 87. The purchase of special cat food for Lou is not listed on the vet invoices. But was purchased from Century Animal Hospital. Additional invoices would be in vendor files for THPM in folder C for Century.

88. All telephone records for all telephone numbers, including both land lines and cell phones utilized by these organizations January 1, 2008 through the present;

Answer: Much of this is done online with online statements. AT&T, MCI, Sprint, Bestline, Birch, Grande, 8x8, Vonage are the vendors we use. List of current phone lines on disk 1 "Phone lines"

89. All utility company records for all properties associated with these organization from January 1, 2008 through the present;

Answer: See vendor files for El Paso Electric, Austin Electric, San Antonio, Gexa, all in vendor files for THPM.

90. All receipts for all expenses incurred by or on behalf of these organizations or anyone affiliated or associated with your organization since January 1, 2008;

Answer: See vendor files.

91. All documentation that indicates the criteria for being inducted into the Museum Hall of Fame, including but not limited to, all costs associated with the selection of being chosen for induction into the Hall of Fame. Also, include the names of the persons who make the decisions regarding how the Hall of Fame members are chosen;

Answer: The board members decide on a Hall of Fame inductee during a normal board meeting. Costs would be having the family come to the museum for the dedication ceremony.

92. All documentation which reflects all expenses related to the National Police Memorial Annual Ride in Washington, D.C. since January 1, 2008 through the present incurred by any person associated with these organizations. This includes all receipts or invoices for airline tickets, lodging, meals, entertainment expenses or any other expenses of any kind associated with these trips which were paid for by your organization. Please include in your documentation all persons for whom expenses were paid;

Answer: See vendor files for reimbursements or credit card statement for airline tickets purchased. Also box 13 for Memorial in DC.

93. All documentation which reflects the donation/receipt of any law DPS related artifacts kept at the Museum located in San Antonio, Texas, including, but not limited to the DPS vehicle door which is on display at said location;

Answer: DPS vehicle door donated by Sergeant James Colunga. Other items in the museum were donated by families. 1958 restored Ford DPS vehicle in possession of Sergeant Robert Bernard, on loan from Tommy Taylor (see title item #93, binder 1). See pictures of items in the museum in binder 1, #93

94. All documentation which includes records of ALL families of DPS troopers who have ever received monies from the Trooper Benefit Fund. Note: this request is not limited in time;

Answer: See item #44, my accounting software goes back to 2008. See binder #1 item 94 for troopers killed in the line of duty since 1997/

95. All documentation which demonstrates all families or individuals who have ever received scholarships/funeral protections funds or any funds from these organizations. Please note this request is not limited in time;

Answer: My accounting software goes back to 2008. Funeral protection explained

earlier.

96. All records of ALL persons, whether employees of your organization or troopers, who are receiving dental benefits paid by these organizations from January 1, 2008 through the present. Please include the name as well as address and phone number of each person;

Answer: See item #53 & 55 above. Troopers addresses are in the membership binders, the most current ones are in boxes 7 & 8.(older in box 9)

97. Any and all documents which reflect all funding used to produce the "Cruising' to Coffins" program, all schools to which the program was presented and which of those schools presented the program. Please include documents of the total amount of money that has been spent on this program, how the funds were spent and when the funds were spent. Please include all documents from the time the of the program's inception through the present;

Answer: See items 61-63 above. Funds not specifically coded to programs, printing costs are coded to printing.

98. Copies of your publication for the past year;

Answer: See Box 1 envelope "Magazines"

99. All documents regarding payments for any other programs or services related to any DPS officer or employee, including the "Texas Police Volleyball" event referenced by Tim Tierney at page 44 of his sworn statement the "Police Unity Tour" at page of 41 of the statement and the "Friends Project;"

Answer: See attached item #56, vendor files, and binder 1 #99.

100. List of all current and former members, including names, addresses and phone numbers, who belong to these organizations;

Answer: See Boxes 7, 8 and 9.

101. All documents which demonstrate how much money has been received as donations by your organization since January 1, 2008. Please include a list of the names of each donor, including any contact information you have for each individual;

Answer: See disk 1 folder Donations Received

102. Copies of all personnel files, including all background checks for your employees; Copies of all employee handbooks utilized by your organization;

Answer: Response to be furnished later. Museum operating procedures is in binder 1, item 102.

103. Copies of all employee handbooks utilized by your organization:

Answer: Non-applicable

104. Copies of all fundraising materials, including pledge forms, special event information or the like

utilized by these organizations;

Answer:  See binder #1, item 104

105.    Copies of all risk management programs for these organizations;

Answer:  Waitin for Kim Brown

106.    Copies of all fidelity insurance policies held by these organizations;

Answer:  See Barclay Insurance D&O insurance on disk 1.

107.    Copies of all budgets utilized by these organizations since January 1, 2008 through the present. Please include the dates in which the budget was approved by the board;

Answer: Non-applicable

108.    Copies of all receipt, purchase orders, invoices, expense reports or other documents which support, describe, or explain all of these organizations' expenditures made by cash or check from January 1, 2008 to the present;

Answer:  See vendor files and bank statements

109.    Copies of all visitor ledgers or other documents which reflect persons who have visited the Museum in San Antonio, Texas;

Answer:  2011 visitor log in box 11, 2010 and prior was on a hard drive that has crashed. Actual visitor books are being looked for in storage.

110.    All documents that indicate all special events or functions that have been held at the Museum. Include all operating costs of such events or functions.  Also, include all who was. invited to and attended such functions;

Answer:  Box 11, Box 12

111.    All documents which indicate your organization has permission, in writing, from any public safety agency or organization, to use any name, symbol or statement similar to a name symbol, or statement used by a-public safety agency or organization.

Answer: Non-applicable

program such as the humanitarian award -- they would decide that -- to do that.

Q. Do you have any type of separation of powers within your organization to make sure there's no risk of inappropriate use of the company's assets for funds?

A. Well, everything that we do goes to the CPA, and the CPA reviews everything. They go through every -- they go through every deposit and check to make sure it's coded correctly, and then they fill out the financial reports at the end of the year.

Q. But within the organization, other than the CPA, nobody else reviews anything?

A. No. The CPA -- yeah, the CPA, being Ken Gorence. And the other CPA that works for Ken Gorence is Sandy Simmons, and she does that.

Q. Let me ask you a quick question about the accountant. When you have issues that come up when you need the accountant's assistance, do you mainly call Ken; or do you mainly call Sandy?

A. Sandy.

Q. How often do you speak to Ken?

A. Maybe once a month.

Q. How often do you speak with Sandy?

A. Well, we e-mail. So she will say -- an example was she will send me a deposit and say: How did it get

PLAINTIFF'S
EXHIBIT
42

coded like this, shouldn't it have been coded to this department, or an expense -- how did it get coded to this when it should have been coded to that?

And so I'll say, "You're right. It was mistyped." And I will change the coding.

Q. Do you send all your credit card statements to the -- to Sandy or Ken?

A. No.

Q. Have they ever seen your credit card statements?

A. They see the breakdown when we pay the credit card of what -- what each item is and how much -- what's allocated to where.

Q. And who sends them that breakdown?

A. That goes in QuickBooks, and it goes to Sandy Simmons and to Ken Gorence.

Q. Who prepares the breakdown?

A. I.

Q. And how can you ensure -- if they don't see any of your credit card statements, how can you assure that there's no inappropriate use of the company's money, going for inappropriate things?

A. Well, the credit cards that I use, I know I appropriate it the way it is. The company -- the card that C.R. Villalva uses, he breaks his down and sends a

contributing five or ten dollars or fifteen dollars or twenty dollars.

Q. So he tells you basically "The company's having some financial issues and we need to tighten our belt."

A. Yeah. I think -- I believe that we went to him -- or I went to him and said, you know, we're -- we have a break-even point and that we've been below the break-even point for a while, what can we do.

And that's when he said, "Let's talk on the phone. Do a conference call."

Q. And he tells you, "Gentleman, we obviously have some hard and important decisions to make in order to secure the organization's continued existence. We must act responsibly and quickly in developing a plan which will accomplish this goal."

Did y'all ever develop a plan to accomplish this goal?

A. Mr. Villalva increased his sales. He dealt with his managers and was able to bring those numbers up so that we were more than breaking even.

Q. And that -- that was the goal? That was the plan.

A. That was the goal, yes.

Q. The plan was for C.R. to get his employees to get more money from the public?

PLAINTIFF'S EXHIBIT

43

A.   Well, or I -- yeah, I believe so.

Q.   Did it ever occur to you to possibly decrease your expenses?

A.   Yes.  I've done all I can to decrease the expenses.  We even switched utility companies to -- in Houston you have a choice.  So we've switched to ones that are giving a different rate.  The telephone companies -- we switched from AT&T to MCI, then back to MCI or AT&T when they raised their rates.

Q.   And how much money did that save you?

A.   I'm not sure.

Q.   Did you do that after he gave you this letter?

A.   No.  We're -- we're constantly doing that.

Q.   You're constantly trying to save them money?

A.   Yes.

Q.   Okay.  Did it ever occur to you to reduce the salaries of yourself or your employees?

A.   No.  I feel like my employees -- in my view, I think our employees in my office -- their salaries are low, so I have not done that.

Q.   What about your salary?

A.   I haven't been in position yet to have to decrease my salary.  We're breaking even, and everything's been going smoothly.

Q.   Do you think your pay of over $200,000 a

vehicle?

A.   Yes.

Q.   And what kind of vehicle is that?

A.   A Toyota 4Runner.

Q.   What year is it?

A.   2010, I believe.

Q.   And who pays for it?

A.   The company -- the company pays for it.  At the end of the year, the CPA let's me know how much I need to pay for my personal usage of that vehicle based on a percentage of something he came up with.

Q.   Okay.  I'm confused.  It could be just getting late in the day.  You said the company pays for it.

A.   Yes.  It's a lease.

Q.   Okay.  And they pay it on a monthly basis?

A.   Yes.

Q.   Do you know how much --

A.   The lease.

Q.   -- the lease is?

A.   The lease is a thousand a month.

Q.   A thousand a month.  And how long have you had that 4Runner?

A.   Since 2010, I -- my --

Q.   So you got it --

A.   Well, it might have been December 2009.  I

Integrity Legal Support Solutions
www.integrity-texas.com



PLAINTIFF'S
EXHIBIT
44

vehicle?

A.   Yes.

Q.   Was that on a lease or did you --

A.   A lease, yes.

Q.   What about the 2007 BMW?

A.   That was Bill Billingsley's, and that was paid personally by me.

Q.   Okay.  But yet you had it on the policy that is paid by the company.

A.   No.  It's USAA.  It's under my policy, my name, and, as I said a minute ago, I don't believe USAA can break it out into different things.  They break it out on there, and on their pages they tell you exactly how much each vehicle costs.

Q.   Are you aware of any vehicle accidents that Lane Denton had during the course of driving his company vehicle?

A.   I know his car's been in the shop, but I don't know about the accidents, no.

Q.   Okay.  When was his car in the shop?

A.   I don't remember.  It's on the -- it would be on the credit card statements.

Q.   Okay.  Do you know what kind of vehicle it is that Lane drives?

A.   That's a Titan.  I think Nissan makes the Titan


PLAINTIFF'S
EXHIBIT

45

Tab F

REPORTER'S RECORD

**COPY**

TRIAL COURT CAUSE NO. 2025DCV3641

COURT OF APPEALS NO. 15-25-00141-CV

VOLUME 2 OF 5 VOLUMES

| | |
|---|---|
| POWERED BY PEOPLE, ) | |
| ) | |
| Plaintiff, ) | IN THE DISTRICT COURT |
| ) | |
| vs. ) | |
| ) | 41ST JUDICIAL DISTRICT |
| KEN PAXTON ) | |
| IN HIS OFFICIAL CAPACITY AS ) | |
| TEXAS ATTORNEY GENERAL, ) | EL PASO COUNTY, TEXAS |
| ) | |
| Defendant. ) | |

*********************************

TEMPORARY RESTRAINING ORDER

*********************************

The 13th day of August 2025, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Annabell Perez, Judge Presiding, held in El Paso, El Paso County, Texas:

Proceedings reported by machine shorthand utilizing computer-assisted realtime transcription.

BERTHA A. PRIETO; OFFICIAL COURT REPORTER

41st Judicial District Court; 500 E. SAN ANTONIO, RM. 1006

EL PASO, TX 79901 (915) 273-3728

APPEARANCES

Ms. Beth Stevens                     Mr. Johnathan Stone
SBOT NO. 24065381                    SBOT NO. 24071779
        -and-                                -and-
Mr. Joaquin Gonzalez                 Mr. Scott Froman
SBOT NO. 24109935                    SBOT NO. 24122079
MARZIANI, STEVENS &                  OFFICE OF THE ATTORNEY
GONZALEZ, PLLC                       GENERAL
500 W. 2nd Street                    Consumer Protection Division
Suite 1900                           300 W. 15th Street
Austin, TX 78701                     Austin, TX 78701
(210) 343-5604                       (512) 936-2613

        -and-                        ATTORNEYS FOR DEFENDANT

Ms. Lynn Coyle
SBOT NO. 24050049
ATTORNEY AT LAW
2700 Richmond Avenue
El Paso, TX 79930
(915) 276-6700

ATTORNEYS FOR PLAINTIFF

CHRONOLOGICAL INDEX
VOLUME 2
TEMPORARY RESTRAINING ORDER

|  | PAGE | VOL |
|---|---|---|
| AUGUST 13, 2025 | | |
| Court Calls Case | 4 | 1 |
| Announcement of Counsel | 4 | 1 |
| Opening Remarks by Ms. Coyle | 6 | 1 |
| Response by Mr. Stone | 11 | 1 |
| Motion by Ms. Stevens | 15 | 1 |
| Response by Mr. Stone | 41 | 1 |
| Motion by Mr. Froman | 68 | 1 |
| Motion by Mr. Stone | 72 | 1 |
| Response by Ms. Stevens | 84 | 1 |
| Response by Mr. Stone | 101 | 1 |
| Response by Ms. Stevens | 114 | 1 |
| Response by Mr. Stone | 116 | 1 |
| Response by Ms. Stevens | 116 | 1 |
| Court's Ruling | 117 | 1 |
| Adjournment | 118 | 1 |
| Court Reporter's Certificate | 119 | 1 |

EXHIBIT INDEX

| COURT'S NO. | DESCRIPTION | OFFERED | ADMITTED | VOL |
|---|---|---|---|---|
| 1 | Plaintiff State of Texas's Emergency Motion for Contempt and Show Cause Order | 33 | 33 | 1 |

(Open court, counsel present)

THE COURT: The Court calls Cause Number 2025DCV3641, Powered by People, plaintiff v. Ken Paxton, In His Official Capacity as Texas Attorney General, defendant.

May I have announcement of counsel, please?

MS. COYLE: Good morning, Your Honor. Lynn Coyle serving as local counsel for plaintiff, Powered by People. And I'm joined today by Joaquin Gonzalez and Beth Stevens, who will be acting as lead counsel for this hearing.

THE COURT: Thank you. Good morning.

MS. STEVENS: Good morning.

THE COURT: Thank you.

MS. COYLE: We're ready to proceed.

THE COURT: Good morning. Thank you.

MS. STEVENS: Good morning.

MR. STONE: And on behalf of the Attorney General, I am Johnathan Stone. And I am joined by my colleague, Scott Froman. And we're also ready to proceed.

THE COURT: Mr. Scott, what is your last name again?

MR. FROMAN: Froman, F-R-O-M-A-N.

THE COURT: Good morning.

The Court has received the verified amended petition for declaratory relief filed by the plaintiff in this cause.

This morning I did receive the response filed by the Attorney General, which was filed this morning. I've had an opportunity to read that response.

They have also filed a plea to the jurisdiction, which I don't think was set today, but I don't know. I'll let the plaintiff address that, but it was not set. What was set today and what we're scheduled to discuss is the temporary restraining order that's being requested in the plaintiff's petition, and then we proceed from there.

Let me set it up the way I think we should proceed. I want to be as efficient as possible with everybody's time. I feel that because we have a similar -- I'm not going to go all out and say "same case" but a similar -- involving the same parties, a case is pending in Tarrant County. We have some -- some preliminary procedural questions to answer, and that's the Court's jurisdiction, the first-filed rule, Tarrant County's jurisdiction -- because I understand that's being challenged there -- or at least the choice of venue there -- and whether that plays any part on

whether we should proceed here in El Paso County.

So those are the issues that I think we need to sort out before we get to the merits of the complaints, those primarily being the constitutional complaints on the actions made by the Attorney General against Powered by People.

Any thoughts on my posture here?

MS. COYLE: If I may, Judge?

Yeah. I understand how you see the issues, but if we can help to clarify. So this morning, we're seeking emergency temporary relief, which as you know, is to maintain the status quo and prevent irreparable harm.

And as our proposed order shows, we are not asking the Court for a ruling on the merits, and we're not asking the Court for a ruling on jurisdiction. And the Eighth Court of Appeals has spoken to this very issue --

THE COURT: Okay.

MS. COYLE: -- which is that the Court absolutely has jurisdiction to hear a request for emergency relief. Because without yet making a ruling on jurisdiction, even though the pleading has been filed, because of the nature of emergency relief which is to maintain the status quo and avoid irreparable

harm.

That case, Your Honor, is *Fernandez v. Pimentel*. That's 360 S.W.3d 643, and that was authored by Justice Antcliff. And he addressed this exact issue, which is that the Court noted that -- let me find the quote here.

Since the judge -- in that case, what happened is, there was a request to extend the temporary restraining order. A plea to the jurisdiction had already been filed and the district court judge said, "Well, I'm going to extend it," and then set a hearing on the plea to the jurisdiction. The parties took that extension of the TRO as a denial of the plea to the jurisdiction. They sought an interlocutory appeal. And the Eighth Court of Appeals said: No. The ruling on the extension for the TRO is explicitly not a denial of the plea to the jurisdiction. It is only a ruling on whether emergency relief should be extended.

And so they dismissed that interlocutory appeal. And that's almost --

If I may, Judge? I can provide you with a copy of that case.

THE COURT: Well, you know, I have it here.

MS. COYLE: Okay.

THE COURT: If you -- I have my Lexis here, so it's not a problem to pull it up.

MS. COYLE: So, Your Honor, I'm not disagreeing with you. If you want to have a discussion -- some sort of preliminary discussion about jurisdiction, but we think -- first of all, I will tell you our presentation on our application for the temporary restraining order is going to carefully walk the Court through everything that's happened in what is a remarkable last seven days, okay? This started seven days ago on August 6th.

So we will walk you through exactly what happened here in El Paso and what happened in Tarrant and why emergency relief is being sought today. So that may help the Court understand all the other issues and the context in which they're arising.

THE COURT: The -- and I understand the point you're making, is that's what the case says. And I'm going to read the case to make sure.

Unlike that case, I feel that -- in that case, the trial court had the case from its onset without the interference of another pending case, a pre-filed case. In that case where the judge extended that temporary restraining order -- I can understand that's not a ruling on the plea.

But here, first hearing upon filing of the lawsuit, there already existed another court in another county that claimed proper venue, claimed -- you know, I don't know. I'm going to assume, but I don't know if that judge went through that exercise of determining whether she had the proper jurisdiction to entertain it but she issued an order, a TRO.

So that's a little different for me than maybe the case that you're explaining. Because at the onset, I am aware of another court exercising jurisdiction on the -- at least the parties without commenting on that similarity between the case because I think the causes of action are a little bit different. The claims are different. And maybe you can argue that they're reciprocal. The Attorney General doesn't think he's violating the Constitution but exercising his statutory authority, but then we have the reciprocal argument that this is clearly a violation of the First Amendment. So -- but I already have a court already moving on this.

So I don't feel like I can just summarily ignore that. And maybe we develop a record on whether I should or should not. I completely agree with the concept of keeping the status quo -- maybe keep the status quo until you hash it out in Tarrant County.

Let's keep the status quo so that Mr. O'Rourke doesn't go to jail. You know, whatever the concerns might be, keeping the status quo is intended to kind of keep the peace until we get through some of these issues, in fairness to both sides.

So that's my thinking on your proffer with that case, without having read it, but I immediately saw that distinction.

MR. STONE: Your Honor, can I add something?

MS. COYLE: I'm sorry. I didn't mean to interrupt, but can I just respond real quick to that?

THE COURT: Yes.

MS. COYLE: That -- you are correct. That is a difference. There was not another action filed in a separate venue, but I -- the argument that we have on why emergency relief is being sought and why the status quo needs to be maintained and the urgency with that is, in part, what you've already identified. But our argument is going to explain carefully -- because there is a lot of procedure that's happened. There's a lot that's happened, and so our argument in support of our request for relief will walk you through why this court has authority, notwithstanding the action that the AG filed in Tarrant County. And we're ready to address

the Court's concerns on that right now.

THE COURT: Okay. Yes, sir?

MR. STONE: Your Honor, if we can just add one more thing to what the Court has already concluded. Another distinction that I think is significant is we filed the plea to the jurisdiction on Monday before they ever sought this temporary restraining order, I think -- I believe the next day they sought the temporary restraining order. So there's already a preexisting plea to the jurisdiction before they ever sought the TRO.

And one more fact that I think is really notable, all the arguments I'm going to be making today go to mootness and dominant jurisdiction by the other court, which is exactly the same argument we made in our plea to the jurisdiction and plea in abatement.

So to have a second hearing in a week or two weeks where both sides get together and make the same argument is a waste of judicial resources. I'm going to be arguing that same thing today, so the Court should just rule on it today.

Does the Court have jurisdiction? Yes or no?

Does Tarrant County have dominant jurisdiction over the issues? Yes or no?

THE COURT: Yeah. I haven't concluded anything, just for purposes of the record. I'm just reacting to the explanation and I'm just thinking out loud.

What I would contemplate that if the TRO is granted or denied, the next hearing would be on addressing your plea to the jurisdiction and then delving into that probability of -- of the plaintiff being able to stay in their claims -- their underlying claims, with evidence or any of those things.

I think while this is a status quo conversation, I do think we need to talk about whether or not I have the authority to issue an order to maintain that status quo.

I understand the purpose of the request, but do I have that underlying authority? And if that equates to a plea to the jurisdiction question, perhaps.

What I'll do -- what I'm going to do is I'm going to let you present what you were going to present here today and then make a decision on the TRO based on that. But having spoken out loud on what my concerns are, I hope that you do tailor a little bit of your argument to address some of that.

If I -- because if I deny the TRO, the case doesn't go away.

MR. STONE: It doesn't go away, Your Honor, but we'd still be coming back.

If the Court concludes today that it has jurisdiction to take up their TRO request and get into it, then we would ask the Court to just go ahead and sign an order denying our PTTJ -- our plea to the jurisdiction. We don't need to come back and do the same argument again. You've already heard all the arguments today, and you can just deny it today if that's the -- if you reach the TRO, you might as well just deny our plea to the jurisdiction and deny the TRO.

THE COURT: So that you can take your interlocutory appeal?

MR. STONE: Yes, Your Honor.

THE COURT: Right.

MR. GONZALEZ: And stay the proceedings.

MS. COYLE: And stay -- and press out on the issue before the Court.

But we are very mindful, Your Honor, of your concern. That is a valid concern. I mean, it's an unusual posture; we agree.

THE COURT: Yeah.

MS. COYLE: And we are absolutely ready to address that thoroughly, including with the white board, to walk you through it, to address your concern about

the Court's power here, today's temporary restraining order, in the context of our application.

THE COURT: Sure. And that's why I want to allow it. Look, this is a -- I'm very honored to be part of this case because it's very historical in my opinion. It's very legally significant and a lot -- a lot is at stake here for our community and our state.

And so to be part of this case is critical to me as a member of the judiciary to do it right. And part of that duty is to ensure that your record is complete. So I will never -- have never with any party -- it could be the simplest car accident or something of this magnitude, as I perceive it, would never cut off anybody's ability to properly preserve your record and take your procedural steps as you think deem appropriate.

I think to get there, though, we need to fully develop the record, and I can be as thoughtful as I can and mindful of the law on when I make that call, okay?

MS. COYLE: Thank you.

THE COURT: Let's go ahead and start.

And just so you know, my way of doing things is I type out my notes. So as I'm typing, I am listening. I'm basically writing down what you're

telling me, okay?

MS. STEVENS: Understood. Thank you, Your Honor.

May it please the Court, counsel.

Your Honor, I'm here today representing Powered by People, which is a political action committee and Texas organization. But before I jump into argument, I want to emphasize to the Court, the sole question we're here today is on whether the Court should issue the TRO to preserve the status quo because of imminent irreparable injury to Powered by People.

The RTE that's been referenced thus far in the lead-up to discussing this hearing is a key background fact that goes to the constitutional violations of the heart of the lawsuit, but it is not the subject of today's hearing, rather we're here to ask the Court to stop Defendant Paxton from proceeding on his third abusive legal maneuver in the last week.

Powered by People, the organization, was created in 2019 by Beto O'Rourke, David Wysong, and Gwen Pulido. It is an El Paso organization. All members of the board live in El Paso. Their senior leadership is in El Paso, and their business office is in El Paso. All key decision-makers are in El Paso.

Again, Your Honor, we are here today to

ask you to grant a temporary restraining order against Defendant Ken Paxton. We do not do so lightly. Quick action through a TRO is required to prevent the irreparable harm that my client faces through Defendant Paxton's abuse of process, actions which violate my client's constitutional rights.

In a few moments, I'm going to talk the Court through details to explain why we are entitled to the TRO, including that courts frequently bring up anti-suit injunctions. But before I turn to that, it's important to walk the Court through the larger picture.

This larger context is crucial to why we are entitled to relief -- the relief we seek today -- and to understand how we got here in an emergency posture less than a week after the Defendant Attorney General began legal proceedings against my client to stifle their First Amendment right to free speech and association.

It is no secret that the ideals that Powered by People fight for are in direct contravention to actions taken by Defendant Ken Paxton. It is no secret that Defendant Paxton has identified Mr. O'Rourke, who is the founder of Powered by People, as a political opponent in his upcoming 2026 Senate race. He has said as much on social media postings.

And it is no secret that Defendant Paxton has it out for Mr. O'Rourke and Powered by People as a result of that political ire. We need only see the recent reference to attempting to jail Mr. O'Rourke and shut down Powered by People.

Now, Defendant Paxton, through this -- his attempt to file an action *quo warranto* seeks nothing short of shutting down an organization that is his political opponent. This is a direct assault on Powered by People's right to free speech and association under the Constitution. He does so in flagrant violation of our judicial system rules, in a county that cannot have jurisdiction over a *quo warranto* proceeding and doing so in naked effort to rest jurisdiction from El Paso County, the rightful venue, for such a proceeding.

Defendant Paxton has demonstrated over the last week that he will abuse every process, every procedure, every rule to get his way. Despite the very short timeline -- it has literally been less than a week since this ordeal started. This story is quite a saga, so I ask the Court's patience when I describe everything that's gone on here.

And I do have a demonstrative for the Court, a timeline.

May I approach?

THE COURT: Yes. The -- he'll hand it to me. Thank you.

MS. STEVENS: Okay. Thank you.

THE COURT: So for purposes of the record, I have received a three-page Word document with what appears to be a timeline.

MS. STEVENS: Thank you, Your Honor.

I'm not going to go through every bullet point on this timeline, but I am going to hit the key points of what happened, all of which, I believe, is in the record before you in various filings -- separate filings.

So, again, less than a week ago, on the evening of Wednesday, August 6th, Defendant Paxton served a "Request to Examine" to Powered by People seeking a plethora of documents -- documents related to an ongoing very political fight between Texas Republicans and Texas Democrats about those Republican's efforts to further racially gerrymander the State's political maps, a political fight that Mr. O'Rourke and Powered by People participating in by publicly pushing for support of those Democrats.

Defendant Paxton asked for these plethora of documents to be turned over by the organization to Defendant Paxton with a less than 48-hour deadline --

less than 48-hour timeline. The deadline set was Friday, August 8th, at 4 o'clock, Mountain Time; 5 o'clock, Central.

Powered by People sought two different extensions of this patently unreasonable timeline provided by the Attorney General. One was denied. The corporate counsel sent a request. That was denied. The second request was sent by me, Ms. Stevens, at 10:21 a.m., Mountain Time, on Friday August 8th -- less than an hour after we had been looped in a conversation with the Attorney General. This email put Defendant Paxton on notice that Powered by People was represented by Texas counsel.

Then before the deadline to respond to the Request to Examine, and over three hours after Defendant Paxton was on notice that Powered by People is represented by Texas counsel, at 1:46 p.m., Mountain Time, and without previously notifying counsel for Powered by People about their intent to seek an *ex parte* TRO, Defendant Paxton filed a Deceptive Trade Practices Act petition and request for TRO in Tarrant County district court.

Again, this was despite the fact that Defendant Paxton had already kicked off legal proceedings in El Paso County when he served the Request

to Examine, and despite the fact that there is a mandatory venue provision in the Civil Practice and Remedies Code requiring that late filing DTPA filing also be filed in El Paso.

These procedural manipulations were only the first in a long string of abuse of process by Defendant Paxton over the last three business days.

Literally one minute after filing suit in Tarrant County, Defendant Paxton's counsel emailed in the same email chain through which we had asked for an extension to the RTE response and indicated that they were filing suit, seeking a TRO, and asking if counsel wished to be heard on the TRO.

We responded that it was completely inappropriate to notify us of the filing -- to not notify us of the filing and request for an *ex parte* TRO when they knew full well that Powered by People was represented and that, yes, we wanted to be heard on the hearing.

After contacting Defendant Ken Paxton's counsel over the phone, we learned that one of Defendant Paxton's Austin-based attorneys was in person in Tarrant County, drove the three hours to Tarrant County, and was actively working on getting a TRO hearing. Then less than two hours after the suit was --

the DTPA suit was filed, Defendant Paxton's counsel obtained a hearing before the Tarrant County court. Counsel for Powered by People with no time to prepare or to brief this complicated DTPA argument and the First Amendment issues that are inherent in those arguments but in -- of course, in an effort to defend our client against this manufactured emergency process, counsel attended that hearing. After business hours on Friday the 8th, the Tarrant County issued the TRO.

The maneuvering between Wednesday and Friday were not enough for Defendant Paxton. He accelerated his abuse of my client and the rules governing our process from there.

On Saturday, August 9th, Defendant Paxton notified counsel for Powered by People -- actually, excuse me, Your Honor. On Friday afternoon, we filed the instant matter in El Paso, seeking relief -- before the 5 o'clock deadline, seeking relief from the "Request to Examine."

On Saturday, August 9th, Defendant Paxton notified counsel for Powered by People that he was, quote, withdrawing the "Request to Examine" and asking that we dismiss this case.

We know this was another effort to try to rob this court and El Paso County, more generally --

which I think is an important issue -- of jurisdiction; something that Defendant Paxton can't actually do himself.

On Monday afternoon, Powered by People and Mr. O'Rourke filed an emergency motion to transfer venue in the Tarrant County case, as there is a mandatory venue provision which requires Defendant Paxton's DTPA lawsuit be filed in El Paso County.

That is set for hearing tomorrow morning in Tarrant County.

THE COURT: May I stop you right there?

MS. STEVENS: Yes, Your Honor.

THE COURT: So Saturday morning -- by Saturday morning, August 9th, the Attorney General's Office had already filed and obtained their TRO in Tarrant County; and then Saturday morning are telling you they are withdrawing the request for -- I keep calling it request for production -- request to examine for -- for examination.

Had you replied to any part of the request at that point?

MS. STEVENS: No, Your Honor. We filed the -- the instant lawsuit -- the original petition in this lawsuit by seeking a protective order. The Rules of Civil Procedure indicate that you are protected from

having to respond --

THE COURT: So -- okay. I missed that part. You did file for a protective order.

MS. STEVENS: Yes, Your Honor.

THE COURT: In Tarrant County?

MS. STEVENS: In this court --

THE COURT: In this court?

MS. STEVENS: -- and before the 5 o'clock deadline.

THE COURT: On Friday?

MS. STEVENS: Yes.

THE COURT: Okay. And then they withdraw, again -- but all that happened after they had already filed their petition in Tarrant County?

MS. STEVENS: That's correct, Your Honor.

THE COURT: And on Friday afternoon at 1:45?

MS. STEVENS: At 1:45, Mountain Time.

THE COURT: So my point is this. They proceeded with their action in Tarrant County without the benefit of their investigative efforts, their -- the records they needed to prove their allegations or to support, presumably, their claims in their petition?

MS. STEVENS: Yes, Your Honor.

THE COURT: Okay.

MS. STEVENS: And I would also like to note that the -- the venue provision in the Rule of Civil Procedure that allows us to move for a protective order against the RTE, that was specifically invoked by the Texas Supreme Court in the Annunciation House case; dictates that we seek that protective order in El Paso.

THE COURT: Uh-huh. Yeah. I got that.

I'm just trying to, again, either reconcile the two causes of action or distinguish them. And I just found it interesting that you went ahead and filed your DTPA, or whatever the claims were, in Tarrant County without the benefit of meeting that investigation.

That's -- that's how it's supposed to happen. You get your evidence and then you proceed with a decision on whether you're going to file a petition or not, but --

MR. STONE: I think the Court is making a conclusion that we haven't represented to the Court at all that was the case. We continued to collect information. Once we reached a critical mass, we believed that we had enough information to proceed under a DTPA lawsuit. We filed the DTPA lawsuit, and it was good enough evidence that the Tarrant County court gave us a TRO. And we have -- as to venue and the

sufficiency of our evidence to establish venue in Tarrant County, of course, that will be heard tomorrow. We would have withdrawn the RTE on Friday, but they filed their lawsuit before we had an opportunity to talk to them and we were trying to get a TRO hearing scheduled because there was a rally in Fort Worth the very next day.

THE COURT: Right. I know it's all pivoted around Tarrant County because of this public rally --

MR. STONE: Right.

THE COURT: -- and a lot of social media and that business. I mean, if that's enough for that court to conclude that there's a -- enough facts for a DTPA cause of action, I have -- that's not my call at this point, but for me of interest is the timing.

You had a TRO hearing on Zoom with that court and you're telling me now at that point you had the intention of withdrawing the request but never said anything.

MR. STONE: Well, I mean, Your Honor, we -- again, we filed that afternoon and they filed their lawsuit challenging the RTE, which froze it in place within two hours.

If we -- even if we had contacted them --

if we filed the Tarrant County lawsuit and I called opposing counsel and told them, "I'm withdrawing the RTE," which I did the next day, they would have sued us here anyway.  I don't think it would have made any difference.

THE COURT:  I'm not suggesting that you should have set it to preempt this lawsuit.  I'm saying that if that was your intention all along, then --

MR. STONE:  It was not our intention all along.  Once we had sufficient information, we pursued the DTPA lawsuit.

THE COURT:  Right.

MR. STONE:  We did not have sufficient information at the time we sent the RTE, but we continued to conduct investigations and collect evidence and information.

So once we had enough, we determined that we could proceed with a DTPA lawsuit based on statements and a lot of information that had occurred after we sent the RTE to them.

Now, the information from the RTE would have been helpful --

THE COURT:  Just -- but, again, I'm not commenting on the sufficiency of your evidence for your DTPA.  There's a judge that felt that there was.  All

I'm saying is that the timing is a little odd on your intent to withdraw. It seems reactive to this lawsuit as opposed to, "Hey, I have enough evidence for my DTPA lawsuit. I'm going to withdraw it. Let's just proceed with" -- "with the cause of action."

MR. STONE: We would have had to withdraw it no matter what, in our reading of the law.

THE COURT: Well, it didn't happen that way. That's all I'm commenting on, that it didn't happen that way.

MR. STONE: Okay.

THE COURT: But let her finish, and then I'm going to let you fully give me how you see it, okay?

MR. STONE: (Moving head up and down).

THE COURT: I'm sorry. Go ahead.

MS. STEVENS: Thank you, Your Honor.

May I respond just a moment to the representation just made by counsel?

He indicated that they intended to withdraw the RTE at the time of the hearing on Friday afternoon. A few hours before that, we had asked for an extension of the RTE deadline, and they did not respond to that. They didn't grant it. They didn't say, "We're about to withdraw." They didn't do that.

And counsel just represented to you that

they did not have sufficient evidence to pursue the DTPA lawsuit at the time that they served this "Request to Examine." They represented to the Tarrant County court that they learned of the -- the political rally that was to occur on Saturday, on Wednesday, which is when our client was served with a "Request to Examine." And so there is a need to really delve into the representations made to both courts, if the court is inclined to care about that timeline between Wednesday and Friday.

THE COURT: Well, I'm -- I'm taking it in.

MS. STEVENS: Yes, Your Honor.

THE COURT: I'm taking it in, and I'm not going to -- like when I ask questions, it's only to clarify this timeline. I think the timeline is important. I just want to make sure I'm clear with it on when things happened. And if there's an underlying explanation on why, I'll give both sides that opportunity to explain it.

Go ahead.

MS. STEVENS: Thank you, Your Honor.

So then -- let me find it. One moment.

Yes. Monday afternoon, Powered by People filed its emergency motion to transfer venue in Tarrant. Again, that is to be heard tomorrow.

Then at 4:00 p.m., Mountain Time, also on

Monday afternoon, Defendant Paxton's counsel over the telephone with Powered by People's counsel informed us that they planned to file a motion for expedited discovery in Tarrant County, seeking many of the same materials that they sought and they requested to examine in the first place, and that they were going to file -- seek to -- leave to file, excuse me, an information in the nature of *quo warranto* in Tarrant County. We objected and responded that we opposed -- we had opposed both of those.

Also on Monday -- Monday evening, plaintiff filed its amended petition -- so it's a live pleading in this matter -- and request for temporary restraining order, asking this court to stop Defendant Paxton from pursuing *quo warranto* proceedings. If they're to go forward at all, from filing them in any venue but El Paso County.

THE COURT: On this -- you already have this petition, *quo warranto*, and then underlying challenges to their intent and the effect it has on the constitutional rights.

Why would you not take it up on a -- like some sort of expedited emergency appeal? And I'm not an appellate lawyer, so I don't know. But it seems that -- and if you feel that Tarrant County doesn't have

jurisdiction, this is a targeted effort, you know, unfettered authority of the Attorney General, why wouldn't you just take it up to the Tarrant County Court of Appeals?

MS. STEVENS: All right. Two things on that, Your Honor. One is, we had requested an opportunity to respond. Because they have to seek leave. They have sought leave. They have not gotten leave. There is no live petition -- or live information, excuse me.

THE COURT: Okay.

MS. STEVENS: And so it's important to note that we're asking this court for a TRO before making that filing for a petition for leave. We filed our request for TRO on Monday evening at about 1:30 in the morning. On Tuesday, they filed their petition for leave to file the information in the nature of *quo warranto*, and that was despite our request for a TRO in this matter.

MR. STONE: But, Your Honor, can I just make sure --

MS. STEVENS: Your Honor, may I proceed with my presentation?

THE COURT: Yeah.

MR. STONE: I'm sorry. I didn't mean

to --

THE COURT: That's fine. Thank you.

MR. STONE: It's just the timeline --

THE COURT: And I'm going to assert my own authority to interrupt. But, again, this is just for me to take it in. I'm going to give both sides a full opportunity to develop their record and make sure I'm clear on what things are.

Thank you, sir.

MS. STEVENS: So, again, plaintiff's -- plaintiff, excuse me, filed our amended petition and request for this temporary restraining order on Monday evening after we had been informed by counsel that they planned to file this *quo warranto* proceeding in a wholly improper county.

At 1:32 in the morning on Tuesday, they did just that. Defendant filed a petition for leave for -- to file an information in the nature of *quo warranto* in Tarrant County, despite this pending request for TRO.

And then to highlight the abusive nature of the proceedings that have occurred thus far by Defendant Paxton, yesterday he filed three emergency motions in Tarrant County district court: An emergency motion for discovery, again, seeking almost exactly the

same documents that were in the RTE; a motion to modify the TRO; and a motion to hold our client in this case, Powered by People and Mr. O'Rourke, in contempt -- in civil contempt but also in criminal contempt, threatening to jail Mr. O'Rourke.

And we think it's important for the Court to actually see that contempt motion because it does a couple of things. You see the political animus that is running through this situation, and you see that the statements that they are quoting by Mr. O'Rourke and thus attributing to Powered by People are protected core political speech protected by the Constitution.

And if I might approach? We have a couple of copies of the motion to --

THE COURT: Thank you.

MS. STEVENS: It's right here.

Thank you so much.

THE COURT: Thank you.

THE BAILIFF: Thank you.

THE COURT: Now, I, for the record, have been handed a copy of -- in Tarrant County, Cause Number 348-367652-25, in the State of Texas v. Robert Francis O'Rourke and Powered by People, "Plaintiff's State of Texas's Emergency Motion for Contempt and Show Cause."

MS. STEVENS: And, Your Honor, if I might

direct the Court to page 5 of this pleading.  Robert Francis O'Rourke --

THE COURT:  I'm going to mark this as Court's Exhibit 1.

(Exhibit offered and admitted, Court's 1)

MS. STEVENS:  Okay.  Thank you, Your Honor.

THE COURT:  Go ahead.

MS. STEVENS:  Directing the Court's attention to paragraph 9.  I'm just going to read a few portions of speech that they -- that the Defendant Paxton highlights and that are core political speech protected by the Constitution.

It -- paragraph 9 starts with what happens when a consumer opens a link.  And then it says -- that page states it is taking the fight "to Paxton, Abbott, and Trump," in quotes.  That's it.

Taking the fight "to Paxton, Abbott, and Trump."

And requests -- it quotes:  Requests a show of "support for our fight for Texas."  The page hyperlinks an address to support Texas dems.

And then further down, paragraph 11, it talks about the Fort Worth rally that was to occur on Saturday -- that did occur on Saturday.  And their --

the speech that they highlight, the stated statements by Mr. O'Rourke and Powered by People, are, quote, Texas FIGHT to 20377 to help Texas Democrats stop Trump's power grab, end quote.

These are the type of statements by Mr. O'Rourke and Powered by People that Defendant Paxton unconstitutionally seeks to silence.

Moving to, Your Honor -- with all of that background, it's key to highlight for the Court what we're not here to consider today. We are not here on defendant's motion to transfer venue in Tarrant County, even though the filing of the DTPA lawsuit in Tarrant County was a flagrant violation of Civil Procedure. That matter will be heard tomorrow in front of the Tarrant County court.

We're not here to talk about the TRO in Tarrant County. We're not here to collaterally attack that TRO. The court in Tarrant County will consider some of the substance of that tomorrow.

What we are here about is the Attorney General's abuse of the judicial process. The Attorney General's attempt to end-run El Paso's jurisdiction in a *quo warranto* proceeding. And the narrow issue for this court to consider is that we're asking for a TRO to enjoin Defendant Paxton from

pursuing a *quo warranto* action against Powered by People in any venue but El Paso.

THE COURT: But El Paso?

MS. STEVENS: But El Paso, yes, Your Honor.

I promised the Court I would walk through why Powered by People is entitled to the TRO relief we seek, and I'm going to proceed to do that.

The misuse and abuse of the judicial process by Defendant Paxton over the last only three business days is drastically outside the bounds of the Rules of Civil Procedure and the process provided by the Texas Supreme Court and lower courts. Both the Texas and United States Constitutions prohibit abuse of power in this way.

Plaintiffs ask Your Honor to reinstate key -- a key part of that process and procedure by preserving the status quo, requiring the defendant if he's going to pursue a *quo warranto* proceeding at all -- which we will vigorously fight -- against Powered by People, to do so in El Paso County with leave of court where Powered by People can defend against such further harassment in the proper venue.

I would note for the Court, we do believe it would be warranted for this court to enjoin the

defendant from even seeking leave to file an information, but we recognize the -- this necessarily narrowly tailored ask of the Court. And so what we're asking for is to provide the procedural safeguard to ensure that if they're going to pursue this, they do so in El Paso.

Now, why is this relief proper, why we're entitled to the TRO, including that courts frequently grant anti-suit injunctions.

Although we are seeking the narrowest possible relief, it's important to note for the Court anti-suit -- excuse me -- anti-suit injunctions are well-recognized -- a well-recognized remedy when equity demands it, including temporarily -- temporary equitable relief to avoid subjecting a party to harassing litigation for improper purposes.

As the Texas Supreme Court wrote in *Gannon v. Payne* -- the cite is 706 S.W.2d 304 -- quote, Texas state courts do have the power to restrain persons from proceeding with suits filed in other courts of this state, end quote.

The El Paso --

THE COURT: Say it again. Texas state courts do have the power to --

MS. STEVENS: Restrain persons from

proceeding with suits filed in other courts of this state.

THE COURT: Okay.

MS. STEVENS: The El Paso Court of Appeals in *Chandler v. Chandler*, the -- I just have the pin site for that, but we'll pull the full site. 991 S.W.2d -- it's at 403. The Court noted, quote, an anti injunction -- anti-suit injunction is appropriate in four instances: One, to address a threat to the Court's jurisdiction; two, to prevent the evasion of important public policy; three, to prevent a multiplicity of suits; or, four, to protect a party from vexatious or harassing litigation.

In that El Paso case, the Court found it was proper to enjoin an individual from any further vexatious litigation against his former wife because he had filed, quote, a continuous barrage of lawsuits against her.

Here, all four situations are at issue. Of particular importance are Defendant Paxton's contravening public policy in having the chief law enforcement officer of this state unconstitutionally target and chill the speech of political opponents -- of admittedly and publicly stated political opponents. It defies the Constitution on its face, especially when

this is accomplished through vexatious and harassing litigation.

As courts have recognized in the anti-suit injunction context, merely being subject to improper court processes and particularly in proper processes in incorrect venues can constitute the irreparable harm in and of itself.

When the act of subjecting a private party to that sort of vexatious improper process is a government actor, then the Constitution is implicated and there can be no question that it creates irreparable harm, which is the question before the Court today. Is there irreparable harm by having Defendant Paxton run to Tarrant County to file -- to proceed with a *quo warranto* proceeding?

THE COURT: Well, do you think --

MS. STEVENS: And --

THE COURT: Do you think -- assuming that is the objective with the litigation here that you've started in El Paso, but do you think those things would be protected nonetheless if presented to the Court in Tarrant County? And if you said, "Hey, look, this is harassing, and this is contrary to public policy, and this is intended to be a political maneuver instead," and all those things you just explained, you would have

those same protections in Tarrant County, especially during these preliminary stages.

Do you think that's the case?

MS. STEVENS: We don't, Your Honor, because of one of the quotes that I just read about being subjected to the improper processes and improper venue in and of itself is an abuse of his office and irreparable harm to our client.

And this is not a typical -- the plaintiff filed in the wrong venue, and we will have a motion to transfer venue argument. This is harassing and abusive maneuvers against a political opponent over the course of three business days. It is -- boggles the mind, the things that have been filed by Defendant Paxton against Powered by People and -- in Tarrant County -- Mr. O'Rourke as well.

And I'd just like to note for the Court, of course, the definition of "irreparable harm" is harm that cannot be compensated adequately with money damages, and that is certainly the case here.

In conclusion, we seek a narrow injunction here today that this court require Defendant Paxton, if he is bound and determined to file this *quo warranto* proceeding -- which we don't think he should do -- but if he's determined to do so against my client, he can

only do so in the county of proper venue.

Your Honor, that's the end of my presentation, but I'd be happy to answer the Court's questions.

THE COURT:  Have any of these emergency motions filed yesterday by the defendant -- by the Attorney General been set for hearing?

MS. STEVENS:  Yes, Your Honor.  The -- so tomorrow's hearing covers the motion to transfer venue, the motion for expedited discovery and their motion to modify the TRO.  Notably, the motion for contempt has been set for, I think, the 26th.  So --

THE COURT:  Okay.  And the motion to modify the TRO, what is the -- what modification is being sought?

MS. STEVENS:  They seek to further chill my client's speech.  They want the TRO to --

Actually, do we have a copy of that?

(Sotto voce discussion between attorneys for the plaintiff)

MS. STEVENS:  They want their TRO to be sent to other political actors in the political space.

I have it here, Your Honor.  Thank you.

THE COURT:  They want to include other respondents, I guess?  The -- other than O'Rourke --

Mr. O'Rourke and Powered by People?

MS. STEVENS: They specifically ask -- well, that's the original TRO. My apologies, Your Honor. These look similar.

Actually, might I provide a copy to Your Honor?

THE COURT: Yes, we -- you can.

MS. STEVENS: Okay.

THE COURT: And we -- I think, probably, the defendant would be better able to answer my question anyway.

So if there's nothing further, let me hear from the Attorney General's Office.

MS. STEVENS: Thank you, Your Honor.

THE COURT: Yes, sir -- yes, ma'am.

MR. STONE: Thank you, Your Honor. I'll take up that issue first and just address it.

The motion to modify the TRO just seeks to enjoin -- or to expand the restraint to officers, employees, and anyone acting in concert with the defendants in that lawsuit. And it orders them to provide a copy to anyone else that might be acting in concert with them, such as a bank or ActBlue, which is the fundraising platform.

This is in response to the motion to --

for contempt, which got brought up a moment ago, and show cause order. This relates to allegations that the defendants in that lawsuit -- which involve Powered by People and Mr. O'Rourke -- they have not complied with the TRO and they're in violation of the TRO.

THE COURT: How did they not comply?

MR. STONE: Your Honor, that's before the Tarrant County court. But, in summary, as we've discussed in our motion for contempt, we contend that Mr. O'Rourke presented -- sent Tweets out and made representations that he was going to keep fundraising, and he was going to keep raising money and that he wasn't constrained by the Court's temporary restraining order.

Now, I'm not prepared to argue all that on the merits today --

THE COURT: No.

MR. STONE: I've prepared for this hearing, so I -- we have a number of lawyers in Dallas that are handling that portion, I believe -- which goes to one of the representations made: We have an attorney that drove from Austin all the way up to Fort Worth. That's just not true. We have an office in Dallas and some of our Dallas attorneys that are working on this case, and it was one of our Dallas attorneys that drove

to Fort Worth.

Small things but I think it's worth correcting because it goes to their so much belief that everything we did was in bad faith and that we're acting with such animus. And it's just not true. And I'm going to go through the timeline with the Court and explain what happened and, hopefully -- and address any concerns.

So if the Court -- if you were concerned that there's animus or that we acted in bad faith, stop me as I go through this timeline, and I will do my best to explain to you so that you will see we were acting in good faith. We're just acting on an expedited timeline because of circumstances related to the special session and what's going on and the harm that's occurring currently from the fundraising issues.

THE COURT: Okay.

MR. STONE: Okay. I know that's a lot.

THE COURT: I don't want to -- I don't want to -- I don't want to say that there's malice or any of those things by you or any of your colleagues. But, you know, that -- I'm very annoyed by -- as in a lot of context, social media. And we take, you know, "I'm going to keep doing this," blah-blah-blah, versus, "Beto bribes." You know, all that is such noise, and I

want to be fair to the legal issues.

Just so you know, that's in my head, that there's a lot of noise happening by really both sides. And we're here to make sure that we adhere to Texas law and make sure we protect people's constitutional rights. And I don't -- I haven't concluded in any way that you're intentionally trampling on somebody's, but, you know, the facts will be the facts.

Go ahead.

MR. STONE: Thank you, Your Honor.

And I'm not lecturing, but the Attorney General's Office is entitled to a presumption that we're acting in good faith and that we are trying to comply with the law and that we're acting with normality. And hopefully, again, you're going to understand that as I walk through the same timeline as they are.

So let's jump back just a couple of days before we sent the "Request to Examine." That's when a number of legislators from the Texas legislature left the state on private-chartered jets and are -- in an attempt -- with an intent to deprive the legislature of quorum, okay?

So this issue only began a few days before we sent the RTE. It's not like we were sitting on this

for months and months and then like, "Oh, well, we launched an investigation." Everything was moving very, very quickly all at once. So we're acting in an emergency posture when we sent the "Request to Examine." And we sent that on August 6th, the afternoon of August 6th. They got served that evening.

In that "Request to Examine," we expressly say that we're acting in an emergency posture because these things are happening right now. If there's deceptive practices or there's violations of law that are occurring, they're occurring right now. And it's time sensitive -- that we figure out if they are or are not happening -- and act or not act, depending on what we then determine.

THE COURT: So just for clarification, are you pursuing a deceptive trade practices conduct --

MR. STONE: Yes.

THE COURT: -- or action, or are you utilizing these processes to -- to close in on these legislators that left the jurisdiction? One is by far not even close to the other.

MR. STONE: Correct. Yes. I completely agree with Your Honor. The issue that we're zoning in on is, is there fraud? Is there misrepresentations in the fundraising that is going on to fund the

legislators?

So the legislators are a whole separate issue. There is a *quo warranto* up in the Supreme Court that's going on.

THE COURT: Right.

MR. STONE: That's totally different attorneys. I don't have a lot of insight into that, but there's a different group of folks that are working *quo warranto* and relates to that, and the governor's involved. I can't really speak to all of that. I can talk about the Consumer Protection Division's focus on representations made to Texans, made to consumers about what their money was being raised for and what it's going to be used for.

So that's what the focus of our investigation was. And if that money was being raised for an unlawful purpose or being used for an unlawful purpose without disclosure to consumers, that is something that the Consumer Protection Division is going to act on. So that's what we were looking at when we sent the RTE.

Okay. So we sent it out on Wednesday. It gets served on them Wednesday evening. Meanwhile, we are continuing to conduct an investigation. We're looking into things. I believe at some point that day

we found out that there was going to be an upcoming Fort Worth rally that was going to be -- and we started watching the Tweets and the information that was going out and the representations that were made relating to that rally and representations to consumers about fundraising and what -- at that rally and what that money was being used for.

So we're looking at that. On Thursday, they reach out to us. It's out-of-state counsel. They asked for a two-week extension. We respond to them and said, because of the exigencies of the circumstances here -- and I -- by way of a catch-all correspondence to my plea in abatement -- and so the Court can review that if you'd like, and you'll see that we acted with extreme professionalism at all times.

We told them in response: You guys wanted a two-week extension but because this is time sensitive and we need information ASAP; but listen, we're willing to talk to you about narrowing the scope.

And we were willing to talk to them about maybe rolling production. We were willing to engage in some conversation to see what we can do to get what we needed. So we sent them an offer expressing our willingness to narrow the scope and to work with them, but we couldn't give them a blanket two-week extension.

And we also asked them to give us some more details.

For example -- we can give the Court an example. This isn't in an email, but we -- if they had called us -- but, you know, they emailed back and said, "Yes, let's talk" -- we could have explained this to them. If they told us, "Hey, we got 10,000 records and it's going to take a long time to review," we could have worked out some kind of rolling production or the normal things that people do in discovery and when we send out requests to examine. It's pretty normal. They didn't respond, though. We asked them to provide us more information, and they ignored us.

So at that point, we continued to collect information and we started working on a draft lawsuit because we thought there -- we might have enough, and it started -- the next day, we got an email from them. We're discussing it internally, and I don't want to get into attorney-client privilege, but we were thinking about it like that night -- like late that night on Thursday.

Friday morning, they -- at 10:56 a.m., Mountain Time, they email us and they're making a lot about like this Texas counsel was involved, like that triggered something or it makes a difference. We're willing to extend the same courtesy to an out-of-state

counsel as we would an in-state counsel. It makes no difference to us. We're willing to work with them.

So they sent us an email at 10:00 a.m., saying that "Hey, we've added this new counsel." About 30 minutes later, they sent us a follow-up email asking for a 10-day extension. And, once again, they've ignored our prior request to talk about scope, talk about rolling -- there's none of that. They just asked for a categorical 10-day extension.

At that point, we had concluded -- we concluded that we had had -- that we had enough information. And given the looming rally that was going to be held the next day in Tarrant County, the Tweets and the advertising and solicitations around that, we determined that we needed to act.

So we went into high-speed mode. We're drafting, and we're finalizing a lawsuit and we get it on file at 1:46 p.m. in Tarrant County. We asked for it ex parte if necessary, which is without opposing counsel, but there's no hidden agenda there. We contacted opposing counsel.

And then what they don't tell you is I must have sent them ten emails, and I had a phone call with them helping coordinate to ensure that they would be able to appear at a Zoom hearing for the temporary

restraining order. We went out of our way.

We didn't walk into court and just say, "Hey, sign this order, Judge. We're not going to tell the other side." We were blowing up the phones and emails to make sure that they -- once they told us that they wanted to be at the hearing, to make sure that they would be at the hearing so they could be heard. Again, nothing irregular. We're acting in good faith and with professionalism.

So while we're communicating to them about the temporary -- the request for a temporary restraining order -- which was, again, not ex parte. Ultimately, it was not ex parte. It says it in the temporary restraining order because they appeared. They had notice of it. They appeared. They made their arguments. They -- I think the hearing lasted 45 minutes.

That afternoon, after we filed our lawsuit, they filed their lawsuit, I don't know, about an hour and a half, two hours later. It says 2:25 p.m. here. The notice we got was, I think -- it looked more like two hours to us, but we get a notice of their lawsuit.

They sent us an email about it notifying us that they had filed a lawsuit. But at that point,

all the conversations really going on at that point were about getting them scheduled for the TRO and getting them there for the hearing that afternoon.

So we have the hearing -- the Mountain Time's throwing me off, Your Honor.

So we have a hearing in Tarrant County. And, again, it was attended by one of our attorneys in the Dallas office who drove -- I don't know -- 20 minutes over to the courthouse. He didn't drive three hours from Austin.

We were there. We were waiting. We arrived early. Actually, we were waiting in the hallway so that we could get opposing counsel on the phone so that we could proceed with the TRO and make sure that they were there. So, eventually, we had the hearing. Both sides made their arguments and the Court entered a TRO, given that there was going to be a rally the next day in Fort Worth.

The next day -- that went until after hours. And then we had them go back and forth to get the temporary restraining order language right and then get it signed by the judge. So that's Friday night.

The next morning, we email opposing counsel and we withdraw the "Request to Examine" and let them know, "Hey, there is no pre-suit investigation

anymore. We're not" -- everything we were investigating, like we just proceeded to litigation. So there's no, "Will you" -- we asked them, "Will you withdraw the" -- "will you dismiss the El Paso lawsuit? There's no need to continue on with the El Paso lawsuit." Like, let's go, both sides, go fight this out in Tarrant County. There's a live suit now.

They didn't respond. They ignored us, which is a bit of a pattern, but they just didn't respond at all to us.

On -- on Monday, we had a -- they filed an emergency motion to transfer venue. This is really important. Their motion to transfer venue makes exactly the same argument that they are making to you today. They are -- they argue in their motion to -- emergency motion to transfer venue in Tarrant County, that Tarrant County lacks -- is the improper venue because there is a mandatory venue statute that says that all -- all or substantially all of the events giving rise to the -- to the facts, giving rise to the claims, that's the county that has proper venue.

And the site for that -- sorry. My computer's locked up.

THE COURT: I have it . I have the rule.

MR. STONE: Yeah. Exactly.

Well, Your Honor, if you compare that with what they've argued here today and what they put in their TRO for today, with the motion to transfer venue, it is exactly the same argument. So they filed that on Monday afternoon, about 3 o'clock, Central Time.

We set up a call with them -- and we previously set up a call with them for 5:00 p.m., Central Time, to confer to see if we could work out some agreed discovery, so that we could -- so we're not doing the TI by -- the temporary injunction hearing by trial by ambush. Like, we want to work out discovery, exchanges of exhibits and witness lists; all that stuff that makes it orderly so you don't show up and get surprised.

So we scheduled a call with them at 5 o'clock that evening. And during that call, we discussed that. They said they won't agree to any discovery. It's attached, the memorialization of that meet and confer.

During that meet and confer, we notified them that we would be seeking leave to add a *quo warranto* claim in our Tarrant County proceeding. This is at 5 o'clock. We're in our meet and confer with them, and that's what we tell them.

Two hours later, they amended their

petition in this lawsuit here in El Paso County to seek a TRO, preventing us from initiating or seeking -- I think the word that they used was "instituting" -- instituting a *quo warranto* claim in Tarrant County.

Nonetheless, we proceeded with amending our petition that Monday night -- this all happened Monday night -- and filing a motion for leave to -- for leave to add the *quo warranto* claim in Tarrant County. That all happened on Monday.

We also filed our plea to the jurisdiction and plea of abatement here in El Paso on Monday. They added the TRO late Monday night to their claims.

So Tuesday -- now we're Tuesday. And I know this is a lot of history, but I'm trying to flush out and help you understand that we're not acting with animus. Things are just happening fast.

On Tuesday, we -- yeah, it was in the middle of the night. Yeah, they're correct. It was in the middle of the night. We were working late.

On Tuesday, we filed a motion to hold Mr. O'Rourke and Powered by People in contempt based on statements that were made over the course of the weekend that our office felt violated the temporary restraining order.

Again, that will be adjudicated by the

Tarrant County court on August 26th. The Court will say yay or nay.

We also filed a request for an emergency motion to modify the temporary restraining order in light of what we think are violations of the TRO. And we filed that on Tuesday as well, and that's going to be heard tomorrow in Tarrant County. And we filed a motion for expedited discovery. Since they wouldn't agree to any discovery, we've asked for expedited discovery. And that will be heard tomorrow, along with their emergency motion to transfer venue.

And I want to flag the motion to transfer venue, Your Honor, because this is really important. Under the rules and statute, we're entitled -- you're not supposed to set a motion to transfer venue for 45 days, right? We're supposed to get a 45 days' notice before you can take up a motion to transfer venue, but the court in Tarrant County is going to take it up anyway tomorrow.

And the court in Tarrant County is going to hear the arguments -- the same arguments with the same issues about whether or not, substantially -- a substantial portion of the events giving rise to why we're seeking relief in our Tarrant County lawsuit occurred in Tarrant County or in El Paso County. That's

going to be decided by a Tarrant County judge tomorrow in a first-filed lawsuit and in a response to a first-filed motion to transfer venue.

Because, remember, they filed their motion to transfer venue, making the same arguments they're doing here today about the TRO before they filed a TRO request in this case, in El Paso.

THE COURT: Say that last sentence again.

MR. STONE: Yes. They filed their motion to transfer venue in Tarrant County three or four hours before they filed -- I'm sorry, four hours before they sought a temporary restraining order in El Paso County on the same arguments and allegations.

THE COURT: Okay.

MR. STONE: So --

THE COURT: And so two questions. Why does that matter, legally, number one?

Number two, well --

MR. STONE: Well, I've got an answer for that.

THE COURT: Answer that one first.

MR. STONE: Yes. Oh, yes, Your Honor. Because they're going to create conflicting rulings.

If you rule in response to this TRO -- and what -- the order they've given you, that El Paso is the

appropriate venue to hear the *quo warranto* proceeding because that's where all or substantially all of the acts giving rise to that allegation occurred, in El Paso. There's going to be, potentially, a conflicting ruling between this court and the Tarrant County court who is going to hear the same argument and make a determination of whether all or substantially all of the facts giving rise to the claims in that lawsuit happened in El Paso or happened in Tarrant County.

So you're both considering -- you and Tarrant County are considering exactly the same arguments as to venue. This is -- it's an attempt to get two bites of the apple. They can argue today here before you that venue is here because all their substantial elements happened here. And then tomorrow they're going to argue in Tarrant County that all or substantially all of the events occurred in El Paso, so the court must transfer venue to El Paso. It's improper because it's going to create conflicts.

THE COURT: So you -- you -- I understand your argument. Certainly, that's a point of concern.

If I grant the TRO, set it for 14 days, in those 14 days we will have a ruling from Tarrant County on jurisdiction without necessarily a ruling from me on jurisdiction on the venue.

58

MR. STONE: To be clear, the order that they're asking you to sign expressly finds that all our substantially all of the events happened in El Paso County. And exactly the same issues -- exactly the same fact pattern for the *quo warranto* proceeding and the DTPA proceeding, exactly the same fact pattern is at issue here. So there's going to necessarily --

THE COURT: Well -- but those are different things. That's why I clarified earlier, why is the AG proceeding against this entity? And you said your Consumer Protection section feels that there is a -- there are fraudulent statements being made to the people on how and why they should contribute to Power of the People. So you raised -- you narrowed it to a DTPA claim.

MR. STONE: Well --

THE COURT: Here, what we have are complaints of -- constitutional complaints -- First Amendment, Fourth Amendment -- all those other complaints.

And so you might be able to adjudicate a DTPA matter in Tarrant County, theoretically -- and I know it has to do with some of the same evidence and statements made publicly, and all those things, but the -- my only question here are the constitutional

questions.

And, I mean -- and I know I'm going kind of beyond the initial venue question, but I think -- I think there's a way to reconcile the two separate causes of action.

MR. STONE: I think that -- Your Honor, if I may? I don't mean to be impudent, but the -- there's a difference in the *quo warranto* proceedings going on. The *quo warranto* proceeding in the Supreme Courts that are against the legislators, seeks to remove them from office. That is totally different than the *quo warranto* proceeding that we're initiating in Tarrant County. The *quo warranto* proceeding that we seek to initiate in Tarrant County relates to representations that were made during the Fort Worth rally and whether or not those representations made in the lead-up to and at the Fort Worth rally violated Texas law.

THE COURT: Right.

MR. STONE: So if it did, then we can revoke their charter, but we're not seeking to remove the legislators from office --

THE COURT: No, I'm not referring to that.

MR. STONE: Okay. Okay.

THE COURT: Yeah. No, I'm sorry if I -- I'm understanding that you're -- that what you're --

your business in Tarrant County and the business here, I'm saying that they're distinguishable and they're two different claims.

And -- I mean, I think there may be some overlapping pieces of evidence, but the ultimate decisions to be made by the courts are different, and --

MR. STONE: Well, Your Honor, the burden is very high if you're going to issue an anti- -- an anti-suit injunction, which is what they're asking for.

You heard them say it themselves. They're asking for an anti-suit injunction, so the burden is quite high if you're going to do that. You're effectively depriving the Tarrant County court of deciding this very issue.

Because, remember, there's a motion for leave pending in Tarrant County to file an action in *quo warranto*. So this issue is already before the Tarrant County district court.

THE COURT: Uh-huh.

MR. STONE: What you're doing is saying -- to the Tarrant County district court and to the Attorney General's Office -- this cannot be decided in Tarrant County. I'm saying today that the Attorney General's Office must come back to El Paso and they have to first argue in El Paso whether or not this

is the appropriate venue.

I'm not going to let them select the venue that they think is appropriate -- based on the evidence they have, based on the declarations that they have. I'm not going to let them make that decision. I'm going to make them come to me, and I'll make that decision.

THE COURT: Yeah, but the story didn't start with that Tarrant County rally. The story started with your service of a request for examination before you even knew about a Fort Worth rally. So the story doesn't start there.

MR. STONE: The Court is narrowed to the facts that are within our verified petition in Tarrant County. That's the allegations that we're making as the basis for establishing venue in Tarrant County.

So to the extent that they disagree and that they think that there's more to the story because the RTE that we sent somehow relates to what happened in Fort Worth -- which we didn't even know about the time that we issued the --

THE COURT: I think you're relying on that. I think what they're doing is just arguing the rule. This is -- what the rule says is -- where it substantially happened.

And so you have to point to where it

started, rather than subsequent events for you to pick your venue. They're relying on the rule. You're relying on, "Okay, now we can hang our hat in Tarrant County and proceed that way."

MR. STONE: Respectfully, that is exactly wrong, Your Honor.

THE COURT: Okay.

MR. STONE: The -- we, as the moving party, get to choose our venue, number one. We get to choose. But, number two, let's take that to a logical conclusion. To suggest that all or substantially all of the events giving rise to our *quo warranto* lawsuit occurred when we sent a pre-suit investigative RTE that we later withdrew, and not the rally that happened for multiple hours and the advertising that happened around that and the fundraising that happened all around that, all in Tarrant County --

THE COURT: Do you have evidence of actual fundraising and -- other than the Tweets about "Come" -- "Come to the rally and" -- but do you have evidence of any of that?

MR. STONE: Yes, Your Honor. And that's going to be adjudicated on Tuesday -- next Tuesday at the upcoming temporary injunction hearing. We also attached a verification to our amended petition that

alleges all of this, and we attached screenshots of the web flow -- the fundraising web flow that folks go through. We have lots of representations in evidence, and we may have more by the time the temporary injunction hearing happens on Tuesday.

So we absolutely have evidence. But you're getting into that right now; right? Like you're sort of asking us, like, "State, can you present your evidence showing that venue is proper" --

THE COURT: No. I'm trying to get to that substantial -- where it substantially happened question --

MR. STONE: Exactly --

THE COURT: -- and for venue purposes only.

MR. STONE: Right. And that's the very issue that we're going to be arguing tomorrow in front of the district court in Tarrant County.

I think the question today is whether or not this court has jurisdiction to consider the temporary restraining order, and we would urge the Court not to reach that venue question. The Court doesn't have all the record before it.

We don't have witnesses here. We're going to present actual evidence tomorrow during the hearing

on the -- on the motion to transfer venue tomorrow in Tarrant County. And then we've got an upcoming temporary injunction hearing in Tarrant County that's going to be presenting all of the evidence showing that all or substantially all of the events occurred in Tarrant County, but we're not going to have an opportunity to do all of that if this court is already prejudging that and saying: "Without knowing any of that, I'm going to enter a TRO saying that venue is proper in El Paso. And before you seek to file a *quo warranto* proceeding anywhere else, you have to first come to me and I'm going to review your evidence and then I will decide whether or not I will let you file a lawsuit in" -- "seek a *quo warranto* proceeding in Tarrant County," or seek -- initiate a *quo warranto* proceeding somewhere else.

Like, they're asking you to take all of that out of Tarrant County and take the authority that we have as a plaintiff to pick our venue where we file suit, and it restrains us from making that decision with an anti-suit injunction per the rules. I'm not arguing outside of those. I'm arguing in the rules.

THE COURT: Uh-huh.

MR. STONE: So -- okay. I have a little bit more, Your Honor.

THE COURT: Go ahead. Go ahead.

Thank you.

MR. STONE: So I'm going wrap that as the timeline -- my response to the timeline.

I want to get into the mootness question because we think it's extremely relevant. We withdrew the RTE on Saturday. And in our plea to the jurisdiction and plea in abatement, we attached a declaration affirmatively representing that we will not reissue it.

It's not an issue before the Court. It is absolutely clear that we're not going to reissue it. I think if we even tried, it would be an issue because there's an ongoing lawsuit in Tarrant County and any attempt to conduct a pre-suit investigation, including using pre-suit investigative tools to gather evidence for an ongoing lawsuit, violates the Texas Rules of Civil Procedure. It's wholly improper.

If we're going to conduct discovery on them at this point, it needs to happen within the confines of ongoing litigation, not a pre-suit discovery tool like a "Request to Examine." So it will not be reissued. We have sworn to the Court that it will not be reissued.

And in the absence of any evidence to the

contrary from them that it's reasonably likely that we would reissue it, the Court must dismiss it as moot -- both the lawsuit itself, the claim, as well as the request to restrain us from enforcing the RTE. There's no RTE to enforce. It's been withdrawn, and it will not be issued. So there's no live issue before the Court to decide as it relates to the RTE.

As it relates to instituting a *quo warranto* lawsuit, we have already initiated or instituted the *quo warranto* lawsuit. We filed an amended pleading adding a *quo warranto* claim on Monday night in Tarrant County. We also filed a motion seeking leave from Tarrant County to initiate that *quo warranto* or to add that *quo warranto* claim.

So that's also moot. They're not trying to stop us from instituting it. What they're trying to do is have the -- prevent the Tarrant County court from deciding an issue that is already before it.

Finally, Your Honor, as to dominant jurisdiction. I want to talk a little bit about that as well. I mentioned before the same arguments involving the motion to transfer venue and the problem with conflicting rulings that are potential to come out -- potentially could come out because you're both looking at exactly the same thing -- the fact pattern that is in

our verified petition and determining whether or not the facts in that petition weren't venue, either in Tarrant County or in El Paso County.

And I want to add one more thing because I think I made a misstatement before, Your Honor. You asked me what evidence I have that shows that venue is proper in Tarrant County. And my response was we have lots of evidence and you're going to see that at the upcoming TI hearing, but that's improper. That's not what happens.

When you do a motion to transfer venue, you look at the pleading itself. That is what determines whether or not venue is proper. It's the pleading.

The TI hearing will happen next week, and that's when we will present lots of additional evidence. But the only issue as to venue needs to be tied to what is in the pleading itself. And if the Court looks at our pleading that we filed in Tarrant County -- and we've attached it as one of our exhibits -- the Court will see that the allegations all relate to conduct that is alleged to have occurred in Fort Worth -- or in Tarrant County. That's why it's the appropriate venue to get to the merits.

But I want to give my junior attorney

here, Scott Froman -- if the Court will indulge us. I want to give him an opportunity to make an argument about dominant jurisdiction so that he can get some time in front of the Court and make the argument if the Court will allow it.

THE COURT: Don't let him call you junior.

MR. STONE: I'm his boss.

MR. FROMAN: So we are arguing that these two suits are inherently related. And as a general rule, for dominant jurisdiction, the court in which suit is first filed requires dominant jurisdiction to the exclusion of all the coordinate courts.

So if the party asserting dominant jurisdiction establishes that this doctrine applies, the trial court in the second filed suit, here, has no discretion to deny the plea in abatement if the party establishes -- unless the other party establishes an exception to that rule, which we're arguing that there's no exception here.

So we are arguing that because there is dominant -- the dominant jurisdiction doctrine applies, and opposing counsel has not stated any kind of exception here that the Court shouldn't grant an abatement pending resolution of the first-filed suit in Tarrant County.

So, generally, a plea in abatement must be granted when an inherent interrelation of the subject matter exists in two pending suits, here and the one in Tarrant County. So the first question to address in that is whether there is an inherent relationship here, which we've already addressed somewhat before.

So in this case, the first-filed suit and the second-filed case -- I mean, sorry. In the first-filed suit in Tarrant County and this, the second-filed suit, so if, yes, then dominant jurisdiction applies. And absent an exception, the second-filed suit must be abated.

Courts are guided by the compulsory counterclaim rule, and we have a list of factors there in our pleading for that. Opposing counsel, I don't think, has made any objection to any of those. But on top of all of that, the same allegations are made between these suits. It's our position that -- and they'll necessarily involve the same underlying records and challenges that form the basis of this second-filed El Paso suit between those two suits.

So as the courts already pointed out, this could create conflicting rulings and inconsistent obligations, particularly if the Court rules that the RTE statute is unconstitutional. Should this court rule

that the withdrawn RTE requests are unconstitutional, those inconsistent obligations between the two courts will almost certainly occur.

THE COURT: I think there's already Supreme Court ruling saying that it's not facially unconstitutional; right?

MR. FROMAN: I'm sorry?

THE COURT: Yeah, it's in that *Annunciation House* --

MR. FROMAN: Right. Correct.

THE COURT: So I'm going to follow what my bosses say, that it's not going to be unconstitutional. But in its application by -- you know, with the aggression, it could be used unconstitutionally.

MR. FROMAN: Uh-huh.

THE COURT: So that's, I think, the allegation.

MR. FROMAN: Correct.

THE COURT: But go ahead.

MR. FROMAN: Okay. And then -- and I agree with that.

And so -- also, just -- you know, these two suits are going to address the same questions of unconstitutionality, and it's going to create confusion. But not only that, it's going to waste judicial

resources between these two courts.

So we're also arguing that there's no exception to the first-filed rule. A race to the courthouse is not by itself inequitable conduct. And that's cited by the -- in the *Texas Christian University* case.

And, basically, because the Tarrant County case is first filed and it has the dominant jurisdiction and there isn't any kind of exception to that rule, based on the race to the courthouse, then we are arguing that this case must be abated pending the resolution of the Tarrant County matter.

THE COURT: Okay. A motion to abate instead.

So if I would grant a motion to abate, can I put conditions on that, such as: Don't pursue your request to examine? Without necessarily touching the motions -- the subject of the motions pending in Tarrant County, such as, you know, the motion for leave --

MR. FROMAN: Right.

THE COURT: -- the motion to modify the TRO, the motion to -- any of those things?

MR. FROMAN: Well, I'll let my colleague speak here, but I know that we've already addressed that there is a declaration that he made about the RTE, but

if he wants to fill in more on that.

THE COURT: I know. I'm not comfortable with that because I have to trust you. You know, I don't know you. I don't know if you're really not going to do it, unless we tack on some consequences if you do.

MR. STONE: Your Honor --

THE COURT: So that's kind of what I'm getting at, on whether I can put conditions on a motion to -- on an order to abate.

MR. STONE: Your Honor, we're the Attorney General's Office and we're also officers of the court. If we represent to the Court that we will not reissue an RTE, our office will not issue -- reissue an RTE.

You have a sworn declaration from me that we will not reissue the RTE. There is no other evidence or document or anything that we could give you. My bar license is on the line, and I'm the one that decides whether another RTE will be issued. There will be no further RTEs, and the Court does not need to attach any conditions. We're representing that we will not reissue it, and we will not reissue any RTE that is similar to that one to Powered by People.

So it's moot. There's nothing -- there is no live controversy before the Court to decide.

But as to abatement, could you thread the needle? Could you abate part of the case and then maybe do like some kind of tailored --

THE COURT: Yeah. Kind of like a tailored: I'm going to abate this proceeding pending rulings of the Tarrant County that will maybe shed some clarification on the arguments being made in both courts. Pending those rulings, thou shall not do another RTE. You shall not impede -- you know, some of the -- I can't remember some of the things they requested, but -- really, that's just the only one that comes to mind.

MR. STONE: The --

THE COURT: Because I don't want to interfere unlawfully in another court's -- things happening in another court. I'm following your argument, and -- but I need to -- I need to research how -- how I and the Tarrant County district court need to conduct ourselves as we proceed.

MR. STONE: Your Honor --

THE COURT: And you both can make arguments about it, but there's a process in place. You've given me information about some of those tools that we can use, but I still feel compelled to factor in protections in place for a citizen against the powers of

the State. I think that's an important part of it without -- I can't ignore that.

So, respectfully, I don't have any doubt on your proffer to me on your -- putting your bar license on the line and those things. I'm not trying to put you in bad light, but you have a boss. And you have -- your office has very strong constitutional and statutory powers that defy any other tools any other regular litigant might have. So I need to make sure that we're both clear on the scope of those powers, the limits of those powers, and really some heightened authority that your office might have despite court rulings and arguments made in the courtroom.

The power of the Attorney General is very strong, very -- and I would be remiss in my duties in justice to ignore any impact it would have to the litigants in this court. So that's where I'm coming from.

MR. STONE: Your Honor, I would like to direct the Court -- because we feel very strongly that -- I have the authority by the Attorney General's Office -- and because there's not a live controversy -- the Court would -- if it issues a TRO relating to protecting them from future RTEs -- from future challenged RTEs, it is an advisory opinion because there

is no live controversy and we will not reissue it.

And I want to direct the Court to the *Annunciation House* --

THE COURT: No. There's legal authority cited by the plaintiff about how -- even if you withdraw it, it's moot. The potential of this continuing on, this -- this exercise of authority over a citizen in a constitutional context, that in and of itself still creates a justiciable issue of live controversies, just the potential.

And so you're asking me -- "The potential's not there because I'm promising you it won't happen."

MR. STONE: Correct.

THE COURT: And I'm saying, let me explore the law and the -- and the force of the Attorney General to make sure that is -- because without the protections of a court in light of consequences if you do that, or would there be any consequences if you did it anyway, or Mr. Paxton said you're going to do it anyway, then where would we be and what's the point of a court of law?

MR. STONE: Your Honor, that is a hypothetical. It will not happen. I bind the Attorney General when I stand before a court and a representative as an officer of the court on behalf of

the Attorney General's Office that something will not happen. We have a long tradition of that. It will not be overridden by the Attorney General or anyone else. And my bar license is not only on the line, but the agency's reputation and its history of being able to make forthright representations to courts is at stake.

So it is very big deal to us. We have a presumption that when we say something to a judge, that we mean it and that we will stand by it.

Here, there is nothing else I can do beyond a sworn declaration to the Court that we will never reissue the challenged RTE. We cite the case law that repeatedly says they are correct. If I equivocate, if I qualify, if I say, "Well, maybe. I'll withdraw this RTE, but maybe another one in the future might go out. I'm only withdrawing as to this one," if I were to prevaricate or equivocate, then, yes, then there is the potential that it could be reissued in the future. There is none of that. It is absolutely --

THE COURT: So you're saying you will never --

MR. STONE: Correct.

THE COURT: -- ever, under any circumstances issue another RTE against Powered by the People or Robert O'Rourke?

MR. STONE: Related to any of the issues in this case; correct. That is -- and that's what we're here about. You can't enjoin me from ever issuing an RTE ten years from now related to a completely different thing.

THE COURT: No. No. You're right, but you're a completely different thing. It could be very, very similar to this thing and that would be something that you would hash out in the future.

So I agree with you that any restriction would have to be carefully craftily to not usurp the authority of the Attorney General in -- forever, absolutely. I would not do that, but that's where my thoughtfulness on the decision has to come in, is -- you know, the government is going to call another special session. He's already said that. I don't know what 50 Democrats are going to do that in that session, and I don't know what Mr. O'Rourke might be doing during that next session if the issue of restricting is still on the table.

That -- this is evolving as we go. And what if there's another rally in Houston? There's a rally in Texarcana?

MR. STONE: But this is all hypothetical.

THE COURT: It is hypothetical.

MR. STONE: If you're going to be doing hypotheticals --

THE COURT: It is. It is.

MR. STONE: That is an advisory opinion.

THE COURT: No.

MR. STONE: That is the definition of an advisory opinion, Your Honor.

THE COURT: It's not advisory when I'm trying to preempt future bad conduct.

MR. STONE: But --

THE COURT: And that's what -- that's not advisory. Advisory is something that's not based on any facts. Here, we have an ongoing situation. As you've said, an ongoing emergency situation for the legislator and the governor's office.

So -- so it's not -- this is not a hypothetical. This is -- he's called another special session, and it's a hotly contested problem in the House. So how do we protect people's rights in the interim?

MR. STONE: Yes, Your Honor. Absolutely. We can do that right now by myself making a representation to you we will not issue an RTE related to the special session and related to fundraising or expenditures of funds by Powered by the People or

Mr. O'Rourke. We're not going to issue another RTE. We are in litigation.

So if the governor calls more special sessions here because they're out of state, I'm not issuing another RTE. We will not issue another RTE to Powered by the People or Mr. O'Rourke.

THE COURT: So what would be the harm in me putting it in an order abating this case and the "Attorney General shall not issue any RTE associated with fundraising on the issue" -- "by Powered by the People and Beto O'Rourke and his affiliates"?

MR. STONE: Yes, Your Honor. Please don't take this the wrong way, okay? This is going to sound a little strong. But from our perspective, you're essentially calling us liars. You're saying that we're not trustworthy.

THE COURT: I'm not.

MR. STONE: Your Honor, I don't mean to interrupt you. I'm just telling you like from our -- what our office will see this as. We are making a representation to you that we will not do something. And you're saying, like, "I'm going to have to order" -- that "I don't believe you. I don't trust you that you will do what you say."

THE COURT: Let me just tell you that that

is -- while I feel this case is -- as I said at the beginning, this is significant through the State of Texas -- not just El Paso -- not even just for the people here in the room, but that's what courts do. They issue orders saying, "Don't do this."

And I've had lawyers tell me, "Judge, I promise I'm going to turn over the discovery in two weeks. I promise." And so if I put it in the order, "You shall turn it over in two weeks," and then they don't, then there's remedies. There's -- I'm not treating you any differently than I would any issue that I have to -- to make a decision on and make sure that my ruling stands and it's not going to be interrupted.

What if you win the lottery tomorrow and you leave and the next guy appointed in your position could feel otherwise.

MR. STONE: He could not. He doesn't have a choice. Our office would say, "You do not have a choice."

And you just gave some examples of misrepresentations. None of them involve the Attorney General's Office. Our office is --

THE COURT: Not misrepresentations, but "I really thought, Your Honor, that my client was going to give me all the documents, and he didn't."

So things happen, so I'm not -- and with all due respect to you, I have integrity, too. I have responsibility, too. I have canons -- judicial canons that I need to abide by aside from professional responsibilities. I'm a lawyer, too. I litigated, too. And so I do not take kindly anyone calling anyone a liar, but you need to understand that I have a duty to make sure that the rule of law is followed and that my rulings are followed and that I'm not treating you any differently than I would any other party.

And so I think we've spent way too much time in you trying to convince me that you're not a liar and that --

MR. STONE: Yeah.

THE COURT: -- you can bind the Attorney General.

That's not what the point is. The point is that I need to make some rulings here that keep the status quo, that protect the parties from each other, if needed -- whatever it may be -- that I respect the -- my sister court, having a responsibility to her case that was filed before mine; that I have those responsibilities.

And so your credibility and your law license on the line really doesn't make a difference

because I have to follow my duties as an officer of the court -- as the judicial officer of this court. And so it's not swaying me that you make your promises. You seem like a good person. You seem like an excellent lawyer, but that doesn't sway me. I have responsibilities as well.

So the more we talk about it, the more agitated I'm going to get.

MR. STONE: Yes. Yes, Your Honor. I got you. I understand. I understand completely. I'm not going to argue it further.

I will leave it at this. There may be a way that the Court could thread the needle by talking about how -- the representations that the Attorney General's Office has made and relying on those. There might be a way to thread it where our office would not take offense that we, again --

THE COURT: You shouldn't take offense; right?

MR. STONE: I understand, Your Honor.

THE COURT: There's separate branches of government that have separate duties. I'm on the record, and I don't find you to be either a liar or a bad lawyer. That's not what this is about, and so you should never take offense by any ruling. That's why we

have processes. That's why we have appeals. That's why we have things that we need to abide by. And so same way you have -- you take your job seriously, so do I.

Is there anything further on this?

MR. STONE: No, Your Honor. I will -- I think we can wrap with this. We just want to close by saying that in all times we've acted in good faith. We've just been acting very quickly because of the exigencies of the circumstances. We hope the Court can appreciate that.

And we believe for all the reasons that we've stated and discussed today, that the Court should grant our plea to the jurisdiction. And it should find that if it doesn't have jurisdiction to reach these issues, and that even if it did, it should abate this proceeding because there was a first-filed lawsuit in Tarrant County that has dominant jurisdiction. Things need to play out there. And tomorrow this whole case may be back down here. We might be here tomorrow after the Tarrant County judge considers their motion to transfer venue. The whole case would come down here.

So I think that -- we'd ask the Court to let it play out in Tarrant County.

Thank you, Your Honor.

THE COURT: Thank you, sir. I appreciate

that.

Can we address their argument on the dominant jurisdiction first-filed rule?

MS. STEVENS: Yes, Your Honor.

I had a whole presentation. Do you want me to start there? Or as long as I get there, is that okay?

THE COURT: Let's start there. I mean -- yes. Sorry. I don't mean to throw you off.

MS. STEVENS: I think it's important to note -- and our understanding of this discussion is -- as we understand it, the Court is inquiring as to mootness, abatement, and those arguments are all couched in determining whether you have probable jurisdiction vis-à-vis the TRO only and that we are not hearing somehow with -- bootstrapped in the plea to the jurisdiction or the plea in abatement, which are set for hearing on Monday.

THE COURT: Yes. And I haven't seen your proposed order. But if your proposed TRO says: Tarrant County, you cannot proceed with their motion for leave to pursue their *quo warranto*, that might be problematic.

So that's what I'd like to hash out with you.

MS. STEVENS: Yes, Your Honor. Yes.

May we approach and provide the Court with a copy?

THE COURT: Yes. Thank you.

And now what I've been handed is the draft temporary restraining order that I think you've emailed me; I just haven't had a chance to look at.

MS. STEVENS: Yes, Your Honor. And it is several pages, but I will represent to the Court that I don't believe it speaks in the terms that Your Honor just articulated, rather it seeks to enjoin the Attorney General from proceeding at all in *quo warranto* unless it's filed in El Paso County.

THE COURT: Well, that decision is the Tarrant County court. Wouldn't it?

MS. STEVENS: Respectfully, Your Honor, we disagree with their characterization of "this is in the Tarrant County court case." In fact, what they have done is sought leave. They have not gotten leave.

THE COURT: Right.

MS. STEVENS: There is no active information in front of Tarrant County court, and so it is -- and they filed that after we filed this amended pleading that -- the live pleading on file with Your Honor and requested this TRO hearing.

So they have gone outside the bounds of

this Court's jurisdiction where we specifically asked for a TRO to stop them from taking the further steps that they're going to take related to *quo warranto*.

THE COURT: So is there authority that does that to their case, separates their -- they filed a lawsuit first.

MS. STEVENS: Uh-huh.

THE COURT: But what you're telling me is they filed a lawsuit, and then you filed your petition for TRO and then they filed their petition for *quo warranto* in their original lawsuit.

Is there any authority or rule or procedure that can help me do what you're saying; that it separates them into, essentially, two causes of action?

Because you're saying your TRO preempts, or is the first filed against their petition for *quo warranto*?

MS. STEVENS: That's right, Your Honor. And I think it's important -- this is important to the Court's jurisdiction in the first place, is -- two things are equally important here. One, the RTE is not the subject of this TRO, and their issuance of the RTE in El Paso started the legal proceedings in El Paso.

I will direct the Court's attention --

there's not a page number. It's the second page of the RTE.

THE COURT: Okay. I have it marked.

MS. STEVENS: Yes, Your Honor.

At the -- towards the bottom where it says "Notice of Right and Penalties" on the second page --

THE COURT: Yes.

MS. STEVENS: -- the very last paragraph says: Take further notice that penalties for a legally unexcused failure or refusal to timely produce records for the Attorney General's examination include the Office of the Attorney General initiating a legal action for the entities, quote, "Registration of Certificate of Formation" to be revoked or terminated.

Those are the *quo warranto* proceedings.

If the Office of the Attorney General deems such penalty warranted, proceedings to revoke or terminate an entity's registration or certificate of formation are initiated through a petition for leave to file an information in the nature of *quo warranto.*

It cites the Rule of Civil -- excuse me, from the Civil Practice and Remedies Code. They chose the venue. They chose El Paso County when they served this RTE and started this legal process. That is key.

The other thing that is key --

THE COURT: So, counsel -- hold on.

MS. STEVENS: Yes, Your Honor?

THE COURT: I'm sorry. Don't lose that thought.

MS. STEVENS: Yes.

THE COURT: So by this document, this mechanism, the request to examination, it's based on the statute, on the -- this Business Organization Code. By them initiating this in El Paso County, that sets the proper venue, the proper jurisdiction --

MS. STEVENS: Yes.

THE COURT: -- the proper court in El Paso County?

MS. STEVENS: Yes.

THE COURT: And where's -- okay.

Where's that authority? number one. And number two -- so you have -- they have lawsuits going all over the place; right? And they decide: We're going to sue this company in Harris County. And then for this other thing, we're going to sue this company in El Paso County. But now we're just going to drop this one because of the efficiency -- you know, this one's stronger.

Whatever reason they want to drop one and not the other, by them withdrawing the RTE, is that

initially abandoning their cause of action or process in El Paso County? Is that the next thought, that that would happen? If they set the venue with this -- with this RTE, by them withdrawing it, it's like nonsuiting a case?

MS. STEVENS: The problem with that is they can't nonsuit the case because we filed the case in El Paso pursuant to the process invoked by them in the RTE. So they started it. We filed this lawsuit, and so they can't nonsuit now and deprive this court of jurisdiction.

And -- I think this is important for a couple of things. They -- they not only put jurisdiction in El Paso County for the RTE, they cite the *quo warranto* statute here for El Paso County.

The two venue provisions in the Code -- it's Civil Practices and Remedies Code and Rules of Civil Procedure that dictate where these things can be filed -- are two different provisions. But they're two different mandatory provisions that say this should be filed in El Paso County.

We are going to argue the DTPA venue transfer tomorrow in Tarrant County. That in no way touches on the venue -- mandatory venue provisions for the *quo warranto* -- which they have not had time to

file. There is no active pleading in Tarrant County on *quo warranto*. They've just asked for leave to file. They have not done it.

That is different from the DTPA venue transfer question before the Tarrant County court tomorrow. We are not asking this court to touch that. We are asking this court to tackle something completely different, which is where the *quo warranto* can be filed. And the only place it can be filed is El Paso County.

THE COURT: I know, but wouldn't that point be decided by the Tarrant County judge in consideration of their motion for leave?

MS. STEVENS: We have not gotten a hearing set. We have asked for time to brief that. We don't know what that court will determine.

THE COURT: We don't know, but she will. She's going to make a ruling on that; right?

I'm not saying that you know. I'm just saying that there's a motion for leave to do it. And in that context, she's going to hear arguments about the proper venue and may or may not decide that it's Tarrant County or not. I don't know. The point being is that that question is in her court already by the motion for leave.

MS. STEVENS: And we would submit that

that question was before your court first. That question was before your court when we filed our amended petition and request for TRO to stop the Attorney General from proceeding on a *quo warranto* at any time in El Paso. They tried to do an end-run. They tried to go and file this in Tarrant County despite this being before this court. But it is squarely before this court on the -- our request for TRO well before they filed in Tarrant County.

THE COURT: So your petition was based on their telling you, "Hey, we plan to file"?

MS. STEVENS: Yes, Your Honor.

THE COURT: And when they said, "We plan to file," did you know it was going to happen in Tarrant County or -- I guess you would have. That's the petition.

MS. STEVENS: They indicated it at the phone call that afternoon --

THE COURT: Okay.

MS. STEVENS: -- that they planned to file in the improper county -- not their words; mine.

THE COURT: Yes.

She's the one saying --

MR. STONE: Oh, okay. Yeah.

THE COURT: She's the one saying it's

improper.

MS. STEVENS: Sorry.

THE COURT: My words; not yours.

Okay. So that's the significance of that -- those events -- the timing of those events.

MS. STEVENS: Yes, Your Honor.

THE COURT: Okay.

MS. STEVENS: In addition -- so my statement at the --

THE COURT: So I -- hold on. Just to follow through.

MS. STEVENS: Yes.

THE COURT: If I follow your argument that the question on proper venue is -- was first in this court -- on a *quo warranto* stemming from the activity in question -- the fundraising and all those things -- if it was filed -- that question was filed here first because of virtue of the RTE being served here in El Paso County, and I issue a TRO today saying proper venue for *quo warranto* is in El Paso County, and I did so with a finding that that question of law and fact was presented first in El Paso County, does that trump any ruling that the judge would make in Tarrant County? Because that question of law and fact was presented to a court first in El Paso.

That's what you're saying?

MS. STEVENS: We would -- Your Honor, if Your Honor grants that temporary restraining order today, we would notify the Tarrant County wherein the petition for leave is pending of your ruling.

But, yes.

MR. GONZALEZ: And we would be asking you to restrain the activity of the Attorney General from proceeding with that -- not to in any way restrain a sister court. The restraint is on the part -- and that's what an anti-injunction suit is.

THE COURT: Uh-huh. Okay. I think I'm following the argument.

MS. STEVENS: Your Honor, as I -- as I said when I got back up here, we understand the arguments about jurisdiction are related to whether you have proper jurisdiction such that you can grant the TRO today. I will note we have not had the opportunity to brief and respond to their motion -- or, excuse me, to their plea to the jurisdiction and their plea in abatement. That hearing, of course, is set for Monday.

Arguing -- or, excuse me, focusing on the arguments that were raised by counsel related to mootness and abatement, just to state the obvious, as the defendant acknowledges in their own briefing, one of

the exceptions for a plea in abatement is equitable conduct -- inequitable, excuse me, conduct. Here, of course, their overall inequitable conduct, that is the subject matter of our lawsuit; that is to say that the unconstitutional harassment and attempt to restrain the First Amendment rights of his political opponent. And there is particular inequitable conduct related to how Defendant Paxton has proceeded with his abuse of process in multiple filings.

We just went over this, but he initiated the legal process in El Paso County -- the proper venue -- for seeking a protective order; was here. Then they obfuscated. They did not tell Power of the People that -- Powered by People that despite knowing they were represented by counsel, that they were working behind the scenes to go to Tarrant County.

One of -- one of the fundamental elements of their argument is that it arises out of a transaction or occurrence that is the subject matter of the opposing party's claim. The subject matter of our claim is his abuse; his unconstitutional harassment of our client. That is wholly different from the subject matter of their suit.

And I -- it's important to note for Your Honor, the key -- I think this goes under

harassment and abuse. It also goes under the argument that there's -- that Defendant Paxton has been forthright to all the courts at issue here.

Yesterday they filed a motion for contempt, which we provided to the Court in my initial presentation. But what I did not address at the time is, we quickly filed what we termed a notice to the Tarrant County court because there were blatant misrepresentations about what Mr. O'Rourke and Powered by People said at the Tarrant County rally that were the basis of this request for contempt in front of the Tarrant County court and our -- part of the basis for their request to modify the TRO.

We don't want this court to get into any of that. Of course, those are in front of the Tarrant County, but it's important to note because it reemphasizes the harassment and abuse by Defendant Paxton here.

We have a copy of that notice report if I might provide it to --

THE COURT: Yes. Thank you.

I've been handed what's styled in the Tarrant County case, notice to the Court, filed August 12th, 2025, at 1:04 p.m. on -- yeah, August 12th.

Go ahead.

MS. STEVENS: And, Your Honor, I apologize that I don't have the -- I have a copy for counsel. And, actually, I gave you my copy.

THE COURT: Can you make a copy?

MS. STEVENS: But I will note on page 2, we -- there is a quote that is used multiple times in their motion for contempt and their motion to modify the TRO where they quote Mr. O'Rourke in a way that makes it sound like he undermines and disrespects the Tarrant County court based on -- based on the quote that they misleadingly -- that is putting it mildly -- misleadingly quote him as on those motions.

We provided to the Tarrant County court and to Your Honor, when you read the notice, the full text of Mr. O'Rourke's statement at Tarrant County and then to compare with how they quoted him.

It is beyond the pale the way that that was quoted. I don't know what counsel drafted that. I don't know who, but it is attributable to Defendant Ken Paxton; that he is continuing to abuse the process to target our client's protected constitutional speech. And we are asking this court for a very narrow decision today to stop him from engaging in another abuse of process by filing a *quo warranto* process in a venue that is not proper.

The case law demonstrates that it is irreparable harm -- it can be irreparable harm for a party to have to go through an abuse of process and particularly using improper venue for that abuse of process. That in and of itself can be irreparable harm sufficient to require a temporary restraining order.

The last thing on the abuse of process that is note for this court, last night while on our way to this court, we were informed that the State is attempting to subpoena Powered by People and Mr. O'Rourke for -- to have them testify next week in Tarrant County -- not take a deposition in El Paso County, in Tarrant County. We believe this is further evidence of the bad faith.

And I would like to apologize to Your Honor about the characterization of the attorney, he drove from Austin to Dallas. I misunderstood based on his -- his address on the State Bar website. My apologies to the Court. But the -- whether he drove an hour to get there from his office in Dallas or he drove three hours, they did not inform represented Powered by People that they intended to go seek a TRO later that afternoon. We believe that is evidence of Defendant Paxton's bad faith.

I'm just making sure I've addressed

several things.

THE COURT: When would -- when should you have known? Because there's emails saying, "Hey, we're going to have a TRO hearing. Let me know if you want to make an appearance."

And what was represented earlier was there were calls and emails about that and trying to accommodate to make sure that you got the Zoom link and things like that.

When -- what should have happened?

MS. STEVENS: They -- when we asked for an extension on that RTE, they knew we were actively working on these matters. And they knew that they were going to go file in Tarrant County to seek a TRO against our client with -- we had less than two hours' notice to -- it wasn't even notice. We had less than two hours from when we got notified about their suit and -- that they were seeking a TRO to actually being in a Zoom hearing.

And I -- I don't think counsel meant to misrepresent it this way. The email notifying us that they were filing the suit and were seeking the TRO and asked if we wanted to be heard, that was the first notice we had.

The later conversations trying to get a

Zoom link happened after that email and after we called the court coordinator to ask respectfully that we be heard at that hearing.

THE COURT: Okay.

MS. STEVENS: A few things to note about *quo warranto*. The -- again, the motion to transfer venue is not -- tomorrow will not address the *quo warranto*. It is about their active pleading. It is a different mandatory statute than the venue statute we are going to argue about tomorrow.

The thing to come back to multiple times is -- the sole question before the Court today is not a ruling on the merits. It is preserving the status quo as it's -- only as it relates to the *quo warranto.* We're not asking for anything outside of that, but we are asking this court to preserve the status quo.

And that despite the protestations by the Attorney General's Office, that has not been instituted. They have asked for leave to file something. That is all. That has not been instituted and this court can and still enjoin them from pursuing *quo warranto* proceedings in an improper venue.

May I just consult with counsel momentarily?

(Sotto voce discussion between attorneys

for the plaintiff)

THE COURT: You were going to point something out about your draft TRO?

MS. STEVENS: Yes, Your Honor.

THE COURT: And I -- and we went on to something else.

MS. COYLE: Your Honor -- if I may, Your Honor? I think we may have given you the wrong one. Can I --

THE COURT: Okay.

MS. COYLE: I want to make sure. I want to make sure that this is the final, okay?

I'll take this one.

THE COURT: I think this is the one I was handed.

MS. COYLE: Okay. Just in case. Thank you.

THE COURT: All right. And this draft TRO --

MS. STEVENS: Yes, Your Honor. I believe that I provided it to the Court, just so that you can verify yourself that we were not asking you to stop the Tarrant County court from doing anything. We're asking Your Honor to enjoin the Attorney General.

THE COURT: Okay. The way it's proposed

is: Defendant is restrained and enjoined from initiating, filing, or prosecuting any *quo warranto* proceeding against Powered by People, or it's officers, directors, or founders, without leave of this court or leave of another El Paso County district court. Nothing in this order is intended to bind any court, rather it binds defendant and those in active concert from participation with them.

Okay. And no findings about constitutionality about anything or any of those things?

MS. STEVENS: Correct, Your Honor.

THE COURT: Okay.

Anything further?

MS. STEVENS: No, Your Honor. Thank you.

THE COURT: One last word.

MR. STONE: Yes, Your Honor. I'll be brief. I've got five things.

THE COURT: Five?

MR. STONE: I know. There was supposed to be three, but they kept -- I kept accruing things. I'll try to be quick.

THE COURT: Go ahead.

MR. STONE: The first one, I did not -- in their motion for request for temporary restraining order, they did ask for you to restrain us from

enforcing the RTE that's in their petition. So I was not aware that --

MS. STEVENS: I'll respond when -- sorry.

MR. STONE: To the extent that they're -- I'll be more specific, Your Honor, since there might be confusion.

Paragraph 59 of their petition says the following: Here, plaintiff is entitled to preservation of the status quo because it will suffer immediate irreparable harm if there is not adequate -- for which no adequate remedy at law exists if defendants are not restrained from enforcing the RTE.

That's paragraph 59.

And then in their prayer for relief, it says here: For the foregoing reasons, Plaintiff Powered by People are requesting immediately -- immediate protective order -- and then it cites to the Texas Rules of Civil Procedure.

And then it says: And a temporary restraining order issued to defendants preventing enforcement of the RTE in its entirety.

A temporary restraining order issued to defendants preventing enforcement on the RTE in its entirety.

I'm reading from their prayer for relief,

so...

MR. GONZALEZ: It says temporary injunction, Your Honor. That's not the -- our TRO at issue.

MR. STONE: I'm reading it, Your Honor. Please look at page 26 of their amended petition and their prayer for relief. It says, and I quote: And a temporary restraining order issued to defendants preventing enforcement of the RTE in its entirety.

I'm reading it.

MR. GONZALEZ: I think it might have been a typo, Your Honor. Obviously, when we enumerate the request for relief in our actual proposed order, Your Honor can see that we're not requesting that.

THE COURT: So I -- when I first read it -- because we kind of talked -- when we were talking about enforcement of the RTE and stuff, I read that part of it to see -- you know, how would I create an order that doesn't violate any rules?

I skipped into that next sentence that says: Further, plaintiff requests that defendant be cited to appear and answer; and that on hearing, issue plaintiff judgment --

MR. STONE: Judgment.

THE COURT: Judgment -- which to me is

later --

MR. STONE: Yeah.

THE COURT: -- on numbers (a) through (h).

I didn't see the sentence that you -- or I probably did, but like I said, I skipped into the next sentence.

It does read: For the foregoing reasons, plaintiff requests immediate protective order and a temporary restraining order issued to defendant preventing enforcement of the RTE.

MR. GONZALEZ: Your Honor --

THE COURT: So we you asking for that or not?

MR. GONZALEZ: No, Your Honor. In the application itself and the petition does not talk about that and the proposed order does not talk about that, and then the enumerated relief does not talk about it. I think it must have been a typo that was overlooked or something.

THE COURT: Yeah. It's a lengthy pleading, so...

MR. GONZALEZ: Yes, Your Honor.

MR. STONE: And I'm not fighting with them on that. I'm okay with that. So if the RTE is not an issue --

THE COURT: Now your promise not to do is really important.

MR. STONE: Exactly. Exactly, Your Honor. We don't have to even address it because it doesn't come up, so we're very happy with that. And we'll just note that for -- I thought it was an issue, and I apologize to the Court for taking a bunch of time on this issue when it wasn't even an issue.

MR. GONZALEZ: And we apologize for the typo.

THE COURT: Somebody could have said something sooner; right?

MR. FROMAN: I wish.

THE COURT: But, okay. So that's clear. That's not the relief being requested today in the requested TRO.

MR. STONE: Okay. And second, Your Honor, the question of whether or not this court acquired jurisdiction as to *quo warranto* proceedings because we sent an RTE to the defendants who are domiciled in this jurisdiction.

I want to talk a minute about what an RTE -- first, I want to pause for a second and say this assumes that we only issued one RTE in this case. When we conduct investigations -- an RTE is a pre-suit

subpoena that asks for the production of records. We have a similar tool under the DTPA called a "civil investigative demand." So it's a variety of pre-suit investigative subpoenas that we can send out regarding documents.

If every time I send a pre-suit subpoena asking for documents, I -- whoever I send it to suddenly acquires jurisdiction as to the ultimate lawsuit that I filed, then -- if I send five -- five pre-suit subpoenas, do all five jurisdictions have the same jurisdiction over the resulting claims when we finally decide who we're going to sue?

So even just by analogy, if you think about like sending a subpoena while you're conducting discovery, it doesn't make any sense for the ultimate lawsuit that you may or may file at some point in the future, is suddenly -- that it's mandatory venue that it be filed where you send in the subpoena at some point to collect records.

I'll note for the Court they couldn't cite to any actual case law or any statute that said that. The statute that they mentioned only says that the *quo warranto* must be initiated in the proper county. That's all it says.

And they have gone on to argue that the

proper county should revert to the standard rules, which are where all or a substantial amount of the actions giving rise to the claims occurred.

In this case, where the claim -- the claims that are at issue are the ones in Tarrant County about the Fort Worth rally, okay? Not other information from beforehand.

So we think that -- the fact that they can't cite to any authority and then just -- logically, it doesn't make sense because we send pre-suit subpoenas all the time. It doesn't make any sense what they're arguing, and that's -- there's a reason they don't have any legal authority they can cite to.

Third -- unless you want to ask me any questions?

THE COURT: No.

MR. STONE: Third, inequitable conduct and the sort of abuse of process argument, I need to address it. I've walked the Court through the timeline, and I hope that I have assuaged any concerns that the Court might have about us acting in bad faith or acting quickly, but that doesn't mean that we're trying to harm the other side. We're communicating with them. We're giving them notice. We are working with them in trying to cooperate to make sure that they have opportunities

to be heard. An abuse of process would occur if we were trying to preempt them or prevent them from being able to make their arguments.

So, for example, they're upset that we believe that they may have violated the temporary restraining order and that we filed a motion for contempt. That's an abuse of process. That's going to go before a judge in two weeks. She's going to hear out both sides and issue a ruling.

We filed a lawsuit, and we're not -- they're not -- if -- they're not entitled for us to call them up and say, "Hey, we want to sue you," before we file a lawsuit. We don't do that to any party, and it's not an abuse of process or punishment because we believe that we have evidence when we initiate a lawsuit.

If you listen to their list of grievances, it's every single thing we did. It's everything that we've done. But when we withdrew the RTE on Saturday, that was an abuse of process. When we called them on Monday to confer about the temporary injunction hearing, it was an abuse of process. Everything we do is an abuse of process. Like, they're presuming there's bad faith on our part, and there's just not bad faith.

THE COURT: So what is -- what is -- like if you want to discuss that, we can, but I'm actually

trying to stay away from --

MR. STONE: I understand.

THE COURT: -- some of those communications.

So how is that point of assistance to me in the questions I have to answer today?

MR. STONE: Well, I don't think it is, Your Honor. But I wanted to just, for the record, defend -- to defend our -- kind of integrity if that's okay.

THE COURT: Yeah.

MR. STONE: I'm done. I'll move on. That's all I had to say about that.

THE COURT: No. But, you know, like I said earlier, there's just a lot of noise --

MR. STONE: Agreed.

THE COURT: -- happening, frankly, with -- you know, from what's in the pleadings, also happening from the Attorney General himself.

Mr. O'Rourke is a political person, not just through his -- this entity, but he's been a statewide candidate, a national candidate, but certainly he's a presence in the State of Texas.

And, you know, when he interjects things like -- that Mr. O'Rourke is going to be his opponent

and picking on Mr. O'Rourke as a Democrat that's trying to further the Democrat agenda on restricting or any other issue, you know, Austin is very partisan. The capital is very partisan. And I don't know if you want to assign bad faith, but people move forward on that partisanship line.

And so there's definitely evidence on that, statements that are beyond your control attributed to the Attorney General, beyond your control. You --

MR. STONE: Yes.

THE COURT: You work with what you've got; right?

MR. STONE: Yes.

THE COURT: And so to the extent there isn't bad faith -- I'm not going to make a finding of one or the other. You're the one that kind of keeps interjecting that, but there are -- there are concerns about that, and that's -- and I can admit to you that's part of the reason why I need to really pause and make sure that constitutional -- fundamental constitutional mandates -- you know, constitutional law 101 are not stepped on regardless of that partisanship line.

MR. STONE: I understand, Your Honor. Can I add one more clarifying thing?

And I know I'm bringing up the bad faith

part because I feel like we're being attacked. But I keep hearing the other side arguing that we're abusing the process or that there's inequitable conduct, and so I'm trying to -- I'm being reactive here.

THE COURT: Yes.

MR. STONE: I'm not responding to it --

THE COURT: I understand.

MR. STONE: And just one final thing about Powered by People. The reason that they got an RTE and the reason that there is a lawsuit in Tarrant County involving them is because of the Fort Worth rally and because there are representations in the media that that is the entity that is primarily doing -- engaging in this conduct. If we had a --

THE COURT: What conduct?

MR. STONE: The misrepresentations related to the fundraising for political purposes, yet disbursing money for personal purposes that --

THE COURT: It's not personal purposes. I can tell you -- well, I can't tell you, I guess.

My guess is that those individuals, those legislators did not jet off to another state for vacation, for personal purposes. This is -- whether we like it or not -- political conduct. Whether it's legal or not, that's for the Supreme Court to decide. And,

you know, they have rules on how you try to manage those situations.

But there's political conduct and then there's personal conduct. Personal conduct is not at play here, in my mind -- not in the causes of action, certainly not in your own claims whether here or in Tarrant County.

But, you know, I think we're getting really philosophical about things that I really want to avoid interjecting in the decision, but I do want to put on the record that I am very mindful of what is happening, way beyond the control of you as counsel and any of us, really, doing our jobs. It is what it is, but let's not color it with --

MR. STONE: Yes, Your Honor.

THE COURT: -- with what it's not.

So anyway. Point number four?

MR. STONE: Number four, yes. And this one's quick. Just in the venue statute. There was a mention that there are different venue statutes at play, and I just want to bring to the Court's attention that that is -- we don't believe that's true.

If you compare their verified petition and you look at the citation that they've relied on, it's in -- and the other petition is in paragraph -- let me

give you the specifics cite. It is in footnote 10 to paragraph 20.

The citation that they give is Texas Civil Practice and Remedies Code, Section 15.002(a). And it provides that: In relevant part, that venue is only proper in the county in which all or substantial -- or a substantial part of the events or omissions giving rise to the claim occurred, or in the county of the defendant's principal office in the state.

And that's in footnote 10, again, on paragraph 20. It's what they've been arguing today. And if you compare that with their motion to transfer venue -- that will be heard tomorrow -- it is the same citation. So they are -- it is the same argument.

The final thing. Fifth: Anti-injunction. They're trying to kind of craft this thing of, "Well, we're not allowing" -- you're only enjoining the State from proceeding and engaging and instituting the *quo warranto*. You're not enjoining the Tarrant County court from deciding it. But the fact of the matter is, there's already a pending motion before the Tarrant County court, and we've already amended our petition to add the claim. We've now asked her for leave to authorize it. That's all before the Tarrant County judge.

So whether you enjoin us from proceeding on that, the pending thing that's in front of that court, or you enjoin that court itself, it is all the same thing because you're preventing the Tarrant County court from being able to adjudicate the merits.

And for that reason, we ask that, again, the Court either dismiss -- deny the TRO and dismiss the suit for lack of jurisdiction; or in the alternative, abate this proceeding, let it play out in Tarrant County. We might be back here tomorrow.

So that's all. Thank you, Your Honor.

THE COURT: Yes. Thank you.

MS. STEVENS: May I point out two quick things, Your Honor?

THE COURT: Yes, ma'am.

MS. STEVENS: One, on that last point about whether we're talking about the same venue provisions. We've provided Your Honor with a copy of the motion to transfer venue. A key point of the motion to transfer venue that will be heard tomorrow is that there is a mandatory venue provision for injunctions, and it's not the rule that counsel just referenced. Rather, it's Civil Practice and Remedies Code 65.023, which, of course, is referenced in the motion to transfer venue, but it is not at issue here.

And then the second point is, counsel said --

I put the quote down.

-- that they're attempting to revoke the charter of Powered by People because of statements made in a lead-up to -- and at the rally in Fort Worth, and those are the bases for the *quo warranto*.

But I have here their motion that is in front of the -- that has been filed before the Tarrant County court, and it says: The State seeks to revoke Powered by People's registration on the grounds that it's operating in violation of criminal laws of the State and have done so in a manner that brought the Texas House of Republicans to a legislative standstill and prevented the State's ability to address critical State interests, including flood relief, property tax relief, public school reforms, matters related to the protection of women's privacy, and congressional restricting for the people of this state.

Nowhere in there, of course, is reference to Tarrant County. Nowhere in there is even tieing the conduct that they claim is the basis for this *quo warranto* to Tarrant County.

It underscores why this court should grant the TRO, prohibiting Defendant Paxton from pursuing

*quo warranto* in any other county in the state besides El Paso.

THE COURT: All right.

MS. STEVENS: Thank you, Your Honor.

MR. STONE: Your Honor, may I make a representation to you that I think may make your job easier? I'll make a representation today. It binds us, okay?

I know the Court -- but I'll make a representation to you. If they win tomorrow on the motion to transfer venue and we get transferred to El Paso County, we will similarly bring the *quo warranto* proceeding to El Paso County. This whole case moves together, okay?

So if El Paso -- if the proceedings get transferred for El Paso tomorrow, all of it gets transferred to El Paso. We're not going to bring another *quo warranto* proceeding in some other county. We will bring it with the DTPA suit, wherever that DTPA suit ultimately is decided for that DTPA lawsuit.

MS. STEVENS: May I respond, Your Honor?

THE COURT: Yes.

MS. STEVENS: With all due respect to counsel, that's -- it's not really relevant to the question here, which is, El Paso County being the proper

venue. And the direction that we're asking this court to give to the Defendant Paxton, that he can only bring that suit, if he's going to bring it at all -- and we vehemently will oppose it -- it has to be in El Paso County.

Thank you, Your Honor.

THE COURT: All right. Is there anything further by the plaintiff?

MS. STEVENS: No, Your Honor.

THE COURT: Anything further by the defendant?

MR. STONE: No, Your Honor.

THE COURT: All right. I am going to think this through. I'm going to consider the authority that you've provided me, and I hope to have a ruling for you before you appear in tomorrow's Tarrant County hearing. And so I'm working on it.

MR. STONE: May we submit to the Court a proposed order on the PTTJ issue? Just a proposed order. You don't have to -- may we present one to the Court?

MS. STEVENS: May I respond, Your Honor?

THE COURT: Yes.

MS. STEVENS: The Rules of Civil Procedure provide us 3 days' notice before we have a hearing on

that. We're entitled to briefing on this plea to the jurisdiction.

THE COURT: Yes, you are. You can send me the order. People send me the order weeks in advance.

MR. STONE: Thank you, Your Honor.

THE COURT: But we're set. And if you would, though, send it to me on Word.

MR. STONE: Yes, Your Honor.

THE COURT: I'm not going to rule on the plea to the jurisdiction.

MR. STONE: Thank you, Your Honor.

THE COURT: All right.

MS. STEVENS: Thank you.

THE COURT: Thank you all for your time. I really appreciate your travel to El Paso and the work that you do.

At this time, we're adjourned.

(Proceedings concluded)

STATE OF TEXAS                    )

COUNTY OF EL PASO                 )


    I, Bertha A. Prieto, Official Court Reporter in and for the 41st Judicial District Court of El Paso County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

    I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

    WITNESS MY OFFICIAL HAND this the _4_th day of September 2025.



                    /s/ Bertha A. Prieto
                    BERTHA A. PRIETO, Texas CSR# 7222
                    Official Court Reporter
                    41st Judicial District Court
                    500 E. San Antonio, Rm. 1006
                    El Paso, TX 79901
                    (915) 273-3728
                    Expires July 31, 2027

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Pauline Sisson on behalf of Abigail Smith
Bar No. 24141756
pauline.sisson@oag.texas.gov
Envelope ID: 105414468
Filing Code Description: Brief Not Requesting Oral Argument
Filing Description: 20250909 Texas Mandamus Response w Appendix
Status as of 9/10/2025 7:05 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Sean McCaffity | 24013122 | smccaffity@textrial.com | 9/9/2025 6:55:10 PM | SENT |
| Robert Farquharson | 24100550 | rob.farquharson@oag.texas.gov | 9/9/2025 6:55:10 PM | SENT |
| Maria Williamson | | maria.williamson@oag.texas.gov | 9/9/2025 6:55:10 PM | SENT |
| William FCole | | William.Cole@oag.texas.gov | 9/9/2025 6:55:10 PM | SENT |
| Mimi Marziani | | mmarziani@msgpllc.com | 9/9/2025 6:55:10 PM | SENT |
| Joaquin Gonzalez | | jgonzalez@msgpllc.com | 9/9/2025 6:55:10 PM | SENT |
| Brian Falligant` | | bfalligant@inquestresources.com | 9/9/2025 6:55:10 PM | SENT |
| William Peterson | | william.peterson@oag.texas.gov | 9/9/2025 6:55:10 PM | SENT |
| Rebecca Neumann | | rneumann@textrial.com | 9/9/2025 6:55:10 PM | SENT |
| Rebecca Stevens | | bstevens@msgpllc.com | 9/9/2025 6:55:10 PM | SENT |
| Pauline Sisson | | pauline.sisson@oag.texas.gov | 9/9/2025 6:55:10 PM | SENT |
| Emily Samuels | | emily.samuels@oag.texas.gov | 9/9/2025 6:55:10 PM | SENT |

Associated Case Party: State of Texas

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Johnathan Stone | | johnathan.stone@oag.texas.gov | 9/9/2025 6:55:10 PM | SENT |
| Rob Farquharson | | rob.farquharson@oag.texas.gov | 9/9/2025 6:55:10 PM | SENT |
| Abby Smith | | abby.smith@oag.texas.gov | 9/9/2025 6:55:10 PM | SENT |
| William Peterson | | William.Peterson@oag.texas.gov | 9/9/2025 6:55:10 PM | SENT |
| William Cole | 24124187 | William.Cole@oag.texas.gov | 9/9/2025 6:55:10 PM | SENT |